UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

    v.

HAMID AKHAVAN,
   a/k/a "Ray Akhavan",

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CASE NO. 20 -CR-188

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

## DEFENDANT HAMID AKHAVAN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

William Burck
Derek Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com

Christopher Tayback
Paul Slattery
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Email: christayback@quinnemanuel.com
Email: paulslattery@quinnemanuel.com

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone:  (713) 221-7010
Email: saraclark@quinnemanuel.com

*Attorneys for Hamid Akhavan*

# <u>TABLE OF CONTENTS</u>

**Page**

I.      Introduction ............................................................................................................1

II.     The Indictment ........................................................................................................3

III.    Analysis..................................................................................................................7

        A.    The Indictment should be dismissed for lack of specificity. ...................7

              1.    The established standard for specificity requires more than a generic recitation of the elements of an offense. ....................................7

              2.    The Indictment lacks the requisite specificity. ...........................9

        B.    The Indictment fails to state an offense. ................................................13

              1.    18 U.S.C. § 1344................................................................14

              2.    The Indictment fails to allege an offense under 18 U.S.C. § 1344. ...........15

                    i.    The Indictment fails to allege any intent to harm by Defendants. ..................................................16

                    ii.   The Indictment fails to allege materiality. ....................19

IV.     The Indictment defies the Rohrabacher-Farr Amendment. ...............................22

I.      Conclusion ...........................................................................................................26

# TABLE OF AUTHORITIES

**Page**

## Cases

*Gross v. United States*,
    140 S. Ct. 1224, 206 L. Ed. 2d 219 (2020) ..................................................... 18

*H&Q Properties, Inc. v. Doll*,
    793 F.3d 852 (8th Cir. 2015) ....................................................................... 11

*Hamling v. United States*,
    418 U.S. 87 (1974) ......................................................................................... 8

*Loughrin v. United States*,
    573 U.S. 351 (2014) ............................................................... 14, 15, 16, 20

*Russell v. United States*,
    369 U.S. 749 (1962) ................................................................................. 8, 9

*Sandusky v. Goetz*,
    944 F.3d 1240 (10th Cir. 2019) ................................................................. 24

*Shaw v. United States*,
    137 S.Ct. 462 (2016) ................................................................................. 17

*United States v. Agone*,
    302 F. Supp. 1258 (SDNY 1969) ............................................................... 9

*United States v. Ahmed*,
    133 F.3d 908 (2d Cir. 1998) ..................................................................... 15

*United States v. Ajayi*,
    808 F.3d 1113 (7th Cir. 2015) ................................................................. 18

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016) ..................................................................... 15

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ............................................................. 16, 17, 20

*United States v. Crespo*,
    No. 16-CR-536 (PKC), 2017 WL 685572 (S.D.N.Y. Feb. 21, 2017) ............. 8

*United States v. Cruikshank*,
    92 U.S. 542, 23 L. Ed. 588 (1875) ............................................................. 8

*United States v. DiMarzo*,
    No. 93 CR. 247 (RPP), 1993 WL 426936 (S.D.N.Y. Oct. 21, 1993) ............. 10

ii

*United States v. Gonzalez,*
   686 F.3d 122 (2d Cir. 2012) .................................................................. 9

*United States v. Laljie,*
   184 F.3d 180 (2d Cir. 1999) ................................................................ 14

*United States v. Lebedev,*
   932 F.3d 40 (2d Cir. 2019) ............................................................ 18, 22

*United States v. McIntosh,*
   833 F.3d 1163 (9th Cir. 2016) .............................................................. 23

*United States v. Mercado,*
   No. S1 02 CR 675 WHP, 2003 WL 21756084 (S.D.N.Y. July 30, 2003) ...................... 10

*United States v. Mermelstein,*
   487 F. Supp. 2d 242 (E.D.N.Y. 2007) ..................................................... 8

*United States v. Metaxas,*
   No. 14-CR-0190 (BMC), 2020 WL 1472440 (E.D.N.Y. Mar. 26, 2020) ...................... 17

*United States v. Morganfield,*
   501 F.3d 453 (5th Cir. 2007) ............................................................ 17

*United States v. Nejad,*
   2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ............................................... 18

*United States v. One White Crystal Covered Bad Tour Glove and other Michael Jackson Memorabilia,*
   2012 WL 8467459 (Sept. 6, 2012) ........................................................ 19

*United States v. Puerta,*
   607 F. App'x 635 (9th Cir. 2015) ........................................................ 21

*United States v. Stavroulakis,*
   952 F.2d 686 (2d Cir. 1992) ............................................................... 8

*United States v. Svoboda,*
   347 F.3d 471 (2d Cir. 2003) .............................................................. 13

*United States v. Tomasetta,*
   429 F.2d. 978 (1st Cir. 1998) ............................................................ 10

*United States v. Walsh,*
   194 F.3d 37 (2d Cir. 1999) ................................................................ 8

## **Statutes**

18 U.S.C. § 1344 .................................................................................. 14

18 U.S.C. § 1344(2) ............................................................................... 16

18 U.S.C. § 2 ..................................................................................... 10

18 U.S.C. § 20 ............................................................................................................... 14

18 U.S.C. §20 ............................................................................................................... 10

Fed R. Crim. P. 7(c)(1) ................................................................................................... 7

Fed. R. Crim. P. 12(b)(3)(B)(iii) ..................................................................................... 7

Fed. R. Crim. P. 12(b)(3)(B)(v) ...................................................................................... 7

## <u>Other Authorities</u>

*Buffalo – S. Main St.*,
   MedMen (2019), https://www.medmen.com/stores/buffalo ............................................ 25

David Migoya, *Recreational pot: Processors of credit, debit cards relax rules*,
   DENVER POST (Jan. 7, 2014, last update Oct. 2, 2016),
   https://www.denverpost.com/2014/01/07/recreational-pot-processors-of-credit-
   debit-cards-relax-rules/ ................................................................................................. 4

*Dosist West 3rd*,
   Yelp, https://www.yelp.com/biz/dosist-west-3rd-west-hollywood-2 ............................ 24

*FAQ,* Ganja Goddess (2019),
   https://goddessdelivers.com/faq .................................................................................. 24

*Frequently Asked Questions*,
   Harvest Bloom (2020), https://getharvestbloom.com/faq/ ............................................ 24

*Las Vegas – Downtown (Arts District)*,
   MedMen (2019), https://www.medmen.com/stores/las-vegas-downtown-vegas-
   arts-district .................................................................................................................. 24

*Long Island – Lake Success (Marcus Ave.)*,
   MedMen (2019), https://www.medmen.com/stores/lake-success ................................... 25

*Los Angeles- Venice (Lincoln Blvd)*,
   MedMen (2019), https://www.medmen.com/stores/venice-beach-lincoln-blvd ............. 24

