UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :   20-cr-188 (JSR)
        -v-                         :
                                    :   OPINION & ORDER
RUBEN WEIGAND and HAMID AKHAVAN,    :
                                    :
        Defendants.                 :
                                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

The indictment in this case alleges that many banks will not approve credit or debit card transactions for marijuana, even in states like California and Oregon that permit the sale of marijuana. To circumvent this, the indictment continues, defendants Ruben Weigand and Hamid Akhavan, and their co-conspirators, set up fictitious businesses, complete with websites and bank accounts, purporting to sell a host of products like dog food, face creams, green tea, carbonated drinks, and diving gear. They then used these fictitious businesses to fool the banks into approving marijuana credit card and debit card sales by disguising those transactions as sales of dog food and the like. As a result, the banks processed more than $100 million worth of transactions that they otherwise would have declined. Based on these allegations, the indictment here charges defendants with one count of conspiracy to commit bank fraud.

Now before the Court are defendants' motions to dismiss the indictment, defendant Weigand's motion to suppress electronically stored information that the Government seized from him pursuant to a warrant, and defendants' motions to compel certain discovery and to set pretrial disclosure deadlines.

## I.   MOTIONS TO DISMISS

The following allegations are drawn from the third superseding indictment.  The Court accepts them as true for the purpose of evaluating the defendants' motions to dismiss.  See United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

A credit or debit card transaction generally involves five parties:  the cardholder (here, the would-be purchaser of marijuana), the merchant (here, the company created by the defendants and their co-conspirators to facilitate these card purchases, which the indictment calls the "Online Marijuana Marketplace Company"), and three intermediaries -- the issuing bank, which issued the customer's card and funds the transaction; the processor (e.g., Visa), which processes the transaction; and the merchant's bank, also known as the "acquiring bank," which receives funds on behalf of the merchant.  S3 Superseding Indictment, ECF No. 16, at ¶¶ 7, 10.  In the usual course, a cardholder initiates a transaction by seeking to purchase a good or service (such as here the purchase of marijuana) and offering a credit or debit card for payment.  The merchant then transmits

information regarding the transaction to the processor (or to the merchant's bank, which then passes the information on to the processor). This information includes a "merchant category code" ("MCC") that describes the category of product or service that the merchant sells. Id. ¶¶ 9, 10(d). The processor then passes that information to the issuing bank, which approves or declines the transaction. If the issuing bank approves the transaction, it then transfers funds through the processor to the merchant's bank. Finally, the merchant's bank credits the merchant's account, and the issuing bank debits the cardholder's account (in the case of a debit card) or includes the charge on the cardholder's next monthly statement (in the case of a credit card). See id. ¶ 11(b)-(d).

The indictment alleges that Weigand and Akhavan were principals of the Online Marijuana Marketplace Company, which developed a website and mobile phone application through which customers in California and Oregon could order marijuana for delivery from a variety of retailers. Id. ¶¶ 1, 3. Many United States banks, however, are unwilling to process card payments for marijuana. Id. ¶ 1. Weigand and Akhavan, together with unnamed co-conspirators, allegedly deceived United States banks by disguising the transactions to create the false appearance that they were unrelated to the purchase of marijuana. Id. ¶¶ 1, 16.

To do so, Weigand, Akhavan, and their co-conspirators, beginning in 2016 and continuing through mid-2019, created a series of fictitious merchants purportedly selling legitimate goods including dog products, diving gear, carbonated drinks, green tea, and face creams (the "Phony Merchants"). The conspirators created web pages to support the illusion that the Phony Merchants had actually sold these legitimate goods. Id. ¶ 13. The conspirators worked with third-party payment processors and offshore merchant banks to create bank accounts for these Phony Merchants. Id. ¶ 12. The conspirators then applied incorrect MCCs to the Online Marijuana Marketplace Company transactions in order to create the appearance that the transactions were related to the Phony Merchants and unrelated to marijuana. Id. ¶ 14.

When cardholders attempted to use credit and debit cards to make marijuana purchases from the Online Marijuana Marketplace Company, the issuing banks, at least some of which were federally insured financial institutions, were tricked into believing that cardholders were purchasing legitimate goods from the Phony Merchants. Id. The issuing banks approved over $100 million of credit and debit card transactions for the Online Marijuana Marketplace Company. Id.

The defendants move to dismiss on three grounds: (A) failure to state an offense; (B) lack of specificity; and (C) violation of a provision in an appropriations act (the "Rohrabacher-Farr

Amendment") that bars certain Government interference with state medical marijuana regimes.  The Court addresses each argument in turn.

### A.    Failure to State an Offense

Defendants argue that the indictment does not state an offense, for three reasons:

(1)  Bank fraud requires an intent to inflict harm on a financial institution, and the indictment does not allege such an intent.   Weigand Mem. in Support of Mot. to Dismiss, ECF No. 62 ("Weigand MTD"), at 12; Akhavan Mem. in Support of Mot. to Dismiss, ECF No. 72 ("Akhavan MTD"), at 15.

(2)  Bank fraud requires an intent to deceive a financial institution, but the indictment does not allege that defendants made misrepresentations to issuing banks -- only to intermediaries who are not protected by the bank fraud statute.  Weigand MTD 15, 17.

(3)  Because at least some issuing banks were willing to process marijuana-related transactions, the indictment does not allege that defendants' misrepresentations were material. Akhavan MTD 15; Weigand MTD 17.

As noted, this indictment charges defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349.  Bank fraud, in turn, is defined in 18 U.S.C. § 1344, as follows:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice –
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.[1]

The bank fraud statute was modeled on prior federal fraud statutes, as a Senate Judiciary Committee Report explained:

> The proposed bank fraud statute is modeled on the present wire and mail fraud statutes which have been construed by the courts to reach a wide range of fraudulent activity.  Like these existing fraud statutes, the proposed bank fraud offense proscribes the conduct of executing or attempting to execute "a scheme or artifice to defraud" or to take the property of another "by means of false or fraudulent pretenses, representations, or promises."

