**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000 | FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3170**

WRITER'S INTERNET ADDRESS
**christayback@quinnemanuel.com**

September 2, 2020

The Honorable Jed R. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Weigand, et al.*, 20 cr. 188 (Opposition to Violation Memorandum and Remand Recommendation re Defendant Akhavan)

Dear Judge Rakoff:

On behalf of Defendant Hamid "Ray" Akhavan, we respectfully request that the Court deny the request of Pretrial Services to remand Mr. Akhavan for alleged violations of the terms of his pretrial release.  Mr. Akhavan is neither a flight risk nor a danger.  As discussed below, the tests which are the basis for the alleged violation are unreliable, but even considered in the light most favorable to Pretrial Services' request, remanding him in the current circumstances is not warranted. Mr. Akhavan continues to make significant efforts to overcome his addiction, has shown resiliency in bouncing back from challenges, has a substantial support group available to him to assist in his recovery, and will best be able to prepare for his upcoming trial if permitted to prepare out of custody.

## I.     **BACKGROUND**

On March 27, 2020, Mr. Akhavan was arrested in the Central District of California pursuant to a warrant issued in this district where he is charged with 18 USC 1349; Conspiracy to Commit Bank Fraud.  On that date, he appeared before Magistrate Judge John E. McDermott for an initial appearance and was ordered released upon posting $5,000,000 bail with conditions of release including:

- Do not use for purposes of intoxication any controlled substance analogue as defined by federal law or street, synthetic, or designer psychoactive substance capable of impairing

mental or physical functioning more than minimally, except as prescribed by a medical doctor.

- Submit to drug testing.

- Participate in residential drug treatment as directed by Supervising Agency.

On April 15, 2020, this Court modified his bail to postpone the commencement of location monitoring until after Mr. Akhavan was discharged from his residential treatment program.

On June 22, 2020, Mr. Akhavan successfully completed a 90-day residential inpatient drug treatment program at Alo House Recovery Center (AHRC).  *See* Exhibit A (Proof of Completion Letter).  He voluntarily entered AHRC on March 26, 2020, where he attended psycho educational groups, individual and group therapy, 12 step meetings, relapse prevention, EEG Neurofeedback, life skills training, and aftercare planning on a weekly basis.  He also tested negative in all weekly urinalysis and BAC tests.  Upon successful completion, he was discharged from that program and returned to his home.

Pursuant to his bail conditions, he enrolled in the location monitoring program and was assigned to the supervision of United States Probation Officer Damion Davis of the Central District of California.

On July 22, 2020, Mr. Akhavan entered a second in-patient treatment program at Inland Valley Recovery System (IVRS), upon recommendation of Officer Davis as a result of a single positive drug test for cocaine on July 7, 2020, following Mr. Akhavan's immediate self-admission to Officer Davis that he had relapsed.[1]

Pretrial Services has now reported alleged violations of the terms of Mr. Akhavan's pretrial release and recommended remand to custody based on positive tests while in the custody of IVRS.

## II. <u>THE TEST RESULTS AT IVRS ARE UNRELIABLE</u>

According to Pretrial Services' letter to the Court, Mr. Akhavan allegedly tested positive for cocaine metabolite on August 3, 2020, followed by three negative drug tests and then a positive test for Suboxone (a drug used to treat opioid dependency) on August 21, 2020, resulting in his discharge from IVRS.

---

[1]   Pretrial Services did not make any recommendation that Mr. Akhavan return to custody based on the July 7 test, suggesting all parties agreed at the time that Mr. Akhavan needed continued rehabilitation, rather than incarceration.

**A. <u>August 3, 2020 Test</u>**

Defense counsel received Mr. Akhavan's drug test report from Pretrial Services on August 31, 2020.  The report shows that Mr. Akhavan tested positive for benzoylecgonine-cocaine metabolite.

Defense counsel has obtained an opinion from a forensic toxicologist, Okorie Okorocha, that indicates benzoylecgonine may be detected for up to 22 days in chronic cocaine users.[2][3][4]  *See* Exhibit B (Declaration of Okorie Okorocha, M.S.).  This suggests that the benzoylecgonine detected in Mr. Akhavan's urine on August 3, 2020 is from *before* he entered IVRS on July 22, 2020.  As a result, this test should not have been used as a basis to discharge Mr. Akhavan from the program and subsequently argue he violated the terms of his release.

