## quinn emanuel trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 | FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3170**

WRITER'S INTERNET ADDRESS
**christayback@quinnemanuel.com**

November 3, 2020

**VIA EMAIL**
Christopher J. DiMase
Nicholas S. Folly
Tara LaMorte
*Assistant United States Attorneys*
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re:   Disclosure of Potential Defense Experts in *United States v. Weigand, et al.*, 20 cr. 188 (JSR)

Dear AUSAs DiMase, Folly and LaMorte:

Defendant Hamid "Ray" Akhavan ("Akhavan") hereby provides notice, pursuant to Federal Rule of Criminal Procedure 16, that he expects to call the following witnesses to provide expert testimony in the areas outlined herein: (1) Jeffrey Rankin, (2) Monica MacGregor, and (3) John Vardaman. A copy of each of their CVs is attached.

### (1) Jeff Rankin

### Mr. Rankin's Qualifications

Mr. Rankin is an expert in credit card processing and payment services. He has more than 25 years of experience working at all levels of the payment network, from credit card companies, to merchant member banks and issuing member banks. Most recently, he was a senior executive at U.S. Bank, where he provided payment services to a broad range of large market clients, including the United States Federal Government, state governments, public and private universities and large Fortune-listed corporate entities worldwide. Prior to U.S. Bank, Mr. Rankin worked as a client services executive at Visa, Inc. and a merchant services executive at Bank of America, where he developed experience in advising high-risk merchants, including those involved in adult entertainment and gambling.

While at Visa, Mr. Rankin's responsibility was managing member relationships for issuing, acquiring and processing members across the Midwest, which included interpreting rules and regulations. When advising acquiring members, Mr. Rankin assisted acquiring banks in utilizing Visa guidelines and reporting tools to understand know your customer ("KYC") protocols, how to set up merchant category codes ("MCCs"), and how to settle transactions.

**Bases for Mr. Rankin's Testimony**

Mr. Rankin will base his explanations of credit card rules and regulations and issuing and acquiring bank responsibilities on his education, training, professional experience, and other specialized knowledge. To the extent he renders opinions, they will be based on those same things as well as his review and consideration of:

1. Documents and information produced by the government in connection with this proceeding, including, but not limited to Visa Core Rules and Interlink Rules (April 2020) and MasterCard Rules and Transaction Processing Rules (December 2019), subpoena returns from Visa, disclosure correspondence and other materials from the government for Visa.

2. MasterCard and Visa publications, guidelines, and references.

3. Cardholder and credit card agreements for JP Morgan Chase, U.S. Bank, Bank of America and Capital One.

4. Merchant Applications.

5. Office of the Comptroller of the Currency Comptroller's Handbook on Merchant Processing.

6. The content and functionality of the Eaze platform.

Mr. Rankin is continuing to review additional data and information. He may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Mr. Rankin's trial testimony and/or as permitted by the Court.

**Mr. Rankin's Expected Testimony**

With reference to the specific facts and allegations of the case:

Mr. Rankin will explain the roles, processes and responsibilities of each of the players that make up the payment network – the merchant, the independent sales organization ("ISO"), payment service providers ("PSP"), the merchant/acquiring bank, the credit card network and the issuing bank. He will describe the privity, and lack of privity, between each player. Specifically, there is no contract or agreement between the merchant and the card-issuing banks. The merchant relies on the acquiring bank, including the terms of its' agreement with the acquiring bank for rules, law and compliance.

Mr. Rankin will explain the Visa and MasterCard rules and regulations and how to apply them with respect to the subject areas below. He will also testify to the evolution of the Visa and Mastercard rules, customs and practices as they relate to cannabis.

Mr. Rankin will testify that under Visa and MasterCard rules, there is no specific written rule prohibiting merchant banks from onboarding cannabis merchants in a state where cannabis is legal, where the merchant will be conducting intrastate business. Rather, he will testify that within the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client.

Mr. Rankin will explain the role and responsibilities of acquiring banks, and rules acquiring banks must follow, in onboarding clients, signing the merchant up and integrating them into the network. He will explain the KYC process, including the merchant application process.

Mr. Rankin will explain the process of how an MCC is selected and by whom. He will testify that MCCs are established by the acquiring bank, not the merchant.

Mr. Rankin will testify that the acquiring bank has the sole responsibility and discretion in selecting an MCC. MCCs are not made to identify products but general categories.

