UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :

UNITED STATES OF AMERICA,        :
           :
           :
           :    No. 20 Cr. 188 (JSR)
     v.        :
           :

RUBEN WEIGAND and       :
HAMID "RAY" AKHAVAN,   :
           :
           :
    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF HAMID "RAY" AKHAVAN'S MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL

William Burck
Derek Shaffer
Brian McGrail
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW #900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone:  (713) 221-7010
Email: saraclark@quinnemanuel.com

*Attorneys for Hamid "Ray" Akhavan*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ..........................................................................................................2

I.    Mr. Akhavan Is Entitled to a Judgment of Acquittal under Rule 29 ...................2

    A.    Legal Standard ......................................................................................2

    B.    No Rational Jury Could Have Found That The Defendants' Alleged Misrepresentations Were Material To An Objectively Reasonable Bank ..............3

        1.    Legal standard ..........................................................................3

        2.    There was no evidence that a reasonable bank would have declined to authorize Eaze transactions even absent the defendants' alleged misrepresentations ................................................................4

        3.    Testimony that some banks would not have "knowingly" processed marijuana transactions is insufficient to prove materiality ........................8

        4.    The evidence showed the U.S. issuing banks made a conscious decision to authorize marijuana transactions ...............................................9

        5.    Evidence that the defendants submitted false information to European banks and of the banks policies related to marijuana-related businesses is irrelevant ................................................................13

    C.    No Rational Jury Could Have Concluded That the Defendants Intended To Defraud the "Victim" Issuing Banks .......................................................15

        1.    Intent to harm ..........................................................................15

            a.    Legal standard ..........................................................15

            b.    Application ................................................................20

        2.    Intent to deceive a bank ..........................................................21

II.    In the Alternative, Mr. Akhavan Is Entitled to a New Trial Under Rule 33 ...............................................................................................................23

    A.    Legal Standard ....................................................................................23

    B.    The Evidence Preponderated Heavily Against The Verdict ................................24

    C.    The Court Should Order A New Trial at Which All Witnesses Are Required To Testify in Person ...........................................................................24

        1.    *Crawford v. Washington* overruled *United States v. Gigante* ...................24

        2.    The difficulties experienced during Mr. Elliott's testimony prejudiced the defense ..........................................................................28

i

D.      The Court Should Not Have Changed the Jury Instructions After Summations.............................................................................................................33

CONCLUSION...............................................................................................................................34

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................. 3

*California v. Green*,
  399 U.S. 149 (1970) ................................................................. 25

*Cort v. Marshalls Dep't Store*,
  2017 U.S. Dist. LEXIS 208424 (E.D.N.Y. Dec. 18, 2017) ............. 9

*Crawford v. Washington*,
  541 U.S. 36 (2004) ............................................................ passim

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020) ............................................................ 11

*Giles v. California*,
  554 U.S. 353 (2008) ................................................................. 28

*Kelly v. United States*,
  140 S. Ct. 1565 (2020) ............................................................ 19

*Loughrin v. United States*,
  573 U.S. 351 (2014) ....................................................... 13, 18, 19

*Maryland v. Craig*,
  497 U.S. 836 (1990) ........................................................... 27, 28

*Michigan v. Jemison*,
  952 N.W.2d 394 (Mich. 2020) ................................................. 27

*Neder v. United States*,
  527 U.S. 1, 16 (1999) ............................................................... 3

*Rainey v. Paquet Cruises, Inc.*,
  709 F.2d 169 (2d Cir. 1983) ..................................................... 10

*Shaw v. United States*,
  137 S. Ct. 462 (2016) ............................................................... 18

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020) ..................................................... 24

*United States v. Banyan*,
  933 F.3d 548 (6th Cir. 2019) .................................................... 21

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015)............................................................... 18, 19

*United States v. Bordeaux*,
    400 F.3d 548 (8th Cir. 2005) ................................................................... 25

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016)............................................................... 21, 23

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ........................................................................ 3

*United States v. Carter*,
    907 F.3d 1199 (9th Cir. 2018) .......................................................... 25, 26

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)..................................................................... 2, 3

*United States v. Chandler*,
    98 F.3d 711 (2d Cir. 1996)............................................................ 16, 17, 21

*United States v. Cox*,
    871 F.3d 479 (6th Cir. 2017) ............................................................ 25, 27

*United States v. Davis*,
    2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017)...................................... 17, 19

*United States v. Dinome*,
    86 F.3d 277 (2d Cir. 1996)...................................................................... 17

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001).................................................................... 24

*United States v. Finazzo*,
    850 F.3d 94, 108 (2d Cir. 2017)........................................... 16, 17, 18, 20

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999).............................................................. 25, 26, 27

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)........................................................................ 2

*United States v. Jabar*,
    2017 WL 4276652 (W.D.N.Y. Sept. 27, 2017) ................................ 16, 17

*United States v. Kipp*,
    2017 WL 2662983 (W.D.N.C. June 20, 2017),
    *aff'd*, 793 F. App'x 166 (4th Cir. 2019)................................................. 19

*United States v. Landau*,
    155 F.3d 93 (2d Cir. 1998)...................................................................... 23

*United States v. Lebedev*,
    932 F.3d 40 (2d Cir. 2019)...................................................................... 19

iv

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015)...............................................................................3

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) ..........................................................................17

*United States v. Milstein*,
    401 F.3d 53 (2d Cir. 2005).................................................................................7

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994)...............................................................................3

*United States v. Mollica*,
    849 F.2d 723 (2d Cir. 1988)...............................................................................7

*United States v. Nkansah*,
    699 F.3d 743 (2d Cir. 2012)................................................................18, 19, 21

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006).............................................................................16

*United States v. Pangelinan*,
    2020 U.S. Dist. LEXIS 157465 (D. Kan. Aug. 31, 2020) ...............................27

*United States v. Perez-Ceballos*,
    907 F.3d 863 (5th Cir. 2018) ............................................................................21

*United States v. Pierce*,
    785 F.3d 832 (2d Cir. 2015)...............................................................................7

*United States v. Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970)...........................................................................17

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)...............................................................................3

*United States v. Roshko*,
    969 F.2d 1 (2d Cir. 1992)...................................................................................7

*United States v. Salmonese*,
    352 F.3d 608 (2d Cir. 2003)...............................................................................7

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007).................................................................16, 19, 20

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987)..........................................................................16, 21

*United States v. Truman*,
    688 F.3d 129 (2d Cir. 2012)..................................................................3, 14, 24

*United States v. Weigand*,
    482 F. Supp. 3d 224 (S.D.N.Y. 2020)................................................................4

*United States v. Yates*,
    438 F.3d 1307 (11th Cir. 2006) (en banc) ........................................................ 25

## **Statutes**

18 U.S.C. § 1344 ............................................................................................................ 18

Fed. R. Crim. P. 29 ........................................................................................................... 2

Fed. R. Crim. P. 33(a) ..................................................................................................... 23

## **Other Authorities**

Jeremy Berke *et al.*, *The House just passed a cannabis bill that could open up bank
    access and supercharge the industry*, Business Insider (Apr. 19, 2021),
    https://www.businessinsider.com/cannabis-banking-bill-safe-act-congress-
    marijuana-credit-debit-card-2021-3 .......................................................................... 12

Order of the Supreme Court, 207 F.R.D. 89 (Apr. 29, 2002) ....................................... 25

*U.S. House of Representatives approves cannabis banking bill*, Reuters (Apr. 19, 2021),
    https://www.reuters.com/business/us-house-representatives-approves-cannabis-
    banking-bill-2021-04-19/ ............................................................................................ 12

Defendant Hamid "Ray" Akhavan hereby respectfully submits this memorandum of law in support of his motion for a judgment of acquittal or, in the alternative, for a new trial.

## PRELIMINARY STATEMENT

The government's theory, stated repeatedly at trial, was "lies, lies, lies."  But 'lies' alone, even if proven, do not constitute conspiracy to commit federal bank fraud.  Mr. Akhavan seeks a judgment of acquittal because the government failed to prove that his alleged misrepresentations were material or that he intended to defraud the "victim" issuing banks, both of which are essential elements of the charge.  To prove materiality, the government was required to prove beyond a reasonable doubt that an objectively reasonable U.S. issuing bank would not have authorized Eaze transactions but for the defendants' alleged misrepresentations.  But the government failed to produce a shred of evidence that *any* bank has *ever* declined to authorize an Eaze transaction or any other marijuana transaction.  As demonstrated below, the only inference a rational factfinder could draw from the evidence presented at trial is that the banks simply do not care if their cardholders use their cards to purchase marijuana.

