L31AWEI1ps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                                    20-cr-188 (JSR)

RUBEN WEIGAND and
HAMID AKHAVAN,

          Defendants.                    Trial

------------------------------x

                       New York, N.Y.

                       March 1, 2021
                       9:15 a.m.

Before:

             HON. JED S. RAKOFF

                       District Judge

L31AWEI1ps

1                                    APPEARANCES

2    AUDREY STRAUSS
          United States Attorney for the
3         Southern District of New York
     BY:  NICHOLAS FOLLY
4         TARA MARIE LA MORTE
          EMILY S. DEININGER
5         CHRISTOPHER J. DIMASE
          Assistant United States Attorneys
6
     DECHERT LLP
7         Attorneys for Defendant Weigand
     BY:  MICHAEL J. GILBERT
8         SHRIRAM HARID
          ANDREW J. LEVANDER
9         STEPHEN PELLECHI
               –and–
10   MICHAEL H. ARTAN
          Attorney for Defendant Weigand
11             –and–
     WILSON, SONSINI, GOODRICH
12        Attorneys for Defendant Weigand
     BY:  MORRIS J. FODERMAN
13        KATHERINE T. MCCARTHY

14   QUINN EMANUEL URQUHART & SULLIVAN, LLP
          Attorneys for Defendant Akhavan
15   BY:  WILLIAM A. BURCK
          CHRISTOPHER TAYBACK
16        SARA CLARK
          MARI HENDERSON
17        DEREK SHAFFER
          PAUL SLATTERY
18             –and–
     ROTHKEN LAW FIRM LLP
19        Attorneys for Defendant Akhavan
     BY:  IRA P. ROTHKEN
20        JARED R. SMITH

21   WILMER CUTLER PICKERING HALE AND DORR LLP
          Attorneys for Interested Party
22        Bank of America, N.A.
     BY:  JUSTIN GOODYEAR
23
     NELSON MULLINS RILEY & SCARBOROUGH LLP
24        Attorneys for Interested Party
          Circle Internet Financial, LLC
25   BY:  MATTHEW G. LINDENBAUM

1           THE COURT:  All right.  Since Mr. Akhavan is not here,

2     we'll deal first with some matters that relate only to

3     Mr. Weigand.  But first, will counsel please identify

4     themselves for the record.

5           MR. FOLLY:  Good morning, your Honor.  Nicholas Folly,

6     Tara La Morte, and Emily Deininger for the government.

7           MR. GILBERT:  Good morning, your Honor.  Michael

8     Gilbert on behalf of Mr. Weigand.

9           THE COURT:  Who else?  Oh, is that Mr. Weigand there?

10           MR. GILBERT:  Yes, that is Mr. Weigand sitting next to

11     me.

12           DEFENDANT WEIGAND:  Good morning, your Honor.

13           MR. TAYBACK:  Good morning, your Honor.  Christopher

14     Tayback on behalf of Mr. Akhavan.  Behind me is Mr. Burck and

15     Sara Clark.

16           THE COURT:  OK.  So two matters relating to

17     Mr. Akhavan.

18           The first is that because I didn't think it would be

19     useful to have his armed guard here in the courthouse, what I

20     arranged, and had my law clerk send an email to counsel, was

21     that the armed guard or guards would leave him, make sure he

22     has entered the security area, and then, at the end of the day,

23     we'll have to call them, they'll pick him up once he leaves the

24     courthouse.  Understood?

25           MR. GILBERT:  Yes.  Thank you, your Honor.  I believe

1    the guard came into the courthouse this morning.  But moving

2    forward it's not necessary --

3            THE COURT:  If they can come in, that's fine.  That's

4    even better.  Because otherwise I was going to suggest that you

5    would have to stick with Mr. Weigand at every moment.  If he

6    went to the men's room you'd have to go to the men's room, etc.

7    So you may prefer to have those important duties left to the

8    armed guard.

9            MR. GILBERT:  I will stick with him, your Honor.

10           THE COURT:  Very good.

11           We had a *Curcio* hearing some months ago, but my

12   understanding is there is some additional *Curcio* matter that

13   the government wishes to have Mr. Weigand questioned about?

14           MS. LA MORTE:  Your Honor, there is one additional

15   *Curcio* matter, but it came to Mr. Akhavan, not Mr. Weigand.

16           THE COURT:  Oh, I see.  Nothing as to Mr. Weigand.

17           MS. LA MORTE:  We were going to redo the *Curcio* that

18   occurred by videoconference with respect to Mr. Weigand.

19           THE COURT:  Because you interpret the statute as

20   requiring it to be in person?

21           MS. LA MORTE:  Yes, your Honor.  There is a -- when

22   you read that provision, it can be interpreted to require that

23   the --

24           THE COURT:  I don't interpret it that way, but, on the

25   other hand, since Mr. Akhavan is here, time is hanging heavy on

1    our hands, so go ahead.

2              MS. LA MORTE:  This would be with respect to

3    Mr. Weigand, your Honor.

4              THE COURT:  OK.  So, Mr. Weigand, I'm going to have

5    the government put all the questions that their little hearts

6    desire to you at this time regarding possible conflict.

7              Go ahead.

8              MS. LA MORTE:  Your Honor, would you like me to stand

9    for this?

10             THE COURT:  No.

11             MS. LA MORTE:  OK.

12             THE COURT:  Just as a general matter, because of the

13   pandemic arrangements, I don't think any lawyer needs to stand

14   when making objections or any other -- the only time he needs

15   to stand is when the jury comes into the courtroom and when the

16   jury leaves the courtroom, out of respect for the jury.  But

17   otherwise it's better if you actually sit but speak directly

18   into the mike.

19             While I'm thinking about that, let me mention about

20   objections.  So I do not allow so-called speaking objections.

21   So if you have an objection, you say either -- no more than

22   three words.  The first word is "Objection."  And the second

23   word is either your ground, like "hearsay," "foundation," etc.,

24   or the rule under the Federal Rules of Evidence on which you're

25   basing your objection, like 403.  So if you feel you need a

1    sidebar, you may ask for one.  Usually I will grant that.  But

2    I discourage having too many sidebars because, to do sidebars

3    and not have them heard by the jury, we really have to go into

4    a separate room down the hallway.  So it always takes a while.

5    The jury is there twiddling their thumbs.  So I think we need

6    to try to limit sidebars as much as possible.  But if you want

7    a sidebar, I will give you a sidebar, unless I think it's

8    utterly unnecessary.

9              Any question about that?

10             OK.  So go ahead with the *Curcio*.

11             MS. LA MORTE:  Mr. Weigand, how old are you?

12             DEFENDANT WEIGAND:  I'm 38.

13             MS. LA MORTE:  How far did you go in school?

14             DEFENDANT WEIGAND:  I have a bachelor's degree.

15             MS. LA MORTE:  Do you currently consult a doctor for

16   any condition?

17             DEFENDANT WEIGAND:  No.

18             MS. LA MORTE:  Are you currently under the influence

19   of alcohol or drugs of any kind?

20             DEFENDANT WEIGAND:  No.

21             MS. LA MORTE:  Are you feeling well enough to proceed

22   with this hearing today?

23             DEFENDANT WEIGAND:  Yes, I do.

24             MS. LA MORTE:  Are you currently represented by

25   Michael Gilbert and Shriram Harid of the law firm of Dechert

1    LLP and also by Michael Artan?

2              DEFENDANT WEIGAND:  Yes, I am.

3              MS. LA MORTE:  Mr. Gilbert, Mr. Harid, and Mr. Artan

4    are retained or appointed counsel?

5              DEFENDANT WEIGAND:  Retained.

6              MS. LA MORTE:  Do you know that Mr. Harid has applied

7    for a position with the U.S. Attorney's Office for the Southern

8    District of New York --

9              DEFENDANT WEIGAND:  Yes.

10             MS. LA MORTE:  -- that is the office that is

11   prosecuting you?

12             DEFENDANT WEIGAND:  Yes, I know.

13             THE COURT:  I'm sorry, excuse me.  What is the person

14   in the back -- either come in or stay out, but don't just stand

15   there with the door half open.

16             Go ahead.

17             MS. LA MORTE:  Mr. Weigand, because of Mr. Harid's

18   pending application for employment with the U.S. Attorney's

19   Office for the Southern District of New York, I wish to apprise

20   you of certain matters.  It is substantial to the idea of an

21   adequate defense in a criminal proceeding that your attorney

22   has no conflict or adverse interest of any kind.  That is to

23   say, he cannot, unless it is with your knowledge and consent,

24   have any conflicting interest in the case.  You have the right

25   to the assistance of a lawyer whose loyalty to you is undivided

and not subject to any factor that might intrude upon that
loyalty.  The purpose of this is to ensure that you have a full
devoted defense furnished to you by an attorney who has no
other possible interest of any kind in this matter.  Do you
understand that?

DEFENDANT WEIGAND:  Yes, I understand.

MS. LA MORTE:  Do you understand that Mr. Harid's
application for employment with the U.S. Attorney's Office for
the Southern District of New York as a prosecutor creates a
potential that he may have allegiances to interests that may be
adverse to your interests?

DEFENDANT WEIGAND:  You can see it that way maybe,
yes.

MS. LA MORTE:  Do you understand that by deciding to
proceed with Mr. Harid and Mr. Gilbert, you are waiving any
argument as to your sentencing that they were ineffective or
deficient in their representation of you because Mr. Harid
suffered from a conflict of interest by virtue of his
application for a position with the U.S. Attorney's Office?

DEFENDANT WEIGAND:  Yes, I understand.

MS. LA MORTE:  Have you discussed these conflict-of-
interest matters with Mr. Gilbert, Mr. Harid, and Mr. Artan?

DEFENDANT WEIGAND:  Yes, I did.

MS. LA MORTE:  Are you satisfied with their
representation of you?

1          DEFENDANT WEIGAND:  Yes, I am.

2          MS. LA MORTE:  If you could describe for me in your

3     own words your understanding of the conflict of interest that

4     potentially arises from Mr. Harid's representation of you while

5     pursuing his application for a position with the U.S.

6     Attorney's Office.

7          DEFENDANT WEIGAND:  Yeah.  I think it might be that he

8     would represent me less effectively to -- that's -- because

9     trying to get accepted as a prosecutor.

10          (Pause)

11          DEFENDANT WEIGAND:  So you couldn't hear?  OK.

12          I said, you might think that he is defending me less

13     effectively because he thinks that it's increasing his chance

14     to be selected as a U.S. Attorney.

15          MS. LA MORTE:  Mr. Weigand, do you understand that you

16     have a right to consult with a lawyer other than Mr. Gilbert

17     and Mr. Harid in order to determine whether you wish Dechert to

18     represent you?

19          DEFENDANT WEIGAND:  Yes, I know.

20          MS. LA MORTE:  This is a question for Mr. Harid.

21     Mr. Harid, have you discussed the potential conflicts of

22     interest with Mr. Weigand?

23          MR. HARID:  Yes, I have.

24          MS. LA MORTE:  And do you feel that he understands the

25     possible risks of being represented by a lawyer with a

1    potential conflict of interest?

2            MR. HARID:  I do, yes.

3            MS. LA MORTE:  Mr. Harid, is there anything else you

4    would like the Court to state or inquire about in this regard?

5            MR. HARID:  Nothing else.  Thank you.

6            MS. LA MORTE:  Mr. Weigand, would you like the

7    opportunity to consult with another attorney?

8            DEFENDANT WEIGAND:  No.

9            MS. LA MORTE:  Do you still wish to proceed with

10   Mr. Harid and Dechert as your attorneys in this case?

11           DEFENDANT WEIGAND:  Yes, I want.

12           MS. LA MORTE:  Have you received any inducements,

13   promises, or threats with regard to your choice of counsel in

14   this case?

15           DEFENDANT WEIGAND:  No.

16           MS. LA MORTE:  Do you agree to waive any and all

17   future arguments on appeal or otherwise that you were denied

18   effective assistance of counsel because of Mr. Harid's pursuit

19   of a position as a federal prosecutor with the Southern

20   District of New York?

21           DEFENDANT WEIGAND:  Yes.

22           MS. LA MORTE:  Is your waiver of your right to

23   conflict-free representation voluntary?

24           DEFENDANT WEIGAND:  Yes.

25           MS. LA MORTE:  No further questions from the

1    government.

2              THE COURT:  All right.

3          I find that Mr. Weigand fully understands the

4    potential conflict and has waived the conflict and can proceed.

5          I think we can proceed with the rulings on the motions

6    in limine for both parties, or all three parties, because this

7    could have taken the form of a written order from me, and

8    therefore it's not necessary that Mr. Akhavan be present, but

9    of course I will leave it to his counsel to inform him of those

10   rulings when he arrives.

11         This is in no particular order, but I would note for

12   the record first, there is no right to a motion in limine.  You

13   will not find motions in limine listed anywhere in the federal

14   rules.  They are a convenience for the parties, and I try to

15   accommodate those conveniences.  However, every one of my

16   rulings is subject to reconsideration if a party so-called

17   opens the door.  So if I've excluded some evidence and then the

18   door is opened, then the adversary party can reraise the

19   question at that time.  So being very aware of that, there may

20   be other reasons for reconsideration, but that would be usually

21   the only one.

22         So the first motion that I want to rule on is the

23   government's motion in limine no. 4, to preclude evidence or

24   argument regarding whether it was "reasonable" for banks to

25   process marijuana-related transactions.  That motion is

1   granted, and that area will be excluded.

2          The second is the government's motion in limine no. 2

3   to preclude evidence or argument regarding federal enforcement

4   of marijuana laws, legalization of marijuana in certain states

5   and/or countries, and efforts to legalize marijuana.  That

6   motion is granted in part, excluding evidence relating to

7   federal efforts to legalize marijuana or to offer safe harbors

8   to banks.  In all other respects, I will take it up as the

9   matter is raised.  So with respect to these motions in limine,

10  if I reserve on any matter, then when a question is about to be

11  put to a witness -- here's Mr. Akhavan.

12          All right.  Mr. Akhavan is here.  So let me interrupt

13  the motions in limine.  Let's do the *Curcio* hearing with

14  respect to Mr. Akhavan.

15          MS. LA MORTE:  Yes, your Honor.  There are two

16  matters, two *Curcio*s, that have to occur with respect to

17  Mr. Akhavan.  One is the one that we had conducted before.  And

18  then the other one is a separate potential conflict for which

19  the government submitted a letter yesterday.  And so I will

20  start with the one that we had already done before.

21          THE COURT:  That's fine.

22          MS. LA MORTE:  Mr. Akhavan, how old are you?

23          DEFENDANT AKHAVAN:  42.

24          THE COURT:  You want to bring the microphone --

25          DEFENDANT AKHAVAN:  42, ma'am.

1              THE COURT:  Very good.

2              MS. LA MORTE:  How far did you go in school?

3              DEFENDANT AKHAVAN:  High school, ma'am.

4              MS. LA MORTE:  Do you currently consult a doctor or

5    mental health professional for any condition?

6              DEFENDANT AKHAVAN:  No, ma'am.

7              MS. LA MORTE:  Are you currently under the influence

8    of alcohol, drugs, or medication of any kind?

9              DEFENDANT AKHAVAN:  No, ma'am.

10             MS. LA MORTE:  Do you understand what is happening

11   today?

