```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                        20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
                Defendants.               Trial
7    ------------------------------x

8
                                          New York, N.Y.
9
                                          March 10, 2021
10                                        10:40 a.m.

11
     Before:
12
                         HON. JED S. RAKOFF,
13
                                          District Judge
14

15                         APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25                    APPEARANCES CONTINUED
```

SOUTHERN DISTRICT REPORTERS, P.C.

```
QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
      CHRISTOPHER TAYBACK
      SARA CLARK
      MARI HENDERSON
      DEREK SHAFFER
      PAUL SLATTERY
      -and-
ROTHKEN LAW FIRM LLP
      Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
      JARED R. SMITH
```

```
 1                (Trial resumed; jury not present)
 2           THE COURT:  The jury is on their way up.  Let's get
 3   the witness on the stand.
 4           It's 10:40 now.  We will probably give the jury their
 5   midmorning break at around 11:35, something like that.
 6                (Jury present)
 7           THE COURT:  Good morning, ladies and gentlemen.  Thank
 8   you for your promptness.  I'm sorry.  The matter that I had
 9   took a little bit longer than I thought it would, but we are
10   ready to go.
11           Counsel.
12           MR. ARTAN:  Thank you, your Honor.
13   OLIVER HARGREAVES, resumed.
14   CROSS-EXAMINATION cont'd
15   BY MR. ARTAN:
16   Q.  Good morning, Mr. Hargreaves.
17   A.  Good morning.
18   Q.  Now, over the course of the last several months -- actually
19   years since the time of your arrest, can you approximate how
20   many meetings in person or telephonically you have had with the
21   government?
22   A.  I would say, in excess of 20, 30 meetings, more.
23   Q.  And in preparation for your testimony today you've had
24   meetings with the government, I expect, is that correct?
25   A.  Yes, sir, that's correct.
```

 1  Q.  How many meetings have you had in relation to preparing for

 2  this trial?

 3  A.  I've had maybe ten.

 4  Q.  What was the last meeting you had?

 5  A.  Last -- I think last Sunday.

 6          MR. ARTAN:  I'd like to show the witness Government's

 7  Exhibit 4116.  If Mr. McLeod could put that up for the witness,

 8  I would be grateful.

 9  Q.  Do you see that, Mr. Hargreaves?

10  A.  Yes, I do.

11  Q.  Do you recognize it?

12  A.  Yes, I do.

13  Q.  It's a contact sheet for your phone.

14          MS. LA MORTE:  Objection.  Counsel is testifying.

15          THE COURT:  Sustained.

16  Q.  Could you tell us what that is.

17  A.  Yes.  It is from my telephone.  It's from my contacts in my

18  telephone.

19          MR. ARTAN:  May we publish it to the jury, your Honor,

20  and move it into evidence?

21          MS. LA MORTE:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 4116 received in evidence)

24  Q.  There is no e-mail address on Exhibit 4116, is there, sir?

25  A.  No, there is not.

1           MR. ARTAN:  If we could take that down.

2           I'd like to now place in front of the witness Exhibit

3    WX-207.

4    Q.  Do you recognize that, sir?

5    A.  It's an e-mail from my ProtonMail account.

6    Q.  You are copied on that e-mail, correct, sir?

7    A.  That is correct.

8           MR. ARTAN:  We'd like to move it into evidence, your

9    Honor, and publish it to the jury.

10          MS. LA MORTE:  No objection.

11          THE COURT:  Go ahead.

12          (Defendant's Exhibit WX-207 received in evidence)

13   Q.  Let me ask you this.  Based on your testimony in this

14   trial, the sender of the e-mail is Michele Furlan, is that

15   correct?

16   A.  Yes, that's correct.

17   Q.  And the e-mail is to Marty25@protonmail, correct?

18   A.  That is correct.

19   Q.  You are copied on the e-mail, correct?

20   A.  Yes, I am.

21   Q.  EUprocessing is also one of the people copied on the

22   e-mail, correct?

23   A.  That is correct.

24   Q.  You notice that the word Andi appears before the

25   EUprocessing e-mail address.

1          Do you see that?

2     A.   Yes, I do see that.

3     Q.   The Andi refers to Andreas, does it not?

4     A.   I have no idea.

5          MR. ARTAN:  We could put that down now, if you please.

6          One moment, please, your Honor.

7     Q.   Now, Mr. Hargreaves, on October 1 of 2018, you were

8     returned your back iPhone by the government, correct?

9     A.   I was returned my phone, yes.

10    Q.   In relation to that -- let me back up, if you don't mind.

11         At the time you were arrested you also had another

12    phone, correct?

13    A.   Yes, I did.

14    Q.   And that phone was returned to you as well, correct?

15    A.   That is correct.

16    Q.   If I'm not mistaken, you told the government recently that

17    you had lost the black iPhone, correct?

18    A.   Yes, I had.

19    Q.   In fact, you lost three phones since the time of your

20    arrest, is that correct?

21    A.   Unfortunately so, yes.

22    Q.   At the time you were returned the black iPhone, on October

23    1, 2018, you were advised by the government that you were only

24    to record incoming calls?

25    A.   If you have something --

 1   Q.   Isn't that correct, sir?

 2   A.   Could you show me something that refreshes my memory on

 3   that?

 4   Q.   Yes.

 5          MR. ARTAN:   If we could put on the screen item

 6   3501-0051, I would be grateful.  Page 2.  I'm sorry.  Page 3.

 7   A.   OK.  Yes.

 8   Q.   You were also advised that any messages that you sent from

 9   the phone must be able to be monitored by the U.S. Government,

10   correct, sir?

11   A.   That is correct.

12   Q.   Now, yesterday you testified about a phone call you made to

13   Ruben Weigand in May of 2019, correct?

14   A.   Yes.

15   Q.   And that phone call was Government Exhibit 28, correct?

16   The recording of that call was Government Exhibit 28, correct?

17          MS. LA MORTE:   Objection.  It was Weigand Exhibit 28,

18   so the record is clear.

19          MR. ARTAN:   Pardon me.  Thank you.

20          THE COURT:   Weigand exhibits.

21          MR. ARTAN:   Yes.

22          THE COURT:   Very good.

23   Q.   So that was a recording of a call you made, correct?

24   A.   Are you able to clarify whether I made it or whether it was

25   made to me.  I don't recall, I'm afraid.

1   Q.   You recorded the call, correct?  You recorded the call?

2   A.   I'm just asking you if you could clarify because I don't

3   recall, if you are able to.

4   Q.   You have no memory as to whether you recorded the call or

5   not?

6   A.   Sorry.  Apologies.  Yes, I did record the call.

7   Q.   And you recorded the call to help bolster the idea that you

8   are trying to help the government in relation to these various

9   investigations you've been working on, correct?

10  A.   I was adhering to the terms of my cooperation agreement,

11  sir.

12  Q.   Now, you didn't take note of the date and time of the phone

13  call, did you?

14  A.   No, I didn't.

15  Q.   Do you even know where you were at the time of the phone

16  call?

17  A.   Yes, I do.

18  Q.   Where were you?

19  A.   In my living room in my house.

20  Q.   In what country?

21  A.   In Barcelona.  Sorry.  In Spain.

22  Q.   And what phone was it you used?

23  A.   It was an iPhone.

24  Q.   Was it the same one that was released to you at the time

25  the government gave you the phone on October 1 of 2018?

1    A.  I don't know.  I don't recall.

2    Q.  Now, you didn't tell the government about the lost

3    telephones until the last week or so, correct?

4    A.  No, that is not correct.

5    Q.  Weren't you asked about your phones in general within the

6    last week, sir?

7    A.  Yes.  It was discussed.

8    Q.  You revealed at that time that you had lost three phones,

9    correct?

10   A.  Actually, I made -- I spoke with the agents who were

11   dealing with me.  At the time I didn't actually lose three

12   phones.  Some of them were broken, and they were broken to a

13   point where they had to be returned, and the insurance company

14   just provided me with a new phone.  I took photos of those

15   phones in case the agents asked me at the time because it meant

16   I was out of contact for a period of time.  I obviously

17   contacted my lawyer and had him contact the agents.

18        Yes, there was discussion surrounding these phones

19   put -- questions put to me in the last week regarding these

20   phones.

21        MR. ARTAN:  Your Honor, could I have a moment to

22   confer with counsel?

23        THE COURT:  Yes.

24        MR. ARTAN:  Thank you.

25   Q.  Mr. Hargreaves, I'd like an exhibit placed before you for

1    your examination, and that would be Government Exhibit 3970.

2            Do you recognize that?

3    A.  Yes.  It's an e-mail, presumably, from my ProtonMail

4    account.

5    Q.  The e-mail is from Kate Farmer of your group, correct?

6    A.  Yes, sir.

7    Q.  It's to EUprocessing, correct?

8    A.  Yes, sir.

9    Q.  And within the e-mail there is some discussion about

10   domains, hosting telephone numbers, and marketing service,

11   correct?

12   A.  Yes, sir.

13   Q.  The e-mail states:  The invoice supports payments for these

14   services -- let me back up, actually.

15           MR. ARTAN:  May we move this into evidence, your

16   Honor?

17           MS. LA MORTE:  I believe it's already in evidence,

18   your Honor.

19           MR. ARTAN:  Then I'll withdraw my request.

20           Could we publish it to the jury?

21           THE COURT:  Go ahead.

22           MR. ARTAN:  Thank you, your Honor.

23   Q.  The e-mail says:  The invoice supports payments for these

24   services through to 30 June 2019.  The second page provides a

25   full breakdown of these fees.

1    You see that?

2  A.  That's correct.

3  Q.  Then in bold type it says:  Please note we are ceasing

4  operations for support of websites and their maintenance.  We

5  will cease paying for these services after 30 June 2019.

6    You see that?

7  A.  Yes, I do.

8  Q.  The subject of the domains ending -- let me rephrase the

9  question.

10    The subject of the domains, hosting, and telephone

11  numbers were touched upon in the phone conversation that was

12  recorded and set forth in Weigand Exhibit 28, correct?

13  A.  Yes, sir.

14    MR. ARTAN:  If we could, your Honor, I would ask to

15  have Weigand Exhibit 28-T, the transcript, placed before the

16  witness.

17    THE COURT:  OK.

18    MR. ARTAN:  I'd like to go to page 3, line 16.

19  Q.  Now, in the transcript you are CS, correct?

20  A.  Yes.

21  Q.  You said:  Are you still dealing with the -- with the group

22  that the traffic -- that we were trying to deal with.

23    Do you see that?

24  A.  Yes, I do.

25  Q.  Mr. Weigand answers:  Possibly.  I know that there's

1    still -- there's some guys that I know or that I introduced.

2    They are taking care of it.  I've seen, something

3    unintelligible, hosting and phone numbers and all of that.  So

4    this is -- became to my attention and, unintelligible, because

5    this.

6          Then it continues.  You say:  Yeah, mate.  Mr. Weigand

7    says:  So.  Then you say:  You should be aware on that note and

8    I -- you know -- I know that my team had made everyone and who

9    they have been communicating with as aware of it as they can,

10   but I just -- you know, based on past experience -- it's

11   probably good that I'm speaking to you so I can reaffirm it.

12   In June, you know, we wanted to hand this over to you.  Yeah.

13   We are not doing -- providing this service to anyone anymore,

14   and we wanted to hand this over to you when.

15         Then Mr. Weigand says up at line 9:  So this is -- so

16   you're shutting this operation down.  Is this going to be

17   much -- because I -- you say we're not.  We're not shutting.

18         Do you see that?

19   A.  Yes, sir.

20   Q.  And then you say, at line 14:  We're not -- it's -- we've

21   just -- we're just refocused and we're really -- and I am --

22   iMerchant pay direct is purely gonna be focused on our banking

23   relation.  That's it.  It's profitable for us and this service

24   isn't.  So we basically just really -- because you guys --

25   because whoever we were speaking with basically said you

1    weren't set up to take it over yet, we basically extended it

2    and continued to -- and we've continued to manage it for you

3    until the end of June.

4              Do you see that?

5    A.  Yes, I do.

6    Q.  On the following page, on line 9, you say:  Yeah, yeah.

7    What you've done is paid for those, but we don't want to be

8    managing any of it beyond June.  I -- when it comes to June it

9    needs to come -- basically -- look, whoever we're communicating

10   with -- honest, whoever's been dealing with it, they're fully

11   aware of all of this, and I'm just letting you know.

12             Then on the following page, line 18, Mr. Weigand says:

13   So take over -- so I'm not operationally involved at all, but

14   I've rearranged some people, so that's OK.  I'll make sure they

15   are properly aware.  I guess they are, but yeah.  You know,

16   actually -- and that are more complicated and doing things your

17   own way.

18             Do you remember all that?

19   A.  Yes, sir.

20   Q.  Now, at no point during that conversation did you say to

21   Mr. Weigand, hey, I'm just repeating what was in that e-mail

22   that we sent in April.  You don't say anything like that,

23   correct?

24   A.  I didn't send the e-mail, sir.

25   Q.  The e-mail that Kate Farmer sent that we looked at earlier,

1   you didn't mention that, did you?

2   A.  No, I didn't.

3   Q.  You referred to whomever was receiving the communications,

4   correct?

5   A.  Yes, I did.

6   Q.  And at no point did you say -- you were operationally

7   involved.  You didn't say anything like that, did you?

8   A.  No, I didn't.

9   Q.  You never contradicted or corrected anything that

10  Mr. Weigand said, did you?

11  A.  No, I did not.

12          MR. ARTAN:  Nothing further at this time, your Honor.

13          THE COURT:  Cross-examination from Mr. Tayback.

14  CROSS-EXAMINATION

15  BY MR. TAYBACK:

16  Q.  Mr. Hargreaves, can you hear me?

17  A.  Yes, I can.

18  Q.  My name is Chris Tayback.  I'm here representing

19  Mr. Akhavan.  I am going to ask you a few questions.  OK?

20  A.  Yes.

21  Q.  I want to start with following up --

22          THE COURT:  Just put questions, counsel.

23          MR. TAYBACK:  Thank you.

24  Q.  With respect to the circumstances of your arrest, you were

25  arrested and you testified about your efforts to attempt to

SOUTHERN DISTRICT REPORTERS, P.C.

1    commit extortion.

2           Do you recall that?

3    A.  Yes, sir.

4    Q.  Now, the attempted extortion that you described having

5    committed, that was to collect money from a man who was here in

6    New York?

7    A.  No, that's not correct.

8    Q.  It was to collect money from a man who you believed or you

9    had understood had stolen money from your employer?

10   A.  No.

11   Q.  What was the attempted extortion plot?

12   A.  So -- could you ask the question in a different way.

13   Q.  What were you attempting to recover through the extortion

14   scheme?

15   A.  Money.

16   Q.  Why did you try to get that money?

17   A.  To gain -- I was hoping to make money from doing that.

18   Q.  You were paid for it?

19   A.  I was going to be paid a commission or a percentage of what

20   was recovered.

21   Q.  One of the ways to obtain that money through the extortion

22   scheme -- by the way, you were obtaining money from a man,

23   correct, a person?

24   A.  That is correct.

25   Q.  And the man that you tried to extort, the way you did that

1   was to try to intimidate him, correct?

2   A.  Yes, sir.

3   Q.  One of the ways that you tried to intimidate him was you

4   sent him photos, correct?

5   A.  I didn't send photos, no, sir.

6   Q.  But photos were sent in connection with the scheme,

7   correct?

8   A.  That is correct, yes.

9   Q.  And you were charged with the extortion scheme, right?

10   A.  I was charged with attempted extortion, yes.

11   Q.  And you read the complaint that charged you with attempted

12   extortion?

13   A.  Yes, sir.

14   Q.  And that complaint says that this man was sent a photo of

15   his wife and daughter, correct?

16   A.  That is correct, sir.

17   Q.  And the intent of that communication, sending the photo,

18   was to intimidate him, correct?

19   A.  Yes, it was, sir.

20   Q.  A subsequent photo was also sent as part of this extortion

21   scheme, correct?

22   A.  Yes, sir.

23   Q.  And that photo was of the man's daughter and her boyfriend,

24   correct?

25   A.  That is correct, yes.

1    Q.  And that was also sent for the same purpose, to try to

2    intimidate or threaten him, correct?

3    A.  Yes, it was.

4    Q.  In fact, your scheme was to try to convey a credible threat

5    that bad things would happen to this man if he didn't do what

6    you were asking, isn't that right?

7    A.  Yes, sir.

8    Q.  Now, after you were arrested you said that you spent the

9    next two days or more talking to the government, correct?

10   A.  Yes.  I spent time speaking with the government.

11   Q.  You recall in those rooms there were multiple law

12   enforcement agents?

13   A.  Yes, sir.

14   Q.  FBI?

15   A.  Yes, sir.

16   Q.  And IRS agents?

17   A.  I don't recall if that was the case or not.

18   Q.  And there were Assistant United States Attorneys,

19   prosecutors, correct?

20   A.  Yes, sir.

21   Q.  And these people took notes while you talked to them,

22   didn't they?

23   A.  Yes, sir.

24   Q.  By that point, that is to say, by the time you started

25   talking to these government lawyers and investigators, you had

 1   decided to cooperate with the government, right?

 2   A.  Yes, I had.

 3   Q.  Because you thought that was your best chance to save

 4   yourself?

 5   A.  Yes, I did.

 6   Q.  As you said yesterday, it's your view that no person in

 7   their right mind would want to go to jail, right?

 8   A.  Yes.

 9   Q.  That was your mindset at the time?

10   A.  Yes, sir.

11   Q.  So you would consider yourself to have been incentivized by

12   your arrest to tell the government everything you could think

13   of about the criminal activity that you knew of, right?

14   A.  I was incentivized to be honest about activities that I've

15   been involved in and that they were aware of.

16   Q.  In fact, you told them a lot of information, right?

17   A.  Yes, I did.

18   Q.  You told them about things that you did that were criminal,

19   correct?

20   A.  Yes, sir.

21   Q.  And you also described your general work that was not

22   criminal?

23   A.  Yes, sir.

24   Q.  Now, you didn't mention the efforts that you've described

25   throughout the course of your direct testimony to process

1    marijuana payments until the middle of the second day that you

2    spoke to the government, right?

3    A.  If you say so.  I don't recall exactly when.

4    Q.  I could not hear you.

5    A.  I said if you say so.  I do not recall exactly when.

6    Q.  You would expect it to show up in notes that the government

7    was taking if they said it earlier?

8    A.  Could I have one of these things that goes on the

9    microphone.  I can't see them here, and I think it's affecting

10   my ability for you to hear me clearly.

11        Is that better?

12   Q.  Yes.

13   A.  Could you repeat the question, please.

14   Q.  I'll reask a new question.

15        In your conversations with the government, after you

16   were arrested and before you were released and sent home, you

17   didn't mention any of the fake websites that you testified

18   about in direct, correct?

19   A.  I don't recall when we started discussing it.

20   Q.  You didn't mention any of the allegedly fraudulent

21   documentation that you described in your direct testimony?

22   A.  Sorry.  At which point?

23   Q.  During your conversations with the government, after your

24   arrest and before you were sent home to Barcelona.

25   A.  I don't recall.

1    Q.  Is it true that you didn't use the word fraudulent at all

2    to describe the work you did with respect to processing what

3    you understood to be marijuana credit card transactions during

4    your conversations with the government from the time of your

5    arrest until you were sent home to Barcelona a couple of weeks

6    later?

7    A.  Sorry.  I can't recall that.

8    Q.  Would it refresh your recollection to see notes from that

9    conversation?

10   A.  By all means.

11         MR. TAYBACK:  Your Honor, may I place in front of the

12   witness 3501-0010.

13   Q.  Mr. Hargreaves, if you look at the date at the very top, I

14   am going to have you read this to yourself.  You could skim

15   through.  It's a number of pages.

16   A.  I'll let you know when I get to the bottom.

17   Q.  Confirm me that you don't mention this marijuana company

18   for which you did business, you claim.

