L3FPWEI1                         Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,
6
               Defendants.               Trial
7
    ------------------------------x
8
                                          New York, N.Y.
9
                                          March 15, 2021
10                                        9:15 a.m.

11

12  Before:

                        HON. JED S. RAKOFF,
13
                                          District Judge
14

15                          APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand

25
                        APPEARANCES CONTINUED

L3FPWEI1                        Trial

```
QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:    WILLIAM A. BURCK
       CHRISTOPHER TAYBACK
       SARA CLARK
       MARI HENDERSON
       DEREK SHAFFER
       PAUL SLATTERY
       -and-
ROTHKEN LAW FIRM LLP
       Attorneys for Defendant Akhavan
BY:    IRA P. ROTHKEN
       JARED R. SMITH
```

1        (Trial resumed; jury not present)

2        THE COURT:  Please be seated.  So yesterday my

3   chambers received a call from juror No. 2, who had told the

4   following story.  Her nine-year-old daughter is at a school

5   where earlier Sunday a test for another student came back

6   positive for Covid-19, and even though, as I understand it,

7   juror No. 2's daughter was not in the same class, it's a small

8   school and so the school is having all the students tested

9   today for Covid-19.

10       But given the fact that this was only discovered on

11  Sunday, or at least that's when the test results came back, and

12  given the limited information that we had, I had one of our

13  experts talk to the juror.  And even though the chances that

14  the juror contracted anything are very low, the recommendation

15  I received was not to take the chance, and so I excused juror

16  No. 2 and replaced her with our remaining alternate.  Just

17  lending a little bit of excitement to the proceedings.

18       So anyone object to that?

19       MR. TAYBACK:  No, your Honor.

20       MR. HARID:  No, your Honor.

21       MS. LA MORTE:  No, your Honor.

22       THE COURT:  Very good.

23       Secondly, we had a letter motion from a reporter,

24  Mr. Matthew Russell Lee, asking that certain previously

25  redacted or sealed items be made public.  I have granted that

motion and issued an order, which you all should have got a few

minutes ago, and I will follow that up with an opinion in due

course.

          Third, and this is of no relevance to anyone but me,

but I have to share it with you.  So there will be officially

this morning nominated to the Supreme Court of New Jersey my

former law clerk, Rachel Wainer Apter, who, you know, she's

already 40 years old; so I mean, it's about time.  But in any

event, I'm very proud of her, and I wanted to share that with

you.

          Okay.  What else do we have?

          MR. HARID:  We have the papers we filed over the

weekend and this morning about the potential --

          THE COURT:  I'm sorry.  It's not that I can't hear

your voice.  It's that when you get that close to the

microphone, it gets blurry.

          MR. HARID:  Is this better, your Honor?

          THE COURT:  Yes, it's better.

          MR. HARID:  We filed a few letters over the weekend

and this morning about the potential expert witnesses we

discussed on Friday.

          THE COURT:  So, you know, I haven't had a chance yet

to review the stuff that was due at 9:00 a.m. this morning with

the defense experts, but my understanding was there was

agreement reached that is to the introduction of certain

L3FPWEI1                         Trial

1    memoranda --

2              MS. LA MORTE:  Yes, your Honor.

3              THE COURT:  -- obviating the need for that particular

4    expert.

5              MS. LA MORTE:  Correct.  That was Mr. Vardaman, and

6    there was an agreement on the memoranda.

7              THE COURT:  Yes, okay.

8              MR. HARID:  Your Honor, there was just one more issue

9    pending.  Both sides agree that Mr. Vilfer would subject

10   himself to a three-hour deposition on Wednesday evening, in the

11   event the Court permits him to testify.

12             THE COURT:  Very good.  Thank you very much.  Anything

13   else?

14             MS. LA MORTE:  Not from the government.

15             MR. TAYBACK:  Not on behalf of Mr. Akhavan.

16             MR. HARID:  Nothing else.

17             THE COURT:  All right.  Okay.  So why don't we take a

18   15-minute break and the jury should be up promptly at 9:45.

19             (Recess)

20             (Jury present)

21             THE DEPUTY CLERK:  If juror No. 13 could come to seat

22   No. 2 seat.  Thank you so much.

23             THE COURT:  Congratulations, juror No. 13.

24             JUROR:  Awesome.  Finally made it.

25             THE COURT:  Please be seated.

1          So, ladies and gentlemen, the following occurred

2     yesterday.  I want to make you aware of it.  The juror No. 2

3     has a nine-year-old daughter who received word, or the parent

4     received word, that another student in her daughter's school,

5     not even in the same class but in the school, had tested

6     positive yesterday for Covid-19.  So the school wants to test

7     all of the students in an excess of caution, not just those in

8     the same class, and the parent is going to be tested as well.

9          The likelihood that the parent has Covid-19 is really

10    very low, given that chain of events.  Nevertheless, the most

11    important thing for us is to make sure that you're safe at all

12    times, and so after talking with the experts, I was advised

13    that we should excuse juror No. 2.

14         And, fortunately, we have another alternate.  So, you

15    know, we'll continue to monitor it, and I'll report back to you

16    if there's anything more serious.  It doesn't sound to me like

17    it's serious at all, but I wanted you to be aware of it.

18         Okay.  Let's continue, counsel.

19     JAMES PATTERSON,

20    DIRECT EXAMINATION (RESUMED)

21    BY MR. FOLLY:

22    Q.  Good morning, Mr. Patterson.

23    A.  Good morning.

24    Q.  Before we finished on Friday, you had explained that Eaze

25    had stopped card processing with Clearsettle in around early

1    2018; is that right?

2    A.  Yes, that's right.

3    Q.  And after card processing went down with Clearsettle, you

4    mentioned that Eaze had discussions with some additional card

5    processors?

6    A.  Yes.

7    Q.  Who were those processors?

8    A.  Well, we were talking to probably maybe a dozen, but the

9    two that were -- we started working with were Icanpay and

10   CardConnect.

11   Q.  Can you explain what happened with Icanpay and CardConnect?

12   A.  Yes.  So we started processing with Icanpay in February; so

13   shortly after all of our dispensaries finally received their

14   licenses.  After a few weeks of processing with Icanpay, the

15   accounts got frozen at the bank.

16   Q.  And you also mentioned that you had done some processing

17   with CardConnect.  Can you explain what happened with that

18   processing?

19   A.  Basically the same thing.  So after about a month of

20   processing with CardConnect, the accounts were frozen at the

21   bank.

22   Q.  Now, I want to direct your attention to approximately early

23   March of 2018.  Did anything significant happen involving you

24   and the defendant Ray Akhavan around that time?

25   A.  Yes.  I got some disturbing text messages from him

L3FPWEI1                         Patterson - Direct

1    regarding credit card processing.

2    Q.  Mr. Levine, if you could show the witness only what's been

3    marked for identification as Government Exhibit 301.

4             Mr. Patterson, do you recognize this?

5    A.  Yes.

6    Q.  What is it?

7    A.  These are the text messages that I recieved.

8    Q.  And what form did you receive these text messages in?

9    A.  They were over a messages app called Telegram.

10            MR. FOLLY:  The government offers Government

11   Exhibit 301.

12            MR. TAYBACK:  Objection, 403.

13            THE COURT:  Overruled.  Received.

14            (Government's Exhibit 301 received in evidence)

15            MR. FOLLY:  You can publish those, Mr. Levine.

16   BY MR. FOLLY:

17   Q.  Now, just focusing on the messages that are all at

18   7:09 a.m., who wrote those messages?

19   A.  Ray wrote those.

20   Q.  And who received those messages?

21   A.  I did.

22   Q.  And if you'll see in the upper left-hand corner, it says

23   Nick Fasano.  Can you explain why his name is shown here?

24   A.  After I received these, I took a screenshot of these

25   messages and later forwarded it to Nick Fasano.

L3FPWEI1                     Patterson - Direct

1    Q.  Can you read aloud the messages?

2    A.  "I see your processing with others while I pay for your

3    merchants.  Get ready to get fucked.  You're in deep shit."

4    Q.  Where were you at the time you received these messages?

5    A.  I was at my home in San Francisco.

6    Q.  Before we go through the messages themselves, what was your

7    reaction when you received the messages?

8    A.  Well, I knew that this was about that Ray found out that we

9    were working with another company, and this was something I

10   feared would happen.  I had seen him talk in threatening ways

11   to other people that had crossed him in the past.

12           MR. TAYBACK:  Objection.  Move to strike.  Lack of

13   foundation.  Hearsay.

14           THE COURT:  Overruled.

15   Q.  What did you do at the time you received the messages?

16   A.  Well, when I got the messages, I just remember my heart

17   started racing.  My mind was racing.  I remember I got up and I

18   actually just walked over to the window just to look to see if

19   anyone was out there.  I just felt that I was kind of being

20   watched.  I knew if I ignored these messages, that I wouldn't

21   feel safe; so I decided to call Ray to try to diffuse the

22   situation.

23   Q.  Before we get to that call, I want to talk about the

24   messages themselves.  In the first message it says:  "I see

25   you're processing with others while I pay for your merchants."

1  What was your understanding of what Ray meant in that messages?

2  A.  That he had found out that we were working with another

3  company.

4  Q.  And in the second and third messages it says:  "Get ready

5  to get fucked.  You're in deep shit."  What was your

6  understanding what Ray meant in those messages?

7  A.  I took that as a physical threat to me.

8  Q.  You mentioned that you called Ray after receiving these

9  messages; is that right?

10  A.  Yes.

11  Q.  I'd like you to describe that call with Ray in as much

12  detail as possible, and just make sure you clearly identify who

13  said what during that call?

14  A.  Okay.  So, you know, I called him.  He picked up right

15  away, immediately started screaming at me very aggressive.  I

16  remember he said, you know:  You fucking piece of shit.  You

17  little worm.  I've lost tons of money working with you.  You go

18  behind my back.  You know, you better figure out some way to

19  make sure that I get paid back.

20        He talked -- he was very aggressive about how -- the

21  fact that he had lost money with Eaze.  He viewed me working

22  with others as a betrayal and, you know, that I needed to pay

23  him back.  I was just -- the thing that stuck out to me most

24  was just the personal nature of it.  It wasn't that this was a

25  company dispute that Eaze, the company, owed him money.  It was

1    very much that I, personally, owed him money and I, personally,

2    better figure out a way to pay him back.

3    Q.  During that discussion with Ray, you mentioned that he had

4    indicated that he had lost money.  What was your -- what is

5    your recollection of what he said about that?

6    A.  Well, that the rate, the processing rate that he had

7    negotiated with Keith was such that he wasn't making any money

8    on that rate.  The other thing he said was that he was paying

9    for the customer service costs associated with the credit card

10   processing and that that alone had cost him hundreds of

11   thousands of dollars for -- just to be running the customer

12   service.

13   Q.  What did you say in response to Ray during that call?

14   A.  I just tried to placate him.  I told him that, look, we'll

15   figure it out.  I want to make sure that you're paid back; so

16   let me know -- I essentially told him, tell me what needs to be

17   done in order to pay that back.  And, ultimately, I agreed to

18   all of the demands that he had in terms of how to make this

19   right.

20   Q.  What were those demands?

21   A.  To restart processing, but now at a higher rate.  So

22   whereas before the rate was 8.5 percent, he wanted to increase

23   it to 10 percent.  In addition to that, Eaze would pay for all

24   of the customer service costs.  He wanted stock options in the

25   company and also to install a special server called a proxy

1  server on our system that would enable him to monitor all of

2  our credit card transactions, even ones that occurred with any

3  other processor.

4  Q.  What was Ray's demeanor during that phone conversation?

5  A.  I mean, at the beginning, just extremely aggressive,

6  threatening, at the beginning.  And towards the end, once I

7  agreed to continue processing at the higher rate, and he calmed

8  down, and so we ended it, I would say, you know, placated.

9  Q.  You mentioned a moment ago that you had interpreted his

10  text messages as being a physical threat.  Why did you

11  interpret that as being a threat to you physically?

12  A.  Well, I remembered an incident that happened about six

13  months prior to that.  I was at his office, at a meeting with

14  him and Keith, and he asked me if --

15          MR. TAYBACK:  Objection, your Honor.  403.

16          THE COURT:  Sustained.

17  Q.  You mentioned that after this phone call, you had, I

18  believe, taken a screenshot of the messages and sent them to

19  Nick Fasano; is that right?

20  A.  Yes.

21  Q.  Who was Nick Fasano?

22  A.  Nick -- well, Nick was, first and foremost, a friend of

23  mine.  I'd known him for about 15 years.  He also worked at

24  Eaze.  He was the chief revenue officer at Eaze.  He was the

25  first person that I recruited when I took over as CEO.

1   Q.  Approximately how long -- I believe you just said that, 15

2   years.

3           What did you do after that phone conversation with Ray

4   ended?

5   A.  Well, I mean, after my -- I really felt like alone and sort

6   of isolated.  I knew I wanted to tell someone.  I felt strongly

7   that I needed to tell someone.  You know, I considered

8   reporting it, but I just felt like that would lead to

9   retaliation.  I didn't want to tell my wife because she was

10  going through fertility treatments at the time, and I just

11  didn't want to add to her stress.  So ultimately, I decided to

12  call Nick just to tell somebody about what happened.

13  Q.  Did you, in fact, call Nick?

14  A.  Yes.

15  Q.  What was Nick's role at Eaze at the time?

16  A.  So Nick, his title was chief revenue officer; so he oversaw

17  the partnership with all of Eaze dispensary partners.

18  Q.  What time period did he work for Eaze?

19  A.  2017 to, I believe he still works there.

20  Q.  Did Eaze eventually resume credit card processing through

21  Ray's organization?

22  A.  Yes.

23  Q.  What was your role at the company at the time?

24  A.  I was -- I was the CEO.

25  Q.  As CEO, why did you make the decision to resume credit card

L3FPWEI1                       Patterson - Direct

1    processing through Ray's organization?

2    A.  I agreed to it because I just felt scared.  I didn't feel I

3    could ignore his threats, that I need to figure out how to pay

4    him back.

5    Q.  Going back to the phone conversation that you had with Ray,

6    you mentioned that there was a discussion about the rates that

7    were getting charged by Ray; is that right?

8    A.  Yes.

9    Q.  Prior to that conversation, what had the rates been that

10   Ray was charging?

11   A.  It was 8.5 percent.

12   Q.  After that conversation, when card processing resumed, what

13   were the rates that were being charged?

14   A.  10 percent.

15   Q.  Now, you just mentioned Eaze resumed card processing

16   through Ray's organization.  Approximately when did Eaze resume

17   the card processing?

18   A.  Late -- late April 2018.

19   Q.  Before card processing resumed with Ray's organization, did

20   you have any in-person meetings with Ray?

21   A.  Yes.

22   Q.  Approximately when was that?

23   A.  Late March 2018, shortly after the messages.

24   Q.  How did that meeting in late March of 2018 come about?

25   A.  So after we agreed to start processing again, I told Ray

1    that, moving forward, that Eaze needed to have the dispensaries

2    be the ones that had the direct relationship with the

3    processors, since that's how we were doing it with the other

4    processors we were working with.

5            Ray said that was fine, but he wanted to meet all of

6    the dispensary owners face to face before starting processing

7    again.  So he requested a meeting at his office with all of the

8    heads -- the owners of all of the dispensaries; so we arranged

9    for that meeting.

10   Q.  Did Ray indicate why he wanted to meet with the

11   dispensaries before moving forward with card processing?

12   A.  What he said is he wanted to see everyone face to face and

13   explain how credit card processing worked so that everyone

14   fully understood what they were signing up for.

15   Q.  In the lead up to that meeting, who was responsible for

16   making the logistical arrangements for the meeting?

17   A.  So I tasked our VP of operations Darcy Cozzetto with

18   setting up the meeting.

19   Q.  Where did that meeting with Ray take place?

20   A.  At his office in Calabasas, California.

21   Q.  Is that the same office that you had testified about during

22   your testimony on Friday?

23   A.  Yes.

24   Q.  If we could show the witness what's been marked for

25   identification as Government Exhibit 441.

1         Do you recognize this?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a calendar -- it's a calendar invitation for that

5    meeting.

6              MR. FOLLY:  The government offers Government

7    Exhibit 441.

8              MR. TAYBACK:  No objection.

9              MR. GILBERT:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 441 received in evidence)

12   BY MR. FOLLY:

13   Q.  Mr. Patterson, can you read aloud the date listed on the

14   calendar invitation?

15   A.  Wednesday, March 24th -- 21st, 2018.

16   Q.  Can you also read aloud the address that's listed there?

17   A.  5146 Douglas Fir Road, Calabasas, California 91302.

18   Q.  We can take that down.  Let's now go through the events on

19   the day of that meeting.  What happened first?

20   A.  Well, everyone met at Eaze's office in LA.  Several of the

21   dispensary owners were flying in from northern California; so

22   everyone met at our office.  It was about ten to 12 people; so

23   we ordered two Uber cars to pick us all up, and we all drove

24   together to Ray's office.  It was about a 30, 40-minutes drive.

25   Q.  Who attended the meeting on behalf of Eaze?

L3FPWEI1                         Patterson - Direct

1   A.   So from Eaze it was myself, Darcy, Nick Fasano, and David

2   Amable, who is on Nick and Darcy's team.

3   Q.   Who attended the meeting on behalf of the dispensaries?

4   A.   It was the owners of the majority of Eaze's dispensaries;

5   so our largest dispensary partners.

6   Q.   Now, you mentioned that you drove from Eaze's office to the

7   meeting; is that right?

8   A.   Yes.

9   Q.   Can you describe the drive from Eaze's office over to the

10  meeting?

11  A.   Yes.  So in my car, I mean, the main thing is I -- since

12  I've been the only one that had met Ray in the past, I had been

13  to his office; so I just -- I gave the people in my car kind of

14  a view of what -- you know, what Ray was like.  So I said, so

15  first, is most of these dispensaries had been processing in the

16  past with Clearsettle, but I explained to them that we're

17  meeting with Ray, that it wasn't -- that really we weren't

18  working with Clearsettle anymore.  It was just Ray we were

19  working with.

20          The main thing was that the dispensaries -- the way

21  Eaze was operating then was the dispensaries, each one had to

22  make the decision to sign up separately.  It actually wasn't

23  required at the time to use any particular payment processors.

24  So I wanted the dispensaries to know what we knew; so I told

25  them about Ray's background, just everything I knew up to that

1    point before we arrived.

2    Q.   Describe what happened when you first arrived at Ray's

3    office?

4    A.   So we all got there and went upstairs.  And so Ray was in a

5    meeting already; so we were just kind of waiting outside of his

6    office, his office suite.  Eventually that meeting ended.  He

7    came out with the people in that meeting.  There were some

8    introductions where we went in.

9         Since it was so many people, we had to pull in a lot

10   of chairs to be able to set up around his desk.  I remember I

11   was sitting there in Ray's office with Nick and Ray, and they

12   were -- he was talking to the people he was talking to before

13   in the meeting, and they were looking at something on his

14   phone.  And he turned to me and he showed me what they were

15   looking at, and it was an article about a bank being under

16   investigation by the FBI.  And he sort of said, in a almost

17   half-joking, half-bragging way that --

18             MR. TAYBACK:  Objection.  Hearsay.

19             THE COURT:  Overruled.

20   Q.   You may continue, Mr. Patterson.

21             THE COURT:  Maybe we need a sidebar.

22             (Continued on next page)

23

24

25

1           (At the side bar)

2           THE COURT:  I wanted a sidebar really for several

3    reasons.  First, I do not understand how a statement of a party

4    adversary can ever be hearsay.

5           MR. TAYBACK:  This is why I think this conversation is

6    hearsay because it sounds like he's going to say -- the

7    reference, the prelude to this testimony was he was speaking to

8    somebody else about something on his phone, at which whatever

9    it is he's reading aloud or somebody is already commenting on,

10   somebody else, it sounds like it's not in furtherance of the

11   conspiracy.

12          THE COURT:  No, no, but that's what I thought.  It

13   doesn't matter whether it's in furtherance of the conspiracy.

14   It's the statement --

15          MR. TAYBACK:  It's my client's statement --

16          THE COURT:  -- of a party adversary.

17          MR. TAYBACK:  Agreed if it's my client's statement.

18   But there is a conversation happening with someone else, who

19   was clearly not part of the conspiracy.

20          THE COURT:  All right.  Noted it's still overruled.

21          Second, though, while I appreciate that the government

22   has avoided leading questions, what you have been inviting are

23   these long narratives that often include all sorts of things

24   that are either irrelevant or refer to this witness' state of

25   mind, which is only modestly relevant at best.

1          And what I'm not hearing is facts.  I'm just hearing a

2     bunch of casual comments from this witness.  Now, I have not

3     intervened.  I was hoping the government would intervene and

4     just say, as you did at one point, let's move on to another

5     question.  If you don't do it, I will do it, and you won't like

6     it.  Understood?

7          MR. FOLLY:  Yes, your Honor.  The next section of his

8     testimony is going to be recounting statements that were made

9     by the defendant during a meeting; so I was going to do my best

10    to let him be the one to --

11         THE COURT:  How about a question like:  What did he

12    say to you and what did you say to him?  As opposed to:  What

13    was your state of mind?  Oh, and was the weather nice?

14         And by the way, I sustained the 403.  I do think that,

15    while it's not irrelevant what he felt physically, going into

16    details about it, which is where I sustained it, is gross

17    overkill and raises 403 problems.

18         I'm amazed counsel for the co-defendant sat there like

19    a bump on the long, but it's early in the day and maybe you're

20    just getting moving.

21         So understood, everyone?

22         MR. FOLLY:  Yes.

23         MR. TAYBACK:  Yes, your Honor.

24         THE COURT:  Good.

25         (Continued on next page)

1              (In open court)

2     BY MR. FOLLY:

3     Q.  Mr. Patterson, before that break, I believe you had started

4     to testify about the statement that Akhavan had made to you

5     before the meeting started.  Could you just start there,

6     please?

7     A.  Yes.  So he showed me an article that they were looking at.

8     It was about a bank being under investigation by the FBI.  He

9     said that that was one of his banks, and he said that, you

10    know, basically, every three-letter agency is after me, again

11    in a sort of joking, bragging kind of way.

12             MR. TAYBACK:  Objection.  Move to strike.  403 and

13    404.

14             MR. GILBERT:  Join.

15             THE COURT:  No, that's -- I think that was within the

16    framework of what I can allow, and a modest of opinion as what

17    he perceives is permitted under the rules.

18    BY MR. FOLLY:

19    Q.  Mr. Patterson, I'd like to direct your attention now to the

20    meeting that took place, and I'd like you to describe what was

21    stated by Mr. Akhavan during that meeting.

22    A.  So the meeting started.  Ray said that he --

23             THE COURT:  I'm going to interrupt you, Mr. Patterson.

24    In a court of law, we have fairly strict rules of evidence,

25    which you're obviously not familiar with, but we all are.  When

you're asked about what someone said, basically just say what

he said; what you said, if you're asked for that.  We don't

need the history of the universe as a preface to it.  Just what

was said.  Okay?

          THE WITNESS:  Okay.

          THE COURT:  Thank you.

A.  He said he wanted to meet with everyone, explain how credit

card processing was going to work, and so he proceeded to

actually white board various parts of the credit card

processing.

Q.  And when he white boarded those parts of the credit card

processing, can you explain what he said about that?

A.  Yes.  So he started by just talking generally about how the

credit card money flowed.  So starting with the credit card

owner and the issuing banks in the U.S., money would then flow

to the merchant banks that he worked with in Europe.  And then

from there, the money would come back to the U.S. to be

deposited into a dispensary's bank accounts.

          So he talked about the money flow, and then he talked

specifically how in this case the merchant bank accounts that

were being set up were not going to be in the dispensary's

names.  They couldn't be because Visa and MasterCard didn't

allow for marijuana transactions.  He was going to take care of

that part of it.

          Also, that the dispensaries were going to fill out

L3FPWEI1                        Patterson - Direct

1   applications, merchant processing applications.  He said that

2   the dispensaries should fill out the merchant processing

3   applications accurately and honestly, even going so far as to

4   put their marijuana business license attached to the

5   applications.  Those applications would be submitted to his

6   team.

7            So he mentioned that he had an associate, Ruben, who

8   was not at the meeting at the time but he said would be joining

9   us later at the meeting.  That Ruben would be the one

10  collecting the applications and opening the bank accounts.  He

11  also mentioned that he -- that they were working with someone

12  in Europe who was terminally ill, and that person would be the

13  person actually taking -- attaching their name to the new

14  applications that were being submitted to the bank.  So what he

15  said was with this setup made it so that the dispensaries

16  didn't have any --

17           MR. TAYBACK:  Object to the narrative.

18           THE COURT:  Well, finish just what you were saying

19  there, and then we'll go to another question.

20  A.  That the dispensaries didn't have any risk because they

21  were filling out applications honestly, so that if anyone ever

22  came looking, they could say that they filled out the

23  applications truthfully and that all of the risk was being

24  taken on by this middleman in Europe who was terminally ill.

25  Q.  During that meeting, did Mr. Akhavan give any indication of

L3FPWEI1                      Patterson - Direct

1    where Ruben was from?

2    A.   Germany.

3    Q.   Mr. Patterson, during that meeting, was there any

4    discussion of the topic of chargebacks?

5    A.   Yes.  Ray talked about chargebacks and the importance of

6    keeping chargebacks low because if they went above one percent,

7    that could automatically trigger an investigation.  And also,

8    that just generally, complaints by customers to their issuing

9    bank could also jeopardize the accounts if the bank found out

10   that marijuana was being processed.

11   Q.   Was this meeting the same or different than other business

12   meetings you had attended in the past?

13   A.   Different.

14   Q.   How so?

15   A.   Well, I would say the -- just the fact that there was

16   laying out a very clear criminal conspiracy on a white board is

17   just not something I've ever experienced in the past.

