L3GAWEI1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,

6
             Defendants.                 Trial
7   ------------------------------x

8
                                         New York, N.Y.
9
                                         March 16, 2021
10                                       9:15 a.m.

11
    Before:
12
                        HON. JED S. RAKOFF,
13
                                         District Judge
14

15                      APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand

25                  APPEARANCES CONTINUED

L3GAWEI1ps

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant Akhavan
BY:  WILLIAM A. BURCK
     CHRISTOPHER TAYBACK
     SARA CLARK
     MARI HENDERSON
     DEREK SHAFFER
     PAUL SLATTERY
     -and-
ROTHKEN LAW FIRM LLP
     Attorneys for Defendant Akhavan
BY:  IRA P. ROTHKEN
     JARED R. SMITH

L3GAWEI1ps

```
 1              (Jury not present)

 2              THE COURT:  As I suspected, the chief judge was

 3    concerned about having photographs taken of the jurors, because

 4    there is a ban on that in this courthouse.  I explained to her

 5    the situation.  It is interesting.  You would think that the

 6    confrontation clause would be satisfied by the defendants'

 7    being able to see, hear, and completely observe the witness,

 8    which of course we have arranged.  But there is case law that

 9    says that the witness has to see the lawyers -- not just the

10    lawyer questioning, the way this makes sense, but also other

11    lawyers in the courtroom and most importantly the jury.  I

12    don't understand the rationale of those cases, but I'm willing

13    to abide by their suggestions, illogical though it seems to be

14    they are.

15              So what I have worked out, with the consent of the

16    chief judge, is that when Mr. Elliott testifies, he will see

17    the jurors, and he will be testifying from his lawyer's office.

18    They will -- they have already received an email that my clerk

19    sent them -- they will make no photographs or reproductions of

20    any of the jurors.  And they will destroy the pictures of the

21    jurors as soon as the testimony is over.

22              Now, with respect to the witnesses who are going to be

23    testifying remotely for the defense, I don't see any reason why

24    those witnesses have to see the jury.  Does any defense counsel

25    disagree with that?
```

L3GAWEI1ps

1                MR. GILBERT:  No, your Honor.

2                THE COURT:  Mr. Tayback?

3                MR. TAYBACK:  Your Honor, I do think that, if I

4     understood your question, I do think the case law provides that

5     they're supposed to see -- you say that the witness is supposed

6     to see the jury?  I believe that that is what's required.

7                THE COURT:  Excuse me?

8                MR. TAYBACK:  I'm not sure I understood your question,

9     your Honor.

10                THE COURT:  Is there any reason -- the jurors have to

11     see the witness, of course.

12                MR. TAYBACK:  Yes.

13                THE COURT:  My question is, is there any reason why

14     the witness has to see the jurors?

15                MR. TAYBACK:  I think there is.

16                THE COURT:  Yes.  And what is your legal authority for

17     that ridiculous proposition?

18                MR. TAYBACK:  I believe it's the authority that we

19     previously submitted regarding the confrontation clause.

20                THE COURT:  Yes, but I'm talking about your witnesses.

21                MR. TAYBACK:  Our witnesses.  I apologize, your Honor.

22     I misunderstood the question.  No.  I agree.

23                THE COURT:  I'm sorry you misunderstood.  I would not

24     have spoken so abruptly.  I agree with you that the case law

25     says that when the government's witness testifies, he has to

L3GAWEI1ps

         1    see the jurors, although I continue to believe that is without

         2    any real logic.  But I know there's case law.  I'm going to

         3    abide by it.  I see no reason why defense witnesses, where no

         4    confrontation clause issue is involved, would have to see the

         5    jurors.

         6             MR. TAYBACK:  Agreed 100 percent.

         7             MS. LA MORTE:  Your Honor, just one point of

         8    clarification, and it may already be established, so you can

         9    shut me down if that's the case:  The government just wanted to

        10    confirm that the defense, understanding that when it's the

        11    defense's own witnesses there generally isn't a confrontation

        12    clause problem, but our understanding of the law -- and if you

        13    need authority I can provide it at the lunch hour -- is that

        14    the confrontation clause issue doesn't arise as a result of who

        15    is calling the witness but whether the witness is going to be

        16    adverse to the position of the party calling it or not.  And

        17    so, for example, in this case, our understanding is that, among

        18    the potential witnesses that the defense may call would be some

        19    bank witnesses, which the government submits supports the

        20    government's case.  And so we would just ask for the record

        21    whether the defense, to the extent there is any confrontation

        22    clause right in those types of circumstances, whether the

        23    defense is waiving that right.

        24             THE COURT:  Who are we talking about?

        25             MS. LA MORTE:  The defense calling certain bank

L3GAWEI1ps

1    witnesses.

2            THE COURT:  Who?

3            MS. LA MORTE:  I believe Capital One, TD Bank, and

4    JPMorgan.

5            MR. TAYBACK:  I would need to talk to my client

6    briefly, if I can?

7            THE COURT:  I'm sorry?

8            MR. TAYBACK:  I need to speak to my client briefly

9    before waiv --

10           THE COURT:  You can speak all you want.  But I only

11   gave permission for the defense to call these people because I

12   didn't do the kind of analysis I did of the government's

13   witness.  If they can't agree to that, they'll testify live.

14           MR. TAYBACK:  Understood, your Honor.  I just think if

15   the question is, will we waive the constitutional right, I --

16           THE COURT:  I'm not asking you to waive a

17   constitutional right.  I'm asking you to produce these

18   witnesses for the defense here in court unless you want to

19   agree to Rakoff's rules.

20           MR. TAYBACK:  I understand, your Honor.  And we would

21   be inclined to agree.  That was our understanding.

22           THE COURT:  All right.  Consult with your client.

23           MS. DEININGER:  Scheduling-wise, your Honor, following

24   our discussion yesterday --

25           THE COURT:  I don't actually share the government's

L3GAWEI1ps

1    view of the con -- I think the confrontation clause is

2    automatically waived when the defense calls someone that the

3    government hasn't called as part of the defense case.  Whether

4    they call them as a hostile witness or not is neither here nor

5    there, in my view.

6         MS. LA MORTE:  Hopefully it's a moot issue, but if

7    it's not, we'll look at the case law.

8         THE COURT:  All right.

9         Go ahead.

10        MS. DEININGER:  Scheduling-wise, I just wanted to

11   notify your Honor that following our conversation yesterday, we

12   would propose that, in terms of conducting this remote

13   testimony, that we get it all set up during lunch and then

14   Mr. Elliott begin his testimony immediately following lunch.

15   Our prediction at this point is that, prior to lunch, we will

16   be in the direct of Ms. Cozzetto, so we would just pause for

17   testimony to conduct the testimony of Mr. Elliott.

18        THE COURT:  That's fine.

19        MR. TAYBACK:  We would agree, your Honor.

20        THE COURT:  All right.  So I think we're all set.

21   Anything else we need to take up today?

22        MS. LA MORTE:  Not from the government, not this

23   morning.

24        MR. TAYBACK:  No, your Honor.

25        MR. GILBERT:  No, your Honor.

L3GAWEI1ps

1          THE COURT:  Very good.

2          MS. DEININGER:  Sorry, your Honor.  I actually think

3     there were objections to two documents that we expect to

4     introduce through Cozzetto, who could be this morning.

5          THE COURT:  OK.  Which are they?

6          MS. DEININGER:  The first one that the defense raised

7     an objection to is Government Exhibit 458.

8          MR. GILBERT:  With regard to Government Exhibit 458,

9     our objection is focused -- I don't know if it's available on

10    the screen -- thank you -- on emails that are from -- not from

11    the witness but from an email address Frenchy ESQ at

12    ProtonMail.com.  And those appear on page 7393, 7392, and 7391.

13         THE COURT:  Yes, all right.  Let me ask the government

14    before I hear further from the defense, because ostensibly it

15    looks like hearsay, what's the government's view?

16         MS. DEININGER:  Well, this whole exchange, there are

17    emails in here from Frenchy Esq., but the response to those is

18    by Darcy Cozzetto and Guy Mizrachi, who are co-conspirators,

19    and so those emails are necessary for the context of the

20    exchange.

21         THE COURT:  What does the defense say about that?

22         MR. GILBERT:  Briefly, these are, they're fairly

23    hearsay.  Frenchy Esq. does not come up in this trial at all

24    and appears to be one of the few individuals who is not a

25    co-conspirator.  So there's no co-conspirator.

L3GAWEI1ps

1          THE COURT:  I don't think --

2          MR. GILBERT:  It's a separate trend -- I'm sorry.

3          THE COURT:  The claim is that Darcy is a

4     co-conspirator.

5          MR. GILBERT:  Right.  And that's so.  But the

6     communications from Frenchy, which are not independently

7     admissible, in our view, are unnecessary to understand the

8     context of the other communication.  It's a separate --

9          THE COURT:  Well, let me -- if someone can blow up

10    Mr. Darcy's response, I'll see what Frenchy has to say.

11          What's the relevance of all this?

12          That's a question for the government.

13          MS. DEININGER:  The relevance is that they are first

14    of all talking about the need to set up bank accounts for the

15    dispensaries that are unrelated to their actual marijuana

16    business.  And they're talking about --

17          THE COURT:  That's not stated in this particular

18    exhibit.

19          MS. DEININGER:  It is in the chain.  It's farther

20    down.  And then the addresses that are discussed, that Guy

21    Mizrachi is sending, they're talking about the corporate

22    addresses, and they show the lack of connection to the defense.

23    He says these are the corporate addresses for the new admin

24    companies.

25          THE COURT:  Do you have a hard copy of this?

L3GAWEI1ps

1            MS. DEININGER:  Sure.

2            THE COURT:  Because you keep going down the screen,

3    and then having to blow it up and so forth is not easy to

4    follow.

5            Which witness is this coming in for?

6            MS. DEININGER:  Darcy Cozzetto.

7            And then there is talk, after they talk about the --

8    after they talk about the need to set up the bank accounts,

9    they then discuss how settlement will be hitting the accounts,

10   and Darcy thanks everyone for the updated information provided.

11           THE COURT:  Yes.  So now that I've seen the whole

12   exhibit, I understand the government's point of view.  The

13   objection is overruled and they will be received.  It seems to

14   me clear that the other emails just set the context in which

15   Darcy's responses are relevant on the issues just mentioned.

16           (Government's Exhibit 458 received in evidence)

17           THE COURT:  So let me give this back to the

18   government.

19           So what's the next one?

20           MS. DEININGER:  The government one is Government

21   Exhibit 715.  And this is actually just a subset of the exact

22   chain that we looked at.  The reason that the government is

23   seeking to introduce this excerpt of it is that -- if you can

24   see, it's the last one we just looked at.  The only email

25   addresses visible at the top were Darcy Cozzetto and Frenchy

L3GAWEI1ps

```
 1     Esq.  But this one includes additional header information to

 2     show the other parties that were involved at that point in the

 3     conversation.  But it is otherwise in the exact same context.

 4              THE COURT:  Yes.  So any other additional objection to

 5     this from the defense?

 6              MR. GILBERT:  The same objection.

 7              THE COURT:  Thank you.  That objection is overruled.

 8              (Government's Exhibit 715 received in evidence)

 9              MS. DEININGER:  I believe there may have been

10     objection to Government Exhibit 303.  We have redacted the end

11     of this because there are messages -- it was going to be

12     authenticated by Darcy Cozzetto.  It's a Telegram exchange.

13     There are messages exchanged after she left Eaze, and my

14     understanding is that she never reviewed those messages and

15     would not be able to authenticate them, so we were going to

16     introduce a redacted version.  But if there is no objection to

17     authenticity, then we will produce the complete exchange.

18              MR. GILBERT:  There is no objection, your Honor.

19              MR. TAYBACK:  No objection.

20              THE COURT:  Very good.

21              (Government's Exhibit 303 received in evidence)

22              THE COURT:  All right.  Anything else?

23              MS. DEININGER:  Nothing further from the government.

24              THE COURT:  We'll see you all in about 12 minutes.

25              (Recess)
```

L3GAWEI1ps                    Patterson - Redirect

1            (Jury present)

2            THE COURT:  All right.  Our excellent jury is here and

3   they're on their way up.  So let's get the witness back on the

4   stand.

5            15 minutes, if I recall.

6            MR. FOLLY:  Yes, your Honor.

7            THE COURT:  You want the stopwatch to make a loud

8   sound at 15:01?

9   JAMES PATTERSON, resumed.

10           (Jury present)

11           THE COURT:  Good morning, ladies and gentlemen.  I'm

12   glad to see the world's greatest jury is back in session.

13           I also notice Juror No. 6 is doing his thing, and I

14   see Juror No. 4 is moving a little in that direction.  So there

15   we are.

16           All right.  We are ready to continue.

17           MR. FOLLY:  Thank you, your Honor.

18   REDIRECT EXAMINATION (Cont'd)

19   BY MR. FOLLY:

20   Q.  Good morning, Mr. Patterson.

21   A.  Good morning.

22   Q.  You were asked some questions on cross-examination

23   yesterday about Ruben.  Do you recall that?

24   A.  Yes.

25   Q.  And specifically you were asked about Ruben's involvement

L3GAWEI1ps                    Patterson - Redirect

1    in the Clearsettle operation during the 2016 to 2017 time

2    period.  Do you recall that?

3    A.  Yes.

4    Q.  He was not involved in the card processing operation during

5    that time period, correct?

6    A.  No, not to my knowledge.

7    Q.  And to your knowledge Ruben became involved in 2018, in a

8    card processing operation; is that right?

9    A.  Yes.

10   Q.  And that was when the name of the card processing operation

11   was EUprocessing.  Right?

12   A.  Yes.  That's correct.

13   Q.  Ray mentioned Ruben at the Calabasas meeting in 2018,

14   correct?

15   A.  Yes.

16   Q.  And the purpose of that meeting was to discuss credit and

17   debit card processing through Ray's organization, correct?

18   A.  Yes.

19   Q.  What did Ray say about Ruben specifically at that meeting?

20   A.  He said that he lived in Germany and he had connections to

21   the banks that would be used to set up the accounts, and that

22   specifically he was going to collect the applications from the

23   dispensaries via an email address that was set up, and that he

24   was responsible for opening the accounts.

25   Q.  I believe you testified that you left that meeting early,

1    correct?

2    A.  Yes, I did.

3    Q.  At the time that you left the meeting, what was happening?

4    A.  There was a break in the meeting, and so everyone who was

5    in the company went to the bathroom.  And Ray had said that

6    Ruben would be joining us after -- at that point, before I --

7    before I left he said that, and then I didn't stay for the

8    second half, the second part of that meeting.

9    Q.  You testified that you spoke with Nick Fasano after the

10   meeting about the meeting?

11   A.  Yes.

12   Q.  Is that right?

13        What did Nick Fasano say had occurred at the meeting

14   after you left the meeting?

15        MR. GILBERT:  Objection, asked and answered.

16        THE COURT:  Overruled.

17   Q.  You can answer, Mr. Patterson.

18   A.  Well, he said that -- the quote he used was, he said Ray's

19   German banker joined the meeting, and then went through the

20   application process with the dispensaries.

21   Q.  Someone named Ruben W also participated in Telegram

22   messages discussing the card processing operation, correct?

23   A.  Yes.

24   Q.  You were also a participant in those messages, right?

25   A.  Yes, I was.

L3GAWEI1ps                    Patterson - Redirect

1              MR. FOLLY:  Can we show the witness what's in evidence

2      as Government Exhibit 302.  You can publish that to the jury

3      and the witness, at page 50.

4      Q.  And focusing on where it says 10:52 and downward, can you

5      read aloud just the first four messages there, from Ray

6      Akhavan.

7      A.  Yes.  "Martin and Ruben have both agreed to be actively

8      involved with helping us out.  Martin is handling all reporting

9      and reconciliation.  And Ruben is interfacing with the banks.

10     You all met Ruben in LA, and Martin will be out soon hopefully

11     as well."

12     Q.  You can stop there.  We can take this down.

13             Do you recall being asked questions on

14     cross-examination by Mr. Tayback about your understanding that

15     Ray had contacts at certain merchant banks who were aware that

16     the accounts were being used to conduct marijuana transactions?

17     A.  Yes.

18     Q.  And I believe you testified that your understanding was

19     that some members of those banks were aware that these were

20     marijuana transactions.

21     A.  Yes.

22     Q.  Now, I believe you had also indicated some of the employees

23     at the banks were not aware that these were marijuana

24     transactions.  Is that right?

25     A.  Yes.  That was my understanding.

1  Q.  Such as employees who worked in compliance, right?

2  A.  That was one specific example, yes.

3  Q.  And I believe you had said that there were some situations

4  where those employees had found out that these accounts were

5  being used to process marijuana transactions?

6           MR. TAYBACK:  Objection as to time and leading.

7           MR. FOLLY:  Your Honor, I can rephrase it.

8           THE COURT:  Yes.  The objection on leading is

9  overruled.  But the objection on time is sustained.

10  Q.  Were there certain instances that Ray brought to your

11  attention where employees at some of the merchant banks had

12  found out that accounts were being used to process marijuana

13  transactions?

14  A.  Yes.  There was one instance I recall where an account had

15  gotten closed, so a new account had to be opened, and Ray said

16  that the owners of the bank were aware but that some people,

17  some lower-level people in compliance were not, so that they

18  were -- they let those people close the accounts, didn't tell

19  them what was going on, and I think he said what they said is

20  tell them "Good job," and then they reopened new accounts a

21  little bit later.

22  Q.  Now, it was your understanding that Visa did not know that

23  the fake merchant accounts were being used to process

24  marijuana, correct?

25  A.  Yes.

1   Q.  It was your understanding that MasterCard did not know that

2   these were marijuana transactions, correct?

3   A.  Yes.

4   Q.  It was your understanding that the issuing banks in the

5   United States did not know that these were marijuana

6   transactions, correct?

7            MR. TAYBACK:  Objection, foundation.

8            THE COURT:  Sustained.

9   Q.  Mr. Patterson, was it your understanding that the purpose

10  of this credit card processing operation was to trick US

11  issuing banks into processing these transactions?

12           MR. TAYBACK:  Objection, leading and foundation.

13           THE COURT:  Overruled.

14           Overruled.

15  Q.  You can answer, Mr. Patterson.

16  A.  My understanding was the purpose was to conceal it from the

17  issuing banks and Visa and MasterCard, the fact that the

18  underlying transactions were marijuana.

19  Q.  And it was your understanding that, if the issuing banks

20  found out that these were marijuana transactions, that could

21  eventually lead to the termination or shutdown of the

22  operation, correct?

23  A.  Yes.

24           MR. TAYBACK:  Objection.

25           MR. GILBERT:  Joined.

1          THE COURT:  Overruled.

2    Q.  You can answer, Mr. Patterson?

3          THE COURT:  He did answer yes.

4    Q.  And Mr. Patterson, Ray Akhavan in fact told you that,

5    correct?

6    A.  Yes.

7    Q.  And the underlying goal of the credit card operation was so

8    that Eaze customers could use their credit and debit cards to

9    purchase marijuana products through the Eaze website, correct?

10   A.  Yes, that's correct.

11   Q.  And in order to make that work, you needed to be able to

12   get the money from the Eaze customers' credit card accounts, or

13   bank accounts, to the accounts at the dispensaries, correct?

14   A.  Yes.

15   Q.  You were asked some questions on cross-examination about --

16         THE COURT:  Counsel, I allowed you to ask a series of

17   leading questions because the purpose of the objection on

18   grounds of leading is only relevant with respect to a witness

19   who can be easily led, which is, as one might infer, not

20   necessarily this witness, but I think you've gone as far as I'm

21   going to let you go on leading questions.

22   Q.  You were asked some questions on cross-examination about

23   whose idea it was to have the dispensaries have the

24   relationships directly with the processors; do you recall that?

25   A.  Yes.

1  Q.  And I believe you said that was not Ray Akhavan's decision,

2  correct?

3  A.  That's correct.  That was Eaze's decision.

4  Q.  Now, I'd like to ask you some questions about who was

5  making the decisions about how the credit card processing

6  operation worked.  Who was in charge of overseeing this credit

7  card processing operation?

8  A.  Ray.

9  Q.  Who was responsible for getting the fake merchant accounts

10 that were used for the credit card transactions?

11            MR. GILBERT:  Objection, leading.

12            MR. TAYBACK:  Joined.

13            THE COURT:  I can't imagine why you think that's

14 leading.  The question is "who," an open-ended question.  Could

15 be the man on the moon.  It could be -- well, I won't speculate

16 further, but it's certainly not leading.  Overruled.

17 Q.  You could answer, Mr. Patterson.

18 A.  Can you repeat the question?

19 Q.  Who was responsible for getting the fake merchant accounts

20 that were used to process the credit card transactions?

21 A.  My understanding was that during the Clearsettle phase it

22 was Ray, and then the EUprocessing phase was both Ray and

23 Ruben.

24 Q.  Who were some of the main people that Ray worked with

25 during the credit card processing operation?

L3GAWEI1ps                      Patterson - Recross

1    A.  Hussein, Ozan, Martin, Ruben, Andreas, are names that I saw

2    in the chats.

3    Q.  Mr. Patterson, did you an understanding that this was a

4    criminal scheme during the time period when you participated in

5    it?

6    A.  Yes.  It -- yes.

7    Q.  And you pled guilty to participating in the bank fraud

8    conspiracy?

9    A.  Yes.

10              MR. FOLLY:  No further questions.

11              THE COURT:  Any recross?

12              MR. TAYBACK:  Yes, your Honor.

13   RECROSS EXAMINATION

14   BY MR. TAYBACK:

15   Q.  Mr. Patterson, can you hear me?

16   A.  Yes, I can.

17   Q.  In a couple of places in the documents that you testified

18   about, the word "depots" is used.  "Depots" is a synonym for

19   dispensaries?

20   A.  Yes.

21              MR. TAYBACK:  If you could place before the witness

22   what's been marked and introduced as Exhibit GX 422.

23   Q.  This is an email that you discussed during the course of

24   your testimony.  Do you recognize it?

25   A.  Yes, I do.

L3GAWEI1ps                    Patterson - Recross

1   Q.  I'd like to direct your attention to the sentence that

2   says, "So in itself it's not the issue."  Do you see that?

3   A.  Yes.

4   Q.  Mr. Akhavan says to you, "So in itself it's not the issue.

5   The issue is that usually, with high CBs" -- you understood

6   that to be chargebacks, correct?

7   A.  Yes.

8   Q.  -- "you have high complaints to the bank which can result

9   in people talking about the product, and if you have a high

10  number of, let's say, Wells Fargo customers who complain about

11  not liking the weed or the weed card issuing doctors" -- see

12  that?

13  A.  Yes.

14  Q.  Then we go to the next sentence.  It says, "The higher the

15  chance that Wells Fargo notices weed is being sold and then

16  reaches out to Visa and MasterCard" -- you see that?

17  A.  Yes.

18  Q.  Your understanding was that Visa and MasterCard were the

19  ones that had the rules against processing marijuana, correct?

20  A.  Yes.  I knew that they -- well, I knew that they didn't

21  have MCC codes for marijuana dispensaries.

22  Q.  And Visa and MasterCard were the ones that would be

23  potentially the ones to actually contact the merchant bank and

24  do -- and cause an investigation to occur, correct?

25  A.  Yes.

L3GAWEI1ps                    Patterson - Recross

Q.  And the events described here that you understand, the risk
was after the transaction, correct?  That somebody would say
afterwards they contact the bank and they didn't recognize
something on their bank statement?

A.  On this particular point, yes.

          MR. TAYBACK:  Thank you.  You can take it down.

Q.  As I believe you indicated previously, you did not spend
time looking at the different banks' policies, what the issuing
banks would or wouldn't do, correct?

A.  That's correct.

          MR. TAYBACK:  I have no further questions.

          THE COURT:  Anything from -- yes.

RECROSS EXAMINATION

BY MR. GILBERT:

Q.  Mr. Patterson, you have no personal knowledge of Ruben
Weigand collecting applications for bank accounts, correct?

A.  That's correct.

Q.  You have no personal knowledge of Mr. Weigand submitting
any application to open a bank account, correct?

A.  That's correct.

Q.  And you have no personal knowledge of him getting what
you've described as fake merchant accounts, correct?

A.  That's correct.

Q.  And you understood that, from Ray, that Mr. Weigand was
supposed to be joining the meeting in March of 2018 that you

L3GAWEI1ps                    Patterson - Recross

1    testified about?

2    A.  Yes.

3    Q.  And after you learned that, you left the meeting.  Correct?

4    A.  Yes.

5    Q.  Before meeting with Mr. Weigand.

6    A.  That's right.

7    Q.  And it's true that you never requested of Mr. Akhavan that

8    he introduce you to Mr. Weigand at any time.  Correct?

9    A.  Correct.

10   Q.  And you never requested to speak to Mr. Weigand on the

11   phone.  Correct?

12   A.  Correct.

13   Q.  And in fact you never did.

14   A.  No, I've never spoken to him.

15   Q.  And you testified yesterday -- well -- that you believed

16   that you started committing bank fraud in the year 2018.  Isn't

17   that true?

