L3HPWEI1                        Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
               Defendants.                 Trial
7
     ------------------------------x
8
                                           New York, N.Y.
9
                                           March 17, 2021
10                                         9:20 a.m.

11

12   Before:

13                       HON. JED S. RAKOFF,

14                                         District Judge

15                       APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25                       APPEARANCES CONTINUED

L3HPWEI1                          Trial

```
QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant Akhavan
BY:  WILLIAM A. BURCK
     CHRISTOPHER TAYBACK
     SARA CLARK
     MARI HENDERSON
     DEREK SHAFFER
     PAUL SLATTERY
     -and-
ROTHKEN LAW FIRM LLP
     Attorneys for Defendant Akhavan
BY:  IRA P. ROTHKEN
     JARED R. SMITH
```

1        (Trial resumed; jury not present)

2        THE COURT:  Please be seated.  So for the last couple

3   of days I've been receiving complaints from various powers that

4   be that there was a camera mounted on the wall of the

5   courtroom, and I said:  I don't see any camera.  And now, I

6   realize that I didn't see it because my view is right on the

7   line with that device that's above the witness Plexiglas stand,

8   which blocks my view of just a little bit of the wall and

9   that's the little bit where the camera is.

10        So what's that camera doing there?  Who put it up?

11        MR. BURCK:  Your Honor, I'm --

12        THE COURT:  Who put it up?

13        MR. BURCK:  Your Honor, this is Bill Burck.  I believe

14   this is a camera that was requested by our co-counsel, Ira

15   Rothken for purposes of this witness.

16        THE COURT:  Is there someone here who knows anything

17   about -- this gentleman back there seems to.  Come on up.  You

18   can and takeoff your mask.  So what's the story?

19        MR. McCLEOD:  It's just a camera that was placed for,

20   like Mr. Burck said, for our co-counsel.  It was placed up at

21   the start of the trial, and it's by -- the camera's by

22   Courtroom Connect.

23        THE COURT:  By who?

24        MR. McCLEOD:  Courtroom Connect.

25        THE COURT:  And who is it focused on?

1           MR. McCLEOD:  The podium.  It gives this view, sort of

2    right here, into the line.

3           THE COURT:  I'm sorry?

4           MR. McCLEOD:  It gives the view like a wide angle; so

5    it captures the podium, the witness and yourself, your Honor.

6           THE COURT:  And I mean, if we took it off, what would

7    change from what I'm looking at right now?

8           MR. BURCK:  Your Honor, we're happy to take it down.

9    One hundred percent happy.

10          THE COURT:  At the break, please take it down.

11          MR. BURCK:  We will, your Honor.

12          MR. TAYBACK:  Sure.

13          THE COURT:  And when you take it down, one of the

14   things that concerned our folks was it was put up with some

15   sort of plastic.

16          MR. McCLEOD:  That tape was to not damage the

17   furniture.

18          THE COURT:  Well, it better not.  When it's taken off,

19   I don't want to see any marks there.  I hope you guys are

20   insured.

21          MR. McCLEOD:  Sure.

22          MR. BURCK:  Yes.  Very good, your Honor.

23          THE COURT:  All right.  Thank you.

24          Okay.  Now, there was the question that's likely to

25   come up before the end of the day -- by the way, is the

1   government still hoping that they will end their case by

2   tomorrow morning?

3          MS. LA MORTE:  We are confident, your Honor, that we

4   will end tomorrow.  We apologize.  We did underestimate the

5   length of Visa direct, but we are still on track to finish

6   tomorrow.  It will likely be in the afternoon, however.

7          I will tell the Court that we sat and went through our

8   remaining witnesses and believe that we have roughly three

9   hours of direct remaining of all of our witnesses, and if you

10  add in objections and the like, it will be a little bit longer,

11  but that's what we're looking at.

12         THE COURT:  You're not suggesting that your

13  adversaries would object to any of your --

14         MS. LA MORTE:  Of course not, because we have perfect

15  questions and perfect answers.  No need to object.

16         THE COURT:  All right.  Because I want to tell the

17  jury at the end of today sort of what the schedule is so that

18  they're not left.

19         So now, on the defense side, assuming we finish before

20  the end of the day Thursday, you'll put your first witness on

21  the stand?

22         MR. BURCK:  Yes, your Honor.

23         THE COURT:  And you will tell me at the close of the

24  government's case whether either defendant is going to take the

25  stand?

1          MR. BURCK:  Yes, your Honor.

2          THE COURT:  Putting that aside, how long do you think

3     your case will be?

4          MR. BURCK:  Your Honor, like the government, we've

5     actually been working to try to narrow our case, to be more

6     focused.  We are hopeful.  We know we can't give you a firm

7     amount of time because we have to hear from the rest of the

8     Visa witness, as well as the Citibank witness today, and a

9     couple other witnesses that are out there.  We are hopeful,

10    Judge, that we can get this done in a full day, between a few

11    witnesses, effectively.

12         THE COURT:  Okay.

13         MR. BURCK:  Yet, I don't want to promise that, Judge,

14    if something goes really strange today, we might need to add

15    additional witnesses, but we're hopeful for a day.

16         THE COURT:  Is everyone comfortable --

17         MR. BURCK:  And that is, of course, assuming that the

18    defendants don't testify.

19         THE COURT:  I understand.

20         MR. GILBERT:  And, your Honor, also, we have

21    Mr. Vilfer who is going to be deposed.

22         THE COURT:  Yes, and I know I have to make rulings on

23    that.

24         So we can talk more about this because I won't

25    instruct the jury until the end of the day, but it sounds to me

```
 1   like I can probably tell the jury that the government's case
 2   will for sure conclude on Thursday.
 3             MS. LA MORTE:  Yes.  It may be the end of the day, but
 4   it will for sure conclude on Thursday.
 5             THE COURT:  That the defense, it's a little less
 6   clear, but we're hopeful that they'll conclude their case by
 7   Friday or, worst case, Monday, and then we will have summations
 8   and charge.
 9             Now, in that regard, how long does -- let's start with
10   the government.  How long do you want for your initial
11   summation and rebuttal summation?
12             MS. LA MORTE:  For the initial summation, your Honor,
13   we're estimating between an hour and an hour and a half.  Hour
14   and a half being the max that it would be.
15             Mr. Folly, what are you thinking for rebuttal?
16             MR. FOLLY:  Your Honor, 45 minutes to an hour.
17             THE COURT:  I'm not going to allow that much for
18   rebuttal.  I wouldn't allow an hour for rebuttal.  Let me,
19   before I say that actually definitively, let me found out how
20   much the defense wants for their summations.
21             MR. BURCK:  Your Honor, I'm somewhat guided by your
22   guidance in the last trial we had, which I think you put it at
23   about an hour and a half, and so I think an hour and a half
24   would be fine for us.
25             THE COURT:  Okay.
```

L3HPWEI1                    Trial

1          MR. GILBERT:  And that was our request as well.

2          THE COURT:  So that's an hour and a half for each of

3     you?

4          MR. BURCK:  Yes, your Honor.

5          THE COURT:  Okay.  So in light of that, I will give

6     the government 45 minutes on rebuttal, but not an hour.  You

7     can anticipate on your opening summation a lot of what the

8     defense is going to say.  There's no great surprises at this

9     point.  So if you want an hour and 45 minutes max on your

10    opening, you can have it, and your colleague can have 45

11    minutes on rebuttal but that's as far as I'm willing to go.

12         MS. LA MORTE:  Okay.  Thank you, your Honor.

13         THE COURT:  All right.

14         MS. LA MORTE:  Your Honor, one other thing, just it's

15    vaguely related to timing.  I'm just confirming on the record.

16    We spoke with both defense counsel and neither intends to call

17    Mr. Hargreaves back to the stand as part of their case, and I'm

18    saying that on the record because it's the government's

19    intention to send him home; so I just want to be one hundred

20    percent before we do that.

21         THE COURT:  Thank you for putting that on the record.

22         So now the question is if the defense finishes on

23    Friday, then it's easy.  I don't care when you end on Friday,

24    even if it's before our normal closing time, summations will be

25    on Monday.  But let's assume we go over to Monday.  We will

L3HPWEI1                    Trial

still then start summations, after a reasonable break, maybe a

half hour, after the close of all of the evidence.

I often tell the story, I may have even told it in the

last trial, about one of my mentors, Judge Pollack, Milton

Pollack, a great judge in this court, who always began

summations in a criminal case five minutes after the close of

all the evidence.  That's because it took him five minutes to

deny the defense motions, get a cup of coffee and go to the

bathroom.

And there was a lot to be said for that because it

forced both sides to focus on the real issues and not get into

all the extraneous stuff.  Nevertheless, because I'm, by

nature, a generous soul, I might give you as much as half an

hour between close of evidence and summations.  But we will

start because this jury was told three weeks, and it's going to

be a little bit more than three weeks.

And then if summations start and they don't finish,

we'll go over to Tuesday morning, and then immediately after

the close of that, we'll have the charge to the jury.  And as

you know, we'll have the charging conference on Friday after

court.

Let's see.  Now, I think the only thing that's liable

to come up this afternoon that I haven't yet ruled on is the

completeness issue with respect to the statement by Mr. Weigand

that is going to be introduced by the government.

L3HPWEI1                    Trial

1          MS. LA MORTE:  Yes, your Honor.  That's an outstanding

2     issue.  I don't know if that will arise today, but it is an

3     issue that's been -- that we still need to work through.

4          THE COURT:  All right.  I mean, I think I've already

5     indicated, in a general sense, that I think there is something

6     that should be added, but very little because I think the

7     defendants have misconstrued the scope of the completeness

8     rule.

9          The completeness rule is not that if you put in as

10    admissions of a party, page 2 and page 7 of the statement, that

11    opens the door to all the other 20 pages of the document.

12    Classically, it really is if you, for example, give half a

13    sentence, the other half of the sentence comes in, or if you

14    give one sentence and there are three sentences in the

15    paragraph, then the rest of the paragraph may sometimes come in

16    but not always.

17         But what the defense has requested in this regard is

18    much broader than that.  Nevertheless, I think there are some

19    things that should come in under completeness, but I'll hear

20    argument on that.  Given what you've just said, I don't think

21    we need to take it up right now.

22         Anything else we need to take up?

23         MR. BURCK:  Your Honor, I just have one thing that I

24    raised with the government about two exhibits that I may show

25    the witness, the Visa witness.  I haven't decided if I'm going

L3HPWEI1                    Trial

1    to offer it into evidence, but I just wanted to raise the issue

2    with the Court because I'm conscious of my 45 minutes, and I

3    didn't want to take any time away for sidebars and such.

4           THE COURT:  Yes.  Well, good idea because, as you know

5    from yesterday, you won't get 46.

6           MR. BURCK:  It's over at 46.  Exactly, your Honor.

7           So Mr. McLeod, if you could show HAX5049.

8           And, your Honor, this is a press release by Circle,

9    which you heard about in the case, in which they announced in

10   December of 2020 -- and I'll address the date in a moment, your

11   Honor -- a partnership with Visa to do business using Circle's

12   products.  It's Bitcoin products.  It's actually called U.S.

13   Coin.

14          And, your Honor, the relevance of this to the Visa

15   witness -- and again, I don't know if he knows this, your

16   Honor.  He may say, I don't know anything about it, and I may

17   just show it to him and see if it refreshes his recollection,

18   and he may just say it doesn't refresh my recollection, and

19   I'll drop it.

20          But if he knows about it, I'd like to ask him about it

21   because I think it's relevant to all the issues in the case for

22   a couple of reasons.  And, your Honor, I know a couple of

23   things you're thinking about is the date.  The reason why we

24   don't think the date matters is because, as the Court has said

25   to the jury, and everyone I think understands, the law hasn't

changed at all with respect to the illegality of marijuana

under federal law.  State laws haven't changed in the last

couple of years, as relevant to this case.

          And the fact that Visa is willing to do business

openly with Circle, that we have shown is engaged directly with

Eaze, is relevant, your Honor, I think, to all of the issues

that we have that we're raising in the case in our defense.

          So the idea behind this, your Honor, again, if he

says, no, I don't know anything about that, I'm not going to

ask him.  Obviously, if he says, I don't know, I'm going to

show it to him, see if it refreshes.  If it doesn't, I drop it.

If he says, oh, yeah, I know about this, then I may ask him

questions about it and may offer it into -- try to offer it

into evidence, your Honor.

          And the second document that is --

          THE COURT:  Hold on with the second document.  Let me

hear if the government has any objection, assuming it's not

dropped and the witness does know about it.

          MS. DEININGER:  Yes, your Honor.  We would object to

this under rule 401 and 403 for the reasons discussed at

sidebar a few days ago.  We think that the discussion of Circle

and crypto -- digital currency, wallets, is irrelevant and

confusing.

          This is a document that postdates the conspiracy.  It

has no mention of Eaze or marijuana.  It is generally about

1    Circle's base, which serves many industries.  And for all the

2    reasons we previously discussed on sidebar, we would object to

3    its submission.  It's also a hearsay document.

4              THE COURT:  I am very doubtful I would allow this into

5    evidence, but I will allow you to at least put foundational

6    questions because if he doesn't know anything about it, then I

7    don't have to otherwise rule.

8              MR. BURCK:  Okay, your Honor.  Thank you.

9              THE COURT:  And there was a second document?

10             MR. BURCK:  Your Honor, the second document is exactly

11   the same issue.

12             THE COURT:  Oh, okay.  I think the government counsel

13   is correct, and I adopt by reference what I said at sidebar on

14   a similar issue a few days ago, at least it seems like a few

15   days.  Maybe it's a century ago.  Okay.

16             MR. GILBERT:  Judge, just one other issue.  We have,

17   as part of our defense case, a witness who's a private

18   investigator who made purchases through Eaze and, you know,

19   that witness we intend to call remotely, and the government has

20   consented to that.  So I just wanted to alert the Court that

21   that's how we intend to proceed by that.

22             THE COURT:  Yes, just to repeat what we all agreed to

23   yesterday, if the defense calls anyone remotely -- though I

24   don't believe there is then any confrontation clause issue --

25   to the extent there arguably is, the defense waives it,

L3HPWEI1                         Trial

1    correct?

2              MR. GILBERT:  Correct.

3              THE COURT:  Very good.

4              MS. DEININGER:  Your Honor, on that witness, just to

5    be clear.  We have agreed that, to the extent they're being

6    called, they can be called remotely.  We would, however, object

7    to testimony related to Circle related transactions for the

8    same reasons that we were just discussing.

9              THE COURT:  So maybe it's time for someone to explain

10   to me what the relevance of Circle post-conspiracy activities

11   is on any issue in this case?

12             MR. BURCK:  Sure, your Honor.  I'm happy to start.

13   So, your Honor, as the government's case is, at least on the

14   materiality point, is that these banks say they won't allow

15   illegal transactions, that includes marijuana, nothing about

16   the changes that have occurred in state law matter to them, and

17   all that matters to them is that it's illegal under federal law

18   and that they will elicit testimony -- I think they will elicit

19   testimony on these facts that it doesn't matter anything --

20   nothing matters to them other than they don't want to do

21   business with marijuana sales because of it's illegal under

22   federal law.

23             And the scheme they've alleged is that we've -- our

24   clients have concealed, assisted in concealing the fact that

25   marijuana was happening or going through these networks in

L3HPWEI1                        Trial

1    order to allow it to happen.  In other words, if they hadn't

2    done that, it would not have happened.

3         The Circle/Eaze transactions, and I think the Court,

4    you saw one of the Bank of America statements that was offered

5    and admitted into evidence through the witness from Bank of

6    America, that goes directly to contradict that entire premise.

7    Because under the -- in the statements and information the

8    banks receive from Circle about Eaze, it's directly stating

9    that Circle is processing Eaze transactions on the network.

10        THE COURT:  Yes, so that, part I understood, and I

11   allowed in that document, as you recall, I think over

12   objection.

13        MR. BURCK:  Yes.

14        THE COURT:  But, for example, the document you are

15   showing now doesn't have anything to do with Eaze.

16        MR. BURCK:  Your Honor, it doesn't have anything

17   directly to do with Eaze, but it has to do with the concept of

18   a wallet.  And the wallet issue -- and I think that the Bank of

19   America witness testified to this.  I'm going to ask

20   Mr. Elliott a bit about this to see what he says about it, too.

21   They seem to think there's a distinction with a wallet because

22   they say, well, a wallet is kind of like an ATM, and the

23   government actually argued this, I think, to the Court.

24        It's like an ATM, where you take money out of your

25   ATM, you buy whatever you want with it.  Nobody knows what you

L3HPWEI1                    Trial

 1    do with it.  Our point is that's not actually what happens with

 2    a wallet.  In fact, you can look at the information that goes

 3    to the bank, and the information that goes to the bank says

 4    Circle is doing business on behalf of Eaze.  And Eaze, they all

 5    know, is a marijuana marketplace.

 6            THE COURT:  Well, I can see your putting questions

 7    along those lines, but I don't see any -- the problem is, like

 8    the document the other day, this is all about cryptocurrency

 9    and stuff like that.

10            MR. BURCK:  Your Honor, that's -- I think, actually,

11    maybe we can put up HAX11009, Mr. McLeod.

12            Because I think this will -- this is really what we're

13    trying to elicit, your Honor, and this is in evidence.  So,

14    your Honor, this is the --

15            THE COURT:  Yes, isn't that already in evidence?

16            MR. BURCK:  That's in evidence, your Honor.  And our

17    point is that the descriptor, which says:  Circle Wallet Eaze

18    11/07 purchase, London, is clearly putting the banks on actual

19    unimpeded notice.

20            THE COURT:  That's why I let it in.

21            MR. BURCK:  Right.

22            THE COURT:  So you could make that argument, but I

23    still don't see how that relates to the document you just

24    showed me that you wanted to admit if you can lay a foundation

25    for that.

1      MR. BURCK:  Sure, your Honor.  I think what it tells

2  us is that the Circle is -- the concept here is that the banks

3  don't want to have anything to do with marijuana, no how, no

4  way.  This is actually in their policy.  Their policy actually

5  says that, and actually the Visa policy says that, no

6  transactions involving marijuana at all, no debit card, no

7  credit card.

8      This is a debit card that they used something called

9  Circle and, effectively an intermediary, to allow them to then

10 process marijuana.  The point is that Circle -- the business of

11 Circle is to provide a currency that will then be allowed to be

12 used by anybody in the Visa network to buy anything they want,

13 apparently, including marijuana, which is illegal, according to

14 Visa.  So the fact is, they are allowing an entity to step in,

15 to allow and facilitate marijuana transactions --

16     THE COURT:  I think that's a different issue.  I think

17 that's totally different from what we have here.  The exhibit

18 that's on the screen right now, this is what?

19     MR. BURCK:  This is Akhavan Exhibit 11009, your Honor.

20     THE COURT:  You have the bank, arguably, being told

21 directly that Eaze is involved.  They know Eaze is a marijuana

22 company and, therefore, the argument is they don't really care,

23 this is all immaterial.

24     The document you showed me earlier is all about -- at

25 least the little bit I saw of it, it's all about just the

```
 1   general nature of Circle.  You know, I do not see why that is

 2   relevant.

 3              MR. BURCK:  Your Honor, fair enough.  I think that

 4   the -- and I think I understand where the Court's going, and I

 5   understand what your concerns are.

 6              With respect to the Circle witness that we propose for

 7   the defense case, we would want to focus literally on the

 8   transactions that Circle has processed on behalf of Eaze

 9   through U.S. issuing banks.

10              THE COURT:  That's fine.  I'll hear any objections at

11   the time that the government has.  That's fine.

12              MR. BURCK:  I'll limit it to that then, your Honor.

13              THE COURT:  All right.

14              MR. BURCK:  Your Honor, if I can ask him, though,

15   about wallets and then see what he says?

16              THE COURT:  I'll let you go a question or two.

17              MR. BURCK:  I may be running out of time anyway, your

18   Honor, and then I'll just skip it.

19              THE COURT:  Okay.  Let me ask my law clerk to tell my

20   courtroom deputy to bring up the jury.

21              MS. LA MORTE:  Your Honor, should we have the witness

22   ready to go on the screen?

23              THE COURT:  Sure.

24              (Jury present)

25              THE COURT:  Please be seated.  Good morning, ladies
```

L3HPWEI1                         Elliott – Cross

1    and gentlemen, and welcome back.  So getting down to the

2    important things, juror No. 6 is more muted today but, by

3    contrast, juror No. 5, for example, is in a wonderful green

4    outfit; so that will make my day sufficiently.

5              All right.  We are ready to continue.

6              MR. BURCK:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. BURCK:

9    Q.  Mr. Elliott, good morning.  I know it's very early for you.

10   Can you hear me okay?

11   A.  I can, yes.  Thank you.

12   Q.  And you can see me as well?

13   A.  I can, yes.

14   Q.  Okay.  And is there anything changed with your ability to

15   see the various people that you testified that you could see

16   yesterday?

17   A.  I can see everyone clearly, yes.

18   Q.  Okay, great.  And if there's a problem with hearing me,

19   please let me know.  And one last thing, I may have to ask you

20   sometimes to repeat things because the court reporter may have

21   a hard time hearing you.  Okay?

22   A.  That's fine.

23   Q.  Okay.  Thank you.

24             Let me start with showing the witness Government

25   Exhibit 2218, just for the witness.  And can you show him the

L3HPWEI1                          Elliott - Cross

1    second page as well.

2              Mr. Elliott, do you --

3    A.  Am I supposed to look in the binder or is it going to be on

4    the screen?

5    Q.  It should be in the binder.

6    A.  I see 2217.

7    Q.  You don't see 2218?

8    A.  Oh, okay.  Okay, yes.  I do see it now.  Thank you.

9    Q.  Do you recognize that document?

10   A.  I do, yes.

11   Q.  What is it?

12   A.  It's a summary of the Visa payment network.

13             MR. BURCK:  Your Honor, we'd offer Government

14   Exhibit 2218.

15             MS. DEININGER:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibit 2218 received in evidence)

18   BY MR. BURCK:

19   Q.  So, Mr. Elliott, as you said, it's a schematic of Visa's

20   processing system; is that right?

21   A.  It is, yes.

22   Q.  Now, on the far right-hand corner there's merchants and

23   acquiring banks, right?

24   A.  There are merchants and acquiring banks, yes.

25   Q.  Okay.  And in that scheme, the merchant's point of contact

L3HPWEI1                        Elliott - Cross

1    in the Visa network is the acquiring bank, right?

2    A.  Acquirers are responsible for the merchants, and yes, they

3    typically work together.

4    Q.  Okay.  And the contract that exists between the merchant

5    and anyone on the Visa network is with the acquiring bank,

6    right?

7    A.  The acquiring banks do establish those contracts, yes.

8    Q.  Okay.  Now, you testified the acquiring bank is responsible

9    for the merchant; is that right?

10   A.  Acquiring bankers are responsible for their merchants.

11   Q.  And that means they're solely responsible for the merchant

12   in the context of the Visa network, right?

13   A.  Well, the acquirers are responsible for the merchants, but

14   the merchants are also responsible for complying with the Visa

15   rules, and the agents that they use are also responsible for

16   making sure that both they and their merchants comply with the

17   rules.

18   Q.  Okay.  But the merchant banks, the acquiring banks, are

19   ultimately responsible for what the merchants do in the

20   network, correct?

21   A.  The acquirers are ultimately responsible under the Visa

22   rules, yes.

23   Q.  And you testified yesterday that the merchants sponsor the

24   acquiring bank in the network, right?

25   A.  Acquirers do sponsor merchants, yes.

L3HPWEI1                          Elliott - Cross

1    Q.  Okay.  Now, the acquiring bank collects a lot of

2    information from the merchant during the on-boarding process;

3    isn't that right?

4    A.  Well, the acquiring banks will or their agents will.

5    Q.  All right.  But somebody, either the acquiring bank or the

6    agents, will acquire information from the merchant, correct?

7    A.  Acquirers or agents will do that job, yes.

8    Q.  And they learn about, for example, the type of business the

9    merchant's in, right?

10   A.  Well, based on what the merchant provides on the merchant

11   application, the agents and the acquirers make those

12   determinations.

13   Q.  So that's a yes, they learn about what the business is of

14   the merchant?

15   A.  Well, can you restate?

16   Q.  I'm asking, do they learn about the type of business the

17   merchant is involved in when they on-board the merchant to the

18   system?

19   A.  They do they make that attempt, yes.

20   Q.  And they receive, often, websites and URLs about the

21   merchant, correct?

22   A.  Based on what is provided on the application, they do.

23   They should be reviewing that, yes.

24   Q.  And they get what's generally known as KYC, or know your

25   customer, information, right?

L3HPWEI1                        Elliott - Cross

```
1    A.  They gather a lot of that from the merchant application.
2    Q.  And the merchant application is something that is submitted
3    to the acquiring bank, correct?
4    A.  It's submitted to the -- well, it depends.  It depends on
5    how that acquiring bank is set up.  If the acquiring bank does
6    not use any agents, then it goes directly to the acquiring
7    bank.  If they use agents, it may go to the agents, and then
8    ultimately the acquiring banks should look at it, but they may
9    not in every case.  They may have set some type of established
10   allowable merchants and prohibited merchants, and if it's an
11   allowable merchant, they may not look at everything on that
12   application.
13   Q.  Okay.  But --
14   A.  They may have given the agent authority to sign certain
15   low-risk merchants, and certain high-risk merchants may need to
16   be reviewed by the bank, or what we say, they must concur on
17   the approval.
18   Q.  The acquiring bank receives the application file or these
19   other third-party agents, right, receive the application file,
20   correct?  Yes or no?
21   A.  Can you say that again?  I'm sorry.
22   Q.  The acquiring bank or the agents that you just testified
23   about, receive the application file from the merchant; yes or
24   no?
25   A.  Yes, they do.
```

L3HPWEI1                      Elliott - Cross

1    Q.  And the application file does not go to the Visa network or

2    to the issuing bank; yes or no?

3    A.  It does not go to Visa or the issuing bank.

4    Q.  So the application file, as far as you know, remains with

5    the merchant bank or the acquiring bank or the agents; yes or

6    no?

7    A.  It does, yes.

8    Q.  Now, all of these on-boarding responsibilities are with the

9    acquiring bank or its agents, correct?

10   A.  Yeah, the on-boarding responsibilities are definitely with

11   the acquiring bank or its agent, yes.

12   Q.  And the acquiring bank can't delegate or assign those

13   responsibilities to someone else in the network, right?

14   A.  Can you say that again?  I didn't quite hear if you said

15   "can" or "can't."

16   Q.  Can't, cannot.

17   A.  Well, look, I think, as I described earlier, the acquiring

18   bank, if they're working with an agent, may set out parameters

19   that allow an agent to on-board certain types of merchants.

20          And so it's common place that an acquirer might say

21   that you can sign a restaurant that does less than 100,000 a

22   month without our concurrence.  But if you're signing a

23   higher-risk merchant or an entity above a certain volume, then

24   we want to see all the paperwork.

25   Q.  Okay.

L3HPWEI1                          Elliott - Cross

1   A.   So it all depends on the individual circumstances.

2   Q.   The agents who the acquiring bank may use, as you just

3   testified, they work for the acquiring bank in some agency

4   capacity, correct?

5   A.   They do, yes.

6   Q.   Okay.  Now, you testified about what information does go

7   from the merchant bank on through to Visa and the issuing bank.

8   Do you recall you testified what information that is, right?

9   That's a "yes" or "no" question.  I'm asking, just do you

10  recall testifying to that?

11  A.   Well, I'm not following your question.

12  Q.   Do you recall testifying about information that goes from

13  the merchant, an acquiring bank, into the network, to the

14  issuing banks?

15  A.   Well, you're using the word "information."  I testified

16  about transaction information.

17  Q.   Okay.

18  A.   That's based off of what is transmitted electronically

19  through a terminal.  That's what I was referring to.

20  Q.   Right.

21  A.   Nothing to do with a merchant application, sir.

22  Q.   Right.  Understood.  So the information, the transactional

23  information that you testified about, was the following:  the

24  merchant's name, correct?

25  A.   Yes.

1   Q.  The merchant descriptor, correct?

2   A.  The merchant descriptor includes the merchant name.  It's

3   the holistic category.

4   Q.  The MCC code, correct?

5   A.  Correct.

6   Q.  The location of the merchant, correct?

7   A.  There's a city and the state field.  That's what I meant,

8   yes.

9   Q.  A location, right?

10  A.  Well --

11  Q.  City and state is the location?

12  A.  The state -- yes, state is a location, but --

13  Q.  Okay.

14  A.  -- that's my definition.

15  Q.  Okay.  And the amount of the transaction, correct?

16  A.  Correct.

17  Q.  And there's credit card or debit card information specific

18  to the card, right?

19  A.  And the card -- well, the card number.

20  Q.  The card number.  And then the country code, right?

21  A.  Yes.

22  Q.  Now, if you turn to the second page, Mr. McLeod.  If you

23  could highlight No. 5 in the flow, on the right-hand side.

24          So now you testified --

25  A.  You said Mr. McLeod, is that --

1   Q.  Mr. McLeod is the person who's showing the jury

2   information.  So this is now the second page of the document

3   you have.

4   A.  Okay, got it.

5   Q.  So if you see No. 5 in the left-hand circle?

6   A.  I see that.

7   Q.  It says:  "Card issuer approves or declines the

8   translation."  I think it meant to say "transaction," but the

9   title of this is "Transaction message flow," right?

10  A.  It is.

11  Q.  And you testified that the process of a card being

12  submitted for a transaction and then being approved for the

13  transaction takes place in nanoseconds, right?

14  A.  I did.

15  Q.  And No. 5, the card issuer approves or declines the

16  transaction, that's where -- that's the spot where the issuing

17  bank decides whether or not to approve the transaction,

18  correct?

19  A.  It is.

20  Q.  And now, based on your experience, you are aware of the

21  criteria that are used by issuing banks to authorize or not a

22  transaction, right?

23  A.  I'm aware of it, yes.

24  Q.  And that includes the credit limit that the card has,

25  correct?

L3HPWEI1                        Elliott - Cross

A.  It does include the credit limit, yes.

Q.  And for debit cards, whether you have enough money in your
account, correct?

A.  That's one of the things that issuers would look into if
it's a debit card, yes.

Q.  And there's also indicia of whether or not there's fraud
associated with the transaction, correct?

A.  Say that again?

Q.  Does the card issuer consider indicia, indicators, of fraud
when it decides whether or not to authorize a transaction?

