L3IAWEI1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,

6
             Defendants.                 Trial
7
    ------------------------------x
8
                                         New York, N.Y.
9
                                         March 18, 2021
10                                       9:30 a.m.

11
    Before:
12
                      HON. JED S. RAKOFF,
13
                                         District Judge
14

15                       APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       AMY LESPERANCE
         -and-
24  MICHAEL H. ARTAN
         Attorney for Defendant Weigand

25

L3IAWEI1ps

APPEARANCES CONTINUED

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
        CHRISTOPHER TAYBACK
        SARA CLARK
        MARI HENDERSON
        DEREK SHAFFER
        PAUL SLATTERY
        -and-
ROTHKEN LAW FIRM LLP
        Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
        JARED R. SMITH

L3IAWEI1ps

1          (Trial resumed; jury not present)

2          THE COURT:  So there was this request from the defense

3     to reconsider my exclusion of one slide, Exhibit HAX5014, and

4     we were waiting on the transcript, and I see the parties have

5     supplied me with something, but I haven't, because I had

6     another matter earlier this morning, had a chance to look at it

7     yet.  So let me hear from whoever wants to be heard.

8          MR. TAYBACK:  Good morning, your Honor.

9          THE COURT:  Good morning.

10          MR. TAYBACK:  What we put before your Honor in the

11     form of a letter addressing the issue is not only the entry

12     foundation that Mr. Burck laid consistent with what I believe

13     the rules required to get the document in but also an

14     articulation of why it's relevant.  That is to say, the

15     audience to whom Visa was communicating this information, it's

16     not being offered for the truth.  It's being offered for the

17     effect on the listener.  It's the various Visa stakeholders,

18     including acquiring bank representatives, including issuing

19     bank representatives, the same as the slide presentation

20     offered by the government.

21          And the point is not whether they are accurately or

22     correctly predicting the growth or looking back on the growth

23     of the marijuana market, but the fact is, they were looking at

24     the size of the market for the purpose of making decisions

25     about what to do with marijuana as an industry.  It's very

L3IAWEI1ps

1    similar to the gambling analogy that Mr. Elliott talked about

2    as being a business, as being an industry.  Marijuana was

3    viewed the same way by Visa.  And I think it really is directly

4    relevant, exactly the point that Mr. Burck opened on, which is

5    to say the profit motive is a factor, at least, in determining

6    whether these banks and their credit card companies that are

7    affiliated with them care or not.

8              THE COURT:  Well, I hear you, but I have some

9    questions.  First, this was Mr. Elliott's slide.  The fact that

10   some member of the issuing banks might have been there doesn't

11   seem to me to be either here or there.  I don't see how the

12   jury can reasonably infer from, for example, if I hear a speech

13   from Donald Trump saying X, that I necessarily share

14   Mr. Trump's point of view.

15             So it only goes to Mr. Elliott's state of mind.  And

16   if Mr. Elliott had been from an issuing bank, maybe your

17   argument would be a little stronger.  But of course he's from

18   Visa.  Visa is not unrelated to all this, as we know from the

19   endless testimony we've heard on the relationship between the

20   various people, but in the end, what you're talking about is

21   evidence of an issuing bank's motive, not Visa's.

22             MR. TAYBACK:  It's really interrelated in this

23   respect, your Honor, which is to say, all the issuing banks

24   have said, you know, we subscribe to the Visa network, or the

25   MasterCard network, and we follow their rules.  And so what

L3IAWEI1ps

1    Visa is thinking and contemplating about what they care about

2    and what they don't care about and what that matters to Visa is

3    exactly relevant to what the issuing banks might reasonably

4    think.  That's what it is.

5              THE COURT:  That would only go to, since it's only, as

6    you say, it's an objective standard what a reasonable banker,

7    then the question would be, would it be reasonable for a banker

8    to rely on what Visa's state of mind is, because this is being

9    only offered for state of mind.

10             MR. TAYBACK:  Yes.

11             THE COURT:  Even if you could make an argument that,

12   yes, it would, it would be so far removed, far removed from

13   direct evidence on that point.  Plus, this of course comes at

14   the tail end of the conspiracy, so you're asking the jury to

15   also infer that the state of mind reflects back.

16             And then what I'm most concerned about is, the slide

17   on its face is blatantly hearsay, and I think it would be very

18   difficult for any reasonable juror seeing this slide to think,

19   oh, it's only being offered for state of mind, for

20   Mr. Elliott's state of mind, when the slide on its face

21   purports to be a definitive factual assertion of what's going

22   on in the marijuana market, complete with numbers and so forth.

23             MR. TAYBACK:  May I offer one more response to that?

24             THE COURT:  Yes.  Before you do, just one other

25   question.

L3IAWEI1ps

1          MR. TAYBACK:  Yes.

2          THE COURT:  And also, hasn't there already been more

3    general evidence in this case about the marijuana market being

4    not trivial?

5          MR. TAYBACK:  I think there may have been some

6    testimony to that effect.  However, our point is a little more

7    specific than that.  And that is, first of all, we would agree

8    with any limiting instruction, any limiting caveat, anything

9    that makes clear what the limitations are of this document, and

10   we would so argue it consistently with that.  However --

11         THE COURT:  I don't think you would agree with *any*

12   limiting instruction.  "Ladies and gentlemen, this document,

13   which you must not consider for its truth, which may be

14   potentially confusing and which is only indirectly and

15   tangentially related to any issue in this case, will

16   nevertheless be received."  I don't think that's the

17   instruction you want me to give.

18         MR. TAYBACK:  Perhaps I may have overstated that.  But

19   the point is, I think that all the little facts, the little

20   dots that might lead one, if not individually, collectively --

21   so, for example, the FinCEN guidance, which your Honor is

22   allowing, it's similar.  It's a statement out there that could

23   influence a reasonable banker, could bear on the question of

24   reasonableness.  And I think that's what the question is.  And

25   that's really what the relevance is.  And I think it's

L3IAWEI1ps

incredibly important to be consistent with our opening about

the motivations of these businesses that are making these

determinations.

THE COURT:  Well, you know, I have of course allowed

you, from the opening statement on, to make that argument and

adduce other evidence bearing on that.  We're just talking

about this particular exhibit.

MR. TAYBACK:  Yes.

THE COURT:  But let me hear from the government.

MS. DEININGER:  Yes, your Honor.  I think that the

government agrees with many of the points you've raised.  This

slide is absolutely hearsay.  We also objected to it under Rule

403 and under motion in limine 2.

The defense has already stated it shows that the

parties had a financial incentive, which goes to materiality.

And then it's clearly being offered for the truth or we believe

will be taken as being offered for the truth, especially to the

extent that there are numbers regarding the size of the

industry that predated the time of the slide.  I think they

went back to 2014.  All this to the extent that it is -- we do

not believe it reflects the state of mind of any of the issuing

banks.  As your Honor said, at most, it shows the state of mind

of Mr. Elliott.  But on that, I would note, your Honor, that is

correct; we don't actually know -- there were no questions put

to Mr. Elliott about what his state of mind or purpose was.

L3IAWEI1ps

1    THE COURT:  Well, that's what I wanted to -- as I

2    indicated even yesterday, I'm leaning towards excluding this.

3    But, because I didn't have the chance this morning to look at

4    the transcript -- and I am grateful to counsel for providing me

5    with the relevant portions of the transcript -- I will hold off

6    making a final decision until later today.  And I'll look at

7    the transcript.

8    MS. DEININGER:  If I may be heard for just one more

9    minute on that?

10    THE COURT:  Yes.

11    MS. DEININGER:  There were no questions put to

12    Mr. Elliott regarding the purpose of that slide and what he

13    intended to show, and so while the defense is making one

14    argument -- obviously they're arguing that it shows that there

15    was a financial motivation to engage in these types of

16    transactions -- it could have just as easily have been that

17    Mr. Elliott was trying to warn the council that there was a

18    reason to step up their enforcement efforts because the size of

19    the industry was growing.

20    THE COURT:  I made my ruling at the time, and what the

21    record should reflect is obvious.  This is in effect a motion

22    for reconsideration after the witness has gone.  And for

23    obvious reasons we're not going to call him back.  So that's

24    another potential difficulty with admitting this exhibit.

25    MR. TAYBACK:  Just to make a record, your Honor, we

L3IAWEI1ps

1    would be happy to call him back if that mattered.  I

2    understand.

3              THE COURT:  Now, it would require setting up all the

4    equipment again and the whole rigmarole.

5              MR. TAYBACK:  Yes.

6              THE COURT:  And we don't know at the moment its

7    availability.  But I'll keep that in mind.

8              OK.  Very good.  Is there anything else?

9              MR. TAYBACK:  Your Honor, I don't think it needs to be

10   taken up right this moment, but we do have some objections to

11   some documents that we offered by a summary witness.  I believe

12   that they're a final witness, and there are several before

13   that, so --

14             THE COURT:  How long are you going -- the witness is

15   presently on the stand.  How much longer do we have?

16             MR. BURCK:  Your Honor, if I may have 45 minutes.

17             MR. ARTAN:  In the same ballpark, your Honor.

18             THE COURT:  It sounds like we'll probably get to the

19   midmorning break or close to it, so we can take up any other

20   matter then.

21             MR. ARTAN:  One housekeeping matter?

22             In my screen there, the lines are compressed.

23             THE COURT:  I can't hear you.

24             MR. ARTAN:  On my screen the lines are compressed.

25   Maybe at some point before the jury comes in --

L3IAWEI1ps

1          THE COURT:  Oh, yes.

2          MR. ARTAN:  On my screen, looking --

3          THE COURT:  It's very pretty, but it's probably not

4    evidence.

5          There we go.  Thank you.

6          The gentleman who just did that, I wanted to ask you

7    yesterday your name.

8          MR. McLEOD:  Brandon McLeod, your Honor.

9          THE COURT:  You're very impressive on all this

10   technical stuff.  I applaud your efforts in helping us, and if

11   I ever run into a computer problem of my own, I know who to go

12   to.

13         MR. McLEOD:  Thank you, your Honor.

14         THE COURT:  Let's get the witness on the stand.

15         Are you having trouble with LiveNote?  Is that an

16   issue?

17         MR. ARTAN:  I don't know about the documents.  They're

18   on the screen.

19         THE COURT:  OK.  We're fine, it sounds like, now.

20         There is of course no right to LiveNotes in any event,

21   and I'm old enough to remember when none of us had it.

22         MR. ARTAN:  Well, the government's is working.

23         THE COURT:  So you're going to have to actually listen

24   with your ears.  It's a capacity that human beings have.

25         MR. ARTAN:  I understand, your Honor.

L3IAWEI1ps

1          THE COURT:  We'll try and get it fixed if we possibly

2     can.

3          MR. BURCK:  Judge, I wanted you to know when that when

4     you told the story yesterday about the five minutes I had in

5     fact told our team about that, from the last trial.  So I said,

6     we may have to be ready to close in five minutes.

7          THE COURT:  You need that much time?

8          MR. BURCK:  Right to it, your Honor.

9          (Jury present)

10         THE COURT:  Just give us one minute, ladies and

11    gentlemen.  We have a little technical issue that we're

12    addressing.

13         OK.  All done.

14         MR. BURCK:  So, your Honor.  May I proceed?

15         THE COURT:  Yes.

16         MR. BURCK:  Thank you, your Honor.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1   MICHAEL STEINBACH, resumed.

2   CROSS EXAMINATION (Cont'd)

3   BY MR. BURCK:

4   Q.  Good morning, Mr. Steinbach.

5   A.  Good morning.

6   Q.  Can you hear me OK?

7   A.  I hear you.

8   Q.  Great.  Let's pick up where we left off yesterday.

9   A.  Sure.

10  Q.  When we concluded, you were answering questions regarding

11  how Citi decides to authorize other decline a credit card or a

12  debit card transaction.  Do you remember that?

13  A.  I do.

14  Q.  And you testified that the key issue in that decision is

15  whether there is fraud.  Right?

16  A.  Correct.

17  Q.  And you said that the fraud strategies that Citi pursues

18  are all designed around, is it the cardholder or is it not the

19  cardholder, right?

20  A.  Correct.

21  Q.  So in fact using yourself as an example, is it Michael

22  Steinbach or is it not Michael Steinbach, right?

23  A.  Correct.

24  Q.  And that's the fraud you're talking about, right?

25  A.  Yes.

L3IAWEI1ps                    Steinbach - Cross

1   Q.  And you said that if it is Mike Steinbach -- again, I'm

2   just going to use you as the example, just, easier than

3   "cardholder" -- and if Michael Steinbach is within the credit

4   card limit for his card, you can do whatever you want with the

5   card.  Right?

6   A.  Correct.  In general.

7   Q.  In general, right.

8           And you testified that in those instances where bank

9   contacts -- where the bank contacts the cardholder to help

10  determine if it is in fact the cardholder, the bank does not

11  ask the cardholder, are you making a legal or illegal

12  transaction.  Right?

13  A.  Correct.  So there are a couple instances when we would

14  contact the cardholder, but I believe the instance that you

15  were referring to is at the time of transaction.

16  Q.  Exactly, the time of transaction.  The bank does not ask,

17  are you making a lawful or unlawful transaction.  Right?

18  A.  No.  The basis of that particular contact is to

19  authenticate the customer.

20  Q.  OK.  Thank you.

21          Now, you testified about the decision engine.  Do you

22  remember that?

23  A.  Yes.

24  Q.  And that's like software, or something like that?

25  A.  It's a -- yes.  It's a fairly advanced algorithm or model,

L3IAWEI1ps                    Steinbach - Cross

1    much higher than my capability, a lot of stuff.

2    Q.  Above your capability and mine, but it's software, it's

3    automated technology of some sort.

4    A.  Correct.

5    Q.  And it sorts through all kinds of, I think you said

6    hundreds of thousands of variables, right?

7    A.  Hundreds or thousands.

8    Q.  I'm sorry.  Hundreds or thousands.

9    A.  Up to a thousand or so.  It's a decision tree, essentially,

10   a very large decision tree.

11   Q.  And yet it's automated, by computer.

12   A.  Correct.

13   Q.  And it applies metrics.

14   A.  Correct.

15   Q.  That's the algorithm you're talking about?

16   A.  Yeah.  We're simplifying.  It's lots of algorithms.  Lots

17   of models are involved in this, but yes.

18   Q.  And it's all done in a split second, this determination by

19   the decision engine, right?

20   A.  It's done in within milliseconds, yes.

21   Q.  And, again, it's all there to determine if it's really

22   Michael Steinbach using Michael Steinbach's card.  Right?

23   A.  Yes.  The primary purpose of the fraud strategies, separate

24   from the policy that I talked about, the primary purpose of the

25   fraud strategies is to ensure that it is the cardholder making

1   the purchase.

2   Q.  And the decision -- it's the decision engine that makes the

3   ultimate decision whether to approve or decline on behalf of

4   the bank, right, at that millisecond?

5   A.  Within limits.  There are times when we can what we call

6   force approve, but for the most part, the vast majority of the

7   transactions, the decision engine makes that approve or decline

8   transaction, yes.

9   Q.  And you testified about, I think you just mentioned, there

10  were differences, there's the policies rules, right --

11  A.  Yes.

12  Q.  -- that go into this?  And then you testified about

13  something else called the strategy rules, right?

14  A.  Yes.

15  Q.  And the policy rules are the information you get from the

16  network, right, like the MCC?

17  A.  No.

18  Q.  No.  What are the policy rules?

19  A.  The policy rules would be more static things like the

20  account number on the card, the name on the card, the

21  expiration date on the card, things that you could think of as

22  static, things that wouldn't change, the credit limits for that

23  particular customer.

24  Q.  Understood.  So that's information that's generated by the

25  issuing bank for that cardholder.

L3IAWEI1ps                     Steinbach - Cross

1   A.   Yeah.  And you would, in many of the cases, it would be

2   transmitted via the card's magnetic stripe or the chip, some of

3   that information.

4   Q.   And the MCC and the merchant name, that kind of information

5   comes from the network.

6   A.   Comes from the network, yes.

7   Q.   And you testified that Visa and MasterCard control what

8   transaction information Citi receives over the payment system.

9   Do you recall that?

10  A.   Correct, yes.

11  Q.   And you said that it's up to them to determine what comes

12  through to you through the payment system, right?

13  A.   Yes.

14  Q.   Up to Visa and MasterCard?

15  A.   Yes.

16  Q.   And you said that if you could get more transaction

17  information from Visa and MasterCard, you want that

18  information, right?

19  A.   We don't need more information, but if that's -- you're

20  asking me, if I get more information?

21  Q.   No.  I'm saying, you testified that -- I believe you

22  testified that if you could get more information from Visa and

23  MasterCard through the network, you would want that additional

24  information.

25  A.   Sure.

1   Q.  Now, the second set of rules that you testified about are

2   the strategy rules.  Right?

3   A.  Correct.

4   Q.  And their purpose is to determine essentially one thing,

5   which is whether or not it's you using the card, the

6   cardholder, right?

7   A.  The cardholder or a bad actor, yes.

8   Q.  And when you say "a bad actor," it's somebody who is using

9   someone else's card, correct?

10  A.  Correct, or assuming the person's identity, etc.

11  Q.  Pretending to be other person -- pretending to be the

12  cardholder.

13  A.  Correct.

14  Q.  So the bad actor, the fraudster, there, is somebody who's

15  pretending to be the cardholder.

16  A.  Correct.

17  Q.  Or has stolen their information.

18  A.  Correct.

19  Q.  Now let's talk a little bit more about this, the concept of

20  the fraud.  And you were asked a number of questions by the

21  prosecutor about how you looked for fraud in the credit card

22  business at Citibank.  Do you remember those questions?

23  A.  I do.

24  Q.  And you are the head of the fraud prevention group at

25  Citibank, right?

1  A.  Correct.

2  Q.  And that's for the consumer bank, which is the bank that

3  issues the credit cards, right?

4  A.  Correct.

5  Q.  And your goal is to protect the cardholders and Citibank

6  from fraud, right?

7  A.  It's a little more nuanced than that, yes, but --

8  Q.  What is the nuance?

9  A.  The nuance is to protect the bank as well as the cardholder

10  from fraud while ensuring that the customer has a, I'll call it

11  seamless experience.

12  Q.  So it's both customer service as well as preventing fraud.

13  A.  Yeah.  And unfortunately fraud is not a black or white

14  thing.  You can't turn it on or off.  So you have to balance

15  fraud with customer impact.

16  Q.  Understood.  And the information that Citibank received

17  from the network for a particular transaction helps you to

18  accomplish that goal, right?

19  A.  Yes.

20  Q.  And the information that Citibank obtains on its own for

21  its own processes helps you do that as well.  Right?

22  A.  Yes.

23  Q.  And the point of all this is to make sure that when Michael

24  Steinbach's card details come to the network to make a

25  purchase, it really is Michael Steinbach, right?

L3IAWEI1ps                    Steinbach - Cross

1   A.  Yes.

2   Q.  And this prevents fraud on the cardholder, right, on

3   Michael Steinbach?

4   A.  Yes.  It protects the cardholder as well as the merchant,

5   as well as the issuing bank.

6   Q.  It protects everybody.  Right?

7   A.  Correct.

8   Q.  And it's because the cardholder is actually getting what he

9   or she paid for.  Isn't that right?

10  A.  That's correct.

11  Q.  And this also prevents fraud on the bank.  I think you

12  testified to that a moment ago.  Right?

13  A.  Yes.

14  Q.  Because the bank doesn't have to worry about, for example,

15  chargebacks.  Right?

16  A.  Yeah.  When fraud occurs on a card, one of three entities

17  absorb that loss: the customer, the bank, or the merchant.  So

18  it's going to protect one of those three.

19  Q.  And if there's no chargeback because the customer -- let me

20  ask you this way.  Chargebacks occur when the cardholder

21  doesn't recognize the charge on the card.  Right?

22  A.  Not necessarily.

23  Q.  Well, explain when it happens.

24  A.  So the first part of your question is correct.  If the

25  charge is not the customer and it's a fraudster, the

association on the networks, Visa and MasterCard, have

essentially a playbook.  Certain types of transaction, the

liability is with the merchant, and certain types of

transaction, the liability is with the bank, issuing bank.  So

when that charge is determined to be fraud, based on that

playbook, the issuing bank, if it's allowable in their

playbook, will send the charge to the merchant in chargeback.

If it's not allowable in that playbook, the bank eats that

loss.

Q.   Understood.  And the cardholder, when this chargeback

occurs, there's a dispute about the charge between the

cardholder and the merchant, correct?

A.   The overall dispute process, yes, it's initiated when the

cardholder contacts the bank.  When it goes to that flow, we've

accepted the cardholder's statement that it's not his.  There

is a separate, more lengthy dispute process when we are

disputing the customer.

Q.   Understood.  But the chargeback process is not started by

the bank on its own.  Right?

A.   It is.  Well, it depends on how you look at it, nuance.  So

if we alert the customer to a potential fraud, we are initially

starting that process.  The customer will see the alert, will

contact us.  So you can look at it both ways.  Ultimately the

customer has to say, I agree that's not my charge, and then the

process continues.

L3IAWEI1ps                     Steinbach - Cross

Q.   Right.  So for example in the example you just used, where
the bank would contact the customer, the cardholder, the
customer -- the cardholder says, no, that was my charge, then
there's no chargeback issued, correct?
A.   There's no chargeback issued.
Q.   So it has to be that at some point in the process the
cardholder has to say, that wasn't my charge -- right?
A.   Yes.
Q.   -- in order to start the charge back process.  Correct?
A.   Yes.  Again, to make sure -- to start the dispute process,
which may at times result in a chargeback process.
Q.   Right.
A.   Not every dispute results in a chargeback.
Q.   Understood.  Because sometimes you will investigate and
determine that in fact the customer made the charge.  Correct?
A.   Or sometimes the liability, based on the playbook, rests
with the bank, and therefore it doesn't do us any good to
request a chargeback when we know that's not going to happen.
Q.   You're not going to get the money back.
A.   Correct.
Q.   Understood.
        Now, the fraudsters in these examples and what you
look at are trying to trick Citibank and the customers to get
money that doesn't belong to them, right?
A.   Yes.

L3IAWEI1ps                  Steinbach - Cross

1   Q.  In effect they're trying to steal from the cardholder and

2   from Citibank, right?

3   A.  Correct.

4   Q.  Now, you testified about something called net fraud loss?

5   Remember that?

6   A.  I do.

7   Q.  And these come from chargebacks, right?

8   A.  Yeah.  The difference between the incoming loss, the gross

9   loss, and the net loss, is, that amount we get back is

10  chargeback.

11  Q.  Understood.  So, just so that that gets clear, the example

12  would be if Michael Steinbach's card has a hundred-dollar

13  charge on it, then Michael Steinbach disputes that charge, what

14  happens next?

15  A.  Sure.  I dispute that charge through the issuing bank, in

16  this case Citi.  It goes through a somewhat automated

17  process -- in most cases that's an automated flow, 80 percent

18  of the time it's an automated flow -- when we would make a

19  determination that we would agree that it's not Mike

20  Steinbach's charge, and then it would be either, depending on

21  the playbook, request chargeback from the merchant or just take

22  that loss ourselves.  In a small percentage of the cases, we

23  would dispute the fact that Mike Steinbach is saying he didn't

24  make the charge and would go through an investigation to obtain

25  some more details to determine whether or not we believe Mike

1    Steinbach made the charge or it was in fact a fraudster.

2    Q.  So when that chargeback occurs, the hundred-dollar

3    chargeback, and imagine that it is chargeback to the merchant,

4    does Citibank lose money on that chargeback?

5    A.  I believe so, but I'm not qualified to talk.  But there's a

6    small delta that I think we lose, but I'm not qualified to talk

7    about it.

8    Q.  Understood.  But the vast majority in your experience and

9    knowledge is coming from -- from sometimes when you can't get

10   the money back at all.

11   A.  Yeah.  When you're referring to the net fraud loss, you're

12   referring to those instances when we don't have chargeback

13   rights and Citi absorbs the loss.

14   Q.  Now, you testified also about something called collusive

15   merchants.  Do you remember that?

16   A.  I do.

17   Q.  And these are merchants involved in higher-than-usual fraud

18   rates, right?

19   A.  Correct.

20   Q.  And sometimes it could be because they're fraudsters or it

21   could be because they're victims; that's what you testified,

22   right?

23   A.  Correct.

24   Q.  And again, in these circumstances with the collusive

25   merchants, we're talking about cardholders disputing charges,

1    right?  Chargebacks.

2    A.  Yes, in most cases, yes.  We may on our own identify a

3    collusive merchant, but probably the beginning of that story

4    starts with a customer disputing a charge, which then leads us

5    to the merchant.

6    Q.  And so again, it's the same type of process that you talked

7    about.  Right?  It's a potential fraud on the cardholder and

8    the bank.  It's a potential theft, right?

9    A.  In general.  There's, again, more nuances to it, but, yes,

10   in general.

11   Q.  But the cardholder is telling you that, I didn't make the

12   purchase.  Correct?

13   A.  Correct.

14   Q.  And they're saying someone else did, a fraudster.  Correct?

15   A.  Correct.

16   Q.  Using the cardholder's account, right?

17   A.  Yes.

18   Q.  And the collusive merchant in that scenario is one who you

19   believe may be in on it in some way potentially.

20   A.  Well, it could be two scenarios.  It could be fraudsters

21   that just identify a particular merchant, particularly in a

22   town where they are using that merchant because they feel the

23   merchant's got weak processes or protocols, so in that case the

24   merchant's a victim, but it also could be a case where the

25   merchant is in fact in collusion with fraudsters.

L3IAWEI1ps                    Steinbach - Cross

1    Q.  But in the second scenario, the merchant is trying to rip

2    off the cardholder as well, right?

3    A.  Yeah.  In those instances, there are -- there's a lot of

4    different scenarios you can come up with, but in some cases

5    perhaps the fraudster is providing the kickback to the merchant

6    for not following through or, there's a lot of scenarios.

