L3JPWEI1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
               Defendants.              Trial
7
     ------------------------------x
8
                                        New York, N.Y.
9
                                        March 19, 2021
10                                      9:00 a.m.

11
     Before:
12
                         HON. JED S. RAKOFF,
13
                                        District Judge
14

15                       APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25

L3JPWEI1                         Trial

APPEARANCES CONTINUED

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
        CHRISTOPHER TAYBACK
        SARA CLARK
        MARI HENDERSON
        DEREK SHAFFER
        PAUL SLATTERY
        -and-
ROTHKEN LAW FIRM LLP
        Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
        JARED R. SMITH

L3JPWEI1                    Trial

1             (Trial resumed; jury not present)

2             THE COURT:  Good morning.  Please be seated.  So a

3    number of scheduling matters.  First, I teach first-year

4    criminal law at Columbia Law School.  Someday I'll get it

5    right.  And I forgot there's a make-up class that I have to

6    teach from 3:30 to 4:50 today; so we will end today at 3:25,

7    and then we'll have the charging conference at 5:00.  That's

8    just as well because although I hope to get you the draft

9    charge by lunch, in any event, you'll have it well before the

10   charging conference, and then I'll give you an hour or more to

11   look it over.

12            MR. TAYBACK:  Your Honor, with respect to the charging

13   conference, your clerk asked whether we would waive the

14   appearance of our clients, and we will.

15            THE COURT:  Very good.  That makes a lot of sense

16   because it's all going to be legalistic.

17            MR. TAYBACK:  Yes.

18            THE COURT:  Then in terms of summations, think about

19   this and then we'll discuss this at the charging conference.

20   If we finish today, including any rebuttal witness, great.  If

21   we don't, what I'm about to say will be moot, but assuming we

22   finish today, on the time estimates that we worked out

23   previously, we would have a situation where we would have the

24   government's opening summation, the two defense summations and

25   then the government's rebuttal summation would be the following

L3JPWEI1                         Trial

1    morning.

2              Actually, that's the way it worked out the last trial

3    I had.  It occurred to me that the defense might prefer to have

4    everything done in one day.  If you do, it would mean everyone

5    is going to cut 15 minutes off their original estimate.  The

6    government, I gave an extra 15 minutes.

7              MR. TAYBACK:  Your Honor, we can do that.

8              MR. GILBERT:  We would agree to do that.

9              THE COURT:  Okay.  That's great.  We will work out the

10   absolute specifics this evening, but that all sounds great.

11             Okay.  Now, tell me who we have as our witnesses

12   today.

13             MR. TAYBACK:  I'm going to cede the microphone to

14   Mr. Burck.

15             THE COURT:  Yes.

16             MR. BURCK:  Morning, your Honor.

17             THE COURT:  Mr. Burck is not happy unless he's at a

18   microphone.

19             MR. BURCK:  Your Honor, you read me too well.

20             Your Honor, we're planning to -- we have, I think, a

21   maximum of three witnesses, maybe only two, and the third I'll

22   explain in a moment, your Honor.  We have a summary witness,

23   who is also going to be a fact witness on purchasing marijuana

24   on the Eaze website through Circle.  So he's going to testify

25   to his own actual purchase, which is the document that is

L3JPWEI1                        Trial

1    already in evidence --

2            THE COURT:  You said a summary witness.  What's he

3    going to summarize?

4            MR. BURCK:  He's really not a -- he's mostly a fact

5    witness.  There are a couple of documents in the end, just like

6    the government used an agent, we're just going to have him

7    introduce those documents.

8            THE COURT:  Okay.

9            MR. BURCK:  But he's primarily a fact witness about

10   what he did.  So that should be a pretty short direct, your

11   Honor, and then there's a second witness, because what we plan

12   to do is put up the screen.  Mr. McLeod, who you met yesterday,

13   has assured us that it's going to take a couple minutes, tops,

14   to put the screen on here, plug it in, ready to go, and have

15   the Circle witness up.

16           My intention, your Honor, is to have that direct done

17   in a half hour.  The only thing that even makes it that long is

18   that, because of the remote, we're going to have the same

19   issue, where it's going to take some time to find the document

20   that I'm looking for.  We put it in order form, but we don't

21   control him so we don't know exactly what he's going to do.

22           One of the things I wanted to raise with this witness,

23   your Honor, is that to your point we don't want to get into the

24   crypto and all the nonsense about how it all works, I'm going

25   to have to lead him a little bit because, again, I don't

L3JPWEI1                      Trial

1    control him; so he might ask --

2          THE COURT:  You know, as I've indicated before, of all

3    the objections set forth in the Federal Rules of Evidence, the

4    one that I think is most waivable, so to speak, is leading

5    because it really only makes sense when you have a witness who

6    can be easily led, a person of limited education or something

7    like that.

8          Clearly, this witness is not a witness who can be

9    easily led, just given his position; so that's fine.

10         MR. BURCK:  Okay, your Honor.  Thank you.  And I'm

11   going to keep it at a very high level.  I'm going to ask him

12   nothing that goes into the details of the business.

13         And then the only question at that point, your Honor,

14   is whether we're going to have a third witness, who would

15   actually go in between these two witnesses, which is a witness

16   from Mr. Weigand, which is similar to our investigator.  It's

17   an investigator who did the same thing with a couple other

18   banks, and we have asked the government to stipulate to

19   authenticity.  They've done so.

20         The question really as to whether or not we need her

21   is whether or not the documents are coming into evidence.  So

22   they're authentic, and the only thing she'd be doing is the

23   same thing our first investigator will be doing is saying,  I

24   went to the website, I pressed the button, I pressed this

25   button, I entered my debit card and I got marijuana product.

L3JPWEI1                    Trial

1          THE COURT:  Okay.  And so that's your only witness,

2    Mr. Weigand's side?

3          MR. GILBERT:  Yes, it is.

4          THE COURT:  Thank you.  All right.  That all sounds

5    very good.

6          Let me ask the government, are you planning to call a

7    rebuttal witness?

8          MS. LA MORTE:  Not at this time, your Honor.

9          THE COURT:  Okay.  Well, then we are in very good

10   shape.  So I guess the government will have to give their first

11   summation today.  Just kidding.

12         MS. LA MORTE:  I would vehemently object to that.

13         THE COURT:  Okay.  Anything else we need to take up

14   this morning?

15         MS. DEININGER:  Yes, your Honor, the government does

16   have objections to certain of the exhibits that we were

17   informed that defense will be seeking to be admitted through

18   its initial witness.  And so I'd like to start on that with

19   Exhibit HAX11006.

20         I don't know, Mr. McLeod, if you -- if Mr. McLeod has

21   the ability to pull it up to look at, and if not, I have a hard

22   copy I can bring up.

23         THE COURT:  I see it.

24         MS. DEININGER:  But this appears to be screen shots

25   and photographs taken by the defense investigator --

L3JPWEI1                     Trial

1          MS. CLARK:  Emily, this is Ms. Clark for the defense.

2     We can obviate this.  We're not going oh to offer it.

3          MS. DEININGER:  Okay.  Then our next objection is to a

4     group of documents that are marked as HAX814 to 828, I believe.

5          If we can pull up one of those as an example.  Thank

6     you, Mr. McLeod.

7          So I believe the defense intends to introduce this

8     through its summary witness.  The government objects on rule

9     401 and 403 grounds.  I think, these were originally produced

10     to us as potential exhibits for Mr. Vardaman to testify to, and

11     then I think the position that the defense took is they wanted

12     to say that it was -- that Mr. Vardaman was going to talk about

13     what the U.S. government has said about marijuana sales in this

14     particular context.

15          This has nothing to do with what the government said

16     about marijuana sales.  It takes another step, and it's

17     completely removed from the central issues in this case.  It is

18     not at all about the government's enforcement of laws

19     prohibiting marijuana sales, and has extremely minimal

20     relevance, if any.  I think their argument --

21          THE COURT:  Before you go further, I'm having a little

22     trouble seeing the fine print.  So let me ask defense counsel,

23     so what does this purport to show?

24          MS. CLARK:  Your Honor, did you say what is this

25     showing?

1           THE COURT:  Yes.

2           MS. CLARK:  So, your Honor --

3           THE COURT:  Number of depository institutions actively

4    providing banking services to marijuana-related business, what

5    does that have to do with anything?

6           MS. CLARK:  Yes, your Honor.  So we think that the

7    government opened the door on these exhibits.  You've heard

8    testimony from a number of witnesses on specifically two of the

9    issuing banks, that the banks don't bank marijuana-related

10   businesses or have policies against it.

11          Mr. McLeod, if you could turn to page 2 of this.

12          The federal government has identified hundreds of

13   banks that do bank MRBs.  These are banks that we haven't heard

14   from, and we won't hear from in the trial otherwise, your

15   Honor.  So we think this directly rebuts the government's

16   evidence from bank records regarding, for example, closure of

17   MRB accounts or policies against them.

18          THE COURT:  This seems to me to be very, very

19   marginally relevant, if at all.  The government's position is

20   that if a reasonable banker knew that the defendants and their

21   co-conspirators were repeatedly lying to them by providing

22   false information about purchases, that would be important to a

23   reasonable banker.

24          The defense has said, no, they really knew, in this

25   case.  Although, the standard here is objective and not related

L3JPWEI1                       Trial

1    to directly what was known in this case.  They really knew it

2    was marijuana, but they didn't care.  And that's why I'm

3    allowing in the Circle stuff as bearing on that.

4          This, if anything, shows some other banks -- who knows

5    who they are -- knowingly, without any lying to them as far as

6    the chart suggests, processed marijuana.  That's a totally

7    different situation.

8          MS. CLARK:  Your Honor, I --

9          THE COURT:  One of the reasons I allowed -- even

10   though the standard is objective, one of the reasons I allowed

11   the defense in this case to put in evidence of what was the

12   alleged state of mind of the banks that were here involved was

13   because I think that was responsive to the government's

14   position that lying was itself the be-all and end-all.

15         This obscures that critical distinction.  This just

16   says, as best I can tell, that there were some financial

17   institutions, unspecified, who --

18         MS. CLARK:  Your Honor, we're happy to pull them.

19         THE COURT:  -- allowed marijuana transactions.

20         MS. CLARK:  We'll pull them.  We don't need to offer

21   them.

22         THE COURT:  Okay.  Very good.

23         MS. DEININGER:  Your Honor, we also had an objection

24   to HAX11001, and this is a document -- this is a series of

25   photographs -- we have two objections, one general and one to

L3JPWEI1                    Trial

1   specific pages of this document.

2         But the general objection is that this appears to

3   relate to a transaction through Eaze utilizing Circle, but it

4   doesn't indicate that the transaction was actually ever

5   approved, settled or cleared by an issuing bank.  It says that

6   it's processing at the top, and because of that --

7         THE COURT:  I'm sorry.  Yes, blow it up.  Let me see.

8   So it was processed.

9         MS. DEININGER:  And, Mr. McLeod, if you can just

10  scroll down a little bit.  No, sorry, the same page.

11        THE COURT:  Yes, now you've gone too far.

12        MS. DEININGER:  But just for comparison with the other

13  entries on that same sheet, where you can see that transactions

14  that have been approved, settled and cleared, have dates.

15        THE COURT:  All right.  What's redacted there?

16        MS. CLARK:  Your Honor, those are other unrelated

17  transactions but, your Honor, I would just let you know that

18  the witness is going to testify that the transaction that's

19  showing as processing on this page is the same transaction that

20  cleared that we already have in evidence.  But to the extent

21  that this particular page is objectionable, we can remove this

22  page.  It's just the complete record of his transaction; so

23  that's why it's included.

24        THE COURT:  Since the bottom line is already in

25  evidence, we don't need this page.  So that's fine.

1              MS. CLARK:  Okay.

2              THE COURT:  Is there any other objection?

3              MS. DEININGER:  Yes, your Honor.  So I think most of

4     the rest of this exhibit is screen shots from the Eaze website

5     as of the time of the transaction, and we would object to those

6     as confusing and prejudicial because they represent the Eaze

7     website as it is now, but it leaves an impression that it's

8     what the Eaze website was at the time of the conspiracy and

9     that these are the products being offered, and there is no

10    evidence of that.

11             So if we can scroll past this page.  This page is the

12    receipt.  To the next, past this one, but there's a bunch of

13    pages of the Eaze website from the time of the transaction --

14             THE COURT:  Well, so let me ask defense counsel.  If

15    there's no way of knowing from anything in the record whether

16    this was the website at the time of the conspiracy, what's its

17    relevance?

18             MS. CLARK:  Your Honor, the exhibit, in its total, is

19    just walking through the transaction that Mr. Whelan is going

20    to testify to.  As far as the website in its current state, I

21    think we can pull some of these.  I think I would direct you

22    to, Mr. McLeod, it's HA0029.  There are certain aspects of this

23    that we think are particularly relevant.

24             THE COURT:  All right.  Well, I think on this one,

25    you'll show it to the witness, each portion that you want to

L3JPWEI1                    Trial

1   introduce, and I'll rule then.  I now know --

2          MS. CLARK:  Okay.  And he'll make it clear that this

3   transaction was in 2020; so I don't think there will be any

4   confusion about --

5          THE COURT:  No, it's different.  If the fact that the

6   banks are still taking knowingly now, according to the defense

7   view, Eaze transactions and processing them, that I've already

8   ruled is relevant.  The fact that Eaze is advertising widely,

9   or something like that, seems to me to be irrelevant.

10          MS. CLARK:  Your Honor, I understand.  Yes, sir.  And

11   we'll propose some redactions to this anyway, and as we go

12   through, I'll offer them in that form.

13          THE COURT:  Yes.

14          MS. DEININGER:  On that last note, our last objection

15   was to HAX1036, which I think goes to whether Eaze is widely

16   advertising, which as you just noted, currently, is irrelevant.

17          THE COURT:  Yes, we already have, of course, in

18   evidence the billboard as I recall.

19          MS. LA MORTE:  Yes, your Honor, and you had ruled that

20   that was admissible in connection with rebutting the

21   post-arrest statements.

22          THE COURT:  So I don't see -- I mean, I'm sure Eaze

23   welcomes the free advertising in this courtroom, but it doesn't

24   seem to be relevant.

25          MS. CLARK:  Okay.  We don't have to offer these

L3JPWEI1                     Trial

 1   billboards, your Honor.

 2              THE COURT:  All right.  Anything else?

 3              MR. FOLLY:  Your Honor, there were a few Circle

 4   documents.  I think we had discussed them, at least some of

 5   them, previously.  But we have our same objections to those

 6   documents.

 7              THE COURT:  I've already ruled on them; so I'm not

 8   going to go through them again.

 9              MR. FOLLY:  Your Honor, I'm not sure if defendants are

10   still intending to offer 549 and 5050 -- 5049 and 5050.

11              MR. BURCK:  Your Honor, those are these Circle

12   announcements that they had Visa -- a partnership with Visa.

13   We're not going to offer these documents.  I may can ask him:

14   Do you have a partnership with Visa, as part of this colloquy,

15   but I'm not going to offer these documents.

16              THE COURT:  All right.  Very good.

17              MR. BURCK:  And also to speed up the direct, since

18   you've already ruled that the documents -- that the financial

19   records that we're going to offer in can come in, is it okay if

20   I just offer them in, rather than go through and show each one

21   to him because it will just eat up time?

22              THE COURT:  Unless the government has some different

23   specific objections to a particular one.

24              MR. BURCK:  Okay.  Thank you, your Honor.

25              MR. FOLLY:  Your Honor, there is one document, 14007,

L3JPWEI1                    Trial

1    it's unclear what the testimony is going to be regarding what

2    this represents; so I think we'd like to reserve our objection

3    on that.

4                    THE COURT:  14007?

5                    MR. BURCK:  I'm not offering that.  It's out.

6                    THE COURT:  You're not.  Okay.  So they're not going

7    to offer it.  That's good because then I'd have to wonder what

8    the other 14,006 exhibits are that you plan to offer.

9                    MR. BURCK:  Your Honor, it would be news to me.  I

10   have no idea either.

11                   THE COURT:  All right.  Anything else?

12                   MS. LA MORTE:  No.

13                   MR. BURCK:  No, your Honor.  Thank you.

14                   THE COURT:  Very good.  All right.  So we'll take a

15   short break, and we'll start promptly at quarter of.

16                   (Recess)

17                   THE DEPUTY CLERK:  Jury entering the courtroom.

18                   (Jury present)

19                   THE COURT:  Please be seated.  So good morning, ladies

20   and gentlemen.

21                   As you know, the burden is always on the government to

22   prove its case beyond a reasonable doubt; so the defense

23   doesn't have any obligation to call any witnesses, but they

24   have decided to call a few witnesses.

25                   So please call your first witness.

1           MS. CLARK:  The defense calls Daniel Whelan.

2           THE COURT:  Okay.  Let's get the witness on the

3    witness stand.

4           You may be wondering what all these wires are.  The

5    second witness is going to be a remote witness; so we'll set up

6    for that.  I know, you thought these were whips and chains, but

7    no, they're just wires.

