L32PWEI1                        Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
              Defendants.               Trial
7
     ------------------------------x
8
                                        New York, N.Y.
9
                                        March 2, 2021
10                                       9:30 a.m.

11

12   Before:

13                     HON. JED S. RAKOFF

14                                        District Judge

15                     APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand
          -and-
25   WILSON, SONSINI, GOODRICH
          Attorneys for Defendant Weigand

L32PWEI1                    Trial

```
 1   BY:  MORRIS J. FODERMAN
          KATHERINE T. MCCARTHY
 2
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 3        Attorneys for Defendant Akhavan
     BY:  WILLIAM A. BURCK
 4        CHRISTOPHER TAYBACK
          SARA CLARK
 5        MARI HENDERSON
          DEREK SHAFFER
 6        PAUL SLATTERY
          -and-
 7   ROTHKEN LAW FIRM LLP
          Attorneys for Defendant Akhavan
 8   BY:  IRA P. ROTHKEN
          JARED R. SMITH
 9
     WILMER CUTLER PICKERING HALE AND DORR LLP
10        Attorneys for Interested Party
          Bank of America, N.A.
11   BY:  JUSTIN GOODYEAR

12   NELSON MULLINS RILEY & SCARBOROUGH LLP
          Attorneys for Interested Party
13        Circle Internet Financial, LLC
     BY:  MATTHEW G. LINDENBAUM
14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Please be seated.  Okay.  We have a number

3   of things to take up.  First, my law clerk received a message

4   from juror No. 16.  You may recall that is the woman who had

5   said that she was the sole income for her household, but that

6   she felt she could work early in the morning and late in the

7   afternoon and in the evening; so it wouldn't be a problem for

8   her to serve.  But she's had second thoughts about that; so we

9   will take that up with her in a few minutes, as soon as she

10  arrives.

11         Then my law clerk tells me that the parties e-mailed

12  him about various evidentiary disputes that are likely to come

13  up today.  I thank you for doing that.  First, the government

14  intends to introduce through its first witness, Michael

15  Tassone, certain e-mails from the ProtonMail e-mail account

16  that allegedly was used by Weigand, and this was one of the

17  motions in limine that I had reserved on.

18         The defendants argue that the government has not shown

19  these were e-mails to and from Weigand.  Most of the e-mails

20  involving this e-mail address are signed "EUP" or

21  "EUprocessing," somewhere drafted by someone named Andreas.

22  Only three exchanges reference a Ruben.  The defendants argue

23  that this evidence is unfairly prejudicial because, among other

24  things, it may lead the jury into believing, without sufficient

25  evidence, that Mr. Weigand sent or received all of these

L32PWEI1                        Trial

1    e-mails.

2            So let me hear the government on that.

3            MS. LA MORTE:  Yes, your Honor.  I have a few

4    responses to that.  The first response, your Honor --

5            THE COURT:  I'm sorry, we can continue because it only

6    relates to Mr. Weigand at the moment, but we need to bring in

7    the other defendant.  Thank you.

8            Yes.

9            MS. LA MORTE:  Your Honor, the first point that the

10   government wants to make, and I have several points to make, is

11   that the government doesn't have to show that Ruben,

12   Mr. Weigand, was the user or the controller of this account for

13   the e-mail to and from and including EUprocessing.com to come

14   in.

15           And just to take a step back for the Court, as the

16   Court is aware from the filings and the statements in this

17   case, in the 2016 and 2019 period, there were two primary

18   processors at play, one was Clearsettle and one was

19   EUprocessing.  And there's going to be witness testimony in

20   this case from several witnesses that both of those entities

21   were controlled by Ray Akhavan.

22           And within Eaze, the company, there's going to be

23   testimony that employees within the company referred to

24   Clearsettle as "Clearsettle" and to the EUprocessor as "EUP" or

25   "EUprocessing."

1          Now, the government has identified EUprocessing as a

2     co-conspirator in a bill of particulars, which has been

3     furnished to the defendants.  And the whole point of setting up

4     the EUprocessing.com account, and there will be testimony on

5     this, is in furtherance of the scheme.  We provided your law

6     clerk --

7          THE COURT:  In short, you're saying regardless of

8     whether or not it came from Mr. Weigand, these are statements

9     of a co-conspirator in furtherance of a conspiracy?

10          MS. LA MORTE:  Yes, your Honor.  And there will be

11     witness testimony in the case to help corroborate that.  But in

12     addition, your Honor, we do have evidence and testimony that

13     goes to show separately that Ruben Weigand was the individual

14     that controlled this account, even though, at times, members of

15     his organization, such as Andreas may have used the account.

16          One of our cooperating witnesses is expected to

17     testify that Ruben directed him to send certain documents to

18     the EUprocessing.com address.  That witness will further

19     testify that whenever he wanted to reach Mr. Weigand via

20     e-mail, he would do so at the EUprocessing.com address, and as

21     the defense has noted, many of the e-mails are signed "EUP" --

22          THE DEPUTY CLERK:  Jury entering the courtroom.

23          THE COURT:  We'll take up the matter of the juror at

24     the sidebar in the other adjoining room.

25          (Continued on next page)

1           (At the side bar)

2           THE COURT:  Come on in.

3           THE DEPUTY CLERK:  This is juror No. 16.  Only one

4      attorney from each side is supposed to be in this room, and

5      also one attorney for each entity.  There are too many people.

6           MR. GILBERT:  May we have our client in as well, your

7      Honor?

8           THE COURT:  Yes, but as a regular matter on sidebars

9      that will just be dealing with true and legal issues, no

10     clients.  It just complicates matters, but if they're here,

11     they're here; so....

12          MS. LA MORTE:  Your Honor, would like some of us to

13     leave?

14          THE COURT:  No, that's okay.  You know, space yourself

15     as best you can.

16          THE DEPUTY CLERK:  Six feet away.

17          THE COURT:  Being only five-foot-six myself, I have no

18     idea what six feet looks like.

19          MR. GILBERT:  I wondered myself.

20          MS. LA MORTE:  Being only five feet --

21          THE COURT:  All right.  So --

22          THE DEPUTY CLERK:  There are too many people in that

23     room right now.

24          THE COURT:  So why don't you fellows stay there.  You

25     can hear from there.

1            Okay.  So I heard you had a problem?  What's the

2       problem?

3            JUROR:  Yes, your Honor.  So apologies, but yesterday

4       when you were questioning my occupation and the flexibility, I

5       realized right after, and I let the clerk with the microphone

6       know.  And I raised my hand that the financial hardship that a

7       three-week trial would prevent, there is no flexibility.  It is

8       a 9:00 to 5:00 contract with Verizon; so I'm not able to be as

9       flexible as initially the --

10           THE COURT:  Yes, I wish you would have told us when we

11      were first because now, of course, we have -- we could have

12      replaced you right away.

13           JUROR:  No, and I did -- excuse me.

14           THE COURT:  You indicated to someone?

15           THE DEPUTY CLERK:  So I indicated right away to the

16      clerk with the microphone, and I didn't even get a chance to

17      finish whether I'm from Manhattan or single; so it just kind of

18      quickly happened.  And right afterwards, I said to him that

19      there was further details that I think would be important to

20      the matter.  So apologies, your Honor.

21           THE COURT:  Yes.

22           JUROR:  But I did try.

23           THE COURT:  You have a -- normally, I would have

24      excused you without any question, and the problem now is, of

25      course, we can't replace you because the jury's been selected,

1    but what -- you say you have a 9:00 to 5:00 contract with

2    Verizon, what do you mean by that?

3             JUROR:  Yes, so when you asked if it was a remote

4    position, so it's not in an office at the moment due to Covid.

5    So you did ask if it was remote, and I said yes.  And then you

6    did question if there might be flexibility, and a quick moment

7    I thought, yes.  But then right as I, you know continued, I

8    realized the financial hardship that that would place.

9             THE COURT:  What's the financial hardship?

10            JUROR:  So the $50 a day would not be able to provide

11   me to pay my rent or student loans that are not federal loans.

12            THE COURT:  No, no, I understand that, but tell me

13   more about what you do for a living.

14            JUROR:  So I'm a web designer, but I supervise a team;

15   so it is 9:00 to 5:00 versus -- you know, freelance web design

16   would be more flexible that I could work weekends or after

17   hours, but that's not the case.

18            THE COURT:  Because?  Just because of that contract

19   with Verizon?

20            JUROR:  Right, because it's a 9:00 to 5:00 position,

21   and not being able to be there would disrupt.

22            THE COURT:  All right.  Do counsel for any of the

23   parties want to put any questions to the witness, to the juror?

24            MR. TAYBACK:  Not on behalf of Mr. Akhavan.

25            MR. GILBERT:  No, your Honor, on behalf of

1    Mr. Weigand.

2              THE COURT:  Very good.  Why don't you go back into the

3    courtroom.  We'll be with you.  I'll discuss it with the

4    attorneys, and we'll give you a decision very shortly.

5              JUROR:  Okay.  I appreciate your time.  Thank you.

6              THE DEPUTY CLERK:  In the jury box, Judge?

7              THE COURT:  Yes.

8              (Juror not present)

9              THE COURT:  So I'm always reluctant to excuse a juror

10   once we have a jury in place because you never know what's

11   going to happen.  Nevertheless, we have four alternates.  She's

12   No. 16, the very last; so if we had to excuse anyone, she's a

13   good candidate.  So I'm inclined to excuse her, but let me hear

14   if there's anyone that disagrees with that?

15             MS. LA MORTE:  No, your Honor, not from the

16   government.

17             MR. TAYBACK:  No, not from Mr. Akhavan.

18             MR. GILBERT:  No, your Honor.

19             THE COURT:  All right.  Let's go back.

20             (Continued on next page)

21

22

23

24

25

L32PWEI1                      Trial

1          (In open court)

2          THE COURT:  All right.  Well, you'll be delighted to

3     know that the jury of lawyers have reached a verdict, and they

4     all agree that you should be excused.  So anyway, thank you for

5     bringing that to our attention.  I'm sorry that we didn't work

6     this out yesterday.

7          Anyway, when you go back to the jury room, just get

8     your stuff and leave.  Don't get into any conversation.  I'll

9     tell the jury that something unexpected came up, and you had to

10    be excused.  All right?

11         JUROR:  I appreciate it.  Thank you, your Honor.

12         THE DEPUTY CLERK:  Joe Dornley, juror No. 13, takes a

13    train from White Plains.  He called me, and he said the train

14    was delayed and he won't get to Grand Central until 9:30.

15         THE COURT:  Okay.  So we have other things to discuss.

16         THE DEPUTY CLERK:  Okay, very good.

17         JUROR:  Thank you, your Honor.

18         THE COURT:  Linda, let us know as soon as all of the

19    jurors are in.

20         THE DEPUTY CLERK:  Will do.

21         (Juror excused)

22         THE COURT:  Was there anything else the government

23    wanted to say on those exhibits?

24         MS. LA MORTE:  No, other than they're admissible as

25    statements of a co-conspirator, notwithstanding that whether or

1    not the government directly connects them to Ruben Weigand, but

2    in any event, the government intends to connect them to Ruben

3    Weigand.  And the e-mails are in furtherance of the scheme.

4            The only thing I would add is the government's

5    intention.  There are a number of these e-mails in this motion

6    in limine, and with respect to the first witness, and I believe

7    many of the other witnesses, the foundation is the same.  And

8    so the government is intending to move them in en mass, you

9    know, all at once.

10           THE COURT:  I will deal with that when you move them.

11           MS. LA MORTE:  Okay.

12           THE COURT:  But assuming -- well, let me hear from

13   defense counsel.

14           MR. GILBERT:  Thank you, your Honor.  Well, first,

15   with regard to the co-conspirator statement --

16           THE COURT:  Yes, you need to get a little bit closer

17   to the microphone.

18           MR. GILBERT:  If I understand the government's

19   position, I don't see how an e-mail address, which is what EUP

20   is, could possibly be a co-conspirator.

21           THE COURT:  Well, an e-mail address is an instrument

22   of either a person or an entity, and so if that person or

23   entity is a co-conspirator, then the e-mail address is an agent

24   of the co-conspirator.

25           MR. GILBERT:  The government hasn't produced any

metadata or any evidence that would demonstrate who it was

communicating with on the EUP e-mail address at any given time

or at any time at all.  And so in the absence of --

THE COURT:  No, no.  But maybe I'm misunderstanding

the government's point, but as I understand it, this is an

e-mail that was associated with EUprocessing?  And EUprocessing

is allegedly a co-conspirator.

MR. GILBERT:  Exactly.  I believe that's what the

government's articulating.  I don't understand how EUprocessing

could possibly be a co-conspirator because EUprocessing is an

e-mail address.  It isn't an entity.  It isn't a party.  It

isn't a person.

THE COURT:  When you say it's an e-mail address, what

function did it serve?

MR. GILBERT:  My understanding is that it was an

e-mail address that --

THE COURT:  I mean, it wasn't just out there in the

ether.

MR. GILBERT:  Right.  There are over 200 EUprocessing

e-mails that the government has listed on its exhibit list, and

the majority of them, at least on the face of them, suggest

that there were communications between someone named Andreas --

THE COURT:  No, no.  Excuse me.  That's important, but

what is your understanding, if you have one, as to what the

purpose of EUprocessing e-mail address was?

1          MR. GILBERT:  There are communications that purport to

2     be from EUprocessing that -- in which there are discussions

3     about merchant accounts related to processing these on the face

4     of them.  We don't disagree with that itself.

5          THE COURT:  All right.

6          MR. GILBERT:  But the concern, among others, is that,

7     in the absence of any evidence as to who was communicating

8     about the merchant account through this e-mail address and that

9     the e-mail address -- the exhibits that are from EUP, on the

10    face of them, demonstrate that there are multiple people

11    communicating at the e-mail --

12         THE COURT:  I guess maybe I'm still missing your

13    point.  Let's say, in my hypothetical, company X is a

14    co-conspirator and they have an e-mail address, and it is used

15    by various people to further the activities of company X, which

16    are alleged, in my hypothetical, to be unlawful.  Why doesn't

17    that clearly fit within the co-conspirator section?

18         MR. GILBERT:  If there was a company, let's say

19    hypothetically Hewlett Packard because I see the name there,

20    was listed as a co-conspirator, and there are e-mails that are

21    from the Hewlett Packard e-mail address, that would be one

22    thing.  That's not what we have here.  The EUP is not a Hewlett

23    Packard.  It's not a company.  It's not an entity.

24         THE COURT:  Who set it up?  Maybe I should ask the

25    government?

1          MR. GILBERT:  I don't believe that --

2          THE COURT:  Let me ask them.

3          MS. LA MORTE:  It's certainly not, as far as we are

4     aware, our knowledge, that it's a formally incorporated

5     company.  It's basically a criminal organization, your Honor.

6          THE COURT:  No.

7          MS. LA MORTE:  And there is case law --

8          THE COURT:  Wait a minute.

9          MS. LA MORTE:  It's Mitchum Weigand --

10         THE COURT:  Who set it up was my question.

11         MS. LA MORTE:  Who set it up?  Someone -- the e-mail

12    address or the organization?

13         THE COURT:  Well, let's -- when you say organization,

14    what do you mean?

15         MS. LA MORTE:  I'm referring to Mr. Weigand and his

16    agents.

17         THE COURT:  So you think Mr. Weigand created

18    EUprocessing?

19         MS. LA MORTE:  I'm not saying Mr. Weigand created

20    EUprocessing.  I'm saying EUprocessing.com was an e-mail that

21    was used by Mr. Weigand and his agents.

22         THE COURT:  I'm sorry?

23         MS. LA MORTE:  I'm sorry, your Honor.  This feedback

24    is --

25         THE COURT:  Yes.

L32PWEI1                         Trial

1          MS. LA MORTE:  Our position, your Honor, is that

2     EUprocessing.com is an e-mail address that was created

3     specifically for this scheme for use by Mr. Weigand and his

4     agents to further the scheme.

5          THE COURT:  Okay.  So now back to Mr. Gilbert.

6     Assuming the government can introduce evidence to that effect,

7     why isn't that -- Weigand then becomes statements of

8     co-conspirators?

9          MR. GILBERT:  If I understand the government

10    correctly, I believe what they were saying is the way they

11    intend to introduce such evidence is to have the government's

12    cooperating witness testify that he sent communications to this

13    e-mail address, and I don't think that makes the connection

14    because I don't believe you will see any evidence that

15    Mr. Weigand then engaged in a communication with this person;

16    so --

17         THE COURT:  Well, that's a different question.  So

18    you're saying that while, hypothetically -- though you are not

19    conceding it, but it seems to me the government is well on its

20    way to establishing -- that this, the statements made by those

21    who set up and use this e-mail address, where a statement is

22    spoken of co-conspirators, that doesn't make the statements of

23    people from outside who made statements to the e-mail address,

24    the same as the co-conspirator; now, that's the point you're

25    making, yes?

1          MR. GILBERT:  Well, I don't believe the government

2     will be able to establish that any statement on its EUP address

3     was a statement of a co-conspirator because it --

4          THE COURT:  Well, I understand that's your position,

5     but I thought you were making a separate point now, which I

6     understood to be that, even assuming arguendo and contrary to

7     your view, that statements made on EUprocessing by people who

8     were associated with EUprocessing in the scheme as alleged here

9     might -- assuming they are statements of co-conspirators, that

10    that doesn't make a statement of an outsider that goes to the

11    e-mail address, the statement of a co-conspirator?  Isn't that

12    your fallback position?

13         MR. GILBERT:  That is one of them.

14         THE COURT:  Okay.

15         MR. GILBERT:  I can give you another one.

16         THE COURT:  So what about that?

17         MS. LA MORTE:  Your Honor, that might be a

18    case-by-case determination in terms of e-mails or messages that

19    are sent to EUprocessing.  I imagine some of them would be for

20    context, many of them are going to be of co-conspirators.

21         THE COURT:  Excuse me.

22         MS. LA MORTE:  If not all --

23         THE COURT:  Can you give me -- I have a few exhibits

24    that were apparently sent to my --

25         MS. LA MORTE:  Yes.

1            THE COURT:  Pick one and tell me what the foundation

2    you will lay for its admissibility.

3            MR. GILBERT:  Apologies, your Honor.  Can I interrupt

4    on a slightly different issue?  We have some concerns that the

5    first witness for the government may be in the courtroom.  We

6    just want to confirm that we're wrong about that.

7            MS. LA MORTE:  No.

8            THE COURT:  Is he here?  He shouldn't be here.

9            MS. LA MORTE:  He is here, your Honor, but he's not in

10   the courtroom.

11           MS. DEININGER:  Your Honor, the witness is present in

12   the courthouse.  He's not in the courtroom.  He's waiting in a

13   conference room outside.

14           THE COURT:  That's fine.

15           MR. GILBERT:  Okay.

16           THE COURT:  So he's not in the courtroom, that's all

17   we care about.

18           MS. DEININGER:  That's correct.

19           THE COURT:  Go ahead.

20           MS. LA MORTE:  All right.  Your Honor, I'm just

21   looking at the e-mail I sent your clerk this morning to find an

22   example.

23           THE COURT:  So I have here, it's Exhibit --

24           MS. LA MORTE:  I mean, we can start with 566 is one of

25   the ones I sent you.

L32PWEI1                     Trial

1             THE COURT:  All right.  Let's start with 566.  So this

2    is an e-mail from EUprocessing.

3             MS. LA MORTE:  So they're actually -- on this one,

4    they're both from EUprocessing.  The bottom e-mail is a message

5    from EUprocessing to Michael Tassone, who is the government's

6    first witness, as well as John Wang, who is also on the

7    government's witness list.

8             It says:  Hello, Michael.  Hello, John.  A new

9    processing channel has been opened by the bank today.  The

10   accounts are set up, account names.  Please use the account as

11   an extension for Grieve Goddess.  In the e-mail it is spelled

12   G-o-d-d-n-e-s-s.  And then there's a chart below.

13            And what we see on this chart is a marijuana

14   dispensary name, all the way in the left-hand column.  These

15   are the dispensaries that advertise their products on the Eaze

16   platform.  You have a site address, which is the fake website.

17            THE COURT:  So --

18            MS. LA MORTE:  I'm sorry.

19            THE COURT:  So who do you contend this e-mail is from?

20   It says EUP.

21            MS. LA MORTE:  Two things, your Honor.  It is from the

22   EUprocessing organization, which is a co-conspirator identified

23   in this case.

24            THE COURT:  All right.  So this doesn't fall into the

25   category that I was asking about, which was e-mails from

L32PWEI1                    Trial

1   outsiders to the e-mail.  This is from the EUprocessing people?

2               MS. LA MORTE:  Correct.  Let me --

3               THE COURT:  Okay.  So I don't have any problems with

4   that.  The defense has their objections.  I'm overruling those

5   objections subject to, of course, laying a proper foundation

6   through the witness, but I thought there were some e-mails that

7   defense counsel has also objected to that came from other

8   people to EUP.

9               MS. LA MORTE:  That was not identified with

10  particularity from the government, but I have an example that I

11  sent to the Court, where there is a response sent to

12  EUprocessing.  If you want to --

13              THE COURT:  Yes, so if an e-mail that comes in from

14  the third party, who is not a co-conspirator, it is still

15  admissible if there's a response from the co-conspirator.

16              MS. LA MORTE:  Correct.

17              THE COURT:  Yes, thank you.  Good to know.

18              MS. LA MORTE:  You know better than I, your Honor.

19  Far better, but yes.  I didn't mean it that way.

20              THE COURT:  The objections are overruled.

21              MR. GILBERT:  If I may, your Honor, briefly be heard?

22              THE COURT:  Yes.

23              MR. GILBERT:  In addition to our -- to the hearsay

24  objection, we have a 403 objection, and I think our discussion

25  this morning really makes very clear how confusing and likely

L32PWEI1                      Trial

1    it is that this will mislead the jury and ask them or require

2    them to speculate about who it is that actually communicated,

3    and it's a critical point.

4            THE COURT:  Well, I think I have to hear the testimony

5    of the witness before I can rule on the 403, but at least

6    tentatively I don't see it as a 403 problem.  Since there are a

7    whole bunch of these e-mails, we can confront the 403 issue on

8    the first or second one that comes up, and then if I rule in

9    your favor, the others will not come in, and if I rule against

10   you, the others probably will.  All right.

11           MR. TAYBACK:  Your Honor, so the record is clear,

12   Mr. Akhavan joins in those objections, although Mr. Gilbert

13   argued them.

14           THE COURT:  Okay, duly noted.  Why don't we just

15   assume, to make things easy, that any objection made by either

16   defendant is joined in by the other defendant automatically; so

17   you don't have to say anything on the record.  If there's

18   ever -- which I doubt that there will ever be -- an objection

19   made by one defendant and the other defendant does not want to

20   join in, then you have to tell me, but other than that, it will

21   just be assumed.

22           MR. TAYBACK:  Thank you, your Honor.

23           MR. GILBERT:  Thank you.

24           THE COURT:  All right.

25           MS. LA MORTE:  There was one additional document the

1   defense raised an objection to that is not an EUprocessing

2   e-mail.

3          THE COURT:  I'm sorry?

4          MS. LA MORTE:  There is one other -- I felt like I was

5   doing much better yesterday with my volume.  There was one

6   other document that the defense raised an objection to that the

7   government intended to admit with this witness.

8          THE COURT:  That's 679?

9          MS. LA MORTE:  Yes, your Honor.

10         THE COURT:  Let me pull that out.  Hang on.  All

11  right.  So this is an e-mail from Michael Tassone, who is --

12         MS. LA MORTE:  Your Honor, it's to Michael Tassone,

13  who is the government's first witness.

14         THE COURT:  I'm sorry, to Michael?

15         MS. LA MORTE:  Tassone.

16         THE COURT:  From Stephen Pearce.  Who's Stephen

17  Pearce?

18         MS. LA MORTE:  He is the CEO and owner of a marijuana

19  dispensary, at one point, called Wildflower.

20         THE COURT:  Okay.  And what's the basis for

21  admissibility?

22         MS. LA MORTE:  Co-conspirators' statement in

23  furtherance of --

24         THE COURT:  Who is the co-conspirator?

25         MS. LA MORTE:  Stephen Pearce, the owner of

L32PWEI1                     Trial

1    Wildflower.

2              THE COURT:  So assuming that he is a co-conspirator, I

3    think -- any other objection that's being made because that

4    contrasts with the defense counsel.

5              MR. GILBERT:  Our objection is hearsay and relevance,

6    and if I may address the co-conspirator?

7              THE COURT:  Hearsay -- assuming they establish enough

8    to show that he's a co-conspirator, is there any other

9    objection you're raising?

10             MR. GILBERT:  Relevance.

11             THE COURT:  Yes.  Okay.  All right.  So subject to

12   foundation being laid, that objection is overruled.  All right.

13             MR. GILBERT:  May I be heard?  May I be heard briefly

14   on the co-conspirator issue, your Honor?

15             THE COURT:  Sure.

16             MR. GILBERT:  So we received a list literally of 146

17   individuals from the government that they notified us, pursuant

18   to your order, were co-conspirators in this scheme.

19   Mr. Stephen Pearce is not on that list.

20             MS. LA MORTE:  Wildflower, your Honor, is on that list

21   as an entity that is a co-conspirator.  Stephen Pearce is the

22   CEO and owner of Wildflower.  In November the government

23   produced an exhibit list that included documentation that

24   showed that Stephen Pearce is the owner of Wildflower.

25   Obviously, entities as to individuals, this is the highest

1   member of the entity.

2          MR. GILBERT:  The list, in addition to 146

3   individuals, also included at least 50 entities, and many of

4   the individuals who were associated with entities were on the

5   list.  Mr. Pearce, again, was not on it.

6          THE COURT:  First of all, on its face, it seems to be

7   at least in part being stated in his capacity as CEO of

8   Wildflower.  Second of all, on its face, he expresses an

9   effective identity between Wildflower and himself, at least

10  with respect to matters in this matter.  So I think there's no

11  surprise that he would be considered a co-conspirator.

12         MR. GILBERT:  He -- I'm sorry.  He, also in the

13  e-mail, your Honor, recounts statements from a bank manager,

14  who is presumably not a co-conspirator and that -- those

15  statements do not fall within the objection.

16         THE COURT:  I'm sorry, what are you referring to?

17         MR. GILBERT:  In the first paragraph he says:  The

18  last bank closer, the manager, came right out and said we

19  cannot do any business with Eaze.

20         THE COURT:  So that's why I asked you if you had any

21  other objection because I thought you might have an objection

22  to that.  That is hearsay within the hearsay.  So the

23  co-conspirator hearsay exception doesn't cover that, but I take

24  it it's not being offered for its truth, but to explain what

25  follows in the rest of the letter.  So that objection, while it

1    is a separate objection, is overruled.

2              MR. GILBERT:  The same objection applies to the next

3    paragraph, where he says:  I've spoken with people with

4    supposed banking solutions.

5              THE COURT:  But all of this is just to explain why he

6    is saying that he either is going to take action or how he

7    wants them to indicate how they want to proceed.  None of it is

8    being offered for its truth.  It's just to explain what follows

9    from the rest of the letter.  Overruled.

10             Jimmy, what's the story on the jury?

11             THE LAW CLERK:  I have not been informed that the jury

12   are all here yet.

13             THE COURT:  Why don't you call down?

14             THE LAW CLERK:  Will do.

15             THE COURT:  Okay.  I'm a little disappointed to go

16   forward without the juror.  The juror said he was going to be

17   in Grand Central by 9:30.  That would have put them here by

18   now.

19             Anything else we need to take up?

20             MR. FOLLY:  Your Honor, there is one additional issue

21   with respect to an exhibit that we intended to offer during the

22   second witness' testimony today, who is an employee at

23   MasterCard.

24             THE COURT:  All right.  Hang on a minute.  Are they

25   being offered as a business record?

L32PWEI1                    Trial

1          MR. FOLLY:  Your Honor, if it would be helpful, I can

2     hand you the exhibit here for the Court's reference.

3          THE COURT:  Okay.  For the record, these are

4     Government Exhibits 2309 and 2313.

5          MR. GILBERT:  With the Court's permission, my

6     colleague, Shriram Harid, will come up.

7          THE COURT:  Okay.  All right.  So go ahead.

8          MR. FOLLY:  Thank you, your Honor.  These records the

9     government is intending to offer them pursuant to the

10    declaration of the custodians of records as business records.

11    And, your Honor, there's no real dispute that these are

12    authentic business records that were kept in the ordinary

13    course of MasterCard's business.  I believe the real focus of

14    the dispute is the contents of these e-mails.

15         THE COURT:  All right.  Well, let me hear from defense

16    counsel.

17         MR. BURCK:  Thank you, your Honor.  Yes, there is no

18    dispute from us that these are authentic.  The issue for us,

19    your Honor, is really twofold.  One has to do with the content

20    of the documents and the origins of the documents, and the

21    second has to do with the witness that the government intends

22    to put up there to get these documents in.

23         The first issue, your Honor, is that this is

24    effectively -- we think, although we haven't been told this by

25    the government -- we believe this is effective as some kind of

1  compliance file.

2          THE COURT:  I'm sorry, you need to --

3          MR. BURCK:  I'm sorry.  Can you hear me now?

4          THE COURT:  Yes.

5          MR. BURCK:  We believe this is some kind of compliance

6  file --

7          THE COURT:  He just faded.

8          MR. BURCK:  So, your Honor, I was saying that we have

9  two objections.  One is based on the content of the file that

10 the government intends to introduce, not the authenticity, we

11 don't contest that; and the second is the witness who they

12 intend to use to get this evidence into before the jury.

13         On the first issue, your Honor --

14         THE COURT:  As to the second issue, why isn't that a

15 matter for voir dire?

16         MR. BURCK:  Your Honor, it very well might be.  We

17 wanted to raise it now because this witness, who they intend to

18 offer, he's not on any of the documents.  He's not on any

19 e-mails.  He's not copied.  There's no evidence he saw any of

20 this.  In fact, in the --

21         THE COURT:  But they're being offered as business

22 records.  Typically a business record witness is someone who is

23 a custodian of records or has similar kind of responsibilities.

24         MR. BURCK:  Your Honor, we understand that the

25 government intends to have this witness explain these

L32PWEI1                    Trial

1   documents.  He's not a custodian -- they haven't told us he's a

2   custodian, he's simply a custodian of record to offer these in,

3   We understand they intend to have him go through the documents

4   almost like a summary witness and explain what these documents

5   are.

6          The problem with that, your Honor, is that he has no,

7   by his own admission, your Honor, has no actual personal

8   knowledge of this investigation.  He told the government on

9   several occasions in interviews that he was not really involved

10  in the investigation that is --

11          THE COURT:  Okay.  So I'm still unclear what the

12  nature of your objections are.  Are you objecting -- forget

13  about the contents for the moment.  Are you objecting to

14  whether they are business records?

15          MR. BURCK:  Yes, we are, your Honor.  We're saying

16  they are not business records.

17          THE COURT:  On the ground that you think they're not

18  business records, or on the ground that you think this witness

19  cannot testify to the business records?

20          MR. BURCK:  I would say the first, your Honor.  The

21  reason why it's the first, this goes to the content, your

22  Honor.

23          THE COURT:  Okay.  So you think they're not business

24  records because?