*Menu*, Green Goddess,
   https://shop.greengoddesscollective.com/store/green-goddess-collective1/menu ........... 24

*Merchant Category Codes*, Citibank, N.A. (2015)
   https://www.citibank.com/tts/solutions/commercial-
   cards/assets/docs/govt/Merchant-Category-Codes.pdf, at 2 ............................................ 6

*Merchant Data Standards Manual*,
   Visa, at p. 15 (Oct. 2019),
   https://usa.visa.com/dam/VCOM/download/merchants/visa-merchant-data-
   standards-manual.pdf ................................................................................................... 12

Ninth Circuit Jury Instructions Committee,
   *Manual of Model Criminal Jury Instructions*, 8.127, p. 355 (2019) .............................. 17

*NYC – Fifth Avenue (Bryant Park),*|
    MedMen (2019), https://www.medmen.com/stores/nyc-fifth-avenue-bryant-park.......... 25

*Santa Ana – Orange County,*
    MedMen (2019), https://www.medmen.com/stores/orange-county-santa-ana................ 24

*Store Locator,*
    MedMen (2019), https://www.medmen.com/stores ....................................................... 24

*Syracuse – Galeville (Buckley Rd.),*
    MedMen (2019), https://www.medmen.com/stores/syracuse ......................................... 25

*Tallahassee – Thomasville Rd.,*
    MedMen (2019), https://www.medmen.com/stores/tallahassee-lafayette-park .............. 24

*Today's Menu*, Green Dot (2018),
    https://www.thegreendotla.com/pick-up-menu.html ...................................................... 25

United States District Court of Maine,
    *2019 Revisions to Pattern Criminal Jury Instruction for the District Courts of the*
    *First Circuit*, 4.18.1344 (2019)................................................................................... 17

*Visa Core Rules and Visa Product and Service Rules,*
    Visa, at 580, *et seq.*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-
    rules-public.pdf (Apr. 18, 2020) .................................................................................... 12

*Visa, MasterCard Relax Rules for Marijuana Purchases,*
    Convenience.Org (Jan. 10, 2014),
    https://www.convenience.org/Media/Daily/ND0110143 .................................................. 4

Defendant Hamid Akhavan hereby respectfully submits this Memorandum of Law in support of his Motion to Dismiss the Superseding Indictment (ECF 16) charging him with Conspiracy to Commit Bank Fraud.[1]

## I.    Introduction

This appears to be the first indictment for economic fraud that lacks any economic victim—whether potential, actual, or intended.  The Government alleges defendants were co-conspirators (though not the direct actors) in a scheme to convince banks to process marijuana-related transactions that were *legal* (by the Government's tacit acknowledgement), that were intended and requested by the sellers and cardholders, and that in fact closed, precisely as agreed between sellers and cardholders, at the prices transacted by the banks.  On those facts, the Government somehow charges federal bank fraud was committed at the expense of United States banks.  For the reasons stated herein, the instant indictment is legally defective in its foundations and should be dismissed.

Not only is there no allegation that any underlying transactions were fabricated, uninformed, or even dissatisfactory, but there is also, strikingly, no theory of harm to the issuing *banks*, which are the only participants in these transactions that allegedly lacked complete information.[2]  First and foremost, the Government conspicuously fails to allege the banks incurred potential *legal* risk.  Indeed, the Government has ostensibly made a considered judgment to eschew

---

[1]    In addition to the arguments set forth herein, Defendant Ray Akhavan joins in full and adopts the arguments set forth in the Memorandum of Law in Support of Defendant Ruben Weigand's Motion to Dismiss the Indictment.

[2]    As described further below, the Government fails to allege that the banks, or any other party to the transactions, would have rejected them had they known the transactions involved the legal intrastate sale of marijuana.  Moreover, the misrepresentations alleged—incorrect merchant category codes—are not, in reality, considered precise enough to discern that cannabis is a product in a given transaction.  Rather, they are assigned categorically to industries, like pharmacies and department stores, and not to products.  The Government does admit in the indictment that there is no merchant category code for cannabis.

any allegation that U.S. banks *cannot* process marijuana-related transactions precisely as U.S. banks did according to this indictment.  Instead, the Government is trying to rest its criminal case on the mere happenstance that *some* (not all) U.S. banks allegedly opted to maintain their own policies against processing marijuana-related transactions.

Second, there is no allegation of *economic* loss to the banks.  Nor is there any allegation of increased economic risk—even deferred or theoretical risk.  There is not even an allegation these transactions stood to make the banks smaller *profits* than alternative transactions they would have otherwise pursued.  By all indications, the banks made the same money from this additional transaction volume as they would from any other, which is why the Government makes no allegation about the economics of this alleged crime ever harming or threatening any U.S. bank.

Third, the Government fails to allege that the "fraud," even if it existed, was *material* to the U.S. banks.  At bottom, this indictment rests entirely on the premise it is a federal crime to induce a U.S. bank to deviate from what the Government alleges to be a variable industry policy in processing transactions, even where the transactions are perfectly legal, bona fide, and profitable.  Even on *that* theory, however, the Government *still* comes up blank in an essential respect:  nowhere does the indictment allege that the supposed misrepresentations could have or did actually induce the banks to take any action—i.e., that the supposed misrepresentations were material, such that any particular bank would not have processed any particular transaction in the face of complete information.  Still more strikingly, the Indictment effectively admits that the existing structure of the transactions did not enable the banks to weed out cannabis transactions, even if the banks had so desired.

The operative theory of this indictment is utterly alien to the federal bank-fraud statute, which is anchored in protecting the safety and thus solvency of depository institutions the federal

government insures via the FDIC.  Consistent with the statute and its defining purpose, settled law does not admit of federal bank fraud in a case where U.S. banks' customers are fully informed and consenting, and where the U.S. banks face no legal or economic exposure.  Perhaps because it recognizes as much (or because it hopes to steer around the Rohrabacher–Farr amendment, which forbids use of federal funds to interfere with States' medical marijuana programs), the Government has tried to shroud core legal defects in a haze of vague pleading.  Far from solving the underlying problem, however, the Government's pleading omissions preclude it from stating any offense.  The indictment is therefore misconceived and deficient at its inception, and should be dismissed for multiple reasons.

## II.    The Indictment

On March 9, 2020 a Grand Jury issued a one-count indictment (the "Indictment") against Hamid Akhavan and Ruben Weigand (together, the "Defendants").[3]   The Indictment alleges generically that "many United States banks are unwilling" to process transactions involving marijuana. (Indictment at ¶1); *see also* (Indictment at ¶12) ("[M]ost banks in the United States were unwilling to process credit and debit card transactions involving marijuana . . . .").[4]  It also alleges the Defendants and their California-based company provided a mobile platform to process

---

[3]    Capitalized terms not otherwise defined have the meanings ascribed to them in the Indictment.