S. Rep. No. 98-225, at 378 (1983); see also 18 U.S.C. § 1341 (prohibiting "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," using the mail); 18 U.S.C. § 1343 (same, but with use of interstate wire connection).

To state a violation of Subsection 1 of the bank fraud statute, the Government must allege that a defendant (1) knowingly

---

[1] "Financial institution" is defined at 18 U.S.C. § 20.  The indictment here alleges that at least some of the issuing banks were financial institutions, as defined in Section 20.  ECF No. 16, ¶ 16.

executed (or attempted to execute) a scheme to "deceive [a] bank,"[2] (2) through "a misrepresentation or concealment of material fact,"[3] and (3) to "deprive it of something of value,"[4] with (4) "knowledge that [the defendant] would likely harm the bank's property interest" through the scheme.[5]

To state a violation of Subsection 2, the Government must allege that a defendant (1) knowingly executed (or attempted to execute) a scheme through which the defendant "intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" (hereinafter, "bank property");[6] (2) the defendant made "false or fraudulent pretenses, representations, or promises" (hereinafter, "misrepresentations");[7] (3) the misrepresentations were "of

---

[2] Shaw v. United States, 137 S. Ct. 462, 469 (2016).

[3] Neder v. United States, 527 U.S. 1, 3 (1999).

[4] Shaw, 137 S. Ct. at 469. Although the defendant must intend, through the scheme, to "deprive [the bank] of something of value," id. at 465, the Government need not allege "that the defendant intend that the victim bank suffer [financial] harm," id. at 467. A scheme to obtain an accountholder's funds is enough, because the bank holds a property interest in those funds, akin to a bailee. Id. at 465.

[5] Id. at 468.

[6] Loughrin, 573 U.S. at 355-56. While the indictment must allege an intent to obtain bank property, it need not allege that "the defendant's scheme created a risk of financial loss to the bank." Id. at 366 n.9.

[7] Id.

material fact";[8] and (4) the misrepresentations were the "means" by which defendant intended to obtain the bank property.[9]

### 1.   Intent to Harm Banks

Defendants first argue that the indictment must be dismissed for failure to allege an intent to harm.  Defendants cite United States v. Miller, a Ninth Circuit opinion that reasoned in the case of wire fraud (but with frequent analogies to bank fraud) that "the government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."  United States v. Miller, 953 F.3d 1095, 1102 (9th Cir. 2020) (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970)) (alterations in original).  Defendants argue that here the indictment does not adequately allege an intent to impose "actual harm or injury" on the issuing banks.

In describing the sorts of harm that qualify, however, the Supreme Court's bank fraud precedents cast a wide net.  The

---

[8] Neder v. United States, 527 U.S. 1, 3 (1999).

[9] Loughrin, 573 U.S. at 355-56.  The Supreme Court has described this as "a relational component:  The criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation . . . such that the connection between the two is something more than oblique, indirect, and incidental."  Id. at 362-63.  In other words, the Government must prove that "the defendant's false statement [was] the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control."  Id. at 363.

indictment need only describe a scheme to "deprive [the bank] of something of value," Shaw, 137 S. Ct. at 469 (Subsection 1) or to "obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution," Loughrin, 573 U.S. at 356 (Subsection 2).  The Government need not allege harm in the sense of pecuniary loss.  Shaw, 137 S. Ct. at 467 (Subsection 1 "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."); Loughrin, 573 U.S. at 366 n.9 (Subsection 2 does not "require[] the Government to prove that the defendant's scheme created a risk of financial loss to the bank" or that it, in fact, caused "damage.").

Here, the indictment alleges that the defendants intended to deprive the issuing banks of certain property rights and to obtain money that was under bank control.  The particular property rights at issue depend on whether the transaction was by credit card or by debit card.  When a customer bought marijuana with a credit card, the issuing bank transferred to the merchant bank its own funds, which it had offered on credit to the cardholder.  When a customer used a debit card, the bank transferred funds from the cardholder's account.  Nevertheless, even in the debit card situation, the bank, prior to the transfer, held a property interest in those funds.  "When a customer deposits funds," sometimes the bank "becomes the owner of the funds," subject to a customer's right to withdraw them; other times "the bank merely

assumes possession." Shaw, 137 S. Ct. at 466. But even in the latter case, "the bank is like a bailee" and has a "special qualified property" right in the account. Id. (quoting 2 W. Blackstone, Commentaries on the Laws of England 452-454 (1766)).

Because the indictment alleges that defendants intended to deprive the bank of these property rights, and to thereby obtain money under bank control, it sufficiently describes an intent to cause harm under both subsections of the bank fraud statute. Compare United States v. Lebedev, 932 F.3d 40, 49 (2d Cir. 2019), cert. denied sub nom. Gross v. United States, 140 S. Ct. 1224 (2020) (upholding bank fraud conviction where "there was sufficient evidence showing that [defendant] caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with" an unlicensed Bitcoin exchange, "with the intent to obtain funds under those institutions' custody and control"). Id. at 49.

To be sure, the foregoing analysis applies Supreme Court precedent. Defendants argue that more is required in the Second Circuit because a panel of the Second Circuit stated in 2012 that bank fraud requires an "intent to victimize the institution by exposing it to actual or potential loss." See United States v. Nkansah, 699 F.3d 743, 748 (2d Cir. 2012) (emphasis supplied; internal quotation marks omitted). Last year, the Second Circuit declined to address whether this holding survives Shaw and

Loughrin.   See United States v. Calderon, 944 F.3d 72, 92 (2d Cir. 2019) ("We need not wade into this debate.").

Though apparently an open question, this is not a difficult one.   Four years after the Second Circuit's decision in Nkansah, the Supreme Court, as already noted, explicitly held that Subsection 1 requires no "intent to cause financial loss," Shaw, 137 S. Ct. at 467, and that Subsection 2 requires no "risk of financial loss to the bank," Loughrin, 573 U.S. at 366 n.9.   Thus, Nkansah is no longer good law.