Moreover, notwithstanding the fact that any cocaine metabolite present in Mr. Akhavan's urine may pre-date his entry into the facility, Mr. Okorocha also opines that these test results are unreliable for several reasons, as detailed in his attached expert declaration (*See* Exhibit B), including:

(1) The drug test report fails to provide both the quantitative value (how much benzoylecgonine was in his urine) and the uncertainty level (margin of error).  It is widely understood that all measurements require an "uncertainty" to be reported.[5]  Depending on the quantity and the margin of error, Mr. Akhavan could have been under the reporting limits.

(2) The drug test report does NOT indicate that the sample was "normalized for creatinine" in Mr. Akhavan's urine.  Creatinine normalization is generally accepted as being required for accurate results.[6]  Creatinine indicates whether the urine is more or less concentrated than it should be.  There is no indication that the normalization for creatinine in Mr. Akhavan's urine occurred.  It is widely accepted among

---

[2]   Chumley H.S., & Smith M.A., & Perez-Rodriguez E.R., & Speedlin S.L (Eds.), *Cocaine, The Color Atlas and Synopsis of Family Medicine, 3e*. McGraw-Hill (2019), https://accessmedicine.mhmedical.com/content.aspx?bookid=2547&sectionid=206783435.

[3]   Roger D. Weiss, M.D., & Frank H. Gawin, M.D., *Protracted Elimination of Cocaine Metabolites in Long-Term, High-Dose Cocaine Abusers*, The American Journal of Medicine Volume 85 (December 1988).

[4]   Vandevenne, M., Vandenbussche, H., & Verstraete, A. *Detection time of drugs of abuse in urine*, Acta Clinica Belgica, 55(6), 323-333 (2000).

[5]   Taylor, B. N., & Kuyatt, *C. E. Guidelines for evaluating and expressing the uncertainty of NIST measurement results* (1994).

[6]   Paul S. Cary, M.S., *Urine Drug Concentrations: The Scientific Rationale for Eliminating the Use of Drug Test Levels in Drug Court Proceedings*, National Drug Court Institute Vol. IV, No. 1 (January 2004).

Forensic Toxicologists that drug concentrations in urine can be misinterpreted if there are not adjustments to urine water content.[7]  Without adjusting for creatinine, Mr. Akhavan could have been under the reporting limits, which would mean nothing is detected in his system.

(3) The lab failed to provide chain of custody documentation, including intra-laboratory documents for Mr. Akhavan's sample.  *Twenty four days* passed between the time Mr. Akhavan's urine was collected and the time it was received by the lab.  There is no documentation as to how the sample was stored during the intervening period or how it was transported between the facility and the lab in order to ensure the integrity of the sample.

(4) The lab failed to provide maintenance and repair records of the instrument used in the analysis of Mr. Akhavan's urine.

(5) The lab failed to provide data regarding quality control and calibration tests performed on Mr. Akahavan's sample.

According to Mr. Okorocha, behind every lab test, there are hundreds of pages of raw data to analyze before a forensic toxicologist can attest to its' reliability.  For example, changes in temperature can affect results.  Potential carryover from other test tubes in the batch can also affect results.  Without further information regarding the testing methodology and how the sample was collected and handled, Mr. Okorocha cannot rule out the possibility of a false positive, mixed sample or contaminated sample.

**B.  <u>August 21, 2020 Test</u>**

Defense counsel received a scanned copy displaying Mr. Akhavan's handheld multi-drug screen test results from Pretrial Services on August 31, 2020.  The handheld device allegedly shows that Mr. Akhavan tested positive for Suboxone.