Mr. Rankin will explain the purpose, history and evolution of MCCs. Mr. Rankin will testify that during the relevant period, there was no product level MCC for cannabis. He will explain that when there is no specific product-level MCC that applies, it is under the discretion of the acquiring bank to select an MCC that fits. Mr. Rankin will testify that regardless of the MCC chosen by the acquiring banks there was no MCC that would allow the issuing banks to know that any transaction involved the sale of cannabis. Mr. Rankin will also testify regarding the various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks.

Mr. Rankin will testify as to the roles, rules, customs and practices related to e-commerce, payment gateways, processors, debit cards and credit cards. He will testify about the lack of specificity of rules and practices regarding what content should appear on a merchant website and what information must be included in a merchant name. He will explain that the purpose of merchant names and websites is not for the benefit of the issuing banks. Rather, it is to reduce cardholder confusion so that when the transaction appears on the cardholder's statement, they are able to recognize the purchase, thereby reducing the number of disputes and chargebacks.

**(2) Monica MacGregor**

**Ms. MacGregor's Qualifications**

Ms. MacGregor is an expert in evaluating, designing, implementing and remediating Anti-Money Laundering, Sanctions and Anti-Corruption Compliance Programs to the satisfaction of both financial institution regulators as well as Boards of Directors. She is a senior compliance professional with over 20 years of experience specializing in the areas of Anti-Money Laundering and Sanctions, Anti-Corruption, the investigation of International Financial Crimes and Global Risk Management. She is currently a Managing Director in Berkeley Research Group's Global Investigations and Strategic Intelligence practice. Ms. MacGregor is a Certified Anti-Money Laundering Specialist and a Certified ISO 37001 (Anti-Corruption) Lead Auditor.

Most recently, Ms. MacGregor served as a senior in-house compliance officer for Oriental Bank in Puerto Rico during the period when cannabis was legalized. While there, she leveraged her past experience working with financial institutions to re-evaluate their risk profiles, integrate technology platforms and design tailored policies and procedures to effectively meet ever increasing demands relating to customer due diligence ("CDD"), enhanced due diligence ("EDD") and Suspicious Activity Monitoring and Reporting systems. During her tenure she successfully remediated an FDIC mandated Consent Order and laid the groundwork for sustained regulatory compliance as the basis for managed growth and diversification by the institution.

Ms. MacGregor has served as a financial expert assisting the Asset Forfeiture and Money Laundering Division of the DOJ with the investigation and prosecution of systemic compliance deficiencies at US and foreign institutions and has worked directly with DEA, FBI and ICE investigators. Ms. MacGregor has also served as a liaison with foreign government agencies. She has assisted numerous financial institutions with the remediation of their Anti-Money Laundering and Sanctions Compliance Programs and has presented her findings to a variety of institutions including FinCEN, OFAC and banking regulatory agencies.

**Bases for Ms. MacGregor's Testimony**

Ms. MacGregor will base her explanations of risk compliance and due diligence policies and procedures for issuing banks on her education, training, professional experience, and other specialized knowledge. To the extent she renders opinions, they will be based on those same things as well as her review and consideration of:

1. Documents and information produced by the government in connection with this proceeding, including, but not limited to, subpoena returns from Citibank, Bank of America and JP Morgan Chase, disclosure correspondence and other materials from the government for Citibank, Bank of America and JP Morgan Chase.

Ms. MacGregor is continuing to review additional data and information. She may offer additional opinions, or additional bases for her opinions, as a result of her ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Ms. MacGregor's trial testimony and/or as permitted by the Court.

**Ms. MacGregor's Expected Testimony**

With reference to the specific facts and allegations of the case:

Ms. MacGregor will testify regarding the role and responsibilities of issuing banks when it comes to cannabis transactions. She will explain that issuing banks provide Visa or MasterCard branded credit-cards to their account holders as a service and that, as part of that service, these banks take on the risk that their account holders may purchase cannabis.

Ms. MacGregor will testify that issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice. In practice, there is no specific transactional typology to easily identify cannabis transactions. Ms. MacGregor

will testify to the lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods or services.

Ms. MacGregor will testify to the monies made by issuing banks, including on cannabis transactions, among others, and the manner and method in which the funds are provided, as well as how risk is allocated within the system.