The government's evidence of the defendants' intent to defraud was likewise insufficient. It is well-established in the Second Circuit that, for a jury to infer intent to defraud under the bank, mail, and wire fraud statutes, the government must prove that the defendants' misrepresentations affected an essential element of the alleged victim's bargain.  The government failed to show the four specific misrepresentations it identified as the bases for the prosecution (the merchant name, merchant location, merchant descriptor, and the merchant category code) were essential to the banks' decision to authorize marijuana transactions.  Because of that failure, no rational factfinder could have concluded that the defendants acted with intent to defraud and Mr. Akhavan is entitled to a judgment of acquittal.

In the alternative, Mr. Akhavan is entitled to a new trial.  Most importantly, the evidence preponderated heavily against the verdict.  The complications associated with Visa witness Martin Elliott's remote testimony are independent grounds for relief under Rule 33.  Mr. Elliott's remote testimony violated Mr. Akhavan's constitutional right to confrontation.  The prejudice associated with that violation was exacerbated by the strict time limitations on Mr. Elliot's testimony.  The inherent difficulties associated with cross examining a remote witness while adhering to strict time limitations effectively deprived Mr. Akhavan of his right to cross examine one of the most important witnesses at his trial, compromising the reliability of the jury's verdict.  If the Court does not grant a judgment of acquittal, a new trial is warranted.

## **ARGUMENT**

### I.   MR. AKHAVAN IS ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29

#### A.  Legal Standard

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[1]  Fed. R. Crim. P. 29.  Although a defendant's burden to demonstrate the insufficiency of the evidence is a heavy one, it is "not insurmountable."  *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005).  Courts set aside guilty verdicts when "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt," and "a reasonable jury must necessarily entertain a reasonable doubt" when the evidence at trial, viewed in the light most favorable to the prosecution, provides "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."  *Id.* at 98–99; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).  And witness testimony that is "incredible on its face" does not meet the

---

[1]  Unless otherwise noted, all internal citations, quotation marks, and alterations have been removed from citations in this brief.

threshold for sufficiency.  *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012).  Because "few events in the life of an individual assume the importance of a criminal conviction," district courts must "take the 'beyond a reasonable doubt' requirement with utmost seriousness." *Cassese*, 428 F.3d at 103.

### B. No Rational Jury Could Have Found That The Defendants' Alleged Misrepresentations Were Material To An Objectively Reasonable Bank

The government's evidence of materiality was insufficient to sustain the conviction for conspiracy to commit bank fraud.  Where the underlying object of an alleged conspiracy is found to be legally insufficient, the conspiracy count must be reversed. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1218–20 (2d Cir. 1994).

#### 1. Legal standard

"The wire and bank fraud statutes do not criminalize every deceitful act, however trivial." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019).  A misrepresentation "is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999).  To be material, the misrepresentation must be "*reasonably likely* to influence the [decisionmaker] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (emphasis added).  A "mere metaphysical possibility" of influence is insufficient. *United States v. Litvak*, 808 F.3d 160, 173 (2d Cir. 2015).  "[M]ateriality is judged according to an objective standard." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  The materiality inquiry boils down to one question: "[W]ould the misrepresentation actually *matter* in a *meaningful way* to a rational decisionmaker?" *Calderon*, 944 F.3d at 86 (emphasis in original).

The relevant decision in this case is that of an objectively reasonable U.S. issuing bank to authorize, in the first instance, credit and debit card transactions for marijuana. *See United States*

3

*v. Weigand*, 482 F. Supp. 3d 224, 237 (S.D.N.Y. 2020) (noting that the indictment alleges that "many issuing banks *would not have approved these transactions* if they had known marijuana was involved") (emphasis added); *see also* ECF No. 246 at 17 (jury instructions using the word "authorize" instead of "approve").   The government argued at trial that the defendants misrepresented four pieces of information to U.S. issuing banks:  the merchant name, merchant location, merchant category code (MCC), and merchant descriptor (the "Transaction Information").   *See, e.g.*, Tr. 2445:23–25 (government's opening summation).   Thus, the government bore the burden of proving beyond a reasonable doubt that an objectively reasonable bank would not have authorized Eaze transactions but for these four specific misrepresentations.

> ### 2. There was no evidence that a reasonable bank would have declined to authorize Eaze transactions even absent the defendants' alleged misrepresentations

The government adduced no evidence that *any* bank has *ever* declined to authorize a credit or debit card transaction for marijuana, much less declined to authorize a marijuana transaction based on the Transaction Information.

The government's failure is even more striking given that it was on notice that the defense intended to argue materiality for more than nine months.  ECF No. 72 at 20 (arguing that the indictment failed to allege "that the purported misrepresentations were material to[] and thus induced the financial institutions to process the transactions").  Yet the government failed to identify even a single instance in which a bank declined one of its cardholders' transactions for marijuana.  In fact, the defense proved that the banks *do* authorize marijuana transactions that are identified as such.  In its examination of Circle's witness, the defense showed that the banks have processed almost $50 million worth of transactions that use "Eaze" in the descriptor since July 2020, months after the indictment was filed in this case and a year after Visa and MasterCard both

became aware that Eaze was an online marijuana marketplace that accepted credit and debit cards.[2] Tr. 2378:9–14 (Reginatto).  The defense also showed that Actors Federal Credit Union processed transactions for well-known marijuana dispensary MedMen during the conspiracy.  Tr. 1789:2–5 (Brown).

The government's failure of proof is even broader:  It failed to adduce evidence that *any* bank has *ever* declined *any* transaction based on a merchant name, descriptor, or location.  The evidence showed that "the central purpose of the name is to aid the cardholder in the recognition of the transaction when they look at their statement at the end of the month, so that they realize that this is a charge that they actually engaged in," Tr. 1943:19–24 (Elliot), so the banks do not rely on the merchant name or descriptor to authorize transactions.  The defense showed several examples at trial of transactions with merchant descriptors that contained no information whatsoever about the merchant but were authorized nonetheless.  *See, e.g.*, Tr. 1799:25–1800:7 (Brown) (descriptor "fyesct"); HAX-10057 at 23–24 (descriptors "tstskv.com," "dvrhthylv.com," and "sntchs.com," among others).[3]  The government harped on the fact that many of the merchant descriptors associated with Eaze transactions did not contain the word "Eaze."  But the evidence that some descriptors are no more than a jumble of incoherent letters amply demonstrated that there is no requirement that a merchant descriptor include the merchant's name.

---

[2]   The government repeatedly noted that Circle began to process Eaze debit card transactions in 2020 after the charged conspiracy ended.  But there has been no change in the law or any other relevant circumstance from which a reasonable juror could infer that the banks would have behaved differently in 2019 than they did in 2020 and 2021.  Indeed, the only salient change is that the government decided to prosecute this case, which gave the banks a *stronger* incentive to decline Eaze and other marijuana transactions.  Even in the wake of that change, the government failed to identify a single transaction that was ever declined.

[3]   HAX-10057 is attached as Exhibit A.

Nor did the government present any evidence from which a rational juror might infer that any bank would have declined the Eaze transactions in this case if the merchant location associated with the transactions had been in California or Oregon.  Mr. Steinbach testified that the merchant location is a zip code.  Tr. 2113:22–23.  There was no evidence that a reasonable bank could or would have declined all transactions from an entire zip code on the suspicion that some fraction were marijuana related.

Banks also did not and could not have relied on MCCs to block marijuana transactions. While banks will sometimes block all transactions for a given MCC, there is no marijuana-specific MCC.  Where marijuana *is* legal, like Canada, merchants are instructed to use the MCC for pharmacies.  *See, e.g.*, Tr. 2172:4–9 (Steinbach), 571:12–573:3 (Verdeschi).  Had the defendants coded the Eaze transactions with the pharmacy MCC the network instructs its merchants to use today, the banks could not have blocked those transactions because that would have meant blocking standard pharmacy transactions such as those for toiletries or Tylenol.

Contrary to the government's materiality argument, the evidence established that the banks rely solely upon the sufficiency of funds and identity of the cardholder to authorize or decline credit and debit card transactions.  As Mr. Steinbach testified for CitiBank, "[i]f it's Mike Steinbach, if I'm within the credit limit, I can do whatever I want."  Tr. 2117:25-2118:1.  That testimony sums up the case.