12             DEFENDANT AKHAVAN:  Yes, ma'am.

13             MS. LA MORTE:  Mr. Akhavan, do you wish to have Quinn

14   Emanuel Urquhart & Sullivan, which I will abbreviate to Quinn

15   Emanuel, including attorneys Christopher Tayback and William

16   Burck, represent you in this matter?

17             DEFENDANT AKHAVAN:  Yes, ma'am.

18             THE COURT:  Do you wish to have Ira Rothken of the

19   Rothken Law Firm represent you in this matter?

20             DEFENDANT AKHAVAN:  Yes, ma'am.

21             MS. LA MORTE:  Have you been satisfied with the

22   services Quinn Emanuel provided you so far with respect to

23   matter?

24             DEFENDANT AKHAVAN:  Yes, ma'am.

25             MS. LA MORTE:  Has Quinn Emanuel represented you in

1   other matters which occurred before this one?

2             DEFENDANT AKHAVAN:  No, ma'am.

3             MS. LA MORTE:  Turning to Mr. Rothken, have you been

4   satisfied with the services Mr. Rothken has provided you so far

5   with respect to this matter?

6             DEFENDANT AKHAVAN:  Yes, ma'am.

7             MS. LA MORTE:  Has Mr. Rothken represented you in

8   other matters which occurred before this one?

9             DEFENDANT AKHAVAN:  Not me directly, but my company.

10            MS. LA MORTE:  Were you satisfied with Mr. Rothken's

11  representation of your company in the prior matter?

12            DEFENDANT AKHAVAN:  Yes, ma'am.

13            MS. LA MORTE:  Your Honor, previously when we had done

14  this, we had referred to two particular individuals that are

15  involved as subject one and subject two.  May I have a moment

16  to consult as to whether we should use their names or continue

17  to refer to them in that manner?

18            THE COURT:  I think you should.

19            MS. LA MORTE:  Thank you.

20            Thank you, your Honor.

21            THE COURT:  That reminds me of something else I want

22  to check while it's on my mind.  The government has given me

23  three immunity orders.  When you're about to call a witness who

24  needs immunity, ask for a sidebar, and we will bring the

25  witness into the sidebar area, and I'll question him as to his

```
 1    taking the Fifth and I'll grant him immunity, and then and only
 2    then will I sign the order.  So that is my practice, but we do
 3    that out of the presence of the jury.
 4              OK.  Go ahead.
 5              And one other thing.  What's the full name of Quinn
 6    Emanuel?
 7              MS. LA MORTE:  I probably butchered it when I
 8    pronounced it.  I can let them tell you.
 9              MR. TAYBACK:  Quinn Emanuel Urquhart & Sullivan, your
10    Honor.
11              THE COURT:  I think the worst fate of the world is to
12    the third or fourth name in any law firm.
13              MS. LA MORTE:  OK, Mr. Akhavan.  Has Quinn Emanuel
14    informed you that they represent Ardhashir Akhavan, your
15    brother --
16              DEFENDANT WEIGAND:  Yes, ma'am.
17              MS. LA MORTE:  -- and Guy Mizrachi, who the government
18    asserts are subjects of the bank fraud conspiracy charge
19    brought against you in this case?
20              DEFENDANT AKHAVAN:  Yes, ma'am.
21              MS. LA MORTE:  Have your attorneys discussed with you
22    their representation of Ardhashir Akhavan?
23              DEFENDANT AKHAVAN:  Yes, ma'am.
24              MS. LA MORTE:  Have they discussed with you their
25    representation of Guy Mizrachi?
```

1          DEFENDANT AKHAVAN:  Yes, ma'am.

2          MS. LA MORTE:  Do you understand that Quinn Emanuel

3    has a duty of loyalty to your brother and Mr. Mizrachi and that

4    they are required by their duty of loyalty to serve the best

5    interests of your brother and Mr. Mizrachi as well as your best

6    interests?

7          DEFENDANT AKHAVAN:  Yes, ma'am.

8          MS. LA MORTE:  Do you understand that your attorney's

9    representations of your brother and Mr. Mizrachi may put them

10   in a position where their duty to them conflicts with their

11   duty to you?

12         DEFENDANT AKHAVAN:  Yes, ma'am.

13         MS. LA MORTE:  And do you understand that it may be in

14   the best interests of your brother and Mr. Mizrachi to take

15   certain positions or actions that may be harmful to your

16   interest in this case?

17         DEFENDANT AKHAVAN:  Yes, ma'am.

18         MS. LA MORTE:  And do you understand that if you

19   continue to be represented by Quinn Emanuel, they cannot advise

20   or help you in doing anything that would hurt your brother or

21   Mr. Mizrachi, even if it's in your best interests that they do

22   so?

23         DEFENDANT AKHAVAN:  Yes, ma'am.

24         MS. LA MORTE:  Are you aware that your attorney may

25   have learned information from your brother and Mr. Mizrachi

1   that may be helpful in defending you but they are absolutely

2   prohibited from using it to defend you because of the

3   attorney-client privilege?

4              DEFENDANT AKHAVAN:  Yes, ma'am.

5              MS. LA MORTE:  Do you understand that Quinn Emanuel

6   cannot help you in providing assistance to the government if

7   you wish to do so that might hurt your brother or Mr. Mizrachi,

8   even if it turns out that providing assistance for the

9   government might be in your best interests?

10             DEFENDANT AKHAVAN:  Yes, ma'am.

11             MS. LA MORTE:  Do you understand that your attorneys

12  may not wish to take positions in your case before, during

13  trial, or at sentencing, that are critical of or harmful to the

14  interests of your brother or Mr. Mizrachi, even if criticizing

15  one of them -- one or both of them might be helpful for your

16  defense?

17             DEFENDANT AKHAVAN:  Yes, ma'am.

18             MS. LA MORTE:  Do you understand that should you go to

19  trial, Quinn Emanuel may refrain from making certain

20  arguments -- well, we are going to trial -- at your trial or at

21  some other proceeding, even though such arguments may be

22  beneficial to you, because of their representation of

23  Mr. Mizrachi and your brother?

24             DEFENDANT AKHAVAN:  Yes, ma'am.

25             MS. LA MORTE:  So that we are sure that you fully

1  understand these issues, could you describe in your own words

2  your understanding of the potential problems created by Quinn

3  Emanuel's role as your attorney in this case and as counsel for

4  your brother and Mr. Mizrachi?

5      DEFENDANT AKHAVAN:  I understand it.  We've been

6  through it and had a *Curcio* hearing before, and they explained

7  everything to me, and I -- I'm good with it.

8      MS. LA MORTE:  So you do understand that your

9  attorneys may wish to take certain positions in your case that

10 they are unable to take due to their duty of loyalty to

11 Mr. Mizrachi and your brother?

12     DEFENDANT AKHAVAN:  Yes, ma'am.  He is my brother.

13     MS. LA MORTE:  Do you understand that in every

14 criminal case, including this one, a defendant is entitled to

15 assistance of counsel whose loyalty to him is undivided?

16     DEFENDANT AKHAVAN:  Yes, ma'am.

17     MS. LA MORTE:  Have you had the opportunity to speak

18 with Quinn Emanuel about the conflict of interest issues that

19 have arisen because of their representation of your brother?

20     DEFENDANT AKHAVAN:  Yes, ma'am.

21     MS. LA MORTE:  And with respect to their

22 representation of Mr. Mizrachi, have you had the opportunity to

23 speak with them about that?

24     DEFENDANT AKHAVAN:  Yes, ma'am.

25     MS. LA MORTE:  Has Quinn Emanuel informed you that

1    they currently also represent Quantum Solutions?

2              DEFENDANT AKHAVAN:  Yes, ma'am.

3          MS. LA MORTE:  Has Mr. Rothken informed you that he

4    also currently represents Quantum Solutions?

5              DEFENDANT AKHAVAN:  Yes, ma'am.

6          MS. LA MORTE:  Are you aware that the government

7    asserts that Quantum Solutions is a subject of the bank fraud

8    conspiracy charge in this case?

9              DEFENDANT AKHAVAN:  Yes, ma'am.

10         MS. LA MORTE:  And you're aware that Mr. Rothken

11   previously represented Quantum Solutions in civil litigation

12   that involved some of the same allegations as those charged in

13   this criminal case against you?

14         MR. TAYBACK:  May I have one moment, your Honor?

15         DEFENDANT AKHAVAN:  I'm aware that he sent some emails

16   that may come up in the course of the trial, and it's -- I'm OK

17   with it.

18         MS. LA MORTE:  So that is a different issue.  Just to

19   be clear, I'm inquiring as to whether you understand that

20   Mr. Rothken had previously represented Quantum Solutions in a

21   civil case that involved some of the same allegations that are

22   at issue in this criminal case.

23         DEFENDANT AKHAVAN:  Yes, ma'am.

24         MS. LA MORTE:  Has Quinn Emanuel discussed with you

25   their representation of Quantum Solutions?

1              DEFENDANT AKHAVAN:  Yes, ma'am.

2              MS. LA MORTE:  And has Mr. Rothken discussed with you

3     his current and previous representation of Quantum Solutions?

4              DEFENDANT AKHAVAN:  Yes, ma'am.

5              MS. LA MORTE:  So previously we discussed the duty of

6     loyalty that an attorney owes a client.  Do you understand that

7     Quinn Emanuel and Mr. Rothken both owe a duty of loyalty to the

8     company?

9              DEFENDANT AKHAVAN:  Yes, ma'am.

10             MS. LA MORTE:  And do you understand that the fact

11    that your attorneys represent both you and Quantum Solutions

12    may lead them to have divided loyalties between yourself and

13    the company?

14             DEFENDANT AKHAVAN:  Yes, ma'am.

15             MS. LA MORTE:  Do you understand that your attorneys

16    may have an incentive to put the interests of the company

17    before yours?

18             DEFENDANT AKHAVAN:  Yes, ma'am.

19             MS. LA MORTE:  Do you understand that your attorneys

20    may have learned certain information from their previous or

21    current representation of the company that is beneficial to

22    your defense, if the government doesn't grant permission, your

23    lawyers would be forbidden from using this information when

24    they're representing you?

25             DEFENDANT AKHAVAN:  Yes, ma'am.

1          MS. LA MORTE:  Do you understand that it may be in the

2     best interests of the company to take certain positions --

3     Quantum Solutions -- to take certain positions or actions that

4     are harmful to your interests in this case?

5          DEFENDANT AKHAVAN:  Yes, ma'am.

6          MS. LA MORTE:  Do you understand that your attorneys

7     may not wish to take positions on your behalf throughout the

8     very stages of this case that are critical of Quantum Solution,

9     even if criticizing that company may be helpful to your

10    defense?

11         DEFENDANT AKHAVAN:  Yes, ma'am.

12         MS. LA MORTE:  Do you understand that your attorneys

13    may be limited in making arguments about your level of

14    involvement in the offense, the role in the offense, and your

15    culpability?

16         DEFENDANT AKHAVAN:  Yes, ma'am.

17         MS. LA MORTE:  Mr. Akhavan, do you understand that you

18    are entitled to an attorney who only has your interests in mind

19    and not the interests of any other person or third party?

20         DEFENDANT AKHAVAN:  Yes, ma'am.

21         MS. LA MORTE:  Have you received any inducements,

22    promises, or threats with regard to your choice of counsel in

23    this case?

24         DEFENDANT AKHAVAN:  No, ma'am.

25         MS. LA MORTE:  Do you understand, if you choose to

continue with representation by Quinn Emanuel and Mr. Rothken,

you're waiving your right to be represented solely by attorneys

who have no potential conflict of interest?

DEFENDANT AKHAVAN:  Yes, ma'am.

MS. LA MORTE:  And do you agree that if the Court

permits you to proceed with Quinn Emanuel and Mr. Rothken, in

the event that you are convicted, you will not be permitted to

make any argument, on appeal or otherwise, based on the

representation of Quinn Emanuel and/or Mr. Rothken and the

conflicts or potential conflicts that we've been discussing?

DEFENDANT AKHAVAN:  Yes, ma'am.

MS. LA MORTE:  Do you agree to waive and give up any

argument of that kind?

DEFENDANT AKHAVAN:  I do.

MS. LA MORTE:  Do you wish to consult with -- you have

the right to consult with separate counsel if you wish

regarding these potential conflicts of interest.  Do you wish

to do that?

DEFENDANT AKHAVAN:  No, thanks.

MS. LA MORTE:  Your Honor, no further questions from

the government.

THE COURT:  All right.  Thank you very much.

I find that Mr. Akhavan is fully aware of the

potential conflicts that have been raised with him and that he

has knowingly and voluntarily waived those conflicts.  So he

1    can continue to be represented by Quinn Emanuel.

2            Going back to the motions --

3            MS. LA MORTE:  Your Honor, there was one more

4    potential conflict, the new potential conflict.

5            THE COURT:  Oh, yes.  I'm sorry.  Go ahead.

6            MS. LA MORTE:  I'll turn it over to Mr. Folly for

7    that.

8            MR. FOLLY:  Mr. Akhavan, you stated earlier that you

9    are represented by Christopher Tayback and William Burck from

10   Quinn Emanuel, as well as Ira Rothken of the Rothken Law Firm.

11   Is that correct?

12           DEFENDANT AKHAVAN:  Yes, sir.

13           MR. FOLLY:  Are they retained counsel?

14           DEFENDANT AKHAVAN:  Yes, sir.

15           MR. FOLLY:  Are you aware that, at trial, certain

16   evidence could be introduced that refers to Mr. Rothken's

17   involvement in negotiations with the company Eaze, regarding an

18   exclusive processing relationship with your company?

19           DEFENDANT AKHAVAN:  Yes, sir.

20           MR. FOLLY:  Because of this, it is possible that you

21   may wish to advance defense theories that might reflect

22   adversely on Mr. Rothken and he might not want to pursue those

23   theories, because it might reflect adversely on him.  Do you

24   understand that?

25           DEFENDANT AKHAVAN:  Yes, sir.

1              MR. FOLLY:  Because it could create a potential

2      conflict of interest, I wish to advise you of certain matters.

3      You should understand that, under the Constitution and the laws

4      of this country, you are entitled to the aid and assistance of

5      counsel at all times in these proceedings.  You are entitled to

6      counsel of your own choice unless there is a strong legal

7      reason for disqualifying that counsel.  Do you understand that?

8              DEFENDANT AKHAVAN:  Yes, sir.

9              MR. FOLLY:  You have the right to the assistance of a

10     lawyer whose loyalty to you is undivided and not subject to any

11     factor that might intrude upon that loyalty.  Do you understand

12     that?

13             DEFENDANT AKHAVAN:  Yes, sir.

14             MR. FOLLY:  Do you understand that because Mr. Rothken

15     might be mentioned at this trial as someone who participated in

16     some of the underlying events that might be discussed at this

17     trial, it creates the potential that he may have interests that

18     may be adverse to your own interests?  Do you understand that?

19             DEFENDANT AKHAVAN:  Yes, sir.

20             MR. FOLLY:  Do you understand that if you proceed with

21     Mr. Rothken, you are waiving any argument as to your sentencing

22     that your lawyers were ineffective or deficient in their

23     representation of you because Mr. Rothken suffered from a

24     conflict of interest by virtue of his involvement in some of

25     the underlying events in this case?

1          DEFENDANT AKHAVAN:  Yes, sir.

2          MR. FOLLY:  Have you had the opportunity to discuss

3    these conflicts-of-interest matters that I've been asking you

4    about with Mr. Burck and Mr. Tayback?

5          DEFENDANT AKHAVAN:  Yes, sir.

6          MR. FOLLY:  Are you satisfied with their

7    representation of you?