19   A.  Sure.  Sorry.  You are asking me to confirm what again?

20   Q.  To confirm that you did not mention anything about this

21   alleged marijuana processing scheme you described in direct

22   testimony in this first meeting with the government.

23   A.  No, I do not.

24   Q.  Meaning you don't see any reference to it, correct?  Does

25   that refresh your recollection?

1    A.  Yeah.  I see no reference to it.

2    Q.  Does that refresh your recollection --

3          THE COURT:  This is totally improper, totally

4    improper, and you know better.  You cannot refer to an exhibit

5    that's not in evidence.  You can't ask him to comment about

6    what's in the exhibit or what's not in the exhibit.  You can

7    ask him for his memory of the meeting and that's it.

8          MR. TAYBACK:  Understood, your Honor.

9    Q.  Let me ask you some questions about the second date that

10   you spoke to the government.  In fact, at that time, when you

11   mentioned -- at that time did you say to the government that

12   you tried to process medical marijuana traffic?

13   A.  I believe -- yes, I believe so.

14   Q.  And you said -- what you described at the time was we tried

15   to get involved in that, correct?

16   A.  Correct.

17   Q.  You said at that time that it was a U.S. client located in

18   Los Angeles, California, correct?

19   A.  Correct.

20   Q.  And you said at that time that they were a payment

21   processor that took in medical marijuana money, correct?

22   A.  Can I see this?  Is this something I can read?

23   Q.  Would it refresh your recollection to review notes?

24   A.  Yes, please.  Thank you.

25          MR. TAYBACK:  If you could place before the witness

1    only Exhibit 3501-0011.  You could bring up the paragraph that

2    I referred to.

3    Q.  You can read this to yourself only.

4    A.  Thank you.

5    Q.  Does that refresh your recollection with respect to what

6    you said to the agents and the government lawyers the second

7    day --

8    A.  Yes, thank you.

9         MR. TAYBACK:  You can take it down.  Thank you.

10   Q.  What you said was, they were a payment processor that took

11   in medical marijuana money, correct?

12        MS. LA MORTE:  Objection to the extent he is reading

13   from the document, your Honor.

14        MR. TAYBACK:  I believe I am asking him --

15        THE COURT:  Yes.  Her point, which is correct, is,

16   just be sure that you are not looking down and reading from the

17   document because that would be then putting in evidence

18   something that's not in evidence.  But the question was

19   otherwise proper.  So it's just a question of decorum.

20        MR. TAYBACK:  Just my outline, your Honor.

21   Q.  Didn't you tell them that they were a payment processor

22   that took in medical marijuana money?

23   A.  I believe so, yes.

24   Q.  Didn't you tell them, we were trying to capture some of

25   that traffic and process it?

1    A.   Yes, sir.

2    Q.   That meant you and your company, correct?

3    A.   Yes.

4    Q.   The company you were working for?

5    A.   Correct.

6    Q.   And you told them at that time, we actually tried to code

7    as medical services 8099, correct?

8    A.   That is correct.

9    Q.   Let me pause there.   8099 is a merchant category code?

10   A.   Yes, sir.

11   Q.   That's a four-digit number?

12   A.   Yes.

13   Q.   And 8099 stands for miscellaneous medical services.   Is

14   that your understanding?

15   A.   It is, yes.

16   Q.   Do you know that there is no merchant category code or MCC

17   for marijuana?

18   A.   Yes, I do.

19   Q.   Is it your understanding that in 2017, that marijuana was

20   legal in California for medical purposes only?

21   A.   Sorry.   I wasn't massively in favor of the laws about that.

22   Q.   You would agree that medical services miscellaneous is a

23   close approximation for marijuana in those circumstances?

24   A.   We were trying to -- I think the term that was used

25   frequently was, be elegant about the solution that we were

1   trying to put together.

2   Q.  You thought that 8099 was an approximately correct code,

3   correct?

4   A.  I didn't personally.  It was something that was presented

5   to us by a consultant and by some of my coconspirators.

6   Q.  It's fair to say you had no opinion on it?

7   A.  I'm not saying I didn't have an opinion on it.  I just went

8   along with it.

9   Q.  You also told the government in this second day of meetings

10  that you did not end up processing any of it, correct?

11  A.  Through this bank, yeah.

12  Q.  And you said, we did not process a single dollar.  Isn't

13  that what you told them?

14  A.  Yes, sir.

15  Q.  And you said, we spent a lot of time and effort trying to

16  make that work, but it did not?

17  A.  As I mentioned, we couldn't make it work at Paynetics.

18  Q.  That's everything you told the government in those first

19  two days of meetings about the marijuana credit card

20  processing, correct?

21  A.  I believe so.

22  Q.  That's what you told them while you were concerned that you

23  were literally facing time in prison, something you really

24  wanted to avoid?

25  A.  It is something I told them, yes.

1  Q.  You also spoke to the agents on October 2, several days

2  later.

3           Do you recall that?

4  A.  I recall that I was in the United States for a period of

5  about two weeks, during which I spoke to the agents on a number

6  of occasions.

7  Q.  Again, in this particular meeting you recall there were

8  four, five agents, a couple of lawyers for the government

9  taking notes?

10  A.  Yes, I do, sir.

11  Q.  And at that meeting you mentioned the marijuana processing

12  work again, correct?

13  A.  Again, you'd have to refresh my memory on exactly what I

14  said.

15  Q.  Would it refresh your recollection to look at notes?

16  A.  I'd appreciate that.  Thank you.

17           MR. TAYBACK:  May I place before the witness Exhibit

18  3501-0013 at page 4, just for the witness.

19  Q.  Read it to yourself only.

20  A.  OK.  I read it.

21           MR. TAYBACK:  You can take it down.  Thank you,

22  Mr. McLeod.

23  Q.  This October 2 meeting with the government, did you tell

24  them, we tried to do medical marijuana with Ray?

25  A.  Yes.

1  Q.  And you told them that the application was a delivery

2  service -- I'm sorry.  The applicant was a delivery service.

3  A.  By applicant do you mean Eaze?

4  Q.  Yes.

5  A.  Yes.  I believe it was on a website.

6  Q.  But you didn't know the name of the company Eaze at that

7  point in time, correct?

8  A.  When I had spoken with the government.

9  Q.  I'm sorry?

10  A.  Do you mean when I was speaking with the government?

11  Q.  Yes.

12  A.  Yes, I knew who the company were.

13  Q.  You did not mention the name?

14  A.  I don't know if you notice, but I don't have a great

15  memory.

16  Q.  You told the government that we created a website and

17  application packs for him, correct?

18  A.  Correct.

19  Q.  You did not say that anything about those applications or

20  websites were fraudulent in that interview, correct?

21  A.  I did not use the word fraudulent, I believe.

22  Q.  You didn't use the word false either, correct?

23  A.  No, sir.

24  Q.  You didn't use the word misleading, correct?

25  A.  No, sir.

 1   Q.  You didn't use the word deceptive, correct?

 2   A.  No, sir.

 3   Q.  Yet, at that moment in time, on October 2, several days

 4   after your arrest, you knew that the government, the FBI, the

 5   agents, the prosecutors, what they were looking for was

 6   criminality known to you, correct?

 7            MS. LA MORTE:  Objection.

 8            THE COURT:  Well, in terms of form, it's not a model

 9   of precision, but I think it is within the realm of what can be

10   asked about what this witness knew or understood.

11            Overruled.  You may answer.

12   A.  Would you mind repeating the question?

13   Q.  Yes.

14            At that moment in time, on October 2, when you were

15   speaking to the government, to the agents and the lawyers both,

16   you knew they wanted to talk to you about was your knowledge of

17   criminality, correct?

18   A.  I was answering questions that were put to me based on

19   information, I presume, that was extracted from the devices

20   that they took from me when I was arrested.

21   Q.  At this point in time you also told them, that is to say,

22   on October 2, you also told the government that the client was

23   very demanding, in your opinion, correct?

24   A.  Yes.

25   Q.  And that they didn't pay your last invoice?

1    A.  Yes, that's correct.

2    Q.  And you charged them 12 to $15,000 for the work?

3    A.  No.  It was more than that.

4    Q.  You recall it being more than that?

5    A.  I saw what you presented in front of me and I saw the

6    numbers there.  But as a totality it was more than that.

7    Q.  You are saying the amount that you believed you were owed

8    at the time and hadn't been paid was 12 to $15,000?

9    A.  Can I see the document again?  Do you mind?

10   Q.  If it would refresh your recollection.  Will it?

11   A.  What I'm saying is, I know what we charged per individual

12   application pack, but we didn't do just one application pack.

13   It was actually more money owed than just -- than one

14   application pack.

15   Q.  Let me ask you this.  Among the things you told the

16   government on October 2, that you did tell the government about

17   this is, is you felt aggrieved because they were a demanding

18   client and you were owed money, right?

19   A.  I wasn't owed money.  My company was owed money.  The money

20   did not come to me.  If you are asking me whether I was

21   personally aggrieved, not really, no.

22   Q.  But you believe your company was owed money, correct?

23   A.  Yes, we did.

24   Q.  That's something you shared with the government on October

25   2, correct?

1    A.   I believe so, yes.

2    Q.   You also said that at that time, in October, you told the

3    government, we would resell services and packages, company,

4    director, website --

5         MS. LA MORTE:  Objection to the extent counsel is

6    quoting from the document.

7         MR. TAYBACK:  I'll rephrase the question.  I'll break

8    it into component parts.  I'll withdraw it.

9         May I ask another question, your Honor?

10        THE COURT:  Yes.

11   Q.   Mr. Hargreaves, at that time, on October 2, you told the

12   government that we would resell services and packages, right?

13   A.   At some point I discussed that with them, yes.

14   Q.   By resell you mean you would use the work that you had done

15   for different clients on different matters, correct?

16   A.   No.

17   Q.   What did you mean by resell?

18   A.   I meant if there was -- for example, we were not -- for

19   example, the companies, the shelf companies that we purchased,

20   we were not personally forming those companies.  It was a

21   service provider who would do that.  We would pay them and we

22   would put a markup on it and sell it to clients.

23   Q.   So you would get these items from other providers and then

24   mark them up, correct?

25   A.   Yes, sir.

1   Q.  And at the time, October 2, when you were speaking to the

2   government, you did not describe any aspect of this as

3   fraudulent, didn't use that word.

4   A.  I don't recall the exact language I used.

5   Q.  Would it refresh your recollection to review the document?

6   A.  Is it the same document as before?

7   Q.  Yes.

8   A.  Then, no, I did not use that language.

9   Q.  You what?

10  A.  No, I did not use that language.

11  Q.  You didn't use the word false, correct?

12  A.  Correct, sir.

13  Q.  You didn't use the word deceptive?

14  A.  No, sir.

15  Q.  Now, isn't it true that you proposed at that time to use

16  some of that same work that you buy and resell to use it in

17  other efforts to try to obtain and identify other criminals?

18  I'll withdraw the question.

19          Did you try to use your business at that point in time

20  to help the government identify other criminals?

21  A.  Do you mean when I left the United States?

22  Q.  Did you propose that idea to the government in October?

23  A.  I don't know if I proposed it or not.  Again, if you can

24  share something that I can review, that would be helpful.

25  Q.  Now, you testified yesterday that after your arrest and

1   your return to Barcelona that you really did not do much work

2   with respect to the marijuana processing that you described

3   earlier, correct?

4   A.   That is correct, yeah.

5   Q.   You spoke to the government again on November 20, correct?

6   A.   November 20 of when?  Sorry.

7   Q.   November 20.

8   A.   Sorry.  Of which year?

9   Q.   2018.

10  A.   I'm sorry.  I don't recall the exact dates of when the next

11  time I spoke to them.

12  Q.   Let me put it to you this way.  Even after you returned to

13  Barcelona, you continued to talk to the government, correct?

14  A.   Yes, of course.

15  Q.   How frequently?

16  A.   I had to speak -- I had to touch base with the agents every

17  48 hours or so.

18  Q.   So you not only spoke to them during the time you were in

19  the United States between late September and mid October, when

20  you returned, but you talked to them afterwards as well?

21  A.   Yes, sir.

22        MR. TAYBACK:  May I have one moment, your Honor?

23        THE COURT:  Yes.

24  Q.   Would it refresh your recollection as to the date that you

25  next spoke to the government about marijuana processing to

1  review notes of your conversations?

2  A.  Yes, please.

3       MR. TAYBACK:  Can you place before the witness Exhibit

4  3501-0303.  Would you go to the next page.  This is just for

5  the witness.

6  Q.  You see at the top of the first page, if you could read to

7  yourself anything that indicates the date.

8  A.  Thank you.

9       MR. TAYBACK:  You can take that down.

10 Q.  Does that refresh your recollection --

11 A.  Would you mind putting the first one up again?

12 Q.  The first what?

13 A.  I saw some text.

14 Q.  Yes.

15      MR. TAYBACK:  Place that back up.

16 Q.  Does this refresh your recollection that you spoke to the

17 law enforcement agents about marijuana processing on November

18 20 of 2018?

19 A.  Yes.

20 Q.  At that time you, again, mentioned Ray, correct?

21 A.  Correct.

22 Q.  And he was identified as Ray, last name unknown, right?

23 A.  Yes.

24 Q.  You didn't know his last name?

25 A.  I didn't recall his last name.

1    Q.   You, again, mentioned the application packets, correct?

2    A.   Yes.

3    Q.   The way you described it at that time, on November 20, was

4    that you were involved previously with Ray, last name unknown,

5    about the creation of application packets regarding medical

6    marijuana, right?

7    A.   Correct.

8    Q.   You didn't say at that time that they were fraudulent,

9    right?

10   A.   I think it was very clear from the conversations we had

11   that my business was completely based around fraudulent

12   application packs.

13   Q.   You didn't say the word fraudulent, correct?

14   A.   No, I didn't say.

15   Q.   You didn't say the word fake, correct?

16   A.   No, sir.

17   Q.   You didn't say the words intent to deceive, correct?

18   A.   No, sir.

19   Q.   You testified yesterday about some crimes that you had

20   committed after you were released from custody and went back to

21   Barcelona?

22   A.   Yes, sir.

23   Q.   Is it true that after agreeing to work as a cooperator for

24   the government and agree to tell the truth, you broke that

25   agreement, right?

1    A.  Yes, sir.

2    Q.  I believe you said there were two separate thefts.  One was

3    $40,000.

4    A.  Two separate what?

5    Q.  Thefts that you committed.

6    A.  No.  One.

7    Q.  Did you indicate that you stole $40,000?

8    A.  Yes, sir.

9    Q.  That was from whom?

10   A.  The company.

11   Q.  Did you also steal $200,000?

12   A.  No, I did not.

13           MR. TAYBACK:  May I have one moment, your Honor?

14           THE COURT:  Yes.  Sometime in the next couple of

15   minutes we will give the jury their midmorning break.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  Did you say that among your -- in addition to stealing the

2    $40,000, you also transferred $200,000?

3    A.  Yes, sir.

4    Q.  And that was in a manner to you to be criminal at the time

5    you did it?

6    A.  I didn't -- so that transfer was to pay staff wages.  I

7    didn't really think about if it was criminal or not.  I was

8    under pressure, but I certainly shouldn't have done it.

9    Q.  Now, when did the government find out about what you've

10   described as these offenses?

11   A.  I told the --

12             MS. LA MORTE:  Objection.

13             THE COURT:  Sustained.

14   Q.  When did you tell the government about these events?

15   A.  I contacted the agents that were tasked with keeping in

16   contact with me.  I phoned them that same day and told them.

17   Q.  And when was that?

18   A.  I don't remember the date.

19   Q.  Do you remember the year?

20   A.  I'm going to go 2018.

21   Q.  Is it fair to say that at that point, you were even more

22   scared that you had maybe blown your cooperation deal?

23   A.  To be perfectly honest with you, I've been fairly nervous

24   throughout this whole situation, sir.

25   Q.  Is it true that at that point in time -- withdraw that

```
 1   question.
 2           THE COURT:  All right.  Ladies and gentlemen, we're
 3   going to give you your mid-morning break at this time.  I do
 4   want to keep it strictly to 15 minutes, since we're running a
 5   little late.  So we'll reconvene in 15 minutes.
 6           (Jury not present)
 7           THE COURT:  The witness can step down.  We'll see you
 8   in 15 minutes.
 9           (Witness temporarily excused)
10           Please be seated.  So, Mr. Tayback, how much more do
11   you have?
12           MR. TAYBACK:  I would estimate an hour and a half.
13           THE COURT:  Okay.  I think that's reasonable with a
14   witness of this kind.  I wouldn't want it to go much beyond
15   that, but an hour and a half sounds reasonable.
16           Okay.  Real good.  We'll see you in 13 minutes.
17           MS. LA MORTE:  Your Honor, is the lunch break still at
18   the same time?
19           THE COURT:  Well, I was thinking we'd move the lunch
20   break to 1:00 to 2:00.
21           MS. LA MORTE:  Okay, that makes sense.  Okay.
22           (Recess)
23           THE COURT:  Please be seated.  The jury is on their
24   way up, please get the witness on the stand.  We will go to
25   1:00 and have lunch from 1:00 to 2:00.
```

```
 1              THE LAW CLERK:  Jury entering the courtroom.

 2              (Jury present)

 3              THE COURT:  Please be seated.  All right.  Ladies and

 4   gentlemen, we're going to go until 1:00 and take our lunch

 5   break from 1:00 to 2:00; so we'll have a full hour now.

 6              Go ahead, counsel.

 7   BY MR. TAYBACK:

 8   Q.  Mr. Hargreaves, while you were working for the government,

 9   after you'd been released and sent home, you were authorized to

10   record telephone conversations, correct?

11   A.  Yes, sir.

12   Q.  Did you record any conversations with Mr. Akhavan during

13   that time period?

14   A.  Yes, sir.

15   Q.  How many?

16   A.  I remember one.  There may have been more, but I remember

17   one definitely.

18   Q.  And did you call Mr. Akhavan or did he call you?

19   A.  I don't recall.  I certainly -- I know that I made phone

20   calls to him.  I don't recall if the recorded call was incoming

21   or outgoing.

22   Q.  Did you -- you say you had multiple telephone conversations

23   with Mr. Akhavan after you were released?

24   A.  I said I remember having one.  There may have been more.  I

25   don't recall.
```

1    Q.  My question is slightly different.  Did you have

2    conversations with Mr. Akhavan after you were released that you

3    didn't record?

4    A.  I don't recall; so, no, I don't believe so.

5    Q.  And you recall one conversation with him that you did

6    record?

7    A.  Yes, sir.

8    Q.  Was it your goal in that conversation to try to get

9    Mr. Akhavan to say incriminating things?

10   A.  It was my goal to have a discussion with him about the

11   nature of our typical business.

12   Q.  The reason you recorded it, though, was to provide evidence

13   to the government if it was of value?

14   A.  That is correct, yes.

15   Q.  You testified previously about your plea agreement; do you

16   recall that?

17   A.  Yes, sir.

18   Q.  You did not enter into that written plea agreement that we

19   looked at yesterday until February of 2020, correct?

20   A.  That is correct, sir.

21   Q.  So that was about a month before this case was charged?

22   A.  If you say so, yes.

23   Q.  I'm asking you.

24   A.  I don't recall.

25   Q.  Is it your expectation, as you sit here now, that your

1   level of substantial assistance to the government will be

2   measured, at least in part, by how you do as a witness at this

3   trial?

4   A.  No.

5   Q.  You consider your testimony at this trial part of your

6   cooperation with the government, correct?

7   A.  Yes, sir.

8   Q.  I will ask you some questions now on a different topic.

9        You testified yesterday and used the term "high-risk

10  businesses;" do you recall that?

11  A.  Yes.

12  Q.  By high-risk you do not necessarily mean illegal, correct?

13  A.  No.

14  Q.  Well, you referenced gambling, which can be legal or

15  illegal, correct?