18   Q.   Did you stay for the full meeting?

19   A.   No, I had to leave early.

20   Q.   Why did you have to leave early?

21   A.   The meeting started late, and I had a flight to catch back

22   to San Francisco.

23   Q.   What was happening at the meeting at the time that you left

24   the meeting?

25   A.   So at the time I left was a break in the meeting, and what

L3FPWEI1                        Patterson - Direct

1   Ray said was that I guess he said that Ruben had arrived, and

2   he would be joining us.  So there was a break, and I left at

3   that point between when Ruben was going to join the meeting.

4   Q.  After the meeting, did you have any conversations with

5   anyone from Eaze who had attended the meeting?

6   A.  Yes.  So later that night, I followed up with Nick Fasano

7   about the meeting.

8   Q.  What did you discuss with him?

9   A.  Well, the first thing he said was, I can't believe you left

10  me there.  I understood what he meant and apologized, and then

11  he told me what had happened after I left.  He said that --

12  what he said was -- I'll just quote him.  He said:  Ray's

13  German banker showed up.  I took that to mean Ruben.  And he

14  said that the rest of the meeting was just going through the

15  application process whereby the dispensaries were told what

16  they should do, what they should fill out, that they should

17  submit the applications to a specific e-mail that was set up

18  for this purpose.

19  Q.  Mr. Levine, can you publish what's in evidence as, side by

20  side, Government Exhibit S2 with Government Exhibit 441.  And

21  going to the second paragraph, if we could zoom in on that, of

22  S2.

23          And, Mr. Patterson, if you could read aloud the second

24  sentence?

25  A.  Defendant Ruben Weigand --

1  Q.  The second sentence, sorry.

2  A.  Weigand traveled from Frankfurt, Germany, to Los Angeles on

3  March 14th, 2018, and returned from Los Angeles to Frankfurt on

4  April 1st, 2018.

5  Q.  And can you also read aloud the date of the meeting on the

6  right in 441?

7  A.  Wednesday, March 21st, 2018.

8  Q.  We can take those down.

9         Mr. Patterson, after the meeting in March of 2018 that

10  you just described, did Eaze eventually resume credit and debit

11  card payments?

12  A.  Yes.

13  Q.  And was that through Ray's organization?

14  A.  Yes.

15  Q.  Approximately when did Eaze resume credit and debit card

16  payments?

17  A.  Approximately three weeks after the meeting; so mid- to

18  late April, 2018.

19  Q.  Was the arrangement at that time the same or different than

20  it had previously been under Clearsettle?

21  A.  Different.

22  Q.  In what ways was it different?

23  A.  Well, that was the point where it started to become known

24  to us as EUprocessing; so there was no more mention of

25  Clearsettle.  So it was now called EUprocessing.

1          As I mentioned, the rate was higher.  Eaze was doing

2     the customer service for all of the credit cards, and to my

3     understanding, was there were differences in terms of how the

4     money was being paid out to the dispensaries.  Specifically, it

5     was being -- there was something to do with converting between

6     Euros and dollars.  That wasn't present in the first setup.

7     Q.  And if you recall during your testimony last week, you had

8     testified about at least one of the descriptors that had been

9     used during the Clearsettle phase of the processing; do you

10    recall that?

11    A.  Yes.

12    Q.  Was the use of descriptors the same or different in the

13    EUprocessing phase?

14    A.  It was different.  So when the -- in the Clearsettle phase,

15    there was one, single descriptor being used for all of the

16    transactions.  During the EUprocessing phase, there were

17    multiple descriptors being used; so at any one time, there were

18    ten or more descriptors being used across the whole system.

19          (Continued on next page)

20

21

22

23

24

25

L3FAWEI2ps                    Patterson - Direct

1            MR. FOLLY:  Mr. Levine, if you could show the witness

2     what's been marked for identification as Government Exhibit

3     302.

4     Q.  Mr. Patterson, do you recognize this?

5     A.  Yes.

6     Q.  What is it?

7     A.  It's a Telegram chat between Ray's team and the Eaze team.

8     Q.  Were you a participant in this chat?

9     A.  Yes.

10           MR. FOLLY:  The government offers Government Exhibit

11    302.

12           MR. TAYBACK:  No objection.

13           MR. GILBERT:  No object.

14           THE COURT:  Received.

15           (Government's Exhibit 302 received in evidence)

16    Q.  You just mentioned that this is a Telegram chat.  What is

17    Telegram?

18    A.  Telegram is an encrypted communications app you can install

19    on your phone to create one-to-one and group messages.

20    Q.  Are you aware of whether Telegram had any privacy features?

21    A.  Yes, it did.

22    Q.  What were some of those features?

23    A.  The primary one is the end-to-end encryption, meaning the

24    messages aren't stored unencrypted on any central server, so

25    they're only accessible on the devices themselves.  It also had

1   a feature where, if you don't use it for a period of time, it

2   automatically wiped all of the messages, deleted them.

3   Q.  Prior to the time period of these messages here, in April

4   2018, how did you typically communicate with Ray?

5   A.  So initially it was via Skype and email, and then changed

6   to using -- we changed to using Telegram.

7   Q.  Did you have any discussions with Ray about how the two of

8   you would communicate?

9   A.  Yes.  He said he preferred Telegram.  He said it was more

10   secure.  I knew he was -- he got very concerned about the

11   privacy of his messages.  Even at one point he said that he

12   didn't trust Telegram anymore, that he had -- he actually got a

13   special phone, with a different app on it but you needed to

14   have a special phone.  And he suggested that I get one of those

15   phones.

16   Q.  What was your understanding of what he meant by "more

17   secure"?

18   A.  The messages weren't able to be read or intercepted by law

19   enforcement.

20        MR. FOLLY:  Mr. Levine, if you could take this down

21   for a moment and publish what's in evidence as Government

22   Exhibit 1728.

23   Q.  Mr. Patterson, where it says "Ruben W," are you familiar

24   with who that is?

25   A.  Yes.  There was a Ruben W in the chat, so he was the one,

1   to my knowledge, was processing applications.

2           MR. FOLLY:  If you could go to page 3.

3   Q.  Mr. Patterson, if you could read aloud the first three

4   messages from Ray.

5   A.  "Hey, let's chat on Wickr Me.  Download the private

6   messenger for free at me-download-Wickr.com.  My Wickr ID is

7   Jawbreaker13.

8   Q.  You can read the next two.

9   A.  "This is the best, apparently.  Get it, please."

10          MR. FOLLY:  You can take that down.

11          If we could go back to Government Exhibit 302, on

12  page 1.  Mr. Levine, if you could highlight the section

13  starting at 10:25 and downward.

14  Q.  Mr. Patterson, if you could read aloud the messages from

15  10:25 through 10:26 from Ray.

16  A.  So Ray writes, "Yes.  Medical-stf.com," and phone number.

17  "Medical-dsr.com," and phone number.  "These two should be the

18  current two.  I need to know if they are live.  And we urgently

19  need to set up CS that can answer calls that are forwarded from

20  those numbers."

21          Then Darcy writes, "I'll confirm with John right now.

22  Give me a moment."

23          And Ray writes, "But when they answer, they have to be

24  generic and answer as Medical STF and Medical DSR, not Eaze.

25  Just initially, they say they" --

L3FAWEI2ps                    Patterson - Direct

1    Q.  You can pause there.  There's a reference to

2    medical-stf.com with an 877 number, as well as medical-dsr.com

3    with another 877 number.  What do each of those represent?

4    A.  So those were the initial descriptor, descriptor websites

5    that Ray set up for -- for this -- for restarting processing.

6    Q.  There's also 877 phone numbers listed here.  What was the

7    significance of those phone numbers?

8    A.  So those were phone numbers for customer service.  So

9    those -- calls to those numbers would be forwarded to the Eaze

10   customer service.

11   Q.  Were those phone numbers part of the descriptors or

12   separate from the descriptors?

13   A.  They would be part of the descriptor.

14   Q.  What was the purpose of those phone numbers?

15   A.  So that if a customer made a purchase on Eaze and they saw

16   this descriptor, they would either go to the website or call

17   the number, and if they would call the number, they would be

18   verified and then they would be told that it was an Eaze

19   purchase, just like if they went to the website they would be

20   able to sign in and see that it was an Eaze purchase, so that

21   they wouldn't initiate a chargeback.

22   Q.  In the section you just read at 10:26, Ray wrote, "But when

23   they answer they have to be generic and answer as Medical STF

24   and Medical DSR, not Eaze."  What was your understanding of

25   what that meant?

A.   So that when -- if -- when Eaze customer service answered

the call that was forwarded from one of those numbers, they

shouldn't initially say that it's Eaze, but they should be --

what he says, give a generic answer before they're verified to

be an Eaze customer.  So this is related to what he had said

before, where sometimes people from Visa and MasterCard can

call these numbers or go to these websites, and they didn't

want to -- he didn't want to tip off the fact that this was

associated with Eaze before it could be verified that it was

actually an Eaze customer.

Q.   Was there anyone at Eaze who was in charge of customer

service?

A.   Yes.

Q.   Who was that?

A.   His name is Mick Frederick, who was our VP of customer

experience.

Q.   What time period did Mick Frederick work at Eaze?

A.   2019 to -- he was there when I left.

         MR. FOLLY:  Below that message, if we could zoom back

out, and if we could just scroll down.  You could zoom in where

it says "Darcy Cozzetto 10:27."

Q.   Who was Darcy?

A.   So Darcy was our VP of operations.  So she was overseeing

the implementation of the credit cards here.

Q.   Can you read her message at 10:31.

A.   She says, "Ray, we are still showing Hot Robots as our

descriptor.

Q.   What was your understanding of what Hot Robots was?

A.   Well, at the time I had no idea what Hot Robots was.  Ray

had told us the descriptors were going to be Medical DSR,

Medical STF.  However, what's happening here is, when Darcy did

test transactions, the descriptor was actually showing up as

Hot Robots.  I thought this was a mistake or a bug, and I think

she did too.  That's why she's telling Ray that it's coming up

and essentially saying it needs to be changed to Medical DSR.

Q.   Did your understanding of what Hot Robots was eventually

change?

A.   Yes.

Q.   How did your understanding change?

A.   I eventually found out that it was the actual name of the

merchant on this account.

Q.   How did you learn that?

A.   So Ray eventually shared a letter with me from Visa to the

bank that referenced this account.  It said Hot Robots was the

merchant name.

Q.   Let's turn to the bottom of page 14 of this chat.  Going to

the messages that start at 8:39, can you read that aloud.

A.   It says, Ray says, "I was just telling Jim if you guys or

the depots are OK with miscoding in the States, then that opens

up tons of possibilities, and if you're all good with that

1    risk, I can help with those accounts."

2          MR. FOLLY:  If we can scroll down, see if it

3    continues.

4    Q.  And if you could continue, finishing that section.

5    A.  "If we're OK with not being up front with the bank, we can

6    get amazing rates and no reserves and daily settlements."

7    Q.  What was your understanding of what Ray was describing in

8    these messages?

9    A.  Well, here he was talking about -- he was talking about

10   setting up with merchant banks in the US as opposed to the

11   merchant banks he was working with in Europe, specifically

12   because he knew that we were talking to other processors, and

13   they were based in the US, so he was saying he could do that as

14   well; however, you have to not be up front with the banks, so

15   essentially lie to the banks in the US in order to open

16   US-based merchant accounts.

17         MR. FOLLY:  Mr. Levine, if you can turn to page 17 of

18   this same chat.  Now, if we could actually start -- we could

19   just zoom in from the very top through the bottom.

20   Q.  And if you could start at the very top with Ray's messages

21   that begin at 9:25.

22   A.  So Ray writes, "The not being able to afford reserves

23   changed everything on my side.  I need to totally change

24   strategy from friendly banks to basically doing what everyone

25   else does, which is use big tier 1 banks and not tell them what

1    it is.  I'll be able to set up those accounts, but it's going

2    to take me two to three weeks.  I'm going to Europe on the 1st

3    through the 10th, pretty sure I'll be able to come back with

4    deals that are more like the Card Connect deal."

5    Q.  And then Darcy responds, "That's phenomenal.  Thank you."

6    And can you continue on with Ray's messages.

7    A.  He continues, "I'll set up more of my friendly banks for

8    surplus or backup volume for when and if your better domestic

9    solutions don't work.  The only thing I want to make sure you

10   guys know is two things.  Number one, I can't vouch or

11   guarantee the money when we aren't honest with banks or working

12   with people I trust.  Number two, we need to understand that if

13   something does occur with legal or law enforcement, the big

14   banks who don't know what they're processing will turn on your

15   depots or whoever officially owns the account, so they should

16   be very careful there.  If possible, you guys should do what

17   you did with us, which is everyone fills out and submits a 100

18   percent accurate application on the depot side but then some

19   middleman changes or alters it so no one can say Eaze or the

20   depots miscoded knowingly."

21   Q.  You can stop there.

22          Focusing on point no. 1, if we could just highlight

23   that.  What was your understanding of what Ray meant when he

24   said, "I count vouch or guarantee the money when we aren't

25   honest with banks"?

1   A.  Well, that he -- he's contrasting what -- what he was

2   currently doing with European banks, who were aware, and versus

3   US banks, which would not be aware.  So he's saying that if we

4   were to work with US banks, he couldn't guarantee that they

5   wouldn't -- they wouldn't seize the funds if they found out it

6   was cannabis.

7   Q.  Focusing now on the first sentence of point no. 2.  When

8   Ray wrote, "We need to understand that if something does occur

9   with legal or law enforcement," what was your understanding of

10  what he meant by that part of the message?

11  A.  That if law enforcement investigated into what was

12  happening.

13  Q.  And then he says "the big banks who don't know what they're

14  processing will turn on your depots or whoever officially owns

15  the account, so they should be very careful there."  What was

16  your understanding of what he meant by that?

17  A.  That the large US banks would fully cooperate with law

18  enforcement and provide them all of the information about what

19  was going on in the accounts.

20  Q.  Now, in the second sentence of this same section, there's a

21  reference to the submission of applications that would be

22  changed by a middleman.  Can you explain your understanding of

23  what Ray was referring to there.

24  A.  Well, this is where he said in the meeting, was that the

25  dispensaries fill out the applications and then someone else

L3FAWEI2ps                     Patterson - Direct

alters them and submits different applications to the banks, so

that would give the dispensaries a plausible deniability that

they -- they actually filled out accurate applications so they

themselves weren't lying to a bank.

MR. FOLLY:  You can scroll down onto the top of the

next page.

Q.  Can you read aloud your response at 9:43.

A.  "Thanks, Ray.  So to confirm, when do we need to stop

sending transactions to the current bank?"

Q.  What did you mean when you asked when you needed to stop

sending transactions to the current bank?

A.  Well, at this time, previous to this, Ray had said that the

account -- the account he was using had gotten flagged, and

that it was going to be shut down by the end of the month, so I

was -- we were going to convert everything over to CardConnect,

our other processor, so I was confirming with him when exactly

we needed to stop sending him transactions on that account.

Q.  What was your understanding of how the account had been

flagged?

A.  What he said was the chargeback rate on the account was too

high and it had automatic -- been automatically flagged by Visa

and the account was being investigated for high chargebacks.

Q.  How did you learn about the Visa investigation?

A.  So Ray told me and also shared a document with me that was

from Visa to the bank.

1        MR. FOLLY:  If we could show the witness what's been

2   marked for identification as Government Exhibit 2215.

3   Q.  Mr. Patterson, do you recognize this?

4   A.  Yes.

5   Q.  What is it?

6   A.  This is that document I referred to about the investigation

7   of the merchant account.

8        MR. FOLLY:  The government offers Government Exhibit

9   2215.

10        MR. TAYBACK:  No objection.

11        MR. GILBERT:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 2215 received in evidence)

14   Q.  Mr. Patterson, could you read aloud the date of the letter

15   in the upper left corner.

16   A.  6 June 2018.

17   Q.  Can you also read aloud what it says directly below that.

18   A.  "Kalixa Accept Limited, United Kingdom."

19   Q.  Can you read aloud just the first sentence of the letter.

20   A.  "Dear Acquirer:  The Visa Chargeback Monitoring Program

21   (VCMP) a merchant-level chargeback monitoring program to help

22   acquirers identify merchants with excessive levels of

23   chargebacks and implement corrective plans to protect the

24   integrity of the payment system."

25   Q.  You can stop there.

L3FAWEI2ps                    Patterson - Direct

1          Going to where it says "merchant name," can you read

2     aloud?

3     A.  Merchant name is Hot Robots.

4     Q.  If we could go back to Government Exhibit 302, at page 22.

5     And if we could zoom in on the bottom half of the page,

6     starting at 10:02.  You can read the Ray Akhavan messages and I

7     will read the Dan Erickson response.

8     A.  Ray writes, "H'm, really?  Once everyone's stable and up

9     again, we should look at tweaking it.  Do you know what MCC is

10    being used?  I was hoping you'd see a 10 percent improvement in

11    sales authorized."

12    Q.  Dan Erickson says, "The SIC code is 5399 -- miscellaneous

13    general merchandise."

14          And then Ray says, "That's why.  In case you want or

15    can implement it, we used 8099 after testing a lot of MCCs,

16    including 5399, and 8099 is by far the best, and it's also nice

17    because it's medical services, not elsewhere classified.  If

18    you were under pressure, you could say you did pick an accurate

19    MCC."

20          MR. FOLLY:  Mr. Levine, if you could just highlight

21    that last sentence.

22    Q.  Mr. Patterson, where it says, where Ray wrote, "If you are

23    under pressure you could say you did pick a accurate MCC," what

24    was your understanding of what he meant by that?

25    A.  Well, he explained in the meeting at his office that the

1    5399 code, because it was miscellaneous general, was nice

2    because it was technically the most accurate MCC code that was

3    available because the credit card company didn't actually have

4    an MCC code for marijuana, for marijuana dispensaries, so it

5    was a generic MCC, and he said that it's nice because if you

6    are under pressure, which I took to mean for legal and law

7    enforcement pressure, that the dispensaries could say that they

8    picked the most accurate MCC that was available.

9           MR. FOLLY:  Let's turn to page 49 of this same

10   exhibit.

11   Q.   Focusing on the bottom where it says 31 July '18 and below

12   that, can you read aloud the first two lines there.

13   A.   "Ray Akhavan invited Ruben W."

14          "Ray Akhavan invited Marty."

15   Q.   Where it says "Ray Akhavan invited Ruben W," what was your

16   understanding of what was happening in this part the chat?

17   A.   That he was adding Ruben and Marty to the chat.

18   Q.   What was your understanding of who Ruben W was?

19   A.   Ruben was the person he referenced in the prior meeting

20   who'd be collecting the applications and opening the accounts.

21          MR. FOLLY:  You can zoom back out.  If we could just

22   scroll down so we can see this page going on to the next page.

23   Q.   And Mr. Patterson, if you could start reading where it

24   says, starting at 10:50, on the top of the message from Ray

25   Akhavan.

1   A.   So Ray writes, "I've add added Martin and Ruben."

2            "Morning, Dan.  I have good news."

3            Dan says, "I like good news."

4            Ruben says, "Hey everybody."

5            Ray says, "Martin and Ruben have both agreed to be

6   actively involved with helping us out.  Martin is handling all

7   reporting and reconciliation, and Ruben is interfacing with the

8   banks.  You all met Ruben in LA, and Martin will be out soon

9   hopefully as well."

10  Q.   There's a reference there where it says "you all met Ruben

11  in LA."  What was your understanding of what that was referring

12  to?

13  A.   The meeting in Ray's office in Calabasas.

14  Q.   There's also a reference here where it says, "Martin is

15  handling all reporting and reconciliation."  What was your

16  understanding of what that meant?

17  A.   So that was the payments that were being made out to the

18  dispensaries.

19  Q.   And directly below that it says, "And Ruben is interfacing

20  with the banks."  What was your understanding of what that

21  meant?

22  A.   That he would be collecting the applications and opening

23  the accounts.

24  Q.   And which banks were being referred to there?

25  A.   The banks in Europe, the merchant banks.

L3FAWEI2ps                    Patterson - Direct

1    Q.  And if you could keep reading, picking up from where it

2    says, "So here's the situation."

3    A.  So Ray writes, "So here's the situation.  We have two

4    accounts that we have now and have been using.  The same bank

5    gave us two more accounts, and also agreed and fixed the

6    reserve issue and set it to zero.  We have another bank who has

7    given us two more accounts with a zero reserve as well.  Those

8    are the ones that Conal is supposed to set live today.  And

9    from that same bank we are getting more and more accounts."

10   Q.  Now, there's references here.  It says, "We have two

11   accounts that we have now and been using.  The same bank gave

12   us two more accounts."  What was your understanding of what

13   accounts were being referred to here?

14   A.  Merchant accounts at the banks.

15   Q.  What was your understanding of the purpose of those

16   merchant accounts?

17   A.  Well, the merchant accounts are being opened on behalf of

18   the dispensaries because the dispensaries themselves couldn't

19   directly have merchant accounts because they're cannabis

20   businesses.  So these accounts are being opened just to

21   essentially act as a one-to-one mapping between dispensaries

22   and these merchant accounts.

23              MR. FOLLY:  Let's go to the bottom of page 55 of the

24   same exhibit.

25   Q.  There's a message here, starting at 16:16, from John Wang.

L3FAWEI2ps                    Patterson - Direct

1   What was your understanding of who John Wang was?

2   A.   John -- so John is a product manager who worked for Eaze.

3   So he oversaw all of the payment processing on the Eaze side.

4   Q.   Can you read aloud his message, starting at 16:16.

5   A.   So he says, "I have the spreadsheet ready to walk through.

6   I want to make sure we're doing this right.  Can we get on a

7   call, a quick call to go over?  I can set up a conference

8   number, dial into a conference number room, or we can do a

9   Telegram call (not sure if they do group calls)."

10  Q.   In response, Ruben W wrote, "Hey John, Marty is out for

11  today.  I can give you a call in something like 20 to 30

12  minutes."

13          Going back to -- if we could actually continue down on

14  this.  Could you read aloud John's next message.

15  A.   He says, "Works for me.  I want to go over the game plan

16  for volume by MID by site ID (dispensary)."

17  Q.   What was your understanding of what John was referring to

18  here when he's referencing "the game plan for volume by MID by

19  site ID (dispensary)"?

20  A.   So him and Ruben are discussing, as I said, the matching

21  between dispensaries on the Eaze side and merchant accounts

22  that Ruben was opening.  So the MID, the mid, those are the

23  merchant accounts, and the site ID, those are dispensaries, so

24  they have to -- they were planning on mapping one to another,

25  so a specific Eaze dispensary would be mapped to a specific

L3FAWEI2ps                     Patterson - Direct

1    merchant account on the other side.

2    Q.  Let's go now to page 59 of the same exhibit.  We could zoom

3    in starting at 10:50 and below.  And if you could read aloud

4    John's message through where it says 10:54.

5    A.  He says, John says, "I just looked at both websites and I

6    am concerned about chargebacks: No. 1, the website is very

7    product specific.  Unlike GoodeGreenBazaar, visitors will

8    immediately think they were mischarged and issue a chargeback.

9    No. 2, contact numbers are a little hidden -- it's not the very

10   first thing visitors see.

11          "To mitigate chargebacks, can we:  No. 1, put the

12   1-800 number on the descriptor so customers don't ever visit

13   the website in the first place; no. 2, put the 1-800 number

14   more prominently on the websites?"

15   Q.  Now focusing on the top portion of the message, John writes

16   that he had looked at the website and said, "The website is

17   very product specific.  Unlike GoodeGreenBazaar, visitors will

18   immediately think they were mischarged and issue a chargeback."

19   What was your understanding of what John was referring to here

20   in this message?

21   A.  Well, at the time I wasn't sure, but I later found out that

22   the new descriptor website --

23          MR. TAYBACK:  Objection, foundation.

24          THE COURT:  Sustained.

25   Q.  Did there come a time -- well, actually, we'll come back to

1   this.

2           Focusing on the portion below that where John writes

3   "to mitigate CBs" what was your understanding of what "CBs"

4   meant?

5   A.  Chargebacks.

6   Q.  And in point no. 1 he says, "Put the 1-800 number on the

7   descriptor so customers don't ever visit the websites in the

8   first place."  What was your understanding of what he meant by

9   that?

10  A.  Well, to actually add the phone number to the descriptor so

11  that the phone number would appear on the customer's credit

12  card statement as opposed to the website so that if a customer

13  was confused as to what the purchase was, they would call the

14  1-800 number instead of going to the website.

15          MR. FOLLY:  If we could turn to page 63 of the same

16  exhibit.  Going into the middle of the page, at the message at

17  14:18.  Can you read that aloud.

18  A.  John Wang writes, "@Jawbreaker13.  Got two questions for

19  you:  No. 1, what do we need to do with the cookie

20  implementation?  No. 2, can we put the 1-800 number on the

21  descriptors so fewer customers need to visit the website?"

22  Q.  Focusing where it says @Jawbreaker13, what was your

23  understanding of who that was referring to?

24  A.  So that was Ray.  He at some point changed his user name to

25  Jawbreaker13.

1    Q.   Now looking at the two questions posed by John, for

2    question no. 1, what was your understanding of what John meant

3    when he referred to "cookie implementation"?

4    A.   So the cookie implementation was something set up so that,

5    on these descriptor websites, they would automatically be able

6    to recognize an Eaze customer from someone who was not an Eaze

7    customer.  So that if an Eaze customer visited these websites,

8    they would be detected and automatically redirected to their

9    account page, so they wouldn't be confused as to what the page

10   was, because that account clearly said it was associated with

11   Eaze.  If they were not an Eaze customer, then the cookie

12   implementation would send them to a different landing page that

13   was set up to look like a generic website not associated with

14   Eaze or Eaze dispensaries.

15   Q.   What was your understanding of why there was not a redirect

16   feature for the non-Eaze customers?