18   A.  What I said is that that's when I would say the lingering

19   doubts that I had were removed.  Before that I was -- I knew it

20   was -- what we were doing was -- it felt wrong, but I didn't

21   know for sure, I would say, until after that meeting.

22   Q.  And that meeting was in the year 2018.  Correct?

23   A.  Yes.

24          MR. GILBERT:  Nothing further.

25          THE COURT:  Anything else?

1          MR. FOLLY:  No, your Honor.

2          THE COURT:  Thank you very much.  You may step down.

3          (Witness excused)

4          THE COURT:  Please call your next witness.

5          MS. DEININGER:  The government calls Chuck Brown.

6   CHARLES BROWN,

7        called as a witness by the government,

8        having been duly sworn, testified as follows:

9          THE COURT:  Counsel.

10   DIRECT EXAMINATION

11   BY MS. DEININGER:

12   Q.  Good morning, Mr. Brown.

13   A.  Good morning.

14   Q.  Can you hear me OK?

15   A.  Yes, I can.

16   Q.  OK.  Please tell me if you are not able to at any point.

17          Mr. Brown, where do you work?

18   A.  I work at Actors Federal Credit Union.

19   Q.  Do you mind if for the purpose of our conversation I call

20   it Actors?

21   A.  Yes.  That's fine.

22   Q.  How long have you worked at Actors?

23   A.  Since 2008.

24   Q.  And what is your current role there?

25   A.  I'm the chief compliance and risk officer.

1   Q.   What do you do as the chief compliance and risk officer?

2   A.   My primary duties are to research and advise our board of

3   directors and the credit union staff on matters of regulatory

4   issues that come up in the course of business.

5   Q.   And do you specialize in any particular regulatory areas?

6   A.   Yes.  I'm a certified anti money laundering specialist.

7   Q.   What is anti money laundering?

8   A.   Well, money laundering is when the proceeds of an illegal

9   action are introduced into the US banks system in an effort to

10  obscure the origin of the funds or the fact that they came from

11  an illegal activity.  Anti money laundering would be monitoring

12  and setting up systems and personnel in place to look for signs

13  of that and report it to the property authorities.

14  Q.   What is an example of the types of proceeds from illegal

15  actions that might appear to be laundered?

16  A.   Well, for instance, if a drug dealer, you know, earns money

17  selling drugs on the street, then they would -- that would

18  probably be in the form of cash, and they would need to

19  introduce it into the system and pay their suppliers in some

20  way.  So they might try to do something like bring it into

21  their bank and deposit it in smaller amounts than would

22  normally need to be reported.  And then from there they might

23  even take more steps that are called layering.  They might send

24  a wire transfer to another bank or they might purchase money

25  orders and then take it perhaps to another institution and take

L3GAWEI1ps                     Brown – Direct

1    further steps from that until the actual origin of the funds is

2    no longer really very easily traced.

3    Q.   How long have you been the chief compliance and risk

4    officer at Actors?

5    A.   For a little over three years.

6    Q.   Did you hold any other role at Actors from the 2016 to 2019

7    time period?

8    A.   Yes.  I was the senior compliance officer before I was

9    named chief.

10   Q.   How was your role different as senior compliance officer,

11   if at all, from the role you hold now?

12   A.   It's slightly more expanded.  I have a larger staff that I

13   oversee, and some areas of regulatory issues have been expanded

14   as well.  I have a slightly broader definition for my job than

15   I did as senior compliance.  But otherwise it's basically the

16   same.

17   Q.   What type of company is Actors?

18   A.   Actors is a federally chartered credit union, which

19   essentially just means that it's a not-for-profit financial

20   cooperative, offering essentially the same services as banks.

21   Q.   But what does it mean that it's federally chartered?

22   A.   Well, there are two types of charters.  There's a federal

23   charter, or a state charter.  It means that, if we're federally

24   chartered, it means that we're regulated by the National Credit

25   Union Administration and insured by a division of that National

L3GAWEI1ps                          Brown – Direct

1    Credit Union Administration called the National Credit Union

2    Share Insurance Fund.

3    Q.   So is Actors insured by the National Credit Union Share

4    Insurance Fund?

5    A.   Yes, we are.

6    Q.   Where is Actors headquartered?

7    A.   We're headquartered in Manhattan in Times Square.

8    Q.   And what banking services does Actor offer its members?

9    A.   We offer full banking services, almost everything that a

10   commercial bank would offer.  We offer deposit accounts,

11   savings and checking accounts, debit cards.  We offer a variety

12   of sending products, personal loans, auto loans, mortgage

13   damages, credit cards, almost everything that you would find at

14   a bank.

15   Q.   With respect to the credit and debit card that you just

16   mentioned, is Actors what is referred to as the issuing bank?

17   A.   Yes, we are.

18   Q.   So during the 2016 to 2019 time period, what credit and

19   debit card brand did Actors partner with?

20   A.   Over 99 percent of our cards were branded with the Visa

21   logo.  We did have a few MasterCards left over in that time

22   from an earlier time period.

23              (Continued on next page)

24

25

1  Q.  So in your role, are you familiar with how transactions for

2  credit and debit card issued by Actors are processed?

3  A.  In given terms, yes.

4  Q.  And what is that understanding based on?

5  A.  Well, for every transaction for a credit or debit card,

6  there are a number of different entities involved.  There's the

7  cardholder, of course, or the customer --

8  Q.  Mr. Brown, if I can just pause you for a second?

9  A.  Sure.

10 Q.  I was just asking how you became familiar with how that

11 process works.

12 A.  Mostly just through experience, as well as reading some

13 rules and regulations.

14 Q.  And in your role, are you also familiar with Visa and

15 MasterCard's rules for the bank and its networks?

16 A.  Again, generally, yes.

17 Q.  Now, I think is where you were starting to say.  Can you

18 walk me through a little bit of your understand of how

19 transactions for Actors credit cards are processed?

20 A.  Sure.  There are a number of entities involved.  There is a

21 cardholder who holds an account at the issuing bank.  The

22 issuing bank, in this case us, might also use a third-party

23 payment processor.  Then there is the payment network, which we

24 mentioned Visa and MasterCard already, but another credit card

25 also might be Discover or American Express.  They might also be

L3GPWEI2                          Brown - Direct

1    the issuer if it's a credit card.

2            Then, on the other end of the transaction, is a

3    merchant, which is a business selling goods or services of some

4    type.  That merchant would have an account with an acquirer,

5    and that acquirer could be a financial institution, or they

6    also might be using a third-party payment processor.

7            So when the customer or cardholder makes a purchase

8    from a merchant, information about that card and about the

9    transaction and about the merchant are transmitted

10   electronically through the payment network to the issuing bank

11   or the issuing bank's payment processor.  The information

12   transmitted would be the card number and expiration date, the

13   CDB code.

14           MR. PELLECHI:  Objection.  Narrative, lacks

15   foundation.

16           THE COURT:  Well, the question called for a narrative,

17   and there was no objection; so I will allow him to answer that.

18           However, going forward, let's be a little careful

19   about that.

20           MS. DEININGER:  Yes, your Honor.

21           THE COURT:  You can finish your answer.

22   A.  The information would include the card number, expiration

23   date, the -- possibly the code on the back of the card, a PIN

24   validation code, if it was a transaction where the customer had

25   to put in a PIN number, the date, time and location and dollar

L3GPWEI2                    Brown – Direct

1   amount of the transaction, and then the merchant's name or a

2   merchant descriptor, and a merchant category code, which is the

3   classification for what types of goods and services this

4   particular merchant might fall under, under the definition of

5   the payment networks, Visa or MasterCard.

6   Q.  So just to be clear, Mr. Brown, what is your understanding

7   of what Visa and MasterCard's role is in this process?

8   A.  They establish the rules, but they also own essentially the

9   networks that the transaction travels through.  They also take

10  care of the settlement of the funds between the two parties.

11  Q.  And what is the role of the acquiring bank?

12  A.  The acquiring bank essentially sponsors the merchant into

13  the payment network.  They are required to abide by a certain

14  set of rules.  They essentially do what is sometimes called an

15  underwriting process of the merchant, meaning that the merchant

16  applies for an account and the acquirer verifies and does due

17  diligence on the merchant to make sure that they are -- they

18  are who they say they are and that they are providing the goods

19  and services that they say they provide.

20  Q.  And are there any other things that the acquiring bank is

21  looking to confirm during the due diligence process?

22         MR. TAYBACK:  Objection, foundation.

23         THE COURT:  Sustained.

24  Q.  Mr. Brown, taking a step back, you mentioned that one roll

25  of Visa and MasterCard is taking care of the transfers of funds

L3GPWEI2                          Brown - Direct

1   between the two parties?

2   A.  Yes.

3   Q.  What's your understanding of what two parties -- what two

4   parties did you mean there?

5   A.  Well, it would essentially be the two institutions

6   involved, the issuing institution and the acquiring

7   institution.  When the transaction is made, the funds are

8   either --

9            MR. TAYBACK:  Objection.  It's a narrative.

10            THE COURT:  Sustained.  The first sentence will

11   remain.  The rest is stricken.

12            Go ahead.

13   BY MS. DEININGER:

14   Q.  Mr. Brown, what's your understanding of what the merchant's

15   responsibility is when they're being sponsored into the network

16   by an acquiring bank?

17            MR. TAYBACK:  Objection.  Foundation.

18            THE COURT:  Overruled.

19   A.  Their responsibility is to present themselves honestly and

20   accurately with information about their business and their

21   goods and services to the acquirer.

22   Q.  Now, you mentioned that issuers -- issuing banks can work

23   with a payment processor.  Does Actors employ a payment

24   processor?

25   A.  Yes, we do.

1   Q.  And what's the role of the payment processor?

2   A.  The payment processor's role is technological, and they are

3   the party involved in validating the transaction for security

4   and risk mitigation purposes.

5   Q.  And what does that mean, that they are responsible for

6   validating the transaction for mitigation purposes?

7   A.  So all of that information that was transmitted

8   electronically through the payment network has to be read by

9   our payment processor.  So they're verifying that it's a valid,

10  unexpired card; that the correct PIN code was used.  They're

11  looking to see if there is enough credit or funds available to

12  cover the transaction, and they're also looking for any signs

13  that it might be a prohibited transaction.

14  Q.  And so then, finally, what is Actors' role in the

15  transaction process?

16  A.  So once that information has been transmitted and gone

17  through the processor, our role is to verify whether there

18  is -- whether there are funds available, and we send a message

19  back through the payment processor -- our system does this

20  automatically; we don't have a human looking at it -- sends a

21  message back that either approves or declines the transaction.

22  Q.  Can you give me some examples of where a transaction would

23  be declined or blocked?

24  A.  Well, the most obvious one would be if there were not

25  available funds or available credit to cover the transaction.

1    But it might also be blocked if -- we, as Actors, had set up

2    certain parameters or certain rules to decline certain types of

3    transactions or certain merchants even.

4    Q.   And under what circumstances would Actors set up those type

5    of rules?

6    A.   Generally, it's in response to situations of fraud,

7    complaints by our cardholders, our members who have had cases

8    of fraud perpetrated against them.  Oftentimes it comes when we

9    have seen a pattern of fraud from a particular merchant or a

10   particular merchant in a particular geographic location.

11   Q.   Does Actors work with its payment processor to identify

12   those patterns of fraud?

13   A.   Yeah, the Actors is a small institution; so we don't really

14   have the personnel necessarily to do a deep investigation on

15   every case or pattern of fraud, but we work with our payment

16   processor.  Sometimes they also alert us if they see patterns

17   of fraud across multiple institutions, since they work with

18   more than us.

19   Q.   So a few minutes ago you listed a bunch of transaction

20   information that's received by the payment processor and Actors

21   in the course of the transaction authorization process.  One of

22   those was amount, right?

23   A.   Sorry?

24   Q.   One of those was the amount of the transaction, right?

25   A.   That's right.

L3GPWEI2                        Brown - Direct

```
 1   Q.  And I think you also mentioned merchant name?

 2   A.  Yes.

 3   Q.  Or merchant descriptor?

 4   A.  That's right.

 5   Q.  And then is there also location information transmitted?

 6   A.  Yes, yes.

 7   Q.  And I think you mentioned a code.  What were you referring

 8   to there?

 9   A.  Merchant category code.  These are a series of codes that

10   are set up by Visa or MasterCard to indicate the type of

11   business involved.

12   Q.  And just remind us, so who is -- who is that information

13   transmitted to?

14   A.  It's transmitted from the acquirer, through the payment

15   network, to the issuing bank.

16   Q.  And again, how does the payment processor that Actors works

17   with utilize that information?

18   A.  They verify that it's a valid merchant category code, and

19   that information is transmitted to our system so that it can be

20   printed on the member's monthly statements.

21   Q.  And is that information utilized when they are looking for

22   patterns of fraud, like you mentioned earlier?

23   A.  Yes.  It could be that we've noticed or they have noticed

24   patterns of fraud amongst an electronic -- you know, in

25   electronics stores or something like that, so that might raise
```

1    a red flag.

2    Q.  So this transaction information that the payment processor

3    Actors receives, is it important to Actors that that

4    information be accurate?

5    A.  Yes, it is.

6    Q.  Why?

7    A.  Well, the integrity of the entire payment system is --

8    depends on all parties playing by the same rules, and the

9    accuracy of that information is important from a consumer

10   protection point of view as well.  It's important that the --

11   what appears on the member's statements is accurate so that the

12   member of or the cardholder knows exactly what their purchase

13   was and who it was from.

14   Q.  Okay.  Thank you.  Once a transaction is approved, can you

15   describe how the money for the goods or services flows?

16   A.  The settlement process happens once a day and the payment

17   network is really in charge of that.  They are in charge of

18   deducting the funds from, in our case, our settlement account

19   at our corporate credit union, and depositing it into the

20   acquirer's settlement account, which might be at the Federal

21   Reserve or at their headquarters.

22   Q.  So you mentioned that funds are deducted from "our

23   settlement account;" is that an account held by Actors?

24   A.  That's correct.

25   Q.  And what information from card transactions ultimately goes

1   onto an Actors' customer's statement?

2   A.   The date, time, location, dollar amount and the merchant

3   name or descriptor.

4   Q.   Generally, what can happen if a customer sees a transaction

5   on their statement that they don't recognize?

6   A.   What can happen is that they might call us and say that the

7   transaction was not authorized.

8   Q.   And what would Actors do if they received that sort of call

9   from a customer?

10  A.   We would ask the cardholder for information, whether they

11  had had the card in their possession at the time of the

12  transaction or not, what all the facts were about the

13  particular transaction.

14       We would then send that information to our payment

15  processor, who would initiate an investigation.  We would be

16  required, within ten days of that cardholder reporting that

17  unauthorized transaction to us, to give the cardholder the

18  credit back for that, and if ultimately the transaction could

19  not be approved to be authorized, that credit would be

20  permanent.

21  Q.   Now, you mentioned that you had sent information you

22  received to your payment processor who would initiate an

23  investigation.  Do you have an understanding, based on your

24  role, of generally some of the types of things your payment

25  processor might do in that investigation?

L3GPWEI2                          Brown - Direct

1    A.  Very generally, yes.

2    Q.  Generally, so what is your understanding?

3    A.  They would probably try to contact the merchant.  They

4    would look into the coding of the transaction to see whether a

5    PIN number was used or a signature was provided.  If it was a

6    signature, they would obtain proof, if they had a copy of the

7    proof of signature, to see if it was the cardholder's signature

8    or not.  And essentially that's my basic understanding of some

9    of the elements that would go into it.

10   Q.  You mentioned they might contact the merchant.  Do you know

11   how they might do that for an online merchant?

12   A.  I don't know that.  I'm sorry.

13   Q.  A minute ago we discussed how certain information regarding

14   each transaction is sent to Actors through the network,

15   correct?

16   A.  Yes.

17   Q.  How does Actors receive that information?

18   A.  It's sent to our server, essentially our computer system in

19   our main office in New York.

20   Q.  And so that office is here in New York City; that's where

21   the server is located?

22   A.  That's correct.  It's located in our Times Square office.

23   Q.  And was it located there in the 2016 to 2019 time period?

24   A.  Yes.

25   Q.  So based on your role, are you familiar with Actors'

1   policies prohibiting certain uses of Actors credit and debit

2   cards?

3   A.  Yes.

4   Q.  I'd like to, Mr. Levine, if you can pull up just for the

5   witness what's been marked for identification as Government

6   Exhibit 2717.

7           Mr. Brown, do you recognize this?

8   A.  Yes, I do.

9   Q.  What is it?

10  A.  It's our Visa credit card holder agreement.

11          MS. DEININGER:  Your Honor, the government offers

12  Government Exhibit 2717 into evidence.

13          MR. TAYBACK:  No objection.

14          MR. PELLECHI:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 2717 received in evidence)

17          MS. DEININGER:  Mr. Levine, you can show that to

18  everyone.

19  BY MS. DEININGER:

20  Q.  Now, Mr. Brown, does this cardholder agreement apply to all

21  Actors' credit cards?

22  A.  Yes, it does.

23  Q.  And was a version of this cardholder agreement in effect in

24  the period between 2016 and 2019?

25  A.  Yes, it was.

1    Q.  If we can scroll down to paragraph 8.  I think it might be

2    page 5.  There we go.

3              Do you see paragraph 8?

4    A.  Yes.

5    Q.  Can you read that for me?

6    A.  "Your card may not be used for any illegal transactions."

7    Q.  And is it -- what's your understanding of whether marijuana

8    transactions would be prohibited under this rule?

9    A.  They would be.

10   Q.  Why?

11   A.  Because marijuana purchases are still illegal at the

12   federal level and because they are against Visa rules.

13   Q.  In terms of the rule in this cardholder agreement, does it

14   make any difference whether the transaction is conducted in a

15   state that has legalized personal use of marijuana?

16   A.  No.

17   Q.  Did all versions of the cardholder agreement in effect

18   between 2016 and 2019 contain this rule?

19   A.  Yes.

20   Q.  Mr. Levine, you can take that down.  Thank you.  And can we

21   now show, just for the witness, what has been marked for

22   identification as Government Exhibit 2704.

23              Mr. Brown, do you recognize that document?

24   A.  Yes.

25   Q.  What is it?

L3GPWEI2                          Brown - Direct

 1  A.  This is the terms and conditions of our account holder

 2  agreement, including the account debit card.

 3          MS. DEININGER:  Your Honor, the government offers

 4  Government Exhibit 2704 into evidence.

 5          MR. TAYBACK:  No objection.

 6          MR. PELLECHI:  No objection.

 7          THE COURT:  Received.

 8          (Government's Exhibit 2704 received in evidence)

 9          MS. DEININGER:  Mr. Levine, if you can show that to

10  everyone.

11  BY MS. DEININGER:

12  Q.  And so again, Mr. Brown, what's the title of this document?

13  A.  Terms and Conditions of Your Account.

14  Q.  And I think you said these terms and conditions apply to

15  all Actors' bank accounts; is that right?

16  A.  That's correct.

17  Q.  Was a version of these terms and conditions in effect in

18  the period between 2016 and 2019?

19  A.  Yes.

20  Q.  If we can go to page 5.

21          About a third from the top there's a paragraph, it

22  says in bold:  "Advisory against illegal use."  Do you see

23  that?

24  A.  Yes.

25  Q.  Can you read the sentence following that?

1   A.  "You agree not to use your cards for illegal gambling or

2   other illegal purpose."

3   Q.  You can stop there.  Actually, sorry.  Read the second

4   sentence?

5   A.  "Display of a payment card logo by, for example, an online

6   merchant does not necessarily mean that transactions are lawful

7   in all jurisdictions in which the cardholder may be located."

8   Q.  And just to be clear, there's a reference here to "cards."

9   What "cards" does this apply to?

10  A.  This applies to our debit cards.

11  Q.  And did all versions of the Actors' terms and conditions

12  effective between 2016 and 2019 have this rule?

13  A.  Yes.

14  Q.  What's your understanding of whether marijuana transactions

15  in the United States would be prohibited under this rule?

16  A.  They would be prohibited under this rule.

17  Q.  Why?

18  A.  For the same reasons as the credit card, the marijuana

19  purchases are not legal at the federal level and it is against

20  Visa/MasterCard rules.

21  Q.  So again, would it make any difference if the transaction

22  is conducted in a state that has legalized marijuana sales?

23  A.  No.

24  Q.  Mr. Levine, you can take that down.

25          Mr. Brown, does Actors collect any fees when its

1    members use their cards for transactions?

2    A.  Yes, we use get interchange income.

3    Q.  And how much are those fees on any given transaction?

4    A.  I really don't know for certain.  It's a few cents.

5    Q.  Is it important to Actors that it remain in compliance with

6    Visa's rules?

7    A.  Yes, it is.

8    Q.  Why?

9    A.  Not remaining in compliance could result in sanctions,

10   either from our federal regulators or from Visa themselves.

11   Q.  And what impact would it have on Actors' business if it

12   wasn't able to participate in the Visa network?

13   A.  It could be a huge impact.  We would likely no longer be in

14   existence.

15   Q.  Would Actors knowingly approve marijuana credit or debit

16   card transactions?

17   A.  No.

18   Q.  Are marijuana-related businesses permitted to open accounts

19   with Actors?

20   A.  No.

21   Q.  Why not?

22            MR. TAYBACK:  Objection.  Relevance.

23            THE COURT:  Overruled.

24   Q.  You can answer the question.

25   A.  While it's not explicitly prohibited by our federal

L3GPWEI2                         Brown - Direct

regulators, the requirements for banking marijuana businesses
are very stringent as a high-risk business, and Actors doesn't,
at this time, have the resources to conduct the level of due
diligence and take on the risk involved in banking marijuana
businesses.

Q.   And you mentioned that there were requirements for banking
marijuana business.  Generally, what requirements are you
referring to?

A.   Extensive due diligence on the businesses, as well as
almost constant reporting of transaction activity to the
Financial Crimes Enforcement Network.  In many cases, many
regulators feel that the institution's responsibility is to
follow every transaction from seed to sale.

Q.   So what, if anything, does Actors do to make sure it
doesn't open up an account for a marijuana-related business?

A.   We ask each business that opens an account for us what the
nature and purpose of their business is.  We do due diligence
by verifying that through their corporate documents, online
searches, things like that.  So if we were to receive an
application from a marijuana business, we would not accept it.

Q.   And just to be clear, what would Actors do if a
marijuana-related business applied for an account with Actors?

A.   We would decline the account.

Q.   What would Actors do if it learned that one of its bank
accounts that it already had was held by a marijuana-related

L3GPWEI2                        Brown - Direct

1    business?

2    A.  We would be required to report them to the Financial Crimes

3    Enforcement Network, or some form of law enforcement, and we

4    would close the account.

5    Q.  Is there a name for this type of report that you would

6    submit to the Financial Crimes Enforcement Network?

7    A.  It's called a Suspicious Activity Report, often referred to

8    as a SAR.

9    Q.  Is Actors required to submit SARs under certain

10   circumstances?

11   A.  Yes.

12   Q.  Can you generally tell me what -- when it's required to

13   submit a SAR?

14   A.  It's required to submit a SAR if we become aware of a crime

15   being committed or if we strongly suspect so.

16   Q.  So going back to debit and credit card transactions for a

17   minute.  What would Actors do if it became aware that a

18   particular transaction was fraudulent or illegal, after it was

19   approved?

20   A.  I'm sorry, could you rephrase the question?

21   Q.  Sure.  What would Actors do if it received a customer

22   complaint indicating that a transaction might have been

23   fraudulent or illegal, after it was approved?

24            MR. PELLECHI:  Objection.  Compound question.

25            THE COURT:  Sustained.

1    Q.  What would Actors do if it received a customer complaint

2    indicating that a transaction might have been illegal, after it

3    was approved?

4    A.  We would initiate the investigation with our payment

5    processor, and if the customer said that the transaction was

6    not theirs, then we would give them the provisional credit

7    pending the completion of the investigation.

8    Q.  And what would Actors do if it received a customer

9    complaint indicating that a particular transaction was

10   fraudulent after it was approved?

11   A.  The same thing.

12   Q.  Can you give us some examples of how fraud or illegality

13   might come to Actors' attention?

14   A.  It would primarily be through our customers.

15   Q.  And would that generally be for transactions that had

16   already been processed?

17   A.  Yes, they would see it on their statements.

18   Q.  What would Actors do if it found out that a merchant was

19   submitting marijuana transactions into the Visa network for

20   payment?

21   A.  We would block that merchant.

22   Q.  And how would you do that?

23   A.  We would set up a rule, parameters with our payment

24   processor.

25        MS. DEININGER:  At this time, your Honor, the

L3GPWEI2                    Brown - Direct

1    government would like to offer into evidence as -- actually, my

2    apologies.

3            Mr. Levine, if you can pull up just for the witness

4    what has been marked for identification as Government

5    Exhibit 2705.

6    BY MS. DEININGER:

7    Q.  Mr. Brown, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is a signature card from one of our members.  It's an

11   account-opening application.

12   Q.  And, Mr. Levine, if you can now pull up, just for the

13   witness, Government Exhibit 2706 and 2707 next to each other.

14           Mr. Brown, do you recognize these?

15   A.  Yes.

16   Q.  What are they?

17   A.  2706 is a checking account application, and 2707 is an

18   application for membership.