A.  They do, yes.  They try to.

Q.  And the fraud they're concerned about is fraud on the
cardholder, correct?

          MS. DEININGER:  Objection.  Foundation.

          THE COURT:  Overruled.

Q.  You can answer the question.  The fraud they're concerned
about is fraud on the cardholder, correct?

A.  When it comes to fraud, they're concerned about whether or
not the cardholder is actually engaging in that transaction.

Q.  Thank you.  And sometimes the bank will call the cardholder
or contact the cardholder to find out, are you engaged in this
transaction, correct?

A.  Sometimes they will, yes.

Q.  And as far as you know, based on your experience with the
Visa network, when they do that, they don't ask the cardholder:

L3HPWEI1                        Elliott - Cross

1   Are you buying an illegal product, correct?

2   A.  Well, I wouldn't be able to, you know, tell you one way or

3   another because I've not been, you know, on any of those calls.

4   They may ask the cardholder any question they want.  I just

5   don't know if they ask that question or not.

6   Q.  Okay.  You don't know one way or the other, correct?

7   A.  I don't know.

8   Q.  And you know, though, that they don't ask the cardholder

9   what product they bought, correct?

10              MS. DEININGER:  Objection.  Foundation.

11              THE COURT:  Sustained.  Lay a foundation, if you can.

12              MR. BURCK:  I'm sorry, lay a foundation?

13              THE COURT:  Yes.  Sorry.

14              MR. BURCK:  Sorry, your Honor.

15  BY MR. BURCK:

16  Q.  When the product is purchased, or they attempt to purchase,

17  on the system and you testified that the issuing bank may call

18  the cardholder, what types of questions do they ask, as far as

19  you're aware?

20  A.  Well, I would say this, though.  Things have changed

21  dramatically over the years.  There's an alert system in place

22  now; so the use of calls is, in my opinion, is greatly

23  minimized.  It may have been something that happened years and

24  years ago, but it's infrequent for something like that to ever

25  happen.  It's more of they use an alerting system.

L3HPWEI1                        Elliott - Cross

1            So cardholders may sign up for fraud alerts, and if

2    something comes through on their account, they'll get an alert

3    on their phone or an e-mail.  And if the cardholder, you know,

4    looks at it and doesn't recognize it, then it turns things

5    around so that the cardholder is then contacting the issuing

6    bank to say, hold on, this one looks weird to me.  I probably

7    didn't do this.

8            And so I see where you're going with the whole notion

9    of calling, but that doesn't happen anymore.  That's something

10   from decades ago.

11   Q.  Okay.  So alerts?

12   A.  Things have changed.  There are alerts.

13   Q.  There are alerts, which are texts or e-mails or something

14   along those lines --

15   A.  Correct.

16   Q.  -- correct?  And those alerts, to your knowledge, you just

17   testified about them, they do not request information about

18   what product you bought, correct?

19            MS. DEININGER:  Objection.  Foundation.

20   A.  I --

21            MR. BURCK:  There's an objection.  You have to wait

22   until the Judge rules.

23            THE WITNESS:  Okay.  Sorry.

24            THE COURT:  Overruled.

25   Q.  So you can answer that question.  The alerts that you just

L3HPWEI1                          Elliott - Cross

1    testified about, do they request -- to your knowledge, do they

2    request information from the customer on what they bought?

3    A.  I have not -- I'm not the party that set up the alert

4    system --

5    Q.  Sir, I'm sorry to interrupt.  That's not my question.  My

6    question is, do you know, do the alerts ask the customer what

7    they bought?  That's my question.

8    A.  I don't know if they do.

9    Q.  Okay.  Thank you.

10   A.  And I --

11   Q.  So --

12   A.  Yeah.

13   Q.  You don't know?

14   A.  I don't know that they do, no.

15   Q.  Okay.  Thank you.  Now, you testified about the merchant

16   name being an important factor and the descriptor being

17   important, right?

18   A.  I did.

19   Q.  And the central purpose of having the name and the

20   descriptor is to get those to the cardholder, ultimately?

21   A.  The central purpose of the name is to aid the cardholder in

22   the recognition of the transaction when they look at their

23   statement at the end of the month, so that they realize that

24   this is a charge that they actually engaged in.

25   Q.  And this helps reduce fraud in the network, right?

L3HPWEI1                          Elliott - Cross

1    A.  It helps reduce disputes in the network.

2    Q.  Disputes --

3    A.  The transaction --

4    Q.  Sorry, go ahead.

5    A.  Transactions that may not be recognized.

6    Q.  Disputes between the cardholder and the issuing bank,

7    right?

8    A.  Disputes between the cardholder and the merchant that is

9    billing them.

10   Q.  The cardholder and the merchant.  Understood.

11          Now, let's turn to just Visa generally.  Visa is a

12   for-profit business, right?

13   A.  It is, yes.

14   Q.  And you issue shares on the stock exchange?

15   A.  We do, yes.

16   Q.  And you generate revenue and profit from this network that

17   we've talked about, right?

18   A.  We do.

19   Q.  And you testified that Visa is an electronic super highway;

20   do you remember that?

21   A.  I do.

22   Q.  And is it fair to say that Visa charges tolls on that

23   highway, like you would with a normal highway, in order to pay

24   for the infrastructure and generate revenue, right?

25   A.  Well, Visa has fees built into the network and certain

1  transaction fees, I'm not an expert on all of them, but yes, we

2  do earn revenue from the operation of our network.

3  Q.  And you want Visa cards to be used more, rather than less,

4  in the network, of course, right?

5  A.  Well, yes.  You know, widespread acceptance is a positive

6  thing for our business, yes.

7  Q.  So higher volume of use of cards means more revenue

8  ultimately for Visa, correct?

9  A.  Higher volume generates higher revenue, yes.

10 Q.  All right.  Let's please put up for the witness what's in

11 evidence as Government Exhibit 2203, and we go to page 18.

12 And -- sorry, one second.

13         So if you look at the very top of that page, Program

14 Violations -- and you can highlight for the jury.

15         Are you there, Mr. Elliott, page 18 of 2203?

16 A.  I'm lost.  One moment.

17 Q.  Sure.

18 A.  Sorry, I have to get used to your tab system here.  Okay.

19 Under B, I think I have it.

20 Q.  Is it page 18 of the lower right-hand side of the page?

21 You know what, just to speed this along, why don't you just put

22 it down, and I'll ask you a couple of questions, since you

23 testified about this yesterday.

24         Do you recall that there's a global brand protection

25 guide for acquirers, right?

L3HPWEI1                          Elliott - Cross

1   A.   I do, yes.

2   Q.   And you recall that you testified that a transaction must

3   be lawful in both the seller's and the buyer's jurisdictions,

4   correct?

5   A.   They must be lawful in the buyer and seller jurisdiction.

6   I did, yes.

7   Q.   Okay.  Now, you also understand, based on your experience

8   and knowledge of this manual, that nothing in the manual

9   specifies what happens when something is legal in a state

10  jurisdiction but illegal under federal jurisdiction, right?

11  A.   Can you repeat that?  Someone was handing me your

12  attachment when you said that.

13  Q.   Sure.  You would agree with me, based on your experience

14  and your knowledge of this manual, that it says nothing about

15  what happens if something is legal in a state jurisdiction but

16  illegal under federal jurisdiction, right?

17  A.   We don't break out the difference between state and federal

18  jurisdictions in the guide.

19  Q.   Okay.  Now, do you have the document in front of you at

20  this point?

21  A.   I have a document that's titled Section 5, Program

22  Violations, and it's page 18 of this guide.

23  Q.   Okay.  Can we go to page 7 of the guide?

24  A.   I believe I have that as titled Section 2, Visa Global

25  Brand Protection Program; is that correct?

L3HPWEI1                          Elliott - Cross

1    Q.  That's correct.

2    A.  I have it.

3    Q.  And you testified -- and we can blow up the first

4    paragraph.

5          You testified about this language yesterday; do you

6    recall that?

7    A.  I do, yes.

8    Q.  And it lays out certain things that are specific

9    challenges, and we can highlight that language for the jury.

10         Specific challenges include risk presented by online

11   merchants selling illegal or miscoded online gambling,

12   prohibited pornography, and then it goes through examples,

13   contraband tobacco, illegal or counterfeit pharmaceuticals, and

14   some other things, and it ends up with illegal sale of any

15   other products or services, right?  Do you see that?

16   A.  I see that, yes.

17   Q.  And you testified yesterday that it does not specifically

18   say anything about marijuana, right, specifically about

19   marijuana?

20   A.  It does not specifically mention marijuana, no.

21   Q.  And you testified yesterday that these things represent the

22   biggest risks -- those were words, I believe -- to Visa based

23   on some criteria you use, right?

24   A.  These are the highest risks that we see today based on the

25   impact they have on the payment system, the volume of the

L3HPWEI1                        Elliott - Cross

1   activity and specific rules that apply to Visa and its clients.
2   Q.  So fair to say, based on the analysis that you've done,
3   contraband tobacco, for example, or illegal or counterfeit
4   pharmaceuticals or online gambling, for that matter, are more
5   risky than marijuana?
6   A.  More risky than marijuana?  I think that -- I would explain
7   it this way.  We use a risk-based approach to protect the
8   integrity of the payment system, and we focus our resources in
9   a proactive and reactive manner.  We do not ignore illegality
10  on the network.  If we come across or get tips on something
11  illegal, like marijuana, we'll pursue it, but it's not the
12  primary focus of our program.
13  Q.  Thank you.
14  A.  And these other items are.
15  Q.  Those other items are, is that what you said?
16  A.  Yes, sir.
17  Q.  Thank you.  Can we put up Government Exhibit 2217, which is
18  in evidence, and if we can highlight for the jury -- and,
19  Mr. Elliott, I'd ask you to look at the first paragraph under
20  the heading Marijuana, and then highlight that for the jury,
21  please.
22          You testified about this document yesterday, and you
23  said, I believe, that this represents Visa's internal policies
24  about marijuana sales, correct?
25  A.  Yeah, let me read it for one moment.  All right.  Yes, I

L3HPWEI1                        Elliott - Cross

1   did testify about this yesterday, and it is our position.

2   Q.  Okay.  And it says:  Visa's official position, correct?  Is

3   that what it says?

4   A.  It does.

5   Q.  And then it goes on to have a quote, correct?  You

6   testified about that quote yesterday, right?

7   A.  It does, yes.

8   Q.  Now, if we turn to page 2, at the bottom of that page,

9   there's a question in this, at the very bottom of the page.

10  And the question is --

11  A.  I see, yes.

12  Q.  Page 2.  Are debit transactions okay for the sale of

13  marijuana?  Right?

14  A.  I see that, yes.

15  Q.  And the answer is on the next page:  No, Visa prohibits all

16  transactions involving the purchase and sale of marijuana from

17  being entered into the Visa payment system.  Correct?

18  A.  That's correct.

19  Q.  So, to you, does that mean that Visa does not allow debit

20  cards, correct?

21         MS. DEININGER:  Objection.  Vague.

22  Q.  Does not allow debit cards for marijuana transactions,

23  correct?

24         THE COURT:  Are you asking him --

25  A.  The --

1          THE COURT:  Excuse me.  Are you asking him about

2     instances where Visa knows it's being used for marijuana?

3          MR. BURCK:  Yes, your Honor.  I'm asking only whether

4     or not they knowingly allow debit card.

5          THE COURT:  Okay.  Go ahead.

6     Q.  So, Mr. Elliott, to your knowledge, does Visa knowingly

7     permit debit cards to be used to purchase or sell marijuana?

8     A.  Well, Visa prohibits the sale of marijuana on its network

9     for debit cards or credit cards.  It's any Visa branded payment

10    product.  And that would surely apply to the acquiring banks

11    that are not supposed to sign merchants that sell illegal

12    products.  That's how it all folds together.

13    Q.  Understood.  And the next question under it is -- and you

14    can blow that up -- What if a merchant is selling a gift card,

15    certificate or voucher that can be used to purchase marijuana?

16    Do you see that question?

17    A.  I do, yes.

18    Q.  And then it says the same thing it said above:  Visa

19    prohibits all transactions involving the purchase and sale of

20    marijuana.  Right?  Disguising the transaction as a gift card

21    or other quasi-cash sale violates Visa rules, right?

22    A.  Yes.

23    Q.  And this is your understanding of what Visa's policy is,

24    correct?

25    A.  It is.

L3HPWEI1                          Elliott - Cross

1    Q.  Now, you testified that in -- you can take that down,

2    Mr. McLeod -- that in the various policies and rules, outside

3    rules, rules that go to acquirers, to people outside of Visa,

4    that no specific mention of cannabis is made, correct?

5    A.  Cannabis is not mentioned specifically in the rules, no.

6    Q.  Okay.  And I'd like to show the witness Government

7    Exhibit 2204 that was entered into evidence yesterday.  And you

8    recall testifying about this document, correct?

9    A.  Well --

10   Q.  I'm sorry, it's Government Exhibit 2204.  It's a

11   presentation by Elizabeth Scofield?

12   A.  Yes, I see it.  I see the presentation.

13   Q.  And you remember testifying about it yesterday, correct?

14   A.  I did, yes.

15   Q.  And this was a presentation made by your colleague in 2019;

16   isn't that right?

17   A.  It is.

18   Q.  And what the government showed you was a two-page excerpt

19   from that presentation, right?

20   A.  They did, yes.

21   Q.  Just this page, which is the cover page, correct?  And then

22   a second page, which you can show the jury -- I'm sorry, that

23   was not -- why don't you take that second page down.  You

24   recall this document, correct?

25   A.  I recall the document, yes.

L3HPWEI1                         Elliott – Cross

1    Q.   Okay.  Now, I'd like to show you, just for the witness,

2    Akhavan Exhibit 5014.

3    A.   Okay.  I'm there.

4    Q.   And do you see the title of this document?

5    A.   I do, yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HAWEI2ps                         Elliott - Cross

Q.   Do you see the person who is the author or presenter of the

document?

A.   That I see, yes.

Q.   Do you recognize the document?

A.   I do, yes.

Q.   Do you know what -- can you tell us what it is?

A.   This is a document that -- it's a PowerPoint presentation

that I gave to one of our risk executive committee meetings.

At the top it's one of the marijuana laws and fact that they're

evolving and changing.

Q.   And this was presented to Visa internally, correct?

A.   It was present -- it was presented to internal Visa people

and clients that are members of our risk executive council that

we meet with to discuss merchant issues.

Q.   And clients would include issuing banks, right?

A.   Issuing and acquiring banks.

Q.   And this presentation occurred in 2019, did it not?

        If you turn to the second page and you look at the

bottom, I think it will help you understand -- or right

underneath.  Do you see that?

A.   Yes.  2018 or 2019, somewhere in that time period.

        MR. BURCK:  Your Honor, we offer Akhavan Exhibit 5014.

        MS. DEININGER:  Objection, Rule 403 and government

motion in limine 2.

        THE COURT:  Do you want to give me a hint what motion

L3HAWEI2ps                       Elliott - Cross

1   in limine no. 2 is?

2          Here it is.

3          MR. BURCK:  Your Honor, with respect to -- I think

4   no. 2 is talking to legislation.  I am not going to elicit

5   anything about legislation from this document.

6          MS. DEININGER:  It is in the document, though.

7          MR. BURCK:  Your Honor, we could also redact it before

8   it goes to the jury.

9          THE COURT:  As so redacted, it will be received.

10         (Defendant's Exhibit 403 received in evidence)

11         MR. BURCK:  Thank you, your Honor.

12         Can you show the witness Akhavan Exhibit 5014.

13  Q.  Now, sir, this is titled "Cannabis and Hemp Products,"

14  correct?

15  A.  It is.

16  Q.  That's the same title as the document that Elizabeth

17  Scofield provided -- or presented that you looked at for

18  Government Exhibit 2204, correct?

19  A.  I don't know if it's the same title.  I'd have to go back

20  and look at it.

21  Q.  Why don't you take a quick look.

22  A.  I'm just doing that right now.

23  Q.  Sure.

24  A.  Yeah.  It's the same title, yes.

25  Q.  So fair to say the same topic, right?

L3HAWEI2ps                    Elliott – Cross

1    A.  Yes, similar topic.

2    Q.  OK.  Now, you testified that this happened in 2018 or 2019,

3    right?

4    A.  It did.

5    Q.  And you testified that there were issuing banks and

6    acquiring banks present, right?

7    A.  I did.

8    Q.  And also Visa executives, right?

9    A.  Yes.

10   Q.  All right.  Let's turn to the second page.  And the second

11   page, fair to say it's about the terms that you're going to be

12   using, which are cannabis, marijuana, THC and CBD, industrial

13   hemp.  Right?

14   A.  Yes.

15   Q.  And the next slide, about global legalization --

16          MS. DEININGER:  Objection.

17          MR. BURCK:  Sorry.  We'll skip that slide.  Sorry.

18   We'll skip that slide.  Sorry, your Honor.  I had missed one

19   part of it.

20          Go to the third slide, please.

21          MS. DEININGER:  Objection.  Motion in limine 2.

22          MR. BURCK:  Your Honor, I'm looking at the slide that

23   says "Legal Landscape of Marijuana in the U.S."

24          THE COURT:  Does somebody have a hard copy of this, so

25   I can see the whole exhibit?

L3HAWEI2ps                    Elliott - Cross

1           MR. BURCK:  Your Honor, I think they have elicited

2      this from their witnesses, this very fact.

3           MS. DEININGER:  We have not.

4           MR. BURCK:  OK.  Your Honor, I can skip that slide

5      too.  I don't want to waste the jury's time.

6           THE COURT:  All right.  Skip that slide.

7           MR. BURCK:  Let's go to the next one.

8      Q.  Marijuana --

9           MS. DEININGER:  Objection, same objection.

10          THE COURT:  Now, see, what I didn't have before me

11     when this was offered was the whole -- let me see without

12     showing the jury --

13          MR. GIBERT:  We can't hear you, Judge.

14          THE COURT:  I'm sorry.  When I made a ruling a minute

15     ago I didn't have before me the full document, and now I'm

16     reconsidering.  Let me see, without showing it to the jury, all

17     the slides you want to show to this witness.

18          MR. BURCK:  Yes, your Honor.  It's the cover slide.

19     It's the second slide.  Give me that a little smaller so the

20     witness -- the judge can see.

21          The second slide.  And then you skip the third slide,

22     your Honor.  Skipping that one.

23          The fourth slide the government has objected to.  We

24     would offer -- I think it was offered in evidence, but we could

25     also skip that if it's easier.

L3HAWEI2ps                    Elliott - Cross

```
 1              THE COURT:  What else do --
 2              MR. BURCK:  I'm sorry, I couldn't hear?
 3              THE COURT:  I want to see everything.
 4              MR. BURCK:  Sorry, your Honor.  And then the next
 5    slide, that slide, your Honor, is the one we really want to
 6    talk about.  And then that's it, your Honor.
 7              THE COURT:  And is the government objecting to all
 8    this?
 9              MS. DEININGER:  We do not object to the cover or
10    slide 2, but we are objecting to the last two slides that were
11    shown as irrelevant.
12              THE COURT:  Sustained.
13    BY MR. BURCK:
14    Q.  Mr. Elliott, do you recall -- you recall this presentation,
15    correct?
16    A.  I do, yes.
17    Q.  And the purpose of the presentation was what, your Honor --
18    Mr. Elliott?
19    A.  The purpose of the presentation was to educate a group of
20    stakeholders on the requirement that we're shifting in the U.S.
21    marketplace and there has been some states pushing for
22    legalization, there has been some conjecture in Congress about
23    legalization --
24              MS. DEININGER:  Objection.  Move to strike.
25              THE COURT:  Yes.  So the answer will stand through
```

the -- the following portion of the answer will stand: "The

purpose of the presentation was to educate a group of

stakeholders on the requirement that we're shifting in the U.S.

marketplace and there have been some states pushing for

legalization," period.  The rest will be stricken.

Put another question.

MR. BURCK:  Your Honor, I'll move on from this

document.

BY MR. BURCK:

Q.  You testified yesterday about the Global Brand Protection

Program.  Do you recall that, Mr. Elliott?

A.  I did.

Q.  And you testified that it helps ID problematic merchants,

right?

A.  Yes.

Q.  Now, it does that after the transaction has occurred.

Right?

A.  Not always.

Q.  So sometimes the program stopped the transaction from

occurring, in a nanosecond?

A.  No.  What I'm referring to there was an educational

component about the program, and so as acquirers understand

what their obligations are and what areas we focus on, they may

not find certain problematic merchants to begin with, and that

way it prevents the transactions coming in.

L3HAWEI2ps                    Elliott - Cross

1   Q.  OK.  But when you talk about specifically identifying a

2   problematic merchant, that happens after the transaction has

3   occurred, correct?

4   A.  Well, what I was talking to you then about was the testing

5   process or the identification process.  And so, yes, once we do

6   a test transaction, we then can identify who that merchant is.

7   Q.  OK.  So the testing process that you talked about occurs

8   only after the transaction has occurred.  Correct?

9   A.  Well, it occurs during it, actually.

10  Q.  Sir, I'm not talking about the testing transaction itself.

11  I'm talking about the transaction that leads to the text.

12  Right?  You understand that?

13  A.  Well, I think I -- the way I think of it is that the test

14  is the transaction.

15  Q.  OK.  So when you -- so how do you -- you testified

16  yesterday that testing occurs after you are notified of a

17  potentially problematic merchant, right?

18  A.  I did in the reactive mode, yes.

19  Q.  And then that testing leads to this transaction you're

20  talking about, right?

21  A.  The testing leads to the identification of the merchant

22  name descriptor in the system and then ultimately the acquiring

23  bank to the merchant connected to it.

24  Q.  Let me show you Government Exhibit 2226.  Let me find that

25  document.

L3HAWEI2ps                      Elliott - Cross

1   A.  I got it.

2   Q.  Do you recall that you testified this was about a Texas

3   bank that had been problematic relating to potential marijuana

4   sales?  Right?

5   A.  Yes.

6   Q.  Now, this had nothing to do with Eaze, correct?

7   A.  This identification was unique to a Texas bank and

8   merchants they had, so -- so yes.

9   Q.  Nothing to do with Eaze, yes?

10  A.  Well, let me say this.  I don't know whether it had

11  anything to do with Eaze or not.  But this identification was

12  unique to the Texas bank that was an acquirer of this specific

13  group.  I don't know if Eaze was connected to it or not.

14  Q.  You testified yesterday about the testing process you would

15  use, right?  Remember that?

16  A.  Yes.

17  Q.  And you testified that Visa does not have a systematic

18  program to detect marijuana sales on its platform.  Right?

19  A.  I testified that we're not proactively, as a matter of

20  course, proactively testing marijuana sites.

21  Q.  And you're not routinely checking for marijuana either.  Is

22  that what you said?

23  A.  Well, I wouldn't say "routinely" is the right word.  It's a

24  matter of, you know, business as usual.  If we get tips or we

25  come across something that shows that an illegal marijuana

1   transaction is coming in, we'll action it like we would any

2   illegal transaction that we're made aware of.

3   Q.  Right.  But you did not proactively search for marijuana,

4   right?

5   A.  We're not proactively -- it's not part of our -- our stated

6   testing regimen to our vendor.

7   Q.  You testified that illegal gambling and illegal

8   pharmaceuticals were much more important to you, right?

9   A.  Those are considered high-priority items.

10  Q.  Thank you.

11          Now, turning to Eaze, you testified --

12          MR. BURCK:  You can take that down, Mr. McLeod.

13  Q.  You testified that Eaze, the Eaze inquiry came from a tip,

14  right?

15  A.  It did.

16  Q.  And the tip was based on a news story that someone at Visa

17  had seen about Eaze possibly using Visa.  Right?

18  A.  It was, yes.

19  Q.  And you conducted a test transaction based on that tip,

20  right?

21  A.  Visa did, yes.

22  Q.  Visa, your team did.

23  A.  Yes.  Our team did.

24  Q.  And you testified that they went to the website, right?

25  A.  Yes.  We -- our vendor --

L3HAWEI2ps                    Elliott - Cross

1    Q.  Yes or no, Mr. Elliott?  I'm sorry.  Yes or no.  I'm just

2    conscious of the time.

3    A.  Restate it?

4    Q.  These teams would go to the website of Eaze?  Yes or no.

5             I'll help you.  Why don't you look at --

6    A.  My vendor went to the test site and conducted the test

7    transaction.

8    Q.  Your vendor who works for Visa, correct?

9    A.  Yes.

10            MR. BURCK:  Can we show the witness Government Exhibit

11   2231 and 2232, which are in evidence.

12   Q.  OK.  You recall testifying about this, right?

13   A.  Well, I have to get them.

14   Q.  Sorry.  I'm sorry.

15   A.  2230 -- I think you said --

16   Q.  2231 and 2232.

17   A.  OK.  I'm at 2231.  Yes, I testified about that.

18   Q.  And then 2232.

19   A.  Yes.  I see that.  I also testified about that.  Yes.

20   Q.  And on 2232, you testified that you can clearly see the URL

21   is eaze.com, right?

22   A.  Yes.

23   Q.  Now let's look at Government Exhibit 2227.

24            MR. BURCK:  Your Honor, I'm conscious that I'm running

25   up on my 45 minutes.  Could I beg the Court's indulgence?

L3HAWEI2ps                    Elliott - Cross

1    Could I have a few more minutes after that?

2              THE COURT:  OK.  But I will give the government extra

3    time as well.

4              MR. BURCK:  I'm sorry, your Honor.  I couldn't hear

5    you.

6              THE COURT:  I'm sorry.  OK, but I will give the

7    government, then, extra time as well.

8              MR. BURCK:  Thank you.  That's fine.  Thank you, your

9    Honor.

10   Q.  So looking at Government Exhibit 2227, do you recall that

11   document?

12   A.  I do, yes.

13   Q.  And you testified that this shows a series of merchants

14   that were terminated as a result of the Eaze inquiry, right?

15   A.  I did, yes.

16   Q.  And all the merchants that were terminated used the

17   merchant URL eaze.com or eazewellness.com, right?

18             MR. BURCK:  You can highlight that to the jury,

19   please, Mr. McLeod.

20   Q.  You see that?

21   A.  I do see it, yes.

22   Q.  And you see next to the merchant URL "merchant name,"

23   correct?

24   A.  I do, yes.

25   Q.  And none of those merchants is Eaze, right?

L3HAWEI2ps                    Elliott - Cross

1           I should say -- let me withdraw the question.

2           None of those merchants said Eaze.  Right?

3    A.  None of the merchant names on this document say Eaze, under

4    that column.

5    Q.  But you understood, and your team understood, that Eaze was

6    behind all these merchants.  Correct?

7    A.  We understand that because the test transactions took place

8    at the Eaze website, and the names that came through the

9    payment system were the five different names in that merchant

10   name column.

11   Q.  Are you familiar based on your knowledge and experience in

12   this field with the term "proxy"?

13   A.  Excuse me?

14   Q.  "Proxy," p-r-o-x-y, proxy.

15   A.  I'm not familiar with the way you use that term, no.

16   Q.  I didn't ask the way you use it.  I just asked you if you

17   are familiar with the word "proxy."

18   A.  I don't know what you mean by that.

19   Q.  OK.  Let's turn to Government Exhibit 2228.  And can we

20   highlight, in the middle, and if you could find that document,

21   Mr. Elliott.

22   A.  I found it, yes.

23   Q.  And you see that -- you testified about this document as

24   well, right?

25   A.  I believe so, yes.

L3HAWEI2ps                    Elliott - Cross

1    Q.  And on the far left do you see under "Merchant Name"

2    SonicLogistix, correct?

3    A.  I see that, yes.

4    Q.  And under "Merchant URL," you see eaze.com, correct?

5    A.  I do, yes.

6    Q.  So when we were looking at the prior exhibit, 2227,

7    right -- we'll go back to that -- the merchants that were

8    terminated were just SonicLogistix, advancedphotovoltaics,

9    advanced-electricity.com, and advanced-dynamic.com -- and also,

10   I'm sorry, BTPinternet-trans, right?

11   A.  Those were the merchant names that were terminated, yes.

12   Q.  Eaze was not terminated, right?

13   A.  Our belief was -- and very typical --

14   Q.  Sir, before you answer -- before you explain, my question

15   was, was Eaze terminated?  Yes or no.  Then I'll let you

16   explain.

17   A.  My belief was that Eaze was being terminated because they

18   were using a name other than their own.  And the purpose of the

19   test transaction was to conduct a test at the Eaze website.

20   But the Eaze name did not flow through the system.  Another

21   name did.  And the acquirer responsible for it indicated to us

22   that they have terminated it, which to us meant they terminated

23   Eaze.  That's the explanation.

24   Q.  So when you say that it meant to you that they had

25   terminated Eaze, did anybody tell you they terminated Eaze?

1   A.  They wouldn't have told me, but they would have indicated

2   that fact to the program managers in the European region that

3   were administering this program.

4   Q.  And they would have done that.  Do you know if they did

5   that?

6   A.  Well, I know that one of the documents I looked at from, I

7   want to say PXP Financial stated that.

8   Q.  I'm not familiar with that document, sir.  Do you know what

9   time you're referring to?

10  A.  There was a document I looked at yesterday which was a

11  letter from one of the acquiring banks that stated, based on

12  the identifications, that the entity had been terminated.

13  Q.  And the entity being Eaze?

14  A.  The entity being the agent and the related merchants, yes.

15  Q.  Does that --

16  A.  I remember it from yesterday.

17  Q.  Did it say the word "ease"?

18  A.  I'd have to look at it again to do that.  But that was an

19  indication that it was terminated, to us.

20  Q.  So you're saying that your understanding was that Eaze was

21  terminated from the Visa system as of this inquiry in 2018 time

22  frame.

23  A.  I believe it was 2019.

24  Q.  2019.  I'm sorry.  2019.

25  A.  And I'm looking at your exhibit that you put in front of

L3HAWEI2ps                    Elliott - Cross

1  me, 2228, and it states the merchant termination date was

2  6/26/19.