7    Q.  Right.  In the first one where they're a victim, the

8    merchant is an unwitting part of some kind of theft attempt.

9    A.  Correct.

10   Q.  Correct?

11   A.  Correct.

12   Q.  And you also testified that sometimes cardholders dispute a

13   charge but they're not being honest about it, right?

14   A.  Correct.

15   Q.  And that's in a circumstance where a cardholder says, that

16   wasn't my charge, but in fact it turns out it was.  Right?

17   A.  Correct.

18   Q.  And you testified that Citi will investigate these types of

19   situations.  Sometimes you find that a cardholder is not honest

20   about it.  Right?

21   A.  Correct.

22   Q.  And what happens when you determine that a dispute -- a

23   cardholder -- excuse me -- is not honest about not making a

24   charge?

25   A.  So the charge will remain with the customer.

1   Q.  You also testified about the annual budget for North

2   America for preventing fraud is around $270 million.  Is that

3   right?

4   A.  I think my budget this year is 276.9.

5   Q.  Exact.  OK.  Good.  276.9 million.  And about 18 million in

6   technology investments, is that right?

7   A.  For this year, yes.

8   Q.  And this money is aimed at preventing the kind of fraud

9   that you just testified about, right?

10  A.  Yes.

11  Q.  Let's turn to some of the testimony you had about marijuana

12  sales and policy at Citibank.  Do you remember that testimony?

13  A.  I do.

14          MR. BURCK:  If we can show the witness -- I mean, it's

15  in evidence -- Government Exhibit 2502.

16  Q.  And if we could go -- you recall that document?

17  A.  I do.

18  Q.  And it's the global consumer banking AML program, right?

19  A.  It is.

20  Q.  And you testified that this is an internal policy at

21  Citibank, right?

22  A.  That is correct.

23  Q.  This is attributed to Citibank personnel.

24  A.  Correct.

25  Q.  It's not attributed to cardholders, for example.

L3IAWEI1ps                    Steinbach - Cross

1   A.  It is not.

2          MR. BURCK:  Can we turn to page 19, I believe, on the

3   document.  5.2, yes.  If you could highlight the first

4   paragraph, bring that up.  Thank you.

5   Q.  Now, you remember testifying about this section

6   yesterday --

7   A.  I do.

8   Q.  -- in direct examination?

9   A.  I do.

10  Q.  And I'm just going to read part of it again.  "5.2, GCB,"

11  which is this policy, right, "prohibited customers and/or

12  accounts."  It says "customers and/or accounts," right?

13  A.  Yes.

14  Q.  It says, "Unless otherwise granted a customer-specific

15  exception in accordance with Citi policy or GCB procedures, GCB

16  businesses are prohibited from opening accounts for or

17  establishing relationships with any of the inherently high-risk

18  or statutorily prohibited clients or account types listed

19  below."  Correct?

20  A.  Correct.

21  Q.  So it's fair to say that this is directed at clients or

22  account holders at Citi.

23  A.  Could you repeat the question?

24  Q.  When you read this, in your understanding, is this

25  paragraph directed at clients and account holders and customers

L3IAWEI1ps                          Steinbach - Cross

1   of Citi?

2   A.  Yes.

3   Q.  So then turning to the next page, please --

4           MR. BURCK:  No. 12, Mr. McLeod.  Thank you.

5   Q.  "Marijuana providers and distributors."  Right?  That is

6   one of the groups that are prohibited, right?

7   A.  Correct.

8   Q.  And you testified that that was one of the groups that are

9   prohibited, right?

10  A.  Correct.

11  Q.  And what this is saying is that Citi may not take on

12  clients, customers, or account holders who are marijuana

13  providers and distributors.  Isn't that right?

14  A.  Yes.

15  Q.  Now, a cardholder could be a marijuana provider or

16  distributor.  Right?

17  A.  Not a Citi cardholder.

18  Q.  Well, let me ask you this way.  A cardholder could be

19  somebody -- a cardholder at Citi could theoretically be a --

20  work for a distributor, right?

21  A.  I think theoretically, yes.

22  Q.  Theoretically, right.  But all those other cardholders --

23  Michael Steinbach, all the millions of cardholders -- those

24  people are not marijuana providers and distributors, are they?

25  A.  I -- well, I mean, I don't know, but I mean, I know for

1   Michael Steinbach he is not a marijuana distributor, but I

2   can't speak for the hundreds of thousands of other customers.

3   Q.  Most of the customers, to your knowledge and your

4   experience, are most customers of Citibank marijuana providers

5   or distributors?

6   A.  Not that I have done any analysis but my guess is probably

7   not.

8   Q.  Very few probably, right, in your view?

9   A.  Probably yes.

10  Q.  And this is talking about customers, account holders and

11  clients of Citibank, right?

12  A.  That's what this refers to, this particular policy, yes.

13  Q.  And you testified yesterday that you're familiar with, in

14  your experience, with the credit card transaction process,

15  right?

16  A.  Correct.

17  Q.  And you know, for example, that the customer of Citibank in

18  the transaction process is the cardholder, right?

19  A.  Yes.

20  Q.  And you also know that the merchant who sells the product

21  to the cardholder is not a customer or a client of Citibank,

22  right?

23  A.  It could be, yes.  I mean, in general, yes.  Doesn't have

24  to be.

25  Q.  In the credit card system, is a merchant a client or

1    customer of Citibank?

2    A.  Correct.  Not -- no.

3              MR. BURCK:  You can take that down, Mr. McLeod.

4              Now let's turn to Government Exhibit 2512 in evidence.

5    Q.  And you recall this document, Mr. Steinbach?

6    A.  I do.

7    Q.  And this is a credit card agreement, right, between Citi

8    and an unnamed cardholder, right?

9    A.  A cardholder agreement, yes.

10             MR. BURCK:  And if we could turn to, I think it's page

11   3 of the document.  Two more pages on.  And if we highlight the

12   "unlawful Transactions," which is in the top half on the

13   right-hand side, Mr. McLeod.

14   Q.  You recall testifying about this language?

15   A.  I do.

16   Q.  And this is the agreement between Citi and the cardholder

17   about how to use the card, right?

18   A.  Yes.

19   Q.  And this says that "Unlawful Transactions.  You aren't

20   permitted to use your account for unlawful transactions.  If

21   you do use your account for unlawful transactions, this

22   agreement still applies and you must pay us for those

23   transactions."  You see that?

24   A.  I do.

25   Q.  "You also may have to pay the card network and/or us for

1    any damages and expenses resulting from that use.  In addition,

2    we may close your account."  You see that?

3    A.  I do.

4    Q.  Now, I think you testified, there's no specific mention of

5    marijuana in this language, right?

6    A.  Correct.

7    Q.  But your understanding is that unlawful transactions would

8    include marijuana purchases over a credit card, right?

9    A.  I'd say it's more than my understanding.  I mean I just --

10   I know what unlawful transactions are.  So, yes, I'd say

11   unlawful transactions from a federal perspective includes

12   marijuana.

13   Q.  Are you also aware that from a state perspective, for

14   California, for example, it's not unlawful under California

15   law, right?

16   A.  If you say so.  I guess, yes.

17   Q.  You don't know.

18   A.  No.  I don't know what states marijuana is lawful in.  I

19   believe it's somewhere in the neighborhood of 30, but I'm not

20   sure.  It wouldn't surprise me if it's California, though.

21   Q.  But you're the head of fraud prevention at Citibank and you

22   don't know if marijuana is lawful in California, right?

23   A.  I don't.

24   Q.  And this language doesn't say anything about the difference

25   between state or federal law when it comes to unlawful

L3IAWEI1ps                    Steinbach - Cross

1   transactions, right?

2   A.   Correct.

3   Q.   Doesn't give anybody guidance what to do in those

4   circumstances, right?

5   A.   Not in this paragraph, correct.

6   Q.   Anywhere else?

7   A.   I have to review it.

8   Q.   But sitting here right now, you don't know of anywhere else

9   that tells you what happens in the scenario where federal and

10  state law differ.

11  A.   Are you asking me if it applies to state or federal law, or

12  are you asking me if there's a conflict what the outcome would

13  be?

14  Q.   No.  I'm asking you if the document says anything to the

15  cardholder about what to do if there's a conflict between state

16  and federal law.

17  A.   Yeah.  I don't believe it does, but I'd have to review it

18  carefully.

19  Q.   Now, you testified about the robust internal system and

20  processes to detect fraud, right?

21  A.   Yes.

22  Q.   And you talk to your peer institutions, banks like Bank of

23  America or other banks, right?

24  A.   Sure.

25  Q.   And you said you talk to law enforcement too, correct?

1   A.  Yes.

2   Q.  But Citi does not have a program for ferreting out

3   marijuana sales, does it?

4   A.  On the card business?  You're asking me?

5   Q.  Yes.

6   A.  No.  From our perspective, the card business wouldn't

7   include marijuana because it's not allowed in the payment

8   system, so we don't have a separate system to ferret out

9   marijuana or any other specific type of transaction.

10  Q.  So -- and, again, you are the head of fraud and you don't

11  even know it's legal in California.  Right?

12          MS. DEININGER:  Objection.  Asked and answered.

13          MR. BURCK:  Your Honor, I can --

14          THE COURT:  Overruled.

15  Q.  You can go ahead and answer the question, yes.  You're the

16  head of fraud and you don't know even whether or not it's

17  lawful in California, right?

18  A.  Yeah.  So let me clarify.  I have not reviewed state by

19  state every state law with respect to marijuana.  I can make

20  some assumptions based on what I know.  But to testify and say

21  that I know for a fact that I've reviewed state law, that's

22  actually correct; I do not know for a fact that in the state of

23  California marijuana is legal or illegal.

24  Q.  Understood.  Now, there's no program at Citi designed to

25  detect marijuana sales when using credit cards branded by Citi,

L3IAWEI1ps                    Steinbach - Cross

1    right?

2    A.   There are no programs designed to identify a marijuana

3    transaction; is that what you're asking?

4    Q.   Yes.

5    A.   No, there's not.

6    Q.   And the 278.9, or 276.9 million dollar budget which you

7    talked about, the $18 million technology, how much of that

8    would you say is dedicated to ferreting out or identifying

9    marijuana sales?

10        MS. DEININGER:   Objection.   Asked and answered.

11        THE COURT:   Overruled.

12   A.   None.

13   Q.   You talked a bit about regulatory risk.   You remember that?

14   A.   I do.

15   Q.   And you testified that there is regulatory and legal risk

16   to Citibank -- or, I'm sorry, I keep on calling it Citibank.   I

17   don't know if it's still called that.

18   A.   There's lots of names.   Citi works.

19   Q.   Citi.   Do you remember that testimony?

20   A.   Yes.

21   Q.   And you testified about some of the U.S. regulators who

22   regulate Citi.   Right?

23   A.   Correct.

24   Q.   And you're familiar with the Department of Justice, right?

25   A.   I am familiar with the Department of Justice, yes.

L3IAWEI1ps                    Steinbach - Cross

1   Q.  And that's because you were an FBI agent, right?

2   A.  Correct.

3   Q.  And the FBI is part of the Department of Justice, right?

4   A.  It is.

5   Q.  And you're familiar with the United States Department of

6   Treasury, right?

7   A.  I am.

8   Q.  And you worked with the Department of Treasury when you

9   were an FBI agent, right?

10  A.  I did.

11  Q.  And they're also involved in regulating Citi, right?

12  A.  Yes.

13  Q.  Now, are you familiar with something called Cole memo?

14  A.  I'm sorry.  What?

15  Q.  The Cole memo?

16  A.  I am not.

17  Q.  Do you know anything about FinCEN, a FinCEN memo regarding

18  marijuana sales?

19  A.  I know about FinCEN.  I don't know about a FinCEN memo

20  specific to marijuana, no.

21  Q.  Let's go back to Government Exhibit 2515.

22          By the way, let me just go back one moment, before we

23  get to that.  You're not familiar with the Cole memo.  You're

24  not familiar with any FinCEN memo about marijuana.  Right?

25  A.  Not particularly, no.

L3IAWEI1ps                    Steinbach - Cross

```
 1   Q.  And you are, again, you're the head of fraud prevention at
 2   Citi.
 3   A.  I am.
 4   Q.  So your basis for your testimony about regulatory risks is
 5   because you understand that marijuana is illegal under federal
 6   law.  Correct?
 7   A.  I'm not sure I follow that language.
 8   Q.  Let me ask you this way.  You're not aware of any
 9   particular guidance from the Department of Justice or the
10   Treasury Department regarding enforcement of marijuana laws,
11   correct?
12   A.  Enforcement of marijuana -- I'm not.
13   Q.  So the basis of your testimony yesterday that there's
14   regulatory risk for Citi is based on your understanding that
15   marijuana is illegal under federal law.  Correct?
16   A.  Not exactly.  I think you're, you're conflating or you're
17   kind of combining two --
18   Q.  I'm not trying to.  Please, just explain --
19   A.  So regulatory risk involves a lot of assets.  So we are
20   regulated for processes, controls to make sure that we monitor
21   all parts of the bank.  So if we have both internal or external
22   policies at Citi, we are regulated and reviewed hundreds of
23   times a year to make sure that our monitoring and controls are
24   correct.  So if we had a policy and we were improperly
25   monitoring or controlling that policy, that would be a
```

L3IAWEI1ps                    Steinbach - Cross

1   regulatory risk because it would be flagged internally and

2   eventually make it to a regulator, who would note that and look

3   at Citi with a less than stellar control process.  In the past

4   that's resulted in regulatory fines.

5   Q.  Understood.  But you are not aware of the Department of

6   Justice's position on marijuana enforcement, right?

7   A.  I am not aware of the Department of Justice's role in

8   enforcement, correct.

9   Q.  And you're not aware of the Treasury Department's role --

10  or view of enforcement, correct?

11  A.  Enforcement, correct, I am not.

12  Q.  Let's turn now to Government Exhibit 2515.

13         I want to take a look first at this first page.  You

14  testified about the fees that are made by Citi in connection

15  with the credit card business.  Right?

16  A.  Correct.

17         MR. BURCK:  Actually, Mr. McLeod, can you go to the

18  top of that, please.

19  Q.  Now, I think you testified about a transaction fee, like

20  1-point-something percent?

21  A.  Interchange fee, yes.

22  Q.  Interchange fee.  Citi also makes money from the actual

23  credit card holders too, correct?

24  A.  Yes, they do.

25  Q.  And here, for example, there's an annual percentage rate

1   for purchases of 17.49 percent.  Correct?

2   A.  Correct.

3   Q.  And you're generally familiar with how the APR works for

4   Citi?

5   A.  I am.

6   Q.  So is it fair to say that a cardholder, if they don't pay

7   their balance in 25 days, must -- is going to be charged 17.49

8   percent?

9   A.  So that's a -- that's a sample and there's variations.

10  Q.  In this particular example.

11  A.  Yes.  In this particular example, balances that go beyond a

12  period of time are subject to interest, yes.

13  Q.  So the larger a balance grows over time for a particular

14  cardholder, unpaid, the more money City will make from that

15  cardholder, correct?

16  A.  Correct.

17  Q.  There are also penalties that are associated with late

18  payment, correct?

19  A.  There are, yes.

20  Q.  And that's also potential revenue to Citi.  Correct?

21  A.  Correct.

22  Q.  Now let's go back to the language on the unlawful

23  transactions on, I think, the fifth page.  Right.  And then if

24  you could highlight that language again.

25          So we read this before, but this says that even if

1    there's an unlawful transaction by the cardholder, what you're

2    saying to the cardholder is, "This agreement still applies, and

3    you must pay us for the transaction."  Right?

4    A.  Correct.

5    Q.  So you're not off the hook, the cardholder, if you use the

6    card for an unlawful transaction, right?

7    A.  That's what it says, yes.

8    Q.  You still have to pay Citi the balance, correct?

9    A.  Correct.

10   Q.  And it also says that "you also may have to pay the card

11   network and/or us for any damages and expenses resulting from

12   that use."  You see that?

13   A.  I do.

14   Q.  Now, are you aware of any cardholders who Citi has demanded

15   pay for damages and expenses for using their cards for

16   marijuana sales?

17   A.  I am not.

18   Q.  Are you aware of any cardholders whose cards have been

19   terminated for using them to buy marijuana?

20   A.  I am not.

21   Q.  And that's the last thing, right?  "In addition, we may

22   close your account," right?

23   A.  Correct.

24   Q.  You're not aware of anything happening like that in

25   marijuana sales, right?

L3IAWEI1ps                    Steinbach - Cross

1   A.  I am not.

2   Q.  Are you aware of a warning that Citi has put out to

3   customers who have bought marijuana to stop or face

4   consequences?

5   A.  I am not.

6   Q.  Have you or -- you or anyone at Citi -- are you aware of

7   anyone at Citi -- reported any cardholders to law enforcement

8   for using their cards to buy marijuana?

9   A.  I don't know the answer to that.

10  Q.  Well, how about you?  Have you ever done that?

11  A.  Have I ever done that?  Personally no.

12  Q.  But when you say you don't know the answer, that means you

13  don't know?

14  A.  We file thousands of suspicious activity reports a year.  I

15  have not reviewed them.  My guess is there -- likely, some of

16  those suspicious activity reports, which go to FinCEN, which go

17  to law enforcement, may have to deal with illegal drug use.

18  But I can't confirm that.

19  Q.  You said "likely, may."  You don't know?

20  A.  I don't know, no.

21  Q.  Sitting here today, you can't identify a single time this

22  happened, right?

23  A.  I can't personally, no.

24  Q.  You testified about the losses that Citibank -- excuse me,

25  Citi -- suffers from fraud.  Right?

L3IAWEI1ps                    Steinbach - Cross

1   A.   Correct.

2   Q.   Have you ever estimated the losses to Citi caused by

3   marijuana sales over a credit card system?

4   A.   I don't know how I would do that.

5   Q.   So the answer is no.

6   A.   The answer is no.

7            MS. DEININGER:   Objection.

8            THE COURT:   Objection to what?

9            MS. DEININGER:   To the question, your Honor, about

10  estimating the losses, and motion in limine 3.

11           THE COURT:   There was no objection to the first

12  question.   "Have you ever estimated the losses to Citi caused

13  by marijuana sales over the credit card system?"

14  "A. I don't know how I would do that.

15  "Q. So the answer is no.

16  "A. The answer is no."

17           And only then did I get an objection.   So I don't know

18  if it was a good objection, but assuming it was, it was waived.

19           MR. BURCK:   Your Honor, may I have a moment?

20           No further questions, your Honor.

21           THE COURT:   Counsel for Mr. Weigand.

22  CROSS-EXAMINATION

23  BY MR. ARTAN:

24  Q.   Good morning, Mr. Steinbach.   Can you hear me OK?

25  A.   I can.   Thank you.

L3IAWEI1ps                    Steinbach - Cross

1    Q.  My name is Michael Artan.  I represent Ruben Weigand.

2    A.  Good morning.

3    Q.  Now, you had several meetings with the government in

4    anticipation of your testimony today, correct?

5    A.  Correct.

6    Q.  And you've been apprised generally what this case is about,

7    correct?

8    A.  I have.

9    Q.  And understand that this is about whether -- this concerns

10   marijuana sales in California.  Correct?

11             MS. DEININGER:  Objection.

12             THE COURT:  Sustained.

13   Q.  Are you aware of that?

14             MS. DEININGER:  Objection.

15             THE COURT:  Sustained.

16   Q.  What's your understanding of what this case is about?

17   A.  My general understanding is, the case is about a company, a

18   California-based company, that sold marijuana using a

19   fraudulent MCC so that when credit cards purchased, the MCC

20   would not reflect the true item.

21   Q.  And in the process of getting ready to testify, you haven't

22   checked to see if marijuana was legal in California?

23             MS. DEININGER:  Objection.

24             THE COURT:  Sustained.  And I haven't heard yet a

25   proper question on this cross-examination.  Move on.

L3IAWEI1ps                    Steinbach – Cross

1    Q.  Now, you testified quite a bit yesterday about fraud,

2    correct?

3    A.  Correct.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3IPWEI2                    Steinbach - Cross

Q.   Now the fraud you've testified about generally concerns
situations in which what you've termed bad actors use stolen
credit card information to make fraudulent purchases, correct?
A.   That is one form of fraud, yes.
Q.   That's one of the major forms of fraud you're concerned
about, correct?
A.   It is a form of fraud I'm concerned about, yes.
Q.   And would you agree that Citi's policy relevant to cannabis
really doesn't impact fraud?
            MS. DEININGER:  Objection.
            THE COURT:  Sustained.
Q.   Now, if I'm understanding you correctly, the only reason
that Citibank does not want to process marijuana transactions
is because it is federally illegal, correct?
            MS. DEININGER:  Objection.  Misleading.
            THE COURT:  Well, I think he can answer that.
Overruled.
A.   We have no say in whether or not we transact with
marijuana.
Q.   I'm sorry, let me restate it.
            Do you know of any reason, other than the fact that
marijuana is federally illegal, that Citibank's policy is not
to process marijuana credit card transactions?
A.   The reason we don't -- in addition to our policy, is that
marijuana doesn't flow through U.S. payment systems.  There is

L3IPWEI2                    Steinbach - Cross

1    no marijuana transaction that flows through.  We don't even

2    have the decision to approve or decline a marijuana

3    transaction.  It's not in the U.S. payment system.

4    Q.  So as you sit here today, are you saying that marijuana

5    transactions don't go through the U.S. banking system?

6    A.  What I'm telling you is that if we see it's an MCC -- there

7    is no MCC for marijuana.  So I couldn't provide any clarity to

8    you as to whether we approve, decline marijuana because we

9    don't see it.

10   Q.  Okay.  But whether you see it or not, are you saying it

11   doesn't exist?

12   A.  Are you asking me to tell you what I know for a fact, or to

13   guess or suppose?

14   Q.  You are the head of fraud for Citi, correct?

15   A.  Mmm, hmm.  Yes.  Sorry about that.

16   Q.  Okay.  And is it your testimony that you don't have any

17   knowledge as to whether or not marijuana sales transactions

18   occurred through the Citi financial network?

19   A.  As a principal matter, what I'm telling you is there are

20   lots of things that flow through Citi that are, unfortunately,

21   illegal.  What I'm saying is I can't clarify or provide any

22   clarity as to that because I don't see it in the system because

23   it's not allowed on the U.S. payment rounds.  There is no code

24   for marijuana.

25            MR. ARTAN:  Could I have a moment, please, your Honor?

1              (Pause)

2              If I could have a moment, please, your Honor.

3              (Pause)

4    BY MR. ARTAN:

5    Q.   Yesterday, Ms. Deininger asked you about whether there's an

6    MCC code for purchasing other illegal drugs like cocaine and

7    heroin; do you remember that?

8    A.   Correct.

9    Q.   Do you know of any state in America where cocaine or heroin

10   sales are legal?

11   A.   I do not.

12             MR. ARTAN:   Could I have one more moment, your Honor?

13   Thank you.

14             (Pause)

15             Mr. Burck covered everything I wanted, your Honor.   I

16   think I have no further questions at this time.

17             THE COURT:   All right.   Redirect.

18   REDIRECT EXAMINATION

19   BY MS. DEININGER:

20   Q.   Good morning, Mr. Steinbach.

21   A.   Good morning.

22   Q.   Sorry.   It's at the time of day where I have to check to

23   make sure it was actually still morning.

24             All right.   You were asked on cross-examination some

25   questions about whether there were marijuana transactions going

L3IPWEI2                    Steinbach - Redirect

1   through the card network, as far as you're aware.  Do you

2   recall that?

3   A.  I am.

4   Q.  Are marijuana transactions allowed in the Visa and

5   MasterCard card networks?

6   A.  They are not.

7   Q.  And is that, in part, because they are against federal law?

8   A.  That is the reason.

9   Q.  Is it also against Visa's rules?

10  A.  It's against Visa and MasterCard policy, yes.

11  Q.  And you looked, during cross-examination, at one of Citi's

12  cardholder agreements; do you remember that?

13  A.  I do.

14  Q.  And the cardholder agreement also has a prohibition on

15  using cards for unlawful transactions; is that right?

16  A.  It does.

17  Q.  So those marijuana transactions, I mean, they're also

18  against Citi's rules?

19  A.  They are.

20  Q.  Now, if we can -- Mr. Levine, if you can pull up Government

21  Exhibit 2512 for us for just a minute.  And if we can go to --

22  if we can scroll down to the next page.  Sorry, one more.

23  Thank you.

24          You've looked -- we've been looking at this on both

25  direct and cross.  You've been looking at the section on

1   unlawful transactions; do you recall that?

2   A.  I do.

3   Q.  And here it says that you aren't permitted to use your

4   account for unlawful transactions.  Right?

5   A.  It does, correct.

6   Q.  Now, under this rule, are marijuana transactions in the

7   United States prohibited?

8   A.  They are.

9   Q.  And why?

10  A.  So the policy, unlawful transactions, applies to both

11  federal and state laws.  Since federal law prohibits marijuana,

12  this policy applies.

13  Q.  Okay.  And so fair to say federal law applies in all 50

14  states, right?

15  A.  It does.

16  Q.  And so under this rule, it doesn't matter what the state

17  law is; is that right?

18  A.  That is correct.

19  Q.  It is always prohibited in the United States?

20  A.  Correct.

21  Q.  Now, you also got asked some questions on cross-examination

22  about whether Citi specifically attempts to look for marijuana

23  transactions; do you recall that?

24  A.  I do.

25  Q.  And you said that that is not a specific part of the fraud

1   prevention program; is that right?

2   A.  Correct.

3   Q.  Why not?

4   A.  So I think there's basically two fundamental reasons.

5   First of all, marijuana is illegal and is not allowed on the

6   U.S. payment system; and more specifically, the networks do not

7   provide us transaction purchase-specific information.  We get

8   an MCC, which is a general category.