8           Please remain standing.

9     DANIEL WHELAN,

10        called as a witness by the Defendants,

11        having been duly sworn, testified as follows:

12          THE COURT:  You can be seated.  Please state and spell

13   your full name for the record.

14          THE WITNESS:  Name is Daniel Whelan, W-h-e-l-a-n.

15          MS. CLARK:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MS. CLARK:

18   Q.  Good morning, Dan.

19   A.  Good morning.

20   Q.  Mr. Whelan, how old are you?

21   A.  58 years old.

22   Q.  And where do you live?

23   A.  Newport Beach, California.

24   Q.  Did you go to college?

25   A.  Yes.

L3JPWEI1                        Whelan - Direct

Q.   Where did you go to college?

A.   Georgia Southern.

Q.   And what was your degree in?

A.   Accounting.

Q.   What year was that?

A.   1984.

Q.   Mr. Whelan, would you please walk me through your
employment history briefly, starting right after college
through today?

A.   After graduating, I went to work for a CPA firm in Atlanta
called Jones and Kolb, where I worked there for a little over
two years, obtained my CPA certificate, then joined the FBI at
that point, and worked for the FBI for 25 years, and then
retired from the FBI in 2011.

         And then went to work for a year for a group called
SIGTAR, with Treasury Department.  That's a Special IG for the
Troubled Asset Relief Plan.  And in 2012, started my own
private investigation business, and then in 2015, started
working with Guideposts as an independent contractor.

Q.   And do you currently work for Guidepost as an independent
contractor?

A.   I work for Guidepost as an independent contractor, yes.

Q.   Okay.  And, Mr. Whelan, I think you said that you worked
for FBI for 25 years.  During that time, did you have
experience reviewing financial transaction data?

L3JPWEI1                    Whelan - Direct

1   A.  Yes.

2   Q.  All right.  Mr. Whelan, I would like to -- you have a

3   binder in front of you with some documents.  You can use that

4   or you can rely on the screen, whatever is easier for you.

5   A.  Okay.

6   Q.  Mr. Whelan, were you asked to review some Excel

7   spreadsheets in connection with your testimony here today?

8   A.  Yes, I was.

9   Q.  And did you also review summaries of some of the data taken

10  from those spreadsheets?

11  A.  Yes.

12  Q.  Mr. McLeod, would you please place before the witness and

13  the jury Government Exhibit 2201, it's in evidence.

14          Mr. Whelan, can you see that on your screen?

15  A.  Yes, I can.

16  Q.  Are you familiar with this document?

17  A.  Yes, I can -- or yes, I am.

18  Q.  Did you review it?

19  A.  I did.

20  Q.  And just, in general, what kind of information is presented

21  on this document?

22  A.  It's a spreadsheet containing Visa credit card

23  transactions.

24  Q.  And could you please read for me the first -- sorry, the

25  titles of columns A and B?

L3JPWEI1                    Whelan - Direct

1   A.  Column A is "issuer name;" Column B is "issuer country."

2   Q.  Thank you.

3           Mr. McLeod, could you please place before the witness

4   only Defense Exhibit 10067.

5           Mr. Whelan, could you take a look at that document?

6   A.  Yes.

7   Q.  Do you recognize that document?

8   A.  Yes.

9   Q.  And briefly, what is this document?

10  A.  This document is a listing of all U.S. issuing banks on

11  that spreadsheet 2201; so they were part of the credit card

12  transactions.  They are only U.S. banks.

13  Q.  And, Mr. Whelan, did you review this for accuracy against

14  2201?

15  A.  Yes.

16          MS. CLARK:  Defense offers Defense Exhibit 10067.

17          MS. DEININGER:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 10067 received in evidence)

20  BY MS. CLARK:

21  Q.  Mr. Whelan, how many bank names were reflected in 10067?

22          If you could go to the last page, Mr. McLeod, that

23  might help.

24  A.  There were 915 bank names reflected.

25  Q.  Thank you.

L3JPWEI1                        Whelan - Direct

 1              Mr. McLeod, if you could take that down.  Could you

 2    please place before the witness and the jury Government

 3    Exhibit 2202 in evidence.

 4              Mr. Whelan, can you see that document?

 5    A.  I do.

 6    Q.  Are you familiar with this document?

 7    A.  I am.

 8    Q.  And did you review it?

 9    A.  I did.

10    Q.  What do you understand this document to represent,

11    generally?

12    A.  Visa credit card transactions.

13    Q.  And could you read for me, please, the titles of Column B

14    and C?

15    A.  Yes.  For B, it's "issuing countries," and C it's "issuing

16    institutions."

17    Q.  Would you please place before the witness only Defense

18    Exhibit 10070.

19              Mr. Whelan, do you recognize this document?

20    A.  I do.

21    Q.  Did you review it?

22    A.  I did.

23    Q.  And did you review it for accuracy similarly to the way

24    that you reviewed 2201?

25    A.  I did.

L3JPWEI1                       Whelan - Direct

1    Q.  Did you find it to be accurate?

2    A.  I did.

3    Q.  And, Mr. Whelan -- apologies -- how many different U.S.

4    issuing banks were listed in 10070?

5    A.  There were 763 banks.

6    Q.  And did you confirm that total to be accurate as against

7    exhibit -- Government Exhibit 2202?

8    A.  I did.

9    Q.  Please take that down, Mr. McLeod.  I'm sorry.  Mr. McLeod,

10   would you mind putting that back up.

11            MS. CLARK:  Defense offers Exhibit 10070.

12            MS. DEININGER:  No objection.

13            THE COURT:  Received.

14            (Defendant's Exhibit 10070 received in evidence)

15   BY MS. CLARK:

16   Q.  Mr. McLeod, would you please place before the witness only

17   Defense Exhibit 10068.

18            Mr. Whelan, do you recognize this document?

19   A.  I do.

20   Q.  Did you review it?

21   A.  Yes.

22   Q.  And what generally does this document represent?

23   A.  This is the combination of spreadsheets 2201 and 2202's

24   U.S. banks that we pulled from those spreadsheets.

25   Q.  And did you review this document for accuracy?

L3JPWEI1                    Whelan - Direct

```
 1   A.  Yes, I did.
 2              MS. CLARK:  Defense offers Defense Exhibit 10068.
 3              MS. DEININGER:  No objection.
 4   Q.  And how many different U.S --
 5              THE COURT:  Yes, received.  Thank you.
 6              (Defendant's Exhibit 10068 received in evidence)
 7              MS. CLARK:  Apologies.
 8   BY MS. CLARK:
 9   Q.  And could you provide us the total number of banks
10   reflected on this document?
11   A.  Yes, it's 1,113.
12   Q.  Thank you.
13              Mr. McLeod, would you please place before the witness
14   and the jury Government Exhibit 2301 in evidence.
15              Mr. Whelan, are you familiar with this document?
16   A.  I am.
17   Q.  And what do you understand this document to represent,
18   generally?
19   A.  These are MasterCard credit card transactions.
20   Q.  And if you could please read for me the titles of --
21   sorry -- of column I and column G?
22   A.  Column I and column -- I'm sorry?
23   Q.  Scrap that.  Just column I, please?
24   A.  Column I is "issuer name."
25   Q.  Thank you.
```

L3JPWEI1                        Whelan - Direct

1                Would you please place before the witness only Defense

2       Exhibit 10071.

3                And do you recognize this document, Mr. Whelan?

4       A.   Yes.

5       Q.   Is this a similar summary to the types of summaries

6       prepared for 2201 and 2202?

7       A.   Yes, it is.

8       Q.   And did you review this document for accuracy?

9       A.   I did.

10               MS. CLARK:   Defense offers Defense Exhibit 10071.

11               MS. DEININGER:   No objection.

12               THE COURT:   Received.

13               (Defendant's Exhibit 10071 received in evidence)

14      BY MS. CLARK:

15      Q.   Mr. Whelan, how many U.S. banks were represented in this

16      summary?

17      A.   There were 263 banks represented.

18      Q.   Thank you.

19               Finally, Mr. McCleod, could you please place before

20      the witness only Defense Exhibit 10069.

21               Mr. Whelan, are you familiar with this document?

22      A.   Yes, I am.

23      Q.   And did you review it for accuracy?

24      A.   I did.

25      Q.   And what does it represent?

L3JPWEI1                        Whelan - Direct

1    A.  It represents -- it referenced three spreadsheets we just

2    spoke about, 2201, 2202, 2301, a combination of all the U.S.

3    banks.

4    Q.  And what's the total number of U.S. banks reflected in this

5    exhibit?

6    A.  The total number was 1,324 banks.

7            MS. CLARK:  The defense offers Defense Exhibit 10069

8    into evidence.

9            MS. DEININGER:  No objection.

10           THE COURT:  Received.

11           (Defendant's Exhibit 10069 received in evidence)

12   BY MS. CLARK:

13   Q.  Mr. Whelan, recalling Government's Exhibit 2201, 2202 and

14   2301, do each of those columns reflect a merchant name?

15   A.  Yes.

16   Q.  And does each of those spreadsheets also contain a date

17   associated with each of those transactions presented in it?

18   A.  Excuse me, can you say that one more time?

19   Q.  Yes.  Sorry.  Do each of those spreadsheets also include a

20   date associated with each transaction?

21   A.  Yes.

22   Q.  Mr. McLeod, would you mind putting up Government

23   Exhibit 2201 and 2301 side by side, showing the date column in

24   each.  It's column B, Mr. McLeod.

25           Mr. Whelan, is there a difference between how the date

L3JPWEI1                    Whelan - Direct

1   is represented in 2201 and 2301?

2   A.  Yes, there's a difference in how it's represented here.

3   Yes.

4   Q.  What's the difference?

5   A.  The difference is on 2201, you have an actual day date.  If

6   we take the first one, 5-3-2018 in D5 of the cell, and then on

7   the 2301, you have just the month and year.  If you take cell

8   B2 you see 2017-01.

9   Q.  Thank you.

10          Mr. McLeod, would you please place before the witness

11   only Defense Exhibit 10073, 10074 and 10075.

12          Mr. Whelan, take a second, but can you let me know if

13   you recognize these documents?

14   A.  I do.

15   Q.  And are you familiar with the contents of those documents?

16   A.  I am.

17   Q.  What, generally, do they represent?

18   A.  It represents the change in merchant's name over time.

19   When you take all those records, you see the period of time the

20   merchant name was used from a beginning date to an end date.

21   Q.  Okay.  And did you confirm that these summaries were

22   accurate?

23   A.  I did.

24          MS. CLARK:  Defense offers Exhibits 10073, 10074 and

25   10075.

1           MS. DEININGER:  Your Honor, the government does have

2    an objection just to the title of the document as misleading.

3           MS. CLARK:  Your Honor, if we just changed it to

4    merchant names, would that obviate the objection?

5           MS. DEININGER:  Yes, it would.

6           MS. CLARK:  Okay.  Mr. McLeod, if it's possible to

7    redact the first two and last two words of each slide before it

8    goes to the jury on each of those exhibits.

9           I guess, as redacted, the defense would offer those

10    three exhibits.

11           MS. DEININGER:  No objection as redacted.

12           THE COURT:  Great.  Received.

13           (Defendant's Exhibits 10073, 10074 and 10075 received

14    in evidence)

15    BY MS. CLARK:

16    Q.  Mr. Whelan, thank you for walking us through those.  I'm

17    going to switch to a different topic.  Are you familiar with a

18    company called Eaze?

19    A.  I am, yes.

20    Q.  How are you familiar with it?

21    A.  I purchased cannabis or marijuana from them online.

22    Q.  And this may fall under your previous answer, but generally

23    what does Eaze do?

24    A.  Eaze sells cannabis, marijuana products.

25           (Continued on next page)

1   Q.  In your understanding, is Eaze fairly well known in

2   California?

3   A.  Yes.

4   Q.  Mr. Whelan, I believe you said you've made a purchase

5   through Eaze.

6   A.  I did.

7   Q.  How many times have you made purchases through Eaze?

8   A.  On two separate occasions.

9   Q.  I'm just going to speak about the first.  When did you make

10  a purchase through Eaze?

11  A.  I did it on November 7th of 2020.

12  Q.  That was last year?

13  A.  That was last year.

14  Q.  Where were you when you made that purchase?

15  A.  I was in my house, my home.

16  Q.  And Mr. Whelan, you have before you a binder, if you could

17  take a look at what's marked as Defense 11001 in there.

18          MS. CLARK:  And Mr. McLeod, if you would place that --

19  the subset of that exhibit that we discussed.

20  A.  OK.

21  Q.  Can you flip through that and let me know if you recognize

22  what's reflected in 11001.

23  A.  Yeah.  These were, when I was making the purchase online,

24  these were the screenshots I was taking, because I would go to

25  different pages or --

L3JAWEI2ps                    Whelan - Direct

1   Q.  And then I'm going to just stop you there.  Do you

2   generally recognize what's reflected in the document?

3   A.  Yes, such documents as my purchase online of the cannabis.

4           MS. CLARK:  The defense is going to offer into

5   evidence Defense Exhibit 11001, showing only pages 0027 and

6   0028 of the previous document.

7           MS. DEININGER:  Your Honor, just our prior 401 and 403

8   objections.

9           THE COURT:  Yes.  Overruled.  The document is

10  received.

11          (Defendant's Exhibit 11001 received in evidence)

12  Q.  Mr. Whelan, can you walk me through the steps that you took

13  to make the purchase at Eaze.

14  A.  Yes.  So I went to the Eaze website, eaze.com, placed in a

15  zip code around me, but they said they would -- you know.  And

16  then it allowed me to shop online and I chose some products,

17  some cannabis products.  And you put them in an electronic cart

18  and then you go to check out, and it says that I need to have

19  an account with Eaze.  And so I go through the process to

20  create this account with Eaze.  And part of creating the

21  account, they require some form of ID.  So I provide that.  And

22  they have a system in place to do that online.  So I provided

23  my ID.

24          And then you have the cart, and then you go to check

25  out.

L3JAWEI2ps                    Whelan - Direct

1   Q.  So once you created your cart -- your account and went to

2   check out, were you prompted to select a payment method?

3   A.  Yes.

4   Q.  And what did you select?

5   A.  I selected to pay by debit card.

6          MS. CLARK:  Mr. McLeod, if you could highlight on

7   Exhibit 11001 the payment at the top.

8   Q.  Is that how it was represented to you?

9   A.  Yes.

10  Q.  And did the last four reflect your debit card?

11  A.  Yes.

12  Q.  What did you do next?

13  A.  I clicked "confirm," and then it took me to another window.

14  Q.  And on that --

15         MS. CLARK:  Mr. McLeod, if you would skip to the next

16  page, please.

17  Q.  Does this reflect the next window that you saw?

18  A.  Yes.

19  Q.  And, Mr. McLeod --

20         MS. CLARK:  Mr. McLeod, if you wouldn't mind

21  highlighting the bottom part of the "remember" section in the

22  middle.

23  Q.  And Mr. Whelan, did this provide you with information about

24  how the transaction would appear on your statement?

25  A.  Yes, it did.

L3JAWEI2ps                     Whelan - Direct

1   Q.  And could you read that for us.

2   A.  Yes.  It says, it says, "Remember, you'll see a charge from

3   Circle Wallet Eaze.

4   Q.  And did you in fact receive your delivery, Mr. Whelan?

5   A.  I did.

6   Q.  Did you get what you paid for?

7   A.  I did.

8   Q.  Would you say your transaction was successful?

9   A.  Yes.

10  Q.  And was your card ultimately charged?

11  A.  Yes.

12          MS. CLARK:  Mr. McLeod, would you please put up

13  Defense Exhibit 11009 in evidence.

14  Q.  Mr. Whelan, looking at this, is this the confirmation of

15  that transaction which you just described?

16  A.  Yes.

17  Q.  And I know that this says "post date 11/9/2020."  You said

18  this is for the same transaction that you did on November 7th?

19  A.  Yes, it is.

20  Q.  Did you recognize the description of the transaction on

21  your statement when you received it?

22  A.  Yes, I did.

23  Q.  And was it the same as the description that Eaze had

24  prompted you when you checked out?

25  A.  It says "Circle Wallet Eaze 11/7 purchase London."

1    Q.  And did you recognition the transaction?

2    A.  Yes.

3             MS. CLARK:  If you could please show the witness only

4    Defense Exhibit 11010.

5    Q.  Mr. Whelan, do you recognize this document?

6    A.  Yes.

7    Q.  Generally what is this document?

8    A.  It's the bank charge for the Eaze transaction prior to

9    this.

10            MS. CLARK:  Defense offers Exhibit 11010.

11            MS. DEININGER:  No objection.

12            THE COURT:  Received.

13            (Defendant's Exhibit 11010 received in evidence)

14   Q.  Mr. Whelan, were you charged a fee for your Eaze

15   transaction?

16   A.  Yes.

17   Q.  And was if in excess of the transaction amount of your

18   purchase?

19   A.  No.

20   Q.  Was it --

21   A.  Oh, excuse me.  It's, yeah, it's the purchase and then,

22   yeah.  So it's on top.

23   Q.  And was this fee charged by your bank?

24   A.  Yes.

25   Q.  How much was the fee?

L3JAWEI2ps                    Whelan - Cross

1    A.  The fee was $6.79.

2    Q.  What is the description of the fee provided by your bank?

3    A.  It was -- it was described as "international transaction

4    fee 11/8 Circle Wallet Eaze London."