25          MR. BURCK:  Because, your Honor, again, we're not

1  exactly sure what the government is going to allege this came

2  from.  But we understand from the discovery that this

3  investigation, the fact that there was an internal review that

4  was done by MasterCard, resulted not from normal business

5  activity, not from MasterCard's activity of going out and

6  searching or trying to proactively prevent or react to

7  violations, but instead came from an employee of MasterCard,

8  who doesn't work in compliance, has nothing to do with

9  compliance, just happens to work in another part of MasterCard,

10 who was, for some reason, buying marijuana off of Eaze and saw

11 that he could buy it with MasterCard and then decided to tell

12 people inside MasterCard, hey, this seems weird; we shouldn't

13 be able -- people shouldn't be able to do this.  And then it's

14 reported up into the compliance system.

15        And so our view, your Honor, is that that origin and

16 where it all leads is not normal, in fact, activity.  It's not

17 as if the compliance department itself discovered this.

18        THE COURT:  Let me hear from the government.

19        MR. FOLLY:  Your Honor, the origin e-mail that defense

20 counsel was referring to was what prompted the internal

21 investigation.  There was an employee at MasterCard who

22 discovered that --

23        THE COURT:  I'm sorry, let me interrupt you.  The jury

24 is all here; so I will tell my law clerk to ask that they be

25 brought up, but while we wait, we'll continue the discussion.

1          MR. FOLLY:  Thank you, your Honor.  There was an

2     employee at MasterCard who discovered that -- basically

3     discovered this very scheme.  He discovered that Eaze

4     transactions were being disguised through fake merchants, and

5     he brought that discovery to the attention of the compliance

6     group at MasterCard, who in turn took steps to shut the scheme

7     down.

8          And the origin e-mail, it's not being offered for its

9     truth.  It's being offered to show the effect on the listener.

10    Here, that was MasterCard's compliance department.  In the

11    defense's opening yesterday, they put --

12         THE COURT:  Okay.  So you're saying this is to rebut

13    their immateriality argument?

14         MR. FOLLY:  It's directly to rebut their immateriality

15    argument and also to help the government establish materiality.

16         It shows that when MasterCard learned about this very

17    scheme on trial here, that they took direct steps to respond to

18    that scheme, to gather information and to eventually shut down

19    those merchants.  And that's directly relevant for a

20    non-hearsay purpose.

21         THE COURT:  Okay.  Well, if it's a non-hearsay purpose

22    that you indicated, I don't see any objection.

23         MR. BURCK:  Well, your Honor, we also think, and I

24    wanted -- because I know the jury is coming up, your Honor.  We

25    think it's important that this witness is not an appropriate

1     witness to discuss this because the witness is -- he's a

2     senior-vice-president level.  I think compliance, to some

3     extent, reports to him.

4             There is zero evidence and, in fact, again, his

5     admission that he had nothing to do with the investigation.  So

6     to have these documents come in and have this witness

7     effectively describe an investigation that he had nothing to do

8     with, that he's not copied on, that he has no involvement in

9     would be very prejudicial to the defendants.

10            THE COURT:  All right.  So let me get back to the

11    government.  So the defense says, assuming you're proffer that

12    this is to show that this is how MasterCard reacted, in

13    contrast to the way the defense have argued they would have

14    reacted, that's all fine -- that is not to say it's all fine,

15    but assuming that's all fine -- this witness can't testify

16    about that.

17            MR. FOLLY:  This witness can testify in two primary

18    ways.  The first way is the fact is that he does have direct

19    personal knowledge of the general investigation.  He was

20    informed about it in realtime.  Was aware of the investigation

21    and the general steps that were taken to terminate these

22    merchants.  So that's the first part of it.

23            THE COURT:  Informed about it in realtime, that sounds

24    like hearsay to me.

25            MR. FOLLY:  Your Honor, it's not hearsay, again, for

1   the same reason we've discussed, which is that it's going to

2   MasterCard's response.

3           THE COURT:  I know, but his knowledge that that was

4   MasterCard's response comes through hearsay.  You are offering

5   it for the truth that he was so informed.

6           MR. FOLLY:  Your Honor, I think he learned about this

7   in his capacity as the person who oversaw this very group.

8   Your Honor, but there's a second reason that's relevant --

9           THE COURT:  That may or may not solve your problem,

10  but it doesn't make it any less hearsay.  There may be an

11  exception, but it doesn't make it any less hearsay.

12          MR. FOLLY:  Your Honor, I understand your point, your

13  Honor.  The second point, however, is that this witness does

14  have testimony that is relevant and important about these very

15  documents.  He can identify the people that are involved in

16  these e-mail communications.  He can help the jury understand

17  certain terminology that was used at MasterCard that is

18  reflected in these communications, and for that reason, it's

19  fully appropriate for the government to ask him questions about

20  evidence that will be in evidence at that time.

21          THE COURT:  I think the only objection I'm hearing so

22  far that may have some validity, though I'm not sure, relates

23  to how he learned about all of this.  That's different from him

24  saying, oh, yeah, that's a term we use every day, X or Y or

25  something like that he can testify to as being part of the

1    business without it being a hearsay problem.

2              But if he's saying I learned that such and such was

3    done by MasterCard, I'm not sure that you can get that in

4    without a hearsay objection.  That sounds like hearsay to me.

5              MR. FOLLY:  Your Honor, I think one reason it still

6    would be admissible, again, is that there is a challenge to the

7    state of mind of people at MasterCard in this case.  There is

8    an assertion that they wanted these transactions to continue.

9    If a MasterCard employee is told about something, and then he

10   does not, for example, allow these transactions to keep going

11   on, as the head of compliance, that's relevant, your Honor.

12             THE COURT:  All right.  I'm going to allow him to

13   testify because it sounds like, in any event, he has other

14   things to say, but we will take it -- as we get it to these

15   documents, we'll take it one step at a time, and you'll make an

16   objection and I'll rule.

17             MR. BURCK:  Thank you, your Honor.

18             THE COURT:  All right.  All right.  The jury is coming

19   up.

20             MS. LA MORTE:  Your Honor, may I put -- I have a

21   binder of exhibits for the witness, as well as a thumb drive

22   that he initialed.  Can I put that -- or how shall I handle

23   that?

24             THE COURT:  Whatever way you like.

25             MS. LA MORTE:  All right.  I'm going to put that up

L32PWEI1                          Trial

1    there.

2                THE DEPUTY CLERK:  Jury entering the courtroom.

3                (Jury present)

4                THE COURT:  All right.  Please be seated.  So good

5    morning, ladies and gentlemen, and I know one of you had a

6    train delay that was not that person's fault.  Thank you very

7    much for letting us know about that, and those things do

8    happen, but obviously, we do try to avoid that as much as we

9    can.

10               I can't help but mentioning, even though it has

11   nothing to do with anything, that today I'm celebrating my 25th

12   anniversary as a federal judge.  Eventually, I'll learn how to

13   do it right.

14               (Applause)

15               So anyway, now that I got that off my chest, I'm ready

16   to begin.  So please swear in the first witness.

17               MS. LA MORTE:  The government calls Michael Tassone.

18               One preliminary matter, your Honor, from my colleague.

19   We do need a sidebar.

20               THE COURT:  Okay.

21               (Continued on next page)

22

23

24

25

1             (At the side bar)

2             THE COURT:  So what's the problem?

3             MS. LA MORTE:  The immunity order, your Honor?

4    Apologies.

5             THE COURT:  So state your name for the record.

6             THE WITNESS:  Michael Tassone.

7             THE COURT:  Mr. Tassone, do I understand correctly

8    that you will invoke your Fifth Amendment right not to testify

9    with respect to any and all questions, if not granted immunity?

10            THE WITNESS:  Yes, your Honor.

11            THE COURT:  And are you aware that if I do grant

12   immunity and you then say something that is false, that would

13   subject you to punishment for perjury?

14            THE WITNESS:  Yes, I do.

15            THE COURT:  Very good.  I will sign the immunity

16   order.  I didn't realize that's what it was.  I left it on the

17   bench.

18            MS. LA MORTE:  That's why I didn't want to --

19            THE COURT:  You have another copy, very good.

20            Okay.  All right.  Very good.  Let's go back in.

21            MR. TAYBACK:  May I request a copy of the signed order

22   before cross-examination at some point?

23            THE COURT:  Why don't you take this one.  I have

24   another one on the bench.

25            MR. TAYBACK:  Thank you.
              (Continued on next page)

L32PWEI1                          Tassone – Direct

1                (In open court)

2                THE COURT:  Okay.  Are we ready to proceed?

3     MICHAEL TASSONE,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6                THE DEPUTY CLERK:  State your name and spell it slowly

7     for the record.  Please angle the microphone so you're speaking

8     directly into it.

9                THE WITNESS:  My name is Michael Tassone,

10    M-i-c-h-a-e-l, T-a-s-s-o-n-e.

11    DIRECT EXAMINATION

12    BY MS. LA MORTE:

13    Q.  Good morning, Mr. Tassone.

14    A.  Good morning.

15    Q.  How old are you?

16    A.  Thirty-two years old.

17    Q.  Where do you live?

18    A.  I live in Joshua Tree, California.

19    Q.  Are you currently employed?

20    A.  Yes, I am.

21    Q.  Where do you currently work?

22    A.  Eaze Technologies.

23    Q.  What is Eaze Technologies?

24    A.  Eaze is a marijuana marketplace platform that allows for

25    the sale of marijuana products through its platform.

1    Q.   When you say marijuana-based platform, can you explain what

2    that means?

3    A.   Yes.  Eaze works with licensed dispensaries across the

4    State of California, and they sell marijuana products from

5    third-party manufacturers on the platform and that sale is

6    available to customers in the State of California over the age

7    of 21 years old.

8    Q.   So to be clear, who develops the products that are sold

9    through the Eaze platform?

10   A.   It's mostly third-party vendors and manufacturers.

11   Q.   How long have you worked at Eaze?

12   A.   Roughly six years.

13   Q.   So approximately when did you start?

14   A.   June of 2015.

15   Q.   What is your current title?

16   A.   V.P. of Operations.

17   Q.   Did there come a time when Eaze accepted credit and debit

18   cards for the purchase of marijuana through its website?

19   A.   Yes, there was.

20   Q.   During what period of time did this occur?

21   A.   Roughly the periods of 2016 through 2019.

22   Q.   And during that time period, were you involved with

23   facilitating Eaze's acceptance of card payments?

24   A.   Yes, I was.

25   Q.   Can you provide the jury with an overview of how you were

1    involved?

2    A.   Yes.  My involvement was to work with licensed marijuana

3    dispensary partners that were partners with Eaze within our

4    network, and my involvement was to help them set up business

5    accounts with the credit card companies that we were working

6    with.  I was also to help them with any financial statements or

7    questions they had in regards to their credit card accounts.

8    Q.   And in connection with your involvement in that process,

9    did you participate in the scheme to conceal that the products

10   being sold were marijuana products?

11   A.   Yes, I did.

12   Q.   And did that scheme include concealing the fact that Eaze

13   was a company that was involved in selling this product?

14   A.   Yes, it was.

15   Q.   Who or what were you concealing this information from?

16   A.   The banks that were processing the transactions.

17   Q.   What do you mean by that?

18   A.   There were customer banks -- when a customer places a

19   purchase or transaction on the website, there are customer

20   banks that would process that transaction, and that's who was

21   seeing which types of transactions were coming through.

22   Q.   So can you explain to the jury, at a high level, how the

23   scheme worked?

24   A.   Yes.  So essentially a customer would make a purchase of

25   marijuana on the platform, and then they would see some sort of

1    billing descriptor that was listed on their credit card or bank

2    statement, and that billing descriptor or -- billing descriptor

3    on their statement was for a different type of website not

4    listed as Eaze.

5    Q.  Who was in charge of this operation from the credit card

6    processing side?

7    A.  I was led to believe that that was Ray Akhavan.

8    Q.  Was he internal or external to Eaze?

9            MR. TAYBACK:  Objection, move to strike, hearsay.

10           THE COURT:  Sustained.

11   Q.  Did you come to learn who was in charge of the credit card

12   operations at Eaze from the processor side?

13   A.  Yes, I did.

14   Q.  Who did you learn that information from?

15           MR. TAYBACK:  Objection, hearsay.

16           THE COURT:  No, I have to -- she's setting a

17   foundation.  Go ahead.

18   Q.  Who did you learn that information from?

19   A.  I learned it from the former CEO Keith McCarty and the

20   other former CEO, Jim Patterson.

21           THE COURT:  Okay.  Then I will --

22           MS. LA MORTE:  I'm sorry, your Honor, I can't hear?

23           THE COURT:  On that foundation, I will reverse the

24   previous ruling and let the previous answer stand.

25           MS. LA MORTE:  And, your Honor, before I go on, is my

L32PWEI1                          Tassone - Direct

1    microphone working?

2              THE WITNESS:  It could be louder.

3              MR. FOLLY:  Your Honor, I believe the court reporter

4    and the witness have indicated they're having a challenge

5    hearing.

6              THE COURT:  Challenge with who?

7              MR. FOLLY:  Ms. LaMorte.

8              THE COURT:  The witness can't hear well, so do you

9    want to speak a little louder or closer to the microphone?  I,

10   by nature, am a very soft-spoken fellow, but you go ahead.

11   BY MS. LA MORTE:

12   Q.  Was Ray Akhavan internal or external to Eaze?

13   A.  He was external.

14   Q.  Who were some of the other participants in the scheme that

15   worked with Ray?

16   A.  I would know them as Guy, Esra, Cat, Methat and Andreas.

17   Q.  Did you work with others internal to Eaze to implement the

18   scheme?

19   A.  Yes, I did.

20   Q.  Can you categorize or describe some of the people you

21   worked with internally?

22   A.  Yes.  It was former CEO, Keith McCarty; former CEO, Jim

23   Patterson; former SPV of Operations Darcy Cozzetto; former VP

24   of Operations, Noah Tutak, to name a few.

25              (Continued on next page)

Q.   Now, Mr. Tassone, are you testifying here today because of
what is called an immunity order issued by this Court?

A.   Yes, I am.

Q.   What is your understanding of what this order requires you
to do?

A.   My understanding is that the order requires me to tell the
truth here today.

Q.   Does the order protect you from what you say today being
used against you?

A.   Yes, it does.

Q.   Does the order provide you with immunity from prosecution
in general, or with immunity from the use of your words today?

A.   No it does not protect me from prosecution in general, just
from what I tell here today.

Q.   What is your understanding of what happens if you don't
tell the truth?

A.   That I can be charged for that.

Q.   To your knowledge, does the immunity order protect you from
prosecution if you lie today or if you make a false statement?

A.   No, it does not.

Q.   OK.  Mr. Tassone.  Let's learn a little bit about your
background.  Where did you grow up?

A.   Chicago, Illinois.

Q.   Did you graduate high school?

A.   Yes, I did.

1    Q.  When was that?

2    A.  2006.

3    Q.  Can you walk us through your educational background,

4    starting from what you graduated from high school.

5    A.  Yes.  After high school, I graduated from Illinois State

6    University with a bachelor's degree in business education -- in

7    business management.  That was in 2010.

8    Q.  What did you do after you received your business degree?

9    A.  I started working for a company based in Chicago, known as

10   Groupon.

11   Q.  And what kind of company is Groupon?

12   A.  It is an e-commerce website.

13   Q.  What was your role there?

14   A.  Senior account executive was my title, mainly inside sales.

15          (Pause)

16          THE CLERK:  The court reporter asks if the witness

17   could please repeat his title.

18          THE COURT:  Oh, I'm sorry.

19   A.  My title at Groupon was senior account executive.

20   Q.  From when to when did you work with Groupon?

21   A.  Roughly 2010 to 2015.

22   Q.  What did you do after you stopped working there?

23   A.  After Groupon, I shortly moved to California and started

24   working for Eaze.

25   Q.  And I believe you said earlier, but approximately when did

L32AWEI2ps                         Tassone – Direct

1    you start working for Eaze?

2    A.   June of 2015.

3    Q.   And are you still currently working there?  Correct?

4    A.   Yes, I am.  I am working for a subsidiary of Eaze known as

5    Stachs LLC.

6    Q.   Who hired you to work at Eaze?

7    A.   The former VP of operations, Noah Tutak.

8    Q.   Who was in charge of Eaze when you began working there?

9    A.   The former CEO Keith McCarty.

10   Q.   And when you joined Eaze in 2015, what was your title at

11   the time that you joined?

12   A.   Operations specialist.

13   Q.   And what were your duties and responsibilities in that

14   position?

15   A.   My responsibilities were to manage relationships and

16   operations with our dispensary partners across the state of

17   California.

18   Q.   Who did you initially report to?

19   A.   I initially reported to the former VP of operations, Noah

20   Tutak.

21   Q.   And how if at all did your role change moving forward

22   through 2019?

23   A.   Through the course of my time at Eaze, I received several

24   different promotions and had essentially just grown in my

25   responsibility in scope of the operations and partner

L32AWEI2ps                        Tassone - Direct

1   management with our dispensary partners.

2   Q.  OK.  Let's talk a little bit more now about how Eaze works.

3   When was Eaze started?

4   A.  It was founded in mid of 2014.

5   Q.  Who founded the company?

6   A.  Former CEO Keith McCarty.

7   Q.  Where is the company headquartered?

8   A.  San Francisco, California.

9   Q.  Where does the company operate?

10  A.  They operate in several different locations across the

11  state of California today.

12  Q.  Approximately how many employees did the company have when

13  you joined in 2015?

14  A.  Approximately, when I joined, about 12 to 15 employees.

15  Q.  And how did that change in the present, if at all?

16  A.  Today there's roughly 200 corporate employees and somewhere

17  close to a thousand employees that work in the warehouse or

18  work as a driver for the company.

19  Q.  OK, Mr. Tassone.  Let's focus on the 2016-to-2019 time

20  period.  Can you tell us what the different components or

21  divisions of Eaze's as a company work, different units?

22  A.  Yeah.  There are standard business departments.  So there's

23  a marketing department, customer service, operations, finance,

24  things like that.  And also product and engineering teams that

25  would build the website.

1    Q.   And you were involved in operations.  Is that right?

2    A.   That's correct.

3    Q.   And during that time, did Eaze's platform sell marijuana

4    products that had been developed by third-party dispensaries,

5    like you had told us earlier?

6    A.   Yes, third-party dispensaries or third-party client

7    vendors.

8    Q.   So what is a marijuana dispensary?

9    A.   A marijuana dispensary is a licensed retailer in the state

10   of California that is licensed to sell marijuana products to

11   anyone of the age 21 or older.

12   Q.   Now you say it was a licensed retailer.  What particular

13   government or unit provides the license?

14   A.   There's requirements for both a city permit or license as

15   well as a state license.

16   Q.   And are there other names that you in the course of your

17   job have referred to the marijuana dispensaries that are

18   selling through the Eaze platform?

19   A.   Yes.  Delivery -- dispensaries, dispensary partners, or

20   depots.

21   Q.   OK.  Can you walk the jury through, step by step, how a

22   customer would order a product through the Eaze platform and

23   then receive that product.

24   A.   Yes.  So a customer would go to Eaze.com either on their

25   computer or phone.  They would set up an account profile, in

which they would have to submit their driver's license, and

that would be checked by a real person on our customer service

team, to validate that they're 21 years of age.

From there, the customers would be able to browse a

menu of different various cannabis products.  Once they added

those products to their cart, they can go to check out.  Once

they check out, they are provided with a total amount that is

due, a payment option, as well as the estimated time of arrival

for their delivery.

Q.  And how does their delivery arrive?

A.  Their delivery arrives through a licensed delivery driver

who is employed by one of the local dispensaries.  So they

received the order and then they deliver it to the customer's

home address.

Q.  And to be clear, who is responsible for the delivery

driver?

A.  They would be a licensed dispensary, so they're

responsible.

Q.  Is there a receipt that's generated for the customer in the

course of ordering through Eaze?

A.  Yes, there is.

Q.  At what point in the process does that happen?

A.  The receipt is generated and usually sent to the customer

after the transaction has been successfully completed.

Q.  And how is the receipt generally delivered to the customer?

1   A.  Generally it's been sent via email.

2   Q.  Are there receipts that are generated for the relevant

3   marijuana dispensary whose products were sold as well?

4   A.  I'm sorry.  Can you repeat that?

5   Q.  Sure.  Aside from receipts that go to the customer, are

6   there receipts that also go to the marijuana dispensary whose

7   product the customer purchased?

8   A.  Yes.  That's a part of the requirement from the BCC of

9   California, a statement.

10  Q.  And generally how is the receipt provided to the marijuana

11  dispensary?

12  A.  Those would also be sent via email.

13  Q.  So, again, during this 2016-to-2019 time period that we're

14  focusing op, how did Eaze generate revenue from this

15  relationship with the dispensary that is in operation?

16  A.  Yeah.  During that time, Eaze would have contractual

17  partnerships with Eaze license dispensaries, and then there

18  would be a percentage or a flat fee per transaction generally

19  that Eaze would take as part of the sale from the dispensaries.

20  Q.  Were there any other ways that Eaze obtained revenue during

21  the time period through this process?

22  A.  That was the main form.  There were some brand partner

23  agreements as well, where they would receive revenue from.

24  Q.  And how does the dispensary generate revenue?

25  A.  Dispensaries generate revenue from selling the marijuana

1    products on our platform at a marked-up rate from what they

2    bought them, and then they would receive the margins from those

3    markups.

4    Q.  Now, Mr. Tassone, when you joined Eaze in 2015, how did

5    customers pay for the marijuana products that they ordered

6    through the platform?

7    A.  I'm sorry.  Can you repeat the year?

8    Q.  In 2015 when you joined Eaze, how did the customers pay for

9    product ordered through the platform?

10   A.  In 2015, customers can pay with cash.

11   Q.  Was there any other option in 2015?

12   A.  There was no other option.

13   Q.  So explain to us how that works, how the customer would pay

14   in cash.

15   A.  Yes.  So the customer would check out their products of

16   marijuana on the website.  They would be provided a total

17   amount due.  And then, when a delivery driver would show up to

18   deliver the products, the customer would pay them in cash.  If

19   there was any change due, then the driver would give them

20   change that was due to their order.

21   Q.  And then what would the driver do with the money?

22   A.  The driver would keep that money on them for the duration

23   of their shift that day, and then once they got -- when they

24   completed their shift, they would drive back to the delivery

25   depot and they would pass that money along to their supervisor.

1   Q.   Now, at some point did Eaze begin exploring offering a card

2   payment solution?

3   A.   Yes, they did.

4   Q.   And were you involved in discussions on that topic?

5   A.   Yes, I was.

6   Q.   Approximately when did those discussions begin?

7   A.   In the spring of 2016, from my perspective.

8   Q.   And who else at Eaze was involved in those discussions?

9   A.   The former CEO Keith McCarty, the former chief products

10  officer Roie Edery.

11  Q.   And what is your understanding of the obstacles if any in

12  offering the card payment solution at that time?

13  A.   The obstacles are challenges with offering a card payment

14  option, which is being able to do it in a space where the banks

15  didn't want to even allow dispensaries to open up cannabis

16  banks, and so being able to process transactions, it just

17  seemed very, very difficult to do.

18  Q.   So earlier you told us that Eaze in fact implemented a card

19  solution roughly in the fall of 2016.  Is that right?

20  A.   Yes, that's correct.

21  Q.   OK.  So we are going to talk in detail about that in a

22  little bit.  But first I want to discuss some basic principles

23  surrounding credit card processing.

24          So, Mr. Tassone, earlier you told us that you were

25  involved in operations surrounding Eaze's acceptance of card

1   payments.  Is that correct?

2   A.  Yes, that's correct.

3   Q.  And remind us how long you were involved in that process?

4   A.  Roughly 2016 through 2019.

5   Q.  And, Mr. Tassone, do you personally own and use credit

6   cards?

7   A.  Yes, I do.

8   Q.  And as a result of those experiences, both working at Eaze

9   and your own personal experience, do you have a basic

10  understanding of how credit card processing works?

11  A.  Yes, I do, from my experience, yes.

12  Q.  And who are the primary entities that are involved in

13  processing credit card transactions?

14  A.  The business and the banks, you know, my bank or my credit

15  card company.

16  Q.  Any other en–– I'm sorry.  Could you repeat your answer.

17  A.  Yes.  So the business in which I'm making the transaction

18  it was purchased from, myself, and then, you know, either my

19  bank or my card company would be involved in that transaction.

20  Q.  Any other entity that is involved in the transaction?

21  A.  Not to my knowledge.

22  Q.  OK.  So among the entities that you just named, who

23  issues –– what sort of entity if any issues your credit card?

24  A.  The bank or the credit card processing company.

25          I'm sorry.  My, my credit card company.

L32AWEI2ps                          Tassone - Direct

1   Q.   Yes.

2   A.   Yeah.

3   Q.   Have you used your personal credit card to make purchases

4   through Eaze?

5   A.   Yes, I have.

6   Q.   Now, as far as any purchase with your own credit card,

7   through Eaze or otherwise, have you ever had a transaction

8   declined?

9   A.   Yes, I have.

10  Q.   And who is your contact in that situation?

11  A.   I contact my credit card company.

12  Q.   Were there instances when that transaction was then

13  authorized?

14  A.   Yes.  Eventually it was.

15  Q.   And who authorized the transaction?

16  A.   Once I spoke to my credit card company, then they validated

17  that -- I validated the transaction was legitimate, and they

18  authorized it.

19  Q.   And in connection with your card purchases, do you receive

20  credit card statements?

21  A.   Yes, I do.

22  Q.   How often do you receive them, generally?

23  A.   Generally a month, monthly case -- monthly payments.

24  Q.   And who provides you with your credit card statements?

25  A.   The credit card company does.

1    Q.  What do you think credit card company -- can you put that

2    in the context of a particular example.  So what kind of credit

3    card do you have?

4    A.  Yes.  So I have a -- one would be a Freedom Card from Chase

5    Bank.

6    Q.  So when you're saying "credit card company," can you be

7    specific with respect to your own credit card, which entity

8    you're referring to?

9    A.  Yes.  Chase Bank.

10   Q.  Chase Bank, OK.

11   A.  Yes.

12   Q.  Mr. Tassone, what kind of information is on your credit

13   card payment?

14   A.  My account information, as well as the number of

15   transactions and the financial amount of those transactions for

16   that statement period, which is generally a, you know, 30-day

17   or month-long period.  It all --

18   Q.  Did --

19   A.  I'm sorry.  Yeah.  And then it also just shows the -- shows

20   the name of the business or entity in which those transactions

21   occurred for.

22   Q.  And just to go back for a minute to clarify, which entity

23   issued you that statement?

24   A.  My credit card company or in this case specifically Chase

25   Bank.

L32AWEI2ps                    Tassone – Direct

1    Q.   OK.   Does the information on your card statement help you

2    identify the merchant from whom you made purchases?

3    A.   Yes, it does.

4    Q.   Are you familiar with the term "descriptor"?

5    A.   Yes, I am.

6    Q.   How are you familiar with that term?

7    A.   I'm familiar with it through my work and experience at

8    Eaze, as well as just, you know, being a customer, using a

9    credit card, seeing the descriptors on my statement.

10   Q.   What is a descriptor?

11   A.   A descriptor is a -- something that identifies the business

12   or the merchant from which you made a purchase.

13   Q.   Mr. Tassone, have you ever had a situation where you did

14   not recognize a charge on your card statement?

15   A.   Yes, I have.

16   Q.   What did you do?

17   A.   The first thing, I Googled the name of the -- the name of

18   the business that was listed in the descriptor.  When I still

19   was looking for more answers or didn't know, then I contacted

20   my credit card company, which was Chase Bank.

21   Q.   And what did you -- what did you tell Chase Bank?

22            MR. GILBERT:  Objection.

23            THE COURT:  Ground?

24            MR. GILBERT:  Relevance, your Honor.

25            THE COURT:  Overruled.

L32AWEI2ps                         Tassone - Direct

1   Q.   What did you tell Chase Bank?

2   A.   I told Chase Bank that I didn't recognize the charge and

3   wanted it to be reversed.

4   Q.   What is that process called?

5   A.   I know it to be called a chargeback.

6   Q.   Now, are you familiar with the term "acquiring bank" or

7   "receiving bank"?

8   A.   Yes, I am.

9   Q.   What is that?

10  A.   The -- and I'm sorry.  Could you repeat that question?

11  Q.   Yes.  I asked you if you're familiar -- sorry -- familiar

12  with the term "acquiring bank" or "receiving bank"?

13  A.   OK.  Yes, I am.

14  Q.   What is that?

15  A.   The receiving bank, to my knowledge, is the bank that is

16  holding -- holding the funds from a credit card or debit card

17  transaction.

18  Q.   OK.  So let's look at a few examples of Eaze transactions.

19          MS. LA MORTE:  Mr. Levine, can you display for the

20  witness what has been marked as Government Exhibit 686 and 709

21  for identification.

22  Q.   Do you recognize these?

23  A.   Yes, I do.

24  Q.   What do you recognize them to be?

25  A.   These are receipts that were emailed from Eaze to a

L32AWEI2ps                     Tassone - Direct

1    dispensary partner of ours, and so they're customer receipts

2    for transactions of marijuana that was purchased on our

3    website.

4    Q.  How are you familiar with receipts such as these?

5    A.  I'm sorry.  Can you repeat that?

6    Q.  How are you familiar with receipts such as these?

7    A.  This was common knowledge for me to see these in my normal

8    course of business, and I would also receive these as a

9    customer if I ordered from Eaze as well.

10   Q.  Are these receipts made in the course of Eaze's regularly

11   conducted business activity?

12   A.  Yes, they are.

13   Q.  Are these receipts routinely made by Eaze as a regular

14   practice of its business activity?

15   A.  Yes, it is.

16   Q.  Are these receipts made at or near the time of the

17   transactions set forth therein?

18   A.  Yes, they are.

19            MS. LA MORTE:  The government offers Government

20   Exhibit 686 and 709.

21            MR. GILBERT:  No objection, your Honor.

22            THE COURT:  Received.

23            (Government's Exhibits 686 and 709 received in

24   evidence)

25            MS. LA MORTE:  Mr. Levine, can you publish for the

L32AWEI2ps                        Tassone - Direct

1   jury Government Exhibit 709.

2           Is that on everyone's screen?

3           A JUROR:  No.

4   Q.  Mr. Tassone, you told us that this is a receipt reflecting

5   a purchase from Eaze.  Is that right?

6   A.  Yes, that's correct.

7   Q.  And how was this receipt delivered?

8   A.  This was delivered and sent via email.

9   Q.  So let me direct your attention to the top left of this

10  exhibit, 709.  Who is this email from, according to the

11  exhibit?

12  A.  This is from the Eaze team.

13  Q.  And who is it to?

14  A.  Andy at Eaze.com.

15  Q.  And generally who is the "to"?  Who does that reflect?

16  A.  "To" is who the email is being sent to.

17  Q.  Is that the person that made the purchase or someone else?

18  A.  Yes.  That would be the person who made the purchase.

19  Q.  And what is the subject?

20  A.  The subject line is "Your order was delivered, Andrew!"

21  Q.  And can you tell us what the map on page 1 of this exhibit

22  reflected.

23  A.  The map is reflecting the address in which the order was

24  placed and then successfully delivered to.

25          MS. LA MORTE:  Your Honor, it's come to my attention

L32AWEI2ps                    Tassone - Direct