[4]    Part and parcel of the vagueness suffusing the Indictment, the Government leaves unclear what constitutes an alleged "marijuana" transaction.  For instance, there is no way to determine whether and to what extent such transactions include those for products that come from the marijuana plant but lack the Delta-9-tetrahydrocannabinol ("THC") secreted by the plant and/or were for paraphernalia from dispensaries that itself does not contain THC.  The Government likewise leaves unclear whether and which transactions specifically involved medical marijuana.  Any written policies on which the Government might rely would need to make clear their contours; the Indictment, however, is studiously unclear.

marijuana-related transactions for California and Oregon purchasers through both debit and credit card payments. (Indictment at ¶¶ 3–4).

These payments were allegedly conducted through "payment networks" run by Credit Card Companies like Visa and MasterCard—entities not covered by the bank-fraud statute. The Government asserts these companies "have rules that prohibit their credit cards from being used for marijuana purchases," even though this is false in at least the cases of Visa and MasterCard.[5] (Indictment at ¶5) (claiming these policies also apply to many debit cards). The Government then explains violations of these alleged prohibitions may result in a merchant being terminated from the payment network. (Indictment at ¶7-8). Notably, the Government does not and cannot complain of any fraud against the Credit Card Companies.

The scheme outlined in the Indictment boils down to inducing, via allegedly incorrect merchant coding, some set of U.S. banks to process some transactions involving marijuana even while some U.S. banks would otherwise opt against doing so.[6] Yet the Indictment hides the ball about how that scheme actually operated. Despite lavishly detailing how "Phony Merchants" would appear on customers' credit cards statements (Indictment ¶2), the Indictment says nothing about how any of those particulars matter to review or processing by U.S. banks. Similarly, the

---

[5] The Government's failure to cite specifics of the rules it references betrays fundamental weaknesses in the Indictment. Indeed, since 2014 the two largest Credit Card Companies—Visa and MasterCard—have (at least publicly) left to local and merchant banks the decision to process card payments. *See Visa, MasterCard Relax Rules for Marijuana Purchases*, CONVENIENCE.ORG (Jan. 10, 2014), https://www.convenience.org/Media/Daily/ND0110143; David Migoya, *Recreational pot: Processors of credit, debit cards relax rules*, DENVER POST (Jan. 7, 2014, last update Oct. 2, 2016), https://www.denverpost.com/2014/01/07/recreational-pot-processors-of-credit-debit-cards-relax-rules/. In any event, however, the Credit Card Companies are not and cannot be the alleged victims of any bank fraud under the statute, nor can the violation of their (unspecified) contractual terms support a criminal offense.

[6] This coding system employs "Merchant Category Codes," which are assigned by merchant banks (not issuing banks or Credit Card Companies) to specific merchants (not products).

Indictment includes allegations about companies having "offshore bank accounts," but says nothing about how that was improper or induced U.S. banks to process marijuana transactions contrary to their policies.  (Indictment ¶12).  The same holds for allegations about companies' websites, addresses, and phone numbers, which the Indictment never ties to U.S. banks' processing of marijuana transactions and never even alleges were reviewed by or known to U.S. banks. (Indictment ¶13).

The only allegation in the Indictment that appears logically related to how the scheme might operate—although the Indictment does not spell out the connection—is the use of "merchant category codes" that are alleged to be deceptive.  (Indictment ¶9).  According to the Indictment, because there were no merchant codes specifically for marijuana, someone (implicitly the Defendants) needed to assign intentionally false merchant codes to dispensaries in order to set up processing of the transactions.[7]

The Indictment does not identify who—the Defendants, unidentified co-conspirators, or other third parties—generated or assigned those codes.  (Indictment ¶ 9).  It alleges merely that Akhavan "and others" "worked with and directed others to apply incorrect [merchant codes] to their transactions," and that various transactions were ultimately processed.  (Indictment ¶ 14).  In other words, an unindicted, unnamed party took every alleged action that forms the gravamen of the alleged crime, including assigning the merchant category codes.

---

[7]   In essence, the Indictment admits that there are no entirely accurate codes for marijuana transactions.  The Government thereby effectively admits that these codes could never be used as a filtering device for issuing banks in the United States, because no code would have contained enough information to allow the bank to clearly identify the transaction as involving marijuana. Indeed, federal privacy laws, which encompass medical marijuana from dispensaries, prohibit the use of merchant codes that might reveal the precise drugs—including marijuana—purchased by consumers.

Despite going long on extraneous details, the Indictment is sparse about what merchant category codes actually are and how they operate.[8]  It simply assumes these codes are precise, well-understood warranties to the acquiring bank as to the exact subject matter of a particular transaction—such that use of an inaccurate or inapposite category code, or underlying sale of an item that has no applicable category code, translates to an intentional falsehood.  (Indictment ¶ 9).  But that blinks (or at least elides) reality.[9]

The most notable aspect of the Indictment is what it does not allege.  First, there is no allegation of intent to cause loss or risk of loss, just as there is no allegation that any loss or risk of loss in fact resulted.  Second, there is no allegation of intent to illicitly obtain funds, as all transactions were in fact legitimate and intended by a consenting, fully informed buyer and seller.  Third, there is not even an allegation that *any* particular financial player to which the bank fraud statute applies would or could have known to refuse a more properly-coded transaction (using a more accurate code, to the extent one existed), refused a differently-coded transaction, or refused any transaction in the face of perfect information.  Here, the Indictment's failure to include any

---

[8]   The Indictment's allegations about merchant coding whistle past the fact that the Defendants do not assign these codes.  Nor is it clear how coding was anything other than incidental to the transactions; the Indictment omits any explanation or indication as to how different, closer or "better" coding would have resulted in U.S. banks rejecting or stopping any of the marijuana-related transactions described.  And, despite going into extraneous detail about the "Phony Merchants," the Indictment does not allege that the non-U.S. Merchant Banks were the targets of the alleged fraud.  Nor can it.  By the Government's own admission, these entities are offshore banks that are not U.S. entities and are not protected by the bank fraud statute.

[9]   Even a cursory review of the Credit Card Companies' merchant category code lists available online themselves reveal that the codes designedly fall far short of capturing the entire range of possible commercial activity, that the codes frequently change, and that they differ between payment institutions and credit card networks.  *See, e.g.*, *Merchant Category Codes*, Citibank, N.A.          (2015)          https://www.citibank.com/tts/solutions/commercial-cards/assets/docs/govt/Merchant-Category-Codes.pdf, at 2 (describing purpose of codes) and generally (listing codes, including lengthy lists of travel codes).  Notably, the codes tend to be quite general—although there are merchant category codes for "pharmacy" products, the exact drugs are not broken out, thereby preserving consumers' privacy.

specifics about the name or policy of any issuing bank (which are the only statutorily possible victims of the alleged scheme) draws into stark relief its impenetrable vagueness.