Finally, defendants argue that even if the indictment alleges some intent to harm banks, the only bank property at stake here is the "ethereal right to accurate information," Weigand Reply in Support of Def'ts' Mots., ECF No. 82, at 7, which, they argue, cannot support a fraud conviction in light of the Supreme Court's recent decision in Kelly v. United States, 140 S. Ct. 1565 (2020). This argument, however, stretches Kelly to the breaking point. Kelly concerned public corruption and the misuse of regulatory power, holding that an allegedly corrupt state regulatory decision, where no actual money changed hands, did not have as its object money or property.   See Kelly, 140 U.S. at 1572-74.

Here, by contrast, the object of the alleged scheme was money. The banks had concrete property interests in these funds, and defendants allegedly sought to injure those interests by causing the banks to relinquish those funds through deception.   Thus, the

indictment sufficiently stated an intent to harm their property interests; whether the banks also had a "right to accurate information," "ethereal" or otherwise, is beside the point.

### 2.   Intent to Deceive Banks

Defendants next argue that the Government has not alleged an intent to deceive a covered financial institution (i.e., an issuing bank). Rather, "the Government has maintained that the defendants were responsible for sending 'application packages' and credentials for the Phony Merchants only to offshore banks and payment processors," which, unlike the issuing banks are not protected by the bank fraud statute. Weigand MTD 18. In other words, the defendants argue that the defendants' deception must be aimed at the same banks as are harmed.

If the charge here were wire fraud, the argument would be meritless. Five courts of appeals, including the Second Circuit, have concluded that the wire fraud statute does not "require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." United States v. Greenberg, 835 F.3d 295, 306-07 (2d Cir. 2016); see id. n.16 (collecting cases).

But when it comes to the bank fraud statute, it appears that the Supreme Court does require such convergence. With respect to Subsection 1, this is because of how the Court construes the statutory language itself. Specifically, Subsection 1 of the bank

fraud statute requires that a defendant attempt both to "deceive [a] bank" and to "deprive it of something of value." Shaw, 137 S. Ct. at 469. But because the bank fraud statute only applies to federally insured banks, the Supreme Court has also read a similar requirement into Subsection 2 for "federalism-related reasons": the indictment must allege "some real connection to a federally insured bank -- namely, [that] a false statement will naturally reach such a bank (or a custodian of the bank's property)." Loughrin, 573 U.S. at 365 n.8.[10]

But though this convergence is required, here it is met. Specifically, the indictment states that the purpose of defendants' alleged misrepresentations to merchant's banks (e.g., inaccurate MCCs) was so that those misrepresentations would be conveyed to the issuing banks to secure their approval for the transactions. Accordingly, the indictment adequately alleges an intent to deceive financial institutions protected by the bank fraud statute.

---

[10] For example, building upon an example offered by the Supreme Court in Loughrin, imagine a con artist who tricks a tourist into buying a handbag, claiming it is a designer brand. The tourist purchases the handbag by credit card. The MCC and other transaction information transmitted to the bank were accurate. Was this bank fraud? The con artist intended to obtain bank property, and he made misrepresentations of material fact. However, the con artist never intended that the misrepresentations would be conveyed to the financial institution. Therefore, the con artist did not deceive a bank (Subsection 1), and the misrepresentation was not the means by which the defendant obtained bank funds (Subsection 2). This was fraud, but not bank fraud.

### 3.   Materiality

Finally, defendants argue that the indictment does not state a claim because it does not allege that the misrepresentations were material.   This borders on the frivolous.   The indictment explicitly alleges that many issuing banks would not have approved these transactions if they had known marijuana was involved.   ECF No. 16, ¶ 1.

Defendants, however, argue that the indictment implicitly concedes that at least some issuing banks would have been willing to process marijuana transactions, even if they knew they were marijuana transactions.   But the Government need not allege that every issuing bank would have refused to process accurately presented marijuana transactions.   The indictment alleges that many banks would have refused to do so; that is enough, at this stage, to allege materiality.

For the foregoing reasons, the indictment states a claim for conspiracy to commit bank fraud.

### B.   Lack of Specificity

Defendants next move to dismiss the indictment for lack of specificity.   On rare occasion, "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment," but otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly

informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 125-26, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).

Defendants argue that the indictment is insufficiently specific for four reasons:

(1) The indictment does not point to a specific transaction or misrepresentation. Akhavan MTD 10.

(2) Although, as this Court ordered, the Government provided a bill of particulars identifying the alleged co-conspirators, it offered "nothing concrete . . . to indicate how the alleged scheme was executed, or by whom . . . [nor] who the intended victim supposedly was." Id. at 12.

(3) The indictment essentially charges a violation of bank policy, without citing any specific policy. Id. at 9-10.

(4) The indictment does not allege that the misrepresentations induced the issuing banks to enter into the transactions, i.e., that they otherwise would have been unwilling to do so. Id.

These arguments are largely an attempt to relitigate the motion for a bill of particulars. See Order, ECF No. 38, at 5-7 (finding that, apart from the request for a list of

co-conspirators, the information sought by defendants was either "irrelevant" or "merely evidentiary detail at best," and the indictment was "sufficiently clear" without such information).   In particular, the Court has already considered and denied defendants' request (1) for information regarding specific transactions and misrepresentations and (2) for more concrete information regarding how the alleged scheme was executed and against which victims.   The Court adheres to its prior holding that the indictment is sufficiently particular on these points.

The Court likewise rejects the arguments that the indictment (3) does not cite a bank policy and (4) does not show that the misrepresentations induced the banks to act.   The indictment alleges that the defendants "engaged in a scheme to deceive United States banks . . . into processing . . . payments for the purchase and delivery of marijuana products." ECF No. 16, ¶ 1.   It asserts that "many United States banks are unwilling to process payments involving the purchase of marijuana, [so] the Online Marijuana Marketplace Company used fraudulent methods to avoid these restrictions."   Id.   This sufficiently describes the applicable bank policies and alleges that the defendants intended deception to be the means by which they obtained bank property.