Forensic toxicologist Okorocha also is of the opinion that this multi-drug screen test is unreliable, as outlined in his attached expert declaration.  *See* Exhibit B.  According to Mr. Okorocha, the test taken by Mr. Akhavan on August 21, 2020 appears to be an "immunoassay" test, an unreliable testing method due to problems with both specificity and selectivity.  An immunoassay test is an unsophisticated, rudimentary, preliminary test solely used for the purposes of determining if a "confirmation" test is warranted.  It is well-accepted among Forensic Toxicologists that "[n]o scientist should go to court and testify a drug was definitely present in an individual or specimen based solely on a screening test!"[8]  "To say that a drug is definitely present, the presence of the drug

---

[7]   *Id.*

[8]   Suzanna E. Dana and Vincent J.M. Di Maio, *Handbook of Forensic Pathology*, 262-263 (2006).

must be confirmed by a second (confirmatory) test that is highly specific. This confirmatory test is absolutely necessary to confirm a positive screening test."[9]

Immunoassay tests cannot be relied upon as accurate and are known to have a high rate of false positives.[10] As a result, a presumptive positive drug screen without confirmation is highly speculative. It cannot, and should not, be used as a basis to violate Mr. Akhavan.

## C. IVRS Breached Several Standards of Care in Handling Mr. Akhavan's Alleged Addiction and Drug Testing

Although the urine test was collected at IVRS on August 3, 2020, the test was not received by the lab for confirmation until August 27, and it was not reported until August 29. This was more than a week after Mr. Akhavan had already been discharged from the facility. As a result, Mr. Akhavan was discharged from the program *before* any laboratory testing was done to confirm he indeed had cocaine in his system while at the facility.

To our knowledge, the August 21, 2020 handheld test showing a presumptive positive for Suboxone has still not been submitted to a lab for confirmation despite the fact that Mr. Akhavan pleaded with the program to allow him to take a follow-up urine test (not the handheld immunoassay test), and to have the test sent to the lab for confirmation.

Defense counsel has obtained an opinion from a certified drug counselor, Anthony Marks, M.S., that indicates when a patient receives a presumptive positive test from a urine screen, proper protocol dictates that the urine test should be sent out to a lab for confirmation either that day or the following day, or in the case of a holiday, as soon as possible, with confirmatory results to be received a few days later. *See* Exhibit C (Declaration of Anthony Marks, M.S.). It is inappropriate for the rehab facility to have discharged Mr. Akhavan based on a presumptive positive test only, submitted to a laboratory weeks after its collection, without confirmation.

Additionally, the rehab facility should not have discharged Mr. Akhavan on the basis of his first urine screen test, which was taken on August 3, 2020. According to Mr. Marks, it is widely understood among drug counselors that the first test is typically positive, because it includes drugs ingested by the patient *prior to* entry into the facility, which is the case here for Mr. Akhavan, as explained above. As a result, this first drug screen should be used as a comparative test in treatment, to show a decrease in levels in subsequent tests. It should not be held against the patient, and should not be used as a reason for discharge. Here, after Mr. Akhavan's first positive urine test on August 3, he had three subsequent negative tests on August 5, August 12 and August 17, 2020.[11]

---

[9]   *Id*.

[10]  Jill Tate, Greg Ward, *Interferences in Immunoassay*, Clin Biochem Rev Vol 25, 105-120 (May 2004).

[11]  The August 17, 2020 negative test date was not included in Officer Moscato's letter but was confirmed by Officer Davis.

Moreover, notwithstanding the fact that Mr. Akhavan's presumptive positive test results for Suboxone while residing at IVRS are unreliable and highly speculative, assuming the test results were indeed accurate, then the facility may have acted negligently in their treatment and admittance of Mr. Akhavan.

If, in fact, the Suboxone was not in Mr. Akhavan's system from use prior to his entry into IVRS, then it would follow that he somehow received the prescription medication while residing at the in-patient facility, or, Mr. Akhavan's person and property was not thoroughly searched prior to admittance, and Mr. Akhavan had the medication in his possession.

According to certified addiction specialist Anthony Marks, M.S., Suboxone is typically prescribed for patients coming off of opioid dependence. If Mr. Akhavan received the medication while living in the facility, then the facility may not have had the proper measures in place to protect against pill-sharing among its residents or smuggling within the facility.

Proper protocols require facility staff to distribute medication to each patient individually and to supervise as the patient ingests the medication. Simply put, facility staff needs to watch the patient take the medication, then check to ensure the medication is not stored under their tongue or in their cheek. Additionally, if a patient is prescribed Suboxone as part of their treatment, then weekly drug screen tests, and follow-up confirmatory tests, would show the patient has positive results. If a patient on Suboxone, or other prescribed medication, has negative test results, the facility must investigate whether the patient is sharing, or selling, their medication.