Ms. MacGregor will testify that issuing banks are given limited pieces of information or metadata through the Visa and MasterCard networks and will describe the related responsibilities of the issuing and acquiring banks. Visa and MasterCard have not created a system for issuing banks to make product level decisions on transactions, such as cannabis. Ms. MacGregor will testify about the data issuing banks look to, as a matter of custom and practice, in determining whether to approve or reject transactions. While an MCC would be the most efficient way to set up an algorithm to detect cannabis transactions, because there was and is no MCC for cannabis or most other products, algorithms based on MCCs are not sufficient.

Ms. MacGregor will testify that during the relevant period there was no specific MCC for cannabis and even codes such as those for pharmacy or medical miscellaneous would still not allow an issuing bank to determine whether the purchase was cannabis.

Ms. MacGregor will explain that due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions.

### (3) John Vardaman

**Mr. Vardaman's Qualifications**

Mr. Vardaman is an expert on banking compliance, anti-money laundering ("AML")/bank secrecy act ("BSA") laws, and other financial crimes. He is an attorney with fifteen years of senior federal government experience in the enforcement and application of federal laws and policies concerning the Bank Secrecy Act, money laundering, and other financial crimes. Mr. Vardaman served with the U.S. Department of Justice for ten years identifying and addressing threats related to the financial system and national security, and worked for the Department of the Treasury on a range of terrorist financing issues in the wake of September 11th.

In 2014, while serving as Assistant Deputy Chief for Policy in the DOJ Asset Forfeiture and Money Laundering Section, Mr. Vardaman drafted the DOJ policy for cannabis banking, known as the Cole Memorandum, which outlined enforcement priorities for AML/BSA laws as they related to the banking of marijuana-related businesses ("MRBs"). The goal of the Cole Memorandum was to address the adverse public policy effects stemming from the lack of banking access available to the cannabis industry by outlining a path for banks to permissibly service MRBs. He also worked closely with the Financial Crimes Enforcement Network ("FinCEN") to draft the simultaneously issued FinCEN Guidance on BSA Expectations Regarding Marijuana-Related Businesses.

Mr. Vardaman has served as Chief Compliance Officer for Simplifya, a regulatory technology company that works with state-legal cannabis companies and financial institutions to ensure compliance with relevant laws and regulations. He has also served as Executive Vice

President of Hypur, a financial technology company specializing in banking platforms for MRBs. In these roles, Mr. Vardaman frequently met with financial institutions interested in serving MRBs to explain the complicated legal and regulatory landscape surrounding cannabis banking. He is currently on the advisory board of ComCard, where he gives legal advice regarding providing payment services in certain high-risk industries.

**Bases for Mr. Vardaman's Testimony**

Mr. Vardaman will base his explanations of banking for marijuana related businesses on his education, training, professional experience, and other specialized knowledge. To the extent he renders opinions, they will be based on those same things as well as his review and consideration of:

1. FinCEN Guidance (FIN-2014-G001) on BSA Expectations Regarding Marijuana-Related Businesses, issued on February 14, 2014.

2. "Cole Memorandum" on Guidance Regarding Marijuana Related Financial Crimes, issued on February 14, 2014.

3. "Cole Memorandum" on Guidance Regarding Marijuana Enforcement, issued on August 29, 2013.

4. "Sessions Memorandum" on Marijuana Enforcement, issued on January 4, 2018.

5. FinCEN Marijuana Banking Updates from March 2017 through December 2019.

6. The Rohrabacher–Farr Amendment, signed into law on December 16, 2014.

Mr. Vardaman is continuing to review additional data and information. He may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Mr. Vardaman's trial testimony and/or as permitted by the Court.

**Mr. Vardaman's Expected Testimony**

With reference to the specific facts and allegations in this case:

Mr. Vardaman will testify about the February 14, 2014 issuance of FinCEN guidance, which clarifies how financial institutions can provide services to MRBs, and the simultaneous issuance of the Cole memorandum, which laid out eight priorities for federal prosecutors in enforcing offenses related to cannabis. He will explain the FinCEN guidance on how financial institutions should conduct due diligence to assess the risk of providing services to MRBs.

Mr. Vardaman will testify that since the issuance of the 2014 FinCEN guidance, it is well known that numerous financial institutions (banks and credit unions) are actively servicing the industry, based, in part, on statistics extrapolated from SARs report data and released in quarterly FinCEN Marijuana Banking Updates. Mr. Vardaman will explain how six years after it was issued, the FinCEN guidance has to be considered a qualified success in bringing some measure of banking

access to the cannabis industry and addressing the underlying policy goals of the Cole Memorandum.