Moreover, of the more than 1,000 financial institutions that allegedly processed transactions for Eaze based on misleading information, the government presented testimony from only four.  On its face, that evidence is insufficient to support a verdict based on what a "reasonable" bank would do.  Indeed, the government offered evidence of internal policies from only Bank of America, Citi, and Wells Fargo, three of the largest financial institutions in the

world.[4]  Notably, Actors Federal Credit Union—the only non-gigantic financial institution about which the jury received evidence—did *not* have any such internal policy.  The scant proof regarding "policies" from three non-representative banks—which were the central pillar of the government's case—constituted a constructive amendment of, or prejudicial variance from, the indictment, which charged that "[i]ssuing banks in the United States *generally* will not extend credit (*i.e.*, approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana."  ECF No. 16 at 7 (emphasis added).[5]

Even leaving that issue aside, this evidence is insufficient to show that a *reasonable* bank would have developed such a policy.  The government did *not* offer evidence from a survey of policies from many banks of various sizes.  For all we know, 99 percent (or more) of banks have

---

[4]    As discussed further below, these policies are irrelevant because they relate to prohibitions on providing financial services to marijuana related businesses, not cardholder transactions for marijuana.

[5]    *See United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (The government constructively amends an indictment "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment."); *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) ("A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.").  The risk of constructive amendment is especially pronounced in fraud trials, making it "critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988); *see also United States v. Roshko*, 969 F.2d 1, 4–5 (2d Cir. 1992) ("[B]ecause the fraud statutes target a broad range of conduct, it is even more critical that reviewing courts be vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions.").  A constructive amendment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment, requiring vacatur without a showing of prejudice.  *Roshko*, 969 F.2d at 5–6.  Variance is unconstitutional where, as here, it "substantial[ly] prejudice[s]" the defendant.  *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015).  Because the government constructively amended the indictment, the Court need not decide whether the variance substantially prejudiced Mr. Akhavan to grant relief under Rule 29.  In the alternative, the variance from the indictment substantially prejudiced Mr. Akhavan, so he is entitled to relief on that ground.

no such policy.  Even if the policies were relevant, evidence from banks that are *atypical* does not

meet the government's burden to prove what an *ordinary*, reasonable bank would do.

> 3.  <u>Testimony that some banks would not have "knowingly" processed</u>
> <u>marijuana transactions is insufficient to prove materiality</u>

The government never argued that the value of the Transaction Information to the banks is

greater than the sum of its parts considered in isolation.  The only testimony the government

elicited from the banks that is directly relevant to materiality is that they would not "knowingly"

authorize marijuana transactions.  But that testimony is wholly disconnected from the four specific

misrepresentations the government identified as the basis for this prosecution.  Even if it were true

that the banks would not knowingly process marijuana transactions (and it is not), that would not

show that the *defendants' misrepresentations* were material.  It was the government's burden to

prove that an objectively reasonable bank would not have authorized the Eaze transactions at issue

here but for the defendants' misrepresentations.  Whether the banks will "knowingly" process

marijuana transactions is irrelevant to materiality unless the government can show that an

objectively reasonable bank would "know" it was processing marijuana transactions based on the

Transaction Information.  The government failed to make that showing, and evidence about

whether the banks would "knowingly" process marijuana transactions is thus insufficient to prove

materiality.

The immateriality of the Transaction Information is confirmed by testimony from the bank

witnesses themselves.  Mr. Brown testified that Actors does not even look at the MCC or

descriptor.  Tr. 1804:17–19; *see also* Tr. 1232:15–18 (Clow) (conceding that descriptor often isn't

"valuable"), 2176:3–13 (Steinbach) (noting that an MCC is just a "general category").  The

evidence showed that, when authorizing their cardholders' purchases, banks care about whether

the purchaser is the cardholder and whether the cardholder can afford the purchase.  Tr. 2117:25–

2118:1 (Steinbach), 2140:1–6 (Steinbach), 1242:5–14 (Clow).  In other words, when deciding whether to authorize their cardholders' purchases, the banks do not use the Transaction Information to determine what their cardholders are purchasing because they *do not care* what their customers are purchasing.

The evidence showed not only that the banks do not care about the Transaction Information but that they do not care if their cardholders use their cards to purchase marijuana in general.  The banks' cardholder agreements said nothing about marijuana, and the banks made money by authorizing Eaze transactions.  Tr. 2164:22–2165:21 (Steinbach), 1202:18–1203:16 (Clow), 1783:22–1784:24 (Brown).  Given marijuana's unique legal status, the banks also did not face meaningful reputational risk from authorizing marijuana transactions.  Tr. 1242:5–14 (Clow) (If "our card member thinks that it's permissible, it doesn't necessarily put us in a brand risk or reputational risk.").

4. <u>The evidence showed the U.S. issuing banks made a conscious decision to authorize marijuana transactions</u>

Confronted with the Circle evidence and other evidence that banks, including those the Government called to testify, uniformly process their cardholders' marijuana transactions—even during the pendency of this trial—the government argued that negligence is not a defense to bank fraud.  The implication of that argument is that the banks were (and are) negligently authorizing Circle-enabled Eaze transactions and other marijuana transactions.  This argument makes no sense.  Negligence is a deviation from a standard of ordinary care.  *See, e.g.*, *Cort v. Marshalls Dep't Store*, 2017 U.S. Dist. LEXIS 208424, at *14 (E.D.N.Y. Dec. 18, 2017).  What all (or most) banks actually do (regardless of what they say) *defines* the standard of ordinary care.  A behavior that banks *uniformly* engage in—such as processing Circle-enabled Eaze transactions—cannot be a deviation from what banks *ordinarily* do.

To the contrary, even assuming that the banks lacked actual knowledge of each transaction it authorized, the only reasonable inference is that the banks and credit card companies have made a calculated *and reasonable* decision not to investigate whether they are processing marijuana transactions because *even if* they are authorizing such transactions, they do not care.  *See, e.g.*, Tr. 1887:22–1888:4 (Elliott) (Visa is "not proactively testing marijuana merchant websites" because it has "taken a risk-based approach" that focuses on higher priorities).  That is, the banks have reasonably (*i.e.*, not negligently, *cf. Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 171 (2d Cir. 1983) (Negligence is "defined as the failure to use the care which the law's reasonably prudent man should use under the circumstances of a particular case.")) decided that it does not matter whether they are authorizing marijuana transactions.

Consistent with that decision, the banks do not purport to rely on any of the four categories of allegedly false information to determine whether a transaction is for marijuana or otherwise. Indeed, the banks have decided not to take *any* affirmative steps to learn if their cardholders are using their cards to purchase marijuana.  *See* Tr. 2172:4–9 (Steinbach) ("There is no MCC for marijuana.  So I couldn't provide any clarity to you as to whether we approve, decline marijuana because we don't see it.").  The banks' transaction monitoring systems do not detect whether they are authorizing marijuana transactions because the banks are indifferent to whether their cardholders purchase marijuana.

Whatever the explanation, the evidence at trial demonstrated conclusively that the banks do not care if they authorize their cardholders' marijuana transactions.  Mr. Steinbach testified that Citi spends *zero dollars* of its nearly $300 million anti-fraud budget on detecting its cardholders' marijuana transactions. Tr. 2160:24–2161:12 (Steinbach).  There is no evidence in the record that any bank has ever so much as *warned* a customer about making marijuana purchases, much less

terminated a customer for such behavior.   Tr. 2166:14–2167:9 (Steinbach), 1258:24–1259:2 (Clow), 1797:14–24 (Brown).   When issuing banks contact their customers about suspected fraud, they do not even ask whether the customer engaged in an illegal purchase.   Tr. 2118:20–23 (Steinbach), 2140:8–19 (Steinbach), 1994:15–1995:12 (Clow).   Incredibly, Mr. Steinbach—Citi's head of fraud prevention—testified that he did not even know whether marijuana is legal in California.   Tr. 2158:13–23.   And Citi never added Eaze to its list of more than a quarter of a million merchants that are blocked or marked as high risk.   Tr. 2180:23–2181:8, 2186:7–21. Likewise, Bank of America also has not added Eaze to its internal list of marijuana merchants. Tr. 1284:24-1286:10 (Clow).