8          DEFENDANT WEIGAND:  I am.

9          MR. FOLLY:  Can you please describe in your own words

10   your understanding of the conflict of interest that potentially

11   may arise from Mr. Rothken's representation of you when

12   evidence may be introduced at this trial that refers to his

13   involvement in some of the underlying events in this case.

14         DEFENDANT AKHAVAN:  Mr. Tayback and Mr. Burck have

15   explained it to me, and I understand it, and I'm OK with it.

16         MR. FOLLY:  Can you explain the conflict in your own

17   words?

18         DEFENDANT AKHAVAN:  I understand that Ira, he knows

19   about some agreements and that might cause conflict between him

20   and my interests.

21         MR. FOLLY:  And you understand that he may give advice

22   as a result of that that diverges from your own interests?

23         DEFENDANT AKHAVAN:  I do.

24         MR. FOLLY:  Mr. Tayback, have you discussed the

25   potential conflict of interest with Mr. Akhavan?

1              MR. TAYBACK:  I have.

2              MR. FOLLY:  Do you feel he understands the possible

3    risks of being represented by a lawyer with a potential

4    conflict of interest?

5              MR. TAYBACK:  I do.

6              MR. FOLLY:  Is there anything else you would like to

7    ask of Mr. Akhavan here today in this regard?

8              MR. TAYBACK:  No.

9              MR. FOLLY:  Mr. Akhavan, is there anything that you

10   wish to have explained further to you?

11             DEFENDANT AKHAVAN:  No, sir.

12             MR. FOLLY:  Do you still wish to proceed with

13   Mr. Rothken as one of your attorneys in this case?

14             DEFENDANT AKHAVAN:  Yes, sir.

15             MR. FOLLY:  Have you received any inducement,

16   promises, or threats with regard to your choice of counsel in

17   this case?

18             DEFENDANT AKHAVAN:  No, sir.

19             MR. FOLLY:  Are you agreeing to waive any and all

20   future arguments on appeal or otherwise that you were denied

21   effective assistance of counsel because of the conflict of

22   interest that we discussed with you here today?

23             DEFENDANT AKHAVAN:  Yes, sir.

24             MR. FOLLY:  Is your waiver of your right to

25   conflict-free counsel voluntary?

1          DEFENDANT AKHAVAN:  Yes, sir.

2          MR. FOLLY:  No further questions, your Honor.

3          THE COURT:  So I find that Mr. Akhavan fully

4    understands this additional potential conflict and has waived

5    any such conflict and may continue to be represented by Quinn

6    Emanuel, et al., throughout this trial.

7          All right.

8          (Discussion held off the record)

9          THE COURT:  All right.  So we'll continue with the

10   motions in limine.

11         So I was talking about the government's motion in

12   limine no. 2 to preclude evidence or argument regarding federal

13   enforcement of marijuana laws, legalization of marijuana in

14   states and/or countries, and efforts to legalize marijuana

15   federally.  And I had granted the latter part, excluding

16   evidence relating to federal efforts to legalize marijuana or

17   to offer safe harbors to the banks.  And actually I think the

18   defense has not opposed an exclusion.

19         With respect to the rest, as I was beginning to tell

20   you before, I don't think I can rule across the board at this

21   point.  Therefore, before any counsel wants to put a question

22   to the witness related to the federal enforcement of marijuana

23   laws or the legalization of marijuana in certain states and/or

24   countries, they need to ask for a sidebar.  We'll take it up at

25   the sidebar at that time.

1          I'm skeptical that this is really stuff that is the

2     subject of testimony.  For example, the fact that marijuana is

3     legal in certain states I think is an issue of law, which a

4     party can ask and I take judicial notice of the law for that

5     purpose if it's otherwise relevant.  But usually matters of law

6     are not properly a matter of testimony.

7          With respect to the defendant's argument that the

8     federal government ensure the banks that it will not enforce

9     federal law regarding marijuana in states where it was legal

10    and that this is part of their materiality or immateriality

11    argument, are you planning to do that through your own

12    witnesses?  It sounds like hearsay to me.

13         MR. TAYBACK:  Your Honor, it is certainly through our

14    own witnesses.  Our expert -- we have an expert that we

15    proffered, Mr. Gardovan.  But more importantly --

16         THE COURT:  I don't see how an expert can -- it's a

17    fact matter.  It doesn't -- all right.  Go ahead.

18         MR. TAYBACK:  But I would say, more importantly, I

19    think the whole business at the center of this case is the

20    marijuana delivery service.  I think it's reasonable to be able

21    to ask witnesses, some of whom deliver -- continue to work for

22    a company that delivers marijuana.  They do so with the belief

23    they're not going to be prosecuted federally.

24         THE COURT:  That's a different -- their belief is

25    different, from at least what you said to me.  You said in your

papers that, quote, the federal government assured the banks
that it would not enforce federal law regarding marijuana in
states where it is legal.  That sounds to me like a hearsay
issue.

          MR. TAYBACK:  I do believe it goes to -- and this, I
believe, relates to an earlier ruling your Honor made with
respect to government's motion no. 4.  The standard, I believe,
should be whether the allegedly deceptive statement or act is
capable of influencing an objectively reasonable bank.  Our
view is that the knowledge and state of affairs of the banks,
as it relates to federal enforcement, influences that equation,
certainly is relevant to it.

          THE COURT:  The issue I'm raising is not -- I have
some questions about relevancy, but the issue I'm raising is
hearsay.

          MR. TAYBACK:  I believe it's not hearsay if it goes to
the state of mind of why the banks do what they do and why they
don't do other things.

          THE COURT:  Well, we'll see how it comes out.  As I
indicated, I'm not ruling one way or the other at this time.

          The next one is government motion in limine no. 3, to
preclude evidence or argument that the victim banks purportedly
failed to act with sufficient diligence or acted negligently in
enforcing policies prohibiting transacting business involving
marijuana transaction.  That motion is granted.

1          The next one is government motion in limine no. 1, to

2     preclude evidence or argument that the scheme did not cause

3     pecuniary loss.  I think I'm going to want further argument on

4     that after we have picked the jury or after I finish the --

5     give you my rulings.

6          The next one is -- again, this is in no particular

7     order -- Mr. Akhavan's motion in limine no. 5 to preclude

8     evidence regarding transaction lines and commercial settlement

9     accounts.  That motion is denied.

10         The next one is Akhavan motion in limine no. 4, to

11    preclude the government from eliciting disguised expert

12    testimony from certain witnesses.  The details there do not

13    sound to me like disguised expert testimony.  So that motion is

14    denied but without prejudice; if there is a particular answer

15    that the parties think goes beyond the pale, I'll reconsider,

16    perhaps.

17         The next one is the government's separate motion,

18    which doesn't have a number, to preclude defendants' various

19    experts and to preclude -- this includes both the three experts

20    for Mr. Akhavan and the two experts for Mr. Weigand.  I think

21    that with respect to each of those, some of their testimony may

22    be admissible and some may not.  And therefore I think we'll

23    probably need to take, at a break shortly before the first

24    expert is proffered, a sidebar or preferably we can do this

25    simply end of the day before the first expert is offered, to go

1    over in more detail as to what I will permit and what I will

2    not permit in that regard.

3            In that, I should mention, the jury will sit from 9:45

4    to 3:45, in accordance with the pandemic rules of this

5    courthouse.  Lucky you, you get to come in at 9 o'clock every

6    morning so we can discuss things like what I just described,

7    and you get to stay who knows how long for the same purpose.

8    So just bear that in mind.

9            The next -- I think I also have real doubts for, just

10   to give an example, about Mr. Artan saying he's going to be a

11   future government employee or something like that.  I think

12   that is clearly prejudicial.

13           OK.  So, next is the government's motion in limine to

14   admit certain categories of evidence as direct evidence of the

15   defendants' bank fraud conspiracy or, in the alternative,

16   pursuant to Rule 404(b).  That motion is granted.

17           The next is the government's motion in limine no. 7,

18   to preclude evidence that the defendants failed to engage in

19   fraud with respect to other merchants and banks.  That motion

20   is granted in part.  But I think there may be instances where,

21   for example, the defendants seek to show that a document that

22   is being offered pertains to another business rather than Eaze,

23   a legitimate business, that would not be excluded.  So that's

24   the line I'm drawing for now.

25           Next we have Weigand's motion in limine no. 4,

1    Akhavan's motion in limine no. 1, and government motion in

2    limine no. 9, all relating to prior arrests, prior convictions,

3    prior bad acts, wealth, and lifestyle.

4              (Continued on next page)

L31PWEIh2

1          THE COURT:  I will grant the defendants' motions

2    regarding the exclusion of evidence relating to wealth,

3    lifestyle, and I don't think I need to reach the question of

4    prior convictions of Mr. Akhavan unless and until the

5    government's case is closed and he tells me he is going to take

6    the stand.

7          In that regard, while I'm thinking about it, while the

8    defense needs to tell me who their witnesses are going to be,

9    they've already given me a list, and also, when we get down to

10   it, who's coming next on any given day, the one thing that

11   defense doesn't have to tell me until the close of the

12   government's case is whether a given defendant will take the

13   stand, but then you have to tell me.  If, at that point, it's

14   dependent on a ruling on prior convictions, I will make the

15   ruling then.  Before you tell me otherwise, you'll just wait.

16         THE COURT:  Mr. Weigand's motions in limine two and

17   three to preclude documents seized from Weigand's laptop, where

18   no witness can testify to their substance or whether there's no

19   evidence to show that Weigand had the evidence on his laptop

20   during conspiracy, generally that motion is denied, but there

21   may be specific items where it's a closer call and it will be

22   taken up at the time.

23         Next, and this is a good example why the broad motions

24   in limine that you guys submitted were perfectly appropriate.

25   Some of these more nitty-gritty things, really, the Court can't

L31PWEIh2

1    for sure rule on them until the specific testimony is elicited

2    or the specific document is offered.  So again, if you know

3    it's been challenged in a motion in limine, you need to alert

4    me to that so that if we have to have a sidebar before we get

5    before get to jury, we'll manage that.

6         Okay.  The Weigand motion in limine No. 5 and the

7    related Akhavan motion in limine No. 7 to preclude evidence of

8    Telegram, WhatsApp and ProtonMail, on the current showing, I

9    would grant that motion, but I think that the government may be

10   able to lay an adequate foundation.  It's, again, not really

11   possible to give a definitive ruling at this time.

12        And then there is Mr. Akhavan's motion in limine No. 2

13   to exclude Farm Solutions and MasterCard documents produced in

14   response to the grand jury subpoena.  That motion is denied.

15        And then there's Mr. Akhavan's motion in limine No. 6

16   to require the government to prove the prerequisites for

17   admission of certain alleged co-conspirator statements outside

18   the presence of jury and prior to admitting such statements

19   into evidence.  That motion is denied.  Once again, there may

20   be a particularly intricate situation that might arise with a

21   particular piece of testimony settled at the sidebar, but as a

22   general matter, that motion is denied.

23        And finally -- no, not finally.  Next, government's

24   motion in limine No. 5 and Weigand's motion in limine No. 6

25   relating to Mr. Weigand's post-arrest statements, I think the

L31PWEIh2

1    best I can tell you at this point, we can discuss it later

2    today, but is some come in and some don't.  So we'll take it up

3    further later.

4            Next, Akhavan's motion in limine No. 3 to preclude the

5    government from referring to victims or to shell or proxy

6    entities, that motion is denied.

7            And finally, government motion in limine No. 6 to

8    preclude the defendants from asserting a presence of counsel

9    defense.  Basically, I'm going to deny that motion because I

10   think -- I'm sorry.  Actually, I take that back.  The problem

11   there is anything that would suggest an advice-of-counsel

12   defense is going to be precluded.  So it's really a question of

13   how the question is phrased, and we'll take it up when the

14   question is raised.

15           Okay.

16           (Pause)

17           THE DEPUTY CLERK:  Ten more minutes.

18           MS. LA MORTE:  Your Honor?

19           THE COURT:  Yes.

20           MS. LA MORTE:  One additional motion that I don't

21   believe that your Honor has spoken about, and that had to do

22   with the cross of the government's witnesses on certain matters

23   pertaining to, for example, prior drug use and the like.

24           THE COURT:  Yes, that motion is granted.

25           MS. LA MORTE:  Thank you.

L31PWEIh2

1          MR. GILBERT:  Your Honor, with regard to the motions

2     in limine relating to the negligence of the bank, do I

3     understand your ruling to permit the defense to argue that the

4     issuing banks were --

5          THE COURT:  I'm sorry, you need to speak louder.

6          MR. GILBERT:  Do I understand the ruling to,

7     nonetheless, permit the defense to argue that the banks were

8     willfully blind, not simply negligent?

9          THE COURT:  No.  The one motion I wanted to hear more

10    argument on -- and since we've got ten minutes, we may as

11    well -- is the motion, which I know is close to the heart of

12    the defense in this case, regarding that the scheme did not

13    cause pecuniary loss.

14         So let me hear from -- I guess this was the

15    government's motion to preclude evidence or argument that the

16    scheme did not cause pecuniary loss, but let me hear first, if

17    I may, from defense counsel as to what issue they think this is

18    relevant to.

19         MR. BURCK:  Thank you, your Honor.  Bill Burck, your

20    Honor.  Your Honor, we think that the pecuniary loss issue is

21    part of our defense.  As the Court recognized in the Circle

22    opinion about the subpoena that the banks didn't care about

23    these transactions, they were immaterial to the banks, and the

24    reason why we think the pecuniary loss issue is important to

25    that is because it's sort of the flip side of the fact that the

L31PWEIh2

1      banks actually made money, not in the sense of any pejorative

2      sense, but they had fees that they get for processing these

3      transactions.

4           And there's nothing in the evidence to suggest that

5      they didn't get their fees or there was some attendant loss

6      that they suffered by processing these transactions.  And to

7      us, that goes right to the core of why the banks don't care,

8      and they know what's going on, and they allow it to happen, and

9      they continue to allow it to happen because --

10          THE COURT:  Let me make sure I understand what you

11     expect your evidence will show in that regard.  The government,

12     as I understand it, will be introducing evidence that the

13     defendants disguised these marijuana transactions to look like

14     transactions of other goods and services because they believed

15     that the banks would not otherwise process them and that,

16     therefore, they could offer a service to marijuana purchasers

17     who wanted to use credit cards by disguising that.

18          Your defense, so far as it relates to this issue, as

19     near as I can tell is, yeah, that may be what the defendants

20     thought, but they were wrong.  Objectively, the banks couldn't

21     care less and, therefore, it was immaterial to them whether it

22     said marijuana or widgets.  Do I have all that right?

23          MR. BURCK:  Your Honor, I think that's very close to

24     right.  I think the only thing I'd add is that -- and it's not

25     a question of willful blindness in the sense of -- it's a

L31PWEIh2

1   question of they know what's going on and the system is set up

2   by MasterCard and Visa, with the bank's agreement, so that no

3   one ever finds out that it's marijuana.  So they know it's

4   marijuana.  They know these are marijuana transactions, but

5   there's no coding for marijuana.

6            THE COURT:  What's your proof that they knew it was

7   marijuana?

8            MR. BURCK:  I'm sorry, your Honor.  I couldn't hear.

9            THE COURT:  What's your proof that they knew it was

10   marijuana?