16  A.  Correct.

17  Q.  You mentioned Forex trading, which you said can be legal or

18  illegal, depending on licensing, right?

19  A.  Correct.

20  Q.  And you mentioned the travel industry?

21  A.  Yes.

22  Q.  How is the travel industry high-risk?

23  A.  Well, if you have an airline and an airline -- and you can

24  cancel your tickets -- you know, book your ticket four months

25  in advance, cancel it -- we look at it from the standpoint of

1    chargebacks.  And also, if an airline was to go bust, which is

2    not uncommon, it's a hell of a liability.

3    Q.  And so businesses that have a risk of bankruptcy would

4    constitute high risk?

5    A.  One of them, yeah.

6    Q.  And businesses that are in -- where the business is one to

7    likely generate chargebacks or returns, that's also high risk?

8    A.  Again, it's another thing that's taken into consideration.

9    Q.  Now, is it your understanding that -- let me back up.

10             You used the term sometimes acquiring banks?

11   A.  Yes, sir.

12   Q.  And is that the same as a merchant bank?

13   A.  No, it's not.

14   Q.  What's the merchant bank?

15   A.  Do you mean a merchant bank account?

16   Q.  Yes.

17   A.  It's an account given to a merchant that is typically

18   housed with an acquiring bank.

19   Q.  The term you use for the banks that would open accounts on

20   behalf of merchants was acquiring bank?

21   A.  Yes, sir.

22   Q.  And is it your understanding that acquiring banks monitor

23   the chargebacks from their merchants?

24   A.  Not only, but yes.

25   Q.  Isn't it true that regardless of -- even in the legal world

1   of credit card processing, chargebacks are a significant issue

2   for any acquiring bank?

3   A.   They're a significant issue for everybody.

4   Q.   And have you heard the term MIDs?

5   A.   Yes, sir.

6   Q.   What's a MIDs?

7   A.   It's a merchant account.

8   Q.   And who holds the merchant accounts?

9   A.   When you say hold, could you --

10  Q.   Are the merchant accounts opened with acquiring banks?

11  A.   Again, it really depends.   They can be, yes.

12  Q.   And it's your understanding that there's nothing illegal

13  about merchant banks opening MIDs for merchants, correct?

14  A.   I presume, if the nature of the business is legal, yes.

15  Q.   And can some of the merchants have multiple MIDs within a

16  merchant bank?

17  A.   Within a single merchant?

18  Q.   Within a single acquiring bank.

19  A.   Why would they do that?   Sorry.   I'm asking you a question.

20  Q.   Let me withdraw the question.   Ask you a new question.

21         Isn't it true that merchants can have multiple MIDs?

22  They can have different acquiring bank representations?

23  A.   Yes, sir.

24  Q.   And there's nothing wrong with that, in your view?

25  A.   In my opinion, no.

1    Q.  Now, isn't it correct that a high chargeback rate is

2    something that can get a merchant disqualified from

3    participating in the Visa or MasterCard networks; is that your

4    understanding?

5    A.  It would certainly lead to questions from the acquiring

6    bank usually.

7    Q.  And that's true even if the business is like a travel

8    agency or airline?

9    A.  Any business.

10   Q.  Is it your understanding that there is a percentage of

11   chargebacks that's used in the -- among European acquiring

12   banks to determine whether it's a risk that can be tolerated or

13   not?

14   A.  Yes, sir.

15   Q.  And what's that percentage?

16   A.  I don't recall.  It's different for Visa and MasterCard.

17   It's been a while.

18   Q.  Is it your understanding that European acquiring banks have

19   a higher percentage tolerance risk than American banks?

20   A.  I don't believe, no.

21   Q.  Do you know if that was ever true?

22   A.  I don't believe so, no.

23   Q.  How many -- if you have a sense, approximately how many

24   acquiring banks are there in Europe that process credit card

25   transactions?

1    A.  I have no idea.

2    Q.  It's more than the few that you've mentioned in your

3    testimony?

4    A.  Yes, sir.

5    Q.  Now, it's the merchant bank's responsibility -- withdraw

6    that.

7         It's your understanding, isn't it, that it's the

8    merchant bank's responsibility to monitor its merchants,

9    correct?

10   A.  The acquiring banks, you mean.

11   Q.  I apologize.  The acquiring banks?

12   A.  Yes.  Sorry.  If they have a direct relationship with the

13   merchant, and there was no business in between, then, yes.

14   However, if they have a relationship with a payment service

15   provider or payment facilitator, depending on license, then

16   they also are responsible.

17   Q.  And there are times where the acquiring bank's relationship

18   with the merchant is through an intermediary, correct?

19   A.  Yes, sir.

20   Q.  What are those intermediaries called?

21   A.  They could -- there are various different types of

22   intermediaries.  Typically, I would say a payment service

23   provider or payment facilitator.  There are different degrees

24   of responsibilities that are allowed.

25   Q.  What is an ISO?

1   A.   It can stand for an independent sales operator or an

2   independent sales organization.

3   Q.   And is that also sometimes an intermediary between the

4   merchant and the acquiring bank?

5   A.   That is what it is, yes.

6   Q.   That is what it is, correct?

7   A.   To answer your question directly, it stands for independent

8   sales operator or operative.

9   Q.   Now, were you -- you were not working as an ISO with

10  respect to any of the banks that you've identified as being

11  involved in the marijuana processing work, correct?

12  A.   No.  I was not an ISO, sir.

13  Q.   Were you aware of an ISO that was, in fact, serving that

14  purpose?

15  A.   In relation to which part, sir?

16  Q.   With respect to the marijuana processing work that you said

17  you worked on in 2018?

18  A.   Not in relation to Paynetics, but yes, in relation to

19  the -- well, the defendants, the banks that the defendants had

20  relationships with.

21  Q.   Was that ISO named Esepa?

22  A.   To be perfectly honest, I'm a little bit hazy about what

23  exactly their role was, but I'm familiar with that name, yes.

24  Q.   Do you remember the name of ISO that was involved?

25  A.   The reason I'm slightly hesitating is things mutated quite

1    a lot from initial discussions as we progressed.  And initially

2    there was a gentleman who -- called, I believe his name was,

3    Andreas.  He was meant to be, effectively, the ISO within the

4    scheme, and I remember receiving messages about Esepa, but

5    unless you can refresh my memory, I can't -- I know they were

6    involved certainly.

7    Q.  Do you know a person named Michael or Michele Kindle?

8    A.  I saw that we put his name on applications.

9    Q.  Do you know who that is?

10   A.  No, I don't really.

11   Q.  So you don't know if he's associated with Esepa, correct?

12   A.  I know as much as his name was on the -- his name was

13   brought up in relation with that, and on the documents we had,

14   his name was all over our documents as requested.

15   Q.  And is your understanding that he's associated with Esepa?

16   A.  Yes.

17   Q.  And, in fact, he was identified in some of the application

18   packages you looked at yesterday as a point of contact for a

19   number of them, correct?

20   A.  And that's why I recognize the name.

21   Q.  You testified on direct that you had reviewed, at some

22   point in time, the Visa rules or some parts of the Visa rules?

23   A.  Are you referring to my discussion regarding a question

24   that I posed in a message to Mr. Skoglund?

25   Q.  In part, yes.

1  A.  I asked that question, yes.

2  Q.  And so did you -- you did, in fact, review some aspect of

3  the Visa rules?

4  A.  I don't recall beyond that message.

5  Q.  Other than the instance that you described in your

6  testimony, do you have any recollection of ever reviewing the

7  Visa rules?

8  A.  To be honest with you, a few times I tried to actually

9  Google them and get up -- or request them from different

10  people.  It's quite arduous reading.

11  Q.  You did -- so the answer is, no, because it was arduous?

12  A.  No, I was really more -- to be perfectly honest, my role

13  within -- initially within this, this specific scheme, was one

14  to engage with acquiring banks and, at a later date, to create

15  application packs.  I wasn't -- there was a reason why we

16  engaged with consultants, that this was more their subject

17  matter.  They were more experts on the subject matter.

18  Q.  And one of the consultants you mentioned dealing with was

19  Stanley Skoglund?

20  A.  Yes, sir.

21  Q.  And he was someone you understood had previously been an

22  executive at Visa?

23  A.  That's my understanding, yes.

24  Q.  Do you understand what his position had been at Visa?

25  A.  No.

1    Q.   And did you find him knowledgeable about the Visa rules?

2    A.   Knowledgeable in I didn't really -- my knowledge was not

3    great; so he certainly knew more than I did.

4    Q.   So is it fair to say that you don't have any understanding

5    as to how the Visa rules applied to acquiring banks bringing on

6    merchants, correct?

7    A.   I know it's a fairly wide-ranging question, sir.

8    Q.   Is it fair to say you don't consider yourself an expert in

9    those Visa rules, correct?

10   A.   No, I relied on others.

11   Q.   You used the term a couple of times, including just now,

12   called a scheme.  You know the word scheme?

13   A.   Sure.

14   Q.   The phrase "card scheme" is something that's used in the

15   credit card industry, independent of any illegality, correct?

16   A.   I would say credit -- I would sometimes -- personally, I

17   would sometimes refer to Visa and MasterCard as the card

18   schemes.

19   Q.   And so the fact that the word "scheme" is in there doesn't

20   necessarily connote illegality, correct?

21   A.   Are you referring to the statement that I made?

22   Q.   Yes.

23   A.   I was referring to illegality.

24   Q.   Well, when you see the word "card scheme" in the credit

25   card business, you don't immediately think that that means

1    illegality, correct?

2    A.  No, I don't, sir.

3    Q.  And just to make clear I understand, you used, in that

4    context, it refers to a system or plan for the use of credit

5    cards or debit cards, right?

6    A.  Sorry, I'm getting a little bit lost in that line of

7    question.

8    Q.  A card scheme, in the terminology of credit card

9    processing, refers to the system for Visa or MasterCard to

10   process credit card transactions or debit card transactions?

11   A.  Me, myself, personally?  Yes.  Yes, actually.

12   Q.  Now, you talked about a few documents in your testimony

13   that you said were submitted to banks.  I want to ask you some

14   questions about that.

15        I believe you testified that you personally submitted

16   certain applications to some banks; is that right?

17   A.  No.  Myself, personally?  No.

18   Q.  Who did -- to your knowledge, if you have some

19   understanding, who did submit the applications that we looked

20   at yesterday to any bank?

21   A.  In my team, it would have been Kate Farmer.

22   Q.  And which banks do you recall actually having seen an

23   application submitted to?

24   A.  Having my seen?  Are you asking me ones that I personally

25   saw them submitted to --

1    Q.   Yes.

2    A.   Other than, therefore, cc'd?

3    Q.   Yes.

4    A.   I can't remember.

5    Q.   So as you sit here now, you can't remember a single bank

6    that you recall having seen the application submitted to?

7    A.   No, I don't know.

8    Q.   And your knowledge of that, your personal knowledge, were

9    based on you being copied on an e-mail?

10   A.   Yes.  Unfortunately, I was copied on hundreds of e-mails

11   daily.

12   Q.   And were the submissions always by e-mail, do you know?

13   A.   So again, unfortunately, things mutated a little bit.

14   Initially, as I think I mentioned, it was meant to be literally

15   a physical handover.  That was what was discussed.  Then

16   communications started between us, my team and Ruben, and I

17   know that packs were presented to Ruben.  I know that

18   submissions were made to settlement banks, acquiring banks by

19   my team.

20   Q.   I'm going to ask you a few follow-up questions about that.

21   You understand Mr. Weigand, that's the Ruben you're referring

22   to?

23   A.   Yes, sir.

24   Q.   You don't have any understanding that he worked for any of

25   the banks, correct?

 1   A.  No, I didn't say that, sir.

 2   Q.  When you say it was submitted to him, I want to clarify

 3   that you're not counting that as a submission to a bank?

 4   A.  No, sir.

 5   Q.  You also talked about settlement banks.  That's the phrase

 6   you used?

 7   A.  Yes, sir.

 8   Q.  A settlement bank is different than an acquiring bank,

 9   right?

10   A.  It's a different service, yes.

11   Q.  And the settlement bank is where they're not necessarily

12   part of the Visa or MasterCard network at all, correct?

13   A.  No, they provide effectively what I guess you could term a

14   business bank account.

15   Q.  So they just received the deposits, correct?

16   A.  Yes.

17   Q.  And the settlement banks that you submitted paperwork to,

18   what were they, which ones can you recall?

19   A.  Mistertango, Settlego, those are the two that spring to

20   mind.

21   Q.  Paygo, or no?

22   A.  Paygo, as in my company.

23   Q.  It was not -- is Paygo -- withdraw that question.

24        Paygo is not a settlement bank, correct?

25   A.  Are you talking about the company I worked for?

1    Q.  Yes, correct.

2    A.  No, it was not a settlement bank.

3    Q.  What is the nature of Paygo's business?

4    A.  It was an unlicensed payment service provider.

5    Q.  Isn't it correct it would have been the responsibility of

6    the ISO to actually submit any applications, if they were

7    submitted, to the acquiring banks?

8    A.  When you say the responsibilities, under what guise?  Do

9    you mean legally or --

10   Q.  Well, let me withdraw the question and rephrase it.

11           Isn't it true that, as you understood the process to

12   work during that period of time in 2018 when you were working

13   on it, that any application submitted would be submitted by the

14   ISO?

15   A.  So that was the initial discussions we had in the offices

16   in Calabasas, and again, as you -- as you -- I don't want to

17   say as you, I'm sure, have seen, but if you look at the notes,

18   you will notice that things evolved and changed constantly

19   because things were not quite going to plan, and that led to us

20   utilizing the merchants.

21           We were setting up e-mail accounts on behalf of the

22   merchants -- the fraudulent merchants, to clarify -- that

23   basically were then submitted through those e-mails.  We were

24   also providing documentation to the e-mail account,

25   EUprocessing, and a couple of other ones less frequently.

1   Q.   So --

2   A.   So, no, in the end, no I can't remember, and I can't

3   remember if we sent e-mails to Esepa or anyone else.  We were

4   asked -- sorry.  If you were listed as an ISO, certainly we

5   didn't send any e-mails outright knowingly to the gentleman

6   Andreas, who was originally meant to be the ISO.

7   Q.   So as you're here today, as you sit here today, you don't

8   have any idea if ISO, Esepa or any other ISO ever submitted any

9   application package that you prepared?

10  A.   I can only talk about what we did.

11  Q.   And as you sit here today, you can't remember a single bank

12  that you recall having seen the application submitted to the

13  acquiring bank?

14  A.   I don't know.

15  Q.   Now, the acquiring banks that I understood you referred to

16  yesterday were Kalixa, that's an acquiring bank?

17  A.   It was, yes.

18  Q.   Wirecard was an acquiring bank?

19  A.   Yes, sir.

20  Q.   And Ecom Processing was an acquiring bank?

21  A.   Yes, sir.

22  Q.   Those banks were all based in Europe, correct?

23  A.   Yes.

24  Q.   Kalixa is based in the United Kingdom?

25  A.   In Vienna, I believe.  Austria, sorry.

1   Q.   You believe in Vienna?

2   A.   Austria and United Kingdom.  I believe their license was in

3   the United Kingdom.

4   Q.   And Wirecard was based in Germany?

5   A.   Yes, sir.

6   Q.   And Ecom Processing was based in the UK?

7   A.   I think they're in -- I think they had offices in Sophia

8   and in London.

9   Q.   And to your knowledge, none of them are U.S. banks, right?

10  A.   Yes, sir -- no, sir, they're not.

11  Q.   And they're not the same as the issuing banks that you were

12  describing before, correct?

13  A.   Yes, sir.  Well, some of them provided issuing.  For

14  instance, Wirecard also issued.  I don't know if Ecom or Kalixa

15  also issued cards as well.

16  Q.   To be clear, when you described U.S. issuing banks, none of

17  them are U.S. issuing banks, to your knowledge?

18  A.   Not to my knowledge, no, sir.

19  Q.   It's true, isn't it, that you never -- you personally never

20  communicated with any U.S. issuing bank in connection with any

21  of the work that you describe doing for Eaze?

22  A.   No, I did not.

23  Q.   In fact, no one in your circle did, correct?

24  A.   No.

25  Q.   And you never reviewed any issue -- U.S. issuing bank

1   policies, correct?

2   A.  No, sir.

3   Q.  You didn't review policies from the Bank of America,

4   correct?

5   A.  No, I did not.

6   Q.  Or Citibank?

7   A.  No, sir.

8   Q.  Or Wells Fargo?

9   A.  No, sir.

10  Q.  So your preparation of these application packages was

11  solely for European banks, correct?

12  A.  That's correct, sir.

13  Q.  Either through an ISO or otherwise, correct?

14  A.  Through -- yeah, I mean, the application packs that I was

15  dealing with were for European banks.

16  Q.  Now, is it your understanding that, at the highest level of

17  the three acquiring banks I just mentioned, Kalixa, Wirecard

18  and Ecom Processing, that those banks knew that they were being

19  asked to process marijuana?

20          MS. LA MORTE:  Objection.  Foundation.

21          THE COURT:  Sustained.

22  Q.  Did you testify yesterday that -- didn't you previously

23  testify that some people within each of those banks knew that

24  they were processing marijuana?

25  A.  First, so sorry, are we talking about just Wirecard, Kalixa

1   and Ecom Processing?

2   Q.  Yes.

3   A.  I can -- only based on communications that I had with Ray

4   and Ruben.  I didn't directly discuss that with the banks.

5   Q.  Because you didn't discuss directly with those banks?

6   A.  No, sir.

7   Q.  In fact, did you ever speak to anybody at any of those

8   banks?

9   A.  Yes, sir.

10  Q.  With respect to the work for Eaze?

11  A.  No, sir.

12  Q.  On other matters?

13  A.  Yes, I did on other matters.

14  Q.  Do you know who Jan Marsalek is?

15  A.  Yes, sir.

16  Q.  And do you understand that he's the COO of Wirecard, or was

17  the COO of Wirecard?

18  A.  Yes, sir.

19  Q.  And your partner, he was -- I'm sorry, Jan Marsalek, he was

20  at that February 2018 meeting you described in London, correct?

21  A.  Yes, sir.

22  Q.  And the Eaze processing was discussed there, correct?

23  A.  It wasn't discussed with him, no.

24  Q.  You weren't present when it was discussed with him; is that

25  what you're saying?

 1    A.   No.  I'm saying I didn't discuss it with him.

 2    Q.   Do you know whether anybody else discussed it with him?

 3    A.   No idea, sir.

 4    Q.   So you don't remember saying -- as you sit here now, you

 5    don't know whether he knew that that bank was processing

 6    marijuana transactions?

 7    A.   That's correct.

 8    Q.   I want to ask you some questions about Kalixa, your

 9    partner, Koen, Koen Vanpraet?

10    A.   He was not my partner, sir.

11    Q.   I'm sorry.  He was your business associate?

12    A.   Yes, sir.

13    Q.   Is that an accurate way to phrase it?

14    A.   Yes.

15    Q.   Your business associate, Koen Vanpraet, he became the CEO

16    of Kalixa, didn't he?

17    A.   My understanding is that Kalixa no longer exists, sir,

18    certainly in brand anyway.

19    Q.   He became the COO in 2019 for a period of time, correct?

20    A.   COO or -- I'm sorry, I don't know, to be honest with you.

21    I know that he works in the payment industry.

22    Q.   Let me ask it a different way.  At some point in time,

23    didn't you come to know that Koen Vanpraet started working for

24    Kalixa?

25    A.   I know that he started working for a company that I believe

1    was a new branding, for whatever reason, of Kalixa, but again,

2    that's information seen online, nothing else.

3    Q.  And I'm not sure I understand.  So do you know or do you

4    not know whether or not he ever became a CEO --

5    A.  I guess the question -- I can't answer that question

6    without asking you a question, and I'm not allowed to do that.