17   A.   So what they said was that, in the case that someone from

18   Visa and MasterCard were looking into the accounts and visited

19   these websites, they wouldn't be able to detect that the

20   websites were associated with Eaze.

21   Q.   Looking at point no. 2 from John, he references putting a

22   "1-800 number on descriptors so fewer customers need to visit

23   the website."  What was your understanding of what he was

24   referring to there?

25   A.   Well, again, he was -- this is what he was asking for

1    before, was, instead of putting a website, which could be

2    confusing, the cookie implementation didn't work a hundred

3    percent of the time, so he was proposing putting the phone

4    number in addition or instead of the website, so that customers

5    would call rather than visit a website.

6            MR. FOLLY:  If we could go to page 85.  Focusing on

7    the top half of the page.

8    Q.  Can you read those messages aloud, starting at 12:37.

9    A.  "Hey guys.  Hope all is well.  We have a chargeback issue

10   with Natoma.  They are way high.  Can we please look into it

11   and find out what's going on and why they would be different --

12   why would they be so different than anyone else, etc.?"

13   Q.  And at the top it says that this is from JB13.  What was

14   your understanding of who that was?

15   A.  That was Ray, Jawbreaker13.

16           MR. FOLLY:  If we could zoom back out.

17           Now if we could go to the series of messages that

18   start at 12:45 at the bottom, from John downward.

19   Q.  Can you read aloud these messages here.

20   A.  Yes.  John Wang writes, "I'll take a look on my end to see

21   if it's related to the new mid we recently put Natoma on."  And

22   then Ruben W says, "Hey John, thanks.  But the issue has been

23   there before.  I've asked the team to prepare an overview.

24   They are significantly higher than everybody else."

25   Q.  In John's message he refers to a new mid.  What was your

1  understanding of what he was referring to there?

2  A.  So "mid" is a merchant account.  It stands for merchant ID.

3  So what he's saying here was that Natoma, which is one of the

4  Eaze dispensaries, had recently been put on a new account, and

5  they are speculating that that could be the reason that the

6  chargebacks are higher on this particular account.

7  Q.  There's a reference below that from Ruben.  He says, "But

8  the issue has been there before."  What was your understanding

9  of what Ruben meant by "the issue"?

10 A.  So he's saying that the chargeback issue existed before

11 they moved Natoma onto the new account.

12 Q.  He also says in that same message, "They are significantly

13 higher than everybody else."  What was your understanding of

14 what he meant there?

15 A.  Well, that this particular dispensary, Natoma, had a higher

16 chargeback rate than any of the other Eaze dispensaries.

17 Q.  If we could turn to page 87 now.  Focusing from 10:51 down,

18 can you read John's message aloud that starts at 10:51.

19 A.  John writes, "Hi there, pixel redirects for these sites are

20 broken.  Can we prioritize fixing the redirect to minimize

21 fraud and chargebacks?  SonicLogistix, desirescent.com,

22 feel-kvell.com.  Also, can we add the pixel redirect for

23 www.somepearls.com?  I'd like to have that up before that mid

24 is enabled."

25 Q.  You can pause there.  Where John writes, "Pixel redirects

1    for these sites are broken," what was your understanding of

2    what that meant?

3    A.  Well, there he's referring to the cookie -- the cookie

4    feature, where it would detect -- these websites were set up in

5    such a way where they would detect if it was an Eaze customer

6    and then automatically redirect them away from these websites.

7    Q.  And there's three websites listed there, soniclogistix.com,

8    desirescent.com, and feel-kvell.com.  What was your

9    understanding of what those URLs that are listed there

10   represented?

11   A.  So those were descriptor websites that were set up by Ray's

12   team.

13   Q.  If we could go on the same page, could you read aloud your

14   message at 16:02.

15   A.  "Www.somepearls.com doesn't redirect and it's causing

16   confuse and potential chargebacks."

17   Q.  With a were you describing in this message?

18   A.  So here, what had happened is, I -- I did a test order

19   myself, and the descriptor website that I got was this website

20   somepearls.com.  But when I clicked it, the pixel redirect

21   didn't work, so I wasn't -- I was an Eaze customer, so I wasn't

22   redirected, so I actually saw the landing page that was at

23   somepearls.com.  So I was telling everyone that the redirect

24   wasn't working.

25   Q.  What did you observe when you had seen the landing page for

L3FAWEI2ps                    Patterson - Direct

1   the somepearls URL?

2   A.   So when I went to this page, this page was very different

3   than the -- the -- the descriptor websites that I had seen in

4   the past.  So in the past, the descriptor websites I had seen,

5   they were set up to be more generic customer service-looking

6   portals, so they would have fields to enter in your credit card

7   number, order number, and it would be -- you know, they would

8   have a picture of someone with a headset.  This website was set

9   up to be -- it looked like a fake store, or a fake business of

10  some kind.  So this was the first time that I'd ever seen this

11  type of landing page being set up to look more like a fake

12  store.

13  Q.   To your recollection, was there any reference to Eaze on

14  that fake store web page?

15  A.   No.

16  Q.   What about any reference to the sale of marijuana on that

17  fake store web page?

18  A.   No.

19          MR. FOLLY:  We can take this down.

20  Q.   Mr. Patterson, I'd like to direct your attention to October

21  of 2020.  Did you begin cooperating with the government around

22  that time?

23  A.   Yes.

24  Q.   Had you been charged with any crimes at the time that you

25  started cooperating?

1   A.  No.

2   Q.  Why did you decide to start cooperating with the government

3   at that time?

4   A.  Because I knew what we had done was wrong and I didn't want

5   to pretend otherwise.

6   Q.  Were you hoping for leniency by cooperating?

7   A.  Yes.

8   Q.  Around how many times have you met with the government?

9   A.  Around 15.

10  Q.  Were you truthful in those meetings with the government?

11  A.  Yes.

12  Q.  Was every one of those meetings to prepare to testify at

13  this trial, or were those meetings for other purposes as well?

14  A.  No.  Some of the meetings -- most -- the majority of the

15  meetings were to just provide information, and then some of the

16  meetings were to prepare for the trial.

17  Q.  As part of your cooperation, were you required to disclose

18  to the government all of the crimes that you had committed?

19  A.  Yes.

20  Q.  Did you do that?

21  A.  Yes.

22  Q.  Did you plead guilty in connection with this case?

23  A.  Yes, I did.

24  Q.  Approximately when was that?

25  A.  February of this year.

L3FAWEI2ps                    Patterson - Direct

1   Q.  What did you plead guilty to?

2   A.  Conspiracy to commit bank fraud.

3   Q.  What made you guilty of that crime?

4   A.  Well, that I coordinated with Ray to enable credit card

5   transactions by concealing the true nature of those

6   transactions from the banks and credit card companies.

7   Q.  What is the maximum sentence the judge can give you as a

8   result of your guilty plea?

9   A.  30 years in prison.

10  Q.  When you pled guilty, did you enter into a cooperation

11  agreement with the government?

12  A.  Yes.

13          MR. FOLLY:  If we could show the witness only what's

14  been marked for identification as Government Exhibit 2102.  We

15  could just flip through the pages all the way to the back page.

16  Q.  Mr. Patterson, do you recognize this?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is the cooperation agreement that I entered into.

20          MR. FOLLY:  You could scroll down just two pages down.

21          The government offers Government Exhibit 2102.

22          MR. TAYBACK:  No objection.

23          MR. GILBERT:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 2102 received in evidence)

1    Q.  Mr. Patterson, what are your obligations under this

2    cooperation agreement?

3    A.  So my obligations are to first and foremost tell the truth

4    about everything I know and what I did in connection with this,

5    as well as show up to meetings and court proceedings that

6    related to this case.

7    Q.  If you meet your obligations under this agreement, what is

8    your understanding of what the government will do?

9    A.  So if I meet my obligations, my understanding is that, at

10   the time of my sentencing, the government will provide to the

11   Court, in addition to my criminal conduct, an overview of the

12   nature and extent of my cooperation.

13   Q.  And is your understanding that will be in the form of a

14   letter to the Court?

15   A.  Yes.

16   Q.  What is your understanding of who writes that letter?

17   A.  The government, prosecution.

18   Q.  What is your understanding of who receives the letter?

19   A.  The judge who will sentence me.

20   Q.  What is your understanding of what type of information will

21   go into that letter?

22   A.  So it will -- an overview of my conduct, my criminal

23   conduct in the case, as well as the details about my

24   cooperation, the nature and extent of it.

25   Q.  What sentence are you hoping to get in this case?

L3FAWEI2ps

1   A.   Probation.

2   Q.   Have you been promised any particular sentence as you sit

3   here today?

4   A.   No.

5   Q.   Have you been promised that the government will write the

6   letter that you just referenced as you sit here today?

7   A.   Only if I'm truthful and fulfill my obligations.

8   Q.   What is your understanding of what will happen if you do

9   not tell the truth?

10   A.   Well, that -- one, I could be charged with an additional

11   crime, and that the -- that this agreement is null and void.

12   Q.   To your understanding, does the outcome of this trial

13   affect whether you will receive the letter that we've been

14   discussing here?

15   A.   No, it does not.

16          MR. FOLLY:   We could take this exhibit down.

17   Q.   Mr. Patterson, I'd like to direct your attention to March

18   of 2019.   Did anything --

19          THE COURT:   Maybe this is a good time, we take our

20   midmorning break?

21          MR. FOLLY:   Yes, your Honor.

22          THE COURT:   All right, ladies and gentlemen.   We'll

23   take a 15-minute break.

24          (Continued on next page)

25

L3FAWEI2ps

1          (Jury not present)

2          (Witness excused)

3          THE COURT:  So how much longer, counsel, do you think

4    you'll be on direct?

5          MR. FOLLY:  Your Honor, I don't think this will be

6    more than 20 minutes.

7          THE COURT:  OK.  And this is not binding, but will

8    counsel for the defense give me a ballpark as to the length of

9    their cross-examination.

10          MR. TAYBACK:  Two hours, your Honor.

11          MR. GILBERT:  45 minutes.

12          THE COURT:  OK.  Very good.

13          Now, I had raised briefly on Friday an issue and to

14    since I'm going to be turning, fairly soon, to starting on the

15    draft charge to the jury, let me raise it again.  I think there

16    is at least a question in my mind, but I haven't researched it

17    yet, as to whether the defense argument on materiality is valid

18    as a matter of law.  And here's why I say that.  The defense

19    view is that the banks really did not care about the

20    representations being made by the defendants because they were

21    perfectly content to transact marijuana purchases as long as

22    they were disguised in a way to give them, quote, plausible

23    deniability.  And Mr. Tayback, I think you confirmed to me

24    Friday but just again, to be sure that's your basic argument

25    on -- it's not your only argument, but it's one of your

L3FAWEI2ps

1    arguments.

2            MR. TAYBACK:  Yes.  That's an accurate summary, your

3    Honor.

4            THE COURT:  Yes.  So my question is, since the

5    ultimate question is not what these banks thought, that's just

6    being introduced as a way of giving information to the jury

7    from which they can help assess materiality, but, rather, what

8    a reasonable banker would think.  As a matter of law, can it

9    ever be that a reasonable banker would not care about

10   representations made to them because the reasonable banker had

11   already concluded that it was OK to violate the federal law as

12   long as they had a good cover?  And I just wonder -- and as I

13   say I haven't researched this -- whether as a matter of law

14   that can really work.

15           So, lucky you, I'm going to ask all parties to give me

16   some learning on that, maybe by noon tomorrow?  Is that too

17   soon?

18           MR. TAYBACK:  That's fine, your Honor.

19           MR. GILBERT:  That's fine.

20           MS. LA MORTE:  That will work.

21           THE COURT:  Very good.  So just in letter form to my

22   law clerk and we'll take it from there.

23           MR. TAYBACK:  Your Honor, while I have you, can I

24   request oral leave to submit an application to exonerate

25   Mr. Akhavan's bond, given that he's in custody?  The government

L3FAWEI2ps

1    does not oppose.

2              THE COURT:  I'm happy to agree to that, but I think

3    the Clerk's Office is going to want something in writing.

4              MR. TAYBACK:  Oh, yes.  I'm not asking it to be

5    exonerated, just to file the papers.

6              THE COURT:  Yes.  Sure.

7              MR. TAYBACK:  Thank you, your Honor.

8              THE COURT:  All right.  Very good.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3FPWEI3                      Patterson - Direct

1           (In open court; jury not present)

2           THE COURT:  The jury is on its way up.  So get the

3    witness back in the seat.

4           (Pause)

5           So while we're waiting, when is the government's

6    current estimate of when they will rest?

7           MS. LA MORTE:  I think we're still on track for

8    Thursday.  We're trying to see what we can do to make it

9    Wednesday, but we're still on track for Thursday.

10          THE COURT:  Okay.

11          (Jury present)

12          THE COURT:  Please be seated.  All right.  Counsel?

13          MR. FOLLY:  Thank you, your Honor.

14   BY MR. FOLLY:

15   Q.  Mr. Patterson, I want to direct your attention to March of

16   2019.  Did anything significant happen at Eaze around that

17   time?

18   A.  Yes.  So in March of 2019, we -- Eaze was served a legal

19   letter from a company called DionyMed.  DionyMed was a

20   Canadian-based public company.  They purchased one of Eaze's

21   dispensaries called Hometown Heart, and they actually operated

22   a competitor service to Eaze called Chill.com.

23          So they purchased one of Eaze's dispensaries, and then

24   immediately sent Eaze a legal letter stating that they intended

25   to sue Eaze because of our credit card processing they said was

L3FPWEI3                        Patterson - Direct

1   illegal and constituted an unfair business advantage.

2   Q.  Did you have any discussions with the defendant Ray Akhavan

3   regarding the situation with DionyMed?

4   A.  Yes.

5   Q.  Was that a discussion in person or over the phone?

6   A.  Over the phone.

7   Q.  Can you describe, in as much detail as possible, what you

8   discussed with Ray Akhavan during that call?

9   A.  Yes.  So after I received the letter, I called Ray and told

10  him about the letter, about the situation.  I explained that

11  one of our dispensaries was suing us, and they were essentially

12  claiming that the credit card processing was illegal and that

13  this was a problem because it was going to -- they were going

14  through all of the details of the credit card processing in the

15  complaint.

16          Ray initially got very angry.  He -- the first thing

17  he said was he didn't understand.  These guys came to my

18  office.  I explained everything to them.  Why are they doing

19  this?  I explained to him that it wasn't Hometown Heart

20  actually initiating.  It was this other company who acquired

21  Hometown Heart; so they were no longer in control of what was

22  happening.

23  Q.  What was Ray Akhavan's reaction when you explained to him

24  that it was not Hometown Heart that was in control of the

25  lawsuit at that point?

1    A.  Well, like I said, at first, he got angry.  Then once I

2    explained the situation, he actually got a little panicked, I

3    would say.  It was the first time I'd ever seen really Ray more

4    out of control with panic like that.  He said:  You know this

5    fucks us.  Don't these guys know what they're doing?  He said:

6    They're going to tear my fucking bank apart.

7         He got really upset, and then started to ask me if

8    there's other ways we can figure out how to make this go away.

9    One of the things he asked about was could he purchase the

10   company, Hometown Heart and DionyMed.  I said:  I don't know.

11   But he asked how much I thought it would cost.  At the time,

12   DionyMed was a publicly traded company.  Their market cap was

13   around $20 million.  I told him that.  He said he actually

14   thought he could maybe get that money together and thought

15   about raising the money to buy the company.

16   Q.  Did Ray have any other suggestions about how to handle the

17   situation with DionyMed during that conversation?

18   A.  I mean, another thing he said was he asked me who these

19   people were, and I gave him the names of the guys who ran

20   DionyMed and he said, you know, maybe someone should pay these

21   guys a visit.

22             MR. TAYBACK:  Objection, move to strike.

23             THE COURT:  Overruled.

24   Q.  You can finish, Mr. Patterson.

25   A.  And I took that to mean go physically threaten them.

L3FPWEI3                        Patterson - Direct

1   Q.  After that conversation that you just described with Ray

2   Akhavan, did card processing through Ray's organization

3   continue?

4   A.  Yes.

5   Q.  What, if anything, changed regarding the card processing

6   operation after that conversation?

7   A.  Well, after that conversation, shortly after that

8   conversation, MasterCard stopped working through Ray's

9   organization.

10  Q.  Can you explain what happened with MasterCard?

11  A.  So shortly after the conversation with DionyMed, Ray called

12  me up and asked me if I thought that someone had reported

13  things to MasterCard.  I had no information about that.

14          So then he called me a few days later, and he told me

15  that he had gotten some information that apparently someone who

16  is a high-level executive at MasterCard, a relative of theirs,

17  they had an underage person who was able to -- who was caught

18  with marijuana.  When their parents questioned them about where

19  they got it, they said that they had purchased it on Eaze with

20  their parent's credit card.

21          So this got reported to this executive at MasterCard,

22  and they sent an e-mail to the compliance department to look

23  into the descriptor that was used on Eaze on that credit card

24  purchase.  Ray said that he had someone who worked at

25  MasterCard who forwarded him the e-mail, the compliance e-mail,

L3FPWEI3                          Patterson - Direct

1   and that he was proactively going to shut down MasterCard

2   processing because of this incident.

3   Q.   Did there come a time when Eaze stopped card processing

4   through Ray's organization all together?

5   A.   Yes.

6   Q.   Approximately when was that?

7   A.   June 2018.

8   Q.   Can you explain the circumstances that led up to that?

9   A.   So June, that is when DionyMed officially filed the lawsuit

10  against Eaze, and as part of that, we had legal counsel

11  representing us in the lawsuit.  So also, when the letter came

12  in and I told Ray about it, that's when payments to the

13  dispensaries had stopped.

14       So credit cards had been processed for about two,

15  three months where no payments were being made to the

16  dispensaries.  So it was about $8 million that had not been

17  paid out.  So a call was set up to inquire about the missing

18  funds between Eaze's team -- Eaze's legal team and Ray and his

19  lawyer.  At the time, we were only communicating through

20  lawyers because of the lawsuit.

21       So on that call, Ray said that the funds had been

22  frozen by the banks because of the lawsuit; that they had found

23  out that -- that they had found out that the accounts were

24  associated with marijuana.  The funds were frozen and couldn't

25  be recovered.

1        So after that call, Eaze made the decision to stop

2   processing completely through Ray's organization.

3   Q.  And just one question for clarification.  I believe you had

4   said that the card processing stopped in 2018.  Was it 2018 or

5   2019?

6   A.  Sorry, 2019.

7            MR. FOLLY:  No further questions.

8            THE COURT:  Cross-examination.

9   CROSS-EXAMINATION

10  BY MR. TAYBACK:

11  Q.  Mr. Patterson, can you hear me?

12  A.  Yes.

13  Q.  I'd like to start with the reference to the lawsuit.  The

14  company that sued Eaze was named Herbn, was that the name of

15  the company?

16  A.  That was the -- yes, that was the holding company that was

17  the parent company of DionyMed.

18  Q.  So if I call it "the Herbn lawsuit," you'll understand what

19  I'm referring to?

20  A.  Yes.

21  Q.  And that's H-e-r-b?

22  A.  I think it was H-e-r-b-n.

23  Q.  Now, Herbn was, I think you said, the holding company or a

24  part of the holding company that owned the competitor called

25  Chill?

L3FPWEI3                          Patterson - Cross

1    A.  Yes.

2    Q.  So it was a competitor that filed the lawsuit against Eaze

3    regarding Eaze's use of credit cards, correct?

4    A.  Yes, that's correct.

5    Q.  Now, Eaze handled that lawsuit itself, correct?

6    A.  Yes.

7    Q.  Meaning it hired lawyers and defended the lawsuit?

8    A.  Yes.

9    Q.  Was Eaze's strategy in that case to blame the dispensaries

10   because they're the ones that submitted the applications?

11            MR. FOLLY:  Objection.

12            THE COURT:  Sustained.

13   Q.  Mr. Akhavan was not a party to that lawsuit, correct?

14   A.  No.

15   Q.  Eaze itself did stop processing credit cards, at least in

16   part, in reaction to that lawsuit, right?

17   A.  Yes, in reaction to the lawsuit.

18   Q.  And it wasn't because of an investigation by MasterCard or

19   Visa, correct?

20   A.  That's right.

21   Q.  And it wasn't because of any complaint by a U.S. issuing

22   bank that Eaze stopped processing credit cards, correct?

23   A.  That's correct.

24   Q.  Eaze ultimately settled that lawsuit, right?

25   A.  Yes.

L3FPWEI3                         Patterson - Cross

1   Q.  And as part of that settlement, Eaze acquired the

2   dispensary that used to be called Hometown Heart, correct?

3   A.  Yes.

4   Q.  So the result of that lawsuit is that Eaze acquired a

5   dispensary that not only -- that cultivated or produced

6   marijuana products that Eaze delivers, correct?

7   A.  Yes.

8   Q.  Now, even after that lawsuit resolved, Eaze, to your

9   knowledge, has not been blacklisted by Visa or MasterCard,

10  correct?

11          MR. FOLLY:  Objection.  Foundation.

12          THE COURT:  Well, lay a foundation.

13  Q.  As of the time you -- well, let me back up.  As of the time

14  you left the company, the company Eaze, to your knowledge, Eaze

15  had never been blacklisted by Visa or MasterCard, right?

16  A.  Not to my knowledge.

17  Q.  In fact, Eaze, to your knowledge, even at the time you

18  left, still accepted Visa or MasterCard debit cards, right?

19  A.  Yes.

20  Q.  Through a company called Circle Wallet?

21  A.  Not when I left.  When I left, it was through a different

22  company called MTrac.

23  Q.  Would you say the name again?

24  A.  MTrac, M-T-r-a-c.

25  Q.  Now, you're still a shareholder of Eaze?

L3FPWEI3                         Patterson - Cross

1   A.  Technically, I have options, but --

2   Q.  Don't you also own shares that you purchased yourself?

3   A.  Yes.  I was a small investor when I first joined.

4   Q.  And you're still an investor, correct?

5   A.  Yes, I still have the shares.

6   Q.  And that investment is about 1.5 percent of the company?

7   A.  Approximately, yes.

8   Q.  Do you know what the company's valuation is?

9   A.  I don't know what the last valuation was.

10  Q.  What was the valuation at the time you left the company?

11  A.  Around $250 million.

12  Q.  Now, on the Eaze website, at the time you left, you were

13  familiar with the website that is shown to consumers, correct?

14  A.  Yes.

15  Q.  At the time you left, a customer could still use their

16  funds from any bank to pay for its Eaze purchases, right?

17  A.  I'm not sure about any bank.

18  Q.  Most banks?

19  A.  Some banks, yes.  I don't know what most or --

20  Q.  If you could put up WX2601, which is in evidence.

21          Do you recognize this as a page from the Eaze

22  application?

23  A.  Yes.

24  Q.  Or the Eaze app, I should say?

25  A.  Yes.

L3FPWEI3                    Patterson - Cross

1    Q.  And it describes some of major banks listed there on the

2    first page; do you see that?

3    A.  Yes.

4    Q.  But there are other banks, and you'll see that there's a

5    search bar that says:  Don't see your bank?  Search instead?

6    Do you see that?

7    A.  Yes.

8    Q.  So that's not an exhaustive list of banks that Eaze makes

9    available to its customer to use funds from to buy marijuana,

10   right?

11   A.  Well, no, that's not how this works.

12   Q.  How does it work?

13   A.  So this is a plug-in from a company called Plaid, where

14   they just list all of the banks that Plaid supports.  The

15   customer would insert their bank information and issue --

16   essentially sign into their bank account, and then try to do a

17   transaction.  At that point, some banks allowed it and some

18   banks didn't.  This list is only the banks that Plaid supports,

19   not necessarily that work on Eaze.

20   Q.  But through its relationship with Plaid, these banks' icons

21   are on the Eaze website, correct?

22   A.  Yes, it works through Plaid that way.

23   Q.  And to your knowledge, no bank has ever written Eaze and

24   said take our name down off of that app, correct?

25             MR. FOLLY:  Objection.

1  A.  Not to my knowledge, no.

2  Q.  Let me ask you some questions about the Eaze business

3  model.  When you started with the company, what year was that?

4  A.  2016.

5  Q.  It was just a delivery platform, right?  Let me rephrase

6  the question.

7       It was a delivery platform for marijuana products, but

8  it didn't cultivate the plant itself?

9  A.  That's correct.

10 Q.  In fact, you had thought about joining Eaze prior to when

11 you actually joined Eaze, a couple of years before that, right?

12 A.  Yes.

13 Q.  Around 2014, I think you said?

14 A.  Yes.

15 Q.  And at that time, you declined to join Eaze because you

16 thought it was too risky, right?

17 A.  Yes.

18 Q.  In fact, you said that you were concerned that if you don't

19 do things right, you could wind up going to jail, correct?

20 A.  Yes.

21 Q.  You don't want to go to jail, right?

22 A.  No.

23 Q.  Now, between 2014 and 2016, what happened in your mind that

24 made it less risky?

25 A.  Well, the Eaze business model changed.  So initially Eaze

L3FPWEI3                          Patterson - Cross

1    was the one selling the marijuana.  So Eaze actually had the

2    marijuana in its inventory and were selling it directly to

3    consumers prior to me joining the company.

4         The company changed its business model, where it

5    partnered with dispensaries; so the marijuana being sold wasn't

6    actually owned by Eaze.  The drivers themselves weren't

7    employees of Eaze.  They were employees of the dispensaries.

8    So the company moved to this model that they called "We don't

9    touch the plant" and that made it seem less risky to me.

10   Q.  And so you viewed it as less risky to be the deliverer of

11   marijuana than to be one that cultivated or produced the

12   products, right?