19   Q.  Are these Actors' bank account records?

20   A.  Yes, they are.

21   Q.  Can we pull -- Mr. Levine, if you can pull up, just for the

22   witness, what's been marked for identification as 2708 and

23   2709.

24           Mr. Brown, do you recognize these?

25   A.  Yes.

L3GPWEI2                        Brown - Direct

1   Q.  Are these also Actors' bank account records?

2   A.  Yes, they are.

3   Q.  Mr. Levine, if you can pull up, just for the witness,

4   what's been marked for identification as 2710 and 2711.

5            Mr. Brown, do you recognize these?

6   A.  Yes.

7   Q.  Are these also Actors' bank account records?

8   A.  Yes, they are.

9   Q.  For individual accounts?

10  A.  Yes.

11  Q.  Mr. Levine, if you can now pull up, just for the witness,

12  what's been marked for identification as 2712 and 2713.

13           Mr. Brown, do you recognize these?

14  A.  Yes.

15  Q.  Are these also Actors' bank account records for individual

16  accounts?

17  A.  Yes, they are.

18  Q.  Mr. Levine, if you can pull up what's been marked for

19  identification as Government Exhibit 2714 and 2715.

20           Mr. Brown, do you recognize these?

21  A.  Yes.

22  Q.  Are these also Actors' bank account records?

23  A.  Yes, they are.

24  Q.  For individual accounts?

25  A.  Yes.

1   Q.  And lastly, Mr. Levine, if you can pull up Government

2   Exhibit 2716.

3            Mr. Brown, do you recognize this?

4   A.  Yes.

5   Q.  What is it?

6   A.  It's also a bank record and application for an individual

7   account.

8            MS. DEININGER:  Your Honor, the government offers

9   Government Exhibits 2705 through 2716 into evidence.

10           MR. TAYBACK:  The government stipulates that they're

11   business records and no objection.

12           MR. PELLECHI:  No objection.

13           THE COURT:  Received.

14           MS. DEININGER:  Mr. Tayback, I believe you meant the

15   defense?

16           MR. TAYBACK:  I said the defense stipulates that they

17   are business records.

18           (Government's Exhibits 2705 through 2716 received in

19   evidence)

20   BY MS. DEININGER:

21   Q.  Mr. Levine, can you publish Government Exhibit 2705, page

22   5, for everyone.

23           All right.  Mr. Brown, can you explain what we're

24   looking at?

25   A.  It's a monthly statement of one of our members.

L3GPWEI2                     Brown - Direct

1   Q.  And looking at the top, can you read the name and address

2   of the bank that's listed?

3   A.  Actors Federal Credit Union, 165 West 46th Street, New

4   York, New York 10036-2508.

5   Q.  And directing your attention to the very last entry on the

6   page, can you read that?

7   A.  It's from October 3rd, 2018, point of sale purchase for a

8   card number ending in 1332.  It's for $46.25, and the merchant

9   is Goodegreenbazaar.com, Leeds GB on 10-3-2018 at 20:23.

10  Q.  I think you -- who did you say -- based on this statement,

11  who does the merchant appear to be?

12  A.  Goodegreenbazaar.com.

13  Q.  And what's your understanding of what Leeds GB reflects?

14  A.  That would reflect the location.

15  Q.  Is that the location of the -- the location of who?

16  A.  It would be the location of the merchant.

17  Q.  Is there anything you can identify in this record that

18  links this transaction to a marijuana business in California?

19  A.  No.

20  Q.  Mr. Levine, if we can now publish what's in evidence as

21  Government Exhibit 2707 and go to page 11.

22          Mr. Brown, what is this?

23  A.  It is also a monthly statement.

24  Q.  And what city does this account holder reside in?

25  A.  New York.  Astoria, New York.  Queens, New York City.

L3GPWEI2                          Brown – Direct

1   Q.   Looking down at the page to an entry October 11th, 2018; do

2   you see that?

3   A.   Yes.

4   Q.   There we go.  All right.  Looking at that October 11th,

5   2018, entry, who does the merchant appear to be?

6   A.   Organikals.store.

7   Q.   And do you see where it says GB?

8   A.   Yes.

9   Q.   What's your understanding of what GB reflects?

10  A.   My understanding is that it stands for Great Britain.

11  Q.   And again, whose location is that supposed to be?

12  A.   The merchant's.

13  Q.   Is there anything you can identify in this statement of

14  accounts that links this transaction to a marijuana business in

15  California?

16  A.   No.

17  Q.   Now, if we can just go to page 12 of this same document.

18            And, Mr. Brown, if you can look to where there's an

19  entry from November 19th, 2018; do you see that?

20  A.   Yes.

21  Q.   And who does it indicate is the merchant in that

22  transaction?

23  A.   Greenteacha.com.

24  Q.   And based on the entry, where does it indicate that the

25  merchant is located?

1   A.  Leeds, Great Britain.

2   Q.  Is there anything you can identify in that transaction that

3   links it to a marijuana business located in California?

4   A.  No.

5   Q.  One more.  Mr. Levine, can you publish for everyone what's

6   in evidence as Government Exhibit 2710, and we can go to page

7   14.

8        Mr. Brown, just again generally, what are we looking

9   at?

10  A.  It's another statement of account, a monthly statement.

11  Q.  And again, looking near the top of the statement where it

12  identifies the cardholder, can you tell me what city the

13  cardholder resides in?

14  A.  New York.

15  Q.  And what's the time period for this statement?

16  A.  This is a statement for the month of October 2018.

17  Q.  And now if we look down the -- actually, we can go to page

18  19.  If you can just scroll, I think this statement continues,

19  and we're looking for an entry from October 11th, 2018.  It

20  would be the fourth entry down.

21        Mr. Brown, do you see that?

22  A.  Yes.

23  Q.  And who does it indicate that the merchant was in that

24  transaction?

25  A.  Soniclogistix.com.

1   Q.  And where does it indicate that the merchant was located?

2   A.  Great Britain.

3   Q.  Is there anything that you can identify in that transaction

4   information that links this transaction to a marijuana business

5   in California?

6   A.  No.

7   Q.  Now, Mr. Brown, directing your attention to 2020, did

8   Actors, at some point, receive a subpoena from the government

9   in connection with this case?

10  A.  Yes.

11  Q.  And does that subpoena identify the names of any merchants?

12  A.  Yes.

13  Q.  Did it identify -- does that include the names of the

14  merchants we just looked at --

15  A.  Yes.

16  Q.  -- on this bank account record?

17  A.  Yes, it did.

18  Q.  Did you conduct any investigation into the merchants

19  identified on the government's subpoena after you received

20  that?

21  A.  We did a preliminary investigation, yes.  Essentially, we

22  looked up their names on the internet.

23  Q.  And were you able -- what were you able -- were you able to

24  make any determinations as to their business?

25  A.  No, not really.  We found nothing definitive.

L3GPWEI2                          Brown - Cross

1   Q.  And have you taken any other action with regard to the

2   merchants identified in the government subpoena to Actors?

3   A.  I'm sorry, could you repeat that?

4   Q.  Have you taken any other action with regard to the

5   merchants identified in the government's subpoena?

6   A.  Yes.  Once we understood a little bit more about the facts

7   of the case, which has been very recent, then we did institute

8   a rule with our payment processor to block transactions from

9   the merchant names that we knew about.

10  Q.  And roughly when was that done?

11  A.  It was done about a week ago.

12          MS. DEININGER:  No further questions, your Honor.

13          THE COURT:  All right.  Cross-examination.

14  CROSS-EXAMINATION

15  BY MR. TAYBACK:

16  Q.  Mr. Brown, can you hear me?

17  A.  Yes, thank you.

18  Q.  My name is Christopher Tayback, and I represent Mr. Akhavan

19  during this trial.  I have a few questions for you.

20          If you could -- if Mr. McLeod could bring up GX2704.

21          That's the debit cardholder agreement you testified

22  about.  It should be on the screen in front of you.  One

23  moment.  Do you have that in front of you?

24  A.  Yes.

25  Q.  If I could direct your attention to page 5?

L3GPWEI2                          Brown - Cross

1            And bring up the paragraph that says "advisory against

2       illegal use."

3            Do you see that?

4   A.  Yes.

5   Q.  You say there you agree not to use your cards for illegal

6       gambling or other illegal purpose.  You don't define in this

7       agreement anywhere illegal purpose, correct?

8   A.  That's correct.

9   Q.  You do give an example here as illegal gambling as one

10      specific example, correct?

11  A.  Yes.

12  Q.  Now, you understand that during the period of time in which

13      you testified that this agreement was in effect, marijuana was

14      legal in California for medicinal and then for all purposes?

15  A.  I'm not aware of when it became legal, but I am aware that

16      it has been made legal.

17  Q.  Now, there's nothing in this agreement to the customer that

18      specifically addresses marijuana, correct?

19  A.  That's correct.

20  Q.  And, in fact, Actors, the bank itself, the credit union

21      itself, has no policy anywhere, no written policy, with respect

22      to marijuana specifically, correct?

23  A.  That's correct.

24  Q.  Now, the sentence in this -- or this provision then goes on

25      with another sentence that says, "display of payment card logo

1    by, for example, an online merchant, does not necessarily mean

2    that transactions are lawful in all jurisdictions in which the

3    cardholder may be located."  Do you see that?

4    A.  Yes, I do.

5    Q.  When you say "all jurisdictions in which the cardholder may

6    be located," you mean there are some things that may be legal

7    in some places but not in others?

8    A.  Yes.

9    Q.  And the cardholder -- you understand Actors' cardholders,

10    they're free to use their card in any or all 50 states,

11    correct?

12    A.  As well as overseas.

13    Q.  And you don't specify here for your cardholders how they're

14    to determine the legality in a situation where something might

15    be legal in one jurisdiction versus illegal in another,

16    correct?

17    A.  I'm sorry, could you repeat that?

18    Q.  You don't give the customers any instruction about how to

19    determine whether or not a transaction is lawful in one

20    jurisdiction versus another, correct?

21    A.  That's correct.

22    Q.  Now, because you mentioned illegal gambling, it's clear

23    that Actors can specify specific kinds of activities that it

24    believes customers need to know are disapproved by Actors,

25    correct?

L3GPWEI2                          Brown – Cross

1    A.  We can.

2    Q.  And you did not do that for marijuana?

3    A.  That's correct.

4    Q.  And you say illegal gambling, is it your understanding that

5    gambling with your credit or, in this case, debit card is legal

6    in some states but not in others?

7    A.  No, that's not my understanding.

8    Q.  Your understanding is it's illegal, correct?

9    A.  My understanding is that it is illegal for a gambling

10   institution located in the United States.

11   Q.  To take a debit card?

12   A.  Correct.

13   Q.  Now, if I could have you, Mr. McLeod, put up

14   Exhibit GX2717.

15             And now, you recognize this as the credit card holder

16   agreement that you testified about?

17   A.  Yes, sir.

18   Q.  If you could bring up page 5830.  Now, this one just says,

19   "Your card may not be used for any illegal transactions."  Do

20   you see that?

21   A.  Yes.

22   Q.  You don't define illegal transactions anywhere in this

23   agreement either, correct?

24   A.  That's correct.

25   Q.  In fact, you don't even specifically mention illegal

L3GPWEI2                          Brown - Cross

1    gambling in this agreement, correct?

2    A.  That's correct.

3    Q.  Why is that?

4    A.  I don't know.  I wasn't the -- I didn't write it.

5    Generally, credit card agreements are taken directly from Visa.

6    Q.  Okay.  And you understand, as you just testified, that

7    marijuana, at least during some period of time when these

8    agreements were in place, was legalized in California?

9    A.  Yes.

10   Q.  So you understand that a customer might be confused, absent

11   further guidance, about whether or not a transaction to buy

12   marijuana with a credit card is legal or not legal?

13             MS. DEININGER:  Objection.

14             THE COURT:  Sustained.

15   Q.  It is correct that Actors have chosen not to give any

16   instruction in its cardholder agreements, debit or credit, to

17   its customers specifying what the rules are for marijuana,

18   correct?

19             MS. DEININGER:  Objection.

20             THE COURT:  Asked and answered, and also I think

21   ambiguous.  Sustained.

22   Q.  It is true that Actors chose not to modify this agreement

23   in any way, correct, to specify marijuana?

24   A.  That's correct.

25   Q.  I want to ask you a question about this particular

L3GPWEI2                          Brown - Cross

1    document.

2              If you go back to the first page.

3              As opposed to the debit agreement, that doesn't seem

4    to have any of the Actors' header on it; do you see that?  It

5    doesn't have the Actors logo on it?

6    A.   That's correct.

7    Q.   Do you know why that is?

8    A.   I believe it's because it's part of a larger document.

9    Q.   So this is only a portion of the document?

10   A.   It's the entire cardholder agreement.  I'm not actually

11   certain whether it is part of our application or a separate

12   agreement.

13   Q.   And if you look at the next page -- or, I'm sorry, the

14   final page, this paragraph sort of stands on its own on this

15   page.  Is that the way the agreement actually looks?

16   A.   I believe that this is a printout from our online

17   application; so it may not look that way online.

18   Q.   And if you could go back to the second page, I think you

19   said this was taken from a Visa form?

20   A.   The general language is, is my understanding.

21   Q.   And if you could take a look at the second page, the letter

22   C.   You'll notice in that first sentence, where it says

23   "cardholder agrees to pay Actors Federal Credit Union an annul

24   membership," that's a typo, right?

25   A.   Yes, it is.

L3GPWEI2                         Brown - Cross

1    Q.   That should be the word "annual," correct?

2    A.   Yes.

3    Q.   You can take that down.  So you describe how the bank

4    relies upon Visa for a variety of aspects of its credit and

5    debit card processing?

6    A.   We rely on Visa to provide the network for the transactions

7    to follow.

8    Q.   And I believe I understood you to say that if Actors was

9    not part of the Visa network, Actors might very well go out of

10   business; is that right?

11   A.   Yes.

12   Q.   And that's not just because of the fees that it earns

13   whenever any customer uses a credit or debit card, correct?

14   For other reasons as well?

15   A.   Yes, it is for other reasons.

16   Q.   In fact, it's in part because you want to please your

17   customers, correct?

18   A.   Yes.

19   Q.   Having access to a credit and debit card you can use around

20   the country is important to your customers, right?

21   A.   It would be, yes.

22   Q.   And you want to please them, correct?

23   A.   Yes.

24   Q.   Because you're a full -- you endeavor to be a full-service

25   credit union, like a full-service commercial bank?

L3GPWEI2                        Brown – Cross

1    A.  That's correct.

2    Q.  Now, for this trial you were asked about some documents

3    that the government subpoenaed; do you remember that?

4    A.  Yes.

5    Q.  And you testified about a few of them.  I'm going to ask

6    you about some of those and some others.  You produced to the

7    government files for individual customers, correct, individual

8    consumers of the bank?

9    A.  That's correct.

10   Q.  If you could put up for the witness only GX2712.

11           I'd ask if you recognize this -- and maybe flip

12   through it -- as a portion of the file for one of those

13   customers.  Do you see that?

14   A.  Yes.

15   Q.  And then I'm going to have -- just if you can recall the

16   name of this particular --

17           MR. TAYBACK:  At this point, your Honor, I would offer

18   Exhibit GX2712.

19           MS. DEININGER:  I believe it's already in evidence.

20           MR. TAYBACK:  Okay.

21   BY MR. TAYBACK:

22   Q.  If this is in evidence, this is the particular customer I'm

23   going to show you.  I'm going to ask you, there are an

24   additional -- you produced all the bank statements for this

25   particular customer, correct?

L3GPWEI2                         Brown – Cross

1    A.  I'm sorry?

2    Q.  I'll withdraw the question.  Let me show you what's been

3    marked but not yet introduced, HAX10054.  Now, do you recognize

4    this as additional bank statements produced by you with respect

5    to that same customer?

6    A.  Yes.

7               MR. TAYBACK:  At this time, I'd offer HAX10054.

8               (Pause)

9               THE COURT:  You need to reach a decision.

10              MS. DEININGER:  No objection.

11              THE COURT:  Received.

12              MR. TAYBACK:  Thank you.

13              (Defendant's Exhibit HAX10054 received in evidence)

14   BY MR. TAYBACK:

15   Q.  This is additional account information for the same

16   customer we just looked at, correct?

17   A.  That's correct.

18   Q.  Now, if I could direct your attention to page 32, an entry

19   for May 15th, 2019.  In order to be able to see it, I've

20   brought it up.

21              MR. TAYBACK:  Your Honor, at this time, we offer

22   Exhibit 10054.  We ask it to be displayed.  I can't see if it

23   is being displayed.  It is.  Thank you.

24   Q.  Now, you have in front of you a particular line item; do

25   you see that?

1   A.  Yes.

2   Q.  Now, do you see that it says OMO CBS/Medmen; do you see

3   that?

4   A.  Yes, I do.

5   Q.  Do you know that Medmen is a marijuana dispensary?

6   A.  No, I was not aware of that.

7   Q.  The first time you're hearing that is now?

8   A.  Yes.

9   Q.  So if there were a transaction for Medmen for this

10  particular customer on May 15th, on July 12th and on August 5th

11  of 2019, that's not something that Actors has done anything to

12  investigate, correct?

13          MS. DEININGER:  Objection.

14          THE COURT:  Ground?

15          MR. TAYBACK:  I can rephrase the question, your Honor.

16  BY MR. TAYBACK:

17  Q.  Is it true that you haven't done anything -- Actors hasn't

18  done anything to investigate this purchase?

19          MS. DEININGER:  Objection.  There's a motion in limine

20  on this point.

21          THE COURT:  I'm sorry?

22          MS. DEININGER:  I believe it was motion in limine 4.

23          THE COURT:  Oh, okay.  Now, I understand your

24  objection.  Sustained.

25  BY MR. TAYBACK:

L3GPWEI2                          Brown - Cross

1    Q.  Now, Mr. Brown, I'd like to show you what's been introduced

2    as an exhibit, GX2713.  It's another customer's account file.

3    Do you see that?

4    A.  Yes.

5    Q.  Now, there were some additional bank statements also

6    produced for this witness, correct?

7    A.  Yes.

8    Q.  Did you do anything to investigate whether any of the

9    transactions reflected on that additional bank statement also

10   included other marijuana transactions?

11             MS. DEININGER:  Objection.

12             THE COURT:  Sustained.

13   Q.  The transaction we just looked at for that first customer,

14   do you know what the MCC was that was used for that

15   transaction?

16   A.  No.

17   Q.  In fact, it's fair to say that you can't tell from any of

18   the records what the MCC was for any of the transactions,

19   correct?

20             MS. DEININGER:  Objection.  Vague.

21             THE COURT:  Overruled.

22             THE WITNESS:  I'm sorry, I didn't hear the ruling.

23             THE COURT:  You can answer that question.

24   A.  Could you repeat the question?

25   Q.  In fact, looking at the transaction I just asked questions

L3GPWEI2                          Brown – Cross

1    about previously, fair to say you can't tell what the MCC that

2    was used for this transaction was, correct?

3    A.  I can't tell, but our payment processor could.

4    Q.  At the time of the transaction, correct?

5    A.  Correct.

6              THE COURT:  How much more do you have?

7              MR. TAYBACK:  About 15 minutes, your Honor.

8              THE COURT:  So in about three minutes we'll give the

9    jury their mid-morning break.

10             MR. TAYBACK:  Understand.

11   Q.  Now, the transaction that we just looked at was processed,

12   as was the transactions that the government highlighted from

13   this customer, correct?

14   A.  Yes.

15   Q.  That means that Actors actually did make, whatever amount

16   it is, cents per swipe, correct?

17   A.  Yes.

18   Q.  And the customer, in the absence of any challenge to the

19   transaction, the customer presumably got what they were paying

20   for?

21   A.  I wouldn't know that.

22   Q.  You don't know one way or the other, correct?

23   A.  Yes.

24   Q.  But you didn't receive any complaints from the -- about the

25   transactions that the government showed you, correct?

L3GPWEI2                        Brown - Cross

1                MS. DEININGER:  Objection.  Foundation.

2                THE COURT:  Overruled.

3       A.  I'm not aware if the transactions were challenged or not.

4       Q.  And in your review of the files, the bank files of these

5       customers, you didn't see challenges to the transactions that

6       the government just highlighted, correct?

7       A.  That is correct.

8                MR. TAYBACK:  Your Honor, if you want to take the

9       break, I'm going to move to a slightly different subject.

10               THE COURT:  All right.  So we are going to take our

11      mid-morning break.  We'll see you in 15 minutes.

12               (Jury not present)

13               THE COURT:  You may step down.  I'll see you in 15

14      minutes.

15               (Witness temporarily excused)

16               Please be seated.  Anything anyone needs to raise with

17      the Court?

18               MR. TAYBACK:  No, your Honor.

19               THE COURT:  Okay.

20               MR. FOLLY:  Your Honor, this is not an issue that is

21      going to come up today, but we do anticipate it for tomorrow.

22      So we may be at the point where we were planning to introduce

23      the portion of defendant Weigand's post-arrest statement.

24               THE COURT:  I was waiting.

25               MR. FOLLY:  We had started that discussion but never

L3GPWEI2                        Brown - Cross

1    finished.

2              THE COURT:  All right.  So maybe at the end of today

3    we'll take that up.

4              MR. FOLLY:  Thank you.

5              MS. DEININGER:  Your Honor, after this witness, the

6    government is anticipating calling Darcy Cozzetto, and we'll

7    just need a brief sidebar before that to discuss her immunity

8    order.

9              THE COURT:  Okay.  We'll take a sidebar then.  Okay.

10   Very good.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L3GAWEI3ps

1           (Jury not present)

2           THE COURT:  The jury is on its way up.  That takes a

3    couple minutes.  So do you want to handle that immunity?

4           MS. LA MORTE:  Do you want me to get her?

5           THE COURT:  Yes.  We can do it right here in open

6    court.

7           You can just stand there.  That's fine for this

8    purpose.

9           So please state your name for the record.

10          MS. COZZETTO:  Darcy Cozzetto.

11          THE COURT:  And Ms. Cozzetto, is it your intention to

12   invoke your Fifth Amendment privilege against self-incrimina-

13   tion to any and all questions that might be put to you in this

14   matter?

15          MS. COZZETTO:  Yes, your Honor.

16          THE COURT:  And I will therefore grant the immunity

17   order.  You understand that if you fail to tell the truth in

18   any respect, that voids this immunity.  You understand that.

19          MS. COZZETTO:  Yes, sir.

20          THE COURT:  Also, you understand that this immunity

21   only protects against use of whatever you say here in court.

22   It doesn't protect against any independent accusation that

23   might be brought.  You understand that.

24          MS. COZZETTO:  Yes, sir.

25          THE COURT:  OK.  Very good.  You can return to the

L3GAWEI3ps                    Brown - Cross

1    witness room.

2              MS. COZZETTO:  Thank you.

3              THE COURT:  Then I'll give the signed order and

4    attachments to the government.

5              And let's get the witness back on the stand.

6    CHARLES BROWN, resumed.

7              (Jury present)

8              THE COURT:  All right.  Counsel, continue.

9    CROSS EXAMINATION (Cont'd)

10   BY MR. TAYBACK:

11   Q.  Mr. Brown, if I could ask Mr. McLeod to bring up GX Exhibit

12   2712.  You've previously looked at that.

13             MR. TAYBACK:  I apologize for the delay, your Honor.

14             THE COURT:  No problem.

15             MR. TAYBACK:  GX 2712.

16   Q.  Let me start by asking some questions -- there it comes.

17             If we go to the entry of the bank statement for April

18   8, 2019.  Now, you looked at this particular entry on your

19   direct examination, where it says "point-of-sale purchase,

20   soniclogistix.com."  You see that?

21   A.  Yes.

22   Q.  There is a number there that's after 18003052157.  Did you

23   ever try to call that number?

24   A.  No.

25   Q.  Did anyone from Actors?

1          MS. DEININGER:  Objection, foundation.

2     Q.  If you know.

3          Do you know whether anyone from Actors ever tried to

4     call that number?

5          MS. DEININGER:  Objection, foundation.

6          THE COURT:  Sustained.

7     Q.  Did you ever try to call that number?

8     A.  No.

9     Q.  And you have no idea, then, what that number is, correct,

10    what it refers to?

11         MS. DEININGER:  Objection, foundation.

12         THE COURT:  Well, I don't know about that, but let's

13    see.  First you asked him, "Did you ever try to call that

14    number?"  He answered, "No."  Then you asked him, "Did you ever

15    try to call that number?"  He answered, "No."  And now you're

16    asking him, "And you have no idea, then, what that number is,

17    correct, what it refers to?"

18         "Objection, foundation."

19         I'll overrule it.  You want to ask that question twice

20    too?

21         MR. TAYBACK:  I'll withdraw the question when you put

22    it that way, your Honor.

23    Q.  Let me ask you this.  You produced documents, that is to

24    say Actors produced documents, to the government in February of

25    2020, correct?

1    A.  Yes.

2    Q.  In that intervening year or 13 months, did you do anything

3    to investigate any of the entries that the government asked you

4    about, until last week?