3  Q.  So just to be clear, your testimony is that as of that

4  date, you understand that Eaze had been terminated from the

5  Visa system, network.

6  A.  That's my understanding.  That's why --

7       THE COURT:  Counsel, I do think now you're --

8       MR. BURCK:  Your Honor, I've just got a few more.

9  Just a couple minutes just to wrap up questions.

10      THE COURT:  I'll give you two minutes.

11 BY MR. BURCK:

12 Q.  Are you familiar with a company called Circle?

13 A.  I am, yes.

14      MS. DEININGER:  Objection.

15      THE COURT:  No, I'll allow that.  Overruled.

16 Q.  So you are familiar with a company called Circle, right?

17 A.  Not, not intimately, but I know that it exists.

18 Q.  And you are familiar that it provides what's called a

19 digital wallet, right?

20      MS. DEININGER:  Objection.

21      THE COURT:  Overruled.

22 A.  I, I -- I'm not familiar with the product offering.  I know

23 they're a participant in the payment system, but I have not

24 been personally involved with interactions with that entity.

25 So I don't have any direct knowledge as to how they operate.

L3HAWEI2ps                    Elliott - Cross

1    Q.  Understood.  And you just testified that Eaze, as far as

2    you know, Eaze was terminated from the Visa network in 2019.

3    Correct?

4    A.  I did, yes.

5    Q.  So as far as you're aware, they are not operating in the

6    Visa network today, correct?

7    A.  No, that's -- that's not true, because we recently got a

8    complaint from Bank of America about this particular entity,

9    Eaze, coming through Circle.  And it's being investigated.  But

10   I don't know how it's been determined.

11   Q.  When did you get that inquiry, sir?

12   A.  Oh, I would say it's probably a couple weeks ago.

13   Q.  A couple weeks ago.

14          And then --

15          MR. BURCK:  Your Honor, this is my last set of

16   questions.

17          THE COURT:  I agree with that.

18   Q.  Now, Visa has not asked any of the issuing banks to warn

19   cardholders not to engage in marijuana sales, right?

20          MS. DEININGER:  Objection.

21          MR. BURCK:  Your Honor, I can lay a foundation.  I'm

22   just trying to get to the --

23          THE COURT:  I'll allow it.

24          MR. BURCK:  You'll allow it, your Honor?  Thank you.

25   Q.  So Visa has never asked -- or has not asked issuing banks

L3HAWEI2ps                          Elliott - Cross

1    to warn its cardholders, stop using these cards for marijuana

2    sales.  Right?

3              MR. BURCK:  You're frozen.

4              Your Honor, I think the witness is frozen.  Not

5    literally frozen, but the screen.

6              Your Honor, just to speed this along, your Honor, what

7    I could do, if I could have time in my -- I know there was

8    supposed to be no more cross, but just this last set of

9    questions, so we don't waste time with the jury.

10             A JUROR:  He's back, he's back.

11             MR. BURCK:  Oh, he's back.  I'm sorry.

12   Q.  Can you hear me now, Mr. Elliott?

13   A.  I did, and I answered the question.

14   Q.  We didn't hear it, so you're going to have to answer it

15   again.  I'm sorry.

16   A.  That's OK.  Go ahead.

17   Q.  So the question was, did Visa ask its issuing banks to warn

18   cardholders to stop using their cards for marijuana sales?

19   A.  We did not make that specific warning to issuers or

20   requests.

21   Q.  Did Visa ever threaten to penalize the issuing banks for

22   not preventing its cardholders from purchasing marijuana using

23   Visa-branded cards?

24   A.  We did not.

25             THE COURT:  All right.  That concludes the cross.

L3HAWEI2ps                    Elliott - Cross

1   Cross from counsel for Mr. Weigand.

2   CROSS-EXAMINATION

3   BY MR. HARID:

4   Q.  Good morning, Mr. Elliott.  Can you hear me?

5   A.  I can, yes.

6   Q.  Thanks for waking up this early.  I appreciate it.

7   A.  Sure.

8   Q.  You testified yesterday about merchant category codes.  Do

9   you remember that?

10  A.  I do.

11  Q.  And these are four-digit codes that classify merchants and

12  the industries they're in, right?

13  A.  They're four-digit codes that identify the merchant

14  industry, yes.

15  Q.  And do you recall testifying that they serve a risk

16  management function for acquirers?  Right?

17  A.  They do for both acquirers and issuers, yes.

18  Q.  And you said that the international -- the Industry

19  Standards Organization sets industry codes, right?

20  A.  I refer to them as ISO, but, yes, ultimately they approve

21  new codes, and they're the body that blesses the creation of

22  new codes, yes.

23  Q.  And those codes essentially become, or are, the MCCs.

24  A.  They are, yes.

25          MR. HARID:  I'd like to show the witness Akhavan

L3HAWEI2ps                    Elliott - Cross

1    Exhibit 5047.

2    Q.  Have you seen this document before?

3    A.  One moment.

4         No.

5    Q.  But you see it says --

6    A.  No.

7    Q.  What does it say at the top?

8         MS. DEININGER:  Objection, not in evidence.

9    Q.  It appears to say Visa --

10        MS. DEININGER:  Objection.

11        THE COURT:  Yes.  It's not in evidence.  You can't --

12        MR. HARID:  Well, I'd like to offer the document into

13   evidence.

14        MS. DEININGER:  Objection.

15        THE COURT:  Sustained.

16        MR. HARID:  No objections, or are we --

17        THE COURT:  No.  The objection was sustained.

18        MR. HARID:  I'm sorry.  I couldn't hear you.  Couldn't

19   hear you.

20   BY MR. HARID:

21   Q.  Mr. Elliott, is it true that Visa is on various ISO

22   subcommittees?

23   A.  I don't know what -- how many ISO subcommittees Visa is on.

24   I'm not an expert.

25   Q.  But it's on at least some of them.

L3HAWEI2ps                          Elliott - Cross

1   A.  I don't know.

2   Q.  Do you know if it's on the technical committee?

3            MS. DEININGER:  Objection.

4            THE COURT:  Sustained.

5   Q.  Visa has the ability to give ISO input, correct?

6            MS. DEININGER:  Objection, foundation.

7            THE COURT:  I'm not seeing the relevance of any of

8   this.  Sustained.

9   Q.  Let me put it this way.  Mr. Elliott, to your knowledge,

10  does Visa have the ability to create -- to influence the

11  creation and definition of merchant category codes?

12           MS. DEININGER:  Objection.

13           THE COURT:  OK.  Now I do understand.  I will allow

14  that.

15  Q.  You can go ahead, Mr. Elliott.

16  A.  And can -- sorry.  Just restate it one more time?

17  Apologies.

18  Q.  The question was, to your knowledge, does Visa have the

19  ability to influence the creation of merchant category codes?

20  A.  It does, yes.

21  Q.  I'd like to return to the Global Protection Program guide

22  that you reviewed with Ms. Deininger and Mr. Burck, which is

23  Government Exhibit 2203, Section 4.4, on page 14.  This is the

24  section on illegal or miscoded gambling transactions, right?

25  A.  I have it now.  Yes.

L3HAWEI2ps                        Elliott - Cross

1           MR. HARID:  Mr. McLeod, can you close that out,

2     please.

3     Q.  Mr. Elliott, do you see the section that identifies MCC

4     7995?

5     A.  I'm looking at the table?

6     Q.  Correct.  Correct, yes.

7     A.  Yes, I do see that.

8     Q.  7995 is a mandatory MCC for online gambling.  Right?

9     A.  It is.

10    Q.  And that code is blocked by U.S. issuers, right?

11          MS. DEININGER:  Objection, foundation.

12    Q.  U.S. issuing banks?

13          THE COURT:  Sustained.  Lay a foundation.

14    Q.  Do you know what approach issuing banks in the United

15    States take to that specific MCC code?

16    A.  I do.

17    Q.  And what is that approach?

18    A.  The majority of the U.S. issuers will block offshore online

19    gambling transactions.

20          MR. HARID:  You can close out of that, Mr. McLeod.

21          Same document, please, same section.

22    Q.  At the bottom of the page, do you see the paragraph

23    beginning "in December 2014," and then "intrastate gambling"?

24    A.  I'm looking at the -- I'm on page 14.  It says "United

25    States Only"?  Is that what you're --

L3HAWEI2ps                    Elliott - Cross

1   Q.  Correct.  Can you read that paragraph, please, for the
2   jury.
3   A.  Yes.  "In December 2014, three new MCCs (7800, 7801, 7802)
4   were introduced in the U.S. for legal gambling transactions.
5   The new MCCs were implemented to help issuers capture volume
6   from recently legalized intrastate gambling."
7   Q.  So what that means is that those three MCCs were introduced
8   into the system by Visa in December 2014, right?
9             MS. DEININGER:  Objection, misleading.
10            THE COURT:  Slightly misleading.  Why don't you
11  rephrase.
12  Q.  Mr. Elliott, based on what you see here, do you agree that
13  Visa and ISO introduced those three new MCCs -- 7800, 7801, and
14  7802 -- in December of 2014?
15  A.  We did.
16  Q.  And those three MCCs correspond to very specific
17  activities, right?
18  A.  Are --
19  Q.  Let me just direct you to the following page.  Do you see
20  the table that identifies what each MCC is associated with?
21  A.  I do.
22  Q.  And so MCC 7800 codes government-owned lotteries, right?
23  A.  It does.
24  Q.  And 7801 is the applicable code for government-licensed
25  casinos, right?

1    A.  It is.

2    Q.  And 7802 is the applicable code for government-licensed

3    horse and dock racing, right?

4    A.  It is.

5    Q.  I'd like to just get a better understanding of how MCC 7995

6    works, if I may.  Assuming I'm a U.S. cardholder and the

7    merchant, gambling merchant, is based in Europe, and the

8    issuing bank is based in Europe, that code would be -- that

9    transaction would be coded 7995.  Right?  Online gambling?

10   A.  It should be if the cardholder in the -- pardon me.  I

11   think I heard you say if a cardholder and a merchant were in

12   Europe, they would both be in 7995.  And that's generally true.

13   Q.  Assuming the cardholder was in the U.S., would it still be

14   7995?

15   A.  Oh, wait.  I -- I'm getting confused.  Back up.  I'm sorry.

16   Can you describe where the merchant and the acquirer are one

17   more time?

18   Q.  The cardholder is in the U.S.  The merchant is in Europe.

19   It's a Europe-licensed online gambling merchant.  And the

20   issuing bank is in Europe.  Right.  That transaction would be

21   coded 7995?

22   A.  It -- well, let's just say this.  If the merchant is a

23   gambling merchant and it's based in Europe, then it should be

24   in 7995.

25   Q.  Right.  And if the issuing bank was a European issuing

L3HAWEI2ps                     Elliott - Cross

1    bank, that transaction would go through, right?

2              MS. DEININGER:  Objection, foundation.

3              THE COURT:  Sustained.

4    Q.  Mr. Elliott, you recall testifying moments ago that the

5    code 7995 is blocked by U.S. issuing banks, right?  By most

6    U.S. issuing banks.

7    A.  It is.

8    Q.  Do you also recall --

9    A.  If I may --

10   Q.  There is no pending question.  I think minimum time is

11   limited?

12   A.  I think -- I do need to clarify, sir.  There's a --

13             THE COURT:  We'll give you a brief moment to clarify.

14   Go ahead.

15             THE WITNESS:  What I want to say, to give a complete

16   answer, is that when it's a card-not-present transaction in

17   7995, the U.S. issuers generally block all of those because it

18   would appear that they're offshore illegal transactions.  7995

19   card-present transactions where the cardholder is physically

20   present in, say, Las Vegas or New Jersey, those largely get

21   approved because they know there's no risk of possible

22   illegality.

23             THE COURT:  All right.  Put another question.

24   BY MR. HARID:

25   Q.  Mr. Elliott, do you recall testifying yesterday that there

L3HAWEI2ps                    Elliott - Cross

1    is no MCC code for illegal industries or illegal products?

2    A.   I do.

3    Q.   We just established that there is a specific code for

4    illegal online gambling, which is 7995?

5            MS. DEININGER:  Objection, misleading.

6            THE COURT:  Well, it's, as phrased, it's not a

7    question, it's a statement.  So the objection is sustained on

8    that ground.

9    Q.   Mr. Elliott, do you agree that there is a specific

10   mandatory code for illegal online gambling?

11           MS. DEININGER:  Objection.

12           THE COURT:  Overruled.

13   A.   Can I answer that?

14   Q.   You can go ahead, yes.

15   A.   No, I don't agree that there is an MCC for illegal online

16   gambling.  And it gets back to the point I made earlier.  Our

17   rules say the transactions must be legal in buyer and seller's

18   jurisdiction.  And in fact online gambling is absolutely legal

19   in many jurisdictions around the world, including Europe.  So

20   it's very normal and acceptable for online gambling in Europe

21   and other countries to be in 7995.

22           So 7995 has never been for illegal transactions.  It's

23   for legal transactions.

24           THE COURT:  Mr. Elliott, Mr. Elliott, I think you've

25   answered the question.

L3HAWEI2ps                         Elliott - Cross

1           Go ahead.

2    BY MR. HARID:

3    Q.  You told Mr. Burck earlier that, you said you were familiar

4    somewhat with Circle.  Is that correct?

5    A.  Yes.  I had a slight knowledge of it.

6    Q.  And you're aware of their digital wallet?

7    A.  I'm not fully aware of their business model or how they

8    operate.

9    Q.  I'd like to turn to Government Exhibit 2207, which was the

10   Visa data standards manual.  Mr. Elliott, are you familiar with

11   this document?

12          MS. DEININGER:  Objection.  It isn't in evidence.

13          MR. HARID:  I will offer it.

14   Q.  Mr. Elliott, are you familiar with this document?

15          You can go ahead.

16   A.  I didn't hear the judge's response.

17          THE COURT:  Well, the last thing I heard was that

18   defense counsel offered the document, but I haven't heard any

19   response from the government.

20          MS. DEININGER:  No objection.

21          THE COURT:  Received.

22

23          (Defendant's Exhibit 2207 received in evidence)

24          MR. HARID:  I'd like to offer Government Exhibit 2207

25   into evidence.

L3HAWEI2ps                    Elliott - Cross

1           Can we please turn to page 79.  79.  Can we please

2    blow up the section that says 6540, nonfinancial

3    institutions -- stored value purchase card.

4    Q.  Mr. Elliott, can you please read the paragraph beginning

5    "this MCC."

6    A.  Sure.  One moment.

7           "Nonfinancial institutions -- stored value card

8    purchase/load."

9           It reads, "This MCC must be used for the initial

10   purchase and/or any subsequent reloads of stored value cards

11   (including Visa prepaid cards) occurring at nonfinancial

12   institutions.  This MCC is not applicable for use with staged

13   digital wallet operators."

14   Q.  I'd like to turn to the Visa rules.  That's Government

15   Exhibit 2208, which you reviewed yesterday.  If we could turn

16   to page 338 of the PDF, table 5-1.

17          Mr. Elliott, have you seen this table before?

18   A.  I'm not there yet.  You said 2208?

19   Q.  Correct, yes.

20   A.  That's 2202.  One moment, please.

21          OK.  I'm looking at the Visa core rules of Visa

22   product and service rules?

23   Q.  That's right.

24   A.  Is that it?

25   Q.  That's right.

L3HAWEI2ps                    Elliott - Cross

1    A.  OK.

2    Q.  Page 338.

3    A.  338.  Sorry.  One minute.

4            I'm looking at something that says "Table 5-1."

5    Q.  Yes.  That's right.  That's right.

6            Do you see the column that says "MCC"?

7    A.  I do, yes.

8    Q.  And you see the column that says "Use"?

9    A.  I do, yes.

10   Q.  And can you read what's below "Use."

11   A.  "Funding the wallet before the cardholder makes the

12   purchase."

13   Q.  What this appears to show, Mr. Elliott, is that there are

14   applicable MCC codes for staged digital wallet transactions,

15   right?

16           MS. DEININGER:  Objection.  He's testifying.

17           MR. HARID:  A leading question, your Honor.

18           THE COURT:  Well, putting aside that I don't really

19   understand either the objection or counsel's response to the

20   objection, the objection is overruled.

21   Q.  You can go ahead, Mr. Elliott.

22   A.  Do you want to repeat it?

23   Q.  Based on your review of this table, do you agree that there

24   appear to be prescribed MCCs for staged digital wallet

25   transactions?

L3HAWEI2ps                    Elliott - Cross

A.  So the MCC column gives instructions on merchant category

codes to be used under three circumstances: for account

funding, there is MCC 6051; if the funds will be cued for a

high-brand risk transaction, then the applicable high-brand

risk MCC; and then if the funds are used for a gambling

transaction.  So there are three different indicators.

Q.  So in the case of a staged wallet transaction, the

applicable MCC would either be 6051 or the applicable

high-brand risk MCC.  Right?  Or the applicable gambling MCC.

Right?

A.  Generally speaking, it should be.  However, I would say

this.  The whole notion of staged digital wallets and that

business model is new.  And without knowing the use case of the

specific merchant, how they operate, what they do, whether it's

truly a staged digital wallet or not, I really couldn't tell

you much further -- what specific MCC should be used.

Q.  You would agree that Circle, at least to your knowledge, is

a staged digital wallet?

          MS. DEININGER:  Objection.

          THE COURT:  Sustained.  I think you need to move on.

He has already indicated that he has only modest information on

this.

          MR. HARID:  Sorry, your Honor?

          THE COURT:  I think you need to move on.  He's

already -- he's already indicated he has only minimal knowledge

L3HAWEI2ps                    Elliott - Cross

1   in this area.

2              MR. HARID:  I understand.  Thank you.

3   BY MR. HARID:

4   Q.  Mr. Elliott, you told Mr. Burck that the word "marijuana"

5   doesn't appear anywhere in the Global Brand Protection Program

6   guide, yes?

7   A.  I believe I said we didn't specifically refer to cannabis

8   in a specific section.

9   Q.  Or anywhere in the GPB Program guide.

10  A.  To the best of my knowledge --

11  Q.  It's yes or no.

12  A.  I thought I heard somebody objecting.  I'm sorry.  To the

13  best of my knowledge, I don't know it is in there.  No, I don't

14  think we put that specific word in there.

15  Q.  And what you told Mr. Burck was that it's not the primary

16  focus of the program.  Right?

17  A.  It's not -- what I told him is, we used a risk-based

18  approach and it's not one of the high-priority segments at this

19  time.

20  Q.  Yesterday, when you discussed proactive testing and test

21  transactions, you testified that Visa uses vendors to smoke out

22  illegal transactions, right?

23  A.  Yes.  I did testify that we use vendors to conduct test

24  transactions of various entities.

25  Q.  And you said it was a risk-based approach to testing.

```
 1   A.  I did, yes.

 2   Q.  And you said the entities that are tested are the ones that

 3   present the most significant threat to the payment system.

 4   A.  I did say that, yes.

 5   Q.  And you testified both yesterday and today that Visa does

 6   not proactively test marijuana websites.  Right?

 7   A.  They're not one of our proactive segments at this point.

 8   Q.  So based on the omission of marijuana in the GBP guide and

 9   based on the lack of proactive testing that Visa does for

10   marijuana, would it be fair to say that marijuana is not a

11   significant threat to the payment system?

12   A.  No, I wouldn't go that far.  We have a catchall phase.  We

13   don't allow anything illegal.  And so the last sentence in our

14   guide, the guide that you questioned me on or your fellow

15   lawyer questioned me on, we had a catchall phrase to basically

16   say anything else that's illegal.  And so given our limited

17   resources, we do go after the greatest risk --

18   Q.  Mister -- I think that's enough.

19   A.  -- to not have any illegal activity in the system.

20            THE COURT:  Counsel, how much more do you have?

21            MR. HARID:  About a minute.

22            Can you show the witness Government Exhibit 2228.

23   Second page, please.

24   Q.  Can you see the name under "Acquirer Name"?

25   A.  I just want to make sure we're looking on the same page,
```

L3HAWEI2ps                         Elliott - Cross

1    sir.  Is this the GBPP detail?

2    Q.  No.  Government Exhibit 2228.

3    A.  I'm looking at -- it says Government Exhibit 2228.  It says

4    "GBPP details brand-protection identification management."  I

5    understand.  Is that correct?

6    Q.  Yes.  Right.

7    A.  OK.  I got it.

8    Q.  And what's the name under Acquirer Name?

9    A.  Let me find it.  One moment.

10   Q.  Under "Acquirer Information"?

11   A.  That's on page 2, the name is Emerchantpay Limited.

12   Q.  Right.

13            MR. HARID:  And, Mr. McLeod, if you could close out of

14   that, please.

15   Q.  The section under NCA Information.  What does it say under

16   Regional Recommendation?

17   A.  It says "Waive."

18   Q.  And under "waived amount"?

19   A.  25,000.

20   Q.  Does that mean the fine was -- the recommended amount was

21   not paid?

22   A.  What that indicates is that Visa did not assess the

23   acquirer a $25,000 noncompliance assessment.

24            MR. HARID:  Thank you.  No more questions.

25            THE COURT:  Redirect.

L3HAWEI2ps                    Elliott - Redirect

1    REDIRECT EXAMINATION

2    BY MS. DEININGER:

3    Q.  Good morning, Mr. Martin.

4    A.  Good morning.

5    Q.  I'd like to start by drawing your attention to Government

6    Exhibit 2227.  Do you have that in front of you?

7            MS. DEININGER:  And Mr. Levine, that's in evidence.

8    If you can pull it up for everyone to look at.

9    A.  I do have it.

10   Q.  OK.  So this is the cable of the merchants that related to

11   either eaze.com or eazewellness.com that were terminated as a

12   result of a Visa inquiry.  Right?

13   A.  It is.

14   Q.  So focusing just on the merchant name, do any of those

15   contain the word "ease" in them?

16   A.  No.

17   Q.  Generally in your experience, is blocking a particular

18   merchant name, is that an effective way of keeping a merchant

19   from conducting illegal business in the Visa system?

20   A.  No.

21   Q.  Why not?

22   A.  Because the merchant name field can be manipulated

23   actively.  And it's not a viable way of keeping a problematic

24   entity out of the system.

25   Q.  Can merchants change their name?

L3HAWEI2ps                          Elliott - Redirect

1   A.  They can, yes.

2   Q.  And now looking at the merchant URL column, there are two

3   URLs there, eaze.com and eazewellness.com.  Do you see that?

4   A.  I do, yes.

5   Q.  Are merchant URLs submitted to Visa as part of transaction

6   information?

7   A.  To my knowledge, no.

8   Q.  Does Visa have the ability to put in place a block for a

9   merchant URL?

10  A.  No.

11  Q.  And would it be effective for Visa to put in a general

12  block for all merchants containing the word "ease"?

13          MR. BURCK:  Objection, your Honor.

14          THE COURT:  Overruled.

15  Q.  You can answer, Mr. Elliott.

16  A.  Can you just restate it one more time?  Sorry.

17  Q.  I'll restate.  Would there be any issues if Visa attempted

18  to put in place a block that just blocked all merchants with

19  the word "ease" in their name?

20  A.  It would be impractical and not possible.

21  Q.  And in particular why would it be impractical?

22  A.  Well, because the way the name descriptor in the

23  transaction information flows, it would have to presuppose that

24  we would know every instance that an acquirer would be using

25  the name Eaze, and what I mean by that is, every acquirer --

1   and this is where it gets confusing -- has an individual bank

2   identification number.  Every one of those would have to be

3   blocked.  And on top of it, we would have to know that that was

4   the actual entity that we intended to block and not somebody

5   else that had a similar name.

6   Q.  And could it end up potentially blocking legitimate

7   merchants?

8   A.  It could, but, you know, keep in mind I think it's very

9   important to understand that Visa does not sign these

10  merchants.  And so there are hundreds of acquiring banks around

11  the world that sign merchants, and so the block or stop should

12  start with those acquirers, not at the Visa network.

13  Q.  OK.  So looking back at the Exhibit 2227, I think you

14  testified that to the best of your understanding, after these

15  merchants were terminated, Visa had no knowledge of Eaze

16  transacting through the system.  Is that right?

17  A.  We did not, no.

18  Q.  And does this list all of the merchant names that Visa

19  identified as being associated with eaze.com in 2019?

20  A.  These are the names that we were aware of in 2019 through

21  our program, yes.

22  Q.  And these were all terminated, correct?

23  A.  To the best of our knowledge, they were terminated, and

24  that was what was communicated to us by the acquirer.

25  Q.  And you also said that recently you became aware of --

L3HAWEI2ps                    Elliott - Redirect

1    because of a referral from Bank of America, that Eaze may be

2    transacting through the network.  Is that correct?

3    A.   That is.

4    Q.   And after you got that referral, what steps has Visa taken?

5    A.   Visa is in the process of investigating that now with the

6    acquiring bank in the region where it's occurred.

7    Q.   And if it's determined that those are illegal marijuana

8    transactions that are being processed through these networks,

9    what steps will Visa take?

10   A.   Well, we would go through and apply the traditional Global

11   Brand Protection Program process and expect that Eaze be

12   terminated.

13   Q.   All right.  Switching to a different topic for a minute,

14   you looked at some issues briefs regarding Visa's marijuana

15   position.  Do you recall that?

16        I just want to ask you generally that.  I don't want

17   to pull the document.

18   A.   I do, yes.

19   Q.   And those were internal documents, but they had a key

20   statement, right?

21   A.   They did, yes.

22   Q.   And that statement, that was intended to be a response to

23   any public inquiries regarding marijuana.  Is that correct?

24   A.   That was a public response to any media inquiries or also

25   when client banks had questions.  That's our position.

L3HAWEI2ps                    Elliott - Redirect

1    Q.  So that's a public position Visa took, right?

2    A.  Well, it's an internal memo, but it is intended to share

3    with our client banks so I guess would be public and any media

4    inquiries that we responded to.  That's what we would say to

5    them, yes.

6    Q.  And we also looked yesterday at a presentation Visa gave at

7    a Visa security summit.  Do you recall that?

8    A.  I do, yes.

9    Q.  And that was the summit at which acquiring and issuing

10   banks were invited to attend.  Do you remember that?

11   A.  I do, yes.

12   Q.  And so all of this, are these elements, are these part of

13   the Global Brand Protection Program's proactive component?

14   A.  Are they part of the proactive component?  Well, when I

15   talk about the proactive component, I'm talking about --

16   Q.  Let me rephrase.  I think you mentioned before that the

17   Global Brand Protection Program has a proactive educational

18   component?

19   A.  It is part of the educational component, yes.

20   Q.  And that educational component aims to make acquirers and

21   issuers aware of Visa's positions on its rules?

22   A.  It is.

23   Q.  And in coming up with its position regarding marijuana, did

24   Visa consider state laws legalizing marijuana?

25   A.  We did, yes.

L3HAWEI2ps                    Elliott – Redirect

1   Q.  And did it generally consider guidance issued by the

2   federal government for banks related to marijuana?

3   A.  We did, yes.

4   Q.  And did it also consider the federal law prohibiting

5   marijuana sales?

6   A.  We did, yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HPWEI3                          Elliott - Redirect

1  Q.  And so Visa took all of that into account in coming up with

2  its position regarding marijuana transactions?

3  A.  We did, yes.

4  Q.  And just to be clear, Visa's position is that marijuana

5  transactions are prohibited because they are still illegal

6  under federal law; is that correct?

7  A.  Our marijuana transactions are prohibited in U.S. based on

8  federal laws, yes.

9  Q.  Are there any exceptions to that position?

10 A.  Any exceptions?  No, not in the U.S., no.

11         THE COURT:  Counsel, how much more do you have?

12         MS. DEININGER:  Permission to ask two more questions?

13         THE COURT:  Okay.

14 Q.  Mr. Elliott, you were asked on cross -- I think you were

15 asked -- you said that one of the central purposes of the

16 merchant name with descriptors is a cardholder reviewing their

17 transactions; is that right?

18 A.  Yes.

19 Q.  Is the merchant name and descriptor also utilized by

20 issuing banks and Visa after the fact, on the back end, when

21 conducting its risk mitigation analysis and investigations?

22 A.  It is, yes.

23 Q.  How so?

24 A.  Well, it's very much the primary way of identifying the

25 entity responsible for those transactions.

L3HPWEI3                     Elliott - Redirect

1            MS. DEININGER:  Thank you.  No further questions, your

2     Honor.

3            THE COURT:  All right.  Thank you very much.

4            Mr. Elliott, you are excused.  Thank you very much.

5            (Witness excused)

6            Ladies and gentlemen, we'll give you your mid-morning

7     break at this time.  I have another matter that I have to take

8     up telephonically; so it will probably be about 20 minutes.

9            (Jury not present)

10           THE COURT:  Please be seated.  Now, over the next 20

11    minutes, I want all cameras removed.  The big screen that's in

12    front of the jury removed.  The camera that's up on the wall

13    removed, everything turned off, nothing in front of anyone,

14    including me, and if that's not done in the next 20 minutes,

15    then you'll need to look and see whether your insurance covers

16    punitive damages.

17           MR. BURCK:  Your Honor?

18           (Recess)

19           (In open court; jury not present)

20           THE COURT:  Please be seated.  There is something that

21    defense counsel wanted to raise?

22           MR. BURCK:  Yes, your Honor.  I'm sorry.  Your Honor,

23    I just wanted to -- can you hear me okay, your Honor?

24           THE COURT:  Yes.

25           MR. BURCK:  I just wanted to re-raise it's Akhavan

1    5014.  And, Mr. McLeod, if you could just go to the slide

2    that's titled:  Marijuana sales in the U.S.  Thanks a lot.

3    There it is.

4         Your Honor, we offered this document into evidence

5    because the timing of the document was -- we thought, was very

6    relevant because it was in 2019.  The witness had testified

7    about a colleague making a presentation about the same topic,

8    and this was the -- Martin Elliott was the guy actually giving

9    this presentation.

10        This slide, we thought, was very important because all

11   it's about -- it's not about legislation, it's not about

12   legalization, it's not about federal bills or anything.  It's

13   literally about the size of the business of marijuana in the

14   United States, and the --

15        THE COURT:  Why isn't it hearsay?

16        MR. BURCK:  Well, your Honor, this goes purely to the

17   state of mind.  This has nothing to do --

18        THE COURT:  State of mind of this -- to be continued.

19        THE DEPUTY CLERK:  Jury entering.

20        (Jury present)

21        THE COURT:  Get the next witness or the previous

22   witness on the stand.