9           So we never, unfortunately, get the exact item.  So we

10  would get health and beauty or tools, but we wouldn't get the

11  specific item of health and beauty or tools.  So we don't have

12  an ability to look for marijuana or any other particular item

13  that is not available to us.

14  Q.  So because there's no marijuana MCC code, you can't

15  automatically look for marijuana transactions; is that right?

16  A.  Correct.

17  Q.  If there was a marijuana MCC code, would you block

18  marijuana transactions?

19  A.  Based on the policy with Citi today, yes.

20  Q.  And you said -- I think you said before that part of the

21  problem is you don't have product-specific-level information;

22  is that right?

23  A.  That is correct.

24  Q.  If Citi could receive that level of information, would you?

25           MR. ARTAN:  Objection.  Speculation.

1              THE COURT:  Sustained.

2    Q.  If Citi could receive more information, would it be helpful

3    to the fraud prevention program?

4    A.  It would.

5    Q.  And would you want to receive that information?

6    A.  Yes.

7    Q.  Now, you got asked some questions on cross-examination

8    about the fees Citi charges; do you recall that?

9    A.  I do.

10   Q.  So Citi generally does make some fees on each transaction;

11   is that correct?

12   A.  They do.

13   Q.  And I think you testified before on direct that that was

14   about, somewhere between one and two percent of each

15   transaction?

16   A.  That's a good industry average, yes.

17   Q.  So would Citi make more money if it just -- on fees if it

18   just approved all credit card transactions?

19   A.  Yes.

20   Q.  So why doesn't Citi do that?

21             MR. ARTAN:  Objection.  Speculation.

22             THE COURT:  Overruled.

23   A.  So I think there's a number of reasons.  First of all,

24   approving all transactions, from a fraud perspective, would

25   allow more fraud in the door, but then it would also subject us

L3IPWEI2                     Steinbach - Redirect

1   to, again, legal regulatory or reputational risk.

2   Q.  And couldn't, in fact, Citi -- if Citi was willing to break

3   the law, aren't there even more ways that it could make money?

4          MR. BURCK:  Objection, your Honor.

5          THE COURT:  Sustained.

6   Q.  You were also asked on cross-examination a number of

7   questions about how Citi -- about what types of fraud Citi

8   looks at; do you recall that?

9   A.  I do.

10  Q.  And I think you testified that one of the primary types of

11  fraud Citi is looking for is whether its cardholders -- whether

12  someone other than a cardholder that is actually using the

13  card; is that right?

14  A.  Correct.

15  Q.  Is that the only type of fraud that occurs in the card

16  payment network?

17  A.  No.

18  Q.  Is that an example of, I think you've described it as

19  first -- are you familiar with the term first-party fraud?

20  A.  I am.

21  Q.  And what is that?

22  A.  So the type of fraud that I have been speaking about is

23  called third-party fraud, where there is a fraudster or bad

24  actor.  In other words, there's a victim.

25          First-party fraud, essentially there is no victim.

It's the customer abusing the privileges, and so there's no

victim to report.  So we distinguish between third-party, where

there's a victim, and first-party fraud, where there's no

victim; it's generally the customer.

Q.  And is there also a type -- are you also familiar with the

term synthetic fraud?

A.  I am.

Q.  And what's that?

A.  So if you think of first-party fraud, synthetic fraud is a

rare -- is an extreme form of first-party fraud.  It's where an

individual customer or an individual customer information

creates fake or synthetic identities, creates a whole new

person, obtains a credit card or purchasing power of a deposit

account for that fake person, and then uses that and, of

course, makes money.  Again, there's no victim because it's a

completely fake person.  So it's a rising fraud in today's

market.

Q.  Is Citi only concerned about the type of fraud where it's

not actually the cardholder, or is it concerned with all these

types of fraud?

A.  It's concerned about all these types of fraud.  Synthetic

fraud, there is no ability to chargeback; so we absorb all of

the losses for synthetic fraud or first-party fraud.

Q.  And if a merchant was submitting false information into the

payment network, in your view, is that also a form of fraud?

L3IPWEI2                      Steinbach - Redirect

1   A.  Yeah, that could either fall into third-party or

2   first-party fraud, depending on where it landed.

3   Q.  And what's your understanding of who would be the party

4   being defrauded in that instance?

5   A.  In most cases, it would be the issuing bank.

6   Q.  And in this case, if it was a Citi card, that would be

7   Citi?

8   A.  Correct.

9   Q.  And how could that type of fraud impact Citi?

10  A.  Well, it results in, of course, greater losses on an annual

11  basis.  That would affect our bottom dollar if we make X amount

12  of money in revenue and subtract all the losses.  So it impacts

13  our bottom dollar.  You would then push that cost, in general,

14  back out into the customer.

15  Q.  And what action would Citi take if it discovered that a

16  merchant was submitting fraudulent information to the payment

17  networks?

18  A.  So on an individual basis, we would likely file a SAR.  Law

19  enforcement's Suspicious Activity Reports.  We would either

20  block or somehow restrict purchases from that merchant,

21  depending on the severity and the amount and the volume of

22  fraudulent purchases.

23  Q.  And you described on direct a block list that Citi

24  maintains, correct?

25  A.  Correct.

L3IPWEI2                          Steinbach – Redirect

1   Q.  And there are a number of merchants on that list, correct?

2   A.  Correct.

3   Q.  I think you said about 65,000 on it because Citi has

4   determined that they are high risk, right?

5   A.  We have about 65,000 where we increase the risk on.  We

6   have an additional 200,000 that are just completely blocked,

7   and that's a very fluid number that changes periodically as we

8   evaluate merchants.

9   Q.  And so if Citi learned that a merchant was submitting false

10  information to the payment network, they would go on that list;

11  is that right?

12  A.  Correct.

13  Q.  And if a merchant is on the block list, what would that

14  mean if they did try to submit a transaction into the network?

15  A.  For Citi, they would be declined.

16  Q.  Going back to MCC codes for a minute.  We were just

17  discussing how Citi is not able to automatically find marijuana

18  transactions because there is no marijuana MCC; is that

19  correct?

20  A.  That is correct.

21  Q.  But MCC codes are not the only piece of information that's

22  provided to Citi in connection with particular transactions,

23  right?

24  A.  That is correct.

25  Q.  I think one of the other pieces of information that you

L3IPWEI2                        Steinbach - Redirect

1    testified it's provided is a merchant name, right?

2    A.  Correct.

3    Q.  And if a merchant conducting illegal transactions started

4    doing business under a different name, after being identified,

5    would that interfere with Citi's ability to keep its

6    transactions out of the system?

7    A.  Could you repeat the question?

8    Q.  Sorry.  If a merchant, who had been identified by Citi as

9    conducting prohibited transactions, then started doing business

10   under a different name, would that interfere with Citi's

11   ability to block those transactions?

12   A.  It would.

13           MR. BURCK:  I withdraw the objection now.

14   Q.  And in the decision engine in deciding -- in Citi's

15   deciding engine, which decides -- that would decide whether --

16   and it makes an initial decision as to whether it offers a

17   transaction to be approved or declined, right?

18   A.  The merchant, yes.

19   Q.  Sorry.  And is merchant history also one factor that goes

20   into Citi's decision engine?

21   A.  Yes.

22   Q.  And that merchant history, that's something that's in

23   Citi's system prior to an individual transaction being

24   submitted, right?

25   A.  Yes.

1   Q.  Citi collects -- as transactions from a particular merchant

2   occur, Citi collects and builds information on the merchant's

3   history, right?

4   A.  Yes.  We would know how long that merchant had been

5   transacting in the Citi system, five years, five months, five

6   days.  That would all impact our score on the riskiness of that

7   merchant.

8   Q.  And there's other information that goes into the decision

9   engine that Citi has even before a particular transaction

10  occurs, right?

11  A.  Correct.

12  Q.  So one other piece of information might be whether a

13  merchant is on the block list, right?

14          MR. BURCK:  Your Honor, I just object to the leading

15  questions.

16          THE COURT:  Well, it's getting a little close to

17  leading.

18          MS. DEININGER:  Okay.

19          THE COURT:  Why don't you rephrase the question.

20  BY MS. DEININGER:

21  Q.  Is information on whether a merchant is on the block list

22  something that goes into the decision engine?

23  A.  Yes.

24  Q.  And is that information that Citi already has before a

25  particular transaction occurs?

A.  We maintain a block list or a negative file, and that is a
list that is input into the decision engine; so as we add
merchants to that, that is a factor in our decision process.

Q.  You were saying before that if you discovered that a
merchant was submitting false information into the system, that
you would place them on your block list, right?

A.  Correct.

Q.  Is it important, generally, for Citi to know who it's doing
business with?

A.  It is.

Q.  And is it fair to say that it's important to Citi to
receive accurate information about transactions that it is
approving?

A.  It is.

Q.  And why is it important for it to receive accurate
transaction information?

A.  I mean, there are a number of reasons.  Obviously, the
reason I'm most concerned about is fraud.  We can't make an
accurate decision if we don't know the company name.  So
particular merchants and categories of purchases have higher
risk.  There's also, again, legal, reputational, regulatory
risk.

Q.  And if a merchant was purposely submitting false
information into the credit card system, would that be a
problem for Citi's fraud prevention effort?

L3IPWEI2                        Steinbach - Redirect

1    A.  It would.

2    Q.  Why?  What sort of problems would that cause?

3    A.  The decision engines and the fraud rules are built on

4    models that take into account the types of transactions and

5    what's being transacted.  Certain -- big screen TV is a lot

6    more susceptible to fraud than groceries and it's higher risk;

7    so we have to know the type of transaction and the merchant.

8            Certain merchants are more susceptible that are

9    detections within their systems.  So all of that information

10   plays into allowing Citi to make very targeted decision with

11   their fraud rules.

12   Q.  And does it play into whether Citi is able to identify

13   these types of first-party frauds that we were talking about?

14   A.  It plays into both situations.

15   Q.  So it also plays into whether there's the third-party

16   fraud, where there isn't necessarily an easily identifiable

17   victim?

18   A.  So with third-party fraud, there is an easily identifiable

19   victim.

20   Q.  Sorry.  I thought I had it flopped in my mind.

21   A.  With the first-party fraud, where there is no victim,

22   having an understanding of the totality of the information with

23   respect to transactions is also important.

24   Q.  And would it also play into Citi's ability to detect

25   merchants engaging in prohibited transactions?

1    A.  Yes.

2            MS. DEININGER:  No further questions, your Honor.

3            THE COURT:  Recross?

4            MR. BURCK:  Yes, your Honor.  Very briefly.

5    RECROSS EXAMINATION

6    BY MR. BURCK:

7    Q.  Hi, Mr. Steinbach.  You were asked about a block list that

8    Citi bank maintains?

9    A.  Yes.

10   Q.  And this is a list of merchants that Citi has said we're

11   not going to do business with, we're not going to allow it to

12   be on the network, right?

13   A.  It is both a list of merchants that are completely blocked

14   and others that there is a higher risk associated with that

15   particular merchant.  We call it a negative file.

16   Q.  Have you ever heard a company Eaze?

17   A.  I have.

18           MS. DEININGER:  Objection.

19           THE COURT:  Overruled.

20   Q.  Is Eaze on that block list?

21   A.  No.

22           MR. BURCK:  No further questions, your Honor.

23           THE COURT:  Anything further from Mr. Weigand's

24   counsel?

25           MR. ARTAN:  No, your Honor.

1           THE COURT:  Very good.  Anything further from the

2    government?  Anything further from the government?

3           MS. DEININGER:  Sorry.  No further questions, your

4    Honor.

5           THE COURT:  Thank you very much.  You may step down.

6           (Witness excused)

7           Please call your next witness.

8           MS. DEININGER:  The government calls Jacob Pechet.

9           THE COURT:  Please remain standing but take off your

10   mask.

11    JACOB PECHET,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14          THE COURT:  Please be seated.  State your full name

15   and spell it for the record.

16          THE WITNESS:  My name is Jacob Pechet, J-a-c-o-b,

17   P-e-c-h-e-t.

18          THE COURT:  Counsel.

19   DIRECT EXAMINATION

20   BY MS. DEININGER:

21   Q.  Good morning, how are you doing?

22   A.  Good morning.  Well, thanks.

23   Q.  I think I might have mispronounced your name.  Can you

24   spell your last name for me?

25   A.  It's Pechet.

L3IPWEI2                        Pechet - Direct

1    Q.  Mr. Pechet, where do you work?

2    A.  I work for the U.S. Attorney's Office for the Southern

3    District of New York.

4    Q.  And what is your title?

5    A.  I'm a paralegal specialist.

6    Q.  How long have you worked at the U.S. Attorney's Office --

7              THE COURT:  So am I right that, as with FBI agents,

8    all paralegals of the Southern District of New York are

9    paralegal specialists?

10             THE WITNESS:  Something like that.

11             THE COURT:  No regular guys?

12             THE WITNESS:  No regular guys.

13             THE COURT:  Go ahead.

14   BY MS. DEININGER:

15   Q.  All right.  How long have you worked at the U.S. Attorney's

16   Office?

17   A.  Almost two years.

18   Q.  And what are your general duties and responsibilities as a

19   paralegal specialist?

20   A.  Generally, I help Assistant United States Attorneys with

21   investigations and trials.

22   Q.  Did there come a time when you began to assist in

23   connection with this trial, the trial of Akhavan and Ruben

24   Weigand?

25   A.  Yes.

L3IPWEI2                        Pechet - Direct

1    Q.  And roughly when did you begin assisting with that trial?

2    A.  I guess about a month ago.

3    Q.  And how did you assist?

4    A.  I just reviewed a few documents that I understood I was

5    going to be reading today.

6    Q.  And prior to that, did you have any involvement in this

7    investigation?

8    A.  None whatsoever.

9    Q.  Or any involvement in this case?

10   A.  No.

11            MS. DEININGER:  Your Honor, the government would like

12   to offer into evidence Government Exhibit 4501.  This is one of

13   the documents that was subject to agreement between the

14   parties.

15            THE COURT:  Yes.

16            (Government's Exhibit 4501 received in evidence)

17            MS. DEININGER:  Mr. Levine, if you can pull that up

18   for everyone.

19   BY MS. DEININGER:

20   Q.  Mr. Pechet, what's the date on this document?

21   A.  February 14th, 2014.

22   Q.  And looking at the top right, who does it appear -- what

23   entities does it appears issued this document?

24   A.  U.S. Department of Justice, Office of the Deputy Attorney

25   General.

1    Q.  And then do you see where it says Memorandum for all United

2    States Attorneys, and there's a subject below that?

3    A.  Yes.

4    Q.  What does the subject say?

5    A.  Guidance regarding marijuana-related financial crimes.

6    Q.  Can you read the first paragraph for me?

7    A.  Sure.  "On August 29th, 2013, the department issued

8    guidance (August 29 guidance) to federal prosecutors concerning

9    marijuana enforcement under the Controlled Substances Act

10   (CSA).  The August 29 guidance reiterated the department's

11   commitment to enforcing the CSA, consistent with Congress'

12   determination that marijuana is a dangerous drug that serves as

13   a significant source of revenue to a large scale of criminal

14   enterprises, gangs and cartels.  In furtherance of that

15   commitment, the August 29 guidance instructed the department

16   attorneys and law enforcement to focus on the following eight

17   priorities in enforcing the CSA and its marijuana-related

18   conduct."

19   Q.  And can you now read those eight bullet points for me?

20          Mr. Levine, if you can blow up the eight bullet

21   points.

22          Mr. Pechet, if you could read those for me?

23   A.  "Preventing the distribution of marijuana to minors.

24          "Preventing revenue from the sale of marijuana from

25   going to criminal enterprises, gangs and cartels.

1           "Preventing the diversion of marijuana from states
2   where it is legal under state law in some form to other states.
3           "Preventing state-authorized marijuana activity from
4   being used as a cover or pretext for the trafficking of other
5   illegal drugs or other illegal activity.
6           "Preventing violence and the use of firearms in the
7   cultivation and distribution of marijuana.
8           "Preventing drugged driving and the exacerbation of
9   other adverse public health consequences associated with
10  marijuana use.
11          "Preventing the growing of marijuana on public lands,
12  and the attendant public safety and environmental dangers posed
13  by marijuana production on public lands.
14          "And preventing marijuana possession or use on federal
15  property."
16  Q.  And now, Mr. Levine, if we can scroll to the second page.
17          Mr. Pechet, do you see the second full paragraph that
18  starts with "The provisions of the money laundering statutes"?
19  A.  Yes.
20  Q.  Can you just read that first sentence for me?
21  A.  "The provisions of the money laundering statutes, the
22  unlicensed money remitter statute, and the Bank Secrecy Act
23  (BSA) remain in effect with respect to marijuana-related
24  conduct."
25  Q.  And then, if we can zoom out and look at the last two

L3IPWEI2                    Pechet - Direct

1   sentences of that paragraph.  It starts with "Additionally,"

2   kind of in the middle of the paragraph.

3   A.  "Additionally, financial institutions that conduct

4   transactions with money generated by marijuana-related conduct

5   could face criminal liability under the BSA for, among other

6   things, failing to identify or report financial transactions

7   that involved the proceeds of marijuana-related violations of

8   the CSA."  And it cites to a statute.  "Notably for these

9   purposes, prosecution under these offenses based on

10  transactions involving marijuana proceeds does not require an

11  underlying marijuana-related conviction under federal or state

12  law."

13  Q.  Thank you.

14      And, Mr. Levine, if we can zoom out, and look at the

15  next paragraph.  I'd like to look at the first two sentences of

16  that next paragraph.

17      Can you read those?

18  A.  "As noted in the August 29 guidance, the department is

19  committed to using its limited investigative and prosecutorial

20  resources to address the most significant marijuana-related

21  cases in an effective and consistent way.  Investigations and

22  prosecutions of the offenses enumerated above, based upon

23  marijuana-related activity, should be subject to the same

24  consideration and prioritization."

25  Q.  And then if we can look towards the bottom of that page,

1    there's a sentence that starts "Similarly" right at the bottom.

2    Do you see that, Mr. Pechet?

3    A.  Yes, I do.

4    Q.  Can you read that?

5    A.  "Similarly, if the financial institution or individual is

6    willfully blind to such activity by, for example, failing to

7    conduct appropriate due diligence of the customer's activities,

8    such prosecution might be appropriate."

9    Q.  Okay.  Mr. Levine, let's go to the next page.  And on the

10   next page there's another paragraph that starts "The August 29

11   guidance;" do you see that?

12   A.  I do, yes.

13   Q.  Can you read the first sentence of that paragraph for me?

14        We can zoom in on the whole paragraph.

15   A.  "The August 29 guidance rested on the expectation that

16   states that have enacted laws authorizing marijuana-related

17   conduct will implement clear, strong and effective regulatory

18   and enforcement systems in order to minimize the threat posed

19   to federal enforcement priorities."

20   Q.  If you look about halfway down the paragraph, there's a

21   sentence that starts "in addition," on the right.  Can you

22   start reading that?

23   A.  "In addition, because financial institutions are in a

24   position to facilitate transactions by marijuana-related

25   businesses that could implicate one or more of the priority

L3IPWEI2                      Pechet - Direct

1    factors, financial institutions must continue to apply

2    appropriate risk-based anti-money laundering policies,

3    procedures and controls sufficient to address the risks posed

4    by these customers, including by conducting customer due

5    diligence designed to identify conduct that relates to any of

6    the eight priority factors."

7    Q.  You can keep going.

8    A.  "Moreover, as the department's and FinCEN's guidance are

9    designed to complement each other, it is essential that

10   financial institutions adhere to FinCEN's guidance.

11   Prosecutors should continue to review marijuana-related

12   prosecutions on a case-by-case basis and weigh all available

13   information and evidence in determining whether a particular

14   conduct falls within the identified priorities."

15   Q.  Looking just below that, the next paragraph, I'd like to

16   look just at -- can you just read the first three sentences?

17   A.  "As with the department's previous statements on this

18   subject, this memorandum is intended solely as a guide to the

19   exercise of investigative and prosecutorial discretion.  This

20   memorandum does not alter in any way the department's authority

21   to enforce federal law, including federal laws relating to

22   marijuana, regardless of state law.  Neither the guidance

23   herein, nor any state or local law, provides a legal defense to

24   a violation of federal law, including any civil or criminal

25   violation of the CSA, the money laundering and unlicensed money

1   transmitter statutes, or the BSA, including the obligation of

2   financial institutions to conduct a customer due diligence."

3   Q.  Thank you.

4           MS. DEININGER:  Your Honor, the government --

5   Mr. Levine, you can take that one down.

6           Your Honor, the government would like to now offer

7   into evidence Government Exhibit 4502, which is subject to the

8   same agreement.

9           THE COURT:  Yes, received.

10          (Government's Exhibit 4502 received in evidence)

11   BY MS. DEININGER:

12   Q.  Mr. Pechet, if you could -- what does the title of this

13   document say, the header information?  Sorry.  What agency

14   issued this document?

15   A.  The Department of the Treasury.  More specifically, the

16   Financial Crimes Enforcement Network.

17   Q.  And what does it say right underneath that?

18   A.  "Guidance" and then the subject line is "BSA expectations

19   regarding marijuana-related businesses."

20   Q.  Okay.  Looking at that introductory paragraph, could you

21   read the first two sentences for me?

22   A.  "The Financial Crimes Enforcement Network (FinCEN) is

23   issuing guidance to clarify Bank Secrecy Act (BSA) expectations

24   for financial institutions seeking to provide services to

25   marijuana-related businesses.  FinCEN is issuing this guidance

L3IPWEI2                          Pechet - Direct

in light of recent state initiatives to legalize certain

marijuana-related activity and related guidance by the U.S.

Department of Justice (DOJ) concerning marijuana-related

enforcement priorities."

Q.  And now, if we can just look towards the bottom of that

page, the very last paragraph.  If you can read the first

sentence?

A.  "The Cole memo reiterates Congress' determination that

marijuana is a dangerous drug and that the illegal distribution

and sale of marijuana is a serious crime that provides a

significant source of revenue to large-scale criminal

enterprises, gangs and cartels."

Q.  So now if we can go to the next page, under the bullets

there is a paragraph that starts "Currently."  Actually, sorry.

Can you read that?

A.  "Concurrently with this FinCEN guidance, Deputy Attorney

General Cole is issuing supplemental guidance directing that

prosecutors also consider these enforcement priorities with

respect to federal money laundering, unlicensed money

transmitter, and BSA offenses predicated on marijuana-related

violations of the CSA."

Q.  And then there's a section "Providing financial services to

marijuana-related businesses;" do you see that?

A.  I do.

Q.  Can you read the first paragraph for me?

1   A.   In its entirety?

2   Q.   Yes.

3   A.   Okay.  "This FinCEN guidance clarifies how financial

4   institutions can provide services to marijuana-related

5   businesses consistent with their BSA obligations.  In general,

6   the decision to open, close or refuse any particular account or

7   relationship should be made by each financial institution based

8   on a number of factors specific to that institution.  These

9   factors may include its particular business objectives, an

10   evaluation of the risks associated with offering a particular

11   product or service, and its capacity to manage those risks

12   effectively."  Through customer due diligence -- excuse me.

13   "Thorough customer due diligence is a critical aspect of making

14   this assessment."

15   Q.   Thank you.  I'd like to now look at the next page, and the

16   first full paragraph.  It starts "As part of the customer due

17   diligence."  Can you read that paragraph in its entirety?

18   A.   "As part of its customer due diligence, a financial

19   institution should consider whether a marijuana-related

20   business implicates one of the Cole memo priorities or violates

21   state law.  This is a particularly important factor for a

22   financial institution to consider when assessing the risk of

23   providing financial services to a marijuana-related business.

24   Considering this factor also enables the financial institution

25   to provide information in BSA reports pertinent to law

1   enforcement's priorities.  A financial institution that decides

2   to provide financial services to a marijuana-related business

3   would be required to file Suspicious Activity Reports (SARs),

4   as described below."

5   Q.  And now, I'd like to go to page 5.  On page 5 there's a

6   title that says "Red flags and to distinguish priority SARs."

7   Do you see that?

8   A.  I do.

9   Q.  Can you read the first three sentences in that top

10  paragraph?

11  A.  "The following red flags indicate that a marijuana-related

12  business may be engaged in activity that implicates one of the

13  Cole memo priorities or violates state law.  These red flags

14  indicate only possible signs of such activity and also do not

15  constitute an exhaustive list.  It is, thus, important to view

16  any red flags in the context of any indicators and factors --"

17  I'm going to start that over.  "It is, thus, important to view

18  any red flags in the context of other indicators and factors

19  such as the financial institution's knowledge about the

20  underlying parties obtained through its customer due

21  diligence."

22  Q.  And if we look at the paragraph below that, there's a

23  number of bullet points.  Can you read the first one for me?

24  A.  "A customer appears to be using a state licensed

25  marijuana-related business as a front or pretext to launder

L3IPWEI2                       Pechet - Direct

money derived from other criminal activity, i.e. not related to

marijuana, or derived from marijuana-related activity not

permitted under state law."

Q.  Okay.  Thank you.  You can stop there on that one.  And now

it says after that, it says "relevant indicia could include;"

do you see that?

A.  I do.

Q.  And then there's a further list.  If we look down that

list, there's a bullet on the next page.  Okay.  The bullet on

that page that's third from the bottom of the list, that starts

"individuals conducting transactions;" do you see that?

A.  I do.

Q.  Can you read that one for me?

A.  "Individuals conducting transactions for the business

appear to be acting on behalf of other undisclosed parties of

interest."

Q.  Okay.  We can zoom out of that.  And then in the middle of

the page there's a bullet that says "a customer seeks to

conceal."  Can you read that one for me?

A.  "A customer seeks to conceal or disguise involvement in

marijuana-related business activity.  For example, the customer

may be using a business with a nondescript name, e.g. is a

consulting, holding or management company that purports to

engage in commercial activity unrelated to marijuana, but is

depositing cash that smells like marijuana."