5    Q.  And Mr. Whelan, is Bank of America your bank?

6    A.  Yes.

7    Q.  Did Bank of America ever contact you about this

8    transaction?

9    A.  No.

10   Q.  Did Bank of America ever inform you that you could not use

11   your card to purchase marijuana?

12   A.  No.

13   Q.  Do you still have your Bank of America card?

14   A.  I do.

15   Q.  Thank you.

16           MS. CLARK:  One second, your Honor.

17           No further questions, your Honor.

18           THE COURT:  Anything from Mr. Weigand?

19           MR. GILBERT:  No, your Honor.

20           THE COURT:  Cross-examination.

21   CROSS-EXAMINATION

22   BY MS. DEININGER:

23   Q.  Good morning, Mr. Whelan.

24   A.  Good morning.

25   Q.  My name is Emily Deininger.  I'm an assistant United States

1    attorney.  We've never met before, right?

2    A.   In, we haven't.

3    Q.   You were retained by the defendants in connection with this

4    case, is that correct?

5    A.   Correct.

6    Q.   You were retained by Mr. Akhavan?

7    A.   I was -- yeah.  Guy Post is who I work for, and that's who

8    would obtain me.  So I was working -- that's how -- I'm sure if

9    we worked out the chain.

10   Q.   You're getting paid for your time in connection with this

11   case?

12   A.   Yes, I am.

13   Q.   And how much are you getting paid per hour?

14   A.   I get paid $185 per hour.

15   Q.   How many hours have you worked in connection with this

16   case?

17   A.   It will be a guesstimate.  Let me -- I'm going to say 50

18   hours total.  But, again, that's an estimate.

19   Q.   And you are getting paid for the time you spent making

20   marijuana purchases from eaze.com?

21   A.   Yes.

22   Q.   And you're getting paid for the time you're spending

23   testifying here, right?

24   A.   Yes.

25   Q.   And for all those hours you're getting paid $185 an hour?

1   A.  Yes.

2   Q.  Mr. Whelan, I think you said your bank is Bank of America,

3   right?

4   A.  Yes.

5   Q.  You have a Bank of America Visa debit card?

6   A.  I do, yes.

7   Q.  Do you have a cardholder agreement in connection with that

8   debit card?

9   A.  I mean, I imagine.  I mean, I -- could say I have one, but

10  yeah.

11  Q.  Have you ever read that cardholder agreement?

12  A.  No.

13  Q.  So you don't know that that cardholder agreement prohibits

14  making unlawful transactions with your debit card?

15          MR. GILBERT:  Objection.

16  A.  No.

17          THE COURT:  One minute.  That was an objection.

18          The objection is overruled.

19  Q.  Your answer to that was no; is that correct?

20  A.  That's correct.

21  Q.  You reviewed several spreadsheets of transaction

22  information in connection with this case, right?

23  A.  Correct.

24  Q.  And those were Government Exhibits 2201, 2202, and 2301?

25  A.  That's right.

L3JAWEI2ps                    Whelan - Cross

 1   Q.  And each of those included, I think you said on direct,

 2   information on the merchant name.  Right?

 3   A.  Correct.

 4   Q.  For each transaction that was listed in the spreadsheets?

 5   A.  That's correct.

 6   Q.  And that was hundreds of thousands of transactions, right?

 7   A.  Yes.

 8   Q.  Did any of those merchant names reference Eaze?

 9   A.  Is there a -- can you put some of these documents in front

10   of me?  There may have been, but there are several there.

11   Q.  Sure.  We can pull up just as an example Government Exhibit

12   2201.

13            Mr. Levine can show what's in evidence as Government

14   Exhibit 2201.  And if you look at the column G, it says

15   "merchant name."  Do you see that?

16   A.  I do.

17   Q.  We can scroll it a little bit.

18            Do you see Eaze listed as any of those merchant names?

19   A.  In these, no.

20            Can I ask you something?

21            THE COURT:  No.

22            THE WITNESS:  I'm sorry.

23   Q.  Mr. Levine, you can stop.  To your knowledge, Eaze was not

24   listed as a merchant name in any of the transaction spread

25   sheets you reviewed.

L3JAWEI2ps                    Whelan - Cross

1    A.   In the documents where we go from period to period, the

2    merchant name --

3    Q.   I'm talking about in those transaction spreadsheets.  Did

4    you see Eaze reviewed as a merchant name?  Do you recall any of

5    those?  Eaze.com?

6    A.   The word eaze.com?

7    Q.   Yes.

8    A.   No.

9    Q.   And you said you're familiar, from your work in the FBI,

10   you have experience reviewing financial documents; is that

11   correct?

12   A.   Yes.

13   Q.   Are you familiar with merchant category codes?

14   A.   Could you say that again?

15   Q.   Are you familiar with merchant category codes?

16   A.   No.

17   Q.   So you described on direct, you made a purchase from the

18   Eaze website, right?

19   A.   Yes.

20   Q.   And to your knowledge, when you made that purchase, there

21   was no fake company name involved, was there?

22               MR. GILBERT:  Objection.

23   A.   Not that I'm aware of.

24               MR. GILBERT:  Objection.

25               THE COURT:  Overruled.  The answer will stand.

L3JAWEI2ps                    Whelan - Cross

1   Q.  And to your knowledge when you made that purchase, there

2   was no fake -- there was no fake company involved, was there?

3            MS. DEININGER:  I'm sorry.  You have to answer the

4   question.

5   Q.  To your knowledge, was there any fake company involved when

6   you made the purchase?

7   A.  In that Eaze transaction we talked about?

8   Q.  Yes.

9   A.  I'm not aware of one.

10  Q.  And to your knowledge, was there any fake website involved

11  when you made that purchase?

12  A.  I'm not aware of one.

13  Q.  And to your knowledge you weren't provided with a fake

14  customer service number when you you made that purchase.

15  A.  No.

16  Q.  You made that purchase in 2021, right?

17  A.  Excuse me?

18  Q.  You made that purchase, sorry, in 2020, right?

19  A.  In 2020.

20  Q.  In November 2020?

21  A.  Correct.

22  Q.  And you understand that the scheme charged by the

23  government in this case ended in 2019?

24  A.  I'm not aware of when the scheme ended, so --

25           MS. DEININGER:  Mr. Levine, if we can pull up

L3JAWEI2ps                    Whelan - Cross

1    what's -- actually, Mr. McLeod, I'm going to ask you to help me

2    since it was a redacted version.  Can we pull up what's in

3    evidence as HAX11001 at page 2.

4    Q.  Now, Mr. Whelan, I believe you testified on direct that

5    this is a pop-up you got on your screen when you made the

6    purchase from eaze.com.  Right?

7    A.  That's right.

8    Q.  And it said that you would see a charge from Circle wallet

9    star Eaze, right?

10   A.  That's right.

11   Q.  And that's in fact what happened, right?

12   A.  Yes.

13   Q.  That's what you saw on your statement.

14   A.  Yes.

15   Q.  And so to your knowledge, this descriptor accurately

16   reflects the purchase you made, right?

17   A.  Yes.

18   Q.  Can we pull up what's in evidence as Government Exhibit

19   11 -- sorry, not Government Exhibit -- HAX11009.

20   Q.  And so, Mr. Whelan, here we see that merchant name.  It

21   says "Circle wallet star Eaze," right?

22   A.  Merchant name, yes.

23   Q.  It doesn't say happypuppybox.com, right?

24   A.  That does not say "happypuppybox."

25   Q.  Or greenteacha.com?

L3JAWEI2ps                    Whelan - Cross

1   A.  No.

2   Q.  Or desirescent.com?

3   A.  No.

4   Q.  Or Hot Robots?

5   A.  I'm sorry?

6   Q.  It doesn't say Hot Robots, does it?

7   A.  No.

8   Q.  Mr. Whelan, you're not an expert on cryptocurrency, right?

9   A.  No.

10  Q.  You're not an expert on Circle and how it works?

11  A.  No.

12  Q.  You don't work at Circle, right?

13  A.  I'm sorry?

14  Q.  You I don't work at Circle.

15  A.  I do not.

16  Q.  You don't work at Eaze.

17  A.  I do not.

18  Q.  With regard to this transaction that you made from eaze.com

19  on November 7, 2020, you have no reason to believe that any

20  lies were passed to Visa and MasterCard, do you?

21  A.  Could you say once more the last?  I didn't hear.

22  Q.  In connection with the purchase that you made from eaze.com

23  on November 7, 2020, you don't have any reason to believe that

24  lies were passed to Visa and MasterCard, do you?

25  A.  No.

L3JAWEI2ps                    Whelan - Redirect

1    Q.  And you don't have any reason to believe that any lies were

2    passed to U.S. issuing banks in connection with that

3    transaction either, do you?

4    A.  No.

5    Q.  And you know lying is wrong.  Right?

6    A.  If lying is wrong?

7    Q.  Yes.

8    A.  I mean, in most cases, I think it -- there are

9    circumstances, yeah.

10   Q.  In most cases lying is wrong, right?

11   A.  Yes, I would say.

12          MS. DEININGER:  No further questions, your Honor.

13          THE COURT:  Any redirect?

14          MS. CLARK:  Briefly, your Honor.

15          THE COURT:  Go ahead.

16          MS. CLARK:  Mr. McLeod, would you mind putting up

17   again Defense Exhibit 10072.  Or 10074 if it's faster.

18   Whatever is easier.

19   REDIRECT EXAMINATION

20   BY MS. CLARK:

21   Q.  While we're looking for that for the jury, Mr. Whelan,

22   would you please turn to tab 10072 in your binder?

23   A.  10072?

24   Q.  Yes.  We've got it now.

25   A.  OK.  It's on the screen now.

L3JAWEI2ps                    Whelan - Recross

1    Q.  And can you just take a second to look at this document and

2    let me know if you see the word "Eaze" on this document.

3    A.  "Eaze Payment" about two thirds of the way down on the

4    left-hand side.

5    Q.  Thank you.

6             MS. CLARK:  Mr. McLeod, could you put up 10072 now.  I

7    believe that's with 74.  Would you put up 10073.

8             Your Honor, can I have a minute to check if the

9    exhibit number is correct?  Apologies.

10            We'll just leave that aside.  No further questions.

11            MS. DEININGER:  Very briefly, your Honor.

12            THE COURT:  OK.

13            MS. DEININGER:  Mr. McLeod, can I ask for your help in

14   pulling back up what's in evidence as HAX10074.

15   RECROSS EXAMINATION

16   BY MS. DEININGER:

17   Q.  And Mr. Whelan, I believe you just testified that you saw

18   the word "Eaze" on this page in connection with -- "Eaze"

19   spelled E-a-z-e -- in connection with eazepayment.com.  Is that

20   correct?

21   A.  Correct.

22   Q.  And so if we look at this column, it actually looks like

23   eazepayment.com shows up twice, once in the middle and then

24   once two lines below that.  Do you see that?

25   A.  Correct.

L3JAWEI2ps

1    Q.  And can you read what the dates are next to the first

2    reference on eazepayment.com, the one in the middle of the

3    page?

4    A.  Yeah.  Tell you?

5    Q.  Yeah.

6    A.  It's 8/5/2017.

7    Q.  That's the first-used date.  And what's the last-used date?

8    A.  8/5/2017.

9    Q.  So that merchant name was only in use for that one day?

10   A.  Here, yes.

11   Q.  And let's look to three lines down where we see

12   eazepayment.com again.

13   A.  Yes.

14   Q.  What's the first-used date for that merchant name?

15   A.  8/30/2017.

16   Q.  And what's the last-used date?

17   A.  8/30/2017.

18   Q.  So eazepayment.com was also only used for one day there?

19   A.  In this case, yes.

20            MS. DEININGER:  No further questions.

21            THE COURT:  Anything else?

22            MS. CLARK:  Nothing further.

23            MR. GILBERT:  No, your Honor.

24            THE COURT:  Thank you very much.  You may step down.

25            (Witness excused)

L3JAWEI2ps

1              THE COURT:  Please call your next -- do we have to set

2      up the next witness?

3              All right.  You can set up.

4              MR. BURCK:  Your Honor, just for the record, we are

5      waiving any confrontation clause issue with respect to this

6      witness.

7              THE COURT:  Very good.

8              MR. BURCK:  And I think I state that on behalf of

9      Mr. Weigand as well?

10             MR. GILBERT:  That's correct.

11             (Pause)

12             THE COURT:  I'm pretty sure that tone is a G below C,

13     but the rest of you can figure that out.

14             MR. BURCK:  Your Honor, I'm just going to test to make

15     sure that I can be heard?

16             THE COURT:  Yes.

17             MR. BURCK:  Mr. Reginatto, can you hear me?

18             THE WITNESS:  I can, yes.

19             MR. BURCK:  And your Honor, I want to make sure he can

20     hear you in particular.

21             THE COURT:  Yes.  Can the witness hear me as well?

22             THE WITNESS:  I can indeed, yes.

23             THE COURT:  All right.

24             MR. BURCK:  Before we start, Mr. Rock bring, are you

25     comfortable taking off your mask, or no?

1          THE WITNESS:  Yeah, absolutely.

2          MR. BURCK:  OK.  Thank you.

3          MR. BURCK:  Mr. McLeod, the government is not, their

4    screen is not --

5          MS. LA MORTE:  No, no.

6          MR. BURCK:  Your Honor, the defense calls jor ral

7    regularna oto.  I hope I'm pronouncing the name correctly.

8          THE WITNESS:  That's correct.

9    JOAO PAULO REGINATTO,

10         called as a witness by Defendant Akhavan,

11         having been duly sworn, testified as follows:

12         MR. BURCK:  May I proceed, your Honor?

13         THE COURT:  Yes.

14         MR. BURCK:  Thank you.

15         THE COURT:  Can everyone hear this witness?

16   DIRECT EXAMINATION

17   BY MR. BURCK:

18   Q.  Reginatto, I just ask that you speak into the mike as much

19   as possible so that everyone can hear you.  And of course let

20   me know if you can't hear me or anyone else.  And there may be

21   objections, and so if you hear anything in the background, it

22   may be the judge objecting, so just -- we'll try to indicate

23   that to you in case you don't hear.

24   A.  OK.

25   Q.  Thank you.

1              Mr. Reginatto, where do you work?

2     A.  I work for a company called Circle.

3     Q.  And where is Circle headquartered?

4     A.  Yes.  That's an interesting question these days.  When we

5     are a technology company, we mostly work remotely today.  But

6     most of our staff is based out of Boston, Massachusetts.

7     Q.  It's out of Boston, Massachusetts; is that what you said?

8     A.  That's right.  I'm based out of Boston.

9     Q.  Is that where you are currently?

10    A.  That's correct.  Yes.

11    Q.  And where else does circle have significant offices, even

12    if it's remotes working in them today?

13    A.  New York City is another major hub for us, and we have a

14    relevant presence in Dublin, in Ireland, and in London in the

15    U.K. as well.

16    Q.  And how long have you worked at Circle?

17    A.  I have worked at Circle since September 2015.

18    Q.  When was Circle founded?

19    A.  I, I don't know precisely the month, but I believe it was

20    founded in 2013.

21    Q.  What is your current title?

22    A.  My current title is vice president of products.

23    Q.  Vice president of products?  Is that what you said?

24    A.  Correct.

25    Q.  Can you just tell us generally speaking what your

L3JAWEI2ps                    Reginatto - Direct

1   responsibilities are as vice president of products.

2   A.   Sure.  I, I am responsible for defining the product

3   statement and the strategy, work with our customers to

4   understand their needs, translate those needs into a set of

5   products features and the roadmap that we want to pursue

6   internally, and then cooperating with all our internal teams,

7   but most importantly software engineering teams to build those

8   products and bring them to market.

9   Q.   And based on your current job and your history with Circle,

10  would you say that you are familiar with how Circle operates

11  its business, generally speaking?

12  A.   I would say so, yes.

13  Q.   And would that include how it operates in credit card or

14  debit card networks?

15  A.   Yes, I would say so.

16  Q.   Now, Mr. Reginatto, you are appearing here today pursuant

17  to a subpoena that was issued by the defendants requiring you

18  to -- the company provide a witness at the trial.  Correct?

19  A.   That's correct.

20  Q.   So you are not here voluntarily.  Right?

21  A.   That's correct.

22  Q.   And you and I have never met before, or spoken before?

23  A.   No.

24  Q.   And you've never met with the defendants in this case,

25  Mr. Akhavan and Mr. Weigand, right?

1   A.  No, not at all.

2   Q.  You've never spoken to them before?

3   A.  No.

4   Q.  And you never met with anybody on the defense side or

5   spoken with anybody on the defense side before, correct?

6   A.  That is correct.

7   Q.  And just to be clear, neither the defense, lawyers for

8   Mr. Weigand or Mr. Akhavan, have prepared you for your

9   testimony today.  Right?

10  A.  That is correct.

11  Q.  So let me start with, are you familiar with a company

12  called Eaze?