```
 1    that one of the jurors can't see their screen.

 2              THE COURT:  Which juror is that?

 3              A JUROR:  That one works.

 4              THE COURT:  Yes.  You want to move over there?

 5              THE LAW CLERK:  This one here is working, Judge.

 6              THE COURT:  OK.

 7              Can the juror now see?

 8              A JUROR:  Yes.

 9              THE COURT:  OK.  Go ahead.

10    Q.  All right.  Let me just go back to that last one.  What is

11    the map on page 1 of Government Exhibit 709 reflecting?

12    A.  The map is reflecting the address in which the order was

13    placed and then successfully delivered.

14    Q.  All right.  So let's look --

15              MS. LA MORTE:  And, Mr. Levine, can you blow up the

16    bottom half, where it says "itemized receipt," and the items

17    under it.

18    Q.  So you see on the left, Mr. Tassone, where it says "Durban

19    Poison, Releaf Balm," and "Original Mint Tablets"?

20    A.  Yes, I do.

21    Q.  With are these a reference to?

22    A.  These are a reference to the products, the marijuana

23    products that were added to the customer's cart and purchased.

24              MS. LA MORTE:  Mr. Levine, can we go to page 3 of the

25    receipt.  Actually go up one, please.  Thank you.
```

L32AWEI2ps                    Tassone - Direct

1   Q.  OK.  And then, on the top of this receipt, you see where it

2   says "order total"?

3   A.  Yes, I do.

4   Q.  What is stated there?

5   A.  It says it's $82.61.

6   Q.  What does that reflect?

7   A.  That reflects the customer's total that they paid for the

8   order.

9   Q.  Thank you, Mr. Levine.

10          All right.  And then under there, do you see where it

11  says "credit card"?

12  A.  Yes, I do.

13  Q.  What is that a reference to?

14  A.  That would represent the payment type for this transaction,

15  which was a credit card.

16  Q.  All right.  So let me direct your attention to the blue box

17  that's on the screen.

18  A.  OK.

19  Q.  Do you see the bottom blue box?

20  A.  Yes, I do.

21  Q.  Can you read that aloud.

22  A.  "You will see a charge from 'Hot Robots' for $83.61 on your

23  statement."

24  Q.  When this says "on your statement," what is the "statement"

25  here referring to?

L32AWEI2ps                    Tassone - Direct

1    A.   This is referring to the customer's credit card statement.

2    Q.   What is Hot Robots?

3    A.   Hot Robots, I believe, is a website.

4    Q.   Was Hot Robots the real -- is Hot Robots a website that is

5    connected to Eaze?

6    A.   No, it is not.

7    Q.   Is Hot Robots a real merchant for the transaction?

8               MR. TAYBACK:  Objection, foundation.

9               THE COURT:  OK.  Lay a foundation.  Lay a foundation.

10   Q.   When you say "website," Mr. Tassone, what do you mean?

11   A.   Website, website would be -- I'm sorry.  Can you rephrase

12   the question?

13   Q.   Sure.  You identified Hot Robots before as a website.

14   What -- explain to us, can you elaborate for us what that

15   means.

16   A.   Yes.  So if this showed up like on a customer's credit card

17   statement, they may Google it or, you know, go to HotRobots.com

18   and then be able to see a website.

19   Q.   And would that website be Eaze's website?

20   A.   No, it would not be.

21              THE COURT:  I think the question was:  Is Hot Robots a

22   real merchant for the transaction?  And I will allow you to

23   answer that, but then I'll have some follow-up questions.  So

24   what's the answer?  Yes or no.

25              THE WITNESS:  I'm sorry.  I can't hear you, Judge.

1          THE COURT:  So the question was:  Is Hot Robots a real

2     merchant for the transaction?  Is the answer to that yes or no?

3          THE WITNESS:  No.

4          THE COURT:  How do you know that?

5          THE WITNESS:  Because it was not associated with Eaze.

6          THE COURT:  So these were just made up?

7          THE WITNESS:  To my knowledge, yes.

8          THE COURT:  All right.  The objection is overruled.

9     Q.  Mr. Tassone, what is the period of time that Eaze used

10    falsified merchants in connection with card purchases?

11    A.  Roughly the spring of 2016 through mid 2019.

12    Q.  And during this time period, to your knowledge, did Eaze

13    ever deal with actual names of the customers' banks in

14    connection with card transactions through its site?

15    A.  To my knowledge, no.

16    Q.  Why was Eaze using falsified merchants for card

17    transactions?

18    A.  There was a concern that, if Eaze was listed in a

19    customer's credit card statement, that potentially a bank or

20    credit card company would see that and flag that transaction,

21    and there was a concern because they were marijuana

22    transactions.

23    Q.  And when you say "bank" there, are you referring to the

24    customer's bank or some other bank?

25    A.  I'm referring to the customer's bank.

1  Q.  Who did Eaze work with outside the company to accomplished

2  this?

3  A.  We worked with credit card processors.

4  Q.  What were the names of those credit card processors?

5  A.  During that time period, Clearsettle was one, and then EU,

6  or EUprocessing.

7  Q.  And what is your understanding of who was in charge of

8  those credit card processors?

9  A.  My understanding is that Ray Akhavan was.

10            MR. TAYBACK:  Objection, move to strike, hearsay.

11            THE COURT:  What's the basis of that understanding?

12            THE WITNESS:  What's the basis of the understanding?

13  I was told that from former CEO Keith McCarty and former CEO

14  Jim Patterson.

15            THE COURT:  Overruled.

16  Q.  To your knowledge, Mr. Tassone, was Ray Akhavan ever

17  employed by Eaze?

18  A.  Not to my knowledge.

19  Q.  To your knowledge, was he ever a director or officer of

20  Eaze?

21  A.  Not to my knowledge.

22  Q.  Did you understand Ray to work alone or with other people?

23  A.  I understood he worked with other people.

24  Q.  More specifically, what is your understanding of the role

25  that Ray and Keith played in the Eaze credit card operation?

A.  I'm sorry.  Can you repeat that or rephrase that?

Q.  Sure.  I asked more specifically what is your understanding
of the role that Ray and Keith played in the credit card
operation?

A.  My understanding is that their role was to be able to
successfully process high-risk transactions, and in this case
specifically for marijuana transactions.

Q.  And just generally speaking, what does it mean to process a
card transaction?

A.  For basically when a customer uses their credit card,
having the company that is able to process and complete that
transaction so that their card has been charged, and -- their
card has been charged and then those funds are held in another
bank.

Q.  How did you refer to Ray's team internally at Eaze?

A.  Which time period?

Q.  Let's -- well, just tell me, how -- did that change at all
or the various means by which you referred to them.

A.  Sure.  In -- over the course of 2016, 2016, we referred to
them internally as the company Clearsettle, and then sometime
in 2018 and through 2019, we referred to them as EU or EUP or
EUprocessing.

Q.  OK.  Just to clarify, what period of time was Clearsettle a
processor for Eaze card transactions?

A.  2016 and 2017.

L32AWEI2ps                          Tassone - Direct

1    Q.  And EUP or EUprocessing?

2    A.  2018 and 2019.

3    Q.  Now, during the course of that time, from 2016 and 2019,

4    would you say you became more involved, less involved, or

5    equally involved in the operation over time?

6    A.  More involved over time.

7    Q.  OK.  So let's take a step back and talk about how this

8    began.  So in 2016, how did you initially learn that Eaze was

9    interested in providing a card payment option for its

10   customers?

11   A.  I initially learned through our former CEO Keith McCarty.

12   Q.  What did Keith say to you?

13   A.  He said that he has found a solution that may be able to

14   find a way to successfully process credit card transactions

15   for, for a marijuana company.

16   Q.  Did he say anything specifically about the solution?

17   A.  Only that it was with a credit card processing company that

18   typically deals with high-risk processing and that they, you

19   know, would be experienced in order to do this.

20   Q.  Around this time period, what if anything did Keith McCarty

21   tell you about Ray Akhavan?

22   A.  Just that, you know, he led me to believe that he was in

23   charge of the company.

24   Q.  Did Keith McCarty ask you to do anything?

25   A.  Yes, he did.

L32AWEI2ps                        Tassone - Direct

1    Q.  What was that?

2    A.  Keith asked me to coordinate a meeting, basically one of

3    our licensed dispensary partners at the time, in order to meet

4    Ray and the Clearsettle team.

5    Q.  Did you in fact coordinate that meeting?

6    A.  Yes, I did.

7    Q.  And what was the dispensary that was involved?

8    A.  They were known as Sweetwood.

9    Q.  Who were your points of contact or point of contact at

10   Sweetwood?

11   A.  That would be the principal or owner Craig Wald and his son

12   Cameron Wald.

13   Q.  And did there come a time that you actually participated in

14   a meeting with Sweetwood to discuss the concept?

15   A.  Yes, that's correct.

16   Q.  Approximately when did that meeting occur?

17   A.  In the spring of 2016.

18   Q.  What was the overall purpose of the meeting?

19   A.  The purpose of the meeting was to introduce Clearsettle and

20   Eaze and Sweetwood, the dispensary, as well as discuss the

21   processing options and -- processing options for processing

22   credit cards on the platform.

23   Q.  Mr. Tassone, you should have in front of you a thumb drive

24   that's marked as Government Exhibit 716.  Do you see that?

25   A.  Yes, I do.

L32AWEI2ps                          Tassone – Direct

1    Q.  Do you recognize it?

2    A.  Yes, I do.

3    Q.  How do you recognize it?

4    A.  I initialed the card.

5    Q.  Have you reviewed the contents of it?

6    A.  Yes, I have.

7    Q.  When did you do that?

8    A.  I did that this previous Sunday.

9    Q.  What is on it?

10   A.  There are a list of several emails in which I either sent

11   or am listed on the email, and other documents as well.

12   Q.  What email account is used by you in connection with the

13   emails?

14   A.  Yes.  Either Michael.Eaze or Michael.Tassone@eaze.com.

15   Q.  Are both of those your work email accounts?

16   A.  Yes.  I also have new email, but yes.

17   Q.  But you use both those accounts for work-related reasons;

18   is that right?

19   A.  Yes, I do.

20   Q.  Are they fair and accurate copies emails from your work

21   accounts?

22   A.  Yes, they were.

23   Q.  And what is the general topic that's covered in these

24   emails?

25   A.  Credit card processing.

L32AWEI2ps                    Tassone – Direct

Q.  Mr. Tassone, I'm now going to ask you whether Government
Exhibit 716 contains the following government exhibits, and I'm
going to read out a list.

A.  OK.

Q.  401, 713, 425, 428, 553, 554, 555, 565, 566, 567, 558, 706,
485, 489, 490, 560, 630, 674, 615, 683, 570, 574, 568, 630,
632, 638, 684, 589, 590, 594, 596, 597, 598, 599, 632, 642,
649, 650, 655, 661, 607, 674, 672, 678, 679, 680, 683, 714,
527, 523, 479, 698, 480, 481, 482, 483, 484, 485, 489, 490,
491, 492, 493, 494, 495, 499, 501, 502, 503, 504, 505, 507,
508, 511, 534, 691, 692, 693, 694, 695, 696, 697 -- almost
there -- 698, 699, 701, 702, 703, 704, 705, 706, 707, 708, 709,
710, 711, 712, 677, and 585.  Are those government exhibits
included on that drive?

A.  Yes, they are.

Q.  How do you know that?

A.  Because I reviewed them.

        MS. LA MORTE:  The government offers Government
Exhibit 716, along with the list that I just read and I can
read again if that's necessary.

        THE COURT:  I think we'll pass on your doing it again.

        Any objection?

        MR. GILBERT:  The objections we raised earlier.

        THE COURT:  Yes.  The objections that were raised
outside the presence of the jury are preserved but overruled.

L32AWEI2ps                    Tassone - Direct

1    So the exhibits are received.

2              (Government's Exhibits 401, 713, 425, 428, 553, 554,

3    555, 565, 566, 567, 558, 706, 485, 489, 490, 560, 630, 674,

4    615, 683, 570, 574, 568, 630, 632, 638, 684, 589, 590, 594,

5    596, 597, 598, 599, 632, 642, 649, 650, 655, 661, 607, 674,

6    672, 678, 679, 680, 683, 714, 527, 523, 479, 698, 480, 481,

7    482, 483, 484, 485, 489, 490, 491, 492, 493, 494, 495, 499,

8    501, 502, 503, 504, 505, 507, 508, 511, 534, 691, 692, 693,

9    694, 695, 696, 697, 698, 699, 701, 702, 703, 704, 705, 706,

10   707, 708, 709, 710, 711, 712, 677, and 585 received in

11   evidence)

12             MS. LA MORTE:  Mr. Levine, let's display for the

13   witness Government Exhibit 401.

14   Q.  Mr. Tassone, what is this?

15   A.  This is an email sent from Roie Edery.

16   Q.  Who is Roie Edery?

17   A.  Roie Edery is a former chief product officer at Eaze.

18   Q.  Did he have a role in connection with the Eaze credit card

19   scheme?

20   A.  Yes, he did.

21   Q.  What was his role?

22   A.  To help design and implement the technology side of the

23   processing payment option on Eaze.

24   Q.  And the email is sent to you; is that right?

25   A.  Yes, it is.

L32AWEI2ps                    Tassone - Direct

1   Q.  Who is cc'd?

2   A.  Keith McCarty and former director of business development,

3   Evan Tennenbaum.

4   Q.  Just briefly, who is Keith McCarty?

5   A.  He is the CEO.

6   Q.  And who is Evan Tennenbaum?

7   A.  He was a former director of business development.

8   Q.  And what is the subject of the email?

9   A.  The subject is "Sweetwood/payment processing meeting" --

10  I'm sorry -- "payment processor meeting."

11          MS. LA MORTE:  Mr. Levine, can you go to the last page

12  of this exhibit, which spans pages 2 to 3.  There we go.

13  Q.  So you see the email, the email, Mr. Tassone, April 19,

14  2016, at 11:13 a.m.?

15  A.  Yes, I do.

16  Q.  And who is that email from?

17  A.  It was from Edmonton & Co.

18  Q.  And can you read what it states.

19  A.  "Keith -- Tassone spoken with Sweetwood.  Craig is flexible

20  Monday or Tuesday for a meeting.  Craig and Ken are both free

21  for a meeting Monday morning.  He's ready to permit meeting."

22  Q.  And remind us loosely, what is and who Craig and Cameron

23  are?

24  A.  Sweetwood was a licensed dispensary partner within the Eaze

25  network.  Craig is Craig Wald, who is the principal owner.  And

L32AWEI2ps                    Tassone - Direct

 1   Cameron is Cameron Wald, his son, also a partner.

 2               MS. LA MORTE:  OK.  Let's go to page 2, Mr. Levine.

 3   The email that's April 19, 2016 at 6:19 p.m., from where it

 4   says Roie Edery, sort of the middle of the document.

 5   A.  Yes.  I see that.

 6               MS. LA MORTE:  Mr. Levine, could you just blow that

 7   up.

 8               Who is this email from?

 9   A.  This is from Roie Edery.

10   Q.  Can you read aloud what he says.

11   A.  He says, "Ray is available Monday to meet in his office in

12   Calabasas or on the phone, whatever works."

13   Q.  And the reference here, Ray, who do you understand that to

14   be?

15   A.  Ray Akhavan.

16   Q.  OK.  So let's go up further now, pages 1 through 2.

17               THE COURT:  Actually, counsel, I think this is a good

18   time to give the jury their midmorning break.

19               MS. LA MORTE:  Yes, your Honor.

20               THE COURT:  Ladies and gentlemen, we'll take a

21   15-minute break at this time and then resume.

22               THE WITNESS:  Did you say break?

23               THE COURT:  Yes.

24               (Jury not present)

25               THE COURT:  Is there anything counsel needs to raise

1    with the Court?

2              MR. TAYBACK:  Not for Mr. Akhavan.

3              MR. GILBERT:  No, your Honor.

4              THE COURT:  OK.  We'll see you all in 15 minutes.

5              (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Trial resumed; jury not present)

2              THE COURT:  Please be seated.

3              MR. TAYBACK:  Your Honor, this is Christopher Tayback.

4    Before the jury comes back, I wanted to make a brief oral

5    application --

6              THE COURT:  Yes.

7              MR. TAYBACK:  -- to be able to meet with my client

8    over the lunch break in a conference room where we can

9    interact.  The marshal suggested I make the application in

10   order to effectuate that.

11             THE COURT:  It's fine with me.  Whatever the marshals

12   agree to is fine with me.

13             MR. TAYBACK:  Thank you, your Honor.

14             MR. FOLLY:  Your Honor, would you like the witness

15   back or would you prefer to wait for the jury?

16             THE COURT:  Yes, why don't we have the witness here.

17             Are you planning to cover all of those exhibits that

18   we just --

19             MS. LA MORTE:  No.

20             THE COURT:  That's a relief.

21             MS. LA MORTE:  I know.  I knew everyone was wondering,

22   but no.

23             (Pause)

24             THE DEPUTY CLERK:  Jury entering the courtroom.

25             (Jury present)

1           THE COURT:  All right.  I received a note from a

2    juror, which we'll take up after -- at an appropriate time.

3    It's not pressing at the moment, but why don't we continue with

4    this witness.  Please proceed.

5    BY MS. LA MORTE:

6    Q.  So, Mr. Tassone, when we just broke before, we were looking

7    at Government Exhibit 401, which we will continue to look at.

8    So I believe we left off at the bottom of page 1, going into

9    page 2 of an e-mail, April 20th, 2016, at 2:18 p.m.; do you see

10   that?

11   A.  Yes, I do.

12   Q.  Who is that e-mail from?

13   A.  Roie Edery.

14   Q.  Can you read the e-mail aloud?

15   A.  If we must do a call, then fine, but I would say it will be

16   worth their while one hour drive -- I'm sorry.  It will be

17   worth their one-hour drive, as this will be a big opportunity

18   for them and Eaze.  Also, it could set them up to be the

19   initial pilot dispensary with payment processing.

20   Q.  Can you tell us what you understand this to mean?

21   A.  Yes.  This is Ray -- or I'm sorry, this is Roie explaining

22   that it would be a big opportunity for Sweetwood, which was the

23   dispensary at the time, to join this meeting in person.

24   Q.  And when it references the one-hour drive, what is that

25   referring to?

1    A.   The one-hour drive that Sweetwood would be obligated to

2    take from their location to the offices.

3    Q.   Which offices?

4    A.   The Clearsettle offices in Calabasas.

5    Q.   Okay.  Let's go to the second e-mail from the top.

6    April 24th, 2016, at 2:03 p.m. from you.  Do you see that?

7    A.   Can you repeat the time?

8    Q.   Yes.  April 24th, 2016, at 2:03 p.m.  It's the --

9    A.   Yes, I see that.

10   Q.   -- the second e-mail.

11   A.   Yes.

12   Q.   Can you read that?

13   A.   Hey, Roie.  Just following up for the address to Ray's

14   office.  Thanks.

15   Q.   And does Roie respond?

16   A.   Yes, he does.

17   Q.   And what is the response?

18   A.   The address, which is 5146 Douglas Fir Road, Calabasas,

19   91302.

20   Q.   What state is Calabasas is?

21   A.   California.

22   Q.   And what do you understand that address to be?

23   A.   The address of the Clearsettle offices.

24   Q.   Is this where a meeting actually occurred?

25   A.   Yes, it is.

1          MS. LA MORTE:  Okay.  Mr. Levine, you can take this

2     down.

3     Q.  And did you, in fact, attend a meeting there in mid-2016?

4     A.  Yes, I did.

5     Q.  Can you describe what the outside of the building looks

6     like?

7     A.  It looked like a normal or regular building for business.

8     Q.  And where inside the building did you meet?

9     A.  We met inside a conference room.

10    Q.  What did it look like?

11    A.  It looked like a standard conference room, conference

12    tables, things like that.

13    Q.  Who was present during the meeting?

14    A.  Roie Edery, Keith McCarty, Craig Wald, Cameron Wald,

15    myself, and Ray Akhavan.

16    Q.  Is this the first time that you met Ray, this 2016 meeting?

17    A.  Yes, I believe so.

18    Q.  Is it the only time you met Ray?

19    A.  Yes, I believe so.

20    Q.  Who led the meeting?

21    A.  Ray did, as well as Keith McCarty did.

22    Q.  Can you provide us with just an overview of the topics that

23    were discussed at the meeting?

24    A.  Yes.  They discussed that there was a potential solution to

25    integrate credit card processing payment for an option on Eaze;

L32PWEI3                        Tassone - Direct

1    so there was discussion around that, as well as the fees that

2    would be associated with that process.

3    Q.  And what did you understand, based on this meeting, Ray's

4    role to be in this process?

5    A.  I understood him to be leading the process.

6    Q.  Why do you say that?

7    A.  I was led to believe by Keith McCarty prior to the meeting,

8    as well as just from the demeanor that he had in the meeting

9    held.

10   Q.  So earlier you mentioned that one of the topics discussed

11   during the meeting was high-risk processing?

12   A.  Yes, that's correct.

13   Q.  Who discussed high-risk processing?

14   A.  Ray primarily did.

15   Q.  What did he say about that topic?

16   A.  He said that he has experience with processing high-risk

17   industries and that, you know, they would possibly have a

18   solution for the marijuana industry for us.

19   Q.  And I believe you also mentioned that one of the issues

20   that was discussed during this meeting was fees; is that

21   correct?

22   A.  Yes, that's correct.

23   Q.  So what was said during the meeting regarding fees?

24   A.  It was said that there would be higher fees than normal,

25   than you would normally have for payment processing due to the

1    increased risk, in that there was discussion just around why

2    or, you know, or how it would actually cut into dispensary

3    profits.

4    Q.  Who spoke about that?

5    A.  Ray described the fees, and then Craig Wald and Cameron

6    Wald commented and had issues with the nature of the fee and

7    how they were.

8    Q.  And was there a particular rate that was discussed?

9    A.  8.75 percent was the rate.

10   Q.  And was this rate to apply to each and every card

11   transaction or something else?

12   A.  Yes, it would apply to every card transaction processed on

13   the platform.

14   Q.  And I believe -- I'm sorry, did I interrupt you?

15   A.  No.

16   Q.  And I believe that you said that Sweetwood had a negative

17   reaction to that rate; is that fair?

18   A.  Yes, that's fair.

19   Q.  Why was that?

20   A.  Because the rate was much higher than a standard processing

21   rate would be for, you know, standard business that's not high

22   risk.  And they already didn't see high margins in their

23   business, and so this was going to be cutting into their

24   margins and potentially something that they could lose money

25   on.

L32PWEI3                          Tassone – Direct

1   Q.   And how, if at all, did Ray justify the rate?

2   A.   Just that, you know, he and his team had experience with

3   high-risk industries such as this; so it's just a higher burden

4   and a higher administrative cost for those resources.

5   Q.   Was there a white board in the conference room?

6   A.   Yes, there was.

7   Q.   Was it used in any way during the meeting?

8   A.   Yes, it was.

9   Q.   How was it used?

10  A.   Roie Edery drew a high-level diagram of just how he

11  depicted how the processing would work and take place on the

12  website.

13  Q.   Do you recall the general structure of that, or no?

14  A.   Yes, somewhat vaguely, but yes.  He described that there

15  would be some sort of e-gift card that a customer would

16  purchase, and they wouldn't know about it; so the customer

17  would make this purchase of this electronic gift card, and then

18  that would be what would be used to actually process and

19  purchase the marijuana transaction.

20  Q.   Do you know, one way or the other, whether that was a

21  solution that was eventually implemented?

22  A.   I don't know if it was eventually implemented, but I do

23  know that it was different after that.

24  Q.   Okay.  And when you say it was different during that --

25  after that, what period of time are you talking about?

1   A.   I believe when I came -- when I had more knowledge of it,

2   either later 2016 and 2017.

3   Q.   And did Ray have any input into the structure that was

4   being discussed on the white board?

5   A.   Not that I have from specific memory.

6   Q.   What was your understanding of the reason why that

7   particular structure was being discussed?

8   A.   So that all parties understood what was happening, so

9   Clearsettle, Eaze and Sweetwood, the dispensary, so they could

10  understand how this process was going to work and how their

11  part and role would be in it.

12  Q.   Was there any discussion of chargebacks at this meeting?

13  A.   Yes, there were.

14  Q.   And who discussed that issue?

15  A.   Ray did.

16  Q.   And what was said?

17  A.   He said that chargebacks were a part of his normal course

18  of business with his other clients, and that they could

19  utilize -- they can leverage and utilize the transactions from

20  our company in order to lower the overall chargeback rate that

21  they were seeing.

22  Q.   Okay.  So earlier you said that Eaze actually began

23  accepting card payments for purchases through its platform in

24  2016, right?

25  A.   That's correct.

1  Q.  And at this time, Clearsettle was the processor?

2  A.  Yes, that's correct.

3  Q.  Can you describe for us how that launch occurred?

4  A.  Yes.  So at Eaze, we had several internal meetings with

5  different department heads in order to coordinate that launch.

6  Q.  Which dispensary or dispensaries were included in the

7  launch?

8  A.  Sweetwood was the first dispensary included in that launch.

9  Q.  Were additional dispensaries included over time?

10  A.  Yes.  Once we had a successful rollout with Sweetwood,

11  others dispensary did enroll again.

12  Q.  So let's discuss the role that various Eaze employees

13  played in the launch.

14        So, Mr. Levine, can you display for everyone what is

15  marked as Government Exhibit 713.

16        And, Mr. Tassone, it's on your screen, but you also

17  have a binder in front of you, if that's easier for you, just

18  so you know.

19  A.  Okay.  This is fine.

20  Q.  What is this?

21  A.  This is an internal e-mail from our former VP of

22  Operations, Noah Tutak.

23  Q.  What's the date of the e-mail?

24  A.  Friday, July 1st, 2016.

25  Q.  And you're on this e-mail, right?

1    A.  Yes, that's correct.

2    Q.  And who is cc'd?

3    A.  Evan Tenenbaum, Libby Cooper, Jamie Feaster, Sheena

4    Shiravi, Aaron Ganz, Jim Patterson, Chris Elkins, myself, David

5    Kram, Kyle Rios-Merwin and Jonathan Lau.