## III.   Analysis

The Indictment should be dismissed on multiple grounds.  As a procedural matter, the Indictment is defective under Federal Rule of Criminal Procedure 12(b) for lack of specificity; by obscuring and withholding key particulars, the Government fails to afford notice of the alleged crime.  *See* Fed. R. Crim. P. 12(b)(3)(B)(iii).  On the merits, the Government's theory of economic fraud against U.S. banks is not anchored in any economic threat (actual, potential, or intended) to U.S. banks.  The Government spins an unprecedented theory of victimless bank fraud solely on the basis that the subject matter of the transaction (marijuana) might run afoul of some banks' policies, even though such transactions are legal in the relevant states, are not alleged to be illegal here, and federal prosecution of any such transaction is foreclosed by a statutory bar.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).

### A.  The Indictment should be dismissed for lack of specificity.

The lack of specificity in the Indictment is glaring, and should be fatal in and of itself. Although this case is about alleged conspiracy to commit bank fraud, the Government fails to specify even one example of any U.S. bank actually being defrauded.  If a crime is to be validly alleged, then the Government should, at a bare minimum, supply specifics about who, what, when, where, and how.  Judged against that rudimentary standard, the Indictment fails.

#### 1.  The established standard for specificity requires more than a generic recitation of the elements of an offense.

The Federal Rules of Criminal Procedure require "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed R. Crim. P. 7(c)(1).  An

indictment must "(1) contain[] the elements of the offense charged and fairly inform[] the defendant of the charge against which he must defend, and (2) enable[] [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Crespo*, 2017 WL 685572, at *1 (S.D.N.Y. Feb. 21, 2017) (internal quotations and citations omitted).

Put differently, while "the language of the statute may be used in the general description of an offense, . . . it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Russell v. United States*, 369 U.S. 749, 765 (1962).[10]  To be sufficiently specific, an Indictment must "set[] forth the elements of the charged offense and [provide the defendant] with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Mermelstein*, 487 F. Supp. 2d 242, 249 (E.D.N.Y. 2007) (quotations omitted) (citing *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) and *Hamling v. United States.*, 418 U.S. 87, 117 (1974)).

In addition, the indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Mermelstein*, 487 F. Supp. 2d at 249 (quoting *Walsh*, 194 F.3d at 37).  Further,

---

[10]  *See also United States v. Cruikshank*, 92 U.S. 542, 558 (1875) ("It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars.  The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.  For this, facts are to be stated, not conclusions of law alone.  A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances"); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (recognizing that the Supreme Court has said that an indictment requires specific allegations, and cannot simply parrot elements of a crime).

"it is a settled rule that a bill of particulars cannot save an invalid indictment" because a bill of particulars does not satisfy a defendant's Fifth Amendment rights. *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (citing and quoting *Russell*, 369 U.S. at 770).

### 2. The Indictment lacks the requisite specificity.

The Indictment's allegations addressing the elements of the crime are bereft of concrete facts that would enable Defendants to understand what specific transactions are at issue, what banks allegedly were defrauded, and how various dots supposedly connect. These pleading defects are especially problematic considering that the Government is, per its peculiar theory of the crime, bootstrapping the corporate policies of an amalgamation of unspecified private banking institutions all presumably involved in different underlying transactions. No one can tell from the indictment "the specific offense, coming under the general description," and none of the Defendants could subsequently plead double-jeopardy, given serial failures of specificity.

First, where the alleged bank fraud is predicated upon violating the alleged individual policies of individual banks, those banks and policies should be identified. *See United States. v. Agone*, 302 F. Supp. 1258 (SDNY 1969) (dismissing Indictment for lack of requisite specificity where crime as alleged could have been committed against multiple individuals, and Indictment failed to identify the victim). As it stands, however, the Indictment fails to specify any of the key players other than the Defendants—*i.e.*, the merchant or processing banks or the financial institutions who were purported "victims" of the conspiracy—much less the policies at issue. The Government pleads only that "many United States banks are unwilling to process [marijuana] payments", (Indictment ¶ 1), "[t]he Credit Card Companies have rules that prohibit their credit cards from being used for marijuana …. [d]ebit cards … often fall under the same rules," (Indictment ¶ 8), and "most banks in the United States were unwilling to process credit and debit

card transactions involving marijuana," (Indictment ¶ 12).  Notably, neither the Credit Card Companies nor the foreign and/or offshore Merchant Banks (all unidentified) can be the victims of a bank fraud under the statute, which applies only to those institutions defined in 18 U.S.C. § 20.[11]  Even isolating solely the issuing banks, however, the Government is hiding all the key balls from the Defendant.  The Government is effectively relying upon particular policies of particular banks to supply the predicates for the alleged crime, *without* setting forth *any* policy for *any* bank, or any method by which notice of same was provided.

Second, where the supposed mechanism of the bank fraud is misrepresentations that induced specific transactions (allegedly processed by the banks in violation of their policies), the misrepresentations and the corresponding transactions should be identified.  *C.f., e.g., United States v. DiMarzo*, 1993 WL 426936, at *2 (S.D.N.Y. Oct. 21, 1993) (concluding that an indictment for bank fraud is sufficient where it tracks the language of the statute but also "sets forth the dates upon which defendant deposited or attempted to deposit altered or forged stolen checks, the nature of the alteration or forgery, the name of each bank in which each check was deposited or attempted to be deposited, and the name of the account and bank against whom each of the checks was drawn."); *United States v. Mercado*, 2003 WL 21756084, at *2 (S.D.N.Y. Jul. 30, 2003) (indictment charging bank fraud sufficient where it identifies specific deposits of false checks and withdrawals, including dates and amounts); *see also United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1998) (dismissing indictment for failure to identify victim, time, place, or means

---

[11]   Financial institutions, as defined for purposes of Section 1344, include federally insured depository institutions and their holding companies, certain credit unions with federally insured accounts, federal loan banks or members of the Federal home loan bank system, certain institutions affiliated with the Farm Credit System, small business investment companies, Federal Reserve banks or members of the Federal Reserve System, certain organizations operating under the Federal Reserve Act, branches or agencies of foreign banks operating in the U.S., or mortgage lending businesses that make certain federally-related mortgage loans.  18 U.S.C. §20.

of allegedly criminal extortion). Here, however, the Government fails to state any specific date on which any offending transaction actually occurred. Its sprawling morass of generalities has not been reduced to even a single concrete instance where nebulous allegations crystallize into a bank fraud against any particular bank.