In short, the Court reaffirms its prior holding that "[t]he indictment's description of the Transaction Laundering Scheme . . . is sufficiently clear for the defendants to understand the

crime with which the Government accuses them . . . thus placing the defendants on notice and allowing them to prepare a defense." Order, ECF No. 40, at 6.

### C.    The Rohrabacher-Farr Amendment

Finally, defendants argue that the indictment must be dismissed because it contravenes an appropriations law binding on the Government.  The Rohrabacher-Farr Amendment was originally passed by Congress as part of the omnibus spending bill in 2014; it has been renewed each year since.  The amendment provides, in part, that "[n]one of the funds made available in this . . . Act to the Department of Justice may be used, with respect to . . . California [or] Oregon . . ., to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, § 531, 133 Stat. 2317 (2019).

Defendants contend that "the Government is attempting to prosecute Defendants for a federal felony based only on conduct that is legal under applicable state law," thus violating the Rohrabacher-Farr Amendment.  Akhavan MTD 24.  The defendants rely on United States v. McIntosh, 833 F.3d 1163 (9th Cir. 2016).  In McIntosh, the Ninth Circuit considered appeals by defendants charged with marijuana-related violations of the Controlled Substances Act.  The Ninth Circuit opined that the Rohrabacher-Farr

Amendment limited the DOJ's authority to bring such prosecutions. "By officially permitting certain [marijuana-related] conduct, state law provides for non-prosecution of individuals who engage in such conduct.  If the federal government prosecutes such individuals, it has prevented the state from giving practical effect to its law providing for non-prosecution of individuals who engage in the permitted conduct," which would violate the Rohrabacher-Farr Amendment.  Id. at 1176-77. Therefore, the Ninth Circuit remanded to the district courts, holding that "[i]f DOJ wishes to continue these prosecutions, Appellants are entitled to evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." Id. at 1179.

If the defendants here had been similarly charged with violations of the Controlled Substances Act, then this Court would need to consider whether to adopt the reasoning of McIntosh.  But the indictment in this case does not charge defendants for behavior that is legal under state medical marijuana laws.  It charges conspiracy to commit bank fraud.  The Rohrabacher-Farr Amendment does not condone bank fraud by a medical marijuana dispensary any more than it condones murder, robbery, or assault.  Thus, the Amendment, and McIntosh, are inapplicable on their own terms. See

18

id. at 1178 (noting that the Rohrabacher-Farr Amendment does not apply when the DOJ "prosecutes individuals who engage in conduct unauthorized under state medical marijuana laws").

For these reasons, the motions to dismiss are denied.

## II.  MOTION TO SUPPRESS

Defendant Weigand moves to suppress evidence seized from two cell phones and a computer that were in his possession when he was arrested on March 9, 2020 at Los Angeles International Airport. The evidence was seized pursuant to a warrant, which a magistrate judge issued upon the application of FBI Special Agent Matthew Mahaffey.

The affidavit supporting the request for a warrant, which is filed at ECF No. 70-1 ("Aff."), describes the alleged scheme, attaches the indictment, and identifies the three devices.  It avers that Weigand, Akhavan, a cooperating witness, and various co-conspirators communicated using an end-to-end encrypted messaging application (i.e., an application that transmits communications in such a way that they can only be read on the sender's and the recipient's devices and cannot be intercepted by wiretap or by a search warrant served on an internet service provider).  It also avers that the alleged conspirators used an encrypted email service.

The affidavit includes several quotations from a group message on the encrypted messaging application involving the

cooperating witness on April 27, 2018.  Other participants in the group message had the display names "Ray CE" and "Ruben Weigand"; according to the cooperating witness, these were Akhavan and Weigand, respectively.  The conversation appears to relate to the setup of a Phony Merchant, including what prices the conspirators should display on the fictitious website to ensure that they matched the price points for the associated marijuana transactions.  Later that day, the conversation turned to the brief descriptions of goods and services that issuing banks would list on customers' monthly credit card statements.  Id. ¶ 17(c).

According to the affidavit, the conspirators continued communicating about the alleged scheme using the encrypted messaging application until at least late 2018 and using encrypted emails until May 2019.  Weigand also spoke with the cooperating witness about the alleged scheme by phone in May 2019 (i.e., approximately ten months before Weigand was arrested).

The affidavit does not link criminal activity specifically to the three seized devices.  However, it says generally that "[l]ike individuals engaged in any other kind of activity, individuals who engage in fraud and money laundering offenses store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the Subject Devices."  Id. ¶ 22.  The affidavit further states that files can

be recovered "months or even years after they have been created or saved." Id. ¶ 23.

The affidavit sought permission for, if necessary, up to "a complete review of all the [electronically stored information] from the Subject Device to locate all data responsive to the warrant." Id. ¶ 27. The agent sought to seize certain specific, detailed categories of information. Warrant, ECF No. 70-2, at 5-6.

A magistrate judge approved the warrant. To be lawful under the Constitution, a search warrant must, inter alia, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched. "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). It is a "flexible, common-sense standard," Texas v. Brown, 460 U.S. 730, 742 (1983), which requires a case-by-case analysis of the totality of the circumstances, see Illinois v. Gates, 462 U.S. at 230. A nexus with criminal activity may be supported by a "reasonable inference from the facts presented based on common sense and experience." United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).

Even where probable cause is established, still "those searches deemed necessary should be as limited as possible," as to avoid a "'general warrant,'" i.e., "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) (citations omitted). At the same time, some threshold review may be necessary to identify items of potential relevance because courts recognize "the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" United States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990).

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." United States v. Ulbricht, 858 F.3d 71, 99 (2d Cir. 2017), overruled on other grounds by Carpenter v. United States, 138 S. Ct. 2206 (2018). It must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes." Id. (internal citation omitted). "The Fourth Amendment does not require a perfect description of the data to be searched and seized." Id. at 100. Indeed, "[s]earch warrants covering digital data may contain some ambiguity." Id. (internal citation omitted).