### III. MR. AKHAVAN HAS SHOWN CONTINUED COMMITMENT TO HIS RECOVERY SINCE DISCHARGE FROM IN-PATIENT TREATMENT

More important than the unreliability of the test samples, and even assuming their accuracy and that Mr. Akhavan lapsed in his recovery efforts, the Court should credit Mr. Akhavan's significant and continuing efforts to overcome his addiction.

Since March, Mr. Akhavan has worked diligently to comply with his pre-trial release conditions, including the successful completion of a 90-day drug treatment program. The road to recovery from substance addiction is not linear and "expands far beyond abstinence versus relapse," according to American Addiction Centers. Seventy to 80 percent of in-patient drug treatment participants relapse on the road to sobriety.[12]

According to certified addiction specialist Anthony Marks, M.S., there are five stages of change on an individual's road to recovery.[13]

---

[12] *Rehab Success Rates and Statistics*, American Addiction Centers (2020), https://americanaddictioncenters.org/rehab-guide/success-rates-and-statistics.

[13] *The Transtheoretical Model*, Pro-Change Behavior Systems, Inc. (2018), https://www.prochange.com/transtheoretical-model-of-behavior-change.

(1) <u>Pre-contemplative stage</u>: Clients are not considering a need for change and are therefore uninterested in seeking help.

(2) <u>Contemplative stage</u>: Clients are aware of the personal consequences of their addiction and spend time thinking about their problem.

(3) <u>Preparation stage</u>: Clients have made a commitment to make a change.

(4) <u>Action stage</u>: Clients believe they have the ability to change and are actively involved in taking steps in recovery. This is the stage where the education, coping strategies, and interpersonal communication skills offered in treatment help to bolster the client's personal recovery. The client dives deep into assignments, personal inventories, and relapse prevention work to ensure a successful transition out of treatment and into recovery.

(5) <u>Maintenance stage</u>: The client learns to successfully avoid triggers and other temptations that would lead back to active addiction.

According to Mr. Marks, a patient such as Mr. Akhavan successfully completing a 90-day in-patient program at AHRC, and then showing decreasing levels of addiction while at the IVRS program in August, demonstrates that the patient—here, Mr. Akhavan—is in stages four and five of the recovery model. *See* Exhibit C. He has displayed the appropriate steps and progress for recovery. Patients in the action stage are still relatively fragile, according to Mr. Marks, and it is important to encourage the steps they are taking to continue to modify behavior. A custody environment is not typically conducive to behavior modification.

Mr. Akhavan has demonstrated a continued commitment to his sobriety since his return home from the facility on Friday, August 21, 2020. He has replicated all of the services he would have received at an inpatient facility in his home, and is in sessions for three to four hours a day. Moreover, he hired a sober living coach, who resides with him 24 hours a day, seven days a week to monitor his recovery. He has also taken the following proactive steps to address his substance issues while at home:

- Submitted to daily supervised at-home urine drug tests submitted to QuestLabs for testing.[14]

- Attended twice-daily Alcoholic Anonymous meetings by Zoom.

- Attended therapy sessions with a certified counselor by Zoom.

Despite being discharged from the IVRS in-patient program, Mr. Akhavan has independently taken steps to continue with treatment while at home. He continues to benefit from a strong family support group, including his longtime girlfriend, parents, siblings, and friends. He would like to continue to make progress while on pretrial release, and fears that being remanded into custody during a pandemic will inhibit his road to recovery. Accordingly, Mr. Akhavan is ready, willing and

---

[14]   Mr. Akhavan has been regularly successfully testing at home with reported results.

able to be admitted into any residential facility and to submit to any type of monitoring ordered by Pretrial Services.