Mr. Vardaman will explain that the 2018 rescission of the Cole memorandum had no practical effect on DOJ enforcement practices with respect to cannabis banking, and that the Cole memorandum remains the de facto guidepost for federal prosecutors. He will further explain how the FinCEN guidance remains in place, which confirms that the underlying federal policy towards cannabis banking has not changed.

Mr. Vardaman will testify that the federal government permits issuing and acquiring banks to enter the cannabis space, given the federal guidance on banking MRBs and the practical effect of how that guidance has played out. He will explain that the government has, in effect, encouraged banks to facilitate this industry and endorsed or acquiesced to banking services, including credit card payment network services, for the cannabis industry. The cannabis industry is operating under the color of state law with the acquiescence of the federal government, which has effectively suspended enforcement of federal cannabis laws in states where it has been legalized. As a result, banks, including for example issuing banks, can permissively service an industry that remains illegal under federal law.

Mr. Vardaman will discuss the lack of enforcement actions taken against banks since the issuance of the FinCEN guidance. There has not been a single enforcement action against a financial institution for solely banking cannabis since the issuance of the guidance in 2014. Additionally, there have been no criminal regulatory sanctions for solely banking cannabis. While the policy of non-enforcement of federal cannabis law was first issued during the Obama administration, it continues to the present. Accordingly, banks can and do rely on the federal government's hands-off policies with respect to cannabis banking.

Mr. Vardaman will testify the government is on record saying banking MRBs is a permissible activity. Taking the government's very own action through its words, and inaction through lack of enforcement, the alleged risk is, at best, theoretical and fictitious.

Sincerely,

*Christopher Tayback* (signature)

Christopher Tayback

**ELEVEN**CANTERBURY

# JEFFREY RANKIN
# MISSOURI

## EXPERIENCE

**US BANK**                                                                                       **2007 - 2020**
*Large Market / Public Sector Commercial Card Executive, Retired June 2020*
- Business executive delivering $450MM annual revenue, $65MM Pre-tax Income Total 300 FTE under management
- Provided payment services to a broad range of large market clients, including the United States Federal Government, state governments, public and private universities and large Fortune-listed corporate entities worldwide.
- Maintained personal relationships with client executives
- Initiated and maintained client advisory panel with bi-annual meetings to gain market understanding and input for future offerings. Consistent ratings of 4.5 on 5.0 scale
- Teams based throughout the United States, Canada, Europe, and Singapore.

**VISA INC**                                                                                          **2003 - 2007**
*Client Services Executive Midwest Region*
- New business development and client retention of national and region financial institutions and platform processing services 13 mid-western states.
- Additional accountability for credit union client relations throughout the US.
- Critical success in attaining new agreement from all clients prior to Visa conversion from bank owned to public stock ownership

**BANK OF AMERICA**                                                                        **1993 - 2003**
*Merchant Services Executive*
- Profit and loss responsibility for credit card merchant services business, 200,000 bank clients, $70B annual volume, $300MM revenue, $140MM NIBT
- 7 direct reports, 700 total staff. Integrated product development and lead generation with Small Business and Commercial Banking Divisions
- Commercial Card Senior Manager
- Entered business in start-up phase in 1996. Managed substantial growth in sales volume (from $300MM to $7B), built proprietary client card management system.

## EDUCATION & TRAINING

Business Management Major, University of Indianapolis
Certified Six Sigma Green Belt
American Bankers Association National School for Bank Card Management

## BOARDS & MEMBERSHIPS

Leukemia and Lymphoma Society Board Trustee
Consumer Credit Counseling Service Board President
Junior Achievement Project Business Instructor
Piedmont Youth Football League Co-founder and Commissioner
Matthews Athletic and Recreation Association Football Commissioner and Coach
Advisor and instructor for ABA Bankcard School

# Curriculum Vitae



**MÓNICA M. MACGREGOR**
BERKELEY RESEARCH GROUP, LLC
1800 M Street, NW 2nd Floor | Washington, DC 20036

## SUMMARY

Mónica MacGregor is a Managing Director in BRG's Global Investigations + Strategic Intelligence practice and is based in Washington, DC.   Ms. MacGregor is a senior compliance professional with over 20 years of experience specializing in the areas of Anti-Money Laundering and Sanctions, Anti-Corruption, the investigation of International Financial Crimes and Global Risk Management.  She has excelled in the management of high-stakes criminal, civil and internal cross-border investigations.