The banks' devil-may-care approach to marijuana transactions makes sense because there is no meaningful risk of enforcement action by the federal government and absent such risk, there is no reason that an objectively reasonable bank *would* care.   Guidance published by the Financial Crimes Enforcement Network (FinCEN) was designed to encourage marijuana-related businesses to access the financial system.   According to this guidance, which has never been rescinded,[6] the federal government will not bring an enforcement action against a bank for offering financial services to a marijuana-related business unless the business implicates one of the government's limited enforcement priorities.   And the federal government has never brought such a prosecution since the guidance was first published in 2014.[7]   If the federal government is encouraging financial

---

[6]   Notably, the Trump administration rescinded the Cole Memorandum but not the FinCEN guidance.

[7]   Even if the federal government wanted to prosecute one of the banks that has begun offering banking services to marijuana-related businesses, it is unclear whether it could do so because the banks have reliance interests in the FinCEN guidance.   *Cf., e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913–14 (2020) (nonbinding guidance can create legally cognizable reliance interests).

institutions to offer banking services to *marijuana-related businesses*, there is no reasonable possibility that a bank will be prosecuted for authorizing their *cardholders'* purchases of marijuana.[8]

Further demonstrating that the banks do not care about tracking their customers' marijuana purchases, the evidence at trial showed that the banks did not push for a specific MCC for marijuana, even though they could have. The evidence at trial showed that participants in the payment industry can create new MCCs to identify specific types of transactions when they care enough to do so. For example, as online gambling became legal in an increasing number of states, the International Standards Organization (ISO) introduced a new MCC in 2014 specifically for online gambling in the United States, in part so that the banks and the credit card companies could track it and automatically block it in States where gambling was still illegal. Tr. 1974:1–15 (Elliott) ("Visa and ISO introduced … three new MCCs … in December of 2014"). But the banks and the credit card companies did not ask for a new MCC for marijuana, even though marijuana is fully legal in some jurisdictions like Canada, because they have no interest in tracking their cardholders' marijuana purchases.

---

[8]  Recent, bipartisan legislation to legalize marijuana banking more broadly confirms that banks faced no meaningful reputational risk from authorizing their cardholders' marijuana purchases. *See U.S. House of Representatives approves cannabis banking bill*, Reuters (Apr. 19, 2021) (noting that the SAFE Banking Act passed the House of Representatives with 321 votes and is supported by the American Bankers Association), https://www.reuters.com/business/us-house-representatives-approves-cannabis-banking-bill-2021-04-19/; *see also* Jeremy Berke *et al.*, *The House just passed a cannabis bill that could open up bank access and supercharge the industry*, Business Insider (Apr. 19, 2021) (The SAFE Banking Act would "allow customers to use credit or debit cards to buy [marijuana] products."), https://www.businessinsider.com/cannabis-banking-bill-safe-act-congress-marijuana-credit-debit-card-2021-3.

5. <u>Evidence that the defendants submitted false information to European banks and of the banks policies related to marijuana-related businesses is irrelevant</u>

Evidence that the defendants were aware that false information would be submitted to European *acquiring* banks is not sufficient to meet the government's burden that the defendants' alleged misrepresentations were material to U.S. *issuing* banks.  Oliver Hargreaves testified that he submitted merchant applications that contained false information to certain acquiring banks in Europe.  The government named at least some of these acquiring banks as co-conspirators, so even the government does not argue that they were deceived as to the nature of the Eaze transactions. But even if those banks were deceived, European banks are not covered by the bank fraud statute. And, even assuming that the defendants were legally responsible for Mr. Hargreaves' actions, application information is not passed on to credit card companies or U.S. issuing banks.  Tr. 1936:1–3 (Elliott).  Thus, false statements embedded in applications submitted to acquiring banks cannot serve as the predicate for a bank fraud conviction.[9]

The government elicited testimony from the bank witnesses about irrelevant internal bank policies that state that certain banks do not provide banking services to marijuana-related businesses (MRBs).  But, as the bank witnesses themselves acknowledged, the MRB policies do not prohibit cardholder marijuana transactions.  *See, e.g.*, Tr. 1215:24–1216:3 (Clow).  The MRB policies speak to the banks' relationships *with MRBs*, but the relevant relationships for materiality purposes are the banks' relationships *with their cardholders*.  None of the MRB policies in evidence so much as mentions cardholders.  *See, e.g.*, Tr. 1214:16–21 (Clow) (confirming Bank

---

[9]  The "fraudulent application packs" (to borrow Mr. Hargreaves' locution) also cannot be the predicate for a bank fraud conviction under subsection 2 because they were not the "mechanism[s] naturally inducing" the issuing banks "to part with money in [their] control" and thus were not a "means" by which the issuing banks were induced to part with money in their custody or control.  *Loughrin v. United States*, 573 U.S. 351, 363 (2014).

of America's MRB policy "does not mention credit card holders"), 2155:11–2157:2 (Steinbach) (testifying that Citi's policy says that it "may not take on clients, customers, or account holders who are marijuana *providers and distributors*") (emphasis added).

Thus, the banks' policies say nothing about cardholders, and there is no evidence that any bank has ever declined a marijuana transaction.  When evaluated against those two undisputed facts, any suggestion that the banks would have applied inapposite internal policies to decline marijuana credit and debit card transactions is "incredible on its face," and does not meet the threshold for sufficiency.  *Truman*, 688 F.3d at 139.

That the banks had internal policies addressing MRBs undermines rather than strengthens the government's case.  The MRB policies show that the banks were aware that marijuana's legal status was unique and warranted special policies.  The banks did not rely on a generic disclaimer in their internal policies that the bank was prohibited from offering banking services to "illegal businesses."  To borrow the government's favorite comparison, the banks saw no need to publish internal policies instructing their employees that the banks would not offer banking services to cocaine- or heroin-related businesses.  But marijuana is different because marijuana is legal under state law in some states—and dispensaries openly sell marijuana there, federal statutory law notwithstanding.  Given that reality, the banks apparently concluded that they needed to clarify their position, so that their employees would not be confused.  In contrast, when it came to consumer cardholders, the banks remained mum.  If even the banks' employees needed further guidance as to whether and how to provide banking services, why not provide any such marijuana-specific guidance to cardholders?  The discrepancy gives the lie to any suggestion that the banks were simply careless in failing to address marijuana in their cardholder-facing documents.

By failing to adduce evidence that any bank has ever declined an Eaze (or any other marijuana) transaction, the government failed to offer anything from which a rational juror could have concluded that an objectively reasonable bank would have declined to do so.  And, as a matter of law, the government cannot argue that all banks (or an objectively reasonable bank) would have processed these transactions negligently.  Indeed, the government has never offered a legally sufficient explanation for the uncontroverted evidence that the banks process Eaze and other marijuana transactions that are clearly identified as such.  No rational juror could conclude beyond a reasonable doubt from this evidence—or any of the evidence at trial—that banks would decline to authorize Eaze transactions even absent the misrepresentations it has identified as the basis for this prosecution.

### C. No Rational Jury Could Have Concluded That the Defendants Intended To Defraud the "Victim" Issuing Banks

The government also failed to prove that the defendants intended to defraud the issuing banks.  The Court's jury instructions required the government to prove the defendants "devised a scheme to defraud a federally insured bank or credit union by means of misrepresentations" and "devised the scheme knowingly, willfully, and with a specific intent to defraud."  ECF No. 246 at 16.[10]

1. Intent to harm

*a. Legal standard*

Intent to defraud requires intent to cause actual harm.  "To act with 'intent to defraud' means to act knowingly and with the specific intent to deceive, for the purpose of causing some

---

[10]   The defense respectfully notes that to the extent the Court's final instructions varied from the defendants' proposed instructions, the Court held at trial that those objections are preserved.  Tr. 2427:16–25.

financial or property loss to another." *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017) (affirming jury instruction). "[P]roof of a scheme or artifice to defraud … demands a showing that the defendants possessed a fraudulent intent.  Fraudulent intent necessarily includes an intent to cause some kind of actual harm." *United States v. Jabar*, 2017 WL 4276652, at *3 (W.D.N.Y. Sept. 27, 2017) (citing *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)); *see also United States v. Chandler*, 98 F.3d 711, 715 (2d Cir. 1996) (holding in bank fraud prosecution that "[e]ssential to a conviction under the 'scheme to defraud' clause of the mail [and bank] fraud statute[s] is a showing of fraudulent intent: *i.e.*, intent to deceive *and* intent to cause actual harm") (emphasis in original); *Starr*, 816 F.2d at 98 ("Only a showing of intended harm will satisfy the element of fraudulent intent.").  An "alleged harm" that is "at most 'metaphysical'" is "not enough from which to infer fraudulent intent." *Jabar*, 2017 WL 4276652, at *3 (quoting *Starr*, 816 F.2d at 100).