11            MR. BURCK:  Your Honor, I think there's going to be

12   two sets of proof that they knew it was marijuana.  First,

13   there is evidence from the beginning of the alleged scheme in

14   2016 that there were references to the company Eaze, which is

15   the company that is at the heart of the -- that advertised

16   itself as the biggest cannabis marketplace in California.  And

17   then after, and this goes to the subpoena that the Court issued

18   an opinion on, that the banks to this day, the issuing banks

19   and the credit card companies, to this day, allow Eaze to use

20   debit cards or allow, I should say, customers to use debit

21   cards with Bank of America and Citibank and everything on those

22   cards, with the Visa logos and everything, to buy cannabis.

23            Openly it says in the statements, and it says to the

24   whole system, that it's Eaze that they're buying these products

25   from.

L31PWEIh2

1          THE COURT:  So that may show that they know now and

2    still don't consider it important, that would go to your

3    materiality, but I don't see how it shows that they knew then.

4          MR. BURCK:  Your Honor, there's going to be evidence,

5    we believe, that in the beginning of the scheme, in 2016,

6    that's part of the alleged timeframe here, that there were

7    references to Eaze and products that would clearly put someone

8    on notice they were talking about marijuana; that the period of

9    time in which there was a change to these strange websites that

10   have clearly have nothing to do with marijuana or appear to not

11   be marijuana, is only one piece of this entire timeframe.

12          And so we believe the evidence is going to show that

13   the banks, and certainly the credit card companies, understood

14   that these were transactions that were likely marijuana or were

15   marijuana and, that to this day, they are allowing Eaze to

16   openly process these transactions.  And the reason why we think

17   that's important --

18          THE COURT:  So why didn't the defendants, under your

19   theory, have any motive to disguise?

20          MR. BURCK:  Your Honor, our view is that they didn't

21   have a motive to disguise.  We have several defenses, your

22   Honor, on this front.  One, we don't think it was our clients

23   that came up with these fake websites.  We think it's actually

24   the government's cooperating witness, a man name Oliver

25   Hargraves, not our defendants.

L31PWEIh2

1          We also think that, again, Visa and MasterCard -- Visa
2     and MasterCard create the codes to allow people to sell
3     whatever they're going to sell over the credit cards.  The
4     merchant banks who are accused of being co-conspirators in this
5     whole thing are the ones who assign the codes for the
6     merchants, and our view is that the reason that Visa and
7     MasterCard and the banks don't have a code for marijuana,
8     whereas they do for gambling, your Honor -- they do for illegal
9     gambling; they actually say if you're going to use gambling,
10    there's a code you're supposed to use for it -- is because
11    they're trying to actually say we don't want to know about
12    marijuana, even though we know marijuana is being sold.

13          And it's important that it's happening now, your
14    Honor, from 2020 to this present time because there has been no
15    change in the law, as you know, your Honor, federal law or the
16    State laws that are at issue here that would say, oh, now Eaze
17    and the credit card companies and the banks are allowed to do
18    this.  Nothing has changed.

19          It's exactly the same system that was in place before,
20    except now arguably now it's more open.  And the reason why we
21    think that's important because it does go right to the
22    materiality question, which is that these banks ultimately
23    don't care at all that these are marijuana transactions.  What
24    they're doing, as the Court said in the Circle opinion, is
25    they're giving themselves a fig leaf to say we don't want to be

L31PWEIh2

1     involved in illegal transactions, whatever that means.

2               And some banks, you'll see, your Honor, in the course

3     of the trial, have policies which are very vague that say,

4     well, we don't want illegal transactions done where they are

5     legal.  And they specify gambling, for example; it can be legal

6     in some states and not others.  They never talk about

7     marijuana.

8               There's going to be evidence, your Honor, about the

9     dialogue inside the banks, about the fact that they are -- and

10    the credit card companies in that they don't really know what

11    to do with marijuana because there is the federal problem and

12    there are state differences.

13              So, your Honor, in our view, if you look at today, we

14    can link this up and the evidence will show this, back to the

15    beginning of the scheme that there is evidence throughout and

16    now it's open, that Eaze is using debit cards and they used to

17    be credit cards and debit cards, to allow people to buy

18    marijuana and the banks knew.

19              THE COURT:  Forgive me for interrupting.  Part of what

20    you're saying is why I denied, just a minute ago, the willful

21    blindness question because the assertion here is the banks

22    actually knew, not they were just willfully blind.

23              MR. BURCK:  That's correct, your Honor.  We don't

24    intend to argue they are willfully blind.  We're not intending

25    to argue that it's negligence.  We're saying they knew, and the

L31PWEIh2

1    system is set up so they can have plausible deniability, your

2    Honor.  That is our argument.  It's not that --

3         THE COURT:  All right.  That's very helpful.  Did

4    co-counsel for the other defendants want to add anything to

5    that?

6         MR. GILBERT:  Yes, your Honor.  I would like to be

7    heard on the question your Honor raised about pecuniary harm,

8    and we think it's certainly relevant to show the intent of the

9    defendants and to show their good faith with.  We requested and

10   we think we're entitled to a good-faith instruction, and we

11   certainly believe that the evidence will show, with regard to

12   Mr. Weigand, that he had no intention to harm any bank in this

13   country, and that is a perfectly legitimate line of argument

14   that we intend to pursue and we think is consistent with the

15   law.

16        THE COURT:  Well, if you recall from my opinion on the

17   motions to dismiss, I think I take a somewhat different view of

18   harm than you do as to what the law requires or doesn't require

19   in that regard.  Putting aside the whole argument that's just

20   been made about the banks' actual knowledge, if the banks, in

21   fact, decided we're not going to process marijuana transactions

22   because we don't want to take on the risk that we might get

23   prosecuted or in trouble or litigated if we do, and your

24   clients then, in order to obtain money and property from the

25   banks, then disguise the true nature of the transactions, I

L31PWEIh2

1    think that meets the harm requirement.

2          MR. GILBERT:  Our defense, your Honor, is that -- in

3    part, that there will be no evidence that Mr. Weigand had any

4    such intent or knowledge with regard to -- and so that's an

5    essential element of our defense.  I take it from your nodding

6    that you deem to be an appropriate line of --

7          THE COURT:  All right.  Let me hear from the

8    government.

9          MR. FOLLY:  Thank you, your Honor.  The government's

10   argument, fundamentally, is that pecuniary loss is simply not

11   an element of this case.  It's also not a theory that the

12   government is advancing at trial here.

13         THE COURT:  To me, it seems to me that if it's

14   permissible at all, it is linked solely to the issue of

15   materiality.  The argument is the banks really knew what was

16   going on, but they didn't care because they got their money.

17   And why isn't that then admissible?

18         MR. FOLLY:  Your Honor, I think that in the context of

19   this case, it really is a fact that the defense is using to try

20   to essentially tell this jury, like, there wasn't -- no one got

21   harmed; so there wasn't a crime.

22         THE COURT:  I understand, if your argument is a 403

23   argument, that it's relevant to materiality, but the prejudice

24   outweighs the relevance because they can, without even ever

25   mentioning that, they can argue the bank knew and here's why

L31PWEIh2

1    you should find the bank knew.  That, I understand.  But I

2    don't understand any argument about this being irrelevant.  So

3    if this is a 403 argument --

4         MR. FOLLY:  Particularly here, yes, your Honor, and

5    particularly in this case, where the government is not alleging

6    that the banks lost money on these transactions, it's not part

7    of the theory.  It's only about --

8         THE COURT:  Yes, so I think -- I will think about this

9    a little bit more before, but I want to give you a ruling,

10   obviously, before opening statements.  I think the 403 issue is

11   a real one but can be handled by an instruction to the jury,

12   and I had asked each side to submit a preliminary instruction

13   that I can give to the jury before the end of this week

14   flagging, as I do in almost every trial now, flagging that here

15   are some of the issues you should be thinking about.

16        And I think that might be an opportune time to tell

17   them what the government is required to prove, which is that

18   they don't have to prove any loss of money by the banks.  I

19   don't think I get into more detail than that at a preliminary

20   instruction.  So I'm inclined to let it in, but I'll think

21   about it.

22        Were there further things you wanted to say?  I'm

23   sorry.

24        MR. FOLLY:  Your Honor, on that point, if your ruling

25   is that it's allowed in with the instruction that you're

L31PWEIh2

1    contemplating, we would just ask for a ruling that that fact,

2    pecuniary harm to the banks, can only be argued in connection

3    with the defense theory on materiality --

4                THE COURT:  Absolutely.

5                MR. FOLLY:  -- and notice.

6                THE COURT:  And that I feel fairly strongly about,

7    with respect to all these motions in limine, if someone says to

8    the Court, from any party, this is coming in on theory X, and

9    then they try to suggest it for theory Y, you will not be happy

10   campers when you do that because, sua sponte, I will say

11   something very unpleasant to the jury about how you were

12   forbidden to do that and you've now violated my ruling.

13               So no one should try any trick like that, but I'm sure

14   we have very competent counsel here.  I'm sure that won't

15   happen.  So that sub-motion is granted.  It will be only coming

16   in for the limited purposes related to materiality.

17               Okay.  Linda?

18               MR. BURCK:  Your Honor, I just had two questions.

19   Sorry, your Honor.

20               THE COURT:  Let me just find out what the story is

21   with the jury.

22               (Pause)

23               THE DEPUTY CLERK:  Ten minutes.

24               THE COURT:  That's what they told us ten minutes ago.

25               THE DEPUTY CLERK:  Yes.

L31PWEIh2

1         (Pause)

2              THE COURT:  All right.

3              MR. BURCK:  Your Honor?

4              THE COURT:  Yes.  I'm sorry, there were two people

5    that were about to talk, but you were first, I think.

6              MR. BURCK:  Thank you, your Honor.  I just had two

7    clarifying questions relating to your rulings on the motions

8    this morning.  First, I understand I believe the reasonableness

9    motion to grant.  Understood, your Honor.

10             We are -- I am planning to open, your Honor, very much

11   on the "don't care."  I'm not going to mention reasonable

12   banks.  I'm going to say:  These banks didn't care.  I assume

13   that's okay?

14             THE COURT:  Yes.

15             MR. BURCK:  And that doesn't cross the line?

16             THE COURT:  Yes.

17             MR. BURCK:  I just wanted to make sure.  I will not

18   mention the word "reasonable."

19             THE COURT:  That's your defense, and given my rulings,

20   you can certainly present that defense.

21             MR. BURCK:  Thank you, your Honor.

22             And then the second question is, I don't believe the

23   government opposed or moved to limit references to the fact

24   that marijuana is legal in California and Oregon for purposes;

25   so I assume we can say that, your Honor?  We're not going to go

L31PWEIh2

1    beyond that.

2              THE COURT:  Yes.  Yes, I was really looking more at

3    that from an evidentiary standpoint.  It looked like there was

4    going to be some testimony about that, and that sounded like an

5    issue of law.  And the only person who can testify about law is

6    me; so that was the only nuance.  But I assumed that both sides

7    are in agreement that the jury can be informed that the sale of

8    marijuana is legal, so far as state law is concerned in those

9    two states.

10             MR. BURCK:  Thank you, your Honor.

11             MR. GILBERT:  We intend to open with a statement that

12   I described before, that there will be no evidence that

13   Mr. Weigand had any intent to cause harm to a U.S. bank,

14   pecuniary or otherwise.

15             THE COURT:  Well, that's certainly -- you know, intent

16   is an essential element of the crime; so you certainly can open

17   on denying that the government can prove intent.

18             MR. GILBERT:  Thank you.

19             THE COURT:  The government had something else?

20             MR. FOLLY:  Your Honor, defense counsel for Weigand

21   has proposed certain demonstratives to use in their opening

22   that the government has an objection to.

23             THE COURT:  Yes, let me see them.  Supposedly, you're

24   not supposed to hand paper exhibits.  However, both my law

25   clerk and me have been double vaccinated; so we will take the

L31PWEIh2

 1    risk.

 2            Okay.  So let's take these one at a time.  The first

 3    is entitled "Status of Eaze in January 2018;" although, it also

 4    includes a nice photo of Mr. Weigand and a little reference to

 5    his home in Germany.  But the main emphasis is, I'll read it:

 6    "Eaze was a silicon valley company with sophisticated U.S.

 7    investors."  What's the relevance of that?

 8            MR. GILBERT:  It goes, your Honor, to Mr. Weigand's

 9    understanding when he was first introduced to this situation

10    involving Eaze.  What was the information available to him was

11    that it was a U.S. company with sophisticated investors that

12    had been operating, accepting credit cards for some period of

13    time, a lengthy period of time before he even got involved; so

14    from his perspective, there was no reason to think that this

15    there was anything wrong.

16            THE COURT:  At best, that is only slightly relevant,

17    and it shouldn't be part of a demonstrative; so take out that

18    part.

19            MR. GILBERT:  Respectfully, your Honor, it goes to his

20    state of mind and --

21            THE COURT:  Well, I don't think so at all.  First of

22    all, here you're asserting a fact.  You don't say in your chart

23    Weigand believed X, Y or Z.  You say Eaze was a Silicon Valley

24    company with sophisticated U.S. investors.  How are you going

25    to prove that?

L31PWEIh2

1          MR. GILBERT:  That, we think, will certainly come out

2      in testimony of the various Eaze witnesses who will be

3      testifying at trial, and it's in the discovery material.

4          THE COURT:  What do you mean by sophisticated U.S.

5      investors, as opposed to simple barefoot investors?

6          MR. GILBERT:  I don't think they were barefoot, your

7      Honor.  In 2017 I believe it was $50 million of venture capital

8      funds invested in Eaze; so I think the --

9          THE COURT:  I'm still mystified as to why you think

10     this proves anything about intent.

11         MR. GILBERT:  In our view --

12         THE COURT:  Because your argument is sophisticated

13     investors don't break the law?

14         MR. GILBERT:  From our client's perspective, yes.

15     That from what was available then, this was basically --

16         THE COURT:  What planet?

17         MR. GILBERT:  -- America being presented to him.  It

18     this was a sophisticated company with sophisticated backers

19     that had consultants that were out of Visa and MasterCard.  So

20     there was no reason for him to believe, walking into this, that

21     this was a situation that would ever involve all of these

22     people agreeing to violate U.S. law.  That will be the evidence

23     of what was the information that was available to him that goes

24     directly to what his state of mind was, what his intent was in

25     agreeing to do anything in connection with Eaze and --

L31PWEIh2

1          THE COURT:  All right.  Is there any other objection

2     to the first?

3          MR. FOLLY:  Your Honor, I think a similar objection to

4     all of the charts is that it's the way that they're put

5     together and the things that are listed in them.  Among other

6     objections is they're argumentative and also seem to be --

7          THE COURT:  They're argumentative?  Oh, my gosh.  I've

8     never heard a presentation from any lawyer on opening

9     statements that is argumentative.  So the government, since

10    they don't want argumentative openings, is not going to say:

11    We think we can prove this beyond a reasonable doubt this guy

12    is guilty as sin, or anything like that, because you don't

13    believe that argument can be part of opening statements?  Come

14    on, counsel.  Give me a break.

15         MR. FOLLY:  Your Honor, the other additional issue

16    with these slides, particularly the way that Mr. Gilbert just

17    framed them, is that they are entirely about what the

18    defendant's state of mind, which unless the defendant --

19         THE COURT:  It's part of --

20         MR. FOLLY:  -- unless the defendant is testifying --

21         THE COURT:  Pardon?

22         MR. FOLLY:  Unless the defendant now is committing to

23    testifying.

24         THE COURT:  Oh, my gosh.  How long have you been a

25    prosecutor?

L31PWEIh2

1          MR. FOLLY:  Your Honor, I've been a prosecutor nearly

2     five years.