7    Q.  Don't ask me any questions.

8    A.  Sure.

9         MS. LA MORTE:  Objection on personal knowledge.  I

10    think it's clear, your Honor.

11         MR. TAYBACK:  I've not asked a question.

12         THE COURT:  There's no pending question at the moment.

13         MS. LA MORTE:  Okay.

14    Q.  Let me ask you about Clearsettle.  I'm sorry, let me ask

15    you about Ecom Processing.  Do you know a person named Yoni

16    Roth?

17    A.  Only by name.

18    Q.  Wasn't he also at the meetings in London in February of

19    2018?

20    A.  If he was, I don't recall.

21    Q.  Now, you've described a bank called Paynetics as well,

22    correct?

23    A.  Yes, sir.

24    Q.  And that's also an acquiring bank?

25    A.  Yes, sir.

1   Q.  And that's a bank that was not ultimately -- did not

2   ultimately process any of these transactions, correct?

3   A.  Correct.

4   Q.  You testified that Paynetics knew that the processing work

5   that was to be done was marijuana, correct?

6   A.  Yeah.  Yes.

7   Q.  Is that because you told them that?

8   A.  Yes.

9   Q.  Do you know whether Ecom Processing is still in business?

10  A.  I don't know, no.

11  Q.  Now, was it -- when you were doing this work with respect

12  to the processing of marijuana transactions in 2018, was it

13  your understanding that -- let me withdraw that.

14        If I could display for the witness Exhibit GX4004 at

15  page 45.  It's already in evidence.

16        If you could take that down, and I think I have the

17  wrong page.  I have to find the right page.

18        MR. TAYBACK:  May I have one moment, your Honor?

19        THE COURT:  Yes.

20        (Pause)

21        MR. TAYBACK:  Sorry, if you could bring up page 71 of

22  that document.

23  BY MR. TAYBACK:

24  Q.  Now, do you recognize this as the series of chats that you

25  looked at during your testimony, entitled Olliebaba?

 1   A.  Yes.

 2   Q.  You'll see a statement one, two, three, four bubbles down?

 3   A.  Yes.

 4   Q.  "Jan suggested we make nutra sites;" do you see that?

 5   A.  Yes.

 6   Q.  Did you understand that to refer to Jan Marsalek?

 7   A.  Yes.

 8   Q.  And did you have an understanding at this time that

 9   Mr. Marsalek was the CEO -- or I'm sorry, the COO of Wirecard?

10   A.  Yes, I did.

11   Q.  And that he was aware of the applications that were to be

12   submitted for the processing of marijuana?

13   A.  Sorry, could you repeat that last question?

14   Q.  I'll rephrase it.

15        Was it your understanding at this time that

16   Mr. Marsalek was aware that applications were being submitted

17   for merchants that would be in the business of processing

18   marijuana?

19   A.  I don't know how to answer that.

20   Q.  I'm sorry?

21   A.  I don't know how to answer that.  I'm reading a statement

22   written by a third party alluding to this person.  I can't tell

23   you whether he knew something or didn't know something.

24   Q.  Do you recall at the time understanding that Mr. Marsalek

25   had suggested that some of these merchants should talk about

1   nutraceuticals, something like that?

2   A.  All I know is what is being said to me by the person

3   sending me that message and what is suggested within those

4   messages.  I can't tell you what Jan does or does not know.

5   Q.  So you have no recollection, as you sit here, whether or

6   not anyone at Wirecard, in fact, knew that they were being

7   asked to process marijuana?

8   A.  I don't know.  I didn't speak with anyone at Wirecard, sir.

9   Q.  And you don't know whether anybody at Ecom Processing was

10  being asked to process marijuana, correct?

11  A.  I did not speak to anyone at Ecomm Processing, sir.

12  Q.  And you have no understanding otherwise, correct?

13          THE COURT:  This would, under the guise of his

14  understanding, really call for hearsay.  Sustained.

15  Q.  And you have no knowledge of whether anyone at Kalixa knew

16  that they were being asked to process marijuana with respect to

17  any of the applications that you worked on?

18  A.  I can only -- I did not communicate with anyone at Kalixa

19  directly, no.

20  Q.  Now, let me ask you some questions about the websites that

21  you testified to working on.  Is it your understanding that

22  those websites are part of the submission to the acquiring

23  banks?

24  A.  Yes.

25  Q.  And as far as you know, that information, the websites

1    themselves, do not go to the issuing banks, correct?

2    A.  No, they don't.

3    Q.  And nor do the applications, correct?

4    A.  No, sir.

5    Q.  Now, I'm going to ask you some questions about the work

6    that you did -- you say you did on those applications.

7           Was it your understanding that the merchant itself or

8    the acquiring bank decides what an appropriate merchant

9    category code is?

10   A.  Certainly not the merchant.

11   Q.  The merchant?

12   A.  I said, it's certainly not the merchant.

13   Q.  Not the merchant, correct?

14   A.  Correct.

15   Q.  The acquiring bank, or do you know?

16   A.  I would -- I ought to say my memory is slightly hazy.

17   Q.  So your memory --

18   A.  If I was to give you my opinion, it would be that they

19   had -- that MCC codes are generated by Visa and MasterCard, and

20   those are provided to the acquiring banks.

21   Q.  Is that based on your hazy memory of what your

22   understanding was at the time?

23           MS. LA MORTE:  Objection.  Form.

24           THE COURT:  No, I think the door was opened.

25   Overruled.  You may answer.

1    A.   It's my understanding.

2    Q.   Based on the hazy recollection that you've just said you

3    had, or is it clearer now?

4    A.   It's what I think.

5    Q.   Now, the descriptors, do you know what a descriptor is?

6    A.   Yes, sir.

7    Q.   It's different than a merchant name, correct?

8    A.   Right.  It's the information that's on your credit card

9    statement, or you would see on your credit card statement.

10   Q.   So if you buy something from Amazon, it might be AMZN?

11   A.   Potentially.

12   Q.   A descriptor -- let me ask another question.

13        Isn't it true that, in your understanding, a

14   descriptor is not necessarily the same as the merchant's name?

15   A.   My understanding is it would need to be the phone number or

16   the website.

17   Q.   That must be included in the descriptor, correct?

18   A.   Yes, sir.

19   Q.   But the descriptor itself need not say Joe's Coffee Shop,

20   or any other particular merchant name, correct?

21   A.   Are you suggesting that if you have company name, website

22   name, it could be something completely different?  I'm sorry, I

23   don't understand that.

24   Q.   I can't answer your question, but I can ask you another

25   question.

1    A.   Sure.   Thank you.

2    Q.   Isn't it your understanding that the descriptor can be

3    different from the actual name of the merchant company?

4    A.   It's my understanding it would need to be the company or

5    the website for the company that made the application.

6    Q.   And the website could have a name different than the names

7    of merchant's name?

8    A.   It could be, yes.

9    Q.   Now, you didn't -- the applications that you worked on that

10   you described working on in 2018, those didn't vary much,

11   correct?

12   A.   We tried quite hard to make them vary, actually.

13   Q.   Well, do you recall taking -- if you could put up GX3915

14   and then go to the page that begins -- this is in evidence,

15   your Honor.   Go to the page that lists the articles of

16   incorporation.   Right there.

17        Do you see that you attach the articles for these

18   companies?   Do you see those?

19   A.   Yes, sir.

20   Q.   The articles you submitted for each of the applications,

21   for the different companies that you worked on, those are all

22   identical, right?

23   A.   They were all British companies, sir.

24   Q.   And they're -- meaning this -- these articles didn't vary

25   at all, correct?

1    A.  I hadn't actually read them all or looked at them all in

2    any detail.

3    Q.  You can take it down.  Thank you.

4         Now, when you began working on the solution for

5    obtaining -- for processing credit card transactions for Eaze,

6    you communicated with Mr. Akhavan regarding what he was saying

7    Eaze required, correct?

8    A.  Yes.

9    Q.  Isn't it true that one of the things that Mr. Akhavan made

10   clear to you is that he thought that the merchant category code

11   needed to be the closest thing to describe the delivery of

12   marijuana?

13   A.  I don't recall that.  If you have something that would

14   refresh my memory, that would be helpful.

15   Q.  And when you first started mentioning your understanding of

16   what the merchant category code for the sale of marijuana was,

17   you described to the government it was 8099, right?

18   A.  That was what we looked at originally, based on the

19   recommendations received.

20   Q.  And that's medical miscellaneous, correct?

21   A.  Yes.

22   Q.  And it's your understanding that that's the code that --

23   well, did you speak to Mr. Akhavan about numeric code that

24   could be used or should be used?

25   A.  Possibly.

1  Q.  And he suggested 8099, right?

2  A.  I don't recall.

3  Q.  Did you speak to Mr. Stanley Skoglund about what code to

4  use?

5  A.  Yes, I did.

6  Q.  And he suggested 8099, correct?

7  A.  Yes, he did.

8  Q.  Do you understand that -- with respect to the descriptors,

9  you testified that you communicated with Mr. Akhavan about what

10  descriptors could be used?

11  A.  Possibly.

12  Q.  Well, didn't he tell you that you needed to use a

13  descriptor that would remind the customer of what their

14  purchase was?

15  A.  Yes.  Sorry, yes, we discussed the fact that it was

16  important as much -- in fact, it was -- yeah, it was difficult.

17  We had to -- the descriptor had to match the -- what we termed

18  the proxy website, the fraudulent website, whatever you want to

19  call it, and the actual true merchant Eaze.  So it was trying

20  to come up with something that sort of met the requirements of

21  the acquiring bank and also jogged the memory of the customers

22  of Eaze to try and avoid chargebacks, basically.

23  Q.  And to avoid chargebacks by making sure that the customer,

24  when they looked at their bank statement, recognized that, oh,

25  yeah, this was a delivery or a delivery of marijuana?

1    A.  Sure, yeah.

2    Q.  So didn't Mr. Akhavan tell you that the descriptor needed

3    to have a reference to logistics or distribution for marijuana?

4    A.  Yes, we had conversations on that basis.

5    Q.  And he proposed some to you, correct?

6    A.  Yes.

7    Q.  One was Indus-DS, DIST?

8    A.  Something like that, yeah.

9    Q.  And you know Indus is a marijuana company, correct?

10   A.  I didn't know that, no.

11   Q.  It was your understanding that DIST stood for distribution?

12   A.  Yeah.

13   Q.  And did you have any understanding as to what Indus

14   referred to?

15   A.  I really didn't.

16   Q.  If you could bring up Exhibit GX1449, and if you could look

17   at the descriptor column.

18              This is in evidence also.

19              These descriptors, were they things that you came up

20   with?

21   A.  Certainly Goodegreenbazaar was, Organikals and Green -- and

22   Greenteacha.  I think Indus-dist and Soniclogistix, Ray was

23   involved in those, I think.  I can't remember, but the last

24   three certainly were.  We came up with those.

25   Q.  And is it your understanding when you came up with

1    Greenteacha and Goodegreenbazaar Organikals, that those were

2    referencing marijuana?

3    A.   No.   Greenteacha was tea.

4    Q.   But wasn't the purpose to remind the customer of what it

5    was they bought?

6    A.   No.   At this point, we were way beyond that being possible.

7    Q.   So Indus.distr.com, you didn't know what that referred to?

8    A.   You see, the thing is, you're looking at these as if they

9    were all done together.   These were created over a timeline of

10   quite a long period of time, and certainly at the beginning,

11   you will see, if you look beyond these descriptors or these

12   website addresses, there were ones that even involved, in some

13   way, Eeazzed, E-E-A-Z zed.   And so but unfortunately, you can

14   appreciate that the banks were not particularly -- certainly

15   banks -- I can only talk directly about Paynetics.   They were

16   not particularly interested in having things that remotely

17   sounded like -- that referenced marijuana.

18   Q.   Can we take this down and put up Exhibit 45004 at page 24.

19        Well, you recognize, if you go down to the bottom of

20   the page, where it begins "Lorry draft key"?

21   A.   Yes, I see that.

22   Q.   Do you see Mr. Akhavan is the person speaking here?   Do you

23   see that?   You've got to go up a little bit to see that.

24   A.   Thanks.

25   Q.   Do you see that?

1   A.  Yes, I see it.  Thank you.

2   Q.  If you go down, he says -- sorry, just above it there; just

3   one line above -- "Soniclogistix."  Mr. Akhavan is saying "Why?

4   I don't get it.  That makes no sense."  Do you see that?

5   A.  Yes, sir.

6   Q.  And if you look at the bottom of the page there, where it

7   says Sonistics?

8   A.  Yes.

9   Q.  He says, "Sonistics has to go.  That one makes zero sense."

10  Do you see that?

11  A.  Yeah, I see it.

12  Q.  If we could finish this.  It says, "The whole reason we use

13  the name, the whole reason we use the name Soniclogistix is so

14  we could have logistics in the descriptor;" do you see that?

15  A.  Yes, sir.

16  Q.  Okay.  Take it down.  Isn't it true that Mr. Akhavan

17  corrected proposed descriptors when he thought they didn't

18  refer adequately to marijuana or delivery?

19  A.  I think it was more to do with Eaze than marijuana.

20  Q.  That didn't refer to Eaze or marijuana or delivery or

21  something that would refresh the customer's recollection of

22  what they bought?

23  A.  Correct.

24  Q.  And if it was -- withdraw that.

25          I want to clear one thing up.  We looked at a chat --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1   well, withdraw that.  Let me go back.

2       You said the reason for that was to reduce

3   chargebacks; do you recall that?

4   A.  Excuse me?

5   Q.  You said a reason for a descriptor connecting to the

6   customer's purchase was to minimize chargebacks, correct?

7   A.  And ultimately account closure.

8   Q.  Which chargebacks can lead to account closures, correct?

9   A.  Certainly.

10  Q.  So the idea is you don't want customers puzzled over what

11  they bought and seeking to refund a purchase, correct?

12  A.  Correct.

13  Q.  And that means the customers and the bank statements that

14  they received through their banks, the idea is to reflect

15  accurately to the customer something that will remind them of

16  what they bought, right?

17  A.  Yes.

18  Q.  Now, we saw one of the chats just now.  You'll recall you

19  were asked some questions about communications on that platform

20  called Telegram, yes?

21  A.  Yes.

22  Q.  There are some references there to "deleted account"; you

23  saw that?

24  A.  Yes.

25  Q.  I believe you indicated, at one point in your testimony,

1  that you believe Mr. Akhavan's account was deleted.  That's not

2  accurate, correct?

3  A.  Did I?  Could you refresh my memory with that?

4  Q.  Let me ask a different question.

5       Having reviewed those chats, isn't it your

6  understanding that Ms. Farmer, your colleague's account is the

7  one that's deleted?

8  A.  It was an account that was deleted, yeah.

9  Q.  And but you saw Mr. -- you saw the icon associated with the

10  Ray, Ray CE, in that chat that you identified as Mr. Akhavan.

11  That is not deleted, correct?

12  A.  Yes, sir -- no, sir, I mean.

13  Q.  Now, isn't it correct that your -- that ultimately,

14  Mr. Akhavan left the E -- handling of the EU side of the

15  acquiring banks to you and your team?

16  A.  In what guise?

17  Q.  Let me rephrase the question.  Your responsibility, in

18  terms of the work that you did in 2018, was to prepare

19  application packages for European banks?

20  A.  Correct.

21  Q.  And your introduction to Mr. Akhavan in connection with the

22  Eaze work was because you and your business associate, Koen

23  Vanpraet, had pitched him that you had a solution, correct?

24  A.  Correct.

25  Q.  If you could put up IWX4.  This is also in evidence.

1    Do you recognize this as an e-mail on which you are

2    copied from Mr. Vanpraet?

3    A.  Yes, I do.

4    Q.  And it's dated September 12th, 2017; do you see that?

5    A.  Yes, I see that.

6    Q.  And do you see in the body of the text Mr. Vanpraet says --

7    go to the substance of it -- "Based on a few WhatsApp exchanges

8    I had with Ray, I would like to plan a call for me to introduce

9    my new role and company I represent, and at the same time,

10   exchange a few ideas Oliver and I have in regards to how we

11   believe we have a few interesting solutions for your business."

12   Do you see that?

13   A.  Yes, sir.

14   Q.  And then the next sentence says, "We took liberty in doing

15   some research as to how we can help you with the adult traffic,

16   but equally believe we can offer a solution for WWW.Eaze.com

17   processing."

18   The date of this e-mail, does that reflect the first

19   time that you began to discuss with anybody that you believe

20   associated with Mr. Akhavan, the idea that you had a solution

21   for processing transactions for Eaze?

22   A.  You'll have to show me the dates of certain messages I had

23   from Koen Vanpraet on WhatsApp.  I don't -- my recollection --

24   so I don't know if this came before or after messages I

25   received from Mr. Vanpraet.

1    Q.  My question isn't whether you spoke to Mr. Vanpraet about

2    it.  This is your first awareness of any communication with

3    anybody associated with Mr. Akhavan?

4    A.  I can't answer that.  I don't know if this is the first

5    e-mail.

6    Q.  Well, I believe you indicated in your testimony that you

7    started work in 2016 or 2017.  Is it fair to say that you

8    didn't meet with them to discuss your work until at least after

9    September of 2017?

10   A.  So I met -- Koen Vanpraet joined our company as the CEO in

11   August of 2017, and shortly thereafter introduced an

12   opportunity, which are the two opportunities expressed within

13   this e-mail, in relation -- if you're asking -- I didn't know

14   about this before then.

15   Q.  And my question is, this is all happening in 2017, not

16   2016, correct?

17   A.  This happened in 2017, yeah.

18   Q.  Now, when you -- the results of that overture was that

19   there was a meeting in Calabasas, California, outside

20   Los Angeles, in January of 2018?

21   A.  Yes, sir.

22   Q.  And your understanding was that Mr. Akhavan was acting on

23   behalf of Eaze?

24   A.  I didn't really question or ask what the relationship was.

25   I trusted Koen, and Koen had an existing relationship with him.

1    Q.   Fair to say, as you sit here, do you know whether

2    Mr. Akhavan ever worked for Eaze?

3    A.   I don't think he ever worked for them, no.

4    Q.   You don't think he worked for them?

5    A.   No, I don't think he worked for Eaze.

6    Q.   And did you have any understanding whether he was an

7    intermediary between --

8    A.   Just to clarify, when you say "worked for ease," do you

9    mean he was an employee of Eaze?

10   Q.   Your understanding was he was not an employee of Eaze,

11   correct?

12   A.   Correct.  I'm guessing.  I don't know if I can answer that

13   question.

14   Q.   So you don't know whether he worked for Eaze?

15   A.   No, I don't.

16   Q.   You don't know whether he was a consultant or an

17   intermediary of some sort, or what his status was?

18   A.   No, I don't.

19   Q.   Now, when you were meeting with the people from -- the

20   people in Calabasas, what company were you acting on behalf of?

21   A.   That's a good question.  It's difficult for me to answer

22   because I basically worked for my main employer, who had a

23   number of companies, as you know.  Where this business was

24   going to be placed, I could -- yeah.

25   Q.   Were you acting as an intermediary at that meeting on

 1   behalf of anyone else who wasn't present?

 2   A.   No, I was working for the company.

 3   Q.   And is that the company Intrapay?

 4   A.   It was -- so there was a bunch of companies that were owned

 5   by a holding company called Sappaya, a lot of different brands.

 6   I worked for all of them, basically, in some guise.

 7   Q.   Among the names that you've mentioned in the your

 8   testimony, just to be clear, that are companies that are

 9   affiliated for the company you were working for at the time,

10   Intrapay was one of them?

11   A.   Yes.

12   Q.   And Paygo is another one?

13   A.   Yes, sir.

14   Q.   Did Mr. Akhavan tell you at all at that meeting why he

15   wanted to find a solution for Eaze?

16   A.   I presumed it was for financial gain.

17   Q.   But he didn't tell you that?

18   A.   If you're asking me if he said:  I want to do this to make

19   money, no, he did not.