13   A.  Well, we weren't delivering.  We were the technology

14   platform.  The delivery drivers were the employees of the

15   dispensaries.  They used our app to fulfill the orders.  It was

16   purely technology.

17   Q.  And you felt that that was less risky?

18   A.  Yes.

19   Q.  Now, at some point after you joined the company, didn't

20   Eaze become the employer of the drivers?

21   A.  No.  At no point when I was there, was that the case.

22   Q.  Do you know whether that occurred later?

23   A.  It occurred after I left.

24   Q.  And were you there when the Herbn lawsuit was settled?

25   A.  Officially, the official settlement happened after I left.

L3FPWEI3                     Patterson - Cross

Q.  But you were still on the board, correct?

A.  Yes.

Q.  So you were aware of that?

A.  Yes.

Q.  And you approved that?

A.  Yes.

Q.  And that didn't create, in your mind, any additional risk?

A.  It did.

Q.  But not so much that you felt that you couldn't pursue that venture, pursue that settlement?

A.  Again, I was just a board member.  I left shortly thereafter.

Q.  Well, you say "just a board member."  Isn't the board the ultimate authority for Eaze?

A.  Oh, yes, but I was just one vote of six.

Q.  And this is the same board that I believe you said were co-conspirators with you?

A.  Some members, yes.

Q.  Some members, but not all of them?

A.  I'm not sure exactly what every single board member knew.

Q.  Well, my question is, do you believe that the board of Eaze, the board of this company, were co-conspirators with you?

A.  The board, yes.

Q.  Because you talked to the board about what was happening with credit card processing, right?

1   A.  Yes.

2   Q.  And you sought their approval, correct?

3   A.  Yes.

4   Q.  And you shared with them what you understood the process

5   was, correct?

6   A.  They were aware of the high-level details but not all of

7   the low-level specific details.

8   Q.  Well, is it fair to say that you never told the board in

9   any of your meetings with them, as the chief technology officer

10  and later the CEO, that you believed what the company was doing

11  was illegal?

12  A.  I never said that, no.

13  Q.  You didn't say that because you didn't believe it at the

14  time you were meeting with the board, right?

15  A.  No, I wouldn't say that's true.

16  Q.  Now, let me go back to the process by which the Eaze

17  application works.  When you started, did the drivers carry

18  portable terminals to use like an ATM for people, for

19  customers?

20  A.  When I started at Eaze?

21  Q.  Yes.

22  A.  No.

23  Q.  At some point while you were there, did that happen?

24  A.  Yes.

25  Q.  Okay.  When did that happen?

L3FPWEI3                        Patterson - Cross

1   A.  After the -- after the Herbn lawsuit, when we switched to

2   using what's called the closed-loop system.

3   Q.  So when you first began with the company, did the company

4   have any system in place to accept any form of credit or debit

5   card before you began talking to Mr. Akhavan?

6   A.  No.

7   Q.  Now, you learned -- well, let me back up.

8           Well, you learned while working there that there were

9   good reasons to not have a cash-only operation for Eaze,

10  correct?

11  A.  Yes.

12  Q.  And what were those?

13  A.  Well, one was customers preferred it.  So it was more

14  convenient; therefore, it increased sales.  Another one was

15  that with cash transactions, it created a high number of

16  robberies.  So during the periods where Eaze was taking cash,

17  we would have an increase in driver and dispensary robberies.

18  Q.  And it also was good for business, correct?

19  A.  Yes, it increased sales.

20  Q.  And when you began to -- when you started with the company

21  and began to discuss how you might be able to accomplish a

22  cash-free method of Eaze doing business, you wanted to do so in

23  a manner that was compliant with the law?

24  A.  That was my understanding, yes.

25  Q.  That was your goal, right?

L3FPWEI3                          Patterson - Cross

1   A.  Yes.

2   Q.  And I believe you testified that during the period of time

3   of 2016, 2017, you spoke to a number of people, you consulted

4   with a number of people about ways to make that happen, that is

5   to say, people other than Mr. Akhavan?

6   A.  Well, not in 2016.  So when I took over as CEO in 2017 is

7   when I started looking for alternative processors.

8   Q.  Let me rephrase the question.  Before you began speaking to

9   Mr. Akhavan, you spoke to others within Eaze about the desire

10  to try to have a credit card or debit card solution, correct?

11  A.  Well, when I joined, Keith had already been talking to

12  Mr. Akhavan.  So I was told that we were integrating credit

13  card payments just as soon as I joined, and I was introduced to

14  Ray within weeks after I joined.

15  Q.  And you spoke to -- among the people within Eaze, though,

16  that you spoke to at the very inception of your efforts to find

17  a credit card solution were Mr. McCarty, correct?

18  A.  Yes.

19  Q.  He was the CEO at the time?

20  A.  Yes.

21  Q.  And there was also a person that I saw in an e-mail named

22  Michael Selepec?

23  A.  Michael Selepec, yes.

24  Q.  And who was that?

25  A.  He worked for Eaze.  He -- his job at the time was

overseeing something called Eaze MD, which was a separate

service that operated video chats for doctors.  So the way that

worked was you needed a medical recommendation in California at

the time to purchase marijuana; so if a customer didn't have

the medical recommendation, there was a separate service called

Eaze MD, where they could consult with a doctor.  And after

that consultation, the doctor would issue them their marijuana

recommendation.

Q.  And that's because, in this early time period here, and I'm

referring to 2016 or 2017, in California, your understanding

was marijuana was only permissible with a medical prescription,

correct?

A.  That's right.

Q.  So Eaze was in the business of providing not only the

marijuana product itself, but a doctor who might be able to

provide a prescription?

A.  Yes.  Eaze ran a service that connected you with doctors.

Q.  And there's another name of someone within Eaze that

appears to be on the discussions that you've testified about in

direct, Dan Erickson.  Who is that?

A.  Well, Dan was the VP of engineering; so he was over all the

software engineering team.

Q.  And another person named Roie Edery, R-o-i-e.  Who was

that?

A.  Roie was one of the co-founders of Eaze, along with Keith.

1    He left right as I was starting at the company.

2    Q.  And what was his responsibility while he was there?

3    A.  He oversaw the technical; so essentially, I was replacing

4    him.

5    Q.  And then you also spoke with a consultant named Jim Black,

6    correct?

7    A.  Yes.

8    Q.  Now, it's true, isn't it, that Mr. Akhavan was never an

9    Eaze employee?

10   A.  That's true.

11   Q.  And he was never an officer of Eaze?

12   A.  That's true.

13   Q.  And he's never been a board member of Eaze?

14   A.  That's true.

15   Q.  And to your knowledge, he's never been a stockholder or

16   shareholder of Eaze, correct?

17   A.  Stock options.

18   Q.  To your knowledge, he doesn't own any stocks, correct?

19   A.  That's correct.

20   Q.  Now, when you --

21              THE COURT:  So the jury knows, what is meant by stock

22   options?

23              THE WITNESS:  Well, a stock option is the right to

24   purchase shares in the future at a specified price.  So you

25   don't actually own the stock; so therefore, you don't have any

1    voting rights associated with that.  You just have a financial

2    option to purchase them in the future at a specific price.

3            THE COURT:  Go ahead.

4    BY MR. TAYBACK:

5    Q.  And is it your understanding -- withdrawn.

6            While you were at the company, you testified earlier

7    about a dispute with Mr. Akhavan about he was out-of-pocket

8    money, and hadn't been paid; do you recall that testimony?

9    A.  Yes, I do.

10   Q.  And at some point in time, you were authorized by the

11   company to offer him stock options, correct?

12   A.  Yes.

13   Q.  I think it was about $25,000 worth of stock options?

14   A.  Yes.

15   Q.  And they were at a price that was higher than the valuation

16   of Eaze at the time?

17   A.  Well, the options were, I believe, at a price lower.  That

18   was the -- that's the point.

19   Q.  And to your knowledge, though, the options were never

20   purchased, correct?

21   A.  That's correct.

22   Q.  And they're not available anymore, correct?

23   A.  I don't know.  I don't know anymore.

24   Q.  So as you are sitting here, to your knowledge, Mr. Akhavan

25   has never received -- has never obtained any stock in Eaze,

L3FPWEI3                        Patterson - Cross

1    correct?

2    A.   That's correct.

3    Q.   And when you left the company, you were the CEO?

4    A.   Yes.

5    Q.   And you had an annual salary of $250,000?

6    A.   Yes.

7    Q.   To your knowledge, did Mr. Akhavan ever get paid anything

8    from Eaze?

9    A.   Not directly, no.

10   Q.   He never received a check from Eaze, correct?

11   A.   Not that I know of.

12   Q.   You say "not directly," meaning you think he got paid

13   indirectly?

14   A.   Well, there were the credit card fees.  I'm not sure how

15   those got disbursed.

16   Q.   Meaning you have no idea one way or the other, correct?

17   A.   That's right.

18   Q.   You have no idea whether the banks, either the acquiring

19   banks, what their percentage was or what they took, correct?

20   A.   Correct.

21   Q.   And you don't know what the intermediaries, if there was an

22   ISO involved, you don't know what they took, correct?

23   A.   Correct.

24   Q.   And so you don't know whether Mr. Akhavan received

25   anything, correct?

L3FPWEI3                    Patterson - Cross

1    A.   That's right.

2    Q.   Do you know whether Mr. Akhavan contributed any costs of

3    his own to facilitate Eaze's efforts to try to find a credit

4    card solution?

5    A.   Sorry, can you rephrase the question?

6    Q.   Do you know whether he contributed any money of his own --

7    A.   I don't know.

8    Q.   -- to Eaze?  You don't know one way or the other, correct?

9    A.   Correct.

10   Q.   Now, when you were first introduced to Mr. Akhavan, your

11   understanding is -- was at the time, that he knew a lot of

12   people in the credit card processing business, right?

13   A.   Yes.

14   Q.   And he said to you that he knew people at banks in Europe

15   that represent merchants, correct?

16   A.   Yes.

17   Q.   Now, at the time, you didn't know much about credit card

18   processing?

19   A.   That's right.

20   Q.   But you learned that those banks are called acquiring

21   banks, right?

22   A.   The banks in Europe, I think, are called merchant banks.

23   Q.   Have you ever heard the term acquiring banks?

24   A.   I have now, yes.

25   Q.   And do you understand that the acquiring bank is the same

L3FPWEI3                          Patterson - Cross

1   as a merchant bank?

2   A.  I guess, no.

3   Q.  You don't know?

4   A.  No, I don't know.

5   Q.  One of the things that Mr. Akhavan did was introduce you to

6   people in the business of credit card processing, correct?

7   A.  I mean, other than people that he worked with directly, I

8   don't think he introduced me to anybody.

9   Q.  But when you say people he worked with directly, you met a

10  person named Ozan Ozerk?

11  A.  Yes, over e-mail.  Yes, we worked with him at the

12  beginning.

13  Q.  If you could put up Exhibit GX403, which is in evidence.

14  And if you could go down to the next page.  Actually, I'm

15  sorry.  It's up at the -- if you could go down to the next

16  page.

17          If you could look at the top of the e-mail, you'll see

18  this is from Ozan Ozerk, and it's dated May 13th, 2016?

19  A.  Yes.

20  Q.  And do you see you're one of the cc's on this, correct?

21  A.  Yes.

22  Q.  And if you look down to the second e-mail text there, where

23  it says -- it appears to say in a foreign language, Mai, M-a-i,

24  2016; do you see that?

25  A.  Yes.

L3FPWEI3                        Patterson - Cross

1    Q.  And that's from that person Roie Edery that you described

2    before?

3    A.  Yup.

4    Q.  And he says:  Gentlemen, this e-mail is to connect --

5             MR. FOLLY:  Objection.  I don't believe this is in

6    evidence.

7             MR. TAYBACK:  I had it marked as in evidence.

8             If you could take it down from the screen please.

9    Q.  Do you recognize that as an e-mail --

10   A.  Yes.

11   Q.  -- that you received?

12   A.  Yes.

13            MR. FOLLY:  Can we show it to the parties?

14            MR. TAYBACK:  To the witness only.

15            (Pause)

16            MR. FOLLY:  Is there more?

17            MR. TAYBACK:  There's -- no, it's only one page.

18            MR. FOLLY:  Objection, hearsay.

19            MR. TAYBACK:  It goes to the witness' state of mind.

20            THE COURT:  Blow it up for me.

21            MR. TAYBACK:  It's the top part.

22            THE COURT:  Sustained.

23            MR. TAYBACK:  If you could place before the -- may I

24   have one moment.  If I could show the witness what's been

25   marked as Exhibit GX917.

L3FPWEI3                          Patterson - Cross

1    BY MR. TAYBACK:

2    Q.  If you look at the middle e-mail?

3    A.  Yes.

4    Q.  For the witness.

5    A.  Yes.

6    Q.  Is that an e-mail from you?

7    A.  Yes.

8    Q.  Now, do you recall corresponding with, at any point in

9    time, Mr. Ozerk?

10   A.  Yes.

11   Q.  You can take this down.

12        And what was your understanding of why you were

13   corresponding with Mr. Ozerk?

14   A.  I mean, my understanding was everyone was under this

15   umbrella called Clearsettle, and they were the technical --

16   Roie referred to them as our technical counterparts.  So I

17   viewed them as the technical people that we would be working

18   with to do the integration into Clearsettle.

19   Q.  You had mentioned at one point in time yesterday, I

20   believe, or Friday, that when you wanted to look up a domain

21   name, you had Googled something called What Is It?

22   A.  WhoIs.

23   Q.  WhoIs.  Did you do anything to Google or look into who

24   Mr. Ozerk is?

25   A.  No, not -- I look at the company, Clearsettle, and I

1    believe his company was called First Remit.  I looked up these

2    companies.  They have websites that just said they were payment

3    processing websites.

4    Q.  So you did looked up even the company Clearsettle, correct?

5    A.  Yes.

6    Q.  And did you see who was in charge of Clearsettle?

7    A.  It didn't say, no.

8    Q.  The website you looked at, did you see whether Mr. Akhavan

9    seemed to have any association with Clearsettle?

10    A.  I couldn't find one, no.

11    Q.  You knew that Mr. Akhavan was suggesting that Eaze work

12    with a bank in Europe, correct?

13    A.  Well, that Eaze wouldn't be working directly with any

14    banks.

15    Q.  You knew that he was suggesting you work with credit card

16    processors in Europe, correct?

17    A.  Yes.

18    Q.  And you knew, even in this early stage, that there would

19    have to be a merchant or acquiring bank -- a "merchant bank," I

20    think is the term you used -- correct?

21    A.  This -- at this early stage, no, I didn't know all of the

22    details of it.

23    Q.  Well, is it accurate to say that you viewed Mr. Akhavan's

24    role in this early stage as being a liaison between Eaze and

25    others who could facilitate credit card processing?

1   A.   Initially that's how he was introduced to me.

2   Q.   And that's the term you used to describe him when you spoke

3   to the government, yes?

4   A.   Possibly.  That's how I viewed it at the beginning.

5   Q.   Now, when you worked with Mr. Akhavan in this period of

6   time, now we're focused on 2016, he answered your questions

7   about credit card processing, right?

8   A.   Yes.

9   Q.   And you didn't know that much about it, right?

10  A.   That's right.

11  Q.   So you consulted with him for the knowledge that he had in

12  the business, right?

13  A.   Yes.

14  Q.   If we could put up for the witness Exhibit GX423.  I

15  believe this exhibit is in evidence, if you could display it.

16       Do you recognize this e-mail exchange as an e-mail

17  exchange, I think, that you had that you testified about

18  earlier?

19  A.   Yes.

20  Q.   Now, if we could go down to the bottom.

21       You understand that e-mails, typically, you read from

22  the bottom to the top?

23  A.   Yes.

24  Q.   Go to the bottom.  That first e-mail in the thread is from

25  you, correct?

1    A.  Yes.

2    Q.  And you're telling this group of recipients that it seems

3    like there were a high number of chargebacks, correct?

4    A.  Yup.  Yes.

5    Q.  And the date of this e-mail is September 26th, 2016.  So

6    this is the early stages of your consultation with Mr. Akhavan?

7    A.  Yeah, this is the beginning of credit card processing.

8    Q.  And in this early stage, where you're seeing what you

9    perceive to be a high number of chargebacks, you already knew

10   that chargebacks were bad, right?

11   A.  Yes, that's what Ray told me.

12   Q.  But you realized independently that customers who return

13   their product or want their money back, that that's bad?

14   A.  Yes.

15   Q.  And it's bad for business, correct?

16   A.  Yes.

17   Q.  And you also know that it's bad for -- that the credit card

18   companies perceived it as bad?

19   A.  Well -- well, my understanding was that there was a certain

20   threshold.  If you go above a certain threshold, then the

21   credit card companies would perceive that as bad, yes.

22   Q.  And because it means that something maybe is wrong with the

23   merchant, correct?

24   A.  Yes.

25   Q.  And that that was -- would be a problem for that merchant,

1  ultimately, correct?

2  A.  Yes.

3  Q.  Now, you say in that second sentence:  I am not sure what

4  to do here.  I know our No. 1 priority is supposed to be

5  keeping chargebacks low, but because of the legal restrictions

6  of not putting Eaze in the billing descriptor, it's inevitable

7  that people are going to get confused and dispute the charge.

8          Do you see that?

9  A.  Yes.

10 Q.  Not putting "Eaze" in the billing descriptor, that wasn't

11 something that Mr. Akhavan suggested, correct?

12 A.  Well, at one point, he said that.  He said it would not be

13 a good idea to do that.

14 Q.  Well, let's keep looking at the e-mail here.  You ask --

15 you then say in the next sentence:  Is there any way -- and you

16 emphasize "any" -- that we can get comfortable with putting

17 Eaze somewhere in the billing descriptor?  Do you see that?

18 A.  Yes.

19 Q.  And then you offer a couple of suggestions, something like

20 "Eaze via Onlinebiller.net" or "Onlinebiller.net/Eaze"; do you

21 see those?

22 A.  Yes.

23 Q.  Now, Onlinebiller.net is a general descriptor, right?

24 A.  That's correct.

25 Q.  Meaning it doesn't mean anything, yes?

1  A.  Yes.

2  Q.  And that's what was being used at that point in time,

3  correct?

4  A.  Yes.

5  Q.  That's what Mr. Akhavan suggested initially?

6  A.  Yes, Onlinebiller.net.

7  Q.  In consultation with you, correct?

8  A.  That's what he said was being used.  We didn't decide it.

9  We were just told that, working through Clearsettle, they were

10  going to use Onlinebiller.net as the descriptor.

11  Q.  Okay.  And if you go up to the next responsive e-mail, and

12  Mr. Akhavan responds and says:  Of course, we can work on it,

13  and if the only choice is to put 'Eaze' on there; we can.

14        Do you see that?

15  A.  Yes.

16  Q.  So he's saying that it would be fine to use "Eaze" as part

17  of the descriptor; you understood that, right?

18  A.  I mean, he's saying it's possible, yes.

19  Q.  So if you go up one more e-mail.  And you say -- he then

20  asks you why you think the number is high, correct, the number

21  of chargebacks, and he responds to that?

22  A.  Hang on one second.  Where are we looking?

23  Q.  If you go -- this is your response to Mr. Akhavan's e-mail

24  below; do you see that?

25  A.  Yes.

L3FPWEI3                    Patterson - Cross

```
 1   Q.  And then there's another response above that from
 2   Mr. McCarty; do you see that?
 3   A.  Yes.
 4   Q.  Bring that one up, please.
 5            And Mr. McCarty says:  I think Black will have an
 6   issue with putting "Eaze" in there, especially if it's not Eaze
 7   MD, but he may want to put something that is more around "MMJ
 8   recommendation" or "doctor evaluation" or "video evaluation;"
 9   do you see that?
10   A.  Yes.
11   Q.  And Mr. Black was the other consultant whose name came up,
12   correct?
13   A.  Yes.
14   Q.  And you see that Mr. McCarty's expressing to you the view
15   that somebody else, not Mr. Akhavan, might have problems
16   putting "Eaze" in the descriptor, right?
17   A.  Yes.
18   Q.  If you could go to the next response.
19            And this is, I believe, you pronounced his name
20   Selepec?
21   A.  Selepec.
22   Q.  Mr. Selepec, who is an Eaze employee, right?
23   A.  Yes.
24   Q.  And he responds:  We make it fairly obvious in the Eaze MD
25   receipt e-mail that the transaction name will appear as
```

1    Onlinebiller.net voucher.  It's even in the subject line.

2              Do you see that?

3    A.  Yes.

4    Q.  So he's explaining why the customer should not be confused

5    because even though it's generic, they're advised that it

6    relates to their transaction, right?

7    A.  Yes.

8    Q.  Because the goal was to make sure that the customers knew

9    what they had bought, right?

10   A.  Yes, that was the reason for putting the Onlinebiller.net

11   in the e-mail receipt.

12   Q.  Now, you -- if you go up to the top, Mr. Akhavan writes

13   this longer e-mail that you testified about in direct; do you

14   recall that?

15   A.  Yup.

16   Q.  And he says to you that he understands the issue with the

17   foreign banks being involved, right?  That that could raise a

18   customer -- could increase the likelihood that the customer is

19   unfamiliar with the transaction, right?

20   A.  Yes.

21   Q.  But the banks he's talking about are the merchant banks,

22   right?  They're the merchant banks that are involved, right?

23   A.  Yes, the merchant banks.

24   Q.  They're not -- he's not talking about any issuing banks,

25   right?

L3FPWEI3                          Patterson - Cross

1    A.  Not here, no.

2    Q.  Now, as Eaze, you have no control over what banks

3    individual consumers bank with, correct?

4    A.  That's correct.

5    Q.  So as part of the discussion about how to process credit

6    cards, you never looked at, well, what are Bank of America's

7    policies or what are Wells Fargo's policies for customers using

8    credit cards, correct?

9    A.  That's correct.

10   Q.  That wasn't something you discussed with Mr. Akhavan,

11   correct?

12   A.  No, not individual bank policies.

13   Q.  And you've never read their policies, right?

14   A.  No.

15   Q.  Because that wasn't of concern with trying to come up with

16   a proposal, a solution to get credit cards and debit cards to

17   be used to purchase marijuana through Eaze, right?

18   A.  Well, to be clear, at this moment, I'm just the technology

19   person.  So I wouldn't say that all of the conversations I was

20   aware of, but in my conversations, it was just focused on the

21   technical component at this stage.

22   Q.  So the answer is for their purposes, to your knowledge,

23   there was no discussion about individual consumer banks'

24   policies, correct?

25   A.  That's right.

L3FPWEI3                         Patterson - Cross

1   Q.  But you did discuss the use of these foreign merchant
2   banks, right?
3   A.  Yes.
4   Q.  And Mr. Akhavan said that there were lots of people -- if
5   you could bring that back up, please.
6           And if you look at the second paragraph, he says:  We
7   would love to move it to the States, as I have my own billing
8   company here in Florida that I'd really like to use, but none
9   of the U.S. banks want to touch it.
10          Do you see that?
11  A.  Yes.
12  Q.  And he's referring there to merchant banks, right?
13  A.  Yes, merchant banks.
14  Q.  Not issuing banks, correct?
15  A.  That's correct.
16  Q.  And if you go down to the third paragraph, it says:  There
17  are many people here that are doing physical processing for
18  dispensaries that are simply lying to the bank.
19          Do you see that?
20  A.  Yes.
21  Q.  And he says:  We could do the same, but then if we have an
22  issue with the bank -- if we have an issue, the bank will screw
23  us by holding all our funds, et cetera.
24          Do you see that?
25  A.  Yes.

L3FPWEI3                          Patterson - Cross

 1   Q.  You understood Mr. Akhavan was saying you shouldn't use a
 2   bank that you're going to have to lie to in order to set up a
 3   merchant account, correct?
 4   A.  Yes.
 5   Q.  And he's saying you might get away with it eight times out
 6   of ten, but it's not worth it in his opinion, correct?
 7   A.  Yes.
 8   Q.  He was saying it's better to use a merchant bank that
 9   you're honest with, correct?
10   A.  Yes.
11   Q.  And so -- you can take this down, now.
12            As opposed to lying to the acquiring bank, you
13   understood that the foreign banks that Mr. Akhavan was
14   suggesting Eaze use as a merchant banks, knew that it was
15   marijuana?
16   A.  That was my understanding, yes.
17   Q.  And that was important to you to understand that, correct?
18   A.  Yes.
19   Q.  Because you believed as long as the merchants were honest
20   with the acquiring banks, that that was going to be good,
21   correct?
22   A.  Yeah.  At the beginning, yes.
23   Q.  And it was -- and you didn't just rely on Mr. Akhavan,
24   correct, in terms of trying to decide whether this was a good
25   proposal, correct?

L3FPWEI3                          Patterson - Cross

1   A.   That's right.

2   Q.   Because you spoke to the people we talked about, the board

3   and your colleagues and your other consultant, Mr. Black, and

4   others, correct?

5   A.   Yes.

6   Q.   Now, you never discussed anything that you were doing --

7   withdraw that.

8          At this point in time, in 2016, 2017, you didn't say

9   to anybody within Eaze, you know, I think we're committing bank

10  fraud, correct?

11  A.   No, I didn't say that.

12  Q.   In fact, you believed that the process you were going

13  through in order to try to implement the credit card solution

14  for Eaze was compliant, right?

15  A.   I'd say over the course of that year, I started to get

16  concerns of things that were happening, but I wasn't -- I was

17  being put under the impression that it was compliant, but I had

18  my own concerns of things that were happening.

19          (Continued on next page)

20

21

22

23

24

25

L3FAWEI4ps                    Patterson - Cross

Q.  But those concerns that you were expressing or saying that

you had now, you didn't express those to anybody at the time.

A.  Well, for example, in the email pointing out things like

not using the Eaze in the descriptor and other things, but I

didn't elevate any concerns to any official channel, no.