5    A.  Yes, we did.

6    Q.  And what did you do?

7    A.  We looked up the merchants online to see if we could

8    determine anything, any additional facts, about what the nature

9    of the case was, and then, when we had a little bit more

10   information, when we learned -- this was sometime later that we

11   learned it was related to marijuana, we contacted our payment

12   processor and asked them if there was a way for them to block

13   marijuana purchases.

14   Q.  You didn't contact the customers, correct?

15   A.  That is correct.

16   Q.  And you haven't terminated their cards, correct?

17   A.  That is correct.

18   Q.  And you haven't warned them not to engage in such

19   transactions in the future, correct?

20   A.  That is also correct.  They are not all still currently

21   cardholders with us.

22   Q.  But those who are, you haven't warned them not to engage in

23   those transactions in the future, correct?

24   A.  That is correct.

25   Q.  Now, if you could take a look at -- let me back up here.

L3GAWEI3ps                    Brown - Cross

1            MR. TAYBACK:  If you could bring up Exhibit GX 2705,

2      which is in evidence.

3      Q.  If you would look at the name of this particular cardholder

4      for Actors Bank.  You produced bank records for this particular

5      customer as well, in response to the subpoena, right?

6      A.  I believe so, yes.

7      Q.  Now, I want to ask you some questions about how descriptors

8      are used.  If I understood you correctly, there's no one at

9      Actors who actually looks at the descriptors to decide whether

10     or not to approve a transaction, correct?

11     A.  Not at the time of the transaction.

12     Q.  And in fact, is it your experience that the descriptors

13     don't always describe what it is that was purchased, correct?

14     A.  They don't describe what's purchased.  They describe the

15     business.

16            MR. TAYBACK:  If you could put up, just for the

17     witness, Exhibit HAX10057.

18     Q.  And you recognize this as the additional bank -- or bank

19     records for one of the customers that you produced bank records

20     for, correct?

21     A.  Yes.

22     Q.  And we looked at some of the account paper work for this

23     customer earlier, correct, in your direct?

24     A.  I believe so, yes.

25     Q.  If I could ask you to direct your attention to --

1        MR. TAYBACK:  What's the date of the next entry?

2   Q.  -- to the entries beginning March 12, 2019.  Do you see

3   that?

4   A.  Yes.

5   Q.  This is a true and accurate copy of the bank records

6   pertaining to that customer you testified about on direct,

7   correct?

8   A.  Yes.

9        MR. TAYBACK:  I would I'd offer Exhibit HAX10057 in

10  evidence.

11       MS. DEININGER:  Objection, relevance.

12       MR. TAYBACK:  May I be heard?

13       THE COURT:  Yes.

14       Go ahead.

15  Q.  If you look at the descriptors for --

16       THE COURT:  Oh, no, I meant --

17       MR. TAYBACK:  May I be heard?

18       THE COURT:  Yes.

19       MR. TAYBACK:  I believe this is an example of the

20  descriptors that do not provide any insight into the merchant.

21       THE COURT: All right.  I'll allow it.  We'll see.

22       (Defendant's Exhibit HAX10057 received in evidence)

23  Q.  Do you see the descriptors that are here?

24  A.  Yes.

25  Q.  The first one is "FYESCT.com."  Do you see that?

L3GAWEI3ps                    Brown - Cross

1   A.  Yes, I do.

2   Q.  You can't tell what that transaction is all about, correct?

3   A.  What the transaction is about?

4   Q.  What the product was or what the merchant was.  Correct?

5   A.  I would assume that the merchant was FYESCT.com.

6   Q.  But you don't know what they do or sell, correct?

7   A.  That is correct.

8   Q.  So you wouldn't know if they were a marijuana merchant or

9   otherwise, correct?

10  A.  I wouldn't personally know.

11  Q.  And as you sit here you don't know whether anybody would

12  know that?

13          MS. DEININGER:  Objection, foundation.

14          MR. TAYBACK:  Well, withdraw the question.

15  Q.  Is there anybody that Actors relies upon that you would

16  expect would know that answer?

17  A.  A payment processor.

18  Q.  And how would *they* know the answer?

19  A.  I don't know.

20  Q.  You'll see that there are other similar collections of

21  letters used as descriptors going down this page.  Do you see

22  that?

23  A.  Yes, I do.

24  Q.  Have you ever seen descriptors like that before?

25  A.  I have.

L3GAWEI3ps                    Brown - Cross

Q.  And they're not -- they don't communicate anything about
the merchant or the product, correct?
A.  My understanding is that if it's a dot-com like that, that
would be the address of the merchant, the URL address, the web
address.
Q.  But you've never gone to any of these URLs, correct?
        MS. DEININGER:  Objection, irrelevant.
Q.  Let me ask the question another way.  That's not something
Actors does, go to various URLs of various descriptors,
correct?
A.  Unless we are alerted to for a particular reason.
        MR. TAYBACK:  You can take that down.  Thank you.
        If you could go to Exhibit 2705.
Q.  This is another customer, whose records you produced to the
government in this case, correct?
A.  Yes.
Q.  And you also produced his bank records, for this particular
customer, correct?
A.  Yes.
        MR. TAYBACK:  If you could put up for the witness only
HAX10056.
Q.  And these are bank records that reflect the bank activity
of that same customer, correct?
A.  Yes.
        MR. TAYBACK:  At this time, your Honor, I'd offer

L3GAWEI3ps                          Brown - Cross

1   HAX10056 in evidence.

2              MS. DEININGER:  Objection, relevance.

3              MR. TAYBACK:  May I be heard?

4              THE COURT:  I will receive it.

5              (Defendant's Exhibit HAX10056 received in evidence)

6   Q.  If you could go to page 5 of this document, I'm going to

7   show you a couple entries, and I blacked out the other one so

8   it's easier to see.

9              MR. TAYBACK:  If you go to the next page, actually.

10  Q.  On 2/27/2018 -- see that?  There is an entry that says

11  www.fantasysportsco.  Do you see that?

12  A.  Yes.

13  Q.  Do you know whether that's a gambling site?

14             MS. DEININGER:  Objection, motion in limine 3.

15             THE COURT:  Sustained.

16             MR. TAYBACK:  Take it down.  Thank you.

17  Q.  Does Actors have any processing place for identifying

18  gambling sites, something that's specifically prohibited by the

19  cardholder agreement in place?

20  A.  Our payment processor would be able to identify, by

21  merchant category code, if there was a gambling location

22  located in the United States.

23  Q.  But you don't know whether the descriptor plays any role in

24  that, correct?

25  A.  I do not know.

L3GAWEI3ps                    Brown - Cross

```
1   Q.  There was -- there is a thing that customers can obtain

2   called overdraft protection, correct?

3   A.  Yes.

4   Q.  And if a customer has an overdraft protection, isn't it

5   true that the bank will cover an overdraft in certain

6   situations, up to a certain amount?

7   A.  Yes.

8   Q.  And then it charges the customer a fee, correct?

9   A.  That's correct.

10  Q.  What's that fee?

11  A.  I'm sorry?

12  Q.  What is that fee?

13  A.  In our case it was $27.

14  Q.  And the determination of whether or not to cover a

15  transaction is made by the bank, not the payment processor?

16  A.  That's correct.

17  Q.  So when the bank decides to approve a transaction, it's

18  looking to see whether the customer has some indicia of fraud,

19  like they're not in the location where the charge is occurring,

20  correct?

21  A.  I'm sorry.  I didn't understand the question.

22  Q.  Sure.  I want to find out the things that the bank looks at

23  before it approves a transaction to go through.

24  A.  If the customer has opted in for overdraft protection and

25  they are in good standing with the credit union, meaning that
```

L3GAWEI3ps                    Brown - Cross

1    their account is on time, that they paid the fees back on time,

2    then we would cover a transaction.

3    Q.  As long as you're convinced that they have money or

4    overdraft protection and that they -- that it's their

5    transaction, correct?

6    A.  Yes.  We wouldn't know whether that was their transaction

7    unless they notified that it wasn't.

8    Q.  So really all you're looking for is, do they have enough

9    money or do they have overdraft protection, correct?  To

10   approve a transaction.

11   A.  We would also be looking to see if it was a valid unexpired

12   card, if the validation code was correct, and if there was any

13   indication that it was a prohibited transaction.

14   Q.  And the things you would look at for that last category,

15   you rely on your payment processor, correct?

16   A.  Yes.

17   Q.  You don't -- the bank doesn't look at the MCC or the

18   descriptor, correct?  The bank.

19   A.  That is correct.

20   Q.  And you don't know what the payment processor, how they --

21   how they determine whether an MCC should or shouldn't be put

22   through?  Correct?

23   A.  Well, I do know that if we have specifically prohibited a

24   particular merchant or merchant category code, then they would

25   not put it through.

1   Q.  And it's true, isn't it, that there is no merchant category

2   code for marijuana?

3   A.  That is correct.

4   Q.  So you haven't prohibited an MCC for marijuana, correct?

5          MS. DEININGER:  Objection, misleading.

6          THE COURT:  Sustained.

7   Q.  And you agree that the descriptors -- withdraw that.

8          In fact there are no descriptors for marijuana that

9   you have asked your payment processor to prohibit, correct?

10  A.  We have established a rule to prohibit the descriptors that

11  we know about.

12  Q.  And are those the ones that the government identified in

13  direct?

14  A.  Yes.

15  Q.  But none others, correct?

16  A.  Not yet.

17  Q.  So that was done in the last couple weeks?

18  A.  Yeah.

19          I'm sorry.  Yes.

20  Q.  Now, you mentioned FinCEN?

21  A.  I'm sorry?

22  Q.  I believe you mentioned your direct testimony a reference

23  to FinCEN?

24  A.  FinCEN, yes.

25  Q.  What is FinCEN?

L3GAWEI3ps                    Brown - Cross

```
 1   A.  FinCEN is the Financial Crimes Enforcement Network.

 2   Q.  And that is the federal government's guidance?

 3   A.  It's a federal -- yeah.  It's a -- it's a -- it's a federal

 4   entity that collects and distributes information about

 5   financial crimes.  It's a law enforcement database.

 6   Q.  And FinCEN has provided guidance to banks and credit unions

 7   with respect to marijuana transactions, correct?

 8   A.  To banking marijuana businesses.

 9   Q.  Is it fair to say you don't consider the use of credit and

10   debit cards to be the same as banking marijuana businesses,

11   correct?

12   A.  No, I do not consider them the same.

13   Q.  When you talked about SARs being filled out, it's not your

14   understanding you have to complete a SARs form for the

15   transactions of your customers where they may have engaged in

16   purchasing marijuana, correct?

17   A.  The decision to file or not file a SAR is in large part up

18   to the discretion of the financial institution.

19   Q.  And you haven't filed any SARs with respect to the

20   transactions that the government identified with you on direct,

21   correct?

22   A.  I'm not entirely clear whether I am allowed to discuss the

23   existence of specific SARs.  It's prohibited.  They are highly

24   secret.

25   Q.  "SARs" stands for "suspicious activity report," correct?
```

L3GAWEI3ps                    Brown - Cross

1    A.  That is correct.

2          MR. TAYBACK:  May I have one moment, your Honor.

3    Q.  To be clear, among the information contained in the

4    descriptor, you understand that to be the URL for the merchant,

5    is one of the things?

6          MS. DEININGER:  Objection, misleading.

7          MR. TAYBACK:  I'll rephrase it.

8    Q.  Is your understanding of what's contained in a descriptor,

9    does it include the URL for the merchant?

10   A.  The examples that you showed me, that would be my best

11   guess.

12   Q.  But it's a guess by you, correct?

13   A.  I'm sorry?

14   Q.  A guess?  It's a guess by you?  That's what you said?

15   A.  Based on what you showed me for those specific examples.

16   Q.  And is it your understanding also that a telephone number

17   is often contained in the descriptor?

18   A.  I have seen them on statements.  I'm not sure which field

19   that is in the transaction code.

20   Q.  Is it also fair to say that you're not an expert in the use

21   of descriptors?

22   A.  That is fair to say.

23   Q.  And you're not an expert in merchant category codes,

24   correct?

25   A.  That is also correct.

1        MR. TAYBACK:  I have no further questions.  Thank you.

2        THE COURT:  OK.  Counsel for Mr. Weigand.

3        MR. PELLECHI:  May I proceed?

4        THE COURT:  Yes.

5   CROSS-EXAMINATION

6   BY MR. PELLECHI:

7   Q.  Good almost afternoon, Mr. Brown.  My name is Steve

8   Pellechi.  I'm an attorney for Mr. Weigand.

9        I just want to address a few of the things that you

10  had testified to on direct.  You had testified that marijuana

11  transactions are against Visa's rules, correct?

12  A.  Yes.

13  Q.  But Visa's rules don't specifically prohibit marijuana

14  transactions, correct?

15  A.  I have not seen it in the written rules, but I've seen a

16  statement by a Visa representative.

17  Q.  But visa's actual rules don't reference marijuana at all,

18  correct?

19  A.  Not to my knowledge.

20  Q.  And to your understanding, is marijuana legal in other

21  countries?

22  A.  I'm sorry.  Could you repeat that?

23  Q.  Is marijuana legal in other countries?

24        MS. DEININGER:  Objection.

25        MR. PELLECHI:  I'm sorry, your Honor.  Was there a

1    ruling?

2              THE COURT:  Yes.  Sustained.

3    Q.  Mr. Brown, you testified on direct that marijuana is not

4    prohibited by your federal regulators, correct?

5    A.  Banking marijuana businesses is not explicitly prohibited.

6    Q.  And it's your understanding that some credit unions

7    actually bank marijuana-related businesses, correct?

8    A.  Yes.

9    Q.  You had described that there's a heavy compliance burden

10   with respect to banking MRBs, marijuana related businesses,

11   right?

12   A.  That's correct.

13   Q.  And it was your testimony that you don't have the capacity

14   to conduct this due diligence, right?

15   A.  It's our judgment that we don't have the resources to do

16   so.

17   Q.  But, Mr. Brown, none of the documents that you have turned

18   over to the government with respect to this case involve

19   opening up a business account, right?

20   A.  I don't believe there are any business documents in this.

21   Q.  How is my volume, by the way?

22   A.  It's getting better.

23   Q.  OK.  Let me know if you can't hear me or if I'm too loud.

24   A.  OK.

25   Q.  Mr. Brown, you've never met with Ruben Weigand before,

L3GAWEI3ps                          Brown - Cross

1   correct?

2   A.   That's correct.

3   Q.   You've never spoken to him?

4   A.   That's correct.

5   Q.   Never emailed him?

6   A.   No.

7   Q.   You never had any communications whatsoever with

8   Mr. Weigand.

9   A.   That is correct.

10  Q.   And you had testified that Actors had turned over a

11  collection of documents in response to a subpoena with respect

12  to this case?

13  A.   Yes.

14  Q.   Did you review those documents?

15  A.   Yes.

16  Q.   And you reviewed all those documents.

17  A.   Yes.

18  Q.   And do you know roughly how many documents you had turned

19  over to the government?

20  A.   It's been a long time.  I have no idea.

21  Q.   You've been prepping for this case for a while?

22  A.   We responded to the subpoena last February.  We didn't hear

23  anything else about it until much later in the year.

24  Q.   And, Mr. Brown, you don't recall ever seeing Ruben

25  Weigand's name on any of those documents, correct?

L3GAWEI3ps                          Brown - Cross

1  A.  That is correct.

2  Q.  Now, you had testified on direct about Actors being a

3  nonprofit, right?

4  A.  That is correct.

5  Q.  Now, that's not unique amongst credit unions, correct?

6  A.  All credit unions are not profit.

7  Q.  Right.  And all credit unions are also financial

8  cooperatives, correct?

9  A.  That is correct.

10  Q.  And when you describe Actors as a nonprofit, that doesn't

11  mean that Actors doesn't produce income, right?

12  A.  That is correct.

13  Q.  And you had explained on direct that you offer a lot of the

14  same financial services that a bank would offer.

15  A.  Yes.

16  Q.  And in the same way a bank would make a profit off of those

17  financial services, so does Actors, right?

18  A.  Yes.

19  Q.  You earn interest on loans.

20  A.  Correct.

21  Q.  You earn a fee per every transaction that a cardholder

22  swipes on one of your cards, correct?

23  A.  Yes.

24  Q.  The only difference is that the profit for Actors, it goes

25  to the owners of Actors, right?

1  A.  That is correct.

2  Q.  And the owners are the members of Actors, correct?

3  A.  That is correct.

4  Q.  Now, on direct, you said that it was part of your role to

5  make recommendations to Actors' board, right?

6  A.  To the board of directors and the staff.

7  Q.  And that -- those recommendations, they relate to

8  compliance policies for Actors?

9  A.  Yes.

10  Q.  Do they relate to how well a compliance policy should be

11  communicated to Actors members?

12  A.  In some cases, yes.

13  Q.  And is it fair to say that one of the purposes for

14  instituting a compliance policy is to make members aware of

15  what is prohibited, right?

16  A.  I'm sorry.  Could you rephrase?

17  Q.  Sure.  Absolutely.

18       One of the reasons -- is it fair to say that a reason

19  for instituting a policy would be so that Actors members are

20  aware of what restrictions they're subject to?

21       MS. DEININGER:  Objection, foundation.

22       THE COURT:  Sustained.

23  Q.  Mr. Brown, in making your recommendations to the board of

24  Actors, do you discuss certain motivations for instituting a

25  policy?

L3GAWEI3ps                      Brown - Cross

1    A.   Yes.

2    Q.   And amongst those motivations for instituting a policy,

3    would it be to let Actors members know what restrictions

4    they're subject to?

5    A.   It depends on what type of policy.  Not all policies are

6    concerning member behavior.

7    Q.   If it does concern member behavior, is it fair to say that

8    that would be one of the motivations?

9    A.   Yes.

10   Q.   And do you believe it's particularly important to institute

11   a policy where Actors' position on a certain matter would

12   otherwise be unclear?

13            THE COURT:   Sustained.

14   Q.   Mr. Brown, on direct you had discussed this kind of general

15   provision in two agreements related to illegal transactions,

16   correct?

17   A.   Yes.

18   Q.   And it was your testimony that this provision encompasses

19   marijuana-related transactions.  Right?

20   A.   Yes.

21   Q.   Now, that's never been communicated to Actors members,

22   right?

23   A.   That is correct.

24   Q.   None of the documents you have produced to the government

25   in this case involve communications between Actors and Actors

L3GAWEI3ps                     Brown - Cross

1   members where you're clarifying that that provision relates to

2   marijuana transactions, correct?

3   A.   That is correct.

4   Q.   Now, you had discussed that Actors outsources its debit and

5   credit card payment processing, right?

6   A.   That is correct.

7   Q.   But Actors is the issuer on the Visa network, right?

8   A.   Yes.

9   Q.   So isn't it true that Actors is the party that's ultimately

10  responsible to Visa with respect to transactions that are

11  processed on Actors cards?

12  A.   Yes.

13  Q.   And you do have the ability, and I think you discussed

14  doing this on direct, but you have the ability to reach out to

15  these third-party processors to discuss what should be blocked.

16  Right?

17  A.   Yes.

18  Q.   And you had discussed reaching out to the third-party

19  processor for your debit cards, right?

20  A.   Yes.

21  Q.   That's Co-op?

22  A.   Yes, that's right.

23  Q.   Now from, 2016 to 2019, have you ever reached out to Co-op

24  with respect to marijuana transactions?

25  A.   Not that I'm aware of.

1    Q.  You never told them that Actors had this policy that

2    prohibits marijuana transactions --

3              THE COURT:  In order to move this along, I need to

4    advise counsel, if an answer to one question precludes the

5    second question, why are you asking the second question?  The

6    first question was, "Now, from 2016 to 2019, have you ever

7    reached out to Co-op with respect to marijuana transactions?"

8    "A. Not that I'm aware of."

9              This next question began, "You never told them

10   that" -- etc., which was nothing but a rhetorical question,

11   given the answer to the first question.  Move on.

12             MR. PELLECHI:  Understood, your Honor.

13   Q.  Now, on direct, Mr. Brown, you had looked at a number of

14   debit card statements, correct?

15   A.  They were bank statements.  Yes.

16   Q.  Right.  And I think you testified on cross that you had

17   never reached out to these cardholders to let them know that

18   what they had done on their debit cards was against Actors'

19   policy, correct?

20   A.  Correct.

21   Q.  But Actors does have the ability to take certain reactive

22   measures when a member violates its policies, correct?

23   A.  Yes.

24   Q.  And the agreements that you had discussed on direct, they

25   give Actors the authority to take actions against those

1   members, correct?

2   A.  Yes.

3   Q.  You could -- there's a number of things you can do, right?

4   You could issue a warning to the cardholder?

5   A.  Yes.

6   Q.  You can instruct them not to do it again?

7   A.  Yes.

8   Q.  You could invoke the limitation of services policy and take

9   away their cards?

10  A.  Yes.

11  Q.  And you didn't do any of that with respect to the

12  cardholders that you had discussed on direct, correct?

13  A.  That's correct.

14  Q.  And you also have the ability to amend your agreements with

15  the cardholders, correct?

16          MS. DEININGER:  Objection, foundation.

17          THE COURT:  Sustained, but also irrelevance sustained.

18          MR. PELLECHI:  One moment, your Honor.

19          No further questions at this time.

20          THE COURT:  Redirect.

21  REDIRECT EXAMINATION

22  BY MS. DEININGER:

23  Q.  Good after -- or still good morning.  Good morning,

24  Mr. Brown.

25          I think you testified a minute ago that Actors never

L3GAWEI3ps                    Brown - Redirect

1  reached out to the payment processor Co-op about any marijuana

2  purchased in the 2016 to 2018 time period.  Is that correct?

3  A.  During that time period we did not reach out to them that

4  I'm aware of.

5  Q.  And to your knowledge, did Actors become aware of any

6  marijuana merchant that it was processing transactions for

7  during that time period?

8  A.  Not that I'm aware of, no.

9  Q.  You also were asked on cross-examination whether Visa's

10 rules reference marijuana transactions.  Do you remember that?

11 A.  Yes.

12 Q.  And you said that they don't reference marijuana

13 transactions, right?

14 A.  That I recall.  I have not read every Visa rule there is.

15 It's a manual the size of *War and Peace*.

16 Q.  Do you know Visa does have rules prohibiting illegal

17 transactions?

18 A.  Yes.

19 Q.  Yes, they do?

20 A.  Yes, I do.

21        MS. DEININGER:  And if we can, Mr. Levine, if you can

22 pull up Government Exhibit 2704 in evidence, and I think it's

23 page 6.  Please scroll down.  Sorry.  Page 5.  OK.

24 Q.  Looking back at the section that had the "advisory against

25 illegal use" --

1   A.   Yes.

2   Q.   -- this says you should not use your cards for illegal

3   gambling or other illegal purpose.  The reference to illegal

4   gambling, is that an example or an exhaustive list of all

5   illegal activity?

6   A.   It was an example.

7   Q.   Are there other types of illegal activity that are

8   prohibited that are not listed here?

9   A.   Yes.

10  Q.   Can you give me some examples?

11  A.   I was afraid you'd ask that.

12  Q.   Any example with other illegal activities that haven't

13  listed here that you can think of?

14  A.   I'm trying to think of them.

15  Q.   Well, sales of cocaine.

16  A.   That's correct.  That would also be illegal.

17  Q.   Or a sale of heroin.

18  A.   That would be illegal.

19            To purchase an unlicensed firearm would be illegal.

20  Q.   Now, you've been asked some questions about what data

21  Actors reviews before it approves transactions on

22  cross-examination, right?  Is that correct?

23  A.   Yes.

24  Q.   And one of the things you talk about is that that you check

25  the account balance, right?

L3GAWEI3ps                    Brown - Redirect

1   A.  Our system checks that.  No, that's not done by human eye.

2   Transactions are taking place 24 hours a day.

3   Q.  But Actors also employs a third-party payment processor,

4   right?

5   A.  That's correct.

6   Q.  And the third payment processor, you testified on direct,

7   does additional review of transaction information before

8   transactions are approved.  Is that correct?

9   A.  That's my understanding, yes.

10  Q.  And they also do a broader review, to your understanding,

11  to look for patterns of fraud and illegality, right?

12  A.  That's correct.

13  Q.  And Actors relies on the work of the payment processor that

14  it has employed; is that correct?

15  A.  That's correct.

16  Q.  You also were asked on cross about whether there's a

17  merchant category code, an MCC, for marijuana.  Do you remember

18  that?

19  A.  Yes.

20  Q.  I believe you said that to your knowledge there's not,

21  right?

22  A.  That's correct.

23  Q.  In fact you went and asked your debit card payment

24  processor if there was one, right?

25  A.  I did.

L3GAWEI3ps                      Brown - Redirect

1   Q.  And that you could block marijuana transactions using that,

2   right?

3   A.  That's correct.

4   Q.  Now, if there had been one, what would you have done?

5   A.  We would have requested a block on marijuana purchases.

6   Q.  And that's because --

7   A.  Category code.

8   Q.  Is that because information about whether something is a

9   marijuana transaction is important to Actors?

10  A.  Yes.

11          MR. TAYBACK:  Objection, leading.

12          THE COURT:  Overruled.

13          He said yes.

14  BY MS. DEININGER:

15  Q.  And you were asked some questions about whether you had

16  closed the cardholder accounts for the bank statements that we

17  looked at earlier.  Do you remember that?