23        Please be seated.

24        I want to note for the record that juror No. 12 is a

25   close competitor of juror No. 5.  All right.  Go ahead,

L3HPWEI3                          Cozzetto - Direct

1    counsel.

2     DARCY COZZETTO, (Resumed)

3    DIRECT EXAMINATION (RESUMED)

4    BY MS. DEININGER:

5    Q.  Good morning, Ms. Cozzetto.

6    A.  Good morning.

7    Q.  You can hear me okay?

8    A.  Yes.  Thank you.

9    Q.  Before we broke yesterday, you were testifying about a

10   meeting that you attended in March 2018 in Calabasas with Ray

11   Akhavan; do you recall that?

12   A.  Yes.

13   Q.  And you said there were several different topics discussed

14   in this meeting, one of which was high-risk credit card

15   processing; is that right?

16   A.  Yes.

17   Q.  And I think you were testifying about how Mr. Akhavan had

18   described the relative risk to different people in the room.

19   How for the dispensaries, there was close to zero, but for

20   himself, it was, I think you said, closer to ten, like an eight

21   or a nine; is that correct?

22   A.  Yes.

23   Q.  And what, again, was your understanding of what risk he was

24   referring to at that moment?

25   A.  My understanding of the risk that he was referring to on

L3HPWEI3                        Cozzetto - Direct

1    the scale off one to ten was the risk of getting caught.

2    Q.  And so then I think you said the next topic that got

3    discussed at that meeting was generally kind of next steps and

4    a Q and A; is that right?

5    A.  Yes.

6    Q.  So what did Ray say during that meeting about next steps?

7    A.  He had said that he needed one point of contact from Eaze

8    and the dispensaries if we decided to move forward, and then he

9    mentioned that kind of his contact would reach out to us.  We

10   shouldn't be contacting them.

11   Q.  And what was your -- was it decided who would -- the one

12   point of contact would be?

13   A.  Yes.

14   Q.  Who was that?

15   A.  Jim decided that would be me.

16   Q.  Did that happen at the time of the meeting?

17   A.  I believe so, yes.

18   Q.  And did Ray say anything to you about who would make

19   contact with you?

20   A.  He mentioned that there was a gentleman who was, if I

21   recall correctly, the president of a German bank, and that this

22   gentleman had been terminally ill and had used cannabis as

23   medicine, and that that gentleman wanted to help Eaze.  And it

24   was my understanding at that time that that gentleman would be

25   reaching out.

L3HPWEI3                          Cozzetto - Direct

1    Q.  And did Ray say anything about why that gentleman would be

2    reaching out?  Would he be providing anything?

3    A.  Yes.  The gentleman would be providing credit card

4    processing applications to me to send to the dispensaries.

5    Q.  And during that meeting, did Ray say anything about what

6    should be done with those applications?

7    A.  He did, yes.

8    Q.  What did he say?

9    A.  He said to the dispensaries that they should fill

10   everything out, and be as honest as possible and as truthful as

11   possible in the application.

12   Q.  And did he say why they should do that?

13   A.  He said that they wouldn't know what happened to the

14   applications after, and if they were truthful, that they could

15   honestly say that they had submitted truthful information.

16   Q.  And what was your understanding of why that was important?

17   A.  My understanding was that the applications may have been

18   changed after they were submitted and possibly shown as not

19   being in the cannabis industry.

20   Q.  And so why -- what benefit was there to the dispensaries in

21   making sure that they filled them out honestly?  What was your

22   understanding of that?

23   A.  My understanding was that the dispensaries would then

24   maintain a low level of risk, I guess, of getting caught.

25   Q.  I think you testified yesterday that you do recall one of

L3HPWEI3                    Cozzetto - Direct

```
 1   Ray's associates being at the meeting; is that correct?
 2   A.  Yes.
 3   Q.  And I think you said that the next phase of the meeting was
 4   kind of a milling, social phase; is that correct?
 5   A.  Yes.
 6   Q.  Did you meet one of Ray's associates during that phase of
 7   the meeting?
 8   A.  Yes, I did.
 9   Q.  Do you remember his name?
10   A.  No, I do not.
11   Q.  Can you describe him?
12   A.  I remember he was -- it was a man, and he was in his 30s or
13   40s, kind of a square-shaped head.
14   Q.  Did you learn anything about his nationality?
15   A.  I remember thinking he was German.  I think he had an
16   accent that I placed as German, in my mind.
17   Q.  Did Ray provide you with any contact information at that
18   meeting?
19   A.  Yes.  During the kind of closing, milling-about session,
20   Nick Fasano and I walked up to him and thanked him for his
21   time, and then Nick and Ray and I exchanged contact
22   information.
23   Q.  And what contact information did Ray provide to you for
24   himself?
25   A.  He provided his phone number, and we had asked for e-mail,
```

1   which he eventually provided as well.

2   Q.  And what was the e-mail address he provided?

3   A.  I don't remember the full e-mail, but I do remember it had

4   "jawbreaker" in it.

5   Q.  And what, if anything, did Ray tell you about how he would

6   like to communicate with you going forward?

7   A.  He asked to be communicated with via Telegram.

8   Q.  Did he say why?

9   A.  No, I don't believe he said why.

10  Q.  So, Ms. Cozzetto, switching topics for a moment, I want to

11  ask you some questions about why you're here today.  Are you

12  testifying pursuant to an immunity order?

13  A.  Yes.

14  Q.  And what is your understanding of the purpose of the

15  immunity order?

16  A.  My understanding is that it's an order to come here and

17  share my version of the events.

18  Q.  Does that mean that you've been ordered to testify here

19  yesterday and today?

20  A.  Yes.

21  Q.  And does the order protect you from what you say here today

22  being used against you?

23  A.  That's my understanding, yes.

24  Q.  Does the order provide you immunity from prosecution in

25  general?

L3HPWEI3                         Cozzetto - Direct

1   A.   No, it does not.

2   Q.   So even with this immunity order, can you still be

3   prosecuted for the criminal activity you've been asked about

4   here today and yesterday?

5   A.   My understanding is yes.

6   Q.   Do you understand that you are under oath and required to

7   tell the truth?

8   A.   Yes.

9   Q.   Does the order protect you from being prosecuted for

10  perjury if you lie here today?

11  A.   No, it does not.

12  Q.   Okay.  So going back to the Eaze credit card processing

13  scheme, what role did you play, if any, in Eaze's processing of

14  credit and debit card payments after the March 2018 meeting?

15  A.   After the meeting, I was essentially a liaison between Eaze

16  and Ray to set up the EUP processing solution.

17  Q.   Did you also work with the dispensaries?

18  A.   Yes, I did work with the dispensaries.

19  Q.   And what was -- in what role?

20  A.   Also as a liaison between the dispensaries and Eaze and

21  Ray.

22  Q.   And I think you mentioned you were also a liaison with,

23  among other parties, EUprocessing, right?

24  A.   Yes.

25  Q.   Who was your first point of contact at EUprocessing?

1    A.  My first point of contact at EUprocessing was a gentleman

2    named Andreas.

3    Q.  And how did you get in touch with him?

4    A.  A few weeks after the meeting in Calabasas, I received an

5    e-mail from Andreas with the blank credit card processing

6    application.

7    Q.  And I think you said that was an e-mail?

8    A.  Yes.

9    Q.  Do you remember what e-mail address it came from?

10   A.  No, I do not.

11   Q.  Do you remember, was it a ProtonMail e-mail address?

12   A.  I believe so, yes.

13   Q.  Did you ever meet Andreas in person?

14   A.  No, I did not.

15   Q.  Did you ever talk to Andreas on the phone?

16   A.  No, I did not.

17   Q.  Did you ever learn a last name for Andreas?

18   A.  Not that I recall.

19   Q.  So did you know who was actually writing e-mails that you

20   believed were from Andreas?

21   A.  No.

22   Q.  You received a number of e-mails from -- did you receive --

23   sorry.

24            Did you receive more than one e-mail from the e-mail

25   address that you believed to be related to Andreas?

1   A.  Yes, I did.

2   Q.  And were those e-mails always -- always signed as coming

3   from Andreas?

4   A.  No, they weren't.

5   Q.  Did that change over time?

6   A.  Yes, it did.

7   Q.  How so?

8   A.  Eventually, the signature just became the initials EUP.

9   Q.  Did Ray ever mention the name Ruben to you?

10  A.  Yes, he did.

11  Q.  What did he say about Ruben?

12  A.  What I remember is, at the beginning, I think possibly even

13  at the meeting in Calabasas, he mentioned that Ruben would be

14  the main point of contact on his side.

15  Q.  And then do you recall whether you were actually ever in

16  contact with Ruben?

17  A.  What I remember is reaching out to someone named Ruben on

18  Telegram but not getting a response.

19  Q.  Mr. Levine, can you show Ms. Cozzetto what has been marked

20  for identification as Government Exhibit 715.

21          Ms. Cozzetto, do you recognize this?

22  A.  Yes.

23  Q.  Is this an e-mail exchange that you participated in?

24  A.  Yes.

25          MS. DEININGER:  Your Honor, the government offers

1    Government Exhibit 715 into evidence.

2              MR. GILBERT:  Previous objection noted.

3              MR. TAYBACK:  Join.

4              THE COURT:  Overruled.

5              (Government's Exhibit 715 received in evidence)

6              MS. DEININGER:  So, Mr. Levine, if you can scroll down

7    to page 3 in this e-mail chain.

8    BY MS. DEININGER:

9    Q.  And so looking -- Ms. Cozzetto, looking at this e-mail at

10   the bottom, on -- that was on May 16th, 2018; do you see that?

11   A.  Yes.

12   Q.  All right.  Who does it say wrote this e-mail?

13   A.  EUP.

14   Q.  And what e-mail address are they using?

15   A.  EUprocessing@ProtonMail.com.

16   Q.  And when you read EUP before, were you looking down at the

17   bottom at the signature?  How was this e-mail signed?

18   A.  Yes, I'm looking at the bottom on the signature.  "All my

19   best, EUP" is how it's signed.

20   Q.  Okay.  And so we can look to the e-mail now just above

21   that.  It's also on May 16, 2018.  Do you see that?

22   A.  Yes.

23   Q.  Is that an e-mail you wrote?

24   A.  I'm sorry, can you ask that again?

25   Q.  That's an e-mail you wrote?

L3HPWEI3                          Cozzetto - Direct

1   A.  Yes, it is.

2   Q.  And what was the name of the person you believed you were

3   writing to?

4   A.  Andreas.

5   Q.  So looking just at the second paragraph now, it starts with

6   "Attached please find."  Can you read the first two sentences

7   there?

8   A.  "Attached please find the information that you requested.

9   I do not have the bank account information from Caliva, as they

10  are in the process of setting up a new account that has a name

11  not attached to cannabis."

12  Q.  So looking at that second sentence, you say that "Caliva is

13  in the process of setting up a new account that has a name not

14  attached to cannabis."  What was your understanding of why they

15  were doing that?

16  A.  My understanding was that they needed a bank account not

17  attached to cannabis in order to receive the money from

18  processing credit cards.

19  Q.  And why was that?

20  A.  My understanding was that if the banks or the credit card

21  companies found out that Caliva was associated with cannabis,

22  that they would shut down the solution.

23  Q.  Did anyone instruct you to have the dispensaries set up

24  bank accounts not connected to cannabis?

25  A.  Yes.

L3HPWEI3                    Cozzetto - Direct

1   Q.  Who?

2   A.  Ray.

3   Q.  So now, if we can go up to the first page of this document.

4   There's a May 17, 2018, e-mail at 12:13 a.m. sent by the

5   EUprocessing@ProtonMail.com address; do you see that?

6   A.  Yes.

7   Q.  Can you read the body of that e-mail?

8   A.  "Hey, all.  For swift wires an address is, in many cases

9   needed.  So it is important we don't use the physical address

10  of the dispensary but the address of the company that holds the

11  bank account line 'account name.'  Best."

12  Q.  And so what was your understanding of why it was important

13  that we don't use the physical address of the dispensary, but

14  use the address of the company that holds the bank account?

15  A.  My understanding was in case someone at the banks or the

16  credit card -- the credit card companies Googled the address

17  and found a link to cannabis.

18  Q.  And why would it be a problem if they found a link to

19  cannabis?

20  A.  My understanding was because it was illegal to process

21  cannabis transactions.

22  Q.  So now, let's go up to the very top of this e-mail

23  exchange.  And just looking at this e-mail, this e-mail is sent

24  to you, right?  Your name is on the "to" line?

25  A.  Yes.

1   Q.   And then also on the "to" line is someone named

2   Michele@spinwild e-mail address; is that correct?

3   A.   Yes.

4   Q.   The e-mailed is signed as being written by someone named

5   Patrick; is that right?

6   A.   Yes.

7   Q.   And that is a person using the e-mail Frenchyesq?

8   A.   Yes.

9   Q.   So we look at the "cc" line.  It looks like this e-mail

10  also went to someone called GZman.  What's your understanding

11  of who was using the e-mail GZman?

12  A.   My understanding was that was Guy.

13  Q.   And then it also looks like it went to jawbreaker 13.  Who

14  did you understand to use the jaw breaker 13 e-mail address?

15  A.   My understanding is that was Ray.

16  Q.   So the last e-mail on this, in this header information, is

17  Andreas/EUprocessing, but can you look down and can you read

18  the greeting there?

19  A.   "Hi Ruben."

20  Q.   We can take this down, Mr. Levine.  Mr. Levine, can you now

21  show just Ms. Cozzetto what's been marked as Government

22  Exhibit 458.

23        Ms. Cozzetto, do you recognize this?

24  A.   Yes.

25  Q.   And what is it?

L3HPWEI3                        Cozzetto - Direct

1    A.   This is an e-mail chain that I participated in

2    while working at Eaze.

3            MS. DEININGER:  Your Honor, the government offers

4    Government Exhibit 458 into evidence.

5            MR. GILBERT:  Previous objection noted.

6            MR. TAYBACK:  Join.

7            THE COURT:  Yes, it's overruled.

8            (Government's Exhibit 458 received in evidence)

9            MS. DEININGER:  Mr. Levine, can you pull up for

10   everyone Government Exhibit 458 and Government Exhibit 715 next

11   to each other.  And now on Government Exhibit 458, if we can go

12   to the e-mail that's at the bottom of the second page.

13   BY MS. DEININGER:

14   Q.   Okay.  Ms. Cozzetto, do you see the e-mail at the bottom

15   of -- Mr. Levine, if you cannot zoom in.  If we can leave the

16   pages up.

17           Do you see the e-mail at the bottom of Government

18   Exhibit 458 and also the e-mail at the top of Government

19   Exhibit 715?

20   A.   Yes.

21   Q.   Are those the same?

22   A.   Yes, I believe so.

23   Q.   So is it fair to say that Government Exhibit 715 is a

24   continuation of that same e-mail exchange?

25   A.   Yes, I think so.

L3HPWEI3                     Cozzetto - Direct

1   Q.  Okay.  So now, let's just go -- sorry.  It's Government

2   Exhibit 458 that's the continuation; is that right?  It has the

3   response after the e-mail we just looked at?

4   A.  Yes.

5   Q.  So now, looking just at Government Exhibit 458, let's go

6   back up to the e-mail towards the bottom of the first page.  It

7   was sent on May 17th at 9:12 a.m. by you; do you see that?

8   A.  Yes.

9   Q.  And who are you writing to?

10  A.  I'm writing to Guy.

11  Q.  Okay.  And can you read the message you wrote?

12  A.  "Thanks, Guy.  Once the wires have been confirmed for

13  today, can you please let me know?  I realize that the funds

14  won't hit for a few days, but it would be nice to let the

15  depots know when to be expecting the money.  Thank you."

16  Q.  Okay.  If we can zoom out.  I'd like to look at the

17  response just above that.

18          Can you read the greeting in the first two paragraphs

19  of the response?

20  A.  "Hi, Darcy.  Just wanted to keep you in the loop of all the

21  wires taking place.  The second round of settlements to

22  merchants have cleared today.  Ruben will be sent the wire

23  proofs later tomorrow."

24  Q.  And did you respond to that?

25  A.  Yes.

L3HPWEI3                         Cozzetto - Direct

1    Q.  What did you say?

2    A.  "Thank you.  I appreciate the update."

3    Q.  Thank you.

4            Mr. Levine, I'm now going to turn to what's been

5    marked for identification as Government Exhibit 303.

6            Ms. Cozzetto, do you recognize this?

7    A.  Yes.

8    Q.  What is this?

9    A.  This is a Telegram chat that I had with the dispensary

10   owners.

11           MS. DEININGER:  Your Honor, the government offers

12   Government Exhibit 303 into evidence.

13           MR. GILBERT:  No objection.

14           MR. TAYBACK:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibit 303 received in evidence)

17           MS. DEININGER:  Mr. Levine, can you publish Government

18   Exhibit 303 for everyone.  Okay.

19   BY MS. DEININGER:

20   Q.  Ms. Cozzetto, looking at this first page, about a couple of

21   lines from the top there's a name Craig Wald; do you see that?

22   A.  Yes.

23   Q.  Who is Craig Wald?

24   A.  Craig Wald was a dispensary owner of Perennial dispensary.

25   Q.  And then right below that there's Justin S.  Who is Justin

L3HPWEI3                         Cozzetto - Direct

```
 1   S?

 2   A.   Justin S was the general manager of the Natoma dispensary.

 3   Q.   Further down the page, about a third of the way from the

 4   bottom, there's a name Marty Schneider.  Who is Marty

 5   Schneider?

 6   A.   Marty Schneider was the owner of Hometown Heart

 7   dispensaries.

 8   Q.   And, in general, what was the purpose of this -- actually,

 9   we can -- look at the top of the document.  Do you see where it

10   says "Your Telegram history" and "Heads of depots"?

11   A.   Yes.

12   Q.   Did you start this Telegram exchange?

13   A.   Yes, I believe I did.

14   Q.   And what was the purpose of this Telegram, this group?

15   A.   I wanted to be able to contact all of the heads of the

16   dispensaries at the same time, as many of them were asking

17   similar questions.

18   Q.   So now going down to the line from May 17th, 2018, at

19   12:17, do you see that?

20   A.   Yes.

21   Q.   Can you read that message and the two messages you wrote

22   right after that?

23   A.   "The other thing that Ray is suggesting is that each time

24   you get money, your teams create and send an invoice back.  It

25   will help with tracking and ensure that there is an audit trail
```

1    just in case.  I'll get all the details, but I wanted to give

2    you all a heads up."

3    Q.  So what were you referring to here in terms of an invoice?

4    A.  What Ray had asked or what Ray had suggested is that the

5    dispensaries have their teams create an invoice that matched

6    the payment amount that they were receiving on a weekly basis.

7    Q.  And was that invoice going to accurately reflect business

8    transactions that had actually occurred?

9    A.  No.

10   Q.  And what was the purpose of these invoices?

11   A.  The purpose of the invoices was to create a fake audit

12   trail.

13   Q.  And how did you know that was the purpose?

14   A.  Umm.

15   Q.  Did someone tell you?

16   A.  Yes.

17   Q.  Who told you?

18   A.  Ray told me.

19   Q.  Ms. Cozzetto, I'd like to continue reading from where you

20   left off through to the last message from that same day.  You

21   can read everything you wrote, and I'll go ahead and read what

22   is written by the other participants.

23          So starting with that highlighted message from Marty

24   Schneider, he says:  "Monday is good for us."

25          Craig Wald says:  "Monday works."  And Justin S says:

L3HPWEI3                          Cozzetto - Direct

1    "Okay."   And then what do you say?

2    A.  "Thanks guys.  For the invoices here is the 'bill to' info.

3    Spinwild Limited, Suites 41/42 Victoria House, 26 Main Street,

4    GX111AA Gibraltar, awesome@spinwild.xyz, www.spinwild.xyz, tax

5    ID 115894-52."

6    Q.  And you can keep going.

7    A.  "Any chance your teams could turn something around quickly,

8    just an invoice matching the statement you got today."

9    Q.  You can keep going.

10   A.  "Also, John Wang from our team is working on better

11   reporting to help with reconciliation.  Justin from Natoma has

12   agreed to help and we are guinea pig."

13   Q.  And what the next message say?

14   A.  "Re the invoices, it doesn't have to be anything major.

15   It's just additional paperwork for the bank to have.  So your

16   current invoice template with the exact dollars to match the

17   statement would be great.  Thank you."

18   Q.  Craig Wald says:  "The invoices are in Euros.  I will

19   convert to dollars and note on the invoice."

20           And then what do you say?

21   A.  "I believe there's a dollar figure called out, too.  Let me

22   look.  I see.  They don't include all the fees in dollars."

23   Q.  And then what do you say?

24   A.  Then it looks like I put an emoji and then "Thanks Craig."

25   Q.  Craig Wald wrote:  "Invoice sent."

L3HPWEI3                    Cozzetto - Cross

1    A.   "Thank you."

2    Q.   Marty Schneider then wrote:  "Sent mine to Ray."

3    A.   "Thanks Marty."

4              MS. DEININGER:  We can stop there.

5              One moment, your Honor.  No further questions.

6              THE COURT:  Cross-examination.

7    CROSS-EXAMINATION

8    BY MR. TAYBACK:

9    Q.   Ms. Cozzetto, can you hear me?

10   A.   Yes.

11   Q.   If for any reason you can't hear me, let me know.  Okay?

12   A.   Thank you.

13   Q.   My name is Christopher Tayback, and I represent Ray Akhavan

14   in this case.  Now, you just mentioned -- and I believe you

15   looked at a chat.  What was the form of that chat?

16   A.   The chat we just reviewed?

17   Q.   Yes.

18   A.   That was a Telegram chat.

19   Q.   And that was a Telegram chat without Mr. Akhavan

20   interacting with you?  You were talking to other people,

21   correct?

22   A.   Yes.

23   Q.   Was Telegram something you used independent of meeting

24   Mr. Akhavan?

25   A.   Yes, it was.

1   Q.  Now, the invoices you mentioned, do you know whether they

2   were submitted to anybody outside of Eaze?

3   A.  I do not.

4   Q.  You don't know one way or the other, correct?

5   A.  I don't know one way or the other, correct.

6   Q.  And did you keep a record of those invoices, or do you know

7   whether Eaze kept a record of those invoices?

8   A.  I do not know.

9   Q.  One way or the other, you don't know?

10  A.  Correct.

11  Q.  Now, let me go back.  You say your understanding of

12  Mr. Akhavan's role in the credit card processing when you first

13  got involved was that he was to make introductions to people

14  that could be helpful to Eaze?

15  A.  That was my understanding at the beginning, yes.

16  Q.  And that he would act as an intermediary with various

17  participants in the credit card processing world?

18  A.  Yes.

19  Q.  And did he, in fact, do that?

20  A.  Yes, I believe he did.

21  Q.  I mean, to your knowledge, with your involvement with him,

22  he introduced you to other people that do other things that

23  said EUprocessing, for example, correct?

24  A.  Yes.

25  Q.  Now, at the time that you were an employee at Eaze, you

1    were an executive, correct?

2    A.  I was an executive, yes.

3    Q.  What was your title?

4    A.  My title was senior vice president of operations.

5    Q.  And did you report to Mr. Patterson?

6    A.  No, I did not.

7    Q.  To whom did you report?

8    A.  I reported to Nick Fasano.

9    Q.  And was Mr. Patterson CEO at any point in time while you

10   were employed there?

11   A.  Yes, he was.

12   Q.  Was he the CEO for the entire time?

13   A.  Yes, he was.

14   Q.  So in some sense, he was -- you didn't report directly to

15   him but ultimately to him?

16   A.  Nick reported directly to Jim; so yes.

17   Q.  Now, is it fair to say that Mr. Patterson, in your view,

18   was the driver for finding a credit card solution for Eaze?

19   A.  Yes.

20   Q.  It was very important to Mr. Patterson, wasn't it?

21   A.  Yes, it was.

22   Q.  And he expressed that on a number of occasions?

23   A.  Yes, that's my recollection.

24   Q.  In fact, at one point in time, didn't he tell you that

25   credit cards were part of the flywheel to drive revenue and

L3HPWEI3                         Cozzetto - Cross

 1   grow Eaze?

 2   A.  Yes, he mentioned that at an executive meeting.

 3   Q.  And what did you understand him to mean by that?

 4   A.  My understanding was that, you know, a flywheel is

 5   something that gains momentum as it turns, and so credit cards

 6   were an important thing that -- if I recall correctly what Jim

 7   explained, was credit cards can gain us more customers.

 8   Customers can gain us more revenue.  More revenue can gain us

 9   more growth, and the flywheel will continue to improve.

10   Q.  And Mr. Patterson was focused on increasing the revenues at

11   Eaze, correct?

12   A.  Yes.

13   Q.  In fact, Mr. Patterson suggested that Eaze operate on

14   multiple credit card platforms, correct?

15   A.  Yes.

16   Q.  That is to say, in addition to whatever Mr. Akhavan was

17   able to help with, Mr. Patterson was looking to do business

18   with other credit card processors as well?

19   A.  Yes, that's what I recall.

20   Q.  And did you have any role in dealing with other credit card

21   processors besides those that Mr. Akhavan introduced you to?

22   A.  I did not, no.

23   Q.  Was there someone else in the company that was responsible

24   for that?

25   A.  Yes, I believe so.

L3HPWEI3                    Cozzetto – Cross

1    Q.   Who was that?

2    A.   I don't recall exactly, but I believe it was Dan Erickson

3    or John Wang.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HAWEI4ps                    Cozzetto - Cross

Q.  Now, in your interactions with Mr. Akhavan, did he

emphasize that it was important that the banks, the acquiring

banks, knew what it was that they were processing?

          MR. GIBERT:  I'm sorry.  Counsel, it's a little hard

to hear you.

          MR. TAYBACK:  I'm sorry.  Is this better?

A.  Yes.  Thank you.

Q.  Ms. Cozzetto, is it true that during your interactions with

Mr. Akhavan with respect to your time at Eaze, that you

understood him to say that it was important that the acquiring

banks know that they were processing marijuana?

A.  I don't remember that conversation.

Q.  Is it fair to say that Mr. Akhavan stressed to you the

importance that he be honest with the banks that he dealt with?

A.  He stressed to me that it is important that the dispensary

be honest.

          MR. TAYBACK:  May I have a moment, your Honor?

          THE COURT:  Yes.

Q.  Now, at one point when you were at Eaze, you dealt with

another card processor called Card Connect?

A.  Eaze dealt with Card Connect I believe, yes.

Q.  Was that sometimes referred to as First Data?

A.  I don't remember exactly.

Q.  Let me ask you to take a look if you can at Exhibit GX 303,

at page 3.  It's part of that same Telegram chat that you just

L3HAWEI4ps                    Cozzetto - Cross

1    looked at.

2               MR. GIBERT:  I'm sorry, Mr. Tayback.  It's a little

3    hard to hear.

4               MR. TAYBACK:  I'll try to keep my voice up.  Maybe

5    that's a little bit better.

6    Q.  Do you have that document in front of you?

7    A.  Yes, I do.

8    Q.  If I could direct your attention to the middle of page 3 of

9    this document, of this chat, where it says 11.7.2018 at 13:52

10   and 35 seconds, down to 11.7.2018 at 14:50 and 23 seconds.  Do

11   you see that?

12   A.  Yes.

13   Q.  Now, you were making a number of sequential statements

14   here, correct?

15               These are all by you.

16   A.  Yes.  These are all by me.

17   Q.  You indicate to the group that's on this chat, "Hi

18   everyone.  You may have already heard this, but Card

19   Connect/First Data is closing the accounts."  You see that?

20   A.  Yes.

21   Q.  What was happening at this moment in time?

22   A.  Sorry.  Just please let me read this.

23   Q.  Yes.  Please do.

24   A.  Card Connect/First Data was, from what I recall, another

25   processing solution that had come up.  I was informing the

1  dispensaries that Processing Solution was going down, Eaze

2  would be stopping processing on the solution, and that they

3  should be aware that Card Connect/First Data was going to owe

4  the dispensaries money.

5  Q.  And that was of concern to you, correct?

6  A.  I'm sorry?

7  Q.  That was of concern to Eaze.

8  A.  Yes.  That was of concern to Eaze and to me.

9  Q.  You didn't want them to hold the dispensary's money, right?

10 A.  Right.

11 Q.  Now, you go on to say further down that chat, "We are

12 taking the position that First Data is being fraudulent because

13 we were very clear that we were in the cannabis industry."  You

14 see that?

15 A.  Yes.

16 Q.  Now, when you say you were very clear that you were in the

17 cannabis industry, do you know where -- withdraw that.

18        Mr. Akhavan is not affiliated with Card Connect or

19 First Data to your understanding, right?

20        MS. DEININGER:  Objection, foundation.

21        THE COURT:  Sustained.

22 Q.  To your interactions with Mr. Akhavan, you didn't interact

23 with him with respect to the Card Connect/First Data work,

24 correct?

25 A.  Correct.

L3HAWEI4ps                     Cozzetto - Cross

1  Q.  Now, you say that "we are taking the position that First

2  Data is being fraudulent."  You never level -- meant to say

3  that Eaze never leveled that accusation against Mr. Akhavan in

4  connection with the credit card processing work that he was

5  doing, correct?

6  A.  Not to my knowledge.

7  Q.  And -- not to your knowledge, correct?

8          Is that what you said?

9  A.  Yes.  Not to my knowledge.

10  Q.  Now, you sometimes refer to the dispensaries as depots.

11  Right?

12  A.  Yes.

13  Q.  If you could take a look at Exhibit GX 715.

14          Now, you're talking, in this particular -- you looked

15  at this email exchange in the course of your direct testimony.

16  Do you remember that?

17  A.  Yes, I did.

18  Q.  And you talk about the different names that might be used

19  by a particular dispensary for opening accounts, correct?

20  A.  Yes.

21          MR. TAYBACK:  You can take this down.  Thank you.

22  Q.  It's true, isn't it, that it was your experience even

23  before meeting Mr. Akhavan that dispensaries often did business

24  in multiple names.  Correct?

25  A.  Yes, that's correct.

1    Q.  And they would sometimes have the name of a dispensary that

2    might be on the store itself.  That would be one name.

3    Correct?

4    A.  Yes.  That could happen.

5    Q.  And then they would have sometimes a holding company.  It

6    would be a different name.  Correct?