L3IPWEI2                        Pechet - Direct

1   Q.  Now, can we look at the bullet at the very bottom of the

2   page?  Can you read that one for me?

3   A.  "A marijuana-related business engages in international or

4   interstate activity, including by receiving cash deposits from

5   locations outside the state in which the business operates,

6   making or receiving frequent or large interstate transfers, or

7   otherwise transacting with persons or entities located in

8   different states or countries.

9   Q.  All right.  Mr. Levine, we can take that document down.

10           MS. DEININGER:  Your Honor, the government would now

11   like to offer into --

12           THE COURT:  I think maybe now is a good time to have

13   our mid-morning break.

14           MS. DEININGER:  Okay.

15           THE COURT:  So we'll take our mid-morning break and

16   resume in 15 minutes.

17           (Jury not present)

18           THE COURT:  And the very special witness can step down

19   and be back in 15 minutes.

20           (Witness temporarily excused)

21           Please be seated.  So I've now had a chance to review

22   the defense letter and accompanying transcript references with

23   respect to slide five of HAX5014, which we've been talking

24   about.  And one additional argument was made by the defense

25   that gives me pause, which was whether the door was opened to

1   the admissibility of this exhibit by testimony that the

2   government elicited from Mr. Elliott earlier in his testimony.

3             MS. DEININGER:  Yes, your Honor, I'd be happy to

4   address that.

5             THE COURT:  So let me just make it clear for the

6   record.  So he was shown Government Exhibit 2204, and he

7   recognized it as "a presentation that one of our staff members

8   gave at one of the security summits," and then he elaborated

9   that this was an industry event Visa held back in 2019, and

10  it's basically client outreach and engagement effort.  And it's

11  attended, among other persons, by representatives of card

12  issuing banks.

13            And then it was presented, this was a presentation by

14  Elizabeth Scofield in August of 2019, and then it's brought out

15  that the purpose of this presentation was "given the questions

16  that had come in from acquiring industry about marijuana

17  transactions, we wanted to educate the acquiring members and

18  their ISOs on Visa's position and give them an update on the

19  things that were, you know, transpiring.  It's basically an

20  education and question-and-answer session."

21            Then the government brought out the portion of the

22  document that says that, "despite the number of states that

23  have legalized the purchase and sale of marijuana, to some

24  degree, marijuana remains illegal under federal law," and then

25  there's a second bullet giving Visa's position, and that was

1   pretty much it.

2          So there was no objection to any of that testimony.

3   So --

4          MS. DEININGER:  Your Honor, so if I may address this?

5   There are a couple of reasons that the government believes that

6   did not open the door.  The first are these are completely

7   different presentations to different audiences being given by

8   different people.

9          THE COURT:  So what?

10          MS. DEININGER:  And, second, the only thing that the

11   government introduced from the first presentation was the slide

12   with Visa's rules that it would --

13          THE COURT:  Yes, but the point of this is you wanted

14   to show how there was a presentation made by Visa in which Visa

15   made clear to, among others, issuing banks its continuing

16   policy against processing marijuana transactions through credit

17   cards.

18          So the defense wants to show that, as part of a

19   similar presentation made actually earlier within the

20   conspiratorial time, although at the end of it, unlike the one

21   you presented, the issuing bank representatives in attendance,

22   among others, were made aware of just how lucrative this market

23   is.

24          MS. DEININGER:  Your Honor, the government doesn't

25   believe it opened the door to any testimony about the size of

1     the marijuana market or its specific status in states other

2     than California.  Notably, there was no information on that in

3     the presentation that we presented, even in the unredacted

4     version.  That was not --

5                THE COURT:  Let's take a much more extreme example.

6     Let's say the government had, in my hypothetical, presented a

7     presentation in which it said:  Now, as you all know, though

8     it's never enforced, there's a technical objection to

9     processing marijuana, and I should also let you know that the

10    marijuana industry is growing by leaps and bounds.  It's now a

11    huge, multi-billion dollar industry, especially in California.

12    I just want to make sure you understand the full context.

13                Could not a reasonable juror, in my extreme

14    hypothetical, conclude that they weren't being serious about

15    their warning, or at least they were suggesting to the issuing

16    banks that there were alternative ways to look at this, and

17    they should know, at a minimum, that they were giving up lots

18    of credit card usage if they kept this out?

19                MS. DEININGER:  So I --

20                THE COURT:  Go ahead.

21                MS. DEININGER:  I think, even in that extreme

22    example -- obviously, I do not think what's happened here --

23    there's no evidence that Visa made that sort of --

24                THE COURT:  I'm giving it as the extreme example.

25                MS. DEININGER:  Even in that extreme example, I think

L3IPWEI2                          Pechet - Direct

1    it would be important to ask the witness about what the purpose

2    was.  And again, there was no foundation laid as to what the

3    purpose of the slide on the financial markets was.

4              THE COURT:  Oh, no, I think there was.  Mr. Elliott

5    had already been asked on direct.

6              MS. DEININGER:  For our presentation, but they are

7    different presentations.  And the one that we admitted did not

8    have any information in it about the size of the marijuana

9    industry, even in the unredacted portions.  I can provide an

10   unredacted portion, if you'd like to see that.

11             THE COURT:  No, no.  I don't need to see it.

12             MS. DEININGER:  So the purpose, the one that he

13   said --

14             THE COURT:  What do you think the purpose was?  They

15   just thought it would be nice to have lunch with

16   representatives of the issuing banks and others?

17             MS. DEININGER:  Well, he said it was a meeting with

18   the executive risk council, but we don't know what the purpose

19   of that slide was.

20             THE COURT:  I'll go back and look at the transcript

21   reference.

22             MS. DEININGER:  He mentioned that they were part of

23   the executive risk council, but we don't know what the purpose

24   of that slide was.  There were no questions about the purpose

25   of that presentation.  Not just -- not just the slide.  Other

L3IPWEI2                    Pechet - Direct

1    than the fact that who he was meeting with, there was no

2    foundation as to whether the purpose was to enhance enforcement

3    priorities, whether it was to consider whether they should

4    start processing it, and also --

5            THE COURT:  Yes, it matters because when I was looking

6    at this, until I read the defense letter and indeed in fairness

7    to the government, the main way the defense was arguing to me

8    was all in terms of the Mr. Elliott's state of mind.

9            But I think now the relevance is that since the

10   government introduced what was told by Visa to the

11   representatives of the issuing banks, the defense is entitled

12   to bring out what was told to representatives of the issuing

13   banks addressed by Visa in terms of the size of the market.

14           MS. DEININGER:  Your Honor, I think that just goes too

15   far.  I mean, we elicited one specific point that he made to

16   issuing and acquiring banks, and your argu- -- I understand

17   your point, but it suggests --

18           THE COURT:  My argument.

19           MS. DEININGER:  -- it suggests that any information

20   that was provided to issuing and acquiring banks.  And as the

21   government argued in its motions in limine, information about

22   the legality and the size and enforcement in other states is

23   just irrelevant in this case and prejudicial.  And, again,

24   there is no evidence as to what Mr. Elliott intended the

25   purpose of this slide to be.  And as your Honor pointed out

L3IPWEI2                    Pechet - Direct

1   this morning, it has minimal, at best, relevant to the mindset

2   of the issuing banks, who did not make the presentation.

3           THE COURT:  All right.  Let me hear from defense

4   counsel.

5           MR. BURCK:  Thank you, your Honor.  First of all, your

6   Honor, you're right a hundred percent that we -- I was focusing

7   on, when I was addressing this yesterday, the state of mind

8   because that was the first issue that was raised by the

9   government.

10          THE COURT:  I don't think you had made this argument,

11  however, because it's in your letter.

12          MR. BURCK:  It's in our letter, yes, sure.  And the

13  point was exactly how you laid it out, your Honor.  When I was

14  listening to the direct examination, I didn't know they were

15  going to offer that exhibit.  They did and, you know, we didn't

16  object.  It comes in.  And they elicit from that exhibit one

17  piece of information from it, which is that she says -- and

18  it's in the slide, she says that it's illegal under federal

19  law.

20          We have another presentation, contemporaneous, as you

21  said, probably earlier that is from the witness himself

22  speaking to a set of people that include acquiring banks and

23  issuing banks, where he talks about the same topic.  It says

24  the same topic, and in that presentation, your Honor, not only

25  is there the slides that you looked at, there is no slide that

L3IPWEI2                         Pechet - Direct

1    says that Visa's policy is not to transact in marijuana.  No

2    slide in the presentation, which is contrast to what his

3    subordinate said.  So the whole point of that, and your

4    Honor --

5         THE COURT:  So I'm going to receive it for the -- and

6    give the jury a limiting instruction as follows:  That this was

7    presented by Mr. Elliott to -- you'll have to give me the date.

8         MR. BURCK:  We don't know the exact date, your Honor,

9    because I -- unfortunately, I wasn't able to --

10        THE COURT:  2019.

11        MR. BURCK:  2019, yes.

12        THE COURT:  At a meeting that included representatives

13   of issuing banks, that we don't know which issuing banks.  You

14   are -- it's being received to complete your understanding of

15   what was presented at various meetings.  It's not being

16   presented for its truth, but really for the fact that it was

17   presented to at least some issuing bank representative,

18   something along those lines.

19        MR. BURCK:  That's fine with us, your Honor.

20        MS. DEININGER:  Your Honor, if I may for just one

21   minute?

22        THE COURT:  Yes.

23        MS. DEININGER:  So on the first presentation,

24   Mr. Elliott did testify that the purpose of that presentation,

25   at the Visa security summit, to which all his clients, issuing

1    and acquirers, were invited, was for an educational purpose.

2    And, obviously, that included the Visa statement that they

3    don't allow transactions.  He never testified that the other

4    presentation, which was to a different body, was for the same

5    purpose.

6            THE COURT:  What purpose do you think it was used for?

7            MS. DEININGER:  I don't know.  The question was never

8    asked and --

9            THE COURT:  The --

10           (Indiscernible crosstalk)

11           MS. DEININGER:  (Indiscernible)

12           MR. BURCK:  Your Honor, can I just point out --

13           THE COURT:  I don't think that matters, and I also

14   think that we've got now two more minutes before the jury is

15   going to finish their break, but hold on just a minute.  I want

16   to look at the transcript on that point.

17           MR. BURCK:  Your Honor, I think you'll find that the

18   government never objected on foundation; so I never even had a

19   chance --

20           THE COURT:  Well, that's certainly true.  Okay.  This

21   is on page 1954 -- a good year -- of the transcript.  This is

22   on the cross-examination of Mr. Elliott, and Mr. Burck:  "Can

23   you show the witness Akhavan Exhibit 5014."

24   "Q. Now, sir, this is titled 'Cannabis and hemp products,'

25   correct?

1   "A. It is.

2   "Q. That's the same title as the document that Elizabeth

3   Scofield provided -- or presented that you looked at for

4   Government Exhibit 2204, correct?

5   "A. I don't know if it's the same title.  I'd have to go back

6   and locate it.

7   "Q. Why don't you take a quick look?

8   "A. I'm just doing that right now.

9   "Q. Sure.

10  "A. Yeah.  It's the same title, yes.

11  "Q. So fair to say, the same topic, right?

12  "A. Yes, similar topic.

13  "Q. Now, you testified that this happened in 2018 or 2019,

14  right?

15  "A. It did.

16  "Q. And you testified that there were issuing banks and

17  acquiring banks present, right?

18  "A. I did.

19  "Q. And also Visa executives, right?

20  "A. Yes."

21          And then we go into discussion of the various slides

22  and so forth.  So I think it's clear from that that the witness

23  was saying this was similar to the presentation that the

24  government had elicited from Ms. Scofield or elicited from

25  Mr. Elliott about Ms. Scofield.

1          MS. DEININGER:  Your Honor, respectfully, I disagree.

2     He said it's a similar topic.  They were both about cannabis

3     and hemp.  He did not say they were for a similar or the same

4     purpose.

5          MR. BURCK:  Your Honor, I would --

6          THE COURT:  I think that's a very clever lawyer's

7     argument, but it doesn't persuade this simple, barefoot judge.

8     I've ruled and I'll hear no further argument.

9          MR. BURCK:  Thank you, your Honor.

10          THE COURT:  I'll see you in five minutes.

11          MR. TAYBACK:  Your Honor, one issue just to identify

12     for you.  I had previously indicated there were some objections

13     to some documents that the government intended to offer and it

14     would be a later witness.  I believe there's now a flip of the

15     witnesses.  The witness who is now on the stand is somebody who

16     was going to testify later.  There are some objections; so I

17     may make them during the course of the direct.

18          THE COURT:  Yes, we've got to move this along.  I

19     can't keep reminding everybody.  If we have to take a sidebar,

20     we will.

21          MR. TAYBACK:  I'll make my objections at the time.

22          THE COURT:  I will allow you to be a little more in

23     the way of speaking objections than I normally do.

24          MR. TAYBACK:  I'll do my best to keep it to a minimum.

25          (Recess)

L3IAWEI3ps

1          (Jury not present)

2          THE COURT:  Before we bring in the witness, let's put

3     that document I just admitted on the screen and I will give the

4     jury my quick instruction.

5          THE CLERK:  Jury entering the courtroom.

6          (Jury present)

7          THE COURT:  Ladies and gentlemen, before we get going

8     again with the witness, there was an exhibit that was

9     originally offered when Mr. Elliott, the gentleman from Visa,

10    testified remotely, was testifying that I ruled out of

11    evidence.  Defense counsel asked for reconsideration on that,

12    and they persuaded me it should come in for various limited

13    purposes.  It's this slide you can see on your screen.

14         This Mr. Elliott testified was part of a presentation

15    he made around 2019 to a group of people that included some

16    representatives of some unnamed issuing banks.  And the only

17    purpose for which you can consider it is that it was presented

18    to some representatives of the issuing banks.

19         We don't know whether those figures are right or

20    wrong.  That's called hearsay in the law.  But the only

21    relevant part of this exhibit is, if at all, is that it was

22    presented, the slide was presented, to some representatives of

23    some issuing banks in or around 2019.

24         OK.  You can take it down now.

25         And let's bring the witness back to the stand.

L3IAWEI3ps                    Pechet - Direct

1    JACOB PECHET, resumed.

2              THE COURT:  Go ahead, counsel.

3              MS. DEININGER:  Thank you.

4    DIRECT EXAMINATION (Cont'd)

5    BY MS. DEININGER:

6    Q.  Mr. Pechet, can you hear me OK?

7    A.  I can.  Thanks.

8    Q.  Good.

9              MS. DEININGER:  Your Honor, the government would like

10   to offer into evidence Government Exhibit 4503, which is

11   subject to the same agreement.

12             THE COURT:  Received.

13             (Government's Exhibit 4503 received in evidence)

14   BY MS. DEININGER:

15   Q.  Mr. Pechet, what entity appears to have issued this

16   document?

17   A.  The Office of the Attorney General.

18   Q.  And what's the date of the document?

19   A.  January 4, 2018.

20   Q.  And what does it say in the header information?

21   A.  It's a memorandum for all United States Attorneys from

22   Attorney General Jeff sessions, and the subject is "marijuana

23   enforcement."

24   Q.  And can you just read the first paragraph for me.

25   A.  "In the Controlled Substances Act, Congress has generally

L3IAWEI3ps                    Pechet - Direct

1   prohibited the cultivation, distribution, and possession of

2   marijuana," citing to a statute.  "It has established

3   significant penalties for these crimes," and the citation.

4   "These activities may also serve as the basis for the

5   prosecution of other crimes, such as those prohibited by the

6   money laundering statutes, the unlicensed money transmitter

7   statute, and the Bank Secrecy Act."  Another citation.  "These

8   statutes reflect Congress's determination that marijuana is a

9   dangerous drug and that marijuana activity is a serious crime."

10  Q.  Now if we can look down to the third paragraph on this

11  page, can you just read the first sentence.

12  A.  "Given the Department's well-established general

13  principles, previous nationwide guidance specific to marijuana

14  enforcement is unnecessary and is rescinded, effective

15  immediately."

16  Q.  Thank you.

17            MS. DEININGER:  Your Honor, the government would now

18  like to offer as self-authenticating business documents

19  pursuant to 902(11) Government Exhibits 2602, 2604, 2607, 2608,

20  2609, 2610, 2615, 2617, 2621, 2623, 2630, 2633, 2634, and 2635.

21            MR. TAYBACK:  Objection to 2609, 2633, 2634, and 2635.

22            THE COURT:  All right.  The rest are received.

23            (Government's Exhibits 2602, 2604, 2607, 2608, 2610,

24  2615, 2617, 2621, 2623, and 2630 received in evidence)

25            THE COURT:  When you get to 2609, counsel, we'll take

1    up the objection, and similarly when we get to the last three.

2              MS. DEININGER:  Your Honor --

3              THE COURT:  Are they all -- take them up collectively?

4         I'm at your pleasure.  Whatever you'd like.

5              MS. DEININGER:  I think it makes sense to take them up

6         collectively.

7              THE COURT:  OK.  So, with apologies, ladies and

8         gentlemen, we'll have a short sidebar.

9              Juror No. 3 is saying, oh, no, my god, another

10        sidebar.  But it's only because you're not wearing your red

11        check sweater today.  Oh, there it is.  All right.  I'm sorry.

12        We're having a sidebar anyway.

13             (In the robing room)

14             THE COURT:  Go ahead.

15             MR. TAYBACK:  My objection to 2609 is that it's an

16        Eaze application for a bank account.  And then there are some

17        related documents that follow.  2633 shows the closure of that

18        account.  It has nothing do with the charged conspiracy.  It

19        simply shows that Wells Fargo was a bank that decided to close

20        its account because it didn't want to bank marijuana, which is

21        its choice.  But it has nothing to do with consumer credit

22        cards.  It has nothing to do with the charged conspiracy.  And

23        it wasn't closed because of anything related to the charged

24        conspiracy.

25             And there are similar closures for two other --

 1          THE COURT:  I don't understand that argument.  You

 2    have been arguing about things even further removed, like

 3    gambling, how they treated gambling, how they treated things

 4    that had nothing to do with marijuana.  But you don't want in

 5    evidence that shows how a bank did treat marijuana?

 6          MR. TAYBACK:  The difference is, this is marijuana not

 7    on a customer credit card.

 8          THE COURT:  I understand that.  I understand that.

 9    But overruled.

10          (In open court; jury present)

11          THE COURT:  I told the lawyers that we had to make it

12    very short or Juror No. 3 would be heartbroken.

13          All right.  We're ready, folks.

14          All those exhibits are now received.

15          (Government's Exhibits 2609, 2633, 2634, and 2635

16    received in evidence)

17          MS. DEININGER:  Thank you, your Honor.

18          Mr. Levine, if we can pull up Exhibit 2609 for

19    everyone.

20    Q.  OK.  Mr. Pechet, can you read what it says at the very top,

21    what the title of this document is.

22    A.  "Business Account Application."

23    Q.  And what bank does this document appear to be from?

24    A.  Wells Fargo.

25    Q.  And what is the -- see on the right side here it says

1    "date"?  What is the date there?

2    A.  It's September 23, 2014.

3    Q.  And do you see where it says "related customer

4    information"?  What's the customer 1 name listed there?

5    A.  Eaze Solutions Inc.

6    Q.  And what's the customer 2 name listed there?

7    A.  Keith A. McCarty, Jr.

8    Q.  All right.  Could we go to page 2.  And about a third from

9    the bottom of the page there's a line that says "industry."  Do

10   you see that?

11   A.  Yes.

12   Q.  And what industry is it?

13   A.  "Information/media."

14   Q.  And that's under, again, the section titled "Customer 1

15   Information," right?  What's the customer name there?

16   A.  The customer name is Eaze Solutions Inc.

17   Q.  And going back to look under Industry, it has "Description

18   of Business."  How is the business described?

19   A.  "IT technologies services."

20        MS. DEININGER:  Mr. Levine, I'd now like to publish

21   what's testified as Government Exhibit 2610.  And if we can go

22   to page 29.  OK.

23   Q.  Mr. Pechet, again, what does the top of this document say?

24   A.  "Business Account Application."

25   Q.  And what bank does this document appear to be from?

1   A.   Wells Fargo.

2   Q.   And what's the date at the top right?

3   A.   February 14, 2017.

4   Q.   And now if we go to the next page, in the section titled

5   "Customer 1 Information" -- you may have to go up a little bit.

6   OK.  Under "Customer 1 Information," what's the customer name?

7   A.   Green Coast Management Inc.

8   Q.   And what is listed as the industry for Green Coast

9   Management Inc.?

10  A.   "Management of companies and enterprises."

11  Q.   And what's the description of the business?

12  A.   "Housing management."

13          MS. DEININGER:  Mr. Levine, can we now look at what's

14  in evidence as Government Exhibit 2633.

15  Q.   OK.  Mr. Pechet, at the very top of the page in yellow, on

16  the left, do you see what it says there?

17  A.   It says "wells Fargo."

18  Q.   And what does it say just to the right of that?

19  A.   "Enterprise exit management system."

20  Q.   And looking down the page, under "RECR Details," it has an

21  entry for "RECR Title."  What is written there?

22  A.   "Keith A. McCarty Jr."

23  Q.   And what does it say under "RER Activity Type"?

24  A.   AML.

25  Q.   And how about under, next to "Risk Categories"?

L3IAWEI3ps                    Pechet - Direct

```
 1    A.  "Regulatory."

 2    Q.  And to the right of that, what does it say for "Status"?

 3    A.  "Closure confirmed."

 4    Q.  And what is the issue date below that?

 5    A.  The RECR issue date?

 6    Q.  Yes.

 7    A.  It is May 2nd, 2016.

 8    Q.  And now at the bottom of the page, the bottom of the

 9    portion that we're reviewing right now is a paragraph next to

10    "Overview of Activity."

11    A.  Mm-hmm.

12    Q.  Can you read that for me.

13    A.  "Wells Fargo customer Keith McCarty Jr., Sean Cavanagh, and

14    are Linda Cademartori, the owners of recent start-up company

15    Eaze Solutions Inc.  Eaze is a mobile technology application

16    that users can access via their cellphone or computer and

17    subsequently order medicinal marijuana to be delivered to their

18    doorstep.  While Eaze is not a medical marijuana dispensary,

19    its business operation is heavily affiliated with the sale of

20    marijuana, an apparent violation of federal law.  Between March

21    2015 and October 2015, Eaze remitted over 293,000 to Spark, a

22    MMD who appears to be the primary provider for Eaze customers.

23    McCarty also conducted two debit card transactions which

24    totaled $2,095 to separate MMDs.  The aforementioned

25    transactions appear to have been funded by seemingly legitimate
```

investments into Eaze's mobile technology platform.  Based on

the totality of the circumstances, including activity

consistent with money laundering associated with the sale of

marijuana, FCI believes these relationships expose Wells Fargo

to excessive regulatory reputational risk and recommends the

relationships be exited."

Q.  Thank you.

        MS. DEININGER:  Mr. Levine, can we now publish what's

in evidence as Government Exhibit 2634.

        And we can zoom in on the top through the paragraph on

the right.

Q.  So, Mr. Pechet, again, what's in the top left in yellow?

A.  "Wells Fargo."

Q.  And what does it say to the right of that?

A.  "Enterprise Exit Management System."

Q.  And looking down the page next to "RECR Title," what does

at that T say?

A.  "Green Coast Management Inc."

Q.  And what does it say as the RECR activity type?

A.  "AML."

Q.  And next to "Risk Categories"?

A.  "Regulatory, reputational."

Q.  And under that there's a category for special activity

types.  What does it say?

A.  "Marijuana business."

L3IAWEI3ps                    Pechet - Direct

1   Q.  And what does the "overview of activity" say?

2   A.  "A review of publicly available transactional data found

3   that Green Coast Management Inc. operates as a medical

4   marijuana dispensary.  Specifically, Green Coast Management

5   Inc. appears to operate in the sales and delivery of medical

6   marijuana.  A transactional review revealed a large number of

7   wire transfer credits, deposited cash, business check deposits,

8   and outgoing checks, with activity totaling over $371,000.

9   Based on the apparent operation of a marijuana dispensary,

10  which is a prohibited business across the enterprise, FCI

11  believes the relationship expose Wells Fargo to excessive

12  regulatory risk and recommends the relationship be exited."

13  Q.  And then what does it say next to Status above that?

14  A.  "Closure confirmed."

15  Q.  And what's the DECR issued date?

16  A.  The DECR issue date?

17  Q.  Yes.

18  A.  January 20, 2017.

19  Q.  All right.

20          MS. DEININGER:  Mr. Levine, can we now publish what's

21  in evidence as Government Exhibit 2635.  And zoom in on the

22  same content as we did with the last document.

23  Q.  And so Mr. Pechet, again, what's in the top left in yellow?

24  A.  "Wells Fargo."

25  Q.  And what does it say to the right of that?

L3IAWEI3ps                    Pechet - Direct

1    A.   "Enterprise Exit Management System".

2    Q.   And next to RECR Title what does it say?

3    A.   "SPC Fleet LLC."

4    Q.   And what does it say for RECR Activity Type?

5    A.   "AML."

6    Q.   And for Risk Categories?

7    A.   "Regulatory, reputational."

8    Q.   And what does it say next to Special Activity Types?

9    A.   "Marijuana business."

10   Q.   And can you read what the overview of the activity says.

11   A.   "No managed relationship: Wells Fargo business customers

12   SPC Fleet LLC and Two LLC are associated with a consistent

13   series of transactions between August 2015 and March 2017.  The

14   business checking accounts received just over $874,000 in wire

15   transfers and ACH credits, primarily from businesses that

16   appear to be online payment processing services, such as The

17   Currency Cloud, although some credits were also received from

18   prior Wells Fargo customer Eaze Solutions.  It is noted that

19   Eaze Solutions was previously exited by Wells Fargo due to the

20   fact that the business operation is heavily affiliated with the

21   sale of marijuana as it is a mobile technology application used

22   to order medicinal marijuana for direct delivery.  In addition,

23   the accounts received cash deposits totaling nearly $581,000.