13  A.  Yes.  I am familiar with them, yes.

14  Q.  And does circle have a business relationship with Eaze?

15  A.  Yes.  Eaze is one of Circle's customers currently.

16  Q.  And approximately when did that business relationship

17  begin?

18  A.  I believe it began in the summer of 2020.

19  Q.  So that would be last year, summer of 2020.

20  A.  Summer of last year, correct.

21  Q.  And is that relationship continuing to this day?

22  A.  Yes.

23  Q.  And are you familiar with what types of products Eaze

24  sells?

25  A.  Yes, I am familiar with them.

L3JAWEI2ps                     Reginatto - Direct

1   Q.  And what do they sell?

2   A.  As far as I understand, they have a marketplace where

3   customers in the State of California can purchase myriads of

4   products, but most of those products are marijuana-related

5   products.

6   Q.  And you said that it's in California; is that right?

7   A.  That's what I understand, yes.

8   Q.  Now, you mentioned in the beginning that Circle is a tech

9   company, right?

10  A.  Yes.  We view ourselves as a fintech company, so financial

11  services technology company.

12  Q.  "Fintech" stands for financial tech, a shorthanded term for

13  "financial tech company"?

14  A.  Financial services technology, correct.

15  Q.  That's f-i-n-t-e-c-h, fintech.

16  A.  That's right.

17  Q.  So Circle itself would be a fintech company, correct?

18  A.  Correct.

19  Q.  And Circle provides a way to pay for goods bought online

20  for customers, right?

21  A.  Not precisely.  So if I can state how we view what we do --

22  Q.  Please do.

23  A.  We are a company founded on the basis of cryptocurrency

24  technology, so essentially --

25  Q.  You -- no, go ahead, please.

1   A.  So essentially we build a type of payment and treasury

2   services for our customers that allow them to build products on

3   top of our infrastructure.  Then that infrastructure

4   essentially involves an infrastructure that we call a digital

5   wallet.  Our customers can create a myriad of digital wallets

6   for their users or for the purpose of their business.

7           And then we also facilitate payments from what we see

8   as traditional payment methods, things like cards and bank

9   accounts, into that infrastructure of digital wallets, and we

10  also facilitate payments that process digital wallets.

11  Q.  Understood.  So your customer in that scenario would be,

12  for example, Eaze.

13  A.  Correct.

14  Q.  Eaze is a platform that you provide additional services and

15  products to.

16  A.  That's correct.

17  Q.  So as one of your services to Eaze, does Circle provide a

18  way for people to use their debit cards to make purchases on

19  Eaze's website?

20  A.  So the product that we offer to Eaze is a product where

21  Eaze has access to our infrastructure of digital wallets, so

22  they can create a digital wallet in a way that's useful for

23  their marketplace.  Typically, as far as I understand, they

24  create those digital wallets for both buyer purchases on the

25  marketplace and seller purchases on the marketplace.  And then

L3JAWEI2ps                    Reginatto - Direct

1    they also use our payments product to essentially operate the

2    wallets' top-up, so to deposit or to fund the digital wallets,

3    especially on behalf of buyer end users.  And then they also

4    utilize our platform to facilitate payments between the buyer

5    and the seller.

6    Q.  And one of the things that Eaze does is use a -- allow

7    customers to use debit cards through the Circle platform.

8    Correct?

9    A.  Yes, that's correct.  They facilitate the use of debit

10   cards to top up, to deposit funds into those the buyer's

11   digital wallet.

12   Q.  Thank you.

13            MR. BURCK:  Your Honor, at this time I want to offer

14   HAX12011 into evidence.  It's a certificate of authenticity for

15   the business records that I'm about to offer.

16            MR. FOLLY:  Your Honor, I don't think the certificate

17   itself needs to go into evidence.

18            MR. BURCK:  OK.  That's fine.

19            Your Honor, then we would offer Akhavan Exhibits

20   14006, 14003, 14004, 14008, and 14005 into evidence, your

21   Honor.

22            MR. FOLLY:  Can you just publish 008 for the parties.

23   Can you just scroll through this.  Can you also just publish

24   for the parties the certificate.

25            MR. BURCK:  Publish HAX12001.

1          MR. FOLLY:  Your Honor, the government does have

2     objections on 140008 and 140005.

3          THE COURT:  What's your objection?

4          MR. FOLLY:  The objection is based on the

5     insufficiency of the certification of custodian of business

6     records.  These are voluminous data pulls that don't appear to

7     have any sort of valid foundation or certificate.

8          MR. BURCK:  Your Honor, we have the person who signed

9     the certificate and the witness, so we can ask if this was

10    produced by Circle.

11         THE COURT:  The objection is overruled.  The documents

12    are received.

13         MR. BURCK:  Thank you, your Honor.

14         (Defendant's Exhibits 14006, 14003, 14004, 14008, and

15    14005 received in evidence)

16    Q.  Let's start with, you're generally familiar with Visa and

17    MasterCard networks for how -- for credit and debit cards,

18    correct?

19    A.  I believe I am familiar with how that works, yes.

20    Q.  And Circle is a merchant in those networks, right?

21    A.  Yes.

22    Q.  And does Circle have what's called an acquiring bank or

23    merchant bank as part of its involvement in the network?

24    A.  Yes, that's correct.

25         MR. BURCK:  I'd like to show the witness and the jury

1    what's in evidence as Akhavan Exhibit 14006.  Would you

2    highlight the top of that.  Thank you.

3    Q.  So this appears to be a settlement agreement.  It's titled

4    "ECPE-comprocessing."  Is that right?

5    A.  That's right.

6    Q.  Can you turn to the next -- and it's dated May 2019?

7         On the front of the page, right underneath the title.

8    A.  Yes.  Yes.  I can see that, yes.

9    Q.  And if you turn to the second page, Mr. McLeod.

10   A.  Yes.

11   Q.  On the second page, it says that the agreement -- this is

12   at the very top -- if you can highlight that -- "the agreement

13   is entered into between" -- it says "Circle UK Trading

14   Limited."  See that?

15   A.  Yes.

16   Q.  And what is Circle UK Trading Limited?

17   A.  Circle UK Trading Limited is one of the Circle companies in

18   the family of companies.

19   Q.  But it's a company that's owned by Circle.

20   A.  Yes, that's correct.

21   Q.  Got it.  And it says that it's located at 131 Finsbury

22   Pavement, London, UK, correct?

23   A.  Yes, that's correct.

24   Q.  So it's located, or it's based, in the United Kingdom?

25   A.  Yes.  That's right.

1   Q.  And below that it says Circle Internet Financial Inc. is

2   another party to the agreement?

3   A.  Correct.

4   Q.  And it says that it's located at 99 High Street in Boston,

5   Massachusetts, or Boston, United States, correct?

6   A.  That's correct.

7   Q.  Is that the entity that you work for?

8   A.  Yes, that's correct.

9   Q.  Is that a holding company for Circle?

10  A.  I, I wouldn't -- I wouldn't be an expert on the structure

11  of the company.

12  Q.  No problem.

13         And then it says the other party of course is

14  E-Comprocessing, a division of eMerchantPay Limited, right?

15  A.  That's right.

16  Q.  So would it be fair to say that ECP, or E-Comprocessing, is

17  the acquiring bank for Circle?

18  A.  Yes.  I'm not sure if I would qualify them as an acquiring

19  bank, but it might be my lack of understanding, but there

20  certainly was an acquiring processor or acquiring partner, yes.

21  Q.  And they're also known as the merchant bank.

22  A.  Correct.

23         MR. BURCK:  You could take that down, Mr. McLeod.

24         Now I'd like to show the jury and the witness what's

25  been marked as Akhavan 14003.  And it's very small, so we have

L3JAWEI2ps                      Reginatto - Direct

1    to blow it up.  And actually can we start with the top

2    left-hand side, Mr. McLeod.  Thank you.

3    Q.  So that's ECP, the same company you just talked about, the

4    acquiring processor or bank?

5    A.  Correct.

6            MR. BURCK:  And then can you blow up the right-hand

7    section under "MID Details."  Thank you.  And make it a little

8    larger, too, so he can read.  Thank you.

9    Q.  Merchant ID.  This is Circle UK Trading Ltd., is the

10   merchant name or identification?

11   A.  Yes.

12   Q.  And then it has the descriptor below it, just an email

13   address, help@circle.com?

14   A.  Yes.

15           MR. BURCK:  And then if you go further down,

16   Mr. McLeod --

17   Q.  -- you'll see something called a merchant category code.

18   Do you see that?

19           MR. BURCK:  Can you highlight that.

20   Q.  And it says "Merchant category code 6540."  Right?

21           Is that correct?

22   A.  That's correct.

23   Q.  Do you know what 6540, the merchant category code, what it

24   means?

25   A.  Yes.  I believe it's a category code for transactions that

1    are associated with the top-up of digital wallets, but in other

2    terms, funding of accounts, of QuickPay, Dwolla, or Stripe,

3    things like that.

4    Q.  Do you know what the name of it is, for the category code?

5    A.  No, I don't recall exactly the name.

6            MR. BURCK:  OK.  We can take that down, Mr. McLeod.

7    Let's show the witness Akhavan Exhibit 14004.  And highlight

8    the top.

9    Q.  Now, Mr. Reginatto, the top, the title of these letters and

10   numbers is "customer entity ID."  See that?

11   A.  Yes.

12   Q.  And there's a very long set of numbers and letters

13   underneath it.  Correct?

14   A.  Correct.

15   Q.  And you understand that to be what is called a customer

16   entity ID, correct?

17   A.  That is correct.

18   Q.  And then next to that is says "payment settings."  And

19   below that it says "card payment descriptor: Circle wallet star

20   Eaze," correct?

21   A.  Correct.

22   Q.  And what is that?

23   A.  That is a record of an internal configuration of our

24   product that is essentially saying that, for that customer

25   entity ID, which is the, I believe, the customer entity ID for

L3JAWEI2ps                    Reginatto - Direct

1   Eaze as our customer, every time we process a card transaction
2   to top up one of their digital wallets, we are going to
3   instruct our acquirer department to initialize that payment
4   descriptor "Circle Wallet star Eaze."
5   Q.  And when you say "card," a debit card?
6   A.  A debit card.
7   Q.  And then next to it, it says "create date" and "update
8   date," and there are some dates there.  And it looks to be the
9   same:  5/05, 2020, 5/5/2020 looks to be the date that it was
10  create and updated?
11  A.  That's correct.
12          MR. BURCK:  You can take that down, Mr. McLeod.
13          Now let's show the witness Akhavan Exhibit 14008, and
14  the jury, which is in evidence.
15  Q.  Blow up the very top of that, Mr. McLeod.
16          Now, Mr. Reginatto, the customer and ID, you see at
17  the top of this, there is "customer entity ID" and "IIN," and
18  "issuer name."  Would you highlight that, Mr. McLeod.  "Total
19  payments."  And "payments amount."  You see that?
20  A.  Yes.
21  Q.  And then below the "customer entity ID" is a series of
22  numbers and letters.  See that?
23  A.  Yes.
24  Q.  And it may be we could go reference back to 14004, if it
25  doesn't look familiar, but the "customer entity ID" underneath

1    the --

2              MR. BURCK:  Yes.  Thank you, Mr. McLeod.

3    Q.  Does that appear -- the number that's underneath "customer

4    entity ID" under 14008, does it appear to be the same as the

5    "customer entity ID" under Akhavan Exhibit 14004?

6    A.  That's correct.  They appear to be the same, yes.

7    Q.  And so that to you indicates that this is about "Circle

8    Wallet and star Eaze" transactions, correct?

9    A.  Correct.

10   Q.  And then next to that is "IIN."  Do you know what that

11   means?

12   A.  Yes.  I believe that means "Institution Identification

13   Number."

14   Q.  "Institution Identification Number."  And there's a number

15   next to that, correct?

16   A.  Correct.

17   Q.  And then next to that is issuer name, right?

18   A.  Right.

19   Q.  What do you understand that to reference?

20   A.  So issuer name, number, is typically the first six digits

21   of the debit card, and that identifies the issuing entity, so

22   essentially the bank that hands to you that card, and the name

23   of the bank is what you see in the "issuer name" column.

24   Q.  Got it.  The issuer name there, as you just said, is the

25   name of the bank associated with the IIN.  Correct?

1    A.  Correct.

2    Q.  And the IIN -- sorry.

3    A.  I would only say, as far as we know, it's an internal

4    database that we have access to, so as far as our

5    understanding, you know, at the time of processing those

6    transactions, we associate that IIN to that bank.

7    Q.  And that's based on the debit card number that is entered

8    and identified the bank.

9    A.  Correct.

10   Q.  And then on the far end, you see "total payments" and you

11   see "payments amount."  As the first example that's there, it

12   says 3,706.  Does that indicate the number of payments that

13   were associated with "Circle Wallet star Eaze" transactions for

14   that bank?

15   A.  That's correct.

16   Q.  And then next to it is a number, and that -- it's the

17   amount.  Does that mean 400,301 dollars, U.S. dollars?

18   A.  Yes.  That's correct.

19           MR. BURCK:  Now can we zoom back out, Mr. McLeod.  And

20   can we just blow it up, the whole page.  I'd like to scroll

21   through it.  Let's just start going down.  These are all a

22   bunch of different banks.  Right?  Can you stop there,

23   Mr. McLeod.

24   Q.  In the middle of a bunch of different banks and credit

25   unions, on the far left, are Eaze, Circle Eaze transactions,

L3JAWEI2ps                        Reginatto – Direct

1    correct?

2    A.  Correct.

3              (Continued on next page)

L3JPWEI3                      Reginatto - Direct

```
 1   Q.  And then on the far right are the number of transactions

 2   associated with each of these entities and the amount of money

 3   that was spent, correct?

 4   A.  Correct.

 5   Q.  And can we keep scrolling down.  Keep going, Mr. McLeod,

 6   page 3, and let's stop right there.

 7          Do you see on the bottom of page 3, a series of Bank

 8   of America transactions?

 9   A.  Yes.

10   Q.  And, again, these are Eaze -- these are Circle Wallet star

11   Eaze transactions, correct?

12   A.  Correct.

13   Q.  And these were issued -- these were used -- these were

14   purchased using Bank of America debit cards, correct?

15   A.  Correct.

16   Q.  And on the far right, it says, for example, the top, 2,413

17   transactions for $272,251, right?

18   A.  Correct.

19   Q.  A couple down it says 2,441 transactions for $304,664,

20   right?

21   A.  Right.

22   Q.  And it says more.

23          Can we keep going, Mr. McLeod?  Just keep scrolling

24   until we get to page 7, and let's stop at the bottom of the

25   page.
```

1          Do you see some more Bank of America transactions

2     there in the middle?  Do you see that Mr. Reginatto?

3     A.  Yes.

4     Q.  Keep going.  And then at the bottom of the page, do you see

5     Wells Fargo?

6     A.  Yes.

7     Q.  For example, there's one set of transactions that, 1,243

8     payments, $151,420, correct?

9     A.  Right.

10    Q.  If we can keep going, Mr. McLeod, and scroll a little more

11    quickly until we get to page 16.  I can't see the bottom of the

12    page; so I'm not going to know it's 16.  Thank you.

13         Now we're on page 16 of this list.  Again, more Bank

14    of America in the middle.  But let's go a little bit down, and

15    then do you see in sort of the middle, it's going to be

16    highlighted for the jury, but I'm going to ask you to look for

17    something called Actors Federal Credit Union?

18    A.  Yes, I see that.

19    Q.  And that's another credit union whose debit card was used

20    to purchase Circle Wallet star Eaze products?

21    A.  Correct.

22    Q.  All right.  We can keep going, and let's go to page 20, and

23    this will be the final page, page 25, bottom of the page.  Do

24    you see Citibank?

25    A.  Yes.

L3JPWEI3                         Reginatto - Direct

Q.  And you'll see that, for example, there's one set of

transactions, 916 for $113,714; and then there's another set of

transactions, 259 of them for $251,239, correct?

A.  Correct.

Q.  Again, these are examples of Citibank debit cards being

used by their customers to buy Circle Wallet star Eaze

products, correct?

A.  Correct.

Q.  And then just keep going, scroll a few more pages, and

actually, to the end of the document, Mr. McLeod.  And I think

it's a total of 68 pages of banks and transactions.  You can

put that away, Mr. McLeod.

          And I want to turn to Akhavan Exhibit 14,005, which is

in evidence.  If you can highlight the top of that, Mr. McLeod.

          So on the -- again, we see the same customer entity ID

on the far left, right?  It looks to be the same?

A.  Yes, correct.

Q.  And we see a month next to that.  And starting from the

bottom to the top, it seems to go from July 2020 through

February 2021, correct?

A.  Correct.

Q.  And then it says "total attempted payments."  Then it says

"approved payments."  Then it says the "total attempted

payments amount" and then it says "approved payments amount"?

A.  Correct.

L3JPWEI3                    Reginatto - Direct

1   Q.   So I'm just going to start with the bottom because that's

2   where -- it's almost like an e-mail, you're reading from the

3   bottom to the top to get to the present.  And this was drawn

4   from your records, right, from Circle's records?