6    Q.  Are these all Eaze employees?

7    A.  Yes, former Eaze employees.

8    Q.  Former Eaze employees.  And who is cc'd?

9    A.  Keith McCarty.

10   Q.  Okay.  So can you read the first two paragraphs following

11   the greeting, and then the first sentence of the third

12   paragraph?

13   A.  I'm sorry, which paragraphs?

14   Q.  Sure.  The first two paragraphs after the greeting, and

15   then the first sentence of the third paragraph.

16   A.  As you may know, we working on three strategic initiatives

17   over the next few months.  We believe that these three

18   initiatives will play a significant role in positioning Eaze

19   for our next stage of growth and expansion.  Each of you has a

20   role to play in one or more of these initiatives as outlined

21   below.

22   Q.  Okay.  Let's go to page 2 now, Mr. Levine.

23        Okay.  Do you see on the top where it says "credit

24   cards"?

25   A.  Yes I do.

1    Q.   Is this a reference to Eaze's acceptance of credit cards

2    that we've been discussing?

3    A.   Yes, it is.

4    Q.   Do you see where it says "Phase 1" right under there?

5    A.   Yes.

6    Q.   What does phase 1 refer to?

7    A.   Phase 1 is referring to a project plan listed by

8    department, and really just identifying which department and

9    which person or representative from Eaze would be responsible

10   for carrying that out.

11   Q.   Okay.  Do you see on the -- do you see it says "due by

12   July 15th;" do you see that in red?

13   A.   Yes, I do.

14   Q.   And then under there, there is a bullet "credit card

15   payment processing, Sweetwood only, limited scope;" do you see

16   that?

17   A.   Yes.

18   Q.   What is that a reference to?

19   A.   That is a reference to identifying Sweetwood is going to be

20   the first pilot dispensary to launch credit card payment

21   processing.

22   Q.   And then you see we have a list of bullet points?

23   A.   Yes.

24   Q.   Generally, what does this reflect?

25   A.   These reflect the different teams or initiatives for each

1  time and the person who would be assigned with carrying that

2  out.

3  Q.  Okay.  So let's just look at a couple of these.  Do you see

4  the fourth bullet down, "payment processor agreement"?

5  A.  Yes.

6  Q.  And do you see the name "Keith" there?

7  A.  Yes.

8  Q.  Who do you understand that to be a reference to?

9  A.  That was a reference to Keith McCarty.

10 Q.  And "payment processor," what do you understand that to be

11 a reference to?

12 A.  Payment processor would be referring to Clearsettle.

13 Q.  All right.  And then two bullet points down from that, do

14 you see where it says "product engineering, Jim P"?

15 A.  Yes, I do.

16 Q.  Who would that refer to?

17 A.  That would refer to Jim Patterson.

18 Q.  And at this time, at the time of this e-mail, what was Jim

19 Patterson's role at Eaze?

20 A.  He was the Chief Product and Technology Officer.

21 Q.  And then under that, do you see it says "partner comms"?

22 A.  Yes.

23 Q.  What is that a reference to?

24 A.  That would be partner in communications or dispensary

25 communications and outreach.

1   Q.  And then the names listed there are Noah, and then

2   parenthesis, Chris, Michael and David support; do you see that?

3   A.  Yes, I do.

4   Q.  And who was Noah?

5   A.  Noah was Noah Tutak.

6   Q.  And what was his role again?

7   A.  VP of operations.

8   Q.  And then Chris, Michael and David.  Is the "Michael" there

9   referring to you or someone else?

10  A.  Yes, it is.

11  Q.  Okay.  And then you see where it says "phase 2 due by

12  August 15th"?

13  A.  Yes.

14  Q.  What is phase 2 a reference to?

15  A.  This would refer to after we had a successful launch with

16  Sweetwood for credit card payment processing, we would, about a

17  month later, plan to roll out other dispensary partners for

18  credit card processing.

19  Q.  And again, what do these bullets generally reflect?

20  A.  Similar as above, but different departments or initiatives

21  to be carried out by specific individuals.

22  Q.  Okay.  And those individuals include Jim Patterson, Noah

23  Tutak and yourself; is that right?

24  A.  They include Jim Patterson, Noah Tutak.  I do not see

25  myself listed there.

1    Q.   Let me --

2    A.   Oh, I do see that.  Sorry.

3    Q.   Where is that, to be clear?

4    A.   Fourth bullet down, "partners comms," where it says "Noah,

5    Chris, Michael and David support."

6    Q.   Okay.  So we can take that down, Mr. Levine.  Thank you.

7            Mr. Tassone, I want to focus a bit more on your role

8    now.  In the 2016 to 2017 time period, what was your role in

9    relation to Clearsettle and this dispensary?

10   A.   Yes, my role with the dispensaries was to manage their

11   account and their operations, and as that pertained to

12   Clearsettle, I was basically managing the relationship between

13   the three parties; so between Eaze, Clearsettle and the

14   dispensary partners.

15   Q.   So what kind of documents would you pass between the

16   dispensaries and Clearsettle?

17   A.   So two different sets of documents, particularly a merchant

18   or business application to set up a credit card account.  So

19   Clearsettle provided a template application that dispensary

20   partners would fill out in order to establish their credit card

21   account, and then Clearsettle also provided weekly settlement

22   statements or financial statements that would be passed along

23   to dispensaries as well.

24   Q.   So is it fair to say that you were sort of the conduit of

25   information passing between the dispensaries, on one hand, and

1  Clearsettle, on the other?

2  A.  Yes, that's fair to say.

3  Q.  Who were your primary points of contact at Clearsettle?

4  A.  I knew them as Guy, Cat and Esra.

5  Q.  Let's start with Guy, who is Guy?

6  A.  I understood Guy to be a representative of Clearsettle, who

7  helped in that coordination of information or troubleshooting

8  of any issues that we had between the dispensaries and

9  Clearsettle.

10            MR. TAYBACK:  Objection as to his understanding.

11            THE COURT:  What was the basis of your understanding?

12            THE WITNESS:  The basis of my understanding was I

13  received e-mails from Guy in regards to Clearsettle details

14  that I would communicate and convert between dispensaries.

15            MS. LA MORTE:  Did you say -- I'm sorry?

16            THE COURT:  I'll overrule it.  Continue.

17  BY MS. LA MORTE:

18  Q.  And you mentioned Esra?

19  A.  Yes, that's correct.

20  Q.  Who is Esra?

21  A.  I understood Esra to be a similar counterpart of Guy --

22  Q.  And before you go forward with that, did you communicate

23  directly with Esra?

24  A.  Yes, I did.

25  Q.  How so?

1   A.  Via e-mail.

2   Q.  And what did you understand Esra's role to be?

3   A.  A representative of Clearsettle and someone who is also

4   just helping coordinate, pass along information.

5   Q.  And finally you mentioned Cat?

6   A.  Yes.

7   Q.  Who is Cat?

8   A.  Again, I believe a similar representative of Clearsettle

9   that I communicated with via e-mail.

10  Q.  And what kind of issues would you communicate with Cat

11  about typically?

12  A.  Generally, like financial questions or statement questions

13  that dispensaries may have had with their financial statements

14  that were provided from Clearsettle.

15  Q.  Now, earlier you stated that one of your tasks is to help

16  dispensaries set up credit card accounts through Clearsettle;

17  is that right?

18  A.  Yes, that's correct.

19  Q.  And what is your understanding of what those accounts would

20  allow the dispensaries to do?

21  A.  My understanding is that once the dispensaries filled out

22  and submitted those applications, then they would be allowed to

23  set up a credit card account with Clearsettle.

24  Q.  And from an Eaze customer perspective, what does that mean?

25  A.  That means once they are set up, and it's implemented on

1   our website, then from a customer perspective, they would be

2   able to use credit cards or debit cards to complete their

3   transaction on Eaze.

4   Q.   Okay.  And so be clear, then if there's a dispensary that

5   has a credit card account that's set up, then its products that

6   are being offered on Eaze can be purchased using a credit or

7   debit card; is that right?

8   A.   Yes, that's correct.

9   Q.   And with respect to dispensaries that are not set up with

10  Clearsettle or don't have that credit card processing account

11  with Clearsettle, what are the options to pay for their

12  products on your website?

13  A.   The options would be cash only.

14  Q.   Can you elaborate a little bit more on the relationship

15  between Eaze, Clearsettle and dispensaries, if and how they

16  were integrated with one another?

17  A.   Yes.  So from my perspective, Eaze was the technology

18  platform in which the marijuana products were sold, and so we

19  also acted as the -- or at least my role acted as someone who

20  would coordinate and pass along information, and so between

21  Eaze, Clearsettle and the dispensaries, all entities that were

22  involved in processing the credit card payments.

23  Q.   Can you describe the process by which the dispensaries that

24  were participating in this operation received funds for the

25  sale of their products through the Eaze site?

L32PWEI3                           Tassone - Direct

1    A.  Yes.  So after a period of time in which products were

2    purchased, and there's a period of transaction time, they would

3    receive generally like weekly wires from Clearsettle into their

4    own business bank accounts.

5    Q.  All right.  Mr. Levine, could you display for everyone what

6    is Government Exhibit 425.

7            And, Mr. Tassone, what is the date of this e-mail?

8    A.  Monday, October 17th, 2016.

9    Q.  Who is it from?

10   A.  Craig Wald.

11   Q.  Are you can you remind us who that is, briefly?

12   A.  He is the principal owner of Sweetwood.

13   Q.  And who is it to?

14   A.  It's to Keith McCarty, myself, Michael Tassone, and Noah

15   Tutak.

16   Q.  And what is the subject?

17   A.  The subject is Sweetwood settlement statement with the

18   dates, September 8th, 2016, through October 2nd, 2016.

19   Q.  Okay.  Let's go to the e-mail that's on the bottom of the

20   page 2, continuing into page 3.  Great.

21           Okay.  Who is this e-mail from?

22   A.  Esra Eren.

23   Q.  Is that one of the Clearsettle points of contact that we

24   discussed earlier?

25   A.  Yes.

1    Q.  And who is it to?

2    A.  Craig Wald and Cameron Wald.

3    Q.  Going back to Esra for a minute, what is his e-mail address

4    that's on this e-mail?

5    A.  Esra@Clearsettle.com.

6    Q.  Okay.  And then looking at the "to" line, I believe you

7    stated that this was Craig Wald; is that right?

8    A.  Yes, that's correct.

9    Q.  And what is the e-mail address?

10   A.  CraigW@two-LLC.com.

11   Q.  What is two-LLC.com?

12   A.  That was Craig's business entity.

13   Q.  Okay.  And then who is cc'd?

14   A.  Guy and Kudret.

15   Q.  And is Guy one of the points of contact that we were

16   discussing before at Clearsettle?

17   A.  Yes, they were.

18   Q.  Can you read the e-mail out loud?

19   A.  The e-mail address?

20   Q.  No, I'm sorry.  The body of the e-mail.

21   A.  Okay.  Good morning.  Please find attached the settlement

22   statement for Sweetwood for the dates September 8th, 2016,

23   through October 2nd, 2016.

24   Q.  Keep going.

25   A.  Please kindly be informed that weekly settlement statements

will be sent every Monday and wire transfer for the previous

week's settlement will be processed every Monday as well.

Basically, you will be receiving a settlement statement and

previous week's payment confirmation in the e-mail we will send

you on a weekly basis.  Please let me know if you need further

assistance.

Q.  And then who signed off?

A.  Esra Eren Yildirim.

Q.  Is that the person you know as Esra?

A.  Yes.

Q.  So looking at this top line of e-mail, please find attached

the settlement statement for Sweetwood; do you see that, what

we just read, the first part?

A.  Yes.

Q.  And what does settlement statement refer to?  Can you

explain that?

A.  A settlement statement is like a financial statement for a

period of time that reflected the transactions that were

processed through Clearsettlement on behalf of the dispensary.

Q.  Okay.  Let's go to the third e-mail on page 1 of this

document.  Okay.  So focusing on the e-mail at the top, who is

the author of this e-mail?

A.  Craig Wald.

Q.  Can you read the e-mail aloud?

A.  Hi, guys.  Attached are the first three settlement

1    statements received from Clearsettle for your review.  I want

2    to be transparent with your back end of the card transactions.

3    Please note that 8.75 percent fee is on the gross, including

4    refunds and bank fees.  When we drill down to the various cost

5    per transaction, the percentage of fee to gross ticket amount,

6    it gets interesting.

7    Q.  All right.  So let's focus on the last two lines of this

8    e-mail, Please note the 8.75 percent fee is on the gross,

9    including refunds and bank fees.  When we drill down to the

10   various cost per transaction, percent of fee to gross ticket

11   amount, it gets interesting.  What is your understanding of

12   what Mr. Wald means here?

13   A.  He's saying that the 8.75 percent fee that is charged per

14   transaction is on the entire transaction, regardless if there

15   was any refund or bank fee.

16   Q.  And when he says:  When we drill down to the various costs

17   per transaction, percentage of fee to gross ticket amount, it

18   gets interesting, what do you understand him to mean when he

19   says "it gets interesting"?

20   A.  I believe he's meaning that the fee is higher.  He believes

21   the fee to be higher than 8.75 percent.

22   Q.  All right.  So let's go now to the attachments, which I

23   believe begin on page 5 of the PDF.  Mr. Tassone, what is this?

24   A.  This is a settlement statement from Clearsettle to the

25   Sweetwood dispensary.

1    Q.   Okay.  So let's look at the top left.  What does it say

2    there?

3    A.   The top left says "Clearsettle."

4    Q.   And what does it say on the top right?

5    A.   Bureau Solutions Limited, The Shard, 25th floor, 32 London

6    Bridge Street, London SE19SG.

7    Q.   Are you familiar with Bureau Solutions Limited?

8    A.   No, I'm not.

9    Q.   Are you familiar with that address?

10   A.   No, I'm not.

11   Q.   Where did you believe that Clearsettle was located?

12   A.   Calabasas, California.

13   Q.   Why do you believe that?

14   A.   That's where I had the meeting with the Clearsettle team.

15   Q.   Do you know earlier in your testimony we talked about what

16   you call receiving banks or acquiring banks; do you remember

17   that?

18   A.   Yes, I do.

19   Q.   Do you know what, if anything, receiving or acquiring banks

20   Clearsettle worked with to facilitate the card transactions?

21   A.   No, I do not.

22   Q.   All right.  So let's look at this statement.  What is the

23   date range of this Sweetwood settlement statement?  And I can

24   direct your attention to the first blue line, if it's helpful.

25   A.   The date range is October 10th, 2016, through October 16th,

1    2016.

2    Q.  All right.  And then let's look at, do you see on the top,

3    the top row it says "gross amount USD"?

4    A.  Yes, I do.

5    Q.  And then there, what's the number there?

6    A.  15,106.

7    Q.  And what do you understand that number to reflect?

8    A.  Reflect the total amount of marijuana transactions

9    processed in USD, United States dollars.

10   Q.  And when you say "amount," are you referring to dollar,

11   volume or number, or when you say "amount," what do you mean?

12   A.  Yes, dollar amount, yes.

13   Q.  And then further down, like the sixth line down, do you see

14   "No. of transactions"?

15   A.  Yes.

16   Q.  And there's 723; is that right?

17   A.  That is correct.

18   Q.  What does that refer to?

19   A.  The number of transactions that were processed for that

20   period of time.

21   Q.  And then the last row in that particular section of rows,

22   it says "card rate 8.75 percent;" do you see that?

23   A.  Yes.

24   Q.  Is that what we've been discussing in connection with this

25   exhibit?

1   A.  Yes, that would be the fee, yes.

2   Q.  And then on the bottom it says "net payout USD,

3   $13,727.22;" do you see that?

4   A.  Yes, I do.

5   Q.  What does that reflect?

6   A.  That is the net amount that a dispensary would receive

7   after all the fees and deductions have been made; so deductions

8   for refunds, bank fees, and the card processing fee of

9   8.75 percent.  So once all that's removed, that would be the

10  total amount that would be sent to dispensaries.

11  Q.  And it would be sent from where to where?

12  A.  My understanding, it's sent from one of the Clearsettle

13  receiving banks to the dispensary's bank.

14  Q.  All right.  We can take that down, Mr. Levine.  Thank you.

15          So, Mr. Tassone, earlier today we talked about

16  chargebacks; do you remember that?

17  A.  Yes, I do.

18  Q.  Can you remind us briefly what a chargeback is?

19  A.  Yes, a chargeback is when a customer sees something that

20  they dispute or don't recognize on their bank or credit card

21  statement, and then they would contact their bank and request

22  to have that charge investigated and/or reversed.

23  Q.  Were chargebacks a particular concern with respect to the

24  payment processing of Eaze transactions?

25  A.  Yes, they were.

1   Q.   Why is that?

2   A.   There was concern because if a customer initiated a

3   chargeback, we believe they would call their bank or their

4   credit card company, and then that would lead to the credit

5   card company investigating or looking closer into the

6   transaction, which would potentially be flagged as a marijuana

7   transaction.

8   Q.   And when you say that the customer would contact the bank

9   or a credit card company, could you be more specific about what

10  bank or what credit card company you're talking about?

11  A.   Yes.  They would contact their bank or credit card

12  companies which, you know, they see the charge for on their

13  statement.

14  Q.   Were steps taken to minimize chargebacks?

15  A.   Yes, there were.

16  Q.   Generally speaking, what steps were taken?

17  A.   There were different billing descriptors that were created

18  in order to -- in order to -- I'm sorry, could you repeat the

19  question?

20  Q.   Sure.  Generally speaking, what steps were taken to

21  minimize chargebacks?

22  A.   Yes.  So on a customer's receipt, they would actually --

23  they would actually see like the name of the billing descriptor

24  that was being used; so if they had any question of what was

25  being processed or charged on their statement, they would be

1    able to see that and reference it and correlate it to the Eaze

2    platform.

3    Q.   Is that something that we saw earlier today on the

4    Government Exhibits, a particular receipt with that type of

5    information?

6    A.   Yes, that's an example.

7    Q.   Mr. Tassone, are you familiar with the domain

8    Onlinebiller.net?

9    A.   Yes, I am.

10   Q.   How are you familiar with it?

11   A.   It was one of the billing descriptors that was used for a

12   period of time in relation to Clearsettle and Eaze.

13   Q.   And briefly remind us what a billing descriptor is?

14   A.   Billing descriptor is what is shown on a customer's bank or

15   credit card statement describing the entity or the business in

16   which they purchased the transaction from.

17   Q.   And how do you access the domain, or did you access the

18   domain Onlinebiller.net in the 2016 or 2017 time period?

19   A.   Yes, I did.

20   Q.   Mr. Levine, can you display for the witness only what has

21   been marked for identification as Government Exhibit 3606, 3607

22   and 3608.  And you can do it side by side or one at a time,

23   whatever is easier.

24          And, Mr. Tassone, once you've had an opportunity to

25   look at each of these exhibits, let me know.

1    A.  Okay.  I've seen this.

2    Q.  Mr. Tassone, do you recognize these?

3    A.  Yes, I do.

4    Q.  What do you recognize it to be?

5    A.  This is something from the -- oh, it just changed.

6    Q.  Oh, I wanted you to look at all of them.  So there are

7    three exhibits here, and I want you to look at each one.

8    A.  Okay.

9    Q.  So let me know when you're done doing that.

10   A.  I think I saw 3607, and now I'm on 3608.  I can go to the

11   next one, if there is one.

12   Q.  It should be 06, 07, 08.

13   A.  Okay.

14   Q.  All right.  So this is 3606.

15   A.  Can you move to the next one?

16   Q.  3607, do you see that?

17   A.  Yes.

18   Q.  And then last one, Mr. Levine.

19           3608?

20   A.  Okay.  I see that.

21   Q.  Okay.  Do you recognize these?

22   A.  Yes, I do.

23   Q.  What do you recognize them to be?

24   A.  This is an image from the Wayback Machine pulling a website

25   from that time, and it is a website that was used as a billing

1    descriptor on the Eaze platform in correlation to

2    Clearsettlement.

3    Q.  Aside from the reference to the Wayback Machine that

4    appears on these, are these fair and accurate representations

5    of Onlinebiller.net as you accessed them in the 2016, 2017 time

6    period?

7    A.  Yes, they are.

8            MS. LA MORTE:  Government offers 3606, 3607 and 3608.

9            MR. GILBERT:  No objection.

10           MR. TAYBACK:  No objection.

11           THE COURT:  Received.

12           (Government's Exhibits 3606, 3607 and 3608 received in

13   evidence)

14   BY MS. LA MORTE:

15   Q.  Mr. Levine, can you please publish for everyone Government

16   Exhibit 3608.

17           Okay.  Can you walk us through what this is,

18   Mr. Tassone?

19   A.  This is the landing page that you would see if you went to

20   Onlinebiller.net, and it is a template that you can fill out if

21   you sought a purchase on your statement and you were trying to

22   look up that purchase and where it came from.

23   Q.  So how, if at all, did this relate to a credit or debit

24   transaction through Eaze in the 2016 through 2017 time period?

25   A.  Yeah, it relates if a customer purchased marijuana on the

1   Eaze platform, they may see Onlinebiller.net on their bank or

2   credit card statement; so they may question what that is, and

3   in that case, they would go to the website, and they would be

4   prompted with this to plug in or punch in the information,

5   credit card information that they used to make the purchase to

6   look up their order.

7   Q.  Was Onlinebiller.net provided for use in this scheme by

8   Clearsettle, by Eaze or someone else?

9   A.  My understanding from Clearsettle.

10  Q.  All right.  Mr. Levine, can we go to Government

11  Exhibit 3606.

12          Mr. Tassone, what is this?

13  A.  This is a prompt that a customer would see, basically like

14  an FAQ section.

15  Q.  And would this include an Eaze customer that used their

16  card to purchase marijuana in the 2016 and 2017 time period?

17  A.  Yes, it would.

18  Q.  Okay.  So let's look at this.  Do you see where it says

19  "What is Onlinebiller?" at the top?

20  A.  Yes.

21  Q.  Can you read that aloud?

22  A.  Onlinebiller processes payments for various e-commerce

23  companies.  The e-commerce company will fulfill the order and

24  deliver the products you purchased.  Onlinebiller processes the

25  payment and charges your card.

1    Q.  Mr. Tassone, it says here in the second sentence that you

2    just -- of the paragraph you read, the e-commerce company will

3    fulfill the order and deliver the products you purchased.  Did

4    Onlinebiller fulfill orders for products purchased through the

5    Eaze website?

6    A.  Not to my knowledge, no.

7    Q.  Now, let's go -- well, just to continue, did Onlinebiller

8    ever deliver products purchased through the Eaze website?

9    A.  Not to my knowledge, no.

10   Q.  All right.  Let's go to the second paragraph.  Do you see

11   where it says "What is this charge from Onlinebiller?"

12   A.  Yes.

13   Q.  Can you read that paragraph aloud?

14   A.  The charge you received from Onlinebiller is for an

15   e-commerce transaction made on the date of the transaction of

16   your statement.  If you are able to recall any goods or

17   services you purchased around the date of the transaction,

18   those are most likely what you are being charged for.

19   Otherwise, feel free to contact us at support@onlinebiller.net

20   for more information on your charge.

21   Q.  Okay, let's go to the next paragraph, "I have a problem

22   with an order that was processed with Onlinebiller, what should

23   I do?"  Do you see that?

24   A.  Yes, I do.

25   Q.  Can you read this aloud?

1    A.  If you have a problem with an order that was processed with

2    Onlinebiller, the first step is to go back to the original

3    merchant's customer support to see if they can resolve the

4    issue.  If you do not know who the original merchant is, you

5    can e-mail us at support@onlinebiller.net, and we will be happy

6    to point you to the correct merchant.  Once you have contacted

7    the original merchant, they will attempt to resolve the issue

8    with you directly.  If you're still not satisfied with the

9    resolution, please contact Onlinebiller again for assistance.

10   Q.  Is there anything in here about the customer contacting

11   their banks?

12   A.  No.

13   Q.  What direction is given to the customer by

14   Onlinebiller.net?

15   A.  To contact the merchant or business that they made the

16   transaction for, and if they still cannot get the answers that

17   they're looking for, then they can e-mail the support team at

18   Onlinebiller.net.

19   Q.  Okay.  Let's just read the last two paragraphs, "What types

20   of credit cards does Onlinebiller take?"  Do you see that?

21   A.  Yes.

22   Q.  Can you read that?

23   A.  We currently process Visa and MasterCard cards.  Any card

24   that's functions as any of these cards will work.  Debit,

25   prepaid credit, as long as there is sufficient balance

1   available.

2   Q.   And what about "I did not purchase anything from

3   Onlinebiller"?

4   A.   Onlinebiller is not -- sorry.   Onlinebiller is not an

5   e-commerce company, but a payment processing company.   You

6   purchased something from a company that uses Onlinebiller to

7   process payments.   If there is a purchase that you made online

8   from around this time of your Onlinebiller payment that does

9   not show up elsewhere on your statement, that may be what you

10   bought.   If you have question or suspect fraud, please reach

11   out to us at support@onlinebiller.net and we'll be happy to

12   help as soon as possible.

13   Q.   Is there anything in what you just read about contacting

14   your bank if you have a question or suspect fraud?

15   A.   No, there is not.

16   Q.   Now, earlier you told us that the processor that Eaze was