Third, where intent to harm or cause risk to a party and actually causing harm or risk to a party are both elements, as discussed at length below, some harm or risk of harm to a party should be alleged. Based upon the pleading, however, there is no reason to conclude there was any intent to harm a party because there was no reason to believe any party, nor any federal interest, would be harmed, and, unsurprisingly, no parties were in fact harmed. *See H&Q Properties, Inc. v. Doll*, 793 F.3d 852 (8th Cir. 2015) (explaining, in context of motion to dismiss a civil RICO case predicated on a violation of 18 U.S.C. § 1344(2), that failure to allege that Plaintiff defrauded the *bank* at issue, rather than his business partner, was fatal to the complaint, and noting that "even assuming . . . some kind of fraud [had been pled], § 1344(2) is not a plenary ban on fraud and does not federalize frauds that are only tangentially related to the banking system.") (citations, quotations and alterations omitted). To the extent the Government's account may differ and it may be positing some theory of harm, its Indictment should so reflect—yet the Indictment is blank in this critical respect.

Fourth, where any misrepresentation has to be intended to actually induce a bank to take actions it otherwise would not have (for the sake of establishing materiality), the Government should be pleading that particular banks would have behaved differently in particular transactions—*i.e.*, they would have refused to process them. All the Government offers on this point, however, is that "most" or "many" banks—the Government toggles between those terms—were allegedly unwilling to process these transactions in general. (Indictment at ¶¶ 1, 12). That

11

amounts to fudging.  If the Government can allege that certain banks would not in fact have processed the transactions at issue, then it should come clean with those specifics in its allegations.

Moreover, the Government should be required to plead that the Defendants intended the misrepresentations and what the misrepresentations induced.  As to the "scheme" itself, the Indictment fails to describe—even cursorily—how the Defendants managed to have "incorrect" codes assigned.[12]  It fails to allege any role the Defendants played in the purported scheme, other than creating a mobile application to facilitate intrastate marijuana-related transactions in two States where such transactions are legal.

Finally, this is conspiracy case, yet there is no allegation the Defendants ever selected or submitted a merchant code, which is the core of the supposed crime.  In the Indictment, the co-conspirators were not only unnamed but also unidentified and undescribed.  In response to the order to file a bill of particulars by June 19, 2020, the Government has provided (but not filed) a "confidential" list of co-conspirators.  The Government has indicated that it will provide, but has not yet provided an amended or supplemental bill of particulars.  Even now, nothing concrete is available to indicate how the alleged scheme was executed, or by whom.  Nor is it clear who the intended victim supposedly was.

In sum, the allegations do not connect actual, concrete facts so as to establish, as they must, that a scheme was intended to or did in fact afford means to induce U.S. financial institutions to incur losses or exposure that would not have occurred but for the fraud.  The resulting Indictment

---

[12]  The Defendant notes that, as a general matter, it is the merchant banks, not individuals or companies facilitating commerce, who assign merchant category codes.  *See e.g., Merchant Data Standards Manual*, Visa, at p. 15 (Oct. 2019), https://usa.visa.com/dam/VCOM/download/merchants/visa-merchant-data-standards-manual.pdf; *Visa Core Rules and Visa Product and Service Rules*, Visa, at 580, *et seq.*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf (Apr. 18, 2020).

does not give notice of an offense or afford meaningful opportunity for defense, including from the perspective of double-jeopardy, and it should be dismissed for lack of specificity.

**B.  The Indictment fails to state an offense.**

Not only does the Indictment fail to identify a specific instance of actual bank fraud against any specified bank, it also fails to allege, even in the abstract, a series of events that would amount to a conspiracy to commit bank fraud.  The Indictment should therefore be dismissed for failure to state an offense on the merits, as well as for lack specificity.

To state a claim for conspiracy under 18 U.S.C. §371, the Government must allege *inter alia*, an underlying "offense against the United States" that is the object of the conspiracy.  *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) (setting forth the "three essential elements" of a conspiracy:  "(1) an agreement among two or more persons, the object of which is an offense against the United States; (2) the defendant's knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators.").

Stripped of puffery and legal conclusions, the instant Indictment does not describe the federal offense of bank fraud—the only "offense against the United States" allegedly at issue.  At bottom, the Defendants merely facilitated lawful, legitimate transactions between willing, informed parties within the states of California and Oregon.  The Government fails to allege (because it cannot allege) that the Defendants intended to harm *anyone*—banks, payment processors, Credit Card Companies, customers, or anyone else—even though that is an essential element of this crime.  Because there is no actual or intended victim here, there can be no fraud, and the Indictment fails at the first element.  Indeed, it would be unprecedented to sustain an

13

Indictment for a victimless "bank fraud" (*i.e.*, in which no one was, in fact or by intention, injured by any fraud).

### 1. 18 U.S.C. § 1344

The federal prohibition against U.S. bank fraud serves the fundamental purpose of protecting U.S. financial institutions, the U.S. financial system, and the FDIC's investment in the same. *See United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999) ("The purpose of this section is to protect the federal government's interest as an insurer of financial institutions.").[13]  To that end, the statute makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344.

The statute has two distinct operative clauses—subsection (1) protects the banks themselves from fraud, while subsection (2) extends that protection to those who put their faith (and their money) in the security of the federal banking system.  The statute thus protects against more than the classic instance of fraudsters hoodwinking U.S. banks into parting with their own money (a scenario that is not remotely posed here).  *See Loughrin v. United States*, 573 U.S. 351, 356 (2014) (subsection (2) of bank fraud statute extended to conduct involving intent to deprive third-party retailer of its money, even where there was no intent to harm the bank).

---

[13]   Consistent with this policy, the statute is limited to U.S. federally insured institutions—here, the issuing banks—and excludes the Credit Card Companies and foreign merchant banks.  *See* 18 U.S.C. § 20.

But the statute does not go so far as to transmute otherwise legitimate commercial transactions—those that are neither intended to nor actually do put any party at risk of loss—into crimes. Nor does the statute give the discretionary policy of a particular private bank the force of federal criminal law whenever such a policy is arguably violated or bent.[14] That certain *bank policies* may allegedly have been violated does not mean that the *criminal prohibition* of Section 1344 was violated. Because this Indictment rests on the opposite premise and that premise is wrong as a matter of law, the Indictment should be dismissed at the pleading stage. When held to the measure of Section 1344 and cases construing it, the Indictment fails to allege anything that might establish *either* (1) the intent to harm some party *or* (2) the materiality of any misrepresentations made in the course of the transactions at issue, *both* of which are essential.