In light of these standards, Weigand argues that the Government lacked probable cause because (A) the affidavit did not

link his specific devices to the crime, Weigand Mem. in Support of
Mot. to Suppress ("Weigand MTS") 9; and (B) any probable cause
that might have previously existed had dissipated due to the
passage of time between any alleged conspiratorial communications
and the seizure, id. at 11.  He also argues that the warrant was
(C) overbroad because it permitted a preliminary search of the
entire device, id. at 14; and (D) insufficiently particular
because it failed to provide meaningful guidelines for what could
be seized, id. at 15.  The Court addresses each of these arguments
in turn.

### A.   Probable Cause

Under the circumstances of this case, there was probable cause
to believe the devices would contain evidence of crime.  The
charged crime is conspiracy, so communications with alleged
co-conspirators, and evidence regarding such communications, is
directly relevant.  The affidavit tends to show that Weigand used
encrypted messaging applications and encrypted email to
communicate about the alleged conspiracy.  There was, thus,
probable cause to believe that evidence of the alleged conspiracy
would have existed on electronic devices possessed by Weigand.

Weigand offers no persuasive support for his claim that the
Government must show that these very devices were used for
conspiratorial communications in order to justify searching them.
Weigand, in addition to citing to cases where warrants were

lawfully issued, cites to one case where a warrant was held improper because "two-year-old evidence of participation in a heroin mill, not at the dwelling to be searched, is stale and cannot support a search warrant." United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985). That case is inapposite because in Thomas, the Court knew that the location to be searched was different from the location of the old heroin mill. Weigand does not allege that the Government knew that Weigand had, for instance, changed phones between the end of the period of the charged conspiracy and his arrest.

Therefore, there was probable cause to search these devices -- at least at some point in time.

### B. Passage of Time

Weigand correctly points out that there is a further question whether probable cause continued to exist despite the passage of time. The Government's general allegations that files can be stored for a long time and can be recovered even after deletion are insufficient to provide probable cause that evidence would remain on Weigand's devices indefinitely. That said, the affidavit quotes messages on the encrypted messaging application that were less than 2 years old at the time of seizure and avers that there were pertinent encrypted emails and phone calls within one year prior to the time of seizure. Under these circumstances, there was still probable cause to believe evidence would remain.

## C.   Preliminary Search of the Entire Device

Weigand argues that "the [w]arrant made no attempt to limit the scope of the search to the locations on the [d]evices for which there was probable cause to believe evidence of the scheme could be found." Weigand MTS 13.  The Government responds that it must be able to conduct a preliminary search of the entire device to determine which folders, files, and data may be responsive to the warrant.  This is analogous to "searches for papers," for which "it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976).

Here, the magistrate judge reasonably issued a warrant that permitted threshold searches across the entirety of the devices. Weigand objects that such a review is overbroad given the terabytes of at-issue data and the fact that the devices clearly contained legitimate files of a personal nature, such as folders full of family photos and a folder labeled "private." To be sure, the Government must reasonably limit its initial search, taking only those steps reasonably necessary to identify documents responsive to the warrant.  This is what the affidavit requested and what the warrant permitted.  See Aff. ¶¶ 25-27.

Weigand is incorrect to suggest that the review must be limited from the outset to folders that, on their face, might be

linked to crime.   "[F]ew people keep documents of their criminal transactions in a folder marked 'drug records.'"   <u>United States v. Riley</u>, 906 F.2d 841, 845 (2d Cir. 1990).

### D.   Particularity of the Specific Requests

Finally, Weigand argues that the designated categories of material to be seized are overbroad and insufficiently particular. The Court considers the evidence by category:

- Evidence of the subject offenses and evidence concerning co-conspirators, their relationships and relationships with victims, and transactions between co-conspirators and victims, from 2016-2019.  Warrant, ECF No. 70-2, at 5-6, #2-5.

This evidence goes to the heart of the alleged scheme; its relevance is readily apparent.

- "Evidence concerning the location of other evidence of the Subject Offenses," such as social media accounts, and passwords for those accounts.  <u>Id.</u> #6-7.

Because this evidence would show the location of other evidence, it is relevant.  Of course, the warrant did not authorize the Government to search other locations (e.g., Weigand's social media accounts) or to use passwords that it found.  Rather, if the Government uncovered evidence showing that further evidence of the conspiracy existed in other locations, it would then need to seek another warrant.

- "[E]vidence concerning the identity or location of the owner or user of the Subject Device" and concerning subscriber information for the devices.  <u>Id.</u> #1, 9.

Evidence that Weigand owns and used these devices is of threshold relevance in determining whether other documents on the device could be evidence that he committed a crime.  Subscriber information is relevant to ascertaining identity.  Billing records and location information are also independently relevant, as the affidavit establishes probable cause to believe that Weigand spoke with co-conspirators by phone and met with them in person.

- "[N]on-content transactional information of activity of the Subject Devices, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations." Id. #8.

Setting aside location information (which is already included in the previous category), this category of data is somewhat broad. At oral argument, the Court inquired as to its relevance.  The Government explained that this data is relevant, especially when viewed in conjunction with other information, to establish that Weigand was the specific individual who used the device at a particular time.  For example, if the method of connection was through Weigand's home internet, then that would help to corroborate the location of the device and Weigand's control over it.  The Court finds this justification sufficient and concludes that this category of data was described with enough particularity.

For these reasons, the warrant was supported by probable cause; probable cause remained despite the passage of time; a limited, preliminary review of the entire device was justified;

and the specific categories of information to be seized were described with enough particularity. The motion to suppress is, therefore, denied.[11]

## III. MOTIONS TO COMPEL DISCOVERY AND SET PRETRIAL DISCLOSURE DEADLINES

Defendants move to compel production of many categories of materials under Rule 16, move to compel production of a narrow set of materials under Brady, and request that the Court set pretrial disclosure deadlines for exhibits, witness lists, and Jencks Act and Giglio material.

### A.   Rule 16 Discovery

Defendants first seek to compel discovery under Federal Rule of Criminal Procedure 16.