## IV. THE SPREAD OF COVID-19 CONSTITUTES EXCEPTIONAL CIRCUMSTANCES WARRANTING CONTINUED RELEASE ON CONDITIONS

Since March, the COVID-19 pandemic has resulted in a rapidly escalating number of cases and deaths on a daily basis.  As of September 1, 2020, more than 6 million people across every state have tested positive for the virus.  More than 184,536 people have died in the United States.  Most of the biggest known clusters have been in correctional facilities.  In American jails and prisons, more than 176,000 people have been infected and at least 1,080 inmates and correctional officers have died.[15]

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe."[16]   These problematic prison conditions include forced interactions with correctional officers; inmates in close confines with multiple other inmates in shared cells or rooms, and the resulting impossibility of social distancing; limited access to soap, hand sanitizer, cleaning supplies and disinfectants; and delayed medical evaluation and treatment.[17]  Due to these conditions, physicians and other public health experts have described prisons as "petri dishes" for contagious respiratory illnesses, such as COVID-19.[18]

For these reasons, in the past five months, many courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody because of COVID-19.  *See, e.g.*, *United States v. Chandler*, 2020 WL 1528120, at *1–3 (granting bail application, pursuant to 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm); *United States v. McKenzie*, 2020 WL 1503669, at *2–3 (granting bond pending sentencing, pursuant to 18 U.S.C. § 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and

---

[15]   "Coronavirus in the U.S.: Latest Map and Case Count," THE NEW YORK TIMES (September 1, 2020), at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[16]   "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[17]   Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases*

45(8):1047–1055 (Oct. 2007), at https://doi.org/10.1086/521910; Margo Schlanger and Sonja Starr, "Four Things Every Prison System Must Do Today," SLATE (Mar. 27, 2020), at https://slate.com/newsand-politics/2020/03/four-steps-prevent-coronavirus-prison-system-catastrophe.html.

[18]   Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (May 20, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

had previously been released on bond); *United States v. Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (granting bond pending sentencing, pursuant to § 3145(c), to defendant who had pleaded guilty to a narcotics offense); *United States v. Stephens*, 2020 WL 1295155, at *3 (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement).

Indeed, various lawsuits have been commenced challenging the conditions for inmates at the facility to which Mr. Akhavan would likely be remanded. *Fernandez-Rodriguez v. Lincoln-Vitale*, 2020 WL 36118941, at *1 (Judge Ramos addressing claims regarding the failure on the part of "management of the MCC to implement commonsense measures to stop the spread of the virus."); *see also Chunn v. Edge*, No. 20 civ. 1590, 2020 WL 3055669, at *1 (E.D.N.Y. June 9, 2020) ("MDC officials' response to the pandemic has been so deficient as to violate the Eighth Amendment.").

Courts in both this District and the Eastern District of New York have recognized the risks posed by conditions at the MDC and granted applications for compassionate release on that basis. *See, e.g.*, *United States v. Kissi*, No. 13 cr. 51, 2020 WL 3723055, at *1 (E.D.N.Y. June 26, 2020) (granting motion for compassionate release based in part on "the medical risks presented by the conditions at the Metropolitan Detention Center"); *see also United States v. Lopez*, 16 cr. 317, 2020 WL 3100462, at *2 (S.D.N.Y. June 10, 2020) (recognizing that "the crowded nature of federal detention centers such as the MDC presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.").

Not only does Mr. Akhavan risk exposure to, and infection of, COVID-19 in custody, but his incarceration will severely inhibit his ability to prepare a defense for trial. As Judge Nathan stated in an opinion issued March 19, "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [for pre-trial release] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 2020 WL 1295155, at *3. Even five months later, the Bureau of Prisons continues to suspend legal visits for 30 days, "at which time the suspension will be reevaluated."[19]

Additionally, jury trials have been delayed due to COVID-19 and there are limited trial dates for the remainder of the year. If Mr. Akhavan's current December trial date is extended into 2021, he could remain in custody for an unreasonably long time pending trial.

Accordingly, the unsafe conditions in federal custody and the likely limits on his access to counsel while remanded favor allowing Mr. Akhavan to remain out of custody under the supervision of United States Probation Officer Damion Davis.

---

[19] *BOP Implementing Modified Operations*, Federal Bureau of Prisons (last accessed Sept. 1, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp

## V. **<u>CONCLUSION</u>**

For the reasons above, we respectfully request that the Court deny the request by Pretrial Services to remand Mr. Akhavan for perceived non-compliance with pre-trial release conditions.


Respectfully Submitted,

*Christopher Tayback*

Christopher Tayback


CC:
John Moscato, Intensive Supervision Specialist U.S. Pretrial Services Officer
Gianfranco Furelli, U.S. Pretrial Services Officer
AUSA Christopher J. DiMase
AUSA Nicholas S. Folly
AUSA Tara LaMorte