Ms. MacGregor has served as a financial expert assisting the Asset Forfeiture and Money Laundering Division of the DOJ with the investigation and prosecution of systemic compliance deficiencies at US and foreign institutions and has worked directly with DEA, FBI and ICE investigators.  Ms. MacGregor has also served as liaison with foreign government agencies.

Ms. MacGregor is an expert in evaluating, designing, implementing and remediating Anti-Money Laundering, Sanctions and Anti-Corruption Compliance Programs to the satisfaction of both financial institution regulators as well Boards of Directors.  She has distinguished herself through her ability to handle cross-border matters requiring remediation under various regulatory environments and jurisdictions and has handled complex investigations and other matters for US and foreign multinationals navigating the challenges posed by their globalized operations.  Ms. MacGregor has assisted AmLaw 100 attorneys in their defense of blue-chip clients and has presented her findings to a variety of institutions including FinCen, OFAC, several international organizations and the Volcker Commission.

Most recently Ms. MacGregor served as a senior in-house compliance officer leveraging her past experience working with financial institutions to re-evaluate their risk profiles, integrate technology platforms and design tailored policies and procedures to effectively meet ever increasing demands relating to CDD, EDD and Suspicious Activity Monitoring and Reporting systems.  During her tenure she successfully remediated an FDIC mandated Consent Order and lay the groundwork for sustained regulatory compliance as the basis for managed growth and diversification by the institution.

Ms. MacGregor has also quantified damages in complex litigation, international and investor state arbitration cases in a variety of forums in the US, Europe and Latin America.  Her fluency in English, Spanish and French and proficiency in Portuguese have allowed her to work in a myriad of countries across Western Europe, the Americas and the Caribbean.

## EDUCATION

B.Sc., Economics (Honours)          London School of Economics & Political Science



## EMPLOYMENT HISTORY

Oriental Bank
BSA Officer
2015-2017

Alvarez & Marsal
Senior Director
2009-2015

Huron Consulting Group
Director
2005-2009

PriceWaterhouseCoopers
Senior Associate
1998-2000

KPMG
Senior Associate
1993-1998

## PROFESSIONAL AFFILIATIONS

### ASSOCIATION OF CERTIFIED ANTI-MONEY LAUNDERING SPECIALISTS
Founding Board Member, US Capital Area Chapter, Association of Certified Anti-Money Laundering Specialists

### HISPANIC NATIONAL BAR ASSOCIATION
| | |
|---|---|
| 2017-2018 | Member, Hispanic National Bar Association's Board of Governors |
| 2012-2014 | Co-Chair, Hispanic National Bar Association's Presidential Commission on the Status of Latinas in the Legal Profession |
| 2008-2012 | Commissioner, Hispanic National Bar Association's Presidential Commission on the Status of Latinas in the Legal Profession |
| 2010-2012 | Deputy President, Hispanic National Bar Association, Region V |

### WOMEN IN WHITE COLLAR CRIMINAL DEFENSE ASSOCIATION
Inducted Member, Washington, DC Chapter

### SPEECHES, SEMINARS & WEBINARS
Frequent speaker on topics of Anti-Corruption, Anti-Money Laundering, Internal Investigations and Compliance Risk Management for HNBA, FIBA, ABA Committees, Fortune 500 Companies and AmLaw 100 Firms.

# John W. Vardaman, III

PROFESSIONAL EXPERIENCE:

**ComCard, Inc.**                                                                 Los Angeles, CA
**Legal Counsel/Advisory Board**                                      April 2020 - Present
- Provide legal and strategic advice to start-up business payments card company servicing merchants and customers in targeted industries.
- Coordinate with issuer processing company to develop and implement fraud prevention and payment compliance policies and procedures.
- Assess legal and logistic implications of providing payment services in certain high-risk industries.