For a rational factfinder to infer that that the defendant intended to cause actual harm via a scheme to defraud, the scheme must "depend for [its] completion on a misrepresentation of an essential element of the bargain." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  The Second Circuit has distinguished between schemes that go to an essential element of the bargain, from which the jury can infer intent to harm, and "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid," from which no rational factfinder can so infer.  *Id.*  That is because "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed." *Novak*, 443 F.3d at 159.  "If a party receives what it bargains for and the defendant's conduct does not affect an essential element of that bargain, then 'the evidence is insufficient to show the requisite intent to harm.'"  *Jabar*, 2017 WL 4276652, at *5 (quoting *Novak*, 443 F.3d at 159); *see also*

*United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) ("intent to deceive, and even to induce" is insufficient to prove intent to defraud).  Thus, evidence that a defendant merely intended to induce a party to enter a transaction it would otherwise have avoided is insufficient.  *See United States v. Davis*, 2017 WL 3328240, at *9–24 (S.D.N.Y. Aug. 3, 2017) (granting relief under Rule 29 from conspiracy to commit wire fraud conviction because the government failed to adduce evidence from which a rational juror could find that the defendants' misrepresentations affected an essential element of the alleged victims' bargain); *Jabar*, 2017 WL 4276652, at *3–10 (same).[11]

If the evidence shows that a defendant merely intended to deprive an alleged victim of accurate information, the government must show that the defendants "misrepresentations or non-disclosures can or do result in tangible economic harm" to satisfy the essential element requirement.  *Finazzo*, 850 F.3d at 111.  Under a "right to control" theory, the government can obtain a conviction if it shows "that a person or entity lost its chance to bargain intelligently because of some deceit or non-disclosure."  *Jabar*, 2017 WL 4276652, at *8.  But the government has never pressed a "right to control" theory in this case.  And "misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm."  *Finazzo*, 850 F.3d at 111; *see also United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) ("[T]he information withheld either must be of some independent value or must bear on the ultimate value of the transaction.").  If deceit does not "deprive the victim of potentially valuable economic

---

[11]    "Since the bank fraud statute was modelled after the mail and wire fraud statutes, precedents interpreting those statutes are helpful in interpreting the bank fraud statute."  *Chandler*, 98 F.3d at 715; *see also United States v. Miller*, 953 F.3d 1095, 1102 n.7 (9th Cir. 2020).

information," the essential element requirement is not satisfied. *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015).

The essential element requirement is distinct from the materiality requirement. The "question of whether a defendant's misrepresentation was capable of influencing a decisionmaker [*i.e.*, the materiality requirement] should not be conflated with [the] requirement that that misrepresentation be capable of resulting in tangible harm. It is certainly possible for a misrepresentation to influence decisionmaking in a manner that nevertheless does not produce tangible harm." *Finazzo*, 850 F.3d at 109 n.16. The materiality requirement goes to the *effect* of a defendant's alleged misrepresentations. By contrast, the essential element requirement is about a defendant's *intent*. For the jury to infer that a defendant *intended* to cause actual harm, the government must satisfy the essential element requirement.

Both subsections of the bank fraud statute require an intent to harm someone because "a criminal intent to effect harm on *someone* … is inherent in the idea of a 'scheme or artifice.'" *United States v. Nkansah*, 699 F.3d 743, 757 (2d Cir. 2012) (Lynch, J., concurring in part and concurring in the judgment in part); *see* 18 U.S.C. § 1344. Neither *Shaw v. United States*, 137 S. Ct. 462 (2016), nor *Loughrin v. United States*, 573 U.S. 351 (2014), cast doubt on that fundamental principle. In *Shaw*, the defendant intended to harm the bank's *depositor*, rather than the bank itself. 137 S. Ct. at 465. Similarly, in *Loughrin*, the defendant intended to harm Target, to which he presented fraudulent checks. 573 U.S. at 353–54. *Shaw* and *Loughrin* held that intent to harm *a bank* is not an element under subsections 1 and 2 of the bank fraud statute, respectively. But the Supreme Court had no occasion to decide in either case whether intent to harm *someone* is an element of the bank fraud statute. *Loughrin* and *Shaw* thus do not call into question the proposition that a defendant who "believe[s] in good faith that [a] misrepresentation was innocently intended

18

to further a transaction that would in the end benefit the bank … lack[s] any criminal intent" and is not guilty of bank fraud. *Nkansah*, 699 F.3d at 757 n.2.[12] And neither opinion discussed the essential element requirement because that requirement is derived from Circuit precedent.[13]

The argument that a defendant possesses the requisite intent to harm any time he merely intends to obtain property within the bank's custody or control is irreconcilable with the essential element requirement. Indeed, the implication of the "custody or control" theory is that defendants commit bank fraud whenever they cause anyone with a bank account (including but not limited to the bank itself) "to enter into transactions they would otherwise avoid" and thereby to part with funds within the bank's custody or control. *Shellef*, 507 F.3d at 108. But that is not sufficient to satisfy the *essential element* requirement. *See, e.g.*, *id.*; *Davis*, 2017 WL 3328240, at *8 (citing *Binday*, 804 F.3d at 570). The defendants' misrepresentations must also affect an essential element of the bargain.

The "essential element" requirement is a necessary limitation on the otherwise unchecked sweep of the bank fraud statute. Under the capacious "custody or control" theory, the government could obtain a conviction for federal bank fraud based on *any* alleged deviation from a bank or

---

[12]     *See also United States v. Kipp*, 2017 WL 2662983, at *21 (W.D.N.C. June 20, 2017) (acquitting a defendant charged under subsection 2 after a bench trial because the Court did not "find the 'usual' pecuniary gain that typically accompanies fraudulent intent" and the government failed to meet its "burden of showing specific intent to defraud"), *aff'd*, 793 F. App'x 166 (4th Cir. 2019); ECF 182 at 22–23 n.14 (Defendants' Request to Charge collecting authorities for the proposition that specific intent to defraud is an element under subsection 2).

[13]     *Loughrin* does not absolve the government from meeting the essential element requirement in this case for an additional reason: The Court instructed the jury here that the government was required to prove that the defendants "devised a scheme to defraud a federally insured bank or credit union" and did so "with a specific intent to defraud." ECF No. 246 at 16. And for the government to prove "intent to defraud," it must satisfy the essential element requirement. The same is true of *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019), in which the government was not required to prove that the defendant had engaged in a "scheme to defraud." *Cf. also Kelly v. United States*, 140 S. Ct. 1565 (2020) .

credit-card company's claimed policy (no matter how arbitrary) and obtain a conviction based on a finding that a particular transaction (no matter how voluntary, productive and legal it would otherwise be) might not have been authorized absent the deviation.  In *Finazzo*, the Second Circuit considered a hypothetical "in which a clothing retailer does business with a supplier, and the supplier misrepresents its identity to the retailer."  850 F.3d at 111 n.18.  "[W]hat if [a] supplier misrepresents its identity merely because [a] retailer's board of directors has agreed not to transact business with the supplier due to inter-personal animus?"  *Id.*  Even though "the Government would likely be able to easily prove that the supplier's misrepresentation affected the retailer's decisionmaking," the Second Circuit has held that this kind of misrepresentation cannot support a finding of a "scheme to defraud."  *Id.*

### b.  Application

The government adduced no evidence from which a rational factfinder could conclude that the four alleged misrepresentations on which the government staked its case (merchant name, merchant location, merchant descriptor, and MCC) affected an essential element of the banks' bargain with their cardholders.  As explained above, the evidence adduced at trial shows that the banks are perfectly willing to process marijuana transactions for their cardholders.  But even crediting the government's theory that the banks would not have authorized marijuana transactions if they had been labelled as such,[14] the evidence at trial conclusively refutes any notion that the banks consider this information "essential" for all the reasons explained in the preceding section.

---

[14]     As explained above, the government was required to prove that an objectively reasonable bank would not have authorized the Eaze transactions at issue in this case but for the defendants' misrepresentations to prove materiality.  "But for" causation is a *necessary* but not *sufficient* condition for conviction because "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid" do not satisfy the essential element requirement.  *Shellef*, 507 F.3d at 108.

"[A]ny 'harm' intended by" the defendants was, "at most, metaphysical" and is thus insufficient "to infer fraudulent intent." *Starr*, 816 F.2d at 100. In short, the banks do not care if their customers use their cards to purchase marijuana, and something that the banks do not care about cannot be an "essential element" of their bargain. *See supra* §§ I.B.2-4.