3          THE COURT:  So is this your first fraud case?

4          MR. FOLLY:  No, your Honor.  It is not.

5          THE COURT:  So are you not aware of the law of the

6     United States that has existed since at least 1800 that the

7     government has to prove every essential element, including

8     intent, beyond a reasonable doubt?

9          MR. FOLLY:  Your Honor, I'm very aware of that.  The

10     concern with this slide is simply --

11          THE COURT:  I think what your argument is, you're

12     saying, and I think it's only the first chart, that it relates

13     to, you're saying -- you're arguing there are things in the

14     first chart that can only come into evidence if the defendant

15     testifies because there will be no other source.

16          Now, that clearly is not true with respect to

17     "marijuana was recently legalized in California for

18     recreational use."  That is clearly not true, for Eaze was

19     already accepting Visa, MasterCard since 2016.  They expect to

20     be able to deduce that even through the government's witnesses.

21          MR. FOLLY:  I agree with that, your Honor.

22          THE COURT:  And the only one I'm having trouble with

23     is the first one, Eaze was a Silicon Valley company with

24     sophisticated U.S. investors.  I understand the whole point of

25     this chart is to say here was this simple, honest businessman

L31PWEIh2

from Germany, where people in Germany don't know anything about

American investments and here they did, this poor fellow got

roped into this terrible situation because, and then he goes

through his three items.  And that's -- you know, far be it for

me to preclude an argument of that sort.

I'm going to -- I want to go back to defense counsel.

How do you propose, without your client taking the stand, to

show that he knew that Eaze was a Silicon Valley company with

sophisticated U.S. investors?  Because unless you can show --

that's the relevance.  This whole first chart goes to intent.

The other things you can show without, but how are you going to

show that he knew that without his taking the stand?

MR. GILBERT:  Can I have one moment, your Honor?

THE COURT:  Yes.

(Pause)

MR. GILBERT:  Primarily, I think there will be --

well, I'll answer directly the question you've asked.

THE COURT:  That's always a good idea.

MR. GILBERT:  One way of doing that is through

cross-examination of the government's cooperating witness, who

met with Mr. Weigand and described Eaze and described the

background of this entire situation.  So we expect he will not

quibble with the fact that he understood and described that

Eaze was a Silicon Valley company.  I don't think there's any

debate about that, and it had sophisticated U.S. investors, it

L31PWEIh2

1    had venture capital backing.  That will certainly be -- there

2    will certainly be evidence of that.

3           And so for those reasons, I think it's entirely

4    supportable that we'll be able to show that that should be a

5    relevant consideration as to this individual's intent and what

6    his state of mind was about Eaze in general.  It wasn't a

7    secret.  I mean, there were billboards outside the airport in

8    Los Angeles that had Eaze on them, and his post-arrest

9    statement, which I understand your Honor hasn't made a ruling

10   on, but if those statements come in, he discusses that, which

11   shows that it was very well known --

12           THE COURT:  All right.  Forgive me for interrupting.

13   I'll think a little bit more about the first chart.  The second

14   chart, only U.S. banks are covered by the bank fraud statute.

15   You may be entitled to an instruction of law at some point; so

16   but it's not for opening statement so that chart is excluded.

17   That chart is excluded.

18           The next chart, Eaze payment processing 1.0, what's

19   the point of this?

20           MR. GILBERT:  This is demonstrative to help the jury

21   visualize a simple point, which is that Eaze was using payment

22   processing through New York, through the same merchant banks

23   that were involved in a later time, when Mr. Weigand had some

24   involvement, but that had been going on in 2016 and 2017

25   through this company called Clear Settle that's depicted here.

L31PWEIh2

1          At that point, Mr. Weigand had nothing to do with it.

2    He only got involved starting with January 2018, what we refer

3    to, for simplicity sake, is Eaze processing version 1.1 --

4    that's how we'll describe it in opening for the jury -- so that

5    they understand clearly that that's when his connection to this

6    began.

7          And all of this was going on before he got involved,

8    which I think is critical to help the jury understand that

9    despite what we expect the government to say, that he was

10   some -- Mr. Weigand was some critical link to Europe --

11         THE COURT:  How are you going to prove that he knew

12   that without his taking the stand?

13         MR. GILBERT:  We'll be able to establish through

14   cross-examination of the government's cooperating witness that

15   there was a description of what had been the payment processing

16   that had been in place before, and the whole purpose of the

17   meeting that takes place in January of 2018 is to discuss and

18   to explain, in part, to Mr. Weigand what they were hoping to do

19   to change the already existing payment processing that Eaze was

20   doing.

21         THE COURT:  And then your last chart is Ruben

22   Weigand's focus was on Europe, and how are you going to prove

23   that without his taking the stand?

24         MR. GILBERT:  Through voluminous -- I shouldn't say --

25   there are voluminous chats being entered into evidence.  The

L31PWEIh2

1   communications in which Mr. Weigand was involved, which is a

2   small subset of all of those, I think will clearly demonstrate

3   what we've said here, which is that his focus was on dealing

4   with European merchant banks and opening European accounts, all

5   of it was focused on Europe.

6           THE COURT:  All right.  Let me --

7           MR. GILBERT:  And in part, that is what the

8   government, as we understand it, is alleges his role to have

9   been.

10          THE COURT:  Let me ask the government.  The

11  representation is that they will be able to prove everything

12  that's on these charts independently of his taking the stand.

13  Of course, if that proves to be false, you are free on

14  summation, or anything else that anyone else says on opening

15  statement that isn't proved get up, and say:  Remember when he

16  said that he was going to show that?  You haven't heard one

17  word about that.

18          I will also instruct the jury, as I always do, that

19  nothing that any counsel says on opening argument is evidence.

20  But having said that and given the representations, putting

21  aside the second chart which I'm excluding, the one about all

22  the U.S. banks are covered by the bank fraud statute, any

23  remaining objection to the other three charts?

24          MR. FOLLY:  Your Honor, one concern with respect to

25  the Eaze payment processing 1.0 chart, for some reason, the

L31PWEIh2

1    chart ends in 2018.  I think it is a misleading

2    characterization of what this case is about.  It's a conspiracy

3    charged through 2019.  It involves --

4              THE COURT:  What about that, counsel?  I'm sorry.

5    Counsel for Weigand, what about the claim is that this is

6    misleading because it limits itself to a period before the key

7    events in this case?

8              MR. GILBERT:  The purpose of the chart is simply to

9    depict when Mr. Weigand got involved.

10             THE COURT:  Yes.

11             MR. GILBERT:  And that's all this shows.  So it

12   doesn't purport to state that anything started in '18 and was

13   over at the end of '18.  So we can adjust it to add another

14   extension of it, but the whole point of it is not -- is a

15   simple one, which is he wasn't involved --

16             THE COURT:  I'm going to, on the representations made,

17   I'm going to allow all the charts except the one about only

18   U.S. banks are covered by the bank fraud statute.  It will be a

19   good test of the credibility of counsel to see whether this, in

20   fact, comes into evidence independent of the defendant taking

21   the stand.

22             MR. GILBERT:  Your Honor?

23             THE COURT:  Now, yes?

24             MR. GILBERT:  I'm sorry.  With regard to the -- and I

25   understand your ruling about the demonstrative, but the concept

L31PWEIh2

1    which we would like to touch upon in the opening, and it's

2    critical to our defense, is that what Mr. Weigand's role was,

3    as the government I think agrees, related to merchant banks in

4    Europe.  I think there's a risk here that the jury is going to

5    be somewhat confused with various financial institutions, Visa,

6    MasterCard, various different banks in Europe.  And it is

7    critical that we be able to explain to them that the

8    specific --

9              THE COURT:  How is your chart, even as a matter of

10   law, because doesn't deal with indirect relationships which

11   are, of course, part of what was involved here.  So I think

12   it's misleading.  I continue to exclude it.

13             All right.  Now, we're going down -- I'm sorry, yes?

14             MR. FOLLY:  Your Honor, just one additional concern

15   about the way Mr. Gilbert articulated the argument or principle

16   that they intend to use in their opening about Weigand's not

17   having any intent to cause harm.  Your Honor, I think that

18   comes dangerously close to intent to cause the banks pecuniary

19   loss, and we are articulating a very narrow allegation with

20   respect to harm, which is depriving the banks of their

21   property --

22             THE COURT:  We're going to deal with that in the

23   preliminary instruction I'm going to give later this week.  I

24   think that will be sufficient, but thank you for raising it.

25             Now, the parties, their counsel and the marshals are

L31PWEIh2

going to enter the jury room through the entrance that says

"closed," the one right near the elevators, and I will go down

there as well, and then we will pick the jury.  All right.  So

I'll meet you down there forthwith.

          (Recess)

L31AWEI3ps

                    A F T E R N O O N   S E S S I O N

                              1:30 p.m.

1       (Jury not present)

2       THE COURT:  Anything counsel needs to raise with the
3  Court?

4       (Jury present)

5       THE COURT:  I want to remind counsel and the parties
6  that you need to stay in exactly where the marker is for your
7  seats.  There was some movement earlier this morning between
8  various people that unfortunately is not permissible because of
9  the pandemic requirement social distancing.  So just be sure
10  you keep in your seats.

11       OK.  Ladies and gentlemen, we are about to hear
12  opening arguments of counsel.  I want to caution you at the
13  beginning that nothing that counsel says is evidence.  The
14  evidence will come, as I mentioned downstairs, from testimony,
15  and it will be from this little box here next to me.  And the
16  witnesses can remove their mask because this is designed to
17  allow that.

18       It will come from documents, which you will see on
19  your screen.  And at the very end of the case we will give you
20  a thumb drive or some equivalent so you can access any and all
21  documents as well as an exhibit of the documents.

22       And occasionally there may be what's called a
23  stipulation where the parties agree on a particular fact, and

L31AWEI3ps                   Opening - Ms. Deininger

1   you can take that as evidence as well.

2           Those are the only sources of evidence.  Nothing that

3   counsel says, nothing that I say is evidence.

4           So why do we have opening arguments at all?  The

5   reason is because the evidence, as again I mentioned before, is

6   going to come in one little bit at a time, and it may be a

7   while till you see the whole picture.  So opening statements

8   are the opportunity that's given to counsel to give you a

9   preview of what they expect the proof will show, or will fail

10  to show, as the case may be.  So it's kind of an overview.

11          Each side gets a half -- each party gets a half hour.

12  So the government will have a half hour.  Then each of the

13  defendants will have a half hour.

14          The government goes first because, as I mentioned

15  earlier, the burden of proof is always on the government.  The

16  defendants are presumed innocent until and unless the

17  government has proven that they are guilty beyond a reasonable

18  doubt.  So for that reason the government gets the opportunity

19  to open first, because they have the burden of proof.

20          So we'll begin with the opening statement from the

21  government.

22

23          And you can take down your mask too.  That box is also

24  designed to allow you to take down your mask.

25          MS. DEININGER:  I'm sorry.  Can everyone hear me?

L31AWEI3ps              Opening - Ms. Deininger

1        THE CLERK:  I'm sorry.  I have to change the

2   microphone cover.  Sorry, everybody.

3        MS. DEININGER:  These two men, Ray Akhavan, Hamid

4   Akhavan, and Ruben Weigand, for years, they built a business of

5   lies, in exchange for millions of dollars.  They offered a

6   unique set of services creating fake companies, fake products,

7   fake websites, and even ginning up fake web traffic for those

8   websites, all in the service of pushing money through U.S.

9   banks for illegal products.  With that multilayered web of lies

10   they duped the banks into approving more than $150 million in

11   debit and credit card transactions.  That's why we're here

12   today, because these two men, they made it their business to

13   commit bank fraud.

14        So let's talk about what the evidence is going to

15   show.  You're going to learn that from 2016 to 2019, the

16   defendants made millions tricking U.S. banks into approving

17   illegal purchases.

18        I'm going to explain how the defendants pulled this

19   off.  But before I do that, I want to talk to you about two

20   things that I think you're going to hear a lot about at trial.

21   The first thing that you're going to hear a lot about is the

22   companies the defendants were paying to lie for, their clients,

23   a company called Eaze.  Eaze was a marijuana delivery company.

24   It had an online application that its customers in California,

25   where marijuana is legal under state law, could use to order

L31AWEI3ps            Opening - Ms. Deininger

marijuana products from marijuana dispensaries and have them

delivered to their door.  Eaze marketed itself as a mover of

product.  But Eaze wanted to give its customers the option to

use credit and debit cards.  And Eaze had a problem with that.

The credit companies and many U.S. banks don't allow debit and

credit cards to be used to purchase marijuana, because those

purchases are still illegal under federal law.  And that's

where defendants came in.  The defendants offered these and the

marijuana dispensaries a solution, a solution of tricking the

U.S. banks and card companies.  These marijuana dispensaries

hired defendants to get around the bank and credit card rules.

And how did they do that?  They lied.  The defendants created

layer upon layer of lies to disguise the transactions and make

them look like they were for other legal things.

          The second thing that you're going to hear a lot about

at this trial are the credit card networks and the rules that

govern them.  Defendants' exploitation of these networks was

the heart of the scheme.

          So who were the players in these networks?  Visa and

MasterCard are at the center of these networks.  They set rules

that the banks have to follow.  Then there are the merchants.

These are the companies selling something; take Target or

Starbucks.  In this case, Eaze and the marijuana dispensaries,

they were the merchants.  The merchants work with merchant

banks, that are sometimes also called acquiring banks.  If a

L31AWEI3ps                    Opening - Ms. Deininger

1    merchant wants to accept credit and debit cards, it has to have

2    a bank account.  Without that, their customers would have to

3    pay in cash.

4              Then on the other side you have cardholder banks, or

5    issuing banks.  They offer credit and debit cards to the

6    public.  For example, you might have a Bank of America

7    MasterCard credit card, or a Wells Fargo Visa debit card.

8    Cardholder banks have their own rules about how their cards can

9    be used and what transactions they will approve.

10             So the rules of the cardholder banks and Visa and

11   MasterCard, those rules, those rules that you can't use the

12   cards for illegal purchases, including marijuana, the

13   defendants decided to make money breaking those rules.  And to

14   do that, they lied, and lied again.

15             Now let me tell you a little bit about the

16   step-by-step of how defendants ran their scheme.  Step one.

17   They bought shell companies with no connection to Eaze or the

18   marijuana dispensaries' actual business.  For example, they

19   bought a shell company called Linebeck Ltd.

20             Step two.  They used the shell companies to give bank

21   accounts to overseas merchant banks.  The bank account

22   applications were full of lies.  They lied about what the

23   companies sold, where the companies were located, and who

24   controlled them.  The bank account application for Linebeck

25   Ltd., it said that Linebeck was a British company selling face

L31AWEI3ps              Opening - Ms. Deininger

1    cream off a website called organicals.org.  It wasn't.  That

2    was all lies.

3            Step three.  The defendant used the fake merchants and

4    the overseas merchant bank accounts to hide transactions in the

5    Visa and MasterCard network.  So, for an example, when an Eaze

6    customer uses a Visa credit card to purchase marijuana from

7    Eaze, instead of listing Eaze or one of the marijuana

8    dispensaries as the merchant, it would show up as a transaction

9    for organical face cream.

10           What was the point of all this deception, of the fake

11   products or the fake companies?  It was to deceive.  It was to

12   prevent the banks and credit card companies from understanding

13   the true nature of the transactions that the defendants were

14   pumping into the U.S. financial system.

15           And for a while the scheme worked.  The purchases were

16   approved and the cardholder banks sent money to the companies

17   that they thought were the real merchants.