20   Q.   So you presumed it?

21   A.   I presume that's why I was there, yeah.

22   Q.   But you don't know whether he had any other agenda or

23   reason to do it, correct?

24   A.   No, I don't.

25   Q.   Because all you know is what he said?

1   A.   Yes.

2   Q.   Now, even before that meeting, before you began working for

3   Eaze, you had acquired some of the shelf companies that you

4   described that you later used in connection with the

5   applications you prepared, correct?

6   A.   I don't recall.

7   Q.   Well, if we could put up IWX22.  If you could go down.

8   Actually, I'm sorry.  Go up.

9        The date of this e-mail from you is November 22nd,

10  2017; do you see that?

11  A.   Yes, I do.

12  Q.   And that's before you even had the meeting in Calabasas,

13  correct?

14  A.   Yes, it was.

15  Q.   If you could --

16       MR. TAYBACK:  May I have one moment?

17       (Pause)

18       If you could put up Exhibit 3906.

19  Q.   One of the companies that you used was called Hot Robots?

20  A.   Yes, sir.

21  Q.   And you indicate -- rather, Ms. Farmer -- MF is who?

22  A.   Michele Furlan.

23  Q.   Michela Furlan?

24  A.   Correct.

25  Q.   And that's a male, a male person, correct, Michele?

1    A.  Michele.

2    Q.  And it is a man, correct?

3    A.  It is a man, correct.

4    Q.  Indicates:  With respect to Hot Robots, we purchased it on

5    August 15th, 2017; do you see that?

6    A.  Yes, I do, sir.

7    Q.  And that was before your meeting in Calabasas, right?

8    A.  Yes, it was.

9    Q.  And now if you could go to -- we can take that down.  Thank

10   you.

11            THE COURT:  Counsel, keep in mind we're going to take

12   our lunch break in about three minutes.

13            MR. TAYBACK:  Will do.  This might be a good time for

14   the break, if we can take it three minutes early, your Honor.

15            THE COURT:  Okay.  So ladies and gentlemen, we'll take

16   our lunch break now.  We'll see you at 2:00.

17            (Jury not present)

18            THE COURT:  You may step down.  We'll see you at 2:00.

19            (Witness temporarily excused)

20            All right.  Mr. Tayback, how much more do you have?

21            MR. TAYBACK:  About 35 minutes or so.

22            THE COURT:  Okay.  Does the government want to give me

23   a ballpark on redirect?

24            MS. LA MORTE:  15 to 20 minutes.

25            THE COURT:  Okay.  So who is the next witness?

1          MS. LA MORTE:  A witness from Bank of America, your

2     Honor, Richard Clow.

3          THE COURT:  Okay.  And will that take us to the end of

4     the day?

5          MS. LA MORTE:  Yes, it will.

6          THE COURT:  All right.  Very good.  We'll see you at

7     2:00.

8               (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        AFTERNOON SESSION

2            2:05 p.m.

3        THE COURT:  The jury is on their way up, so please put

4    the witness back on the stand.

5        (Jury present)

6        THE COURT:  Counsel.

7        MR. TAYBACK:  May I place before the witness Exhibit

8    GX4105.  It's admitted in evidence and it is a long document,

9    so I would draw the witness' attention to row 20230.

10   Q.  If I could ask the witness, Mr. Hargreaves, do you recall

11   looking at this document, which I believe you indicated was a

12   summary of certain messages, WhatsApp messages of yours?

13   A.  It's a subsection of WhatsApp messages from my phone, yes.

14   Q.  It's a subset of messages from your phone, correct?

15   A.  Looks like it, yes.

16   Q.  Did you go through this chart and confirm that these

17   messages are accurate with respect to the messages that

18   actually existed on your phone?

19   A.  Yes.

20   Q.  Did you determine what subset to include in this chart?

21   A.  No, I didn't.

22   Q.  Who did?

23   A.  The government.

24   Q.  Meaning the prosecutors?

25   A.  Yes.  Sorry.

1  Q.  If I could direct your attention to that row, that's a

2  WhatsApp communication between you and Koen Vanpraet, correct?

3  A.  Yes, it is.

4  Q.  The text of the message says:  Koen, apologies.  I forgot

5  we need a specific MCC code for Ray's business.

6         You see that line?

7  A.  Yes, sir.

8  Q.  This is you confirming to Mr. Vanpraet, and you include a

9  four-digit code there, 8099.

10        You see that?

11  A.  Correct.

12  Q.  That's your understanding of what the code was that should

13  be used for marijuana?

14  A.  It's the code that we were advised would be the best one to

15  use because there was not one for medical marijuana.

16         MR. TAYBACK:  You could take that down.

17  Q.  I asked some questions about Mr. Vanpraet before we broke.

18  Is it your understanding that Kalixa Bank is now known as PXP

19  Financial?

20  A.  I know that Kalixa Bank doesn't exist.  I know that PXP

21  does and I know that Koen Vanpraet works for them.

22  Q.  That's the institution at which Mr. Vanpraet works?

23  A.  I believe so, yes.

24  Q.  In fact, he's the CEO, correct?

25  A.  Is he?

1  Q.  You don't know?

2  A.  I don't know his exact position, no.

3  Q.  Did you tell the government in any of your meetings with

4  them that he was the CEO of PXP Financial?

5  A.  I don't recall.

6  Q.  Would it refresh your recollection to review a passage from

7  the notes?

8  A.  That would be great.  Thanks.

9          MR. TAYBACK:  If you could place before the witness

10  what's been marked 3501-0076.  I'm sorry.  195.

11  Q.  If you could just look at the date and then a passage of

12  this document that we will direct you to, read it to yourself.

13  A.  Got it.  Thanks.

14  Q.  Does that refresh your recollection as to whether you told

15  the government --

16  A.  Yes, thank you.

17  Q.  You told the government on May 19 of 2020 that Mr. Vanpraet

18  was the CEO, correct?

19  A.  OK.  Yes.

20  Q.  Of PXP Financial, correct?

21  A.  Yes.

22  Q.  Didn't you also tell the government in a subsequent

23  interview that Mr. Vanpraet, in his capacity as president of a

24  bank, was fine processing Eaze transactions?

25  A.  Yes.  I don't recall if I said that or I didn't.  You are

1   asking me if I told the government that?

2   Q.  Yes.

3   A.  Do you have something I could see?

4   Q.  Would it refresh your recollection to review notes?

5   A.  Certainly, it would.

6           MR. TAYBACK:  If you could place before the witness

7   3501-0076 at page 2.

8   Q.  If you look at the date and then also page 2.

9   A.  Yes.  Thanks.  Yes, I see it.  Thank you.

10  Q.  Does that refresh your recollection?

11  A.  Thank you.  Yes.

12  Q.  Did you tell the government in May of 2020 that

13  Mr. Vanpraet was fine processing the Eaze marijuana

14  transactions?

15  A.  Yes, I did.

16  Q.  Is it your understandings that PXP is an acquiring bank?

17  A.  I don't know what licenses they hold.

18  Q.  You testified about a meeting in London with Mr. Akhavan

19  and a number of other people.

20          Do you remember that?

21  A.  In January, yes.

22  Q.  I'm sorry.  It was January?

23  A.  I'm asking.  Is that when it was?

24  Q.  I believe it was February of 2018, is what you said

25  yesterday.

1    A.  Sorry.  February.  Yes.  Thank you.

2    Q.  You indicated that Mr. Vanpraet was one of the people who

3    was present in London at that time, correct?

4    A.  Correct.

5    Q.  And he was one of the people that met with you, correct?

6    A.  He was one of the people there, yes.

7    Q.  And didn't Mr. Akhavan also introduce you to a woman from

8    Kalixa Bank named Andrea Bricci?

9    A.  I don't recall that, no.

10   Q.  You do know who Andrea Bricci is, correct?

11   A.  Yes.  I had a conversation with her on the phone.

12   Q.  In fact, she was the head of compliance for Kalixa at the

13   time you spoke to her?

14   A.  That's correct.

15   Q.  You spoke to her in November of 2018?

16   A.  I don't remember the date.

17   Q.  You spoke to her regarding processing transactions

18   including relating to Eaze?

19   A.  No, I did not.

20   Q.  Do you know whether or not Andrea Bricci, based on your

21   conversations with her, knew that Kalixa was processing

22   marijuana transactions for Eaze?

23   A.  I actually don't recall -- I recall sections of that

24   conversation.  I don't recall if I discussed Eaze with her or

25   not.

1    Q.  Now, other than participation in chats, you never

2    introduced Mr. Akhavan by phone or in person to Kate Farmer?

3    A.  Only on Telegram, I believe.

4    Q.  You never introduced him by phone or in person to Michele

5    Furlan?

6    A.  No, I did not.

7            MR. TAYBACK:  You could bring up Exhibit IWX-22.

8    Q.  Before we go to this document, do you recall Mr. Akhavan

9    ever asking, in connection with those chats, who are these

10   people, who is KF?

11   A.  Yes, I do.

12   Q.  Because he didn't have any familiarity with who they were,

13   correct?

14   A.  He didn't know who Kate Farmer was until I introduced her.

15   Q.  By Telegram only, correct?

16   A.  Yes.

17   Q.  The same is true with Mitchell Furlan?

18   A.  Are you asking me whether he knew Michele Furlan?

19   Q.  Yes.  Did you have any reason to think he knew that person?

20   A.  Yes.

21   Q.  How?

22   A.  Before this endeavor, or whatever you are calling it, I

23   engaged in Michele Furlan, who was introduced to me as somebody

24   working, I believe -- to use the term ISO on behalf of

25   Mr. Akhavan seeking Asian banking partners for his adult

1  business.

2  Q.  But you were the person who brought Michele Furlan into the

3  work that you were doing, correct?

4  A.  Yes, that's correct.

5           MR. TAYBACK:  Bring up IWX-22.

6  Q.  This is an e-mail from you, dated November 22 of 2017, to a

7  number of people.

8           Do you see that?

9  A.  Yes, sir.

10 Q.  And one of the recipients is Ray and also Koen Vanpraet.

11          You see that?

12 A.  Yes.

13 Q.  This is before your meeting in Calabasas, is that right?

14 A.  Yes, that's correct.

15 Q.  Because your meeting it wasn't until January of 2018,

16 right?

17 A.  Sorry.  Excuse me?

18 Q.  Your meeting in Calabasas was not until January of 2018,

19 right?

20 A.  Yes, that's correct.

21 Q.  And in this e-mail you are laying out the setup and your

22 proposed plan for how to offer a solution with respect to the

23 processing of credit and debit card transactions for Eaze,

24 right?

25 A.  That is correct.

1          MR. TAYBACK:  If you scroll down.  If you go up a

2    little bit.

3    Q.  You say:  Websites.  All websites have been set up in house

4    at Pago by our dedicated team of developers.

5          You see that?

6    A.  Correct.  Yes, sir.  Yes, I do.

7    Q.  That had already been done before you even met in January,

8    correct?

9    A.  Yes.  Some had.

10   Q.  You say:  They were passing through strict compliance

11   checks prior to the application being issued to our acquirer.

12         That had already been done even before you met in

13   January of 2018, correct?

14   A.  That is correct.

15   Q.  You say:  Where they then pass through a final compliance

16   check before being approved.  You say:  All applications have

17   initially been compiled of X2 websites per company.

18         That work had already been done before you ever met in

19   Calabasas in January of 2018, right?

20   A.  That's correct.

21   Q.  Then you described features.  You see that?

22   A.  Yes, I do.

23   Q.  Those were existing features as of November, at least, of

24   2017, right?

25   A.  Yes.

1  Q.  Then you described company's key futures below that?

2  A.  Yes, I do.

3  Q.  Those were already things that were in place before you met

4  in Calabasas in January of 2018, right?

5  A.  That is correct.

6  Q.  If you go down further, there is descriptor fields and a

7  reference to those being partially dynamic.

8       You see that?

9  A.  Yes, sir.

10 Q.  Then it says defined in our back office and can be edited

11 to meet requirements.

12       Do you see that?

13 A.  Yes.

14 Q.  Who was your back office?

15 A.  I had a team -- we had an internal team of -- basically, it

16 was Michele and his team and the people I discussed.

17 Q.  Michele Furlan and Kate Farmer?

18 A.  Yeah.  Those were the key players, yes.  I don't recall

19 directly who I'm referring to, but it was -- we had access to

20 the compliance team at Intrapay, who we may have asked to look

21 over the application packs.

22 Q.  There may have been other people, but you can't remember

23 their names now, is that right?

24 A.  I can remember one of their names, yes, certainly.

25 Q.  What's that name?

1  A.  Mark -- I can't pronounce his surname.  He is a Maltese

2  gentleman.  Mark Toomer.

3  Q.  There is another name that shows up on some of the e-mails

4  we looked at named Marty.  Was he part of that back office

5  team?

6  A.  No.

7  Q.  Who is Marty?

8  A.  I don't know.

9  Q.  Below this it says:  Existing descriptors for initial X4

10  proxies.

11       You see that?

12  A.  Yes.

13  Q.  Proxies, that's a word that's describing these companies

14  set up in Europe that would be acting for the dispensaries in

15  the United States?

16  A.  It's a term that we used for the pack as a whole.

17  Q.  Is there intending to be proxy companies for another

18  company, right?

19  A.  Again, proxy pack as in a fraudulent application pack.  We

20  called them proxy packs.

21  Q.  The word proxy to you is the same as fraudulent?

22  A.  To me, I'm telling you what we termed the application packs

23  that contained -- that are fraudulent.

24  Q.  And this description that you wrote here, it was, again,

25  before you even met with people in Calabasas, correct?

1    A.   Yes, sir.

2    Q.   Here you talk about several companies, one called Lorry

3    Limited and International Standard Limited.  Those were

4    companies you acquired before you even met with Mr. Akhavan in

5    January of 2018, right?

6    A.   Yes.

7            MR. TAYBACK:  You could take this down.

8    Q.   That January 2018 meeting in Calabasas, we viewed some

9    photographs of that meeting.  Those are photographs you took,

10   right?

11   A.   Correct.

12   Q.   Took using your phone?

13   A.   Correct.

14           MR. TAYBACK:  If you could put up GX-101 through 105,

15   just scroll through them.  Next one.

16           Go to 102, 103, 104, and 105.

17   Q.   You took those pictures secretly, right?  That is to say,

18   you didn't say, hey, pose for a photo?

19   A.   No, I didn't say, hey, pose for a photo.

20   Q.   So you just took them without people knowing, correct?

21   A.   That is correct.

22   Q.   Why?

23   A.   I wasn't involved in the part of the conversation that was

24   going on, and I was text messaging with my former boss, and he

25   was curious to know what people in the meeting looked like.

1   Q.  That's Gary Murphy, is that correct?

2   A.  That's correct.

3        MR. TAYBACK:  If you can bring up 105 again.

4   Q.  You stated that the diagram on the white board in the back

5   was an outline of how you were proposing how things would work

6   for the Eaze transaction, correct?

7   A.  I didn't say it was how I was proposing.  I said it was

8   something drawn up on the board by Mr. Akhavan, which I

9   contributed to.

10  Q.  So is it different than the proposal that we just looked at

11  that you sent in November of 2017?

12  A.  So what you are looking at here on this board is a flow of

13  the logistics of an application being made by, in this case,

14  Eaze, and that flow resulting in one of the application packs I

15  created ending up in the hands of an acquiring bank.  If you

16  are referring to what the difference is -- sorry.  Please carry

17  on.

18  Q.  My question is, is this different than what you had

19  proposed in your e-mail from November that we just looked at?

20  A.  It involved the logistics and people involved in managing

21  the transaction fraudulent scheme.

22  Q.  When you described this to the government in your

23  interviews with them, what happened was a sloppy version of

24  this, correct?

25  A.  Did I use that language?

 1   Q.  Would it refresh your recollection to look at the notes?

 2   A.  If you wouldn't mind.

 3        MR. TAYBACK:  If we could put before the witness

 4   3501-2, first page, and then the date and then -- thank you.

 5   A.  Correct, yes.

 6        MR. TAYBACK:  You can take it down.  Thank you.

 7   Q.  Does that refresh your recollection that you described what

 8   happened as a sloppy version of what had been outlined?

 9   A.  Yes, sir, I used the word sloppy.

10   Q.  Isn't it true that you considered Mr. Akhavan to be a

11   difficult client because -- withdraw that.

12        Isn't it true you considered him a difficult client?

13   A.  I find him a demanding client.

14   Q.  A demanding client?

15   A.  Yes.

16   Q.  Isn't it true that he expressed dissatisfaction along the

17   way with the solutions that you were providing?

18   A.  I think he was a perfectionist.

19   Q.  He expressed dissatisfaction with the work you were doing?

20   A.  At times, yes.

21   Q.  Now, you pitched a complete solution for Eaze's processing

22   of credit cards, correct?

23   A.  We pitched an initial idea, yes.

24   Q.  Your idea was termed a solution in that e-mail from

25   Mr. Vanpraet, correct?

1    A.  Do you want to show me if you want me to confirm that

2    language.

3           MR. TAYBACK:  Put up for the witness Exhibit IWX-22.

4    I apologize.  It's actually an earlier e-mail.  It is IWX-4.

5    Q.  In that middle one-sentence paragraph it says:  We equally

6    believe we can offer a solution for www.eaze.com processing.

7    You see that?

8    A.  Yes.

9    Q.  That's what you went into that meeting in January

10   proposing, correct?

11   A.  Yes.

12   Q.  Isn't it fair to say that your experience in 2018 with

13   Mr. Akhavan was, he was frustrated that you didn't have a

14   solution, correct?

15   A.  Sorry.  You are saying his frustration or his

16   dissatisfaction to me that I did not have a solution.

17   Q.  Correct.

18   A.  I would say that it was a number of dissatisfactions all

19   the across a number of subjects.

20   Q.  Would you say that those number of dissatisfactions across

21   different subjects all related to the fact that the solution

22   you were proposing wasn't workable, in his view?

23   A.  I would say that the solution that we worked on together

24   again and again was being rebuffed by the banks that they were

25   being submitted to.  And initially in relation to Paynetics,

1    yes.  There was frustration there as well.

2    Q.  You viewed Mr. Akhavan as your client?

3    A.  I did, yes.

4    Q.  But you knew Eaze was the ultimate client, correct?

5    A.  Yes.

6    Q.  He came to you with a problem and you proposed a solution,

7    right?

8    A.  I think it was probably more Koen Vanpraet reached out to

9    tell me he joined a new company.  I don't know what was

10   discussed specifically between the two of them, but this was

11   then presented as a business opportunity to me, and then we

12   engaged on pursuing a business opportunity.

13   Q.  One of the things you described as part of what you did at

14   some point in time was you engaged a third-party service to run

15   like a credit risk report on some of the companies you were

16   proposing?

17   A.  Is the question did I engage them?

18   Q.  Yes.

19   A.  No, I did not.

20   Q.  Did you work with them?

21   A.  We were given access to their software.

22   Q.  That's Webshield, correct?

23   A.  Yes, sir.

24   Q.  You have heard of Webshield, correct?

25   A.  Yes, I have, sir.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1   Q.   What is Webshield?

2   A.   It's software service.

3   Q.   They provide the credit store of companies to banks and

4   merchants --

5   A.   They provide a software that has a range of services that

6   if you were going to encompass it into what is it for, it's to

7   assist any on any business that is taking on the risk of

8   providing a merchant account to a website, an online business.

9   This is a tool that can be used to assess -- to help in that

10  decision making.

11  Q.   This is the company that you referenced Christian Chmiel?

12  A.   Yes, it is.

13  Q.   He's affiliated with the company, correct?

14  A.   Yes.

15          MR. TAYBACK:   If you could display GX-3965.

16  Q.   This is an e-mail that was shown to you yesterday from Kate

17  Farmer to you.   It indicates there are some attachments.

18          Do you see that?

19  A.   Yes, I do.

20  Q.   If you go to the next page, do you recognize this as the

21  Webshield analysis of some of the work that you've been doing?

22  A.   The section you are showing me is not a Webshield analysis.

23  Q.   Where it says merchant services and then it says Webshield

24  red/yellow flags report in the upper left-hand corner, what

25  does that indicate?