Q.  So, for example, there is no email that you sent to

Mr. McCarty or to the board or to any of your colleagues at

Eaze saying, I'm concerned with the legality of what we're

doing with credit cards.  Correct?

A.  Correct.

Q.  And that's true up to today.  Right?  You've never sent

such an email to anybody at Eaze.

A.  No email, no.

Q.  No other written communication of any sort, correct?

A.  Not written, no.

Q.  Now, when you first met with the government in October of

2020, you told them at that time that you had understood that

Mr. Akhavan had relationships with European banks, when you

first met him, right?

A.  Yes.

Q.  And you also told the government that you had an

understanding that Mr. Akhavan had experience with what's

called high-risk credit card processing?

A.  That was the phrase that was used, yes, high-risk credit

card processing.

L3FAWEI4ps                    Patterson - Cross

1    Q.  That was used from the very beginning, right?

2    A.  Yes.

3    Q.  Even before you had any concerns about whether or not what

4    you were doing was legal, the term "high risk" was used.

5    A.  Yes.

6    Q.  And you understood that "high risk" in that context means a

7    high risk of chargebacks, correct?

8    A.  Yes, high risk of chargebacks and fraud.

9    Q.  Could be a legal transaction or an other transaction, not

10   illegal transaction.  Correct?

11   A.  Yes.

12   Q.  And so "high risk" didn't in and of itself mean to you,

13   there's something wrong here, something illegal here, correct?

14   A.  That's correct.

15   Q.  You eventually came to understand that the use of

16   descriptors for the billing of the products that Eaze was

17   delivering would not create a lot of chargebacks; that was a

18   goal of those descriptors, correct?

19            Let me withdraw the question.  I messed it up.

20            You eventually came to understand that the goal for

21   the use of the descriptor was to ensure that the customer

22   recognized the transaction, correct?

23   A.  No.

24   Q.  What is your understanding of a descriptor?

25   A.  A descriptor is what appears on the customer's credit card

1    statement.

2    Q.  Was it your understanding, was it ever your understanding,

3    that a goal of that descriptor is to make the customer be able

4    to recognize the transaction?

5    A.  Yes.  That's the goal of a descriptor, but just not, in

6    this case, wasn't the goal of the descriptors.

7    Q.  Wasn't the discussion that we just looked at about making

8    sure that the descriptor was sufficient to be able to allow a

9    customer to recognize the transaction, correct?

10   A.  No.  What we did is, that's why we had to add the

11   descriptor to the receipt and the card collection point, was

12   because it was completely unclear based on those descriptors

13   what the charge was -- where the charge was from.

14   Q.  You mean when it was onlinebiller.com?

15   A.  Yeah.  There is no connection to Eaze.

16   Q.  And that's why the reason, though, you wanted to insert

17   Eaze is because it would be clearer to the customer, correct?

18   A.  Yes.

19   Q.  Now, when you met with the government in October 2020 --

20   withdraw that.

21          The actual name of Eaze is Eaze Solutions, right?

22   A.  It's now called Eaze Technologies.  It was called Eaze

23   Solutions.

24   Q.  It was called Eaze Solutions?

25   A.  Yes.

L3FAWEI4ps                     Patterson - Cross

1  Q.  It change its name while you were CEO?

2  A.  Yes.  I changed the name.

3  Q.  If we could put up Exhibit GX 411, which I believe is in

4  evidence.  If you could take a look at this email and let me

5  know if you recognize it as an email that was forwarded to you

6  from Mr. McCarty?

7  A.  Yes.

8  Q.  In about July of 2016.  Do you see that?

9  A.  Yes, I do.

10 Q.  If I could direct your attention to the fourth page of this

11 document --

12          MR. TAYBACK:  May I have one moment, your Honor?

13          THE COURT:  You may.

14 Q.  And at this point in time in July of 2016, you were

15 discussing ways in which to enable credit card processing for

16 Eaze, correct?

17 A.  Well, at this point I was told that we were using

18 Clearsettle.  There wasn't any discussion about it.  I was told

19 we were using Clearsettle, and I was working on implementing

20 that.

21 Q.  And that was Mr. McCarty's decision ultimately?

22 A.  Yes.

23 Q.  And at this point in time, was there a discussion about

24 whether the merchant should be Eaze or should be the individual

25 dispensaries?

L3FAWEI4ps                      Patterson - Cross

1    A.  Yes.

2    Q.  And the resolution you reached at this point in time, in

3    2016, was that it would be Eaze, correct?

4    A.  No.  The resolution was that it should be the dispensaries.

5    The problem was, technically, that there was no way to

6    implement that, so there was a single merchant account and

7    subaccounts for each dispensary.

8    Q.  Because the -- one of the complications that you were

9    trying to work around in implementing the solution was that --

10             MR. TAYBACK:  You could take this down.  Thank you.

11   Q.  -- was that the dispensaries -- there are multiple

12   dispensaries, right?

13   A.  Yes.

14   Q.  And Eaze, Eaze's business model was to position itself as

15   an intermediary, correct?

16   A.  Yes.

17   Q.  And so you couldn't pick -- you couldn't pick just one of

18   the dispensaries to have a merchant account, correct?

19   A.  At the early stage, no.

20   Q.  And so, because there were many of them, you would have

21   needed multiple descriptors too, correct?

22   A.  Yes.

23   Q.  And that was a problem.

24   A.  Yes.  At the beginning it wasn't set up where we could do

25   multiple.

L3FAWEI4ps                   Patterson - Cross

1    Q.  So that was a logistical problem that you consulted with

2    Mr. Akhavan to try to work around.  Correct?

3    A.  Yeah.  Technical problem.

4    Q.  OK.  Technical.  And that's why you wound up with

5    Onlinebiller, correct?

6    A.  Well, no.  I would say -- maybe why we ended up with

7    Onlinebiller is, is a single one instead of having multiple

8    versions of Onlinebiller.

9    Q.  And it's a single one because you understand the descriptor

10   couldn't refer to any one dispensary, if it was only going to

11   be one descriptor, correct?

12   A.  Yes.

13   Q.  Because you had a lot of dispensaries.

14   A.  Yes.

15   Q.  And so you were concerned about having it say Eaze, because

16   Eaze wasn't the dispensary.  Right?

17   A.  When you say I was concerned, you mean --

18   Q.  The company.

19   A.  The company, yes.

20   Q.  The company was concerned.

21   A.  Yes.

22   Q.  And you were one of the officers of the company, right?

23   A.  Yes.

24   Q.  And so you were looking out for the company's interest at

25   the time.

Patterson - Cross

1   A.  Yes.  I was focused on the technical aspect.

2   Q.  And Onlinebiller was at least generic, that it didn't

3   specify one particular dispensary over another.  Right?

4   A.  Yes.

5   Q.  Now, at the time, or, rather, eventually, Eaze did change

6   its mind and put Eaze into the descriptor, right?

7   A.  There was -- there was a short period where one of the

8   descriptors was, I believe it was eazepayments.com.

9   Q.  Eaze Payments.  That was one of the descriptors that went

10  into effect in September 11, 2017?

11  A.  Yes.

12          MR. TAYBACK:  If you could put up just for the witness

13  Exhibit GX 432.

14  Q.  And do you recognize this as an -- do you recognize what

15  this is?

16  A.  Yes.  This is a -- this is a message to an application

17  called Slack, an internal chat.

18  Q.  Was Slack one of the platforms used for Eaze employees to

19  chat internally?

20  A.  Yes.

21  Q.  And the person who's communicating this to you is Dan

22  Erickson?

23  A.  Yes.

24  Q.  And he was an engineer, you said, correct?

25  A.  Yeah.  He was the head of engineering.

L3FAWEI4ps

1          MR. TAYBACK:  I offer Exhibit 432 in evidence.

2          MR. FOLLY:  Objection, hearsay.

3          MR. TAYBACK:  State of mind of the witness.

4          THE COURT:  All right.  I'll tell you what.  I think

5     on this one I want to hear from counsel.  So we are just a few

6     minutes away from our lunch break, so we'll give the jury their

7     lunch break so we don't have to go to the sidebar room.

8          So, ladies and gentlemen, we'll take our lunch break

9     now and we'll reconvene at a quarter to 2.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3FAWEI4ps

 1             (Jury not present)

 2             THE COURT:  You may step down.

 3             (Witness excused)

 4             THE COURT:  So how does this relate to a relevant

 5   aspect of the witness's state of mind?

 6             MR. TAYBACK:  This witness has testified that he

 7   believed he was committing bank fraud, and he'd gone through

 8   extensive testimony in direct describing a lot of the different

 9   things that happened and changes that occurred in the manner

10   that they tried to implement a solution for credit cards, not

11   all of which, I would say, are nefarious.  There are a lot of

12   complicated aspects to the process by which credit card

13   processing is done.  And the debate, the lengthy debate, over

14   whether Eaze or Ease could be in the descriptor or not involved

15   a lot of considerations that have nothing to do with alleged

16   fraud, including minimizing the chargebacks here, which he's

17   testified about a little bit, and the descriptors were

18   effectively changed as of September 2017 to use Eaze.  It

19   wasn't an effort to conceal the name Eaze.

20             THE COURT:  What is the question you would put,

21   assuming this exhibit were received, what is the question you

22   would put to the witness?

23             MR. TAYBACK:  I would say it's a couple questions.

24   The first one is, by September of 2017, you had decided that

25   you could use Eaze as the descriptor.  And he did.  And the

L3FAWEI4ps

 1    reasons that he ultimately did that are what we just described,

 2    I believe, so I don't need to go back into that.

 3              THE COURT:  So why do you need this exhibit at all?

 4              MR. TAYBACK:  Because of the date, that it was

 5    implemented as of September.

 6              THE COURT:  Let me hear from the government.

 7              MR. FOLLY:  Your Honor, I think this is classic

 8    hearsay.  This is a statement by Dan Erickson, not Jim

 9    Patterson.  It's completely unclear how the defendant is trying

10    to use this for state-of-mind evidence as to Jim Patterson, who

11    then makes a statement.

12              The line of cross that he wants to pursue, he's asked

13    questions along similar lines already, he can ask him factual

14    questions if he wants to get at this topic, but I think he's

15    trying to use statements that are made here by Dan Erickson for

16    their truth, which is just precluded.  It's not permissible

17    under the rules.

18              THE COURT:  So I will sustain the objection.  Usually

19    the state-of-mind exception to the hearsay rule is satisfied by

20    a -- I'm sorry -- forgive me.  Before I continue that, who is

21    the author?  This is by Dan Erickson.

22              MR. TAYBACK:  The author is Dan Erickson.  A recipient

23    is listed at the bottom, Mr. Patterson.

24              THE COURT:  So usually the state-of-mind exception is

25    for statements made by the witness or a defendant to show -- or

1    any other person -- to show what's in their mind at the time.

2    So it's not received for the truth of what that person said but

3    to show what was in that person's mind.  Here we have not a

4    statement by Mr. Patterson but a statement by Mr. Erickson that

5    makes a strong statement, quote, we made this change to

6    mitigate some risk, etc., etc., and goes on at some great

7    length to what is his understanding, Mr. Erickson's

8    understanding, his theory, etc., etc.  So the mere fact that

9    Mr. Patterson was a recipient doesn't mean that this in any

10   way, shape, or form shows his state of mind.

11          Furthermore, even if it did, there would be a 403

12   problem, given the length and the complexity of this particular

13   document.

14          So the objection is sustained.

15          See you all in an hour.

16          (Luncheon recess)

17          (Continued on next page)

18              A F T E R N O O N   S E S S I O N

19                        1:50 p.m.

20          (Jury not present)

21          THE COURT:  How much longer do you have, Mr. Tayback?

22          MR. TAYBACK:  I'd say about an hour to an hour and ten

23   minutes.

24          THE COURT:  OK.

25   JAMES PATTERSON, resumed.

L3FAWEI4ps                    Patterson - Cross

1           (Jury present)

2           THE COURT:  I should note for the record that Juror

3    No. 6 took me up on my suggestion.  Excellent.

4           OK.  Counsel, go ahead.

5    CROSS EXAMINATION (Cont'd)

6    BY MR. TAYBACK:

7    Q.  Mr. Patterson, where we left off was, the use of the term

8    Eaze Payments as a descriptor came into use at some point,

9    correct?

10   A.  Yes.

11   Q.  And you would agree that Eaze Payments is not misleading,

12   in terms of describing the service that the customer used if

13   they had Eaze deliver marijuana to them.

14   A.  Yes.

15   Q.  But Eaze itself is not a synonym for marijuana, correct?

16   A.  It's not a synonym, no.

17   Q.  But you had worked to establish brand recognition?

18   A.  Yes.

19   Q.  And by 2017, would you say that Eaze, in your opinion, was

20   well known in California as a marijuana delivery service?

21   A.  Yes, within California.

22   Q.  But it otherwise doesn't necessarily mean, the word Eaze

23   doesn't necessarily mean marijuana, other than the fact of

24   brand recognition, correct?

25   A.  Yes, correct.

1   Q.  If I could direct your attention --

2            THE COURT:  You may be getting too deep into the weeds

3   here.

4            MR. TAYBACK:  I'm moving on, your Honor.

5   Q.  If you could direct your attention to GX 302, which is in

6   evidence, and if you could go to page 59 of that document.

7            This is part of the longer chat, called, I think it's

8   entitled "Easy Company Chat."  Do you recall that?

9   A.  Yes.

10  Q.  I'm going to direct your attention to a portion of this

11  chat that I believe you talked about on direct.  Mr. Wong, what

12  was his job?

13  A.  Wang.  He worked for Eaze.  He was the product manager

14  overseeing the payment process.

15  Q.  I apologize.  He pronounced it Wang?

16  A.  Wang.

17  Q.  He says, "I just looked at both websites and I am concerned

18  about chargebacks."  He says, "1.  The website is very product

19  specific.  Unlike GoodeGreenBazaar, visitors will immediately

20  think they were mischarged and issue a chargeback."

21           What did you understand Mr. Wang's concern to be

22  there?

23  A.  That the descriptor websites, the new ones that he was

24  talking about, that they, instead of being ones that looked

25  like more customer service-oriented websites, that they looked

1  like stores, like e-commerce product-specific -- I think when

2  he says "product specific," he's talking about the fact that

3  these websites look like they're selling other types of

4  products, not marijuana, but other types of products.

5  Q.  And just to be clear, in terms of timing, this is now in

6  the early period of time we talked about when the descriptor,

7  either Online Billing or then Eaze Payments was used, this is

8  now later, after Clearsettle, correct?

9  A.  Yes.

10 Q.  And you have at this point different acquiring banks, and

11 the merchants all have their own accounts, correct?

12 A.  Say that again?

13 Q.  This is now the time period where the merchants themselves,

14 the dispensaries, all have their own accounts, correct?

15 A.  Well, the merchants didn't have the accounts.  They were

16 mapped from the dispensaries to these -- to things like

17 GoodeGreenBazaar, to these other accounts.  Yes.

18 Q.  This is during the period are of time when you had decided

19 that the dispensaries should deal directly with the banks.

20 A.  The dispensaries should deal directly with the processor,

21 not the banks.

22 Q.  With the processor, as opposed to Eaze doing it on their

23 behalf, right?

24 A.  Yes.

25 Q.  So this is now a later time period, correct?

L3FAWEI4ps                    Patterson - Cross

1  A.  Yes.

2  Q.  And Mr. Wang says, "unlike GoodeGreenBazaar, visitors will

3  immediately think they were mischarged and issue a chargeback."

4  Why did you understand him to say "unlike GoodeGreenBazaar"?

5  A.  Well, GoodeGreenBazaar was a previous descriptor website

6  that was used.  In that one, what it looked like was more of a

7  customer service page.  So what they would see on that website,

8  so if you went to GoodeGreenBazaar.com, would be fields to

9  enter in your credit card information, to essentially look up

10 your account.  And then when you looked up your account, it

11 would tell you that you had purchased on Eaze.

12        So he's saying unlike that, this one looks like a

13 store, as opposed to a customer service website.

14 Q.  So is it your understanding, was it your understanding at

15 the time that GoodeGreenBazaar seemed to have customers, were

16 able to recognize that it was an Eaze transaction and go to the

17 right location?

18 A.  Well, only if they either were cookied, so there was that

19 redirect where if they were an Eaze customer, they could be

20 automatically directed away from that website, or the website

21 would prompt them to enter in their credit card information or

22 order details, and then that would do the redirect.

23 Q.  And those are the things that were put in place in order to

24 make that happen, correct?  Cookies and redirection.

25 A.  Yes.

1   Q.  And then if you go down, he says, "We had successful tests

2   for Organikals and Greenteacha."  Do you see that?

3   A.  Yes.

4   Q.  What did you understand that to mean?

5   A.  Just that they -- they're actual -- they were actually

6   functioning, in terms of, when they tested the credit card

7   transactions, those descriptors were coming across.

8   Q.  And you understood that those descriptors were going to be

9   set up the same way as GoodeGreenBazaar, correct?

10  A.  At this time I didn't -- I didn't know.

11              MR. TAYBACK:  You can take that down.  Thank you.

12  Q.  When you began working with Mr. Akhavan, were you familiar

13  with something called a merchant category code?

14  A.  Prior to working with him?

15  Q.  Yes.

16  A.  No.

17  Q.  So you learned about it after you began talking to

18  Mr. Akhavan.

19  A.  Yes.

20  Q.  Didn't Eaze experiment with using different merchant

21  category codes even before it began working with Mr. Akhavan?

22  A.  Not that I'm aware of.

23  Q.  When you began to work on determining a merchant category

24  code, what was your understanding of who decided what a

25  merchant category code should be?

L3FAWEI4ps                    Patterson - Cross

1  A.  I actually didn't know.  I, I actually didn't know who

2  decided.

3  Q.  If you could take a look at the --

4        MR. TAYBACK:  The witness only, Exhibit 415, GX 415,

5  not in evidence.  If you could just show the whole document to

6  the witness.

7  Q.  Mr. Patterson, do you recognize this document?

8  A.  Yes.

9  Q.  What is it?

10  A.  It's an email between -- it's an email internally to Eaze,

11  it appears.

12  Q.  And is it, at least at the top, it's from someone to you?

13  A.  Yes.

14  Q.  You're a recipient of this email, correct?

15  A.  Yes.

16  Q.  And is the general subject matter of this email merchant

17  category coding?

18  A.  Yes.

19  Q.  I need you to read it to yourself.

20  A.  Yes.  It's MCC codes.

21        MR. TAYBACK:  You can take that down for a moment.

22  Q.  Now, in September of 2016, isn't it true that you had --

23  you indicated that you had been working, you, Eaze, had been

24  using a merchant category code called 6012?

25  A.  Yes.  That was the one -- one of the ones used early on.

L3FAWEI4ps                      Patterson - Cross

Q.  And that was because it was a financial institution code,

correct?

A.  Well, I'm not sure if that's why we used.  That's just what

it was.

Q.  Well, didn't Eaze initially code its transactions so that

it could accept debit cards, and have to make cash for

customers, if they took 20 or 40 dollars out?

A.  I'm not sure.

Q.  Well, what's your recollection of who selected 6012 as an

initial code?

A.  I mean, my recollection was, it was selected by

Clearsettle.  I don't know -- I know I didn't select it.

Q.  Well, let me ask you this.  Isn't it true that after you

had some issues with 6012 as a merchant category code, that you

raised that issue with Mr. Akhavan?

A.  Well, I -- yeah -- well, we had issues.  I didn't realize

it was because of the merchant category code.  So I said we

were having these cash advance issues, and he said it's because

of the merchant category code.

Q.  And he in fact said that's the code you shouldn't be using;

I recommended a different code.  Correct?

A.  Well, he said if he -- you used the financial services

code, then some customers are going to get charged a cash

advance fee.  So you had to use a different code if you didn't

want that to happen.

1   Q.  He said the code you should use is 8099.  Isn't that what

2   he recommended?

3   A.  I believe so, yes.

4   Q.  And he said it was a code that means medical miscellaneous,

5   not otherwise described?

6   A.  Yes.

7   Q.  And he said that he thought that would be the most accurate

8   code.  Correct?

9   A.  He did.

10  Q.  And in fact after that you did in fact employ using 8099,

11  correct?

12  A.  Well, again, to be clear, we didn't -- we can't set -- Eaze

13  could not set the code.  They set the code.

14  Q.  And by "they" you mean the acquiring bank, the merchant

15  bank, right?

16  A.  Well, from my perspective it's Clearsettle.  I didn't

17  know -- I was only communicating with Ray and Clearsettle.  I

18  don't know who actually set it beyond that.

19  Q.  You said you were communicating with Ray, Mr. Akhavan, and

20  Clearsettle.  Who else at -- did you believe was affiliated

21  with Clearsettle that you were communicating with?

22  A.  The -- Ozan and Hussein.

23          MR. TAYBACK:  If you could put up for the witness

24  Exhibit 302, at page 2203, using the Bates stamp in the lower

25  right-hand corner, 2203.

1   Q.  This is that same chat, correct?

2   A.  Yes.

3   Q.  Now, later on, you had another issue with a merchant

4   category code in which "miscellaneous general merchandise" was

5   being used.  Do you recall that?

6   A.  No, I'm not sure of the issue with the code.

7   Q.  Let me take a look -- let me have you take a look at the

8   chat that you testified about previously, Exhibit 302, looking

9   at the bottom communications.

10          MR. TAYBACK:  Actually, if you go up one more

11  communication.

12  Q.  You see this communication where, in this chat, Mr. Akhavan

13  says, "Do you know what MCC is being used"?

14  A.  Yes.

15  Q.  And Mr. Erickson says, calls it an SIC.  Do you know what

16  an SIC is?

17  A.  I think of that as synonymous with MCC.

18  Q.  And he said it's 5399, miscellaneous general merchandise.

19  You see that?

20  A.  Yes.

21  Q.  Now, that's Mr. Akhavan asking someone at Eaze what MCC is

22  being used, correct?

23  A.  Yes, for a different processor.

24  Q.  For -- but it suggests that Mr. Akhavan is not the person

25  deciding what code to use, correct?

1          MR. FOLLY:  Objection.

2    A.  No, not at all.

3          THE COURT:  I'm sorry.  When there's an objection, you

4    have to wait.

5          I might have sustained the objection, but in light of

6    the answer given I'll just let it go.

7    Q.  Mr. Akhavan responds to Mr. Erickson and says, "In case you

8    want or can implement it, we used 8099 after testing a lot of

9    MCCs, including 5399, and 8099 is by far the best."  Correct?

10   A.  Yes.  That's what he says.

11         MR. TAYBACK:  You can take that down.

12   Q.  When you worked for Eaze, when you were the chief

13   technology officer and then the CEO, Eaze distributed products

14   beyond just marijuana, correct?

15   A.  Yes.  If you -- depending how you define "marijuana."

16   Q.  Let me put it slightly differently.  It sold things like

17   rolling papers, correct?

18   A.  Yes.

19   Q.  It sold on occasion things like T-shirts or hats, things

20   like that?

21   A.  Yes.

22   Q.  And it sold creams and oils that didn't have the active

23   ingredient, THC, in it?

24   A.  Yes.  CBD.

25   Q.  CBD.  So some things that Eaze sold during the time that

1    you were executive there did not have marijuana in it.

2    A.   Correct.

3    Q.   And it's true, isn't it, that T-shirts and hats and rolling

4    papers are not illegal under federal law, correct?

5    A.   That's right.

6    Q.   Now, Eaze never tracked whether a customer was ordering a

7    marijuana product or a product that did not contain marijuana,

8    correct?

9    A.   No.  That was absolutely tracked.

10   Q.   And was there a different code used at all for that, if you

11   know?

12   A.   At different points -- at some points yes, some points no.

13   Q.   So at some points individual codes were determined based

14   upon the product that the customer bought?

15   A.   Well, at some point there was a separate processor for CBD.

16   CBD's legal status changed and we were able to get a merchant

17   account for CBD.

18   Q.   When was that?

19   A.   I believe at some point in 2019, but -- around then.

20   Q.   And did Eaze ever have a separate merchant account for and

21   other nonmarijuana product like the T-shirts, hats, rolling

22   papers?

23   A.   No.

24   Q.   So it's fair to say that the transactions that one would

25   look at between 2016 and 2019 would be processed the same

1   whether or not a customer bought marijuana or bought just

2   rolling papers.

3   A.   Yes.

4   Q.   And that information, that is to say, the information about

5   what the customer bought, that was never to your knowledge

6   transmitted to any bank.  Correct?

7            MR. FOLLY:  Objection.

8            THE COURT:  Ground.

9            MR. FOLLY:  Foundation.

10            THE COURT:  All right.  Lay a foundation.

11   Q.   Do you know whether that information, actual products that

12   an individual customer bought, were ever transmitted from Eaze

13   to any bank?

14   A.   Not directly, but I believe it was transmitted to the

15   processor, and then what happened to it past that I can't speak

16   to.

17   Q.   So the processor -- explain to me if you can.  Eaze would

18   communicate with the processor the list of specific items that

19   an individual customer bought?

20   A.   I'm not sure that -- I'm not sure if that information was

21   transmitted to the processor.  I think --

22   Q.   You don't know one way or the other, correct?

23   A.   That's right.

24   Q.   I'm going to ask you whether you're familiar generally with

25   the application that a customer uses during the time that you

1    were there when they were to buy something from Eaze.  You're

2    generally familiar with that?

3    A.  Yes.

4            MR. TAYBACK:  Your Honor, I'd like to place in front

5    of the witness an exhibit that's not -- for identification a

6    document marked HAX10058.  It is not yet in evidence.

7    Q.  I'm going to ask you to take a look at this generally and

8    ask if you --

9            MR. TAYBACK:  If you could bring up the full page so

10   we can see the full document.  Thank you, Ray.

11   Q.  Do you recognize this as the terms of service that a

12   customer uses for Eaze?