18  A.  Yes.

19  Q.  And you haven't closed any of those accounts, right?

20  A.  That is correct.

21  Q.  Why not?

22  A.  Because when the -- when they received the subpoena and

23  subsequently for most of the year, we did not know exactly what

24  the nature of the purchases were.  I still can't say I have

25  firsthand knowledge that it was our members making those

1    purchases.  And I can't say for sure whether they knew that

2    what they were doing was illegal.

3              (Continued on next page)

1          MS. DEININGER:  Thank you.  One minute, your Honor.

2          THE COURT:  Okay.

3          MS. DEININGER:  No further questions.

4          THE COURT:  Anything else?

5          MR. TAYBACK:  Very briefly.

6    RECROSS EXAMINATION

7    BY MR. TAYBACK:

8    Q.  Mr. Brown, you indicated in your last answer that you don't

9    know whether the customers that used their Actors cards to buy

10   marijuana knew what they were doing was illegal; do you

11   remember that?

12   A.  Yes.

13   Q.  You haven't called and asked them, correct?

14   A.  That's correct.

15   Q.  And Actors doesn't describe marijuana status regarding

16   legality in any of its consumer-facing documents, correct?

17   A.  That's correct.

18   Q.  It's true, isn't it, that you're not aware of anyplace in

19   the United States where cocaine is legal to buy for a consumer

20   off the street, correct?

21   A.  That is correct.

22   Q.  And the same with heroin?

23   A.  Yes.

24   Q.  You're not aware of any storefronts where you can go in and

25   buy cocaine and heroin, correct?

L3GPWEI4                    Brown - Further Redirect

1   A.  No.

2   Q.  It's your understanding that the -- I'll withdraw that.

3              MR. TAYBACK:  No further questions.

4              MS. DEININGER:  I have one question.

5              THE COURT:  Well, first, is there anything from

6   Mr. Weigand's counsel?

7              MR. PELLECHI:  Nothing further, your Honor.

8   FURTHER REDIRECT EXAMINATION

9   BY MS. DEININGER:

10  Q.  Mr. Brown, just one question.

11             To your knowledge, are there any states in the United

12  States where marijuana sales are legal under federal law?

13  A.  Not under federal law, no.

14             MS. DEININGER:  No further questions.

15             THE COURT:  Anything else?

16             MR. TAYBACK:  Nothing further.

17             THE COURT:  Thank you so much.  You may step down.

18             (Witness excused)

19             Please call your next witness.

20             MS. DEININGER:  The government calls Darcy Cozzetto.

21             THE COURT:  Remain standing but take off your mask.

22  Raise your right hand, please.

23   DARCY COZZETTO,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1      THE COURT:  Please be seated.  State and spell your

2  full name.

3  DIRECT EXAMINATION

4  BY MS. DEININGER:

5  Q.  Ms. Cozzetto, if you could state and spell your name?

6  A.  Darcy Cozzetto, D-a-r-cy, C-o-z-z-e-t-t-o.

7  Q.  Good afternoon, Ms. Cozzetto.  Can you hear me okay?

8  A.  I can.  Thank you.

9  Q.  Okay.  Let me know if you have any problems.  Okay?

10      Ms. Cozzetto, how old are you?

11  A.  I'm 40 years old.

12  Q.  Where do you live?

13  A.  I live in Spokane, Washington.

14  Q.  What do you do for a living?

15  A.  I'm the chief operating officer of The Bouqs Company.

16  Q.  What is The Bouqs Company?

17  A.  Bouqs is a direct-to-consumer flower brand.

18  Q.  And what is your role there?

19  A.  My role as the chief operating officer is to run the

20  day-to-day business.

21  Q.  How long have you worked for The Bouqs?

22  A.  About two-and-a-half years, since November of 2018.

23  Q.  What did you do before you took a job at Bouqs?

24  A.  Prior to working at The Bouqs, I worked at Eaze Technology.

25  Q.  And what kind of company is Eaze Technologies?

L3GPWEI4                          Cozzetto - Direct

A.   When I worked there, Eaze Technology was a technology

company in the legal cannabis space in California.

Q.   I think you described it as being in the legal cannabis

space; is that correct?

A.   Yes.

Q.   And what was your understanding, at the time you worked

there, of whether marijuana sales were legal under California

law?

A.   My understanding, when I worked at Eaze, was that

California sales were legal.  I'm sorry, cannabis sales were

legal under California law.

Q.   And what was your understanding of whether cannabis sales

were legal under federal law?

A.   My understanding was that cannabis sales were illegal under

federal law.

Q.   And you understood that at the time you worked at Eaze?

A.   Yes.

Q.   So when you referred to being in the legal cannabis space,

you were just referring to it being legal under state law?

A.   Yes, under California state law.

Q.   What was your role at Eaze?

A.   My role was senior vice president of operations.

Q.   And what were your general responsibilities at Eaze in that

role?

A.   I had three main components of my team.  One was

1    interfacing with the depots or dispensaries; one was a team

2    method inventory planning and case pack allocation between and

3    pack point and the driver's cars; and the third piece is called

4    the live operations team.  It was a team that, in the moment of

5    a delivery if there was a problem with technology or with the

6    driver or customer service, they would help out.  That team was

7    also responsible for making sure that we hit our daily sales

8    goal.

9    Q.  How long did you hold that role?

10   A.  I worked there about 11 months.

11   Q.  So was that in -- what years was that in?

12   A.  I started October 2017 and left September of 2018.

13   Q.  Thank you.  At the time that you worked there, where was

14   Eaze located?

15   A.  When I worked at Eaze, there were two main corporate

16   offices, one was in San Francisco and one was in Los Angeles.

17   Q.  And where were Eaze's customers located?

18   A.  Eaze's customers were located in California.

19   Q.  And where were the dispensaries located?

20   A.  The dispensaries were also located in California.

21   Q.  So now drawing your attention to the 2017 to 2018 time

22   period, when you were working at Eaze, what payment methods did

23   Eaze offer its customers?

24   A.  When I worked at Eaze, the payment methods offered were

25   cash and credit card.

Q.  And during that time period, did you participate in a
scheme to process Eaze credit and debit card payments?

A.  Yes.

Q.  In that scheme, was the information used to process the
credit card transactions truthful?

A.  No.

Q.  To your knowledge, what types of untruthful information
were included?

A.  To my knowledge, the merchant code was not accurate, and
also the information on the customer's credit card statement
was inaccurate.

Q.  And the information on the customer's credit card
statement, did that include a merchant descriptor?

A.  Yes, I believe it did.

Q.  Or a merchant name?

A.  Yes.

Q.  And were those merchant names and descriptors, were those
accurate?

A.  Not to my knowledge, no.

Q.  Who were some of the main people outside of Eaze, from your
perspective, involved in this credit card processing scheme?

A.  My main persons of contact were Ray, Guy and Andreas.

Q.  Do you know Ray's last name?

A.  I believe it's Akhavan.

Q.  And how about Guy's?

L3GPWEI4                        Cozzetto - Direct

1    A.  I believe Mizrahi.

2    Q.  Did you ever come to learn a last name for Andreas?

3    A.  No, I did not.

4    Q.  When you started at Eaze, were you initially involved in

5    credit card processing?

6    A.  No, I was not.

7    Q.  Did that eventually change?

8    A.  Yes, it did.

9    Q.  So roughly when did that start changing?

10   A.  It started changing in January of 2018.

11   Q.  Okay.  So directing your attention to March of 2018, did

12   you come to attend a meeting with Ray Akhavan?

13   A.  Yes, I did.

14   Q.  How was that meeting arranged?

15   A.  From my understanding -- well, what I know is that my boss,

16   Nick Fasano, told me that we were going to have the meeting.

17   It was my understanding that Jim, our CEO, had told Nick, and

18   Nick asked me to contact some of the dispensary owners to

19   attend the meeting as well.

20   Q.  You mentioned Nick Fasano, who is Nick Fasano?

21   A.  Nick Fasano was my direct manager when I worked at Eaze.

22   At the time, he was the chief revenue officer.

23   Q.  And you mentioned Jim Patterson, who was Jim Patterson?

24   A.  When I worked at Eaze, Jim Patterson was the CEO of the

25   company.

1   Q.  Did they tell you who this meeting was going to be with?

2   A.  Yes, I believe they mentioned Ray's name.

3   Q.  Did you have an understanding of who Ray was at that time?

4   A.  I had heard his name from Jim and Nick in regards to the

5   Clearsettle credit card payment processing.

6   Q.  And what was -- and to your knowledge, what was your

7   understanding about what Clearsettle payment processing was?

8   A.  I didn't have a lot of details about what the Clearsettle

9   payment processing was.  I just knew that Eaze was processing

10  credit cards via Clearsettle.

11  Q.  What was the purpose of the meeting they were asking you to

12  help arrange?

13  A.  My understanding of the purpose of the meeting was Eaze had

14  left credit cards because the Clearsettle solution had gone

15  down, and Ray was going to propose a new solution so credit

16  cards could be back up.

17  Q.  Did Nick Fasano say anything to you about how he felt about

18  attending this meeting?

19  A.  I don't remember --

20          MR. TAYBACK:  Objection, hearsay.

21          THE COURT:  Sustained.

22          MS. DEININGER:  So relevant to the witness' state of

23  mind.

24          THE COURT:  Sustained.

25  BY MS. DEININGER:

1   Q.  What Eaze employees went to the meeting?

2   A.  The Eaze employees that I remember being there were myself,

3   Jim, Nick and David Amable.

4   Q.  And who is David Amable?

5   A.  David Amable was the director of business development.

6   Q.  And who went to the meeting from the dispensaries?

7   A.  The dispensaries that I remember being -- or the people I

8   remember being there from the dispensaries were Justin from the

9   Natoma dispensary, Marty from Hometown Heart, Chris from

10  Emerald City, Craig from Perennial, Nathan from Superior.

11  Q.  Were there any of the -- any of the dispensaries who were

12  working with Eaze who didn't participate in the meeting?

13  A.  Yes.

14  Q.  And what one was that?

15  A.  Will from Herbn Leaf was unable to attend the meeting.

16  Q.  Do you know why they didn't participate in the meeting?

17  A.  I don't know why he wasn't able to attend.

18  Q.  Do you know if they tried to participate in the meeting in

19  another way?

20  A.  Yes.

21          MR. GILBERT:  Objection.

22          THE COURT:  Sustained.

23  Q.  Did Nick Fasano or Jim Patterson mention anything to you

24  about Herbn Leaf trying to attend the meeting?

25          MR. GILBERT:  Objection.

1              THE COURT:  Sustained.

2              MR. TAYBACK:  Statement of co-conspirators, your

3    Honor.

4              THE COURT:  It's not clear -- who are you alleging is

5    the co-conspirator?

6              MS. DEININGER:  They are the named co-conspirators.

7              THE COURT:  So how is this in furtherance of the

8    conspiracy?

9              MS. DEININGER:  It's all referring to arranging this

10   meeting.

11             THE COURT:  But this is about someone who didn't

12   attend, right?

13             MS. DEININGER:  And what they said about their desire

14   to attend.

15             THE COURT:  I think it's relevance is limited.  It's

16   potential for confusion is considerable; so on 403 grounds, I

17   sustain the objection.

18   BY MS. DEININGER:

19   Q.  Ms. Cozzetto, did Jim Patterson tell you anything about

20   whether anyone could call into the meeting?

21   A.  Yes.  He mentioned that we were not to have -- we were not

22   to have phones at the meeting.  We were not to accept any phone

23   calls during the meeting.

24   Q.  And have you ever been to any other business meeting where

25   phones weren't allowed?

 1    A.  No, I have not.

 2              MS. DEININGER:  I'm sorry, your Honor.  I think there

 3    was an objection.  I was just waiting for a ruling.

 4              THE COURT:  I didn't hear any objection.

 5              MR. GILBERT:  Yes, I had an objection, your Honor.

 6              THE COURT:  You have to speak louder.  The reporter

 7    didn't pick up your objection either.

 8              MR. GILBERT:  Sorry.

 9              THE COURT:  But now that I've heard it, I overrule it.

10    I think the answer was given, and you may continue.

11    BY MS. DEININGER:

12    Q.  So, Ms. Cozzetto, where did this meeting take place?

13    A.  The meeting took place in Calabasas.

14    Q.  And did you have an understanding of whose offices it took

15    place at?

16    A.  Yes.

17    Q.  Whose were those?

18    A.  My understanding is that they were at Ray's offices.

19    Q.  Why did you believe those were Ray's offices?

20    A.  I'm fairly certain that Jim mentioned that we were going to

21    meet in Ray's offices, but also once we got there, it was clear

22    that the office we were in -- the personal office we were in

23    was Ray's.

24    Q.  How did you get to the meeting?

25    A.  Nick had a personal driver that he used, and so that driver

1    brought colleagues.  There were two big, black cars that showed

2    up as to the offices in Eaze.  We had asked the dispensaries to

3    meet us at the corporate offices, and then we all got in the

4    cars and went.

5    Q.  And by "all," who are you referring to?  Who got in the

6    cars?

7    A.  Myself, Nick, Jim and David, and then the dispensary owners

8    that were able to come to the meeting.

9    Q.  Did Jim Patterson tell you anything while you were in the

10   car on the way to the meeting?

11   A.  Yes.

12   Q.  What did he say?

13   A.  I believe Jim was in one -- the other car.  Nick and I were

14   in one car, with the dispensaries split.  Jim called, I can't

15   remember if it was me or Nick, but we put him on speaker phone,

16   and he gave everyone in kind of the two cars a pre-meeting

17   conversation.

18   Q.  And what was the substance of that pre-meeting

19   conversation?

20   A.  He just reiterated the importance of credit cards to Eaze

21   and to the dispensaries and, you know, said that this was an

22   important meeting and that we should be professional and polite

23   with Ray.

24   Q.  And what was your impression of all of these arrangements

25   for this meeting?

L3GPWEI4                    Cozzetto - Direct

1           MR. TAYBACK:  Objection.

2           MR. GILBERT:  Join.

3           THE COURT:  Sustained.

4    Q.  What happened after you got to Ray's office?

5    A.  When we got to Ray's office, he was finishing, I believe,

6    another meeting, or he was otherwise engaged.  We waited in the

7    lobby for him to be ready.  I met Guy in person in the lobby.

8    Q.  Was that the first time that you had met Guy?

9    A.  Yes, it was.

10   Q.  Had you had previous interactions with Guy?

11   A.  Yes, I had.

12   Q.  In what form, what form of contact?

13   A.  Mostly via text, possibly some e-mail, but Guy was my main

14   point of contact when I was trying to get some of the funds

15   released for the dispensaries via the Clearsettle processing

16   solution.

17   Q.  So where did the actual meeting end up taking place?

18   A.  The actual meeting took place in Ray's personal office.

19   Q.  And besides the people from Eaze and the dispensaries you

20   came with, who was there?

21   A.  Ray was there, of course.  There was -- there was another

22   gentleman that I met there, but I don't recall how long he was

23   in the meeting.

24   Q.  Okay.  Can you describe the setup of the room where the

25   meeting took place?

1   A.  Ray's personal office was quite large.  There was a kind of

2   living room setup.  That's where we sat.  So there were some

3   couches and chairs.  It was a little bit more of an intimate

4   setting than a conference table.

5   Q.  And how was Ray positioned in contrast to everyone else?

6   A.  Ray was sitting in a chair, I guess, kind of at one end of

7   the circle.  So he was -- he was the main speaker.  At least I

8   know I moved my body kind of so that I could focus on him.

9   Q.  What was the general subject of the meeting?

10  A.  So there were several kind of topics that we discussed.

11  You know, the first part was welcoming us and all that.  Then

12  we talked about standard credit card processing.  From there,

13  we moved into high-risk credit card processing.  Then from

14  there, it was kind of a Q and A, next-steps conversation.  And

15  then finally, kind of the break up of the meeting and milling

16  about, social, you know, "nice to meet you."

17  Q.  Okay.  So let's walk through each one of those.  So you

18  said, first, Ray talked about normal credit card processing; is

19  that right?

20  A.  Yes.

21  Q.  Okay.  So what did he say about that?

22  A.  He first asked if any of us were aware of how standard

23  credit card processing works.  Most of us in the room were not.

24  So he explained it to us.  What I remember is he said there's a

25  merchant ID that the merchant of record will use and that talks

1    about the kind of the industry that the merchant is in.

2              And then there is, on the credit card statement that a

3    customer gets, there is information from the merchant so that

4    the customer is clear to the customer how -- you know, who

5    processed that transaction.  And then we talked about

6    chargebacks a bit as well.

7    Q.  All right.  So you mentioned a merchant ID; was that a

8    code?

9    A.  Yes, it's a code that, I think, links to the industry.  So

10   if you are a grocery store, it might be grocery, or something

11   like that.

12   Q.  All right.  And then you said he talked about chargebacks.

13   What did he say about chargebacks?

14   A.  He mentioned that in the United States, it was legal for

15   customers to issue a chargeback against their credit card

16   company if they were unaware of what the charge on their credit

17   card statement was for.

18   Q.  All right.  And then you said you talked about -- that he

19   talked about high-risk credit card processing, right?

20   A.  Yes.

21   Q.  What did he say about that?

22   A.  He talked about kind of the differences between standard --

23   standard and what he called high risk.  The differences being,

24   that I remember, in the case of Eaze, there is no merchant code

25   for cannabis; so we would have to be creative about what we

chose.  For example, we could choose "delivery" because Eaze

was a delivery service.

Q.  Did he say anything about merchant names in the context of

high-risk credit card processing?

A.  He talked about what would go on the customer statement.

Q.  What did he say about that?

A.  He said that we couldn't use "Eaze."  I wasn't quite clear

as to why we couldn't, but one of the names that was mentioned

at that time in the meeting, I think through a brainstorming

session, was Easy Delivery as an option that could be put.  He

said it was important for the customer to recognize the

transaction so that they didn't issue a chargeback, but that it

shouldn't be Eaze exactly.

Q.  And so you said he said it was important for the customers

recognize it so they didn't institute chargebacks, right?

A.  Yes.

Q.  Did he say anything else about chargebacks in the context

of high-risk processing?

A.  I don't remember specifically if he said anything about

chargebacks.  I know that chargebacks are something that Jim

had mentioned in the past in the company as the reason that

credit cards came down on Eaze.  So from what I remember, at

least for me, is something the company definitely wanted to

avoid.

Q.  And did Ray say anything about fees in the high-risk credit

1    card processing context?

2    A.  He did mention to the dispensaries that fees would be

3    higher for high risk.

4    Q.  Did Ray say anything about how he knew all this about

5    high-risk credit card processing?

6              MR. GILBERT:  Objection.

7              MR. TAYBACK:  Join.

8              THE COURT:  Overruled.  But, counsel, we're going to

9    need to break in another couple of minutes for lunch, but the

10   witness may answer the question.

11   Q.  The question was whether he said anything about how he knew

12   all of this about high-risk credit card processing?

13   A.  He mentioned that he'd been in the industry for quite a

14   while.  I don't recall exactly if he gave specific examples of

15   how he knew, but I remember being very impressed with his

16   knowledge.

17   Q.  Did Ray talk at all about risk to the parties at the

18   meeting?

19   A.  Yes, he did.

20   Q.  What did he say?

21   A.  He told us that everyone in the room should understand that

22   there was a risk to the solution he was presenting; that he was

23   pretty confident that, for everyone that wasn't him, the risk

24   was pretty low.  I remember him talking about, on a scale of

25   one to ten, we would be more on the one side; he would be more

1  on the upper, eight, nine or ten side.

2        But -- and that he couldn't, you know, make the

3  decision for everyone.  So he wanted to make sure that people

4  understood, but in his experience, it was a pretty low risk.

5  Q.  And when he was talking about this, the risk, you know, to

6  some, to the dispensaries on one side being a one but higher

7  for him, what was your understanding of what risk he was

8  referring to?

9  A.  My understanding was he was referring to the risk of

10  getting caught, the risk of, you know, working in an illegal

11  environment.

12  Q.  And did Ray mention the government at any point during this

13  meeting?

14        MR. GILBERT:  Objection to leading.

15        THE COURT:  Overruled.

16  Q.  You can answer.

17  A.  Okay.  Thank you.  He mentioned that he was already on the

18  federal government's radar.

19        MS. DEININGER:  Your Honor, I think this might be a

20  good time for us to take our break.

21        THE COURT:  Okay.  So, ladies and gentlemen, when you

22  come back from lunch, we're going to interrupt this witness and

23  take another witness, and the reason for that is the other

24  witness is going to be testifying remotely, and we have to set

25  up some equipment for that, and then we'll take that down and

L3GPWEI4                        Cozzetto - Direct

1    return to this witness.  So it's just purely a scheduling

2    issue, nothing more.  So have a good lunch and we'll see you in

3    an hour.

4                (Jury not present)

5                You may step down.  We'll see you as soon as we finish

6    the other witness.

7                THE WITNESS:  Thank you.

8                (Witness temporarily excused)

9                THE COURT:  All right.  Anything anyone needs to raise

10   with the Court?

11               MR. FOLLY:  No, your Honor.

12               MR. TAYBACK:  No, your Honor.

13               MR. GILBERT:  No, your Honor.

14               THE COURT:  See you in an hour.

15               (Luncheon recess)

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

L3GAWEI5ps

```
1                    A F T E R N O O N   S E S S I O N

2                               1:55 p.m.

3               (Jury not present)

4               THE COURT:  I see a screen with a number of people.

5   Who is the witness?  Will the witness raise his hand.  Can you

6   hear me?

7               THE WITNESS:  Yes.

8               THE COURT:  Very good.  We'll get started in a minute.

9   You can put your hand down.

10              THE WITNESS:  OK.

11              MR. BURCK:  Your Honor, Bill Burck for Mr. Akhavan.  I

12  just wanted to note for the logistics for us on

13  cross-examination, we have a paralegal who is present with the

14  witness so we can provide him exhibits as we offer it to him,

15  so that's why you may see another person there.  It's just

16  for --

17              THE COURT:  Thank you.

18              MR. HARID:  Same here for Mr. Weigand.  We have a

19  paralegal as well.

20              THE COURT:  You guys are just sparing no expense.

21  That's fine.  That's good.

22              So two of my three daughters are paralegals, but

23  they've recovered.

24              Assuming the government goes into Thursday, are you

25  going the whole day?
```

L3GAWEI5ps                    Elliott - Direct

1                MS. LA MORTE:  I would say probably through the

2      morning and then we would probably free up after lunch.

3                THE COURT:  So defense counsel should be ready with

4      their first witness for later on Thursday.

5                MR. BURCK:  Yes, your Honor.

6                MS. LA MORTE:  Has your Honor decided when it wants to

7      hold a charging conference?

8                THE COURT:  I think probably Friday evening.

9                MS. LA MORTE:  OK.

10               (Jury present)

11               THE COURT:  Ladies and gentlemen, can everyone see the

12     witness?

13               Mr. Elliott, just raise your hand again to make sure

14     everyone can see him.

15               Very good.  Please raise your hand once more.

16     MARTIN ELLIOTT,

17          called as a witness by the government,

18          having been duly sworn, testified as follows:

19               THE COURT:  OK.  Counsel.

20     DIRECT EXAMINATION

21     BY MS. DEININGER:

22     Q.  Good afternoon, Mr. Elliott.

23     A.  Good morning.

24     Q.  You're right.  You're in California.  It's morning.  Right?

25     Good morning.

1          Since we're doing this by video, I just want to

2    confirm, you can see me and hear me, right?

3    A.  I can, yes.

4    Q.  And can you also see an individual in the "Defendant 1"

5    screen?

6    A.  I can see from his chin up, yes.

7    Q.  OK.  And can you also see an individual in the "Defendant

8    2" screen?

9    A.  I can.

10          Yes, from his tie up, so we're good there.

11   Q.  Can you see the judge on your screen?

12   A.  I can see the judge, yes.

13   Q.  And can you also see -- I do know it might be a little

14   smaller and a bunch of them on a single screen, but can you

15   also see the members of the jury?

16   A.  I can, yes.

17   Q.  You can, all right.  Good.

18          Mr. Elliott, where do you work?

19   A.  I work for Visa.

20   Q.  And how long have you worked at Visa?

21   A.  It will be 23 years in June.

22   Q.  Can you describe what Visa is?

23   A.  Visa is the world's largest global payment system operator.

24   We provide credit and debit products to consumers and

25   acceptance ability to merchants.

L3GAWEI5ps                    Elliott - Direct

1    Q.  And was does it mean to be a payment system operator?

2    A.  So what Visa does is, we provide the ability for consumers

3    to pay for business services with credit and debit products,

4    and we also provide the ability for merchants to accept those

5    credit and debit products for payment for their business

6    services.  So we enable commerce around the world.

7    Q.  And drawing your attention to the 2016 to 2019 time period,

8    what was your role at Visa?

9    A.  I was the local head of a group called Franchise Risk

10   Management.

11   Q.  Can you describe generally your duties and responsibilities

12   in that role.

13   A.  Sure.  So I set policy and provide guidance and oversaw the

14   administration of compliance programs that dealt with merchants

15   and acquiring banks that may generate excessive fraud,

16   excessive chargebacks, or if they were introducing illegal

17   activity into the payment system.