7    A.  Yes.

8    Q.  And that wasn't uncommon.  Isn't that right?

9    A.  I can't speak to how common it was.  I can say that that is

10   certainly what someone at a dispensary told me they did.

11   Q.  In your experience, that was not unusual.

12   A.  It wasn't unusual with the dispensaries that I met through

13   doing business at Eaze.

14   Q.  Now, it's true, isn't it, that the names of the

15   dispensaries or the holding companies sometimes were references

16   to marijuana, but sometimes weren't?

17   A.  Yes, that's correct.

18   Q.  In fact Eaze, the name Eaze itself is not necessarily a

19   marijuana reference, correct?

20   A.  Correct.

21   Q.  I want to ask you some questions about the March 2018

22   meeting that you went to in Calabasas.  Do you recall

23   testifying about that?

24           Before that meeting, it was your understanding that

25   credit card processing for Eaze had gone down in January of

1    2018?

2    A.  That's correct.

3    Q.  And that Eaze therefore was not accepting credit cards for

4    a period of about four or five months?

5    A.  Yes.  I don't remember exactly how -- it would be, I

6    believe, January through April or May, yes.

7    Q.  Now, the triggering event for that, was that the

8    legalization of marijuana in California, on January 1st, for

9    more than medical purposes?

10   A.  What I recall Jim telling the company was that credit cards

11   went down because chargebacks were so high.

12   Q.  Do you actually know that to be the case?

13   A.  I don't know if that's the case or not.

14   Q.  Now, at the meeting you went to in March, the idea was to

15   try to find the credit card solution, correct?

16   A.  Yes.  That's my understanding.

17   Q.  At that point in time, I think you said that Mr. Patterson

18   was the one who had told you that you should attend the

19   meeting?

20   A.  Nick Fasano told me, but my understanding was that Jim had

21   instructed Nick.

22   Q.  There was some testimony on direct about not being -- about

23   having phones at the meeting.  Do you recall that?

24   A.  Yes.

25   Q.  You did bring phones, correct, to the meeting?

 1   A.   I believe I had my cellphone in my purse under -- I believe

 2   I had my cellphone in my purse.

 3   Q.   And in fact Mr. Patterson convened a conference call while

 4   he was in the car driving over, correct?

 5   A.   Yes, that's correct.

 6   Q.   Because you caravaned the two different cars.  Right?

 7   A.   Yes.  That's what I remember.

 8   Q.   The Eaze representatives as well as the dispensary

 9   representatives?

10   A.   Yes.

11   Q.   And Mr. Patterson actually left that meeting early?

12   A.   I don't remember if he left the meeting early.

13   Q.   The idea of not having your phones, was that

14   Mr. Patterson's?  He told you that?

15   A.   I can't remember if it was Nick or Jim who told me that.

16   Q.   The idea was not to be interrupted during the meeting?

17   A.   Um, I'm not quite sure, honestly, why, why they said that.

18   Q.   Did you take your phone with you, or just turn it off?

19   A.   I can't remember exactly what I did with my phone.

20   Q.   Let me ask you if you could estimate for me the number of

21   people in this meeting.

22   A.   I would say maybe between 12 and 20.

23   Q.   Now, this 12 to 20 people, was it your impression that

24   Mr. Akhavan did not know any of the people who were

25   representatives of the dispensaries until this meeting?

1   A.  I don't know he didn't know any of them, but I'm pretty

2   confident that he was meeting some people for the first time.

3   Q.  And when he -- when Mr. Akhavan spoke, did he appear to be

4   wanting to keep what was being said a secret?

5   A.  I'm sorry.  Can you repeat that?

6   Q.  Did Mr. Akhavan ever say that you needed -- that people who

7   attended this meeting needed to keep it secret?

8   A.  I don't remember.

9   Q.  You don't remember him saying that.

10  A.  I don't remember him saying that.

11  Q.  Now, did you find Mr. Akhavan scary, at this meeting?

12  A.  No, not at all.

13  Q.  Did he say anything to you about your attendance?

14  A.  About my attendance?

15  Q.  Yes.

16  A.  The only thing he said to me when I met him was -- I think

17  that's when Jim said, "Darcy will be your main point of

18  contact," and he kind of smiled and said, "I should have known

19  because the only woman in the room is usually the one that gets

20  things done."

21  Q.  You viewed that as a compliment?

22  A.  Yes.

23  Q.  The dispensaries themselves that were there, those were all

24  of -- those were Eaze's dispensaries, correct?

25  A.  They were Eaze's partners, yes.

L3HAWEI4ps                     Cozzetto - Cross

1   Q.  And they were the partners that Eaze had invited to this

2   particular meeting.  Correct?

3   A.  Yes.

4   Q.  That is to say, Mr. Akhavan didn't directly reach out to

5   these depots or dispensaries, to your knowledge, to invite

6   them.  Correct?

7   A.  Not to my knowledge.

8   Q.  Now, you said that Mr. Akhavan during this meeting

9   expressed -- rather, explained, credit card processing.  Do you

10  recall that?

11  A.  Yes.

12  Q.  Did you find that he sounded knowledgeable to you?

13  A.  Yes, I did.

14  Q.  And I believe you said, and I'd like to make sure, that you

15  said that it was important that he said that the dispensaries

16  fill out honest applications, correct?

17  A.  Yes.

18  Q.  And as you sit here today, is it fair to say that you have

19  no idea what those applications looked like when they reached

20  the acquiring bank at which accounts were open, correct?

21  A.  Yes.

22  Q.  You don't know one way or the other.

23  A.  I don't know one way or the other.

24  Q.  And Mr. Akhavan also discussed rates, didn't he, what rates

25  would need to be charged for credit card processing?

1    A.  Yes.  I don't recall if he discussed exact numbers, but he

2    did, if I recall correctly, mention that the rates would be

3    higher.

4    Q.  And the reason for that is because this was a high-risk

5    business, correct?

6    A.  That was my understanding.

7    Q.  And by "high risk," you knew that that covered a lot of

8    things that were both legal and illegal.  Correct?

9    A.  My understanding of "high risk" was maybe industries that

10   were not clearly delineated on like the merchant code, etc.

11   Q.  And that's an understanding that you got from your work

12   with Eaze?

13   A.  That's an understanding I got from that meeting.

14   Q.  Now, there were fees that were charged to the dispensaries

15   in connection with the processing of credit cards for their

16   merchandise, through Eaze.  Correct?

17   A.  Yes, I believe so.

18   Q.  And isn't it true that the dispensaries were charged about

19   32 percent?

20   A.  I'm not sure what the final charges were for the

21   dispensaries.

22   Q.  Is it your recollection that the dispensaries were

23   charged -- originally Eaze's share of that charge to the

24   dispensaries was 28.75 percent?

25   A.  The 28.75 percent that I'm aware of was a fee between the

1    dispensaries and Eaze for -- to utilize Eaze technology

2    platform.  I don't remember 28.75 was for credit cards.

3    Q.  So Eaze charged the dispensaries approximately 28.75

4    percent, correct?

5    A.  As part of the contract with the dispensaries, yes.

6    Q.  And if there was some additional fee for credit card

7    processing, that would have been an additional amount that came

8    out of whatever amount the dispensaries would ultimately

9    receive, correct?

10   A.  I'm not sure if the credit card fees were attached to the

11   Eaze fees or if that was separate, but I don't know the

12   financials.

13   Q.  You don't know one way or the other.

14   A.  I don't know.

15   Q.  You do know that the amount that Eaze charged was 28.75

16   percent, correct?

17   A.  That was what Eaze was attempting to charge when I was

18   there, yes.

19   Q.  Now, is it true that at the time you worked at Eaze, you

20   didn't believe you were committing bank fraud?

21   A.  From what I recall, I, I -- I did think we were committing

22   bank fraud.

23   Q.  Let me ask you this.  Did you ever look up what bank fraud

24   was?

25   A.  No.  I don't recall doing that.

L3HAWEI4ps                      Cozzetto - Cross

1    Q.  And in fact when you heard that the government charged this

2    case, in -- a year ago, in March of last year, you didn't reach

3    out to the government to say that you had information about

4    this, correct?

5    A.  No, I didn't.

6    Q.  You waited for the government to contact you?

7    A.  Yes.

8    Q.  And that occurred around October of last year?

9    A.  Yes, I believe so.

10   Q.  And is it true that your interactions on behalf of Eaze,

11   you never reached out to any issuing bank, that is to say any

12   bank that issues a credit card to some consumer that was used

13   to purchase marijuana, correct?

14   A.  Did I reach out to an issuing bank?

15   Q.  Yes.

16   A.  No, I did not.

17   Q.  In fact what was discussed at that March meeting were

18   interactions with the acquiring banks, correct, the ones that

19   would represent the merchants?

20   A.  I don't recall exactly.

21   Q.  And is it true that what you know about merchant category

22   codes is simply what you learned from Mr. Akhavan?

23   A.  Yes.

24   Q.  And what you know about merchant descriptors you also

25   learned from Mr. Akhavan?

1    A.  Yes.

2    Q.  Did you have an understanding that the merchant banks, the

3    acquiring banks, were based in Europe?

4    A.  Yes.  I believe he mentioned that during the meeting.

5    Q.  And do you know anything about those banks, other than the

6    fact they were based in Europe?

7    A.  No.  The only thing I remember is the story of the

8    terminally ill gentleman that I shared.

9    Q.  And you don't know whether -- let me ask you this.  You've

10   never reviewed, for example, the Visa or MasterCard rules

11   regarding the use of their credit cards or debit cards,

12   correct?

13   A.  Have I reviewed the rules?  No, I don't believe I have.

14   Q.  So, for example, you don't have any knowledge about whose

15   responsibility it is to ensure the accuracy of merchant

16   information when they go onto the credit card network.

17   Correct?

18           MS. DEININGER:  Objection, foundation.

19           THE COURT:  Sustained.

20           MR. TAYBACK:  I have no further questions, your Honor.

21           THE COURT:  Cross-examination from Weigand counsel.

22   CROSS-EXAMINATION

23   BY MR. GILBERT:

24   Q.  Good morning, Ms. Cozzetto.

25   A.  Good morning.

1    Q.  My name is Michael Gilbert.  I represent Ruben Weigand in

2    this case.  You and I have never met before, correct?

3    A.  Correct.

4    Q.  Ms. Cozzetto, you became involved in the credit card

5    processing for Eaze in about January or February of 2018; is

6    that correct?

7    A.  Yes.

8    Q.  And at that point you had been working at the company for

9    several months?

10   A.  I started in October of 2017.

11   Q.  You had no prior experience with credit card processing?

12   A.  No.

13   Q.  You got involved because you were told -- you were

14   requested to do so by your superior at the company?

15   A.  I got involved because the dispensary -- interviews with

16   the dispensaries was a big part of my job, and they were very

17   upset in January and February because funds were being held,

18   and I got involved -- I, I believe I asked Jim if I could have

19   a contact to try to get some of those funds released.

20   Q.  And so there was a significant problem at the company at

21   the time because the credit card processing was not working.

22   A.  Yes.

23   Q.  And as a result, the company was using cash only.

24   A.  The customers were paying in cash.  Correct.

25   Q.  And that resulted in many problems with the drivers getting

L3HAWEI4ps                    Cozzetto - Cross

1    robbed from time to time?

2    A.  Yes.  It resulted in multiple problems.

3    Q.  Well, what were the other problems?

4    A.  What I recall, there were driver safety issues, there were

5    dispensary safety issues, so, because the dispensaries were

6    keeping quite a lot of cash on hand, they were also targets

7    potentially.  There was a situation where one of our vendors

8    was robbed.  There was also issues with consumers.  Many

9    consumers don't feel comfortable paying for something with cash

10   online, especially, you know, if it's a cannabis product.

11   Q.  There were many reasons why getting the credit card

12   processing to work again was an important priority for the

13   company.

14   A.  Yes.

15   Q.  And starting in about April of 2018, you became the point

16   person at Eaze who was in charge of communications with

17   EUprocessing?

18   A.  Yes.

19   Q.  Is it fair to say you were the account manager for Eaze,

20   essentially?

21   A.  I would say I was the project manager, but, yes, I think

22   "account manager" is fair too.

23   Q.  And you were the person at Eaze who had the most contact

24   with EUprocessing; is that correct?

25   A.  I believe so, yes.

L3HAWEI4ps                         Cozzetto - Cross

1    Q.  And the way in which you communicated with EUprocessing was

2    through a specific email address that you testified about,

3    correct?

4    A.  Yes.

5    Q.  And that was EUprocessing@protonMail?

6    A.  Yes.

7    Q.  And you continued in this role as the project manager or

8    primary point of contact from approximately April of 2018 until

9    you left the company in September of 2018; is that correct?

10   A.  Yes.

11   Q.  In all that time, your communications with EUP were through

12   the EUprocessing@protonMail.com email address, correct?

13   A.  I'm sorry.  Could you repeat the last part of that

14   question?

15   Q.  In that time period of April 2018 through September of

16   2018, your communications with EUP were through this one email

17   address, EUPprocessing@protonMail.com --

18   A.  Yes.

19   Q.  -- primarily?

20   A.  Yes.

21   Q.  And -- I have a hard time hearing you.  I'm sorry.

22       It's correct, Ms. Cozzetto, that in that entire time

23   period it was always your understanding that when you were

24   communicating with EUprocessing@protonMail.com, you were

25   speaking to somebody named Andres?

1  A.  Yes.  That was my understanding.

2  Q.  And at no time did you ever believe that you were

3  communicating on EUprocessing at ProtonMail.com with Ruben

4  Weigand.  Is that correct?

5  A.  That is correct.

6  Q.  Now, before you came to testify today, I think, as you

7  already testified, you met with the government.

8  A.  Yes.

9  Q.  And you started -- you had your first meeting with the

10  government in October of 2020?  Is that correct?

11  A.  Yes.

12  Q.  And that was a frightening event for you?  Is that fair to

13  say?

14  A.  It was not a very pleasant experience.  Yes.

15  Q.  You, I believe you testified that you thought you were

16  engaged in a federal crime of bank fraud for some period of

17  time before you had that meeting.  Correct?

18  A.  Yes.  I was very nervous at that meeting.

19  Q.  But understood that you had to answer questions truthfully.

20  Correct?

21  A.  Yes.

22  Q.  And when you met with the government for the first time on

23  October 9th of 2020, you were asked the name Ruben Weigand.

24  Correct?

25  A.  Yes, I believe so.

1    Q.  And what you said was that you had heard the name from

2    media reports.  Correct?

3    A.  I don't remember exactly what I said, but yes.  I -- I

4    wasn't very familiar with the name, I believe.

5    Q.  Well, if you don't remember exactly what you said --

6              MR. GILBERT:  Could we please place, in front of the

7    witness only, 3507-03 at page 6.

8              THE COURT:  And while we're doing that, counsel, keep

9    in mind we're going to take our lunch break in a few minutes.

10             MR. GILBERT:  Thank you, Judge.

11   Q.  I'm going to ask you, Ms. Cozzetto, if you could look at

12   this document that's in front of you.  Does that refresh your

13   recollection that you saw Weigand's name in the media, and that

14   was what you told the government?

15   A.  Yes, it does.  Thank you.

16   Q.  Thank you.

17             And you met with the government again after that

18   meeting on October 9th of 2020.  Correct?

19   A.  Yes.

20   Q.  It was about a week later.  Does that sound familiar?

21   A.  Yes.  Yes, it does.

22   Q.  In that meeting, the government again asked you about Ruben

23   Weigand.  Isn't that correct?

24   A.  I don't recall exactly.

25             MR. TAYBACK:  Can we please show the witness only

L3HAWEI4ps                        Cozzetto - Cross

1    3507-05, at page 6.

2    Q.  I'm going to place in front of you -- you'll see on the

3    screen there's another document.  And I'm going to ask you if

4    looking at that document refreshes your recollection that you

5    told the government in your second meeting with them that you

6    had heard about Ruben Weigand only through a media report.

7    A.  Yes, it does.  Thank you.

8    Q.  And did you also tell the government in that meeting that

9    you didn't recall Ray Akhavan ever mentioning somebody named

10   Ruben Weigand to you?  Do you remember that?

11   A.  I don't remember that.  And I -- I'm not sure if that was

12   captured correctly from that interview.

13   Q.  Well, if you don't remember let's also look again at

14   3507-05, again at page 6.  Does that refresh your recollection

15   that you told the government that you didn't recall Ray Akhavan

16   ever mentioning someone named Ruben Weigand?

17   A.  What I recall from looking at this is that the government

18   was asking me about a specific Telegram chat, in which Ray

19   mentioned, "You all met Ruben in LA."  And I didn't remember

20   that chat specifically.

21   Q.  And did you remember -- you didn't recall the chat that

22   referenced you having met Ruben in LA.  Is that what you're

23   saying?

24   A.  Correct.

25   Q.  So you had no recollection of ever meeting Ruben in LA.  Is

L3HAWEI4ps

1    that what you said?

2    A.   I have no recollection of ever meeting Ruben at all,

3    including that meeting in LA.

4    Q.   Thank you.

5         MR. GILBERT:   This would be a good time we could

6    break.

7         THE COURT:   All right, ladies and gentlemen.   We'll

8    give you your lunch break and we'll resume in an hour.   Thank.

9    You very much.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HAWEI4ps

1              (Jury not present)

2              (Witness excused)

3              THE COURT:  How much longer do you have on cross,

4    Mr. Gilbert?

5              MR. GILBERT:  I would estimate 20 minutes.

6              THE COURT:  OK.  And who's the next --

7              MR. GILBERT:  I'm sorry.

8              THE COURT:  Oh, I'm sorry.  Please.

9              MR. GILBERT:  Judge, I'm going to amend my answer.  It

10   may be 30 minutes.

11             THE COURT:  OK.

12             MS. LA MORTE:  And our next witness will be --

13             MS. DEININGER:  -- will be Michael Steinbach from

14   Citibank.

15             THE COURT:  OK.  And how long will he be on direct?

16             MS. DEININGER:  About an hour.

17             THE COURT:  OK.  So that will take us to the end of

18   the day.

19             All right.  I forgot to mention this morning, all of

20   you very kindly submitted your letter briefs on the question

21   that I raised about whether as a matter of law the defense

22   theory of materiality could not be sustained.  And both sides

23   seem to agree that while it may have other difficulties that

24   will be explored before the case goes to the jury, that the

25   question of whether the Court could withdraw the issue of

L3HAWEI4ps

materiality as a matter of law in this case is not something

the Court should do.  So I won't do it.

I will note that you guys are very young.  For

example, the government in its letter of March 16th says, "As

an initial matter, as the Court is well aware, it has long been

established that materiality is an element of bank fraud to be

submitted to the jury."  Now actually, for the first 150-plus

years of the Anglo-American legal system in this country and

going back many hundred years earlier to the English common

law, materiality was a question for the court, not for the

jury.  This only changed in the early 1990s, when a number of

defense counsel began raising the notion that it really was a

jury question because it was fact-related.  For example, in the

case of *United States v. Levine*, a D.C. Circuit case, the then-

defense counsel Jerry Rakoff successfully argued that it was a

matter of fact, not a matter of law.  And eventually the

Supreme Court so held, and the first real case was *Gaudin*,

which is 1995.  And I was so thunderstruck that I figured I'd

better become a judge at that point.

But that's not really the point I was making.  The

point I was making is not that materiality isn't a question for

the jury if it's a matter of fact.  The question is whether

there are certain definitions of materiality or certain

concepts of materiality that are void as a matter of public

policy, so to speak, and therefore cannot be asserted even if

L3HAWEI4ps

1   the facts supported them, because they contemplate a violation

2   of the law.

3           So I don't think the issue is quite what you guys

4   addressed in your letters.  But on the other hand, you're happy

5   to have it submitted to the jury.  I won't disturb that.  There

6   goes the chance to have it resolved on appeal.

7           Now, the government raised a different question, which

8   is whether and to what extent the issue can go to the jury

9   because of alleged lack of evidence.  We'll take that up at a

10  later point.

11          OK.  Anything else we need to take up today?  Or right

12  now?

13          MR. BURCK:  Your Honor, I had --

14          THE COURT:  Oh, yes.  Let's finish that.

15          MR. BURCK:  Thank you, your Honor.

16          THE COURT:  Thank you very much.

17          So that was the slide about -- and I asked you why it

18  wasn't hearsay.

19          MR. BURCK:  Right, your Honor.  And so there are two

20  answers to that.  So the context here is that we have a Visa

21  witness speaking to acquiring banks, issuing banks, and senior

22  executives of Visa.  This is what he testified to in his

23  presentation.  The government elicited from him that one of his

24  colleagues had also spoken to issuing banks and acquiring banks

25  about the same topic, and the purpose the government had for

1    eliciting that testimony was clear, was that Visa was

2    reiterating its policy that you cannot do marijuana

3    transactions on our network.  Now, in this separate

4    presentation, done by that very witness, he's speaking to the

5    same people, and what he's saying to them is, marijuana sales

6    in the United States are booming.  And he's looking at it

7    historically and he's looking at also future growth.

8              And so the point of this slide, your Honor, which is

9    why we think it's very -- it's relevant and it's not hearsay,

10   is that it goes to the state of mind of the listeners, who are

11   the very customers who are at issue in this case, the issuing

12   banks in particular.  And here's what Visa is talking to them

13   about.  And what's important about this set of slides as well,

14   your Honor, is that there's nothing in these slides that

15   actually has Visa say anything like they do in the other

16   slides, which is, oh, by the way, nobody should be selling

17   marijuana.  There's nothing in the slides that says that.  In

18   fact, it's all about the fact that there is this change, a

19   shift in the law at the state level.  It's still federally

20   illegal.  They have a slide on that.  And then there's a slide

21   that talks about the business of booming in marijuana.  So,

22   your Honor, our point, and the reason why we think it's

23   relevant and admissible, is that the state of mind of the

24   issuing banks, the alleged victims of this crime, Visa is the

25   network that is at the center of trying to protect them from

L3HAWEI4ps

1    these crimes.  And what you have here is Visa speaking to the

2    victims and saying, gosh, there's a lot of money out there.

3              I'm not going to draw anything from that, your Honor.

4    I'm not going to argue it with the witness.  But the point is

5    that this slide itself shows him speaking to his people and

6    saying, look, it's a big business, folks.  And we think that's

7    relevant.  It goes right to the motives.  It goes right to the

8    defense that --

9              THE COURT:  My recollection is that you offered this

10   slide before putting to the witness anything about why he --

11   what his purpose was, or what its significance was to this

12   audience or anything like that, anything in the way of a

13   foundation.  You just offered it cold.  And as offered cold, it

14   seems to me it suffered, among other things, from hearsay

15   problems.

16             But what you're now saying, as I understand it, is

17   that Visa -- I'm sorry.  What was his presentation?

18             MR. BURCK:  2019, your Honor.  He estimated 2018 or

19   2019.  I think from the context it's clearly 2019.

20             THE COURT:  So this is after the --

21             MR. BURCK:  This is during --

22             THE COURT:  During the conspiracy.  And so you're

23   saying he is saying to this audience, this is a very lucrative

24   business, as opposed to saying, this is a growing business,

25   we've got to watch out, 44.  And he is at least arguably the

L3HAWEI4ps

1    relevant person, from an enforcement standpoint, at Visa, and

2    the issuing banks rely on Visa, etc.

3         All right.  So now I understand the argument, let me

4    hear from the government.

5         MS. DEININGER:  Your Honor, we do agree that this is

6    improper hearsay and that it should be excluded under Rule 403.

7         I think one thing I want to clarify is who the

8    audience was.  The presentation that the government put in was

9    a public document that was made at a public summit that all the

10   Visa clients, issuers and acquirers, were invited to attend.

11   What the witness testified with this document was that it was

12   presented to an internal Visa executive council that might have

13   had one or two representatives of issuers or acquiring banks

14   who were participants.  And the whole -- and the witness is no

15   longer on the stand to be able to explain that.

16        But in general, to the extent that they are seeking to

17   get this in on materiality based on the potential U.S. revenue

18   from marijuana, we believe that they are seeking to get it in

19   for the truth and not the impact on Visa's state of mind, which

20   has other public statements where they reiterated their rule

21   that marijuana transactions would not be permitted in this same

22   time frame.

23        THE COURT:  Well, in addition to that, since their

24   argument is that part of the motive of the issuing banks and

25   Visa to allow marijuana sales to go through disguised credit

1  cards was the income generated from it, the relevant time

2  period for the great majority of events was before this.

3          So they would have -- I take it the defense is not

4  arguing that, we thought the marijuana business was a tiny

5  little business until the very end of the conspiratorial

6  period, when we concluded it was huge.

7          MR. BURCK:  No, your Honor.  But if you look at the

8  slide, the slide speaks to 2016 through 2020.

9          THE COURT:  But you're not offering it for its truth.

10  You're offering it for the state of mind of the witness and

11  indirectly Visa at the time it was shown to these other people.

12          MR. BURCK:  Absolutely, your Honor, because --

13          THE COURT:  So the fact that it showed -- so it cannot

14  be used, even if I were to allow it in, you could not say to

15  the jury, this shows that marijuana sales in 2018 --

16          MR. BURCK:  No.  Not at all, your Honor.

17          THE COURT:  -- were such and such or etc.

18          MR. BURCK:  Not at all, your Honor.  We would not

19  intend to do that.

20          Your Honor, could I just address a couple things that

21  Ms. Deininger said which I don't think are at all what the

22  witness testified to?  I think she said that he said that there

23  were one or two acquiring banks or issuing banks in this

24  executive council.  That's not in the transcript at all, your

25  Honor.  He said that there were acquiring banks and issuing

L3HAWEI4ps

1    banks who were members of this council, along with Visa.  So

2    that the idea that there was maybe one or two there, I don't

3    know where that's coming from.  Maybe that's from her own

4    discussion with the witness, but that's not what he said.

5           MS. DEININGER:  Well, he said -- organizations -- he

6    said it was an executive council that Visa convened, not a

7    public forum.

8           I also would just note --

9           THE COURT:  I have a 1 o'clock telephone conference

10   that's in one minute.  So here's -- I want to see -- and this

11   can be presented to me either the same afternoon at the end of

12   the day or, if you can't get it by then, you could just send it

13   to my law clerk tonight, the pages of the transcript of this

14   case that preceded the offer of this exhibit.  Because, among

15   other things, I don't recall the argument that's being made now

16   having been made at that time, or the foundation laid for that

17   argument.  But I could be wrong.

18          So anyway, forgive me but I've really got to take this

19   other call.

20          MR. BURCK:  Thank you, your Honor.

21          (Recess)

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                              1:49 P.M.

3           (Trial resumed; jury not present)

4           THE COURT:  Please be seated.

5           Jimi, would you tell Linda to bring up the jury.

6           THE LAW CLERK:  Will do right now, Judge.

7           THE COURT:  Okay.  I don't know if you had a chance,

8    probably not, to get the transcript that I had mentioned.  The

9    only reason I mention that is I have another in-court matter at

10   4:00 today; so we're going to have limited time at the end of

11   the day to deal with anything, but it can come up here, we can

12   take it tomorrow morning as well.

13          MR. BURCK:  Your Honor, we were going to ask if we

14   could have until this evening because that's when we'll have

15   the actual official transcript.

16          THE COURT:  That's fine.  So just so you know, if I

17   had to rule right now, I would still exclude it, partly on the

18   403 grounds, but I think it's a close enough call that I want

19   to see the transcript.

20          MR. BURCK:  Okay, your Honor.  Thank you.

21          THE COURT:  Secondly, at 4:00 today, I have a matter.

22   So if you are going to take up that question of completeness or

23   whatever, you should either start that right now or take it up

24   at 3:45, if it's going to come up tomorrow, and then tomorrow

25   morning I have a guilty plea from 9:00 to 9:30; so again, we'll

1    only have 15 minutes tomorrow to deal with any of these.

2              MS. LA MORTE:  Mr. Folly is going to start now with

3    the post-arrest.

4              THE COURT:  All right.  Let me get my notes.  All

5    right.  So as I understand it, the government intends to

6    introduce two passages from Mr. Weigand's post-arrest

7    statement.  In the first passage, Mr. Weigand indicates that he

8    had vague knowledge of Eaze and having seen it on billboards

9    and such, but had "no involvement in Eaze."  So I take it

10   that's being introduced as a false exculpatory statement, yes?

11             MR. FOLLY:  Yes, your Honor.

12             THE COURT:  And second, in the second passage,

13   Mr. Weigand told the FBI agent that a particular e-mail

14   address, EUprocessing@ProtonMail.com, was not his e-mail

15   address, and he did not use this address.  And again, that is

16   being introduced as a false exculpatory statement, yes?

17             MR. FOLLY:  Yes, your Honor.

18             THE COURT:  Okay.  So with respect to that second

19   portion, taking that up first, the government would include

20   that with the statement from Mr. Weigand "it's, obviously, not

21   my e-mail address."

22             The defense -- he had said earlier that he might have

23   heard of it.  The defense would like to add the following on

24   this aspect:  The agent says, like, where have you heard it?

25   Whose e-mail address is it then?  You're connected in that

1  world, right?  So whose e-mail address is it, if not yours?"

2  Mr. Weigand says:  I think I need to -- I don't know how to

3  continue this without having --

4          THE DEPUTY CLERK:  Jury entering the courtroom.

5          THE COURT:  To be continued.

6          (Jury present)

7          THE COURT:  Please be seated.  So I apologize to juror

8  No. 11.  I only just noticed now what a beautiful outfit you're

9  wearing today that, again, puts to shame so many of the men of

10  this jury.  So anyway, duly noted now.

11          Okay.  Let's continue.

12          MR. GILBERT:  Thank you, your Honor.

13          THE COURT:  Oh, we need the witness.

14          MR. GILBERT:  We are missing one important piece here.

15  No further questions.

16          THE COURT:  I thought you were going to say the

17  witness was unresponsive.  Okay.

18          MR. GILBERT:  Thank you, your Honor.

19  CROSS-EXAMINATION RESUMED

20  BY MR. GILBERT:

21  Q.  Good afternoon, Ms. Cozzetto.

22  A.  Good afternoon.

23  Q.  I usually don't have this problem, but I'm told the

24  microphone might not be working perfectly; so if you have any

25  problems, just let me know and I'll repeat the question.