24   The cash deposits never exceed the CTR threshold and are

25   conducted by unknown individuals in California.  Lastly, the

1    account received nearly $117,000 in checks from confirmed

2    marijuana dispensaries."

3          MS. DEININGER:  Mr. Levine, if I can just pause, if I

4    can have you zoom in on the next sentence.  OK.

5    Q.  Mr. Pechet, you can keep reading.

6    A.  "While the true source of account funding is generally

7    unknown as funds were sent primarily from payment processors

8    disguising the original source as well as cash deposits from

9    unknown sources, due to the credits noted from Eaze Solutions,

10   and because SPC Fleet LLC is listed as a delivery service in

11   bank records with limited publicly available information, it

12   appears likely the business is closely tied to the marijuana

13   industry as a possible marijuana delivery service."

14   Q.  Thank you.

15         MS. DEININGER:  And then if we can just go to -- OK.

16   Towards the bottom is a sentence that starts with "AMLI," and

17   we can just start reading there.

18   A.  "AMLI was unable to identify any significant public data

19   regarding the business to validate the volume of --" excuse

20   me -- "to validate the volume of activity in the account.  The

21   exact source of account funding to the business accounts are

22   unknown.  Based on the totality of the circumstances, including

23   activity consistent with marijuana business, which is a

24   prohibited business across the enterprise, FCI believes the

25   relationship exposes Wells Fargo to excessive regulatory risk

1    and recommends the relationship be exited."

2    Q.  Thank you.  You can stop there.

3          MS. DEININGER:  Mr. Levine, if we can now publish

4    what's in evidence as Government Exhibit 2602.

5    Q.  And Mr. Pechet, what does the top of this document say?

6    A.  "Business Account Application."

7    Q.  And what does it say to the right?

8    A.  "Wells Fargo."

9    Q.  And what is the date on the top right?

10   A.  December 22nd, 2015.

11   Q.  Now if we go to page 2, there is a section of information

12   on customer 1.  Who is listed as customer 1?

13   A.  Hometown Heart.

14   Q.  And at the bottom of that section, what does it say for

15   Hometown Heart's industry?

16   A.  "Professional, scientific, and technical services."

17   Q.  And what is the description of the business?

18   A.  "Healthcare advocacy."

19         MS. DEININGER:  And, Mr. Levine, if you can publish

20   what's in evidence as Government Exhibit 2604.  And go to

21   page 7.

22   Q.  And Mr. Pechet, what does the top of this document say?

23   A.  Business account application for Wells Fargo.

24   Q.  And when what's the date on the top right?

25   A.  August 13, 2015.

1    Q.  And going to the next page, the section on customer 1

2    information, what's the customer name listed?

3    A.  "CLMSS, LLC."

4    Q.  And looking at the bottom of that section, what is

5    described as CLMSS's industry?

6    A.  "Management of companies and enterprises."

7    Q.  And what's the description of their business?

8    A.  "Staffing and management."

9    Q.  Thank you.

10           MS. DEININGER:  Mr. Levine, you can take that down.

11           Your Honor, the government would now like to offer

12   into evidence as a self-authenticating business record

13   Government Exhibit 4302.

14           THE COURT:  Any objection?

15           MR. TAYBACK:  No objection.

16           MS. LESPERANCE:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibit 4302 received in evidence)

19   Q.  All right.  Mr. Pechet, looking at the first line, do you

20   see a column titled "FCIU Comments"?

21   A.  I do.

22   Q.  Can you read what -- actually if we can zoom out a little

23   bit.  And do you see the bottom right?  What's the name that's

24   down at the bottom right next to the numbers?

25   A.  Cathay.

L3IAWEI3ps                    Pechet - Direct

1   Q.  Thank you.

2              So now you can zoom back in.  There is a column named

3   "FCIU" and we're just looking at line 1.  What does it say

4   under FCIU Comments?

5   A.  "Due to the account activity observed, the business has

6   been identified as marijuana related (tier 2).  An email

7   regarding account closure has been sent and scheduled to close

8   on December 14, 2020."

9   Q.  And what does it say for "date to be closed"?

10  A.  December 14, 2020.

11  Q.  And what does it say for "actual date

12  closed/waived/resolved"?

13  A.  December 17, 2020-closed."

14             MS. DEININGER:  Mr. Levine, if you can scroll down to

15  the next line.  Can we zoom out and look at the column headers.

16  Thank you.

17  Q.  All right.  What does it say for the second line of text,

18  what does it say under FCIU Comments?

19  A.  "Our record shows that this entity had the previous

20  relationship with Cathay Bank which was established on December

21  27, 2016.  However, entity's accounts were recommended for

22  closure by the bank.  It was noted that" -- redacted -- "sells

23  products using cannabis cultivation, and while conducting an

24  internet search on the address and business name, we noted the

25  customer to be advertised and referenced in various cannabis

L3IAWEI3ps                     Pechet - Direct

1   growers and related websites.  Due to this reason, previous

2   relationship" -- redacted -- "were closed on June 14, 2017.  At

3   this time account will be escalated for account closure review

4   as the bank deems it necessary to terminate a relationship with

5   a marijuana-related business in order to maintain an effective

6   anti money laundering compliance program."

7   Q.  And what does it say for "date proposed to be closed"?

8   A.  "In progress."

9   Q.  And what does it say for "actual date

10  closed/waived/resolved"?

11  A.  "Pending closure."

12  Q.  And now I'd like to go down so we can see the fourth line.

13  OK.  And looking at the column that says "FCIU Comments," can

14  you read the substance in the fourth line for me.

15  A.  Sure.  So what do you mean by "the substance"?

16  Q.  I'm sorry.  Could you read the contents in the fourth line

17  that starts with "per operations administration."

18  A.  "Per operations administration on September 21, 2020,

19  account scheduled to be closed on October 13, 2020.

20          "Recommendation for closure as MRB account to

21  domiciling branch on September 15, 2020.  Branch concurrence

22  and escalation to operations administration to initiate closure

23  letter process also on September 15, 2020.

24          "During our recent review we discovered that the

25  account holder listed above is highly involved in

1   marijuana-related entities, web.  Web research demonstrated

2   individual regularly listed as an 'accomplished pioneers in the

3   medical marijuana industry' and more recently appointed to the

4   board of" -- redacted -- "which is engaged in cannabis

5   marketing and distribution.  At this time due to the heavy

6   involvement in that industry management advised to move forward

7   with account closure request.  Please contact Isabel Gonzalez

8   closure letters."

9   Q.  Thank you.  And what is the "date proposed to be closed"?

10  A.  October 15 -- excuse me -- October 14, 2020.

11  Q.  And what is the "actual date closed/waived/resolved"?

12  A.  October 14, 2020.

13          MS. DEININGER:  All right.  Mr. Levine, can you scroll

14  out, zoom out a little bit.

15  Q.  Can you look at the -- it's the fifth line but it has a

16  "20" on the left side under Branch Number -- just the bottom

17  line of the page basically.

18          Mr. Pechet, can you read what it says under "FCIU

19  Comments," the last line visible?

20  A.  "Escalated to Diamond Bar Branch No. 20 for closure on

21  October 7, 2020.  Marijuana-related business.  See attached

22  communication."

23  Q.  And what does it say for "date proposed to be closed"?

24  A.  October 15, 2020.

25  Q.  And what does it say for "actual date closed"?

1  A.  October 15, 2020.

2  Q.  And I just want to go back and direct your attention to the

3  second line in the "FCIU Comments."  In the second line in the

4  column tabled "FCIU Comments," there is a -- I think you read a

5  discussion of a previous bank closure, bank account closure.

6  Do you see what year that occurred in?

7  A.  Sorry.  I'm just looking.

8  Q.  Yes.

9  A.  So the year was 2017.

10  Q.  Thank you.

11         MS. DEININGER:  Your Honor, the government would now

12  like to offer into evidence as self-authenticating documents

13  Government Exhibits 2404, 2418, 2419, 2420, just those four.

14         MR. TAYBACK:  No objection.

15         MS. LESPERANCE:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibits 2404, 2418, 2419, 2420 received

18  in evidence)

19         MS. DEININGER:  Mr. Levine, can you pull up Government

20  Exhibit 2418 in evidence, at page 14.

21  Q.  And Mr. Pechet, what bank is this document from?

22  A.  Bank of America.

23  Q.  And underneath the Bank of America logo, what does it say?

24  A.  "Green Coast Management, Inc."

25         MS. DEININGER:  And Mr. Levine, if you can now scroll

L3IAWEI3ps                    Pechet - Direct

1   to the page 15.

2   Q.  And if we can look at the first entry here, for May 7,

3   2019.  Do you see that it says it's a wire?

4   A.  Yes.

5   Q.  And looking in the middle of the entry, do you see what it

6   says next to "orig"?  What entity is that?

7   A.  "BK Kantox, Ltd., PMT."

8   Q.  And then to the left of that there's another portion that

9   says "orig."  Do you see what that says?

10  A.  Yes.  "Spinwild Ltd."

11  Q.  And what's the amount for that wire?

12  A.  $352,877.40.

13  Q.  Thank you.

14          MS. DEININGER:  Your Honor, the government would

15  look --

16          Mr. Levine, you can take that down.

17          The government would also like to offer as

18  self-authenticating exhibits Government Exhibits 2803, 3102,

19  31 -- sorry -- 3301, and 3503.

20          MR. TAYBACK:  No objection.

21          MS. LESPERANCE:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibits 2803, 3102, 3301, and 3503

24  received in evidence)

25          MS. DEININGER:  Your Honor, I would now like to read a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3IAWEI3ps                    Pechet - Direct

1    brief stipulation.

2              THE COURT:  Go ahead.

3              MS. DEININGER:  Mr. Levine, if you can pull up

4    Government Exhibit S2.  Sorry.  You can take that down.  One

5    moment.  OK.  Yes.  Sorry.  It's marked as S-5.

6              Paragraph 1.  "The Government Exhibits listed in

7    Appendix A to this stipulation are true and correct copies of

8    documents maintained by Quantum Solutions, Inc., which was

9    formed in the state of Nevada on or about December 23, 2013,

10   and has its principal place of business located at 5146 Douglas

11   Fir Road, Calabasas, California, 91302.

12             "It is further stipulated and agreed that this

13   stipulation, which is marked as Government Exhibit S5, may be

14   received in evidence as a government exhibit at trial."

15             Your Honor, I would like to offer Government Exhibit

16   S5 into evidence.

17             THE COURT:  Received.

18             (Government's Exhibit S5 received in evidence)

19             MS. DEININGER:  And, your Honor, the government would

20   now like to offer into evidence Government Exhibit 916.

21             MR. TAYBACK:  Objection.

22             THE COURT:  Received.

23             MS. DEININGER:  Mister --

24             THE COURT:  I'm sorry.  Was that -- I thought you said

25   no objection?

L3IAWEI3ps                    Pechet - Direct

1              MR. TAYBACK:  I do have an objection, your Honor.

2              THE COURT:  OK.

3              MS. DEININGER:  Mr. Levine, can you pull it up just so

4    that the judge can see it and the witness.

5              THE COURT:  Do you want to blow it up, please.

6              MS. DEININGER:  And there's a relevant portion at the

7    bottom I could draw your attention to, too, if you would like.

8              THE COURT:  Let me see the bottom.

9              MS. DEININGER:  If we go to the next page, Mr. Levine,

10   and -- sorry -- the August 22 email.  Sorry.  Two below that.

11   The bottom one that's now -- that you can now see.

12             THE COURT:  What's the nature of the objection?

13             MR. TAYBACK:  The objection, your Honor, is, it's a

14   different division that's related to medical prescriptions, not

15   the delivery of marijuana.

16             THE COURT:  Yes.

17             MR. TAYBACK:  403.

18             THE COURT:  You may have cross-examination on that

19   issue, but I think it passes the relevancy test.  Received.

20             (Government's Exhibit 916 received in evidence)

21             MS. DEININGER:  Mr. Levine, if you can now publish

22   what's in evidence as Government Exhibit 916 for everyone.

23             And if we can start at the second-to-last email in the

24   chain.  It was sent on August 22nd, 2016, at 4:24 p.m.

25   Q.  Mr. Pechet, can you read that for me.

1           First, who's sending this email?

2   A.  Guy, guy@cestaff.com.

3   Q.  And what does he write?

4   A.  "Hi Ozan.  Below is the wire information for the Eaze MD

5   client.  They are requesting a wire.  Thanks, Guy."

6           MS. DEININGER:  OK.  You can zoom out of that.

7           And then right above that there's a response from Ozan

8   Ozerk.  Can you read that.

9           No, one below that.

10  A.  The response reads, "Anil," winky face, "please look below

11  and let us send what have been processed until today."

12          MS. DEININGER:  Mr. Levine, can you now scroll up to

13  the first page.  OK.

14  Q.  And now looking at the email in the middle of the page from

15  August 23, 2016, Mr. Pechet, who wrote this?  Who appears to

16  have written this email?

17  A.  Guy.  It says Guy@quantumsolve.com.

18  Q.  And what does he write?

19  A.  "Hi Anil.  Below is the fees schedule that we worked out

20  with the clients.  Is there a way for you to calculate these

21  and hold back the fees so that the client receives the

22  settlement wire net of these charges?"

23  Q.  And then in the table there's a client discount rate.  Do

24  you see that?

25  A.  I do.

L3IAWEI3ps                    Pechet - Direct

1    Q.  What's the client discount rate?

2    A.  8.5 percent.

3    Q.  And now we can go up to the last email in the chain, that

4    top email.  Mr. Pechet, who is this email from?

5    A.  It's from Ray, Ray@quantumsolve.com.

6    Q.  And who is it written to?

7    A.  It's to Guy, and there's people copied as well.  Would you

8    like me to read those?

9    Q.  Yes, please.

10   A.  Anil Uzun, Ozan Ozerk, Guy, and Anil@clearsettle.com.

11   Q.  And what's the date of this email?

12   A.  August 23, 2016.

13   Q.  And what's the subject?

14   A.  "Eaze MD."

15   Q.  And can you read the body of the email?

16   A.  "Anil, when speaking to Ozan this morning about the wire,

17   Ozan said that we would wire them the full amount and charge

18   our fees once a quarter rather than over time.  We pay them

19   settlements.  I'm fine with that if that's what you guys

20   prefer.  The only thing is, I don't see why we wouldn't take

21   our money off the top every time because if something does

22   happen, we don't have reserves on them, so it might be smart to

23   take off the 8 to 9 percent every time we pay them so we build

24   up some reserves for any possible future issues.  Again,

25   totally up to you guys, just wanted to point that out.  Thank

L3IAWEI3ps                          Pechet - Cross

1   you.  Ray."

2   Q.  Thank you.

3              MS. DEININGER:  Mr. Levine, you can take that down.

4              No further questions, your Honor.

5              THE COURT:  Cross-examination.

6   CROSS-EXAMINATION

7   BY MR. TAYBACK:

8   Q.  Mr. Pechet, can you hear me?

9   A.  Yes, I can.

10  Q.  Am I pronouncing your name directly?

11  A.  Sure.  Close enough.

12  Q.  If for some reason you can't hear me, let me know.

13             I'd like you to take a look at Exhibit GX 4501.  I'd

14  like to have you read a couple specific things from this

15  document.

16             MR. TAYBACK:  If you could just bring up the date of

17  that document.

18  Q.  What is the date?

19  A.  It's February 14, 2014.

20  Q.  And the stationery it's on is from what United States

21  Department?

22  A.  The Office of the Deputy Attorney General.

23  Q.  In the U.S. Department of Justice?

24  A.  Yes.

25  Q.  And then the name of the issuer of this particular memo is

1    what?

2    A.   James M. Cole, the Deputy Attorney General.

3    Q.   I'd like you to take a look if you can at the first

4    paragraph at the sentence that starts "in furtherance."  Do you

5    see that?

6    A.   Yes.

7    Q.   If you could just read that sentence.

8    A.   "In furtherance of that commitment, the August 29 guidance

9    instructed Department attorneys and law enforcement to focus on

10   the following eight priorities in enforcing the CSA against

11   marijuana-related conduct."

12   Q.   And then I won't make you reread the eight bullet points

13   that are below there, but you see those?

14   A.   I do.

15   Q.   You did read those on your direct, right?

16   A.   Yes.  I recall reading those.

17   Q.   Not listed among those eight are consumer uses of credit or

18   debit cards, correct?

19   A.   You have to give me a second to just review.

20   Q.   Sure.

21   A.   No, I don't see that, in this list of eight.

22   Q.   And if you can just go to the second page of this document

23   at the top, and the first, the continuation of the paragraph

24   from the other page, the sentence that starts "although," if

25   you could read that sentence, please.

L3IAWEI3ps                    Pechet - Cross

A.  "Although the August 29 guidance was issued in response to

recent marijuana legalization initiatives in certain states, it

applies to all Department marijuana enforcement nationwide."

Q.  And then if I could have you go down to the bottom of this

page, there's a footnote.  And if I could ask you to read the

first two sentences of that footnote.

A.  "The Department of the Treasury's Financial Crimes

Enforcement Network (FinCEN) is issuing concurrent guidance to

clarify BSA expectations for financial institutions seeking to

provide services to marijuana-related businesses.  The FinCEN

guidance addresses the filing of suspicious activity reports

(SAR) with respect to marijuana-related businesses, and in

particular the importance of considering the eight federal

enforcement priorities mentioned above, as well as state law."

Q.  Do you actually know -- do you know what FinCEN is?

A.  I'm vaguely familiar with it.

Q.  Let me ask you to take a look at Exhibit GX 4502.

         Now if I could ask you to tell me the date of this

particular memo.

A.  February 14, 2014.

Q.  The same date as the last exhibit we looked at, correct?

A.  Correct.

Q.  And this was issued by what federal agency?

A.  The Department of the Treasury, Financial Crimes

Enforcement Network.

L3IAWEI3ps                    Pechet - Cross

1    Q.  And you understand that the Department of Treasury is a

2    different federal agency than the Department of Justice.

3    A.  Yes.

4    Q.  Now if I could ask you to read the first sentence of this

5    particular memo at the top there, starting "the financial

6    crimes."

7    A.  "The Financial Crimes Enforcement Network ('FinCEN') is

8    issuing guidance to clarify Bank Secrecy Act ('BSA')

9    expectations for financial institutions seeking to provide

10   services to marijuana-related businesses."

11   Q.  And if you could go to the second paragraph under the

12   heading that says "Marijuana Laws and Law Enforcement

13   Priorities," and if you could please read the two sentences

14   that begin "in light of these developments."

15   A.  "In light of these developments, U.S. Department of Justice

16   Deputy Attorney General James M. Cole issued a memorandum (the

17   'Cole Memo') to all United States attorneys providing updated

18   guidance to federal prosecutors concerning marijuana

19   enforcement under the CSA.  The Cole Memo guidance applies to

20   all DOJ's federal enforcement activity, including civil

21   enforcement and criminal investigations and prosecutions

22   concerning marijuana in all states."

23   Q.  And now if you could go to the next page and read the

24   sentence that, at the top, that begins "in furtherance of,"

25   just down to the colon.

L3IAWEI3ps                     Pechet - Cross

1   A.  In furtherance of those objectives, the Cole Memo provides

2   guidance to DOJ attorneys and law enforcement to focus their

3   enforcement resources on persons or organizations whose conduct

4   interferes with any one or more of the following important

5   priorities (the 'Cole Memo priorities')."

6   Q.  And you'll see below there's the same eight bullet points

7   you read on direct, correct?

8   A.  Yes.

9   Q.  And those are the same as the eight bullet points that were

10  in the document that you looked at just before this?

11  A.  I think so, yes.

12  Q.  And they don't make any reference to consumers using credit

13  or debit cards, correct?

14  A.  No, they do not.

15  Q.  Now if you can take a look at the paragraph that begins

16  "provide" -- or that's got a heading "Providing Financial

17  Services to Marijuana-Related Businesses."  If you could read

18  the first two sentences of that section.

19  A.  "This FinCEN guidance clarifies how financial institutions

20  can provide services to marijuana-related businesses consistent

21  with their BSA obligations.  In general, the decision to open,

22  close, or refuse any particular account or relationship should

23  be made by each financial institution based on a number of

24  factors specific to that institution."

25  Q.  Now, if I could ask you to take a look at GX 4503, do you

1   recall looking at this in your direct testimony?

2   A.  Yes, I do.

3   Q.  And if you could read the second paragraph.

4   A.  "In deciding which marijuana activities to prosecute under

5   these laws with the Department's finite resources, prosecutors

6   should follow the well-established principles that govern all

7   federal prosecutions.  Attorney General Benjamin Civiletti

8   originally set forth these principles in 1980, and they have

9   been refined over time, as reflected in chapter 9-27.000 of the

10  U.S. Attorneys' manual.  These principles require federal

11  prosecutors deciding which cases to prosecute to weigh all

12  relevant considerations, including federal law enforcement

13  priorities set by the Attorney General, the seriousness of the

14  crime, the deterrent effect of criminal prosecution, and the

15  cumulative impact of particular crimes on the community."

16  Q.  And if I could ask you to clarify, this doesn't refer, in

17  this -- it's a short memo, so -- it's three paragraphs.  It

18  doesn't refer to anything about the FinCEN memo that we just

19  looked at, correct?

20  A.  So -- I haven't reviewed this memorandum in its entirety,

21  so I would have to look at it all.

22  Q.  Yes.  Can you just take a look?

23  A.  Sure.

24          I wouldn't mind looking at the next page, please.

25  Q.  I don't think there is a next page.

1    A.  Oh, OK.  No, I don't see it there.

2    Q.  And this -- the letterhead on this particular memo is

3    Office of the Attorney General?

4    A.  That I can see.  Yes, yes.

5    Q.  So that's the Department of Justice, correct?

6    A.  Right.

7    Q.  It's not the Department of Treasury.

8    A.  Correct.

9    Q.  And the memorandum itself is from Jefferson B. Sessions.

10   Do you see that?

11   A.  Yes.

12   Q.  He was the Attorney General under Donald Trump in 2018?

13   A.  That's my understanding, yes.

14   Q.  And this is dated 2018, correct?

15   A.  Yes.

16   Q.  Now if you could go back to Exhibit 4501 that you looked

17   at, the attorney -- the person who is offering this memo is

18   deputy Attorney General James Cole.  Do you see that?

19   A.  I do.

20   Q.  Do you know, in 2014 he was the Deputy Attorney General

21   under Eric Holder in the Obama Administration, correct?

22           MS. DEININGER:  Objection, foundation.

23   Q.  Do you know that?

24           THE COURT:  Your Honor, there was an objection.

25           MS. DEININGER:  Rule 403, relevance, your Honor.

Pechet - Cross

1                THE COURT:  No.  I think I can take judicial notice of

2        that.

3                Overruled.

4                THE WITNESS:  I'm sorry, your Honor.  I couldn't hear

5        you.

6                THE COURT:  Oh, I'm sorry.  I misunderstood.  The

7        objection is on relevance grounds.  Overruled.

8        BY MR. TAYBACK:

9        Q.  You understand that Mr. Cole was the Attorney General under

10       Eric Holder, who was the Attorney General in the Obama

11       Administration, correct?

12       A.  I didn't know that, but I have no reason to doubt it.

13       Q.  Now if I could ask you to take a look at GX 4302.  Do you

14       recall testifying about this document?

15       A.  I do.

16       Q.  Now, there's a column there that says "FCIU comments."  See

17       that?

18       A.  I do.

19       Q.  Do you know what that is?

20       A.  I don't.

21       Q.  You have no idea what it stands for, correct?

22       A.  I don't, no.

23       Q.  And you believe there was a name that was indicated in the

24       lower right-hand corner that said Cathay.  Do you know what

25       that refers to?

L3IAWEI3ps                    Pechet - Cross

1   A.  From reading this document, I think it refers to Cathay

2   Bank, but I don't actually know.

3   Q.  Do you know, is Cathay a U.S. bank?

4   A.  First time I've heard of it was today.

5   Q.  So you don't know one way or the other, correct?

6   A.  No idea.

7   Q.  You've never seen Cathay's policies on marijuana, for

8   example, if they had any?

9   A.  I've never heard of Cathay Bank until today.

10  Q.  Is it fair to say that you don't know anything more about

11  this document or Cathay Bank's position with respect to

12  marijuana than what you read?

13  A.  That's fair to say.

14  Q.  Now, you also looked at some documents, you read from some

15  documents, that I believe indicated they were from Wells Fargo.

16  Do you recall that?

17  A.  I do.

18  Q.  Is it fair to say you also don't know anything more about

19  Wells Fargo policies on marijuana than you do about Cathay?

20  A.  No, I don't know anything about Wells Fargo's marijuana

21  policies.

22  Q.  You haven't looked at them.

23  A.  No.

24  Q.  And you haven't spoken to any of the people at the bank

25  that authored any of those documents, correct?

L3IAWEI3ps                    Pechet - Cross

1   A.  No, I have not.

2   Q.  And so you don't know any of the circumstances behind any

3   of the decisions that are reflected in those documents,

4   correct?

5   A.  No.

6   Q.  Now if you could take a look at Exhibit GX 916.  At the

7   very top of the document, the email headers, do you see the

8   "from" is from a person named Ray@quantumsolve.  You see that?

9   A.  I do.

10  Q.  There's another person on the cc line at the end that says

11  Anil@clearsettle.com.  Do you see that?

12  A.  I do.

13  Q.  Do you know what Clearsettle is?

14  A.  No, I don't.

15  Q.  It's true, isn't it, that Ray had a different email domain

16  than the person who has the domain indicating Clearsettle,

17  correct?