5   A.   That is correct.

6   Q.   And so does this say that in July of -- or as of July 1st,

7   2020, there were 12 total attempted payments, ten approved

8   payments, 479.56 attempted payments and 370.82 actual payments;

9   is that right?

10  A.   That is correct.

11  Q.   Okay.  Just to speed this along, I'm going to skip the

12  attempts and just go to the actual approved and actual approved

13  payment amounts.  So then in August 2020, there were 13,000

14  approved payments, or 13,886 approved payments, right?

15  A.   Correct.

16  Q.   For looks to be $1,445,897.74; is that right?

17  A.   That's correct.

18  Q.   So does that mean in that month, or between 7-01 and 8-01,

19  there is about a million and a half dollars' worth of

20  transactions over debit cards of the banks that we just saw for

21  Circle Eaze pot products?

22  A.   That's correct.

23  Q.   And then above that, for the month of September, or I

24  should say August through September, it's $5,995,292 for that

25  month; and then above that, it's $6,806,625.13; the following

1    month, $7,076,092; and then above that, 830,000 or is it --

2    actually, it's $8,301,488; and then it's $8,664,664.94; and

3    then as the most recent is $6,180,529 of debit card

4    transactions, correct?

5    A.  Yes, that is correct.

6    Q.  And these are for the Circle Wallet star Eaze transactions,

7    correct?

8    A.  Correct.

9    Q.  Do you have a rough sense of how much how much total Circle

10   Wallet star Eaze transactions had been circulated through debit

11   cards since July of last year, rough total?

12   A.  Yeah, I don't know roughly the number, but just by looking

13   at those numbers, it sounds like it's over $50 million,

14   something like that.

15   Q.  And that's in the last eight months or so?

16   A.  That would be correct, yes.

17   Q.  I'd like to show you what's in evidence as Akhavan Exhibit

18   11,009.

19            You can show that to the jury as well.

20            Now, Mr. Reginatto, you may not have seen this before,

21   but it's a document that's in evidence for this trial.  And

22   you'll see it's a online banking statement, right?

23   A.  Seems to be, yes.

24   Q.  And it says Bank of America at the top, right?

25   A.  Mmm, hmm.

1    Q.  You have to say "yes" or "no" sorry.

2    A.  Sorry, I apologize.  Yes.

3    Q.  And then below it, it says a date was 11-9-2020?

4    A.  Yes.

5    Q.  And below that, it says an amount and below that it says

6    debit card, correct?

7    A.  Correct.

8    Q.  And it says the purchaser's name, and then it says the

9    description, Circle Wallet star Eaze, 11-07 purchase London,

10   right?

11   A.  Correct.

12   Q.  Do you recognize that description?

13   A.  Yes.

14   Q.  And what is that description?

15   A.  That would be the descriptor that we use for our acquiring

16   processer partner to utilize for the transactions that are

17   associated with topping out those e-digital wallets.

18   Q.  Got it.  And you see below it says merchant category,

19   right?  And it says, "stored value card purchase or load,"

20   right?

21   A.  Correct.

22   Q.  And below that it says "merchant category code 6540"?

23   A.  Yes.

24   Q.  And do you remember we discussed that code appeared in a

25   different earlier in the ECP document, the acquiring bank

1    document?

2    A.  Yes, correct.

3    Q.  Does this help refresh your recollection as to what 6540

4    stands for?

5    A.  Yes.

6    Q.  It stands for stored value card purchase or load, right?

7    A.  Correct.

8    Q.  And then below that, it says Circle Wallet Eaze, correct?

9    A.  Correct.

10   Q.  And then please show the --

11              THE COURT:  Counsel, we're going to need to take a

12   mid-morning break.  Do you want to do it now or after this

13   next --

14              MR. BURCK:  Your Honor, I probably need about ten

15   minutes; so maybe right after, unless you want me to go.  I can

16   finish this in ten minutes.  I'm just going to go through a few

17   more statements.

18              THE COURT:  Why don't we give the jury a break now.

19              So, ladies and gentlemen, why don't we take a

20   15-minute break now.

21              (Jury not present)

22              THE COURT:  And I see the witness has already taken

23   his break.  So that's fine.  So we'll see you all in 15

24   minutes.

25              MR. BURCK:  Thank you, your Honor.

1          (Witness temporarily excused)

2          (Recess)

3          THE COURT:  Please be seated.  I'm sorry.  It will be

4   another minute or two before the jury is here.

5          MR. BURCK:  Judge, I'll be done in ten minutes.

6          THE COURT:  Great.

7          (Pause)

8          MR. BURCK:  Judge, before the jury comes up, the last

9   of the documents that I'm going to offer in are bank statements

10  from the other investigator, who we don't intend to call.  The

11  government has stipulated to their authenticity.  I'm going to

12  offer them in.  I'm sure they'll object, but I'll offer them in

13  pursuant.

14         THE COURT:  Is the objection that --

15         MS. LA MORTE:  Your Honor, yes.  We don't object to

16  authenticity.  It's the same objections as before.

17         THE COURT:  Oh, I see.

18         MR. BURCK:  Thank you, your Honor.

19         MS. LA MORTE:  One clarification.  Mr. Burck, you

20  intend -- can you be specific about which documents you intend

21  to offer?

22         MR. BURCK:  Yes.  It's 1124, 11025, 11026, 11027, and

23  that's it.

24         MS. LA MORTE:  And these are HAX numbers?

25         MR. BURCK:  Yes.  These are all the statements from

L3JPWEI3                      Reginatto - Direct

1    Lynda Larson.

2             MS. DEININGER:  And just to confirm, for 1124 and

3    1127, those are the newly redacted versions we received this

4    morning?

5             MR. BURCK:  They are all redacted, yes.  They are all

6    redacted.  Even if I miss something, we're only going to that

7    one line.

8             MS. LA MORTE:  In Circle?

9             MR. BURCK:  In Circle, yes.

10            MS. LA MORTE:  Yes, your Honor.  It's just the same,

11   preserving the same objections but, otherwise, we're fine.

12            THE COURT:  All right.  So you will just say

13   "objection."  I'll say "overruled" and they'll come in.

14            MS. LA MORTE:  Yes.

15            THE COURT:  On the other hand, maybe I should say

16   "objection" and you should say "overruled."

17            MS. LA MORTE:  That would be fun, your Honor, and then

18   I would blow that up and hang it on my wall.

19            MR. BURCK:  Your Honor, if you objected, I would

20   definitely rescind the question.

21            THE COURT:  So are you guys too young or perhaps, he

22   said disparagingly, too ignorant --

23            THE DEPUTY CLERK:  Jury entering courtroom.

24            MS. LA MORTE:  To be continued.

25            THE COURT:  To be continued.

1           (Jury present)

2           THE COURT:  Please be seated.  Okay.  Counsel.

3           MR. BURCK:  Thank you, your Honor.

4    BY MR. BURCK:

5    Q.  Mr. Reginatto, can you hear me okay?

6    A.  I can.  Yes.

7    Q.  Great.  And also, the court reporters are asking that you

8    make sure you speak up -- it sounds okay now -- because she's

9    having a little trouble hearing you.

10   A.  Okay.  I'll try to speak closer to the microphone.

11   Q.  Okay.  Thank you.

12          Before we go back on with the documents we were

13   looking at, I want to go back, Mr. McLeod, to Akhavan 14,006.

14          And do you recall this is the ECP, the E-Comprocessing

15   agreement, correct?

16   A.  Correct.

17   Q.  And can we turn to the second page, Mr. McLeod.  And can

18   you highlight in the middle of the page, just the middle of the

19   page, where it says "and E-Comprocessing, a division of

20   EMerchant Limited," that whole paragraph?

21   A.  Yes.

22   Q.  So this was the agreement between Circle and its acquiring

23   bank, ECP, correct?  We looked at this earlier.

24   A.  Yes, correct.

25   Q.  And it says that "E-Comprocessing, which is the acquiring

1   bank, a company organized and existing under the laws of

2   England and Wales, having its business address at 14 Tonbridge

3   Chambers, Pembury Road, Tonbridge, Kent, United Kingdom,

4   registered with companies house," right?  Do you see that?

5   A.  Yes.

6   Q.  So ECP is an acquiring bank based outside the United

7   States?

8   A.  Yes, I believe that to be correct.

9   Q.  And it's based in the United Kingdom, correct?

10  A.  Correct.

11  Q.  So from the perspective of an American, that would be

12  offshore, correct?

13  A.  Correct.

14  Q.  Thank you.  We can take that down.  And if we go to Akhavan

15  Exhibit 11,010, which is in evidence.

16       Now, before we took a break, Mr. Reginatto, we were

17  talking about a debit card transaction that we saw on a Bank of

18  America debit card, correct?

19  A.  Right.

20  Q.  So actually, why don't we go to 11,009 briefly, Mr. McLeod.

21       So do you recall this is the document we were talking

22  about?

23  A.  Yes.

24  Q.  All right.  Now, let's go to 11,010, Mr. McLeod.

25       And you see here it's the same postdate.  It's Bank of

1    America.  There's an amount of minus $6.79.  It says bank

2    charge, and then it says description:  International

3    transaction fee, 11-08, Circle Wallet star Eaze London; do you

4    see that?

5    A.  Yes.

6    Q.  Is that a -- is that charge for $6.79, was that charged by

7    Circle Wallet?

8    A.  I -- I don't believe that the charge that we initiated, no.

9    Q.  That would be Bank of America, you believe?

10   A.  Yes, because it says type, bank charge, I would believe

11   that to be a Bank of America charge.

12   Q.  Okay.  Thank you.  You can take that document down.

13           MR. BURCK:  Now, your Honor, I will offer into

14   evidence a group of bank statements whose numbers are as

15   follows:  Akhavan Exhibit 11,024, Akhavan Exhibit 11,025,

16   Akhavan Exhibit 11,026 and Akhavan Exhibit 11,027.

17           MS. LA MORTE:  Previous objection, your Honor.

18           THE COURT:  Overruled.  Received.

19           (Defendant's Akhavan Exhibits 11,024; 11,025; 11,026;

20   11,027 received in evidence)

21           MR. BURCK:  Thank you, your Honor.

22           Can you show the witness and the jury first Akhavan

23   Exhibit 11,024.  Can you blow up the top of that page first.

24   Thank you, Mr. McLeod.

25   BY MR. BURCK:

L3JPWEI3                        Reginatto - Direct

1    Q.  So, Mr. Reginatto, do you have that document in front of

2    you?

3    A.  I have, yes.

4    Q.  And does it appear to be a bank statement?

5    A.  Yes, it appears to be, yes.

6    Q.  And at the top it says Citibank Client Services; is that

7    correct?

8    A.  Correct.

9    Q.  So this appears to be a Citibank statement, correct?

10   A.  Correct.

11   Q.  And if you turn to the next page, the second page, you'll

12   see under the blackout, the redacted section -- please

13   highlight that, Mr. McLeod -- you'll see debit card purchase

14   01/08, 4:12 p.m. and the date is 1/12.

15            Can you highlight that, Mr. McLeod?  Thank you.

16            And it says beneath it, Circle Wallet star Eaze

17   London; do you see that?

18   A.  Yes.

19   Q.  And do you recognize that descriptor?

20   A.  Yes.

21   Q.  And it's for -- and what is it?  I'm sorry.

22   A.  It is a descriptor that Circle would have used for when we

23   initiate one of those top-up wallet transactions.

24   Q.  Got it.  And next to that it says the amount subtracted is

25   $71.03, correct?

L3JPWEI3                          Reginatto - Direct

1    A.  Correct.

2    Q.  All right.  You can take that down, Mr. McLeod.  Can we go

3    to Akhavan Exhibit 11,025.

4            Again, does this appear to you to be a bank statement?

5    A.  Yes, it does.

6    Q.  And at the top, does it say Bank of America?

7    A.  Yes.

8    Q.  So fair to say this appears to be a Bank of America

9    statement, correct?

10   A.  Correct.

11   Q.  Can we turn to the fourth page of that document.  Can we

12   highlight at the top just the part that is unredacted.

13           And you see that it says 10-30-20, check card 1029,

14   Circle wallet star Eaze London, a series of numbers, minus

15   40.75; do you see that?

16   A.  Yes.

17   Q.  And do you recognize that descriptor?

18   A.  Yes.  It's the same descriptor that would have been

19   initiated by a Circle Wallet top-up transaction.

20   Q.  And can you go to the bottom of that page, Mr. McCleod, and

21   highlight what appears at the bottom, unredacted.  It says,

22   service fees, and then it says 10-30-20, check card 10-29,

23   Circle Wallet star Eaze London, and beneath that, it says

24   international transaction fee, minus $1.22.

25           So let me ask you, do you believe that was a charge

1   made by Circle to this customer?

2   A.  I don't believe so because it seems to be the service fee

3   section of the statement.  I wouldn't believe that would have

4   been initiated by Circle.

5   Q.  Thank you.  You can take that down, Mr. McLeod.  If you can

6   put up Akhavan Exhibit 11,026.

7           Again, this is another Bank of America, and I'll go --

8   again, it appears to be a statement of Bank of America, yes?

9   A.  Yes, it does.

10  Q.  And then can we turn to page 4 of 5, and can we highlight

11  just the middle.  Just the middle section, Mr. McLeod.

12          And again, 9/21/20, check card, Circle Wallet star

13  Eaze London, minus $54.55.  Is that the same descriptor that

14  you discussed before?

15  A.  Yes, it seems to be the same.

16  Q.  And then in the next page -- just the middle, Mr. McLeod --

17  do you see 9/21/20, check card 0919, Circle Wallet star Eaze

18  London, international transaction fee, minus $1.54.  I believe

19  you testified that you do not believe those transaction fees

20  are charged by Circle Wallet, correct?

21  A.  That is correct.  I do not believe those would be fees that

22  we initiated.

23  Q.  Do you have an understanding who charges those fees?

24  A.  My understanding is that that is the bank charging that

25  fee.

1  Q.  In this case, Bank of America, correct?

2  A.  Correct.

3  Q.  All right.  And let's go to the last document, which is

4  Akhavan Exhibit 11,027.  And do you see at the top of that

5  page, do you see Chase?

6  A.  Yes.

7  Q.  And Chase is a U.S. bank, right?

8  A.  Yes.

9  Q.  Sometimes called JP Morgan Chase, as its says beneath it?

10  A.  Correct.

11  Q.  Does this appear to be a bank statement?

12  A.  It does appear to be, yes.

13  Q.  And if you go to the bottom half of that page, Mr. McLeod,

14  and you highlight the section that says "card purchase."

15        Can you see that?

16  A.  Yes.

17  Q.  And it says 12/04, and card purchase 12-02, Circle Wallet

18  star Eaze London, card, minus $85.38.  Again, do you recognize

19  that descriptor?

20  A.  Yes.

21  Q.  And that's the same descriptor you testified before about

22  as reflecting debit card purchase of Circle Wallet star Eaze

23  products, correct?

24  A.  Correct.

25  Q.  Okay.  Mr. McLeod, you can put that down.

1          Just a couple last questions, Mr. Reginatto.  As part

2     of Circle's business, are you aware of any business

3     partnerships that Circle enters into with other companies?

4               MR. FOLLY:  Objection, 401, 403.

5               MR. BURCK:  Your Honor, I can lay a better foundation.

6               THE COURT:  Yes.

7     BY MR. BURCK:

8     Q.  So, Mr. Reginatto, we've just spent -- you've testified

9     about the credit card or debit card business that Circle is

10    involved in with Eaze, correct?

11    A.  Correct.

12    Q.  And as part of that business, you have relationships with

13    credit card companies?

14    A.  No.  I wouldn't say we have direct relationships with

15    credit card companies as part of that business, no.

16    Q.  Okay.  Do you have any partnerships with credit card

17    companies?

18    A.  We do have, yes.

19    Q.  And would one of those companies be Visa?

20    A.  That is correct, yes.

21    Q.  So you have a partnership with Visa, is that your

22    testimony?

23    A.  Yes.

24    Q.  And approximately when did that begin?

25              THE COURT:  Well, before you answer that question.

1    What is the nature of this partnership?

2               THE WITNESS:  The nature of the partnership is around

3    a cryptocurrency that Circle issues that's called USD coin or

4    USDC, the cryptocurrency that is pegged to the value of the

5    U.S. dollar.  And Visa has some ambitions around developing

6    future products that are around that cryptocurrency, and that's

7    what the partnership is around.

8               THE COURT:  I don't think a sufficient foundation has

9    been laid for the ultimate question that you wanted to put, but

10   if you want to try again, go ahead.

11              MR. BURCK:  Your Honor, I'd have to ask him about the

12   cryptocurrency in order to --

13              THE COURT:  That's all right.

14   BY MR. BURCK:

15   Q.  The USD coin cryptocurrency you just testified about as to

16   Visa, right?  Did you just testify to that?

17   A.  Yes.

18   Q.  Is that the same cryptocurrency that you use with Eaze?

19   A.  Yes, that's the same cryptocurrency that we use in our

20   digital wallet for all of our customers, yes.

21              MR. BURCK:  Your Honor, is that a sufficient

22   foundation?

23              THE COURT:  What's the government's view?

24              MR. FOLLY:  Your Honor, I still object.  I don't think

25   there's any foundation that Visa is involved in any of the

1    current transactions.