17   working with during this period of time was Clearsettle; is

18   that correct?

19   A.   That's correct.

20   Q.   To your knowledge, has Eaze ever worked with an online

21   processor called Onlinebiller.net?

22   A.   Not to my knowledge.

23   Q.   All right.   Let's go to Government Exhibit 3607.   Okay.

24   And I'm just going to direct your attention to the section

25   towards the bottom that says "I think someone used my card

1   without my consent;" do you see that?

2   A.  Yes, I do.

3   Q.  Can you read what is stated below?

4   A.  We take fraud very seriously at Onlinebiller.  Please reach

5   out to us at support@Onlinebiller.net, and we will help as soon

6   as possible.

7   Q.  Is there anything in here about contacting your bank if you

8   suspect fraud or that someone used your card without your

9   consent?

10  A.  No, there's not.

11  Q.  What is your understanding of the purpose of the direction

12  from Onlinebiller to contact its customer support team if there

13  are any fraud or any other issues with the purchase?

14          MR. TAYBACK:  Objection, foundation and understanding.

15          THE COURT:  Do you want to lay a foundation?

16  Q.  We talked about chargebacks earlier, Mr. Tassone, right?

17  A.  Yes, that's correct.

18  Q.  And we talked a little bit about ways that the company

19  decided or tried to reduce chargebacks; is that right?

20  A.  Yes, that's correct.

21  Q.  Is Onlinebiller.net an example of an effort to reduce

22  chargebacks or no?

23  A.  Yes, it is.

24  Q.  How so?

25  A.  If a customer were to -- if the customer were to go to

L32PWEI3                        Tassone - Direct

1   Onlinebiller.net, they would be able to view this page, this

2   FAQ, and hopefully reach out to the team that's listed on this

3   page instead of contacting their bank, which would prompt, you

4   know, a closer look into that transaction.

5   Q.  You can take that down, Mr. Levine.  Thank you.

6            Now, Mr. Tassone, were you involved in efforts to

7   apprise Eaze customers the descriptor that they should expect

8   to see on their credit card statements?

9   A.  Yes, I was.

10  Q.  And why were those efforts made?

11  A.  Primarily to reduce customer confusion and improve that

12  customer experience, as well as reduce overall chargebacks.

13  Q.  Can you give us an example of how that was done during the

14  Clearsettle period of 2016 to 2017?

15  A.  Yes.  So what we had talked about already, there was an

16  Onlinebiller.net, that was one of the descriptors used.  There

17  was also a phone service that would call a customer and let

18  them know what was being charged on their card for that

19  transaction.

20  Q.  All right.  Mr. Levine, can you display for everyone what

21  is Government Exhibit 428.

22            Mr. Tassone, what is this?

23  A.  This is an internal communication, internal communication

24  at Eaze.

25            (Continued on next page)

1   Q.  Do you recall what kind of platform this internal

2   communication is on?

3   A.  Yes.  The internal communication platform in which all the

4   companies -- or, sorry -- all the employees of the company had

5   visibility to read or communicate with one another.

6   Q.  And then I see up at the top there is what's deemed a post

7   by Michael Tassone in products.  Is that you?

8   A.  Yes.

9   Q.  What is the date?

10  A.  January 20, 2017.

11  Q.  OK.  Can you read your post aloud.

12  A.  "I placed an order with my CC yesterday.  Afterwards I got

13  a call from a foreign number letting me know that my card was

14  charged by Easymedpay.  Conceptually this is a great idea, but

15  is there a way to make this number based in the US or even a

16  415 number like our current phone masking service?  Jim

17  Patterson.  Jennifer Watson."

18  Q.  OK.  Let's break this down.  So the first sentence is, "I

19  placed an order with my CC yesterday."  What does "CC" refer

20  to?

21  A.  "CC" is "credit card."

22  Q.  When you say you placed an order with your credit card

23  yesterday, what kind of order are you referring to?

24  A.  A marijuana order on the Eaze platform.

25  Q.  And then it says, "Afterwards, I got a call from a foreign

1    number letting me know that my card was charged by Easymedpay."

2    When you say "letting me know that my card was charged by

3    Easymedpay," what do you mean there?

4    A.   The number called to let me know that my card was charged

5    by Easymedpay, and Easymedpay would be -- or was one of the

6    descriptors that was being used for that transaction.

7    Q.   So how does Easymedpay then release your purchase?

8    A.   It would be -- I mean, it, it doesn't, other than being --

9    being called here to let me know that it's related to my Eaze

10   purchase.

11   Q.   And what would appear on your credit card statement

12   reflecting an Eaze purchase?

13   A.   My credit card statement would show Easymedpay.

14   Q.   OK.  So it says, "Afterwards I got a call from a foreign

15   number."  And then your next sentence says, "Conceptually this

16   is a great idea, but is there any way to make this number based

17   in the US or even a 415 number like our current phone masking

18   service?"  When you say "Conceptually this is a great idea,"

19   what do you mean by that?  Why do you say "conceptually it's a

20   great idea"?

21   A.   I thought it was a great idea because it would help

22   mitigate customer confusion about what transactions were on

23   their credit card statements and as a result just reduce the

24   amount of chargebacks that we might see.

25   Q.   And why is it important to reduce the number of

1    chargebacks?

2    A.   From a business perspective, we would want to, you know,

3    limit the amount of refunds and chargebacks for products sold,

4    for profitability's sake as well as to limit chargebacks so

5    that they weren't above a certain threshold or they weren't

6    high, a high number of chargebacks where a bank might actually

7    look into them.

8    Q.   And why don't you want a bank to look into them?

9    A.   If a bank were to look into these chargebacks, they may be

10   able to correlate that they were marijuana transactions.

11   Q.   OK.  Let's look at page 2.  What is this, Mr. Tassone?

12   A.   This is a voicemail transcript from my phone.

13   Q.   I'm sorry.  I didn't hear you.  A voice?

14   A.   This is a transcript of a voicemail that was to my phone.

15   Q.   And is this the voicemail that you were referencing in your

16   post?

17   A.   Yes, it is.

18   Q.   And when you say this is a transcript, how was this

19   transcript created?  By you or automatically or something else?

20   A.   Yeah.  It was automatic.  There is a voicemail out to my

21   phone, and my phone made an attempt to transcribe this into

22   text format.

23   Q.   Can you read this.

24   A.   "Hello.  This is a courtesy call from -- we're just calling

25   to let you know that we have seen that you have received --

1   can -- five -- that will appear at Nex-Tech, a charge on your

2   bank statement would be EasyPay.  If you have any questions,

3   feel free to contact -- fine.  We do appreciate your order and

4   I hope that you have a wonderful good day.  Good-bye."

5           MS. LA MORTE:  OK.  You could take this down,

6   Mr. Levine.  Thanks.

7   Q.  So during the 2016-to-2017 time frame, were there other

8   means used to alert customers besides the phone calls that

9   would appear on their card statements for Eaze purchases?

10  A.  You said 2016, 2019?

11  Q.  2016, 2017, sorry.

12  A.  Yes.  The other means were just the descriptors and then

13  being able to reference those.

14  Q.  So remind us when Clearsettle stop processing card payments

15  for Eaze transactions?

16  A.  The beginning of 2018.

17  Q.  How did that relationship come to an end?

18  A.  Abruptly.  And because -- are you asking -- I'm sorry --

19  are you asking why it came to an end?

20  Q.  How did it come to an end?

21  A.  Yeah.  Basically Eaze dispensaries went offline for a

22  period of time, and so there was no transactions flowing

23  through the platform anymore.

24  Q.  And why did it go offline for a period of time?

25  A.  In 2018, California moved from medical marijuana purchases

1    to adult use, and at the time, the dispensaries that were in

2    our network did not have any provisional licenses to sell

3    marijuana.  So they were taken offline and we paused the sale

4    of marijuana at that period.

5    Q.  And at this point was Keith McCarty still CEO of Eaze?

6    A.  No, he was not.

7    Q.  Who was the CEO of Eaze at that time?

8    A.  Jim Patterson.

9            MS. LA MORTE:  Your Honor, I'm going to switch to a

10   new topic, so, I know that we're near the general lunchtime.

11           THE COURT:  Yes.  So that's a good point.

12           So, ladies and gentlemen, we will give you your lunch

13   break now and we'll resume in an hour.  And we'll also have an

14   answer to the question that one juror sent to us at that time.

15           So, Jim, do you want to lead them out.

16           THE LAW CLERK:  Please follow me.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I received a note from Joseph Dorney.  I'm

3    not sure which juror he is, but I'll find out over the break.

4    The note reads, "Why is this case being tried in New York?"

5          I think there are several possible responses to that.

6    One might be that the charge here is a conspiracy among various

7    persons, and any place where that conspiracy was carried out

8    can be a place where the case is tried.

9          Another kind of answer would be that the determination

10   of where the case can be brought in many different

11   jurisdictions, that is determined by the Department of Justice.

12         Another possibility is, the case can be brought in any

13   place where there is what is called in legal terms venue, and I

14   will be instructing you at the close of this case on venue.

15         And there are probably lots of other answers, too,

16   like, the assistants of the United States Attorney's Office for

17   the Southern District of New York just don't have enough to do,

18   so this looked like a good opportunity.  But I don't think I'll

19   use that one.

20         So any suggestions from counsel, starting with the

21   government?

22         MR. GILBERT:  May I have one moment to confer with

23   co-counsel?

24         THE COURT:  Yes.

25         MR. GILBERT:  We vote for option number two, your

1    Honor.

2              THE COURT:  Which was option number two?

3              MR. GILBERT:  Department of Justice.

4              THE COURT:  Department of Justice, OK.

5              MR. FOLLY:  Your Honor, the government's view is that

6    option number three is the most appropriate here.

7              THE COURT:  What was option number three?

8              MR. FOLLY:  That you would instruct them, your Honor.

9         I believe you said, "It may be brought in any place

10   where there is what is called in legal terms venue," and then

11   you will be instructing them at the close of the case on what

12   venue is.

13             THE COURT:  So both of -- I'm sorry.  Both defendants

14   agreed on the DOJ approach?

15             MR. TAYBACK:  Yes, your Honor.  They're not, I guess,

16   technically mutually exclusive.  The other one, you'd have to

17   decide on the instruction.

18             THE COURT:  I think they will have a better

19   understanding of this a little bit, but what they're really

20   asking is something that I don't think I can instruct them on,

21   which is that, well, it could have been brought where the bad

22   guys are, the alleged bad guys, it could be brought where the

23   alleged victims are, you know, you could go through all that

24   kind of mishegas, but I don't think -- and I don't know the

25   answer to that, for starters, but I also don't think that's

1    appropriate.

2            The trouble with both the DOJ and the venue

3    approaches, which I think both are permissible, really doesn't

4    answer their question.  But I don't think we're going to be

5    able to answer their question in the way that this juror

6    probably intended it, which is, what he's really saying in my

7    view is, why wasn't this brought in California.  The answer, of

8    course, is, they were too busy there in their hot tubs.

9            So as between venue and the Department of Justice, I'm

10   going to do both.  I think what I will say is, the

11   determination of where a conspiracy case which involves many

12   districts can be brought is ultimately determined by the

13   Department of Justice, but you will have to find that there was

14   an act taken in the Southern District of New York that meets

15   the requirements of law that's called venue, and I will

16   instruct you about that at the end of the case.  How about

17   that?

18           MR. FOLLY:  That's fine with the government, your

19   Honor.

20           MR. TAYBACK:  Fine with the defendant Akhavan.

21           MS. LA MORTE:  Can we excuse the witness?

22           THE COURT:  Oh, I'm sorry.

23           MS. LA MORTE:  I just noticed he was in there, in the

24   box.

25           THE COURT:  I -- but he's having so much fun.

1          MS. LA MORTE:  Learning the law on venue.

2          THE COURT:  You're excused.  Yes.  Sorry.  Thank you

3    very much.

4          (Witness excused)

5          THE COURT:  All right.  So I think we have agreement.

6    I'll give a short instruction after we return from lunch.

7          MR. TAYBACK:  I'm sorry, when did you say -- it was

8    scratched out.  When did you say you would do it?

9          THE COURT:  Right after lunch.

10         (Discussion held off the record)

11         THE COURT:  So I'm told that some of you have not been

12   abiding by social distancing.  That may be people here or may

13   be people in the back.  We have an obligation to the jurors,

14   among everyone else, to make sure that all the careful rules

15   that are in place to prevent anyone from coming down with

16   COVID-19 are adhered to.  How many exceptions are there to

17   that?  Zero.  So Linda will give you more chapter and verse.

18   But next time that happens, I would consider the following:  If

19   it's someone in the back who is doing that, they will be

20   excluded from the courthouse for the rest of the trial.  If

21   it's someone at one of these tables who's doing that, we will

22   impose some sort of sanction, including maybe an evidentiary

23   sanction relating to the case, depending on which side is

24   involved.

25         So don't do it.

L32AWEI4ps                    Tassone - Direct

1              All right.  We'll see you after lunch.

2              (Luncheon recess)

3

4                   A F T E R N O O N   S E S S I O N

5                             1:50 p.m.

6              (Jury not present)

7              THE COURT:  The jury is on their way up.

8              MR. TAYBACK:  Your Honor, while you're waiting --

9    Mr. Tayback and Mr. Akhavan -- I have an issue to raise to the

10   Court.  It appears that the telephone system set up at our

11   counsel table to communicate between myself and Mr. Akhavan

12   doesn't work on Mr. Akhavan's side, but, more importantly --

13   well, as importantly -- it broadcasts from my phone to the

14   public line.  It also appears to do so from the government's

15   set of phones, though it's a little fainter when the government

16   uses it, than mine.

17             THE COURT:  It sounds like there's a detriment and a

18   benefit.  But, you're right.  We have to get that fixed.  My

19   inclination, unless you disagree, is to get it fixed at the end

20   of today so we can move forward.

21             MR. TAYBACK:  I, I -- my one concern with that is, I

22   do need to confer with my client during the course of the

23   examination occasionally.  And that will require us to lean

24   together.  I don't want to --

25             THE COURT:  No.

1          MR. TAYBACK:  -- create more issues, but I do feel

2     like due process requires me to confer with my client.

3          THE COURT:  Yes.  All right.  Jim, see if you can get

4     someone up.

5          THE LAW CLERK:  Yes.  Counsel, I want to test

6     something.  So I'd like to -- do we have someone who is

7     listening to the public line, an attorney, maybe, or someone?

8          MR. TAYBACK:  We can call someone who is listening.

9          THE LAW CLERK:  That would be helpful.  I'd like to

10    figure out first whether the overhearing-of-the-discussion

11    issue relates specifically to the use of the phone or whether

12    it's just that the microphone is picking up the conversation.

13    Do you understand the distinction I'm trying to make?

14         MR. TAYBACK:  I do.

15         THE LAW CLERK:  OK.  So I can test that by muting your

16    microphone, which I have just done.  And now I'd like to see

17    whether a discussion, a mock discussion between you and your

18    client, is still overheard by those on the public line.

19         MR. TAYBACK:  Sure.

20         THE LAW CLERK:  I will also bring someone up now to

21    address the separate issue of your client not being able to

22    hear you.

23         MR. TAYBACK:  Would you like me to test it?

24         THE COURT:  Yes.

25         MR. TAYBACK:  It sounds like that may resolve the --

1           THE COURT:  So just put your microphones on mute when

2      you have those conversations.

3           MR. TAYBACK:  I don't know if I have the capability of

4      doing that.

5           THE LAW CLERK:  Yes.  I can do that.  The difficulty

6      is, I can only mute and unmute all defense microphones

7      simultaneously.  So that won't be a solution.  But perhaps you

8      can move the microphones away from you.  And move --

9           MR. FOLLY:  I had thought if you press the push

10     button, the green light goes off --

11          THE COURT:  Yes.  That's what I thought.  So you can

12     mute it from your end.

13          THE LAW CLERK:  You're right.

14          THE COURT:  OK?

15          MR. TAYBACK:  Other than the phone doesn't work.

16     That's the other issue.

17          THE COURT:  I'm sorry?

18          MR. TAYBACK:  You have resolved --

19          THE COURT:  OK.

20          MR. TAYBACK:  You resolved the public --

21          THE COURT:  The only discussion is, where is the jury.

22          MR. TAYBACK:  No, no, the other issue is, his phone

23     doesn't work.  So, even so, he can't communicate.

24          THE COURT:  It doesn't work at all.

25          MR. TAYBACK:  No.  I mean, I could hear him because he

1    talks loud enough and close enough.  But I can't -- it's not

2    coming through the phone.

3         MS. LA MORTE:  We're not allowed to pass notes, right?

4    I just put a sticky there and then tell him to pick it up?  We

5    can't tell him to do that?

6         THE COURT:  Here comes the jury.

7         MS. LA MORTE:  OK.

8         THE LAW CLERK:  I've asked for tech support.

9         (Jury present)

10   MICHAEL TASSONE, Resumed.

11        THE COURT:  Ladies and gentlemen, we got a note from

12   Juror No. 13 asking, why is this case being tried in New York.

13        The decision where to try a federal case is made by

14   the Department of Justice.  They, in a typical bank fraud case,

15   it could be where the defendants are, it could be where the

16   banks are, it could be where third parties are.  There's very

17   broad discretion that the Department of Justice has.  And

18   that's entirely their right and not part of your concern.

19        You will have to decide, however, whether any, if you

20   believe there was a conspiracy to commit bank fraud, about

21   which I will tell you more tomorrow, whether at least one of

22   them occurred in the Southern District of New York, in

23   Manhattan or the Bronx or Westchester.  So that will be the one

24   aspect of that that you will to concern yourself with.  That's

25   called venue, and I'll tell you more about that later as well.

 1            But basically, should not have any concern over where

 2     the Department of Justice -- I don't know why they choose one

 3     place for one case and another place for another case.  Maybe

 4     it's because of where the victims are.  Maybe it's because of

 5     where some key event occurred.  Maybe it's because of where the

 6     defendants are.  There are lots and lots of reasons.  So that's

 7     the answer to the question.

 8            All right.  I think, on the matter that was just

 9     raised, let's see how we go, and raise your hand if there's a

10     problem.  All right?

11            MR. TAYBACK:  Yes, your Honor.

12            THE COURT:  Very good.  All right.  So we'll continue

13     with the witness.

14            MS. LA MORTE:  Yes, your Honor.

15     DIRECT EXAMINATION (Cont'd)

16     BY MS. LA MORTE:

17     Q.  Mr. Tassone, when we broke, I believe we were discussing

18     why Clearsettle had stopped processing.  Do you recall that?

19     A.  Yes, I do.

20     Q.  When Clearsettle stopped processing, how did Eaze accept

21     payments for products on its site?

22     A.  Eaze was cash only after that time.

23     Q.  Roughly how long did that last?

24     A.  A few months.

25     Q.  So, just to orient everyone, what period of time are we

1    talking about?

2    A.  The beginning of 2018 through out to like January, for a

3    couple months.

4    Q.  Was Eaze ultimately able to restart a card payment option?

5    A.  Yes, they were.

6    Q.  Were you involved with that?

7    A.  Yes, I was.

8    Q.  How did that come about?

9    A.  The -- it came about through the relationship with Ray and

10   our former CEO, Jim Patterson.

11   Q.  What processor did Eaze use when it resumed accepting card

12   payments?

13   A.  They were known as EU or EUprocessing.

14   Q.  And I believe you said that relationship came about through

15   Jim Patterson and Ray; is that correct?

16   A.  Yes, that's correct.

17   Q.  And internally at Eaze, how would you generally refer to

18   the processor, by what name or names?

19   A.   Internally we referred to them as EU or EUP or

20   EUprocessing.

21   Q.  Why do you refer to it that way?

22   A.  That was what was told to us from Jim Patterson.

23   Q.  And, again, what was Jim Patterson's role in the company at

24   this time at Eaze?

25   A.  CEO.

L32AWEI4ps                     Tassone - Direct

1   Q.  And from your perspective, how if at all did Clearsettle

2   relate to EUP?

3   A.  From my perspective, they were --

4           MR. TAYBACK:  Objection, foundation.

5           THE COURT:  Hang on.

6           OK.  All right.  You'll need to lay a foundation.

7           MS. LA MORTE:  Sure, your Honor.

8   Q.  Were you involved in processing during the EUprocessing

9   period of time, when EUprocessing was the processor?

10  A.  Yes, I was.

11  Q.  And we just discussed how you were involved when

12  Clearsettle was the processor, correct?

13  A.  Yes, that is correct.

14  Q.  And you had just testified that you understood that Ray

15  Akhavan was in charge of both Clearsettle and EUprocessing; is

16  that right?

17  A.  Yes, that is correct.

18  Q.  From your perspective, how if at all did Clearsettle relate

19  to EUprocessing?

20  A.  From my perspective, they were the same company.

21  Q.  What makes you say that?

22  A.  Just the way that we interacted with them internally and

23  talked about them, like they just seemed like one and the same.

24  Q.  Now, earlier in your testimony, you told us that you became

25  more involved in the scene during the time that EUprocessing

L32AWEI4ps                     Tassone - Direct

 1   served as the processor.  Do you recall that?

 2   A.  Yes, I do.

 3   Q.  Were there differences as to that in your mind, as to how

 4   the payment processing worked under Clearsettle versus

 5   EUprocessing?

 6   A.  Yes, there were.

 7   Q.  Can you elaborate on the differences?

 8   A.  The differences were just the amount of different billing

 9   descriptors that were being used and how they were being

10   changed out over time, in perspective to each dispensary.

11   Q.  What was the fee that EUprocessing charged with respect to

12   each card transaction?

13   A.  The fee was 12 percent plus a foreign exchange fee that

14   could range anywhere from 3 to 5 percent.

15   Q.  How did that compare to the fee charged during the

16   Clearsettle processing days?

17   A.  In Clearsettle it was 8 percent and 5 percent, so this was

18   much higher.

19   Q.  Did you come to learn why the fee became much higher under

20   EUprocessing?

21   A.  I was told that --

22   Q.  Did you come to learn that information?

23   A.  Yes, I did.

24   Q.  From whom did you learn that information?

25   A.  Former CEO Jim Patterson.

1   Q.  And what did you learn about the reason for the increase in

2   fees?

3   A.  He told me that it was due to the high-risk nature, that

4   there were substantially high risks and it would require more

5   resources in order to process the payments.

6   Q.  And what was the foreign exchange fee for?

7   A.  My understanding is, because the receiving or acquiring

8   banks that were holding the funds for the transactions were

9   overseas, and so in order to send -- in order to send money

10  from overseas in euros to domestic banks, there was a

11  conversion fee.

12  Q.  What was your position --

13          MS. LA MORTE:  Did you say something, your Honor?

14          THE COURT:  No.

15          MS. LA MORTE:  Sorry.

16  Q.  What was your position at the company when EUprocessing

17  came on board?

18          THE COURT:  Feedback again.  I don't know why.

19          Go ahead.

20  Q.  What was your position at the company when EUprocessing

21  came on board?

22  A.  Director of operations.

23  Q.  Who did you report to at that time?

24  A.  The senior vice president Darcy Cozzetto.

25  Q.  And what was your role in the credit card processing scheme

L32AWEI4ps                    Tassone – Direct

1    at this time?

2    A.  My role was similar to before, interacting and coordinating

3    between the dispensaries, Eaze, and EUprocessing.

4    Q.  What were your primary points of contact at EUprocessing?

5    A.  Someone named Andres and Medhat.

6    Q.  How did you primarily communicate with EUprocessing?

7    A.  Via email.

8    Q.  Now, you mentioned Medhat.

9    A.  Yes.

10   Q.  What was his role?

11   A.  My understanding is that he was the representative of the

12   company, and he would help with like technical issues as far as

13   pertained to the processing.

14   Q.  How did you communicate with Medhat, primarily?

15   A.  Email or Telegram services.

16   Q.  What is Telegram?

17   A.  Telegram is a phone application, a communication app.

18   Q.  And you also mentioned Andres?

19   A.  Yes.

20   Q.  Did you communicate with Andres?

21   A.  Yes, I did.

22   Q.  On what type of issues did you communicate with him on?

23   A.  Primarily -- I mean, just, just questions around financial

24   settlement statements with dispensaries.

25   Q.  And how did you communicate with Andres?

1    A.  Via email.