### 2.   The Indictment fails to allege an offense under 18 U.S.C. § 1344.

As a preliminary matter, this Indictment requires no serious consideration of Section 1344's subsection (1), which requires specific intent to defraud a financial institution out of its own money.[15] Here, there is no whisper of any such intent on the part of the Defendants.[16] Rather,

---

[14]   That is not to say there are no consequences for deliberately violating the banks' policies. To the contrary, the Government in its pleading references a contractual framework anticipating possible violations of the rules by a merchant, which lead first to financial penalties and thereafter may result in termination from the Credit Card Network. (Indictment ¶ 8). It is telling that the private sector has created a contractual framework—one that obviates resort to litigation, let alone federal criminal prosecution—to handle commercial disputes that the Government here characterizes as felony bank fraud. Painting these practices as criminal ignores the existing contractual agreements and threatens to criminalize a broad range of activities that until now have apparently been largely resolved between private parties.

[15]   *Loughrin*, 573 at 357 (2014) (describing intent to defraud as not simply an element of this offense under § 1344(1), but its "whole sum and substance."; *see also United States v. Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016) (confirming that intent to defraud a financial institution is an element of bank fraud under § 1344(1)).

[16]   To the extent the Government does assert that subsection (1) applies, the argument has no merit. Intent to defraud under subsection (1) requires intent to cause actual loss or risk of loss to a financial institution. *See United States v. Ahmed*, 133 F.3d 908 (2d Cir. 1998) (explaining that

it appears the Government has placed all of its eggs in the more inclusive basket of the second subsection.  But there, too, the Indictment fails.

A violation of 18 U.S.C. § 1344(2) has three elements:  (1) knowing execution of a scheme or artifice; (2) in order to obtain property owned by or in the custody of the bank; and (3) execution by means of false or fraudulent pretenses, representations or promises. 18 U.S.C. § 1344(2); *Loughrin*, 573 U.S. at 355 (2014) (discussing the elements of bank fraud under § 1344(2)).  This second subsection of 1344 is certainly more expansive than the first:  the alleged scheme need not actually target the bank, but can instead target the party for whom the bank held property, so long as the misrepresentation at issue affords the means by which that property is obtained.

In this case, the two most salient requirements of Section 1344(2) are:  (1) intent to harm *someone*; and (2) the materiality of any misrepresentations used to execute the alleged scheme. The Indictment is doubly defective because it independently fails to satisfy each of those two elements.

### i.   The Indictment fails to allege any intent to harm by Defendants.

*Loughrin* established that the key distinction between subsections (1) and (2) is that intent to defraud and the corresponding intent to harm under subsection (2) need not be directed

---

intent to subject a financial institution to risk of loss suffices for the required intent to defraud under § 1344(1)); *United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019) (recognizing that intent to expose a bank to significant economic risk would suffice, but accepting that "[a] genuine belief that the scheme never exposed the victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent").  As described more fully *infra* § III.B.2.i, the Government has not even alleged a theory of *potential* harm—be it legal, financial, economic, or otherwise—to a processing bank, much less that any financial institution was in fact exposed to any loss or risk of loss.  Nor has it alleged any basis to infer Defendants intended any loss or risk thereof.  By failing to allege any loss (actual, potential or intended) to a financial institution, the Indictment fails to allege that the object of the conspiracy—the processing of marijuana transactions in California and Oregon consistent with applicable state law—constituted an offense under Section 1344(1).

specifically at a *financial institution*.  But it did not obviate the requirement that the defendant must intend to harm or risk harm to *someone*, as that is part and parcel of defrauding.  *See* 573 U.S. at 363.

*Loughrin* itself established that an intent to harm a retailer, rather than specific intent to harm a bank, sufficed under Section 1344(2).  *Id.*; *see also Calderon*, 944 F.3d at 92 (2d Cir. 2019) (declining to reach the question of whether *Loughrin* abrogates prior Second Circuit law requiring an intent to harm someone).  Other circuits have reached the same conclusion, finding intent to harm third parties other than the financial institution can constitute requisite intent to defraud. *United States v. Morganfield*, 501 F.3d 453, 464–65 (5th Cir. 2007) (intended victim may be a third party, rather than a bank); Ninth Circuit Jury Instructions Committee, *Manual of Model Criminal Jury Instructions*, 8.127, p. 355 (2019) (requiring proof of intent to defraud, but noting that, consistent with *Loughrin*, that intent need not be directed at the bank); United States District Court of Maine, *2019 Revisions to Pattern Criminal Jury Instruction for the District Courts of the First Circuit*, 4.18.1344 (2019) (explaining that the requirement of intent to deceive may have survived *Loughrin* because *Loughrin* still involved a victim other than the bank).

While there have been numerous prosecutions under §1344(2) since *Loughrin*, the Defendants have not been able to identify a single post-*Loughrin* case where, as here, there is *neither* any intended victim *nor* some concrete risk to that victim.  *See, e.g. Shaw v. United States*, 137 S.Ct. 462, 468–69 (2016) (noting that subsection § 1344(2) covers circumstances involving a false statement to a store or cashier, even when, strictly speaking, the statement is not designed to deceive the bank and therefore might not fall under subsection (1)); *United States v. Metaxas*, 2020 WL 1472440, at *6 (E.D.N.Y. Mar. 26, 2020) ("The intent that is required when dealing with a bank's assets is the intent to take the deceptive action that causes the exposure"); *c.f., United States*

*v. Ajayi*, 808 F.3d 1113, 1124 (7th Cir. 2015) (explaining the harm requirement for bank fraud generally and explaining that "the crime of bank fraud is complete when the defendant places the bank at risk of financial loss, and not necessarily when the loss itself occurs").[17]

Here, the Government simply fails to plead any cognizable theory of harm or risk of harm to *anyone*. At no point does the Government even suggest that there was any harm or risk thereof (intended or not), to any customer, cardholder, Credit Card Company, or merchant bank, all of which were, by all accounts, willing and informed participants in the marijuana transactions. And, despite observing that possession, use, and distribution of marijuana remains unlawful under federal law, the Indictment conspicuously fails to allege that the banks or any other parties to the transaction might have been subject to prosecution, civil liability or economic loss as a result of their participation in processing these payments (Indictment ¶ 10(d), n. 2). To the contrary, the Indictment acknowledges the prospect that at least *some* U.S. financial institutions would have been glad to process such marijuana-related transactions without incident.