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the Government generally must provide an item to the defendant "if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Describing which items are "material to preparing a defense," the

---

[11] The Government further argues that courts "accord[] great deference to a magistrate's determination," and that, here, the officers acted in good faith reliance on the warrant. See United States v. Leon, 468 U.S. 897, 914 (1984). Because the Court finds that the warrant was properly issued, the Court need not reach these arguments.

Second Circuit has said that "[e]vidence is material if it could be used to counter the government's case or to bolster a defense," United States v. Ulbricht, 858 F.3d 71, 109 (2d Cir. 2017) (internal citations omitted), or if it would "[e]nable[] the defendant significantly to alter the quantum of proof in his favor," United States v. Maniktala, 934 F.2d 25, 29 (2d Cir. 1991). "The defendant must make a prima facie showing of materiality and must offer more than the conclusory allegation that the requested evidence is material.  The Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant." United States v. Urena, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (internal citations omitted).

However, Rule 16(a)(2) excludes from the scope of Rule 16(a)(1)(E) "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case," as well as "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500," also known as the Jencks Act.  Grand jury materials are also excluded from the scope of Rule 16(a)(1)(E), per Rule 16(a)(3).

In their instant motion, defendants cast a wide net, seeking eleven categories of material under Federal Rule of Criminal Procedure 16.  The Court addresses them in turn.

### 1.   Issuing Bank and Credit Card Company Policies

The defendants argue that marijuana-related policies of issuing banks and credit card companies are "essential" because "without the actual policies, there is no way to drill into questions of, e.g., notice to the Defendants, reliance by a given bank, or how any of the thousands of transactions even connects to any supposed policy or fraud surrounding same." Akhavan Reply in Support of Def'ts' Mots., ECF No. 83 ("Akhavan Reply"), at 9. However, "the Government represents that it has produced all 'documents and objects' within the meaning of Rule 16(a)(1)(E) in its possession, custody, and control that bear on these issues." Gov't Response in Opp. to Def'ts' Mots., ECF No. 79 ("Opp."), at 32.   In addition, it represents that "to the extent that the Government comes into possession of additional documents or objects reflecting Issuing Bank and/or Credit Card Company policies pertaining to marijuana transactions and related information, the Government will produce them," unless the material is not discoverable under Rule 16(a)(2). Id. at 33.

In light of the Government's representations, this request is denied as moot.

### 2.   Evidence Regarding MCCs

Defendants seek "evidence linking merchant banks, their contracts with the Credit Card Companies and/or issuing banks, their communications with Defendants, the assignment of MCCs to

transactions, or those MCCs being the cause of the transactions going through." Akhavan Mem. in Support of Mot. to Compel ("Akhavan MTC") 5. Defendants argue that MCCs are "fundamental to the Government's proof" because they are "the mechanism for the fraud alleged." Id. The Government counters that the defendants' focus on MCCs is misplaced because the creation of the Phony Merchants, and not the false MCCs, was the "primary method" by which defendants perpetrated the alleged fraud. Opp. 33. Therefore, "contracts and rules from banks and/or other entities reflecting the particulars of how those codes are typically assigned and who assigns them are not material." Id. at 34. The Government contends that what matters here is that "Akhavan and others directed others to apply incorrect MCC codes (however generated) to transactions conducted through the Online Marijuana Marketplace Company." Id. at 34.

The Court agrees with defendants. The Government concedes that some "electronic communications on this issue . . . bear on the defendants' intent," and the Government says it intends to prove that "Akhavan and others directed others to apply incorrect MCC codes . . . to transactions." Id. at 34. Therefore, evidence regarding how MCCs are typically assigned, when, and by whom is relevant. Because the Government seeks to demonstrate that MCCs were assigned in an "incorrect," and thus fraudulent, manner, the defense should receive discovery into the baseline for how a

"correct" MCC would be assigned.  And because the government seeks to demonstrate that Akhavan directed others to assign incorrect MCCs, it is relevant who assigns MCCs and how they do so.

The Government is ordered to promptly produce to defendants documents in its possession, custody, or control concerning (1) communications between merchant banks, credit card companies, or issuing banks on the one hand and the defendants on the other hand; (2) how, when, and by whom MCCs are assigned to transactions; and (3) the relation MCCs have, if any, to the approval or rejection of transactions.

### 3.   Transaction Analyses

The defendants claim that the Government must produce analyses linking specific credit card transactions by the Online Marijuana Marketplace Company to specific issuing banks with anti-marijuana policies.  These analyses are necessary, defendants contend, to demonstrate materiality and intent to deceive.

The Government responds that this is an indictment for conspiracy, and no actual victim is needed.  Therefore, the Government need not offer such an analysis and such an analysis is not material.  Nevertheless, "[t]he Government notes that to the extent it generates any transactional analyses that it intends to use in its case-in-chief, it will produce such analyses pursuant to Rule 16 or, if warranted, as an expert disclosure."  Opp. 36.

The Government is correct that it need not offer evidence of particular transactions to prove conspiracy.   If it chooses to generate such analyses and intends to use them in its case in chief, then it must produce them, as it has represented that it will.   This request is denied.

### 4.   Information   Regarding   the   Proportion   of Transactions Involving Medical Marijuana

The Government told the defendants by letter that the Online Marijuana Marketplace Company represented, through its attorneys, that before January 2018 100% of the transactions at issue were for medical marijuana; by contrast, after January 2018 99% of the transactions were for recreational marijuana.   ECF No. 74-1, Ex. A.   Defendants argue that the calculation is "fallacious" and is attributable to skimpy record-keeping at dispensaries. Akhavan Reply 8.   They move to compel additional information on this point, arguing that it is essential, primarily given their argument under the Rohrabacher-Farr Amendment.

However, as noted above, the Rohrabacher-Farr Amendment is inapplicable.   See supra Section I.C.   The relative proportions of medical and recreational marijuana might be relevant for other reasons -- e.g., in showing materiality, if issuing banks would be willing to process medical marijuana transactions but not recreational ones.   Still, the Government has represented that it has no additional information to support or refute the company's

purported figures, and that it will share additional information if it acquires any.  The request is therefore denied as moot.