**Simplifya, Inc.**                                                                   Denver, CO
**Chief Compliance Officer/General Counsel**                    June 2019 – March 2020
- Managed all legal issues involved with operating a start-up regulatory compliance software company, including content drafting and review, implementing best practices and internal controls, contract drafting and negotiation, overseeing outside counsel.
- Interfaced with licensed operators and financial institution to understand compliance needs and inform and adapt software offerings accordingly.
- Led client management and customer acquisition with financial institutions and governmental entities.
- Involved in all aspects of company operations, including budget, resource allocation, personnel, strategic planning, marketing, and business development.
- Speaker at numerous conferences regarding regulatory compliance, banking, and payments in highly regulated industries.

**Hypur, Inc.**                                                                        Scottsdale, AZ
**Executive Vice President/General Counsel**                    April 2016 – June 2019
- Oversaw and manage all legal issues involved with operating electronic payments and banking compliance FinTech software company, including contract drafting and negotiation, overseeing outside counsel, meeting with banks and investors.
- Ensured that software was updated to enable banks to meet current legal, regulatory and compliance obligations.
- Wrote numerous articles and delivered presentations on the current state of law and policy regarding AML/BSA compliance issues, especially with respect to serving "high-risk" industries.

**United States Department of Justice**                              Washington, D.C.
*Deputy Chief, Asset Forfeiture/Money Laundering Section*    January 2011 – April 2016
- Coordinated with law enforcement, regulators, and prosecutors to identify trends in financial crime and ensure that legal authorities and enforcement priorities were aligned to address them.
- Led Department participation in working groups to improve communication and coordination between government and the financial services industry to enhance AML/BSA enforcement.
- Engaged with international bodies to promote cooperation on wide range of criminal issues such as money laundering, corruption, and transnational organized crime.
- Manage the Section's legislative agenda, including devising legislative strategy, working with Congress on drafting and technical assistance, briefing Members and staff, and coordinating with relevant stakeholders.

**United States Department of Justice**                              Washington, D.C.
*Senior Counsel, Office of Legal Policy*                              January 2006 – January 2011
- Developed and advanced policy on national security, law enforcement, and terrorism-related matters.

- Worked with Congress to advocate legislative priorities of the Department, including Patriot Act reauthorization and the national security implications of a media shield law for reporters.
- Drafted testimony, policy papers, and talking points for senior Department officials.

**Coalition Provisional Authority**                     Baghdad, Iraq
*Associate General Counsel*                             November 2003 - July 2004
- Served as lead U.S. government official in Iraq to locate and repatriate assets of Saddam Hussein and the former Iraqi regime held around the world.
- Traveled to Jordan and Lebanon to negotiate with senior government and banking officials to secure the release of frozen Iraqi assets held in those countries.
- Investigated complex financial transactions, including abuse of the UN Oil-for-Food Program, to trace and return illicit profits of the Saddam regime.

**United States Department of the Treasury**           Washington, D.C.
*Special Assistant to the General Counsel*             July 2001 - December 2005
- Worked on wide array of financial crime issues, including terrorist financing and money laundering.
- Led Department response to *qui tam* lawsuit alleging fraud by contractor in Iraq against the U.S. government.
- Served on Task Force on Terrorist Financing working with foreign governments to coordinate international efforts to combat the financing of terrorist organizations.

**Manatt, Phelps & Phillips, LLP**                     Washington, D.C.
*Associate – Litigation*                               October 1997 - June 2001
- Wrote extensive pleadings for civil and criminal cases in state and federal courts, including motion for summary judgment in a complex savings and loan case and motion to dismiss an indictment for a defendant accused of providing material support to a terrorist organization.
- Argued motions in Virginia state court in case involving alleged malfeasance by corporate officers and directors in connection with the sale of on-line pharmaceutical company.

**District of Columbia Superior Court**                Washington, D.C.
*Clerk to Judge Ellen Segal Huvelle*                   June - August 1995
- Researched and drafted memoranda on civil matters, including discrimination, breach of contract and defamation.

**Peter Hart Research**                                Washington, D.C.
*Administrative Assistant*                             August 1993 - July 1994
- Reviewed focus group and polling data and drafted reports for corporate clients.

EDUCATION:
**Georgetown University Law Center**                   Washington, D.C.
J.D.                                                   1997

**Vanderbilt University**                              Nashville, TN
B.A. (Political Science and European History - Double Major)    1993

BAR ADMISSIONS:  Virginia and the District of Columbia

AWARDS:
- Joint Civilian Service Commendation Award, 2004
- Attorney General's Award for Distinguished Service, 2015