The evidence also showed that the defendants "believed in good faith that" their alleged misrepresentations were "innocently intended to further a transaction that would in the end benefit the bank." *Nkansah*, 699 F.3d at 757 n.2. As explained above, the banks *made* money by authorizing those transactions and faced no meaningful risk from doing so. The only plausible inference from the evidence presented at trial was that the defendants "lack[ed] any criminal intent." *Id.* Because the government failed to prove that the defendants intended to harm anyone, the Court should grant relief under Rule 29.

## 2. Intent to deceive a bank

The government's case also failed for the independent reason that the defendants failed to prove that the defendants intended to deceive an FDIC-insured bank. *See, e.g.*, *Chandler*, 98 F.3d at 715 ("intent to deceive" is a component of intent to defraud). The "intent to deceive" element is not satisfied when a defendant submits "dishonest" information "to an entity which is not itself a federally insured institution without also intending to deceive" an FDIC-insured financial institution. *United States v. Bouchard*, 828 F.3d 116, 125 (2d Cir. 2016) (concluding evidence was insufficient under both subsections of the bank fraud statute); *see also United States v. Perez-Ceballos*, 907 F.3d 863, 867–69 (5th Cir. 2018) (reversing bank fraud conviction because evidence was insufficient to show that the defendants made any false statement to a bank); *United States v. Banyan*, 933 F.3d 548, 552–55 (6th Cir. 2019) (concluding evidence that the defendant intended to defraud an FDIC-insured financial institution was insufficient under both subsections of the bank fraud statute).

Moreover, the evidence at trial established that the European acquiring banks *knew* that they were processing marijuana transactions and were not deceived. *See, e.g.*, Tr. 1115:1–23 (Hargreaves) (conceding that the defendants worked with "insiders" at European acquiring banks), 814:14–19 (Hargreaves) (Mr. Akhavan received "input" from acquiring banks on merchant applications), 931:3–6 (Hargreaves) ("99 percent of the [acquiring] bank" believed that the defendants' actions were "legal"), 962:18–24 (Hargreaves) (identifying an acquiring bank "that was interested in miscoding"). How those European banks managed their responsibilities to Visa or MasterCard under their agreements with Visa and MasterCard is solely a matter of contract between those parties. *See, e.g.*, Tr. 502:11–13 (Verdeschi) ("the acquiring bank is responsible for knowing its customer," *i.e.* the merchant, under the MasterCard rules), 1932:25–1933:22 (Elliott) ("[A]cquirers are ultimately responsible [for merchants] under the Visa rules.").[15]

Indeed, the vast majority of the allegedly false information that Mr. Hargreaves submitted to three European acquiring banks—information embedded within merchant applications—is irrelevant to the charged conspiracy. As explained above, those applications are never submitted to the credit card companies or issuing banks, so the jury could not infer from the submission of

---

[15]    In fact, the Visa and MasterCard rules establish that acquiring banks have a non-delegable duty to code the four data points at issue. Thus, the acquiring banks—not the defendants—are legally responsible for any alleged "miscoding." Moreover, the same rules provide a *civil* remedy for even willful violations. That fact negates any plausible inference that the defendants acted with *criminal* intent. Indeed, the network and issuing bank witnesses testified, and the evidence showed, that miscoding does occur. Still, the rules demonstrate the card networks made a considered judgment to address such violations in a civil venue only. The rules certainly do not contemplate that acquiring banks have committed bank fraud whenever miscoding occurs, as the government's theory would imply. At most, the evidence showed that the acquiring banks breached their contracts with Visa and MasterCard. But even if the defendants were somehow responsible for those breaches, the government's theory still fails because evidence that a defendant breached a contract is insufficient to prove that he *intended to defraud* his counterparty. *See, e.g.*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016).

the applications that the defendants intended to deceive a U.S. issuing bank.  *See supra* § I.B.5. Although the government's theory was that the defendants told "lies," lies cannot constitute a conspiracy to commit federal bank fraud if they never even reach the banks that were allegedly defrauded.

Further, even if the evidence showed that the defendants intended to deceive the credit card companies, that would also be insufficient to meet the government's burden to prove intent to deceive a bank.  Credit card companies like Visa and MasterCard are not covered by the bank fraud statute.  So even if the evidence showed that the defendants intended merely to evade credit card company rules (*cf.* Tr. 516:5–7 (Verdeschi) ("MasterCard rules … are not the law.")), so that Eaze could continue to process marijuana transactions, that would be insufficient to prove that the defendants intended to deceive *a bank*, as required by the bank fraud statute.  *See, e.g.*, *Bouchard*, 828 F.3d at 125.  Because the government failed to prove both intent to deceive an FDIC-insured bank and intent to harm anyone, its proof was doubly defective and a judgment of acquittal is warranted.

## II.   IN THE ALTERNATIVE, MR. AKHAVAN IS ENTITLED TO A NEW TRIAL UNDER RULE 33

### A.  Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  District courts' authority under Rule 33 is even broader than under Rule 29.  *See United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) ("[A] less stringent standard applies to a motion for a new trial" than a motion for judgment of acquittal.).  "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."  *Id.*  And unlike a Rule 29 motion, "a trial judge considering a motion for a new trial is free to weigh the evidence himself

23

and need not view it in the light most favorable to the verdict winner." *Id.* "A district court should grant a new trial motion if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.*; *see also United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (noting that under Rule 33, the district court has "broad discretion" to set aside a jury verdict and order a new trial to "avert a perceived miscarriage of justice").

"When considering a motion for a new trial under Rule 33, a district court has discretion to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Truman*, 688 F.3d at 141. While the Court may not "elect its own theory of the case and view the evidence through that lens," the Court should grant relief under Rule 33 where "the evidence at trial, taken as a whole, preponderated heavily against the verdict." *United States v. Archer*, 977 F.3d 181, 198 (2d Cir. 2020).

### B.  The Evidence Preponderated Heavily Against The Verdict

For the reasons explained above, the evidence at trial weighed heavily against the verdict. The government failed to produce evidence that any bank has ever declined to authorize an Eaze transaction or any other marijuana transactions. For that reason alone and for the reasons previously stated, the Court should grant relief under Rule 33.

### C.  The Court Should Order A New Trial at Which All Witnesses Are Required To Testify in Person

#### 1.  *Crawford v. Washington* overruled *United States v. Gigante*

The Court should also grant a new trial because Martin Elliott's remote testimony violated the defendants' confrontation rights. Over the defense's Confrontation Clause objection, the Court permitted Mr. Elliott to testify remotely. The defense respectfully renews its argument that, under the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), Mr. Elliott should not have been permitted to testify remotely. *See* ECF No. 175 at 1–3.

24

As the defense previously submitted, the Supreme Court has long held that the "'core' of the Confrontation Clause guarantee" is to "provid[e] the accused an 'opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.'" *United States v. Carter*, 907 F.3d 1199, 1206 (9th Cir. 2018) (quoting *California v. Green*, 399 U.S. 149, 156–57 (1970)). "'[C]ompelling witnesses to stand face to face with the jury' as they tell their side of the story" gives the jury an opportunity to observe the myriad nonverbal cues that can betray that a witness is shading the truth. *Id.* at 1207 (quoting *Green*, 399 U.S. at 156). As the Eighth Circuit observed after *Crawford*, the Second Circuit's decision in *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), "does not persuade us that 'confrontation' through a two-way closed circuit television is constitutionally equivalent to a face-to-face confrontation because it neglects the intangible but crucial differences between a face-to-face confrontation and a 'confrontation' that is electronically created by cameras, cables, and monitors." *United States v. Bordeaux*, 400 F.3d 548, 554–55 (8th Cir. 2005); *see also United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006) (en banc) ("The simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation."). "Virtual confrontation might be sufficient to protect virtual constitutional rights," but it is not "sufficient to protect real ones." Order of the Supreme Court, 207 F.R.D. 89, 94 (Apr. 29, 2002) (statement of Scalia, J.).

The Supreme Court made clear in *Crawford* that "a face-to-face meeting between an accuser and the accused [is] an essential part of the confrontation right." *United States v. Cox*, 871 F.3d 479, 493 (6th Cir. 2017) (Sutton, J., concurring) (citing *Crawford*, 541 U.S. at 43–45). The *Crawford* Court focused on the text and history of the Confrontation Clause to conclude that "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 69. In so holding, the Supreme Court expressly

disavowed prior decisions that "replac[ed] categorical constitutional guarantees with open-ended balancing tests." *Id.* at 67–68.