18           Now, because these banks and credit card companies

19   don't allow marijuana transactions, the defendants had to cover

20   their tracks.  They knew the fake merchants had to look like

21   real businesses.  So they set up fake websites for those fake

22   companies, websites that appeared to be selling things, like

23   face cream, dog products.  They even carted in water.  They

24   even paid someone to generate fake traffic to those websites so

25   that, to an investigating bank, it would look like customers

L31AWEI3ps                 Opening - Ms. Deininger

1    are actually visiting it.

2           And that wasn't all.  They did everything they could

3    to make sure they could not get caught.  They also told the

4    marijuana dispensaries to open up bank accounts in names that

5    couldn't be linked back to the actual marijuana business.  Lies

6    at every level.

7           The cardholder banks, like most people, they wanted to

8    know who they were actually doing business with.  But the

9    defendants took that option, the option of knowing the truth,

10   away from them.  They tricked the banks into approving

11   thousands and thousands of transactions for more than $150

12   million, money that came out of the cardholder banks' own

13   accounts based on lies.

14          So that is the scheme.  That's how it worked.

15          Let me tell you about the critical role that each of

16   these defendants played in running the scheme.  It started with

17   Hamid Akhavan, or Ray, as they called him.  Akhavan, plain and

18   simple, was the leader of the fraud scheme.  He oversaw

19   everything.  He hired a team to purchase the shell companies

20   and set up the fake websites for the fake merchants.

21   Eventually you'll learn that he brought Ruben Weigand into the

22   scheme.  Weigand had connections to insiders at the overseas

23   merchant banks.  He helped make sure the merchant bank accounts

24   got opened and that the accounts didn't later get flagged and

25   shut down.

1          He also played a critical role of arranging to get the

2    moneys moved from the overseas merchant bank accounts back to

3    the marijuana dispensary in the United States.

4          And as a result of all of this fraud and lies, the

5    defendants are charged together with one count of conspiring to

6    commit bank fraud.

7          OK.  So now you have a sense of what this case is

8    about.  I want to tell you how we're going to prove it.  The

9    evidence will come in several forms.  You'll see the emails and

10   documents that law enforcement agents recovered from Weigand's

11   computer that was with him at the time he was arrested, bank

12   account applications for the bank merchants, a ledger full of

13   profit calculations, and all of the other paperwork needed to

14   keep the defendants' fraud running.  There will be financial

15   records, records of the rules prohibiting illegal transactions,

16   records that show the thousands of purchases that were

17   processed in the state merchants' names, and records showing

18   how the defendants sent money for the marijuana purchases after

19   taking out their sizeable cut from the overseas merchant banks

20   back to the marijuana dispensaries.

21          You'll also hear from witnesses.  You'll hear from the

22   cardholder banks who approved these purchases based on the

23   defendants' lies.  They will tell you that it is essential to

24   their business that they receive true and accurate information

25   when deciding whether to approve card transactions.  And they

L31AWEI3ps          Opening - Ms. Deininger

1    will tell you that they would not have approved these

2    transactions if they had known they were really for marijuana.

3          You'll hear from credit card companies, who will

4    explain how their networks operate, the rules for those

5    networks, and what they do to make sure those rules are

6    followed.  You'll learn how MasterCard eventually found out

7    about the defendants' scheme and quickly moved to begin

8    shutting it down.  You'll hear from the law enforcement agent

9    who arrested Weigand.  You'll hear the stories Weigand made up

10   when he was caught and how he lied and claimed he had never

11   been involved with Eaze, how he pretended that he had learned

12   about Eaze from seeing it on a billboard.

13         You're also going to hear from some of the people who

14   committed the bank fraud along with the defendants.  They will

15   be able to give you the inside view of how the scheme operated.

16   You're going to hear from several people who worked at Eaze,

17   including the former CEO.  He will tell you how getting credit

18   cards up and running was critical to Eaze.  He will tell you

19   how other credit card processors told Eaze that it couldn't be

20   done for marijuana transactions in the United States.  He will

21   tell you how Eaze ended up having to work with the defendants,

22   who charged fees that were far higher than normal.  And he will

23   tell you that Akhavan justified those fees by explaining that

24   he and his associates were taking on a serious threat, the

25   threat that they would get caught.

1          You're also going to hear from someone who set up the

2     fake merchants for defendants.  You'll hear how he bought shell

3     companies that existed only on paper, created websites for

4     those fake merchants, and then generated fake online traffic to

5     those websites.  You'll hear how he pulled together the bank

6     account applications for the fake companies, full of lies.  And

7     you'll hear about the meetings he attended with Akhavan,

8     Weigand, and other members of the scheme, meetings where they

9     planned out how the scheme would function.

10         Now, I want to be clear.  These people, these

11    individuals, have also committed crimes.  That fake website

12    creator and Eaze's former CEO are testifying because they have

13    pled guilty and entered into cooperation agreements with the

14    government requiring them to testify.  And they hope to receive

15    leniency at sentencing for doing so.  So you should scrutinize

16    their testimony carefully.  You should ask yourselves, how does

17    that testimony match up with all of the other evidence in this

18    case, evidence like the fake merchants and the lies in the bank

19    account application, the records showing the banks' rules and

20    the thousands of transactions that broke those rules, evidence

21    like the defendants' own words, their words.  You'll see their

22    words, in emails, in phone messages, explicitly discussing the

23    fraud scheme; their words planning the fake merchants, the fake

24    websites, and the fake website traffic, and the bank accounts

25    for the shell companies; their words expressing their fears

L31AWEI3ps                    Opening - Mr. Burck

1   about the truth being found out and everything they could do to

2   hide the truth so they might continue to make their millions

3   selling lies after lies.

4           All of this evidence ultimately is about one simple

5   thing.  It's about two men who built a business out of a

6   mountain of lies, lies designed to get illegal purchases

7   approved by U.S. banks.

8           Now, I'm going to sit down, but before I do, I want to

9   ask you to do three things.  First, pay close attention to the

10  evidence.  Second, listen to Judge Rakoff's instructions about

11  the law and follow them.  And, third, use your common sense

12  when examining the evidence and listening to the witnesses.  If

13  you do those three things, you'll reach the only conclusion

14  that is consistent with the evidence, the law, and that common

15  sense: the defendants are guilty.

16          THE COURT:  Thank you very much.

17          Which defendant wants to go first?

18          MR. BURCK:  Your Honor.

19          Good afternoon, your Honor.  Good afternoon, ladies

20  and gentlemen of the jury.

21          Who are the supposed victims of the credit card fraud

22  scheme the prosecutor just told you about?  It's not the card

23  holders.  It's not the regular people who have credit cards or

24  debit cards, who use them to make purchases, including

25  sometimes for marijuana.  This case isn't about card holders

L31AWEI3ps                    Opening - Mr. Burck

getting scammed or having their credit card numbers stolen or

anything like that.  The victims are not the other side of

these marijuana sales.  It's not the small mom-and-pop

dispensaries who worked through Eaze to sell marijuana to

willing buyers.  No one is going to say they were scammed or

tricked out of anything.  No.  The victims in this case,

according to the government, are banks, big banks like

Citibank, Bank of America, and Wells Fargo.  Those are the

victims.  Multibillion dollar banks.  Sophisticated.

        The prosecutors claim the banks are victims of bank

fraud because they supposedly had policies against permitting

people to buy marijuana using credit cards or debit cards

issued by the banks under the Visa and MasterCard logos.  These

policies, the prosecutors say, are taken very seriously by the

banks because marijuana remains illegal under federal law.

Sounds pretty simple, pretty straightforward.  But when you

hear the evidence in this case, it will not be so simple.  You

will learn that marijuana sales remain illegal under federal

law, but they are legal under California and Oregon law, where

these transactions occurred.  They are lawful under those state

laws.

        The sales that occurred in this case happened in

California and Oregon.  There's where the people were located

who were buying the marijuana, and that's where the

dispensaries were located that were selling the marijuana.

1    That's where Eaze, the company you heard about, the

2    marketplace, was located.

3         You will also learn that the credit card processing

4    systems are set up by the credit card companies, by Visa and

5    MasterCard, and by the banks, to conceal, to hide, the truth

6    that the banks know full well that their card holders are

7    buying marijuana with their credit cards and their debit cards.

8    The system is set up to hide the fact that they know.  The

9    system is designed and set up by the credit cards and the banks

10   to give them plausible deniability, plausible deniability that

11   credit card holders are using these cards to buy marijuana.

12        You're also going to learn that the credit card

13   companies and the banks could easily, could easily, set up a

14   system to block marijuana transactions if that's what they

15   really wanted to do.  But they haven't.  And they continue, to

16   this day, to this day, to permit flourishing online sales of

17   marijuana using debit cards, to this day.

18        And the reason, you'll learn, that the banks, who the

19   prosecutors claim were somehow defrauded, allow this is because

20   the reality is they just don't care that their card holders are

21   using the cards to buy marijuana, so long at least as it's

22   legal under the state laws in which the sellers and the buyers

23   are located.  They don't care.

24        And you will hear evidence that the credit card

25   companies and the issuing banks earn fees, they earn money,

L31AWEI3ps                    Opening - Mr. Burck

1    from these transactions, just as they do for any other credit

2    card transaction that they sponsor.  They make money from these

3    transactions.  And you also will not hear, despite the

4    government saying $150 million taken from banks, you will not

5    hear any evidence that these banks lost a dime from this

6    alleged scheme.  No wonder the banks don't care.  They didn't

7    lose any money.  And they've made money off of these

8    transactions.

9         These policies pay lip service to blocking illegal

10   transactions.  We'll talk about what that means.  But their

11   actions, the banks' action show their number one priority was

12   making sure their customers can use their cards to buy goods,

13   including marijuana, if it's permitted under state law, any

14   goods those customers want to buy.  Banks are businesses.  We

15   all know that.  And this is one of the ways they make money,

16   from fees from all of these credit card transactions.  They

17   just don't want to make it clear that they know what their

18   credit card holders are doing with those credit cards that they

19   sponsor.

20        My name is Bill Burck.  And along with my colleagues,

21   Christopher Tayback and Sara Clark, we have the honor and the

22   privilege to represent Ray Akhavan, sitting in the back there.

23        I'm going to tell you a little bit about Ray.  But

24   first I want to describe to you what we believe the evidence

25   will show in this trial and what we don't believe it will show.

L31AWEI3ps                         Opening – Mr. Burck

1             The prosecutors' theories boil down to this:  Ray

2      helped an online company called Eaze trick Visa and MasterCard

3      into processing sales of marijuana using credit cards issued by

4      various U.S. banks.  That's it in kind of a nutshell.  Ray and

5      Eaze and a bunch of others did this, the prosecutors claim, by

6      miscoding and misdescribing marijuana transactions as more

7      benign or uncontroversial products.  If they hadn't done this,

8      the prosecutors say, the marijuana transactions would have been

9      blocked.

10            But the evidence will show something very different

11     occurred.  You will learn from witness testimony and documents

12     in this case that the system is set up to protect banks, to

13     protect them, from admitting knowledge that their customers are

14     using these cards for marijuana purchases.  You will hear that

15     Visa and MasterCard have created no codes, no specific codes

16     for marijuana, to help them identify and block marijuana

17     transactions.  Typical credit card transactions happen at one

18     time, and they're automated.  You will learn that the codes

19     created by Visa and MasterCard are a key part of this automated

20     process, to categorize goods and services that someone is

21     buying when they enter their credit card online, they walk into

22     a store.  You will hear their evidence, there is nothing,

23     nothing stopping Visa and MasterCard from creating a code to

24     block marijuana.  In fact, evidence will show that Visa and

25     MasterCard have done exactly this for gambling and for illegal

L31AWEI3ps                    Opening - Mr. Burck

1    gambling.  They have a code that allows them to identify when a

2    gambling service is being purchased by a credit card.  And they

3    will block that.  Or they'll let it through if it's in a state

4    in which it's legal to gamble.  You'll hear evidence on that.

5         So we know know how to make the codes.  But they have

6    not done it.  And we expect you will hear evidence the banks

7    have written policies, written policies saying, no illegal

8    transactions can be used with our credit cards.

9         Let me show slide no. 2.

10        These are some excerpts from policies that credit card

11   companies and banks issue to card holders, to people who have

12   credit cards, telling them what you can and cannot do.  We'll

13   go through this in much more detail at the trial, but just to

14   give you a sense, here's what they say about illegal

15   transactions.  For example, at the top, "You agree not to use

16   your cards for illegal gambling or other illegal purpose."  You

17   see any reference to marijuana?

18        The next one: "You may not use or permit your account

19   to be used to make any illegal transaction.  You will only use

20   your account for transactions that are legal where you conduct

21   them."  Well, the evidence is going to show that that is quite

22   an interesting question with marijuana, since it is legal in

23   California and Oregon.

24        The other two, similarly, they reference gambling or

25   they make general statements: "You aren't permitted to use your

1    account for unlawful transactions."

2            What you're not going to see in any of these warnings,

3    these policies, to card holders, is a statement that you as a

4    credit card holder cannot buy marijuana in states in which it

5    is legal.  You're not going to see any reference to marijuana,

6    in any of these statements from credit cards.  Gambling, yes.

7    Marijuana, no.

8            But it's not just missing from these policies, from

9    the internal policies.  It's missing from their internal

10   discussions, which, you will see some of this in the course of

11   the trial.  Marijuana is not something that these banks

12   targeted to stop.  The proof will be that they knew exactly

13   what was going on and they wanted it to happen.

14           The banks just didn't care, so long as the credit card

15   holders got what they paid for, there was no fraud to the

16   credit card holders, and the fees that are associated with that

17   transaction went to the banks, and to the credit card

18   companies.

19           The old adage "Actions speak louder than words" is

20   really, really important in this case.  The actions of the

21   banks, the credit card companies, don't line up with the words

22   that they have these policies.  And we're going to hear

23   testimony, we expect, from bank witnesses, who will, we expect,

24   say, oh, it matters to us.  And, again, using your common sense

25   and looking at what actually happened, we believe the evidence

L31AWEI3ps                    Opening – Mr. Burck

1   will show that the banks knew exactly what was going on and

2   tacitly approved it.

3           One of the most important things in this case, one of

4   the most important pieces of evidence in this case, goes to the

5   question of whether or not these banks care.  You're going to

6   hear from witnesses and evidence that the banks and the credit

7   card companies continue, continue, to process marijuana sales

8   to this day, through Eaze, using debit cards.  To this very

9   day.

10          The banks and the credit card companies allow card

11  holders to use their debit cards to buy products online from

12  Eaze, the self-described largest cannabis marketplace in

13  California or, more simply, the Uber of weed.

14          Will you show slide 3.

15          These are examples of cards issued by one of the big

16  banks in this case, Bank of America.  On the left is a credit

17  card.  On the right is a debit card.  The one on the left, the

18  banks will testify, you can't use this to make marijuana

19  transactions.  The one on the right is a debit card.  And

20  you're going to hear evidence that, to this day, Bank of

21  America and other banks allow you to use that card to knowingly

22  buy Eaze products, to buy marijuana.  When I say "knowingly,"

23  I'm talking about the banks and Visa and MasterCard, know that

24  they are using debit cards to buy marijuana to this day.

25          Marijuana sales, the evidence in this case is going to

L31AWEI3ps                    Opening – Mr. Burck

1      show, are immaterial to these banks.  When I say "immaterial,"

2      I mean they don't care.  They are fine with these kinds of

3      transactions.  You will learn from Judge Rakoff that

4      materiality is an important element which the government will

5      have to prove beyond a reasonable doubt in this case.  And we

6      believe the evidence will show overwhelmingly it was

7      immaterial.  It did not matter to these banks.  They knew what

8      was going on and they condoned it and they allowed it to go

9      forward.