1    A.  It says Webshield red/yellow flag report.

2    Q.  What does that indicate?

3    A.  It's a report.

4    Q.  Indicating how Webshield would score these companies on

5    different aspects of them?

6    A.  Yeah.  The section you are seeing at the top there is

7    something that we created.  I presume Kate Farmer created and

8    I'm presuming it's notes based -- sorry.  It has disappeared.

9              MR. TAYBACK:  If you could put that up, please.

10   A.  I think whoever was in my team was entering the information

11   to the software, was trying to provide some overview and notes

12   as to why the scoring was as it is.

13   Q.  Was that coming from Kate Farmer, the person who sent the

14   e-mail?

15   A.  It might have been someone working underneath her.

16   Q.  You don't know who that person is, correct?

17   A.  It depends at what point this was done, at what time we had

18   employees come and go.

19   Q.  The idea that this summarizes what Webshield would have

20   detected in terms of deficiencies in the submissions?

21   A.  That's correct, sir.

22   Q.  As of this point in time, the companies you were proposing,

23   Lorry Limited, for example, is in the lower part of this page,

24   it shows high risk, correct?

25   A.  That's correct.

1    Q.   So that's not adequate for your purposes, right?

2    A.   Yes.  We would have wanted to improve this one.

3    Q.   If you go to the next one, International Standard, high

4    risk, 37 percent.

5          Do you see that?

6    A.   I do, yeah.

7    Q.   That's also not adequate for your purposes, correct?

8    A.   Actually, that's quite a good score, believe it or not.  I

9    know it's a little bit strange.  If you see to the right of it,

10   there are three boxes.  One is yellow filled in and then a

11   green one and then a red one.  You'll notice that even though

12   this says high risk, the box that is highlighted is -- I can't

13   actually read what it says in the yellow box.  Maybe you could

14   help me.

15         MR. TAYBACK:  You'll have to blow that up.

16   A.   I still can't read it, I'm afraid, but it's a traffic light

17   score.  Basically, regardless of what it says on the left, high

18   risk, if it is the green box, it's approved.  If the red box is

19   highlighted, it's flat declined.  If it's the yellow box, it's

20   open to discussion from the risk department of the organization

21   assessing this application form.

22   Q.   If you go to the bottom left, you'll see a third company

23   that's being discussed in this e-mail communication, another

24   one you previously formed, New Opal?

25   A.   Yes, sir.

1  Q.  That's also labeled high risk and it has a yellow box,

2  correct?

3  A.  Yes, sir.

4  Q.  That high risk is 34 percent.

5          You see that?

6  A.  Yes, sir.

7  Q.  You are saying even though it says high risk, you consider

8  this to be pretty good?

9  A.  There is only so much you can do with a new company, sir.

10  Q.  After you were arrested and then returned to Europe, you

11  said that you didn't continue to do much work with respect to

12  the Eaze business, correct?

13  A.  No -- yes, that's correct.  Sorry.

14  Q.  After you were arrested and returned to Europe, you did

15  continue to communicate with the people that you had been

16  working with, Ms. Farmer, for example, correct?

17  A.  I continued in my employment, yes.

18  Q.  And you also continued to communicate with Michele Furlan,

19  right?

20  A.  Yes, sir.

21  Q.  Did you ever tell Mr. Furlan to change the descriptors at

22  all for any of the companies, the companies that were being

23  used to process -- that were intended to be used to process

24  transactions?

25  A.  For him to change the descriptors?

 1   Q.  Correct.

 2   A.  I don't recall.

 3   Q.  I am going to ask you about some names that have come up in

 4   this case and ask if you recognize them as descriptors being

 5   used.  Absolute Soda?

 6   A.  I am not sure.  I don't recognize that one, no.

 7   Q.  Happy Puppy?

 8   A.  I am not sure.

 9   Q.  Diver Kingdom?

10   A.  Is there something you can share with me?

11   Q.  I'm asking if you recognize these as descriptors that you

12   used.

13   A.  I don't recognize them, no.

14   Q.  You recall we looked at a document earlier that had certain

15   descriptors that you said you did come up.  Green Tea?

16   A.  When you say come up with, I think it's important to say

17   that we don't decide what the descriptors are.

18   Q.  Who does?

19   A.  You can submit what you would like to the acquiring bank,

20   and they would come back and tell you what you are allowed to

21   have.

22   Q.  Based on that answer, who came up with the green tea

23   descriptor that you mentioned before?  Was it something you

24   submitted or something that the bank sent back?

25   A.  I don't recall if it was something -- I know it was the

1    name of the website we created.  I don't know what was decided

2    upon as the ultimate -- or what was presented as the preferred

3    descriptor ultimately.

4    Q.  So is it fair to say that all of the descriptors that you

5    used, as you sit here now, you don't recall whether you came up

6    with them or whether the bank did?

7    A.  No.  What I'm saying is, I think it's important to

8    understand that I had a team that were dealing with the

9    application or were communicating back and forth with our

10   clients.  And although I was cc'd on a lot of e-mails, I wasn't

11   really involved in that day to day.  I was involved in other

12   areas of the business.

13   Q.  Let me ask you if you have any recollection whatsoever of

14   ever using the descriptors Absolute Soda.

15   A.  I don't recall it.

16   Q.  Happy Puppy?

17   A.  I also don't recall it.

18   Q.  Diver Kingdom.

19   A.  Doesn't ring a bell.

20   Q.  Hidden Kitten?

21   A.  I don't remember it now.

22   Q.  Outdoormaxx?

23   A.  Doesn't ring a bell.

24   Q.  As you sit here, you have no idea if those descriptors were

25   used, you have no idea where they would have come from?

1   A.   I'm not familiar with them.  I don't remember those names

2   would probably be more appropriate.

3   Q.   You've talked about a number of the people that you have

4   communicated with during the time that you were working on

5   Eaze's matters.  That includes Gary Murphy, correct?  Did you

6   ever talk to him about what you were doing for Eaze?

7   A.   Yes.

8   Q.   And Koen Vanpraet?

9   A.   Yes.

10  Q.   Kate Farmer?

11  A.   Yes.

12  Q.   There is a person on some e-mails I saw named Timo?

13  A.   That's correct.

14  Q.   Who was that?

15  A.   Somebody in Michele's team.

16  Q.   We talked about a person named Marty.  You don't know who

17  that person is, right?

18  A.   No.

19  Q.   Michele Furlan?

20  A.   Yes, I do.

21  Q.   You mentioned that maybe Michele Furlan's wife or maybe

22  mother signed some of the applications?

23  A.   No.  I said there was a conversation that was had with him.

24  I can't remember if I asked him or he told me.  But in the

25  conversation it came up.  He made -- I don't know if it was

1    joking or serious, I didn't really follow up on it, because I

2    really didn't care, to be honest, that his mother was good at

3    forging signatures.

4    Q.  That's your sole knowledge of that, correct?

5    A.  Of what?

6    Q.  Of who signed the applications.

7    A.  I know it was something that Michele was tasked to manage.

8    Q.  That may have been somebody then beyond Michele himself.

9          MS. LA MORTE:  Objection.  Calls for speculation.

10         THE COURT:  Sustained.

11   Q.  Was Mr. Stanley Skoglund also somebody you spoke to about

12   your work with respect to Eaze?

13   A.  In the early days, yes.

14   Q.  How about his other person whose name we saw, associate,

15   Michael Buechler?

16   A.  I know who that is.  I met with that person.  I have had

17   meetings with him because he was working.  I don't know if it

18   was in a consultancy.  I met with him once in London.  I

19   believe that was more about Intrapay integrating with a bank.

20   Again, I don't know if he was an employee or consultant of

21   Kalixa.

22   Q.  Then there is everyone who attended the meetings that you

23   described in Calabasas and in London in February, January and

24   February of 2018.  Those were also people that you discussed

25   your work with respect to Eaze, correct?

```
 1   A.  Some of the people in those meetings were, yes.

 2              MR. TAYBACK:  And then if you could pull up IWX-57.

 3              May I have one moment, please.

 4              Show it just to the witness.

 5   Q.  If I could ask you to take a look at this document.  I

 6   believe it's an e-mail from -- I am going to ask if you

 7   recognize what this is?

 8   A.  I'm looking at e-mails, one sent to me by Kate Farmer, and

 9   I'm looking at a second e-mail --

10              MS. LA MORTE:  Objection.

11   Q.  I'm just asking if you recognize what it is.

12   A.  They are e-mails.

13   Q.  Are you a recipient of these e-mails?

14   A.  I'm a recipient of -- I don't think I'm a recipient for the

15   ones on the right, W57002.  I think I am for the first one.

16   Q.  You can't tell whether the second page -- you understand

17   how when you read a printed e-mail it goes from bottom to top?

18   A.  Sir, I think your question was, am I a recipient.  I am

19   just looking at the one on the right.

20   Q.  I understand your question.  Let me rephrase it.

21              Do you believe this to be an e-mail exchange that this

22   was something that was ultimately sent to you?

23   A.  Are you asking me if that is a thread of e-mails?

24   Q.  Yes, I'm asking you that question.

25   A.  When you asked me that question, I am trying to count the
```

1    amount of REs and forward REs and forwards at the top.

2    Q.  Let me rephrase the question slightly differently, without

3    introducing the document.

4           Did you ever receive e-mails from an e-mail address at

5    Esepa?

6    A.  My team appeared to have, yes.

7    Q.  Who were you dealing with at Esepa, if you know?

8    A.  It doesn't say who it is, but I know that we filled out

9    application forms with the name Michael Kindl.

10   Q.  Thank you.

11          Had you ever met Michael Kindl?

12   A.  No.

13   Q.  But you were comfortable communicating about what you were

14   doing with Eaze in these applications to a person who you never

15   met?

16   A.  Yes.

17   Q.  In fact, you talked to a lot of people about what you did,

18   correct?

19   A.  I talked to the people who we were either introduced to or

20   advised to, by whatever method of communication.

21   Q.  Is it safe to say you felt this was a criminal scheme that

22   you didn't need to keep secret?

23   A.  I communicated with people I was involved in within the

24   scheme.

25   Q.  If I could have you take a look --

SOUTHERN DISTRICT REPORTERS, P.C.

1   A.   I would definitely say I was more blasé than I should have

2   been, definitely.

3   Q.   If I could have you take a look at GX-105.

4            You identified the man sitting whose face -- is

5   wearing a blue jacket?

6   A.   I see him, yes.

7   Q.   You identified him as I think the head of a large Belgium

8   bank or European bank?

9   A.   No.  I referred to him as a sales representative.

10  Q.   From where?

11  A.   I believe I referred to him as a sales representative of

12  the bank --

13  Q.   That's a Belgium bank?

14  A.   Yes, it is.  It's a large bank.

15  Q.   It's a European bank is my question.

16  A.   OK.  Yes, it's European.

17  Q.   If you know.

18  A.   I do know, yes.

19  Q.   I think you said that he wasn't part of the conversations

20  with respect to the Eaze work, is that right?

21  A.   That's correct.

22  Q.   But all the drawing on the board behind him remained on the

23  board, correct?

24  A.   That is correct.

25  Q.   There was no intention to try to conceal that, right?

1  A.  No.

2  Q.  I am going to ask you a few questions about your practices

3  with the phones.  I believe you said that you had several

4  phones over the course of the time you've been working.  Some

5  were broken, some were lost?

6  A.  I had a number of phones, yes.

7  Q.  When you were released and sent home back to Europe after

8  having been arrested, you had two phones with you, correct?

9  A.  Yes.

10  Q.  And you had been told that the government could monitor

11  your messages?

12  A.  They had -- they were using the GPS in my phone.

13  Q.  Do you know, in fact, whether the government ever actually

14  monitored any of your messages?

15  A.  You'd have to ask them.

16  Q.  You don't know?

17  A.  I do not know.  Sorry.  Your first question was -- could

18  you repeat the first question.

19  Q.  First question is, do you know whether the government ever

20  actually monitored any of your messages?

21  A.  They took a dump of my messages, and I was required to

22  provide them with messages thereafter and communicate my

23  communication with them.

24  Q.  How periodically did you do that?

25  A.  As requested.

1   Q.  How periodically did that turn out to be?

2   A.  I don't recall exactly.

3   Q.  Once a month?

4   A.  I do not recall.

5   Q.  You can't estimate?

6   A.  No, I can't.

7   Q.  In between times when you allowed law enforcement to

8   examine your phone or phones, do you have any reason to believe

9   they had any idea what you were doing with them?

10          MS. LA MORTE:  Objection.

11          THE COURT:  No.  I think that's permissible.

12   Overruled.

13          Counsel, I am a little concerned about the quality of

14   your estimates in time.

15          MR. TAYBACK:  I believe this has five minutes and

16   then, if I can confer with my client, I should be able to wrap

17   it up.

18          THE COURT:  Very good.

19   A.  Sorry.  Could you repeat it.

20   Q.  My question is, in between the times that you allowed law

21   enforcement to examine your phone or phones, do you have any

22   reason to believe they had any idea what you were doing with

23   them?

24   A.  I have no idea what the U.S. Government is capable of doing

25   or not doing.

 1              MR. TAYBACK:  May I have one moment, your Honor.

 2              I have one clarifying question.

 3    Q.  Just to be clear, when you said earlier, your testimony

 4    about not speaking to anyone at Kalixa, when you spoke to

 5    Andrea Bricci, she was a person who worked at Kalixa, correct?

 6    A.  She was a person who worked at Kalixa, correct.

 7    Q.  In compliance, correct?

 8    A.  Yes.

 9              MR. TAYBACK:  I have no further questions.

10              THE COURT:  Redirect, please.

11    REDIRECT EXAMINATION

12    BY MS. LA MORTE:

13    Q.  Good afternoon, Mr. Hargreaves.

14    A.  Good afternoon.

15    Q.  Mr. Hargreaves, on cross-examination you were asked a

16    number of questions about your meetings with the government

17    following your arrest.

18              Do you recall that?

19    A.  Yes, I do.

20    Q.  Now, during those meetings, Mr. Hargreaves, the government

21    asked you questions, correct?

22    A.  Yes.

23    Q.  And you responded to the questions that were asked of you

24    by the government, is that right?

25    A.  Yes, I did.

1  Q.  And you testified that you saw or you observed during these

2  meetings that notes were taken, right?

3  A.  Yes.

4  Q.  Those notes were taken by the government, right?

5  A.  Yes.

6  Q.  They weren't taken by you, right?

7  A.  No.

8  Q.  Prior to today, have you ever seen those notes?

9  A.  No.

10 Q.  Now, when the government asked you questions during those

11 meetings you responded to those questions?

12 A.  Yes, I did.

13 Q.  Did you respond truthfully?

14 A.  Yes.

15 Q.  Now, Mr. Hargreaves, you were asked questions about whether

16 you specifically used the term fraudulent or false or

17 misleading in these initial conversations that you had with the

18 government.

19        Do you recall that?

20 A.  Yes, I do.

21 Q.  And the defense counsel even showed you some notes from a

22 meeting that you had with the government on November 20 of

23 2018.

24        Do you recall that?

25 A.  Yes, I do.

1   Q.  And you reviewed those notes, and you indicated that they

2   refreshed your recollection that you specifically did not use

3   the word fraudulent or false, correct?

4   A.  That's correct.

5   Q.  Now, sitting here now, do you recall whether during that

6   same November 20, 2018 meeting with the government that the

7   counsel showed you the government's notes that you used the

8   term miscoding to describe the Eaze scheme?

9   A.  I believe I did, yes.

10  Q.  In addition, Mr. Hargreaves, you testified on

11  cross-examination that, in any event, you thought it was clear

12  from your conversations with the government that your business

13  was completely based around fraudulent application packs, is

14  that right?

15          MR. TAYBACK:  Objection.  Leading.

16          THE COURT:  No.  I think the door was open to that

17  kind of question to clarify as to what was previously testified

18  to previously on cross-examination.  Overruled.

19  A.  Repeat the question, please.

20  Q.  Sure.  I said you had testified on cross-examination that

21  you thought it was clear from your conversations with the

22  government that your business was completely based around

23  fraudulent application packs, is that right?

24  A.  Yes, it was.

25  Q.  Now, part of your cooperation with the government was

SOUTHERN DISTRICT REPORTERS, P.C.

1   providing full access to your phones, correct?

2   A.  Correct.

3   Q.  As well as full access to your ProtonMail?

4   A.  Correct.

5           MS. LA MORTE:  Now, Mr. Levine, can you put up

6   Government Exhibit 3916.  This is in evidence and can be

7   published to the jury.

8   Q.  Mr. Hargreaves, the subject matter of this e-mail is

9   International Standard WC app pack updated, is that right?

10  A.  Yes.

11  Q.  I believe that you testified that International Standard

12  was one of the shelf companies that was used in this scheme?

13  A.  Yes.

14  Q.  To remind us, did it have any actual operations whatsoever?

15  A.  No.

16  Q.  I believe you testified that the intent was to funnel Eaze

17  transactions through a merchant processing account with

18  International Standard, is that right?

19  A.  Yes.

20          MS. LA MORTE:  Now, can we scroll down.  Actually,

21  let's try page 28.  Can we blow up the top half.

22  Q.  Mr. Hargreaves, is this a truthful application or a

23  fraudulent application?

24  A.  It's a fraudulent application.

25  Q.  You remember there were discussions of MCC codes on

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1   cross-examination, correct?

2   A.   Yes.

3   Q.   Specifically, there is a discussion of MCC code 8099?

4   A.   Yes.

5   Q.   Can you just remind us, generally, what that code is for.

6   A.   Medical services unknown or medical services miscellaneous,

7   something like that.

8   Q.   Let's look at this Wirecard application on behalf of

9   International Standard.   You see on the right-hand side, under

10  contractual partner?

11  A.   Yes.

12  Q.   You see the company URL?

13  A.   Yes.

14  Q.   What is it?

15  A.   Goodegreenbazaar.com.

16  Q.   You see object of the company?

17  A.   Product and sale of sheet music.

18  Q.   Would the product and sale of sheet music, to your

19  knowledge, fall under a category for medical services?

20  A.   No.

21           MS. LA MORTE:   We can take that down.   Thank you, Mr.

22  Levine.

23           (Continued on next page)

24

25

1   Q.  Now, put up Government Exhibit 3604.

2          Mr. Hargreaves, do you remember reviewing this

3   exhibit?

4   A.  Yes.

5   Q.  This is one of the websites that your team designed; is

6   that right?

7   A.  Yes.

8   Q.  For purposes of the Eaze scheme?

9   A.  Yes.

10  Q.  Was this a truthful website or a fictitious website?

11  A.  Fictitious website.

12  Q.  And can you remind us of the people that had input into the

13  websites that your team designed?

14  A.  My internal team, which my internal team, initially Stanley

15  Skoglund, from day to day, Christian Chmiel, Ray, Ruben,

16  Michele -- I'm sorry, you mentioned my team.

17  Q.  Yes.

18          Okay.  We can take this down.  Let's put up Government

19  Exhibit 3958 for the jury, please.

20          Do you recall that we looked at this previously,

21  Mr. Hargreaves?

22  A.  Yes.

23  Q.  What is this?

24  A.  It's an e-mail to my ProtonMail account.

25  Q.  And what are the attachments?

1    A.  Greenteacha's business plan Organikals' business plans.

2    Q.  And we looked at these business plans yesterday, correct?

3    A.  Yes.

4    Q.  And are these truthful or fraudulent business plans?

5    A.  Fraudulent.

6    Q.  And these plans were sent to EUprocessing@ProtonMail.com?

7    A.  Yes.

8    Q.  And I believe you testified yesterday that that was the

9    e-mail addressed used by Ruben, as far as you understood,

10   correct?