13   A.  Yes.

14           MR. TAYBACK:  Your Honor, I offer Exhibit 10058.

15           MR. FOLLY:  Can we see the remaining portions of the

16   exhibit.

17           MR. TAYBACK:  Yes.

18           You could flip through it.

19           MR. FOLLY:  You can keep going.

20           You can keep going.  You can keep going.  You can keep

21   going.  You can keep going.  You can keep going.  You can keep

22   going.

23           Objection on relevance grounds.

24           THE COURT:  Overruled.

25           (Defendant's Exhibit HAX10058 received in evidence)

1   Q.  Mr. Patterson, before I ask you some specific questions

2   about this document, there was some testimony you gave on

3   direct about an inquiry that arose from an incident where

4   somebody under age used somebody's credit card, their parents'

5   credit card, to buy marijuana, correct?

6   A.  Yes.

7           I mean, that's what Ray told me.  I have no

8   independent information about that.

9   Q.  OK.  That was your understanding of what happened,

10  occurred, correct?

11  A.  Yes.

12  Q.  And Eaze's policy is to require identification for any

13  purchase, correct?

14  A.  Yes.

15  Q.  So it ensures the person who's purchasing is over -- is of

16  age, correct?

17  A.  Correct.

18  Q.  And that's true when it was medical marijuana and when it's

19  for all purposes, right?

20  A.  Yes.

21  Q.  And so your understanding of that incident isn't the fact

22  that the credit card was used, because -- it's the fact that

23  the person was under age.  Correct?

24  A.  Yes.  I mean -- yes, that would --

25  Q.  That was the issue.

L3FAWEI4ps                    Patterson - Cross

1    A.   That was the issue.

2    Q.   Because whether they paid cash or they paid credit card,

3    they still have to be of age to make the purchase.  Right?

4    A.   Yes.

5    Q.   Now, let me ask you a question about the terms of service

6    and how these would work.  When a customer goes on a website,

7    they're asked to agree to the terms of service before they can

8    make a purchase, right?

9    A.   Yes.  When they first sign up, there's a chat box where

10   they agree to the terms of service.

11   Q.   And if you go to the second page, there's an acknowledgment

12   of federal law and an acknowledgment of California law.  You

13   see that?

14   A.   Yes.

15   Q.   And you identify for the customers that there is this

16   tension between the federal law and state law regarding the

17   legality of marijuana?

18   A.   Yeah.  I mean, it called that out.

19   Q.   It generally identifies the two different states of the

20   law, correct?

21   A.   Yes.  It says illegal under federal law, legal under state

22   law.

23   Q.   Then if you go to page 5, you have some conditions that

24   individual consumers have to agree to, to use the application,

25   correct?

L3FAWEI4ps                     Patterson – Cross

1   A.   Yes.

2   Q.   And the first one says, "You will only use the service or

3   application for lawful purposes; you will not use the services

4   for sending or storing any unlawful material or for fraudulent

5   purposes."  You see that?

6   A.   Yes.

7   Q.   And was it your understanding on behalf of Eaze that a

8   consumer making a purchase was not, to agree to that, was not

9   violating the law?

10            MR. FOLLY:  Objection.

11            THE COURT:  Sustained.

12  Q.   So is it fair to say, Mr. Patterson, that you expected

13  customers to make purchases in compliance with your terms and

14  conditions, notwithstanding the statements of federal and state

15  law you put in here in terms of use?

16  A.   Yes.

17            MR. TAYBACK:  You can take that down, Mr. McLeod.

18  Q.   Now, after a customer agrees with the terms of use, they

19  also identify their method of payment, right?

20  A.   They identify the method of payment when they do their

21  first checkout.

22  Q.   So they make an order, and then they determine how they're

23  going to pay, correct?

24  A.   Yes.

25  Q.   And at that point their order would be processed?

1    A.  Yes.

2    Q.  And Eaze would make the delivery, right?

3    A.  The dispensary would make the delivery.

4    Q.  And at some later point in time -- well, withdraw that.

5            And then later, the payment to Eaze, or the payment to

6    the dispensaries, to fulfill the order, would have to be

7    reconciled, correct?

8    A.  If it was not a cash transaction, yes.

9    Q.  And that reconciliation process was done by Eaze?

10           Let me withdraw that.

11           At any point in time, was that reconciliation process

12   done by Eaze?

13   A.  I'm not sure whether you're -- I'm not sure what

14   encompasses "reconciliation process."

15   Q.  I'll rephrase the question.

16           So during the period of time when the billing

17   descriptor was Eaze Payments -- remember that, in 2016, 2017 --

18   isn't it true that those credit card payments ultimately went

19   to Eaze, for Eaze to distribute to the dispensaries?  Correct?

20   A.  A couple of things.  The descriptor is only Eaze Payments

21   for about three months.  And so my knowledge, no payments were

22   ever made directly -- no credit card disbursements were ever

23   made directly to Eaze.  It always went to the dispensaries.

24   Q.  You agree that, in the beginning, a concern was that the

25   dispensaries themselves didn't have the direct relationship of

1    the processors, correct?

2    A.   Sorry, can you rephrase it?

3    Q.   Sure.  At some point in 2018, you decided the dispensaries

4    themselves should have the relationship with processors,

5    correct?

6    A.   Yeah.  So after recreational, so once the dispensaries had

7    business licenses, then the company decided that they should

8    fill out an application -- they should directly fill out

9    merchant applications, yes.

10   Q.   And prior to that, they weren't filling out those

11   applications, right?

12   A.   No, because they were not -- they were considered

13   nonprofits and didn't have business licenses.

14   Q.   And so the proceeds from the sales, through the credit card

15   companies, before these individual dispensaries opened

16   accounts, went where?

17   A.   My understanding is the money went to the merchant accounts

18   in Europe and then was disbursed to the dispense -- directly to

19   the dispensaries' bank accounts.

20   Q.   Because as you are sitting now you don't -- you didn't have

21   any visibility in that process?

22   A.   No.  Well, I know that the money didn't come to Eaze.

23   Q.   But it was in fact important to you to make sure the

24   dispensaries got paid, correct?

25   A.   Yes.

L3FAWEI4ps                    Patterson - Cross

1   Q.  Because they were your provider of your products, correct?

2   A.  Yes.

3   Q.  And in fact one of your goals, in finding a credit card

4   solution, was to ensure that everybody involved got paid what

5   they were owed, correct?

6   A.  Yes.

7   Q.  That meant that Eaze would make some money for the service

8   it was providing, correct?

9   A.  Yes.

10  Q.  And the dispensaries would be paid for the products they

11  were providing, correct?

12  A.  Yes.

13  Q.  And the consumers would get the products that they were

14  providing, or that they requested, correct?

15  A.  Yes.

16  Q.  And the banks and intermediaries in between would get the

17  percentages that they take under their agreement, correct?

18  A.  Yes.

19  Q.  You never intended to cause anyone to lose any money,

20  correct?

21  A.  That's right.

22  Q.  And to your knowledge, no one did lose any money on the

23  credit card purchases.  Correct?

24  A.  Correct, to my knowledge.

25  Q.  Now, you've talked a little bit about Clearsettle, and I

1    think you said that you have identified it as being

2    Mr. Akhavan?

3    A.  Well, that was how it was explained to me, mostly through

4    Keith.  Keith just told me that we are working with Clearsettle

5    and that he -- the way he sort of described that was, that was

6    Ray.

7    Q.  And have you ever described Clearsettle as being just a

8    gateway?

9    A.  A payment gateway, yes.

10        MR. TAYBACK:  You could put up Exhibit 435 just to

11   this witness.

12   Q.  Do you recognize this document?

13   A.  Yes.

14   Q.  What is this?

15   A.  This is a Slack conversation within Eaze.

16   Q.  Before I ask you some questions about that, you've talked

17   about some various platforms on which people communicate.  I

18   think you've referred to Slack a couple times.  That's a

19   communication platform?

20   A.  Yes.  Internal only.

21   Q.  It was internal to Eaze, correct?

22   A.  Yes.

23   Q.  And then does -- did you also use a company called Facebook

24   Messenger?

25   A.  Yes.

1   Q.  It was also a platform for communicating internally?

2   A.  Internally, yes.

3   Q.  And I think you said you used Telegram, too, correct?

4   A.  Telegram is for external.

5   Q.  And you have used -- in fact your understanding was that

6   Telegram was something that was not uncommon in the cannabis

7   industry, right?

8   A.  That's right.

9   Q.  So before Mr. Akhavan, you were aware of Telegram, correct?

10  A.  Yes.

11  Q.  And Mr. Akhavan told you that he travels abroad a lot?

12  A.  He does, yes.

13  Q.  And did he tell you that Telegram was better for him when

14  he traveled abroad than other communication platforms?

15  A.  Yeah, better than -- better than text message, yes.

16  Q.  Now, you've talked about, briefly you've talked about the

17  fact that you can delete or auto-delete certain accounts on

18  Telegram.  Did you ever delete your accounts?

19  A.  Well, my account was automatically deleted because I

20  stopped using it for a year.

21  Q.  And to your knowledge, do you know whether Mr. Akhavan ever

22  deleted any of his communications with you?

23  A.  Well, there was a -- Telegram did have a feature called

24  "self-destruct timer," and during some conversations he did set

25  the self-destruct timer, which would automatically delete

1   certain messages after a period of time, say a day or a week.

2   So sometimes that was used.

3   Q.  And that chat feature that you just described, is that

4   something that you saw at all in any of the chat messages that

5   you looked at?

6          That is to say, you looked at Telegram messages

7   earlier, correct?

8   A.  Yes.

9   Q.  And those appeared to be complete to you?

10  A.  Yes.  That particular feature is only available in one to

11  one, not group conversations.

12  Q.  And have you done anything to try to retrieve those chats

13  in any way?

14  A.  My phone was imaged by the company.

15  Q.  And have you done anything to see whether you still have

16  those chats?

17  A.  I logged into my Telegram account, and it's gone -- and

18  it's been deleted.

19  Q.  So when you say that was set, did you say anything to

20  Mr. Akhavan about setting this timer?

21  A.  Say that again?

22  Q.  Did you say anything to Mr. Akhavan about not -- this timer

23  when he told you that you were going to set a timer to delete

24  messages?

25  A.  Well, he didn't tell me.  He would just -- when you set it,

L3FAWEI4ps                          Patterson - Cross

1    the other person can see that it was set on particular

2    messages.  We never discussed the setting of it.

3              (Continued on next page)

1  Q.  But you didn't ask.  You saw it, but you didn't ask?

2  A.  I saw it, and I didn't ask.

3  Q.  The messages, how often would you say he did that?

4  A.  It's hard to say.  Periodically.

5  Q.  But none of the messages that you've seen today were ever

6  subject to that deletion policy --

7  A.  That's correct.

8  Q.  -- is that correct?

9       Now, let me ask you to take a look at this Exhibit

10 435.  You're communicating here internally with people about

11 credit card processing issues?

12 A.  Yes.

13 Q.  If you could look at the middle box.  Withdraw that.

14      These messages read from top to bottom, correct,

15 unlike an e-mail?

16 A.  Yes.

17 Q.  Do you see there's a message from a person named Stef

18 VanDyke; do you see that?

19 A.  Yes.

20 Q.  Who is that?

21      MR. FOLLY:  Objection.  Not in evidence.

22      MR. TAYBACK:  I'll rephrase the question.

23 Q.  Who is Stef VanDyke?

24 A.  She was an Eaze employee who worked with the dispensaries.

25 Q.  This e-mail -- withdraw that.

1    MR. TAYBACK:  Your Honor, at this time, I'd offer

2  Exhibit 435 in evidence.

3    MR. FOLLY:  Objection.  Hearsay.

4    MR. TAYBACK:  Witness state of mind.

5    THE COURT:  Well, the statements of the witness might

6  be admissible to show his state of mind, but I don't see the

7  relevance of this state of mind to anything in the case.

8    MR. TAYBACK:  Let me ask a few more questions, your

9  Honor, if I may.

10    THE COURT:  Okay.

11  BY MR. TAYBACK:

12  Q.  Do you recall in late 2017, approximately, a discussion

13  about whether the dispensaries would be receiving the

14  settlements from Clearsettle, or whether they would go through

15  Eaze?

16  A.  No.  I mean, there was never any point that it was even

17  considered that payments -- settlements would go through Eaze.

18  Q.  Who is Marty?

19  A.  Marty is -- was the owner of Hometown Heart, which was one

20  of Eaze's dispensaries.

21  Q.  And do you recall being asked whether Marty at Hometown

22  Heart wanted to know who to hold accountable if they're not

23  getting paid, correct?

24  A.  Yes.

25  Q.  And isn't it true that your answer was:  We're responsible?

L3FPWEI5                          Patterson - Cross

Eaze is responsible; Clearsettle is just a gateway?

A.   Well, so there's a bit of confusion here in that
Clearsettle was a term that was used to describe everything,
but that there was also a Clearsettle that was actually a
company that was actually a payment gateway.

          The problem was Marty was contacting Clearsettle, the
payment gateway, and that is true that they were not
responsible for the actual settlements.  So when we say we're
responsible, it's just that we wanted the dispensaries to
coordinate with us rather than them reaching out directly to
Clearsettle, which they didn't understand was just the
technical payment -- it actually, technically, was the payment
gateway.

Q.   So it is true, isn't it, that when you were asked in
December of 2017 who the dispensaries should contact regarding
ensuring payment, that they are paid timely, you said, you
should contact Eaze, not Clearsettle; they're just a gateway,
correct?

A.   Yes.

Q.   Now, you talked a little bit on direct about the
alternatives beyond the credit card processing arrangements
that Mr. Akhavan introduced you to; do you recall that?

A.   Yes.

Q.   You said that you had looked at dozens of alternatives?

A.   Yes.

1   Q.  I'm going to ask you about a few of them.  There is a

2   company called Icanpay; you used them?

3   A.  Yes.

4   Q.  They're an Asian acquiring bank, aren't they?

5   A.  Yes.  Yeah, the bank was based in Asia.

6   Q.  You didn't have any concern using a bank that was based

7   outside the United States, correct?

8   A.  Well, we were already using a bank in Europe; so, no.

9   Q.  So you did not, correct?

10  A.  I wouldn't say no, there were no concerns.

11  Q.  What were your concerns?

12  A.  Well, for one, we were not having visibility; and two, the

13  regulation overseas, that was a big one.  Our preference was to

14  find a U.S. bank -- a U.S. processor and U.S. bank, but this

15  particular one happened to be in Asia.

16  Q.  And you were hoping that it would work regardless of where

17  it was located, correct?

18  A.  Yes.

19  Q.  And did you ask them what merchant name they would use to

20  process these transactions?

21  A.  Well, this one, John Wang was doing most of the work.  I

22  know they had a descriptor.  I just don't remember what it was

23  in this case.

24  Q.  And do you know what merchant category code they were

25  using?

 1  A.  I don't know.

 2  Q.  You weren't worried about that being a crime at that point

 3  in time, correct?

 4  A.  No, not at that point.

 5  Q.  And, in fact, ultimately, that didn't work out, right?

 6  A.  That's correct.

 7  Q.  They were unsuccessful in terms of being able to process

 8  the credit card transactions that Eaze had hoped?

 9  A.  Yes.

10  Q.  Was currency conversion also an issue that you had to deal

11  with?

12  A.  The only time I remember doing currency conversion was with

13  the EUprocessing setup.

14  Q.  When Icanpay ceased working, were there monies still being

15  held by Icanpay?

16  A.  Either Icanpay or the banks.  The money was with -- the

17  reserves were withheld.

18  Q.  You mentioned the word "reserves;" what are reserves?

19  A.  Reserves are money that either a bank or processor

20  withholds, usually about ten percent of the transactions, to

21  cover any future chargebacks or fraud or other issues.  It's a

22  standard thing in payment processing, to my understand.

23  Q.  Now, when Eaze was processing through Clearsettle, did

24  Clearsettle insist on having reserves?

25  A.  Yes.

L3FPWEI5                         Patterson - Cross

1   Q.  Who paid for those reserves?

2   A.  Well, there was money withheld that was owed to the

3   dispensaries.

4   Q.  So when they first started, there were no reserves until

5   money accumulated; is that your understanding?

6   A.  Yes.

7   Q.  And then when the processing changed and moved to other

8   banks and entities in 2018, did those banks require reserves?

9   A.  Yes.

10  Q.  And how were those reserves funded?

11  A.  The same way.  They withhold a percentage of the payments

12  on a rolling basis.

13  Q.  But it's your understanding that there were no reserves

14  when they first began processing until they began to make

15  sales?

16  A.  Yes, that's right.  The reserves come from the -- come from

17  withholding the processing; so at the very beginning, it's

18  zero.

19  Q.  Did Mr. Akhavan ever tell you that he had used his other

20  businesses to collateralize reserves so that Eaze could access

21  these banks?

22  A.  Yes, he did say that.

23  Q.  So your understanding is there was a reserve available, and

24  Mr. Akhavan personally had placed it up through other

25  businesses he had?

1    A.  Well, I'm not sure why you need a reserve when you weren't

2    processing, but he did say at times that when sometimes

3    reserves were withheld, that he used his other businesses to --

4    as collateral so that the Eaze merchants could get paid.

5    Q.  Now, other companies that you looked at were a company

6    called CardConnect, correct?

7    A.  Yes.

8    Q.  And they were based in the United States?

9    A.  Yes.

10   Q.  And that was not a successful solution for Eaze, correct?

11   A.  Correct.  About a month into processing, those accounts

12   were frozen.

13   Q.  And then 3Rodeo that was another solution?

14   A.  That one, I'm not familiar with.

15   Q.  How about Perfect Processing?

16   A.  Sounds familiar.  Possibly our CBD processor.

17   Q.  And how about Mile High Risk?

18   A.  Yes, Mile High Risk.

19   Q.  And did you use them?

20   A.  I think they were CBD, as well.

21   Q.  So you may have used them for CBD?

22   A.  Yes.

23   Q.  But is it safe to say that before you went back to using

24   the relationships that Mr. Akhavan had, that ultimately your

25   exploration of other alternatives were unsuccessful?

L3FPWEI5                        Patterson - Cross

1    A.  Well, when we decided to go back, we actually were

2    processing with Icanpay.  After -- it got shut down after we

3    had sort of made the decision to start processing again.

4    Q.  Now, just to understand the timing.  I believe you said

5    that marijuana was legalized for all purposes effective

6    January 1st of 2018 in California, correct?

7    A.  Yes.

8    Q.  And at that time, you were anticipating -- well, withdraw

9    that.

10           At that time, you had to pause all credit card

11   processing because the dispensaries largely weren't licensed,

12   correct?

13   A.  Yes.

14   Q.  So they needed time to become licensed under this new

15   regime?

16   A.  Yes, they needed time.

17   Q.  And your idea to have the dispensaries have the

18   relationships directly with the processors, why did you do

19   that?  Why did you want that to happen?

20   A.  I'm not sure I can answer.  It wasn't necessarily my -- it

21   wasn't my decision.

22   Q.  But it wasn't Mr. Akhavan's decision?

23   A.  No, it wasn't his decision.

24   Q.  So someone else you were consulting with provided

25   information to you that led you to want to do it that way,

1    correct?

2    A.  Yes.

3    Q.  And, in fact, when you raised it with Mr. Akhavan, his

4    response was, it's up to you what you want to do, yes?

5    A.  In terms of dispensaries filling out the applications or

6    not?

7    Q.  Yes.

8    A.  Yes.

9    Q.  And he said, if you want to do it that way, that's fine,

10   and if you want to do it through Eaze, that's fine, too,

11   correct?

12   A.  Yes.

13   Q.  He was leaving those decisions to you, as the CEO of Eaze,

14   correct?

15   A.  To the company, yes.

16   Q.  And you were the CEO at that time?

17   A.  Yes.

18   Q.  Now, you mentioned a meeting that occurred in early 2018 at

19   Mr. Akhavan's office.  Now, we saw an invitation that said

20   "Clearsettle meeting;" do you recall that?

21   A.  Yes.

22   Q.  That was an invitation that you had sent out, correct?  You

23   organized that meeting?

24   A.  Yeah, that particular calendar invitation was just for me

25   and Nick.  That wasn't what was sent out to the dispensaries.

L3FPWEI5                         Patterson - Cross

1   Q.  But the calling it a Clearsettle meeting, those were your

2   words, correct?

3   A.  Yes.

4   Q.  It wasn't Mr. Akhavan who sent that out, right?

5   A.  No.

6   Q.  And when you went to Mr. Akhavan's office for that early

7   meeting, or any meeting, you never saw any branding that

8   suggested Clearsettle was located there, correct?

9   A.  No.

10  Q.  Now, in a subsequent meeting, you indicated that

11  Mr. Akhavan had insisted that the dispensaries all have a

12  representative there, right?

13  A.  Yes.

14  Q.  You understood that he wanted to be able to explain to them

15  firsthand that if they were going to be the merchants of

16  record, that they needed to understand the whole process,

17  correct?

18  A.  Well, they were not going to be the merchants of record.

19  Q.  They were going to be the merchants who ultimately

20  benefited from the credit card processing, correct?

21  A.  Yes.

22  Q.  And so he explained that they needed to fill out the

23  applications for the bank accounts, correct?

24  A.  Yes.

25  Q.  And that's with the acquiring banks?

L3FPWEI5                        Patterson - Cross

1   A.   Yes.

2   Q.   The merchant banks you called them?

3   A.   Merchant banks.

4   Q.   And he said they need to be truthful, correct?

5   A.   He did.

6   Q.   And he explained how merchant category codes work?

7   A.   Yes.

8   Q.   And he explained how descriptors work?

9   A.   Yes.

10  Q.   And he explained again at that time to try to pick a

11  merchant category code or make sure to pick a merchant category

12  code that was closest to what describes what they do, right?

13  A.   He said that the ones he -- yes, the ones he used were the

14  closest because they were just generic medical services.

15  Q.   And around this time, you also had decided that you weren't

16  going to continue to use Clearsettle, right?

17  A.   Around the time of this meeting?

18  Q.   Yes.

19  A.   Well, no.  I'm not sure what you mean.

20  Q.   Well, at some point, I think you used to use the term

21  EUprocessors?

22  A.   I never used that term, no.

23  Q.   You never used the term EUprocessors?

24  A.   Well, so this whole -- the reason I even made the meeting

25  called Clearsettle meeting was because I was still under the

1    impression that the setup was going to be the same as it was.

2    When things actually started working, it was clear that it was

3    different.  The API was different, and the e-mail that was set

4    up for the dispensaries, it was just called EUprocessing.  So

5    we just started calling it that.

6    Q.  When you say the API is different, what's the API?

7    A.  So that is the -- the technical endpoint that we were --

8    that Eaze's system was talking to, the gateway.  So it was no

9    longer Clearsettle's gateway.

10   Q.  One thing you were anticipating in this new arrangement is

11   that there would be multiple merchants who needed to get

12   applications on file, correct?

13   A.  Yes.

14   Q.  As opposed to one.  And that there were going to be a

15   larger volume of sales because marijuana had been legalized

16   more broadly in California, correct?

17   A.  Well, actually, the volumes of sales was lower,

18   substantially lower, because of the licensing issues.  It

19   really didn't reach parity for about a year into recreational.

20   Q.  Your expectation was that however long it would take, it

21   would become more because it was broadly legal?

22   A.  Yes, over time.

23   Q.  And that's what you were anticipating when you decided to

24   implement this new credit card solution in 2018?

25   A.  Well, I don't think the growth had anything to do with it.

1   Q.  Did you ever ask why you seemed to be dealing with a

2   different processor?

3   A.  No.  At that point, I didn't ask any questions.

4   Q.  You talked about --

5            MR. FOLLY:  May I have one moment, your Honor?

6            THE COURT:  Okay.

7   Q.  You described how you felt threatened by Mr. Akhavan; do

8   you recall that?

9   A.  Yes.

10  Q.  You never saw Mr. Akhavan strike anybody, correct?

11  A.  That's correct.

12  Q.  You never saw Mr. Akhavan brandish a weapon of any sort,

13  correct?

14  A.  I never saw that, no.

15  Q.  In fact, Mr. Akhavan, would you say, is about

16  five-foot-nine?

17  A.  Yes, something like that.

18  Q.  About 150 pounds or so?

19  A.  Yes.

20  Q.  You found him intimidating, though, correct?

21  A.  Yes.

22  Q.  Did you ever report to anybody, the board of directors or

23  anybody, at Eaze that you thought Mr. Akhavan was intimidating

24  and you weren't comfortable doing business with him?

25  A.  I did say that I wasn't comfortable doing business with

1    him.  I didn't say that -- I didn't tell the board that I had

2    been directly threatened.

3    Q.  Well, you say you were directly threatened.  Did

4    Mr. Akhavan -- when Mr. Akhavan -- can we put up that text, if

5    you can?  Put up the Exhibit 301.

6          Do you see this exchange that you have, that you

7    talked about on direct?

8    A.  Yes.

9    Q.  Shortly after this, in fact, the processing that you were

10   doing with other merchants was, in fact, shut down, correct?

11   A.  Yes.

12   Q.  And that was to your detriment, correct, the company's?

13   A.  We had other ones.  Icanpay shut down, and we started with

14   CardConnect.

15   Q.  And didn't Mr. Akhavan essentially tell you if you wind up

16   doing it with these other companies, that it could cause

17   problems?

18   A.  No.  I mean -- no.

19   Q.  Take it down.  He told you that if you deal with other

20   companies that are going to lie to the banks about what's

21   happening, that it's going to cause problems for your ability

22   to process going forward, correct?

23   A.  Well, he said -- yes, he said if -- what he said was if you

24   lie to the merchant banks, then they could seize your funds,

25   seize your reserve.