18   Q.  What was the primary goal of the team you oversaw?

19   A.  The primary goal is to really protect the integrity of the

20   payment system from illegal or brand-damaging activity or the

21   activities that really damaged our consumers' expectation of

22   using the legal services.

23   Q.  So in the course of your job at Visa, have you become

24   familiar with how credit and debit transactions are processed

25   in the Visa network?

1   A.  I am, yes.

2   Q.  And are you familiar with the various roles of the entities

3   that participate in the Visa network?

4   A.  I am.

5   Q.  Mr. Elliott, can you describe for the jury who the primary

6   players in the Visa network are?

7   A.  Sure.  So we like to describe the participants as being

8   part of a four-party model, and so the first party would be

9   card issuing banks.  These are predominantly financial

10  institutions, banks like Chase, Wells Fargo, Citibank, that

11  issue credit cards or debit cards directly to consumers.

12          The second party, which is tied to the issuing banks,

13  would be the cardholder or the consumers.  And these are the

14  individuals that would hold the Visa product in their wallet

15  and use it to pay for business services.

16          Then the third party would be what we call merchant

17  acquiring banks, or acquirers.  They are typically also

18  financial institutions.  One of the largest in the country is

19  Paymentech, Bank of America, Wells Fargo.  But what they do is,

20  they have a relationship with merchants and they provide the

21  merchants the ability to accept Visa transactions.

22          And then lastly, the other important party in that

23  model would be the merchants themselves.  And so, for example,

24  merchants would be like Amazon.com, Wal-Mart, Home Depot,

25  Target.  They accept Visa payment products, and they work with

1    acquiring banks.  So that's the fourth part of the model.

2    Q.  I think -- I want to make sure -- one example you gave was

3    Bank of America, right?

4    A.  Correct.

5    Q.  And Wells Fargo?

6    A.  Yes.

7    Q.  And Citibank?

8    A.  They are part of Citibank, yes.

9    Q.  And did you say they are also -- they can also play a role

10   of acquiring banks?

11   A.  They can, and oftentimes these are larger financial

12   institutions.  Issuers and acquirers will perform a similar

13   role.  The Wells Fargo issues and acquirers -- it issues and

14   acquires.  Bank of America issues and acquires.

15   Q.  And so, in this model, what is the role of Visa?

16   A.  So Visa's role is, we're in the center of this, and you can

17   think of us as an electronic super highway.  We provide all of

18   the technology and the systems to allow issuers and acquirers

19   to communicate on a 24/7 basis every day around the world.  So

20   we provide the infrastructure that enables the authorization,

21   the clearing, and the settlement of these transactions.

22        We also set the rules to enable commerce.  We set

23   rules for the issuers and for the acquirers.

24        We also provide, you know, fraud mitigation rules,

25   everything they need to support the infrastructure.

1   Q.  What do you mean by "fraud mitigation rules"?

2   A.  We also provide tools to issuers and acquirers that help

3   them identify fraudulent transactions so that they can decline

4   them if need be.

5   Q.  OK.  I think you said a minute ago that acquiring banks

6   sponsor merchants in the system; is that right?

7   A.  Three do, yes.

8   Q.  What does that mean?

9   A.  What I mean by "sponsor" is, acquirers are directly

10  responsible for signing merchants.  Visa, we have typically

11  have relationships, contractual relationships with merchants.

12  So in order to accept Visa, a bank would have to sign them up

13  and contractually obligate them to follow the rules.  And then

14  the acquirers also typically provide the acquiring bank the

15  technology they need to connect into the payment system.  So,

16  for example, it could be as simple as a terminal that connects

17  them into the payment system.

18  Q.  OK.  And one of the -- what steps in this -- does an

19  acquiring bank take when signing up a merchant on the system?

20  A.  So what they typically do is, it all starts with a merchant

21  application.  So they receive applications from merchants.

22  They review the applications.  And they conduct a due diligence

23  review of the merchant, to try to identify the level of risk

24  that the merchant represents.

25  Q.  Are you familiar with merchant category codes?

L3GAWEI5ps                    Elliott - Direct

1   A.  I am, yes.

2   Q.  What are they?

3   A.  A merchant category code is -- we also call it an MCC --

4   but essentially it's a four-digit numeric number that describes

5   the industry that the merchant operates within, and merchant

6   category codes are standard industrial codes that are set by

7   ISO, meaning Industry Standards Organization.  So they

8   essentially identify the type of industry the merchant is

9   operating with.

10  Q.  And who did you say sets those codes?

11  A.  ISO is the Industry Standards Organization, is the group

12  that, you know, Visa and MasterCard go to if we need to set up

13  a new MCC.

14          And so we -- we, Visa -- follow merchant category

15  codes, but they're related to ISO SIC codes, standard

16  industrial codes.

17  Q.  And so those MCC codes you just talked about, are those

18  just used by Visa, or are they used more broadly?

19  A.  Visa and MasterCard both use the same merchant category

20  codes.

21  Q.  Do acquiring banks have responsibilities with regard to MCC

22  codes?

23  A.  They are responsible for assigning the MCC codes to the

24  merchant when they set them up in their system.

25  Q.  Does every merchant have to have an MCC code?

1  A.  They do, yes.

2  Q.  Why?

3  A.  Well, the merchant category code is a field that's

4  transmitted during the authorization process, and essentially

5  the MCC -- well, it's twofold.  The acquirer needs to

6  understand what industry the merchant is so they can evaluate

7  the risk.  And then the card issuing bank that is charged with

8  authorizing the transaction also needs to know what industry

9  the merchant is part of, as part of their decision-making

10  process.

11  Q.  And what role does that play, to your understanding, in the

12  issuing bank's decision-making process?

13  A.  Issuing banks typically use fraud claim technology or what

14  we also call neural networks to score the individual

15  transaction based on the risk it presents.  And what they try

16  do is understand what is the normal behavior for an individual

17  consumer.  And so the risks presented by industries can be very

18  different.  The risk of a restaurant transaction may be very

19  low.  The risk of, let's say, a cruise or airline transaction

20  could be higher.  And so they want to use the type of industry

21  in their decision-making role before they authorize a client

22  transaction.

23  Q.  Is there an MCC code for marijuana?

24  A.  No, there isn't.

25  Q.  And to your understanding, why not?

1    A.  The MCC codes are set up by the overall industry, and so

2    the MCC code that we have that most approximates that is the

3    one for pharmacies, pharmacies and drugstores.

4    Q.  What's your understanding as to whether marijuana sales are

5    legal under federal law?

6    A.  My understanding is that they're illegal under federal law.

7    Q.  And are there generally MCC codes for illegal industries?

8    A.  No.  We don't have an MCC code for illegal industries.

9    Q.  Or an illegal product?

10    A.  Or illegal products, no.

11    Q.  And do acquiring banks have responsibility with regard to

12    the legality of a merchant's products or services?

13    A.  They do, yes.  Our rules require that transactions entering

14    the payment system be legal in both the buyer's and the

15    seller's jurisdiction.

16    Q.  And what's the -- sorry.

17    A.  I'm sorry.  The acquirer's role is to make sure that the

18    merchants comply with the rules.

19    Q.  And why do the acquiring banks have that responsibility?

20    A.  Well, simply because they're the entity that directly signs

21    them and sponsors them into the payment system, so they have a

22    direct due diligence, know-your-customer obligation to

23    understand what the merchant does, how they do it, and to make

24    sure that they're not bringing anything harmful or problematic

25    into the payment system.

1    Q.  And what responsibilities does the merchant have as part of

2    when it's being onboarded by an acquiring bank?

3    A.  Their responsibility is to make sure that they completed

4    the merchant application and any documentation requirements

5    requested by the acquiring bank in an accurate manner.

6    Q.  And just to be clear, in this four-party system that you

7    described, who are Visa's actual clients?

8    A.  So Visa's actual clients are the acquiring banks that are

9    direct members of Visa and also the card issuing banks that are

10   in effectively obligated to do so.  Issuers and acquirers.

11   Q.  Beyond the different players you already described, are

12   there other people, other entities that can be involved in the

13   Visa payment system?

14   A.  There are.  And oftentimes acquirers and issuers will use

15   independent sales organizations to, you know, expand their

16   marketing outreach efforts.

17   Q.  Are independent sales organizations also referred to as

18   ISO?

19   A.  They are, yes.

20   Q.  And what are some of the potential roles for an ISO?

21   A.  ISOs, they do a number of things.  One of their more

22   prolific activities is to source new merchant applicants for

23   acquiring banks, so like a sales and marketing arm of the bank.

24   They also provide fraud reduction technology.  They may help

25   with back-office processing and chargebacks.  You know, they

1   help support the merchant in their activities to accept Visa

2   transactions.

3   Q.  Have you ever heard of offshoring?

4   A.  I have, yes.

5   Q.  What is offshoring?

6   A.  "Offshoring" is a term often used that refers to situations

7   where merchants that are going to be problematic or may not be

8   welcome in their home markets, where they try to move their

9   businesses offshore, they work with agents offshore to find

10  acquirers that may be willing to take their activity.

11  Q.  And what might a merchant to do to get an offshore account

12  if they haven't been able to get one in their home market?

13  A.  Well, in my experience, offshoring is often with merchants

14  that know they can't get an account in a marketplace where they

15  should reside and work with agents or ISOs, and they'll put up

16  multiple accounts offshore, and they'll often set them up using

17  different names and perhaps different principals, but they

18  simply keep their accounts operating and going.

19  Q.  So switching to a different topic for a minute,

20  Mr. Elliott, when a cardholder makes a purchase using their

21  credit or debit card, what information about the transaction is

22  transmitted to Visa?

23  A.  So there is a merchant descriptor that includes a number of

24  transaction fields, and predominantly what they include is the

25  acquiring BIN -- that's the bank identification number -- that

1    identifies the acquirer that processed the transaction.

2    There's also the merchant's name field, and this is the name

3    that appears on the cardholder's statement when they see their

4    bill at the end of the month.  There's also a city field that

5    identifies the city, the state, the merchant category code,

6    obviously the date, the transaction amount.  And there's

7    typically a country code as well, which country it's in.  But

8    when these transactions are transmitted to Visa, we in turn

9    shift them to the issuing bank.

10   Q.  Is there any additional information included for

11   card-not-present transactions?

12   A.  We do have point-of-sale condition codes, which are values

13   that identify whether it's a card-present transaction or a

14   card-not-present transaction, which could be internet or

15   mail/phone order.

16   Q.  OK.  I think you -- I was just going to ask, what is a

17   card-not-present transaction?  What does that mean?

18   A.  "Card not present" means the card -- the cardholder was not

19   physically present when the transaction was consummated.  And

20   so typically today that means an internet transaction or a

21   mail-order transaction.

22   Q.  And so what happens after Visa receives information about

23   an individual transaction?

24   A.  So what I may have said earlier on is, you can think of

25   Visa like a big electronic switch.  And so when an -- when a

transaction comes in from a merchant to an acquirer, the

acquirer routes it to Visa.  And then we immediately route that

transaction to the cardholder's card issuing bank so that they

can decide whether or not they want to approve it or decline

it.

          And then once that card issuing bank either approves

it or declines it, we route that response back to the issuer,

to the acquirer, and the acquirer in turn to the merchant.

Q.  And how long does that process generally take, from when a

Visa cardholder uses his or her card to when the transaction is

approved or declined?

A.  It's typically nanoseconds.

Q.  How many transactions are processed through the Visa

network in any given period of time?

A.  It's about 500, 500 to 600 million a day.

Q.  The information that the issuing bank receives about the

transaction, is that generally the same as the information that

Visa receives?

A.  It is, yes, because it went from the acquiring bank to Visa

and Visa routes it to the issuing bank.  So it's the same.

Q.  So I want to focus on some of the information you mentioned

that Visa receives that relates specifically to the merchant.

And by that I mean the merchant name, the location, and the MCC

code.  That's all part of the transaction information that Visa

receives, right?

1   A.  It is.

2   Q.  And that the issuing bank receives, right?

3   A.  It is.

4   Q.  So as a general matter, is it important to Visa that those

5   pieces of information be accurate?

6   A.  It is, yes.

7   Q.  Can you tell me why?

8   A.  Well, first off, in order to make sure that merchants are,

9   you know, following the rules, we would assume that the

10  information on the merchant application that the acquirer used

11  to enter the system was accurate.  And then ultimately, as the

12  transaction information is routed from the acquirer to Visa to

13  the issuer, the issuer is going to need to make a decision to

14  authorize or decline the sale.  And we would -- in order for

15  them to make the right decision or a good decision, and to take

16  advantage of the risk-scoring models that they use, they need

17  to have accurate information.  So the name should be accurate,

18  the MCC should be accurate, the country from which it came

19  should be accurate so they could, you know, evaluate those

20  different factors in an accurate manner.

21  Q.  Are you familiar with a practice called "miscoding"?

22  A.  Yes.

23  Q.  What is "miscoding"?

24  A.  "Miscoding" is a term used in the industry to describe when

25  a merchant said -- it's using a merchant category code that

1    does not accurately describe their business.  So an example of

2    that might be an internet gambling merchant that is described

3    as an electronics store.  They're concealing the fact that

4    they're actually a gambling merchant.

5    Q.  And what's your understanding of why a merchant might

6    engage in miscoding?

7    A.  Oftentimes it's to conceal the actual activity.  It usually

8    starts with, they don't want the acquiring bank that they're

9    working with to know what they really do.  And then it also,

10   you know, in some instances, merchants realize that issuers

11   would decline their transaction if they knew what they were up

12   to.

13   Q.  And based on your experience, what would a merchant engaged

14   in illegal activity do to prevent miscoding from being

15   discovered?

16             MR. BURCK:  Objection, your Honor.

17             THE COURT:  Sustained.

18   Q.  Generally speaking, who bears the risks that arise from

19   miscoding?

20   A.  Well, first the acquirer bears the risk, because if they've

21   signed a merchant entity that they wouldn't have otherwise

22   signed that they deem to be high risk, the acquirer absolutely

23   has risk in it, for anything that may go wrong with that

24   relationship.  Visa, secondarily, can have risk in it, if

25   illegal activity gets into the system.  And then also the card

L3GAWEI5ps                    Elliott - Direct

issuing bank who authorizes the transaction, if they're

approving something that's not legal or that their fraud model

should have picked up and declined, then they have potential

exposure as well.

Q.  And in your experience, are there steps that you have seen

merchants engaged in miscoding take to prevent that miscoding

from being discovered?

A.  Yes.

Q.  And what are those?

A.  The steps that I see most frequently are merchants that

want the miscode, who oftentimes follow the offshoring model,

which is multiple -- setting up relationships with multiple

acquiring banks, using multiple names, in the wrong MCC.  And

the whole goal is to establish as many merchant accounts as it

takes to stay open and to avoid being shut down if one acquirer

conflicts.

Q.  So going back to the transaction process, and let's assume

that a transaction has been approved.  Can you describe the

money flow for that approved transaction?

A.  Sure.  Assuming that the transaction was approved, what

happens, typically, is, at the end of the business day, the

acquiring bank is going to submit all of their transactions

that were approved that day for the merchant into Visa, into

our clearing and settlement process.  And what happens is, we

receive the transaction from the acquiring banks.  We then

1    immediately go out to all of the various card issuing banks,

2    whose cardholders, you know, engaged in activity that day.  And

3    we bill, or debit, the card issuing banks for all of the

4    activity that their cardholders engaged in for that day.  So we

5    bill the issuers, we take the money from the issuers' accounts,

6    and then we turn around and we pay the acquiring bank the

7    proceeds that are due to them for their merchant sales for that

8    day.  We call that our clearing and settling process, where we

9    pay the acquirers and the acquirers in turn pay the merchants.

10   Q.  OK.  I think you might have already mentioned this but just

11   to be clear, when Visa goes and bills or debits for the

12   settlement process, whose account do they take the money out

13   of?

14   A.  When we bill the issuers, we take it out of an account that

15   the issuer holds.  We bill the issuer's d/b/a.

16   Q.  So in the course of your employment at Visa, have you

17   become familiar with Visa's policies and practices pertaining

18   to illegal transactions?

19   A.  Yes.

20   Q.  Can you describe for me generally what your familiarity

21   with those policies and practices is based on.

22   A.  Sure.  So as the global head of franchise risk management,

23   I've shaped the policy around our compliance program, shaped

24   the development, updated it.  I've enforced the compliance

25   programs for a number of years around the world.  I'm very

1    familiar with how they operate, and I've implemented them.

2    Q.  So does Visa have rules regarding illegal transactions?

3    A.  We do, yes.

4    Q.  And can you tell me at a high level what is Visa's rule

5    regarding illegal transactions?

6    A.  The fundamental rule states something like, transactions

7    must be legal in both the buyer and the seller's jurisdiction.

8    So, for example, if a cardholder in Germany is buying something

9    from a merchant in New York, whatever that product or service

10   is, it needs to be legal in Germany and in New York, not just

11   one side.

12   Q.  And why does Visa have this fundamental rule?

13   A.  Well, we operate a global payment system in almost 200

14   countries around the world, and so we have an obligation to

15   make sure that we're compliant with the rules in all those

16   countries.  And so the best way to do that is to make sure the

17   transactions are legal in both the buyer's and seller's

18   jurisdiction.

19   Q.  And what's the purpose of the rule?

20   A.  The purpose of the rule is to make sure that Visa complies

21   with applicable laws, whether they be in U.S., Canada, or

22   Europe, or anywhere, really, and to meet our own regulatory

23   obligation.

24   Q.  Now, you mentioned, I think you mentioned "regulatory

25   obligation."  Generally what are you referring to there?

L3GAWEI5ps                    Elliott - Direct

1   A.  Well, Visa is regulated by federal banking regulators, and
2   we have an obligation to comply with the laws of this country
3   and the others that we operate within.  And so we want to make
4   sure that we're a good corporate system and compliant with the
5   rules that apply to us and to our clients.
6   Q.  So what is Visa's position specifically regarding
7   U.S.-based transactions involving the sale of marijuana
8   products?
9   A.  Our position is that they're prohibited on the Visa network
10  because they're prohibited by federal law.
11              MS. DEININGER:  Your Honor, at this time I'd like to
12  offer into evidence a self-authenticating document,
13  Government's Exhibit 2201 through 2204, 2208, 2216, 2217, and
14  2221 through 2232.
15              THE COURT:  Any objection?
16              MR. BURCK:  No, your Honor.
17              MR. HARID:  No, your Honor.
18              THE COURT:  Received.
19              (Government's Exhibits 2201 through 2204, 2208, 2216,
20  2217, and 2221 through 2232 received in evidence)
21              MS. DEININGER:  Mr. Levine, can you publish for
22  everyone here in the courtroom what's in evidence as Government
23  Exhibit 2216.
24  Q.  And Mr. Elliott, you, I believe, should have a binder of
25  documents in front of you.

1   A.  There's two binders.  So --

2   Q.  If you can look in that binder for Government Exhibit 2216.

3        Mr. Levine, you can pull it up for everyone here.

4        Let me know when you see it, when you've found that.

5   A.  I found it.

6   Q.  OK.  So Mr. Elliott, do you recognize Government Exhibit

7   2216?

8   A.  I do, yes.

9   Q.  And what is it?

10  A.  This was an internal memo that Visa created to address

11  marijuana acceptance and other questions that we were getting

12  from client banks at the time.

13  Q.  This says "issues brief" up at the top, right?

14  A.  Yes.

15  Q.  Generally what is the purpose of an issues brief at Visa?

16  A.  The purpose of an issues brief in this document is

17  basically to disseminate our position on a given subject and to

18  help our account executive answer questions that client banks

19  may be posing to them, given something that may be going on at

20  the time.

21  Q.  Do you see there's a date in red at the top right?  Can you

22  read that for me?

23  A.  It was dated May 26, 2015.

24  Q.  What is the title?  What does it say after "issues brief"?

25  A.  "Visa Acceptance at Marijuana Dispensaries."

L3GAWEI5ps                    Elliott - Direct

Q.   Now I want to look down the first page a little bit, to the
paragraph that starts "in 2015."  Can you just read that for
me.

A.   The fourth paragraph?

        "In 2015, Visa was advised by a credit union that the
credit union intended to issue corporate cards to marijuana
dispensaries where such businesses were legal under state law.
In addition, Visa received several inquiries from other
financial institutions that were interested in serving the
marijuana industry.  These inquiries prompted Visa's risk and
legal departments to review the state of law and policy with
respect to marijuana.  Since marijuana is still illegal at the
federal level, Visa determined that it cannot process marijuana
transactions until such time as they are permissible under
federal law."

Q.   Thank you.

        And now we can turn to page 2.  There is a section
here that just says "Visa statement."  What does it mean when
it says "Visa statement"?  What does that represent?

A.   That is a statement that we would use if we were involved
in any media inquiry.

Q.   And can you read the statement.  What does it say here?

A.   All right.  It says, "'In offering our payment service,
Visa adheres to the rule of law and seeks to prevent our
network from being used for unlawful purposes.  Although the

L3GAWEI5ps                    Elliott - Direct

1   federal government previously announced it will not challenge

2   state laws that legalize and regulate marijuana sales,

3   marijuana nevertheless has remained illegal under federal law.

4   Such transactions are not permitted on the Visa network until

5   such time as federal law allows otherwise.'"

6   Q.  Thank you.  And now I want to have you turn to what's in

7   evidence as Government Exhibit 2204.

8           MS. DEININGER:  And, Mr. Levine, if you can pull that

9   up for everyone in the courtroom.

10  Q.  Mr. Elliott, let me know when you have it.

11  A.  OK.  I'm there.

12  Q.  OK.  Do you recognize this?

13  A.  I do, yes.

14  Q.  What is it?

15  A.  This is the presentation that one of our staff members gave

16  at one of our security summits.

17  Q.  At the top it says "Visa Security Summit 2019."  What is

18  the Visa security summit?

19  A.  So a Visa security summit is an industry event we held back

20  in 2019 here in San Francisco, and it's an event we hold -- we

21  try to hold them every two years with our clients to update

22  them on issues and to address emerging risks and threats, and

23  basically it's a client outreach and engagement effort.

24  Q.  Who do you understand attends the Visa security summits?

25  A.  Card issuing banks, merchant acquiring banks, and their

L3GAWEI5ps                    Elliott - Direct

1   agent if they wanted to bring them along.

2   Q.  And what's the title of this particular presentation?

3   A.  The title is "Cannabis and Hemp-Derived Products."

4   Q.  And what was the date?  When was this presentation given?

5   A.  August of 2019.

6   Q.  Do you see -- who is the presenter?

7   A.  Elizabeth Scofield.

8   Q.  And I think you mentioned that at the time she was a member

9   of your team?

10  A.  Yes.

11  Q.  So what was her role in Visa?

12  A.  She was head of policy for the BRAM protection team, under

13  my watch.

14  Q.  Did you review this presentation before it was presented at

15  the Visa security summit?

16  A.  Yes.

17  Q.  So just for clarity, you can flip through that document

18  quickly and tell me, is this a full presentation or just an

19  excerpt?

20  A.  It's just two pages of it.

21  Q.  It's just an excerpt, right?

22  A.  It's an excerpt, yes.

23  Q.  So what was the purpose of this presentation?

24  A.  Given the questions that had come in from the acquiring

25  industry about marijuana transactions, we wanted to educate the

1  acquiring members and their ISOs on Visa's position and give

2  them an update on the things that were, you know, transpiring.

3  It's basically an education and question-and-answer session.

4  Q.  OK.  Let's turn to the next page.  Do you see where it says

5  "Visa policy: marijuana"?

6  A.  I'm there.

7  Q.  Can you just read that for me.

8  A.  Are you talking about the two bullet points or the

9  quotation below?

10  Q.  The whole thing really.

11  A.  OK.  The first bullet point reads, "Despite the number of

12  states that have legalized the purchase and sale of marijuana

13  to some degree, marijuana remains illegal under federal law."

14       The second bullet reads, "Visa's official position on

15  transactions involving the purchase or sale of marijuana in the

16  U.S. is as follows" -- and then there's a quote.  Here comes

17  the quote.  "'In offering our payment services, Visa adheres to

18  the rule of law and seeks to protect the integrity of the Visa

19  payment system.  Although several U.S. states have legalized

20  marijuana for medical or recreational use, marijuana

21  nevertheless remains illegal under federal law.'"  And then

22  it's listed in bold: "'As such, Visa prohibits all transactions

23  involving the sale or distribution of marijuana until such time

24  as federal law allows.'"

25       That's it.

1    Q.  So was this Visa's position with regard to marijuana

2    transactions for the entirety of the period between 2016 and

3    2019?

4    A.  It was, yes.

5    Q.  Were there any material changes to that policy with regard

6    to marijuana transactions in that time period?

7    A.  No.

8    Q.  So now I want to ask you to look in your binder for what's

9    marked as Government Exhibit 2217.

10        MS. DEININGER:  Mr. Levine, you can pull that up,

11   since it's in evidence, for everyone here.

12   A.  OK.  I'm at 2217.

13   Q.  OK.  Great.  So you recognize that?

14   A.  I do, yes.

15   Q.  What is it?

16   A.  This is another internal communication for our internal

17   staff to help answer client questions.