L3HPWEI5                         Cozzetto - Cross

```
 1    A.  Thank you.
 2    Q.  So I believe before we broke, you testified that you had no
 3    recollection of ever meeting Ruben Weigand, correct?
 4    A.  Yes, that's correct.
 5    Q.  Now, you were asked on direct examination about a meeting
 6    in March of 2018.  I believe you said that you met an associate
 7    of Mr. Akhavan; do you recall that?
 8    A.  Yes.
 9    Q.  And that you thought that person was someone in their 30s
10    or 40s?
11    A.  Yes.
12    Q.  Now, when you met with the government in October of last
13    year, you didn't mention at that time that you recalled this
14    person at the meeting, did you?
15    A.  I don't recall if I did or not.
16    Q.  Well, do you recall whether the first time you mentioned
17    this associate of Mr. Akhavan's to the government was just a
18    few weeks ago when you met with the government to prepare for
19    trial?
20    A.  I do not recall when I first mentioned the associate to the
21    government.
22    Q.  If we can show the witness, please, 3507.  3507, please.
23    Just the witness.  My apologies.  It's 3508 -- 3507008.
24            Do you see that on the screen now?
25    A.  Yes, I do.
```

1    Q.  Does this refresh your recollection that you talked to the

2    government about this male, brown hair, age 30 to 40 in or

3    about March 5th of 2021?

4    A.  Yes.  Thank you.

5    Q.  And was that -- at some point, Ms. Cozzetto, you learned

6    that you might be getting immunity in this case, correct?

7    A.  Yes.

8    Q.  And did you learn about that at about the time of the

9    meeting that we were just talking about in March of 2021?

10   A.  I don't recall when that conversation first came up.

11   Q.  Do you recall whether it was -- there was any discussion

12   about you receiving immunity when you met with the government

13   back in October?

14   A.  I don't remember exactly, but I don't believe there was a

15   discussion in October.

16   Q.  It was more recently than that, wasn't it?

17   A.  I believe it was more recently than the October meeting,

18   yes.

19   Q.  And, in fact, isn't it true that, at some point, you had

20   the understanding that you wouldn't be required to come here

21   and testify?

22   A.  Yes, that is correct.

23   Q.  And is it your understanding that the government had

24   decided they weren't going to call you as a witness; so you

25   didn't need to come?

1    A.  Yes.

2    Q.  And then, quite recently, you learned that they did want

3    you to come, correct?

4    A.  Yes.

5    Q.  Now, you were asked on direct examination whether you had

6    any memory of Mr. Patterson leaving the March meeting,

7    March 2018 meeting early.  Do you recall that testimony?

8    A.  Yes, I do.

9    Q.  And I believe you said that you had no recollection of him

10   leaving the meeting early; is that right?

11   A.  I don't remember if he left the meeting early or not.

12   Q.  And I believe you said that the person that you recalled

13   doing the talking at the meeting was Mr. Akhavan, correct?

14   A.  Yes.

15   Q.  And you don't recall anybody else that did the talking at

16   that meeting; isn't that correct?

17   A.  There were some questions during the meeting from some of

18   the dispensaries, during the Q and A session, but I don't

19   recall anyone else taking a lead in that meeting, no.

20   Q.  Taking a lead or speaking in any way; is that fair?

21   A.  I'm sorry, could you repeat that?

22   Q.  Other than Mr. Akhavan and the people at the dispensary,

23   you don't have a recollection, as you sit here now, of anybody

24   else addressing the meeting?

25   A.  No.  Jim may have said something, too, but no, outside of

```
 1   people I knew prior to going to that meeting, I don't have a
 2   recollection, outside of Ray speaking.
 3   Q.  Now, was it your -- it was your understanding that after
 4   the meeting, someone would be in contact with you about the
 5   Eaze processing; is that correct?
 6   A.  Yes.
 7   Q.  I believe you said you thought someone would contact you
 8   about opening up accounts?
 9   A.  Yes, someone would -- my understanding was someone would
10   contact me with the credit card applications to send to the
11   dispensaries.
12   Q.  And a few weeks after that meeting, you were contacted by
13   somebody, correct?
14   A.  Yes, I was.
15   Q.  You were contacted by an e-mail, correct?
16   A.  Yes.
17   Q.  And that was an e-mail that came from Andreas at EUP
18   Processing; is that correct?
19   A.  Yes.
20   Q.  If you could show --
21           MS. DEININGER:  Objection.  Misleading.  Move to
22   strike.
23           THE COURT:  Overruled.
24   Q.  If we could show the witness only, please, Government
25   Exhibit 443.
```

1              Ms. Cozzetto, I'm going to ask you to look at the

2    document that's on your screen.  I think we can probably start

3    from the second page.  From the bottom.  Thank you very much.

4              Do you recognize -- Well, take your time.  But my

5    question is just whether you recognize this document?

6    A.  Yes, I do.

7    Q.  And what is it?

8    A.  This is the e-mail that I received from Andreas initially

9    with the applications, the blank applications.

10   Q.  And it's dated April 3rd of 2018?

11   A.  Yes.

12             MR. GILBERT:  Mr. Weigand offers Government

13   Exhibit 443.

14             MS. DEININGER:  No objection.

15             THE COURT:  Received.

16             (Defendant's Exhibit 443 received in evidence)

17   BY MR. GILBERT:

18   Q.  If you look at the e-mail on April 3rd, 2018, at 3:02, do

19   you see that it says from Andreas EUprocessing, with the e-mail

20   address EUprocessing@ProtonMail.com?

21   A.  Yes, I see that.

22   Q.  And it's addressed to you?

23   A.  Yes.

24   Q.  And a little bit further down, the introduction, it says:

25   "Dear, Darcy.  It is a pleasure to emeet you.  Please find

1   attached the merchant application for our EUprocessing

2   solution."  Do you see that?

3   A.  Yes, I do.

4   Q.  And it goes on to discuss what would be needed to complete

5   an application; is that correct?

6   A.  Yes.

7   Q.  And so it was your understanding, as of April 3rd, 2018,

8   that it was Andreas at EUprocessing who had reached out to you

9   as a follow up to the meeting; is that correct?

10  A.  Yes, that is correct.

11  Q.  And if we could look at the first page of the exhibit.  Do

12  you see the e-mail that's dated April 3rd at 6:42 p.m. that you

13  appear to have written?  I'm sorry, did you see that part?

14  A.  Oh, yes.  I'm sorry, I do.

15  Q.  And who did you send this e-mail to?

16  A.  I sent this e-mail to the dispensary ownership.

17  Q.  The recipients there in the "cc" line are people all

18  associated with dispensaries; is that correct?

19  A.  Yes, that's correct.

20  Q.  And you go on to ask them to fill out the company

21  information, and you note that they are going to be the

22  merchants of record.  Do you see that in the second paragraph?

23  A.  Yes.

24  Q.  And then at the end of that paragraph you write "please

25  fill this out accurately and as completely as possible"?

1    A.  Yes.

2    Q.  Do you see that?  Now, we can take it down.  Thank you.

3           After this e-mail, you had further communications with

4    Andreas at EUprocessing, correct?

5    A.  Yes, I did.

6    Q.  If we could show the witness only Weigand Exhibit 119,

7    please.

8           Do you recognize Weigand Exhibit 119 that's on the

9    screen in front of you now, Ms. Cozzetto?

10   A.  Yes, I do.

11   Q.  And what is it?

12   A.  This is an e-mail exchange between myself and Andreas when

13   I worked at Eaze.

14   Q.  What is the date?

15   A.  The date is April 12th of 2018, and then I forwarded the

16   e-mail April 13th of 2018.

17           MR. GILBERT:  We offer Weigand Exhibit 119.

18           MS. DEININGER:  Objection.  Hearsay.

19           MR. GILBERT:  It's not for the truth, your Honor.

20   It's for the witness' state of mind as to whom she's

21   communicating with, which the government has put in issue in

22   this case.

23           THE COURT:  I'm sorry, which portion?  You want to

24   offer all of this?

25           MR. GILBERT:  I'm sorry, your Honor.  I can't hear

1   you.

2            THE COURT:  You want to offer all of this?

3            MR. GILBERT:  Yes, your Honor.

4            THE COURT:  Let me see the bottom.  I can't see it.

5   Let me see now the top portion.  I don't see how the top

6   portion comes in for state of mind, and if you want the bottom

7   portion, you may have it, but that --

8            MR. GILBERT:  That's fine, your Honor.  We have a

9   redacted version of the document.

10            THE COURT:  The redacted, and just the portion from

11   the witness will be received.

12            (Defendant's Exhibit WX119 received in evidence)

13            MS. DEININGER:  Objection.

14            THE COURT:  Objection to what?

15            MS. DEININGER:  The unredacted portion at the top.

16            THE COURT:  Oh.  Yes, it should be only what's on the

17   screen now.  That's all that's being received.

18            MR. GILBERT:  We'll prepare a redacted version for the

19   jury to that effect.  Thank you, your Honor.

20   BY MR. GILBERT:

21   Q.  Ms. Cozzetto, you see what's on your screen now?

22   A.  Yes, I do.

23   Q.  And this is an e-mail from April 12th of 2018?

24   A.  Yes.

25   Q.  And to whom are you communicating here?

L3HPWEI5                        Cozzetto - Cross

1   A.  I'm sending an e-mail to Andreas.

2   Q.  And what is the subject?

3   A.  The subject?

4   Q.  What are you talking to him about?

5   A.  Oh, I'm sorry.  I am asking him for an update on the

6   applications being complete.

7   Q.  Thank you.  You can take that down, please.

8           If we could please show the witness only the redacted

9   version of WX102.

10           Ms. Cozzetto, do you recognize the document on your

11   screen now?

12   A.  Yes, I do.

13   Q.  What is that?

14   A.  This is an e-mail exchange between myself and Andreas when

15   I worked at Eaze.

16   Q.  What is the date?

17   A.  The date is May 16th of 2018.

18   Q.  And it concerns the Eaze processing; is that correct?

19   A.  Yes, it does.

20           MR. GILBERT:  We offer the redacted version of WX102.

21           MS. DEININGER:  No objection.

22           THE COURT:  Received.

23           (Defendant's Exhibit WX102 received in evidence)

24   BY MR. GILBERT:

25   Q.  If you could show the witness only please the redacted

L3HPWEI5                         Cozzetto - Cross

1   version of WX103.  Let's look at, I'm sorry, the top of the

2   redacted page, the first page.

3            Do you recognize WX103?  I realize that some of the

4   material isn't visible to you, but from the top, can you tell

5   me what this is?

6   A.  It looks like that this is an e-mail from Mick Frederick to

7   EUprocessing on June 12th of 2018.

8   Q.  And moving to the second page, do you see a portion of this

9   e-mail at the top that's June 11th of 2018 at 6:18 p.m.?

10  A.  Yes, I see that.

11  Q.  Okay.  And that's an e-mail from you to Andreas; is that

12  correct?

13  A.  Yes, it is.

14  Q.  And it concerns the Eaze processing?

15  A.  Yes, it concerns EUprocessing.

16            MR. GILBERT:  We offer the redacted version of WX103.

17            MS. DEININGER:  No objection.

18            THE COURT:  Received.

19            (Defendant's Exhibit WX103 received in evidence)

20            MR. GILBERT:  Please show the witness only WX107 in

21  redacted form.  There should be a redacted version.

22  BY MR. GILBERT:

23  Q.  Let me direct your attention to the bottom portion.  Thank

24  you.  Do you recognize Government Exhibit -- I'm sorry, Weigand

25  Exhibit 107?

L3HPWEI5                      Cozzetto - Cross

1    A.  Yes, this is an e-mail that I wrote while I worked at Eaze.

2    Q.  And does it concern the Eaze processing?

3    A.  Yes, it does.

4    Q.  And to whom did you write this e-mail?

5    A.  I wrote this e-mail to Andreas.

6            MR. GILBERT:  We offer WX107 in its redacted form.

7            MS. DEININGER:  No objection.

8            THE COURT:  Received.

9            (Defendant's Exhibit WX107 received in evidence)

10   BY MR. GILBERT:

11   Q.  I'm going to show you one more of these, Ms. Cozzetto.

12           If we can get the redacted version, please, of WX111.

13           Do you recognize this document, Ms. Cozzetto?

14   A.  Yes.  This is an e-mail that I wrote while I was at Eaze.

15   Q.  And it concerns EU Processing?

16   A.  Yes, it does.

17   Q.  And what is the date of it?

18   A.  The date is July 30th, 2018.

19   Q.  And do you see up on the second page of this exhibit on

20   July 30th of 2018, does that appear to be an e-mail that you

21   wrote at 11:56 a.m.?

22   A.  I'm sorry, can you repeat the last part of that?

23   Q.  I'm sorry.  On the second page of the exhibit, do you see

24   an e-mail on July 30th of 2018 at 11:56 a.m. that you appear to

25   have written?

L3HPWEI5                        Cozzetto - Cross

1    A.  Yes, I do.

2    Q.  And who did you address that e-mail to?

3    A.  To Andreas and Marty.

4    Q.  And what is your understanding of who Marty was in this

5    e-mail?

6    A.  I don't recall who Marty was.

7    Q.  Andreas is the same person that you've been testifying

8    about today --

9    A.  I'm sorry, can you repeat that one again?

10   Q.  I'm sorry.  Andreas is the same person you've been

11   testifying about today?

12   A.  Yes.  I believe so, yes.

13   Q.  Can we please bring up Government Exhibit 303.

14          Do you recognize this Telegram chat that's entitled

15   "Heads of depots," Ms. Cozzetto?

16   A.  Yes, I do.

17   Q.  This is a document that the government asked you about on

18   your direct examination?

19   A.  Yes, it was.

20   Q.  I'm going to turn your attention to the second page, which

21   had an entry that appears to be a communication on July 3rd of

22   2018 at 9:13 from you; do you see that?

23   A.  Yes, I do.

24   Q.  And you say here:  "Good morning" -- well, just remind us,

25   please, who was participating in this chat, to your

L3HPWEI5                         Cozzetto - Cross

1   recollection?

2   A.   Who was on this chat?

3   Q.   Yes.

4   A.   This was a chat that I started with the heads of the

5   dispensaries that Eaze worked with, is my recollection.

6   Q.   And do you see in this exchange you write:  "Good morning,

7   everyone.  I've got the statements for June 3rd through

8   June 12th.  Andreas also confirmed that the shorter statements

9   last week were due to the bank adapting the billing period;" do

10  you see that?

11  A.   Yes.

12  Q.   And you were also referring to Andreas at

13  EUprocessing@ProtonMail?

14  A.   Yes.

15  Q.   And a little further down, on July 29th at 12:26:23, do you

16  see it says "Darcy Cozzetto:  I just asked Andreas;" do you see

17  that section?

18  A.   Yes, I do.

19  Q.   And this, too, is in connection with your work on Eaze

20  processing and, again, you're referring to Andreas at

21  EUprocessing, correct?

22  A.   Yes.

23  Q.   And a little bit further down on the same page, on

24  July 9th, 2018, at 14:20:43, do you see there's a communication

25  here from you that says "Hey, guys;" do you see that?

1    A.  Yes, I do.

2    Q.  And the next sentence says "I've already hit up Andreas and

3    Ray to get an answer on this, as well as the timing for the

4    wire next week"?

5    A.  Yes.

6    Q.  And this, again, is a reference to the same individual

7    Andreas at EUprocessing, correct?

8    A.  Yes.

9    Q.  And on the next page, on July 13th at 2018 at 7:59 there's

10   a communication from you as well; do you see that?  At the

11   bottom of the page that says:  "What Ray told me was that the

12   wire was initiated Wednesday"?

13   A.  Yes, I see that.

14   Q.  And you go on to say:  "You can ask Andreas.  I'm happy to

15   put you in touch with him if you don't have his information."

16   Do you see that?

17   A.  Yes, I do.

18   Q.  And do you recall who it was that you were going to put in

19   touch with Andreas?

20   A.  Can you take the zoom-out away so I can read earlier?

21           That comment, I think, was directed towards Justin

22   because he was asking about details on the amounts that he

23   should expect to receive, and then his confirmation that there

24   had been no wire that had been received.

25   Q.  And Justin is one of the dispensary individuals?

1   A.  Yes.  Justin worked for Natoma dispensary.

2   Q.  Do you recall whether you, in fact, put Justin in touch

3   with Andreas?

4   A.  Do I recall if I put Justin in touch with Andreas?

5   Q.  Yes.

6   A.  I do not recall if I did or not.

7   Q.  And if you go to July 18th at 13:32, do you see that

8   communication?  It says "Darcy Cozzetto" and it goes on to say:

9   "I'll let Ray, Andreas know"?

10  A.  Yes, I do see that.

11  Q.  And again, you're indicating to the dispensary individuals

12  that you would communicate with Andreas about the subject

13  matter of the processing that you're working on, correct?

14  A.  Yes.

15  Q.  You were asked a few questions on direct examination about

16  an e-mail from a Frenchy, F-r-e-n-c-h-y-e-s-q, do you recall

17  that?

18  A.  Yes, I do.

19  Q.  Do you know who that is?

20  A.  No, I don't.

21  Q.  You have no idea who Frenchyesq is a reference to in those

22  communications, right?

23  A.  I don't know.

24          MR. GILBERT:  Can I have one moment, your Honor?

25          THE COURT:  Yes.

1              MR. GILBERT:  Thank you.

2              (Pause)

3              Thank you, Ms. Cozzetto.  I have no further questions

4    at this time.

5              THE COURT:  Redirect.

6    REDIRECT EXAMINATION

7    BY MS. DEININGER:

8    Q.  Good afternoon, Ms. Cozzetto.

9    A.  Hello.

10   Q.  Now, you were asked on cross-examination about who was the

11   driver of getting credit cards up at Eaze; do you recall that?

12   A.  Yes.

13             MR. GILBERT:  Objection.  Vague.

14             THE COURT:  Overruled.

15   Q.  I think you said that, at Eaze, that was Jim Patterson; is

16   that right?

17   A.  Yes, that's my recollection.

18   Q.  To your recollection, who was primarily responsible for

19   getting Eaze a credit card solution outside of Eaze?

20   A.  For the EUP solution?  My understanding was Ray was our

21   main point of contact.

22   Q.  And did you have an understanding of who the primary person

23   responsible for the solution was prior to EUprocessing?

24             MR. TAYBACK:  Objection.  Foundation.

25             MR. GILBERT:  Objection.  Outside the scope.

L3HPWEI5                          Cozzetto – Redirect

1           THE COURT:  Lay a foundation.

2    Q.  I think I believe you said that on direct that you first

3    became involved in credit card processing for Eaze around

4    January or February of 2018; is that right?

5    A.  Yes.

6    Q.  And you testified on direct that you got involved in trying

7    to help collect some reserves from a credit card solution that

8    had stopped working; is that correct?

9    A.  Yes.

10   Q.  So what was your understanding of who was primarily

11   responsible for that first credit card solution that had just

12   stopped operating?

13   A.  My understanding was that Ray was responsible for that one

14   as well.

15   Q.  Now, sitting here today, you have no recollection of ever

16   meeting a person named Ruben, right?

17   A.  Correct.

18   Q.  And you have no recollection of ever having had any

19   conversations with a person named Ruben, right?

20   A.  Correct.

21   Q.  I'd like to have Mr. Levine pull up what's in evidence as

22   Government Exhibit 302.  And, Ms. Cozzetto, do you recognize

23   this?

24   A.  Yes.

25   Q.  You're a participant in this Telegram conversation,

1    correct?

2    A.  Yes.

3    Q.  Mr. Levine, can you go to page 50.

4            Ms. Cozzetto, do you see up at the top where it says:

5    "Ray Akhavan, I've added Martin and Ruben"?

6    A.  Yes, I do.

7    Q.  And do you see down below there where it says "RA at

8    10:52"?

9    A.  Yes.

10   Q.  Can you read the messages directly below that?

11   A.  Yes.  "Martin and Ruben have agreed to be actively involved

12   with helping us out.  Martin is handling all reporting and

13   reconciliation, and Ruben is interfacing with the banks."

14           Do you want me to stop?

15   Q.  Nope.  One more line.

16   A.  "You all met Ruben in LA, and Martin will be out soon

17   hopefully as well."

18   Q.  And if you look at the next page, do you see that message

19   at 10:57, the second from the top?

20   A.  Yes.

21   Q.  One below that, Mr. Levine.

22           Do you see who that appears to be from?

23   A.  Yes, it appears to be from Ruben W.

24   Q.  Now, you were asked on cross some questions about your

25   meetings with the government and what you talked about, right?

1    A.   Yes.

2    Q.   Generally, did you tell the government anything you wanted,

3    or did you ask the questions -- did you answer the questions we

4    asked?

5    A.   I generally answered the questions that I was asked.

6    Q.   And do you have any idea what other evidence has been

7    introduced in this trial, other than your own testimony?

8    A.   No.

9    Q.   Your first meeting with the government was in October 2020;

10   is that right?

11   A.   Yes.

12   Q.   Did you tell the government at that time that Ray Akhavan

13   had two or three associates in the room at the March 2018

14   Calabasas meeting?

15   A.   I don't remember how many I said, but I do remember I said

16   he had associates there.

17   Q.   Mr. Levine, if we can pull up just for the witness 3507,

18   page 3 -- on page 6 of this document, just for the witness.

19        And, Ms. Cozzetto, I want to focus your attention on

20   the second paragraph from the top and just read it to yourself.

21   Let me know when you're done.

22   A.   I'm done.

23   Q.   Mr. Levine, you can take it down.

24        Ms. Cozzetto, does that refresh your recollection that

25   in October of 2020, you told the government that Ray Akhavan

L3HPWEI5                     Cozzetto - Redirect

1   had two or three associates in the room at the March 2018

2   Calabasas meeting?

3   A.  Yes, it does.

4   Q.  And did you also tell the government at that time the name

5   Ruben rang a bell?

6   A.  Yes, I did.

7   Q.  And how do you recall -- and do you recall Ray mentioning

8   Ruben, generally?

9   A.  Yes.  I don't remember if he mentioned at the Calabasas

10  meeting or not.

11  Q.  And what is your recollection of what Ray said about Ruben?

12  A.  My first memory of hearing about Ruben was -- what I

13  remember is I was supposed to be interfacing with Ruben to set

14  up the process.  I believe I reached out a few times and didn't

15  get a response; so I asked Ray for help, and then he became my

16  main point of contact.

17  Q.  And you also -- you do recall meeting an associate of Ray's

18  at the March 2018 Calabasas meeting; is that right?

19  A.  Yes, that's right.

20  Q.  And I think you described that person as being a man,

21  right?

22  A.  Yes.

23  Q.  In his 30s or 40s?

24  A.  Yes.

25  Q.  With, I think you said, a bit of a square head?

1   A.  Yes.

2   Q.  And that you believed he was German based on his accent?

3   A.  Yes.

4   Q.  And I don't know that you mentioned this before, but do you

5   remember his hair color?

6   A.  Brown or blond -- brownish-blond maybe.

7   Q.  Okay.  Switching topics for a second.  You were asked on

8   cross-examination about another card processing solution that

9   Eaze used for a business CardConnect; do you remember that?

10  A.  Yes.

11  Q.  Was Eaze -- other than the solutions that Eaze worked on

12  with Ray, was Eaze ever able to keep a credit card solution up

13  and running for any period of time?

14  A.  Not that I knew of, no.

15  Q.  And the funds that went through CardConnect, those were

16  ultimately frozen, weren't they?

17  A.  Yes, they were.

18  Q.  So I think you testified on both direct and cross that

19  throughout the time period you worked at Eaze, you believed the

20  person writing to you from EUprocessing@ProtonMail.com was

21  named Andreas, right?

22  A.  Yes.

23  Q.  But you never met Andreas in person, right?

24  A.  Correct.

25          MR. GILBERT:  Objection.  Asked and answered.

 1              THE COURT:  Overruled.

 2   Q.  You never talked to Andreas on the phone, right?

 3              MR. GILBERT:  Objection.  Asked and answered.

 4              THE COURT:  Overruled.

 5   A.  Correct.  I did not talk to him on the phone.

 6   Q.  You never even learned a last name for Andreas, right?

 7   A.  Correct.

 8   Q.  Did you ever get a phone number for Andreas?

 9   A.  I don't believe so, no.

10   Q.  Did you ever visit an EUprocessing office?

11   A.  No, I did not.

12   Q.  Did you ever learn of whether they had an office?

13   A.  No, I don't believe I did.

14   Q.  Did you ever meet anyone who worked at EUprocessing?

15   A.  I don't believe so.

16   Q.  Did you ever talk to anyone who worked at EUprocessing?

17   A.  Outside of the e-mails, no, not that I recall.

18   Q.  Did you ever see a website for EUprocessing?

19   A.  No, not that I recall.

20   Q.  Did you ever have a phone number for anyone at

21   EUprocessing?

22   A.  No, not that I recall.

23   Q.  And based on your experience, is it normal business

24   practice not to have a phone number for a business partner?

25   A.  No, it is not.

L3HPWEI5                    Cozzetto - Redirect

1   Q.  I'd like to pull up what's in evidence as Government

2   Exhibit 443, and you were asked about this document on

3   cross-examination.  Do you remember that, Ms. Cozzetto?

4   A.  Yes.

5   Q.  So if we go to the e-mail at the bottom of the chain, which

6   is the first e-mail in time, April 3rd, 2018.  The top of the

7   e-mail says "Dear Darcy, it is a pleasure to emeet you."  Do

8   you see that?

9   A.  Yes.

10  Q.  Is this the first e-mail that you received from the e-mail

11  EUprocessing@ProtonMail.com?

12  A.  I don't remember exactly, but I believe it would be, yes.

13  Q.  And then can we look at the signature at the bottom.  What

14  does it say there?

15  A.  It says "All my best, Andreas."

16  Q.  So was this e-mail and the signature at the bottom of it

17  one of the reasons that you believed that someone named Andreas

18  used this e-mail?

19  A.  Yes.

20  Q.  Prior to this, had anyone told you that someone named

21  Andreas would be using the e-mail address

22  EUprocessing@ProtonMail.com?

23  A.  No, I don't believe so.

24  Q.  Other than the names written at the bottom of e-mails, did

25  you have any reason to believe it was actually someone named

L3HPWEI5                        Cozzetto - Redirect

1    Andreas that you were communicating with?

2    A.  No.  I believe there was somebody named Andreas from the

3    e-mails.

4    Q.  So if we go up to the top of this document, you were asked

5    some questions on cross-examination about, I believe,

6    instructions that Ray Akhavan had given during the March 2018

7    Calabasas meeting.  Do you remember that?

8    A.  Yes.

9    Q.  And how he had instructed that the dispensaries should

10   truthfully complete the bank accounts, right?

11   A.  Yes.

12   Q.  And you write here in this document:  "Please fill this out

13   as accurately and completely as possible," right?

14   A.  Yes.

15   Q.  And you're writing to the -- your primary audience is the

16   dispensary heads there; is that right?

17   A.  Yes.

18   Q.  Now, why are you giving them this instruction?

19   A.  I am giving them this instruction because I was reminding

20   them, based on the conversation we had at the meeting, fill out

21   the applications as accurately as possible.

22   Q.  And again, what did Ray say at the meeting about why it was

23   so important to fill out the applications as accurately as

24   possible?

25                MR. TAYBACK:  Objection.  Asked and answered.  Beyond

L3HPWEI5                         Cozzetto - Recross

1   the scope.

2           MS. DEININGER:  Your Honor, she was asked about this

3   particular statement on cross-examination.

4           THE COURT:  I'll allow it.  You may answer.

5   A.  Okay.  I'm sorry, can you repeat the question?

6   Q.  Yes.  The question was just, what did Ray say about why it

7   was so important for the dispensaries to be filling out the

8   applications as accurately as possible?

9   A.  It was important because that kept the dispensary owners'

10  level of risk to be pretty low.  They were being as truthful as

11  possible.

12  Q.  And what did you understand the risk at issue to be there?

13  A.  My understanding it was --

14          MR. TAYBACK:  Objection.  Asked and answered.

15          THE COURT:  Overruled.

16  Q.  You can answer.

17  A.  My understanding was the risk of getting caught.

18          MS. DEININGER:  No further questions.

19          THE COURT:  All right.  Anything else?

20          MR. TAYBACK:  Yes, your Honor.

21  RECROSS EXAMINATION

22  BY MR. TAYBACK:

23  Q.  Ms. Cozzetto, can you hear me?

24  A.  Yes, I can.  Thank you.

25  Q.  A consequence of, quote, unquote, getting caught would be

1  that monies that were being held by the bank, the acquiring

2  bank, would be frozen, correct?

3  A.  Yes.

4  Q.  And, in fact, that's actually something you experienced

5  when Eaze was doing business with CardConnect, correct?

6  A.  Yes.

7  Q.  And, in fact, when that happened -- back up.

8        And again, Mr. Akhavan was not part of any

9  relationship that Eaze had with CardConnect for the processing

10  of credit cards, correct?

11  A.  No.

12        MS. DEININGER:  Objection.  Foundation.

13        THE COURT:  Sustained.

14  Q.  You did not go through Mr. Akhavan to introduce Eaze to

15  CardConnect, correct?

16  A.  I personally did not, no.

17  Q.  Do you know whether anybody did?

18  A.  I don't know.

19  Q.  And CardConnect, in fact -- if I could ask you to take a

20  look at 302, which the government just showed you.  If you look

21  at the first page, this is the longer chat called Easycompany

22  chat; do you see that?

23  A.  Yes, I do.

24  Q.  And the date on the very top of the first page is

25  April 27th, 2018?

L3HPWEI5                        Cozzetto - Recross

1   A.  Yes.

2   Q.  And that's when the chat starts, but the chat extends for

3   many months, correct?

4   A.  Yes, I believe so.

5   Q.  If I could ask Mr. McLeod to turn to page 14.  It ends in

6   Bates stamp number 2195.  If I could ask you to go back to the

7   Bates stamp ending in 2190.

8           And if you look in the middle of the page, Mr. Akhavan

9   asks:  "What's the other solution exactly?  That's great news."

10  And if you go down to the next two responses, you'll see one

11  from Mr. Patterson that says:  "I believe the new one is called

12  CardConnect.  Daniel, is that right?"  Do you see that?

13  A.  Yes, I do.

14  Q.  If I could ask Mr. McLeod to go to the Bates stamp number

15  ending in 2195.