18  A.  That's correct.

19  Q.  Ray's is not from Clearsettle, correct?

20  A.  I don't know, either way.  I just see that the email

21  domains are different.

22  Q.  Now, if you could take a look farther down it says, the

23  subject line says "Eaze MD."

24  A.  I see that.

25  Q.  Do you know what Eaze MD is, or -- at all?

L3IAWEI3ps                    Pechet - Cross

1   A.  Beyond what I read in the document today I have no

2   knowledge of Eaze MD.

3   Q.  So you don't know if it's related to company that's

4   sometimes referred to as Eaze or Eaze Solutions or Eaze

5   Technologies?

6   A.  I don't know.

7           MR. TAYBACK:  Now, if you go down a little bit in this

8   document, there's information -- go down one more page, to this

9   next email here where it gives the business name.  Actually

10  it's the August 13, 2016.  Keep going.  A little farther down.

11  There you go.  That one right there.  Blow that up.

12  Q.  And you'll see that there's a name there indicating, a

13  business name, Michael F. Sedrak, a medical doctor?  You see

14  that?

15  A.  I do.

16  Q.  Do you know anything about that doctor?

17  A.  No, I don't.

18  Q.  Anything about what he might have done for Eaze MD?

19  A.  I don't.

20          MR. TAYBACK:  May I have one moment, your Honor?

21          THE COURT:  Yes.

22          MR. TAYBACK:  I have no further questions, your Honor.

23          THE COURT:  Counsel.

24  CROSS-EXAMINATION

25  BY MS. LESPERANCE:

L3IAWEI3ps                    Pechet - Cross

Q.  Good afternoon, Mr. Pechet.

A.  Good afternoon.

Q.  My name is Amy Lesperance, and I represent Ruben Weigand.

If you can't hear me at any point, please just let me know.

A.  Thanks.

Q.  Now, Mr. Pechet, you testified that you work at the United

States Attorney's Office for the Southern District of New York,

correct?

A.  That's correct.

Q.  So you don't work for Wells Fargo, do you?

A.  No, I don't.

Q.  And you don't work for Cathay Bank?

A.  No.

Q.  And in fact you don't work for any bank.

A.  That's correct.

Q.  And you testified on direct examination about certain bank

records.  Do you recall that?

A.  Yes.

Q.  But you don't know anything about those bank policies,

correct?

A.  I don't.

            (Continued on next page)

1    Q.  And that would include your policies about debit and credit
2    card transactions?
3    A.  Correct.
4    Q.  Now, Mr. Pechet, do you recall testifying about three Wells
5    Fargo reports?
6    A.  Three sounds right.  I remember testifying about Wells
7    Fargo reports.  I don't remember the exact number.
8    Q.  Mr. McLeod, can you please put up Government Exhibit 2633.
9    And, Mr. McLeod, can you highlight the words "RECR issue dates"
10   on the right-hand side.
11          Now, Mr. Pechet, what is the date of the RECR issue
12   date?
13   A.  May 2nd, 2016.
14   Q.  And, Mr. McLeod, can you please put up Government
15   Exhibit 2634, and can you please highlight the RECR issue date
16   on this record.
17          Mr. Pechet, what is that date?
18   A.  January 5th, 2017.
19   Q.  And, Mr. McLeod, if we could scroll down to the middle of
20   this document.  That's good.  Thank you.  And if you could
21   highlight the column "Line of Business," please.
22          Mr. Pechet, do you see where it says "Consumer and
23   small business banking"?
24   A.  I do.
25   Q.  And it does say business banking, correct?

1    A.   Consumer and small business banking, right.

2    Q.   And wouldn't you agree that opening a business account at a

3    bank is not the same thing as opening a credit card account?

4              MS. DEININGER:  Objection.  Foundation.

5              THE COURT:  Sustained.

6    Q.   Mr. Pechet, are you generally familiar with opening a bank

7    account?

8    A.   Kind of.  Not really.

9    Q.   Are you generally familiar with opening a credit card

10   account?

11   A.   Kind of.  I think I've opened one in my life.

12   Q.   And when you opened that credit card account, did that open

13   a business bank account?

14   A.   I don't think so.

15   Q.   Now, Mr. Pechet, you don't see the word "debit card"

16   anywhere on this page, do you?

17   A.   No.

18   Q.   And you don't see the word "credit card" anywhere on this

19   page, do you?

20   A.   I don't see "credit card," no.

21   Q.   Mr. McLeod, can you please put up Government Exhibit 4302.

22             And, Mr. Pechet, you testified that you think this

23   document is from Cathay Bank, but you're not quite sure?

24   A.   That's actually not quite what I said, but that is my

25   understanding.

L3IPWEI4                       Pechet - Cross

 1  Q.  Mr. McLeod, can you please highlight the third column from
 2  the left, "Initial request date."
 3          Mr. Pechet, what are the years in this initial request
 4  date column?
 5  A.  2020 and 2021.
 6  Q.  And you don't know how this document was prepared, do you?
 7  A.  I don't.
 8  Q.  And you don't know who prepared this document?
 9  A.  Not for sure, no.
10  Q.  Mr. McLeod, if you could please put up Government
11  Exhibit 916.  Do you recall testifying about this e-mail?
12  A.  Yes.
13  Q.  And what is the date of the top e-mail?
14  A.  That's August 23rd, 2016.
15  Q.  And do you see the name Ruben Weigand anywhere in this
16  e-mail?
17  A.  No.
18          MS. LESPERANCE:  One moment, your Honor.
19          (Pause)
20          Nothing further, your Honor.
21          THE COURT:  Redirect?
22          MS. DEININGER:  No redirect, your Honor.
23          THE COURT:  Very good.  You may step down.
24          (Witness excused)
25          Call your next witness.

L3IPWEI4                    Pechet – Cross

1            MR. FOLLY:  Your Honor, the government's next witness

2    is John Wang.  Can we have a brief sidebar regarding immunity?

3            THE COURT:  Okay.

4            (Continued on next page)

 1              (At the side bar)

 2              THE COURT:  Thank you very much.  I didn't realize

 3     this was the purpose.  So you pronounce it Wang?

 4              MR. WANG:  Yes, sir.

 5              THE COURT:  So, Mr. Wang, is it your intention to

 6     invoke your Fifth Amendment right, your Fifth Amendment

 7     privilege against testifying with respect to any and all

 8     questions that might be raised about this subject?

 9              MR. WANG:  Yes, your Honor.

10              THE COURT:  So I will sign the immunity order and give

11     it to the government.

12              So you recognize that, now that I've signed that

13     immunity order, you have to tell the truth and that if you fail

14     to tell the truth, the immunity order is void?  Do you

15     understand?

16              MR. WANG:  Yes, your Honor.

17              THE COURT:  Also, you understand that you can still be

18     prosecuted for any crimes you may have committed, just that

19     what you say here in court cannot be used against you?  Do you

20     understand?

21              MR. WANG:  Yes, your Honor.

22              THE COURT:  Very good.  Is this your last witness?

23              MR. FOLLY:  Your Honor, we have one additional witness

24     after this.

25              THE COURT:  Okay.  All right.  Let's go back.

L3IPWEI4                           Pechet - Cross

1             MR. FOLLY:  We anticipate the direct will only be 30

2        minutes.

3             THE COURT:  Okay.  But we're only going to go five

4        minutes because --

5             MR. FOLLY:  Lunch.

6             THE COURT:  -- because of the lunch break.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2       JOHN WANG,

3            called as a witness by the Government,

4            having been duly sworn, testified as follows:

5                THE COURT:  Please be seated and state and spell your

6       full name.  State and spell your full name.

7                THE WITNESS:  John Wang.

8                THE COURT:  J-o-h-n.  How do you spell Wang?

9                THE WITNESS:  W-a-n-g.

10               THE COURT:  All right.  Go ahead, counsel.

11               MR. FOLLY:  Thank you, your Honor.

12      DIRECT EXAMINATION

13      BY MR. FOLLY:

14      Q.  Good afternoon, Mr. Wang.

15      A.  Good afternoon.

16      Q.  How old are you?

17      A.  I'm 34.

18      Q.  Where do you live?

19      A.  San Francisco, California.

20      Q.  Who do you live with?

21      A.  My wife and brother-in-law.

22      Q.  Are you currently employed?

23      A.  Yes.

24      Q.  Where do you work?

25      A.  Eaze.

L3IPWEI4                          Wang - Direct

1    Q.   What is Eaze?

2    A.   Eaze is an online cannabis delivery company.

3    Q.   Approximately when did you start working at Eaze?

4    A.   May of 2017.

5    Q.   What is your title there?

6    A.   Lead product manager.

7    Q.   Directing your attention to 2017 through 2019, did Eaze

8    accept debit and credit card payments for the purchase of

9    marijuana products?

10   A.   Yes.

11   Q.   Were those products sold through its website?

12   A.   Yes.

13   Q.   During that time period, were you involved with

14   facilitating Eaze's acceptance of credit and debit card

15   payments?

16   A.   Yes.

17   Q.   What was your role?

18   A.   I was the product lead working with product and engineering

19   on -- working on payments.

20   Q.   In connection with your involvement in that process, did

21   you participate in a scheme to conceal that the products being

22   sold were marijuana products?

23   A.   Yes.

24   Q.   Before we go into the details of how that worked, can you

25   explain what the goal of the scheme was?

1   A.   The goal was to be able to accept Visa and MasterCard

2   credit payments for cannabis deliveries.

3   Q.   Where were Eaze's customers located?

4   A.   In various cities throughout California.

5   Q.   Where were the dispensaries located?

6   A.   Also in various cities throughout California.

7   Q.   At a high level, can you describe how that scheme operated?

8   A.   We used fake merchant accounts tied to dispensaries, and we

9   also used 1-800 numbers associated with the fake merchant

10  accounts, along with fake merchant account websites, as well as

11  cookies and pixels to redirect users to Eaze.com.

12  Q.   Focusing on anyone who was involved in that operation

13  outside of Eaze, who were some of the main people involved in

14  the operation?

15  A.   There were people in Inovio, Conal, as well as Ray's

16  processing organization.  So there was Ray Akhavan, Ruben W,

17  someone named Ollie and someone named Medhat Mourid.

18  Q.   What was your understanding of Ray's role in the card

19  processing operation?

20  A.   He was the main person behind Ray's processing.

21  Q.   What was your understanding of the individual who you

22  referred to as Ruben W's role in the card processing operation?

23  A.   He was the main interface with the acquiring banks.

24  Q.   Mr. Wang, are you testifying here today pursuant to what is

25  called an immunity order that was issued by this Court?

```
 1   A.  Yes.

 2   Q.  Does that mean you've been ordered to testify here today?

 3   A.  Yes.

 4   Q.  What is your understanding of what the order requires you

 5   to do?

 6   A.  The order requires me to tell the truth.

 7   Q.  To your understanding, does the order provide you with any

 8   protections?

 9   A.  Yes.

10   Q.  What are those protections?

11   A.  That as long as I tell the truth, what I say here today

12   cannot be used against me.

13   Q.  Do you get immunity from prosecution in general, or is it

14   immunity from the use of your words while you testify here

15   today?

16   A.  Immunity based on the words -- based on what I testify

17   today.

18   Q.  What is your understanding of what can happen if you do not

19   tell the truth during your testimony today?

20   A.  I can be found of perjury.

21          MR. FOLLY:  Your Honor, I'm going to switch topics.

22          THE COURT:  Maybe then it is a good time to take our

23   lunch break.

24          Okay.  So, ladies and gentlemen, we will take our

25   lunch break.
```

1                (Jury not present)

2                THE COURT:  Mr. Wang, you may step down.  We'll see

3      you in an hour.  You can leave, and we'll see you in an hour.

4                (Witness temporarily excused)

5                Okay.  Anything any counsel needs to raise?

6                MR. TAYBACK:  The only issue I would raise, your

7      Honor, it's not entirely clear exactly what time the government

8      will rest.  Two points.  One, we will have a motion to make.  I

9      don't know what your preference is how we make it, go to

10     sidebar or --

11               THE COURT:  Yes, sidebar.

12               MR. TAYBACK:  Okay.  I'll do it at sidebar.

13               THE COURT:  Yes.  So does the government want to take

14     an estimate at when you'll rest?

15               MR. FOLLY:  Yes, your Honor.  I believe the direct

16     examination of this witness will likely only be about 25

17     minutes longer.

18               THE COURT:  Okay.

19               MR. FOLLY:  And the final witness for the government,

20     the direct examination will likely be no more than 20 minutes.

21               THE COURT:  Okay.  And what's the defense estimate on

22     cross?

23               MR. TAYBACK:  I expect half an hour with Mr. Wang.

24               MR. GILBERT:  Same here, your Honor.

25               THE COURT:  Based on what I was told by the government

L3IPWEI4                        Wang - Direct

1    yesterday, I told the jury that the government's case would end

2    today.  Indeed, the government, at one point, thought it might

3    end as early as this morning.  I think over the lunch break the

4    government should streamline its presentations for both

5    witnesses, and while I won't be as tight on the defense, I

6    think they might want to consider trying to streamline their

7    cross as well.

8            MR. TAYBACK:  Understand, your Honor.  I have one

9    other issue, I guess, that relates to that exact point.  Our

10   first proposed witness would be the Circle witness, which I

11   believe we've now submitted a letter to you in response to the

12   government's.  We can do it, I do believe our entire case will,

13   regardless of what happens if we start today or tomorrow, won't

14   use up the entire day tomorrow.  So we'll be done tomorrow.

15           THE COURT:  All right.  Well, that's good.  I still

16   want to have the government's case over by today.

17           MR. TAYBACK:  I understand.

18           THE COURT:  It sounds to me like you can excuse the

19   Circle witness.  We'll take him first thing in the morning

20   because after the government ends today, we'll have motions.

21           MR. TAYBACK:  Thank you, your Honor.

22           MR. GILBERT:  Thank you.

23           (Luncheon recess)

24           (Continued on next page)

25

1            A F T E R N O O N   S E S S I O N

2                          1:50 P.M.

3          (In open court; jury not present)

4          THE COURT:  Please be seated.  Let's get the witness

5    on the stand.

6          MR. TAYBACK:  Your Honor, if I -- just one thing.  To

7    be clear, just to use the Circle witness, the video would be

8    setup would be done overnight so we won't waste time tomorrow

9    morning, if you permit.  And that will be our first witness.

10         THE COURT:  I haven't seen both the letters yet.

11         MR. TAYBACK:  We will make sure that we have a

12   courtesy copy delivered to you shortly.

13         THE COURT:  Okay.

14         MR. TAYBACK:  I just want to make sure that that

15   schedule is consistent with what your Honor wants.

16         THE COURT:  Bear with me one second.

17         (Pause)

18         Yes.  I think it would make sense to set it up

19   overnight.

20         MR. TAYBACK:  So we'll start our case tomorrow.  Thank

21   you.

22         THE COURT:  All right.

23         THE DEPUTY CLERK:  Jury entering the courtroom.

24         (Jury present)

25         THE COURT:  Please be seated.  Juror No. 10, I have

1    your note.  We can work it out.  Don't worry about it.  I'll

2    relay it to the parties later, but it's all fine.

3              Okay.  Counsel.

4              MR. FOLLY:  Thank you, your Honor.

5    BY MR. FOLLY:

6    Q.  Mr. Wang, I'd like to quickly ask you some questions about

7    your background, educational and work experience.  How far did

8    you go in school?

9    A.  I completed college.

10   Q.  What did you study?

11   A.  I studied business administration.

12   Q.  What did you do after you graduated from college?

13   A.  I joined Google as a -- in their finance rotation program.

14   Q.  Approximately how long did you work at Google?

15   A.  Around two years.

16   Q.  What did you do after you worked at Google?

17   A.  I joined a company called Zynga.

18   Q.  What is Zynga?

19   A.  Zynga Was a online gaming company.  We made games like

20   Farmville and Words With Friends.

21   Q.  Did there come a time when you started to work at Eaze?

22   A.  Yes.

23   Q.  Approximately when was that?

24   A.  May of 2017.

25   Q.  You indicated earlier that from 2017 through 2019, you were

L3IPWEI4                           Wang - Direct

1   involved in a credit and debit card scheme at Eaze; is that

2   right?

3   A.  Yes.

4   Q.  You also mentioned that you understood that Ray Akhavan was

5   in charge of that operation; is that correct?

6   A.  Yes.  Yes.

7   Q.  Have you met Ray Akhavan before?

8   A.  Yes.

9   Q.  Approximately when was that?

10  A.  Sometime in 2017.

11  Q.  Where did you meet him at that time?

12  A.  In Calabasas, California.

13  Q.  Who was present for that meeting?

14  A.  Myself, Ray, the ex-CEO of Eaze, Jim, and Ray's secretary.

15  Q.  What was the purpose of the meeting?

16  A.  To appease Ray and to talk about chargebacks.

17  Q.  When you say appease Ray and talk about chargebacks, can

18  you explain what you mean about that?

19  A.  My understanding was that Ray was concerned about

20  chargebacks and wanted to --

21          MR. TAYBACK:  Object to foundation.

22  A.  My understanding --

23          THE COURT:  Excuse me.  When there is an objection, I

24  have to rule on it.

25          Overruled.

L3IPWEI4                     Wang - Direct

1    BY MR. FOLLY:

2    Q.  You can answer, Mr. Wang.

3    A.  My understanding was that Ray wanted to talk about

4    chargebacks and the importance of keeping the chargebacks

5    below -- low.

6    Q.  Mr. Levine, can you publish for the witness and the jury

7    what's in evidence as Government Exhibit 302.

8              Mr. Wang, do you recognize this?

9    A.  Yes.

10   Q.  What is it?

11   A.  It's a Telegram group chat between Eaze and Ray's

12   processing.

13   Q.  Were you a participant in this chat?

14   A.  Yes.

15   Q.  Can you just read aloud the date at the top of the chat?

16   A.  27 April 2018.

17   Q.  Mr. Levine, can you go to page 51.  If we can zoom in on

18   10:59 through 11:01.

19             Mr. Wang, can you read those series of messages aloud?

20   A.  Marty says:  "Hey guys.  Dan Erickson invited John Wang."

21   Dan Erickson says:  "Added John Wang on our end.  He's our

22   payments lead on our side."

23   Q.  Who is Dan Erickson?

24   A.  He was the ex-vice president of engineering at Eaze.

25   Q.  There's also a reference there to Marty, who was Marty?

L3IPWEI4                          Wang - Direct

1    A.  He was one of Ray's associates.

2    Q.  Dan refers to your role as payment lead.  Can you explain

3    what he meant by that?

4    A.  I was the main payment project manager working with our

5    product and engineering teams, and I would work with -- work

6    with those teams to implement our payment systems.

7    Q.  Turning to the top of the next page, page 52, if you could

8    zoom in on where it says -- sorry -- at 11:32, those series of

9    messages.

10              Mr. Wang can you read those aloud?

11   A.  Marty says:  "Okay, guys.  From our side, Ruben and me will

12   prepare you a list for the available bank accounts with our

13   suggestion of the distribution.  We can compare it then with

14   your list and make it fix."

15   Q.  What was your understanding of what it meant in this

16   message where it says "from our side, Ruben and me will prepare

17   you a list for the available banking accounts"?

18   A.  I believe the list is a list of the fake merchant accounts.

19   Q.  If you can zoom back out.  Focusing on where it says 4:26,

20   we could zoom in there.

21              Can you read those messages aloud?

22   A.  Ruben W says:  "Hey, Dan.  Conal will send you the two new

23   accounts with the respective dispensers in a few minutes.  They

24   are ready to go."

25   Q.  What was your understanding of what Ruben W meant in this

L3IPWEI4                        Wang - Direct

1    message?

2    A.  My understanding was that there were two new merchant

3    accounts that should be tied with their respective dispensaries

4    that should be using these fake merchant accounts.

5    Q.  Turning to the next page, if we could go to where it says

6    4:55 and zoom in there.

7          Can you read aloud Ruben W's message there?

8    A.  "We've volume limits at some accounts.  That's how we've

9    linked merchants, by size."

10   Q.  Where it says "we've volume limits at some accounts," what

11   was your understanding what Ruben meant by that?

12   A.  My understanding is that the merchant accounts had a

13   maximum monthly transaction limit, and that's what the volume

14   limits are referring to.

15   Q.  And there's also reference to linking merchants by size.

16   What was your understanding of what Ruben meant by that part?

17   A.  My understanding is because there were different volume

18   limits at both the merchant accounts and how much was processed

19   by each dispensary, that they should be linked so that the

20   dispensary transactions don't go over the volume limits at the

21   accounts, the merchant accounts.

22   Q.  Going now to page 55.  If we could go from -- zooming in

23   from 15:56, all the way down to the end.

24          There's a reference there to JB13.  What was your

25   understanding of who JB13 was?

1   A.   My understanding was that that was Ray Akhavan.

2   Q.   And if we could read this exchange.  You can read your

3   messages, and I will read JB13 and Ruben W messages.

4   A.   "Give me five minutes.  I'm just running some numbers.  I

5   want to show you a breakdown of volume by MID and site for

6   August.  (Forecast)."

7   Q.   JB13 writes:  "No worries at all.  There is zero rush, and

8   from this point on, we need to be very cautious and accurate

9   with everything we do because if we do that and don't make

10  mistakes, we have enough banks."

11  A.   Upper carat, "Agreed.  I have the spreadsheet ready to walk

12  through.  I want to make sure that we're doing this right.  Can

13  we get on a quick call to go over?  I can set up a conference

14  number, dial into a conference number, or we can do a Telegram

15  call.  (Not sure if they do group calls)."

16  Q.   Ruben W writes:  "Hey, John.  Marty is out for today.  I

17  can give you a call in something like 20/30 minute."

18          If we could continue down, and if you could read your

19  message that starts at 16:23?

20  A.   "Works for me.  I want to go over the game plan for volume

21  by MID and site ID (Dispensary)."

22  Q.   And directly below that it says "Ruben" and then there's a

23  phone number listed there, followed by a pass code, and then it

24  says "or just call me on Telegram."

25          Mr. Wang, when you said "I want to go over the game

1    plan for volume by MID by site ID (Dispensary)," can you

2    explain what you meant by that?

3    A.  I wanted to make sure that the dispensaries, based on their

4    processing volume, were assigned to the correct merchant

5    accounts based on the merchant account transaction volume

6    limits.

7    Q.  There's a reference here to planning a call.  Did that call

8    take place?

9    A.  Yes.

10   Q.  Who participated in that call?

11   A.  Ruben W and myself.

12   Q.  What topics did you discuss during the call?

13   A.  We talked about which dispensaries should be tied with

14   which merchant accounts based on transaction and limit volumes.

15   Q.  What was the purpose of going over those topics?

16   A.  To make sure that the transaction volume of the dispensary

17   did not go over the transaction limits of the merchant

18   accounts.

19   Q.  Did you have an understanding of where Ruben W was from?

20   A.  My understanding was that he was somewhere in Europe.

21   Q.  During that call, did you make any observations about his

22   voice or his accent?

23            MR. GILBERT:  Objection.

24   A.  He seemed to have a...

25            THE COURT:  Overruled.

L3IPWEI4                        Wang - Direct

1   Q.   You may answer.

2   A.   He seemed to have a German accent.

3   Q.   Did you ever meet Ruben W in person?

4   A.   No.

5   Q.   Mr. Levine, if you can display for the witness only what's

6   been marked as Government Exhibit 325.

7              Mr. Wang, do you recognize this?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's a Telegram message channel between Ruben W and myself.

11  Q.   What is reflected on this particular page?

12  A.   Call logs between Ruben W and myself.

13             MR. FOLLY:   The government offers Government

14  Exhibit 325.

15             MR. TAYBACK:   No objection.

16             MR. GILBERT:   No objection.

17             THE COURT:   Received.

18             (Government's Exhibit 325 received in evidence)

19  BY MR. FOLLY:

20  Q.   Can you read the date aloud at the top of the exhibit?

21  A.   31st July 2018.

22  Q.   Do you recognize the first entry that's listed there?

23  A.   Yes.

24  Q.   What is it?

25  A.   It's the phone call that I alluded to earlier, where we

L3IPWEI4                         Wang - Direct

1    were talking about transaction volumes and dispensary mapping

2    to the merchant accounts.

3    Q.   And where it says "incoming" can you read aloud the entry

4    that's listed in parenthesis?

5    A.   "1242 seconds."

6    Q.   Was that the length of that call?

7    A.   Yes.

8    Q.   Going back to Government Exhibit 302, at page 58, looking

9    at the bottom of the page, if we could actually scroll down a

10   little bit so that the next page is visible.

11          Starting at 10:31, can you read aloud your messages

12   there?

13   A.   "Conal said that the accounts are configured to EUR instead

14   of USD.  Can we ask the bank to change them to USD?  Conal said

15   those are now in USD.  I am confirming."

16   Q.   You reference here EUR instead of USD.  Can you explain

17   what you meant by that?

18   A.   I meant that the merchant accounts were configured to

19   process in Euros instead of U.S. dollars.

20   Q.   Why were you asking to change this?

21   A.   Because our customers are in the United States, and they

22   expected to be able to process in U.S. dollars.

23   Q.   Who were you directing this message at?

24   A.   Ruben.

25   Q.   Why did you address this request to Ruben?

1   A.  Because he was the main interface between the banks.

2   Q.  Can you read aloud Ruben W's response?

3   A.  "Hey, this should have been updated.  Inovio will test

4   right now."

5   Q.  What was your understanding of what he meant by that?

6   A.  My understanding is that the accounts had been updated to

7   process from Euros to U.S. dollars.

8   Q.  Focusing on your next message at 10:37, can you read that

9   aloud?

10  A.  "I want to confirm 'G-Johnson-greenteacha-USD' and

11  'G-Linebeck-Organikals-USD' are also good to go live today."

12  Q.  Can you explain what the references were to Greenteacha and

13  Linebeck Organikals?

14  A.  These are the fake merchant accounts.

15  Q.  Can you read aloud Ruben W's response?

16  A.  "We asked Conal to test.  Please take them live if

17  successfully tested."