2              THE COURT:  I agree.  Sustained.

3              MR. BURCK:  No further questions, your Honor.

4              THE COURT:  Anything from Mr. Weigand's counsel?

5              MR. GILBERT:  No, your Honor.

6              THE COURT:  Cross-examination?

7    CROSS-EXAMINATION

8    BY MR. FOLLY:

9    Q.  Good morning, Mr. Reginatto.  Can you hear me?

10   A.  I can hear you, yes.

11   Q.  Okay.  Good morning.

12   A.  Good morning.

13   Q.  You testified on direct examination about some Eaze

14   transactions that went through Circle; do you recall that?

15   A.  Yes.

16   Q.  And Circle did not have any involvement with Eaze's card

17   processing activities in 2016 through 2019, correct?

18   A.  That is correct.

19   Q.  Can you walk us through the different steps that take place

20   in a debit card Eaze purchase through the Circle platform?

21   A.  Sure.  So Eaze collects on their product a set of

22   information and that typically involves information about their

23   consumer, their end user and the end user's payment details.

24              They send an instruction to Circle's platform to

25   charge that end user's payment method.  In this case, a debit

1    card.  We, in conjunction with our acquiring processor, charge

2    that card.  And then Eaze also instructs us to either create a

3    digital wallet for that end user, if it is the first time that

4    they're using the marketplace, or perhaps they might tell us

5    about a previously created digital wallet for that end user.

6    And so we proceed to charge that payment method, and deposit

7    funds into that end user's, or "buyer" as they call it, digital

8    wallet.

9           Subsequently Eaze instructs us to make a payment from

10   that buyer's digital wallet to what they call a seller digital

11   wallet, and so we perform that movement of funds on our part.

12   Q.  In the first stage of the transaction, is the Eaze customer

13   purchasing a cryptocurrency?

14   A.  Yes.  The way that we architect our platform is that in

15   that case, the user is purchasing cryptocurrency for the

16   purpose of depositing that into the digital wallet.

17   Q.  So focusing again just on the first phase of the

18   transaction, where you just described the customer purchasing a

19   cryptocurrency.  In that first stage, are the customer's funds

20   sent from the customer's issuing bank to Circle's acquiring

21   bank account?

22   A.  Yes.  That is the way that it works, correct.

23   Q.  Who is the merchant for that transaction?

24   A.  That's us, Circle.

25   Q.  Can you explain for us just briefly what a cryptocurrency

L3JPWEI3                        Reginatto - Cross

1   is?

2   A.   Yes.   A cryptocurrency is a digital asset that exists on

3   public internet area searchers called the block chains.

4   Essentially it's a representation of card values, such as

5   money, on these public internet networks.

6          MR. FOLLY:   At this time, the government is offering

7   self-authenticated record HAX14001.

8          MR. BURCK:   Your Honor, I'm just trying to see what it

9   is.   No objection, your Honor.

10          MR. FOLLY:   Can we publish that?

11          THE COURT:   I'm sorry, I only heard one --

12          MR. GILBERT:   No objection, your Honor.

13          THE COURT:   Thank you.   Received.

14          (Defendant's Exhibit HAX14001 received in evidence)

15          THE COURT:   Go ahead.

16   BY MR. FOLLY:

17   Q.   Is that also being published to the jury?   Thank you.

18          Can you explain what this Stablecoin Platform Services

19   Agreement is?

20   A.   I believe this is the service agreement that was

21   established between Circle and Eaze for the provision of our

22   platform service.

23   Q.   And focusing just on the -- do you see the introduction

24   clause?

25   A.   Yes.

1   Q.  Can you just read that first sentence?

2   A.  Sure.  "Eaze desires to engage Circle to provide access to

3   certain USDC or other stablecoin wallet and payments platform

4   services as defined below for Eaze and the buyers and sellers

5   (collectively 'users') of merchandise acting within the Eaze

6   platform."

7   Q.  Can we please turn to the fourth page, and scrolling down

8   to 2(b).  If we could enlarge 2(b).  2(b) in the first part

9   says:  "The platform services shall, at a minimum, enable an

10  integrated payment experience that allows:  (i) a buyer to

11  exchange fiat for Circle credits from Circle through the Eaze

12  website; (ii) a buyer to send those Circle credits to a seller

13  in a separate transaction using wallet infrastructure

14  integrated into and operated through the buyer's Eaze account;

15  and (iii) to provide services to the seller that allows

16  management of the Circle credits, conversion of Circle credits

17  to USDC and redemption of USDC into fiat."

18          So focusing on the first part of the transaction, is

19  that what you described earlier, where the Eaze customer

20  purchases a cryptocurrency?

21  A.  Yes, that is correct.

22  Q.  Can you explain how the second phase of the transaction

23  works?

24  A.  So once a digital wallet has a positive balance, Eaze can

25  instruct us to transfer funds, basically, from one digital

1    wallet to the other.  In their case, I believe they do that

2    from a buyer's digital wallet to a seller's digital wallet.

3    Q.  In that case, is that a transfer of cryptocurrency funds?

4    A.  Yes.  The only difference that we qualify internally is

5    when a transfer of digital currency happens between two digital

6    wallets that are on our platform, we consider that what we call

7    an internal transfer.  So essentially, that's a ledger update,

8    and that's just to differentiate because these digital

9    currencies, these cryptocurrencies they can also be transferred

10   outside of the Circle platform.  They are intraoperative with

11   other platforms.

12   Q.  So that's an internal cryptocurrency transfer?

13   A.  Correct.

14   Q.  In that second part of the transaction, the internal

15   cryptocurrency part, is any information sent to the Eaze

16   customer's issuing bank?

17   A.  No, not at all.

18   Q.  Is the Eaze customer's issuing bank required to make any

19   decision at that point?

20   A.  No, not at all.

21   Q.  What about Visa, is any information sent to Visa at that

22   second page?

23   A.  No, absolutely not.

24   Q.  Is Visa required to make any decision at that point?

25   A.  No.

L3JPWEI3                          Reginatto - Cross

1   Q.   Lastly, what about MasterCard, is any information sent to

2   MasterCard during the second phase of the transaction?

3   A.   No.

4                 (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JPWEI3                        Reginatto - Cross

L3JAWEI4ps                      Reginatto - Cross

Q.  Is MasterCard involved in any way in that second phase of
the transaction?

A.  No, not at all.

Q.  Is this second phase of the transaction sent through any of
the card networks?

A.  No.  They don't touch the card networks at all.

Q.  Now, in this particular situation with Eaze, the seller
wallets that you described, are those the dispensary wallets?

A.  Yes, that is correct.  They are wallets that belong to
another business, a dispensary in that case, yes.

Q.  I want to ask you some questions about the due diligence
process that Circle performs when it has a merchant such as
Eaze.  Circle performs due diligence before it onboards any new
merchants; is that right?

A.  Yes.  That is correct.

Q.  How long does that due diligence process typically last?

A.  It can typically last from under a month, so a few weeks,
all the way up to three, four, five months sometimes.

Q.  When Circle onboards a new merchant, the compliance
department is consulted as part of that process, correct?

A.  Yes, that is correct.

Q.  The legal department is also consulted as part of that
process, correct?

A.  Yes, correct.

L3JPWEI3                         Reginatto - Cross

Q.   It's important to Circle that it receive truthful

information from the merchants that it onboards, correct?

A.   Yes, absolutely.

Q.   I believe you testified you have worked at the company

since approximately 2015; is that right?

A.   Yes, that's correct.

Q.   During that time period, have you ever become aware of a

situation where Circle was lying to any banks?

A.   No, I have not, no.  No.

Q.   I'd like to ask you to look at HAX14008.

          MR. FOLLY:  We could also publish that to the jury.

          Just give me one moment.

Q.   Now, all these transactions took place in 2020 or later.

Correct?

A.   Yes.  That's correct.

Q.   And you see where it says "issuer name"?

A.   Yes.

Q.   Circle did not lie to any of these issuing banks, correct?

A.   That's correct.

Q.   Circle did not use fake merchant names for any of the

transactions that are depicted here, correct?

A.   No, it has not.

Q.   Circle did not use misleading descriptors for any of the

transactions that are depicted here, correct?

A.   That's correct.

L3JPWEI3                         Reginatto - Cross

Q.  Circle did not use misleading MCC codes for any of the
transactions that are depicted here, correct?

A.  That's correct.

           MR. FOLLY:  If we can show for the witness HAX11009.

Q.  Do you see in the middle there's a merchant category code
listed there, correct?

A.  Correct.

Q.  6540, right?

A.  Yes.

Q.  And that describes "stored value card purchase or load,"
correct?

A.  Correct.

Q.  And to your understanding that's an accurate description of
this transaction, correct?

A.  I believe that to be absolutely correct, yes.

Q.  And Circle consistently uses the same MCC code, correct?

A.  Yes, exactly.

           MR. FOLLY:  If we could turn to Government Exhibit
2309, at page 4.  If we could focus on the second and the --
sorry -- the third and the fourth columns.

Q.  Do you have those in front of you there?

A.  I do, yes.

Q.  You're not aware of Circle ever using the "freight carrier
trucking" MCC code for any of the Eaze transactions, correct?

A.  No, absolutely not.

L3JPWEI3                         Reginatto - Cross

1    Q.  You're not aware of Circle ever using the "cosmetic stores"

2    MCC code for any of the Eaze Circle transactions, correct?

3    A.  That is correct.

4    Q.  You're not aware of Circle ever using the "clock, jewelry,

5    watch, and silverware" MCC code for any of the Eaze

6    transactions, correct?

7    A.  That's correct.

8    Q.  You're not aware of Circle ever deliberately using

9    misleading MCC codes, correct?

10   A.  That's correct.

11          MR. FOLLY:  We could take that down.

12   Q.  You're not also not aware of Circle ever creating fake

13   websites to disguise the nature of its business activities from

14   banks, correct?

15   A.  That's correct.

16   Q.  You're not aware of any situation where Circle deliberately

17   deceived any banks, correct?

18   A.  Absolutely correct, yes.

19   Q.  You're also not aware of any instance where Circle

20   processed transactions in the name of a different merchant,

21   correct?

22   A.  Yes, that's correct.

23   Q.  You're not aware of any situation where Circle purchased a

24   shell company for the purpose of processing Circle's Eaze

25   transactions, correct?

1   A.  Yeah, absolutely correct.

2              MR. FOLLY:  Just a moment, your Honor.

3              No further questions.

4              THE COURT:  Anything else?

5              MR. BURCK:  Very briefly, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. BURCK:

8   Q.  Mr. Reginatto, can you hear me OK?

9   A.  I can, yes.

10  Q.  Great.  I just want a few questions.  You were asked on

11  cross-examination about the cryptocurrency that is part of the

12  Circle-Eaze integrated platform, right?

13  A.  Correct.

14  Q.  You described in some detail how that works, the mechanics

15  of it, right?

16  A.  The mechanics of the cryptocurrency?

17  Q.  Yes.  You guys -- I'm asking -- you described that in your

18  cross-examination, right?

19  A.  Oh.  Apologies.  I did, yes.

20  Q.  OK.  Now, when a buyer -- and I think -- let's turn to

21  HAX14001, which you were asked about, page 4, section 2, and

22  then under B.  Just highlight that paragraph, Mr. McLeod.

23              Do you see, Mr. Reginatto, you were asked and you

24  testified about this paragraph?

25  A.  Yes.

L3JAWEI4ps                    Reginatto - Redirect

Q.  And it says, "the platform services" -- which refers to the

Circle platform services, right?

A.  Correct.

Q.  -- "shall at a minimum enable an integrated payment

experience that allows" the buyer to do various things, right?

A.  Yes.

Q.  Now, it's your understanding that the buyer presses a

button on Eaze and all of this happens instantaneously.  Right?

A.  I, I believe that is the way that Eaze has implemented our,

our platform services.  It's a diagnostic to how our customer

builds their user experience.  We, although we do provide, you

know, the ability for them to process these payments, top up

the digital wallets, and then transfer funds across the digital

wallets, we don't control the end user experience.

Q.  Got it.  But as you understand it, it's a press of a button

by a buyer, correct?

A.  I, I believe that's the way it works on the Eaze

marketplace, yes.

Q.  And it takes nanoseconds, correct?

A.  I would say it's pretty, pretty short in time, yes.

Q.  OK.  So all the mechanics you were talking with the

government, about cryptocurrency going here and there and

everywhere, that's the details of the software, of the

algorithms that you use.

A.  Those are the mechanics of how our platform works, correct.

1    Q.  Got it.  Now, let's talk about it --

2            MR. BURCK:  You can take that down, Mr. McLeod.

3    Q.  You were also asked about the mechanics as it relates to

4    Visa or MasterCard or issuing banks, right?

5    A.  Correct.

6    Q.  And I think you testified that they're not aware of all of

7    this cryptocurrency mechanics that you discussed.  Is that

8    right?

9    A.  That is correct.

10   Q.  So all they see is a debit from the customer's account for

11   a certain amount.  Correct?

12   A.  Yes.  I believe that's correct.

13   Q.  And that amount corresponds to the amount of marijuana they

14   bought from Eaze.  Correct?

15   A.  In this, in this case, yes, from our perspective, that

16   amount is presented as the amount that is going to be deposited

17   on a -- on a digital wallet.

18   Q.  Now, you told us that you're in the fintech business,

19   right?

20   A.  Correct.

21   Q.  And that's the financial technology business, right?

22   A.  Yes.

23   Q.  And so you in part provide financial services to your

24   customers, correct?

25   A.  Yes, that's correct.

L3JAWEI4ps                    Reginatto - Redirect

1    Q.  And that includes Eaze, right?

2    A.  Correct.

3    Q.  And you know that Eaze is a deliverer of marijuana, right?

4    A.  Yes, I'm aware of that, yes.

5    Q.  And you're aware that are marijuana is lawful in

6    California, correct?

7    A.  Correct.

8    Q.  And you are also aware that it is illegal under federal

9    law.  Correct?

10   A.  I am aware of that, yes.

11   Q.  And Circle is not concerned about the illegality, the

12   illegality, of marijuana under federal law and providing

13   services to Eaze, is it?

14            MR. FOLLY:  Objection, 401, 403.

15            THE COURT:  Sustained.

16   Q.  Now, you were asked some questions about -- I would like to

17   go to HAX11009.  And you see in the middle there, you were

18   asked about this document, both on direct and cross?

19   A.  Yes.

20   Q.  And you see in the middle the merchant category is "stored

21   value card purchase or load"?

22   A.  Yes.

23   Q.  And beneath that it says "merchant category code: 6540"?

24   A.  Yes.

25   Q.  And you testified that that is the merchant category code

L3JAWEI4ps

1   that corresponds with "stored value card purchase or load,"

2   right?

3   A.   Correct.

4   Q.   Is a "stored value card purchase or load" also sometimes

5   referred to as "quasi cash"?

6   A.   Yes.  I believe I've seen that term.  Yes.

7            MR. BURCK:  No further questions, your Honor.

8            THE COURT:  Anything else?

9            MR. FOLLY:  No, your Honor.

10            MR. GILBERT:  No, your Honor.

11            THE COURT:  Thank you very much.

12            (Witness excused)

13            THE COURT:  Maybe we can pause here for a moment and

14   take this equipment down.

15            (Pause)

16            THE COURT:  All right.  Anything else from counsel for

17   Mr. Akhavan?

18            MR. BURCK:  Your Honor, can you hear me?

19            THE COURT:  Yes.

20            MR. BURCK:  Your Honor, we're not sure what your

21   practice is on renewing Rule 29.  But we renew it at this

22   point.

23            THE COURT:  No, no, no.  We'll get to that in a

24   minute.  I'm just saying, do you rest?

25            MR. BURCK:  We rest, your Honor.

L3JAWEI4ps

1          MR. GIBERT:  We rest, your Honor.

2          THE COURT:  All right.  Very good.

3          Anything else from the government?

4          MS. LA MORTE:  No, your Honor.

5          THE COURT:  So the government rests as well.

6          MS. LA MORTE:  Yes.

7          THE COURT:  OK.

8          Ladies and gentlemen, it would not make sense, I

9     think, to start closing arguments now, although we've made

10    great progress for the day, as you can see.  But I think the

11    game plan is, we will have all of the closing arguments on

12    Monday.  Then we'll take the whole day.  On Tuesday morning

13    bright and early I will give you my instructions of law.  That

14    will take about a half hour.  And so at around 10:15 on

15    Tuesday, the case will be yours to deliberate upon.

16          So I think it makes sense to excuse you now for the

17    day.  Please have a terrific weekend.  Since you have all this

18    extra time, I know that several of you are going to shop online

19    for more colorful clothes -- and in any event, in all

20    seriousness, have a terrific weekend.  We'll see you at 9:45 on

21    Monday.

22          (Jury not present)

23          THE COURT:  All right.  So you made the jury's day.

24    That's for sure.

25          All right.  Please be seated.  So I think we can have

L3JAWEI4ps

1     the charging conference now earlier.  So what I'll do is, I

2     will get you my draft charge by 12:45.  We'll just email it to

3     you.  And why don't we have the charging conference at 2

4     o'clock.  And that way we don't have to worry about getting

5     together late in the day.