2    Q.  Are you familiar with the email EUprocessing or

3    ProtonMail.com?

4    A.  Yes, I am.

5    Q.  Did you receive email from that email address?

6    A.  Yes, I did.

7    Q.  How was email typically signed?

8    A.  At one point they were signing by Andres, but over time

9    they were typically just signed EUP.

10   Q.  Did you know who you were communicating with when you were

11   using -- when you were interacting with someone from the

12   EUprocessing email address?

13   A.  No, I did not.

14   Q.  Did you know where EUprocessing.com, or EUprocessing, was

15   based?  Sorry.

16   A.  No, I do not.

17   Q.  Is that typical for you in a business relationship?

18   A.  It can happen, but it's not typical.

19   Q.  So at this point in time, with respect to EUprocessing as

20   the processor, what type of documents and information would you

21   collect from the dispensary that you would then pass on to

22   EUprocessing?

23   A.  We would collect information for their credit card

24   application and stuff that would pertain to their business

25   details, banking details, and then just identification for

1   their principal ownership, so stuff like driver's license,

2   articles of incorporation, things like that.

3   Q.  Who did you send that information to?

4   A.  Once I collected that information, I would send it to

5   EUprocessing at ProtonMail.com.

6   Q.  And by the way, do you know what ProtonMail is?

7   A.  I believe it to be some sort of encrypted email platform.

8   Q.  And what role if any did EUprocessing have in setting up

9   merchant processing accounts for the dispensaries?

10  A.  EU would provide the business application, the template

11  application, that I would pass on to the dispensary and gather

12  that information, once again, with their business-entity

13  details and banking details, and then, once I processed to

14  EUprocessing, they would set up their credit card processing

15  account.

16  Q.  And at that time, what if anything would EUprocessing send

17  back to you?

18  A.  Generally they would send back confirmation that it's been

19  received and that the credit card account was ready to go and

20  set up.

21  Q.  Was there any more specific information that EUprocessing

22  sent back to you in connection with those accounts?

23  A.  Yes.  Once they were ready to go, they would send back a

24  billing descriptor that was correlated to that specific

25  dispensary.

1  Q.  And with respect to -- you would indicate that you passed

2  along banking information from the dispensary to

3  EUprocessing.com; is that right?

4  A.  Yes, that's correct.

5  Q.  Was any sort of financial-type information passed from

6  EUprocessing.com through you for the dispensary?

7  A.  Yes, there was.

8  Q.  What was that?

9  A.  The financial information, which is financial settlement

10  statements, so statements showing the number of transactions

11  and the amount of transaction revenues for a period of time.

12         MS. LA MORTE:  Mr. Levine, can you put up on the

13  screen for everyone Government Exhibit 553.

14  Q.  Mr. Tassone, what is this?

15  A.  This is an email that I sent.

16  Q.  To whom?

17  A.  To John W.

18  Q.  Who is that?

19  A.  John is an employee at Eaze.

20  Q.  What was his role?

21  A.  He was a product manager.

22  Q.  What does that mean?

23  A.  He worked on the product engineering side of the company,

24  so for some of the technical stuff that helps and pertains to

25  building the website.

L32AWEI4ps                    Tassone - Direct

1    Q.  What's the date of this email?

2    A.  Saturday, November 17, 2018.

3    Q.  And what is the subject?

4    A.  "Credit card application for new merchant account."

5    Q.  OK.  Let's go to the bottom email on that page.  Do you see

6    where it says "from: Maxwell Kolden"?

7    A.  Yes, I do.

8    Q.  Who is that?

9    A.  Maxwell Kolden was a senior operations manager.

10   Q.  Could you read the email.

11   A.  "Good afternoon.  Can you please process the attached

12   account for a new merchant."

13   Q.  And who is Mr. Kolden -- I'm sorry.  Did I interrupt you?

14   A.  It's OK.

15   Q.  Who is Mr. Kolden sending this email to?  What email

16   address?

17   A.  He sent it to EUprocessing at ProtonMail.com.

18   Q.  And when it says, "Can you please process the attached

19   account for a new merchant," what do you understand that to

20   mean?

21   A.  He is requesting -- he is requesting that a new credit card

22   account be set up for one of the new dispensaries in the

23   network.

24           MS. LA MORTE:  OK.  Now let's go to the top of page 1,

25   Mr. Levine.

1    Q.  And this is an email from you, I believe you said, to

2    Mr. John Wong, Wang?

3    A.  Yes, that's correct.

4    Q.  Can you read your email aloud.

5    A.  "Hey John, can you set up credit cards for Wildflower.  EU

6    should have their info as of a week ago."

7    Q.  And when you say "Wildfire" -- sorry -- "Wildflower" here,

8    what do you mean?

9    A.  Wildflower is a dispensary, a part of the e-seller.

10   Q.  And when you say "EU" in this email, what are you referring

11   to?

12   A.  EUprocessing, the credit card processing company.

13           MS. LA MORTE:  OK, Mr. Levine.  Can we now go to the

14   attachment.  Here we go.  Thank you.

15   Q.  Generally speaking, Mr. Tassone, what is this?

16   A.  This is a application for a dispensary to set up a new

17   credit card account with EUprocessing.

18   Q.  Now, if you look through -- and Mr. Levine can also scroll

19   through if that's helpful to you -- but if you look through, is

20   there any reference on these forms to any particular bank or

21   institution to which this form is going?  Is that reflected

22   anywhere?

23   A.  Not on this page.

24   Q.  Would you like Mr. Levine to scroll down?

25   A.  Yes, please.

L32AWEI4ps                    Tassone - Direct

1              Not on this page either.

2              Not on this page.  Keep scrolling, please.

3              Please continue.

4              OK.  No.

5              Yes, there are banking details on this page.

6    Q.  But these are banking details for who?

7    A.  For Wildflower dispensary and for Eaze network.

8    Q.  Is there any indication on this form as to where the form

9    would be submitted?

10   A.  No.

11             MS. LA MORTE:  OK.  Let's look on page 1 of the PDF,

12   Mr. Levine, which I believe is the second page of the PDF.

13   It's actually page 1 of the attachment.

14   Q.  I believe you had stated before that this is an application

15   for a processing account for Wildflower.  Is that right?

16   A.  Yes, that's correct.

17   Q.  So taking a look at this first page, what is the company

18   that's noted on here?

19   A.  The company is Wilton Management.

20   Q.  How if at all does that relate to Wildflower?

21   A.  That is a business or management entity company related to

22   Wildflower.

23   Q.  And let's look at the CEO.  Do you see that section in the

24   middle?

25   A.  Yes, I do.

1   Q.  Who is the CEO indicated on this form for Wildflower/Wilton

2   Management?

3   A.  Stephen Pearce.

4   Q.  OK.  Let's now go to the last page of the attachment.

5           OK.  I'm sorry.

6           Do you see where it says "your banking details"?

7   A.  Yes, I do.

8   Q.  According to this form, what banking details are supplied

9   here?  For what company?

10  A.  For Wilton Management.

11  Q.  And what is your understanding of the purpose for

12  submitting this information to EUprocessing, this particular

13  banking information?

14  A.  So that when Wildflower processes marijuana transactions

15  through the processing payment -- or payment processor, they

16  would be able to hold those funds in a certain bank and then be

17  able to send those funds to Wildflower, into their bank.

18          MS. LA MORTE:  Mr. Levine, you can take that down.

19  Thank you.

20  Q.  Now, Mr. Tassone, earlier you told us that once a credit

21  card processing account was set up for a dispensary,

22  EUprocessing would send back a billing descriptor.  Is that

23  right?

24  A.  Yes.  That's correct.

25          MS. LA MORTE:  Mr. Levine, can you explain for the

1  witness Government Exhibit 555.

2  Q.  Mr. Tassone, what is this?

3  A.  This is an email thread with myself on it.

4          MS. LA MORTE:  Mr. Levine, can you display it to

5  everyone.  Can you display it for everyone.  Thank you.

6          Is it up?  OK.  Thank you.

7  Q.  OK.  Can you tell us what this is now, Mr. Tassone.

8  A.  Yes.  This is an email thread with myself on it.

9          MS. LA MORTE:  OK.  Let's go to page 2 through 3 of

10 this PDF email.

11         OK.  Thank you.

12 Q.  Do you see where it says towards the bottom of page 2 of

13 the email "Sunday, November 11, 2018, at 9:03 a.m."?

14 A.  Yes, I do.

15 Q.  Where is this email sent from?

16 A.  EUprocessing@ProtonMail.com.

17 Q.  Can you read it aloud.

18 A.  "Dear Maxwell, we are already working on it.  Could you

19 please provide an estimated monthly processing volume for the

20 application."

21         MS. LA MORTE:  Thank you, Mr. Levine.

22         You can go to page 1.  Thanks.

23 Q.  And what application, looking at Government Exhibit 555,

24 what application is being referred to?

25 A.  The application for Wildflower dispensary.

1    Q.  Did you respond to the EUprocessing.com email that we just

2    looked at?  Mr. Levine can scroll to page 2.

3    A.  Yes, I did respond.

4    Q.  Where is your responds?

5    A.  On the second half.

6         MS. LA MORTE:  Can you blow that up, Mr. Levine.

7    Q.  And what do you write?

8    A.  "Here are the projections for the next three months.

9    November: 500 transactions, roughly $35,000 in revenue.

10   December: 1500 transactions, roughly $105,000 in revenue.

11   January: 3,000 transactions, roughly $2.1 million in revenue."

12   Q.  What do these projections reflect?

13   A.  This is an estimated amount of volume or number of

14   deliveries that this dispensary would process over the three

15   corresponding months, and then it would also be the

16   corresponding amount of revenue that we estimated for those

17   deliveries.

18   Q.  This is information that EUprocessing had asked for?

19   A.  Yes, it is.

20        MS. LA MORTE:  OK.  We can move out of the blow-up,

21   Mr. Levine.

22   Q.  Did EUprocessing respond to this email that we just looked

23   at?

24   A.  Yes, they did.

25        MS. LA MORTE:  Mr. Levine, can you blow up -- there we

1    go.  Thank you.

2    Q.  What did EUprocessing respond?  Can you read that aloud.

3    A.  "Hi Max.  OK.  Thank you for the details.  We will have it

4    up and running by tomorrow evening.  Please wait for our

5    confirmation and instruction details.  Best, EUP."

6    Q.  When it says here, "We will have it up and running by

7    tomorrow evening," what is your understanding of what

8    EUprocessing is referring to?

9    A.  That the account will be enabled and ready to -- ready for

10   launch by tomorrow evening on their end.

11   Q.  And by "account" what are you referring to?

12   A.  The credit card payment processing account.

13           MS. LA MORTE:  We could zoom out of that.  Thank you.

14   And let's go to the first page of the PDF.  Could we blow up

15   the email that's towards the bottom, November 18, 2018 at 8:26.

16   Thank you.

17   Q.  Mr. Tassone, where is this email from?

18   A.  EUprocessing@ProtonMail.com.

19   Q.  Could you please read aloud the first four lines of the

20   email.

21   A.  "Hi Max, hi Michael.  We apologize for the small delay on

22   the application.  Please find attached the current channel

23   distribution, including the new applicant (Wilton in green).

24   Please set up the routing on the Inovio side using the channel

25   K-Grand-Euphorium-USD.

Q.   Now, you see where it states, in the second line, "Please find attached the current channel distribution"?

A.   Yes, I do.

Q.   What is your understanding what a channel distribution refers to?

A.   From my perspective, it referred to the billing descriptors.

Q.   And then when it says, "Please set up the routing on the Inovio side, using the channel K-Grand-Euphorium-USD," what do you understand K-Grand-Euphorium-USD referred to?

A.   I understand that to be the billing descriptor that was to be used.

Q.   And then at the end, the last two lines of the email before the sign-off, can you read those.

A.   "Please kindly confirm, as soon as the setup is done and switched for live."

Q.   Sorry.  I meant the line below that.

A.   "In addition, please fill up again the attached Excel file with the basic information of the applicant and send it back to us."

Q.   When it says here "basic information of the applicant," what do you understand "applicant" to be referring to?

A.   The dispensary applicant.

          MS. LA MORTE:  OK.  Can we now go to the attachment to this email, please.  I think it's at the end.

1          Great.  Can we blow up -- yes.  Can we blow it up,

2     Mr. Levine, from the first column through, let's say, Caliva,

3     which is in the middle?

4     Q.  Mr. Tassone, are you familiar with this chart?

5     A.  Yes, I am.

6     Q.  Have you seen charts like this in the course of your

7     communications with the EUprocessing?

8     A.  Yes, I have.

9     Q.  Can you tell us what the purpose of this chart is.

10    A.  This chart is outlining of the -- or listing of the

11    dispensaries and their legal names, their bank account names,

12    bank address, invoice names, and general banking details.

13    Q.  And was this information that EUprocessing asked you to

14    compile?

15    A.  Yes, it was.

16    Q.  And it asked you to compile it for particular dispensaries;

17    is that right?

18    A.  Yes.

19    Q.  What dispensaries?

20    A.  Dispensaries that were setting up a credit card account.

21    Q.  OK.  So let's take a look at one of them.  Do you see up in

22    the column that says Wildflower?

23    A.  Yes, I do.

24    Q.  And this is a dispensary that we've been talking about; is

25    that right?

L32AWEI4ps                        Tassone - Direct

1   A.  That's correct.

2   Q.  And who is listed as the owner/CEO of Wildflower?

3   A.  Stephen Pearce.

4   Q.  And then Wildflower, is that -- what is Wildflower, that

5   name?  How is it used?

6   A.  Well, I believe Wildflower is a d/b/a, which is used as

7   their dispensary name.

8   Q.  When you say "d/b/a," what do you mean?

9   A.  It's short for "doing business as," so like a nickname for

10  that business.

11  Q.  And then what is the legal name of the dispensary according

12  to the chart?

13  A.  Exclusive Caregivers of California, Incorporated.

14  Q.  And what is the bank account name, according to the chart?

15  A.  Wilton Management.

16  Q.  So those are three names that are associated with

17  Wildflower?

18  A.  Yes, that's correct.

19  Q.  And then let's take a look at Indigo.  Do you see where

20  Indigo is?

21  A.  Yes, I do.

22  Q.  What is Indigo?

23  A.  Indigo is a dispensary name.

24  Q.  And what is the legal name that's listed for the company?

25  A.  Community Health Solutions.

1  Q.  And what is the bank account name listed for the company?

2  A.  Sac On Demand, LLC.

3  Q.  And then finally, let's take a look at Caliva.  That's the

4  column at the end.

5  A.  Caliva is the name of a dispensary.

6  Q.  Is that the d/b/a name or is that a different name?

7  A.  I believe that to be the d/b/a name, yes.

8  Q.  What's the legal name of the company, according to the

9  chart?

10 A.  Nui Ventures, LLC.

11 Q.  And what is the bank account name, according to the chart?

12 A.  Fresh Options, LLC.

13 Q.  And these three names pertain to the same dispensary; is

14 that right?

15 A.  Yes, that is correct.

16 Q.  OK?

17         MS. LA MORTE:  Now, we could get out of this.  Thank

18 you.

19 Q.  So we'll discuss this in a little bit more detail later,

20 but based on your observations, was it common or uncommon for

21 marijuana dispensaries to use different names or change names

22 over time?

23 A.  It was common.

24         MS. LA MORTE:  All right.  Mr. Levine, can you please

25 display for the witness what's been marked for

L32AWEI4ps                    Tassone - Direct

1    identification -- I'm sorry -- what's been marked as Government

2    Exhibit 566.

3    Q.  Mr. Tassone, what is this?

4    A.  This is an email thread from EUprocessing with myself on

5    it.

6    Q.  So let's focus on the email.  This is the bottom of --

7              MS. LA MORTE:  Your Honor, may we pass a note?

8              THE COURT:  I'm sorry?

9              MS. LA MORTE:  Sorry about that.

10             Is 566 up on everyone's screen?  OK.

11   Q.  All right.  So let's start with the email that's on the

12   bottom of PDF, page 1.

13   A.  OK.

14   Q.  What's the date of this email?

15   A.  Wednesday, 5th December 2018.

16   Q.  And where is the email from?

17   A.  EUprocessing.

18   Q.  And it's to?

19             Who is the "to"?

20   A.  Myself and John Wang.

21   Q.  OK.  Can you read aloud the text of the email through to

22   the chart.

23   A.  "Hello Michael, hello John.  A new processing channel has

24   been opened by the bank today.  The account information has

25   been already sent to Inovio for setup.  Account name: K-New

 1   Op-Pearls-USD.  Please use the account as an extension for
 2   Green Goddess, to split the volume over 50/50.  Please let us
 3   know as soon as the adjustment has been done.  Please find
 4   below the actual distribution of the accounts (in green the new
 5   one)."
 6   Q.  OK.  So when EUprocessing states in the first line that "a
 7   new processing channel has been opened by the bank today," what
 8   do you understand that to mean?
 9   A.  I understand that to mean that the processing channel for
10   that dispensary has not been opened in this setup.
11   Q.  And what is the reference to the bank -- what type of bank
12   do you understand that to refer to?
13   A.  The receiving or acquiring bank.
14   Q.  And then do you see where it says "account name:
15   K-New-Op-Pearls-USD"?
16   A.  Yes, I do.
17   Q.  Is that typically how the processing account names
18   appeared?
19   A.  Yes.  That was the general format.
20   Q.  And what is your understanding of what transactions were
21   being run through this account?
22   A.  Marijuana transactions.
23   Q.  And then you see where it says, "Please find below the
24   actual distribution of these accounts (in green the new one)"?
25   A.  Yes, I do.

L32AWEI4ps                    Tassone – Direct

1    Q.  OK.  And then we have a chart here.  Do you see that?

2    A.  Yes, I do.

3              MS. LA MORTE:  Mr. Levine, could we blow up the chart.

4    Q.  OK.  So overall, what do you understand this chart to be

5    reflecting?

6    A.  This chart is listing out the dispensaries and the

7    corresponding billing descriptors relative to those

8    dispensaries.

9    Q.  OK.  So let's go through the columns on the chart.  So you

10   see the third column on the left, "site name"?

11   A.  Yes, I do.

12   Q.  What is your understanding of what that refers to?

13   A.  That is referring to the dispensaries.

14   Q.  And so the list that's below "site name" are a list of

15   dispensaries?

16   A.  Yep, that's correct.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Okay.  And what dispensaries are these?

2    A.  These are the licensed retail dispensaries that are part of

3    the Eaze network.

4    Q.  Do these dispensaries have credit card processing accounts

5    that you do processing?

6    A.  Yes, they do.

7    Q.  All right.  Let's look at the site address.  What is site

8    address, what is your understanding what that reflects?

9    A.  This is the website that was associated with the billing

10   descriptor.

11   Q.  I see.  So if we take the first row, do you see where it

12   says Caliva?

13   A.  Yes, I do.

14   Q.  And I believe you testified that is a marijuana dispensary?

15   A.  Yes, that is correct.

16   Q.  What is the website that is associated with Caliva,

17   according to this chart?

18   A.  Soniclogistix.com.

19   Q.  Is that website associated with other marijuana

20   dispensaries on this chart as well?

21   A.  Yes, it is.

22   Q.  Which ones?

23   A.  Fume, Green Goddess, Indigo and Telos.

24   Q.  So all of those are associated with Soniclogistix.com?

25   A.  Yes, they are.

1  Q.  Now, let's look at the billing descriptor.  Again, remind

2  us what a billing descriptor is?

3  A.  A billing descriptor is the -- is what will show a customer

4  on their bank statement or credit card statement the name or

5  identity of a business that they process the transaction

6  through.

7  Q.  So can you walk us through an example?  If a customer went

8  on the Eaze website and purchased a marijuana product that is

9  sold by the marijuana dispensary Natoma, what would we expect

10  to see on the billing descriptor of that customer?

11  A.  We would expect to see Desirescent.com.

12  Q.  And what if the purchase was through on the Eaze website

13  for a product produced by Wildflower, what would we expect to

14  see on the customer's billing statement?

15  A.  Euphoriumjewelry.com.

16  Q.  Now, you see on the far right there's a column called

17  Processing Account?

18  A.  Yes, I do.

19  Q.  And what do you understand that to refer to?

20  A.  Similar to like a billing descriptor, but I believe that to

21  refer to the descriptors used for the processing or, I'm sorry,

22  the receiving banks.

23  Q.  Now, is Eaze contained -- the name Eaze, is that contained

24  in any of the billing descriptors?

25  A.  No, it is not.

1   Q.  Is the name of any of the marijuana dispensaries contained

2   in any of the billing descriptors?

3   A.  No, it is not.

4   Q.  And directing your attention to processing accounts, that

5   column?

6   A.  Okay.

7   Q.  Aside from this information being provided by

8   EUprocessing.com, do you have any familiarity with Linebeck?

9   A.  No, I do not.

10  Q.  NewOp?

11  A.  No, I do not.

12  Q.  Organikal?

13  A.  No, I do not.

14  Q.  Goodgreenbazaar?

15  A.  No.

16  Q.  Anything on here?

17  A.  No.

18  Q.  You can take that down.  Thank you, Mr. Levine.

19          Now, Mr. Tassone, you also testified earlier that you

20  would receive various statements from EUprocessing; is that

21  right?

22  A.  Yes, that's correct.

23  Q.  And generally what do these statements reflect?

24  A.  These would be financial settlement statements that show

25  the number of transactions and revenue for those transactions

1    over a period of time.

2    Q.  What was the purpose of the statements?

3    A.  The purpose was to give the dispensaries, you know, a

4    statement, a financial record statement for the number of

5    transactions that they were processed through credit cards.

6    Q.  Mr. Levine, could you display for everyone what's been

7    marked as Government Exhibit 485.

8           Mr. Tassone, what is this?

9    A.  This is an e-mail, internal e-mail from John Wang.

10   Q.  And who is it to?

11   A.  It's to myself.

12   Q.  And what is the date?

13   A.  Monday, September 17th, 2018.

14   Q.  Okay.  Let's go to the e-mail at the very bottom of the

15   second PDF page.  Oh, I'm sorry, two into three.  Sorry about

16   that.  Perfect.

17          Do you see this e-mail that starts at the bottom of

18   page 2 and spills onto page 3?

19   A.  Yes, I do.

20   Q.  Where is this e-mail from?

21   A.  EUprocessing.

22   Q.  Okay.  So now, let's focus on the body of the e-mail.  Can

23   you read the greeting in the first two lines?

24   A.  Dear John, please find below the most important details in

25   regard to the supplier statement issuing and transfers.

1    Q.  So the reference here to supplier statement, what is that a

2    reference -- what do you understand that to mean?

3    A.  Supplier would be a dispensary; so the dispensary's

4    financial statements.

5    Q.  Are these the statements that we were just talking about a

6    moment ago?

7    A.  Yes, that's correct.

8    Q.  Okay.  So let's read -- can you read aloud point 1?

9    A.  Statement issuing.  All statements are issued on a weekly

10   base and will be sent to you via e-mail each Friday.  For a

11   better reconciliation, we split the e-mails by processing

12   channel, EXP, K-NewOp -- I'm sorry, example,

13   K-NewOp-Soniclogistix-USD.  This is the name you also see

14   within the Inovio system.  All statements suppliers relating to

15   this channel are always attached to the particular e-mail.

16   Q.  So the first line here say this says all statements are

17   issued on a weekly base and will be sent to you via e-mail each

18   Friday.  Is that, in fact, what would generally occur, that you

19   would receive statements on a weekly basis from EUprocessing?

20   A.  Yes, we would receive them on a weekly basis.

21   Q.  Can you read the first two lines of point 2?

22   A.  Payments.  The payments are initiated on a weekly basis, as

23   well each Monday.

24   Q.  And then what is the last line there of that section?

25   A.  Please keep in mind that an international wire transfer can

1     take up to three working days.

2     Q.  And when we're talking about -- or when EUprocessing is

3     talking about payments in this section, what do you understand

4     payments to be referring to here?

5     A.  The payments would be referring to transaction dollars that

6     were held from marijuana transactions by their banks, and then

7     sent to dispensaries into their banks.

8     Q.  Okay.  Mr. Levine, can we go to page 5 in this PDF?

9             Mr. Tassone, what is this?

10    A.  This is a financial settlement statement from EU to a

11    dispensary partner.

12    Q.  All right.  So let's go through this.  Let's start by

13    blowing up the top half of the document.  Go down a little bit.

14    There you go.  Thank you.

15            All right.  Do you see where it says Partner Name?

16    A.  Yes, I do.

17    Q.  What is the partner name that's listed here?

18    A.  CLMSS, LLC.

19    Q.  What do you understand CLMSS, LLC to be?

20    A.  That's the business entity for a dispensary.

21    Q.  Do you know what dispensary it is?

22    A.  Hometown Heart.

23    Q.  And do you see there's a time period, a service period

24    above?  Do you see that?

25    A.  Yes, I do.

1   Q.  What's the service period here for this statement?

2   A.  August 20th, 2018, through August 26th, 2018.

3   Q.  Now, let's look at the section entitled Total Transactions.

4   Do you see that?

5   A.  Yes, I do.

6   Q.  What is your understanding of what this shows?

7   A.  It shows the total amount of transactions that occurred

8   during that statement period.

9   Q.  How long is the period?

10  A.  Six days.

11  Q.  And lastly, how many transactions -- I'm not expecting an

12  exact figure, but roughly how many transactions occurred in

13  that week?

14  A.  Roughly 4,000.  Or, yeah, 4,500.

15  Q.  Your math is better than mine.

16  A.  Yeah.

17  Q.  Okay.  So now, let's now go to the turnover towards the

18  bottom there.  Do you see that?

19  A.  Yes, I do.