The Indictment betrays the premise that the transactions at issue could be perfectly legitimate had all participants been fully informed. If it could prosecute the banks for processing

---

[17]   The Southern District of New York's statement in dicta in *United States v. Nejad*, 2020 WL 883500, at *3 (S.D.N.Y. Feb. 24, 2020) that the defendant need not intend to cause harm to anyone reflects a misunderstanding of both *Loughrin* and *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019), *cert. denied sub nom. Gross v. United States*, 140 S. Ct. 1224 (2020). Notably, the Court in *Nejad* recognized that the evidence sufficed to show a risk of harm to the victim banks. Further, as explained below, *Loughrin* involved an intent to harm a third-party retailer, while *Lebedev* involved an illegal money-transmitting business that failed to register with federal regulators and failed to obtain state licensure, thereby placing the target financial institution at risk. That is not analogous to a legal marijuana business that fully complies with state laws. Further, *Lebedev* considered whether the **evidence** presented at trial established that the misrepresentations as to nature of the transactions caused the financial institutions to process them when they otherwise would have refused. Here there is not even a foundational allegation that the financial institutions would have refused to process the transactions but for the alleged misrepresentations.

marijuana-related transactions, the Government would simply prosecute *Defendants* on that straightforward basis, without resorting to the tortured workaround of alleging bank fraud. But the Government knows it cannot prosecute banks for processing these transactions exactly as they did here, and appears to have confirmed as much in its briefing.[18]

The failure to allege any intent to harm *anyone*, or any actual harm or risk of harm, should be fatal to the Indictment. *See United States v. One White Crystal Covered Bad Tour Glove and other Michael Jackson Memorabilia*, 2012 WL 8467453 (Sept. 6, 2012) (expressing, pre-*Loughrin*, skepticism of Government's allegation of victimless bank fraud in connection with forfeiture action where individual opened bank accounts using names other than his own, given the absence of any allegations that the individuals attempted to obtain from the bank any funds other than his own, despite using fraudulent means to do so). For all its mudslinging about foreign companies and websites, the Government fails to make *any* allegations—however abstract or theoretical—that might establish a black-letter element of its claim. The Indictment should therefore be dismissed.

### ii. The Indictment fails to allege materiality.

Separately, the Indictment also fails to allege the materiality of the supposed misrepresentations—in fact, the term "material" never once appears in the Indictment. As such, the Indictment fails to satisfy the third element of bank fraud under 18 U.S.C. § 1344(2)—that alleged misrepresentations be the means by which the scheme was accomplished.

---

[18]   *See* ECF 27 at 2, n.1 (where the Government terms it "entirely beside the point" whether the underlying transactions were "legal under state law in several states, including California and Oregon," and instead relies upon the fact that "many United States banks are unwilling to process payments involving the purchase of marijuana," while studiously avoiding any claim that the underlying transactions would be illegal for any, let alone all, U.S. banks to process).

The Supreme Court has clarified that the false statements or misrepresentations at issue in a prosecution under subsection (2) must be more than a simple but-for cause of a bank releasing money—they must be the "mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Loughrin*, 573 U.S. at 363.  Put another way, "to establish the existence of a scheme to defraud, the Government must prove the *materiality* of a defendant's false statements or misrepresentations." *Calderon*, 944 F.3d at 85.

Here, the Government fails to allege any facts in support of the third essential element— that the purported misrepresentations were material to, and thus induced the financial institutions to process the transactions. *See Loughrin*, 573 U.S. at 363.  That omission is noteworthy because the basic allegations needed to satisfy this element would be straightforward, if only the Government had a basis on which to make them.

While the Indictment alleges variably that *most* or *many* U.S. financial institutions are unwilling to process transactions involving marijuana, (Indictment ¶¶ 1, 12), it fails to allege that any particular financial institution that did process the transactions here was unwilling to do so, just as it fails to identify any policies under which those particular banks would have been unwilling to process those transactions.

The Indictment also fails to allege that any particular institution was unaware it was processing marijuana transactions, or that the reason the institution was unaware was co-conspirators' merchant coding—*i.e.* that the supposed misrepresentation actually supplied the means.  Notably, the Indictment alleges there was no proper code applicable to marijuana.  As such, no matter what code had been chosen (*i.e.*, medical, pharmacy, *etc.*), under the Government's own account of the facts, the banks could not possibly have obtained sufficient information to allow them to screen specifically for marijuana transactions.  Moreover, merchant category codes

are assigned categorically to industries for which banks accept transactions—at which point the issuing bank does not consider the individual merchant category code assigned in determining whether to process a particular transaction.  Of course, the Indictment also fails to allege any particular bank would *in fact* have refused to process a particular transaction absent co-conspirators' particular representations, even if the bank somehow had become aware that the transactions involved marijuana.

In a similar vein, while the Indictment alleges that the Credit Card Companies might have terminated their relationship with a *merchant* for failure to abide by their alleged policies (Indictment ¶ 8), there is no concomitant allegation that the Credit Card Companies would have or could have prevented the processing of any transactions the underlying banks were willing to process.  Nor does the Indictment even purport to allege what the Credit Card Companies' policies at issue here actually were.  In fact, as mentioned above, it is at least Visa's and MasterCard's policy to leave to individual banks the decision whether to process marijuana transactions.[19]

The Government's vague allegations about what some banks often do, or about contractual consequences third parties could possibly face, do not suffice to establish the materiality of co-conspirators' alleged representations to particular transactions.  *See United States v. Puerta*, 607 F. App'x 635, 636 (9th Cir. 2015) (failure to introduce sufficient evidence that use of two names and false reason to recall a money transfer caused the bank to part with its money resulted in failure to meet the means requirement under *Loughrin*).  The Government's allegations (or lack thereof) make this comparable to a bank-fraud case that rests on alleged failure to accurately report revenue yet fails to allege that the relevant bank (or transaction) required or considered reported revenue;

---

[19]   *Supra* note 5.

such a theory could not stand.  The Indictment's failure to allege *any* facts that would support the materiality of the misrepresentations should be fatal in and of itself.

The Indictment stands in stark contrast to the facts considered in *United States v. Lebedev*, 932 F.3d at 48–49, where the Second Circuit considered the sufficiency of evidence to convict the defendants of mail fraud and bank fraud based on misrepresentations regarding their unlawful, unregistered and unlicensed virtual currency exchange.  The Court explained that the information withheld regarding the nature of the defendants' bitcoin exchange was "potentially valuable economic information" and noted that the specific bank at issue "consider[ed] transactions with money services or money-transmitting businesses to carry a higher risk of fraud."  *Id.*

The Indictment here lacks any such allegation regarding potential risk to the financial institutions that could make material the fact the transactions involved marijuana.  Nothing in the Indictment suggests that the economics of processing these transactions are less attractive or profitable than processing transactions for sneakers, nor is there any reason to so assume.  In other words, the Indictment does not establish any *economic value* specifically associated with whether a willing, informed cardholder was buying marijuana rather than aspirin via a given transaction.

Absent any allegation of facts establishing materiality (which is compounded here by the failure to allege anything with specificity about banks, policies, or transactions), the Indictment fails to state an offense under Section 1344(2), and correspondingly fails to state the offense of conspiracy.