### 5.  Data Collected During Searches and Seizures

The Government concedes that it possesses data collected during searches and seizures (specifically, the contents of two cell phones belonging to Akhavan and two cell phones and a laptop belonging to Weigand).  It says that it is conducting forensic analyses and will produce the entirety of the analysis to the device's owner and the responsive documents to both defendants.

Because all parties agree that each defendant is entitled to all date seized from him, and that each defendant is entitled to responsive data seized from the other defendant, this request is granted.  If the Government has not already done so, it must share the entire contents of each seized device with the device's owner by no later than 5:00 pm on September 2, 2020.  The Government must share responsive documents with both defendants by no later than 5:00 pm on September 14, 2020.

### 6.  Documents Produced by Third Parties

Defendants speculate that, because of the "extensive lists of unindicted co-conspirators and potentially allegedly victimized banks" recently disclosed, the Government may have additional relevant material in its possession that was produced by third parties. Akhavan MTC 17; see also Weigand Mem. in Support of Mot. to Compel ("Weigand MTC") 7.  Defendants also point to the

Government's June 22, 2020 letter, which disclosed exculpatory information shared with the Government by attorneys for the Online Marijuana Marketplace Company.  ECF No. 74-1.

The Government responds simply that "[t]he Government has produced documents gathered from third parties consistent with the obligations imposed by Rule 16," Opp. 38-39, and that defendants' speculation that the Government possesses other such material discoverable under Rule 16 is unfounded.  Because the Government represents that it has produced all Rule 16-responsive documents in this category, and defendants have offered no persuasive reason to doubt this representation, this request is denied as moot.

### 7.  Taint Protocols

As noted above, the Government seized evidence from the defendants.  That evidence contains potentially privileged material, so defendants request that the Court order the Government to produce the protocols it has applied to ensure that the prosecution team is not exposed to privileged material.  Akhavan MTC 17; see also Weigand MTC 8.

The defendants cite no authority for this request.[12]  The Government notes that the "prosecution team is attuned to avoiding exposure to privileged information" and represents that the

---

[12] The Government cites one district court case in Texas denying a similar request, United States v. Sledziejowski, 2018 WL 2288962 *9 (N.D. Tex. May 18, 2018), on the basis that there was no authority to support such a request.

Government "will take action to ensure that the prosecution team is screened from reviewing privileged communications that may be contained on [Weigand's] devices," now that Weigand has provided a list of attorneys.  Opp. 39-40.  The Government also requested that Akhavan provide a list of his attorneys, but he had not yet done so when the Government filed its Opposition.  Id. at 40 n.19.

Under these circumstances, a "taint protocol" is not "material to preparing the defense" and so does not fall within the scope of Rule 16(a)(1)(E).  Accordingly, this request is denied.  Further, to facilitate the application of a proper privilege screen by the Government, Akhavan, if he has not yet done so, must produce to the Government by no later than 5:00 pm on September 2, 2020, a list of attorneys with whom he may have engaged in attorney-client privileged communications.

8.   Grand Jury Materials

Defendants contend that "the Indictment is subject to dismissal for lack of specificity," so "the grand jury testimony should be disclosed."  Akhavan MTC 18.

In order to pierce the veil of secrecy provided by Federal Rule of Criminal Procedure 6(e), a defendant must demonstrate a "particularized need" for disclosure.  United States v. Procter & Gamble Co., 356 U.S. 677, 683 (1958).  Usually, this means "specific allegations of government misconduct."  United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990), abrogated on other

grounds as recognized by United States v. Marcus, 628 F.3d 36, 41 (2d Cir. 2010). Defendants do not come close to meeting the high burden for overcoming grand jury secrecy, and so the request is denied.

> 9.    Memoranda   Regarding   Witnesses'   Statements   or
>       Interviews

Defendants request memoranda regarding interviews or meetings in this matter to aid in the preparation of their defense. Akhavan MTC 21; see also Weigand MTC 10. Defendants invoke Rule 16 but do not otherwise provide any authority for this request, which the Government calls an "end-run around the Jencks Act." Opp. 36-37. The Government cites circuit precedent that production of non-exculpatory Jencks Act statements cannot be ordered prior to witness testimony, United States v. Coppa, 267 F.3d 132, 145 (2d Cir. 2001), and that the Jencks Act "is the exclusive vehicle for disclosure of statements made by government witnesses," United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974). The Government represents that it will produce the requested documents as needed to satisfy its obligations under Brady, Giglio, and the Jencks Act. Opp. 37.

The Court addresses Giglio and Jencks Act materials separately below, but insofar as defendants seek this material under Rule 16, the Government is correct that the request is barred

both by Rule 16(a)(2) and by the Jencks Act.  This request is therefore denied.

### 10.  Defendants' and Co-Conspirators' Statements

Defendants seek their statements, and the statements of alleged co-conspirators, under Rule 16(a)(1)(A)-(C) & (E).  The Government responds that it has provided each defendant with his own statements in accordance with Rule 16(a)(1)(A) & (B).  To that extent, therefore, this request is denied as moot.

Insofar as defendants seek each other's statements and other co-conspirators' statements, they invoke Rule 16(a)(1)(C) & (E). Rule 16(a)(1)(C) on its face applies only to "organizational defendants," and not to defendants who were merely part of organizations; thus, it does not apply here.  Rule 16(a)(1)(E), as described above, imposes a broad set of disclosure obligations on the Government.  Defendants offer no specific rationale for the request for co-conspirators' statements under Rule 16(a)(1)(E), and the Government offers no response.  Therefore, the request is denied without prejudice.

### 11.  Criminal History Records

Defendants request criminal history records under Rule 16(d). The Government represents that it has produced any such record "that it knows exists within its possession, custody, and control." Opp. 41.  Therefore, this request is denied as moot.

**B.**   **Brady Material**

Defendants next seek materials, and a representation that the Government will comply with its obligations, under Brady v. Maryland, 373 U.S. 83, 87 (1963).