This Court relied on the Second Circuit's decision in *Gigante* in granting Mr. Elliott's application to testify remotely.   ECF No. 208 at 20.   "*Gigante* held that, 'upon a finding of exceptional circumstances, a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice.'"  *Id.* (quoting *Gigante*, 166 F.3d at 81). *Gigante* relied upon a policy-based reading of the Confrontation Clause, whereby "the central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant" as tested at trial.  *Gigante*, 166 F.3d at 81.

*Gigante* is irreconcilable with *Crawford*.  As an initial matter, *Gigante*'s policy-based interpretation of the Confrontation Clause is flawed on its own terms.  As described above, in-person confrontation promotes important interests that *Gigante* barely mentions, except to admit that "[t]here may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony."  *Id.*  Indeed, in announcing its broad rule, *Gigante* also held that "the use of remote … testimony must be carefully circumscribed."  *Id.* at 80.  More importantly, *Gigante* calls for just the sort of "open-ended balancing test[]" that the Supreme Court condemned in *Crawford*.  541 U.S. at 68.  After *Crawford*, other Circuits have criticized *Gigante* as an "outlier."  *Carter*, 907 F.3d at 1208 n.4.  This Court should not wait for the Second Circuit formally to overrule *Gigante*.

In its prior opinion, the Court held that "[t]he error in defendants' reasoning is that *Crawford* and *Gigante* answered different questions.  *Crawford* addressed whether confrontation was required for certain out-of-court statements.  *Gigante* addressed whether, when the defendant undeniably has a Confrontation Clause right, that right can be vindicated in exceptional

circumstances by video testimony." ECF No. 208 at 22. Respectfully, the defense disagrees. The only question here is whether, in these circumstances, the defendants' right to confrontation could be vindicated via a procedure other than the one prescribed by the Constitution: in-person confrontation. And on that question, *Crawford* and *Gigante* point in different directions. Although *Crawford* was not about video testimony, its text-and-history approach to the Confrontation Clause and rejection of balancing tests render *Gigante* a dead letter.

Even under *Gigante*, Mr. Elliott should not have been permitted to testify remotely. *See* ECF No. 175 at 3–5. Although Mr. Elliott had minor health conditions, there was "no evidence that [he was] physically unable to travel like the witness[] in *Gigante*." *United States v. Pangelinan*, 2020 U.S. Dist. LEXIS 157465, at *10 (D. Kan. Aug. 31, 2020). The conditions and life circumstances Mr. Elliott described are common, so they are not "exceptional circumstances" within the meaning of *Gigante*, 166 F.3d at 81.

Nor did Mr. Elliott satisfy the standard (which the defense maintains should not apply here) set forth in *Maryland v. Craig*, 497 U.S. 836, 846 (1990). *Craig* requires that the denial of face-to-face confrontation be "necessary to further an important public policy." 497 U.S. at 850.[16] Visa

---

[16] The Court previously observed that the "defendants would have this Court believe that the *Crawford* Court overruled" the Supreme Court's prior decision in *Craig*. To be sure, *Crawford* and *Craig* are in serious tension. *See, e.g.*, *Cox*, 871 F.3d at 492–94 (arguing that "the two opinions would give Janus a run for his money" and that "[t]o respect the one decision slights the other" and collecting authorities for the proposition that "the two decisions face in different directions," including the Solicitor General's brief in *Crawford* "warn[ing] that the 'categorical approach' sought by the criminal defendant in *Crawford* was 'incompatible' with *Craig*"). As explained in the defense's prior submission, until the Supreme Court resolves that tension, *Craig* should be limited "to the specific facts [on which] it [was] decided: a child victim may testify against the accused by means of one-way video (or a similar *Craig*-type process) when the trial court finds, consistently with statutory authorization and through a case-specific showing of necessity, that the child needs special protection." *Michigan v. Jemison*, 952 N.W.2d 394, 400 (Mich. 2020).

The Court also observed that "'a literal reading of the Confrontation Clause would abrogate virtually every hearsay exception,' a result the Court has long rejected." ECF No. 208 at 17

failed to carry the heavy burden to show that it was necessary for Mr. Elliott to testify remotely. ECF No. 175 at 3 n.2. The Court should order a new trial to vindicate the defendants' Sixth Amendment rights.

>      2.   The difficulties experienced during Mr. Elliott's testimony prejudiced
>           the defense

The practical difficulties associated with cross-examining Mr. Elliott remotely underscore the importance of in-person confrontation. Even assuming *arguendo* that remote testimony may be permissible in certain circumstances, it violated the defendants' Confrontation Clause rights here. That violation was especially prejudicial (and certainly was not harmless) for four primary reasons.

*First*, Mr. Elliott was one of the most important witnesses in this case. The defense's core theory was that Visa, MasterCard, and the issuing banks were complicit in authorizing marijuana transactions, regardless of what any general written "policies" may have provided. Visa had every incentive to resist that theory and to curry favor with the government. The defense argued that Visa and the other participants in the payment network wanted plausible deniability so that they could claim they were not knowingly processing marijuana transactions. Thus, the defense's theory suggested that Visa was being disingenuous at best and was perhaps even a co-conspirator, crediting the government's theory of the case. Representatives from issuing banks also testified that they relied on credit card companies, including Visa, to police their network for marijuana transactions. *See, e.g.*, Tr. 1167:19–1168:2 (Clow). They also testified that they were required to

_____

(quoting *Craig*, 497 U.S. at 848). As the defense previously explained, however, *Crawford* reasoned from the text *and history* of the Confrontation Clause. The Court has thus held that there are narrow, historically-rooted exceptions to the right to face-to-face confrontation including, for example, "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Giles v. California*, 554 U.S. 353, 358 (2008). But there is no such exception for remote testimony or any analogue.

abide by the card network's rules or risk being ousted from the network altogether.  *See, e.g.*, Tr. 1786:8–1787:1 (Brown).  Given the signal importance of Mr. Elliott's testimony, the defense should have been afforded an in-person opportunity to probe issues related to Visa's supposed "policy" against processing marijuana transactions, including whether any such policy was enforced in practice or was merely illusory.

*Second*, the defense had limited time to cross examine Mr. Elliott.  As background, the government estimated that its direct examination of Mr. Elliott would take between an hour and an hour and a half and suggested that Mr. Elliott begin testifying after lunch because it would take time to set up the necessary equipment.  Tr. 1734:10–17.[17]  After Mr. Elliott had been testifying on direct examination for more than 90 minutes, the Court had a sidebar with the parties at which the Court stated "I never would have allowed this to begin after lunch if I had realized it was going to go over to another day."  Tr. 1893:2–4.  The Court then asked defense counsel how long cross examination would take.  Mr. Burck, counsel for Mr. Akhavan, responded "Your Honor, I'll try to keep it very short, maybe 45 minutes."  Tr. 1893:7–8.  The Court concluded the sidebar by stating that there would be "[n]o more than five minutes on redirect" and "[n]o recross."  Tr. 1894:6–7.  Mr. Elliott then testified on direct examination until the end of the day, or for about two hours total.  When the parties returned the following morning, the Court reminded Mr. Burck that he would have 45 minutes for cross examination.  Tr. 1922:23–1923:5.  Thus, there was limited time available for the defense to cross examine Mr. Elliott.

The time limitation exacerbated the prejudice to the defense from Mr. Elliott's remote testimony because the defense's cross examination was beset by logistical difficulties.  For

---

[17]   The defense had previously suggested that Mr. Elliott's testimony could begin after the midmorning break, but that suggestion was not adopted.  Tr. 1726:4–6.

example, Mr. Elliott had difficulty identifying exhibits, or particular pages within certain exhibits, and there were technical difficulties further reducing defense counsel's already limited time for cross examination. *See, e.g.*, Tr. 1931:24–1932:8, 1945:10–23, 1962:12–19, 1979:14–1980:4; *see also* Tr. 1969:3–24 (Mr. Elliott's screen freezing).  Because Mr. Elliott was testifying remotely, the parties could not show him exhibits directly, as they could when witnesses were physically present in the courtroom.  The burden associated with showing exhibits to a remote witness was disproportionately born by the defense because cross examination of a hostile witness is, by its nature, more dynamic than direct examination.