10             Again, I ask you to use your common sense when you

11     hear testimony from bank witnesses saying, we care about this

12     and it was important to us.  Think about the evidence of what

13     they actually did, what was actually happening and what

14     actually is continuing to happen when you decide their

15     credibility.

16             You will also learn at this trial that Eaze, the

17     company at the center of this, continues to do its business of

18     linking up buyers and sellers of marijuana in California and

19     Oregon, despite federal law still banning marijuana sales.

20     Eaze continues to do its business.  They haven't been shut

21     down.

22             MS. DEININGER:  Objection.

23             THE COURT:  Well, I'm not sure that has any relevance,

24     ladies and gentlemen, but we'll take it for now.  This is just

25     opening argument.  I remind you that nothing that counsel says

1    is evidence.

2            But you should go on.

3            MR. BURCK:  Thank you, your Honor.

4            As the prosecutors said, they will have Eaze witnesses

5    at the trial.  Three of them, we expect, will have what are

6    called immunity agreements to testify.  One will be testifying

7    under what's called a cooperation deal with the prosecutors,

8    which the prosecutor told you about.  We expect that all four

9    of these Eaze employees will say that they worked, they were

10   aware of, or involved in, the supposed trickery of the credit

11   card companies and the banks.  But you will also learn that two

12   of these people still work at Eaze.  They haven't been fired.

13   They're still there.

14           You'll also learn that Eaze still doesn't use a code

15   for marijuana.  Still doesn't use one.  And that's because

16   there still isn't a code for marijuana created by Visa or

17   MasterCard.  And their banks remain fine with that.

18           You're also going to learn that the thousands and

19   thousands of credit card holders who used their credit cards

20   and their debit cards to buy marijuana during the time of this

21   alleged scheme, you're not going to hear any evidence that a

22   single one of them had their credit cards canceled by the

23   credit card companies or other banks.  Not one.  Out of all

24   those thousands of people who were supposedly doing something

25   illegal.  Not one.

L31AWEI3ps                    Opening - Mr. Burck

1          Let me pause here to point out another crucial aspect

2     of the evidence in this case and something the prosecutors need

3     to prove beyond a reasonable doubt.  They must prove that the

4     defendants' intent, the defendants' intent, was to defraud the

5     banks that issued the cards, like Bank of America, Wells Fargo,

6     Citi -- the banks.  And in this trial, we do not believe there

7     will be a single shred of reliable testimony or evidence that

8     Ray Akhavan ever intended to defraud anyone, much less the

9     banks.  You heard the prosecutor in her opening blame Ray and

10    Ruben for a bunch of fake websites that the prosecutors say

11    were designed to fool the credit card companies and the banks.

12    But we expect the evidence will show that it was a man named

13    Oliver Hargreaves who was responsible for the websites.  They

14    reference Mr. Hargreaves, naming him as a cooperating witness.

15         Well, who is Oliver Hargreaves?  Well, it turns out

16    that Mr. Hargreaves, you'll learn this at trial, was already

17    accused of multiple federal felonies and secretly agreed to

18    help the prosecutors in this case to get himself a better deal.

19         And we think the evidence will show that the craziest

20    websites, the fake websites that the prosecutors laid out, the

21    ones they really rely on, those types of websites suddenly

22    appeared while Mr. Hargreaves was secretly cooperating with the

23    government.

24         MS. DEININGER:  Objection.

25         THE COURT:  Hold on a minute.

1            MR. BURCK:  We do not believe --

2            THE COURT:  Hold on.  There was an objection.

3            MR. BURCK:  I'm sorry.  I can't hear in here.  I'm

4    sorry.

5            THE COURT:  Overruled.

6            MR. BURCK:  Thank you, your Honor.  And my apologies,

7    your Honor.  I can't hear you very well in here.  That's why

8    I --

9            THE COURT:  No problem.

10           MR. BURCK:  No problem.

11           Let me step back briefly and repeat, we expect the

12   evidence will show that the craziest websites, the ones the

13   government is principally relying upon, suddenly appeared while

14   Mr. Hargreaves was secretly cooperating with the government.

15   We do not believe this is coincidence.  We don't think the

16   evidence will show this is coincidence.  Instead we expect the

17   evidence will show that these websites were Mr. Hargreaves's

18   creation while he was under the direction of the prosecutors.

19   And you will learn he had good reason to believe, and the

20   evidence will support, that this is true because

21   Mr. Hargreaves's job, expertise, is creating websites.  That

22   wasn't and never has been Ray's job, or his expertise.

23           So what was Ray's role in the alleged scheme to

24   allegedly defraud issuing banks?  Ray didn't work at Eaze.  He

25   didn't work at the credit card companies or the issuing banks.

L31AWEI3ps                    Opening - Mr. Burck

1   Ray was an outside consultant to Eaze.  And Eaze wanted him to

2   advise them, based on his experience in the credit card

3   industry, on how to conduct credit card processing business.

4   The evidence will show that Ray was not part of the scheme to

5   defraud issuing banks.  Instead, we believe you will conclude,

6   after hearing all of the evidence, listening to the witnesses

7   and seeing the documents, that Ray's role was to help Eaze

8   navigate a system set up by Visa and MasterCard and the issuing

9   banks to permit marijuana transactions while not permitting the

10  buyer and the seller to be open about those transactions.  That

11  was the system we believe the evidence will show set up by the

12  credit card companies and the banks.

13          In sum, we expect the evidence will show that Ray

14  connected his contacts to the credit card industry, to Eaze, so

15  that Eaze could get marijuana from willing sellers, like

16  dispensaries, to willing buyers, like the thousands of card

17  holders who want to buy marijuana using their credit cards or

18  debit cards.  And the evidence will show that, by their

19  actions, the banks know what was going on, and welcomed these

20  transactions, which earn them fees and make their customers,

21  the credit card holders, the debit card holders, happy

22  shoppers.

23          Ladies and gentlemen, we appreciate your careful

24  attention to the evidence we'll hear at trial.  And like the

25  government, we ask that you use your common sense.  We ask that

L31AWEI3ps            Opening - Mr. Gilbert

 1   you listen to Judge Rakoff.  We believe that if you do that,

 2   after you've considered all the evidence in this case, you will

 3   conclude the prosecutors have not proven their case beyond a

 4   reasonable doubt, and we believe you will return a verdict of

 5   not guilty for Ray Akhavan.  Thank you.

 6           THE COURT:  Thank you very much.

 7           Now we'll hear from counsel for Mr. Weigand.

 8           MR. GILBERT:  Given what we've all been through in the

 9   last year, it may be hard for you to remember, it may seem like

10   a distant memory of what life used to be like.  But let me ask

11   you to imagine something from our lives before this COVID.

12   Just for a minute, imagine a party, a big gathering of friends,

13   some music, some dancing, good food, conversation, and best of

14   all, no social distancing.  Just one of those nights when

15   everything was going well.  Everything is going smoothly and

16   everyone is getting exactly what they wanted out of the

17   evening, exactly what they came for.  And that's what happened

18   with Eaze.  Everyone got what they wanted.  The customers of

19   Eaze, they got legal marijuana delivered right to their door.

20   And they got to pay for it the way they paid for pretty much

21   everything else, using a credit card, exactly what they want to

22   do.

23           The drivers who worked for Eaze and did the

24   deliveries, they made money on the deliveries, and they didn't

25   have to pick up cash.  They were able to do their job without

L31AWEI3ps                   Opening – Mr. Gilbert

1    risking being robbed by having to drive around town with a lot

2    of cash in the car.  The Eaze investors and management, well,

3    they really had reason to party.  They did very, very well as

4    the value of the company skyrocketed.  The champagne was really

5    flowing for them.  The banks, I know you already figured that

6    part out, the banks did their thing.  They stood outside the

7    door where this lovely party was happening and from each person

8    who went inside, dressed to the nines, bringing a bottle of

9    wine, they took a little entrance fee.  And for good measure,

10   when people left laughing and a little tipsy on the way out,

11   they collected their fee too.  That's what banks do.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L31PWEI4                        Opening – Mr. Gilbert

1          MR. GILBERT:  And you may hear from some witnesses

2     from the banks at this trial that, as they stood outside the

3     door, collecting the fees, with the smell of good cooking

4     coming from inside, with people all dressed up, with the music

5     playing loud, well, they had no idea there could possibly be a

6     party going on inside.

7          Now, this was not Ruben Weigand's party.  It wasn't at

8     his house.  It wasn't even in his country.  It wasn't on his

9     continent.  He wasn't even on the guest list.  A friend said,

10    hey, come in and join us.  He came in late, and from what he

11    could see, everything was fine, but now Ruben Weigand is

12    sitting here.  Unfortunately, it's not a party.  It's as

13    serious as it can be, and only you, ladies and gentlemen, by

14    holding the government to its burden to prove the specific

15    crime they have charged, defrauding U.S. credit card-issuing

16    banks, and to prove it beyond a reasonable doubt, the highest

17    standard in our legal system, and let him leave and go back

18    home.

19         There will be no proof beyond a reasonable doubt that

20    Ruben Weigand, who has lived and worked his whole life in

21    Europe, ever intended to defraud banks in the United States,

22    banks whose only role in these transactions is that they issued

23    credit cards to people who wanted to buy marijuana in states

24    where it was perfectly legal to do so.

25         There will be no proof beyond a reasonable doubt that

L31PWEI4                     Opening – Mr. Gilbert

Ruben Weigand acted with criminal intent towards U.S. banks.
There will be no evidence that he had any intent to harm a bank
in this country in any way, shape or form.  To be clear, there
will be no evidence that Ruben ever had a single meeting, a
single phone call, or wrote a single text message or e-mail to
any bank in the United States.  There will be no witness to say
that Ruben ever discussed banks in the United States with
anyone.

There will be no evidence that Ruben Weigand ever gave
a second thought to issuing banks in the United States, and at
the end of the day, you cannot conspire to deceive someone you
haven't even thought about.  The evidence will make clear that
before Ruben even knew about these credit card processing, Eaze
had already been taking credit card payments for years.  Eaze
had already been using European payment processors and European
merchant banks.

This had nothing to do with Ruben.  The evidence will
also show that when Ruben did get involved with Eaze payment
processing, when Eaze was looking to revise the processing
systems they had already been using since 2016, Ruben got
involved in 2018, and he had a very limited role.  And that
role was focused entirely on Europe, which is where he's from.

His role, to put it simply, is that he was an
introducer.  He introduced people he knew from his business
contacts in Europe to assist on the administrative end on the

L31PWEI4                    Opening - Mr. Gilbert

1   ground in Europe, as Eaze revised the payment processing system

2   they'd been using.  And you'll see he weighed in from time to

3   time on some e-mails or chats with some technical advice about

4   how to work with European banks and accounts.

5         And during the few months Ruben was involved, all of

6   the necessary steps to revise the Eaze processing system were

7   taken by others, most of them by Oliver Hargreaves, the

8   government's cooperating witness, who has cut a deal with them,

9   that gives him every reason to pin as much of it on Ruben as he

10  can.

11        But Oliver Hargreaves cannot change the fact that

12  there will be no evidence that Ruben had anything to do with

13  setting up the website that the government talked to you about

14  or those companies that they talked to you about.  There will

15  be no evidence that he even saw those websites.

16        My name is Michael Gilbert, along with Michael Artan,

17  who is seated in the back, and Shriram Harid and our

18  colleagues, we have the honor of representing Ruben Weigand in

19  this case.

20        Now, you've already heard from Mr. Akhavan's very able

21  lawyers about the incredibly tortured theory of bank fraud that

22  the prosecution is pursuing here, a fraud where everyone got

23  what they paid for, where the issuing banks, among them the

24  most sophisticated companies in the world, were supposedly

25  deceived about something that they could see out their windows

1    in California; that people who were buying marijuana using

2    credit cards.

3            I won't repeat everything that Mr. Akhavan's lawyers

4    have said, but the fact that to this day you can continue to

5    use a card with a Visa/MasterCard logo on it to buy marijuana

6    through Eaze and the issuing banks continue day after day to

7    approve those transactions clearly labeled, coded as they say,

8    to make it clear, anyone who is looking at it, that it's

9    marijuana, that certainly bears repeating.

10           But as far as Ruben is concerned, there will be no

11   proof beyond a reasonable doubt that what the issuing banks did

12   with the little information, the codes that they got about

13   their card holder's transactions in the Visa/MasterCard system

14   that that mattered at all to Ruben.  His focus -- he wasn't

15   focused on Eaze at all.  And you'll see in the lengthy text

16   chain and all the documents, and there are many of them, for

17   much of them Ruben says nothing at all.  When he does chime in,

18   his focus is always on Europe and on the merchant banks in

19   Europe, not the alleged victims of this crime, U.S. issuing

20   banks.

21           His role stops and ends.  He was on the other side of

22   the ocean.  So how does Ruben end up here in this courtroom?

23   Well, despite everything I've just told you and everything you

24   heard, you will hear in this trial that in March of last year,

25   this man was on a vacation trip to Costa Rica.  He got off his

1    flight, connecting flight, in Los Angeles, and as he was

2    switching planes, he was arrested by the FBI.  He was

3    interrogated by the FBI.  He never made it to the connecting

4    flight.  He never went on that vacation.

5         Now, I will tell you a little bit more about Ruben,

6    who he is and his role in this Eaze credit card processing, but

7    before I do that, let me give you a few minutes about what Eaze

8    was doing before Ruben had anything to do with it.  Because it

9    is critical to understand what he was walking into, what the

10   evidence will show about what information was available to him

11   at the time he did get involved.

12        You've already heard Eaze was one of these Silicon

13   Valley darling companies, the next big thing, the Uber of pot,

14   a way to get marijuana delivered to your door with just a press

15   of a button on your phone.  And Eaze was not some

16   under-the-radar operation.  They had big-money investors,

17   lawyers, a well-developed website for all the world to see.  It

18   wasn't hidden.  By the end of 2017, Eaze had raised more than

19   $50 million from investors, and they wanted to have Eaze use

20   credit cards so the sales would increase, and Eaze did it.

21        They wanted to set up credit card processing and they

22   did it before Ruben was involved at all.  They used European

23   merchant bank accounts before Ruben was involved.  They used

24   European banks before Ruben was involved.  It was all in place

25   before Ruben had anything to do with it.  To use the label of

L31PWEI4                        Opening - Mr. Gilbert

1    Silicon Valley, let's call that Eaze payment processing version

2    1.0.  That was already set up.

3           Who arranged for these European accounts and banks for

4    Eaze 1.0?  Starting as early as 2016, the evidence will show

5    that Eaze worked with a European company called Clearsettle, a

6    major European financial institution, a licensed UK financial

7    company.

8           Now, under the Visa/MasterCard rules, merchant banks

9    were required to contract only with companies in their own

10   jurisdictions.  It had become a common practice in Europe, and

11   other areas, for entities sometimes called proxy merchants, to

12   be set up in the same jurisdictions where their banks were.

13   Clearsettle was European.  Clearsettle could contract with

14   European parties.

15          You may have noticed yourself from time to time on a

16   credit card statement, if you purchase something online from

17   one company, it shows up on your company statement with the

18   name of a different company.  But you bought the product and

19   you paid for it.