11   A.  Correct.

12   Q.  And finally, Mr. Levine, for now, let's put up Government

13   Exhibit 3959.

14          And again, Mr. Hargreaves, is this another e-mail to

15   Ruben?

16   A.  As far as I understood, yes.

17   Q.  And can you read that e-mail aloud, the first -- well,

18   yeah, just the first part under "Hi"?

19   A.  "Hi, the product doesn't exist in the first place; so we

20   cannot provide any certification.  We can remove those claims

21   from the site if you are okay with that."

22   Q.  And the reference here to "the site" is a reference to

23   what?

24   A.  I don't know which website it is.  The website associated

25   with Johnson NYC.

1    Q.  Was that a truthful website or a fictitious website?

2    A.  A fictitious one.

3    Q.  Okay.  We can take that down.

4         MR. ARTAN:  Your Honor, I'd like to impose an

5    objection.  Just merely repeating direct examination does not

6    constitute redirect.

7         THE COURT:  No, I think this was called into question

8    on cross, as to whether or not the witness was using the term

9    fraudulent simply to curry favor with the government or whether

10   it was his honest assessment of the events in which he was a

11   participant.  So I think this is perfectly proper redirect.

12   BY MS. LA MORTE:

13   Q.  And, Mr. Hargreaves, on cross-examination you were asked

14   about Ruben's involvement in the scheme; is that right?

15   A.  Yes, I was.

16   Q.  Can we put up Government Exhibit 3919, Mr. Levine.

17        This is an e-mail from Kate Farmer, and you're cc'd on

18   it; is that correct?

19   A.  Yes.

20   Q.  What is the e-mail address to whom this e-mail is directed?

21   A.  It's addressed to EUprocessing@ProtonMail.com.

22   Q.  And can you please read the greeting of the e-mail?

23   A.  "Hi Ruben."

24   Q.  Okay.  We can take that down.  And let's put up Government

25   Exhibit 4,008, and let's go to page 5, please.

1              Now, see, the third chat up from the bottom?

2    A.   Yes.

3    Q.   Who is that?  Who do you understand the author of that chat

4    to be?

5    A.   Ruben.

6    Q.   And what does he say there?

7    A.   "Please don't send to Gothardus, but to EUprocessing."

8    Q.   Okay.  Mr. Levine, we can take that down.

9              Okay.  In addition to questions regarding Ruben's

10   involvement in the scheme, you were also asked questions as to

11   the legality of the scheme; is that correct?  Do you recall

12   that?

13   A.   Yes.

14   Q.   Can we put up Government Exhibit 4004, and start on page

15   86, please.  And let's start towards the bottom.

16             Do you see where Ray's comment that says "Ollie" --

17   starts "Ollie"?

18   A.   Yes.

19   Q.   Can you read that, read those three comments?

20   A.   "Ollie, Ruben says all four were submitted to Kalixa.

21   Please confirm with Ruben."

22   Q.   When Ray says "Ruben said all four were submitted to

23   Kalixa," what do you understand him to mean, all four what?

24   A.   Application packs.

25   Q.   Let's go to the next page, page 87.  And then you see where

1    the chat continues with "Ray, we can't be off" towards the top.

2          Mr. Hargreaves, do you see towards the top?

3    A.  Yes.

4    Q.  We could start there.  I'll read Ray's comments and you can

5    read your comments.  Okay?

6    A.  Yes.

7    Q.  "We can't be off like this in our knowledge."

8    A.  "I will check with Ruben.  The advice we gave you is based

9    on the forms that we have filled out and forwarded to Ruben."

10   Q.  "I know.  I just want to make sure we get it right.

11   There's only you and Ruben; so it shouldn't be that hard."

12         And then what do you say?

13   A.  "Can you call me when you see this" -- I'm sorry.  "Ruben,

14   can you call me when you see this?"

15   Q.  Okay.  We can take that down.

16         Now, Mr. Hargreaves, you testified that the merchant

17   name with respect to the application packs was fraudulent in

18   the sense that it was a shell company; is that right, a shell

19   company name?

20   A.  Yes, it was a shell company name.

21   Q.  And you also provided testimony on cross-examination about

22   billing descriptors, correct?

23   A.  Yes.

24   Q.  And that those billing descriptors needed to be tied to the

25   shell companies; is that right?

1    A.   Yes.

2    Q.   And those billing descriptors, I believe you testified on

3    cross, would include the website and/or possibly -- and the

4    phone number, as well, possibly; is that right?

5    A.   Those were both options for a descriptor, yes.

6    Q.   And some of them that we discussed on cross-examination

7    that you were involved with was Greenteacha.com?

8    A.   Yes.

9    Q.   Soniclogistix?

10   A.   Yes.

11   Q.   Organikals?

12   A.   Yes.

13   Q.   Do any of those descriptors include the term Eaze?

14   A.   No, they don't.

15   Q.   Now, you testified that without a fraudulent application

16   packs, Eaze would not have been able to process card

17   transactions; is that right?

18            MR. TAYBACK:  Objection.  Foundation.

19            THE COURT:  All right.  Lay a foundation.

20   Q.   Mr. Hargreaves, you testified that you -- one of your --

21   your job was to create fraudulent application packs; is that

22   correct?

23   A.   It -- yes, it mutated into that.

24   Q.   And why did you do that?

25   A.   It was a requirement in order to obtain merchant accounts

1    for the true merchant in question, in this case Eaze.

2    Q.   And to your understanding, why was that necessary to

3    proceed that way?

4    A.   Because they would not have been able to obtain a merchant

5    account certainly through us.

6    Q.   Now, focusing for a moment on the descriptors that were

7    used in the Eaze scheme, I believe you testified on

8    cross-examination that those descriptors would appear on the

9    card statements of Eaze customers; is that right?

10   A.   Yes, that's correct.

11   Q.   And on direct examination, we saw examples of Eaze

12   customers writing to the fake website address complaining that

13   they didn't recognize the charge; do you remember that?

14   A.   Yes, I do.

15   Q.   And you understood -- or did you understand that those Eaze

16   customers were located in the United States?

17   A.   I think -- I believe so, yes.

18   Q.   And which entity of the payment processing system issues

19   those card statements?

20   A.   Well, the issuing bank of the cardholders.  If they're in

21   the U.S., the U.S. bank.

22   Q.   And I believe you also testified that it's the U.S. banks

23   that are responsible for determining whether to authorize those

24   transactions?

25            MR. TAYBACK:  Objection.  Foundation.

```
 1                 MS. LA MORTE:  I can rephrase it, your Honor.
 2                 THE COURT:  Okay.
 3    Q.  Mr. Hargreaves, who in the payment -- which entity in the
 4    payment processing system is responsible for determining
 5    whether to authorize a transaction?
 6                 MR. TAYBACK:  Objection.  Foundation.
 7                 THE COURT:  Overruled.
 8    A.  The bank of the cardholder.
 9    Q.  Now, Mr. Hargreaves, do you understand that passing lies to
10    banks is wrong; is that right?
11    A.  Yes, I do.
12    Q.  And you understand that -- and you actually, in this case,
13    you pled guilty to bank fraud and money laundering in
14    connection with the Eaze scheme; is that right?
15    A.  Yes, that's right.
16    Q.  And that scheme involved issuing banks in the United
17    States; is that right?
18                 MR. TAYBACK:  Objection.  Foundation.
19                 MS. LA MORTE:  Your Honor --
20                 THE COURT:  I think you do have to lay a foundation
21    for his knowledge of that, if he has it.
22    Q.  Mr. Hargreaves, I believe you, just a few moments ago,
23    testified that your understanding was that the Eaze customer
24    base is located in the United States; is that right?
25    A.  Correct.
```

1    Q.  And I believe you also testified a few moments ago that

2    your understanding, based on your participation in the scheme,

3    was that the issuing banks were predominantly in the United

4    States; is that correct?

5            MR. TAYBACK:  Objection.  I believe it misstates his

6    testimony.  Foundation.

7            THE COURT:  No, I don't think so.  This is a question

8    of his understanding in what is alleged to have been a

9    conspiracy, which, as the jury already knows from my

10   preliminary instruction, is an agreement or a tacit

11   understanding between one or more people.  So I think his

12   understanding is relevant.  Overruled.

13   BY MS. LA MORTE:

14   Q.  Mr. Hargreaves, do you need me to repeat it?

15   A.  Yes, please.

16   Q.  I said, I believe -- and I believe you also testified a few

17   moments ago that your understanding, based on your

18   participation in the scheme, was that the issuing banks were

19   predominantly in the United States; is that correct?

20   A.  Yes, it is.

21   Q.  And, Mr. Hargreaves, did you plead guilty because you're,

22   in fact, guilty?

23   A.  Yes.

24   Q.  Mr. Levine, are we able to display IWX22?

25           Mr. Hargreaves, do you recall reviewing this document

1    on cross-examination?

2    A.   Yes.

3    Q.   And yesterday Mr. Weigand's counsel asked you whether this

4    e-mail contains the word "miscoding," correct?  Do you remember

5    that, actually?

6    A.   Yes, I do.

7    Q.   And you could take a look, but I believe your answer was

8    that it doesn't contain the word miscoding; is that right?  And

9    you can just take a look and reanswer, if that's helpful.

10   A.   It doesn't contain that word.

11   Q.   Okay.  So let's look at what it does contain.  I believe if

12   you look under Set Up, do you see where it says "All traffic is

13   being routed via a proxy setup"?

14   A.   Yes, I see that.

15   Q.   Can you explain again what you mean -- why you use the term

16   "proxy"?

17   A.   Proxy is a term we'd use for proxy application, like a

18   fraudulent application pack.

19   Q.   Okay.  We can zoom out of that.

20           And with respect to the websites that are mentioned

21   here as part of your proposal, would these be true websites or

22   fictitious websites?

23   A.   Fictitious websites.

24   Q.   And then we can zoom out of that.

25           And then looking at -- if we scroll down, do you see

 1   where it says "existing descriptors for initial four proxies;

 2   company one, Lorry Limited; company two, International

 3   Standard?

 4   A.  Yes, I see that.

 5   Q.  And again, we see the use of the term "proxies"?

 6   A.  Yes.

 7   Q.  And Lorry Limited and International Standard, can you

 8   remind us what those were?

 9   A.  Shell companies.

10   Q.  And were they used in the Eaze scheme?

11   A.  Yes.

12   Q.  Now, we can zoom out.  We can keep that up, though.

13           Now, you were also asked yesterday, or noted yesterday

14   I believe by Mr. Weigand's counsel, that there are multiple

15   domains that are on this e-mail, correct?

16   A.  Yes.

17   Q.  Can we blow up that, just the top part, Mr. Levine, for

18   now.

19           Okay.  Do you see where it says "from"?

20   A.  Yes.

21   Q.  That's you, right, obviously?

22   A.  Yes, it is.

23   Q.  Okay.  And then you see where it says "Guy"?

24   A.  Yes.

25   Q.  To your understanding, is that the same person that you

SOUTHERN DISTRICT REPORTERS, P.C.

1    took a picture of at the Calabasas meeting?

2    A.   That's my understanding, yes.

3    Q.   And I believe you said that he was Ray's business partner;

4    is that right?

5    A.   Yes.

6    Q.   And then Medhat Mourid; do you see that name?

7    A.   Yes, I do.

8    Q.   I believe you testified about that individual as well; do

9    you recall that?

10   A.   Yes, I do.

11   Q.   Can you remind us what your understanding, like who this

12   was to your understanding, to your knowledge?

13   A.   Somebody who worked in -- he was in charge of the techie,

14   the tech aspects of Ray's business.

15   Q.   And then there's Ray, correct?

16   A.   Yes.

17   Q.   Koen Vanpraet?

18   A.   Yes.

19   Q.   Who we know was your partner.  Mark Breit, do you know who

20   that is?

21   A.   Yes, I do.

22   Q.   Who is that?

23   A.   It was another employee at -- within the group of

24   companies.

25   Q.   Is that the group of Gary Murphy companies, or some other

1    companies?

2    A.  Yes, that's correct.

3    Q.  And his e-mail was at Pagoglobal, correct?

4    A.  Yes.

5    Q.  And this e-mail is dated November 22nd, 2017; do you see

6    that?

7    A.  Yes.

8    Q.  And I believe that was mentioned that this was before the

9    Calabasas meeting?

10   A.  Yes.

11   Q.  And this e-mail, if you look under Set Up, do you see where

12   it says "the present flow is CE, Clearsettle, Pago, Paynetics"?

13   A.  Yes.

14   Q.  Was this version of the scheme ever implemented?

15   A.  No.

16   Q.  And even before January, the January 2018 Calabasas

17   meeting, you had an earlier meeting with Ray and Koen; is that

18   right?

19   A.  That is correct.

20   Q.  And now, you were also asked -- hold on one sec.

21           So on cross-examination, Mr. Hargreaves, you were

22   asked a number of questions about whether the acquiring banks

23   that were involved in the Eaze scheme knew that it was a

24   transaction laundering scheme; do you recall that?

25   A.  Can you say that one more time?

1    Q.  Yes, and I'm sorry.  I'll repeat it, and if it's still

2    confusing, just tell me.

3            So on cross-examination you were asked a number of

4    questions about whether the acquiring banks that were involved

5    in the Eaze scheme knew that it was a transaction laundering

6    scheme; do you remember questions like that?

7    A.  Yes.

8    Q.  So based on your participation in the Eaze scheme, was it

9    your understanding that Ray and Ruben were working with

10   insiders at these acquiring banks?

11   A.  Yes, it was.

12   Q.  Now, you also testified on cross-examination that words to

13   the effect of 99 percent of the acquiring bank thought that

14   what was happening was legal, can you explain what you meant by

15   that?

16   A.  Yes.  Only a few -- you wouldn't have a blanket-wide

17   understanding of what was going on within an acquiring bank.

18   What you would have is somebody, hopefully, in a position of

19   power -- sorry, "power" is the wrong word -- knowledge or

20   insight or access to what was going on in the bank, to provide

21   guidance or, in a better situation, actually just push the

22   applications through, but obviously, that would depend on, you

23   know, the relationship and the position of that person.

24   Q.  Okay.  Mr. Hargreaves, do you have knowledge of anyone in

25   the Eaze scheme working with insiders at U.S. issuing banks?

1   A.  No, I don't.

2   Q.  Now, you were also asked on cross-examination about a

3   number of descriptors that you said that you didn't recall.  Do

4   you remember those questions?

5   A.  Yes.

6   Q.  They were Happy Puffy Box, remember, Hidden Kitten?

7   A.  Yes.

8   Q.  Now, ultimately, Mr. Hargreaves, you passed off this

9   business at some point in time; is that right?

10  A.  I'm sorry, I don't recall that.

11  Q.  Here, let me direct your attention to an exhibit.  Give me

12  one second.

13          (Pause)

14          Can we put up Government Exhibit 3970.  Take a look at

15  this, Mr. Hargreaves.

16  A.  It's an e-mail from Kate Farmer to EUprocessing.

17  Q.  Right.  And can you read the bold part of this e-mail?

18  A.  "Please note we are ceasing operations for support of

19  websites and their maintenance.  We will cease paying for these

20  services after the 30th of June 2019."

21  Q.  And did this, in fact, occur to your knowledge?

22  A.  Yes.

23  Q.  And who was this passed off to?  Who do you understand it

24  was passed off to?

25  A.  You mean managing the domains and hosting, et cetera?  To

```
 1    the company Spinwild.

 2    Q.  And who was in charge of that company?

 3    A.  Michele Furlan.

 4              MS. LA MORTE:  One moment, your Honor.

 5              (Pause)

 6              No further questions.

 7              THE COURT:  Any recross?

 8              MR. ARTAN:  Just a bit, your Honor.

 9    RECROSS EXAMINATION

10    BY MR. ARTAN:

11    Q.  Good afternoon, Mr. Hargreaves.  Can you hear me?

12    A.  Yes.  Yes, sir, I can.

13    Q.  Ms. LaMorte asked you a series of leading questions just

14    now.

15              MS. LA MORTE:  Objection.

16              THE COURT:  Sustained.

17    BY MR. ARTAN:

18    Q.  You were asked by Ms. LaMorte if you were always truthful

19    to the government; do you remember that?

20    A.  Yes.

21    Q.  And you said you were, right?

22    A.  Yes.

23    Q.  I'd like transcript page 880 put before the witness, if you

24    please, your Honor.  And I'm looking at lines 16 through 18.

25    A.  Sorry, was that question not in relation to --
```

1   Q.  I haven't asked a question yet, sir.

2   A.  Sorry.  Apologies.

3          MR. ARTAN:  May I proceed, your Honor?

4   Q.  Do you see that question and answer?

5   A.  Yes, I do.

6   Q.  The question is:  "Were you truthful with the government

7   during those meetings?"  And your answer was:  "Not all the

8   time, but yes, in general," correct?

9   A.  That is correct.

10  Q.  So you were not always truthful with the government, were

11  you?

12  A.  No, I was not.

13         MR. ARTAN:  Thank you.

14         THE COURT:  Any recross from co-counsel?

15         MR. TAYBACK:  Briefly.

16  FURTHER RECROSS EXAMINATION

17  BY MR. TAYBACK:

18  Q.  Other than 809 -- can you hear me?  I'm sorry.  Can you

19  hear me?

20  A.  Yes, sir.

21  Q.  Other than 8099, were there any other codes that you used?

22  A.  I couldn't tell you what the exact codes were.

23  Q.  The person that you said you, on redirect, passed off the

24  work related to Eaze to was Michele Furlan, right?

25  A.  That's correct -- now, do you mean take -- whenever I said

SOUTHERN DISTRICT REPORTERS, P.C.

1    taking over the hosting the domains?

2    Q.  Yes.

3    A.  Yes, we did give him that work.

4    Q.  And that was the person you worked with, correct?

5    A.  Yes.

6            MR. TAYBACK:  No further questions.

7            THE COURT:  Anything else?

8            MS. LA MORTE:  Yes, one more thing.

9    FURTHER REDIRECT EXAMINATION

10   BY MS. LA MORTE:

11   Q.  Mr. Hargreaves, you were shown a transcript cite where you

12   had stated that you weren't always truthful with respect to the

13   government; is that correct?

14   A.  Yes.

15   Q.  And, Mr. Hargreaves, I believe you also testified that that

16   occurred in relation to your stealing $40,000 from your

17   employer; is that right?

18   A.  Yes.

19           MS. LA MORTE:  No further questions.

20           THE COURT:  Anything else?

21           MR. ARTAN:  If I could have a moment, please, your

22   Honor?

23           (Pause)

24           I'll be very brief, your Honor.

25           If we could go back to page 880, please.

1          May I proceed, your Honor?

2          THE COURT:  Yes.

3    FURTHER RECROSS EXAMINATION

4    BY MR. ARTAN:

5    Q.  Do you see the question and answer?

6    A.  Yes, I do.

7    Q.  The question wasn't whether you were truthful with the

8    government during those meetings, correct?

9    A.  Correct.

10   Q.  And your theft of the $40,000 occurred after the meetings

11   with the government, correct?

12   A.  Yes, sir.

13          MR. ARTAN:  Thank you.  Nothing more.

14          MS. LA MORTE:  No further questions.

15          THE COURT:  Anything further from Mr. Tayback?

16          MR. TAYBACK:  No, your Honor.

17          THE COURT:  I'm a little unclear about the last couple

18   of answers.  When did this theft of 40,000 occur, date-wise?

19          THE WITNESS:  Certainly in the first half of 2018.

20          THE COURT:  I'm sorry?

21          THE WITNESS:  Certainly, I believe, to be in the first

22   half of 2018.

23          THE COURT:  Okay.  And didn't you meet with the

24   government both before and after?