L3FPWEI5                         Patterson - Cross

1    Q.  And that's, in fact, what happened, correct, with Icanpay?

2    A.  The funds were seized, yes.

3    Q.  Let me ask you some questions about your guilty plea.  So

4    when you heard that this case was charged, that was in March of

5    2020?

6    A.  Yes, March.

7    Q.  And you learned and you realized Mr. Akhavan had been

8    charged with bank fraud, conspiracy to commit bank fraud,

9    correct?

10   A.  Yes.

11   Q.  You didn't go to the government in March of 2020 and say

12   I've got information that's relevant to this, correct?

13   A.  Actually, I had my attorney reach out to them, yes.

14   Q.  But you didn't talk to the government in March, correct?

15   A.  No, I didn't.

16   Q.  You didn't talk to them in April?

17   A.  No.

18   Q.  You didn't talk to them in May?  Didn't talk to them in

19   June?

20   A.  No.

21   Q.  You didn't talk to them until October, correct?

22   A.  That's correct.

23   Q.  And the first time you talked to them was about four --

24   about five months ago now, correct?

25   A.  Six, yes.

1    Q.  Isn't it fair to say that your first reaction when you

2    learned that the case had been charged, is that you don't want

3    to be implicated, correct?

4    A.  No, I wouldn't say that's fair to say, I don't want to be

5    implicated.

6    Q.  Was one of your first thoughts that you didn't want to go

7    to jail?

8    A.  Yes.

9    Q.  And one of your other thoughts is you really don't like Ray

10   Akhavan; so you're happy to see him go to jail?

11          MR. FOLLY:  Objection.

12   A.  No, I don't think that's true.  I'm not happy to see anyone

13   go to jail.

14   Q.  Well, it's true that you don't like him, correct?

15   A.  No, that's not true.

16   Q.  So when you agreed to plead guilty in this case, that

17   wasn't in October of 2020, correct?

18   A.  Sorry, say that again?

19   Q.  I'll withdraw it.

20          You agreed to plead guilty in this case on

21   January 25th of 2021, correct?

22   A.  Around then.

23   Q.  So you had been speaking to the government in October,

24   November, December and part of January, correct?

25   A.  Yes.

1  Q.  All before you decided to actually plead guilty; is that

2  right?

3  A.  Yes.

4  Q.  And your guilty plea is subject to an agreement under which

5  you are hoping to get probation, right?

6  A.  Yes.

7  Q.  And you understand that one measure of your level of

8  cooperation is how you perform at trial, right?

9  A.  No, I wouldn't say that, how I perform.

10  Q.  You understand that it's the government that you've given

11  all your statements to, correct?

12  A.  Yes.

13  Q.  And it's the government that's going to make a

14  recommendation on your behalf if they believe that you're being

15  truthful, correct?

16  A.  I mean, my understanding is that I have to be -- I have to

17  be truthful, and they will make the recommendation.

18  Q.  And in terms of deciding whether you have been truthful or

19  not, you understand that the government's going to assess that?

20  A.  I mean, I'm just thinking about telling the truth.  It's

21  hard to say who's assessing the truth.

22  Q.  Now, one aspect of your plea agreement was not that you had

23  to forfeit any of the stock that you own in Eaze, correct?

24  A.  No, my understanding is that will be determined at

25  sentencing.

L3FPWEI5                          Patterson - Cross

1    Q.  But no one has told you you have to forfeit the stock that

2    you own in Eaze, correct?

3    A.  No, not at this time.

4    Q.  And, in fact, you're hoping that Eaze goes on to become a

5    very successful company?

6    A.  I am.

7    Q.  That would inure to your benefit, right?

8    A.  Yes.

9    Q.  Your financial benefit?

10   A.  Yes.

11   Q.  Because you own 1.5 percent of the company, correct?

12   A.  Yes.

13              MR. TAYBACK:  May I have one moment, your Honor?

14              THE COURT:  Yes.

15              (Pause)

16              MR. TAYBACK:  I do have a couple more questions, but

17   they're brief.

18   BY MR. TAYBACK:

19   Q.  Mr. Patterson, at some point in time, you've said that

20   Mr. Akhavan had an obsession with customer service?

21   A.  Well, I think the obsession was around keeping chargebacks

22   low.

23   Q.  And we've talked about chargebacks; so I'm going to focus

24   on the customer service component.

25              It was Mr. Akhavan's idea to ensure that there were

1    cookies that would redirect a customer, regardless of whatever

2    descriptor was used, that would redirect the customer himself

3    or herself to the Eaze website, correct?

4    A.   Was it his idea?

5    Q.   Was it?

6    A.   I actually don't know whose idea that was.

7    Q.   And the telephone number is intended to link -- the numbers

8    would be directed to the Eaze customer service office, right?

9    A.   In the second EUprocessing phase, yes.

10              MR. TAYBACK:  I have no more questions.

11              THE COURT:  All right.  Thank you very much.

12              Mr. Gilbert?

13   CROSS-EXAMINATION

14   BY MR. GILBERT:

15   Q.   Mr. Patterson, you testified that you started working at

16   Eaze in 2016, correct?

17   A.   Yes.

18   Q.   May of 2016?

19   A.   May, yes.

20   Q.   Eaze was an all-cash business at that time?

21   A.   That's correct.

22   Q.   You were there before they started taking any credit cards,

23   correct?

24   A.   Yes.

25   Q.   And you were there when Eaze first started accepting credit

1  cards in 2016, correct?

2  A.  Yes.

3  Q.  And you've testified that that was done, to your knowledge,

4  using merchant accounts in Europe, correct?

5  A.  Yes.

6  Q.  And it was your understanding that the merchant banks in

7  Europe understood that the accounts were for marijuana,

8  correct?

9  A.  That at least some people at the banks knew, yes.

10 Q.  The powers that be at those merchant banks in Europe knew

11 that they were dealing with marijuana transactions, correct?

12 A.  Yes, the -- but what it was, the owners or executives.

13 Q.  And that system was in place in 2016, correct, a

14 Clearsettle system, as you've called it?

15 A.  Yes.

16 Q.  And in 2017?

17 A.  Through 2017.

18 Q.  And in that time period, you were promoted to the CEO of

19 the company, correct?

20 A.  It wasn't exactly a promotion.

21 Q.  Well, you were -- you were in a position that was lower

22 than the chief executive officer of the company, correct?

23 A.  Yes.  I was sort of the interim CEO.  I mean, the agreement

24 with the board.  It wasn't, in my mind, a promotion.

25 Q.  There's no higher position than the CEO of Eaze, correct?

1    A.   Sure, if you want to say "higher," but it...

2    Q.   And, Mr. Patterson, to the best of your knowledge, my

3    client, Ruben Weigand, had no involvement whatsoever with Eaze

4    credit card processing in 2016 or 2017, correct?

5    A.   That's correct.

6    Q.   The entire time the processing was done through

7    Clearsettle, you, sir, never spoke a word to Mr. Weigand,

8    correct?

9    A.   That's right.

10   Q.   And you had no communications of any kind with Mr. Weigand,

11   correct?

12   A.   Correct.

13   Q.   And to the best of your knowledge, not a single person at

14   Eaze had any contact in any form with my client, Ruben Weigand,

15   during the entire period Eaze was processing through

16   Clearsettle in 2016 and 2017; is that correct?

17   A.   Yes, that's correct.

18   Q.   And you became the CEO in December of 2016; is that

19   correct?

20   A.   Yes.

21   Q.   And while you were the CEO, it was important for you to

22   understand who it was the company was dealing with in important

23   relationships, correct?

24   A.   Yes.

25   Q.   It was important to know who the vendors were to the

L3FPWEI5                      Patterson - Cross

1   company, correct?

2   A.  Yes.

3   Q.  Who the service providers were, correct?

4   A.  Yes.

5   Q.  And the consultants, correct?

6   A.  Yes.

7   Q.  And credit card processing was absolutely critical to the

8   business of the company, was it not?

9   A.  Yes.

10  Q.  A significant amount of the company's revenues were

11  generated through credit cards, correct?

12  A.  Yes.

13  Q.  In fact, there was a period of time you testified about

14  where the credit card processing stopped and the revenues

15  tumbled, didn't they?

16  A.  Yes, it would drop around 60 percent.

17  Q.  60?  I'm sorry, did you say 60 percent?

18  A.  Six-zero.

19  Q.  And in 2018, you testified that Eaze switched its credit

20  card processing mechanism to some extent, correct?

21  A.  Yes.  Well, we reengaged it.  It was a different setup the

22  second time.

23  Q.  And that started in approximately 2018?

24  A.  Yes.

25  Q.  And that -- have you referred to that as EUP?

L3FPWEI5                          Patterson - Cross

1    A.   Yeah, EUprocessing.

2    Q.   And that EUprocessing was used, to your knowledge, from

3    approximately April of 2018 through the time you left the

4    company in 2019; is that correct?

5    A.   No, not until I left the company.  We stopped working with

6    EUprocessing in June of 2019.

7    Q.   So it ran from approximately April of 2018 to approximately

8    June of 2019?

9    A.   Yes.

10   Q.   And when did you leave the company?  Was it June of 2019?

11   I'm sorry.

12   A.   In September of 2019.

13   Q.   And in all the time that you were the CEO of the company

14   while Eaze was using the EUP processing, it's true, is it not,

15   that you never spoke to Ruben Weigand?

16   A.   That's right.

17   Q.   You never met Ruben Weigand?

18   A.   No.

19   Q.   When the government asked you, on direct examination, to

20   point to anyone in the courtroom who worked with you in what

21   you say was a bank fraud, you did not identify Ruben Weigand;

22   is that correct?

23   A.   That's correct.

24   Q.   And to the best of your knowledge, Ruben Weigand was never

25   an employee of Eaze, correct?

L3FPWEI5                         Patterson - Cross

1   A.  Correct.

2   Q.  He was never paid any money by Eaze for any services,

3   correct?

4   A.  Not to my knowledge.

5   Q.  Or for anything at all, correct?

6   A.  Correct.

7   Q.  To the best of your knowledge, Ruben Weigand never owned a

8   share of stock in Eaze?

9   A.  Correct.

10  Q.  To the best of your knowledge, Ruben Weigand never had any

11  stock options in Eaze, correct?

12  A.  Correct.

13  Q.  And to the best of your knowledge, Ruben Weigand never had

14  any kind of agreement with Eaze of any kind, correct?

15  A.  That's correct.

16  Q.  Now, you've testified on direct examination you believed

17  you were committing bank fraud from 2016 to 2019; is that

18  correct?

19  A.  No, I would say I believed -- it's hard to say exactly when

20  I started -- when I new for sure, but certainly before I left

21  the company.

22  Q.  What did you plead guilty to, sir?

23  A.  I'm saying I knew before I left the company.  Just, you're

24  saying from 2016 to 2019.

25  Q.  Yeah, no, my question is, in 2016, did you believe you were

1  engaged in the crime of bank fraud --

2  A.  No.

3  Q.  -- for your work at Eaze?  You did not?

4          Did you plead guilty to conspiracy to commit bank

5  fraud in the year 2016, to your knowledge?

6  A.  I'm not sure about the -- I'm not sure if it's scoped to a

7  specific --

8          THE COURT:  I think we may need a sidebar unless you

9  want to go on.

10          MR. GILBERT:  I'll move on, your Honor.

11  BY MR. GILBERT:

12  Q.  Did you believe you were committing bank fraud in the year

13  2017?

14  A.  I'd say I knew for sure in 2018.

15  Q.  You believed as of 2018, you were involved in bank fraud?

16  A.  Yes.

17  Q.  And what was it that made you come to that conclusion?

18  A.  Well, I mean, as I said, there were a lot of red flags,

19  things building up to that.  I would say the meeting at Ray's

20  office with the dispensaries, after that meeting, removed any

21  lingering doubts for me.

22  Q.  The meeting that you testified about in March of 2018,

23  correct?

24  A.  Yes.

25  Q.  Okay.  So before that meeting in March of 2018, you've

1    testified that you felt that you were threatened by

2    Mr. Akhavan, correct?

3    A.  Yes.

4    Q.  And you considered telling your wife that you felt

5    threatened, but you decided against that, correct?

6    A.  Yes.

7    Q.  Because you didn't want to frighten her?

8    A.  Yes.

9    Q.  And you considered making a report to law enforcement and

10   decided against doing that as well, correct?

11   A.  Yes.

12   Q.  And you spoke to Mr. Fasano or communicated with Mr. Fasano

13   about your concerns about that threat, correct?

14   A.  Yes.

15   Q.  And then you've testified about this meeting that you just

16   mentioned in March of 2018, right?

17   A.  Yes.

18   Q.  And that meeting included dispensary partners of Eaze's,

19   correct?

20   A.  Yes.

21   Q.  These were the most critical business relationships that

22   Eaze had, right?

23   A.  Yes.

24   Q.  And these were dispensaries that you'd been working with

25   for some time?

1  A.  Yes.  Most of them had been with Eaze through prior to me

2  even joining the company.

3  Q.  And you, as the CEO of the company, directed others at the

4  company to invite members, representatives of all these

5  dispensaries to come to a meeting at Mr. Akhavan's office in

6  March of 2018, correct?

7  A.  Yes.

8  Q.  And you had other employees of yours join for that meeting,

9  correct?

10  A.  Yes.

11  Q.  So you were not so afraid of Mr. Akhavan that you thought

12  it would not be a good idea to bring Eaze's most important

13  business partners and some of your employees to a meeting in

14  his office in March of 2018, correct?

15  A.  Well, once we were doing what he wanted, no, I wasn't as

16  afraid.

17  Q.  You were no longer afraid of him?

18  A.  As long as we were processing and he was happy.

19  Q.  Now, one of the employees that you brought to this meeting

20  was Nick Fasano, correct?

21  A.  Yes.

22  Q.  And Nick Fasano was, I believe you testified on direct, not

23  only an employee of yours but one of your close personal

24  friends you'd known for 15 years?

25  A.  Yes.

L3FPWEI5                      Patterson - Cross

1    Q.  Who else did you bring from Eaze to this meeting?

2    A.  Darcy Cozzetto and David Amable were the other two Eaze

3    employees.

4    Q.  And Fasano, up until this meeting in March of 2018, had no

5    involvement in credit card processing for the company?

6    A.  No direct involvement.  I shared with him my concerns, even

7    prior to the phone call; so he knew my concerns about it, but

8    in his role, he had no direct involvement.

9    Q.  When you say you shared your concerns, what did you share

10   with him?

11   A.  My concerns about Ray, that I thought he was potentially

12   dangerous.

13   Q.  And did you share with him your concerns that you might be

14   engaging in conspiracy to commit bank fraud?

15   A.  I said that what was happening here was very shady, and it

16   made me uncomfortable, but I didn't use those particular words.

17   Q.  But in your mind, you had that concern?

18   A.  Yes.

19   Q.  Yet, you brought Mr. Fasano, your 15-year friend, to this

20   meeting; is that true?

21   A.  Yes.

22   Q.  And Ms. Cozzetto, at the time you directed her to come to

23   this meeting, she'd worked for the company about six months,

24   right?

25   A.  Something like that, yes.

1  Q.  You didn't know her very well?

2  A.  No.

3  Q.  But you had no problem inviting her to come to this shady

4  meeting with somebody who had threatened you; is that your

5  testimony?

6  A.  Yes.

7  Q.  Did you tell the government that you were so uncomfortable

8  at this meeting, that you felt that you were trapped?

9  A.  I think I did say that, yes.

10 Q.  Did you tell them that you felt physically sick at this

11 meeting?

12 A.  Yes.

13 Q.  And did you tell the government that's why you left the

14 meeting early?

15 A.  Well, I did have a flight to catch, but I was definitely

16 happy to leave early.

17 Q.  You arranged the time and date of this meeting yourself,

18 correct?

19 A.  No.

20 Q.  Well, you knew it was an important meeting?

21 A.  Yes.

22 Q.  And you made an arrangement to be there?

23 A.  Yes.

24 Q.  And you made arrangement for your coworkers to be there

25 with you?

1  A.  Yes.

2  Q.  And you understood that all of your dispensary partners had

3  been invited, and they were going to be there with you, as

4  well?

5  A.  Yes.

6  Q.  But you had a flight out?

7  A.  The meeting started late, and I did have to get home to

8  San Francisco that night.

9  Q.  So you left?

10  A.  Yes.

11  Q.  And you left Mr. Fasano behind?

12  A.  Yes.

13  Q.  Did you have any concerns about leaving your friend at this

14  meeting with Mr. Akhavan, who had threatened you?

15  A.  Yes.  In fact, it was the first thing when I called him and

16  I apologized.

17  Q.  You have any concerns about leaving Ms. Cozzetto there?

18  A.  I mean, the same kind of concern, just leaving people in

19  that situation, yes.

20  Q.  Did you ever talk to her about it?

21  A.  No.

22  Q.  Isn't it true, Mr. Patterson, that after this meeting with

23  the dispensaries in March of 2018, the decision was reached to

24  move forward with Mr. Akhavan's processing again, correct?

25  A.  Well, it was -- the decision was up to each individual

1    dispensary owner.  They all decided to move forward, with the

2    exception of one.

3    Q.  But you understood that there would be a continued

4    relationship, business relationship between Eaze and

5    Mr. Akhavan after this meeting in March of 2018?

6    A.  Yes.

7    Q.  And isn't it true that you made a decision to put Darcy

8    Cozzetto in as the point person to deal with the processing

9    through Mr. Akhavan and EUP?

10   A.  Well, it was naturally -- her particular role would have

11   been to deal with this because she was overseeing the

12   relationships with the dispensaries.  That was her job.

13   Q.  You made the decision about who was going to do what in the

14   company, you were the CEO?

15   A.  Yes.

16   Q.  You gave the job to her to be the point person on this; did

17   you not?

18   A.  Yes.

19   Q.  And did you have any concerns that you were putting her in

20   harm's way?

21   A.  No, because after that, she had no -- she had no reason to

22   meet with Ray in person ever again.

23   Q.  Did you have concerns, sir, that you were getting her

24   involved in a conspiracy to commit bank fraud and putting her

25   in as a point person for that?

L3FPWEI5                      Patterson - Cross

1    A.  Yes, I'd say I had overall concerns about the whole

2    situation.  That was one of them.

3    Q.  Did you ever talk to Ms. Cozzetto about your concerns that

4    she was getting involved with something that you, at that

5    point, believed to be bank fraud?

6    A.  No.

7    Q.  You never mentioned it?

8    A.  No.

9    Q.  I'm sorry, was your answer "no"?

10   A.  "No."

11   Q.  Did it occur to you that -- withdrawn.

12           Now, everything that you testified about in direct

13   that related to Mr. Weigand, all of that was not based on your

14   personal knowledge; isn't that correct?

15   A.  I wouldn't say everything.  I mean, it depends on what

16   you're saying.  I never personally met him, no.

17   Q.  You never met him, correct?

18   A.  Correct.

19   Q.  You never had a phone conversation with him?

20   A.  No.

21   Q.  You never had any kind of conversation with him at all?

22   A.  I was in a group chat.

23   Q.  We'll talk about -- okay, we'll get to that.

24           Now, you said that after the meeting, you had left

25   early, and Mr. Fasano talked to you about what happened when

1    you left, right?

2    A.  Yes.

3    Q.  And he said that one of the things that he mentioned had to

4    do with my client, Mr. Weigand, correct?

5    A.  Yes.

6    Q.  And that Mr. Fasano relayed to you that after you left the

7    meeting, Mr. Weigand entered the meeting; is that right?

8    A.  Well, what he said was that Ray's -- the term he used was,

9    German banker; so I took that to mean Ruben.

10   Q.  But you had never heard the name Ruben Weigand before; so

11   why would you take that to mean Ruben Weigand?

12   A.  Before I left, Ray said that.  He did say that Ruben -- he

13   said the name -- that he would be joining us later in the

14   meeting and that we were waiting for him.  So I did know that

15   someone would be joining later, named Ruben.

16   Q.  You recall, as you sit here today, that Ray told you that

17   someone named Ruben was coming into the meeting?

18   A.  Yes.

19   Q.  Do you recall whether he even gave you his last name?

20   A.  No, he didn't.

21   Q.  He did not?

22   A.  No, I don't think so.

23   Q.  Did he tell you after the meeting what the, quote, unquote,

24   German banker was supposed to be doing in connection with this

25   credit card processing?

1    A.  Are you referring to Nick?

2    Q.  Correct.

3    A.  Yes, that he was the one collecting all of the applications

4    from the dispensaries.  So they were given an e-mail address,

5    and they were supposed to fill out the applications and e-mail

6    the applications to an e-mail address to Ruben.

7    Q.  You also spoke to Ms. Cozzetto after that meeting about

8    this topic, correct?

9    A.  That, I can't remember.  I don't remember talking to her

10   specifically about this meeting.

11   Q.  Do you remember talking to her about the applications that

12   you just referenced?

13   A.  Generally, but not specifically.

14   Q.  Isn't it a fact that Ms. Cozzetto told you that she was

15   communicating with someone named Andreas with regard to the

16   applications?

17           MR. FOLLY:  Objection.

18           THE COURT:  Sustained.

19   Q.  Will you please show, just for the witness at this time,

20   WX118.

21           Do you have the exhibit in front of you now,

22   Mr. Patterson?

23   A.  Yes.

24   Q.  Thank you.  So this -- well, do you recognize this?

25   A.  It's an e-mail between the Eaze team, internal to the Eaze

1  team.

2  Q.  And you're a recipient of this e-mail?

3  A.  Yes.

4          MR. GILBERT:  I'll offer WX118.

5          MR. FOLLY:  Objection.  Hearsay.

6          THE COURT:  Sustained.

7          MR. GILBERT:  State of mind, your Honor.

8          THE COURT:  Sustained.

9  BY MR. GILBERT:

10  Q.  Now, you were asked a number of questions about an

11  Easycompany chat; is that correct?

12  A.  Yes.

13  Q.  If we could please bring up in evidence Government

14  Exhibit 302.  Is this the Easycompany chat you testified to

15  about earlier?

16  A.  Yes.

17  Q.  Now, Mr. Patterson, this page indicates that this

18  communication starts on April 27th of 2018, correct?

19  A.  Yes.

20  Q.  And if you go, please, all the way to the last page of this

21  document.  Do you see that it runs from April of 2018 all the

22  way through December 20th, 2018?  If you look in the middle of

23  the last page there.

24  A.  Yes, I see it.

25  Q.  I'm sorry?

1   A.  Yes, I see that.

2   Q.  I interrupted you.

3   A.  December 2018.

4   Q.  So this was a chat, a communication, that ran from April

5   all the way through December, correct?

6   A.  Yes.

7   Q.  And it runs -- if I were to tell you it's about 80-pages

8   long, would that sound about right to you?  You've read it

9   before?

10  A.  Yes.  It's many, many pages.

11  Q.  It's a lengthy document.  If we could look at 2186, there

12  are messages from May 3rd of 2018.  The bottom number is 2186.

13          Do you see the date near the top of the page that's in

14  front of you that says 3 May 2018?

15  A.  Yes.

16  Q.  And there's a discussion here that's taking place about the

17  customer service functions of Eaze's credit card processing?

18  A.  Yes.

19  Q.  Do you see, there's a reference here to Darcy Cozzetto?

20  That's the employee we've been discussing, correct?

21  A.  It is.

22  Q.  That you put in charge of this?

23  A.  Yes.

24  Q.  And do you see Ms. Cozzetto says:  I let Andreas know that

25  I could intro him to our VP CS?  That means customer service,

L3FPWEI5                          Patterson - Cross

1    correct?

2    A.  Yes.

3    Q.  To review scripts and the process, and I'm happy to include

4    you, if you'd like.

5            Do you see that?

6    A.  I do.

7    Q.  Ms. Cozzetto, in this communication, indicates that she's

8    in communication with Andreas with regard to the processing,

9    correct?

10   A.  Yes.

11   Q.  If we could go to page 2205.  Do you see this is a

12   communication -- if you look at the top portion -- you may have

13   to turn to the prior page.  There's a date of June 29th, 2018?

14   A.  Okay, yup.

15   Q.  Do you see that?  And do you see there's a communication

16   here where Darcy says:  I also haven't heard back from Andreas

17   yet on either the EUprocessing statements for this week or the

18   four days missing from last; so any update there would be

19   appreciated?

20   A.  Yes.

21   Q.  Again, she's referring to Andreas, correct?

22   A.  Yes.

23   Q.  And not to Ruben Weigand; is that correct?

24   A.  Yes, to Andreas.

25   Q.  And if you look at page 2206, do you see a message there

L3FPWEI5                      Patterson - Cross

1   that Darcy Cozzetto sends:  Great, thanks.  I see the

2   settlements from Andreas?  The top of the page?

3   A.  Yes.

4   Q.  If you look at page 2214, on July 9th, 2018, do you see

5   there's a message from Darcy there that says:  I sent this to

6   Andreas as well, but the wire from last week has yet to hit

7   depot's bank accounts; do you see that?

8   A.  Yes.

9   Q.  This week's statement is only four days.  I'm hoping

10  Andreas can resolve for me, but wanted to make sure you were

11  aware.  Correct?

12  A.  Yes.

13  Q.  And again, there's no reference there to Ruben Weigand,

14  correct?

15  A.  Correct.

16  Q.  And it appears obvious to you that Darcy is communicating

17  with Andreas about the matters discussed?

18  A.  Yes.  So Andreas oversaw the settlements at this time.

19  Q.  If you look at page 2222, communication from July 24th of

20  2018.  Do you see there's a comment here that says:  Can you

21  please confirm if Andreas is still sending statements for the

22  newer solution.  Also, we are seeing that some wires are still

23  missing based on the statements.  Is there someone from

24  Andreas' team who can help reconcile?

25            Do you see that?

1    A.  Yes.

2    Q.  Again, there's no reference to Ruben Weigand here, correct?

3    A.  Correct.

4    Q.  And again, it appears that Darcy is working with Andreas on

5    these matters, correct?