18   Q.  OK.  Were you the author of this internal communication?

19   A.  I probably was one of the primary authors of it.

20   Q.  Do you see where it says "from" -- is that a --

21   A.  Oh, yeah.  There I am.  Sure.  Yeah.

22   Q.  What is the date of this document?

23   A.  May 3, 2019.

24   Q.  And what's the title up at the top?

25   A.  "Visa Acceptance for Marijuana and CBD Sales."

1   Q.  So directing your attention to the first two paragraphs

2   under "Marijuana," do you see that?

3   A.  I do.

4   Q.  Is this --

5   A.  Yes.

6   Q.  Is this, in all material respects, the same position that

7   we just read in the issues brief in the Visa security summit

8   presentation?

9   A.  It is, yes.

10          MS. DEININGER:  We can zoom out of that.

11  Q.  Right below the quote, do you see the paragraph below the

12  quote?  Can you read the first two sentences of that paragraph?

13  It starts with "Visa operates."

14  A.  "Visa operates the Global Brand Protection Program to

15  ensure acquirers do not submit illegal or brand-damaging

16  transactions into the payment system.  Acquirers identified as

17  entering illegal marijuana transactions into the payments

18  system may be identified by the program and become subject to

19  noncompliance assessments.  Please direct any questions about

20  the GBPP to Elizabeth Scofield."  And then there's an email

21  address.

22  Q.  So let's go to the second page.  There's a section at the

23  bottom called "frequently asked questions."  Do you see that?

24  A.  I do.

25  Q.  Can you read the first frequently asked question, the

L3GAWEI5ps                    Elliott - Direct

1   question and answer.

2   A.  The first question is, "If state law allows marijuana

3   sales, why does Visa prohibit the transactions?"

4           The answer is, "Marijuana remains illegal at the

5   federal level."

6   Q.  And then do you see --

7           MS. DEININGER:  Mr. Levine, you can zoom out of this.

8   And if you go to the next table, the question and answer that

9   goes from the second to third page.

10  Q.  Can you read that one, the next question and answer.

11  A.  "What if a marijuana" --

12  Q.  No, sorry.  It says starts "are debit transactions."

13  A.  I'm sorry.  It's at the bottom -- OK, I got it.

14          "Are debit transactions OK for the sale of marijuana?"

15          The answer is, "No, Visa prohibits all transactions

16  involving the purchase and sale of marijuana from being entered

17  into the Visa payment system."

18  Q.  And then there's a question and answer right below that

19  that starts "what if a merchant."  Can you read that one as

20  well.

21  A.  Yes.  The question reads, "What if a merchant is selling a

22  gift card, certificate, or voucher that can be used to purchase

23  marijuana?"

24          Answer: "Visa prohibits all transactions involving the

25  purchase and sale of marijuana.  Disguising the transaction as

1    a gift card or other quasi cash sale violates Visa rules."

2    Q.  Thank you.

3            I'd now like to have you turn, then, switching topics

4    a little bit, I'd like to have you turn to what's been marked

5    in evidence as Government Exhibit 2208.

6            MS. DEININGER:  And, Mr. Levine, you can pull that up

7    for everyone in the courtroom.

8    Q.  Let me know when you have it.

9    A.  That's not in the binder?

10           OK.  Thank you.

11           I think we have it up.  It looks like the Visa rules?

12   Q.  That's right.  It should say "Visa core rules and Visa

13   product and service rules."  Do you have that in front of you?

14   A.  Yes.

15   Q.  Does it have a date about two thirds of the way down the

16   page that says 15 October 2016?

17   A.  It does, yes.

18   Q.  OK, great.  So what is it?

19   A.  This is a section from the Visa rules booklet that we

20   distribute to our clients.

21   Q.  Do you see at the top, does it have a yellow sticker or

22   electronic sticker that says "Government Exhibit 2208"?

23   A.  It does.

24   Q.  OK.  I just want to make sure we're all looking at the same

25   document.

L3GAWEI5ps                    Elliott - Direct

1           OK.  So, sorry, tell me, what is this?

2   A.  These are the Visa core rules that our clients are

3   obligated to enforce and comply with.

4   Q.  And what generally is the purpose of Visa's core rules?

5   A.  The rules provide the guideline and the -- they support the

6   infrastructure to allow acquirers and issuers -- to allow them

7   operate a global payment system across 200-plus countries.  You

8   know, without the rules, you know -- basically it's a standard

9   of care and the expectation that acquirers are supposed to

10  follow and issuers as well, so that we have a functioning

11  payment system that works and isn't just turning to chaos

12  because everything is what it was.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

L3GPWEI6                    Elliott - Direct

1   Q.  Does Visa regularly update its core rules?

2   A.  We do, yes.

3   Q.  How often?

4   A.  We update them twice a year, in April and in October.

5   Q.  So focusing on the time period between 2016 and 2019, was

6   there a version of Visa's core rules in effect during that

7   entire time period?

8   A.  Yes, there was.

9   Q.  So I'd like to go to page 39 of this document.  It should

10  be marked at the bottom for you as nine of the Visa rules?

11  A.  Well, okay.  Yes, we're there.

12  Q.  All right.  Do you see where it says:  Introduction to the

13  Visa core rules and Visa product and service rules; about four

14  lines from the top?

15  A.  Yes, I do see that.

16  Q.  Can you read me the two paragraphs underneath that?

17  A.  The first paragraph reads:  "Visa has established rules

18  that are designed to minimize risk and provide a common,

19  convenient, secure and reliable global payment experience,

20  while supporting geography-specific rules that allow for

21  variations and unique marketplace needs.  They are set and

22  modified by Visa to support the use and advancement of Visa

23  products and services, and represent a binding contract between

24  Visa and each member.

25          The second paragraph reads:  The Visa core rules

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    contain fundamental rules that apply to all Visa system

2    participants and specify the minimum requirements applicable to

3    all members to uphold the safety, security, soundness,

4    integrity and interoperability of the Visa system.

5    Q.  So looking at the first sentence in the second paragraph,

6    it says:  Visa core rules contain fundamental rules that apply

7    to all Visa system participants.  What's your understanding of

8    what it means by Visa system participants?  Who's included in

9    that?

10   A.  The parties included would be the acquiring banks, the

11   issuing banks, the merchants, cardholders and, of course, any

12   agent that the issuers or acquirers are using to support their

13   Visa programs.

14   Q.  And then just after that, it says that the Visa core rules

15   specify the minimum requirements applicable to all members to

16   uphold the safety, security, soundness, integrity and

17   interoperability of the Visa system.  What does it mean --

18   what's your understanding who the members are?

19   A.  Well, the members would be the issuers and the acquirers.

20   Q.  Let's go now to page 44 of the PDF.  I think the pagination

21   would be 14 at the bottom for you, Mr. Elliott, CR14 at the

22   bottom left?

23   A.  Yes.  I found it.

24   Q.  Okay.  And then do you see section 1.1.3 titled Applicable

25   Laws and Conflicts?

1    A.   I see that, yes.

2    Q.   The standalone paragraph at the bottom, can you just read

3    that sentence for me?

4    A.   The big paragraph or the second?  Did you say the first or

5    second paragraph?

6    Q.   The second one.  The one-sentence, standalone paragraph.

7    A.   The standalone paragraph reads:  A transaction must be

8    legal in both the cardholder's jurisdiction and the merchant

9    outlet's jurisdiction.

10   Q.   So is this a fundamental rule that you described earlier?

11   A.   It is, yes.

12   Q.   And what does it mean by "cardholder's jurisdiction"?

13   A.   That means that the location where the cardholder is

14   domiciled.

15   Q.   And what does it mean by "merchant outlet's jurisdiction"?

16   A.   That means the physical location of where the merchant

17   outlet is housed.

18   Q.   Are Visa core rules publicly available?

19   A.   They are, yes.

20   Q.   So looking at this fundamental rule, what's your

21   understanding of how this rule applies to marijuana

22   transactions in the U.S.?

23   A.   Based on the fact that a transaction must be legal in both

24   the cardholder's jurisdiction and the merchants outlet's

25   jurisdiction, a marijuana transaction occurring in the United

1    States would be prohibited.

2    Q.  Would it make any difference if the transaction was

3    conducted in a state that has legalized the sale of marijuana?

4    A.  No, it does not.

5    Q.  Does it make any difference if the marijuana transaction is

6    for medical marijuana?

7    A.  It does not.

8    Q.  Was a version of this rule in place for the entirety of the

9    period between 2016 to 2019?

10   A.  Yes.

11   Q.  Were there any material changes made to the rule in that

12   period?

13   A.  No.

14   Q.  All right.  I'd now like to turn to page 77 of this

15   document.  That's 77 in the PDF.  It should say CR47 in the

16   bottom left -- bottom right.  Let me know when you're there.

17   A.  We're there.

18   Q.  All right.  Do you see where it says section 1.5.1.2,

19   Assignment of merchant outlet location?

20   A.  Say that again, please?

21   Q.  In the middle of the page it should say 1.5.1.2, Assignment

22   of merchant outlet location?

23   A.  Where is CR77?  I don't see that.

24   Q.  Sorry.  If you're going by the CR number, it should be

25   CR47.

L3GPWEI6                    Elliott - Direct

```
1   A.  Okay.  So that may be a different page.  Okay, hang on.  CR
2   what?  47?
3   Q.  47.  It's page 77 in the PDF or CR47 on the bottom right.
4   A.  Okay.  We found it.  Yes, Assignment of Merchant Outlet
5   Location is the title.  Is that what you're looking at?
6   Q.  That's what I'm looking at, yes.
7   A.  Okay.
8   Q.  Okay.  Go up to the section title -- if you scroll or look
9   at the very top of the next page, there's a paragraph that
10  starts:  For card-absent environment transactions; do you see
11  that?
12  A.  I do.
13  Q.  Can you read that for me?
14  A.  For a card-absent environment transaction, the acquirer
15  must assign the country of the merchant's principal place of
16  business as the merchant outlet location.  The acquirer may
17  assign additional --
18  Q.  You can stop there.  Thank you.  Is a card -- would a
19  card-absent environment include online commerce?
20  A.  It would.
21  Q.  And this reference here, it says that the acquirer must
22  assign the country of the merchant's principal place of
23  business as the merchant's outlet location.  Is the acquirer is
24  same as the acquiring bank?
25  A.  It is.
```

1    Q.   So what's your understanding of how this rule would apply

2    to online merchant whose headquarters and employees are located

3    in California?

4    A.   If the headquarters and employees are in California, the

5    acquirer should be in the United States, based on the fact that

6    the merchant's principal place of business is in the United

7    States and in California.

8    Q.   And what should the acquirer assign as the merchant outlet

9    location for an online company whose headquarters and employees

10   are in California?

11   A.   It should show as California.

12   Q.   Was a version of this rule in place for the entirety of the

13   period between 2016 and 2019?

14   A.   I believe it was.

15   Q.   And to your knowledge, were any material changes made to

16   this rule in that period?

17   A.   I believe we clarified the rules around the merchant's

18   principal place of sometime during that period, but I can't

19   recall when.

20   Q.   Going down to the next page, do you see a section 1.5.1.3,

21   Merchant Qualification Standards?

22   A.   Yes.

23   Q.   Can you read that for me, through the bullet points?

24   A.   Sure.  Merchant qualification standards.  Before entering

25   into a merchant agreement, an acquirer or payment facilitator

L3GPWEI6                          Elliott - Direct

1    must ensure that the prospective merchant is all of the

2    following:

3              Bullet one:  Financially responsible;

4              Bullet two:  Not engaged in any activity that could

5    cause harm to the Visa system or the Visa brand;

6              Bullet three:  Operating within an allowed

7    jurisdiction;

8              And bullet four:  Effective October 15, 2016, not

9    misrepresenting its merchant outlet location or locations.  The

10   acquirer --

11   Q.  That's okay.  Sorry.  You can stop there.  I just need the

12   bullets.  Thanks.  So at the top it says this referred to

13   entering into a merchant agreement.  What is a merchant

14   agreement?

15   A.  A merchant agreement is the merchant application that the

16   merchant completes when it's applying for acceptance with an

17   acquiring bank.

18   Q.  And also, right after that, it talks about an acquirer or

19   payment facilitator.  Now, I think you already told us that an

20   acquirer is the same thing as an acquiring bank.  What is a

21   payment facilitator?

22   A.  A payment facilitator is a form of merchant -- pardon me,

23   is a form of agent -- excuse me, is a form of agent that

24   contracts directly with the acquiring bank and they essentially

25   provide payment processing services to sponsored merchants.

L3GPWEI6                    Elliott - Direct

1    Q.  Would an ISO be a payment facilitator?

2    A.  Well, an ISO could be an independent sales organization, or

3    it could also operate as a payment facilitator.  It could be

4    both.

5    Q.  So focusing just on the second bullet, where it says:  Not

6    engaged -- the acquirer or facilitator has to ensure that a

7    prospective merchant is not engaged in any activity that could

8    cause harm to the Visa system or the Visa brand.

9              Can you give me some examples of activities that would

10   cause harm to the Visa system or Visa brand?

11   A.  So merchants that are conducting deceptive marketing

12   operations would be one of those types of problems.  Merchants

13   that are selling illegal goods or services would be another

14   one.  Anyone selling counterfeit goods, that's another one.

15   Q.  Sorry, Mr. Elliott.  Can you start again with the examples

16   that you were giving of some times of transactions that could

17   cause harm to the Visa system or the Visa brand?

18   A.  Sure.  So some examples would include any type of merchant

19   engagement in deceptive marketing practices.  Merchants that

20   are selling illegal goods and services, illegal

21   pharmaceuticals, illegal gambling, you know, counterfeit goods

22   and services, any of those things would fall into that second

23   bullet point.

24   Q.  So what are the typical things an acquiring bank would do

25   to confirm that an online merchant that it is sponsoring meets

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    these criteria?

2              MR. BURCK:  Objection, your Honor.  Foundation.

3              THE COURT:  No, I think the foundation is fine.

4    Overruled.

5    BY MS. DEININGER:

6    Q.  You can answer, Mr. Elliott.  Let me know if you need me to

7    repeat the question.

8    A.  Sure.  If you could repeat it, please.

9    Q.  Sure.  So what are some typical things that an acquiring

10   bank would do to confirm that an online merchant that it's

11   sponsoring meets these criteria?

12   A.  So common practice in the industry would be to, based off

13   the information provided on the merchant application, they

14   would pull financial documents for the principal or the

15   merchant to confirm that they're financially responsible.

16         They would run credit reports on the principals if

17   they knew that they had a history of payment and were

18   financially responsible.

19         They would look at the business type that the merchant

20   represents, and try to understand any unique risks presented by

21   the merchant's business, predominantly to make sure that its a

22   legal activity, a legal business.

23         They would also typically review the merchant website,

24   if it's an internet merchant, to try to understand what

25   products are being sold and how they're being sold.  They would

L3GPWEI6                      Elliott - Direct

1   also typically check the --

2   Q.  Sorry.  One second, Mr. Elliott.  Mr. Elliott, can you

3   repeat what kind of file is it that they would usually check?

4   A.  The file that they would typically check, we refer to it in

5   the industry as MATCH, and MasterCard hosts what we call the

6   MATCH file, also known as a terminated merchant file.  And it's

7   a file of merchants that are terminated for cause by other

8   acquiring banks they had problems with.

9           And so, for example, if a merchant was terminated for

10  fraud, lying on their application, chargebacks or doing

11  something illegal, the acquirer would terminate them, and then

12  the rules obligate that they be placed on this MATCH list or

13  terminated merchant file.  By checking any new applicants

14  against this list, they could find out if other banks have had

15  problems with them before they try them.

16  Q.  Okay.  You were actually quite a bit louder when you leaned

17  forward.  So if you don't mind, if you could stay close to the

18  mic, that might be helpful.

19          Who maintains the terminated merchant file that you

20  were just discussing?

21  A.  MasterCard.

22  Q.  And who has access to it?

23  A.  All of the acquiring banks that participate in the Visa and

24  MasterCard program.

25  Q.  For this rule that we were looking at, that should still be

L3GPWEI6                          Elliott - Direct

1   in front of you, about the merchant qualification standards,

2   was the version of that rule in place for the entirety of the

3   period between 2016 through 2019?

4   A.  Yes.

5   Q.  And to your knowledge, were there any material changes made

6   to this rule in that period?

7   A.  The only update was the one in October of 2016, where there

8   was an add about not misrepresenting the merchant outlet

9   location.

10  Q.  Okay.  Looking just a little bit lower down on this same

11  page, do you see a section titled 1.5.1.4, Submission of

12  illegal transactions?

13  A.  Yes.

14  Q.  Can you read what it says below that for me?

15  A.  An acquirer must not knowingly accept from a merchant for

16  submission into the Visa payment system any transaction that is

17  illegal or that the acquirer or merchant should have known was

18  illegal.

19  Q.  And for purposes of this rule, would illegal transactions

20  include marijuana transactions?

21  A.  It would.

22  Q.  Was a version of this rule in place for the entirety of the

23  period between 2016 and 2019?

24  A.  It was.

25  Q.  And are you aware of any material changes being made to

L3GPWEI6                          Elliott - Direct

1    this rule in that time period?

2    A.  I'm not.

3    Q.  So I think we can put the core rules away.  I'd like to

4    have you find what's been admitted into evidence and marked as

5    Government Exhibit 2203.

6              And, Mr. Levine, if you can pull that up for everyone

7    here.

8    A.  2203.  Okay.  We have it.

9    Q.  Okay.  So you have Government Exhibit 2203 in front of you?

10   A.  I do.

11   Q.  Do you recognized this?

12   A.  I do.

13   Q.  What is it?

14   A.  It's the Global Brand Protection Program Guide for

15   Acquirers.  The publication my team puts out about the Global

16   Brand Protection Program.

17   Q.  And when was this particular version of the guide issued?

18   A.  June 2017.

19   Q.  What is the purpose of the Global Brand Protection Program

20   guide?

21   A.  The purpose of this guide is to update and educate

22   acquirers on their obligations under the global brand

23   protection programs and to understand how it operates and what

24   their compliance obligations are.

25   Q.  So I'd like to turn to page 5 of this document.  There's a

1    section one that says About This Guide.  Let me know when

2    you're there.

3    A.   I'm there.

4    Q.   Okay.  Can you just read that first paragraph for me?

5    A.   The Visa Global Brand Protection Program requires Visa

6    acquirers to implement adequate controls to ensure their

7    merchants do not process transactions that are illegal and/or

8    may adversely affect the reputation of Visa or its affiliates.

9    The Visa Global Brand Protection Program guide for acquirers

10   provides that an overview of the GBPP and describes what

11   acquirers must do to effectively control the regulatory,

12   financial, reputation, brand and litigation exposures

13   associated with card-not-present merchants.

14   Q.   Okay.  So looking at the last line, it says "describes what

15   acquires must do to effectively control the regulatory,

16   financial, reputation, brand, and litigation exposures

17   associated with card-not-present merchants."

18           So again, would card-not-present merchants include

19   online merchants?

20   A.   They would, yes.

21   Q.   So let's go to page 7 of this same document, and it should

22   say section 2 at the top, Visa Global Brand Protection Program?

23   A.   Yes, I'm there.

24   Q.   Okay.  Can you just again read this first paragraph for me?

25   A.   With the continued growth of card-not-present transactions

1    and elaborate schemes to conceal illicit activities, Visa and

2    its acquiring members are frequently presented with new threats

3    to regulatory, financial, brand and litigation risk.

4              Specific challenges include risk presented by online

5    merchants selling:  illegal or miscoded online gambling,

6    prohibited pornography, which includes child abuse, bestiality,

7    rape or other non-consensual sexual behavior, contraband

8    tobacco, illegal or counterfeit pharmaceuticals, designer

9    drugs, illegal supplements/nutraceuticals, counterfeit

10   goods/intellectual property, infringing materials or the

11   illegal sale of any other products or services.

12   Q.  So this section lists a number of different types of

13   transactions that Visa says poses specific challenges.  What's

14   your understanding of why these are listed as specific

15   challenges?

16   A.  These happened to be -- the industries represented happen

17   to present the greatest risks to the Visa payment system, based

18   on the number of entities trying to bring these activities in

19   and the dollar volume surrounding those transactions, and then

20   also the laws impacting them.

21   Q.  Are there other types of transactions that can present

22   risks to the Visa payment system?

23   A.  There are, yes.

24   Q.  So listed at the end, among the specific challenges, is the

25   risk presented by the illegal sale of any other products or

1    services.  In the United States, would that include the sale of

2    marijuana?

3    A.  It does, yes.

4    Q.  So I just want to look a little bit further down on that

5    same page.  Section 2.1, Program purpose and components.  And

6    you see where it says:  The program's primary goal is to

7    protect acquirers and the integrity of the Visa payment system

8    by preventing merchants from, and then there's three bullets?

9    Can you just read those three bullets for me?

10   A.  Yes.  Bullet one:  Conducting illegal transactions; bullet

11   two:  Facilitating transactions that endanger public health and

12   safety; bullet three:  Processing transactions that may

13   adversely affect the good will of the Visa payment system.

14   Q.  Okay.  I think we can turn away from the document for a

15   minute.  And can you just generally -- from your experience,

16   can you tell me what the different components are of the Global

17   Brand Protection Program?

18   A.  Sure.  So the first -- and I'm going to cover the

19   components of the program that we enforce against clients

20   without (indiscernible).  The first phase of it is going to

21   include the identification of a problematic merchant, and so

22   that's the point in time where we identify an online merchant.

23   And typically we focused in on online merchants when we

24   identified them selling some illegal product as part of their

25   store.

1      The second thing is once we identify the merchant, we

2  have to identify where they're located in the system.  So once

3  we identify who they're acquiring bank is, we notify the

4  acquiring bank that it's violated the Global Brand Protection

5  Program.  And then, in turn, we ask how are they going to

6  remediate it.  So we send them a letter telling them that they

7  violated it.  Then we ask them to explain how they're going to

8  fix the problem and remediate it, and then we decide, based on

9  the feedback from the acquirer and the history in the program,

10  whether or not we assign risk -- pardon me, whether we assign

11  non-compliance assessments or fines.

12  Q.  So the first phase that you mentioned was identification,

13  right?

14  A.  Yes.

15  Q.  And that involved, among other things, trying to identify

16  illegal transactions in the Visa system, right?

17  A.  That's correct.

18  Q.  So what are the different things that Visa does to identify

19  violations of the Global Brand Protection Program?

20  A.  So we have a two-part approach.  We have a proactive

21  approach, where we use a third-party entity to scan certain

22  websites for illegal activity, and they attempt to make test

23  buys at these merchants.  We do that because we don't

24  necessarily know by looking at websites what the merchant's

25  name actually is and the payment system.

1          So by conducting a test transaction, we can identify

2     if they accept Visa, what bank they're processing with and what

3     the name of that merchant actually is.

4          And once we've been able to identify them, we then

5     look to move to the notification.

6     Q.  But going back to -- for us to focus on the identification

7     phase, other than test transactions, are there other ways that

8     violations are identified?

9     A.  There are.  And the second reactive approach is we work off

10    of tips and feedback we get from our client banks, issuers who

11    often provide us with complaints about problematic merchants

12    that they have identified.  We also get tips from law

13    enforcement or other entities, perhaps in the media about an

14    entity selling something that's prohibited, and then we

15    investigate that and run it through the identification process.

16    Q.  So the first thing you mentioned was test transactions,

17    right?  How frequently does Visa conduct test transactions?

18    A.  We do them weekly.

19    Q.  And does Visa currently routinely conduct test transactions

20    for suspected marijuana merchants?

21    A.  Can you repeat that?

22    Q.  Does Visa -- right now, does Visa do routine test

23    transactions for suspected marijuana merchants?

24    A.  We are not proactively testing marijuana merchant websites.

25    We've taken a risk-based approach, and we're very heavily

1   focused on illegal gambling and illegal pharmacies.  We come

2   across marijuana applications when they are reported to us by

3   our client bank, or if we see them in one of our other

4   compliance posts.

5   Q.  So if I understand you correctly, is it fair to say that

6   your priorities in this area have been set based on your

7   risk-based approach; is that right?

8   A.  That is correct.

9   Q.  What do you mean by risk-based approach?  What are the

10  factors that Visa is considering?

11  A.  We look at entities that are presenting the most

12  significant threat to the payment system, and also, we look at

13  that from the area of legality and laws that may apply to us.

14  And then also, based on the volume of -- from these various

15  industries that try to sneak into the payment system.

16  Q.  You said that marijuana merchants do come to Visa's

17  attention through tips; is that right?

18  A.  That's correct.

19  Q.  So does Visa conduct a test transaction when it receives a

20  tip regarding a potential illegal transaction?

21  A.  We do.  If it's possible to do so, we do.

22  Q.  And remind me again, what are some of the ways that Visa

23  can receive tips about violations of its Global Brand

24  Protection Program?

25  A.  Some of the direct ways are card issuing banks that have

L3GPWEI6                         Elliott - Direct

1    had a negative experience.  They contact us and complain about

2    a certain merchant.  We also may get something from law

3    enforcement, or we may get something that we notice in the

4    media.

5           The other thing that happens is we do run chargeback

6    and fraud programs that identify merchants that have excessive

7    volume of chargeback disputes, and if a merchant fits with the

8    compliance programs, oftentimes the investigation may identify

9    other problematic activity.  But we have top marijuana

10   merchants in the chargeback program, as well.