16          And if you look at the top of that page, it gives a

17  new date.  By then, at least, it's a conversation in June of

18  2018; is that correct?

19  A.  Yes.

20  Q.  And if you go down, you'll see a statement attributed to

21  Mr. Akhavan in the middle of the page that says:  Cuz the zero

22  reserve is really sweet.  I wish I could do the same for you

23  guys.  My problem is all the banks I deal with, I do a lot of

24  business with, and I can't lie to them; so I can't get low-risk

25  rates.  Do you see that?

L3HPWEI5                          Cozzetto - Recross

1   A.  Yes, I do.

2   Q.  You can take that down for the time being.

3           When you did business with CardConnect, they required

4   a reserve to be held, correct?

5   A.  I believe so.  I wasn't as familiar with that process.

6   Q.  And that was the money, ultimately, that was frozen,

7   correct?

8   A.  I believe it was the -- I believe it was the reserve and

9   also some -- potentially, some weekly wires from CardConnect

10  that were frozen.

11  Q.  And was it your understanding that the difference between

12  Eaze's relationship with CardConnect and Eaze's relationship

13  with Mr. Akhavan, is that the banks with Mr. Akhavan was

14  dealing with knew that they were processing marijuana?

15  A.  I --

16          MS. DEININGER:  Objection.  Foundation.

17          MR. TAYBACK:  I'm just asking for her understanding.

18          THE COURT:  Sustained.

19  Q.  Did you seek Mr. Akhavan's help in trying to get the

20  reserves released from CardConnect?

21  A.  I did not, no.

22  Q.  Do you know whether Eaze did?

23  A.  I don't know whether Eaze did.

24  Q.  Did the monies ever get released from CardConnect?

25  A.  I don't recall.

L3HPWEI5                        Cozzetto - Recross

1   Q.  Did you continue to do business with CardConnect?

2   A.  I don't recall, but I don't believe so.

3   Q.  But you don't recall?

4   A.  I don't recall.

5          MR. TAYBACK:  I have no further questions, your Honor.

6          THE COURT:  All right.

7   RECROSS EXAMINATION

8   BY MR. GILBERT:

9   Q.  Ms. Cozzetto, when you met with the government in October

10  of 2019 and you were asked about any associates of

11  Mr. Akhavan's at the meeting, you didn't tell the government in

12  October of 2019 that anybody had a German accent, did you?

13  A.  In October of 2020?  I don't recall.

14  Q.  You don't recall.  And isn't it true, Ms. Cozzetto, that

15  from April of 2018 to September of 2018, you were in regular

16  communication with EUprocessing as part of your job, right?

17  A.  April 2018 through September is?  Yes, that's correct.

18  Q.  It was an important part of what you were doing for Eaze,

19  correct?

20  A.  It was a part of what I did for Eaze, yes.

21  Q.  And you were focused on that work, to some extent, for many

22  months, correct?

23  A.  It was part of my job for many months, yes.

24  Q.  As part of your job for those many months, you had regular

25  communications, like many of them that we've seen, with

L3HPWEI5                          Cozzetto - Recross

1    EUprocessing, correct?

2    A.   Yes.

3    Q.   And in 2018, while you were having those communications,

4    isn't it true that it never occurred to you for one second that

5    Andreas was anybody other than Andreas?

6    A.   That is correct.

7    Q.   And, in fact, the only time that's ever come into your mind

8    was when it was suggested to you by the government?

9              MS. DEININGER:  Objection.

10   Q.   Is that....

11             THE COURT:  Overruled.  You may answer.

12   A.   I still believe that I was talking to somebody named

13   Andreas.

14             MR. GILBERT:  Thank you very much, Ms. Cozzetto.

15             THE COURT:  Anything further?

16             MS. DEININGER:  No further questions.

17             THE COURT:  Thank you very much.  You may step down.

18             (Witness excused)

19             Please call your next witness.

20             MS. DEININGER:  The government calls Michael

21   Steinbach.

22             THE COURT:  Remain standing but take your mask.

23   Please raise your right hand.

24

25    MICHAEL STEINBACH,

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3              THE COURT:  Please be seated.  State and spell your

4    full name.

5              THE WITNESS:  Michael Steinbach, M-i-c-h-a-e-l,

6    S-t-e-i-n-b-a-c-h.

7              THE COURT:  Counsel.

8    DIRECT EXAMINATION

9    BY MS. DEININGER:

10   Q.  Good afternoon, Mr. Steinbach.

11   A.  Hello.

12   Q.  Can you hear me okay?

13   A.  I can hear you.

14   Q.  Okay.  Mr. Steinbach, where do you work?

15   A.  I work at Citi.

16   Q.  How long -- is Citi also known as Citigroup or Citibank?

17   A.  It is.

18   Q.  How long have you worked at Citi?

19   A.  Four years.

20   Q.  What is your current role there?

21   A.  I'm the head of the consumer bank's fraud prevention

22   organization.

23   Q.  And what is the global -- Citi's global consumer bank?

24   A.  So Citi is actually two entities in general.  There's an

25   institutional group, institutional clients group, which is

1    commercial, industrial, trading; and then there's a consumer

2    bank, which is what we would all think of as a bank, a retail

3    bank, a global retail bank.

4    Q.  And what services does the global consumer bank offer to

5    customers?

6    A.  Sure.  So broadly, Citi's consumer bank offers services in

7    United States, Mexico and 17 countries in Asia, Europe and the

8    Middle East in credit cards and essentially retail bank

9    services, deposit banks, checking accounts, savings accounts,

10   that type of thing.

11   Q.  Okay.  And what are your general responsibilities as the

12   head of global fraud prevention?

13   A.  My role and my team's role is to prevent, detect and

14   mitigate fraud across the entire consumer banks, so end-to-end

15   accountability for all fraud from policy, strategy, through to

16   operations.

17   Q.  And what do you mean end-to-end accountability for fraud?

18   A.  So identifying and understanding the types of frauds that

19   are occurring, developing policy and strategies using analytic

20   tools to identify and stop the fraud, and then a large

21   operation staff that interfaces with customers when they

22   encounter fraud.

23   Q.  And how long have you been the head of global fraud

24   prevention?

25   A.  Three years, about three years.

L3HPWEI5                          Steinbach - Direct

1   Q.  What did you do at Citi before you became the head of

2   global fraud prevention?

3   A.  I was hired my first year at Citi to build a cyber fraud

4   fusion center.

5   Q.  And what does that mean?  What is a cyber fraud fusion

6   center?

7   A.  So Citi had a cyber security center, which is an entity

8   that was designed to prevent cyber attacks, the things you see

9   in the news, hacks, attacks to Citi's systems.  But what they

10  didn't have was a fraud-specific team, and fraud, a lot of

11  times, occurs not during the hack but later on down the road.

12          You know, a customer's information is stolen from

13  either Citi, or other places, and so the fraud fusion center

14  was designed to be an intelligence-led entity to go after fraud

15  well after the cyber event occurs.

16  Q.  And what did you do before joining Citi?

17  A.  I was with the FBI.

18  Q.  How long were you with the FBI?

19  A.  Twenty-two years.

20  Q.  What role did you hold at the time that you retired from

21  the FBI?

22  A.  I was the executive assistant director of the FBI's

23  national security branch.

24  Q.  And what are some of the other roles you held during your

25  tenure at the FBI?

1   A.   Prior to the head of the national security branch, I was

2   the head of counterterrorism, responsible for domestic and

3   international terrorism.  Prior to that, I held roles as the

4   head of the office of the Miami division of the FBI, and

5   separately, the Jacksonville, Florida division of the FBI.  I

6   served overseas at Israel, Afghanistan, India, quite a few

7   places.  My first job was working criminal matters in Chicago.

8   Q.   Going back to Citi for a minute, where is Citi

9   headquartered?

10  A.   Here in New York City.

11  Q.   Are you familiar with the Federal Deposit Insurance

12  Corporation?

13  A.   I am.

14  Q.   Are any components of Citi insured –– is that also known as

15  the FDIC?

16  A.   It is.

17  Q.   And are any components of Citi insured by the FDIC?

18  A.   Yes, consumer retail bank accounts.

19  Q.   And what does it mean to be insured by the FDIC?

20  A.   The FDIC insures against loss up to a certain dollar amount

21  for retail deposit accounts.

22  Q.   So I think you touched on this a minute ago, but does Citi

23  issue credit cards to consumers?

24  A.   They do.

25  Q.   And does it also issue debit cards?

L3HPWEI5                          Steinbach - Direct

1   A.  They do.

2   Q.  And so with respect to those cards, is Citi what is

3   referred to as an issuing bank?

4   A.  Citi is, in general, an issuing bank, yes.

5   Q.  During the 2016 to 2019 time period, what payment systems

6   did Citi use in connection with its cards?

7   A.  Primarily MasterCard and Visa.

8   Q.  And what role do those payment systems play in Citi's

9   ability to offer cards to its customers?

10  A.  So you can think of the Visa and MasterCard as kind of the

11  highway that the payment process goes through.

12  Q.  How would it impact Citi business if it wasn't able to

13  participate in MasterCard and Visa's payment system?

14  A.  We would not be able to have a credit card business and

15  make any money.

16  Q.  And is the card business a significant portion of Citi's

17  revenue?

18  A.  In the global consumer bank, it's the majority of our

19  revenue, yes.

20  Q.  In your role as the head of global fraud prevention, are

21  you familiar with Visa and MasterCard's rules for their payment

22  system?

23  A.  In general, yes.

24  Q.  Are those rules relevant to Citi's card business?

25  A.  They are.

L3HPWEI5                         Steinbach – Direct

1   Q.   How?

2   A.   So we have to abide by the rules that the association on

3   the networks, Visa and MasterCard, they set the ground rules

4   for which issuing banks, like Citi, and merchants and acquiring

5   banks can operate.

6   Q.   In the 2016 to 2019 time period, did Visa and MasterCard

7   have rules or policies regarding illegal transactions?

8   A.   They did.

9   Q.   And generally, what did their rules say regarding illegal

10  transactions?

11  A.   Illegal transactions were not allowed on either payment

12  platforms.

13  Q.   Did those rules or policies allow for a marijuana

14  transaction?

15  A.   They did not allow for marijuana transactions.

16  Q.   And why not?

17  A.   Marijuana was against the law from a federal perspective

18  and so, therefore, Visa and MasterCard would not allow payments

19  for marijuana on their systems.

20  Q.   So during the 2016 to 2019 time period, would Citi have

21  knowingly approved marijuana credit or debit card transactions?

22  A.   No.

23  Q.   During that same time period, did Citi have policies

24  regarding its willingness to conduct cannabis business?

25  A.   It did.

1    Q.  I'd like to show, Mr. Levine, if you can show just for the

2    witness, what has been marked for identification as Government

3    Exhibit 2502.

4           Mr. Steinbach, do you recognize this?

5    A.  I do.

6    Q.  And what is it?

7    A.  It's the global consumer bank AML program.

8    Q.  And what does AML program mean?

9    A.  AML stands for anti-money laundering.  It's a program that

10   all banks have.

11          MS. DEININGER:  Your Honor, the government offers

12   Government Exhibit 2502 into evidence.

13          MR. BURCK:  No objection, your Honor.

14          MR. ARTAN:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 2502 received in evidence)

17   BY MS. DEININGER:

18   Q.  Mr. Levine, if you can publish that for everyone.

19          So, Mr. Steinbach, looking back at this document,

20   what's the date of this document?

21   A.  The issue date is April 10, 2014.

22   Q.  And was there a version of this global consumer banking AML

23   program in effect for the entirety of the period from 2016 to

24   2019?

25   A.  There was.

L3HPWEI5                      Steinbach - Direct

1  Q.  Do the policies in this global consumer banking AML program

2  apply to Citi's card business?

3  A.  They do.

4  Q.  I want to, Mr. Levine, if you can, turn us to page 8.

5        And, Mr. Steinbach, do you see this, where it says

6  "Global AML policy"?

7  A.  I do.

8  Q.  Can you read that for me?

9  A.  "The objective of the GAML policy is to establish governing

10  principles and minimum standards to protect Citi, its

11  subsidiaries, affiliates and/or joint ventures from being used

12  to launder money and/or finance terrorism, and to guide all

13  Citi employees as they conduct business in accordance with

14  applicable anti-money laundering and counter-terrorist

15  financing, collectively AML laws and regulations."

16  Q.  You can stop there?

17  A.  "City's global AML program is structured to reflect Citi's

18  AML control framework and its application to the AML life

19  cycle."

20  Q.  Okay.  Thank you.  That's perfect.  So at the beginning of

21  this, it mentions that this is -- this is describing the

22  objectives that GAML policy.  Does that stand for global AML

23  policy?

24  A.  It does.

25  Q.  And it says that those are -- the objective is to establish

1  governing principles and minimum standards to protect Citi from

2  being used to launder money and/or finance terrorism; is that

3  right?

4  A.  That's correct.

5  Q.  And do these same objectives also apply to the global

6  consumer banking AML program?

7  A.  They do.

8  Q.  So in here, there's a reference to laundering money.

9  Generally, what does that mean?  What is laundering money?

10  A.  It's when you hide the origin of money that was obtained

11  illegally.

12  Q.  And can you provide an example of money that might be

13  obtained illegally that someone might seek to launder?

14  A.  A very general example would be a drug dealing, where the

15  proceeds were in cash, and you took those proceeds and took

16  them to a business, say a car wash, and the car wash then

17  deposited them as if they were legitimate funds from a car wash

18  versus from the drug dealing.

19  Q.  Mr. Levine, can we now turn to page 19.  Mr. Steinbach, do

20  you see section 5.2, where it states "GCB prohibited customers

21  and/or accounts"?

22  A.  I do.

23  Q.  Can you read the top paragraph under that for me, up to the

24  colon?

25  A.  "Unless otherwise granted a customer-specific exception in

accordance with Citi policy, or GCB procedures, GCB businesses

are prohibited from opening accounts for, or establishing

relationships with, any of the inherently high-risk or

statutorily prohibited client or account types listed below."

Q.  And then, Mr. Levine, if you can scroll so that we can see

item No. 12 on that list.

          Mr. Steinbach, what does item No. 12 say?

A.  "Marijuana providers and distributors."

Q.  To your knowledge, were there any -- was there a version of

this rule in place for the entirety of the 2016 to 2019 time

period?

A.  There was, yes.

Q.  And were there any material changes to this rule during

that time period?

A.  There were not.

Q.  Can you explain why Citi generally prohibits its businesses

from engaging in business with marijuana providers and

distributors?

A.  So Citi follows all applicable laws, state and federal, and

since marijuana is against the law from a federal perspective,

Citi has a policy that it's not to do business with marijuana.

Q.  Are there risks that Citi is seeking to minimize by having

this policy?

A.  Sure.  In general, Citi, as a consumer bank, has a

reputational risk, a regulatory risk and also a legal risk they

1    worry about.

2    Q.   And what do you mean by a regulatory risk there?

3    A.   So Citi, as one of the largest banks, is fairly heavily

4    regulated by a number of U.S. regulatory agencies, the OCC,

5    Federal Reserve Bank.  And so they govern the actions and

6    policies and procedures that Citi follows.

7    Q.   And you also mentioned legal risk, what did you mean by

8    that?

9    A.   So we are concerned, from a federal perspective, that we

10   are not following federal laws, and since we operate in the

11   United States and follow all applicable federal and state laws,

12   we are concerned, from a legal perspective, we'd be held liable

13   or accountable.

14   Q.   And so what would Citi have done if a marijuana business

15   applied for credit cards?

16   A.   We would not enter into a relationship with a business that

17   dealt with marijuana.

18   Q.   And generally, is it important to Citi to receive accurate

19   information as to whether its customers are engaged in

20   marijuana business?

21   A.   Yes.

22   Q.   Why?

23   A.   So to accurately assess the risk and to follow Citi policy

24   and to understand the business, we have to know what that

25   business is engaged in.

L3HPWEI5                           Steinbach – Direct

1              MS. DEININGER:  Your Honor, the government would now

2     like to offer into evidence Government's Exhibits 2512 to 2515

3     as self-authenticating business records.

4              MR. BURCK:  No objection, your Honor.

5              MR. ARTAN:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibits 2512 to 2515 received in

8     evidence)

9     BY MS. DEININGER:

10    Q.  Mr. Steinbach, you mentioned before that Citi was an

11    issuing bank with regard to credit cards, right?

12    A.  In general, yes, Citi is an issuing bank.

13    Q.  Are there certain instances in which it also serves the

14    role as acquiring bank?

15    A.  It does.

16    Q.  Mr. Levine, can you publish Government Exhibit 2515 and go

17    to page 3.

18              Mr. Steinbach, what is this?

19    A.  This looks to be a cardholder agreement when you apply for

20    a credit card.

21    Q.  And does this apply to cards issued by Citi?

22    A.  This does.

23    Q.  Mr. Levine, if we can go to page 5.

24              And, Mr. Steinbach, do you see under section 2 is

25    titled "Your accounts"?

1  A.  Yes.

2  Q.  On the right-hand side of that, there's a subsection that

3  says "Unlawful Transactions;" do you see that?

4  A.  I do.

5  Q.  Can you just read that for me?

6  A.  "Unlawful transactions.  You aren't permitted to use your

7  account for unlawful transactions.  If you do use your account

8  for unlawful transactions, this agreement still applies, and

9  you must pay for those transactions.  You also may have to pay

10  the card network and/or us for any damages and expenses

11  resulting from that use.  In addition, we may close your

12  account."

13  Q.  Thank you.  So in the United States, would marijuana

14  transactions be prohibited under this rule?

15  A.  They would.

16  Q.  And did Citi's cardholder agreements contain this rule

17  throughout the period between 2016 and 2019?

18  A.  They did.

19  Q.  Let's go to page 12 now.  There's a section up at the top

20  labeled "Governing Law;" do you see that?

21  A.  I do.

22  Q.  Can you just read that one sentence for me?

23  A.  "Governing law.  Federal law and the laws of South Dakota

24  govern the terms and enforcement of this agreement."

25  Q.  Mr. Levine, we can put that down.

L3HPWEI5                         Steinbach - Direct

1              Mr. Steinbach, in your role at Citi, are you familiar

2      with how credit card transactions are processed?

3      A.   I have.

4      Q.   And what is Citi's role in the card payment network?

5      A.   So essentially, Citi, in general, acts as the issuing bank.

6      So we would -- and a customer would apply for a card, and we

7      would issue a card based on that individual's credit.  We

8      essentially -- in the credit card relationship, we act as

9      providing a loan to those customers when they purchase or --

10     purchase goods or services.

11     Q.   And when a cardholder of a Citi credit card buys something,

12     what is Citi's role with regard to that particular transaction?

13     A.   Citi's role in every transaction where we are the issuing

14     bank is to approve or decline that transaction.

15     Q.   How does Citi make that decision?

16     A.   So broadly, when a customer or an individual goes and buys

17     a goods or a service, that information goes from the merchant,

18     through the network, to Citi.  And Citi has two broad

19     categories that they review to determine whether or not to

20     approve or decline a transaction.  There is a set of policy

21     rules and a set of strategy rules that in, quite frankly,

22     milliseconds the decision is made whether to approve or

23     decline.

24     Q.   And so you mentioned policy rules, and I think you said

25     fraud strategy rules; is that right?

L3HPWEI5                         Steinbach - Direct

1     A.  Correct.

2     Q.  What are policy rules?

3     A.  So policy rules would be things like is the name the

4     correct name, is the account number or the credit card the

5     correct number and the expiration date, is the credit limit

6     sufficient to justify or allow that purchase?  Things that are

7     more static and don't change, those are policies.

8     Q.  And what about fraud strategy rules, what are those?

9     A.  So fraud strategies are a broad set of dynamic rules that

10    change quite a bit and are varying, depending on the type of

11    purchase, the location, the channel.  And they go in to

12    determine essentially one thing, whether or not it's you, the

13    customer, or a fraudster or a bad actor, who's not supposed to

14    be charging on your card.

15    Q.  One of the things you mentioned there was the channel.

16    What did you mean by the channel?

17    A.  So you can do it, you know, online is one channel.  You

18    could be in person, over the telephone, numerous channels to

19    make a purchase.

20    Q.  And you referenced that one of the purposes is to try and

21    identify whether it's a customer, the fraudster or bad actor,

22    right?

23    A.  Correct.

24              (Continued on next page)

25

L3HPWEI5                          Steinbach - Direct

L3HAWEI6ps                       Steinbach - Direct

Q.   Would bad actors include merchants that are submitting

false information in the payment system?

A.   It would.

Q.   So you mentioned a lot of information there.  How does Citi

actually process --

          THE COURT:  Just so I'm clear on one thing.  So it

would be important to Citi, in deciding whether or not to prove

or disapprove the transaction, to know whether the customer was

disguising some aspect of the transaction, even -- regardless

of what that related to?  Do I have that right?

          THE WITNESS:  Correct.

          MS. DEININGER:  Thank you, your Honor.  You

anticipated some of my future questions.

Q.   Mr. Steinbach, I did want to ask -- you were saying that

you described a bunch of information that Citi received and

considered, and I wanted to -- I was hoping you could explain

how Citi actually processes that information and makes the

approval or the decline decision.

A.   Sure.  Again, from a broad strategy perspective, there is

essentially what we call a decision engine, which is, usually a

third party from another company gives it to us and we use it,

and this decision engine takes in hundreds if not thousands of

variables, different models and scores, again all in an attempt

to make sure that it's, in my case, Mike Steinbach making a

L3HPWEI5                        Steinbach - Direct

purchase or not Mike Steinbach.  And so those all fire very

quickly, and the decision engine makes the ultimate decision to

most generally either approve the transaction or decline the

transaction.

Q.  And to help reach that decision, does the decision engine

assign scores to different channels or transactions?

A.  There are numerous scores that come in as a result of this

transactional or authorizational attempt.  And based on those

scores, or risk levels, we set thresholds.  So in some cases we

may have a threshold at a certain level, and in other instances

we may raise or lower that threshold.

Q.  OK.  So Citi has risk thresholds at which it will or will

not approve or decline a transaction.  Right?

A.  Correct.

Q.  And I think you said those risk thresholds can vary

depending on a number of wide circumstances?

A.  They can.

Q.  And do they also change over time or are they static?

A.  They're very fluid.  They can change daily.  And there

could be several risk scores all inputted into a single

transaction.

Q.  Can you give me some examples of something that would lead

Citi to change its risk thresholds.

A.  So for instance we may notice increased fraud in a

particular geographic area, a particular state, with particular

L3HPWEI5                     Steinbach - Direct

 1   type of transactions, like big-screen TVs, and that may cause
 2   us to tighten the thresholds of approvals for big-screen TVs
 3   within that geographic area.  The rules are designed to be very
 4   targeted so we don't broadly impact a larger set of customers.
 5   Q.  And why are you trying to avoid impacting a larger set of
 6   customers?  What's the concern there?
 7   A.  So we have three core focuses.  We want to prevent fraud.
 8   We want to allow for a seamless customer experience.  And we
 9   want to keep our operational expenses down.  If we don't target
10   specifically those fraud strategies and affect a larger
11   population, of course a legitimate customer is going to be
12   impacted.  Their card is going to be declined and it's going to
13   cause a not a happy experience for that customer dealing with
14   Citi.
15   Q.  So I want to go back to the categories of information that
16   you said the decision engine takes into consideration.  I think
17   you mentioned location.  Correct?
18   A.  Correct.
19   Q.  And I think you mentioned channel, like whether the card is
20   present or not present?
21   A.  Correct.
22   Q.  Are there other primary factors that go into the decision
23   engine relating to the merchant?
24   A.  Yes.  There's broad categories.  We get merchant
25   information, we get customer information, and information

1    specific to the transaction.

2    Q.  And so what are the other pieces of merchant information

3    that go into the decision?

4    A.  So the networks, Visa and MasterCard, set a standard, what

5    we call level one information.  We get essentially merchant

6    name, date, the amount of the purchase, and something called

7    the MCC.

8    Q.  Do you also get information about -- or do you have

9    information on merchant history?

10   A.  We do.

11   Q.  And what is that?

12   A.  How long the merchant has been in business, what they sell,

13   what their business is, so we can understand the merchant.

14   Q.  And is it important to Citi for its decision process that

15   all of this information be accurate?

16   A.  It is.

17   Q.  Why, generally, is accuracy important?

18   A.  I mean probably two, or three, again, three basic areas.

19   If we don't have accurate information, we may incur more

20   financial loss through fraud.  If we don't have the correct

21   information, we may impact legitimate customers when they're

22   trying to do purchases, therefore impacting that customer's

23   experience.  And then lastly, it may increase our operational

24   expenses if we have the wrong information.

25   Q.  And how does this impact your operational expenses?

1    A.  So when we make a decision, or we alert on a card, that

2    customer is notified.  The more we alert, say in a general

3    sense, if we alert on a lot more customers, all those customers

4    call into our center to speak to an agent.  That's a person

5    they have to talk to.  That's a very significant expense for

6    us, if we have to spend the time with folks on the phone.

7    Q.  Do you know how much, generally, Citi spends on trying to

8    prevent fraud in its card system every year?

9    A.  I do.

10   Q.  How much is that?

11   A.  My operating expense, the annual operating expenses for the

12   North American managed segment are somewhere in the

13   neighborhood of, for this year, about $276 million, and about

14   $18 million in technology investments.

15   Q.  So one of the things you mentioned that Citi takes into

16   consideration is an MCC code.  Is that right?

17   A.  Correct.

18   Q.  What is an MCC code generally?

19   A.  Merchant category code.  It generally identifies the

20   category of merchandise or service that's being provided.

21   Q.  So is it important specifically that the MCC code received

22   for each transaction be accurate?

23   A.  It is.

24   Q.  And why?

25   A.  Certain entities, certain categories of code are more

L3HPWEI5                         Steinbach - Direct

1    subject to fraud.  Frauds are like big-ticket items versus,

2    say, for instance, groceries.  So understanding the specific

3    MCC code, or MCC, I should say, would allow us to understand if

4    we're under an attack, where it's coming from, and how to

5    mitigate it.

6    Q.  Are there any MCCs for which Citi blocks all transactions?

7    A.  There are a few.

8    Q.  Can you give me some examples?

9    A.  We block all cryptocurrency transactions, and we block

10   online gambling if it's illegal in the state in which the

11   transaction occurs.

12   Q.  So you mentioned that one of the ones that -- MCCs that

13   Citi blocks is cryptocurrency transactions, right?

14   A.  Correct.

15   Q.  Would Citi earn fees on cryptocurrency transactions if it

16   permitted them?

17   A.  They would.

18   Q.  Generally what fees does -- Citi earns fees on credit card

19   transactions?

20   A.  Citi, like all issuing banks, earns an interchange fee

21   somewhere in the neighborhood, I think on an average it's about

22   1.8 percent of the transaction.

23   Q.  Are cryptocurrency transactions illegal?

24   A.  They are not.

25   Q.  So why does Citi block cryptocurrency credit transactions

L3HPWEI5                    Steinbach - Direct

1   that it could be earning fees from?

2   A.  So we take a risk perspective to it.  We are concerned

3   that, with the volatility of cryptocurrency on a credit card

4   purchase you are essentially lending money.  And at this time,

5   Citi believes that's too great of a risk.  We do not block

6   debit purchases using cryptocurrency, because it's the

7   customer's money.

8   Q.  So is it fair to say that, for credit transactions, Citi

9   decided that even though those transactions are legal, they

10   involve a level of riskiness that it did not want to take on?

11   A.  That's exactly the reason why we don't.

12   Q.  Another piece of information that you mentioned that Citi

13   receives is merchant name.  Right?

14   A.  Correct.

15   Q.  So thinking just about the merchant name, is it important

16   that merchant name be accurate?

17   A.  It is.

18   Q.  And why is the accuracy of the merchant name important?

19   A.  So, again, as we attempt to stop or block fraud, sometimes

20   there are attacks specific to a type of merchant.  There

21   perhaps may be a problem with that particular merchant, and a

22   fraudster is a bad actor taking advantage of it.  So we need to

23   know, from a fraud perspective, who the merchant is.

24   Q.  Can the merchant name also be important on the back end

25   after an approval or decision is made?

L3HPWEI5                         Steinbach - Direct

1   A.  It is.

2   Q.  And how so?  Why would it be important at that time?

3   A.  The way the associations or networks work is, if a fraud

4   occurs, the liability could be with the bank, such as Citi, but

5   it could also be with the merchant.  So we would, in certain

6   cases, charge back the fraudulent purchase to the merchant.

7   Q.  Would Citi also need to know the merchant name if it was

8   going to conduct any investigation into potential fraudulent

9   activity?

10  A.  They would.

11  Q.  You also mentioned location information.  That goes into

12  the decision engine too.  Correct?

13  A.  It does.

14  Q.  And what does location information generally reflect?

15  A.  So it reflects essentially two scenarios: where the

16  merchant is located, but also where the cardholder is

17  conducting that transaction.  Say, for instance, I'm always

18  conducting transactions in the vicinity of my house, and

19  suddenly there's a transaction occurring a couple thousand

20  miles away.  That would change the riskiness of that

21  transaction for us.

22  Q.  And thinking just about the location information, is it

23  important that that information be accurate for Citi's decision

24  process?

25  A.  It is.

1    Q.  And why is that type of information -- that accuracy

2    important?

3    A.  It comes down to preventing fraud again.  So there are

4    certain fraud rings that operate in a very tight geographic

5    area.  So as we decide what we want to do about increased fraud

6    we may want to tighten the rules and strategies around a very

7    specific geographic area and not impact a larger subset of

8    customers, even if that's the same merchant or type of

9    business.

10   Q.  And so how if at all is Citi impacted if false information

11   regarding credit card transactions is submitted into the

12   payment network?

13   A.  So, again, we could have financial loss; we could subject

14   our clients to increased impact; and of course we could have

15   increased operational losses.

16   Q.  Are there also potential legal implications?

17   A.  There are, as I mentioned earlier, there are both legal

18   regulatory and reputational concerns with Citi if we don't get

19   it right.

20   Q.  OK.  What happens after Citi approves a credit card

21   transaction?

22   A.  The credit card or -- sorry.  When the transaction is

23   authorized, a message goes to that merchant to allow for the

24   transaction to proceed.

25   Q.  And can you describe the flow of money after Citi approves

L3HPWEI5                          Steinbach - Direct

1   the transaction?