18  Q.  What was your understanding of what Ruben meant in that

19  message?

20  A.  My understanding was that if we could successfully test a

21  credit card transaction against these merchant accounts, that

22  they can be enabled for the dispensaries.

23  Q.  And what was your understanding of what Ruben W meant by

24  "please take them live"?

25  A.  My understanding was that "live" meant that they could

L3IPWEI4                        Wang - Cross

1    accept transactions from our customers.

2               MR. FOLLY:  No further questions, your Honor.

3               THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. TAYBACK:

6    Q.  Mr. Wang, can you hear me?

7    A.  Yes.

8    Q.  My name is Chris Tayback, and I'm representing Ray Akhavan.

9    Okay.  If you can't hear me for any reason, please let me know.

10              You used the term "fake merchant accounts" in your

11   testimony.  Did you ever hear those referred to as proxies or

12   proxy merchant accounts?

13   A.  Not that I can recall.

14   Q.  You mentioned chargebacks, and I would like to ask you a

15   couple of questions about that.  You were with the company in

16   January of 2018, correct?

17   A.  That's correct.

18   Q.  And in January of 2018, California legalized marijuana not

19   just for medicinal purposes but for all purposes, recreational

20   as well, correct?

21   A.  That's correct.

22   Q.  And in fact, because of that, some of the dispensaries

23   needed to get re-licensed under the new California laws?

24   A.  I believe that was the case.

25   Q.  And do you recall having an issue -- the issue with

1   chargebacks in January of 2018 being that the volume of

2   transactions had gone way down because so many of the

3   dispensaries weren't licensed at that point in time?

4   A.  I don't recall.

5   Q.  Were you involved at all in interacting with the -- on the

6   business side, the dispensaries and what they're status was in

7   January of 2018?

8   A.  Can you clarify that question?

9   Q.  Yes.  Were you interacting with the dispensaries in terms

10  of their license status in January of 2018?

11  A.  No.

12  Q.  And did you have any responsibility at all for looking at

13  the records to determine why chargebacks were what they were at

14  any point in time?  Was that ever your job?

15  A.  I don't believe so.

16  Q.  Now, the people that you have described working with, with

17  respect to credit card processing while you were at Eaze, they

18  included -- you mentioned some people, but I want to ask

19  whether some of these other people were involved.  Dan

20  Erickson?

21  A.  Based on my interactions with them in the chat, yes.

22  Q.  He was an Eaze employee, correct?

23  A.  He was an Eaze employee at the time.

24  Q.  Darcy Cozzetto, did you interact with her?

25  A.  I interacted with Darcy.

1  Q.  With respect to credit card processing?

2  A.  Yes.

3  Q.  And so all my questions are focused on whether you

4  interacted with these people with regard to credit card

5  processing at Eaze, just so you know.

6          The person you mentioned named Conal, was he at

7  Inovio?

8  A.  Yes.

9  Q.  And that's another company, right?

10  A.  That's correct.

11  Q.  And that's somebody that you -- that Eaze contracted with

12  and worked with as a vendor?

13  A.  Yes.

14  Q.  And was he aware of the credit card processing, including

15  the different merchants and merchant names that needed to be

16  set up?

17  A.  Can you clarify that question?

18  Q.  Sure.  You spoke to him about setting up the technology to

19  allow the credit card processing for the different merchant

20  accounts, correct?

21  A.  I had a conversation to talk about setting up using Inovio

22  as a payment gateway.

23  Q.  And that was with respect to these credit card processing

24  at Eaze, correct?

25  A.  Yes.

L3IPWEI4                        Wang - Cross

1    Q.  Is it fair to say that when you were -- the work you were

2    doing at Eaze, you never considered what you were doing to be

3    bank fraud, correct?

4              MR. FOLLY:  Objection.

5              THE COURT:  Ground?

6              MR. FOLLY:  Relevance, 403, 401.

7              THE COURT:  Overruled.

8    Q.  Would you like me to repeat the question?

9    A.  Yes, please.

10   Q.  While you were working at Eaze on credit card processing,

11   you never considered what you were doing to be bank fraud,

12   correct?

13   A.  I knew what we were doing was wrong on some way, misleading

14   Visa and MasterCard.  Whether it's bank fraud or not, I'm not a

15   lawyer; so...

16   Q.  And so you didn't contemplate when you were doing your

17   work -- withdraw that.

18              You didn't make an effort to keep what you were doing

19   secret from, for example, Conal at this other company, correct?

20   A.  Can you repeat that question one more time?

21   Q.  You didn't make any effort to keep what you were doing a

22   secret from Conal at Inovio, correct?

23   A.  What I communicated to Conal was that we needed to use

24   their gateway to process credit card transactions for our

25   dispensary merchants.

L3IPWEI4                         Wang - Cross

Q.  And you didn't conceal what you were working on from him,
correct?

A.  I told him that we needed to use his gateway to process
credit cards for our dispensary merchants.

Q.  Which was marijuana, correct?  The dispensary merchants
were marijuana merchants, correct?

A.  That's correct.

Q.  And you didn't make an effort, in fact, to conceal what you
were doing, that is to say, endeavoring to process credit card
transactions for marijuana sales from anybody that you spoke to
about your job, correct?

          THE COURT:  I think your question is hopelessly
ambiguous.

          MR. TAYBACK:  I'll withdraw the question, your Honor.

Q.  Mr. Wang, one of the -- one of the aspects of credit card
processing that you worked on while you were at Eaze related to
trying to ensure that customers received something in the
descriptor of their statement that would allow them to
recognize the transaction, right?

A.  Yes.

Q.  And, in fact, you helped implement a cookie, or something
like that, that would allow a person who transacted business
with Eaze to look at their -- to go to the website identified
in the descriptor and then be directed immediately to the Eaze
website, correct?

L3IPWEI4                     Wang - Cross

1    A.   Can you repeat that question?

2    Q.   Sure.  As part of your job at Eaze, you worked on

3    implementing a cookie, or something like that, that would allow

4    a purchaser, a customer of Eaze, to go to the link on the

5    descriptor in their credit card information and be redirected

6    immediately to the Eaze website, correct?

7    A.   That's correct.

8    Q.   So the URL was something that you would be responsible for

9    ensuring that would direct them to the Eaze website, correct?

10   A.   The URL they entered would, based on the cookie that was

11   set on their browser, redirect the user directly to Eaze.com.

12   Q.   Now, is it fair to say when you first started in 2017,

13   there was a company affiliated with Eaze called EazeMD; isn't

14   that right?

15   A.   I believe so, yes.

16   Q.   And that was a separate component of Eaze that used doctors

17   to issue prescriptions?

18   A.   I wasn't on the legal or corporate finance team; so I don't

19   know the corporate structure of that.

20   Q.   Okay.  And do you know what EazeMD did?

21   A.   On a high level, yes.

22   Q.   What did it do?

23   A.   At the time, when California required customers to have a

24   doctor's recommendation letter, EazeMD connected people who

25   wanted to get a doctor's opinion on if they can get a -- if

1   they should -- if they qualified for a doctor's recommendation

2   letter for cannabis use.

3   Q.  And when you started work -- withdraw that.

4           And that didn't involve the actual delivery of

5   cannabis; it was just connecting a person with a doctor,

6   correct?

7   A.  I believe so.

8   Q.  And did you work on credit card processing for EazeMD?

9   A.  I don't believe so.

10  Q.  Now, Mr. Wang, when you first started at Eaze, what was

11  your job title?

12  A.  Senior product manager.

13  Q.  And you're still at Eaze, correct?

14  A.  That's correct.

15  Q.  You were promoted at some point during your tenure at Eaze?

16  A.  That's correct.

17  Q.  When were you promoted?

18  A.  I was officially promoted to the product manager maybe two

19  years ago.

20  Q.  So you think approximately 2019?

21  A.  Sounds about right.

22  Q.  Was that before or after Eaze had stopped processing credit

23  cards with Mr. Akhavan?

24  A.  I don't recall exactly.

25  Q.  You don't have any concerns about going back to work for

L3IPWEI4                        Wang - Cross

1   Eaze, correct?  I can rephrase the question.  I'll withdraw the

2   question.

3           Mr. Wang, Eaze is still in the business of delivering

4   marijuana, correct?

5   A.  Yes.

6   Q.  And you understand that marijuana is illegal under federal

7   law, correct?

8   A.  Yes.

9   Q.  As you sit here now and testify, you don't have any

10  concerns, do you, that you're going to be prosecuted for a drug

11  offense related to your work at Eaze, do you?

12  A.  Can you clarify that question?

13  Q.  As you're sitting here, you don't have any concern that

14  you're going to be prosecuted for your work at Eaze, correct?

15  A.  I can't speak on behalf of the people that would do the

16  prosecution.

17  Q.  I understand, but I'm asking how you feel.  You're still

18  going to go back to work at Eaze, correct?

19  A.  Yes.

20  Q.  And you're not concerned that you're going to be

21  prosecuted?

22  A.  I mean, I hope I'm not prosecuted.

23  Q.  And you don't expect to be, correct?

24  A.  I hope I'm not.

25          MR. TAYBACK:  May I have one moment, your Honor?

L3IPWEI4                          Wang - Cross

1          THE COURT:  Yes.

2    Q.  Mr. Wang, in your current job, the work, that is to say,

3    you're doing today at Eaze -- withdraw that.

4          Does Eaze currently accept debit cards?

5    A.  We accept something called Circle, which can be purchased

6    through a debit card.

7    Q.  And that's a way a customer can use their debit card to

8    acquire marijuana through Eaze, and you use it through a vendor

9    called Circle; is that right?

10          MR. FOLLY:  Objection on 401, 403 and the reasons in

11    the letter.

12          THE COURT:  Well, I'm going to allow it since I

13    haven't yet ruled on the letter controversy, but I'll strike it

14    subsequently if I change my ruling.  So you may answer that

15    question.

16    Q.  Would you like me to re-ask it, reframe it?

17    A.  Yes, please.

18    Q.  It's true, isn't it, that a customer can buy marijuana

19    through Eaze using their debit card currently, correct?

20    A.  That's not exactly correct.  A customer can use their debit

21    card to purchase a USD-stable coin, which they can use to

22    purchase -- to make a purchase with a dispensary for a cannabis

23    delivery.

24    Q.  And that happens all in a single transaction, correct?

25    That is, a customer presents their debit card to Eaze and Eaze

1    processes it, correct?

2              MR. FOLLY:  Objection, foundation.

3              MR. TAYBACK:  I'll withdraw the question and lay a

4    foundation.

5              THE COURT:  No, I -- this is -- even assuming it's

6    permissible, which I haven't fully ruled on yet, it is with

7    this witness so tangential as not to be worth the time; so....

8              MR. TAYBACK:  Understand.  I'll move on.

9              THE COURT:  Thank you.

10             MR. TAYBACK:  May I have one moment, your Honor?

11             THE COURT:  Yes.

12             (Pause)

13             MR. TAYBACK:  I have no further questions.

14             THE COURT:  Cross-examination from Mr. Weigand's

15   counsel.

16   CROSS-EXAMINATION

17   BY MR. GILBERT:

18   Q.  Mr. Wang, you testified on cross-examination about a phone

19   call with Ruben Weigand that took place in July of 2018; is

20   that correct?

21   A.  I testified saying I had a phone call with Ruben W.

22   Q.  Okay.  And that was in July of 2018; is that correct?

23   A.  That's correct.

24   Q.  And that was the first time you spoke with Mr. Weigand,

25   with Ruben W?

1    A.   I believe so.

2    Q.   And the last time?

3    A.   I don't believe that was the last time.

4    Q.   When did you speak to him after that call?

5    A.   According to the Telegram documents, there was one more

6    call at a later date.

7    Q.   Can we show the witness the Exhibit 325 in evidence,

8    please.

9         Are you referring to a second call that's listed on

10   this document?

11   A.   That's correct.  I'm referring to the call at 0914.

12   Q.   And that lasted for a minute and a half?

13   A.   About, about there.

14   Q.   You weren't asked any questions about that conversation on

15   direct, correct?

16   A.   That's correct.

17   Q.   And you have no recollection, as you sit here now, what you

18   discussed, if anything, on that call, correct?

19   A.   Can you repeat the question?

20   Q.   As you sit here now, do you have any recollection of any

21   conversation with Ruben W in that minute and a half?

22   A.   I don't recall.

23   Q.   And Government Exhibit 325 is from the Telegram app; is

24   that correct?

25   A.   That's correct.

L3IPWEI4                        Wang - Cross

1    Q.  And it's fair to say that this doesn't reflect that you had

2    any Telegram chats with Ruben W, correct?

3    A.  Based on this document, there was no direct messages to

4    Ruben on this Telegram chat.

5    Q.  And you have no recollection of ever having a direct chat

6    with Ruben Weigand on a Telegram chat, correct?

7    A.  I don't believe I had any direct Telegram communications on

8    a direct channel with Ruben.

9    Q.  And you started working at Eaze on May of 2017; is that

10   correct?

11   A.  That's correct.

12   Q.  And shortly after you joined, the then-CEO, Mr. Patterson,

13   made you -- put you in the position of product manager for

14   payments; is that accurate?

15   A.  That's accurate.

16   Q.  And in that role as product manager for payments, it's fair

17   to say you were very involved in Eaze's credit card processing?

18   A.  For the most part, yes.

19   Q.  And your role was focused on the technical aspect; is that

20   correct?

21   A.  That was one of my roles, yes.

22   Q.  Was it your primary role?

23   A.  I'd say it's one of the primary.

24   Q.  Well, other than technical work, what did you do?

25            THE COURT:  Is this relevant, counsel?

L3IPWEI4                      Wang – Cross

1          MR. GILBERT:  I'll move on.

2    Q.  Mr. Wang, in 2017 Eaze worked with Clearsettle on credit

3    card processing, correct?

4    A.  We worked with an organization which we referred to

5    internally as Clearsettle.

6    Q.  And you understood, did you not, that the processing from

7    Clearsettle involved merchant accounts in Europe?

8    A.  Yes.

9    Q.  And that processing through Clearsettle was done all the

10   way through January of 2018; is that correct?

11   A.  I believe so.

12   Q.  And in the time that you worked on the processing in 2017

13   and 2018, when you were the product manager for payments for

14   Eaze, you never heard the name Ruben W, correct?

15   A.  I believe so, yes.

16   Q.  You believe I'm correct that you --

17   A.  I believe you're correct.

18   Q.  Thank you.  To the best of your knowledge, Ruben W had

19   absolutely no involvement with Eaze credit card processing

20   through Clearsettle, as far as you know?

21   A.  As far as I know, I don't recall seeing his name or hearing

22   his name during that time period.

23   Q.  And during the time period, when there was processing

24   through EUprocessing; do you recall that?

25   A.  Yes.

```
 1   Q.  There was another employee at Eaze who was primarily
 2   responsible for communicating with EUprocessing, correct?
 3              MR. FOLLY:  Objection.  Foundation.
 4              THE COURT:  Overruled.
 5   Q.  You can answer the question, sir.  Do you need me to repeat
 6   it?
 7   A.  Yes, please.
 8   Q.  During the time when you were working on the processing
 9   through EUprocessing, there was another employee there who was
10   primarily responsible for dealing with EUprocessing?
11              THE COURT:  If you know.
12   A.  May I answer?
13              MS. LA MORTE:  Your Honor, the witness couldn't hear
14   what you said, your ruling.
15              THE COURT:  No, I overruled the objection.  And I
16   simply added to the question.  The question was:  During the
17   time when you were working on the processing through
18   EUprocessing, there was another employee there who was
19   primarily responsible for dealing with EUprocessing?  And I
20   said:  If you know.  So that's the whole question now with my
21   addition.
22              What's the answer?
23   A.  I believe there were several other employees who were
24   involved with interfacing with EUprocessing.
25   Q.  And one of those people was Darcy Cozzetto?
```

L3IPWEI4                     Wang – Cross

1    A.   Yes.

2    Q.   And who else?

3    A.   Michael Tassone and Jim Patterson.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3IAWEI5ps                    Wang - Cross

1  Q.  Jim Patterson being the CEO?

2  A.  Yes.

3  Q.  And you would agree with me that Ms. Cozzetto had far more

4  interaction, as you understood it, with EUP than you did.

5  A.  Based on the program communications, I believe she had

6  communications with EUprocessing, in terms of if she had more

7  communications?

8  Q.  Yes.

9  A.  I couldn't say for certain.  I think we had different roles

10 and job responsibilities.

11 Q.  In terms of your job responsibilities, one of the things

12 you testified about on direct had to do with linking merchant

13 accounts to -- linking dispensaries to merchant accounts,

14 correct?

15 A.  Sorry.  Can you clarify the question?

16 Q.  On direct examination you were asked about a chat in which

17 there was discussion about the topic of linking dispensaries to

18 merchant accounts.  Do you recall that?

19 A.  Yes.

20 Q.  And in that discussion, what was happening there was a

21 technical matter, correct, in terms of how to connect a

22 specific dispensary to a specific merchant account?  Was that

23 the topic?

24 A.  Can you clarify which discussion?

25 Q.  Yes.

1           MR. GILBERT:  Why don't we take a look, please, at

2   Government Exhibit 302.  And if we go to July 31st.

3           Before this, please.

4   Q.  Can you see the document in front of you?

5   A.  Yes.

6   Q.  Do you recall this discussion?

7   A.  Do you have a particular section?

8   Q.  Yes.  Let me turn your attention to 10:50, where it says,

9   "I just looked at both websites" -- I'm sorry.  That's not the

10  correct --

11          MR. GILBERT:  If you could bring up -- sorry.  One

12  second.  The next page, please.  No, that's not it either.

13          Can we take this exhibit down and let me try this

14  another way.

15  Q.  Do you remember having a discussion with Ruben W about the

16  topic of linking dispensaries to merchant accounts, in a chat

17  that you were shown on direct examination?

18  A.  Yes.

19  Q.  And there was also a discussion that you testified about on

20  direct about a company called Inovio, right?

21  A.  Yes.

22  Q.  And Inovio was a payment gateway, I believe you testified?

23  A.  Yes.

24  Q.  And were you the person who brought Inovio's relationship

25  to Eaze, or did somebody else do that?

L3IAWEI5ps                    Wang - Cross

1   A.  I believe I was the one.

2   Q.  And what was the role of Inovio in these transactions, as

3   you understood it?

4   A.  My understanding was, they were the payment gateway.

5   Q.  And what did that mean, "payment gateway"?

6   A.  It means that they're the point of integration between the

7   website and the merchant account.

8   Q.  And there was a discussion about how to link merchant

9   accounts -- how to link dispensaries to merchant accounts,

10  correct, how that would be configured on Inovio?

11  A.  Can you clarify if I'm talking about the discussion on the

12  phone call or some other discussion?

13  Q.  Well, you recall a discussion on the telephone call about

14  that topic, correct?

15  A.  That's correct.

16  Q.  And what you discussed on the phone call, as I believe you

17  testified on direct, was how to arrange to link dispensaries to

18  specific merchant accounts.  Is that correct?

19  A.  And can you define what you mean by "link"?  Because I'm

20  trying to understand if, when you say "link," you mean more of

21  like a technical implementation linking or if you mean more of

22  like an association, like, this should be associated with that.

23  Q.  Well, what was your understanding of what you were

24  discussing on the call you testified about?

25  A.  My understanding was, it was more about an association and

L3IAWEI5ps                     Wang - Cross

1   less about the technical linking.

2   Q.  What do you mean by "an association"?

3   A.  Which dispensary should be using which merchant account.

4   Q.  And that was the topic of the call that you testified about

5   with Ruben W.

6   A.  We talked about which dispensary should be using which

7   merchant account based on transaction volumes and volume limits

8   at the merchant account level.

9   Q.  And the discussion about the volume limits, that meant that

10  the merchant accounts, some of them, could only have a certain

11  amount of transactions or a certain dollar amount run through

12  them.  Correct?

13  A.  Yes, correct.  I believe there was a monthly limit in terms

14  of volume of transactions.

15  Q.  And is it your understanding that that monthly limit was

16  something that was set by the merchant bank?

17  A.  Based on the Telegram communications, that's what was

18  communicated to us in terms of, there are monthly limits.  I

19  don't recall specifically if it was set -- if it was mentioned

20  that it was set by the bank or somewhere else.

21  Q.  And in your discussion on the phone with Ruben W, what he

22  was communicating to you, in effect, was, we need to stay

23  within the limits on those particular accounts, the volume

24  limits.

25  A.  We chatted about which dispensary account should be mapped

L3IAWEI5ps                      Wang - Cross

1   to which business tree based on processing volumes and volume

2   limits.

3   Q.  That issue, the volume limits, it's correct, that had

4   nothing to do with banks in the United States, correct?

5   A.  I can't say for certain.  I don't understand the

6   intricacies of if it could have an impact on U.S. banks.

7   Q.  But the volume limit, it was a volume limit at the merchant

8   bank, which was in Europe; is that correct?

9   A.  My understanding was that there was a volume limit on the

10  merchant accounts.

11  Q.  And the merchant accounts were at merchant banks in Europe.

12  Correct?

13  A.  I believe so.

14        MR. GILBERT:  Let me bring up Government Exhibit 302

15  and page 236 at the end.

16  Q.  Do you have that in front of you, sir?

17  A.  Yes.

18  Q.  And do you see at 16:22, it says, "Ruben W.  Hey John,

19  Marty is out for today"?

20  A.  Yes.

21  Q.  So did you have the understanding that there was another

22  person named Marty who you had been working with on issues

23  related to the merchant accounts in Europe?

24  A.  I remember seeing his name in the Telegram chats.

25  Q.  And Ruben W is communicating to you here that he was

L3IAWEI5ps                     Wang - Cross

1   filling in for Marty on this day, correct?

2   A.  I think Ruben is saying that Marty is out for the day and

3   that he can give me a call.

4   Q.  And you testified on direct, I believe you used the phrase

5   "fake accounts" or "phony accounts."  Do you recall that?

6   A.  Fake merchant accounts, yes.

7   Q.  You didn't use that phrase in your call with Ruben W,

8   correct?

9   A.  I don't recall the exact words I used.

10  Q.  Do you recall referring to phony or fake merchant accounts

11  to anyone before meeting with the government in connection with

12  this case?

13  A.  I don't recall if I used those exact terms.

14  Q.  You testified on direct that Ruben W was the main interface

15  with the banks in Europe.  Correct?

16  A.  That's correct.

17  Q.  It's a fact that you have no personal knowledge of Ruben W

18  communicating with any acquiring bank in Europe.  Isn't that

19  correct?

20  A.  All I know is that when we asked --

21  Q.  Please just answer the question that you were asked.  Thank

22  you.

23          You have no personal knowledge of Ruben Weigand

24  communicating with any bank in Europe.  You were never on a

25  call with him and a bank.  Is that correct?

L3IAWEI5ps                         Wang - Cross

1  A.  That's correct.

2            MR. FOLLY:  Objection, compound.

3            MR. GILBERT:  I'll withdraw the question.

4            THE COURT:  How much more do you have?

5            MR. GILBERT:  About five minutes more.

6  Q.  You have no personal knowledge of Ruben -- withdrawn.

7            You were never on a call that involved Ruben Weigand

8  and any other person, correct?

9  A.  I believe that's correct.

10 Q.  You had no personal knowledge of Ruben W ever submitting

11 any application to any bank at all, correct?

12 A.  That's correct.

13 Q.  You never had any discussion with Ruben about the contents

14 of any website, correct?

15 A.  I don't recall.

16 Q.  And you don't recall ever having a conversation with Ruben

17 about any pixels or cookies, correct?

18 A.  I can't say for certain because I don't know if he was in

19 the chat when we were discussing those matters.

20 Q.  As you sit here now, is it correct that you don't have any

21 specific recollection of any such discussion?

22 A.  I remember discussing that, but I don't know if he was in

23 any chat.

24 Q.  You don't know Ruben W was in that chat.

25 A.  No.

L3IAWEI5ps                    Wang - Cross

 1   Q.  And it's correct that in a phone call that you've testified

 2   about, there was no discussion about credit or debit

 3   cardholders, correct?

 4   A.  I don't recall.

 5   Q.  You don't recall?

 6   A.  No.

 7   Q.  You never discussed, on that one phone call that you do

 8   recall, anything having to do with policies of the United

 9   States issuing banks.  Isn't that correct?

10   A.  I don't recall.

11   Q.  You don't recall?

12   A.  No.

13   Q.  This morning you testified on cross-examination that you

14   still work at Eaze, correct?

15   A.  That's correct.

16   Q.  And you received promotions in the last year?

17   A.  I don't know if it's been made official yet.

18   Q.  An unofficial promotion?

19   A.  I believe it's been approved through the promotion

20   committee, but I don't know when it would become active.

21   Q.  And what's your promotion to?  What are you going to be?

22         THE COURT:  Sustained.  Move on.

23   Q.  Mr. Wang, you received immunity in this case, correct?  You

24   testified to that?

25         You testified here today under an immunity order.  Is

1    that your understanding?

2    A.  Yes.

3              MR. GILBERT:  Thank you very much.

4              THE COURT:  Any redirect?

5              MR. FOLLY:  No redirect, your Honor.

6              THE COURT:  Thank you very much.  You may step down.

7              Mr. Wang.  You may step down.  You may leave.

8              (Witness excused)

9              THE COURT:  The government will call their last

10   witness.

11             MR. FOLLY:  Yes, your Honor.  The government calls

12   Ronald Shimko.

13   RONALD SHIMKO,

14        called as a witness by the government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. FOLLY:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  Where do you work?

21   A.  The FBI.

22   Q.  What is your title there?

23   A.  Special agent.

24   Q.  How long have you been a special agent for the FBI?

25   A.  About five years.

L3IAWEI5ps                    Shimko - Direct

1   Q.  What are some of your main or primary duties and

2   responsibilities as a special agent for the FBI?