6              So very good.  I'll see you all at 2 o'clock.

7              MR. BURCK:  Thank you, your Honor.

8              MS. LA MORTE:  Thank you.

9              MR. BURCK:  Oh, your Honor, I'm sorry.  The Rule 29?

10    How would you like us to handle that, the renewal of the Rule

11    29?

12             THE COURT:  Yes, yes.  This is the right time for it.

13    So it would be a terrible mistake for defense counsel for both

14    defendants not to renew their Rule 29 motions at this time and

15    thus lose all sorts of appellate rights that they otherwise

16    want to preserve.  And that's why I'm glad that both

17    Mr. Akhavan's counsel and, by sign language, Mr. Weigand's

18    counsel have made the motion, and it would be equally terrible

19    if I were to grant the motion, so I'm going to deny it.

20             MR. BURCK:  Thank you, your Honor.

21             THE COURT:  Very good.

22             (Luncheon recess)

23             (Continued on next page)

24    L3JAWEI4ps

25                A F T E R N O O N    S E S S I O N

L3JAWEI4ps

```
 1                              2:00 p.m.

 2              (Jury not present)

 3              THE COURT:  My law clerk tells me that the government

 4    for some reason got my charge much later than defendants.

 5              MS. LA MORTE:  I think it's some firewall issue.

 6              THE COURT:  His liberal leanings were such that he

 7    preprograms it so it only goes to the government long after the

 8    defense.

 9              THE LAW CLERK:  Objection.

10              THE COURT:  But I can give you more time if you want

11    it.  But if not we'll start now.

12              MR. FOLLY:  Yes.  We think it makes sense to go ahead

13    and proceed.

14              THE COURT:  OK.  Let's do it.

15              All right.  So with respect to the general

16    instructions 1 through 8, they are pretty much my standard

17    instructions.  I'll ask each side, each party, to give me any

18    objections, positions, or other comments.  But I don't want any

19    rounds of this.  Tell me all that you have to say.

20              So with regard to 1 through 8, anything from the

21    government?

22              MR. FOLLY:  No, your Honor.

23              THE COURT:  Anything from Mr. Gilbert?

24              MR. GILBERT:  No, your Honor.

25              THE COURT:  Anything from Mr. Tayback?
```

L3JAWEI4ps

1          MR. TAYBACK:  No, your Honor.

2          THE COURT:  Very good.

3          Now, with respect to -- we'll break it down here

4     charge by charge, beginning with no. 9.  I see one typo at the

5     very top of the page 14 charge.  It says "the charges."  It

6     should be changed to "the charge."  It's already been changed

7     in the table of contents.  I don't know why it wasn't changed

8     here.  This is a very serious error.  I will have to take this

9     up with my law clerk as soon as we adjourn.

10         OK.  Any objections to no. 9?  Any more comments?

11    Anything from the government?

12         MR. FOLLY:  No, your Honor.

13         THE COURT:  Anything from Mr. Gilbert?

14         MR. GILBERT:  No, your Honor.

15         THE COURT:  Anything from Mr. Tayback?

16         MR. TAYBACK:  No, your Honor.

17         THE COURT:  Charge 10.  Anything from the government?

18         MR. FOLLY:  No, your Honor.

19         THE COURT:  Anything from --

20         (Pause)

21         MR. FOLLY:  Oh, yes.  Sorry.  This interconnects with

22    another subsequent one.  Our understanding of the law is that

23    1349 does not require an overt act, and that is also included

24    on page 21.

25         THE COURT:  OK.  I didn't bother, to tell you the

L3JAWEI4ps

1    truth, to look at that.  I'm delighted to remove that if all

2    parties are agreed overt act is required.

3              MR. GILBERT:  That is our understanding, your Honor.

4              MR. TAYBACK:  Yes, your Honor.

5              THE COURT:  OK.  So we'll change it so now it reads,

6    "In order for a given defendant to be guilty of the charge of

7    conspiracy to commit federal bank fraud, the government must

8    prove beyond a reasonable doubt each of the following two

9    elements:

10             "First, the existence of a conspiracy to commit

11   federal bank fraud at any time during the charged time period

12   of 2016 through 2019;

13             "Second, that the defendant you are considering

14   knowingly, willfully, and with specific intent to defraud

15   joined and participated in the conspiracy" --

16             I'm sorry.  After "2019" in the previous paragraph,

17   there's a semicolon and then add the word "and," "and second."

18   Then after the word "conspiracy in the next paragraph, period

19   after the word "conspiracy" and strike "and."  Strike the

20   entire next paragraph.  And finally, "I will now instruct you

21   regarding each of these two elements."

22             OK.  Anything else from anyone on instruction no. 10?

23             MR. TAYBACK:  No.

24             MR. GILBERT:  No, your Honor.

25             THE COURT:  Very good.  Instruction no. 11.  Anything

L3JAWEI4ps

1   from the government?

2           MR. FOLLY:  No, your Honor.

3           THE COURT:  Anything from Mr. Gilbert?

4           MR. GILBERT:  No, your Honor.

5           THE COURT:  Anything from Mr. Tayback?

6           MR. TAYBACK:  No, your Honor.

7           THE COURT:  Very good.

8           Instruction no. 12.  Anything from the government?

9           MR. FOLLY:  Yes, your Honor.

10          THE COURT:  Go ahead.

11          MR. FOLLY:  There were a few additional items that

12  your Honor had included in the preliminary instruction that we

13  believe are appropriate to include in the full charge as well,

14  including that the government does not need to prove that a

15  bank suffered any financial loss, as well as --

16          THE COURT:  I thought I had that in later.  But

17  maybe -- hold on a second.  But I'm wrong.  So that should go

18  under the first element.

19          "Also" -- this will be at the end of the paragraph

20  that begins with the words "as to the first element," after the

21  word "federally insured."  Also, it is not necessary -- well,

22  it's really, the place to put it is in the conspiracy.  So I

23  think the place to put it is on page 19, instruction no. 11, as

24  part of that.  So when we get to that I'll suggest some

25  wording.

L3JAWEI4ps

1              MR. GILBERT:  Your Honor, I think you said no. 11 on

2       page 19.  I think you meant no. 13 on page 19.

3              THE COURT:  Yes, thank you very much.  Under no. 13 on

4       page 19.  So we'll take that up when we get there.

5              Anything else, to come back to instruction no. 12,

6       anything else from the government?

7              MR. FOLLY:  Your Honor, in the preliminary charge,

8       there is also the inclusion of the fact that the government

9       does not need to prove reliance on a misrepresentation.  And we

10      think that should also be included in the final charge as well.

11             THE COURT:  OK.  I'm sorry I didn't look back at this

12      as I was doing -- I think the language in the preliminary

13      instruction on the first page of the preliminary instruction,

14      in the third and fourth paragraphs, is actually better than

15      what I have here, in the following respects.  There is a

16      sentence in the preliminary charge, "Here, the alleged bank

17      fraud object was a scheme to deceive U.S. banks into

18      effectuating credit and debit card purchases of marijuana by

19      disguising those purchases as being for other goods."  I think

20      that's maybe a better description of it.

21             If we look at page 12.

22             MS. LA MORTE:  You mean instruction 12?

23             THE COURT:  I'm sorry.  Page 17, instruction 12.

24      Thank you.  I don't have ten fingers.  I can't go above that.

25             I think the sentence I just read -- "here, the alleged

L3JAWEI4ps

1    bank" and so forth -- should go after the first sentence of the

2    sentence beginning "as to the first element."

3              So it will now read as follows:  "As to the first

4    element, a scheme to defraud a bank or credit union means a

5    scheme to use one or more misrepresentations to obtain money or

6    property from a bank or credit union."  And then we would

7    adhere, "The alleged bank fraud was a scheme to deceive

8    U.S.-based banks into effectuating credit and debit card

9    purchases of marijuana by disguising those purchases as being

10   for other kinds of goods."

11             Actually, I don't think we have to say "U.S.-based

12   banks" because we go on to say it has to be a federally insured

13   bank.  So, "A federally insured bank is one that is insured by

14   the Federal Deposit Insurance Corporation, and a federally

15   insured credit union is one that is insured by the National

16   Credit union Share Insurance Fund.  However, the perpetrator of

17   a federal bank fraud is not required to personally know that

18   the bank or credit union was federally insured.  Also" -- here

19   we would pick up with the preliminary charge -- "the government

20   does not need to prove that the scheme succeeded but only that

21   it was planned.  Also, the government does not need to prove

22   that a bank or credit union suffered any financial loss."

23   Let's take it directly from the preliminary charge.

24             So I think that incorporates both the things you asked

25   for.  Yes?

L3JAWEI4ps

1           MR. FOLLY:  Yes, your Honor.

2           THE COURT:  I'm sorry --

3           MR. FOLLY:  And then there is an additional --

4           THE COURT:  And then there's -- you also ask for the

5   reliance part.  I think that should come as the second element.

6   "As to the second element, a material fact, as applicable here,

7   is a fact that a reasonable banker would be reasonably likely

8   to consider in making a decision concerning a bank transaction

9   involving the transfer of money or property.  For example,"

10  etc.

11          I think it would go at the very end of that paragraph,

12  carrying over to page 18 at the top.  "Further, the government

13  does not need to prove that any bank actually relied on a

14  misrepresentation."

15          OK?  Anything else from the government?

16          MR. FOLLY:  Your Honor, yes.  There is an additional

17  item that the government wanted to address.  Under the section

18  2 portion of the statute, the case law is clear that the false

19  statement does not need to be made directly to the bank, and

20  there has been a fair amount of cross-examination, I think,

21  sort of eliciting testimony that there was sort of an attempt

22  to distance the defendants from the issuing banks in the United

23  States.  We would still like the ability, if the false

24  statement is made to -- not to the issuing bank but, rather, to

25  the acquiring bank or to Visa and MasterCard, as long as that

L3JAWEI4ps

1  false statement was the mechanism through which the issuing

2  bank parted with the money, that is still sufficient.  So we

3  would like to incorporate that concept, that the --

4          THE COURT:  Yes.  I'm fine with that but not with the

5  language you just gave me.

6          MR. TAYBACK:  Your Honor, I believe the last three

7  words of this instruction 12 addresses that, "directly or

8  indirectly."

9          THE COURT:  Let me see.

10          I'm sorry.  Where are you referring to?

11          MR. TAYBACK:  Page 18, under the description of the

12  third element, I think you incorporate "directly or

13  indirectly."  The last sentence.

14          THE COURT:  Well, that was the reason I put in

15  "directly or indirectly."  But I think what the government

16  thinks is, it should be a little bit further elaborated.

17          So how about -- I'll tell you where I'll put this in a

18  minute -- "Also, the government does not need to prove that the

19  misrepresentations were made directly to a federally insured

20  bank or credit union, but only that the misrepresentations

21  influenced the federally insured banks or credit unions in

22  processing the transactions."  How about that?

23          MS. LA MORTE:  One minute.

24          MR. FOLLY:  Your Honor, I think the government's only

25  request would be to use the "by means of" language that's

L3JAWEI4ps

1   included in the statute.

2              THE COURT:  Well, you know, that's fine, but I want,

3   from all the parties here, specifically what you want me to

4   say.

5              MR. FOLLY:  Yes, your Honor.

6              THE COURT:  Don't just tell me, oh, use the language

7   in the statute.  What, in the sentence I just read to you, what

8   do you want to change, and how?

9              MS. DEININGER:  Your Honor, I think we would propose

10  that the sentence you proposed stay the same until you said

11  that "only that the misrepresentations were the means by which

12  the federally insured banks or credit unions were induced to

13  part with money in their control."

14             THE COURT:  OK.  So "only that the

15  misrepresentations" --

16             MS. DEININGER:  Mm-hmm.  And instead of saying

17  "influenced" just say "were the means by which."

18             THE COURT:  It's *a* means," right?  It's not the only

19  means.

20             MS. DEININGER:  "A means."

21             MS. LA MORTE:  Yes, your Honor, you're correct.

22             THE COURT:  "Were a means by which" -- what's the rest

23  of it?

24             MS. DEININGER:  Then going back to your language.

25             THE COURT:  -- "the federally insured banks or credit

L3JAWEI4ps

1   unions" --

2            MS. DEININGER:  -- "were induced to" --

3            THE COURT:  -- "were induced to process the

4   transactions"?

5            MS. DEININGER:  Yes.  I think that works.

6            THE COURT:  All right.  I'll tell you what I'm going

7   to do, because you did get this later than I thought you would.

8   After we finish going over all the changes that we're going to

9   discuss now, then I'll prepare a new draft that has all that,

10  and we'll reconvene at 5 o'clock.  And if there's any final

11  objections, changes, whatever, you can give them to me at that

12  time.

13           MS. LA MORTE:  That would be great, your Honor.

14           THE COURT:  And the defendants have already waived

15  their appearance at that time?

16           MR. TAYBACK:  Yes.

17           MR. GILBERT:  Yes, your Honor.

18           THE COURT:  All right.  So anything else from the

19  government on no. 12?

20           MS. LA MORTE:  Just one moment, your Honor.

21           MR. FOLLY:  Your Honor, one additional item we would

22  like to raise is the inclusion of some specific charge -- and

23  I'll provide a proposed charge -- regarding bank due diligence.

24  And we had included a proposed charge on this.  But something

25  to the effect of, "It also does not matter whether any of the

L3JAWEI4ps

1    banks involved might have discovered the fraud had the bank

2    probed further.  If you find that a scheme or artifice existed,

3    it is irrelevant whether you believe that any of the banks" --

4            THE COURT:  That's much too wordy.  As you can see

5    from my charge, I try to keep it simple.  The due diligence

6    argument has never been directly raised by the defense in those

7    words because I excluded it by my motion in limine, and they're

8    not going to raise it in their summation because they don't

9    want to be held in contempt of court.  So I don't really see

10   the need for that.  If it is raised during summation in some

11   indirect way, I can always give a, right then and there, sua

12   sponte, an instruction along the lines you're talking about.

13   But I think it's overkill here.  So I won't add that.

14           Anything else from the government on no. 12?

15           MR. FOLLY:  No, your Honor.

16           THE COURT:  OK.  Anything from Mr. Gilbert on no. 12?

17           MR. GILBERT:  Yes, your Honor.  At the end of the

18   sentence that ends "national credit unions share insurance

19   fund," in the paragraph beginning "as to the first element" --

20           THE COURT:  Yes.

21           MR. GILBERT:  -- "we would request that you include

22   the following: "I instruct you that Visa, MasterCard, and banks

23   outside the United States are not insured by the FDIC or

24   National Credit Union Share Insurance Fund."

25           MR. TAYBACK:  Your Honor, we join, and we have a

L3JAWEI4ps

1    written piece of paper we can hand up.

2            MR. GILBERT:  The proposal that Mr. Tayback is about

3    to hand you is acceptable to us as well.

4            THE COURT:  Well, the trouble with what you've given

5    me here is, I think to make it balanced, I would have to say,

6    "However, Citibank," so forth, list the banks that are

7    federally insured.  If you want me to do that I'm happy to do

8    it.  But I sort of like Mr. Gilbert's approach, which would be

9    simply to say "banks outside of the U.S. are not" -- "banks and

10   credit unions" -- "are not federally insured."  How about "nor

11   are credit card companies"?

12           MR. GILBERT:  Visa and MasterCard -- that's fine, your

13   Honor.

14           THE COURT:  All right.  I will add that.

15           OK.  Anything else, Mr. Gilbert, on instruction 12?

16           MR. GILBERT:  Yes.  In the paragraph beginning "as to

17   the second element" --

18           THE COURT:  Go ahead.

19           MR. GILBERT:  -- we would propose, where it says "a

20   reasonable banker" that it be edited to state "a reasonable

21   U.S.-based issuing bank," which would be consistent with your

22   preliminary instruction.

23           THE COURT:  No.  I think they understand.  I think

24   that's unnecessary surplus.

25           MR. GILBERT:  And with regard to the sentence that

L3JAWEI4ps

begins, "for example, if a perpetrator" --

       THE COURT:  Yes.

       MR. GILBERT:  -- we would request that, after the
phrase "look like the purchases of other goods," that you
include the phrase "that such misrepresentations were
transmitted to the bank."

       So, in other words, it reads, "If a perpetrator made
misrepresentations designed to make marijuana purchases look
like the purchases of other goods" --

       THE COURT:  I don't understand that.  Maybe I'm
missing the point.  Here's the full sentence.  "For example, if
a perpetrator made misrepresentations designed to make
marijuana purchases look like the purchases of other goods, the
misrepresentations would be material if, had the banker known
that the purchases were disguised and were really for
marijuana, rather than the other goods, such knowledge would be
reasonably likely to influence a reasonable banker in deciding
whether to process the purchases."

       What more do you want?

       MR. GILBERT:  That's fine, your Honor.  I would
propose one other minor change then.  Instead of "whether to
process the purchases," we would suggest "whether to authorize
the purchases."  "Process" seems vague for this purpose and
"authorize," I think, is more specific and related to the
evidence from the banks.

L3JAWEI4ps

1          THE COURT:  What does the government think about

2     "authorize"?