20  Q.  So you see under the bolded word Turnover, underneath there

21  it says Gross Turnover?

22  A.  Yes.

23  Q.  What is your understanding of what gross turnover means?

24  A.  Gross turnover means the total amount of revenue collected

25  from the transactions that occurred during that period.

1    Q.  And then do you see where it says Settlement Currency?

2    A.  Yes, I do.

3    Q.  So what is your understanding of what that means?

4    A.  That is the settlement amount or the amount in the currency

5    of Euros.

6    Q.  Why is settlement in Euros, to your understanding?

7    A.  My understanding is that the transactions took place in

8    California or in the United States, and then those funds were

9    sent to international banks that use Euros.

10   Q.  And what is the gross turnover for the six-day period of

11   time?

12   A.  In --

13   Q.  According to this document?

14   A.  The settlement currency?

15   Q.  Yup.

16   A.  253,581.35 Euros.

17   Q.  That's 253,000 or 253 million?  I mean, if you can't tell,

18   that's fine.

19   A.  I believe that's 253,000.

20   Q.  Okay.  Now, let's look at the deductions.  Do you see that

21   mini chart on the right of deductions?

22   A.  Yes, I do.

23   Q.  What is your understanding of what the deductions are

24   reflecting?

25   A.  The deductions show any fees or reverse charges that would

1    be reduced from the total settlement amount.

2    Q.  Do you see under the deductions it says the rate?

3    A.  Yes, I do.

4    Q.  And what is the rate here?

5    A.  12 percent.

6    Q.  And what is your understanding what that reflects?

7    A.  That reflects the 12 percent rate that was applied to the

8    gross transactions for that period.

9    Q.  And what are the other deductions that are taken out of the

10   settlement amount?

11   A.  Refund fees and chargeback fees.

12   Q.  And then here, in this instance for this statement, what's

13   the total deduction?

14   A.  31,962.86 Euros.

15   Q.  And this 31,962.86 Euros, is this money that's going to the

16   dispensaries or money that's being withheld from the

17   dispensaries?

18   A.  Withheld from the dispensaries?

19   Q.  And according to this, what is the largest portion of the

20   money that is being withheld from the dispensary?

21   A.  The rate at 12 percent.

22   Q.  And I believe you testified to this earlier, but who

23   provided that rate?

24   A.  EU did.

25   Q.  All right.  We can zoom out of that.  And then let's zoom

1    on the bottom part, and then we see --

2            Do you see where it says Total Settlement Amount on

3    the bottom?

4    A.  Yes, I do.

5    Q.  What does this number reflect?

6    A.  It reflects the total payment amount to the dispensaries

7    after the fees or anything has been removed from the gross

8    amounts.

9    Q.  In addition to -- we can take that down, Mr. Levine.  Thank

10   you very much.

11           Mr. Tassone, in addition to the supplier statements,

12   are there any other type of financial documents that would be

13   sent to you from time to time from EUprocessing?

14   A.  I'm sorry, can you repeat that?

15   Q.  Sure.  Aside from statements, were there any other sort of

16   financial documents that were sent to you from EUprocessing

17   from time to time?

18   A.  Yes.  So from time to time, there would be receipts of the

19   wire transfers sent.  They would be sent to me.

20   Q.  Mr. Levine, can you put up for everyone Government

21   Exhibit 560.

22           So now, let's go to the e-mail on the bottom of --

23   well, first of all, Mr. Tassone, what is this?

24   A.  This is an e-mail thread from EUprocessing with myself,

25   Michael Tassone.

1    Q.  So let's start with the e-mail on the top.  Right there,
2    thank you.
3           And you said this is from EUprocessing; is that right?
4    A.  That's correct.
5    Q.  Can you read aloud this e-mail?
6    A.  Hi, Michael.  Yes, both wires have been sent to the new
7    bank account.  Please find attached both wire confirmation
8    proofs.
9    Q.  Okay.  Let's go down to the attachment.  Yes, can we blow
10   that up?
11          What is this?
12   A.  This is a receipt for a wire transfer.
13   Q.  And you said this is a receipt for a wire transfer; is that
14   right?
15   A.  That's correct.
16   Q.  And when you say wire transfer, transfer of what?  What is
17   it reflecting?
18   A.  It's transferring the funds that were held from the EU
19   banks for the payment processing to the dispensary banks.
20   Q.  Okay.  So let's take a look at this.  Do you see on the
21   very top where it says:  Proof of payment for order
22   PO-G3KLKWNNQ?
23   A.  Yes, I do.
24   Q.  Do you have any understanding of what the letters and
25   numbers are referring to?

L32PWEI5                         Tassone - Direct

1   A.  No, I do not.

2   Q.  Now, do you see remittance?

3   A.  Yes, I do.

4   Q.  What does it say there?

5   A.  Payment B/O Spinwild Limited.

6   Q.  Do you know, have any knowledge of what Spinwild Limited

7   is?

8   A.  No, I do not.

9   Q.  Now, do you see a few lines down it says Ultimate Debtor?

10  A.  Yes, I do.

11  Q.  What's the ultimate debtor that's listed?

12  A.  Spinwild Limited.

13  Q.  Now, to the ultimate debtor address, just that line, can

14  you read that line?

15  A.  Suites 41/42 Victoria House, 26 Main Street GI.

16  Q.  Are you familiar with that address?

17  A.  No, I'm not.

18  Q.  And see where it says Debtor?

19  A.  Yes, I do.

20  Q.  What's the name of the debtor that's listed?

21  A.  Kantox LTD, 9 Devonshire Square, Third Floor, London EC2M

22  4YD GB.

23  Q.  Do you recognize or do you know Kantox Limited?

24  A.  No, I do not.

25  Q.  Are you familiar with that address?

 1   A.  No, I am not.

 2   Q.  And do you see where it says Beneficiary?

 3   A.  Yes, I do.

 4   Q.  What is the beneficiary listed there?

 5   A.  CLMSS, LLC.

 6   Q.  And I believe we talked about that before, right?

 7   A.  That's correct.

 8   Q.  What is that a reference to?

 9   A.  The dispensary Hometown Heart.

10   Q.  And what's the beneficiary bank?

11   A.  The bank name?

12   Q.  Yes, please?

13   A.  JP Morgan Chase Bank NA.

14   Q.  And on the upper right-hand side, what does it say there?

15   A.  "Transparency counts."

16   Q.  Do you have transparency into the back-end of this process?

17   A.  No, I do not.

18   Q.  Okay.  We can take that down.

19           So let's talk now about chargebacks in the 2018 to

20   2019 time period when EUprocessing was the processor.  Did you

21   participate in discussions with EUprocessing about chargebacks?

22   A.  Yes, I did.

23   Q.  What type of information did EUprocessing provide about

24   chargebacks, generally?

25   A.  Generally, that he wanted to reduce or limit the amount of

L32PWEI5                        Tassone – Direct

1    chargebacks that were being processed on the platform.

2    Q.  Did EUprocessing inform you about the risks associated with

3    chargebacks?

4    A.  Yes, they did.

5    Q.  And what were those risks?

6    A.  The risk would be --

7           MR. TAYBACK:  Object to foundation as to context.  Is

8    it a person or an e-mail or a statement, oral statement?

9           MS. LA MORTE:  Your Honor?

10          THE COURT:  I'm sorry.

11          MS. LA MORTE:  There was an objection.

12          THE COURT:  Yes, I'm sorry.

13          MS. LA MORTE:  That's Okay.

14          (Pause)

15          THE COURT:  You can clarify that.

16          MR. TAYBACK:  I'm sorry?

17          THE COURT:  Clarify that.

18          MS. LA MORTE:  Yes, your Honor.

19   BY MS. LA MORTE:

20   Q.  I had asked you if you had discussion of -- about

21   chargebacks with EUprocessing, right?

22   A.  Yes.

23   Q.  And you had indicated yes?

24   A.  Yes.

25   Q.  How did those discussions occur?

1    A.  They occurred via e-mail and -- yeah.

2    Q.  From what e-mail address?

3    A.  EUprocessing@ProtonMail.com.

4    Q.  And through that e-mail address, what were the types of

5    risks that were told to you concerning chargebacks?

6    A.  The type of risks were going over a certain threshold or

7    percentage; so basically wanting to limit the amount of

8    chargebacks below one percent of transactions.

9    Q.  Why was that?

10   A.  There was a concern that if chargebacks spiked above one

11   percent, that would maybe flag some of these transactions and

12   spur further investigation.

13   Q.  Did EU dispute chargebacks?

14   A.  Not to my knowledge, no.

15   Q.  Mr. Levine, can you display for everyone Government

16   Exhibit 615.

17           Mr. Tassone, what is this?

18   A.  This is an e-mail thread from EUprocessing to myself.

19   Q.  And who else?

20   A.  John Wang.

21   Q.  Okay.  So what is your understanding -- and take a look at

22   the e-mail if you need to for a minute, but what is your

23   understanding of the overall purpose of the e-mail?

24   A.  The overall purpose was to provide some instruction around

25   limiting chargebacks and what the concerning thresholds would

1   be.

2   Q.  So let's read portions of this.  Can you read the greeting

3   before point 1?

4   A.  Hey, guys.  Okay.  Please let's give me an opportunity to

5   provide you a bit more details relating to the CB calculations

6   and rules.

7   Q.  What is your understanding of what EUprocessing means with

8   regard to reference to CB?

9   A.  Chargebacks.

10  Q.  Now, let's go to -- well, just read on point 1 aloud, just

11  the part after the number one?

12  A.  This means, the merchant channel needs -- sorry, let me

13  start that over.  This means the merchant channel need always

14  to stay below one percent or below 100 chargebacks within the

15  processing month.

16  Q.  And I'm sorry, can you also read the part after point

17  No. 1?

18  A.  General rule, one percent or 100 chargebacks per month.

19  Q.  What do you understand that to mean?

20  A.  That the guideline here instruction was to keep chargebacks

21  below one percent or below 100 individual chargebacks per

22  month.

23  Q.  Now, let's go to point -- do you see point 2?

24  A.  Yes, I do.

25  Q.  Early waring, .75 percent and 70CBs?

1   A.   Yes.

2   Q.   Can you read that aloud?

3   A.   Early waring, 75 percent and 70CBs, as soon as a channel

4   reach a chargeback ratio of 75 percent with a chargeback count

5   of 70 and more, the channel will be identified for the early

6   warning program by Visa.  This is also a very important

7   threshold for the bank.

8   Q.   And then what's in highlight here?

9   A.   In general, our goal should be to keep the chargeback ratio

10  under one percent, and much more importantly, to stay below 70

11  chargebacks, even below 60 within one channel.

12  Q.   Now, keep reading below that the next couple of lines?

13  A.   To increase the amount of the processing channels and split

14  the volumes/chargebacks is the first necessary step.

15  Q.   Okay.  So to increase the amount of processing channels and

16  split the volume/CB is the first necessary step, what do you

17  understand that to mean?  What's going on here?

18  A.   I understand that to mean that the first step would be to

19  create more processing channels or more descriptors that would

20  allow us to split the volumes, meaning like the marijuana

21  transactions, over different channels to reduce the

22  chargebacks.

23  Q.   So if we take one particular marijuana dispensary, let's

24  say Hometown Heart, would you be able to process, or did you

25  process in the course of the scheme, marijuana transactions for

1   those products through more than one processing channel?

2   A.  Yes, I believe so.

3   Q.  And what was the purpose of doing that?

4   A.  The purpose was because there were -- it was a high-volume

5   dispensary, and there were a high amount of chargebacks flowing

6   through on that channel, and so we split them up over multiple

7   channels to reduce the amount of chargebacks.

8   Q.  Okay.  So let's take this down for a minute and put up

9   Government Exhibit 566 for everyone.  So this is something we

10  looked at before on the bottom, but I'm going to focus now on

11  the top e-mail.  Who is this e-mail or where is this e-mail

12  from?

13  A.  It's an e-mail from EUprocessing.

14  Q.  Sent to who?

15  A.  Myself and John Wang.

16  Q.  And what is the subject?

17  A.  New processing channel.

18  Q.  Can you read the e-mail through the first four lines?

19  A.  Hi, Guys.  I would like to ask you to start using the new

20  additional channel K-NewOp-Pearls for Green Goddess.  The

21  volume is growing on the current channel and also the CB

22  counts.  Please split the traffic still today.

23  Q.  What is Green -- what is Green Goodness?

24  A.  I'm sorry, it does says Green Goodness, but it's --

25  Q.  What is your understanding?

L32PWEI5                          Tassone - Direct

1    A.  That Green Goddess was the dispensary.

2    Q.  And then it says, the volume is growing on the current

3    channel and also the CB count.  CB refers to?

4    A.  Chargebacks.

5    Q.  Please split the traffic today.  Was this -- how does this

6    relate to the exhibit that we just looked at, Exhibit 615?

7    A.  This is calling out to us that the volume and number of

8    chargebacks on our current channel is increasing, and so they

9    would like us to split that off or create a new channel, split

10   it up.

11   Q.  What is your understanding of the purpose of doing so?

12   A.  To reduce the amount of chargebacks.  The common

13   chargebacks are the percentage of chargebacks on a specific

14   channel.

15   Q.  Now, it says at the bottom -- do you see where it says:

16   The pixel application should be already available or nearly

17   finished?

18   A.  Yes, I do.

19   Q.  What is your understanding of what that means?

20   A.  I understand that the pixel application was something used

21   kind of like cookies on someone's browser to record their

22   browsing history.

23   Q.  So do you have an understanding of how that was used here,

24   or no?

25   A.  Briefly, yes.

1    Q.   What is your brief understanding?

2    A.   That if you were a customer and you were able -- and you

3    visited one of these descriptors or websites -- I'm sorry, let

4    me start that over.  If you were a customer and you purchased

5    on Eaze, the pixel would record the history of that purchase so

6    that if you were to visit one of these websites, you'd

7    potentially be redirected to the Eaze website.

8    Q.   And what is your understanding of the purpose of that?

9    A.   To reduce chargebacks.

10   Q.   How would that reduce chargebacks?

11   A.   If a customer had seen a billing descriptor on their credit

12   card statement that they didn't understand or didn't recognize,

13   they might be inclined to file a chargeback.  But instead, if

14   they were to go to the website, they'd be directed to Eaze.

15   Then they might remember that they made a previous purchase on

16   Eaze.

17   Q.   All right.  Let's take this down and put back up Government

18   Exhibit 615, please.  And can we blow up the e-mail from the

19   highlight to the end of the e-mail.

20          Okay.  So we just discussed increasing the amount of

21   processing channels and split the volume.  Can you read the

22   rest of the e-mail?

23   A.   Starting with "billing descriptor"?

24   Q.   Starting with "Nevertheless."

25   A.   Sorry.  Nevertheless, you need to talk to the single

1    suppliers to improve the performance.

2    Q.   Keep going.

3    A.   Billing descriptor communication.   Is the credit card

4    holder information about the description of the charge on his

5    cc statement?   Customer support, incoming calls.

6    Q.   Okay.   And then it says -- who is this signed by?

7    A.   It says:   Best regards, EUP.

8    Q.   So it says:   Nevertheless, you need to talk to the single

9    suppliers to improve the performance.   What do you understand

10   the reference to "suppliers" to mean?

11   A.   Suppliers would refer to the dispensary partners.

12   Q.   And when EUP is saying to improve the performance, what do

13   you understand that to mean?

14   A.   Improve the performance in order to reduce the number of

15   chargebacks that we're seeing for dispensaries.

16   Q.   And the EUP in this e-mail suggests ways to improve the

17   performance in order to reduce chargebacks?

18   A.   Yes, they do.

19   Q.   And one of those ways that are listed here?

20   A.   One second.   To communicate what the billing descriptor is

21   going to be on the customer's statement so that they aren't

22   confused by that, and then also any customer support or

23   incoming calls to also help clarify that.

24   Q.   And were these steps that Eaze implemented?

25   A.   Yes, they were.

1   Q.  Okay.  We can take this down.

2            And let's put up Government Exhibit 686 for everyone,

3   please.  Can we go to page 2.  Sorry, page 3.

4            Mr. Tassone, what is this?

5   A.  This is an e-mail receipt of a marijuana transaction

6   occurring on Eaze.

7   Q.  Okay.  And let me direct your attention.  It says -- do you

8   see where it says, Itemized Receipt?

9   A.  Yes, I do.

10  Q.  And under there, do you see where it says Blue Dream?

11  A.  Yes.

12  Q.  What is Blue Dream?

13  A.  Blue Dream is a marijuana product.

14  Q.  Okay.  So we can scroll down to the -- a little bit more.

15  Okay.  Do you see where it says Order Total?

16  A.  Yes, I do.

17  Q.  And then underneath, do you see Credit Card?

18  A.  Yes.

19  Q.  What does that refer to?

20  A.  That is the total charged amount to the customer for the

21  transaction and that they paid for it via credit card.

22  Q.  So then you see in the blue box?

23  A.  Yes.

24  Q.  You see where it says:  You will see a charge?

25  A.  Yes.

1    Q.   Can you read that aloud?

2    A.   You will see a charge from "thehiddenkitten.com" for $44.89

3    on your statement.

4    Q.   What is thehiddenkitten.com?

5    A.   That would be a billing descriptor that was used.

6    Q.   Are any of the marijuana dispensaries named

7    hiddenkitten.com?

8    A.   No, they are not.

9    Q.   Does Eaze have a d/b/a of hiddenkitten.com?

10   A.   No, they do not.

11   Q.   Who is the real merchant for the transaction, these

12   transactions?

13   A.   Eaze would be.

14   Q.   Okay.  We can take this down.

15        Mr. Tassone, at my request, did you do a search

16   through your work e-mails to gather certain information to put

17   in the chart?

18   A.   Yes, I did.

19   Q.   Was that a substantial number of e-mails?

20   A.   Yes.

21   Q.   And did you create and review a chart with pertinent

22   information that your search produced?

23   A.   Yes, I did.

24   Q.   Mr. Levine, can we display for the witness what's been

25   marked for identification as Government Exhibit 3701.

1              Mr. Tassone, do you recognize this?

2    A.   Yes, I do.

3    Q.   What is it?

4    A.   This is a list of billing descriptors that were used and

5    the associated exhibit numbers relative to them.

6    Q.   Can you repeat your answer?  I didn't really quite get it?

7    A.   Yes, this is a chart of specific billing descriptors that

8    were used that's listed on the left, and then on the right is

9    the exhibit number that correlates to the billing descriptor.

10   Q.   Okay.  So you said a list of billing descriptors that were

11   used, used in what context?

12   A.   They were used and listed on customer's bank or credit card

13   statements after making purchases on Eaze.

14   Q.   Would this be during the Clearsettle era, the EUprocessing,

15   when EUprocessing was the processor or both?

16   A.   One second.  I believe this to be from the EU time period.

17   Q.   Does this chart fairly and accurately reflect the

18   descriptor information that you compiled from the e-mail?

19   A.   Yes, it does.

20              MS. LA MORTE:  The government offers Government

21   Exhibit 3701.

22              MR. TAYBACK:  No objection.

23              MR. GILBERT:  No objection.

24              THE COURT:  Received.

25              (Government's Exhibit 3701 received in evidence)

1              MS. LA MORTE:  Can we publish this?

2              THE COURT:  Go ahead.

3    BY MS. LA MORTE:

4    Q.  Do any of these descriptors contain the name Eaze?

5    A.  No, they do not.

6    Q.  Do any descriptors contain the names of the marijuana

7    dispensaries that used the Eaze platform to sell their

8    products?

9    A.  No, they do not.

10   Q.  Do you see that some of these descriptors appear to be

11   website names?

12   A.  Yes.

13   Q.  Have you ever visited any of the websites?

14   A.  Yes, I have.

15   Q.  What do you recall observing?

16   A.  A few of them looked like e-commerce websites.

17   Q.  Anything else?

18   A.  They were just e-commerce websites for maybe random or

19   various types of niche products.

20   Q.  Do you recall any specific examples or no?

21   A.  Yeah, I think like thehiddenkitten may have been selling

22   like pet supplies or some sort of pet products.

23   Q.  And when you say like the typical e-commerce website, what

24   do you mean by that?

25   A.  A web platform in which a customer can browse a menu of

1    products and add products to their cart and they can check out

2    and make a purchase for those, similar to Amazon or something

3    like that.

4    Q.  To your recollection, did any of the websites that you

5    visited list Eaze on them in any way?

6    A.  No, not to my memory.

7    Q.  Did any of them list any of the marijuana dispensaries that

8    were partnering with Eaze?

9    A.  No, not to my memory.

10   Q.  All right.  We can take this down, Mr. Levine.  Thank you.

11          Now, I'm going to switch gears slightly now,

12   Mr. Tassone.  So earlier you told us that in the course of the

13   scheme, you observed that dispensaries would switch bank

14   accounts from time to time; is that right?

15   A.  Yes, that is correct.

16   Q.  And were you involved in communications with the

17   EUprocessing@ProtonMail.com e-mail address regarding that?

18   A.  Yes, I was.

19   Q.  Mr. Levine, can you display Government Exhibit 649 and 650

20   side by side for the witness.  Actually, let's just display

21   649.  Okay, let's go to page 3.

22          I want to start by focusing on the bottom e-mail.  Do

23   you see March 11th, 2019, at 10:01 a.m.?

24   A.  Yes, I do.

25   Q.  It says Doug Oberbeck, doug@eaze.com, wrote -- and can you

1  just read those first two lines?

2  A.  Please see a new merchant application attached.  The new

3  partner will be coming online in the next two weeks.

4  Q.  Okay, we can scroll out of that.

5       What is your understanding -- and if you feed to

6  scroll through the e-mail, just let us know -- of what the

7  dispensary is submitting merchant?

8       (Pause)

9       If you need to look through the entire exhibit, feel

10  free to do so.  But what is your understanding of what

11  dispensary is submitting a merchant account application here?

12  A.  Yes, my understanding is that they're submitting a merchant

13  application to set up a credit card processing account.

14  Q.  Which dispensary?

15  A.  From the Earth.

16  Q.  Let's go to page 1 of this document.  Do you see the e-mail

17  March 13th, 2019, at 8:08 p.m. and sort of right below the top

18  e-mail?

19  A.  Yes, I do.

20  Q.  Where is this e-mail from?

21  A.  EUprocessing.

22  Q.  Can you read the body of the e-mail aloud?

23  A.  Hey, guys.  After a deeper proof for the bank account

24  details provided for "From The Earth-Ventura" we have seen the

25  same issue here as well.  Payments to the listed bank account

1    holder will be declined by the bank.  We kindly like to ask you

2    to make always a short research on the internet before

3    approving and forwarding the details to us.

4    Q.  Okay.  It states in the center, payments to the listed bank

5    account holder will be declined by the bank.  We kindly like to

6    ask you to make always a short research on the internet before

7    approving and forwarding the details to us.  And in the first

8    line is referencing the same issue; do you see that?

9    A.  Yes, I do.

10   Q.  What is your understanding of the issue that's being

11   referenced by EUP?

12   A.  My understanding is that they would want to send a wire for

13   credit card -- let me start that over.  My understanding is

14   that once they set up a credit card processing account, they

15   would need a bank account to send a wire to for the funds that

16   were processed; so I think --

17   Q.  I'm sorry to cut you off.  Who would need a bank account

18   for the wire to come through?

19   A.  The dispensary would need to provide a bank account to EU

20   for the wiring to come through.

21   Q.  Okay.  Continue.

22   A.  And the issue here -- my understanding the issue here is

23   that the name on the bank account was associated to marijuana,

24   and that the bank would decline sending that wire or receiving

25   that wire.

1   Q.  Okay.  We can zoom out.  Get out of that.  And let's now

2   look at the top e-mail.

3           And who is this e-mail sent to?

4   A.  Sent to EUprocessing.

5   Q.  Can you read the body of the e-mail aloud?

6   A.  Hi, apologies on this.  Attached is an updated application

7   with a different management entity.  I have Google searched

8   this entity and did not find anything related to cannabis.

9   Please let us know if this will suffice.

10  Q.  Okay.  We can take this down.

11          Now, can we put up for everyone Government

12  Exhibit 650.

13          Take a look at Government Exhibit 650, Mr. Tassone.

14  A.  Okay.

15  Q.  And let me know and if you need us to put up Government

16  Exhibit 649 side by side.  We can do that.  But my first

17  question is how, if at all, Government Exhibit 650 relates to

18  Government Exhibit 649?

19  A.  649 is what we just saw; is that correct?

20  Q.  Yes.

21  A.  Okay.  Okay.

22  Q.  Would you like to see --

23  A.  Can you repeat the question?

24  Q.  How does Government Exhibit 650 relate, if at all, to

25  Government Exhibit 649?

1    A.  It is a response and –– from EU, and it's saying that that

2    this is exactly what we needed, and we needed proof that the

3    legal entity did not have any relation to cannabis.

4    Q.  But it doesn't say cannabis in the e–mail, does he?

5    A.  No, he does not.

6    Q.  He just says dot, dot, dot?

7    A.  That's correct.

8    Q.  And tell us again of what your understanding of what the

9    dot, dot, dot is referring to?

10   A.  To cannabis or marijuana.

11   Q.  Okay.  We can take that down.  One moment.

12          (Pause)

13          Let's put up Government Exhibit 598, please, for

14   everyone.  Let's go to page 2, please, and let's focus on the

15   e–mail at the bottom, January 31st, 2019, at 6:51 a.m.  That's

16   fine.  You can blow that whole thing up.

17          Focusing on this e–mail of January 31st, 2019, at

18   6:51 a.m. where is this e–mail coming from?

19   A.  EUprocessing.

20   Q.  And can you read the first section of the e–mail?

21   A.  Hello, Guys.  All information have been checked now.