## IV.     The Indictment defies the Rohrabacher-Farr Amendment.

The flaws in the Indictment may well reflect the Government's own awareness that the instant prosecution is adventurous, at best, and very likely improper.  Stripped of insinuations, innuendo, and misdirection, the Indictment faults Defendants for creating a mobile platform to

facilitate the purchase, sale, and delivery of marijuana products in California and Oregon—states where such activity is legal under applicable state law, including for medical purposes.  As the Indictment makes clear, there was no intent to harm any of the parties involved in the transactions facilitated by this platform, nor any risk of loss to them.  Indeed, the Indictment leaves open the legal entitlement of U.S. banks to process the underlying transactions as they see fit, without running afoul of federal law.  In nonetheless trying to prosecute a criminal case for *bank fraud*, the Government looks to *bank policies* on marijuana rather than to *federal law* on marijuana, and equates the *discretionary choices* of (unspecified) U.S. banks with the *economic soundness* of U.S. banks (as backed by the United States Government).

Why such contortions?  The Rohrabacher-Farr Amendment may well supply the answer.  Passed in 2014 and included in every omnibus appropriations bill since, the Amendment restricts the Government from prosecuting individuals and entities for marijuana-related commercial activity that is legal under state law.[20]  The Ninth Circuit has interpreted this to mean that, "[i]f the federal government prosecutes [] individuals [engaged in activity permitted under state law], it has prevented the state from giving practical effect to its law providing for non-prosecution of individuals who engage in the permitted conduct."  *See United States v. McIntosh*, 833 F.3d 1163, 176 (9th Cir. 2016).  More recently, the Tenth Circuit permitted a district court to consider whether the same language prohibits the Bureau of Prisons from continuing to expend funds to incarcerate

---

[20]   The rider provides:  "None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, and Wisconsin, to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Consolidated Appropriations Act of 2020*, Pub. L. No. 116-93, § 531, 133 Stat. 2317 (2019).

someone based on a conviction for conduct that complied with state law.  *See Sandusky v. Goetz*,

944 F.3d 1240, 1244, 1247 (10th Cir. 2019).

In this case, the Government is attempting to prosecute Defendants for a federal felony

based only on conduct that is legal under applicable state law, and, what is more, is occurring

openly, notoriously, and as-advertised every day by commercial actors across a variety of states.

*See   Los   Angeles-   Venice   (Lincoln   Blvd)*,   MedMen   (2019),

https://www.medmen.com/stores/venice-beach-lincoln-blvd (advertising ability to pay with debit

cards at one of MedMen's Venice Beach locations for in store purchases or delivery); *Santa Ana

– Orange County,* MedMen (2019), https://www.medmen.com/stores/orange-county-santa-ana

(same   for   Orange   County   location);   *Store   Locator*,   MedMen   (2019),

https://www.medmen.com/stores (same for the other 10 MedMen locations in California); *Las

Vegas – Downtown (Arts District),* MedMen (2019), https://www.medmen.com/stores/las-vegas-

downtown-vegas-arts-district (same for Nevada); *Scottsdale – Talking Stick (Manzanita),*

MedMen (2019), https://www.medmen.com/stores/scottsdale-talking-stick-n-pima-and-e-via-de-

ventura (same in Arizona save no delivery); *Tallahassee – Thomasville Rd.*, MedMen (2019),

https://www.medmen.com/stores/tallahassee-lafayette-park; *Frequently Asked Questions*, Harvest

Bloom (2020), https://getharvestbloom.com/faq/ (marijuana delivery throughout San Francisco

using   all   credit   cards   except   American   Express);   *Dosist   West   3rd*,   Yelp,

https://www.yelp.com/biz/dosist-west-3rd-west-hollywood-2 (noting the Dosist location in West

Hollywood accepts credit cards); *FAQ,* Ganja Goddess (2019), https://goddessdelivers.com/faq

(accepts credit cards for marijuana delivery throughout California); *Menu*, Green Goddess,

https://shop.greengoddesscollective.com/store/green-goddess-collective1/menu (accepts debit and

credit cards for in store or delivery purchases in Los Angeles); and *Today's Menu*, Green Dot (2018), https://www.thegreendotla.com/pick-up-menu.html (same).

Notably, had the Government brought this Indictment in the Central District of California, as the links above illustrate, its case would proceed surrounded by dispensaries that regularly sport Visa and MasterCard stickers on their windows.  That said, even on the streets of New York, the dispensary MedMen also accepts debit cards at all four of its New York locations, including the one on Fifth Avenue.[21]

Simply put, the Government is attempting to prosecute Defendants for engaging in conduct that is not only legal under applicable state law, but widespread and notorious.  To the extent the Government wants to carve our recreational marijuana transactions from medical marijuana transactions so as to circumvent Rohrbacher-Farr, the instant effort to sweep them together hardly affords it the high ground.  And the Government's withholding of key specifics that would illuminate, for instance, where the underlying transactions occurred and whether they involved medical recommendations and uses, may serve to evade proper judicial and congressional scrutiny of such prosecutions.  Such an effort should not be dignified, and affords no justification for the Government to play fast and loose with the Indictment.

In this light, especially, the Court has every reason to enforce basic, established legal strictures by dismissing the Indictment in its entirety.

---

[21]   *NYC – Fifth Avenue (Bryant Park)*, MedMen (2019), https://www.medmen.com/stores/nyc-fifth-avenue-bryant-park (5th Avenue accepts debit cards); *Syracuse – Galeville (Buckley Rd.),* MedMen (2019), https://www.medmen.com/stores/syracuse (same in Syracuse); *Long Island – Lake Success (Marcus Ave.)*, MedMen (2019), https://www.medmen.com/stores/lake-success (same on Long Island); and *Buffalo – S. Main St.*, MedMen (2019), https://www.medmen.com/stores/buffalo (same in Buffalo).

I.        **Conclusion**

For the foregoing reasons, the Court should dismiss the Indictment.


June 26, 2020                    Respectfully submitted,

ROTHKEN LAW FIRM                QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Ira Rothken*                 */s/ William A. Burck*
Ira Rothken                     William A. Burck
Jared Smith                     Derek L. Shaffer
3 Hamilton Landing              777 6th Street NW 11th floor
Suite 280                       Washington, DC 20005
Novato, CA 94949                Telephone: (202) 538-8000
Telephone: (415) 92404250       Fax: (202) 538-8100
Email: ira@techfirm.net         Email: williamburck@quinnemanuel.com
Email: jared@techfirm.net       Email: derekshaffer@quinnemauel.com

                                Christopher Tayback
                                Paul J. Slattery
                                865 S Figueroa Street 10th Floor
                                Los Angeles, CA 90017
                                Telephone: (213) 443-3000
                                Fax: (213) 443-3100
                                Email: christayback@quinnemanuel.com
                                Email: paulslattery@quinnemanuel.com

                                Sara C. Clark
                                711 Louisiana St., Ste. 500
                                Houston, Texas 77002
                                Telephone: (713) 221-7000
                                Fax: (713) 221-7100
                                Email: saraclark@quinnemanuel.com