Under Brady and its progeny, the Government has a constitutional duty "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)). Favorable evidence can be exculpatory or impeaching. Strickler v. Greene, 527 U.S. 263, 281–82 (1999); see United States v. Mahaffy, 693 F.3d 113, 131 (2d Cir. 2012) ("Aside from exculpatory material, Brady applies to material that would be an effective tool in disciplining witnesses during cross-examination.") (quotations marks and citation omitted). Evidence becomes material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quotation marks omitted).

"Unlike Rule 16 and the Jencks Act . . . Brady is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation . . . ." United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted). Accordingly, the purpose of Brady "is not to provide the defendant with complete

disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him." United States v. Ruggiero, 472 F.2d 599 (2d Cir. 1973).

In light of these standards, the Government sent a letter on June 22, 2020, ECF No. 74-1, which disclosed to defendants that the attorneys for the Online Marijuana Marketplace Company made several representations to the Government. One of those representations was that those attorneys learned from employee interviews that Akhavan purportedly said during a March 2018 meeting, inter alia, that he does not "miscode," that he would use the closest MCC code for what is being processed, and that to that end he considered using a medical-related MCC code for marijuana transactions. Id. Defendants argue that this was important and potentially exculpatory information and that the Government provided only a terse summary. Weigand MTC 9-10.

The Government appears to believe that Brady might not have required this disclosure, claiming that the Government sent the June 22, 2020 letter "out of an abundance of caution." Opp. 43 n.20. The Government did not otherwise respond to defendants' arguments that, under Brady, it must produce more detailed information regarding the Online Marijuana Marketplace Company's attorney proffer, nor did the Government represent that it does

40

not have such information.  This Court's Individual Rules require disclosure of Brady materials within two weeks of the indictment being filed or, for Brady material that becomes known to the Government following filing of the indictment, "within two weeks of when it becomes known and, in any event, no later than four weeks prior to any trial or guilty plea."  Hon. Jed S. Rakoff, Individual Rules of Practice, R. 13.  Therefore, the deadline to disclose additional Brady materials received from the Online Marijuana Marketplace Company's attorney proffer, if the Government has additional such materials, has long since passed.

The Government does argue, generally, that it has acknowledged its Brady obligations and its intent to abide by them. Opp. 43.  It claims that, "[b]ecause the defendants have made no particularized showing that materials exist requiring disclosure, the Government need do no more than acknowledge its obligations." Id. at 44.  The Government cites cases in which a court denied specific discovery requests under Brady in light of an apparent good-faith representation from the Government that it recognized and intended to comply with its Brady obligations.

If the Government had represented that it recognized its Brady obligations with respect to information regarding the March 2018 meeting, has complied with them, and has no further exculpatory information on the topic, then the Court would take no action. But it has not done so.  Instead, the Government's brief seems to

imply that the Government believes it had discretion regarding whether to share the information it received from the Online Marijuana Marketplace Company attorneys regarding the March 2018 meeting. If so, the Government misapprehends its Brady obligations. The statements attributed to Akhavan during the March 2018 meeting, as described in the June 22, 2020 letter, speak directly to significant components of the Government's theory of the case and are potentially exculpatory.

Therefore, the Court orders that, to the extent the Government has additional details regarding that meeting -- including, without limitation, the meetings' attendees -- the Government must immediately produce that information in accordance with its Brady obligations.

### C.   **Pretrial Disclosure Schedule**

Finally, defendants request a pretrial disclosure schedule. (The trial of this case is currently set for December 1, 2020.) The Court sets the following schedule:

- Giglio material: the Government must comply with the Court's Individual Rules, which will be strictly enforced (i.e., Giglio material (with certain specified exceptions) must be disclosed four weeks prior to trial).

- Exhibits and witness lists: exhibits and witness lists must be disclosed four weeks prior to trial, with subsequent changes permitted for good cause.

- Jencks Act material: all parties agree that the Court lacks power to compel pretrial production of Jencks Act material. That said, the Government has an obligation to disclose Jencks Act material to defendants sufficiently early to permit them to adequately prepare a defense. As noted at oral argument, the Court would be pleased if the Government produces this material four weeks in advance of trial, which the Court strongly believes would be in the interests of justice in this case. The Court directs the Government to file a notice on the docket by no later than 5:00 pm on September 4, 2020 stating by when it will disclose Jencks Act material.

The Court determines that the foregoing schedule offers adequate time for defendants to prepare a defense. Insofar as defendants' motion requests earlier disclosures, it is denied.

*   *   *

For the foregoing reasons, defendants' motions to dismiss are denied and Weigand's motion to suppress is denied. Defendants' motion to compel and to set pretrial disclosure deadlines is denied, except as follows:

- The Government is ordered to promptly produce to defendants documents concerning (1) communications between merchant banks, credit card companies, or issuing banks on the one hand and the defendants on the

other hand; (2) how, when, and by whom MCCs are assigned to transactions; and (3) the relation MCCs have, if any, to the approval or rejection of transactions.

- For devices seized from defendants, if the Government has not already done so, it must share the entire contents of each device with the device's owner by no later than 5:00 pm on September 2, 2020. The Government must share responsive documents with both defendants by no later than 5:00 pm on September 14, 2020.

- If he has not yet done so, Akhavan must produce to the Government a list of attorneys with whom he may have engaged in attorney-client privileged communications during the relevant period by no later than 5:00 pm on September 2, 2020.

- The Court orders that, to the extent the Government has additional details regarding the March 2018 meeting described in the Government's June 22, 2020 letter -- including, without limitation, the meetings' attendees -- the Government must immediately produce that information in accordance with its Brady obligations.

- Giglio materials must be produced as specified in the Court's Individual Rules.

- Exhibits and witness lists must be produced four weeks prior to trial, subject to change for good cause.

- The Government must file a notice on the docket by no later than 5:00 pm on September 4, 2020 stating by when it will disclose Jencks Act material.

SO ORDERED.

Dated:   New York, NY
         August 31, 2020                    JED S. RAKOFF, U.S.D.J.