Further compounding the difficulty of showing Mr. Elliott exhibits, a defense representative was precluded from sitting or standing near Mr. Elliott during his testimony to help him identify exhibits.  Understandably, Mr. Elliott and his attorneys wanted to maintain social distance.  But during portions of the government's direct examination, an Arnold & Porter technology specialist was permitted to stand near Mr. Elliott to assist him with viewing a voluminous spreadsheet.  The defense was not afforded the same courtesy.  Moreover, Mr. Elliott was the government's witness, so the government had the opportunity to coordinate with him to minimize disruption during its examination.  The defense could not do so for Mr. Elliott's cross examination because it did not have the benefit of Visa's cooperation.  Given the limited time available, it was imperative that the defense be permitted to cross examine Mr. Elliott as efficiently as if he were testifying in person—but the inherent difficulties of remote cross examination frustrated the defense's ability to do so.

*Third*, Mr. Elliott repeatedly gave evasive answers to defense counsel's questions.  For example, in response to Mr. Burck's question "Eaze was not terminated, right?" Mr. Elliott began "[o]ur belief was – and very typical --."  Tr. 1965:12–13.  Mr. Burck interjected "Sir, before you

answer -- before you explain, my question was, was Eaze terminated?  Yes or no.  Then I'll let you explain."  Tr. 1965:14–16.  Yet Mr. Elliott still refused to give a straightforward "yes" or "no" answer.  Tr. 1965:17–23.

As another example, Mr. Burck asked Mr. Elliott whether he was "familiar based on [his] knowledge and experience in this field with the term 'proxy.'"  Tr. 1964:11–12.  Mr. Elliott responded "I'm not familiar with the way you use that term, no."  Tr. 1964:15.  Because that answer was unresponsive, Mr. Burck tried again:  "I just asked if you are familiar with the word 'proxy.'"  Tr. 1964:16–17.  Mr. Elliott responded, "I don't know what you mean by that."  Tr. 1964:18.  Of course, that answer implied that Mr. Elliott *was* familiar with the term "proxy" but instead of answering the question, he attempted to intuit what Mr. Burck "mean[t]" when using the term.

There were multiple similar instances during Mr. Burck's cross examination.  *See* Tr. 1935:2–25, 1941:16–1942:10, 1942:25–1943:8, 1961:24–1962:9.  During cross examination by Mr. Weigand's counsel, Mr. Elliott insisted that he "clarify" his answer to a simple question about whether he *recalled* his prior testimony—over defense counsel's objection that the stringent time limitations meant that there was insufficient time for an unnecessary "clarification."  Tr. 1976:4–22.

Defense counsel's ability to control Mr. Elliott was impaired by the fact that he was testifying remotely.  And Mr. Elliott's evasive answers further reduced the already limited time available for the defense to cross examine him.[18]

---

[18]   Although the defense has no way of knowing whether Mr. Elliott's truculence was deliberate, he had an incentive to run out the clock on the defense's cross examination because the defense's theory reflected poorly on Visa.  And Visa's counsel was present in the courtroom during

*Fourth*, the defense was unable to cross examine Mr. Elliott about a key piece of evidence. During Mr. Burck's cross examination, the government objected to the introduction of an exhibit, HAX-5014. *See* Tr. 1953:22–1957:12.[19]  The exhibit was a slide deck Mr. Elliott presented to Visa stakeholders, which included a slide on revenue generated and projected by the marijuana industry.  Tr. 1953:11–16.  This slide was crucial to the defense because it showed that Visa discussed with its stakeholders—including issuing banks, Tr. 1955:5–7—the potential profit from participating in the marijuana market.  HAX-5014 was a key piece of evidence in favor of the defense's "plausible deniability" theory that the card networks and the issuing banks know they are authorizing marijuana transactions and do not care because they profit from these transactions.

The defense was unable to question Mr. Elliott about this crucial piece of evidence.  The Court initially received HAX-5014 into evidence, Tr. 1954:9, but then sustained the government's objection on relevance grounds, Tr. 1957:12.  Because of the limited available time, the Court did not receive the benefit of a sidebar argument regarding the exhibit.  Eventually, after Mr. Elliott had been excused, the Court admitted a redacted portion of the exhibit into evidence, Tr. 2207:5–7.[20]  But the defense was unable to recall Mr. Elliott to the stand to ask him questions about the exhibit because that would have required setting up multiple cameras in the courtroom and required Mr. Elliott to return to Arnold & Porter's San Francisco office.

These difficulties highlight why remote cross examination is an inadequate substitute for in-person cross examination.  As importantly, they show why permitting Mr. Elliott to testify

Mr. Elliott's testimony, Tr. 1908:19–23, so Mr. Elliott may well have been aware that defense counsel's time for cross examination was limited.

[19]  The parties' back and forth about HAX-5014 also reduced the limited available time for cross examination.

[20]  The redacted version of HAX-5014 that the Court admitted into evidence is attached as Exhibit B.

remotely was especially prejudicial to the defendants' in this case.  Given the totality of the circumstances, a new trial is warranted.

### D.  The Court Should Not Have Changed the Jury Instructions After Summations

The Court should not have granted the government's motion to change the agreed-upon jury instructions after the charging conference.  The Court finalized the jury instructions before the parties presented closing arguments to the jury.  Tr. 2426:15–18 ("THE COURT: … [T]his will be the final version [of the jury instructions] except for any changes we make now. … This is it.").  Those instructions stated "if a perpetrator made misrepresentations designed to make marijuana purchases look like the purchases of other goods, the misrepresentations would be material if, had the banker known that the purchases were disguised and really were for marijuana, such knowledge would be reasonably likely to influence a reasonable banker in deciding whether to *authorize* the purchases."  ECF No. 246 at 17 (emphasis added).  Relying on those instructions, Mr. Akhavan's counsel, Mr. Tayback, stated in his summation that "the question for bank fraud isn't what the banks do after the fact; remember, it's what they do to authorize a transaction."  Tr. 2581:2–4.  The government objected to this characterization of the Court's instructions.  Tr. 2614:19–2615:23.  Mr. Tayback noted in response that he "use[d] the actual language from [the Court's] instruction."  Tr. 2615:25–2616:2.  The following morning, the Court announced that, in its view, Mr. Tayback had misstated the law and decided to amend the agreed-upon jury instructions to correct the perceived error.  Tr. 2619:2–20.

The Court should not have amended the jury instructions in response to this "misstatement" of the law.  Most importantly, Mr. Tayback did not mischaracterize the Court's instructions.  Those instructions directed the jury to focus on what information banks consider important in deciding whether to authorize transactions.  Because Mr. Tayback did no more than highlight that language to the jury, his argument was a fair characterization of the Court's instructions.  The government

disagreed with that characterization, but as the Court noted, the government had presented a competing characterization during its rebuttal summation.  Tr. 2620:22–23.  In that circumstance, the Court should not have intervened to change jury instructions that the Court had already said were final.

The late change to the jury instructions prejudiced the defendants.  When it was reading the instructions to the jury, the Court told the jury that "there may have been some misunderstanding in some of the statements that were made in one of the defense counsel's summations on this point."  Tr. 2637:18–20.  That statement undercut defense counsel's credibility with the jury.  And because the new instruction was not on the printed jury instructions that the Court distributed to the jury, the Court's new instruction may have drawn the jury's attention to the change.  When combined with the other issues discussed above, it is clear that the defendants did not receive a fair trial.  The Court should grant relief under Rule 33 if it does not enter a judgment of acquittal under Rule 29.

## CONCLUSION

For the foregoing reasons, as well as those raised at trial, which Mr. Akhavan re-raises and incorporates by reference, the Court should issue a judgment of acquittal or, in the alternative, vacate Mr. Akhavan's conviction and set a date for a retrial.

April 21, 2021                                  Respectfully submitted,

ROTHKEN LAW FIRM                QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ Ira Rothken                            /s/ William A. Burck
Ira Rothken                                 William A. Burck
Jared Smith                                  Derek L. Shaffer
3 Hamilton Landing                    Brian McGrail
Suite 280                                     1300 I St. NW #900
Novato, CA 94949                      Washington, DC 20005
Telephone: (415) 92404250       Telephone: (202) 538-8000
Email: ira@techfirm.net              Fax: (202) 538-8100
Email: jared@techfirm.net          Email: williamburck@quinnemanuel.com

Email: derekshaffer@quinnemauel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
Email: paulslattery@quinnemanuel.com

Sara C. Clark
711 Louisiana St., Ste. 500
Houston, Texas 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: saraclark@quinnemanuel.com