20          It was only later, in early 2018, when Eaze processing

21   1.0, the first version, needed a system update, and they were

22   looking for the next thing, version 1.1.  Basically the same,

23   but a little bit different.

24          Now, let me pause here and say a little bit about

25   Ruben.  You will hear in this trial that Ruben is from Germany.

1   That's where he grew up.

2            Now, it wasn't that long ago that all this payment

3   processing and being able to pay online for things was

4   something that couldn't be done.  We take it for granted now.

5   Ruben ran a company, a business called Payment Consultants.

6            MS. DEININGER:  Objection.

7            THE COURT:  Sustained.

8            MR. GILBERT:  You will hear that Ruben's unfortunate

9   involvement in this case traces back to a meeting you've

10  already heard about, where -- or you will hear about, I'm

11  sorry, in January of 2018.  He traveled to the U.S. for a trade

12  show.  A lot of payment processing people were attending.  He

13  was at Ray Akhavan's office for a meeting that had nothing to

14  do with Eaze.

15           Before that meeting, someone in Koen Van Prat, who

16  you'll hear about, came in with Oliver Hargreaves, the

17  government's star cooperating witness.  Ruben Weigand had never

18  heard or seen Oliver Hargreaves before.  The subject turned to

19  Eaze.  While marijuana had already been legal in California for

20  medical use, there was a big change in the works.  It was now

21  going to be legal for recreational use too.

22           For Eaze, this required increasing their credit card

23  processing capabilities, and they were looking to scale up

24  their system.  Now, think about the context.  Eaze was a

25  Silicon Valley company literally with billboards along the

L31PWEI4                          Opening – Mr. Gilbert

1    highway in California.  Marijuana was legal in California and

2    about to become legal before --

3              MS. DEININGER:  Objection.

4              THE COURT:  Overruled.

5              MR. GILBERT:  I'm sorry, your Honor.  I couldn't hear

6    you?

7              THE COURT:  Overruled.

8              MR. GILBERT:  Thank you, your Honor.  It was legal

9    already for medical use and was about to become legal for

10   recreational use.  Venture capital funding, input from

11   consultants from the payment card systems, this was blue chip

12   America.

13             Based on the evidence about Eaze that you will see and

14   hear, Ruben had no reason to think that all of these people

15   involved in this would be in some grand conspiracy to violate

16   U.S. law.  Just at the point that Eaze was looking to

17   skyrocket, the processing version 1.0 had hit a wall, and they

18   were looking to do this update.

19             Ruben said at that meeting, you'll hear evidence of

20   it, Oliver Hargreaves will tell you, that there was discussion

21   about how Ruben would introduce people he knew in Europe, who

22   might be able to help Eaze and the team to prepare applications

23   to open additional merchant accounts in Europe, using the same

24   exact banks they had already been using in Europe but different

25   accounts.

1          The idea was that Ruben would introduce some people in

2    person during a trade show in London the next month.  At that

3    trade show in London in February of 2018, Ruben introduced

4    Oliver Hargreaves to one of his contacts in Europe, Andreas, to

5    get involved in the project.  And from there, it was clear that

6    Oliver's team would work with Andreas on new account

7    applications with the same merchant banks in Europe that they

8    had already been using.

9          Andreas was introduced to Eaze, and they started

10   communicate on a group e-mail, something called EU Processing,

11   which you'll hear about in this trial.  I'll just tell you

12   briefly about EU Processing.  It's not a company.  It's not an

13   office.  What is it?  Plain and simple, it's an e-mail address.

14   It's a shared e-mail address, meaning several people used it.

15        There will be no evidence that Ruben set up this EU

16   Processing e-mail account, created the account, or owned the

17   account.  It was an e-mail address used to coordinate the

18   various moving parts, dispensary, Eaze and the representatives

19   of the European merchant banks.  Oliver Hargreaves may look to

20   tie Ruben to everything that was said and done on that EU

21   Processing e-mail, but the evidence does not support it.

22   Guessing, speculating or reading between the lines is not proof

23   beyond a reasonable doubt.

24        Now, as you will see in this trial, Ruben returns to

25   Europe.  This connection has been made, and you're going to see

1    evidence, you're going to see chats and other communications,

2    that Ruben was on relating to the Eaze processing during the

3    next few months in early 2018.  Look at the evidence carefully.

4    You will see that much of it does not involve Ruben doing

5    anything, directing anyone to do anything, or contributing much

6    at all.  He weighs in from time to time with some technical

7    advice from his experience in Europe.

8           You'll see that most of the government's evidence

9    consists of communications that Ruben was not a part of in any

10   way.  And, in fact, you'll see that all of the key aspects of

11   the Eaze credit card processing system, version 1.1, were put

12   in place by Oliver and others.  But most importantly, you will

13   not see communications in which Ruben Weigand is discussing how

14   to go about fooling issuing banks in the United States.  If

15   Ruben was involved in a criminal conspiracy aimed at U.S.

16   issuing banks, you would think that in all the e-mails, chats

17   and texts, all the documents that you'll see in this trial, and

18   there are a lot, you would see him discussing how do you trick

19   banks in the United States.  You will not see that.

20          From mid-2018, Ruben was less and less involved in

21   these discussions and only occasionally heard from the parties,

22   and that makes sense.  He was the introducer.  He got people

23   connected, and they got things up and running.

24          Now, let me say a few words about Europe and about the

25   European side of this processing.  Let me be clear, those

merchant banks that you will hear about, they were not shady

underworld operations.  They were international financial

institutions.

        MS. DEININGER:  Objection.

        THE COURT:  Hold on.

        (Pause)

        Well, I'm doubtful about it, but I will allow it with

all the caveats that I've already given you.

        The members of the jury, nothing counsel says is

evidence.  This is just his prediction.  It must be clear to

you by now that both sides are predicting very different

results of the testimony you will hear.  One side is saying

it's going to show a fraud filled with lies, the other side

says it's going to show nothing of the kind, and in any event,

their clients were not involved.

        You're going to decide those conflicts and all the

other conflicts based on the testimony, not based on what

counsel says in opening arguments.  This is just supposed to

give you an overview.

        And I do think, counsel, maybe you ought to trim your

remarks a bit.  It sounds like we're getting far into more

detail than is appropriate for opening argument.

        MR. GILBERT:  Thank you, your Honor.

        Well, I will just say that the evidence will show that

the merchant banks in Europe were all part of the

1    Visa/MasterCard network.  In order to do that, they had to be

2    accepted onto that network by Visa and MasterCard.

3            Now, the government asks you to use your common sense

4    during this trial, and when you do, you'll be asking yourself:

5    Who are the witnesses against Ruben Weigand?  Almost every

6    single witness you will hear from has never met or spoken to

7    Ruben Weigand.  Listen closely to the witnesses from Eaze, the

8    beneficiaries of this credit card processing.  They barely know

9    who he is.

10            There is no one, no one who will take the stand and

11    tell you:  I can help you get inside the mind of Ruben Weigand

12    because I know him, I've spoken to him; he shared what he was

13    thinking with me.  So instead, what the government is trying to

14    do is string together a bunch of documents with no real

15    explanation and ask you to infer and to speculate and tell you

16    that it's proof beyond a reasonable doubt, but it is not.

17            Now, let me tell you about one witness who did have

18    one very important conversation with Mr. Weigand and that's the

19    government's cooperating witness, Oliver Hargreaves.  He's an

20    admitted money launder, extortionist, and he steals from his

21    own employer.  The evidence will show that.  The evidence will

22    also show that after he was arrested, he got on a flight and

23    went back to Spain.

24            But he got the hang of cooperating, and in May 2019,

25    you will hear he called Ruben.  Tape recorder in hand.  His

whole purpose in making that phone call, we expect he will

acknowledge, was to get Ruben to admit that he was involved in

a bank fraud scheme, that he conspired to victimize banks in

the United States.  He took his shot --

          MS. DEININGER:  Objection.  Your Honor, the government

does not expect to introduce into evidence the call.

          THE COURT:  No, but that doesn't mean that defense

can't elicit this on cross-examination.  Whether or not I will

allow that, we'll have to decide then, under all the facts and

circumstances.  But I don't think it's sufficiently outside the

bounds to warrant it an inappropriate in opening statement; so

it's overruled.

          MR. GILBERT:  We expect the evidence will show that

when Oliver Hargreaves made this call, he got nothing, nothing

at all, from Ruben Weigand.

          Now, the government also mentioned that Ruben made

some statements after he was arrested at the airport in

Los Angeles, and they said he was asked about Eaze, and he said

he saw it on a billboard.  And you'll listen yourself carefully

to that evidence.  But what the government is trying to do --

well, what you'll see, ladies and gentlemen, is that that

statement is just the opposite of what the government has

pointed to it for.

          Think about it.  If Ruben Weigand had any inkling

whatsoever that he'd been involved in some grand conspiracy to

1    victimize the most powerful financial institutions in the

2    United States, do you think he would have signed up for a

3    connecting flight in Los Angeles on his way to a vacation in

4    Costa Rica?  Of course not.

5         The government also said they found some statements

6    and wire confirmations about the Eaze processing on Ruben's

7    computer when he was arrested.  And look at that evidence very

8    carefully, and you will see document after document, file after

9    file, the evidence will show that these materials showed up on

10   his laptop only after this alleged conspiracy was over.

11        And most importantly, when you do look at the

12   materials that they got from his laptop, you will see that

13   there's no evidence of him doing anything with those materials

14   while this conspiracy was going on, this alleged conspiracy was

15   happening.

16        And most importantly, there is nothing in anything

17   from that laptop that is any evidence of Ruben defrauding a

18   U.S. credit card-issuing bank or even discussing a U.S. issuing

19   bank.  And again, if Ruben thought for one second he was

20   involved in some kind of criminal undertaking involving these

21   powerful U.S. institutions, why on earth would he take these

22   materials with him on his flight through the U.S. on a vacation

23   after this was already over?  He wouldn't.

24        Ladies and gentlemen, Ruben is charged with somehow

25   deceiving the most sophisticated financial companies in the

L31PWEI4

1    world when those banks had easy, easy access to the very

2    information the government claims was the topic of some grand

3    deception.  How can you intentionally defraud someone you're

4    not even thinking about, have never communicated with, had no

5    reason to think could be hurt?  You cannot.  And Ruben did not.

6    If you hold the government to its burden of proof, you will

7    find that Ruben Weigand is not guilty.

8              THE COURT:  Thank you very much.

9              All right.  Ladies and gentlemen, that concludes

10   opening statements.  Tomorrow, we will start with the evidence

11   starting at 9:45.  Since we want to make sure that we finish

12   this trial in three weeks or less, it's important that we start

13   every day at 9:45.

14             So what I suggest is that you aim to be in the room

15   that my courtroom deputy showed you that you'll come into in

16   the morning, where you just came up from, by 9:30, and that

17   way, we can be sure that you're all here by 9:45 and we can

18   start right on time.

19             So have a very good evening, and I'll see you tomorrow

20   at 9:45.

21             THE DEPUTY CLERK:  We're going to go back out the way

22   we came in, ladies and gentlemen.

23             (Jury not present)

24             THE COURT:  Please be seated.  So the last objection

25   raised an issue that I don't think had been raised previously

L31PWEI4

1    with the Court, but if I understand what counsel was arguing,

2    you want to argue that when the government attempted, through

3    its undercover agent -- I'm sorry, through its cooperating

4    witness to elicit incriminating statements from Mr. Weigand,

5    they got nothing.  And I think that is probably admissible, but

6    let me hear what the government's objection is.

7         MS. DEININGER:  Your Honor, the evidence of what

8    Mr. Weigand said on this call is -- I think is simply hearsay.

9    It is not being admitted against the --

10        THE COURT:  No, their argument is he was being -- this

11   presumably would come out in cross with your cooperator.  The

12   cooperator is being asked to elicit incriminating statements

13   from Mr. Weigand.  They had a conversation for that purpose,

14   and lo and behold, what Mr. Weigand said was not incriminating.

15   That seems to me to be evidence of his lack of criminal intent.

16        I can instruct the jury it's not being offered for its

17   substance; so I don't understand why that wouldn't be

18   admissible.

19        MS. DEININGER:  It's not that Mr. Weigand said

20   nothing.  They did have conversations, and so the only way to

21   assess whether or not what he said was incriminating would be

22   to hear what Mr. Weigand said in those conversations.

23        THE COURT:  Well, once they go down that road, even if

24   you previously had said you weren't going to introduce it, then

25   the door is open for you to introduce it, if you prefer, as a

L31PWEI4

1  classic opening the door.  But they, obviously, have made that

2  strategic decision.

3        MS. DEININGER:  Your Honor, the government has no

4  intent on introducing those calls, and our position is that

5  asking questions about those statements would be directly

6  attempting to elicit those hearsay statements.

7        THE COURT:  If they were offering it for -- let me

8  give a hypothetical.  So in my hypothetical, undercover

9  cooperator X calls up Mr. Y and says: Don't you remember when

10  we agreed to rob that bank?  And Y says:  You got to be

11  kidding.  We never agreed to anything like that.  Don't joke

12  around.  That's baloney.  That would not be admissible to show

13  that they didn't rob the bank but, over a hearsay objection, it

14  would be admissible to show lack of intent because he was being

15  invited, by someone who allegedly was his co-conspirator, to

16  confirm incriminating matters and instead he didn't.

17        I'm raising this now because if there's case law on

18  this that you want to bring to my attention, that's fine, and

19  I'm not making any final ruling, but it seems to me that it's

20  probably admissible with a limiting instruction.

21        MS. DEININGER:  Yes, your Honor.  I think we would

22  like a chance to submit something in writing on that.

23        THE COURT:  Okay.  That's fine.

24        So just as a more general matter, if, at the end of

25  the day, in reflecting on the day's proceedings, you, any

L31PWEI4

party, comes up with, gee, I wish I had argued more about so

and so, and I have not yet made a final ruling, then you are

free, without further permission needed from the Court, to send

an e-mail, copying of course all lawyers, saying, you know,

apropos the pending issue of so and so, we also want to bring

to your Honor's attention whatever you want to say.

By contrast, once I've ruled finally, I don't want to

hear from you.  Okay?

All right.  Very good.  So I look forward -- as I

said, we should congregate -- I don't think we have much to

discuss -- so maybe 9:30 tomorrow rather than 9:00, and we'll

start promptly at 9:45.

MS. LA MORTE:  Just one point of clarification on the

schedule, your Honor.  I don't remember if this juror was

selected, but there was some juror that had some sort of

doctor's appointment or vaccine.

THE COURT:  That juror was excused.

MS. LA MORTE:  I think it was three.

THE COURT:  There's no juror presently, that I can

recall, that has anything other than a total devotion to

listening to your testimony or to your presentation.  So I'm

sure if there's anything contrary, the juror will let me know,

but I'm pretty sure that everyone -- there were several jurors

that had that chronic problem, and I think they all wound up

being stricken.

L31PWEI4

1          All right.  Very good.  I'm sorry, was there something

2     else?

3          MR. TAYBACK:  There is one additional matter.  We will

4     be submitting a proposed order on an application for, I believe

5     there's a plan to test the remote testimony devices this

6     afternoon in court.  In order to do that, we have to bring in a

7     couple extra laptops that are only for the purpose of that

8     testimony.

9          THE COURT:  It's all okay with me.  The person who

10    knows whether we need an order or not is really Linda; so you

11    should e-mail her and she will let you know.

12         MR. TAYBACK:  We will do that.  Thank you, your Honor.

13         THE COURT:  All right.  See you tomorrow.

14         (Adjourned to March 2, 2021, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25