25          THE WITNESS:  Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1          THE COURT:  So when you answered the question from

2     counsel a minute ago that your theft of the 40,000 occurred

3     after the meetings with the government, did you mean after some

4     of the meetings with the government, or did you mean after all

5     of the meetings with the government?  That's what I was

6     confused about.

7          THE WITNESS:  Would it be possible for me to see -- to

8     look at what you're reading as well?

9          THE COURT:  Sure.

10         Does someone want to put that up on the screen again?

11         THE WITNESS:  Could someone take down the highlighted

12    bit, please?

13         I know that there's no time line.  It makes it a

14    little bit difficult for me to answer.

15         THE COURT:  Well, when did you first start meeting

16    with the government?  Wasn't it --

17         THE WITNESS:  It was at the end of --

18         THE COURT:  -- shortly -- didn't you originally start

19    providing information to them shortly after your arrest?

20         THE WITNESS:  That's correct, sir.

21         THE COURT:  And when was that?

22         THE WITNESS:  In September, October and -- shortly

23    after my arrest at the end of 2017, sir.

24         THE COURT:  Yes.  And then you met with them as

25    recently as last Sunday, yes?

1          THE WITNESS:  That's correct.

2          THE COURT:  And numerous times in between, yes?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  So at one point in time, you did not tell

5    them the truth regarding the $40,000 that you had stolen; is

6    that it?

7          THE WITNESS:  That's correct.

8          THE COURT:  And was that the only thing you did not

9    tell the truth about?

10          THE WITNESS:  I also told them about the transfer of

11   money, a lot of sum of 200,000 I believe was the amount.  I did

12   not tell them until after it was done.

13          THE COURT:  Okay.  And that partial misleading was

14   also as part of the same conversation or about the same time as

15   the 40,000 or later?

16          THE WITNESS:  Are you talking about when I told the

17   government about it?

18          THE COURT:  Yes.

19          THE WITNESS:  No, I told the agents about it the same

20   day it happened.  I don't recall what that day was.

21          THE COURT:  Maybe I'm missing the point.  You stole

22   40,000 and you transferred 200,000?

23          THE WITNESS:  Yes, these were separate events.

24          THE COURT:  They were separate events.  Were they

25   about the same time?

```
 1                THE WITNESS:  I'm sorry, I know this is frustrating --

 2                THE COURT:  In any event, the $40,000, you initially

 3      did not reveal to the government?

 4                THE WITNESS:  That's correct, sir.

 5                THE COURT:  And you knew that was misleading them,

 6      yes?

 7                THE WITNESS:  Yes, I did.

 8                THE COURT:  And the 200,000 you also did not initially

 9      reveal to the government?

10                THE WITNESS:  That is also correct.

11                THE COURT:  And that was also, you knew, misleading?

12                THE WITNESS:  Yes, sir.

13                THE COURT:  Okay.  But those are the only two

14      instances that you misled them, to the best of your knowledge?

15                THE WITNESS:  Yes, sir.

16                THE COURT:  All right.  Very good.  Anything else?

17                MR. TAYBACK:  Your Honor, could I clear up one date

18      question with a question?

19                THE COURT:  Sure, yes.

20      FURTHER RECROSS EXAMINATION

21      BY MR. TAYBACK:

22      Q.  Mr. Hargreaves, you were arrested September of 2018,

23      correct, not 2017?

24      A.  Yes -- I'm sorry, I'm a little bit -- could I possibly look

25      at my document, my police document?
```

```
 1              MR. ARTAN:  Your Honor, that might be something we
 2    could stipulate to.
 3              THE COURT:  Right.
 4              MS. LA MORTE:  Yes.
 5              THE COURT:  So when was Mr. Hargreaves --
 6              MS. LA MORTE:  September 27th.  We can stipulate
 7    September 27th, 2018.
 8              THE COURT:  Okay.  Very good.
 9              MR. TAYBACK:  Thank you.
10              THE COURT:  All right.  Anything else from anyone?
11              MS. LA MORTE:  No, your Honor.
12              THE COURT:  You are excused.  Thank you very much.
13              (Witness excused)
14              Please call your next witness.
15              MS. LA MORTE:  The government calls Richard Clow.
16              THE COURT:  Okay.  You can step into that box.  And
17    once you're in there, you can take off your mask.  Don't sit
18    down yet.
19     RICHARD CLOW,
20         called as a witness by the Government,
21         having been duly sworn, testified as follows.
22              THE COURT:  Please be seated.  And state and spell
23    your name for the record.
24              THE WITNESS:  My name is Richard Clow, R-i-c-h-a-r-d,
25    C-l-o-w.
```

```
 1              THE COURT:  Counsel.

 2   DIRECT EXAMINATION

 3   BY MS. LA MORTE:

 4   Q.  Good afternoon, Mr. Clow.

 5   A.  Good afternoon.

 6   Q.  Mr. Clow, where do you work?

 7   A.  I work at Bank of America in New York City.

 8   Q.  How long have you worked at Bank of America?

 9   A.  About three years.

10   Q.  What is your current title at Bank of America?

11   A.  Senior vice president, president emerging payments and

12   strategy.

13   Q.  Is that part of a particular unit or a group within Bank of

14   America?

15   A.  Yes, I am part of the enterprise payments team.

16   Q.  What is the enterprise payments team?

17   A.  We're an organization that works across all of the bank for

18   the wholesale and consumer businesses to define the strategies

19   for what we need to do in payments, and then execute on those

20   strategies for a wide range of things such as credit card,

21   realtime payments, working with digital wallets and partners.

22   Q.  So you mentioned consumer -- I believe you said the

23   consumer division?

24   A.  Yes.

25   Q.  What is that?
```

1    A.   The consumer division is the division that provides

2    products and services to everyday people like you and I.

3    Q.   What are your duties and responsibilities as a senior vice

4    president of emerging payments and strategy?

5    A.   My responsibilities are to evaluate new and emerging

6    technologies and business models that relate to the way our

7    consumers want to pay for things, and to evaluate whether there

8    are things we should invest in, and then how we would go about

9    validating that they worked and that they were compliant with

10   our various policies and procedures.

11   Q.   Can you provide an example of that for the jury?

12   A.   Sure.  One example was Zelle, which is a payment network in

13   the United States that we enabled for consumers to move money

14   between people, and then my team helped lead the process where

15   we enabled small businesses to also start to use Zelle to move

16   money between a small business and their employees or to

17   collect payments from people.

18   Q.   What did you do before you worked at Bank of America?

19   A.   I worked at Citibank for 18 years.

20   Q.   And towards the end of your time at Citi, what was your

21   job?

22   A.   My job was the head of payments innovation, in a similar

23   role as I'm in at Bank of America.

24   Q.   Okay.  Let's talk a little bit more about Bank of America.

25   Where is Bank of America headquartered?

```
 1   A.   We're headquartered in Charlotte, North Carolina.

 2   Q.   And who manages the affairs of Bank of America?

 3   A.   Our board of directors and senior executives.

 4   Q.   Are you familiar with the Federal Deposit Insurance

 5   Corporation?

 6   A.   Yes.

 7   Q.   Is that also referred to as the FDIC?

 8   A.   Yes.

 9   Q.   Is Bank of America insured by the FDIC?

10   A.   Yes.

11   Q.   And what does it mean to be insured by the FDIC?

12   A.   It means that if our clients have deposits in the bank and,

13   for whatever reason, our bank became non-liquid or we did not

14   have money that they could withdraw against, that the FDIC

15   would provide the funds, up to certain limits, to our clients.

16   Q.   So a few moments ago we talked about the types of consumer

17   services that Bank of America offers its customers; do you

18   recall that?

19   A.   Yes.

20   Q.   And I believe you said that Bank of America, among other

21   products, issues credit cards to individual customers?

22   A.   Yes, we do.

23   Q.   And does Bank of America issue debit cards to customers?

24   A.   Yes, we do.

25   Q.   And with respect to those cards Bank of America is what is
```

1   referred to as an issuing bank?

2   A.  Yes, we are.

3   Q.  And just what does it mean to be an issuing bank?

4   A.  It means that we're the bank that enables our clients to

5   purchase things at various different types of merchants in

6   different ways.

7   Q.  So during your time at Bank of America, what payment

8   networks does the bank -- did the bank partner with to issue

9   debit and credit cards?

10  A.  We primarily work with Visa and MasterCard.

11  Q.  Mr. Clow, are you generally familiar with Visa and

12  MasterCard's rules for their payment systems?

13  A.  Yes, I am.

14  Q.  How are you familiar with those rules?

15  A.  In my day-to-day activities evaluating new solutions and

16  bringing them to market, I need to know about how those

17  networks work and what responsibilities we have as an issuer.

18  Q.  And are those rules and -- relevant to Bank of America's

19  business?

20  A.  Yes, highly relevant.

21  Q.  Can you explain how so?

22  A.  The network rules define what an issuer needs to do to

23  enable payments, and simplest example is, you know, 20 years

24  ago you used to have to look at a store for a sticker to see if

25  MasterCard and Visa were accepted to make sure that you knew

1    how you could pay for something there, and we really pride

2    ourselves in enabling our clients to have choice with how they

3    pay for things with the majority of merchants that they would

4    choose to shop at.

5    Q.   Is it important to Bank of America, as an issuing bank, to

6    comply with the card network rules?

7    A.   Yes.

8    Q.   Why is that?

9    A.   If we're not in compliance with the network rules, then

10   they could either fine us or ultimately not let us operate on

11   their network.

12   Q.   And would that affect Bank of America's business?

13   A.   Yes.  It would severely impact our ability for our clients

14   to use, or to have simple checkout processes, at the majority

15   of merchants that they shop today.

16   Q.   So during the 2018, 2019 time period, did Visa and

17   MasterCard have rules in place regarding illegal transactions

18   on the network?

19   A.   Yes.

20   Q.   Generally speaking, what do those rules provide with

21   respect to transactions that are illegal under the law?

22   A.   They define the roles of people to identify who is trying

23   to do the transactions and to block them effectively, and they

24   fall in a number of categories including, you know, illegal

25   activities.

1    Q.  And does Bank of America consider purchases of marijuana

2    products from U.S. companies to fall within the prohibition of

3    those rules?

4    A.  Yes.

5    Q.  So earlier you told us that you started with Bank of

6    America, I believe you said, roughly three years ago; is that

7    right?

8    A.  Yes.

9    Q.  So that would have been in the 2018 time period?

10   A.  Yes, April of 2018.

11   Q.  So then focusing on that 2018 to 2019 time period, would

12   Bank of America have knowingly authorized direct credit or

13   debit purchases for marijuana products in the United States?

14   A.  No, we would not.

15   Q.  So, Mr. Clow, aside from the card network rules that we --

16   that you just discussed, did Bank of America independently have

17   its own policies and procedures in place concerning engagement

18   with marijuana businesses?

19   A.  Yes, we do, we have an enterprise policy related to

20   marijuana-related businesses.

21   Q.  And are you generally familiar with that enterprise policy

22   relating to the marijuana-related businesses?

23   A.  Yes, I am.

24   Q.  And how are you familiar with it?

25   A.  As part of my role in the payments organization, I need to

1   be familiar with any different types of high-risk transactions,

2   and marijuana-related transactions are in that, are considered

3   high risk.

4   Q.  Can you provide the jury with just a general overview of

5   Bank of America's policy in that regard?

6   A.  Sure.  Basically stated, we -- in the United States, we do

7   not do any form of business with marijuana-related businesses.

8   Q.  And we will discuss this in a bit more detail later, but

9   can you just describe generally for now why that's Bank of

10  America's policy?

11  A.  Marijuana is illegal in federal terms; so it's illegal from

12  our interpretation, and we are not going to engage in illegal

13  practices.

14  Q.  Can we put up on the screen side by side for the witness

15  what's been marked for identification as Government Exhibits

16  2410 and 2411?

17          THE COURT:  Ms. LaMorte, keep in mind that we're going

18  to stop in five minutes.

19          MS. LA MORTE:  Your Honor, then maybe it makes sense

20  for me to offer these, and then that's probably a good place to

21  stop.  Okay?

22          MR. BURCK:  Your Honor, we have no objection to these

23  exhibits.

24          MS. LA MORTE:  Well, then government offers Government

25  Exhibit 2410 and 2411.

1          THE COURT:  They are received.

2          (Government's Exhibits 2410 and 2411 received in

3   evidence)

4          THE COURT:  And the witness is excused.  We'll see you

5   tomorrow at 9:45 a.m.  You can step down.

6          THE WITNESS:  Thank you.

7          (Witness temporarily excused)

8          THE COURT:  I don't know, ladies and gentlemen, the

9   lawyers here are really getting awfully soft.  They're letting

10  you go five minutes early.  I'll have to have a serious

11  discussion with them.

12         Seriously, now we are back on schedule; so tomorrow

13  will be our normal 9:45 and 3:45.  Have a very good evening,

14  and I'll see you tomorrow morning at 9:45.

15         (Jury not present)

16         THE COURT:  Please be seated.  All right.  This is not

17  binding, but I do want a best estimate.  When does the

18  government expect to rest?

19         MR. FOLLY:  Your Honor, our best estimate is that we

20  would rest a week from tomorrow, next Thursday, the 18th.

21         THE COURT:  All right.  Let me ask defense counsel,

22  putting aside the question of whether your clients will take

23  the stand or not, which you can reserve on until the close of

24  the government's case, other than that, how long do you expect

25  your case to take?

1          MR. BURCK:  Your Honor, I think we would expect two

2    days.

3          THE COURT:  All right.  So that would bring us to the

4    end of the third week.  Now, we missed a day, and we had some

5    shortened days for unforeseen reasons, but I think the

6    government should consider shortening their case by one day.

7    Obviously, I'm not going to require you to do that.  I just

8    urge it upon you.

9          Okay.  I also want to remind everyone, even though

10   this is a fair way off, first, I will, at some point next week,

11   get you a proposed draft of my charge to the jury, and then

12   we'll have a charging conference.  And that almost certainly

13   will be in the late afternoon, early evening.

14         Second, don't forget that when the case goes to the

15   jury, we will need to provide them immediately with a list of

16   all of the exhibits and a thumb drive, or some equivalent to a

17   thumb drive, so they can access the exhibits without going

18   through thousands of pages of paper.

19         So, you know, what I don't want to have is a situation

20   where we excuse the jury and then I'm told, oh, the parties are

21   still putting that together.  So you should start thinking

22   about that now.  All right?

23         Anything else we need to take up?  Yes.

24         MR. HARID:  Your Honor?

25         THE COURT:  I'm not hearing you for some reason.

 1            MR. HARID:  Can you hear me now?

 2            THE COURT:  Yes.

 3            MR. HARID:  Your Honor, we have an application.

 4            THE COURT:  The problem is, how tall are you?

 5            MR. HARID:  Six-three.

 6            THE COURT:  Yes, well, that was very un-foresightful

 7    on the part of your parents.  You know, speaking from the

 8    depths of five-foot-six, I am environs as can be.

 9            Anyway, go ahead.

10            MR. HARID:  Your Honor, we have an application

11    designed to streamline tomorrow's testimony, and it concerns

12    the next witness, who's Special Agent Hupcher.

13            THE COURT:  Yes.

14            MR. HARID:  We understand that the government will be

15    attempting to get various documents into evidence that -- and

16    covering various documents that Mr. Hargreaves testified about,

17    and I can list a few of them for the Court.

18            THE COURT:  Well, let me just -- I have a telephone

19    conference in another matter at 4:00; so let me see if I can

20    cut through this at least for now.  We can take it up further

21    tomorrow.

22            The only thing I've seen so far, but maybe I missed

23    it, was this whole question of whether the statements of the

24    defendant that were coming in through this agent should also

25    include other statements under completeness.  Is that a part of

1    this witness?

2            MR. HARID:  No, your Honor.

3            MS. LA MORTE:  That's different, your Honor.

4            THE COURT:  Okay.  That's someone else.  All right.

5    So go ahead.  What are the exhibits?

6            MR. HARID:  Your Honor, we have two different sets of

7    global objections.  The first objection is that there will be

8    various application-specific documents that would be unduly

9    cumulative of Mr. Hargreaves' testimony.  So we would rather

10   the next witness not get into those.

11           And the second, I think --

12           THE COURT:  Well, I don't really understand that

13   objection, given two things.  First, last I heard, the

14   government's burden was proof beyond a reasonable doubt.  So,

15   of course, they have to corroborate testimony; and second,

16   unless I missed it, you and your colleagues were busy attacking

17   him as a liar.  So another reason why they have to corroborate.

18   So I don't really see the force of that objection.

19           MR. HARID:  I understand, your Honor.  There's a

20   separate objection, which is that the witness is an improper

21   witness for the various documents because he was not a case

22   agent in this matter, was just recently recruited by the

23   government to assist with testimony.  So the concern is that he

24   wouldn't have personal knowledge as to any of the documents

25   they're attempting to have him testify about.

1        THE COURT:  Are you challenging the authenticity of

2   those documents?

3        MR. HARID:  No.

4        THE COURT:  Then if you're not challenging the

5   authenticity, my theory would be, or my understanding would be,

6   that the janitor could put them into evidence.  If there was a

7   question about authenticity, that's a different question.

8        MR. HARID:  I understand, your Honor.  It just

9   heightens the 403 issue we have, which we raised in Weigand

10   motion in limine No. 2, which is that they're not

11   self-explanatory documents, and they are nuanced documents that

12   would lead to jury confusion and speculation and --

13        THE COURT:  Well, first, if they are admissible but

14   your 403 argument is that you need a live witness to put them

15   in context, of course, you, in your case, can call some other

16   agent, if that's what you want to do.  That would be somewhat

17   unusual, but you're welcome to do that.

18        MR. HARID:  Your Honor, the concern is that the

19   documents include the co-defendants and alleged

20   co-conspirators, and we may or may not call the defendants to

21   testify, and separately the --

22        THE COURT:  I'm not sure what you're saying there.

23   The government has already established a basis for which the

24   jury could infer, if they wish, that there was a co-conspirator

25   relationship between the defendants here.  If these are

1    subsequent to the conspiracy and you're raising a Bruton

2    problem, that's a different issue.  I'm not quite sure which

3    one you're raising.

4            MR. HARID:  Your Honor, one of the concerns the Court

5    identified was some of the e-mails concern unrelated business

6    activities unrelated to the charged scheme and unrelated to

7    Eaze, and without a witness with personal knowledge to

8    distinguish between --

9            THE COURT:  Yes, I mean, that I can only deal with as

10   they come in individually.  You're right to remind me of that,

11   and that's still alive, so to speak, but I can't deal with that

12   globally.

13           MR. HARID:  I understand.  Thank you.

14           THE COURT:  All right.  Very good.

15           Anything else?

16           MS. LA MORTE:  No.

17           THE COURT:  Very good.  We'll see you all tomorrow.

18           (Adjourned to 9:30 a.m. on March 11, 2021)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

1                          INDEX OF EXAMINATION

2     Examination of:                                    Page

3     OLIVER HARGREAVES

4     Cross By Mr. Artan . . . . . . . . . . . . . 994

5     Cross By Mr. Tayback . . . . . . . . . . .1005

6     Redirect By Ms. La Morte . . . . . . . . . .1097

7     Recross By Mr. Artan . . . . . . . . . . . .1117

8     Recross By Mr. Tayback . . . . . . . . . . .1118

9     Redirect By Ms. La Morte . . . . . . . . . .1119

10    Recross By Mr. Artan . . . . . . . . . . . .1120

11    Recross By Mr. Tayback . . . . . . . . . . .1123

12     RICHARD CLOW

13    Direct By Ms. La Morte . . . . . . . . . . .1125

14                        GOVERNMENT EXHIBITS

15    Exhibit No.                                    Received

16     4116   . . . . . . . . . . . . . . . . . . 995

17     2410 and 2411   . . . . . . . . . . . . . .1132

18                        DEFENDANT EXHIBITS

19    Exhibit No.                                    Received

20     WX-207   . . . . . . . . . . . . . . . . . 996

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300