6             MR. FOLLY:  Objection.

7             THE COURT:  No, I think that was waived by there being

8    no objection to the previous parallel.

9             Question:  How much longer do you have?

10            MR. GILBERT:  I would say about 20 minutes, your

11   Honor, maybe 15.

12            THE COURT:  Go ahead.

13   BY MR. GILBERT:

14   Q.  If you look at page 2223, there's a communication here that

15   says:  Hey, Darcy.  Sorry for the delay.

16            Do you see that?

17            I'm home?

18   A.  Yes.

19   Q.  And there's a reference to a Marty.  Marty25@ProtonMail; do

20   you see that?

21   A.  Yes.

22   Q.  So that's Marty's e-mail, he's going to handle everything

23   for you from now on; do you see that?

24   A.  Yes.

25   Q.  Do you know -- this is not the same Marty that you

1  testified earlier from the Hometown Heart, correct?

2  A.  Correct, different Martys.

3  Q.  Which Marty is this, to your knowledge?

4  A.  This Marty works with Ray.  So he, I think, was replacing

5  Andreas in terms of handling the reconciliations in the

6  dispensaries payments.

7  Q.  And if you see on page 2225, on July 6th of 2018, Darcy

8  says:  Ray, Marty has been fantastic.  I got confirmation from

9  him that reserves were released, and Andreas just sent me the

10  statements and confirmed payments will be issued tomorrow.

11          Do you see that?

12  A.  Yes.

13  Q.  Again, there's no reference there to Ruben Weigand,

14  correct?

15  A.  Correct.

16  Q.  Now, you did testify on direct about a conversation in this

17  chat from July 31st, 2018, correct?  Do you recall that?

18  A.  The one where --

19  Q.  I'll help you.

20  A.  Okay.

21  Q.  If we can look at, please, page 2182 in this exhibit.  Do

22  you recall this?

23  A.  Which part?

24  Q.  I'm sorry, it's page 2230.  Thank you.  This communication

25  on July 31st of 2018?

1  A.  Yes.

2  Q.  And if you go to the next page, please, there's a note here

3  that says:  I've added Martin and Ruben, correct?

4  A.  Yes.

5  Q.  And a little bit further down it says:  Hey, everybody,

6  from Ruben Weigand, or from Ruben W?

7  A.  Yup.  Yes.

8  Q.  So is it correct that this chat, which started in April,

9  the first appearance, to your knowledge, by Ruben was not until

10  the very end of July of 2018?

11  A.  Yes, that's when he was added to the chat.

12  Q.  And prior to that, he had no involvement, to your

13  knowledge?

14          MR. FOLLY:  Objection.

15          THE COURT:  Overruled.

16  Q.  Do you need me to repeat the question?

17  A.  Yes, please.

18  Q.  And prior to that, he had no involvement, to your

19  knowledge?

20  A.  I wouldn't say no involvement.  He wasn't part of this

21  particular chat.

22  Q.  You're not aware of any communications, other than the ones

23  that we're looking at here, prior to July 31st, 2018, that

24  involved Ruben Weigand in any way, correct?

25  A.  Well, other than being at the meeting, no.

1  Q.  Sorry, your testimony was that you left the meeting before

2  he arrived; isn't that true?

3  A.  Yes.

4  Q.  So you have no firsthand knowledge that he was at a

5  meeting, correct?

6  A.  No firsthand, that's right.

7  Q.  Now, you testified about having shares of stock in Eaze,

8  correct?

9  A.  Yes.

10 Q.  You said you own approximately 1.5 percent of the company?

11 A.  Fully diluted with the stock options, correct.

12 Q.  You said that the valuation that you were familiar with

13 was -- the last valuation was that the company was worth $250

14 million?

15 A.  Yes, I think around when I left, that's what I recall it

16 being.

17 Q.  So around when you left, if you owned 1.5 percent of a

18 company that's worth $250 million, you had over $3.7 million

19 worth of shares in the company, correct?

20 A.  Yes.

21 Q.  And, in fact, are you aware of any higher valuations for

22 the company since you left?

23 A.  I'm not aware, no.

24 Q.  Do you know what your shares are currently worth where you

25 own 1.5 percent of the company?

L3FPWEI5                         Patterson - Cross

1   A.  No.

2   Q.  It's not a matter of significance to you to know that?

3   A.  I mean, it's a private company, and they don't publish

4   their valuation.  And since I've left the board, I have no way

5   of knowing the valuation.  It's not public information.

6   Q.  Now, you testified about Hometown Heart.  Are you aware, or

7   do you have any familiarity with whether or not Hometown Heart,

8   in its physical location, accepted MasterCard and Visa?

9   A.  No, I don't.

10  Q.  And are you aware whether any of the dispensaries related

11  to Eaze accepted MasterCard or Visa cards at their physical

12  location?

13  A.  I believe one.  I'm aware of one that did, yes.

14  Q.  Which one is that?

15  A.  It was called Caliva.  They were located in San Jose.

16  Q.  I'm sorry, in San Jose?

17  A.  Yes.

18  Q.  And you're aware that they accepted MasterCard and Visa at

19  their physical location?

20  A.  Yes.  They offered to connect us to their payment

21  processor, and we talked to them; so that's how I know that.

22  Q.  Then when you met with the government, in addition to the

23  prosecutors, there were also representatives of the SEC

24  present?

25  A.  Yes.

L3FPWEI5                    Patterson - Cross

1   Q.  And were you asked questions about your communications with

2   investors or potential investors in Eaze?

3   A.  Yes.

4   Q.  And, in fact, you, while you were the CEO in 2018 and in

5   2019, you had meetings with investors or potential investors,

6   correct?

7   A.  Yes.

8   Q.  And you've testified in that time period you believed you

9   were involved in the crime of conspiracy to commit bank fraud,

10  correct?

11  A.  Yes.

12  Q.  And in any of your communications with any investors or

13  potential investors, did you indicate to them that that was so;

14  that you believed you were committing bank fraud?

15  A.  No.

16  Q.  Were you asked any questions by investors or potential

17  investors about the manner in which Eaze was processing credit

18  card payments?

19  A.  Not usually.  Usually that was handled by the legal team.

20  Q.  But it did happen from time to time, correct?

21  A.  Yes; although, I wouldn't have been present for those.  The

22  diligence process was probably like two weeks of talking to

23  different people.

24  Q.  As you sit here now, do you recall being asked -- you,

25  personally -- any questions by any investor or potential

1   investor in 2018 and 2019 about Eaze's credit card processing?

2   A.  I can't recall the specific question, but generally I might

3   have been asked general questions.  Generally investors were

4   aware that we were processing in Europe.

5   Q.  And generally, so you didn't make any investor or potential

6   investor aware of your belief that you were involved in the

7   crime of bank fraud, did you?

8   A.  No.

9   Q.  You didn't plead guilty to securities fraud, did you?

10  A.  No.

11  Q.  Do you have a concern -- well, withdrawn.

12          Now, you also testified that you believed that members

13  of the board of directors of Eaze were part of your -- what you

14  claim was a conspiracy, correct?

15  A.  Yes.

16  Q.  Who are those people?

17  A.  The members of the board were Keith McCarty, David Chow, PJ

18  Germalack and Jonathan Rosenthal.

19  Q.  Was there an individual named Gardner?

20  A.  Mark Gardner, but he wasn't a member of the board.

21  Q.  He wasn't on the board, but he was an investor in the

22  company?

23  A.  Yes.

24  Q.  What does he -- what are his business interests outside of

25  being an investor in Eaze, if you know?

1    MR. FOLLY:  Objection.

2    THE COURT:  Sustained.

3  Q.  During any board meetings that you can recall, were you

4  asked about the particulars of Eaze's credit card processing?

5  A.  Yes.

6  Q.  And were you truthful in your responses?

7  A.  Yes.

8  Q.  To your knowledge, did any member of the board of directors

9  raise a concern to you that what Eaze was engaging in might be

10  bank fraud?

11 A.  Not directly to me, no.

12 Q.  Somebody else?

13 A.  Yes.

14 Q.  Who was that?

15    MR. FOLLY:  Objection.

16    THE COURT:  Well, the objection is a little late.  It

17 should have been raised before the previous question, but I

18 will overlook that and sustain the objection.

19    MR. GILBERT:  No further questions at this time.

20    THE COURT:  Redirect.

21    MR. FOLLY:  Your Honor, there is one issue that we'd

22 like to briefly address at a sidebar.  If your Honor would

23 like, I will continue questioning the witness through the end

24 of the day, and then address that issue?  I don't think I'll

25 finish in that time.

1          THE COURT:  Okay.

2     REDIRECT EXAMINATION

3     BY MR. FOLLY:

4     Q.  Hi, Mr. Patterson.  You were asked some questions on

5     cross-examination regarding chargebacks; do you remember those?

6     A.  Yes.

7     Q.  Now, the issue of chargebacks was not that customers were

8     returning their products, correct?

9     A.  That's correct.

10    Q.  And the main issue with chargebacks was that customers were

11    confused about the descriptors that were showing up on their

12    card statements, correct?

13    A.  Yes.

14    Q.  Now, could we please publish for everyone what's in

15    evidence as Government Exhibit 422.  If we could zoom in on the

16    top half of the page here.  And this is an e-mail from Ray

17    Akhavan to you, among others, right?

18    A.  Yes.

19    Q.  And it's titled Regarding Chargebacks, correct?

20    A.  That's right.

21    Q.  Now, if you could read the e-mail starting where it says

22    "So in itself"?

23    A.  "So in itself it's not the issue.  The issue is that

24    usually, with high chargebacks, you have high complaints to the

25    bank, which can result in people talking about the product, and

L3FPWEI5                          Patterson – Redirect

1   if you have a high number of, let's say, Wells Fargo customers

2   who complain about not liking the weed or the weed card-issuing

3   doctors, the higher the chance that Wells Fargo notices that

4   weed is being sold and then reaches out to Visa and MasterCard

5   and saying this bank in the UK is doing processing for the

6   weed, that's really the only issue, but they usually go hand in

7   hand."

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    Q.  Now, the reference here to the complaints about, in this
2    case, not liking the weed, or the weed card issuing doctors,
3    that would be a reference, to your understanding, from the Eaze
4    customer, correct?
5    A.  Yes.
6    Q.  And that, in this scenario, that Ray Akhavan is describing
7    in this email, that would be a complaint that is being made to
8    that customer's issuing bank, correct?
9    A.  That's right.
10   Q.  And in this case he's giving an example of Wells Fargo as
11   the issuing bank, correct?
12   A.  Yes.
13   Q.  And the concern there that's being expressed here, when he
14   says that Wells Fargo would notice weed is being sold and then
15   reach out to Visa and MasterCard, what was your understanding
16   of why that would be a problem for Eaze?
17   A.  Well, because Visa and MasterCard didn't allow for
18   marijuana transactions, so if Wells Fargo found out, they could
19   reach out to Visa and MasterCard, and then that would cause the
20   accounts to get shut down.
21          MR. FOLLY:  We can take this exhibit down.
22   Q.  Now, Mr. Patterson, do you recall there were some -- there
23   was a reference on cross-examination to the credit card
24   processing that was being done through Ray's organization as
25   being compliant?  Do you recall that?
```

1    A.  No, not exactly.

2    Q.  Do you recall that there was a discussion about your

3    attempt to have the credit card processing be compliant?

4    A.  This is on cross-examination?

5    Q.  Yes, during your testimony on cross-examination.

6    A.  Sorry.  I'm just not fully getting what you're referring

7    to.

8    Q.  Let's just go to Government Exhibit 302, at page 17.  If we

9    could just zoom in on the bottom section, from 9:27 on.

10          Now, there's a reference here at the top, Ray Akhavan

11   says, "And I'll set up more of my friendly banks for surplus or

12   backup volume for when and if your better domestic solutions

13   don't work."

14          And then in point 2, can you read aloud what he says

15   in the first sentence of point 2.

16   A.  He says, "We need to understand that if something does

17   occur with legal or law enforcement, the big banks who don't

18   know what they're processing will turn on your depots or

19   whoever officially owns the account, so they should be very

20   careful there.  If possible you guys should do what you did

21   with us, which is, everyone fills out and submits a 100 percent

22   accurate application on the depot side but then some middleman

23   changes or alters it so no one can say Eaze or the depots

24   miscoded knowingly."

25   Q.  So in the first sentence of point no. 2, if we can

1    highlight the whole first sentence, there's a reference in the

2    first sentence, he says "we need to understand that if

3    something does occur with legal or law enforcement."  What was

4    your understanding of what Ray Akhavan was referring to when he

5    said "something occurring with legal or law enforcement"?

6    A.  What he's describing here was the -- setting up merchant

7    processing in the US, which would require lying to the banks.

8    So my understanding is, what he's referring to here is that if

9    there was a law enforcement investigation into the fact that

10   you wanted to open the accounts in the US, you'd have to lie to

11   the merchant banks.

12   Q.  Now, you understood that in connection with this

13   processing, card processing organization through Ray's

14   organization, that there were lies that were being communicated

15   to the credit card companies, as well as the issuing banks,

16   correct?

17   A.  Yes.

18   Q.  And you understood that it was wrong to lie to the credit

19   card companies and to the issuing banks, correct?

20   A.  Yes.

21           MR. TAYBACK:  Objection, leading and compound.

22           MR. FOLLY:  Your Honor, I believe there is an

23   objection.

24           THE COURT:  I'm sorry.

25           Overruled.

1    Q.  Your answer was yes, Mr. Patterson?

2    A.  Yes.

3    Q.  You pled guilty to that crime, correct?

4    A.  Yes.

5    Q.  And you said on cross-examination that you knew that this

6    was a crime while you were committing the crime, correct?

7    A.  Yes.

8    Q.  Now, you were asked on questions on cross-examination

9    regarding merchant category codes; do you recall that?

10   A.  Yes.

11   Q.  Those are sometimes referred to as MCCs, correct?

12   A.  Yes.

13   Q.  And during the time period from 2016 through 2019, when you

14   were working with Ray's credit card processing operation, Eaze

15   did not select the merchant category codes, correct?

16   A.  That's correct.

17            MR. FOLLY:  You could go to Government Exhibit 302 at

18   page 22.  Zoom in on the bottom portion of the message.

19   Q.  And you were shown this message on cross-examination,

20   focusing on the bottom portion, from 10:05 downward.

21            MR. FOLLY:  If you could just highlight that whole set

22   of messages.

23   Q.  And, Mr. Patterson, you read the first portion of this

24   message on cross-examination.  Correct?

25   A.  Yes.

1   Q.  The second portion says, "If you were under pressure you

2   could say you did pick a accurate MCC."  That's Ray Akhavan,

3   right, in that message, right?

4   A.  Yes.

5   Q.  What was your understanding of what Ray Akhavan meant when

6   he said, "If you were under pressure you could say you did pick

7   a accurate MCC"?

8   A.  If there was ever a law enforcement investigation and it

9   came to the dispensaries, that they said -- they could say that

10  the code being used was technically the most accurate code,

11  since there actually wasn't a code for marijuana, this is a

12  general medical services code.

13  Q.  And there's a reference here in this message to 8099,

14  correct?

15  A.  Yes.

16          MR. FOLLY:  Go to Government Exhibit 2309 at page 4.

17  If we could zoom in on the second and the third columns in

18  their entirety -- sorry -- the third and the fourth.

19  Q.  And, Mr. Patterson, do you see where it says "Merch

20  Category Cd"?

21  A.  Yes.

22  Q.  If you could just look through those for a moment.  Do you

23  see 8099 listed here?

24  A.  No, I don't.

25          MR. FOLLY:  You could zoom back out for a moment.

1                    About two thirds down the page there's an entry that

2        says www.somepearls.com.  Can we zoom in on that row.

3   Q.  Mr. Patterson, I believe you testified about somepearls.com

4        early in your testimony.  Is that right?

5   A.  Yes.

6   Q.  Could you read aloud what's to the right of the entry that

7        says 5944.

8   A.  It says "clock jewelry watch and silverware store."

9   Q.  And can you remind us what somepearls.com was.

10  A.  Somepearls was one of the descriptors that was being used

11       in late 2018.

12  Q.  And was that one of the websites that you had visited the

13       merchant website for?

14  A.  Yes.  It was the one that I clicked on and saw that it was

15       a -- it was a store.

16  Q.  And did that store give any indication that it was selling

17       marijuana products?

18  A.  No.

19  Q.  Did the store give any indication that it was affiliated

20       with Eaze?

21  A.  No.

22  Q.  Did it give any indication it was affiliated with any of

23       the dispensaries?

24  A.  No, it didn't.

25            MR. FOLLY:  You can take this exhibit down.

L3FAWEI6ps                    Patterson - Redirect

1    Q.  Do you recall during cross-examination you were asked some

2    questions about a descriptor that was used that included the

3    word "ease"?

4    A.  Yes.

5    Q.  I believe you testified that that was used for

6    approximately three months.

7    A.  Yes.

8    Q.  Can we go to Government Exhibit 302 at page 55, and zoom in

9    on the top half of the page.  And there's a reference here to

10   Organikals.store as well as Greenteacha.co.  Do you see that?

11   A.  Yes.

12   Q.  Were those descriptors that were used during the credit

13   card processing foray's operation?

14   A.  Yes.

15   Q.  Was Ray Akhavan one of the participants on this Telegram?

16   A.  Yes, he was.

17   Q.  And there's a message further down, right here at 15:58,

18   that says "JB13."  What was your understanding who JB13 was?

19   A.  It was Ray -- it was, Jawbreaker13 was his user name.

20          MR. FOLLY:  We could go now to page 60 of the same

21   exhibit.

22          THE COURT:  Counsel, keep in mind we're going to stop

23   in about two minutes.

24          MR. FOLLY:  Thank you, your Honor.

25   Q.  If you go to the message at 12:56 from John Wang.  It says,

1    "Here's the dispensary to descriptor mapping," and it has

2    Sonicogistix, Organikals, Greenteacha, GoodeGreenBazaar,

3    Organikals.store.  Do you see all those?

4    A.  Yes.

5    Q.  Did any of those descriptors contain the word "ease"?

6    A.  No, none of them do.

7              MR. FOLLY:  If we could go quickly to pages 88 through

8    89 of the same exhibit.

9    Q.  At the bottom of the page there's additional references to

10   Starstyles, Outdoormaxx, Fly2skyshop.  Do you see those?

11   A.  Yes.

12   Q.  Were those additional descriptors that were used during the

13   credit card processing for Ray's organization?

14   A.  Yes, they were.

15   Q.  Now, there was no -- Eaze was not connected to any of these

16   descriptors that were listed here, correct?

17   A.  No.

18   Q.  There was no corporate affiliation with those names,

19   correct?

20   A.  That's correct.

21   Q.  These names were not -- these were not subsidiaries of

22   Eaze, correct?

23   A.  Yes.  No, they weren't.

24   Q.  And these were not names that Eaze was doing business with,

25   correct?

L3FAWEI6ps

1    A.   Correct.

2              MR. FOLLY:  Your Honor, I think this would be a good

3    place to stop.

4              THE COURT:  OK, ladies and gentlemen.  So we're making

5    good progress, but tomorrow is another day, so be on time and.

6    We'll see you, and have a very good evening.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3FAWEI6ps

1      (Jury not present)

2      (Witness excused)

3      THE COURT:  Before you raise the issue that you want

4  to raise, how much longer do you have?

5      MR. FOLLY:  Your Honor, no longer than 15 minutes.

6      THE COURT:  All right.  You will be held to 15 minutes

7  strictly, and if there's any recross, it will be no more than

8  five minutes a piece.  We are not proceeding with alacrity, and

9  things are bogging down.  This is an important witness, which

10  is why I let you drone on, both sides, but enough is enough.

11      Second, before we deal with the issue, with respect to

12  experts, first, Mr. Akhavan no longer needs to call

13  Mr. Gardovan because the whole memorandum and the guidance will

14  all be introduced.

15      Second, Mr. Rankin can testify to the subjects

16  indicated in the defense letter.

17      Third, as to Mr. Weigand's experts, Mr. Mott will not

18  be permitted to testify.  I will state the reasons for that

19  tomorrow morning, but I have a 4 o'clock matter by telephone

20  coming up, so I can't take the time now.

21      With respect to Mr. Vilfer, I'm skeptical about at

22  least some of his testimony, but I think we need to await his

23  deposition until I take a final determination, so when is the

24  deposition?

25      MS. LA MORTE:  Wednesday, your Honor.

L3FAWEI6ps

1          THE COURT:  OK.  We'll have oral -- I don't need

2  further written submissions, but right after that deposition,

3  the next morning we'll have oral argument.  I'll make any

4  determination.

5          MS. LA MORTE:  Yes, your Honor.

6          THE COURT:  All right.

7          Now what's this issue that you, counsel, want to tell

8  me about?

9          MR. FOLLY:  Yes, your Honor.  This is an issue with

10  something that the government had flagged in its motions in

11  limine concerning the current witness's discussion about the

12  text messages he received from Ray Akhavan and the ensuing

13  discussion that he had with Ray Akhavan in which he felt, both

14  in the text messages and in the discussion, that he was the

15  recipient of a physical threat.  There has been rather

16  extensive cross-examination now on the legitimacy of that fear.

17  And we had flagged in our motion that one of the reasons that

18  Mr. Patterson was concerned and felt threatened by Ray Akhavan

19  was because, prior to that conversation, he had learned that

20  Keith McCarty had visited his house and had walked into Ray

21  Akhavan's walk-in closet, and Jim Patterson had been told by

22  Keith McCarty that he had seen a walk-in closet that contained

23  numerous automatic weapons.

24          And this is relevant to his rightful fear of

25  Mr. Akhavan, which has been repeatedly questioned.  There were

L3FAWEI6ps

1    statements that he never saw Mr. Akhavan strike anyone, that he

2    never saw --

3              THE COURT:  Let me make sure I understand you.  Did

4    Mr. Patterson walk into Mr. Akhavan's closet?

5              MR. FOLLY:  No.  Keith McCarty did, and told

6    Mr. Patterson about that, before he attended a meeting in

7    Calabasas when he was --

8              THE COURT:  I think it is more prejudicial than

9    probative.  It will still be excluded.

10             Anything else?

11             All right.

12             MS. DEININGER:  Wait.  Sorry, yes, your Honor.  I just

13   wanted to flag that, tomorrow, we're expecting the video

14   testimony from Vita.

15             THE COURT:  Yes.  And I received, or, rather, my law

16   clerk received a call that the chief judge wanted to raise an

17   issue about that with me.  I didn't know what the issue is, but

18   I'm guessing, just -- this could be totally wrong.  I will find

19   out when she and I speak, as prearranged, at 9 o'clock tonight.

20   Well, probably the conversation won't go more than four or five

21   hours.  I think she may be concerned, there's a rule in this

22   courthouse, which I had forgotten about, that you can't

23   photograph any juror.  That's for the jurors' protection.  And

24   I wonder if she's concerned that, since arrangements were made

25   that the witness could see the jurors, that that created a

L3FAWEI6ps

problem.  I think she may be reassured when I tell her that, as
I understand it, he's going to be testifying from his lawyer's
office, and we can make sure they all know that no photographs
are to be taken and that any of the jurors may be excised after
the deposition or something like that.  We'll figure that out.
But I think that's her concern.  I'm sure we can figure out
something, but I just wanted to make mention of that.

One time -- is that the next item?

MS. DEININGER:  It's not the next witness.  We're
expecting to call Chuck Brown immediately after Mr. Patterson.
But I believe he will be briefer than many of the other
witnesses.  So the reason I was flagging it for your Honor's
attention is that while we are going to try and set up as much
as we can this afternoon, when it is time for his testimony it
will require setting up additional monitors and starting up the
Zoom calls.

THE COURT:  Yes.

MS. DEININGER:  It may require taking a brief recess,
depending on when --

THE COURT:  Depending on how long.  Well, why can't we
just arrange this so the testimony happens right after lunch,
and so you could spend the lunch time setting things up.

MS. DEININGER:  We can if your Honor doesn't mind it
breaking into other witnesses.

THE COURT:  I think the jury will understand

L3FAWEI6ps

1    completely why we may have to do that.  I do think it's not

2    appropriate for a judge to break into other people's houses,

3    but into other people's witnesses seems to be perfectly fine.

4              MR. TAYBACK:  Your Honor, I don't know how long it

5    will take, but we could use a midmorning break at the time to

6    set it up.

7              MS. LA MORTE:  Yes.  That works with the witnesses.

8              THE COURT:  That's a possibility.  We'll see how it

9    works, but I do think we are not in a position to take a long

10   recess.

11             MS. LA MORTE:  Understood.  And, your Honor, what time

12   should we be here tomorrow?

13             THE COURT:  9:15.

14             MS. LA MORTE:  OK.  Thank you.

15             (Adjourned to 9:15 a.m., March 16, 2021)

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     JAMES PATTERSON

 4    Direct By Mr. Folly  . . . . . . . . . . . 1544 sh

 5    Cross By Mr. Tayback . . . . . . . . . . . .1601

 6    Cross By Mr. Tayback . . . . . . . . . . . .1642

 7    Cross By Mr. Gilbert . . . . . . . . . . . .1683

 8    Redirect By Mr. Folly  . . . . . . . . . . .1711

 9                        GOVERNMENT EXHIBITS

10    Exhibit No.                               Received

11     301     . . . . . . . . . . . . . . . . . .1546
       441     . . . . . . . . . . . . . . . . . .1554
12     302     . . . . . . . . . . . . . . . . . .1566
       2215    . . . . . . . . . . . . . . . . . .1576
13     2102    . . . . . . . . . . . . . . . . . .1590

14                        DEFENDANT EXHIBITS

15    Exhibit No.                               Received

16     HAX10058    . . . . . . . . . . . . . . . .1654

17

18

19

20

21

22

23

24

25
```