11   Q.  So what does Visa do if it identifies illegal transactions

12   being conducted by a merchant?

13   A.  So what do we do?  Well, one, if we identify the merchant,

14   we then notify the acquiring bank that they have a problem,

15   that they're in violation of the Global Brand Protection

16   Program, and that they need to investigate it and get back to

17   us with how they're going to fix it.

18   Q.  And what can be the result of that investigation or

19   notification?

20   A.  Well, the investigation results coming back to us from the

21   acquirer typically is we terminate the merchant, or if there's

22   a question about it, they may want to talk with us and have a

23   discussion, or if it's just a single product, for example,

24   maybe the merchant is selling a counterfeit T-shirt, they may

25   remove that good from the site and come back and say everything

L3GPWEI6                        Elliott - Direct

1    else is legal; we've removed the one problem product, and

2    that's where we go.

3    Q.  Can there also be assessments or fines that are imposed?

4    A.  There can.  The Global Brand Protection Program does

5    include non-compliance assessments that can be assessed to the

6    acquiring bank.

7    Q.  What, if anything, does Visa do if it notices that an

8    acquiring bank has repeated brand protection program violations

9    for merchants it's sponsoring?

10   A.  Well, if we get an acquiring bank that has multiple

11   identifications or a history of violations, we can impose

12   risk-reduction measures on them, which means we can limit them

13   from being able to sign up any new card authorized merchants or

14   agent or payment facilitators.  We may also require them to

15   undergo an operational audit to make sure they're compliant

16   with our rules and have good risk controls in place.

17   Q.  If there were sufficient issues, could you terminate an

18   acquirer from the payment system?

19   A.  We could, yes.

20   Q.  And if a merchant is identified as selling an illegal

21   product, can you require an acquirer to terminate the merchant?

22   A.  We can, yes.

23   Q.  So I think you mentioned Visa also has dispute and fraud

24   monitoring programs?

25   A.  I did.

L3GPWEI6                         Elliott - Direct

1    Q.  Can you just, at a high level, tell me how those work?

2    A.  Sure.  So we operate the Visa fraud monitoring program and

3    the Visa dispute monitoring program.  These programs operate on

4    a monthly basis, and they identify any merchant or acquirer

5    that generates an excessive level of fraud or disputes or what

6    used to be called chargebacks.

7            So when we identify an entity crossing a program

8    threshold, we pretty much rank the dispute.  We send a letter

9    to the acquiring bank, and we inform them that their merchant

10   or themselves are above the acceptable threshold, and it must

11   be fixed.  And we give them a timeline to fix it.  If they

12   don't fix it, then the program will fine and an assessment will

13   be sent to those acquiring banks.

14   Q.  Okay.  And if the thresholds are surpassed, are there any

15   circumstances under which Visa would do its own review or

16   investigation?

17   A.  Well, if we see an entity that's moving across the payment

18   system frequently, and we identify somebody trying to hide from

19   our programs, then we will conduct our own investigation.

20   Q.  If Visa did do its own investigation, what sort of things

21   would Visa look at?

22   A.  Well, we would look at the merchant applications that we

23   would pull from the acquiring banks.  We would look at the

24   merchant website.  We would try to understand what they're

25   selling, how they're selling it.  We'd look at chat rooms to

L3GPWEI6                        Elliott - Direct

1    see what consumers are complaining about, you know, any

2    information that we can obtain from our acquiring banks or from

3    conducting web intelligence is what we would look at.

4    Q.  I'd like to have you look at what's been marked and what's

5    been admitted into evidence as Government Exhibit 1719.  Let me

6    know when you've found that.

7    A.  Is that in this binder?

8    Q.  Hmm, I don't know.

9    A.  Because I don't see anything 1719.

10   Q.  You know what, it might not be.

11            THE COURT:  Counsel, how much more do you have?

12            MS. DEININGER:  Less than half an hour, probably

13   closer to 20 minutes.

14            THE COURT:  Let's have a sidebar.

15   A.  We don't have 17 -- either.

16            THE COURT:  Excuse me.

17            MS. DEININGER:  While I go to sidebar, I wonder if

18   defense counsel's representatives have it there on the laptop.

19   If not, we can move on from it.

20            (Continued on next page)

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  I never would have allowed this to begin

3     after lunch if I had realized it was going to go over to

4     another day, which is what, in effect, you're telling me.

5          MS. DEININGER:  Probably including cross.

6          THE COURT:  How long do you have on cross?

7          MR. BURCK:  Your Honor, I'll try to keep it very

8     short, maybe 45 minutes.

9          THE COURT:  We only have 25 minutes until the jury

10    leaves for the day.  How long does the co-counsel have?

11         MR. HARID:  I think we can keep it to under a half

12    hour for our events.

13         THE COURT:  And we can't start -- well, maybe we can,

14    if he wants to get up at 5:00 a.m.

15         MS. DEININGER:  I've been told he is available to

16    start at the start of the court day.

17         THE COURT:  I'm sorry, do you know that, or are you

18    just guessing?

19         MS. DEININGER:  No, I certainly know today he was.

20         MS. LA MORTE:  We can finish with Darcy Cozzetto, if

21    that's what your Honor prefers, and we can verify --

22         THE COURT:  No, we're going to finish this witness.

23    How much more do you have?

24         MS. DEININGER:  I think it should be about -- I will

25    certainly finish before the end of today.

1            THE COURT:  Okay.  I will hold you strictly to that.

2            MS. DEININGER:  Understood.

3            THE COURT:  45 minutes?

4            MR. BURCK:  45 minutes, your Honor.

5            MR. GILBERT:  Half an hour.

6            THE COURT:  No more than five minutes on redirect.  No

7   recross.

8            MR. BURCK:  No problem, your Honor.

9            MR. FOLLY:  Your Honor, we'll also make your sure that

10  we'll do everything to have him available tomorrow morning so

11  we don't interrupt again the order of witnesses.

12            THE COURT:  I really cannot tell you how disappointed

13  I am.  Let's go.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2     BY MS. DEININGER:

 3     Q.  All right.  Mr. Elliott, can you hear me?

 4     A.  Again, yes.

 5     Q.  Did you find Government Exhibit 1719?  If not, I'll just

 6     move on to a different subject.

 7     A.  We did not.

 8     Q.  Okay.  You should have on the computer in front of you

 9     what's been admitted into evidence as Government Exhibit 2201.

10     It should be on a computer, not a binder.

11     A.  One moment.

12     Q.  Okay.

13     A.  Yes, I see it.

14     Q.  Do you recognize it?

15     A.  I do.

16     Q.  Generally, what is it?

17              Mr. Levine, can you pull that up for everyone here.

18     A.  This is a list of transactions that occurred with various

19     U.S. issuing banks --

20     Q.  Okay.

21     A.  -- for a merchant based in the United Kingdom.

22     Q.  And just looking at the top, I just want to kind of walk

23     through the columns so we understand what we're looking for.

24     Issuer name, what does that refer to?

25     A.  That's the card issuing bank of a consumer engaged in

1    transactions with the merchant within.

2    Q.  What about the issuer country?

3    A.  The country in which the issuer is located.

4    Q.  Scrolling over to merchant category code, are those the --

5    it's Column K.  Are those the MCC codes we discussed earlier?

6    A.  They are, yes.

7    Q.  And then in column L it says Merchant Category.  Does that

8    correspond to the merchant category code in Column K?

9    A.  One moment.  It does, yes.

10   Q.  Okay.  I just want to look at a few lines of examples.  So

11   if you look just at line 1, what's -- the Column D says

12   Purchase Date.  What was the date of the transaction?

13   A.  The purchase date is the date of the transaction with the

14   date there.

15   Q.  And what does it say there, I guess, on line 5, under

16   Column D?

17   A.  Well, it says that the issuer was JP Morgan Chase.  They

18   were in the United States.  The purchase date was May 3rd,

19   2018, and it was a sales draft.  They list the transaction ID

20   number and list the merchant name of medical-stf.com.  It lists

21   the merchant country as United Kingdom, and then it has a phone

22   number of the merchant city field, and it states the merchant

23   category code is 7339, which is stenographic services.

24   Q.  Okay.

25   A.  This is from the acquiring bank, which is PXP Financial.

1   Q.  And can we look at the line below that and look at the same

2   information?

3   A.  The second line is Low Six.  It states that JP Morgan Chase

4   Bank was also the issuer.  This was a debit card.  They were

5   located in the United States of America.  The transaction date

6   was July 3rd, 2018, with a sales draft.  It says the

7   transaction ID.  It lists the merchant name, Soniclogistix.  It

8   lists the country as United Kingdom, the City of Bristol, and

9   then it lists the merchant category code of 4215, which is

10  stated as courier services.  And that was what the bank or the

11  acquirer called EMerchantPay Limited.

12  Q.  If you scroll down just a little bit, line 45, it's another

13  JP Morgan Chase transaction.  Can you read what's in that line

14  once you get there?

15  A.  This is also JP Morgan Chase as the issuer.  They're

16  located in the United States of America.  The date of the

17  transaction was July 7th, 2018.  It was a sales draft, and

18  skipping over the transaction ID, the name of the merchant was

19  Goodegreenbazaar.com.  They are located in the United Kingdom,

20  the city was Leeds.  Merchant category code is 5733.  The music

21  stores/pianos, and it's also the EMerchantPay Limited.

22  Q.  So in these examples that we looked at, the merchant

23  category, the merchant category code, would any of these have

24  been the appropriate merchant category to use for a merchant

25  whose primary business was as a marijuana dispensary?

1    A.   No, it would not be the correct MCC used.

2    Q.   And just focusing on the issuer country column, if you

3    scroll a little bit, what is generally listed as the issuer

4    country for each transaction?

5    A.   The United States of America.

6    Q.   And so I just want to look at some of the issuers that are

7    listed.  In line 11, what issuer is listed?

8    A.   Bank of America.

9    Q.   And how about on line 13?

10   A.   Wells Fargo Bank.

11   Q.   And in line 44?

12   A.   Citibank.

13   Q.   So we can put this away, and I want to talk about a

14   different subject for a minute.  Were you involved on any

15   occasions in the 2016 to 2019 time period when Visa discovered

16   that a merchant was submitting marijuana transactions into the

17   Visa system?

18   A.   I was.

19   Q.   Can you describe an example for me?

20   A.   We had a small bank out of Texas identified in our

21   chargeback and file programs for dispute, and looking further

22   into their activity, meaning looking into their merchant

23   portfolio, we saw what looked like a number of cannabis and CBD

24   purchases.

25   Q.   Just to be clear, how did Visa first become aware that

1    there was a potential issue at this bank?

2    A.  The acquiring bank and some of their merchants showed up in

3    our chargeback dispute program.

4    Q.  Okay.  That's your chargeback and/or dispute monitoring

5    program?

6    A.  That's correct.

7    Q.  And so what action, if any, did Visa take once it became

8    aware that there were potential cannabis merchants?

9    A.  So we reached out to the acquiring bank, had a discussion

10   with their executive management, reminded them of our rules,

11   told them that they could not sign cannabis merchants.  We did

12   assess various program fine assessments to them based on the

13   frequency of their identification.  We also put them under

14   risk-redemption measures, when they were able to revoke people

15   to sign, forced them to have a third-party audit, and when the

16   audit was completed and they remediated their issues, we

17   allowed them to resume normal acquiring.  They basically

18   terminated their cannabis merchant.

19   Q.  So what did happen specifically to the merchants that were

20   identified as selling marijuana products?

21   A.  To the best of our knowledge, they were terminated.

22   Q.  I'd like you to look at what's been admitted into evidence

23   as Government Exhibit 2226.

24          And, Mr. Levine, you can pull that up for everyone

25   here.

L3GPWEI6                    Elliott - Direct

1   A.  Okay.  I found it.

2   Q.  Do you recognize this?

3   A.  I do.

4   Q.  And what is it?

5   A.  This is a case detail related to the Brand Protection

6   Identification Program.

7   Q.  Is this a case detail report for one of the merchants

8   involved in that Texas bank incident that you were just

9   describing for us?

10  A.  It is, yes.

11  Q.  And so looking at the top of the document, what's the case

12  open date?

13  A.  February 15th, 2019.

14  Q.  And going down to violation information, what's the

15  violation category?

16  A.  Illegal transactions.

17  Q.  And what's the merchant name?

18  A.  TGS East Kentucky Avenue.

19  Q.  And the merchant termination date?

20  A.  2/13/2019.

21  Q.  And as kind of in the middle of the page, under product

22  description, what does it say?

23  A.  Sales of cannabis.

24  Q.  And going to page 2, where it says NCA information, what

25  does NCA information refer to?

L3GPWEI6                    Elliott - Direct

1    A.  NCS stands for noncompliance assessment, and this basically

2    summarizes the amount of the NCA liability and the outcome.

3    Q.  And so here, what was the outcome?

4    A.  We assessed a $25,000 noncompliance assessment.

5    Q.  And then going to page 4 really quickly, under Review

6    Information -- do you see where it says Review Information,

7    description of merchant product or services?

8    A.  I do.

9    Q.  What does it say under that?

10   A.  Dispensary.

11   Q.  Okay.  We can turn away from this document.  And I want to

12   ask you, to your knowledge, was Eaze ever -- Eaze, spelled

13   E-a-z-e -- ever identified as being involved in violation of

14   Visa's Global Brand Protection Program?

15   A.  It was.

16   Q.  Were you personally involved in that investigation?

17   A.  I was notified by one of our fellow Visa employees of a

18   media article that suggested that Eaze was accepting Visa, and

19   when I received that notification from the fellow employee, I

20   sent it to our program manager, Ms. Schofield, to have it

21   investigated.

22   Q.  And what is your understanding of what she did?

23   A.  She then ran it through the traditional brand protection

24   program process, which included having our vendor do a test

25   transaction on the website.  Based on the information from the

L3GPWEI6                    Elliott - Direct

1    test transaction, we notified acquiring banks that we had a

2    brand protection program violation.

3    Q.  And just to remind us, what's the purpose of the test

4    transaction?

5    A.  The purpose -- well, since Visa does not have a contract

6    with the merchants, if there's a website out there, we don't

7    know what acquiring bank is processing the transaction.  We

8    don't know what name they're actually using to run through the

9    system.  So by conducting a test transaction, we basically get

10   a sense of what data they're using to enter the system; so we

11   can identify the actual name they're using and to identify the

12   acquiring bank that is routing their transaction into the

13   system.

14        And so you can think of a test transaction kind of

15   like a radar ping that identifies where that identity is

16   located and what the name is.

17   Q.  Okay.  I'd like you to look at what's been admitted into

18   evidence as Government Exhibit 2231 and 2232.  Do you see if

19   you have those in front of you?

20   A.  I do, yes.

21   Q.  Okay.  So looking at Government Exhibit 2232 first, what is

22   that?

23   A.  2232?

24   Q.  Yes.

25   A.  That is a screenshot that our vendor took when they were

L3GPWEI6                        Elliott - Direct

1   conducting the test transaction at the Eaze site.

2   Q.  And what does it say at the top in the URL bar?

3   A.  It says WWW.Eaze.com/checkout.

4   Q.  And what is the product listed in the checkout boxes?

5   A.  Minis Hybrid, Humboldt Farms.

6   Q.  And so now if you look at Government Exhibit 2231.  What

7   generally is that?

8   A.  That's another screenshot of the test transaction that

9   occurred at the website.

10  Q.  And this one says Soniclogistix, what does that refer to?

11  A.  That refers to the merchant name.

12  Q.  And under "Status," it says "declined."  Why does it say

13  "declined"?

14  A.  It says declined because the test cards we use were set to

15  decline so that we wouldn't actually be purchasing the good or

16  service in doing a test.

17  Q.  And what was the date this test transaction was conducted?

18  A.  June 14th, 2019.

19  Q.  So now I'd like you to turn to what's been admitted into

20  evidence as Government Exhibit 2230.  Let me know when you have

21  that.

22  A.  I do.  I have it.

23  Q.  Do you recognize this?

24  A.  I do.

25  Q.  What is it?

L3GPWEI6                        Elliott - Direct

1    A.  This is an example of a letter that was sent to

2    EMerchantPay Limited, the acquiring bank involved in this

3    transaction.

4    Q.  What's the date of this letter?

5    A.  July 30, 2019.

6    Q.  Can you look under the first paragraph, under the greeting

7    "Dear George" and read that for me?

8    A.  It reads as follows:  Visa core rules and Visa product and

9    service rules.  Visa rules prohibits acquirers from submitting

10   illegal or brand-damaging transactions into the Visa payment

11   system.  Acquirers are reminded that their merchant transaction

12   activity must be legal in both the buyer's and seller's

13   jurisdiction to comply with this requirement.

14   Q.  And now looking at the third paragraph that starts

15   "recently," can you read that for me?

16   A.  Recently your merchant, Soniclogistix, was identified by

17   the GBPP for processing illegal and/or brand-damaging

18   transactions.  Information regarding the violation is provided

19   in the brand protection identification management tool.

20   Q.  And the section underneath that says:  Immediate required

21   action.  Can you just read the paragraph below that, through

22   the bullet points?

23   A.  It reads as follows:  Visa requires that your financial

24   institution investigate the claim and provide a written

25   response to Visa within five days of receipt of this

1    notification.  The response must be include:  bullet one, an

2    explanation detailing how the violation will be remediated;

3    bullet two, the merchant application; bullet three, pertinent

4    documentation demonstrating merchant compliance with the Visa

5    rules requirement that prohibits illegal transactions from

6    entering the payment system.

7    Q.  I'd like you to now turn to what's been admitted in

8    evidence as Government Exhibit 2229.  Do you see that?

9    A.  I don't know that I have that.

10   Q.  2229?

11   A.  One moment.

12   Q.  Okay.

13   A.  That's pulled up on the screen now, yes.

14   Q.  Okay.  What is this document?

15   A.  This document is the letter that Visa received from ECP,

16   the merchant acquiring bank after this identification.

17   Q.  And so this is their response in response to your

18   notification letter?

19   A.  This is the bank's response, yes.

20   Q.  Looking at the --

21        THE COURT:  You realize you have three minutes.

22        MS. DEININGER:  Yes.

23   Q.  Looking at the second paragraph, do you see where it says:

24   The merchant operates under direct contractual relationship

25   under agent Esepa finance?

1    A.  Hold on.

2    Q.  It's the second full paragraph, the last sentence there.

3    That's okay.  Let's just turn to the second page.

4    A.  Okay.  I'm on the second page.

5    Q.  And just read the sentence at the very top?

6    A.  All merchants boarded through this partner, Esepa finance

7    GMBH, were terminated.  The partner was deregistered as an

8    agent under the ECP and listed in VMSS.  Please find attached a

9    print screen of the listing.

10   Q.  And what's VMSS?

11   A.  Since this was a European identification, VMSS is Visa's

12   equivalent of MasterCard's MATCH file.  It's a listing of

13   terminated merchants.

14   Q.  Can you pull up now what's been admitted into evidence as

15   Government Exhibit 2229?

16   A.  Okay.

17   Q.  2229.

18   A.  We're there.

19   Q.  Sorry, 2227.

20   A.  Okay, one moment.  Okay.

21   Q.  So what is this?

22   A.  This is a document my team produced that summarized the

23   violations that Eaze had for any Global Brand Protection

24   Program.

25   Q.  And looking at the left-hand side, what does the initial

1    notification mean?

2    A.  Well, that means the date by which we notified the

3    acquiring bank of a violation.

4    Q.  And what month did those occur in?

5    A.  There were two of them in July of 2019, and three of them

6    in June of 2019.

7    Q.  Looking at the fourth column, it says Merchant URL.  What

8    is merchant URL?

9    A.  That are the websites where we conducted the test

10   transactions.

11   Q.  And so there were two merchant URLs listed here.  What are

12   those?

13   A.  One of them is Eazewellness.com; the other is Eaze.com.

14   Q.  And what acquirers were involved with these merchants?

15   A.  There were three, United Bank for Africa, EMerchantPay

16   Limited, and PXP Financial Limited.

17   Q.  What was the category of the violations?

18   A.  Well, these were illegal transactions.

19   Q.  And what was the resolution status for each of these?

20   A.  All five were listed as terminated.

21   Q.  And were assessments imposed on the acquirers?

22   A.  Yes, there were two $25,000 noncompliance assessments at

23   that.

24   Q.  All right.  And --

25             THE COURT:  All right.  That concludes the direct

1    testimony.

2            Ladies and gentlemen, we will continue with this

3    tomorrow morning.  So I don't even need to say be on time

4    because you always are on time.  I'm impressed, but anyway, see

5    you tomorrow morning.  Have a good evening.

6            MS. DEININGER:  Thank you, Mr. Elliott.

7            THE COURT:  Mr. Elliott, please stay there for a

8    minute.

9            THE WITNESS:  Okay.

10           (Jury not present)

11           THE COURT:  Please be seated.

12           Mr. Elliott, we normally start, and we will start, at

13   9:45 New York time.  Are you available to be where you are now

14   at 6:45 your time?

15           THE WITNESS:  I will be, your Honor.

16           THE COURT:  Very good.  Thank you so much.  I

17   appreciate it.  We'll see you then tomorrow.

18           THE WITNESS:  Okay.

19           THE COURT:  Let me also ask, are the Arnold Porter

20   lawyers here?

21           MR. ASNER:  I am, your Honor.

22           THE COURT:  Oh, they're in the courtroom.  They're

23   not -- where is Mr. Elliott?

24           MS. DEININGER:  He's in California.  There is a

25   representative there.

1          THE COURT:  I thought he was in your office in
2   California.
3          MR. ASNER:  I'm in the New York office of Arnold and
4   Porter.
5          THE COURT:  You're misunderstanding my point, excuse
6   me.  Where is physically Mr. Elliott?  Where are you right now?
7          THE WITNESS:  I'm in the Arnold and Porter offices in
8   San Francisco.
9          THE COURT:  Is there someone there?
10         MR. ASNER:  Yes, your Honor.  I have an associate
11  there.
12         THE COURT:  So can either you or the associate tell
13  me, are you recording this testimony?
14         MR. ASNER:  No, your Honor, we're not.
15         THE COURT:  All right.  So that's what I wanted to
16  know.  That puts my mind at rest.  Thank you very much.
17         So counsel already know the time limits for tomorrow.
18         Mr. Elliott, you're excused.  We'll see you tomorrow
19  at right before your breakfast.
20         THE WITNESS:  Okay.  Thank you, your Honor.
21         THE COURT:  Thank you.
22         (Witness excused temporarily)
23         All right.  Anything else we need to take up today?
24  See you tomorrow at 9:30.
25         MS. LA MORTE:  Your Honor, you want us at 9:45, or do

L3GPWEI6                        Elliott - Direct

1    you want us earlier?

2              THE COURT:  Well, what do you want to raise with the

3    Court?  At the moment -- I'm sorry to be so out of joint.  At

4    the moment, I'm not interested, frankly, in hearing from the

5    government about virtually anything, but I'm sure after a good

6    night's rest I will be more --

7              MS. LA MORTE:  Understood, your Honor.  I can lay out

8    a few issues for tomorrow, or we can just do it in the morning.

9    It doesn't matter.

10             THE COURT:  Why don't we meet at 9:15.

11             MS. LA MORTE:  Okay, great.  Thank you, your Honor.

12             (Adjourned to 9:15 a.m. on March 17, 2021)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3   JAMES PATTERSON

4   Redirect By Mr. Folly . . . . . . . . . . .1739

5   Recross By Mr. Tayback . . . . . . . . . . .1747

6   Recross By Mr. Gilbert . . . . . . . . . . .1749

7   CHARLES BROWN

8   Direct By Ms. Deininger . . . . . . . . . .1751

9   Cross By Mr. Tayback . . . . . . . . . . . .1780

10  Cross By Mr. Tayback . . . . . . . . . . . .1795

11  Cross By Mr. Pellechi . . . . . . . . . . .1808

12  Redirect By Ms. Deininger . . . . . . . . .1816

13  Recross By Mr. Tayback . . . . . . . . . . .1822

14  Redirect By Ms. Deininger . . . . .1823 (further)

15   DARCY COZZETTO

16  Direct By Ms. Deininger . . . . . . . . . .1824

17  MARTIN ELLIOTT

18  Direct By Ms. Deininger . . . . . . . . . .1842

19                     GOVERNMENT EXHIBITS

20  Exhibit No.                              Received

21   458   . . . . . . . . . . . . . . . . . .1737
     715   . . . . . . . . . . . . . . . . . .1738
22   303   . . . . . . . . . . . . . . . . . .1738
     2717  . . . . . . . . . . . . . . . . . .1765
23   2704  . . . . . . . . . . . . . . . . . .1767
     2705 through 2716 . . . . . . . . . . . .1775
24   2201 through 2204, 2208, 2216, 2217, . . .1860
           and 2221 through 2232
25
```

1                           DEFENDANT EXHIBITS

2      Exhibit No.                                    Received

3      HAX10054    . . . . . . . . . . . . . . .1788
       HAX10057    . . . . . . . . . . . . . . .1799
4      HAX10056    . . . . . . . . . . . . . . .1802

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25