2   A.   There is a process by which the issuing bank settles with

3   the merchant.  It usually happens overnight, on a nightly

4   basis, where the issuing bank, which is where the money is

5   coming from, as a loan to the customer, then provides that

6   particular merchant with the costs or the fees associated with

7   that transaction.

8   Q.   And so, just to be clear, I think you said that the --

9   during the settlement process, the money comes from the issuing

10  bank, right?

11  A.   Correct.

12  Q.   And that's because for credit transactions it essentially

13  was a loan to the credit card holder; is that correct?

14  A.   It is.  It is a loan to that credit card holder, yes.

15  Q.   So we just heard how Citi uses its decision engine to make

16  approval decisions for credit card transactions in realtime.

17  Right?

18  A.   Correct.

19  Q.   How else, if at all, does Citi use the output of the

20  transaction engine on the back end, after an initial approval

21  decision?

22  A.   So we monitor all of the transaction data throughout the

23  day to identify trends, to see fraud spikes.  Any anomalies

24  could be indicative of a number of things, could be indicative

25  of a sale, but could also be indicative of a fraud attack.

1    Q.  Are there certain metrics that can indicate fraud that Citi

2    looks for as part of that monitoring?

3    A.  There are.  There are dozens and dozens of metrics, yes.

4    Q.  Can you give me a few, just a few examples?

5    A.  So we look at something called the fraud rate.  We look at

6    something called detection rate.

7    Q.  Mr. Steinbach.  I'm sorry.  I'm having trouble hearing you.

8    Could you lean in a little bit?

9    A.  Yes.  So we look at a number of metrics.  There is a metric

10   called customer impact, which talks about how many legitimate

11   customers we're impacting.  There is something called the

12   detection rate.  It's just that, a detection rate.  There is a

13   fraud as a basis points of sale.  And as I learned three, four

14   years ago, there are dozens and dozens or more very finite

15   metrics associated with the process.

16   Q.  And you mentioned "detection rate."  What does that mean?

17   A.  "Detection rate" is how well we are doing our job detecting

18   fraud in our systems.

19   Q.  And are you familiar with chargebacks?

20   A.  I am.

21   Q.  Is that also another indicator of fraud that Citi monitors?

22   A.  So we would look at the write-offs, not necessarily the

23   chargeback.  When a loss occurs, there is a gross fraud loss.

24   The amount of money we charge back to the merchants and get in

25   return results in the net fraud loss to Citi.  So the net fraud

1    loss is an important metric for Citi.  That's ultimately how

2    much we lose as a bank.

3    Q.  So that indicator, the write-off or the net fraud loss, is

4    directly tied to chargebacks; is that correct?

5    A.  Yeah.  As we see write-offs in a particular channel or

6    product or area increase, that's an indicator for us that

7    there's potentially more fraud in that area.

8    Q.  And what does Citi do if it notices an uptake in one of

9    these indicators of fraud?

10   A.  So we have these, as I mentioned, these very dynamic

11   strategies.  We could go in and change the rules or strategies.

12   We could, we could tighten up the, the decision engines or the

13   risk scores to make it more difficult, to ensure that a true

14   customer was in fact making the purchase versus a fraudster, or

15   we quite frankly block or decline all types of those

16   transactions.  There's a number of factors, from least

17   aggressive to most aggressive being denying the transaction,

18   that we could take.

19   Q.  I think the first thing you mentioned there is you could

20   tighten the risk thresholds, right, and that that would make it

21   more difficult.  Does that mean that it's more likely that Citi

22   would end up declining a transaction of that category?

23   A.  Correct.

24   Q.  And then you said that Citi can block merchants entirely?

25   A.  Correct.

1   Q.   Under what sort of circumstances would it do that?

2   A.   So it -- if we felt that there was a high rate of fraud

3   with that merchant, we have a number of actions we could take.

4   At the far end of the spectrum, we could go to the networks or

5   the associations Visa or MasterCard, and make a formal

6   complaint and ask them to investigate.  The threshold for that

7   is that if 50 percent of all the transactions weren't

8   authorized, we have the ability to do that.

9        Much more, I guess, functional is our ability to block

10  internally in our engine, we could block all transactions or

11  authorizations from that particular merchant, or we could

12  assign a higher riskiness to a particular merchant.

13  Q.   And again, assigning a higher riskiness would mean that

14  more transactions from that merchant would get declined; is

15  that right?

16  A.   It's a factor.  So that would be one factor in raising the

17  overall threshold for approval.  Yes.

18  Q.   So we talked before a little bit about chargebacks, right?

19  What does Citi do if a customer disputes a transaction?

20  A.   So there's a dispute process that, when we get noticed from

21  the customer or an account alerts, that we follow a dispute

22  process.

23  Q.   And what is the purpose of that process?  What are you

24  looking for?

25  A.   We are ultimately trying to decide whether it is a

1   legitimate dispute, in other words, it's not the customer, a

2   fraudster, or in some cases not, not, not normally but

3   sometimes the customer is not being honest with us.

4   Q.  And what does Citi look at to determine if, if there was

5   fraud involved in a transaction?

6   A.  So it's initially a largely automated process.  If we get

7   contacted by customer, we immediately close the card, and then

8   we follow a protocol.  If it's not suspicious, we will go ahead

9   and either take liability, take the loss, or issue a chargeback

10  request to that particular merchant.  In a smaller subset of

11  cases where we believe it's suspicious, we will investigate

12  that particular transaction.

13  Q.  So I guess, first of all, what would you look at to decide

14  if you thought it was suspicious?

15  A.  So the type of transaction, very broadly, say, for

16  instance, a card with a chip, a chip in it, was used at noon,

17  and then an hour later, it was used, and an hour after that it

18  was used.  If the customer disputes that middle transaction, it

19  would be almost impossible for it not to be the customer,

20  because the customer had to have the card on both ends of it.

21  So that's a very simplistic example of, we believe in that

22  particular case the customer is not being truthful.

23  Q.  So from what I'm understanding, it's fair to say you look

24  at maybe some of the specifics of the transaction, the

25  circumstances in which it occurred?

L3HPWEI5                      Steinbach - Direct

1  A.  We look at all the information we have, merchant, MCC,

2  date, time, customer behavior, customer history.

3  Q.  And then if Citi decided that it did appear to be

4  suspicious, you said that they could -- it might investigate,

5  right?

6  A.  Correct.

7  Q.  And so what sort of things would Citi look at if it decided

8  it needed to investigate?

9  A.  So there is an automated flow for this process.  If it is

10 suspicious by a number of criteria, we will investigate.  And

11 based on that investigation, we would either keep the charge

12 with the customer or, in most cases we will actually take it

13 off the customer's account.

14 Q.  Can you describe for me generally what types of information

15 Citi might look at during its investigation?

16 A.  So we look at where the purchase occurred, what the

17 merchant was, the amount of the transaction.  We'll look at the

18 history of the transaction before and after.  We will look at

19 the customer's behavior, the customer's background, transaction

20 history.

21 Q.  And what would Citi do if it started receiving an

22 increasing number of disputes from cardholders about

23 transactions with a particular merchant?

24 A.  This happens more and more frequently where the merchant, a

25 specific merchant is involved in a larger number of fraudulent

L3HPWEI5                          Steinbach - Direct

1    claims.

2    Q.   What would Citi do under those circumstances?

3    A.   So if we believed that there was a larger fraud rate or

4    what we would call a collusive merchant, we would either,

5    again, three processes: we would either increase the risk

6    score, which we do to about 65,000 customers at a given time;

7    or we would completely block those merchants, which we do to

8    about 200,000 merchants; or in a very small number of cases we

9    refer to MasterCard or Visa.

10   Q.   I think in there you mentioned that these are steps, among

11   other things, you might take if you discovered that -- if you

12   decided that a merchant was collusive.  What do you mean by "a

13   collusive merchant"?

14   A.   So it's an industry term kind of broadly used to suggest

15   that the merchant is involved in a higher-than-normal fraud

16   rate.  Now, that doesn't mean that the merchant is a bad -- it

17   may be a victim.  But it has to do with it as collusive and

18   it's helpful to the particular fraudster committing fraud.

19   Q.   Are there any particular challenges Citi faces in trying to

20   identify illegal transactions coming over the network?

21   A.   There are lots and lots of hurdles and difficulties in

22   identifying fraud, if that's what you're asking.

23   Q.   And what are some of those hurdles?

24   A.   Fraudsters are -- it's a big business.  Fraud is about a

25   multimillion dollar business, but fraudsters continually are

1  trying to trick us, trick customers, and identifying new ways

2  to steal money that doesn't belong to them.

3  Q.  And specifically for illegal products, what are some of the

4  ways that, in your experience, merchants will go about trying

5  to process illegal transactions into the system?

6  A.  So a merchant could, knowing that a particular product was

7  illegal, they could route it into the MCC, so that when we got

8  it, we would not recognize it for what it actually was or what

9  the MCC shows.

10  Q.  And what are some ways that Citi might find out about

11  potential illegal card transactions?

12  A.  So we find out of course through our internal system.  We

13  have a very robust engine that we are constantly looking for

14  and identifying fraud within our systems.  But we also have a

15  close relationship with a peer financial institution, law

16  enforcement, and other ways, the dark web.  We look at a whole

17  host of areas to see if we can identify information that would

18  help us fight fraud.

19  Q.  Do the fusion centers that you mentioned earlier come into

20  play there too?

21  A.  Yes.  The fraud view center, the cyber fraud view center,

22  is my collection point where they receive both internal and

23  external intelligence and help decide next steps.

24  Q.  So what would Citi do if it discovered that a merchant was

25  involved in a type of business different than that represented

L3HPWEI5                         Steinbach - Direct

1    by its MCC code?

2    A.  We would file a SAR, most likely file a SAR.  And speaking

3    to -- most likely file a SAR, block that merchant.  And

4    probably report it to MasterCard and Visa and likely identify

5    it to some of our peer financial institutions.

6    Q.  And you mentioned a SAR.  What is a -- generally, just,

7    what is a SAR?

8    A.  It's a suspicious activity report that we're required to

9    file, where we believe a crime may have occurred.

10   Q.  And then you mentioned earlier that you have the ability to

11   block merchants, right?

12   A.  I'm sorry?

13   Q.  You mentioned earlier that you have the ability to block

14   merchants and you might do that under these circumstances; is

15   that right?

16   A.  Correct.

17   Q.  And does Citi maintain an active file of merchants that it

18   has blocked?

19   A.  We do.  Citi has what we call an internal negative file as

20   to where all of our blocked merchants are in that list.  And

21   that list is fed into our decision engine.

22   Q.  And what would Citi do if it discovered that a U.S.

23   merchant on the payment network was selling marijuana products?

24   A.  We would block -- it would be difficult because there is no

25   code for marijuana products, but if somehow we were made aware

1    of that situation, we would block the merchant from doing

2    business with Citi, by adding it to the negative list.

3    Q.  And you mentioned that there's no MCC code for marijuana.

4    Right?

5    A.  Correct.

6    Q.  Is that true just for marijuana, or is that generally true

7    for illegal products and services, that there's no MCC code?

8    A.  I don't know.

9    Q.  Are there other types of illegal transactions you can think

10   of that don't have an MCC code?

11   A.  Not off the top of my head, no.

12   Q.  How about, is there an MCC code for purchasing other

13   illegal drugs, like cocaine and heroin?

14   A.  No.

15           MR. BURCK:  Objection, your Honor, asked and answered.

16           THE COURT:  Overruled.

17   Q.  You can answer the question.

18   A.  No.

19   Q.  Does Citi have any control over the transaction information

20   it receives through the Visa and MasterCard payment system?

21   A.  We do not.

22   Q.  Who determines what information is passed through the

23   system?

24   A.  The networks, Visa or MasterCard, determine what

25   information we receive.

L3HPWEI5                        Steinbach - Direct

1   Q.  And when it comes to merchant-specific information, where

2   does that initially stem from?  Who inputs the merchant name

3   and other information into the system?

4   A.  I'm not sure I understand the question.

5   Q.  I will move away from that.

6           So you said that the Visa and MasterCard determine the

7   information -- the amount of information that goes through the

8   system, right?

9   A.  Yes.  There are payment systems.  There are payment rails.

10  We get what they provide to us.

11  Q.  If you and Citi could get more transaction information,

12  would you want it?

13  A.  Absolutely.

14  Q.  Why?

15  A.  The more specific information we have, the better we can

16  identify fraud and fight fraud.

17          MS. DEININGER:  One moment, your Honor.

18          No further questions.

19          THE COURT:  Cross-examination.

20          (Pause)

21          JUROR NO. 4:  They're here.

22          THE LAW CLERK:  Oh.  Thank you.

23          MR. BURCK:  Thank you, your Honor.  May I proceed?

24          THE COURT:  Yes.

25          MR. BURCK:  Thank you.

L3HAWEI6ps                         Steinbach - Cross

1     CROSS-EXAMINATION

2     BY MR. BURCK:

3     Q.  Mr. Steinbach, my name is Bill Burck.  I'm a lawyer for Ray

4     Akhavan.  Can you hear me OK?

5     A.  I can.

6     Q.  OK.  Thank you.

7           I want to start with your testimony about the credit

8     card transaction process.

9     A.  Sure.

10    Q.  And you testified that the credit card company -- I'm

11    sorry -- the issuing bank in the network, which would be Citi

12    in this particular case, Citi is the one that makes the

13    determination about authorizing or declining a transaction.  Is

14    that right?

15    A.  Correct.

16    Q.  And the information that Citi has when it makes that

17    split-second decision includes a certain amount of information

18    that it receives through the network.  Correct?

19    A.  Correct.

20    Q.  And that information includes the merchant's name.  Right?

21    A.  Correct.

22    Q.  The location of the merchant?

23    A.  Zip code, yes.

24    Q.  I'm sorry?

25    A.  Yes, the zip code.

L3HAWEI6ps                    Steinbach - Cross

1   Q.  The dollar amount of the transaction?

2   A.  Yes.

3   Q.  The MCC?

4   A.  Yes.

5   Q.  And then information from the card.  Correct?

6   A.  Information?

7   Q.  From the card, the credit card.

8   A.  The credit card holder, yes.  Yes.

9   Q.  Credit card -- the card number and things like that, right?

10  A.  Yes.

11  Q.  And that's all the information it has at the time that it

12  makes the decision, right, about whether or not to authorize or

13  decline.

14  A.  No.

15  Q.  What other information does it have?

16  A.  So what you described is the information specifically

17  coming from the networks.  There is, I think, as you alluded

18  to, there's information that's encrypted on the card that comes

19  from the card.  There's also information in our database about

20  the customer and the customer transaction history.

21  Q.  Right.  And so about that particular customer, correct?

22  A.  Correct.

23  Q.  So there's information about the cardholder's prior use of

24  the card, right?

25  A.  Correct.

L3HAWEI6ps                        Steinbach - Cross

1   Q.  So that helps you understand, is this a typical transaction

2   by the cardholder, right?

3   A.  Correct.

4   Q.  And one of the important things that you testified to --

5   that, I should say, that was important to Citibank in deciding

6   is whether or not the credit limit for the credit card is --

7   has been met, or hit.

8   A.  Correct.  That doesn't fall under fraud.  It falls under

9   the policy rules that I mentioned, yes.

10  Q.  The policy rules.

11          And in that split second, all of this information is

12  automated, correct?

13  A.  Yes.

14  Q.  Now, you testified on direct that Citi also has information

15  about the merchant's history and the merchant's business.

16  Right?

17  A.  Correct.

18  Q.  Now, is that information also included in this split-second

19  decision?

20  A.  It is.

21  Q.  And how is that done?

22  A.  So our history of the merchants, in other words, what we --

23  our transaction history with the merchant, that's part of the

24  decision process.

25  Q.  So if a merchant has appeared on the system before, that's

L3HAWEI6ps                    Steinbach - Cross

1    what you -- that is important to you.

2    A.  Yeah.  A merchant that's got a long history of

3    transactions, a big box merchant, has less riskiness than for

4    instance a merchant that's only been on the system for a week

5    or so.

6    Q.  Understood.  So one of the things that's important is, how

7    long the merchant has been around.

8    A.  Correct.

9    Q.  In the system.  Correct?

10   A.  Correct.

11   Q.  And the point that the credit -- that the issuing bank

12   makes the decision to authorize or decline, in some instances,

13   when it's declines, it will contact the customer, correct?

14   A.  Correct.

15   Q.  And either that can be by an email or by a text or by a

16   phone call, correct?

17   A.  Yes.

18   Q.  And you're familiar with that process, how that happens,

19   right?

20   A.  I am.

21   Q.  And when the issuing bank decides to contact the customer

22   to ask about a particular transaction, what types of questions

23   does the bank ask the customer?

24   A.  It's very generic.  So what you're describing is what we

25   call a pend transaction or a pending transaction.  We

1   essentially want to know --

2   Q.  Mr. Steinbach, I'm sorry.  Could you speak a little closer.

3   I'm having a real hard time hearing you today.  I'm sorry.

4   A.  So what you're describing is, at the time of transaction,

5   there are instances where we want to make sure it's the

6   customer, so we will pend the transaction.  In other words, we

7   don't approve it until we hear back from the customer.  And we

8   generally ask, is that you or is that not you.  And then

9   depending on the response, we would --

10  Q.  I'm sorry.  You're going to have to speak again.  We lost

11  you at the end.

12  A.  All right.  Sorry.

13  Q.  Thank you.  You said that "we" --

14  A.  So --

15  Q.  It's better, though, loud.

16  A.  So at the time of the transaction, we will either make the

17  decision to approve it or decline it.  And there are instances

18  where we're not quite ready to completely decline it, and so we

19  will reach out to the customer a lot of times through a text,

20  perhaps an email, maybe a phone call, where we will say

21  something along the lines of, can you verify this is your

22  transaction, click push 1 for yes or 2 for no.  That will help

23  us make a determination as to whether, again, the fraud

24  strategies are all designed around, is it Mike Steinbach or is

25  it not Mike Steinbach.  If it's Mike Steinbach, if I'm within

L3HAWEI6ps                     Steinbach - Cross

1  the credit limit, I can do whatever I want.

2  Q.  Understood.  And you don't ask, or the bank, I should say,

3  doesn't ask the customer in those circumstances, what are you

4  buying.  Right?

5  A.  There could be instances where the customer calls in and

6  through the course of the scripts, additional questions are

7  asked.  I don't have detail on what those questions would be.

8  Q.  You're talking about a circumstance where the customer

9  calls up the issuing bank, right?

10 A.  Yes.

11 Q.  I'm talking about when the issuing bank affirmatively

12 reaches out to the customer through a text or through an email

13 or through a call.  Does, in those circumstances, does the bank

14 ask, what are you buying?

15 A.  So there are times, to your point where, although we reach

16 out via text or email or call, customers are wary.  They will

17 not respond.  They will call in themselves.  So to answer your

18 question, I don't have 100 percent insight on all of the

19 questions asked in that particular situation.

20 Q.  Do you know if the issuing bank asks the customer, are you

21 buying a legal or an illegal product or service?

22 A.  The issuing bank, at least in Citi's case, does not ask

23 that question.

24        MR. BURCK:  Your Honor, I see that we only have five

25 minutes left.  I'm going to switch to a topic, it's probably

L3HAWEI6ps

1    going to take a while.

2            THE COURT:  All right.  So why don't we take a break.

3    Thank you very much.

4            THE COURT:  Ladies and gentlemen, I wanted to give you

5    a heads up on our schedule.  We're doing quite well.  The

6    government expects to conclude its evidence sometime tomorrow.

7    The defense, of course, doesn't have to provide any evidence,

8    because, as you will recall, the burden is always on the

9    government to prove its charge beyond a reasonable doubt.

10   However, the defense has indicated that it may call some

11   witnesses.  If that happens, hopefully that can be done on

12   Friday.  In the worst case it will go over to Monday.

13           We will then have closing arguments of counsel and my

14   instructions of law.  So the case will probably be yours late

15   on Tuesday.  So a little later than I thought originally.  We

16   lost a day here and there.  But basically pretty good.  And I

17   wanted to give you a heads up on that schedule.

18           So we'll see you tomorrow at 9:45.

19           (Jury not present)

20           THE COURT:  Mr. Steinbach, you can step down.  We'll

21   see you tomorrow at 9:45.

22           (Witness excused)

23           THE COURT:  All right.  So because I have another

24   in-court matter at 4, the marshals need to take Mr. Akhavan

25   back now.  The one thing I think, if this is agreeable to

L3HAWEI6ps

1     Mr. Akhavan and his counsel, that I could take up in the next

2     few minutes is the question of the completeness of

3     Mr. Weigand's statement, which doesn't directly impact

4     Mr. Akhavan.

5            MR. BURCK:  Yes, your Honor.  That's fine with us.

6     Thank you.

7            THE COURT:  Very good.

8            All right.  So we were talking about the additional

9     statements that Mr. Weigand wanted to introduce, the first in

10    the -- after the government has introduced his statement and

11    it's not his email address, but he might have heard of it.  And

12    the defense argues that the following should be added under the

13    rule of completeness:  The FBI agent says, "Like where have you

14    heard of him?  Whose email address is it, then?  You're

15    connected in that world, right?  So who's email address is it

16    if not yours?"

17           Mr. Weigand says, "I think I need to -- I don't know

18    how to continue this without having" -- and then it says

19    "unintelligible" but it's clear that he's asking for an

20    attorney from what follows immediately thereafter, because the

21    agent says, "Without what?  Why?"  And Mr. Weigand says,

22    "Without having legal advice.  I don't know how to continue.  I

23    don't know what the implication -- I've not done anything.  At

24    least, I don't think that I've done anything that I shouldn't

25    have done or that's illegal, and the fact now it seems that

L3HAWEI6ps

1    this is -- on this I really don't know what I should do and

2    without having any advice on it."

3           And then the agent says, "Understood.  So you want a

4    lawyer?"  Mr. Weigand says, "Yes."

5           I don't see how any of that even remotely comes in

6    under the rule of completeness.  So that will be denied.

7           Then we turn to the other portion that the government

8    wishes to introduce, which is that Mr. Weigand indicated that

9    he had some vague knowledge of Eaze, having seen it on

10   billboards and such, but no involvement in Eaze.  And the --

11   I'm not sure what if anything the defense wanted to introduce

12   on that score.  The one thing I have in my notes, and the one

13   thing I'm considering perhaps admitting is a statement that

14   comes earlier when the FBI agent asks Mr. Weigand, "You

15   understand English and speak English, right?"  And Weigand

16   says, "I'm OKish, I think."  It seems to me that that is

17   relevant to the jury in their overview of what force if any

18   should be given to these allegedly false statements that the

19   government is introducing.

20          So let me hear first from the defense if there's

21   anything I missed that they want to put in.

22          MR. ARTAN:  Thank you, your Honor.

23          THE COURT:  Take your mask off.

24          MR. ARTAN:  Can you hear me OK?

25          THE COURT:  Yes.

L3HAWEI6ps

1            MR. ARTAN:  Good afternoon.

2            THE COURT:  When you take your mask off, then I know

3       it's not Mr. Gilbert.

4            MR. ARTAN:  I even shaved, so --

5            Your Honor, if I could just make a couple of

6       observations before I get into the specifics.

7            THE COURT:  No.  We have ten minutes.

8            MR. ARTAN:  OK.  I'll make it quick.  But I just --

9            THE COURT:  What else if any did you want to

10      introduce?

11           MR. ARTAN:  Well, you know, I think -- one of the

12      things that's -- I will say, in terms of the case law, what's

13      unusual about this is that, in the cases, almost all the

14      sequences involve a defendant making admissions.  And what's

15      different here is that the defendant is being accused of lying.

16      And that's, I think, critically important in the analysis here,

17      because the government is saying, in these particular passages,

18      he's lying about whether it's even email or not or he's lying

19      about how it is that he heard about Eaze.  And it's our

20      position that that middle passage, where he's describing his

21      activities and what he has done, clarify and give context to

22      show that his statements were not lying.

23           THE COURT:  Excuse me for interrupting.

24           (Discussion held off the record)

25           THE COURT:  Go ahead.

L3HAWEI6ps

1           MR. ARTAN:  So it's our view, your Honor, that the

2     context is important in a broader context than if it was just

3     simply an admission.

4           THE COURT:  If I understand what you're saying, it

5     cuts the other way.  If someone gives 14 truthful statements

6     and one big fat lie and the government introduces the big fat

7     lie, that doesn't open the door, under completeness or another

8     doctrine, to the 14 other statements, except in very unusual

9     circumstances that are not present here.

10          MR. ARTAN:  Well, I think the cases say, if they're

11    intertwined, they should come in.

12          THE COURT:  Yes.  Well, you obviously have a much

13    broader view of what constitutes "intertwined."  Here, in the

14    example we just went through, he says, "It's not my email

15    address.  I might have heard of it, but it's obviously not my

16    email address."  And then what you want to put in is his

17    request for counsel.  How is that intertwined?

18          MR. ARTAN:  We moved on from that.  You had already

19    denied that, your Honor.  I was talking about the middle

20    section.

21          THE COURT:  All right.

22          MR. ARTAN:  The middle section where he's describing

23    his other activities.  And in that context, it helps clarify

24    the fact that he had other -- he's made his living productively

25    in completely different ways.  I know in the motion in limine

L3HAWEI6ps

1    originally --

2              THE COURT:  I think that's called hearsay.  It

3    doesn't -- you know, it -- I -- it's very different from the

4    situation where I did allow you to put in the fact that the

5    undercover agent, who he still thought, in the government's

6    view, was a co-conspirator, put questions to him and didn't get

7    the answers that he wanted.  He got exculpatory answers.  There

8    I can see it is admissible as bearing on his intent.  But here,

9    when he's being questioned by an FBI agent and he makes

10   protestations of innocence, that's about as clear an example of

11   hearsay as I know.

12             MR. ARTAN:  But cases allow it to come in when it's

13   needed to provide the context.

14             THE COURT:  How, I ask you again, what is it that's

15   providing the context?

16             MR. ARTAN:  Well, one of the lies is supposedly

17   that -- whether or not EUprocessing is his email or not.  OK.

18   That's supposedly a "big lie."  We've had two witnesses

19   basically say that that email belongs to Andres.  So there's a

20   lot of doubt as to whether it's a "big lie" or not.

21             THE COURT:  That's a different question.

22             MR. ARTAN:  I see that.  But his comments, his

23   descriptions of the work he did and the other things he did,

24   lend support to contradict what it is that he's being accused

25   of lying about.

1      THE COURT:  No.  I'm sorry.  You have a much, much

2  broader view of the rule of completeness than I think is

3  supported by the case law.  And I apologize, but we need to

4  move this along.

5      Let me hear from the government if you have any

6  objection to the one portion I was going to --

7      MR. FOLLY:  Your Honor, we are prepared to offer the

8  portion that you referenced, "You understand English and speak

9  English, right?"  "I'm OKish, I think."

10      THE COURT:  Very good.

11      MR. ARTAN:  One other question, your Honor?

12      THE COURT:  Yes.

13      MR. ARTAN:  I'm presuming that I can cross-examine the

14  agent about the conditions of the interrogation and things of

15  that sort.

16      THE COURT:  You can question him about things like,

17  you know, did this occur in a small room or something like

18  that, but not about -- you can't use that as a device to say,

19  and did he say to you -- you understand that, right?

20      MR. ARTAN:  I not only understand, I get it

21  completely.  No, I just want to make sure -- the reason --

22      THE COURT:  Then we are definitely communicating.

23      MR. ARTAN:  The reason I ask is, the beginning talks

24  about *Miranda* rights and who they are, and it strikes me that

25  if there's three agents in the room, for instance, that's

L3HAWEI6ps

1    something I could ask about.  If he's, you know, confronted

2    with what's going on, those are things I could talk about, not,

3    not --

4              THE COURT:  I'll have to hear it question by question.

5              The general conditions under which he was being

6    questioned, whether they were stressful or something like that,

7    I think, would come in on the question of whether he was

8    consciously lying or just making a mistake or maybe not making

9    a mistake at all.

10             So, OK.  Very good.

11             MS. LA MORTE:  Your Honor, literally 30 seconds.

12             We would just put in a request.  Can we file a letter

13   regarding the Circle matter?  We think it would be helpful for

14   the Court.

15             THE COURT:  Sure.

16             MS. LA MORTE:  OK.  That would be great.  Thank you.

17             THE COURT:  I may even read it.

18             No.  Please, please, do that.

19             If you want to respond on the defense side, you may.

20             (Adjourned to 9:15 a.m., March 18, 2021)

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   Cross By Mr. Burck . . . . . . . . . . . . .1931

 4   Cross By Mr. Harid . . . . . . . . . . . . .1970

 5   Redirect By Ms. Deininger  . . . . . . . . .1985

 6    DARCY COZZETTO

 7   Direct By Ms. Deininger  . . . . . . . . 1994 of

 8   Cross By Mr. Tayback . . . . . . . . . . . .2012

 9   Cross By Mr. Gilbert . . . . . . . . . . . .2029

10   Redirect By Ms. Deininger  . . . . . . . . .2063

11   Recross By Mr. Tayback . . . . . . . . . . .2072

12   Recross By Mr. Gilbert . . . . . . . . . . .2076

13    MICHAEL STEINBACH

14   Direct By Ms. Deininger  . . . . . . . . . .2078

15   Cross By Mr. Burck . . . . . . . . . . . . .2113

16                     GOVERNMENT EXHIBITS
     Exhibit No.                            Received
17     2218    . . . . . . . . . . . . . . . . .1932
       715     . . . . . . . . . . . . . . . . .2002
18     458     . . . . . . . . . . . . . . . . .2006
       303     . . . . . . . . . . . . . . . . .2008
19     2502    . . . . . . . . . . . . . . . . .2084
       2512 to 2515  . . . . . . . . . . . . . .2089
20

21                     DEFENDANT EXHIBITS
     Exhibit No.                            Received
22     403     . . . . . . . . . . . . . . . . .1954
       2207    . . . . . . . . . . . . . . . . .1978
23     443     . . . . . . . . . . . . . . . . .2052
       WX119   . . . . . . . . . . . . . . . . .2055
24     WX102   . . . . . . . . . . . . . . . . .2056
       WX103   . . . . . . . . . . . . . . . . .2057
25     WX107   . . . . . . . . . . . . . . . . .2058
```