3   A.  To investigate possible violations of federal law, so that

4   could include conducting interviews, conducting search

5   warrants, arrests, and other things related to investigations.

6   Q.  What squad do you work for?

7   A.  I'm on a securities fraud squad, which also investigates

8   related offenses, such as money laundering and bank fraud.

9   Q.  As part of your duties as a special agent, do you

10  participate in postarrest interviews?

11  A.  Yes, I do.

12  Q.  Can you explain what that means.

13  A.  Yes.  So the most basic is an interview that would take

14  place after an arrest.  We would conduct them to try to collect

15  additional evidence and also potentially to see if the subject

16  wanted to cooperate in the investigation.

17  Q.  Would that be an interview that's conducted of the

18  individual who is in fact arrested?

19  A.  Yes.  That's correct.

20  Q.  Did there come a time when you participated in the arrest

21  of Ruben Weigand?

22  A.  Yes.

23  Q.  Approximately when was that?

24  A.  March 9, 2020.

25  Q.  Did you also participate in a postarrest interview of Ruben

L3IAWEI5ps                         Shimko – Direct

1    Weigand on that same day?

2    A.  Yes, I did.

3    Q.  Do you see Ruben Weigand here in the courtroom today?

4    A.  Yes.  He's at the front table that's facing part of the

5    jury further from me.

6              THE COURT:  The record will reflect the identification

7    of Mr. Weigand.

8              MR. FOLLY:  Thank you, your Honor.

9    Q.  Can you walk us through the events of Ruben Weigand's

10   arrest.

11   A.  Yes.  On March 9, 2020, Mr. Weigand was connecting through

12   Los Angeles International Airport, also known as LAX, I believe

13   on his way to Costa Rica.  So when he came through second

14   inspection by CEG, which is Customs and Border Protection, we

15   approached him.  We brought him to a room that was kind of

16   directly off of that area.  We told him that he was under

17   arrest.  At the time he was holding two cellphones.  He -- I

18   asked him for the cellphones.  He handed them to me.  I also

19   asked him the other electronics.  He indicated that he had a

20   laptop.  He took it out of his bag and also handed the laptop

21   to me.

22   Q.  At the time of his arrest, were you alone or with other law

23   enforcement officers?

24   A.  I was with others.

25   Q.  Did there come a time on that same day when you

L3IAWEI5ps                    Shimko - Direct

1  participated in a postarrest interview of Mr. Weigand?

2  A.  Yes.  Shortly after initially telling Ruben or Mr. Weigand

3  that he was under arrest, we took him to the FBI office space

4  at the airport and interviewed him in a conference room at that

5  space.

6  Q.  Who was present during that postarrest interview?

7  A.  It was myself, Special Agent Matthew Mahaffey, and Special

8  Agent Angela Tesoni.

9  Q.  Was that interview audio-recorded?

10 A.  Yes, it was.

11 Q.  There should be a thumb drive up there in front of you

12 marked as Government Exhibit 1904.

13 A.  Yes.

14 Q.  Do you see that up there?

15 A.  Yes, I do.

16 Q.  Do you recognize it?

17 A.  Yes, I do.

18 Q.  What is it?

19 A.  It's a thumb drive that includes the recording or excerpts

20 of the interview as well as a transcript.

21 Q.  And does Government Exhibit 1904 contain subexhibits

22 1901-A, 1901-B, 1901-C, as well as 1901-T?

23 A.  Yes.

24         MR. FOLLY:  The government offers Government Exhibit

25 1904, as well as the subparts that I just listed.

L3IAWEI5ps                    Shimko - Cross

1          MR. ARTAN:  Subject to prior objection, no objection.

2          MR. TAYBACK:  Joined.

3          THE COURT:  Received.

4          (Government's Exhibits 1904, 1901-A, 1901-B, 1901-C,

5     and 1901-T received in evidence)

6          MR. FOLLY:  Mr. Levine, if you could publish for the

7     jury and play for the jury 1901-A along with the corresponding

8     transcript.

9          (Audio recording played)

10    Q.  And Special Agent Shimko, the individual who spoke second

11    on that recording, do you recognize who that was?

12    A.  Yes.  It was Ruben Weigand.

13    Q.  Let me go to 1901-B, as well as the corresponding

14    transcript.

15         (Audio recording played)

16         MR. FOLLY:  If we could now play 1901-C and publish

17    the corresponding transcript.

18         (Audio recording played)

19         MR. FOLLY:  No further questions.

20         THE COURT:  Cross-examination.

21    CROSS-EXAMINATION

22    BY MR. ARTAN:

23    Q.  Good afternoon, Special Agent Shimko.  How are you?

24    A.  Good afternoon.  I'm good.  How are you?

25    Q.  A little tired, but thank you.

1          Now, when you participated in the arrest of

2   Mr. Weigand on March 9th, it was around 6:30 in the evening,

3   correct?

4   A.  Correct.  Around then.

5   Q.  And you had received the arrest warrant that morning,

6   correct?

7   A.  Sometime during the day, yes.

8   Q.  And the indictment in that case issued that morning,

9   correct?

10  A.  I believe so, yes.

11  Q.  And Mr. Weigand had come from Europe, correct?

12  A.  I believe so, yes.

13  Q.  And he had a connecting flight within Europe, correct?

14  A.  I don't recall.

15  Q.  And he was on his way to Costa Rica with his fiancée,

16  correct?

17  A.  That's my understanding.

18  Q.  And at that time Europe was either eight or nine hours

19  ahead of Los Angeles time, correct?

20  A.  Sounds about right.

21  Q.  Do you have any recollection as to whether Mr. Weigand had

22  any alcohol on the flight?

23  A.  I can't speak to that.

24  Q.  Now, he was initially taken to a small room, which I think

25  you described was a -- sort of an anteroom, from where you

1    arrested him?  Would that be correct?

2    A.  The initial room was basically where I talked, the

3    secondary area within the terminal.

4    Q.  And he was there for nearly an hour, correct?

5    A.  I don't believe -- there was a bit of a delay because other

6    agents were trying to help his -- I believe his fiancée get

7    situated, because she wasn't expecting to be staying in LA.  So

8    they were trying to help her out, so there was a slight delay

9    between the initial room and getting him to our office for the

10   interview, but I believe it was 20 to 30 minutes.

11   Q.  While he was in that room, he didn't know what was going

12   on, though, to your knowledge.

13   A.  We told him that he was under arrest.  I don't believe we

14   explained too much more until we got up to our office space.

15   Q.  And the room you took him to eventually was a windowless

16   room where the interrogation started, correct?

17   A.  There were no windows, but I would say it was actually a

18   fairly nice conference room for FBI standards.

19   Q.  Now, the question to Mr. Weigand about learning about Eaze

20   was, "When did you first learn about it?"  Correct?

21   A.  I believe so.  I don't remember the exact wording of the

22   question.  I would have to look at the transcript.

23   Q.  That's your best memory of it?

24   A.  Yes.

25   Q.  And you said that, in response to, "when did you first

L3IAWEI5ps                    Shimko - Cross

1   learn about it," "how did it come to your attention," he talked
2   about seeing it on a billboard, correct?
3   A.  Correct.
4   Q.  And he was then asked about how he found out about the
5   details about Eaze, and he said he saw that on the website,
6   correct?
7   A.  Correct.
8   Q.  And you don't have any independent knowledge as to whether
9   that is how he first learned about Eaze, do you?
10  A.  I don't know how he initially learned about it for the
11  first time, no.
12  Q.  And you don't have any independent knowledge as to how he
13  initially learned about the details concerning Eaze, correct?
14  A.  At least initially, no.
15  Q.  Now, I'm not going to ask you anything about what was said
16  during the interview, but this is just -- these are just
17  excerpts from the interrogation, correct?
18  A.  They are excerpts, yes.
19  Q.  Now, part of what was played included a comment by you in
20  which you say, "Everybody knows it's your email address."  You
21  remember saying that?
22  A.  I do, yes.
23  Q.  Now, at the time you said that, the only person from whom
24  you received such information was Oliver Hargreaves, correct?
25          MR. FOLLY:  Objection.

L3IAWEI5ps                    Shimko - Cross

1              THE COURT:  Overruled.

2   A.  That was one data point.

3   Q.  Well, you're talking about "everybody."  So the only person

4   you received that information from was Oliver Hargreaves,

5   correct?

6   A.  So the only person that I spoke to.  However, I saw email

7   evidence and chat evidence to show that Ruben was a user of

8   EUprocessing.

9   Q.  You said "everybody," right?

10  A.  Correct.

11  Q.  You only got that information from one person, correct?

12  A.  Oliver Hargreaves did give us that information.  It was

13  also put out to a chat with additional people on it that we had

14  evidence of.  So there were multiple data points.

15  Q.  I didn't ask you about data points.  I asked you about

16  people.  And it was just Oliver Hargreaves, correct?

17  A.  At that point, I think that's correct.

18  Q.  OK.  When you're talking about data points, you're talking

19  about emails in part, correct?

20  A.  In part.

21  Q.  And there were about, close to 200 emails with

22  EUprocessing, correct?

23              MR. FOLLY:  Objection, outside the scope.

24              THE COURT:  No.  I think this door was opened to some

25  degree by the witness.  Overruled.

L3IAWEI5ps

1   Q.  Isn't that correct?  Almost 200 emails with EUprocessing?

2   A.  I'm not sure of the number of emails.

3   Q.  And in fact there's only one of those emails in which Ruben

4   Weigand signs off as Ruben, correct?

5   A.  I'm not sure of the number.  I know that there is at least

6   one.

7   Q.  At least one.  Thank you.

8        MR. ARTAN:  I think that's it for now.  Thank you.

9        THE COURT:  Anything else from co-counsel?

10        MR. TAYBACK:  No, your Honor.  No questions.

11        THE COURT:  Any redirect?

12        MR. FOLLY:  No, your Honor.

13        THE COURT:  Thank you very much.  You may step down.

14        THE WITNESS:  Thank you.

15        (Witness excused)

16        THE COURT:  Does the government rest?

17        MR. FOLLY:  The government rests, your Honor.

18        THE COURT:  So, ladies and gentlemen, that concludes

19   the government's case.  At this point I have to take up various

20   legal issues with the lawyers, and we're going to end for

21   today.  You will be glad to know that counsel for the defense

22   has estimated that their presentation will take less than a

23   day.  And so we will have closing arguments and my charge, jury

24   instructions, matters of law, on Monday, and the case will be

25   yours either very late Monday or very -- sorry -- Tuesday, so

L3IAWEI5ps

1   we will pick up a day, in fact.  I want you to know that.

2          So have a very good evening.  Don't get too wet.  And

3   we'll see you tomorrow at 9:45.

4          (Jury not present)

5          THE COURT:  I received the following note from Juror

6   No. 10: "Judge Rakoff, on Tuesday, March 23rd, I have a dental

7   appointment in Brewster at 5:30 p.m.  This appointment is for a

8   procedure that I was supposed to have done two weeks ago but

9   had to postpone.  In order to arrive at the appointment on

10  time, I believe I will have to leave the courthouse no later

11  than 3:30 p.m.  Is there any way I/we can be excused earlier

12  for me to make the appointment?  Thank you in advance.  Juror

13  No. 10."

14         And I've already, even without consulting with

15  counsel, indicated to her, as you saw, that, yes, of course

16  I'll let her go and the jury go 15 minutes early.  I assume

17  everyone agrees with that?

18         MR. TAYBACK:  Yes, your Honor.

19         MR. GILBERT:  Yes, your Honor.

20         MS. LA MORTE:  Yes, your Honor.

21         MR. FOLLY:  Yes, your Honor.

22         THE COURT:  OK.  Very good.  Now, I've now had a

23  chance to review the Circle letters, and I have a question for,

24  initially for defense counsel, which is, is the Circle witness

25  going to introduce documents showing that there were

L3IAWEI5ps

1    communications with either the issuing banks or Visa or

2    MasterCard in which Eaze was mentioned?  In other words, we

3    already have one such document in evidence.  Are there going to

4    be more?  Or is it just this one?

5             MR. TAYBACK:  There are such, a handful of additional

6    documents.  And I'm unfortunately not -- I'm not able -- I'm

7    not the person taking the direct, so I can't answer your

8    question precisely right this second.  I can find that answer

9    out.

10            THE COURT:  Well, it seems to me that's important,

11   because the gist of what you're arguing is -- and the reason I

12   allowed in that one document -- is the argument, they know Eaze

13   is now dealing in marijuana.  They are still nevertheless

14   dealing with Eaze, and knowingly so because here is a document

15   that shows that this was conveyed.  If there are no other such

16   documents, I would not allow this testimony.  If there are,

17   then I want to hear from the government.

18            MR. TAYBACK:  There are documents in this fashion,

19   your Honor:  The bank statements themselves generated from

20   transactions with Eaze show that, in the descriptor, that it's

21   Eaze.

22            THE COURT:  OK.  That's what -- it doesn't have to be

23   the same form as that document in evidence, but it's got to be

24   the equivalent.

25            MR. TAYBACK:  Yes.

L3IAWEI5ps

1          THE COURT:  So now I come to the government.  So

2    assuming that this witness can -- and they're coming in through

3    this witness?

4          MR. TAYBACK:  Yes, your Honor.  I anticipate that.

5          THE COURT:  All right.  Why isn't that relevant?

6          MR. FOLLY:  Your Honor, the Circle testimony and

7    related evidence is so far removed from the allegations in this

8    case that it would be completely confusing to this jury.

9          THE COURT:  Well, I'm condensing your letter, but I

10   myself said things along those lines.  All of the business

11   about how cryptocurrency operates in this kind of situation is

12   potentially confusing.  But that's not the heart of what

13   they're offering.  In fact, we may ask the witness not to get

14   into all that.  The gist of it is that, through Circle,

15   descriptors were furnished to the relevant banks or the

16   relevant credit card companies that reveal that the purchases

17   that were being made were through Eaze.  Correct?

18         MR. TAYBACK:  Yes, your Honor.

19         THE COURT:  All right.  That seems to me relevant, you

20   know.  And I actually think it probably could be testified to

21   in about ten minutes.  But that's a different question.

22         MR. TAYBACK:  We do anticipate we are going to

23   streamline the presentation.

24         THE COURT:  I do think -- if the government wants to

25   get into it on cross that's their business, but on direct, all

L3IAWEI5ps

1   this stuff about how Circle operates and like that is, I think,

2   not helpful.

3           MR. TAYBACK:  Understood, your Honor.

4           MR. FOLLY:  Your Honor, may I raise an additional

5   point on this?  For it to be relevant, it would have to be

6   relevant on the issue of materiality.

7           THE COURT:  Yes.

8           MR. FOLLY:  And, here, there is no basis for this jury

9   to conclude that transactions involving a purchase of a

10  cryptocurrency, which are then used in turn to purchase illegal

11  products, are viewed in any way by a regional bank as being

12  analogous to direct credit card transactions from those banks.

13  That's a fundamental issue, because to answer that question,

14  you would need a lot more evidence on this record that is

15  simply not here.  It would create a mini trial.

16          THE COURT:  Maybe I misunderstood.  You're saying that

17  all the bank knows is that they're purchasing cryptocurrency

18  that they then use to pay Eaze?

19          MR. FOLLY:  Correct.

20          THE COURT:  So --

21          MR. TAYBACK:  We fundamentally disagree that that's

22  what the evidence is going to show.

23          THE COURT:  Putting aside, just taking that for the

24  moment, so why isn't that the equivalent of knowing that we are

25  facilitating the purchase of marijuana?

L3IAWEI5ps

1           MR. FOLLY:  It's not the equivalent because there's no

2      evidence that the banks view this property interest as being

3      the same.  Once the money goes to Circle, similar to when a

4      customer makes a cash withdrawal, the risk posed to the bank

5      from their involvement in the transactions that follow that is

6      wholly distinct from a direct transaction where a customer uses

7      a Visa- or MasterCard-issued card to directly purchase the

8      illegal product.  And there has simply been no testimony that

9      banks, a regional bank, would view those things as being

10     equivalent.  And the issue is whether that information is

11     capable of affecting the decision-making of the bank.

12          THE COURT:  Yes, but we heard all this evidence from

13     Mr. Steinbach, for example, about, "We are protecting our

14     reputation, we are protecting against any involvement," etc.,

15     etc.  I didn't hear anything remotely suggesting, "But if

16     there's a loophole, all we know is that our assistance to a

17     marijuana transaction is indirect and doesn't involve a

18     property interest," whatever that may mean in this context,

19     "and then we're fine."  I didn't hear anything even touching

20     that.  The only thing I heard from him was just in the other

21     direction:  "We don't want to touch this stuff.  Sometimes it

22     sneaks by us, but it's not anything we want to be involved in

23     because it's illegal."

24          MR. FOLLY:  Your Honor, that testimony did not pertain

25     to wallet purchases, and actually the Bank of America witness,

L3IAWEI5ps

who was asked some questions about wallet purchases, said that
at that point the issuing bank does not own the customer's
wallet and does not have control over how the customer uses the
funds in the wallet.  And that's a critical distinction.

THE COURT:  I don't understand the relevance of that.
They're still using the bank's credit cards, yes?

MR. FOLLY:  They're using the bank's credit cards to
purchase the cryptocurrency, not the drugs.

THE COURT:  Supposing you were dealing with another
thing that's illegal, a purchase of unlicensed firearms.  So in
my hypothetical, the bank says, we don't want to deal with
anything illegal, including the purchase of firearms.  And then
they get repeated, in my hypothetical, but also, I understand,
if it's analogous to reality, repeated indications that someone
is purchasing money through -- or purchasing cryptocurrency
through Circle for the purpose of purchasing illegal firearms,
and they say, "Oh, well, that's of no concern to us, that's not
contrary to our policy that speaks in absolute terms.  We're
perfectly comfortable with that."  I find that -- if you want
to argue that to the jury, please do.

MR. FOLLY:  Your Honor, one additional issue is that
the merchant here is Circle.  The merchant is not Eaze.

THE COURT:  Well, if the only thing on a descriptor
was Circle, I would be excluding this evidence.  That's why I
put the question I put.  Or if it was just that one time, I

L3IAWEI5ps

1    would be excluding, because then that's like the negligence

2    stuff that I've excluded.  But the representation is, it's

3    repeated.  Right?

4                MR. TAYBACK:  It's repeated, a single line item on a

5    bank statement that says Eaze.

6                THE COURT:  On numerous occasions.

7                MR. TAYBACK:  Numerous occasions.

8                MR. GILBERT:  And if I may briefly, on numerous

9    occasions, the evidence, we expect, will show that in about a

10   six-month period there were $44 million of such transactions

11   processed through the system and about 13 million of them on

12   Bank of America-issued debit cards and I believe about 9

13   million on Citi.  Don't hold me to the exact numbers.  I

14   apologize if I got them wrong.  But that's the ballpark.

15               MR. FOLLY:  Your Honor, I think the final piece of

16   evidence that's clearly not in this record is an indication

17   that the banks have figured this out and that they're aware of

18   these transactions.  The mere fact that they're on the

19   statements does not establish that the issuing banks are

20   knowingly allowing the Eaze transactions.

21               THE COURT:  Are these all sent to one particular

22   company, or a separate -- one particular credit card, one

23   particular issuing bank?

24               MR. GILBERT:  No.  No, your Honor.  They're

25   widespread.

L3IAWEI5ps

1              THE COURT:  If you would like to -- I assume

2    Mr. Steinbach is in New York?

3              MS. DEININGER:  No.  He's in Pennsylvania, your Honor.

4              MS. LA MORTE:  Pennsylvania, your Honor.

5              THE COURT:  Oh, my god.  That far away.  Does he have

6    a passport?

7              All right.  So I will think about the possibility of

8    letting you recall him on rebuttal to say the kind of things

9    that are now being stated by the government.  But I'm going to

10   accept the evidence.

11             MS. LA MORTE:  Your Honor, one clarification.  In

12   terms of thinking about a rebuttal witness for the government,

13   would we have our -- if we wanted the Bank of America --

14             THE COURT:  Bankers, as you all know, are fungible

15   anyway.

16             MS. LA MORTE:  Like lawyers.

17             THE COURT:  Yes, but bankers are a lot richer.

18             MR. TAYBACK:  But not judges.

19             THE COURT:  All right.

20             Who else do you have tomorrow?

21             MR. TAYBACK:  Your Honor, I believe we will be able to

22   finish our case.  We have a private investigator who is also a

23   summary witness.

24             THE COURT:  All right.  Because if we do have this

25   rebuttal, I want to have that done tomorrow if at all possible,

L3IAWEI5ps

1    so you should line that person up.

2              MR. GILBERT:  We also have a private investigator, who

3    is going to give slightly different testimony, but it relates

4    to Circle transactions.  They were referenced in our brief.

5              THE COURT:  Well, don't push your luck.  The Circle

6    thing is at best circumstantial evidence that only

7    inferentially relates to what the bank currently does, which

8    itself is only inferentially related to our ultimate

9    materiality position, which is that this is what a reasonable

10   banker would do.  So I'm not sure I'm going to allow tons of

11   evidence on this.

12             MR. GILBERT:  The transactions records would reflect

13   the codes that we're talking about.

14             THE COURT:  I'm sorry.  I can't hear you.

15             MR. GILBERT:  The banks were notified through the

16   system that this was an Eaze transaction.

17             THE COURT:  We'll take it up as it comes.  What's your

18   private investigator going to say?

19             MR. TAYBACK:  He's a summarize a handful of documents.

20   I think the whole thing is less than 30 minutes.

21             THE COURT:  He's going to summarize a handful of

22   documents.

23             MR. TAYBACK:  There are some summary documents, but

24   there are also some transactions that reflect the use of Eaze.

25             THE COURT:  Let me leave it in the government's hands.

L3IAWEI5ps

1          We will reconvene tomorrow at 9.  If there are further

2     objections to any of their witnesses -- and you are free to ask

3     them tonight, not only who their witnesses are but what their

4     witnesses are going to say.  So we could deal with this before

5     9:45.

6          MR. TAYBACK:  I understand, your Honor.  I expect we

7     will be able to complete our entire case.

8          THE COURT:  So I need to inquire now first of counsel

9     and then of the individual defendants with respect to

10    testimony.  So we'll start, Mr. Gilbert, have you consulted

11    with Mr. Weigand as to whether or not he wishes to take the

12    stand?

13         MR. GILBERT:  I have, your Honor.  If I may have one

14    moment to further consult.

15         THE COURT:  Yes.

16         MR. GILBERT:  We have consulted on that topic, yes,

17    your Honor.

18         THE COURT:  And Mr. Weigand, do you wish to take the

19    stand or not?

20         DEFENDANT WEIGAND:  No, I do not.

21         THE COURT:  OK.  Very good.

22         And Mr. Tayback, have you consulted with your client,

23    Mr. Akhavan?

24         MR. TAYBACK:  I have, your Honor.

25         THE COURT:  And Mr. Akhavan, do you wish to take the

L3IAWEI5ps

1    stand or not?

2             DEFENDANT AKHAVAN:  No, your Honor.

3             THE COURT:  All right.  Very good.

4             OK.  We'll see --

5             MR. TAYBACK:  Your Honor, just to make the record

6    clear, at this time the defendants would move for a judgment of

7    acquittal under Rule 29.

8             THE COURT:  I am so sorry.  Thank you for raising

9    that.  And I assume Mr. Gilbert joins in that.

10            MR. GILBERT:  I certainly do, your Honor.

11            THE COURT:  And you would have been negligent not to

12   have raised that.  I would in my view have been equally

13   negligent not to deny it, so I do so now.

14            All right.  We'll see you tomorrow morning.

15            MS. LA MORTE:  Thank you, your Honor.

16            MR. GILBERT:  Thank you, your Honor.

17            (Adjourned to 9:00 a.m., March 18, 2021)

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    Examination of:                              Page

3    MICHAEL STEINBACH

4    Cross By Mr. Burck . . . . . . . . . . . . .2139

5    Cross By Mr. Artan . . . . . . . . . . . . .2168

6    Redirect By Ms. Deininger  . . . . . . . . .2173

7    Recross By Mr. Burck . . . . . . . . . . . .2186

8     JACOB PECHET

9    Direct By Ms. Deininger  . . . . . . . . . .2187

10   Direct By Ms. Deininger  . . . . . . . . . .2212

11   Cross By Mr. Tayback . . . . . . . . . . . .2234

12   Cross By Ms. Lesperance  . . . . . . . . . .2244

13    JOHN WANG

14   Direct By Mr. Folly  . . . . . . . . . . . .2252

15   Cross By Mr. Tayback . . . . . . . . . . . .2269

16   Cross By Mr. Gilbert . . . . . . . . . . . .2278

17   RONALD SHIMKO

18   Direct By Mr. Folly  . . . . . . . . . . . .2292

19   Cross By Mr. Artan . . . . . . . . . . . . .2296

20

21

22

23

24

25

```
1                        GOVERNMENT EXHIBITS

2    Exhibit No.                                    Received

3    4501      . . . . . . . . . . . . . . . . . .2189
     4502      . . . . . . . . . . . . . . . . . .2195
4    4503      . . . . . . . . . . . . . . . . . .2212
     2602, 2604, 2607, 2608, 2610, 2615, . . . .2213
5            2617, 2621, 2623, and 2630
     2609, 2633, 2634, and 2635  . . . . . . . .2215
6    4302      . . . . . . . . . . . . . . . . . .2224
     2404, 2418, 2419, 2420  . . . . . . . . . .2228
7    2803, 3102, 3301, and 3503  . . . . . . . .2229
     S5        . . . . . . . . . . . . . . . . . .2230
8    916       . . . . . . . . . . . . . . . . . .2231
     325       . . . . . . . . . . . . . . . . . .2266
9    1904, 1901-A, 1901-B, 1901-C, and . . . . .2296
             1901-T

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```