3          MR. FOLLY:  Your Honor, we don't have any objection

4     with the change.  We also think the language as it is is

5     adequate as well.

6          THE COURT:  All right.  So I'll change it to

7     "authorize."

8          Anything else on this charge from counsel for

9     Mr. Weigand?

10         MR. GILBERT:  No, your Honor.

11         THE COURT:  Mr. Tayback?

12         MR. TAYBACK:  Nothing that we haven't discussed.

13         THE COURT:  You covered.

14         All right.  On to instruction no. 13.

15         I will hear from the government first.

16         MR. FOLLY:  We don't have anything on instruction

17    no. 13.

18         THE COURT:  OK.  Mr. Gilbert?

19         MR. GILBERT:  We would propose that in the paragraph

20    that starts "however," in the sentence that starts "likewise"

21    and ends "he would not be guilty of this conspiracy," that you

22    add the following sentence: "Likewise, a genuine belief that

23    the scheme never exposed the victim to loss or risk of loss in

24    the first place would demonstrate a lack of fraudulent intent."

25         THE COURT:  Yes.  Let me hear that again?

1          MR. GILBERT:  "Likewise, a genuine belief that the

2     scheme never exposed the victim to loss or risk of loss in the

3     first place would demonstrate a lack of fraudulent intent."

4          THE COURT:  Hold on a minute.  Sorry.  Let me turn on

5     my LiveNotes here.  "Likewise, a genuine belief that the scheme

6     never exposed the victim to loss or risk of loss in the first

7     place would demonstrate a lack of fraudulent intent."

8          Well, putting aside I don't like it in the first

9     place, but putting aside that, what does the government think

10    about that?

11         MR. FOLLY:  Your Honor, we would oppose this addition.

12    It seems inconsistent with the case law that actual loss to the

13    bank is --

14         THE COURT:  Well, I've added, as you suggested,

15    language now about no one has to suffer loss.

16         MR. FOLLY:  Right, your Honor.

17         THE COURT:  What they're arguing here is that if you

18    believe that your deceptions would not cause a -- actually,

19    it's not the law, now that I think about it.  "If you believe

20    that your deceptions would not be" -- and I'm not going to add

21    this -- "would not be material to the bank's decision regarding

22    the transfer of money or property, then you lack fraudulent

23    intent," etc.  But that's different.  And that's what the law

24    is.  You don't have to -- it's not a defense that, I never

25    thought this would deprive him of any money.  The defense, to

L3JAWEI4ps

1    the extent it exists in this context, is, I never thought that

2    these lies would be material in influencing a reasonable banker

3    to authorize transactions of money or property.  That's all the

4    law requires.

5              So I will not give the language that was just

6    suggested.

7              MR. TAYBACK:  Your Honor, just to be clear, on behalf

8    of Mr. Akhavan we would join in the requested instruction, and

9    our citation to authority would be *United States v. Calderon*.

10             THE COURT:  *United States v. Calderon*.

11             MR. TAYBACK:  *Calderon*, C-a-l-d --

12             THE COURT:  *Calderon*?

13             MR. TAYBACK:  Yes.  944 F.3d 72, 91 (2d Cir. 2019).

14   That was in our proposed --

15             THE COURT:  Yes.  I remember that from your -- I'll

16   take a look at it again.  And if it says what you say it says,

17   then I may put in the language.

18             MR. TAYBACK:  Thank you.

19             THE COURT:  But logically I just don't understand it,

20   because what the statute requires just for bank fraud, before

21   you even get to one step removed, which is conspiracy, what the

22   bank fraud statute requires is a scheme for obtaining money or

23   property, not a scheme for someone else to lose.  The victim

24   has to be injured in some sense.  There's case law on that.

25   But the injury comes from their being deprived of material

L3JAWEI4ps

1    information regarding the transfer of money or property.

2              That's always been my understanding of the statute,

3    but I will look at *Calderon* and if I change my mind you'll see

4    it in the next version.

5              MR. GILBERT:  If I could just one additional citation

6    on the same point.

7              THE COURT:  Yes.

8              MR. GILBERT:  *United States v. Starr*, 816 F.2d at 98.

9    That's the Second Circuit, 1997.

10             THE COURT:  OK.  I will look at both of those.

11             All right.  Now, instruction no. 14 will be removed.

12   That's the overt act.  And we'll renumber all the others

13   accordingly.

14             Any objection to the venue instruction at page 22?

15   Anything from the government?

16             MR. FOLLY:  No, your Honor.

17             THE COURT:  Anything from Mr. Gilbert?

18             MR. GILBERT:  No, your Honor.

19             THE COURT:  Anything from Mr. Tayback?

20             MR. TAYBACK:  No, your Honor.

21             THE COURT:  And I'll take them collectively.  The

22   remaining two instructions on communications with the Court,

23   selection of foreperson, etc., at pages 23 and 24, anything

24   from the government?

25             MR. FOLLY:  No, your Honor.

L3JAWEI4ps

1            THE COURT:  Anything from Mr. Gilbert?

2            MR. GILBERT:  No, your Honor.

3            THE COURT:  Anything from Mr. Tayback?

4            MR. TAYBACK:  No, your Honor.

5            THE COURT:  OK.  Let's do the following.  I will make

6    my changes.  I will have my law clerk have a look at those

7    cases.  I will have my law clerk send the new draft to the

8    parties so that the defense can get them by, say, 3:30 and the

9    government by 4:59, and we will reconvene at 5 o'clock for any

10   final objection.

11           MR. FOLLY:  Good.

12           THE COURT:  Real good.  Thanks very much.

13           (Recess)

14           (Jury not present)

15           THE COURT:  OK.  So you have my latest version of the

16   charge, and this will be the final version except for any

17   changes we make now.  What I'm saying is, I will not accept any

18   changes over the weekend.  This is it.

19           By the way, I always give permission to counsel to

20   refer to my charges in closing arguments.  I know there are

21   some courts that don't allow that, but I do.  So you are free

22   to quote any part of it.  But that's another reason we need to

23   put it in final today.

24           So anything further from the government?

25           MR. FOLLY:  No, your Honor.

L3JAWEI4ps

1          THE COURT:  Anything further from Mr. Gilbert?

2          MR. GILBERT:  Yes, your Honor.  Two minor requests,

3     both on page 17.  To be consistent with the change your Honor

4     made to use the phrasing "authorize," on the second line on

5     page 17, instead of "it was induced to process."

6          THE COURT:  Yes, OK, I'll change that to "authorize."

7          MR. GILBERT:  And two lines below that, it says "in

8     making a decision concerning a bank transaction."  We would

9     request "making a decision authorizing a bank transaction."

10          THE COURT:  Where is that?  I'm sorry.

11          Oh, I see it.  Yes.

12          MR. GILBERT:  And I think that's all we have.  Thank

13     you.

14          THE COURT:  All right.  I will adopt both of those.

15          All right.  Anything, Mr. Tayback?

16          MR. TAYBACK:  The only other request is -- this is

17     really just for the purpose of making a record -- the parties

18     did previously file proposed instructions.  To the extent the

19     final instructions vary, may they be treated as objections to

20     those instructions to the extent they vary so it's preserved?

21          THE COURT:  Yes.  Absolutely.  And of course the

22     arguments you made earlier today are also preserved.  I

23     realized after I got back to chambers that some of those issues

24     had come up in connection with a motion to dismiss.  So it was

25     deja vu.  But in any event.

L3JAWEI4ps

1        MR. TAYBACK:  Thank you.

2        THE COURT:  Now, I want to go over to be sure we have

3   it absolutely right in terms of timing on Monday.  This is a

4   terrific jury, as you undoubtedly have seen.  They will be here

5   at 9:45.  Nevertheless, realistically by the time we get them

6   up it will be 9:50.  So the government will start at 9:50.

7   Now, if you run an hour and a half, you would be over by 11:20.

8   So I take it that's based on what we agreed to this morning;

9   you're only going to go an hour and a half.

10        MS. LA MORTE:  That's fine, your Honor.

11        THE COURT:  OK.  Then, although I give them a

12   15-minute break, again it's more likely to take about 20

13   minutes, maybe even 25.  So let's say the first defense

14   argument starts at 11:45.  And that would go one hour.  And

15   then a lunch break.  And then pick up the rest.  So it's 11:45

16   to 12:45, and then 1:45 to 2:15.  And the second -- I'm sorry.

17   How --

18        MR. GILBERT:  Your Honor, I thought you said an hour

19   and 15 minutes.

20        THE COURT:  An hour and 15 minutes.  Thank you very

21   much.  It would be better if we could complete it before the

22   lunch break.  So why don't I have the jury take a later lunch

23   break.  So it will be 11:45 till 1.  Then second defense will

24   be 2 to 3:15.  We'll go immediately into the rebuttal.  So

25   3:15 -- you want 45 minutes, right?

L3JAWEI4ps

1            MR. FOLLY:  Yes, your Honor.

2            THE COURT:  All right.

3            What I'm going to do is then -- I would like to ask

4       them to stay to 4 o'clock.  But the pandemic rules, are --

5            MR. TAYBACK:  Your Honor, I think in the last trial

6       you asked the jury if they could take a shorter lunch break.  I

7       think they were happy.

8            THE COURT:  Yes.  That's exactly where I'm going.  So

9       we'll take a lunch break from 1 to 1:45, have the second

10      defense submission from 1:45 to 3 o'clock, and then the

11      government's rebuttal from 3 o'clock to 3:45, so that all works

12      out.

13           All right.  Terrific.

14           MS. LA MORTE:  Your Honor, just one scheduling note.

15      I don't know obviously as well as you do what the court's

16      pandemic rules are, but our understanding is that, in the other

17      trial before Judge Castel, that, I think they closed today,

18      they're staying till 4:30.  So I don't know if they have things

19      staggered or not.  But their trial day has been 9:45 to 4:30.

20           THE COURT:  Really.

21           MS. LA MORTE:  Judge Castel.

22           THE LAW CLERK:  What surprises me about that is not

23      that they're going to 4:30 but that they're starting at 9:45

24      because I understood the point was to have the juries on the

25      various trials arriving and leaving at different times.

L3JAWEI4ps

1          MS. LA MORTE:  Maybe I have the start time wrong, but

2     they're definitely ending at 4:30.

3          THE COURT:  Oh, but no, no, no.  If they're

4     starting -- you had the option, I had the option too, to start

5     later and end later.  So there are several alternatives.  One

6     is they're starting later and therefore ending later.  The

7     second is that Judge Castel is a notorious law breaker.  And

8     the third is that no one there can keep time.

9          But anyway, I will nevertheless actually just check

10    with Judge Castel because if he knows something I don't know

11    and we have a little more freedom --

12         MS. LA MORTE:  It might add flexibility.  Even just a

13    few minutes might help.

14         THE COURT:  Anyway, at least for now, it's the

15    schedule we just all agreed to.

16         All right.  So everyone have a good weekend, and I

17    will see you at 9:45.

18         Yes.

19         MR. ARTAN:  Quick question, your Honor.  I know that

20    you omitted the requested instruction about a loss vis-a-vis

21    fraudulent intent, basically because it's not an element.  I

22    was just wondering if we have leeway to argue that point even

23    though there's no instruction.

24         THE COURT:  Well, I'm glad you raised that.  What

25    exactly are you going to argue in that regard?

1              MR. ARTAN:  Well, considering --

2              THE COURT:  I think the only argument I think you

3     could make is, one reason why the banks could care less, in

4     terms of materiality, is because they weren't losing money.  If

5     that's the argument you want to make, I would allow that, but

6     only to that extent.  What I would not allow, for example, is,

7     either directly or in veiled ways, "Ladies and gentlemen, the

8     banks couldn't lose money, so what are we doing here?"

9              MR. ARTAN:  I wasn't planning on that one, but what I

10    was hoping to get into was, why would my client have a

11    fraudulent intent if he doesn't believe that there's going to

12    be any loss?

13             THE COURT:  I'm sorry.  Hold on a minute.

14             Because he's getting money out of it.  But I don't

15    see -- no, that argument is -- I don't -- the argument is --

16             MR. ARTAN:  In other words, he --

17             THE COURT:  I don't even understand that argument,

18    forgetting about whether it's -- the claim is here that he

19    helped devise a scheme to use false -- to make it look like

20    these were not marijuana purchases.  And I haven't -- you may

21    have arguments, there's certainly arguments, that, you know, he

22    wasn't involved and so forth and a lot of witnesses didn't even

23    know who he was, etc.  But the argument that you're now making

24    is, assuming he was involved, he didn't have fraudulent intent

25    because he knew that the banks wouldn't lose any money.  That

L3JAWEI4ps

1    is, I think, contrary to the very issue we were discussing at

2    the earlier charging conference.  He was still, you know, this

3    is assuming he's involved.  Assuming he's involved, he's still

4    concealing information from the bank that he knows will be used

5    to obtain, by him and his co-conspirators and Eaze and so

6    forth, money and property.  That's all that has to be shown.

7            I do think you can make the argument on materiality.

8    But I don't think you can make the argument you just made.

9            MR. ARTAN:  Well, I'm hoping I can make a slight

10   nuance in what you're talking about, which would be that he

11   wasn't even considering the U.S. banks because it was no loss.

12           THE COURT:  But, again, this argument presupposes,

13   because you've always had your argument he wasn't involved,

14   period, but this argument is, "ladies and gentlemen, even

15   assuming you think he was involved and even if he therefore

16   made false statements or helped others make false statements

17   about what these purchases were really about, he had no intent

18   to defraud the banks because he knew that they wouldn't suffer

19   any loss."  That misconstrues the law.

20           MR. ARTAN:  No, but what I'm saying is, he wasn't even

21   thinking about the U.S. banks, which is different.

22           THE COURT:  I hear what you're saying, but I will not

23   permit that argument.

24           There you go.  You have another appeal issue.  I

25   assume you're sure you're going to get an acquittal anyway.

L3JAWEI4ps

```
 1    So -- but I do think that's not a proper argument.

 2              Now, in regard to objections during summations, here's

 3    my preference.  Obviously no one should interrupt as a regular

 4    matter.  We want, as a matter of both effectiveness and

 5    professionalism, we want the -- I guess the best way is to say

 6    summations are not similar to a presidential debate.  But if

 7    someone says something that has absolutely no basis in the

 8    evidence -- and believe it or not, I've had cases where that

 9    happened -- then you should object right then and there,

10    because I want to cure that right at the moment so the jury --

11    I can cure other things.  If someone misstates a law or

12    something like that, that can always be handled after the

13    summation is over, through a curative instruction.  But if

14    someone is saying, "and he couldn't have done this because he

15    was in Rangoon when this meeting occurred," and there's nothing

16    in the record to suggest he was in Rangoon or anywhere near

17    Rangoon, the time to object to that kind of mistake is when

18    it's said so I can tell the jury that there's no evidence of

19    that.  I don't expect that to come up, frankly, with lawyers of

20    your quality, but I just wanted to make that known.  Any other

21    objections, like to misstating the law or something like that,

22    can be saved for the end of the summation, but, you know, ask

23    for a sidebar at that point.

24              All right?

25              Anything else?
```

L3JAWEI4ps

1              MR. TAYBACK:  Nothing from Mr. Akhavan, your Honor.

2              MR. GILBERT:  No, your Honor.

3              MR. FOLLY:  No, your Honor.

4              THE COURT:  Very good.  See you all on Monday.  I know

5      you'll spend most of the weekend watching TV, but have a good

6      weekend.

7              MR. FOLLY:  Thank you, your Honor.

8              THE LAW CLERK:  Judge, what time are we starting on

9      Monday?

10             THE COURT:  I don't see any reason to have you come in

11     early unless you do.

12             Just to be sure, why don't we say 9:30.

13             (Adjourned to 9:30 a.m., March 22, 2021)

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Examination of:                              Page

3      DANIEL WHELAN

4     Direct By Ms. Clark  . . . . . . . . . . . .2330

5     Cross By Ms. Deininger . . . . . . . . . . .2346

6     Redirect By Ms. Clark  . . . . . . . . . . .2354

7     Recross By Ms. Deininger . . . . . . . . . .2355

8     JOAO PAULO REGINATTO

9     Direct By Mr. Burck  . . . . . . . . . . . .2358

10    Cross By Mr. Folly . . . . . . . . . . . . .2392

11    Redirect By Mr. Burck  . . . . . . . . . . .2402

12                    DEFENDANT EXHIBITS

13    Exhibit No.                              Received

14     10067     . . . . . . . . . . . . . . . . .2333
       10070     . . . . . . . . . . . . . . . . .2335
15     10068     . . . . . . . . . . . . . . . . .2336
       10071     . . . . . . . . . . . . . . . . .2337
16     10069     . . . . . . . . . . . . . . . . .2338
       10073, 10074 and 10075 . . . . . . . . . .2340
17     11001     . . . . . . . . . . . . . . . . .2342
       11010     . . . . . . . . . . . . . . . . .2345
18     14006, 14003, 14004, 14008, and 14005  . .2365
       11,024; 11,025; 11,026; 11,027  . . . . . .2385
19     HAX14001     . . . . . . . . . . . . . . . .2394

20

21

22

23

24

25