22   Unfortunately, the company name FTE Management LLC cannot be

23   used at this stage.  The same problem that we already had in

24   the past with some other merchants.

25   Q.  Let me pause you there.  When EUP states the same problem

1   that we had in the past with some other merchants, what do you

2   understand EUP -- what problem?

3   A.   The problem that if you were to Google search for -- yeah,

4   Google search this name, that it might show up with marijuana

5   or cannabis, and that they would not be able to send wires to

6   that bank account.

7   Q.   And then does EUP ask you to do anything with respect to

8   this problem?

9   A.   Yes, they asked if we could provide an independent company

10  or another entity name, actually.

11  Q.   And when EUP is referencing an independent company, what do

12  you understand him to mean?

13  A.   I understand that to mean just a different business entity.

14  It could be related to that dispensary, but a different entity

15  without the name, without anything correlated to marijuana or

16  cannabis.

17  Q.   Okay.  We can take this down.  Thank you.

18        Okay.  We're going to switch topics.  Did there come a

19  time, Mr. Tassone, in 2019 when you arranged to turn off the

20  card payment option with respect to one of Eaze partner

21  dispensaries?

22  A.   Yes, there was.

23  Q.   Which dispensary was that?

24  A.   Hometown Heart.

25  Q.   Can you tell us what happened?

1    A.   Hometown Heart basically understood what type of scheme was

2    being -- I'm sorry.

3    Q.   No, no.  Keep going.

4    A.   Hometown Heart understood the banking scheme that was

5    being -- that happened here and did not want to be a part of it

6    anymore.

7    Q.   Mr. Levine, can you put up Government Exhibit 672 for

8    everyone, and we can go to the bottom of page 1 to the top of

9    page 2.

10             Mr. Tassone, do you see this e-mail?

11   A.   Yes, I do.

12   Q.   Are you the author of this e-mail?

13   A.   Yes, I am.

14   Q.   And can you read the first paragraph of the e-mail?

15   A.   We needed to turn off credit cards for CLMSS, LLC (Hometown

16   Heart) immediately today due to unfortunate circumstances.

17   This will not be turned on moving forward.

18   Q.   And then what's the next paragraph?

19   A.   The volume is immediately being moved over to Green Coast

20   Management, Incorporated and Osiris Ventures LLC.

21   Q.   And then finally?

22   A.   We know that this is not ideal, but please let us know if

23   there are any issues.

24   Q.   Okay.  And did EUP respond to this e-mail?

25             You can scroll out of that, Mr. Levine.

1    A.  Yes, they do.

2    Q.  And what does EUP say?

3    A.  They said:  Hi, Michael.  Are we talking about all the

4    volume from Home TSF and EB?  We need the exact information,

5    please.

6    Q.  Okay.  And then was a credit -- was this type of credit

7    card option ever turned back on for Hometown Heart through

8    2019?

9    A.  No, it was not.

10   Q.  We can remove this.  Thank you, Mr. Levine.  Okay.

11   Mr. Levine, can you display for everyone Government

12   Exhibit 679.

13            Mr. Tassone, what's the date of this e-mail?

14   A.  Thursday, May 16th, 2019.

15   Q.  Who is it from?

16   A.  Stephen Pearce.

17   Q.  Who is Stephen Pearce?

18   A.  Stephen Pearce was the owner or CEO of the dispensary

19   Wildflower.

20   Q.  Is that the dispensary that we talked about earlier today?

21   A.  Yes, it is.

22   Q.  Did that dispensary have a credit card processing account

23   set up?

24   A.  Yes, they did.

25   Q.  And so were their products on the Eaze site available for

1    purchase with a card?

2    A.  Yes, they were.

3    Q.  And so Mr. Pearce is writing to you; is that right?

4    A.  Yes, that is correct.

5    Q.  Can you read this e-mail aloud?

6    A.  Hi, Michael.  We have been going through some banking

7    issues the past few weeks.  I have spoken with Tommy and Ro

8    about this.  Our current bank account is being shuttered.  Any

9    wires from or to Eaze raises a red flag, as your name is

10   synonymous with cannabis.  This has resulted in two account

11   closures for us.  The last bank closure, the manager came right

12   out and said we cannot do any business with Eaze.

13   Q.  Keep going, please.

14   A.  I have spoken to some people with supposed banking

15   solutions, and there are big fees to set up the account with no

16   guarantee, and others with ongoing monthly fees in the 6,000 to

17   9,000 per month range.  While we may have to go this route,

18   this takes time.

19            Keep going?

20   Q.  Yes, please.

21   A.  I had this same issue when our parent company was named

22   Wildflower Marijuana Incorporated.  I used to wire funds

23   through a numbered company associated with the parent company.

24   Otherwise, any of our vendors could be at risk of having their

25   bank account closed.  This did happen a couple of times until

1   we came up with a solution.

2           I know Greg has talked to you, and until we have a

3   solution, we can't risk having our last account in California

4   closed.  I believe the cc payments should be okay, and Greg is

5   going to provide the banking details.

6           Let me know your thoughts or any ideas of how we can

7   proceed.  We are all in this together.  Thanks, Stephen.

8   Q.  Okay.  Thank you.  We can take this down.

9           Approximately when did Eaze stop processing with

10  EUprocessing?

11  A.  Roughly the summer of 2019.

12  Q.  Can you tell us how that came to an end?

13  A.  Yes, my understanding is that the dispensary --

14          MR. TAYBACK:  Objection, foundation as to the basis of

15  his understanding.

16          THE COURT:  All right.  So first, tell us.  You can

17  answer the question, and then I'll have some follow-up

18  questions.  What is your understanding?

19          THE WITNESS:  I can answer the question?

20          THE COURT:  You can answer the question, and then I'll

21  have some follow-up questions.  What was your understanding?

22          THE WITNESS:  My understanding is that the dispensary

23  Hometown Heart that partnered with EU had filed a lawsuit,

24  public lawsuit and basically, you know, created a lot of

25  concern publicly.

1           THE COURT:  What's your basis for that understanding?

2           THE WITNESS:  I saw it in the press, articles, as well

3      as seeing -- you know, discussing that with certain people at

4      the company.

5           THE COURT:  All right.  I'm going to sustain the

6      objection and the jury will disregard it.  We'll strike the

7      answer beginning with everything after the word -- the original

8      word "objection."

9      BY MS. LA MORTE:

10     Q.  Mr. Tassone, at some point, however, Eaze stopped

11     processing with EUprocessing; is that right?

12     A.  That is correct.

13     Q.  And when did that occur?

14     A.  Roughly the summer of 2019.

15     Q.  Now, Mr. Tassone, how long did your job at Eaze include a

16     component involving payment methods for Eaze's product?

17     A.  Since 2016 through roughly the end of 2019.

18           MS. LA MORTE:  Now, your Honor, pursuant to rule

19     902-11, the government offers Government Exhibit 687 into

20     evidence.

21           THE COURT:  Any objection?

22           MR. TAYBACK:  May I have one moment, your Honor?

23           (Pause)

24           No objection.

25           MR. GILBERT:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibit 687 received in evidence)

3    BY MS. LA MORTE:

4    Q.  Mr. Levine, can we blow up sort of the top half of this.

5              Mr. Tassone, can you walk us through what this is?

6    A.  Yes, this is a report that is outlining the amount of

7    credit card transactions processed from Clearsettle, respective

8    to specific dispensaries.

9    Q.  And remind us when Clearsettle operated?

10   A.  Roughly 2016 through 2017.

11   Q.  And are you the person that generated this report?

12   A.  Yes, I am.

13   Q.  Okay.  So can you walk us through the columns of this

14   report and what's being depicted here?

15   A.  In the first column, it's identifying the year in which

16   this information was pulled.  The second column is the depot

17   name or the dispensary name, and the third column is the credit

18   card amounts that were charged via the Clearsettle payment

19   processing for them.

20   Q.  Okay.  So we can move out of that, and let's go to the

21   second page, and we can zoom in on here.  Thank you.

22             And, Mr. Tassone, what does this reflect?

23   A.  This is reflecting the same information; however,

24   aggregated to show a total amount for all of the dispensaries

25   in all of the amounts processed.

1   Q.  So what is the total amount that the dispensaries processed

2   through Clearsettle?

3   A.  $48,120,332.95.

4   Q.  Okay.  We can zoom that back.  You can go down.  Go down

5   one more to page 4, and then let's zoom in here.

6           Now, Mr. Tassone, can you walk us through what we're

7   seeing on this chart?

8   A.  Yes.  This is a similar chart, and it's showing the years

9   2018 and 2019, along with the specific dispensaries for that

10  time period, and then the total amounts that were charged for

11  credit card processing charges for EU during that time.

12  Q.  Okay.  So we can zoom out of that, and let's go up one page

13  and zoom in there.

14          And what does this reflect?

15  A.  Similar information, showing the dispensaries and the total

16  amounts that were charged for each dispensary, and then it

17  shows an aggregated total amount for all of those.

18  Q.  And is this reflecting the total, like the chart that we

19  just looked at on page 4?  Does this pertain to the

20  EUprocessing period or something else?

21  A.  Yes, this is information pulled from the chart we just

22  looked at for the years 2018 and 2019 in regards to credit card

23  processing through EU.

24  Q.  And then what is the total volume in transactions that were

25  processed through EUprocessing?

L32PWEI5                          Tassone – Cross

1    A.   $108,104,878.66.

2    Q.   So then looking at pages 2 and 3 of your chart, and 3 --

3    so, Mr. Tassone, looking at pages 2 and 3 of your chart,

4    roughly, I'm not asking to the cent, but roughly what was the

5    total amount of transactions that Eaze processed through

6    Clearsettle and EUprocessing combined?

7    A.   Roughly $156 million.

8           MS. LA MORTE:   Your Honor, may I have a moment?   No

9    further questions, your Honor.

10          THE COURT:   Cross-examination.

11          MR. TAYBACK:   I don't know if we're required to change

12   the cover.

13          MS. DEININGER:   Your Honor, may I take a seat in one

14   of the empty jury seats?

15   CROSS-EXAMINATION

16   BY MR. TAYBACK:

17   Q.   Mr. Tassone, can you hear me?

18   A.   You need to speak louder.

19   Q.   Mr. Tassone, can you hear me?

20   A.   Yes, I can.

21   Q.   I want to talk to you a little bit about your role at Eaze

22   and you testified about that in direct, I'd like to focus on

23   that initially.

24   A.   Okay.

25   Q.   Eaze is a marijuana delivery service that still operates,

1   correct?

2   A.  Yes, that is correct.

3   Q.  And it operates in California and Oregon?

4   A.  They used to operate in Oregon, but only California today.

5   Q.  Now, Eaze also sells, in addition to marijuana products

6   that contain the substance THC, it sells other products as

7   well, correct?

8   A.  It sells solely products that are THC.

9   Q.  Doesn't it also sell, for example, rolling papers?

10  A.  Yes, it does.

11  Q.  And doesn't it also sell bath oils, body oils and creams

12  that contain cannabis products but not THC?

13  A.  CBD, yes.

14  Q.  CBD is a different extract from the marijuana plant,

15  correct?

16  A.  Yes, I believe so.

17  Q.  And so the answer is that Eaze does sell both THC marijuana

18  and non-THC marijuana products, correct?

19  A.  Yes, that is correct.  If you can test so I can hear you

20  better?

21  Q.  Can you here me now?  I'll keep my voice up.  If for some

22  reason you can't hear me, please let me know.

23  A.  I will.

24  Q.  Now, when you joined the company, Eaze, in 2015, correct?

25  A.  That's correct.

Q.  And at that time, before you joined the company, you did your own personal research into risks or potential risks of working for Eaze, correct?

A.  Yes, I did.

Q.  What did you do?

A.  I Googled and looked up things about the cannabis industry and the information about Eaze and the company itself.

Q.  Did you learn from that point in time that although marijuana in that time frame was being legalized for medical purposes in California, it remained illegal under federal law?

A.  Yes, I did know.

Q.  And that did not dissuade you from taking the job at Eaze, right?

A.  Not after some thought, no.

Q.  In fact, you said it seemed like a good company that was well funded, correct?

A.  I have said that before, yes.

            (Continued on next page)

L32PWEI5                          Tassone – Cross

L32AWEI6ps                        Tassone – Cross

1

2   Q.  Now, when you joined the company, it was much smaller than

3   it is now, correct?

4   A.  Yes.  That is correct.

5   Q.  I think you said it had a dozen or so employees when you

6   first started?

7   A.  Yes.

8   Q.  And as I understood your testimony, it now has roughly 1200

9   people who work for it, both employees and drivers, correct?

10  A.  Yes.  It's pretty specific.  Eaze has roughly a

11  hundred-plus corporate employees, and then there's a subsidiary

12  that employs the thousand-plus employees.

13  Q.  Did that subsidiary you mentioned named Stachs?

14  A.  Stachs, yes.

15  Q.  And is that Stachs LLC?

16  A.  That's correct.

17  Q.  And are you an employee of Eaze, or of Stachs, or of both?

18  A.  I'm an employee of Stachs.

19  Q.  Now, the company grew not only in -- from the time you

20  started until today, in the number of people that worked for

21  it, but it also grew in terms of its revenues, correct?

22  A.  Yes, that is correct.

23  Q.  As I understand it, it made about $2 million a month, when

24  it first started?

25  A.  That was not in profit, but, yes, in revenue, maybe

L32PWEI5                        Tassone – Cross

1    something around 2 million.

2    Q.  And is the revenue now closer to 15 to 18 million dollars

3    per month?

4    A.  Yes.  That is correct.

5    Q.  When you started, your title was, in June of 2015, your

6    title was senior director of operations and expansion; is that

7    right?

8    A.  Can you repeat the year?

9    Q.  When you started in June of 2015?

10   A.  That's not correct.

11   Q.  What was your title when you first started?

12   A.  Operations specialist.

13   Q.  How long after that was it before you were promoted?

14   A.  I was promoted several times.  It probably, you know, after

15   a year or so, year or two.

16   Q.  At some point in time, leading up to approximately October

17   of 2019, you held the position of senior director of operations

18   and expansion, correct?

19   A.  Yes, that's correct.

20   Q.  And by "expansion," your job was to try and grow the

21   business of the company, right?

22   A.  In one form or another, yes.

23   Q.  You hoped that the company would get bigger while you were

24   an executive at that time.

25   A.  I was not an executive at that time, but yes.

L32PWEI5                           Tassone - Cross

1    Q.  While you were the senior director of operations and

2    expansion.  That was your mission.

3    A.  That was my title, yes.

4    Q.  And your goal was to get the company to grow.

5    A.  Yes.

6    Q.  In October of 2019, you were promoted again, correct?

7    A.  Yes, I believe so.

8    Q.  You were promoted at that point in time to what's called

9    head of marketplace?

10   A.  Yes.

11   Q.  What were your responsibilities as head of marketplace?

12   A.  It was pretty similar, actually.  It was still managing

13   relations and operations between our dispensary partners.

14   Q.  Now, you were promoted at another time, in March of 2020,

15   right?

16   A.  Yes.

17   Q.  In March of 2020, you were promoted to the vice president

18   of operations of Eaze; is that right?

19   A.  Yes, that is correct.

20   Q.  And that's the title you hold today.

21   A.  Yes.

22   Q.  Now, March of 2020 coincides with your first awareness that

23   the government had brought an indictment in this case against

24   Mr. Akhavan and Mr. Weigand, correct?

25   A.  Yes, that is correct.

L32PWEI5                         Tassone - Cross

1   Q.  And your first meeting with the government, to talk to the

2   prosecutors about your knowledge of this case, came in

3   approximately September, September 3rd to be precise, of 2020?

4   A.  I don't remember the specific date, but that sounds, sounds

5   close to that time.

6   Q.  When you first spoke to the government, you first spoke to

7   the prosecutors, you did so pursuant to what's called a proffer

8   agreement?  Is that your understanding?

9   A.  Yes.

10  Q.  By that you meant that nothing you said at that initial

11  meeting could be used against you?

12  A.  Yes.  That is correct.

13  Q.  And then subsequently you've spoken to the government

14  prosecutors a number of times, right?

15  A.  Yes.

16  Q.  And all of those were pursuant to various iterations of

17  that same proffer agreement, that same understanding.

18  A.  That is my understanding, yes.

19  Q.  In fact, you've spoken to the prosecutors as recently as

20  only a few days or a week or so ago, correct?

21  A.  Yes, that is correct.

22  Q.  But your testimony here today, in court, for the jury and

23  the judge, is pursuant to what's called an immunity agreement.

24  Right?

25  A.  Yes.

1   Q.  Now, that immunity agreement means it's what you were

2   hoping for from the beginning when you first began to talk to

3   the government, right?

4   A.  I wasn't sure what they were going to talk to me about, so

5   I didn't know, actually.

6   Q.  Well, you sort of suspected they were going to talk to you

7   about all the things they talked to you about in September and

8   October and even a few weeks ago.

9   A.  In my initial proffer agreement, I wasn't sure that I was

10  going to be a witness at that point, so, no, I wasn't thinking

11  about that at that moment.

12  Q.  But you were hoping you wouldn't be charged with a crime.

13  A.  Of course, yes.

14  Q.  And the immunity agreement assures that you won't be

15  charged based on anything that you said to the government.  Is

16  that right?

17  A.  Based on anything that I say here today or in my proffer

18  agreements, that's correct.

19  Q.  Now, you admitted, I believe, in your direct testimony that

20  at some point in time you believed you were committing bank

21  fraud.

22  A.  Yes.

23  Q.  But because of your understanding of your immunity

24  agreement, while you're here today, your admission to

25  committing bank fraud, as you understood it, cannot be used

1    against you.  Is that right?

2    A.  Based on what I say here today, yes.

3    Q.  Did your cooperation with the government have anything to

4    do with your promotion within the company, Eaze?

5    A.  No, it did not.

6    Q.  Isn't it true that in fact one of your goals, in addition

7    to not being prosecuted yourself, is to ensure that the

8    company, Eaze, comes out of this legal case and investigation

9    doing well?

10   A.  Well, yes.  It's the company that I work for, so I want

11   them to do well.

12   Q.  And it's the company that employs you.

13   A.  Yes.

14   Q.  And it pays your salary.

15   A.  Yes.  Well, Stachs does, but yes.

16   Q.  You are actually paid by Stachs, not Eaze?

17   A.  I am paid by Stachs LLC, that's correct.

18   Q.  And do you own stock in Eaze?

19   A.  I have equity grants that I do not own currently.

20   Q.  So you have grants that were given to you but they

21   haven't --

22   A.  Vested, but I have shares that are -- I have vested but I

23   have not purchased those shares, or opt-ins, I should say.

24   Q.  But you have a right to acquire shares that still exist

25   today.

1    A.  Yes, that is correct.

2    Q.  I want to understand your view, as you expressed it, that

3    you believed you were a participant in a scheme to commit bank

4    fraud.  I want to ask you some questions about that.

5            Is it your understanding that it's OK, meaning it is

6    lawful and you're not worried about breaking the law, with

7    respect to the business of Eaze, the delivery of marijuana

8    products?

9    A.  My understanding is that it is lawful based on the state of

10   California, but it is unlawful in, yes, the federal government.

11   Q.  When you leave here after immunity, are you going to go

12   back to your job at Eaze, where the company delivers marijuana

13   products?

14   A.  Yes, I will.

15   Q.  Are you concerned that that's in violation of federal law;

16   you could be arrested?

17   A.  There's always a general concern, but not overly concerned.

18   Q.  So you are going to go back to your job at Eaze.

19   A.  Yes, I will.

20           THE COURT:  Counsel, I'm sorry to interrupt, but we

21   need to end in about two minutes, so --

22           MR. TAYBACK:  I can, your Honor.  I have about six

23   questions.

24   Q.  Is it your understanding that it's OK, meaning lawful, to

25   not only deliver marijuana products but actually cultivate or

L32PWEI5                          Tassone — Cross

1   sell them?

2   A.  My understanding is that it is lawful and legal in the

3   state of California; it is unlawful in the federal government.

4   Q.  And is it your understanding that it's lawful for you to

5   sell marijuana and deliver it in California, as long as the

6   customer pays cash?

7   A.  I'm sorry.  Can you repeat that?

8   Q.  Is it your understanding that it's lawful for your company

9   to deliver marijuana to customers in California provided they

10  pay cash?

11  A.  It is lawful if they pay cash.  If they pay through other

12  means, then it depends on the policies of several banks and

13  entities that are involved in that.

14  Q.  So you think the law -- the legality is figured by the

15  various policies of some institutions, correct?

16  A.  No.  I imagine at certain banks they may have an

17  interpretation of the law in what they want to set their policy

18  to, in regards to that.

19  Q.  Is it your understanding that it's lawful and permissible

20  for your company to sell, deliver and sell marijuana products,

21  to people in California if they pay with a debit card?

22  A.  Yes, it is.

23  Q.  But it's unlawful for customers of Eaze, in California, to

24  purchase marijuana from Eaze using a credit card.

25  A.  That is my understanding, but yeah.

1          MR. TAYBACK:  We can take a break now, your Honor.

2          THE COURT:  All right, ladies and gentlemen.  We're

3    off to a good start.  Please make every effort to be here a few

4    minutes before 9:45 tomorrow, and we will continue promptly at

5    that time.  Have a good evening.

6          THE COURT:  You may step down.

7          (Witness excused)

8          THE COURT:  Thank you for getting me your proposed

9    preliminary instructions.  I will get you my take of all that

10   sometime this evening.  It may not be early, because my clerks

11   are nice enough to be giving me a Zoom reunion for my 25th

12   anniversary.  But since no alcoholic beverages will be served

13   even by Zoom, I am sure I can get you something comprehensible

14   by midnight, but hopefully sooner.

15         Tomorrow we'll get together at 9:15 and I'll hear any

16   objections to my proposed preliminary instructions.

17         Anything else we need to take up?

18         MR. TAYBACK:  Your Honor, if I could have a moment of

19   Jimmy's time when the Court adjourns to address the audiovisual

20   issue.

21         THE COURT:  Yes.  And thank you for working through

22   that.  I know as much about those things now as I did 25 years

23   ago, so I will leave that entirely to the audiovisual people as

24   well as my law clerk.  But, yes, you can stay and work that

25   out.

L32AWEI6ps

1          Anything else?

2          MS. LA MORTE:  Yes, your Honor.  Your Honor made a

3   ruling on one of the motions in limine and I understand we're

4   going to have a chart that has the numbering system, but you

5   had granted the government's motion in limine to exclude

6   certain *Giglio* -- drug use, prostitution, and the like --

7   certain witnesses.  We have since identified two additional

8   witnesses that had not been identified at the time the motion

9   was filed, and we have a similar application to make with

10  respect to those witnesses.  And so we're seeking permission to

11  file a letter on that.

12         THE COURT:  Yes.  Go ahead and we'll take -- maybe we

13  should get together at 9 rather than 9:15, since it sounds like

14  there may be a number of items.

15         However, I have to caution you that Mr. Giglio --

16         MS. LA MORTE:  Oh, my God.

17         THE COURT:  -- pronounces his name "JILL-yo," because

18  that's the Italian pronunciation, and that, as opposed to a

19  Manhattan pronunciation, will prevail in this court.

20         MS. LA MORTE:  I have to tell you there's an AUSA in

21  our office, Cecilia Vogel, who has a picture of the Island of

22  Giglio in her office, and I thought of one day taking a picture

23  of it and sending it to you because you've corrected me on this

24  before.

25         THE COURT:  Yes.  Only because Mr. Giglio, through his

L32AWEI6ps

1    lawyer, has informed me he feels strongly about that.

2               OK.  Anything else?

3               MR. TAYBACK:  No, your Honor.

4               THE COURT:  Very good.  We'll see you tomorrow at 9

5    o'clock.

6               (Adjourned to 9:00 a.m., March 3, 2021)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     MICHAEL TASSONE

 4    Direct By Ms. La Morte . . . . . . . . . . . 137

 5    Cross By Mr. Tayback . . . . . . . . . . . . 280

 6                        GOVERNMENT EXHIBITS

 7    Exhibit No.                            Received

 8     686 and 709  . . . . . . . . . . . . . . . 156

 9     401, 713, 425, 428, 553, 554, 555, 565, . . . 168

10              566, 567, 558, 706, 485, 489,

11              490, 560, 630, 674, 615, 683,

12              570, 574, 568, 630, 632, 638,

13              684, 589, 590, 594, 596, 597,

14              598, 599, 632, 642, 649, 650,

15              655, 661, 607, 674, 672, 678,

16              679, 680, 683, 714, 527, 523,

17              479, 698, 480, 481, 482, 483,

18              484, 485, 489, 490, 491, 492,

19              493, 494, 495, 499, 501, 502,

20              503, 504, 505, 507, 508, 511,

21              534, 691, 692, 693, 694, 695,

22              696, 697, 698, 699, 701, 702,

23              703, 704, 705, 706, 707, 708,

24              709, 710, 711, 712, 677, and

25              585
```

3606, 3607 and 3608 . . . . . . . . . . . 199

3701   . . . . . . . . . . . . . . . . 265

687   . . . . . . . . . . . . . . . . . 278