```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            20-cr-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
                  Defendants.               Trial
7
     ------------------------------x
8
                                            New York, N.Y.
9
                                            March 3, 2021
10                                          9:00 a.m.

11
     Before:
12
                         HON. JED S. RAKOFF
13
                                            District Judge
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           APPEARANCES

 2   AUDREY STRAUSS
           United States Attorney for the
 3         Southern District of New York
     BY:   NICHOLAS FOLLY
 4         TARA MARIE LA MORTE
           EMILY S. DEININGER
 5         CHRISTOPHER J. DIMASE
           Assistant United States Attorneys
 6
     DECHERT LLP
 7         Attorneys for Defendant Weigand
     BY:   MICHAEL J. GILBERT
 8         SHRIRAM HARID
           ANDREW J. LEVANDER
 9         STEPHEN PELLECHI
           -and-
10   MICHAEL H. ARTAN
           Attorney for Defendant Weigand
11         -and-
     WILSON, SONSINI, GOODRICH
12         Attorneys for Defendant Weigand
     BY:   MORRIS J. FODERMAN
13         KATHERINE T. MCCARTHY

14   QUINN EMANUEL URQUHART & SULLIVAN, LLP
           Attorneys for Defendant Akhavan
15   BY:   WILLIAM A. BURCK
           CHRISTOPHER TAYBACK
16         SARA CLARK
           MARI HENDERSON
17         DEREK SHAFFER
           PAUL SLATTERY
18         -and-
     ROTHKEN LAW FIRM LLP
19         Attorneys for Defendant Akhavan
     BY:   IRA P. ROTHKEN
20         JARED R. SMITH

21   WILMER CUTLER PICKERING HALE AND DORR LLP
           Attorneys for Interested Party
22         Bank of America, N.A.
     BY:   JUSTIN GOODYEAR
23
     NELSON MULLINS RILEY & SCARBOROUGH LLP
24         Attorneys for Interested Party
           Circle Internet Financial, LLC
25   BY:   MATTHEW G. LINDENBAUM
```

```
1            (Jury not present)

2            THE COURT:  We're missing a defendant.

3            MR. TAYBACK:  Yes.  Mr. Akhavan is not present.  I

4    believe we can talk about some matters.  I waive his appearance

5    for that.

6            THE COURT:  All right.  Very good.

7            So the first question:  One of the jurors, as they

8    were leaving yesterday, asked my courtroom deputy whether a

9    decision had been made as to whether we were sitting this

10   Friday morning.  I'm inclined not to, just because I had

11   remembered the government's issue, but also, I scheduled some

12   other things for that period now that have to be rescheduled.

13   So I will tell them this morning that we will not be sitting

14   Friday; we will be sitting next Friday.

15           MR. TAYBACK:  Your Honor, with respect to jurors, I

16   was looking at my notes last night, and I had recorded that

17   Juror No. 3, Mr. Blum, had a vaccine appointment.  I didn't

18   write down when, but I do recall some discussion about that.  I

19   recall it, but I don't know when it is.

20           THE COURT:  I will have my courtroom deputy inquire of

21   him, and if so we'll take an early lunch break.  That was the

22   fellow who had, I think, a noon at the Javits Center.

23           MS. LA MORTE:  I think it's something like that.

24           THE COURT:  We could break for lunch early and he

25   could still -- but I will have my courtroom deputy check with
```

1    him.

2         So now, I sent you all a proposed preliminary

3    instruction.  So I have of course your earlier proposals, and

4    if you haven't already, you're free to docket those so you can

5    preserve those for any appeal if you wish, but those that you

6    had was not really what I had in mind, as you may have seen

7    from what I gave you.  So you have now my proposal, which is,

8    as I say, similar to what I've given in many, many trials.

9         So let me hear any suggestions, objections, etc.,

10   starting with the government.

11        MS. LA MORTE:  Yes, your Honor.  The government is

12   largely -- has no objections to what the Court is proposing.

13   We have one proposed addition, and that's required to more

14   specifically account for subsection 2 of section 1344.  And

15   I'll let the Court know what we would propose to add.

16        So on the second page of your proposed instruction, it

17   states, "If you find the government has approved the existence

18   of the same fraud conspiracy, you must consider the second

19   element of the charge, which is whether either or both

20   defendants knowingly joined the conspiracy with intent to

21   defraud the banks."  We would add something like, "or with the

22   intent to make misrepresentations designed to make the bank

23   part with its money or property."  And that would be our one

24   suggestion.

25        THE COURT:  I may make that distinction when I give

1   them the final instructions.  So if you would please explain to

2   me what is the difference between a scheme to defraud and a

3   scheme to obtain money or property by means of false or

4   fraudulent representations.

5       MS. LA MORTE:  I think the difference, your Honor, is

6   that one has to be directly aimed at the banks, per se, the

7   intent to scheme to defraud the banks.  So under subsection 2,

8   for example, and I think it's the Supreme Court decision in

9   *Loughlin*, where the defendant was passing off the fraudulent

10  checks to Target, not necessarily having a scheme to defraud

11  the bank, and that was nevertheless held to be sufficient to

12  sustain a bank fraud charge under subsection 2.  And, here, you

13  know, there were lies and misrepresentations that were made,

14  for example, specifically with respect to Visa and MasterCard,

15  that then caused issuing banks to part with their money and

16  property.  And so we believe we have a strong, actually,

17  subsection 2 case.

18      THE COURT:  I will consider that when we get to the

19  final charge.  I really think, as you can see, I simplified

20  everything --

21      MS. LA MORTE:  Understood.

22      THE COURT:  -- in this charge.  And I don't think I'll

23  add that.  I'm curious, though, because anyone who knows the

24  history of the mail fraud statute, beginning in 1872 --

25      MS. LA MORTE:  I'm sure you do, your Honor.

```
1          THE COURT:  So the original mail fraud statute just
2    criminalized a scheme or artifice to defraud.  In 1909,
3    Congress amended that to add "or to obtain money or property by
4    means of false or fraudulent representations or promises --
5    representations, pretenses, or promises."  And you may say, why
6    were they adding that when they already had a scheme to
7    defraud?  And the answer is that, under the common law, "scheme
8    to defraud" only included false affirmative statements of fact,
9    not misleading statements.  And so as amended in 1909, it
10   includes misleading statements.  But this was misinterpreted by
11   all 11 circuits for many years, notwithstanding an article I
12   wrote in the *Duquesne Law Review* that should have set them
13   straight.  Finally, the Supreme Court in *McNally*, said the 11
14   circuits are wrong.  I was surprised they didn't say, and
15   Rakoff was right, but they didn't say that.  But in any event.
16        So there's really, in the mail fraud statute, no
17   difference between the first clause and the second clause,
18   other than the second clause includes half-truths, which the
19   first clause doesn't.  So I don't see why it should be
20   different under the bank fraud case.
21        MS. LA MORTE:  That may well be the case, your Honor.
22   I have not done a deep dive into the legislative history.  But
23   I will say the Supreme Court has interpreted subsection 2 to
24   apply to the situation as I described it, and that would
25   probably be across mail fraud.
```

1              THE COURT:  What would be the difference in any event

2      if we're only talking here about a conspiracy?

3              MS. LA MORTE:  I'm sorry, your Honor.  I didn't hear

4      you.

5              THE COURT:  I'm sorry.  I'm not quite sure, even

6      taking -- I will have to go look at that Supreme Court case.

7      I've heard of that Court, and they often need to be followed.

8              Even assuming there's a substantive distinction, I'm

9      not sure how it would play out in a conspiracy situation.  It's

10     hard to see how a conspiracy to do one would not be a

11     conspiracy to do the other.

12             But anyway, we'll take that up at the charging

13     conference, but not here.

14             OK.  Anything else from the government?

15             MS. LA MORTE:  Not on the charge, your Honor.

16             THE COURT:  Anything from the defense?

17             MR. GILBERT:  Yes, your Honor.  With the caveat that I

18     understand you've been doing this for about 25 years, I don't

19     know if I can improve upon what you've done, but I'll make some

20     effort.

21             THE COURT:  From what it said yesterday, I hope

22     eventually to learn how to do it right.

23             MR. GILBERT:  One request, your Honor, is that you

24     refer to U.S.-based issuing banks --

25             THE COURT:  Yes.

1          MR. GILBERT:  -- in the fourth paragraph, but there

2    are other places in the instruction where you don't include

3    that preface, just refer to issuing banks.  So we would request

4    that wherever there's a reference to "issuing banks" or

5    "banks," that it say "U.S.-based issuing banks."

6          THE COURT:  That's fine.  I don't have any problem

7    with that.  But let me make sure where that is.  So in

8    paragraph 3, "here the alleged bank fraud was the scheme to

9    deceive U.S. issuing banks."

10         MR. GILBERT:  "U.S.-based," I think it says, in the

11   next paragraph, and that would be our request, your Honor.

12         THE COURT:  "U.S.-based banks."  OK.

13         Any other place?

14         MR. GILBERT:  Yes.  In the final paragraph, in the

15   first sentence, which ends "with intent to defraud the banks,"

16   it should make clear that it's U.S. banks.

17         THE COURT:  I think they only have to defraud one, so

18   we'll change that to "any U.S.-based bank."

19         OK.  Anywhere else?

20         MR. GILBERT:  Well, I think the indictment refers to

21   "U.S.-based," to "issuing banks" multiple.

22         THE COURT:  It doesn't matter.  A conspiracy charge

23   doesn't have to prove everything that's in the indictment.

24   They just have to prove the essential elements of the

25   conspiracy.  If they prove the fraud -- a conspiracy to defraud

even a single U.S.-based bank, that meets the requirement.

There's no requirement that they have to be multiple banks.

MR. GILBERT:  The other request, your Honor, since
we've already seen and I believe will see more today, testimony
about the various financial institutions, such as Visa,
MasterCard, and various European entities, we request that the
Court, which I believe you'll have in your final instructions,
it would be helpful at the preliminary stage to make clear to
the jury that the bank fraud law only applies to specific
institutions that are federally insured financial institutions.
And that does not apply to Visa, MasterCard, or European
entities.

THE COURT:  Yes.  I will include that in my final
charge, but I think again we're just -- this is just to give
them a basic heads up, and I make clear in the very first
sentence that it's not dispositive.  So I don't think I'll add
that.  But thank you for raising that.  It will be included in
the final charge.

MR. GILBERT:  Your Honor, on behalf of Mr. Akhavan,
I'd offer two amendments to what your Honor has drafted.  There
are two places, one in paragraph 3, one in paragraph 4, where
you reference credit card purchases.  I believe it's indicted
as credit and debit card purchases.

THE COURT:  OK.  I have no problem with that.  Credit
and debit --

1          MR. GILBERT:  It's in the last sentence of paragraph

2      3, and then I believe it's in -- well, it's the bottom of

3      page 1.

4          THE COURT:  Last sentence of paragraph 4.

5          MR. GILBERT:  Last, yes.  Yes.

6          And then my second proposed amendment is, in paragraph

7      4, the sentence that reads, "Further, the government does not

8      need to prove that any bank actually relied on a

9      misrepresentation."  I would propose adding an initial clause

10     that says "materiality is objective, not subjective, so the

11     government does not need to prove that any bank actually relied

12     on" --

13         THE COURT:  No.  I think -- we're going to add

14     detailed instruction on that.  I of course mention in the next

15     paragraph materiality, which is obviously an important issue in

16     this case.  But I think that is a nuance that would be

17     confusing at this preliminary stage.

18         OK.  So I will give these few edits to my law clerk to

19     prepare forthwith, copies for all the jurors as well as the

20     parties.

21         OK.  Now, I think the government has indicated its

22     intent to object to five exhibits that Mr. Weigand would like

23     to use on his cross of Mr. Michael Tassone.  Let me pull those

24     out.

25         OK.  Let me hear from the government.

1          MS. LA MORTE:  Yes, your Honor.  If we start with

2    WX 120, that's a calendar invite.  It's unclear to us why this

3    is being offered, but to the extent that the defense intends to

4    note that Jim Black, who is a recipient on this email, is an

5    attorney for the company, pursuant to the -- I can pull out my

6    chart -- the government's motion in limine --

7          THE COURT:  What I said on the motion in limine is

8    that anything that remotely suggested an advice-of-counsel

9    defense, since there is none, would be excluded.  But that

10   doesn't mean, and I didn't rule finally on whether the fact

11   that there is an attorney present in a meeting, for example,

12   would necessarily be excluded, unless they said "and

13   Mr. So-and-so was an attorney, wasn't he?"

14         MS. LA MORTE:  Right.

15         THE COURT:  Yes.  So if the only objection here is

16   that they're just going to say Mr. Black but not identify

17   himself as an attorney, what's the harm?

18         MS. LA MORTE:  There is no harm if that's what they

19   intend to do, but to the extent that they intend to point out

20   that Mr. Black is an attorney, then I think that implicates

21   exactly what your Honor is saying.

22         THE COURT:  All right.  Well, let me hear from --

23         MR. GILBERT:  We did intend to point out that he is an

24   attorney, not -- mindful of your decision, obviously.

25         I'm sorry.

1           THE COURT:  OK.

2           MR. GILBERT:  But it doesn't go toward an advice of

3      counsel defense.  But the thought would be that the fact that

4      lawyers were involved in these meetings about the credit card

5      processing scheme, in this case the initial Clearsettle case,

6      we think is relevant to show that, despite his testimony

7      yesterday that he believed he was committing bank fraud for

8      four years, that is not so and is inconsistent.

9           THE COURT:  I don't see how -- first of all, I don't

10     see that as relevant, but assuming even arguendo relevance, I

11     would exclude it on 403 grounds.  Since someone who happens to

12     be an attorney happens to be present in a meeting, that's

13     irrelevant unless that person either sua sponte says, I think

14     that's legal, or, I think that's illegal, which is not the case

15     in this email or any of the other situations we have talked

16     about, or the defendant is raising an advice of counsel defense

17     and saying, I thought that because he was there he was giving

18     me the silent equivalent of advice of counsel, that this was

19     OK.  And that would raise an advice of counsel defense, which

20     you have expressly disclaimed you're making.  Even assuming

21     there were some relevance to the fact that an attorney was

22     present even though he was not giving any remarks about advice

23     of counsel, I would still exclude the fact of there being an

24     attorney, under 403, because I think it would suggest to the

25     jury that the defendant either was receiving or thought he was

1    receiving implicit advice or approval of counsel, which is

2    exactly what is being disclaimed.

3          So you can introduce this, but you cannot bring out

4    the fact that Mr. Black is counsel.

5          MR. GILBERT:  Well, to be clear, your Honor,

6    Mr. Weigand was not present, the evidence will show.

7          THE COURT:  Well, even a fortiori, as you would say,

8    that makes it even a better case for excluding the fact that he

9    happened to be -- Because then I don't see any relevance

10   whatsoever.  He just was -- you know, I think of emails I

11   receive from time to time which have 500 people copied on them.

12   Half the time it's just because that's the button they push.

13         But in any event, you have my ruling.

14         MR. GILBERT:  Thank you, your Honor.

15         THE COURT:  All right.  Next one.

16         MS. LA MORTE:  All right.  The next ones are WX 199,

17   WX 197, WX 198, as a group.

18         THE COURT:  Yes.  Go ahead.

19         MS. LA MORTE:  So the government's issue with these

20   exhibits, I guess, depends on what the defense intends to bring

21   out with respect to them.  So your Honor did rule on the motion

22   in limine, and I will get better at the numbers, but your Honor

23   did rule that evidence regarding willful blindness of banks and

24   evidence regarding a lack of diligence of banks is not relevant

25   to materiality under well-established case law.  And these

1    exhibits, which are billboards and advertisements, etc., for

2    Eaze, appear designed, based on the statements in counsel's

3    opening statement, designed to say, oh, look, this was out

4    there for everyone to see, the banks just chose to ignore it.

5    And as your Honor is aware, we've already discussed, willful

6    blindness is a subjective standard.  It's inconsistent --

7              THE COURT:  All right.  I take your point.  But what

8    we need to know is what the purpose is for introducing these

9    exhibits.

10             MR. GILBERT:  Well, one of the purposes is, as the

11   assistant just described.  But moreover --

12             THE COURT:  What is it you intend to ask this witness

13   about these exhibits?

14             Just for the record, the first exhibit, 197, is a shot

15   of an airplane and a train, the word "eaze," and the email

16   address for Eaze.  And then it says "marijuana delivered now in

17   Los Angeles."  And I'm of course shocked to see this, because

18   I'm quite sure there was no marijuana in Los Angeles prior to

19   legalization.  But in any event, what is the question you're

20   going to put about 197 to the witness?

21             MR. GILBERT:  Well, with regard to 197 and 199, we're

22   going to ask the witness if he was involved, in addition to his

23   involvement with credit cards for Eaze, he was also involved in

24   expanding the business through various means, including

25   advertising and marketing, and as 199 --

1          THE COURT:  I think this was already asked yesterday
2     to some extent, but OK.
3          MR. GILBERT:  I believe it was asked and established
4     on direct --
5          THE COURT:  Yes.
6          MR. GILBERT:  -- that one of his responsibilities in
7     general was to grow the business.
8          THE COURT:  Yes.  And unless I'm mistaken, that more
9     or less the exact line of questions was asked by your
10    co-counsel yesterday.
11         MR. GILBERT:  I don't believe so, your Honor.  Well,
12    it may be, but I don't believe that, when he was asked about --
13    on cross -- his role in extending the business, that there was
14    any discussion about his involvement with what's depicted in
15    197 and 198.
16         THE COURT:  So putting aside that it's probably
17    cumulative, what's the relevance?
18         MR. GILBERT:  Well, in the government's opening,
19    Judge, they said that Mr. Weigand was asked about Eaze and he
20    said he had only seen -- the government said -- he had seen it
21    on a billboard, and they said repeatedly in effect that that
22    was implausible and that was a lie.  And this would rebut the
23    government's statements to the jury in that regard because it
24    was --
25         THE COURT:  I don't recall what the government said in

1    opening about that, but let me ask the government.

2              MS. LA MORTE:  Your Honor, I think the most we've ever

3    said -- and to be honest maybe Mr. Folly remembers; I just

4    don't remember whether it was in the opening -- was that in the

5    postarrest statement, Mr. Weigand indicated that he was asked

6    like, how did you first learn of Eaze or words to that effect,

7    and his response to the postarrest was, I saw him on the

8    billboard.

9              THE COURT:  All right.  So isn't it then fair game for

10   them to bring out that there are such billboards?

11             MS. LA MORTE:  Sure.  For that purpose, yes, your

12   Honor.  It all obviously turns on the purpose for which it's

13   being offered.

14             THE COURT:  All right.  So it sounds like, for the

15   purpose offered, it's OK.

16             What else?

17             MS. LA MORTE:  The last one, your Honor, is WX 2601.

18             THE COURT:  Yes.

19             MS. LA MORTE:  This came up in the context of the

20   litigation regarding the Circle third-party subpoena.  And what

21   this reflects is the fact that on Eaze now, or at the time that

22   this was printed, after the scheme, you are able to do ACH

23   transfers in order to be able to purchase products.  You know,

24   the government submits that this is not relevant.  The fraud

25   here concerns credit and debit purchases.  And so we believe

1     that it's not relevant and it would additionally be misleading

2     and confusing.

3              THE COURT:  So let me hear from the defense.

4              MR. GILBERT:  Well, your Honor, this clearly depicts

5     that even today, Eaze is advertising, on its own website, that

6     all of these issuing banks, which are the same theoretical

7     victims of this crime, are fine to have the association with

8     Eaze where there's a mechanism to use a Chase, a Bank of

9     America account to purchase marijuana.  So it's directly --

10             THE COURT:  I, while I think at some point we're going

11    to impose some limitations on this post-conspiracy type of

12    evidence, which I think is of modest relevance, I don't think

13    it's irrelevant, so I will allow it.

14             MS. LA MORTE:  Your Honor, may I make one more point

15    on this?

16             THE COURT:  Yes.

17             MS. LA MORTE:  Just in terms of the relevance of

18    post-conspiracy evidence, I understand the Court is going to be

19    drawing lines in that regard.  But unlike with respect to

20    Circle, for example, where that is a debit transaction to a

21    crypto, followed by whatever, this is an ACH transfer, so there

22    is not even that linkage to what was happening during the

23    conspiracy.  And obviously the other difference, which applies

24    to both but here too, is that this case is charging an element

25    of deception, like the point that there is a deception with

```
 1    respect to these other methods.  But just in terms, the

 2    post-conspiracy evidence, the limited relevance --

 3          THE COURT:  I think, in my understanding -- and maybe

 4    defense counsel will correct me if have this wrong -- the

 5    theory of all this stuff is that the banks really didn't care

 6    because it was immaterial, and that one evidence of that is,

 7    even after all this stuff became the subject of government

 8    investigation or even indictment, the banks continued to do

 9    business with Eaze in the processing of marijuana product.  Do

10    I have that -- is that the purpose of this?

11          MR. GILBERT:  Precisely so.  And these transactions

12    are even more directly connecting the banks with --

13          THE COURT:  All right.  So, I mean, that does seem to

14    me relevant.  Their whole defense, increasingly, seems to me to

15    be materiality.

16          MS. LA MORTE:  Yes.

17          THE COURT:  And I think --

18          MS. LA MORTE:  But these aren't the banks that are

19    doing business, your Honor.  That's the difference.  On this

20    website, this is just a list of banks.

21          THE COURT:  Oh, I'm sorry.  That -- oh, these are

22    not -- what are the banks that you are saying, the U.S.-based

23    banks, that you are saying were defrauded?

24          MS. LA MORTE:  I'm sorry, your Honor?  Could you

25    repeat that?
```

1          THE COURT:  What are the banks, the U.S.-based banks,

2    that you are saying were defrauded?

3          MS. LA MORTE:  U.S.-based issuing banks, including

4    Wells Fargo, Bank of America, Actors Bank, and others that are

5    U.S. issuing banks of credit.

6          THE COURT:  So here they have Bank of America.

7          MS. LA MORTE:  But they're not acting in the capacity

8    of a U.S. issuing bank on this website.  This is an Eaze

9    website.  Eaze puts this on here.  And this is an ACH transfer.

10   It is a very distinct type of transfer from a credit and debit

11   transaction.  They are not fraudulent representations or

12   representations that are going to --

13         THE COURT:  I think that goes to weight.  You can

14   bring that out on redirect, and of course you can ask your bank

15   witnesses about this and show why you think it's different, but

16   I think it's generally admissible.

17         OK.  Then --

18         MS. LA MORTE:  I believe that's it for the exhibits.

19         THE COURT:  Let me just look at my list.

20         There is some question about exhibits for the next

21   witness, but we'll take that up later.  But actually let me

22   just ask, how long does Mr. Akhavan's counsel intend -- give us

23   a ballpark -- with your cross-examination?  How long?

24         MR. TAYBACK:  Ballpark would be an hour and 15

25   minutes.

 1              THE COURT:  OK.  That's good.  That sounds quite
 2      precise.
 3              MR. TAYBACK:  Meaning it could be an hour, could be an
 4      hour and a half.
 5              THE COURT:  And how about Mr. Weigand's?
 6              MR. GILBERT:  Ballpark would be 30 to 45.
 7              THE COURT:  OK.  And there will be some redirect.  So
 8      we'll have a chance to take the next questions about the next
 9      witness's cross-examination up maybe at the lunch break or
10      something like that.
11              All right.
12              MR. FOLLY:  Your Honor, there is one additional issue
13      we did want to raise with the Court at some point that does not
14      affect the current witness or the witness after that but that
15      could affect the anticipated third witness for the government's
16      case.  If your Honor would allow me, I can explain the issue
17      now, or if you prefer, we can address it later today.
18              THE COURT:  Well, I'm very anxious, since we started
19      late yesterday, through no one's fault, to start promptly.  So
20      I'll give you the choice.
21              MR. FOLLY:  Your Honor, we --
22              THE COURT:  Either you can tell me now what that issue
23      is, and then you won't have the bathroom break, nor will any of
24      your colleagues, or you can take a bathroom break for ten
25      minutes and you can tell me about that issue at lunchtime.

1          MR. FOLLY:  Your Honor, we would prefer, I think, to

2   address it now, only because it is --

3          THE COURT:  All right.

4          MR. FOLLY:  -- it is important.

5          THE COURT:  Congratulations on your bladder.

6          MR. FOLLY:  I apologize to everyone else in the

7   courtroom.

8          Your Honor, the issue pertains to a discovery that the

9   government made late last night concerning some electronic data

10   that was seized from one of the government's cooperating

11   witnesses, Oliver Hargreaves.  And just as background, when

12   Hargreaves was arrested in the fall of 2018, he had certain

13   electronic devices on him which were seized, and they were

14   subsequently searched by our office.  We produced one of those

15   devices, which was an iPhone, to the defense in April of last

16   year, in its entirety.  We realized late last night that there

17   may have been -- that there was, rather -- an iPad that was

18   also seized and searched, that contained data.  The prosecution

19   team this morning located the data that was contained on that

20   iPad and is in the process right now of burning that data so

21   that it can supply it to the defense the moment that it is

22   available.  We anticipate that we will be able to supply it to

23   the defense within -- we've been told at this time it's

24   developing in real time -- but within a few hours.

25          There is the possibility that there is data from a

1    second iPhone.  We are checking right now.  We have not been

2    able to confirm, actually, whether any data was successfully

3    extracted from that phone, in which case there would not be any

4    data that is in the government's possession.  But we at this

5    stage cannot represent whether that is the case.  It's

6    developing in real time.  Our analyst is checking on that right

7    now.

8           We have brought this to the attention of the defense

9    lawyers.  Obviously, given the situation and the fact that they

10   do not have the data yet from the iPad, we believe it's

11   premature for there to be any application on their behalf.  But

12   obviously they may be entitled to such an application once they

13   actually have the data.  We fully recognize that this is an

14   error entirely of the government's that we did not locate or

15   realize we had this data until very early this morning.  And we

16   are doing everything to produce it to the defense immediately.

17          THE COURT:  All right.  Well, thank you for apprising

18   me of that.  I see that Judge Nathan's opinion has had a

19   meaningful deterrent effect.  But since there's no application

20   at the moment, there's nothing for me to rule on.

21          All right.  We do have time for a five-minute break.

22   And then we will bring up the jury, so be back here at a

23   quarter of.

24          (Recess)

25          (Jury not present)

1              THE COURT:  The jury is on their way up.  My courtroom

2     deputy talked to Juror No. 3, and, confirming what my own

3     memory was, he is not someone who had a vaccine appointment.

4     And in fact the person who you're remembering was one of the

5     jurors who was excused.  So there's no problem.

6              MR. TAYBACK:  My apologies.

7              THE COURT:  No problem.

8              (Jury present)

9              THE COURT:  Counsel, we're going to read the

10    instruction.

11             So, ladies and gentlemen, you should each now have a

12    copy of a preliminary instruction.  We're going to read it

13    together now, but you can keep it with you and take it to the

14    jury room for whatever help it may have.

15             This is designed just to give you a sort of heads up

16    of some of the issues in the case.  We're going to have much

17    more detailed legal instructions at the close of the case, but

18    I thought it would be helpful to you to have a little prelude,

19    so to speak.

20             So let's read this together.

21             At the close of the case, before you begin your

22    deliberations, I will give you detailed instructions about the

23    law governing this case.  But at this early stage, it may be

24    helpful for me to give you a brief summary of some of the

25    issues in this case.  These are no substitute, however, for the

1    final instructions I will give you at the close of the case.

2              The two defendants here, Ray Akhavan and Ruben

3    Weigand, are charged with one count of conspiracy to commit

4    bank fraud.  Let me remind you at the outset that neither

5    Mr. Akhavan nor Mr. Weigand bears any burden of proof.  You

6    must presume them innocent until and unless the government

7    proves their guilt beyond a reasonable doubt.

8              So what must the government establish to prove the

9    charge in this case?  The charge of conspiracy to commit bank

10   fraud has two elements.  First, the government must prove the

11   existence of a conspiracy.  A conspiracy is an agreement

12   between two or more people to accomplish by concerted action

13   one or more unlawful objects.  Here, the alleged object -- I'm

14   sorry, it should have said -- the alleged object was bank

15   fraud.  The alleged bank fraud -- I'm sorry.  There was a word

16   left out.  Here, the alleged bank fraud object was a scheme to

17   deceive U.S.-based banks into effectuating credit and debit

18   card purchases of marijuana, by disguising those purchases as

19   being for other kinds of goods.

20             The government does not need to prove that the scheme

21   succeeded, but only that it was planned.  Also, the government

22   does not need to prove that a bank suffered any financial loss.

23   Further, the government does not need to prove that any bank

24   actually relied upon a misrepresentation.  However, the

25   government must prove that the conspirators' fraudulent

representations were material, in that they were reasonably

likely to influence the U.S.-based issuing banks into making

the decision to process the disguised credit and debit card

purchases.

If you find that the government has proved the

existence of this bank fraud conspiracy, you must consider the

second element of the charge, which is whether either or both

defendants knowingly joined the conspiracy with intent to

defraud any U.S.-based bank.

(Continued on next page)

L33PWEI2                         Tassone - Cross

1              THE COURT:  The government need not prove that a given

2    defendant joined the conspiracy at the outset of the conspiracy

3    nor that he received any money from participating in the

4    conspiracy.  However, the second element, like the first, must

5    be proof beyond a reasonable doubt before a defendant can be

6    convicted.

7              So as I say, you can hold onto that for guidance, but

8    we'll have much more detailed instructions at the close of the

9    case.

10             All right.  Let's get the witness in.

11             By the way, ladies and gentlemen, thank you for your

12   promptness today.  I wanted to let you know that we will not be

13   sitting Friday.  I told you that was unclear, but now we've

14   decided we will not be sitting Friday.  We will be sitting next

15   Friday but not this Friday.

16             Please be seated.  I remind the witness that he is

17   still under oath.

18   MICHAEL TASSONE, resumed.

19   CROSS-EXAMINATION CONTINUED

20   BY MR. TAYBACK:

21   Q.  Can I ask, can the witness hear me?

22   A.  Yes, I can.

23   Q.  Can the jurors hear me?  Okay.  Thank you.

24             Mr. Tassone, I want to pick up where I left off

25   yesterday.  When you learned about the investigation by the

L33PWEI2                              Tassone – Cross

1    government into the case that led to the indictment that is

2    being tried here today, in March of 2020, you viewed that as an

3    enterprise-threatening risk to Eaze, correct?

4    A.   No, I did not at the time.

5    Q.   You certainly -- I believe you testified yesterday that you

6    believed you had been committing bank fraud, correct?

7    A.   Yes, that is correct.

8    Q.   And so when you heard that Mr. Akhavan and Mr. Weigand had

9    been charged with bank fraud, you certainly felt that Eaze was

10   in jeopardy?

11   A.   I thought that there could be concern, but at that time, I

12   wasn't -- I wasn't concerned for myself necessarily.

13   Q.   You weren't concerned for yourself.  By that point in time,

14   Eaze had grown into a very significant business, correct?

15   A.   Yes, it had.

16   Q.   And you had plans for it to continue to grow and get

17   bigger?

18   A.   Yes.

19   Q.   In 2020 it had branched out from being a delivery platform

20   to also owning a dispensary, correct?

21   A.   In the year 2020?

22   Q.   Yes.

23   A.   Yes, Eaze's subsidiary company did acquire dispensary

24   licenses.

25               MR. TAYBACK:  I see the clerk.  Is there feedback?  I

1    can't quite hear in the box.

2              THE DEPUTY CLERK:  It sounds like something keeps

3    brushing against a microphone.

4              THE WITNESS:  There's no cover on this microphone.  I

5    don't know if that matters.

6              (Pause)

7              Is that better?

8              THE DEPUTY CLERK:  Yes.

9    BY MR. TAYBACK:

10   Q.  I'll keep asking questions, and I'll assume someone will

11   tell me if it's not.

12              I believe I asked you that in 2020, Eaze expanded

13   beyond being just a delivery platform to also owning a

14   dispensary?

15   A.  Yes, that's correct.  Eaze's subsidiary company, Stachs

16   acquired a dispensary license.

17   Q.  So Eaze has a company Stachs that both oversees the drivers

18   and that also owns the dispensary?

19   A.  Yes.  In certain locations they own equity in dispensary

20   licenses, as well as employ the staff and drivers there.

21   Q.  And the dispensary provides cannabis products or marijuana

22   products that are the kind that have the THC that give you the

23   high effect, correct?

24   A.  Yes, that is correct.

25   Q.  Do they also sell the kind of products that have the CBD,

1   which is the chemical that doesn't provide the high?

2   A.  Yes, that is correct.

3   Q.  Now, in your time at Eaze, you've invested significantly in

4   advertising throughout California, right?

5   A.  The company did, yes.

6   Q.  Big billboards around the cities, the major cities?

7   A.  Yes.

8   Q.  Now, as Eaze began to expand its business, at some point,

9   you did realize that a criminal indictment that implicated Eaze

10  could be catastrophic to the company?

11  A.  Yes, any criminal indictment to Eaze would be catastrophic

12  or could potentially be catastrophic.

13  Q.  And you came to a conclusion that that was something you

14  didn't want personally either?

15  A.  That would be correct.

16  Q.  So in March of 2020, at the time that this indictment was

17  unsealed as it relates to Mr. Akhavan and Mr. Weigand, you were

18  promoted to the vice president of operations?

19  A.  I believe that's roughly that time.

20  Q.  And in that capacity, you were an officer of Eaze, correct?

21  A.  Yes, that is correct.

22  Q.  And holding that vice presidency position, as an officer of

23  the company, it was your job to try to look out for the best

24  interest of the company, right?

25  A.  I believe that's everyone's role at the company, yes.

L33PWEI2                        Tassone - Cross

1   Q.  Now, you said at the time you learned of the indictment,
2   though, you didn't feel that there was a particularly urgent
3   risk, correct?
4   A.  That is correct.
5   Q.  Isn't it true that you didn't call the government when the
6   indictment -- you learned of the indictment and say, hey, I've
7   been committing bank fraud, too?
8   A.  That's correct.
9   Q.  The government came to you?
10  A.  Yes, they did.
11  Q.  Isn't it true that you didn't actually believe that you
12  committed bank fraud until the government contacted you and
13  said:  We are looking at you?
14  A.  The way I would explain it, no, is that my initial
15  involvement, I didn't -- I didn't necessarily understand that
16  there was a -- I always understood that there was a risk in
17  what I was doing with my job, selling marijuana, that it was
18  illegal in the eyes of the federal government.  Not until later
19  in my involvement in that did I learn that there was more
20  severe risk or a difference in bank fraud.
21  Q.  But even after you learned that there had been an
22  indictment issued, you didn't conclude, wow, I've been
23  committing bank fraud; I need to be really worried for me and
24  the company, correct?
25  A.  I was not at the time.

1  Q.  And it was only in the process of talking to the government

2  that you came to the conclusion, wow, I also must have been

3  committing bank fraud, correct?

4  A.  Well, I mean, I would -- actually, to go back to the

5  previous question, you know those thoughts did cross my mind,

6  but I didn't have any legal concerns because there was no one

7  reaching out to me at that time from a legal perspective.

8  Q.  Now, when you first started at Eaze, you didn't believe

9  that it was engaged in any illegal conduct?

10 A.  That's not true.  I believed that -- the way I understood

11 it is that in the State of California, Eaze was acting as a

12 compliant company within the city and state regulations that

13 they operated in.  However, I did understand the risk that the

14 at the federal level, it was still illegal.

15 Q.  And that was a risk you were comfortable with?

16 A.  Yes.

17 Q.  And that's a risk you're still comfortable with, correct?

18 A.  Yes, it is.

19 Q.  Now, in fact, one of the early slogans when you joined the

20 company was:  We, at Eaze, don't touch the plant; do you

21 remember that?

22 A.  That was not a slogan, to my memory, but that may have been

23 something that someone had said.

24 Q.  It was your understanding that the business model of Eaze

25 was to be a delivery platform and not touch the plant, meaning

1    not cultivate or run a dispensary?

2    A.  Yes, that is correct.

3    Q.  Now, it's true, isn't it, that as Eaze has grown as a

4    company, I think you said that it has branched out from being

5    just a delivery service; so now it does touch the plant,

6    correct?

7    A.  Eaze's subsidiary company does touch the plant, yes, that's

8    correct.

9    Q.  You view it as different?  Is the subsidiary somehow

10   different?

11   A.  A separate business entity, but it is owned by Eaze.

12   Q.  And it also is a California company?

13   A.  Yes.  To my understanding, yes, based in California.

14   Q.  And when you first started at Eaze, when you first started

15   at Eaze in 2015, was marijuana legal in California for all

16   purposes?

17   A.  No, it was not.

18   Q.  Was it legal for just medicinal purposes?

19   A.  My understanding is it was legal just for medicinal

20   purposes, if you had a doctor's recommendation.

21   Q.  And people who purchased, in order to purchase it, they

22   needed a medical card?

23   A.  A medical card or a medical recommendation.

24   Q.  And at that time, you had delivery drivers who would go out

25   and deliver the marijuana products.  And if they were the type

1    of product that had THC, the purchaser needed to show ID, and

2    they needed to show some sort of proof that they were entitled

3    to acquire the product medically?

4    A.   Well, Eaze did not employ those drivers.  The licensed

5    dispensaries that we partnered with did.  And yes, to answer

6    the second part of the question, they did have to validate that

7    they had the medical recommendation and that they were of a

8    legal age to purchase as well.

9    Q.   And when you say the dispensaries they partnered with, Eaze

10   was providing what service to those dispensaries in connection

11   with the distribution of their product?

12   A.   Eaze was the platform or marketplace, similar to something

13   like Amazon, in which a brand or, you know, in this case, a

14   licensed dispensary, can put their products onto the platform

15   on a menu that's specific to that market that they operate in,

16   and then they can sell the products through that website.

17   Q.   And the drivers had instruction about what kind of things

18   they needed to receive from the customers in order to actually

19   make the transaction, right?

20   A.   The licensed dispensary provided those instructions, and

21   yes, in compliance with California law, yes, they had to

22   collect the driver's license and medical recommendations.

23   Q.   Well, Eaze also did something to ensure that they complied,

24   correct?

25   A.   Yes, we wanted to -- well, I'm sorry, can you elaborate on

L33PWEI2                          Tassone - Cross

1   that?

2   Q.  Eaze also wanted to ensure that the drivers complied with

3   California law, correct?

4   A.  But can you elaborate?  What do you mean by that?

5   Q.  Did Eaze do anything to ensure that these drivers complied

6   with California law when they were delivering products?

7   A.  We didn't -- so we worked with our licensed dispensary

8   partners to ensure that they were managing them in a compliant

9   way because we did not want to be working with noncompliant

10  licensed entities.

11  Q.  So you interacted with the dispensary on those issues?

12  A.  Yes, I did.  That was my job.

13  Q.  And that continued to be your job for a number of years at

14  Eaze, interacting with the dispensaries?

15  A.  Yes, that is correct.

16  Q.  Now, the limitations on the legality of marijuana in

17  California changed on January 1st of 2018; isn't that right?

18            MS. LA MORTE:  Objection.

19            THE COURT:  Ground?

20            MS. LA MORTE:  Legal conclusion.

21            THE COURT:  Well, that's right, sustained.

22  BY MR. TAYBACK:

23  Q.  Is it your understanding that the law changed in California

24  on January 1st of 2018?

25  A.  Yes, that is my understanding.

L33PWEI2                         Tassone - Cross

1    Q.   And did that affect the way you did business at Eaze?

2    A.   Yes, it did.

3    Q.   How?

4    A.   The licensed dispensaries that we worked with were no

5    longer serving medical patients but potentially recreational or

6    adult users.

7    Q.   And isn't it true that what happened was the licenses that

8    all these dispensaries had went away?

9    A.   Not necessarily.  So the licenses that they previously had

10   were -- they were required to get provisional licenses or

11   temporary licenses from the cities and the state.  And the

12   cities and the state in that regard didn't issue them in time

13   for the change.

14   Q.   So come January 1st, Eaze's business ceased, for all

15   intents and purposes, for a period of time?

16   A.   My memory is that one dispensary was still on line.  They

17   did receive their license.  All of the other dispensaries were

18   temporary offline and ceased.

19   Q.   And Eaze needed to wait for the dispensaries to get

20   licensed under this new regime that you understood existed in

21   California, where marijuana was legal for all purposes?

22   A.   Yes, Eaze wanted to work with licensed, legal licensed

23   dispensaries; so yes, we did wait until they received their

24   licenses from the cities and the state.

25   Q.   Now, I'll come back and ask a few more questions in a

L33PWEI2                          Tassone - Cross

moment about the effects of that change from medicinal to
recreational, but I want to ask you some more general questions
first.

        Working at a small start-up company as early as you
did, you faced a number of challenges getting the company to
grow, correct?

A.  Yes, that is correct.

Q.  And one of those challenges was the fact that attitudes
about marijuana differ, correct?

A.  Attitudes about marijuana?

Q.  Yes.

A.  What do you mean?

        MS. LA MORTE:  Objection.

        THE COURT:  Sustained.

Q.  Did you have difficulty with Eaze in terms of getting
vendors, drivers, people to support the growth of Eaze?

A.  Not in a significant way, no.

Q.  So the fact that it was a marijuana delivery company when
it started didn't impede your ability to do business, correct?

A.  We did -- we did complete business.  We did do business.

Q.  And the fact that you were a new business in the marijuana
industry, which was itself a new business, that did not
significantly impede your ability to do business?

A.  Well, it was very challenging, as any start-up company that
is that small, under-resourced and in a highly regulated space.

1    So it was highly challenging, but to answer your question, we

2    were a complete business or carrying out business.

3    Q.  And new businesses, as you just described them, start-up

4    businesses, especially in highly regulated businesses, can be

5    riskier than one of the more well-established businesses?

6    A.  It can be riskier, yes.  Like from a financial perspective?

7    Yes.

8    Q.  Wasn't that one of the risks you researched before you

9    decided to make the move from Groupon to Eaze?

10   A.  Yes, it is.

11   Q.  And as a businessman, you know that sometimes higher risks

12   means sometimes you have to pay more if somebody thinks it's

13   too risky, you may have to pay an increased fee to do business?

14   A.  Can you be more specific?

15   Q.  Has that ever been your experience?

16   A.  Yes, I guess so.

17   Q.  Now, the phrase that I believe you used yesterday at some

18   points of your direct testimony was "high risk;" do you recall

19   that?

20   A.  Yes, I do.

21   Q.  And the high risk you were describing in the context of

22   credit card transactions means a high risk of chargebacks,

23   correct?

24   A.  I'm sorry, can you repeat that question?

25   Q.  High risk, the phrase, in the context of credit card

1   transactions, as you described them yesterday, means a high

2   risk of chargebacks, correct?

3   A.   I wouldn't say that those are correlated necessarily.

4   Q.   Have you heard the phrase high risk referred to in a credit

5   card company's assessment of the risks of chargebacks within a

6   company?

7   A.   Yes, I have.

8   Q.   And so you talked a little bit about chargebacks in your

9   direct testimony, and I want to ask you some follow-up

10   questions about that.  You said that credit card companies

11   don't want to do business with companies that have high rates

12   of chargebacks; isn't that your experience?

13   A.   That's what I was told, but I don't have -- I don't have

14   any direct relationships with credit card companies myself.

15   Q.   So that's something you understand, but you don't

16   personally know?

17   A.   That's correct.

18   Q.   Is it your understanding, though, when you testified

19   yesterday about chargebacks, that chargebacks are basically

20   returns?  People that are unsatisfied with their products for

21   some reason, and after having bought it, they want their money

22   back or want to reverse the transaction?

23   A.   No, that's not my understanding.

24   Q.   What's your understanding of a chargeback?

25   A.   My understanding of a chargeback is if a customer doesn't

1  recognize a charge on their bank or credit card statement, or

2  if they think it was a fraudulent charge, like they didn't do

3  the charge themself, maybe their credit card was stolen, then

4  they would contact their bank or credit card companies to issue

5  a chargeback.

6  Q.  And that would be reversing the transaction, correct?

7  A.  Yes.

8  Q.  Now, chargebacks, as you understand it, are only for

9  fraudulent transactions?  Are they not also for transactions

10  where the customer is unsatisfied and says, I want to reverse

11  this transaction because I didn't get what I paid for?

12  A.  I guess in some capacity they could be used for that as

13  well.

14  Q.  Now, as a totally new business, marijuana delivery, there

15  was no track record for knowing how reliable the deliveries

16  would be, correct?

17  A.  That is correct.

18  Q.  There was really no track record for determining how

19  legally compliant with state law the delivery service would be?

20  A.  And I'm sorry, from like what period?  You're saying as a

21  new business?

22  Q.  As a new business, when you first joined the company, there

23  was very little track record for how reliable the company was

24  going to be?

25  A.  From whose perspective?

L33PWEI2                              Tassone – Cross

1    Q.  What?

2    A.  From whose perspective?

3    Q.  Well, from your perspective.  There was not a track record

4    for having done business for many years, correct?

5    A.  Yes.  I mean, there was a track record, I guess, with the

6    people that I worked with and the entity that they were setting

7    up, but as a new business, yes, you know, it was continuing to

8    grow and prove itself out.

9    Q.  And you would agree -- you talked a little bit about the

10   different banks that were involved.  There was a category of

11   banks, I think you referred to them as acquiring banks; do you

12   recall that?

13   A.  Yes, I do.

14   Q.  Are those also called merchant banks?  Have you heard them

15   called that?

16   A.  I believe so, or receiving banks is how I think about them

17   as well.

18           MR. TAYBACK:  I'd like to use the government's

19   demonstrative from opening with this witness that shows the

20   four banks or showed the four parties to the transactions in

21   the large square.  I think both parties used it.  Any

22   objection?

23           MR. FOLLY:  Do you have it there?

24           MR. TAYBACK:  Yes.

25           MS. LA MORTE:  No objection.

L33PWEI2                            Tassone - Cross

             MR. TAYBACK:  Mr. McLeod, if you could display the

graphic.

BY MR. TAYBACK:

Q.  Mr. Tassone, I'd like you to take a look at the chart

that's in front of you?

A.  Okay.

Q.  You will see that there are different icons on this chart?

A.  Yes, I see that.

Q.  And I'm going to identify them for you, and then I'm going

to ask you some questions about the terms used for different

banks that you're familiar with or different entities that

you're familiar with.

A.  Okay.

Q.  The "merchant" would be the dispensary?

A.  In this depiction, yes.

Q.  And somewhere in that line between the merchant, or near

the merchant, Eaze is another entity separate from the

merchant, in most instances, that's also part of the

transaction when a customer would use a credit card or debit

card to buy marijuana?

A.  Eaze was not a part of the transaction, no.

Q.  Did Eaze receive compensation for each transaction?

A.  There was a flat rate per delivery, yes, from our

contractual relationships with the dispensary partners.

Q.  With the dispensaries?

1    A.  Yes, that is correct.

2    Q.  And so when did Eaze receive those funds?

3    A.  Never.

4    Q.  Never?

5    A.  The dispensaries never really paid us.

6    Q.  Even today?

7    A.  Today our business model has changed where we are, you

8    know, equity owners in a lot of the licenses and locations that

9    we operate in.

10   Q.  So you're saying the dispensaries weren't good business

11   partners because they wouldn't pay?

12   A.  I would characterize it as they were not always profitable,

13   and were unable to pay in a lot of situations.

14   Q.  In the model as it was designed, Eaze was intending to get

15   paid by the dispensary, correct?

16   A.  Yes, of course.

17   Q.  And at what juncture was Eaze intending to get paid?

18   A.  Based on our contracts, on a monthly basis.

19   Q.  And based on the volume of product that Eaze delivered for

20   a particular dispensary?

21   A.  Not necessarily based on the volume, but based on the

22   number of transactions.

23   Q.  Now, between the merchant -- if you look up the line from

24   the merchant on the chart, you'll see the merchant bank and in

25   parenthetical it also says "acquiring bank"; do you see that?

1   A.  Yes, I see that.

2   Q.  Now, the merchant bank or acquiring bank, you also referred

3   to it as a receiving banking?

4   A.  Yes, that's correct.

5   Q.  Is it your understanding that that's the bank that has to

6   have the relationship with the dispensary in order for them to

7   accept credit cards?

8   A.  I don't know if they have a relationship.  My understanding

9   is that they just needed banking details in order to send them

10  a wire.

11  Q.  So the merchant bank, as far as you're aware, you have no

12  idea what information the merchant received from the

13  dispensaries?

14  A.  That is correct.

15  Q.  But these merchants all had their own bank accounts,

16  correct?

17  A.  I believe that to be the case, yes.

18  Q.  Commercial bank accounts, correct?

19  A.  I don't know what type of banking, but they all, if they

20  were receiving a wire, then yes they would have a bank account

21  associated with their dispensary.

22  Q.  And the merchant bank -- rather, between the merchant and

23  the merchant bank, is it your understanding that there's

24  another entity, a credit card processor?

25  A.  Yes, I am.

L33PWEI2                    Tassone - Cross

1   Q.  And that's the companies referred to yesterday as

2   Clearsettle or EUP or EUprocessing at different points in time?

3   A.  Yes, that's correct.

4   Q.  Do you know about those credit card processing companies

5   generally?

6   A.  Like outside of Clearsettle or EUP?

7   Q.  Correct.

8   A.  Only general ones, like from public knowledge, like Square

9   payments or something like that.  But I don't have any previous

10  experience or relationship with them.

11  Q.  The line going across on this chart from the merchant bank,

12  it goes to the box that says Visa/MasterCard, that's credit

13  card companies themselves, correct?

14  A.  I believe so.

15  Q.  And then there's a line that goes across again to something

16  called card holder bank or issuing bank; do you see that?

17  A.  Yes, I do.

18  Q.  And you understand that to mean not a bank that has any

19  relationship with any of the merchants, but to be the bank that

20  issued the credit card used by some particular consumer,

21  correct?

22  A.  That is my understanding that the -- yes, that is my

23  understanding.

24  Q.  And below that is the cardholder; isn't that right?

25  A.  The cardholder.  Yes.

1   Q.  Now, my question, to go back to where I was when we talked
2   about fees for risks, was it your understanding that the fees
3   being charged in connection with credit card transactions to
4   the dispensaries were governed by the merchant banks or the
5   acquiring banks or what you call the receiving banks?
6   A.  Can you repeat that?  I just want to make sure I understand
7   it.
8   Q.  Yesterday you testified about certain fees that were
9   charged to the dispensaries in order to have credit card
10  transactions used to acquire, purchase their products?
11  A.  Okay.
12  Q.  Those fees were set by the merchant banks or the acquiring
13  banks or sometimes you called them the receiving banks?
14  A.  I do not know that.
15  Q.  So you don't know who set those fees?
16  A.  No, I was only told what the fees were.
17  Q.  Now, you can understand how a merchant bank, for example,
18  an acquiring bank, would think:  This is a new business, I
19  probably want to charge a higher fee because the risk of
20  nonpayment?
21          MS. LA MORTE:  Objection.
22          THE COURT:  Sustained.
23  Q.  Mr. Tassone, I want to ask you some questions now about --
24  you can take this chart down.  Thank you.
25          I want to ask you some questions about Mr. Akhavan.

1  You testified yesterday that your first meeting with

2  Mr. Akhavan was in April 2016; do you recall that?

3  A.  Yes, I do.

4  Q.  And how long did that meeting last?

5  A.  Hard to say, but maybe an hour, something like that.  It's

6  a typical business meeting.

7  Q.  And who was there besides yourself and Mr. Akhavan?

8  A.  Four other individuals, to my memory; so former CEO Keith

9  McCarty, former Chief Product Officer Roie Edery, the principal

10  owner of the dispensary Sweetwood, which is Craig Wald, and his

11  son, Cameron Wald.

12  Q.  So two people from the dispensaries and two people from

13  Eaze?

14  A.  Yes, that's my memory.

15  Q.  And Mr. Akhavan?

16  A.  Yes, that's correct.

17  Q.  Now, I believe you said Mr. McCarty is the one who set up

18  the meeting; isn't that right?

19  A.  Mr. McCarty, yes, he instructed me to come to the meeting

20  with the Sweetwood team, but my understanding is that, yeah, he

21  set up the meeting.

22  Q.  Now, this was your only, your one and only, meeting with

23  Mr. Akhavan; is that correct?

24  A.  Yes, that is correct.

25  Q.  Other than this event, you never saw him, correct?

L33PWEI2                     Tassone - Cross

1    A.  To my knowledge, no.

2    Q.  In fact, in preparing to testify today or in preparing to

3    testify yesterday, you met with the government and they showed

4    you a photograph and asked if you recognized Mr. Akhavan,

5    didn't they?

6    A.  The government never showed me a photograph of Mr. Akhavan,

7    to my memory.

8    Q.  Could you put up GX1.

9    A.  To be clear, just on that they showed me a photo of someone

10   that I did not recognize.

11   Q.  I'm showing you a photo right now.  Do you see this photo?

12   A.  Yes, I do.

13   Q.  Is that a photo they showed you, the government?

14   A.  Yes, it is.

15   Q.  And you said you did not recognize that person?

16   A.  Yes, that's correct.

17   Q.  And when you said you didn't recognize him, were you saying

18   that that wasn't Mr. Akhavan, or you just have no recollection

19   of what Mr. Akhavan looked like?

20   A.  I had a general recollection of what he looked like, but

21   based on that picture, I couldn't say definitively.

22   Q.  You couldn't say at all?

23   A.  I didn't recognize from that picture.

24   Q.  Now, in fact, when you attended this meeting -- I'm going

25   to actually have the -- can you bring up GX401.

1          This is an e-mail exchange that you testified about
2     yesterday; do you recall that?
3     A.  Yes.
4     Q.  Now, if you can go down on this particular document to
5     where there's an e-mail from you.  There it is right there.
6     Michael Tassone, do you see that?
7     A.  Yes, I do.
8     Q.  Your e-mail address is at Eazeup.com; do you see that?
9     A.  Yes, I do.
10    Q.  Eazeup was not the name of the company at the time?
11    A.  That was our website domain for a period of time, and then
12    it eventually changed.
13    Q.  So your website domain for a period of time wasn't the same
14    as your company name?
15    A.  Yes, that's correct.
16    Q.  There was nothing wrong with that, right?
17    A.  Not to my knowledge.
18    Q.  And Eazeup was associated with Eaze, right?
19    A.  Eazeup was the -- yes.  Yes, it was.
20    Q.  The idea is it's close enough, you can sort of tell that
21    the company is Eaze, right?
22    A.  Well, I worked there, and I knew that it was the website.
23    Q.  Now, I want to ask you some questions about Clearsettle.
24    A.  Okay.
25    Q.  You said yesterday on direct that you came to understand

L33PWEI2                          Tassone - Cross

1   that Mr. Akhavan was in charge of Clearsettle; do you recall

2   that?

3   A.  Yes, I do.

4   Q.  In fact, you said that you understood that Mr. Akhavan was

5   Clearsettle?

6   A.  Did I say that?

7   Q.  I believe you said that.

8            MS. LA MORTE:  Objection.

9   Q.  If you --

10            THE COURT:  I --

11   Q.  Let me ask it this way.

12            MR. TAYBACK:  I'll withdraw the question, your Honor.

13   Q.  You associated Mr. Akhavan with Clearsettle; is that

14   correct?

15   A.  Yes, that is correct.

16   Q.  Because you believed he was in charge of Clearsettle;

17   that's what you said, yes?

18   A.  Yes, that is correct.

19   Q.  You said at that meeting in 2016, you believed it was at

20   Clearsettle's offices?

21   A.  Yes, that's correct.

22   Q.  Now, that's simply not true, isn't it?

23   A.  I'm sorry?

24   Q.  Well, isn't it, in fact, untrue what you testified

25   yesterday, that the meeting was at Clearsettle's offices?

1   A.  I don't know.  That was my understanding, that it was at

2   Clearsettle's office.

3   Q.  Isn't it untrue what you said yesterday, that Mr. Akhavan

4   was in charge of Clearsettle?

5   A.  No, not from my perspective.

6   Q.  In that e-mail exchange we just looked at, you didn't say,

7   no one said the meeting was at Clearsettle's offices; isn't

8   that right?  Do you want to see it again?

9   A.  Sure.  Yes, please.

10  Q.  Take your time to read it.

11        (Pause)

12  A.  Yes, so I see it here.

13  Q.  It says it's at Ray's office, correct?

14  A.  Yes, Roie Edery said that the meeting would be at Ray's

15  office in Calabasas.

16  Q.  Clearsettle is not mentioned anywhere; isn't that right?

17  A.  Based on this e-mail, that's correct.

18  Q.  And when you arrived at this office space, in fact, you

19  didn't see any sign anywhere that said Clearsettle?

20  A.  Not to my memory.

21  Q.  So there was no sign on the front of the building that said

22  Clearsettle?

23  A.  Not to my memory.

24  Q.  There was no sign on the door that said Clearsettle?

25  A.  Not that I remembered.

L33PWEI2                       Tassone - Cross

 1   Q.  When you parked, there was no sign that said:  Reserved for
 2   Clearsettle employee, nothing like that?
 3   A.  Not that I can recall, no.
 4   Q.  When you went to the meeting, there was no stationery or
 5   business cards or anything else that said Clearsettle, right?
 6   A.  Not that I can recall.
 7   Q.  And, in fact, in the entire time that you dealt with
 8   Clearsettle, with your work for Eaze, you never received a
 9   single e-mail from Mr. Akhavan or a single communication where
10   it was something like RayAkhavan@Clearsettle.com?
11   A.  I did not receive an e-mail from something like
12   Ray@Clearsettle.com; that is correct.
13   Q.  Yet, you saw yesterday, the government showed you yesterday
14   a lot of e-mails, a number of e-mails, more than two dozen
15   probably, with a Clearsettle e-mail address; do you recall
16   those?
17   A.  Yes, I do.
18   Q.  And you did communicate with a lot of people who were
19   such-and-such a name @Clearsettle.com, right?
20   A.  Yes, that is correct.
21   Q.  Let's look at those.  Exhibit GX425.  And you'll see here
22   there's a person named Esra Eren, whose e-mail is
23   Esra@Clearsettle.com?
24   A.  Yes, I see that.
25   Q.  Okay.  Did you ever Google or run a search of any sort on

L33PWEI2                      Tassone - Cross

1   the internet for the company Clearsettle?

2   A.  I may have, but I don't recall specifically doing that.

3   Q.  So when you first realized that you maybe were in a bank

4   fraud scheme for years working for Eaze, did you go back and

5   say, wow, I got to find out more about that Clearsettle

6   company?

7   A.  At the -- I'm sorry, at what period of time?

8   Q.  During the time you were working at Eaze and participating

9   in what has been described as a bank fraud scheme?

10  A.  Yeah, I may have gone to the websites, but I don't have any

11  specific memory of doing that.

12  Q.  Well, isn't it true that you saw a document yesterday, a

13  receipt I believe, also Exhibit 425, which I'll show you in a

14  minute, that indicates Clearsettle is based in London?

15  A.  There was a receipt that said that, yes.

16  Q.  Did you ask yourself when you saw that, huh, we met in

17  Calabasas, California, why is this receipt from London?

18  A.  I didn't know what that was in reference to; so I didn't

19  know if that was a different office for them, you know.  I

20  actually had no understanding of that.

21  Q.  Well, would it surprise you that Clearsettle was a company

22  that you could Google and find information about who actually

23  owns it?

24  A.  No, it wouldn't surprise me if that information is on the

25  internet.

L33PWEI2                         Tassone - Cross

1    Q.  Would it surprise you if it's a London-based limited

2    liability company owned by a person named Ozan Ozerk?

3              MS. LA MORTE:  Objection.

4              THE COURT:  So any question by any counsel of the form

5    "Would it surprise you" is totally, completely improper.  It's

6    a disguised form of counsel testifying, which is forbidden, and

7    it should never happen again in this trial.

8              MR. TAYBACK:  Understood, your Honor.

9    BY THE COURT:

10   Q.  Let me ask you a different question.  Did you ever hear

11   that Clearsettle was owned by a person named Ozan Ozerk?

12   A.  No, I did not.

13   Q.  And you don't have any recollection of looking up on the

14   internet, or any other way, information about Clearsettle

15   before you testified that it was -- that Mr. Akhavan was in

16   charge of Clearsettle?

17   A.  No.  My testimony yesterday was based on my experience from

18   2016 to 2019; so, you know, I didn't look up anything prior to

19   this trial in that regard.

20   Q.  Did you ever -- did you talk to Mr. McCarty, the person who

21   informed you about a number of things, about this company

22   called Clearsettle based in London?

23   A.  I talked to Mr. McCarty about a company called Clearsettle.

24   He didn't say that they were based in London.

25   Q.  Did he say to you that he'd actually met with the owner of

1   Clearsettle?

2   A.  I believe he had told me that -- I'm sorry.  Actually, he

3   had told me that he had met with Ray before.

4   Q.  But you didn't know whether that was the same as

5   Clearsettle?

6   A.  Mr. McCarty told me that Ray worked with a company

7   Clearsettle, and that's how I was introduced to him.

8   Q.  But other than what Mr. McCarty said to you, you don't have

9   any independent basis for that?

10  A.  That's correct, only based on what Mr. McCarty had said to

11  me.

12  Q.  Let me go back to your one and only meeting with

13  Mr. Akhavan.  Prior to your meeting, had you done anything to

14  familiarize yourself with what Eaze had done before meeting

15  with Mr. Akhavan to try to assist consumers with not having to

16  pay cash for the purchase of marijuana?

17  A.  The question was prior to the meeting?

18  Q.  Prior to the meeting.

19  A.  Did I -- sorry, I didn't hear.

20  Q.  I'll re-ask it.

21  A.  Thank you.

22  Q.  Prior to the meeting with Mr. Akhavan in April of 2016, did

23  you do anything to familiarize yourself with prior efforts by

24  Eaze to try to have a credit card solution or a debit card

25  solution or any alternative to accepting only cash?

1              MS. LA MORTE:  Objection.

2              THE COURT:  Well, you can answer that question yes or

3     no, but don't add anything on.

4              THE WITNESS:  Did you say I could answer that yes or

5     no?

6              THE COURT:  Pardon?

7              THE WITNESS:  Did you say that I can answer it yes or

8     no?

9              THE COURT:  If you can answer that yes or no -- I'm

10    sorry.  What I said -- I'm sorry you're having trouble hearing

11    me in that box.  If you can answer the question yes or no,

12    answer it yes or no, but don't add anything beyond that.

13    A.  No.

14    Q.  Were you aware -- let me ask you this.  What were the

15    reasons that Eaze wanted to have a credit card solution?

16    A.  There were a couple of reasons, from my perspective.  One,

17    it was safer for drivers to be carrying less cash throughout

18    the workday.

19             And then also it just, you know, based on being an

20    e-commerce, on-demand platform, you know, paying with cash

21    would be not ideal from a customer experience perspective.  So

22    having the ability to offer credit cards or debit cards or some

23    other online payment solution would make a better customer

24    experience and, in theory, increase sales and frequency of

25    sales.

L33PWEI2                       Tassone - Cross

1   Q.  Are you aware that in -- when Eaze started, the drivers
2   carried portable credit card or debit card processing machines?
3   A.  No, I'm not aware of that.
4   Q.  Did you ever deal with a vendor at Eaze called Inovio?
5   A.  I never dealt with them directly, no.
6   Q.  Do you know what Inovio is?
7   A.  I have a vague understanding.
8   Q.  It's a credit card gateway.
9   A.  Yeah, that's pretty much my understanding.
10  Q.  And do you know whether they are a vendor, whether you
11  dealt with them or not, of Eaze?
12  A.  I don't know, I have not dealt with them directly, no.
13  Q.  Do you know whether they were a vendor at the time you
14  joined Eaze?
15  A.  I do not know that.
16  Q.  Now, at the time of this meeting in April of 2016, only
17  medal marijuana was legal in California, correct?
18          MS. LA MORTE:  Objection.
19          MR. TAYBACK:  I'll rephrase it, your Honor.
20  Q.  At the time of this meeting, your understanding was that
21  only medical marijuana was legal in California?
22  A.  At the time of the meeting at Ray's office in Calabasas?
23  Q.  Yes.
24  A.  Yes, that is my understanding.
25  Q.  When you described this meeting a little bit yesterday -- I

L33PWEI2                         Tassone – Cross

1    want to ask you some details -- you said that there was a white

2    board of sorts?

3    A.  Yes, some sort of like portable white board where you can

4    draw on.

5    Q.  And was it Mr. Akhavan who was at the white board?

6    A.  Not to my memory.

7    Q.  Who was?

8    A.  The former Chief Operations Officer, Roie Edery.

9    Q.  And during this meeting, did Mr. Akhavan explain how credit

10   card processing worked?

11   A.  There was, yes, high-level discussions, I think, between

12   Ray, Keith and Roie.

13   Q.  And he -- is it your recollection that, as I understood

14   your testimony, that a couple different possible solutions were

15   discussed at this meeting?

16   A.  I only recall one solution that was discussed, shared with

17   me at that meeting.

18   Q.  And was that the thing I think you called it a gift card?

19   A.  Yeah, like some sort of electronic gift card.

20   Q.  So that's the solution that was discussed at this meeting

21   with Mr. Akhavan?

22   A.  That's my memory, yes.

23   Q.  And the gift card solution, as you understood it, was a

24   person would use a credit or debit card, and in a single

25   transaction, buy the equivalent dollar amount of a gift card

1   that would then be exchanged instantaneously for that value of

2   product?

3   A.   Yes, that was my understanding from the meeting.

4   Q.   That was your understanding?

5   A.   Yes.  From the meeting, yes.

6   Q.   And Eaze opted not to do that at that point in time,

7   correct?

8   A.   I don't know that.

9   Q.   Well, after you left the meeting, that's not what Eaze

10  implemented, was it?

11  A.   No, that is not what we implemented.

12  Q.   So Eaze decided not to do it?

13  A.   I don't know if we decided.  I wasn't part of the meeting.

14  It wasn't what was --

15  Q.   But you know that Eaze did not do that?

16  A.   I'm sorry?

17  Q.   Even though you were not part of the decision, you

18  ultimately know that Eaze did not do it at that moment in time?

19  A.   To be clear, I didn't know how Eaze was implementing it

20  from the beginning.  I came to learn that, you know, throughout

21  the duration of my employment at Eaze.  So I couldn't state

22  definitively that that wasn't done, but I don't have any

23  further recollection or conversation about that.

24  Q.   And in fact, that solution is what Eaze is using now, isn't

25  it?

1              MS. LA MORTE:  Objection.  Foundation.

2              THE COURT:  Sustained.

3   Q.  Do you know what -- whether Eaze is currently using any

4   solution to allow it to take debit cards?

5   A.  Yes, I am aware of that.

6   Q.  What do they do?

7   A.  I don't know.

8   Q.  You know that it exists, but you don't have anything to do

9   with it?

10  A.  Yes, that is correct.

11  Q.  So the term Circle or Circle Wallet, you don't know that

12  term?

13  A.  I'm familiar with the term Circle Debit.

14  Q.  And is that the system that Eaze currently deploys?

15  A.  That's my understanding.

16  Q.  But you don't deal with that; so you don't have knowledge

17  of that?

18  A.  Correct.

19  Q.  Now, in the context of discussing this proposed gift card

20  solution, is your testimony that's the only thing that was

21  discussed, the only possible solution that was discussed at

22  that meeting?

23  A.  That was what was discussed, based on my memory of that

24  meeting, yes.

25  Q.  And that solution, that proposed solution doesn't require

L33PWEI2                        Tassone – Cross

1    particular merchant category codes or does it?

2    A.  I'm not sure.

3    Q.  And you don't recall that being discussed at all?

4    A.  I do not.

5    Q.  And you don't recall it being discussed whether -- how

6    transactions like that would be described on a bank statement?

7    A.  I don't recall that specifically.

8    Q.  So merchant category codes and descriptors weren't

9    discussed, to your recollection, at that meeting?

10   A.  To my recollection, that's correct.

11   Q.  So as you sit here now, you can't say that anybody at that

12   meeting discussed falsifying merchant category codes or

13   descriptors, correct?

14   A.  To the best of my memory.

15   Q.  Isn't it true at that meeting -- do you recall the chart we

16   looked at with different banks?

17   A.  Yes, I recall.

18   Q.  At that meeting, no one discussed the issuing banks,

19   correct?

20   A.  Not to my memory.

21   Q.  No one discussed the policies that the Bank of America or

22   Wells Fargo or Citi or any other of a thousand banks have,

23   correct?

24   A.  Not to my memory.

25   Q.  Now, did you come to know, at some point in time, that

L33PWEI2                        Tassone – Cross

1   there was no merchant category code for marijuana?

2   A.   During that meeting?

3   Q.   Let me rephrase the question.  I'll withdraw the question.

4          Now, after that meeting, at some point in time, Eaze

5   did implement some sort of solution intended to try to take

6   credit cards, correct?

7   A.   Yes, that is correct.

8   Q.   How long after that meeting did that occur?

9   A.   The meeting took place in April, and I believe we

10  implemented credit cards that fall, fall of 2016; so several

11  months later.

12  Q.   I could not understood your answer.

13  A.   I'm sorry.  That meeting took place in April, and I believe

14  Eaze implemented credit cards later that fall of 2016.

15  Q.   So possibly six months or so?

16  A.   Something around that time.

17  Q.   And in that intervening time, you had nothing to do with

18  how Eaze came to that decision as to what solution to employ?

19  A.   That is correct.

20  Q.   We looked at an exhibit yesterday.  I'm going to show it to

21  you.  Exhibit 713, it's GX713.

22  A.   Okay.

23  Q.   Looking at Exhibit 713, if you could go, scroll down to

24  the -- I believe it's the last page or the next-to-last page.

25  Right there.

1          This lists the responsibilities of various people at

2   Eaze with respect to the credit card processing that fall; do

3   you see that?

4   A.  Yes, I do.

5   Q.  And your role is listed under partner comms; do you see

6   that?

7   A.  Yes, I do.

8   Q.  And it's under both phase 1 and phase 2?

9   A.  Yes, that is correct.

10  Q.  And you're the Michael that's referenced there as

11  supporting -- as one of three people supporting somebody else?

12  A.  Yes.

13  Q.  And that was your sole role, right?

14  A.  In regards to --

15  Q.  The rollout of credit card acceptance.

16  A.  Yes, that was my role, yes, was to communicate and

17  coordinate the dispensaries during that rollout.

18  Q.  And the dispensaries are the partners you're talking about

19  communicating with, correct?

20  A.  Yes, that is correct.

21  Q.  Now, the government -- now, at some point in time, you

22  began -- withdraw that.

23          At some point in time, did your role change with

24  respect to the credit card solution employed by Eaze?

25  A.  Yes, it did.  I'd say it grew.

L33PWEI2                              Tassone – Cross

1    Q.  At what point in time did it change?

2    A.  Probably over the course of 2017, and then it grew a bit

3    more into 2018 and 2019.

4    Q.  More in 2018?

5    A.  Yes.

6    Q.  Is that what you said?

7    A.  Yes.

8    Q.  And is that when EUprocessing was involved?

9    A.  Yes, it was.

10   Q.  So your relationships with Clearsettle were exclusively

11   with respect to your interactions with the dispensaries?

12   A.  I had interactions with the dispensaries and with

13   representatives from Clearsettle via e-mail.

14   Q.  And none of those representatives were Mr. Akhavan,

15   correct?

16   A.  Not to my knowledge.

17   Q.  Now, is it fair to say that in your interactions with the

18   dispensaries, it was mostly about ensuring that they would

19   receive the funds for the products that were purchased using

20   credit and debit cards?

21   A.  Yes, that was one of my roles, yes.

22   Q.  And was it also to explain to them the costs that are part

23   of credit card processing with respect to a product like

24   marijuana?

25   A.  Yes, that was part of the communication as well.

L33PWEI2                        Tassone – Cross

1    Q.  And that was the 8.75 percent credit card fee, correct?

2    A.  Yes, that's correct.

3    Q.  Now, is it fair to say that you got paid for your work with

4    Eaze during the period of time in 2016 to 2018, when it was

5    utilizing Clearsettle to process the transactions?

6    A.  Yes, I was paid for my paycheck, yes.

7    Q.  And it was your job to ensure that the dispensaries got

8    paid, correct?

9    A.  I would characterize it as I would coordinate between

10   Clearsettle and the dispensaries if they had questions about

11   their payments.

12   Q.  If we could look at Exhibit 687.  GX687, you looked at it

13   yesterday, and I believe you testified yesterday that these

14   amounts are amounts that these individual dispensaries received

15   in settlements, that is to say, payments from the merchant

16   banks to their commercial accounts reflecting the products that

17   they sold; is that right?

18   A.  That's not entirely true.

19   Q.  What does it reflect?

20   A.  It reflects the amount that was -- the gross amount that

21   was charged on the customer's card for that transaction.

22   Q.  The cumulative amount for each vendor?

23   A.  Yes, for each dispensary during that period of time in

24   2017.

25   Q.  And some portion of that, less fees taken by the banks, was

L33PWEI2                       Tassone – Cross

1   distributed to the dispensaries, correct?

2   A.  Yes, that is correct.

3   Q.  And if you could go to the second page.  And this is a

4   summary of that?

5   A.  Yes, it is.

6   Q.  And if you go to the next page.  And is this a version of

7   that same data but for the 2018 to 2019 period?

8   A.  Yes, and as it pertains to EUprocessing.

9   Q.  So as far as you know, whether it was Clearsettle or

10  whether it was EUprocessing, Eaze kept track of the amount of

11  purchases and reconciled that amount to the dispensaries that

12  were entitled to the funds for the products they provided to

13  Eaze to deliver, correct?

14  A.  Can you repeat that question?

15  Q.  Sure.  From your perspective, from your company's

16  perspective, Eaze tracked and then reconciled the amounts that

17  were sold and the amounts ultimately received by the

18  dispensaries?

19  A.  When you say reconciled, I mean, yes, we tracked it.  We

20  tracked that amount, yes.

21  Q.  And so you were aware that the dispensaries ultimately got

22  paid for the products that they provided to Eaze, correct?

23  A.  Yes.

24  Q.  And that the credit card processors took the fee that they

25  had identified they would require, correct?

L33PWEI2                          Tassone – Cross

1    A.  Yes, that is correct.

2    Q.  And that the credit card companies took the fees that they

3    charged for such transactions, correct?

4              MS. LA MORTE:  Objection.  Foundation.

5              THE COURT:  Sustained.

6    Q.  To track the amount that the dispensaries were entitled to

7    receive, didn't you have to know the costs that were coming out

8    of that ultimate purchase?

9    A.  Yeah, my knowledge was that there was a fee being charged;

10   so Clearsettle was 8.75 percent, and that was what was coming

11   out of their amounts.

12   Q.  And did you know whether any portion of that or any

13   additional amounts were charged by the banks along the way?

14   A.  I was not aware of that specifically.

15   Q.  You don't know how credit card companies get paid, correct?

16   A.  I mean, I know how -- I mean, if they're -- no, I guess I

17   don't, no.

18   Q.  And you don't know how your issuing bank works in terms of

19   whether it charges fees for your use of a credit card, for

20   example?

21   A.  I can only assume, but I don't know that.

22   Q.  And other than the dispensaries not always being timely or

23   complete payors, it was intended that Eaze would also get paid?

24   A.  Yes, it is intended that Eaze would be paid from the

25   dispensaries.

1   Q.  And Eaze did get paid by some of the dispensaries, correct?

2   A.  Eaze did receive some payments over periods of time, just

3   not frequently.

4   Q.  Now, you testified yesterday that Eaze -- that Mr. Akhavan

5   was not affiliated with Eaze, correct?

6   A.  I testified that he was not an officer, director or

7   employee of Eaze.

8   Q.  I think you called him an outsider, correct?

9   A.  I did not call him an outsider.

10  Q.  Well, he never received payment from Eaze, did he?

11  A.  I don't know that.

12  Q.  You don't know that one way or the other?

13  A.  That's correct.

14  Q.  But you -- part of that is you have no reason to think that

15  he was paid by Eaze?

16          MS. LA MORTE:  Objection.

17          THE COURT:  Sustained.

18  Q.  You don't believe -- you don't have any reason to think

19  that Mr. Akhavan was employed by any of the merchant banks

20  themselves contracted with the dispensaries, correct?

21  A.  I don't know that.

22  Q.  You don't know one way or the other?

23  A.  That's right, I don't know that.

24  Q.  And other than what Mr. McCarty told you, you have no

25  reason to believe that Mr. Akhavan was affiliated with

L33PWEI2                        Tassone - Cross

1   Clearsettle, correct?

2   A.  Other than what Mr. McCarty had told me, as well as just

3   the general understanding in the office.

4   Q.  Now, with respect to EUprocessing, I believe you said that

5   Mr -- you also had the understanding that Mr. Akhavan was in

6   charge of EUprocessing, correct?

7   A.  Yes, that is correct.

8   Q.  And just to be clear, EUprocessing is the credit card

9   processor that came onboard post-January 1st of 2018, correct?

10  A.  Yes, that is correct.

11  Q.  And at that point in time, you, Eaze -- Eaze changed its

12  processor, correct?

13  A.  Yes.

14  Q.  You were no longer using Clearsettle and was going to use

15  EUprocessing instead?

16  A.  To my knowledge, yes, that's -- yes.

17  Q.  And you had nothing to do with that decision, right?

18  A.  That's correct.

19  Q.  And so your understanding about Mr. Akhavan's alleged

20  affiliation with EUprocessing, that also comes from

21  Mr. McCarty?

22  A.  No, that came from former CEO Jim Patterson.

23  Q.  And did he use the phrase that Mr. Akhavan was in charge of

24  EUprocessing?

25  A.  I'm not sure if he used that phrase, but he led us to

L33PWEI2                        Tassone - Cross

1   believe that he was in charge.

2   Q.  And did you -- but you never spoke to Mr. Akhavan about

3   EUprocessing, correct?

4   A.  Not to my knowledge.

5   Q.  And, in fact, did you -- you never asked anybody, why are

6   we changing credit card processors?

7   A.  I'm not sure if I asked that, that specific question, but I

8   had known that we were unable to process with Clearsettle or

9   unable to, yeah, process with Clearsettle in 2018.

10  Q.  And do you -- but do you have any information as to why

11  that was the case?

12  A.  My understanding that was told to me was because a lot of

13  dispensaries were off line in the beginning of the year and

14  that we ceased operations.  Sorry, can you hear me?

15  Q.  Yes.

16  A.  That we ceased operations, and they were not able to

17  process anymore, that they went off line and they were unable

18  to process any further.

19  Q.  But you didn't know why that was the case; you were just

20  told they couldn't process any further at that point in time?

21  A.  My understanding was that there may have been a high rate

22  of chargebacks because -- because those dispensaries went off

23  line and because the transactions -- the process transactions

24  stopped and chargebacks were still coming in for previous

25  transactions.

L33PWEI2                        Tassone - Cross

Q.  So it was a business decision, Clearsettle is -- your

understanding, at least, was that Clearsettle just didn't want

to do it anymore because the licensing had changed --

                MS. LA MORTE:  Objection.

                THE COURT:  Sustained.

Q.  I want to understand your answer, Mr. Tassone.  Is it your

understanding that the reason that Clearsettle stopped

processing transactions after January 1st, 2018, was because

there were high chargebacks and the dispensaries were no longer

licensed under the new regime?

A.  My understanding is that because there's a high number of

chargebacks.

Q.  And your understanding comes from Mr. Patterson; is that

correct?

A.  Yes, that's correct.

                (Continued on next page)

L33AWEI3ps                     Tassone – Cross

1    Q.  We looked yesterday at a long list of descriptors.  Do you

2    recall that?

3    A.  Yes, I do.

4    Q.  I want to ask you some questions about the descriptors, but

5    also your understanding of what information goes to credit

6    cards with respect to transactions.  Do you have any

7    information or knowledge about how the merchant category codes

8    work?

9    A.  I understand them to be -- my perspective is that they're

10   the billing descriptor.  I --

11   Q.  You think the billing descriptor is the merchant category

12   code, same thing.

13   A.  Yes.  That's how I understood it, at least.

14   Q.  So as you're here, you've never heard, you don't recall

15   anybody ever saying, wow, we need to have the transactions

16   coded with a certain merchant category code number that is

17   deceptive.

18            MS. LA MORTE:  Objection.

19            THE COURT:  Sustained.

20   Q.  Let me ask you this question, Mr. Tassone.  You talked

21   about the descriptors, which are the names that show up on a

22   person's credit card bank statement.  That's your

23   understanding?

24   A.  Yes.

25   Q.  In terms of information, numeric codes, that were

L33AWEI3ps                      Tassone - Cross

1    communicated in the course of a credit card transaction, you

2    have no information about that, right?

3    A.  I have heard about it, discussed, but I don't have any

4    specific information.

5    Q.  You looked at that long list of descriptors.  In the period

6    of time where Clearsettle was processing transactions, isn't it

7    correct that a number of those descriptors were plays on the

8    words "eaze"?

9         MR. FOLLY:  Objection, foundation.

10        THE COURT:  Well, I'll sustain the objection because I

11   also think it's vague.  Put another question.

12   Q.  Do you recall any of the descriptors that were used that

13   were words like "Ease" with an "s" or "Ease Up," or

14   "Easymedpay"?

15   A.  Yes, I do recall those.

16   Q.  Those were designed to be transparent so the customer would

17   recognize the transaction as being from Eaze, correct?

18        MS. LA MORTE:  Objection.

19        MR. TAYBACK:  I believe there was an objection.  I

20   didn't hear the ruling, your Honor.

21        THE COURT:  Yes.  Sustained.

22   Q.  Isn't it true that if you wanted a customer not to see the

23   word "Eaze" on the communications on its bank statement, you

24   would not have used a word that looked like or sounded like

25   "Eaze"?

L33AWEI3ps                    Tassone – Cross

1              MS. LA MORTE:  Objection.

2              THE COURT:  Sustained.

3              MR. TAYBACK:  May I have one moment, your Honor?

4              THE COURT:  Yes.

5    Q.  I have a couple additional questions, Mr. Tassone.

6    A.  OK.

7    Q.  Just to clarify, your employer is the subsidiary of Eaze,

8    correct?

9    A.  Today it is, yes.

10   Q.  When you first started, you were employed by Eaze, correct?

11   A.  Yes, that is correct.

12   Q.  When did you become employed by the subsidiary?

13   A.  Sometime in the middle of 2020.

14   Q.  And that's the subsidiary Stachs?

15   A.  Yes, that's correct.

16   Q.  How is it spelled?

17   A.  S-t-a-c-h-s.

18   Q.  Does that stand for something?

19   A.  Not to my knowledge.

20   Q.  Does it mean something?

21   A.  I don't know.

22   Q.  If it does, it's not associated necessarily with marijuana,

23   correct?

24             MS. LA MORTE:  Objection.

25             THE COURT:  Sustained.

L33AWEI3ps                    Tassone - Cross

1    Q.  Is it your understanding that it has no -- it's not

2    intended to describe marijuana in any way?

3              MS. LA MORTE:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  I'm sorry?  Can I answer the question?

6    A.  And can you repeat that?

7    Q.  Is it your understanding that the name Stachs is not

8    intended to refer to marijuana in any way?

9    A.  That's not my understanding.

10   Q.  It --

11   A.  I don't have any -- I don't have any knowledge about how or

12   why that name was decided.

13   Q.  You don't have any understanding one way or the other of

14   what it refers to.

15   A.  That is correct.

16   Q.  Understand Eaze's role among other things, in addition to

17   providing and overseeing the deliveries, it collected and

18   transmitted the transaction information to the dispensaries.

19   Correct?

20   A.  Yes, that is correct.

21             MR. TAYBACK:  I have no further questions, your Honor.

22             THE COURT:  All right.  Ladies and gentlemen, I think

23   we'll give you your midmorning break at this time.  And why

24   don't we reconvene at 11:30.

25             (Jury not present)

1          THE COURT:  Anything counsel needs to raise?

2          MS. LA MORTE:  No, your Honor.

3          THE COURT:  Very good.  We'll see you at 11:30.

4          (Jury not present)

5          THE COURT:  The jury is on their way up.  Let's get

6     the witness back on the stand.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L33AWEI3ps                        Tassone – Cross

1           (Jury present)

2           THE COURT:  All right, counsel.  Go ahead.

3    CROSS-EXAMINATION

4    BY MR. GILBERT:

5    Q.  Mr. Tassone, you are the seniormost employee at Eaze; isn't

6    that correct, sir?

7    A.  No, that is not correct.

8    Q.  You've been at the company longer than anybody else; isn't

9    that true, sir?

10   A.  Yes, that is true.

11   Q.  There's nobody that works there now that's worked there as

12   long as you, Mr. Tassone; isn't that right?

13   A.  There are two other people that started on the same day as

14   me, but we are the longest-tenured employees of the company.

15   Q.  You were there before Eaze started accepting credit cards,

16   correct?

17   A.  Yes, to my knowledge, yes, that's correct.

18   Q.  You were there at the very beginning, when Eaze started to

19   accept credit cards, correct?

20   A.  Yes.

21   Q.  You were involved at the meeting you've described in April

22   2016 where the plan for Eaze to accept credit cards for the

23   first time was discussed, correct?

24   A.  Yes.

25   Q.  You were involved in the credit card processing during the

L33AWEI3ps                    Tassone - Cross

1   Clearsettle days, correct?

2   A.  Yes, that is correct.

3   Q.  And you were involved in the credit card processing during

4   the EUP days, correct?

5   A.  Yes, that is correct.

6   Q.  You had intimate knowledge of how Eaze credit card

7   processing worked, correct?

8   A.  Yes, from my perspective, yes.

9   Q.  For years you worked on Eaze credit card processing day

10  after day after day; isn't that correct?

11  A.  It was a part of my role, yes.

12  Q.  It was a part of your role for years, wasn't it?

13  A.  Yes.

14  Q.  You testified on direct about descriptors.  You were very

15  familiar with that concept.  Correct?

16  A.  Yes.

17  Q.  And you've testified about settlement statements, correct?

18  A.  Yes, that's correct.

19  Q.  You worked on those for quite some time.

20  A.  I didn't work on the settlement statements, but I, I

21  forwarded them to dispensary partners and was helpful with

22  answering any questions that they had.

23  Q.  And in all that time, Mr. Tassone, you worked on Eaze

24  credit card processing, from 2016 through the middle of 2019,

25  it's correct that you have never spoken one word to my client,

L33AWEI3ps                    Tassone - Cross

1  Ruben Weigand; isn't that correct, sir?

2  A.  To the best of my knowledge, that's correct.

3  Q.  To the best of your knowledge, you have never sent a single

4  email to Mr. Weigand, correct?

5  A.  Correct.

6  Q.  To the best of your knowledge, you've never exchanged a

7  text message with Mr. Weigand, correct?

8  A.  That is correct.

9  Q.  And until yesterday, to the best of your knowledge, you had

10 never been in the same room with Mr. Weigand; isn't that

11 correct?

12 A.  Yes, that is correct.

13 Q.  And in the hours of testimony that you gave on direct

14 yesterday answering the prosecutor's questions, you were not

15 asked a single question about Mr. Weigand; isn't that correct?

16 A.  Yes, that is correct.

17 Q.  Now, in response to questions from Mr. Tayback, did I

18 understand you correctly to say that, during the years 2016,

19 2017, 2018, and 2019, you did not believe, in your own mind,

20 that you were committing bank fraud; isn't that correct?

21          MS. LA MORTE:  Objection.

22          THE COURT:  Sustained.

23 Q.  Did you have an understanding, while you were working at

24 Eaze in the years 2016 to 2019, that you were engaged in bank

25 fraud?

L33AWEI3ps                     Tassone - Cross

1   A.  At the later part of those years.

2   Q.  But in the earlier parts, you did not -- not have that

3   understanding, correct?

4   A.  Can you rephrase that?

5   Q.  In the earlier parts, in 2016, you went to work every day,

6   correct?

7   A.  Yes.

8   Q.  And you didn't think you were committing bank fraud when

9   you went to work each day; isn't that fair?

10  A.  Yes.  At the time that's fair.

11  Q.  And in 2017 you went to work every day, and you worked on

12  Eaze credit card processing, correct?

13  A.  Yes, that is correct.

14  Q.  You didn't think you were committing bank fraud, did you?

15  A.  Not at that time.

16  Q.  And in 2018, when you got up and you went to work every

17  day, you didn't think you were committing bank fraud, correct?

18  A.  I believe in 2018 I started to learn a little bit more

19  about the process, so I, I did have some more questions and

20  concerns at that time.

21  Q.  Well, sir, if I understood your testimony correctly, didn't

22  you say that when you were first contacted by the prosecutors

23  in this case, you weren't really sure what it was they wanted

24  to speak to you about?

25  A.  No.  I mean, I was -- I was sure that they wanted to speak

L33AWEI3ps                    Tassone – Cross

1   to me about this indictment and in regards to the bank fraud
2   case.
3   Q.  You were sure about that.
4   A.  Yes.
5   Q.  Do you recall when you were testifying yesterday on
6   cross-examination you were asked the following question and
7   gave the following answer:
8   "Q. Now, that" --
9           THE COURT:  Page and line.
10  Q.  "It's what you were" --
11          THE COURT:  Page and line.
12          MR. GILBERT:  Page 287, lines 1 through 5, your Honor.
13  Q.  And the question for you, Mr. Tassone, do you recall being
14  asked, by Mr. Tayback, the following question:
15  "Q. Now, that immunity agreement means it's what you were
16  hoping for from the beginning when you first began to talk to
17  the government, right?"
18          And your answer was:
19  "A. I wasn't sure what they were going to talk to me about, so
20  I didn't know, actually."
21          That was the answer you gave yesterday, correct?
22  A.  Yes, it was.
23  Q.  You testified on direct examination that you had personal
24  experience with having a credit card transaction declined.  Do
25  you remember that testimony?

1   A.  Yes, I do.

2   Q.  You said I believe you had a Chase card and there was a

3   transaction denied on your own personal card; is that correct?

4   A.  It was my own personal card, yes.

5   Q.  And when that happened, your testimony was you contacted

6   Chase Bank?

7   A.  I'm sorry.  Just I -- is the question a chargeback -- or --

8   a declined charge in relation to a transaction on Eaze or

9   outside of Eaze?

10  Q.  You testified about a transaction that had occurred on your

11  own personal account, correct?

12  A.  Yes.

13  Q.  Do you recall what the transaction was for?

14  A.  No, I do not.

15  Q.  But whatever it was for, you contacted Chase Bank to

16  discuss it, correct?

17  A.  Yes.  They, they -- generally they reached out to me and

18  then, yes, I responded.

19  Q.  I -- I'm sorry.  I didn't mean to cut you off.  Have you

20  finished your answer?

21  A.  Yes.

22  Q.  So your bank reached out to you, asked you about a

23  transaction on your card.  Is that what happened?

24  A.  In that instance, yes.

25  Q.  Is it your understanding from your experience working at

1    Eaze that banks that issue credit cards can certainly be

2    expected to have contact with their card holders, just like

3    happened with you?

4    A.  Based on my own personal experience, yes.

5    Q.  Card holders, as far as you know, call their credit card-

6    issuing banks to ask about transactions, correct, or

7    statements?

8    A.  Yes, that's correct.

9    Q.  And as you experienced, card-issuing banks certainly know

10   how to contact their own card holders, correct?

11   A.  From my experience, yes.

12   Q.  There's always a possibility, with regard to any credit or

13   debit card transaction, that there will be communication

14   between the people who hold the card and the banks who gave

15   them the card, right?

16   A.  That's a possibility, yes.

17   Q.  And from your understanding, Eaze -- the marijuana

18   transactions that were being handled by Eaze were legal in

19   California, if I understand your testimony.  That was your

20   understanding.

21   A.  Yes.  My understanding, yes.

22   Q.  So was it your understanding that Eaze customers would have

23   no reason to say, to their credit card issuing banks, anything

24   other than that they had purchased Eaze marijuana.

25        MS. LA MORTE:  Objection.

L33AWEI3ps                        Tassone - Cross

1              THE COURT:  Sustained.

2    Q.  Mr. Tassone, I want to talk to you a little bit about the

3    Clearsettle processing that you've testified about.  You

4    testified on direct that the former CEO of Eaze -- that was a

5    person named McCarty, I believe?

6    A.  Yes, that is correct.

7    Q.  McCarty was the founder of the company?

8    A.  Yes, he was.

9    Q.  And you worked under his direction for some years?

10   A.  I reported to the VP of operations at the time, Noah Tutak,

11   but also under the direction of Keith.

12   Q.  And you testified both on direct and I believe on

13   cross-examination about a comment that you believe he made to

14   you about high-risk credit card transactions; is that right?

15   A.  That's correct.

16   Q.  And it's --

17   A.  I'm sorry.  That's in regards to Keith or --

18   Q.  I'm sorry.  I could not hear that answer.

19   A.  You're saying the comment was in regard to something Keith

20   said.

21   Q.  Correct.

22   A.  OK.  Yes.

23   Q.  It's correct that Keith talked to you about the concept of

24   high risk.

25   A.  Yes, that is correct.

L33AWEI3ps                          Tassone - Cross

1  Q.   And you were asked about high risk on cross-examination

2  today.

3  A.   Yes I was.

4  Q.   I want to understand, make sure I understand your answer.

5  High-risk transactions, as you understand it, means that for

6  whatever reason, in certain industries, there tend to be more

7  chargebacks.  Is that fair?

8  A.   My understanding was specific to the marijuana industry,

9  but, yes, also the broader knowledge of -- it could be, you

10 know, other high-risk industries as well, may see the same

11 occurrence.

12 Q.   There could be businesses like dating services, for

13 example, from your experience with credit card processing, that

14 have high chargebacks, correct?

15          MS. LA MORTE:  Objection.

16          THE COURT:  Sustained.

17 Q.   You didn't have the understanding, when Mr. McCarty

18 mentioned high risk to you, that that only meant transactions

19 that were in some way illegal, correct?  That was not your

20 understanding.

21 A.   My understanding was he was specifically talking to me

22 about the marijuana industry.

23 Q.   And what was the basis of your understanding?  Had you had

24 a discussion with him about it?

25 A.   Yes.

L33AWEI3ps                    Tassone - Cross

1   Q.  The only industry that you recall Mr. McCarty mentioned to

2   you in that discussion was the marijuana industry?

3   A.  He had also mentioned other -- one other industry, from my

4   memory.

5   Q.  And which industry was that, sir?

6   A.  The porn industry.

7   Q.  Now, did he mention to you, if you recall, industries such

8   as the dating services, or Gems?

9   A.  I don't recall that.

10  Q.  What about legal gambling?

11  A.  Yes.  He may have actually mentioned something about

12  gambling as well.

13  Q.  That's an industry where they might have high chargebacks.

14  A.  Yes, that is correct.

15  Q.  Now, you testified about this meeting in Calabasas in April

16  of 2016 that you amended, correct?

17  A.  Yes.

18  Q.  You were one of the key people there for your company for

19  Eaze, right?

20  A.  Yes, I was there.

21  Q.  Well, you were there, and the CEO and founder of the

22  company was there for Eaze, correct?

23  A.  Correct.

24  Q.  Was anybody else there for Eaze?

25  A.  Not to my memory.

L33AWEI3ps                    Tassone - Cross

1   Q.  So your role in the credit card processing from the very

2   beginning, you would agree with me, was that you were one of

3   the key people at Eaze who was involved in it.

4   A.  Yes.  I had to coordinate and communicate with our

5   dispensary partners who were involved in that, yes.

6   Q.  Now, you testified about a plan that was put in place after

7   that meeting, correct?

8   A.  Yes, that's correct.

9           MR. GILBERT:  I want to display Government Exhibit

10  713.

11  Q.  Do you recall this document, sir?

12  A.  Yes, I do.

13  Q.  Different people at Eaze were given different roles?

14  A.  Yes, I do.

15  Q.  Is that fair?

16  A.  Jim Patterson was one of the people who is listed on this

17  document, correct?

18          It says "Jim P." that refers to Jim Patterson?

19  A.  Yes.  That is correct.

20  Q.  Jim Patterson later became the CEO of the company, didn't

21  he?

22  A.  He did.

23  Q.  And one of your -- one of the things you were responsible

24  to do was to be a conduit, as you said, between the

25  dispensaries and Clearsettle, right?

1  A.  Yes, that is correct.

2  Q.  And you understood that your work on the credit card

3  processing involved being responsible for overseeing millions

4  of dollars in transactions.

5  A.  No, I didn't see it that way.

6  Q.  You didn't think that once the credit -- as the credit card

7  processing developed over time, you began to realize that what

8  are you were doing was overseeing a project that involved

9  processing a significant amount of money, right?

10  A.  I was not overseeing that project, no.

11  Q.  You were involved in running the project.

12  A.  I was involved in communicating with our dispensary

13  partners in regards to the project, yes.

14  Q.  Are you were one of the key Eaze employees involved in the

15  project, fair?

16  A.  Yes.  That's fair.

17  Q.  And you understood that ultimately these transactions

18  related to purchases by --

19         MR. GILBERT:  I'm sorry.  Was there an objection?

20  Q.  You understood, sir, that the transactions that you were

21  working on at the end of the day involved individuals in

22  California who were purchasing marijuana to have delivered to

23  their homes.

24  A.  Yes, that is correct.

25  Q.  And so you understood, in dealing with things like that,

L33AWEI3ps                     Tassone – Cross

1    it's important everything be done properly and correctly,

2    correct?

3    A.  Yes.

4    Q.  You had some responsibility for dealing with the business

5    partners, with the dispensaries, right?

6    A.  Yes, that is correct.

7    Q.  And you worked, as you said, you also looked at, as part of

8    your job, the so-called settlement statement, correct?

9    A.  Yes, I did.

10             MR. GILBERT:  If we could please display Government

11   Exhibit 425.

12             The next page.  One more.

13   Q.  Let's put the exhibit aside for a moment.  Let me just ask

14   you.  So you recall seeing both on direct and on

15   cross-examination a settlement statement that had the word

16   "clearsettle" on top, correct?

17   A.  Yes, I do.

18   Q.  And you were asked a number of questions about your

19   understanding of where Clearsettle was, whether in California

20   or somewhere else, correct?

21   A.  Yes, I remember that.

22   Q.  I think you should now have it on your screen.

23             Could you please take a look at Government Exhibit

24   425, and you'll see on the top it says "clearsettle," and then

25   the next column, it says "Bureau Solutions Limited, The Shard,

1   25th Floor, London Bridge Street, London."  Do you see that?

2   A.  Yes, I do.

3   Q.  Now, this settlement statement, that says "clearsettle" on

4   top, is not the only settlement statement that you saw during

5   the time you were working on Eaze credit card processing,

6   correct?

7   A.  That's correct.

8   Q.  This particular one covers what period of time?

9   A.  October -- one second.  I believe it's October 3rd through

10  October 9th, 2016.

11  Q.  So it covers a one-week period?

12  A.  Yes.

13  Q.  Do you recall whether you were receiving such statements

14  weekly, on a weekly basis?

15  A.  Yes.  I -- yes, I was.

16  Q.  And all of those statements, as far as you understood it,

17  would have said "clearsettle, Bureau Solutions Limited,

18  London," correct?

19  A.  I don't have a specific memory of seeing that every time,

20  but on this example, yes, that is correct.  And --

21  Q.  You don't have a memory of these statements coming in any

22  different format, do you?

23  A.  For Clearsettle, no.  This is the format that I'm familiar

24  with.

25  Q.  And you don't have a memory of ever seeing anything that

1   said "Clearsettle California" on the top of it, correct?

2   A.  Not to my memory.

3   Q.  So it's your testimony, sir, that you did not know that

4   Clearsettle was a London-based financial institution?

5   A.  Yes, that is correct.

6   Q.  Even though you got these statements week after week after

7   week after week, you had no idea that Clearsettle was a

8   European financial institution.  That's your testimony, sir?

9   A.  My perspective was that they could have had an office in

10  Calabasas and potentially other offices, but I wasn't sure if

11  that was -- you know, where they were based or headquartered or

12  anything like that.

13  Q.  I didn't ask if you had an understanding whether they had

14  other offices.  My question is, week after week you're getting

15  statements that say London on them, but you didn't make the

16  connection in your mind, that's your testimony, you had no idea

17  that Clearsettle was European?

18  A.  I did not know that they were a European-based company at

19  that time.

20  Q.  And you never looked it up.

21  A.  Not to my memory.

22  Q.  You never asked anybody.

23  A.  Not to my memory.

24  Q.  You were asked whether you had an understanding of which

25  banks were connected -- were used by Clearsettle.  Do you

1    recall that?

2    A.  Yes, I do.

3    Q.  And what was your answer?

4    A.  In my testimony?

5    Q.  Well, what's your answer right now?  Do you know what banks

6    Clearsettle used?

7    A.  I don't know the specific names of the banks, no, I do not.

8    Q.  Do you know -- do you have an understanding of where the

9    banks were located, whether in the United States of America or

10   in a different country?

11   A.  In regards to Clearsettle, I don't know.

12   Q.  You don't know?

13   A.  In regards to Clearsettle, I do not know.

14   Q.  You saw there was a reference to a Bureau Solutions

15   Limited, also in London, on that settlement statement?

16   A.  Yes, I saw that.

17   Q.  What was that?

18   A.  That was an address.

19   Q.  Bureau Solutions Limited, it's your understanding that's an

20   address or that's a reference to an entity?

21   A.  Yes, reference to an entity and its address.

22   Q.  Understood.

23         What was Bureau Solutions Limited?

24   A.  I'm not sure.

25   Q.  In the time you were working on the Clearsettle credit card

L33AWEI3ps                    Tassone - Cross

1    processing, you didn't know where -- you had no idea what

2    Bureau Solutions Limited was, even though that name appears on

3    the statement; that's your testimony?

4    A.  Yes, it is.

5    Q.  And you had no idea where the banks for Clearsettle were;

6    that's your testimony as well.

7    A.  Yes, it is.

8    Q.  Have you ever heard of a bank called ECP?

9    A.  Not to my memory.

10   Q.  Did you have an understanding in 2016, 2017 time period

11   that Clearsettle had banks in the United States of America?

12   A.  I didn't know that definitively.

13   Q.  You were asked on direct --

14           MR. GILBERT:  If I could please have Government

15   Exhibit 3606.

16   Q.  Mr. Tassone, do you recall Government Exhibit 3606?

17   A.  Yes, I do.

18   Q.  And what is this?

19   A.  This is a Wayback Machine image of a previous website,

20   Onlinebiller.net.

21   Q.  And you were asked whether -- and what appears on the

22   screen right now is a number of questions, right?  This is like

23   a FAQ?  Is that right?

24   A.  Yes, that's correct.

25   Q.  So if one went to what had been the Onlinebiller website,

L33AWEI3ps                    Tassone – Cross

1   this FAQ would appear, frequently asked questions.

2   A.  Yes, I believe so.

3   Q.  And you were asked on direct whether -- well, withdrawn.

4            Was it your testimony that you understood that

5   Onlinebiller was requesting that if anybody had a question

6   about a charge, they should deal with Onlinebiller and not the

7   bank?

8   A.  My understanding was that, if they saw it on their

9   statement and they were unclear about what it was, then they

10  can reference that website from their statement, and then they

11  would be able to see this FAQ.

12  Q.  But there's nothing about this FAQ, as far as you

13  understand it, sir, that would prevent anybody who has a credit

14  card and has a question about a charge from contacting their

15  own bank.

16  A.  There's nothing that would prevent that, that's correct.

17  Q.  And from your experience, as you said before, that happens

18  all the time.

19  A.  Yes.  It can happen.

20  Q.  You said, I believe, Mr. Tassone, that the Clearsettle

21  processing stopped at some point in 2018.  Is that correct?

22  A.  Yes.  I believe it stopped either at the end of 2017 or

23  very early 2018.

24  Q.  And as far as you understand it, it didn't stop because

25  there was any complaint by any banks in the United States about

L33AWEI3ps                        Tassone - Cross

1   it, correct?

2   A.  I don't know that information.

3   Q.  Well, why did you think it stopped?

4   A.  My understanding was that the number of transactions that

5   were occurring on their site stopped abruptly and the amount of

6   chargebacks that occurred in -- as a percentage of the

7   remaining transactions were potentially too high.  That's what

8   was told to me.

9   Q.  That made sense to you.

10  A.  I'm not sure it made sense.  That's what was told to me.

11  Q.  That was your understanding.

12  A.  Yes.

13  Q.  You didn't have the understanding that it was stopping

14  because any Eaze customer ever had their credit card canceled

15  because they had purchased through Eaze.  That was not your

16  understanding of why Clearsettle stopped.  Correct?

17  A.  That's correct.

18  Q.  And then of course you testified about the switch to

19  something called EUP or EUprocessing, right?

20  A.  Yes, I did.

21  Q.  What is EUP, sir?  Is it a company?

22  A.  Yes, it is.

23  Q.  What kind of company is it?

24  A.  A credit card payment processing company.

25  Q.  Where is it incorporated?

L33AWEI3ps                      Tassone - Cross

1    A.  I'm not sure.

2    Q.  Did you ever know who the officers of that company were?

3    A.  No.

4    Q.  Did you ever look up the company that you -- what

5    understood to be a company called EUprocessing when you started

6    working with them in 2018?

7    A.  Not to my memory, no.

8    Q.  Did you ever learn -- withdrawn.

9         So it wasn't important for you to understand, in 2018,

10   when you started working with EUP, what you thought was a new

11   company, to do any diligence on what that company was and who

12   owned it.  That's your testimony?

13   A.  That wasn't my job.

14   Q.  Whose job was it?

15   A.  I'm not sure.

16   Q.  You don't know --

17   A.  Yes.

18   Q.  Do you know if anyone at Eaze did that job?

19   A.  I know that the former CEO, Jim Patterson, held the highest

20   understanding of the relationship.  I don't know if he did that

21   research himself or not.

22   Q.  Now, I believe you referred to EUP as a payment processor.

23   Correct?

24   A.  Yes.

25   Q.  But it's correct there was no, as understood it, no link

1 | between EUprocessing and the Eaze computer systems.

2 | A.  Um --

3 |          MS. LA MORTE:  Foundation.

4 |          THE COURT:  I'm sorry.  Was there an objection?

5 |          MS. LA MORTE:  I'm sorry.  Objection, foundation.

6 |          THE COURT:  Sustained.

7 | Q.  You're familiar with a company called Inovio, correct?

8 | A.  Yes.  At a high level I am.

9 | Q.  And at a high level, what did Inovio do?

10 | A.  Some back-end gateway for payment processing.

11 | Q.  It was a back-end gateway for payment processing for Eaze,

12 | correct?

13 | A.  That's my understanding.

14 | Q.  And what is your understanding of what a back-end gateway

15 | does or means?

16 | A.  I'm not really sure.

17 | Q.  Did you ever learn that Inovio had a direct connection to

18 | Eaze's computer system?

19 | A.  I'm not on the technical engineering team, so I don't have

20 | that knowledge directly .

21 | Q.  Are you aware whether Eaze looked for other payment

22 | processors, as you call them, other than EUP and Clearsettle,

23 | during the time you were working on the processing at Eaze?

24 | A.  Yes, I am aware.

25 | Q.  Eaze looked at many different options, correct?

L33AWEI3ps                    Tassone - Cross

1   A.  There were different options to my memory that they looked

2   at, yes.

3   Q.  Some of them they went forward with at some point in time,

4   correct?

5   A.  Yes, that is correct.

6   Q.  You've heard of a company called First Data?

7   A.  Yes, I have.

8   Q.  Do you know HardConnect?

9   A.  I've heard of HardConnect, yes.

10  Q.  Was HardConnect one of the companies that Eaze used as a

11  payment processor at that period of time?

12  A.  I don't have a specific memory.  It's possible, but I don't

13  specifically remember.

14  Q.  Well, which ones do you remember other than EUP and

15  Clearsettle?

16  A.  During that time period, POB, point of banking, through

17  Paybotics.

18  Q.  Any others?

19          I'm sorry.  Any others?

20  A.  There may have been, but I don't have specific memory of

21  those companies.

22  Q.  Now, with regard to EUP, you said on direct that your

23  points of contact there, at EUP, was someone named Medhat --

24  correct?

25          I'm sorry.  Could you not hear me?

1   A.   I'm sorry.  Just to go back to the previous question, there

2   was another company we preferred to as Green Box.  That was a

3   payment processor that I remember as well.

4   Q.   You say Green Box?

5   A.   Yes.

6   Q.   Green Box was a company that provided payment processing

7   services for Eaze during the time you are worked on Eaze

8   processing; is that your testimony?

9   A.   Yes, it is.

10  Q.   Any others that you recall?

11  A.   No.

12  Q.   You said your points of contact at EUP was somebody named

13  Medhat –– right?

14  A.   Yes.  One of them.

15  Q.   And the other one, I believe you said, was Andras?

16  A.   Andrés or Andre.

17  Q.   Those were the people understood were at EUP working on the

18  Eaze processing, correct?

19  A.   They were, yeah, people that were either on an email or a

20  telegram associated with EUprocessing.

21  Q.   They were the principal contacts there, as you understood

22  it.

23  A.   No.  That's not my understanding.  I had limited

24  correspondence with them, and then at some point my

25  correspondence with EUprocessing just became a generic email.

1   Who I didn't know was on the other side of that email.

2   Q.  Mr. Tassone, I'd like to refer you to the transcript of

3   yesterday's proceedings, page 224, lines 4 and 5 of your direct

4   testimony.  You were asked the following question:

5   "Q. What were your primary points of contact at EUprocessing?

6   "A. Someone named Andres and Medhat."

7            Do you recall that testimony, sir?

8   A.  Yes, I recall the testimony.

9   Q.  Thank you.

10           MS. LA MORTE:  I object to this line.

11           THE COURT:  Sustained.

12  Q.  You never had the understanding that Ruben Weigand was a

13  point of contact for EUP because you had never heard of him

14  before in your life, correct?

15  A.  That's correct.

16  Q.  You were shown a thumb drive on direct examination

17  yesterday.  Do you recall that, sir?

18  A.  Yes, I do.

19  Q.  And you were asked some questions about it by the

20  prosecutor?

21  A.  Yes, I was.

22  Q.  What that drive had on it was a collection of emails,

23  correct?

24  A.  Emails or attachments and documents from emails.

25  Q.  And those materials you had put together at the request of

L33AWEI3ps                    Tassone - Cross

1   the prosecutor, correct?

2   A.   What do you mean "put together"?

3   Q.   Did you select the emails that were placed on the thumb

4   drive that was entered into evidence here yesterday?

5   A.   Yes.

6   Q.   You were there was a long list of exhibits that was read

7   while you were sitting there testifying?

8   A.   Yes.

9   Q.   And all of those exhibits, as you understood it, sir, that

10  those were emails, or other documents, that you had selected

11  and put onto that thumb drive?

12  A.   Yes, that's correct.

13  Q.   And is it fair to say not a single one of those emails

14  involved Ruben Weigand?

15  A.   To the best of my knowledge and memory, no, did not.

16  Q.   And is it fair to say not a single one of those emails

17  discussed issuing banks in the United States or the policies

18  they had in place; is that fair?

19  A.   I don't know if any -- there was any discussion on issuing

20  banks.  I can't remember that.  But there was no discussion

21  around banks and their policies.

22  Q.   You said that, as part of your job there, you worked

23  closely with the dispensaries?

24  A.   Yes, that is correct.

25  Q.   Did you ever go to any dispensary?

L33AWEI3ps                    Tassone - Cross

1   A.  Yes, I did.

2   Q.  Do you know if any dispensaries accepted Visa, MasterCard

3   at the time of the dispensary?

4   A.  I do not know that.

5   Q.  Did you ever see Visa or MasterCard logos displayed at a

6   dispensary, if you recall?

7   A.  At one of the dispensaries within the Eaze network, you're

8   asking?

9   Q.  At any dispensary that you've ever visited, in your life,

10  have you ever seen the Visa/MasterCard logo displayed?

11  A.  Yes, I believe I have.  I believe I have something along

12  those lines.  I don't know if I've seen a Visa/MasterCard, but

13  potentially that they can, you know, have some sort of a debit

14  card, something like that.

15  Q.  Well, how would you know if it was -- I'm sorry.  Did you

16  finish your answer?  I don't want to interrupt.

17  A.  No, no.  Go ahead.

18  Q.  So if I understand your testimony, you saw, personally,

19  that there were dispensaries that were taking Visa/MasterCards,

20  be they debit or credit?

21  A.  I don't know if they were taking Visa or MasterCards, but I

22  do know that I've seen dispensaries taking some form of card

23  payment.  I don't know if they were Visa or MasterCards

24  specifically.

25  Q.  How did you come to that understanding?

L33AWEI3ps                    Tassone - Cross

A.  I've seen dispensaries that have had like a handheld type

of terminal in their dispensary.  That was a payment processing

terminal device.

Q.  And did you see that handheld terminal device at

dispensaries that were part of the Eaze network?

A.  The ones that I visited, I don't recall seeing that.

Q.  You don't know one way or the other whether those

particular dispensaries that you saw taking Visa/MasterCards

were on the Eaze network.

        MS. LA MORTE:  Objection.

        THE COURT:  Sustained.

Q.  I believe you testified that amongst your jobs for Eaze,

you had the role to grow the business.  Right?

A.  Yes, that is correct.

Q.  And what did that entail?

A.  It entailed managing partner relationships, our dispensary

partner relationships, and trying to improve their operational

performs.  It also entailed expanding to new cities or new

markets where we can launch a new dispensary location.

Q.  Did you have any involvement in advertising efforts for the

company?

A.  No, I did not.

Q.  Are you familiar with any of the advertising efforts that

were undertaken on behalf of Eaze while you worked there?

A.  Yes, I am.

L33AWEI3ps                    Tassone - Cross

1    Q.  And was one of those techniques to use billboards?

2    A.  Yes, it was.

3    Q.  You were familiar with Eaze billboards?

4    A.  Yes, I am.

5    Q.  There were quite a few of them in the Los Angeles area?

6    A.  Yes.

7    Q.  Do you know if there was one near the airport in Los

8    Angeles, near LAX?

9    A.  There could have been, yes.

10        MR. GILBERT:  If I could please show to the witness

11   only WX 197.

12   Q.  Mr. Tassone, do you recognize what's depicted in WX 197

13   that's on your screen?

14   A.  Yes, I do recognize this.

15   Q.  What is it?

16   A.  It's an image of an Eaze billboard and a plane.

17   Q.  And, I'm sorry, and an airplane?

18   A.  An airplane, yes.

19        MR. GILBERT:  The defense offers WX 197.

20        THE COURT:  Received.

21        (Defendant's Exhibit WX 197 received in evidence)

22        MR. GILBERT:  If you could please display it for the

23   jury.

24   Q.  There was a billboard -- do you know, sir, if this was a

25   billboard near Los Angeles airport, LAX?

L33AWEI3ps                    Tassone – Cross

1    A.  Yes, I believe it was.  I don't know the distance, but,

2    yes, somewhere near that city.

3    Q.  And it says here "Explore Eaze," a little cut off by the

4    palm trees, a problem we don't have here in New York, "Explore

5    Eaze.com."  Do you see that?

6    A.  Yes, I do.

7    Q.  "Marijuana delivered now in Los Angeles."  See that?

8    A.  Yes, I do.

9    Q.  And there were many, many others, to your knowledge, right?

10   A.  Yes, that is correct.

11   Q.  It was openly advertised throughout the city of Los

12   Angeles, correct?

13   A.  Yes, that is correct.

14   Q.  And in other cities as well?

15   A.  Yes.  There were other billboard advertisements in other

16   cities.

17   Q.  Were there, do you recall whether there were advertising

18   efforts on the side of buses?

19   A.  Yes, I do recall that.

20           MR. GILBERT:  If we could please display for the

21   witness only WX 199.

22   Q.  Mr. Tassone, do you recognize what's been marked as WX 199,

23   that's now on your screen?

24   A.  Yes, I do.

25   Q.  What is that?

1  A.  This is an internal post from a communications platform at

2  Eaze.

3  Q.  What do you mean by "an internal post"?

4  A.  Eaze uses communication platforms to communicate with

5  employees internally.  So this would be a post or a thread

6  started by an Eaze employee sharing some information with the

7  rest of the company.

8  Q.  In this particular post, is it sharing photographs?

9  A.  Yes, it is.

10 Q.  And those are photographs of billboards and advertising on

11 the side of a bus for Eaze?

12 A.  Yes, that is correct.

13         MR. GILBERT:  The defense offers WX 199.

14         THE COURT:  Received.

15         (Defendant's Exhibit WX 199 received in evidence)

16         MR. GILBERT:  And if you could please display that for

17 the jurors.

18 Q.  Do you see on the top it says "image by Michael Tassone"?

19 A.  Yes, I do.

20 Q.  Does that mean that you took these photographs, or it

21 doesn't mean that at all?

22 A.  I don't know what that means.  I didn't take the

23 photographs.

24 Q.  But you do recognize the billboard, for example, on the

25 left --

L33AWEI3ps                    Tassone - Cross

1              THE COURT:  I'm sorry.  Just to be clear, because I

2       don't think that part is a part of the post.  It's just a

3       header from something else.

4       Q.  I see.

5       A.  Yeah.

6       Q.  But further down on the page where there are pictures.

7       A.  Yes.

8       Q.  The one on the left looks like it says, "Farmed.  Sealed.

9       Delivered."  And there's an Eaze logo there, you see.  Are you

10      familiar with that one?

11      A.  Yes.  I do see that.

12      Q.  Do you know where that one is located?

13      A.  Can you actually go back to -- can I see the rest of the

14      post, please.

15      Q.  Sure.

16      A.  Based on this post, I believe that is located in Portland,

17      Oregon.

18      Q.  Portland, Oregon, is that what you said?

19      A.  Yes, that's correct.

20      Q.  What about the one right below it where it says, "Shop

21      Local.  From Home.  Eaze."  And there seems to be a picture of

22      a, maybe a warehouse or an apartment building?

23      A.  Yes, I see that.

24      Q.  Do you know where that one was taken?

25      A.  I believe that would be Portland, Oregon.

L33AWEI3ps                    Tassone - Cross

1    Q.  And what about the two images that look pretty much the

2    same of the bus that says -- appears to say "cannabis

3    delivered"?  Do you know anything about that bus?

4    A.  Based on this post, I believe that bus was in Portland,

5    Oregon.

6    Q.  Do you know if that bus was used to advertise for Eaze in

7    other places?

8    A.  Yes, it was.

9    Q.  Where was that?

10   A.  Not in -- to be clear, not that specific bus, but maybe

11   advertisements on other buss with similar advertising means,

12   that happened in San Francisco, California.

13            MR. GILBERT:  You can take that down.  Thanks.

14   Q.  Do you know, Mr. Tassone, if Eaze is accepting debit cards

15   for payment today?

16   A.  Yes, I do.

17   Q.  Eaze accepts debit cards with the MasterCard and Visa logo

18   on them as we sit here today, correct?

19   A.  Yes, I believe so.

20   Q.  So somebody in California today could --

21   A.  I'm sorry.  Actually, I, I don't know that definitively.

22   But I do know that they are accepting the debit cards.

23            (Pause)

24            MS. LA MORTE:  Repeat your answer.

25   A.  Can you repeat the question?

1    Q.  I can repeat the question if that will help.  The question

2    was:  Eaze accepts debit cards with the MasterCard and Visa

3    logo on them as we sit here today, correct?

4    A.  My understanding is that Eaze accepts debit cards.  I don't

5    have any specific knowledge if they accept MasterCard or Visa

6    specifically.

7    Q.  Well, is it your understanding that debit cards typically

8    have a MasterCard logo, either a MasterCard or Visa logo on

9    them?

10   A.  Yes, that's correct.

11   Q.  That's how it works, right?

12            Withdrawn.

13            And so what that means is that, today, if somebody

14   went onto the Eaze website, they could use their debit card if

15   it had the MasterCard or Visa logo on it, to have marijuana

16   delivered to their home.  Is that your understanding?

17   A.  My understanding is that someone could use a debit card to

18   place an order on Eaze and they could have marijuana delivered

19   to their home, yes.

20   Q.  And you understand that those debit cards with MasterCard

21   or Visa logos on them, they are issued to card holders from

22   banks in the United States, like Bank of America and Wells

23   Fargo.  Is that your understanding?

24   A.  They can be issued from banks or credit card processing

25   companies, yes.  Or credit card companies, yes.

L33AWEI3ps                    Tassone - Cross

```
1   Q.  The card you testified about that you had the transaction
2   problem with, that was a Chase card, correct?
3   A.  Yes.  That's correct.
4   Q.  But was that a regard or a debit card, if you recall?
5   A.  That was a credit card.
6   Q.  Do you know, sir, how much volume of -- withdrawn.
7           Do you have any understanding what the dollar volume
8   is, in this month, for example, or let's say February of this
9   year, at Eaze, how many transactions have been processed using
10  debit cards issued by banks in the United States, if you know?
11          MS. LA MORTE:  Objection.
12          THE COURT:  Sustained.
13  Q.  Do you work currently in any capacity with the efforts --
14  with Eaze's acceptance of debit cards for purchases, as we sit
15  here today?  Is that part of your job anymore?
16  A.  No, it is not.
17  Q.  Who does that job at Eaze?
18  A.  There is a team of individuals at Eaze that work on
19  payments.
20  Q.  Who is in charge?
21  A.  I believe that to be -- I mean, David Adams and, you know,
22  whoever is in charge of the company, usually the CEO.
23  Q.  Have you ever heard of something called an ACH transaction?
24  A.  Yes, I have.
25  Q.  What is an ACH transaction?
```

L33AWEI3ps                    Tassone – Cross

1    A.  My understanding of an ACH transaction is when a customer

2    enters in their banking account information, so their account

3    number and routing number, into a website in order to place a

4    transaction or place a purchase.

5    Q.  And is that something that can be done on Eaze's website

6    today?

7    A.  Yes, it is.

8          MR. GILBERT:  Can you show the witness and only the

9    witness at this time WX 2601.

10   Q.  Mr. Tassone, I'm going to ask you if you recognize what's

11   been marked as WX 2601.

12   A.  Yes, I do.

13   Q.  What is it, sir?

14   A.  This is a –– something from the Eaze website, so when you

15   were to connect ACH banking details, you would select, you

16   know, select your bank from one of these choices.

17         MR. GILBERT:  The defense offers WX 2601.

18         MS. LA MORTE:  No objection.

19         THE COURT:  Received.

20         (Defendant's Exhibit WX 2601 received in evidence)

21         MR. GILBERT:  Please display it for the jury.

22   Q.  If I understand your testimony correctly, Mr. Tassone, what

23   we see here is an image from Eaze's website.

24   A.  Yes, I believe so.

25   Q.  And you believe that it's current; this is what it looks

1    like today.

2    A.  I don't know if this is what it looks like today.  I had

3    visited this page as a customer myself several months ago.  It

4    looks similar.

5    Q.  You -- I'm sorry.  I didn't mean to interrupt.

6            Have you finished your answer?

7    A.  Yes, I did.

8    Q.  You visited the page that's displayed on the screen right

9    now at some point after this case was brought by the U.S.

10   Attorney's Office, correct?

11   A.  Can you -- can you clarify, after this case was -- after

12   there was an indictment, you're saying?

13   Q.  Let me try it this way.  You visited this page after March

14   of 2020, correct?

15   A.  Yes, I believe so.

16   Q.  So this means that someone could go to the Eaze website

17   and, through -- an ACH transaction is a way to connect directly

18   to that person's bank account, if I understand it?

19   A.  My understanding is that they enter their bank account

20   details here, yes.

21   Q.  So they could enter their Bank of America account number on

22   the website?

23   A.  Yes.

24   Q.  And money would be transferred from Bank of America to Eaze

25   so that person could purchase marijuana in California, correct?

L33AWEI3ps                    Tassone – Cross

1    A.  I don't know the details of how that happens.  I just know

2    that a customer is able to visit this page and connect their

3    banking details there.

4    Q.  But they would be connecting their banking details there

5    for the purpose, as you understand it, of buying marijuana from

6    Eaze, correct?

7    A.  Yes, for that purpose, that's correct.

8    Q.  Did you actually do that yourself?

9    A.  No, I did not.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  But you know that many other people do?

2  A.  Yes, there are other customers that do.

3  Q.  Mr. Tassone, you were asked on direct examination about

4  Government Exhibit 650, if we could please display that on the

5  screen.

6       Do you recall this exhibit?

7  A.  Yes, I do.

8  Q.  This was an e-mail exchange about a settlement payment

9  being sent to dispensaries called from the earth; is that

10 right?

11 A.  Yes, just give me a second to view it.

12 Q.  I'm sorry, it might help you to look at page 2, I believe.

13 It might help all of us.  In particular, there's a chart at the

14 bottom of the second page?

15 A.  Yes, I do recall this.

16 Q.  So it looks like, from this document, am I correct that

17 From The Earth -- well, From The Earth is a dispensary; is that

18 correct?

19 A.  Yes, that's correct.

20 Q.  And there's a location in Los Angeles, California, and

21 there's also one in Santa Anna, California, correct?

22 A.  No, that's not correct.

23 Q.  What is the reference to Santa Anna, California, at the

24 bottom of the chart in the e-mail?

25 A.  There is a location in Santa Anna, California, to my

1   knowledge, not in Los Angeles, the city.  That's a reference to

2   the address of their banks.

3   Q.  I see.  Okay.  And so the banks, when you say the address

4   of their banks, it says:  Invoice name, From The Earth; do you

5   see that in the chart?

6   A.  Yes, I do.

7   Q.  And then it says:  Bank, Wells Fargo, correct?

8   A.  Yes, that's right.

9   Q.  Is it your understanding that that indicates that the

10  dispensary, From The Earth, has a bank account at Wells Fargo?

11  A.  Yes, that is correct.

12  Q.  And if you look at the chart, one column over, does that

13  indicate to you that the bank -- that the dispensary called

14  From The Earth also has a bank account at Bank Of The West?

15  A.  Yes, and to be clear, it could be a dispensary business

16  entity, a separate business entity.  I'm not sure if their

17  licensed entity held that bank account with those banks

18  themselves.

19  Q.  Well, there's a discussion in this e-mail about a concern

20  about sending a wire transfer; do you recall that?

21  A.  Yes, I do.

22  Q.  Maybe if we can look again at the first page.  This is a

23  communication between EUprocessing and Eaze, right?

24  A.  That's correct.

25  Q.  And do you recall being asked about this by the prosecutor

1    yesterday?

2    A.  Yes, I do.

3    Q.  And the -- is it correct that what was being discussed here

4    was whether EUprocessing could send a settlement payment to

5    From The Earth, the dispensary, or not?

6    A.  Yes, I recall.

7    Q.  And there was a discussion about whether they could do

8    that, and the concern that was raised was that if one were to

9    Google From The Earth, they would -- it was clear that it was a

10   dispensary, right?

11   A.  One second, please.

12   Q.  Sure.

13   A.  My understanding is not from Googling From The Earth, but

14   simply Googling the name of the entity listed on the bank

15   account, and that name may have been associated with cannabis.

16   Q.  And so the people at EUprocessing, in effect, were saying

17   that just by going on the internet, you could see that whoever

18   it was that owned the account was connected to marijuana?

19   A.  That's correct.

20   Q.  And the concern about sending the money had nothing to do

21   with U.S. banks, correct?

22            MS. LA MORTE:  Objection.

23            THE COURT:  Sustained.

24   Q.  Well, doesn't this reflect that the concern being expressed

25   here is that EUprocessing is saying there's a bank that might

1   not let us send money to the dispensary's account?

2           MS. LA MORTE:  Objection.

3           THE COURT:  Sustained.

4   Q.  Do you have an understanding of which or whose bank it was

5   that had the concern about sending this money as reflected in

6   this e-mail?

7   A.  My understanding was that it was the receiving or acquiring

8   bank.

9   Q.  When you say acquiring bank, what do you mean by that?

10  A.  The banks that were holding the funds or that would, in

11  this case, be holding future funds for a dispensary.

12  Q.  But the wire was being sent to that account, correct?

13  A.  No, the wire is not being sent to the acquiring bank.  The

14  wire would be sent to the dispensary.

15  Q.  It would be sent to the dispensary from which bank?

16  A.  My understanding is the acquiring bank.

17  Q.  And you don't know where the acquiring bank was; is that

18  your testimony?

19  A.  Yes, that is correct.

20          MR. GILBERT:  May I have one moment, your Honor?

21          THE COURT:  Yes.

22          (Pause)

23          MR. GILBERT:  I have no further questions.  Thank you,

24  Mr. Tassone.

25          THE WITNESS:  Thank you.

1          THE COURT:  All right.  We'll start redirect for about

2     five minutes, and then we'll break for lunch.

3          MS. LA MORTE:  Sure, your Honor.  I may be -- it's

4     going to be short.

5          THE COURT:  Okay.

6          MS. LA MORTE:  Or I think it is.  I mean, I shouldn't

7     promise.

8          MR. GILBERT:  I'm sorry, your Honor.  I left my mask

9     on the podium.

10          MS. LA MORTE:  And you need to replace the cover, too.

11          MR. GILBERT:  If you give me six feet, I will retrieve

12     it.  Thanks.  Sorry.

13     REDIRECT EXAMINATION

14     BY MS. LA MORTE:

15     Q.  Good afternoon, Mr. Tassone.

16     A.  Good afternoon.

17     Q.  Mr. Tassone, you understood that lying to banks was wrong,

18     correct?

19     A.  Yes, I did.

20     Q.  And that in the scheme that you participated in with Ray

21     Akhavan, there were misrepresentations that were made to banks;

22     is that correct?

23          MR. TAYBACK:  Objection to the phrasing of the

24     question.

25          THE COURT:  Overruled.

A.  Can you repeat that question?

Q.  And in the scheme that you engaged in with Ray Akhavan, there were misrepresentations that were made to banks; is that correct?

A.  Yes, that's correct.

Q.  And in the scheme, you used fake merchant names?

A.  Yes, that is correct.

Q.  Fake websites?

A.  Yes.

Q.  And the purpose of that was to deceive banks in the United States; is that correct?

A.  That was my understanding.

Q.  And your understanding is that the 2016 and 2019 period, unless those steps were taken, you would not -- Eaze would not be able to accept credit and debit cards; is that right?

            MR. GILBERT:  Objection, leading.

            THE COURT:  Overruled.

A.  Can you repeat that again?

Q.  Sure.  Your understanding in the 2016 to 2019 period is that unless you engaged in those deceptive tactics, Eaze would not be able to accept credit and debit card payments; is that correct?

A.  I believe that to be the case in regards to Clearsettle and EU.  I'm not sure about any other payment processing options if that was the case.

1   Q.  Now, you were asked a series of questions on

2   cross-examination yesterday about the legality of certain

3   activities involving the -- about your understanding of the

4   legality of certain activities involving the purchase of

5   marijuana; do you remember that?

6   A.  Yes, I do.

7   Q.  And one of those ways was a purchase of marijuana using

8   cash; is that right?

9   A.  That's correct.

10  Q.  Does purchasing marijuana with cash involve lies to U.S.

11  banks?

12          MR. GILBERT:  Objection.  Leading.

13          THE COURT:  Overruled.

14  A.  Not to my knowledge.

15  Q.  Does the purchase of marijuana with cash involve fake

16  websites?

17  A.  No, it does not.

18  Q.  Does it involve fake merchants like Happy Puffy Box?

19  A.  No, it does not.

20  Q.  And you were asked also yesterday and today about your

21  understanding of the -- or about ACH transfers; do you recall

22  that?

23  A.  Yes, I do.

24  Q.  Now, an ACH transfer, is that a credit card transaction?

25  A.  Not to my knowledge.

1    Q.  Is that a debit card transaction?

2    A.  I don't think so, not to my knowledge.

3    Q.  And with respect to the ACH transfers, did that involve

4    fake websites?

5    A.  I don't have --

6              MR. GILBERT:  Objection, foundation.

7              THE COURT:  Overruled.

8    A.  I don't have any knowledge of that, of what the ACH

9    includes or does not include.

10   Q.  Now, Mr. Tassone, you testified on cross that you did

11   research on Eaze before joining the company as an employee; is

12   that right?

13   A.  Yes, that is correct.

14   Q.  And do you agree it was important for you to understand

15   what you were getting into with that job; is that right?

16   A.  Yes.

17   Q.  It was important for you to have accurate information so

18   that you could evaluate the risk of joining the company; is

19   that right?

20   A.  Yes, I'd say that's fair.

21   Q.  Now, you were asked on cross-examination questions about

22   your proffer agreement, which is the agreement that you had

23   with the government, that covered your meetings with the

24   government; do you recall that?

25   A.  Yes, I do.

L33PWEI4                        Tassone – Redirect

1   Q.   Now, one of the rules in your proffer agreement that

2   governed your meetings with the government said that if you

3   don't tell the truth, you could be charged with obstruction of

4   justice or perjury; is that right?

5   A.   Yes, that is correct.

6   Q.   And that if you lie here today, you could also be charged

7   with perjury; is that right?

8   A.   Yes, that is correct.

9   Q.   And that's part of your immunity order; isn't that right?

10  A.   That's correct.

11  Q.   Now, has Eaze ever turned a profit?

12  A.   No, not to my knowledge.

13            MS. LA MORTE:   One moment, your Honor?

14            THE COURT:   Yes.

15            (Pause)

16            MS. LA MORTE:   No further questions, your Honor.

17            THE COURT:   Okay.   Just so that I'm clear,

18  Mr. Witness, can you hear me?

19            THE WITNESS:   Yes, I can.

20            THE COURT:   So do I understand that you and others

21  disguised what were actually marijuana purchases to make them

22  look like they were purchases of other goods and services?

23            THE WITNESS:   Yes, I have -- I didn't design those,

24  but I coordinated those, or I communicated that between the

25  dispensaries and the --

L33PWEI4                         Tassone – Redirect

1            THE COURT:  You were aware that that was going on?

2            THE WITNESS:  Yes, I was aware.

3            THE COURT:  And what was your understanding of -- that

4   presumably took a lot of effort on the part of Eaze, yes?

5            THE WITNESS:  On the part of Eaze?

6            THE COURT:  I'm sorry.  The part of the people who

7   were disguising those transactions?

8            THE WITNESS:  Presumably.  I don't know how much --

9            THE COURT:  All right.  So what was the purpose?

10           THE WITNESS:  The purpose was to conceal the fact that

11   they were marijuana transactions.

12           THE COURT:  Because?

13           THE WITNESS:  Because, my understanding, that the

14   banks would not want to process those transactions if they

15   knew.

16           THE COURT:  And that included U.S.-based banks?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.  Anything else?

19           MR. TAYBACK:  I do have a brief recross.

20           THE COURT:  All right.  We'll take that up after

21   lunch.

22           All right.  Ladies and gentlemen, we'll give you your

23   lunch break at this time, and we'll resume in an hour.

24           (Jury not present)

25           (Witness temporarily excused)

1              THE COURT:  Please be seated.  So two little items.

2              (Pause)

3              So first, I don't hold people exactly to their

4     estimates of time, but I do ask you to be a little more

5     careful.  In particular, Mr. Gilbert, you had said 30 to 45

6     minutes and you went over an hour.  So you know those things

7     happen but just keep that in mind.

8              Second, when prior testimony is offered as prior

9     inconsistent testimony, my practice is you first identify the

10    page and line, and then you hold off for like five, ten seconds

11    so that your adversary can see whether they want to object as

12    not inconsistent.  In this case, I sustained such an objection

13    on that ground, but it was after it had already been read.  So

14    we want to avoid that in the future, if possible.

15             All right anything counsel needs to take up?

16             MR. FOLLY:  No, your Honor.

17             THE COURT:  Very good, we'll see you all in an hour.

18             MR. TAYBACK:  Your Honor, I do recall there is one

19    disputed evidentiary witness for the next witness.

20             THE COURT:  For the next witness?

21             MR. TAYBACK:  For the next witness.

22             THE COURT:  Okay.  So why don't we resume at 20 of,

23    and I'll take it up then.  As I've learned, it takes the jury

24    longer to come up because they can only come three people at a

25    time; so we'll have at least ten minutes then to discuss it.

1              MR. TAYBACK:  Okay.  Thank you.

2              (Luncheon recess)

3                   A F T E R N O O N   S E S S I O N

4                              1:45 P.M.

5              (In open court; jury not present)

6              THE COURT:  Please be seated.  All right.  There was

7    an objection to an exhibit?

8              MR. FOLLY:  Yes, your Honor.  This was marked as the

9    Defense Exhibit, marked as, HAX4003.

10             THE COURT:  Okay.  I have it.

11             MR. FOLLY:  Your Honor, the main objection is to page

12   No. 2, the second page.  There are two sections that the

13   government has an objection to.  The first is a question and

14   answer referring to the Secure and Fair Enforcement Banking

15   Act, the Safe Act, which was referenced in our motions, in

16   which your Honor granted our motion as to that portion which

17   addressed that issue.  That was government motion in limine

18   No. 2.  So --

19             THE COURT:  Okay.  And what's the other one?

20             MR. FOLLY:  The other one is the language in the

21   section at the very bottom.  It says -- I think it stands for

22   communications or comms-approved language on

23   cannabis/marijuana.  And a similar issue arises in that one,

24   particularly in the third sentence.  It states:  The federal

25   government considers marijuana sales to illegal, but is

1  currently not challenging state laws that legalize marijuana

2  sales.  This, again, goes to federal enforcement of marijuana

3  laws, which was another issue that fell under that same motion.

4          THE COURT:  First of all, who is the next witness?

5  Not name but what is his position?

6          MR. FOLLY:  He is a witness at MasterCard that works

7  in compliance.

8          THE COURT:  So the relevant exhibit would be their

9  internal rules as of the time of the conspiracy, and this, as

10  charged, ending or at least not going beyond 2019 and this is

11  as of 2020.  So let me ask defense counsel, what's the possible

12  relevance?

13          MR. BURCK:  Your Honor, can you hear me okay?  Your

14  Honor, how is that?  Is that better?

15          THE COURT:  Yes.

16          MR. BURCK:  Okay.  So on the question of the date,

17  your Honor, it says as of February 2020, and the content of the

18  document suggests that there are -- these questions have been

19  arising for some period of time.  It doesn't specify when, but

20  it says that there have been questions inside MasterCard about

21  what the policy is of MasterCard.

22          And it does say February 2020, but it's current as of

23  February 2020.  So our position is that it's quite relevant

24  because there's nothing about -- despite the fact that it's

25  technically after the charged conspiracy, because it goes to

1    the policies about cannabis that MasterCard was promulgating

2    not just in February 2020 but, we believe, and I don't think

3    the government would dispute, before 2020.

4              So our position, your Honor, is this document speaks

5    to exactly what the policy was and what they were communicating

6    internally and also, very importantly, externally, your Honor.

7    So our view is that this is a very relevant document.  The date

8    does not preclude it.

9              THE COURT:  Maybe I'm missing something.

10             MR. BURCK:  Sure, your Honor.

11             THE COURT:  It says on the first page, a few

12   paragraphs down:  MasterCard prohibits consumer use of a

13   MasterCard card or access device to purchase cannabis even in

14   those states where the substance is legal for medical or

15   recreational use.  So what are you thinking, the rest of

16   this --

17             THE DEPUTY CLERK:  Jury entering the courtroom.

18             THE COURT:  To be continued.

19             (Jury present)

20             THE COURT:  Let's get the witness back on the stand.

21             Please be seated.  All right.  Recross.

22   RECROSS EXAMINATION

23   BY MR. TAYBACK:

24   Q.  Mr. Tassone, can you hear me?

25   A.  Yes, I can.

L33PWEI4                         Tassone – Recross

Q.  You were asked some questions in the subsequent

examinations following my opportunity to ask you questions, and

do you recall seeing a screen that talked about the banks that

were available for ACH transactions?  Do you recall that

exhibit?

A.  Yes, I do.

Q.  Whether a customer is using an ACH transaction, or at the

time that credit card were accepted by Eaze or debit cards or

cash, isn't it correct that for any of those, a customer

ordering on Eaze has to input some personal information into

the system, the Eaze system?

A.  That is my understanding, yes.

Q.  And you've used the system as a customer, right?

A.  With which system?

Q.  The Eaze system.

A.  Eaze.com, yes, I've purchased from Eaze.

Q.  So you go into the Eaze application, you input some

personal information about yourself, your name, correct?

A.  Yes, that's correct.

Q.  Your age?

A.  Yes.

Q.  Your method of payment?

A.  Yes, at checkout you do.

Q.  And if you use a debit card or when they accepted credit

card, it was the credit card information, correct?

1    A.  Yes, that is correct.

2    Q.  And for ACH, you put your banking account information in,

3    correct?

4    A.  Yes, that's my understanding.

5    Q.  And Eaze itself retains that information, right?

6    A.  I do not know that.

7    Q.  And part of that is also a customer is required to accept

8    the terms and conditions of use of the Eaze application?

9    A.  Yes, that is correct.

10   Q.  And do you maintain -- you, personally -- do you maintain

11   the terms and conditions of use, or is that somebody else's

12   job?

13   A.  That's not my job.

14   Q.  When Ms. LaMorte was up and asked you some questions, she

15   asked you one question that I'm going to follow up on.  She

16   said in the scheme that you participated in with Ray Akhavan,

17   there were misrepresentations to the banks, and you said, yes.

18   I want to focus on the portion of that question that says "with

19   Ray Akhavan."

20        Your understanding of Mr. Akhavan's involvement in

21   that scheme that you said that you participated in, that comes

22   from the conversations you had with Keith McCarty that you

23   testified about in direct and cross-examination, correct?

24   A.  That's correct, as well as conversations with former CEO

25   Jim Patterson.

1   Q.  So your conversations were with other people, not your own

2   personal conversations with Mr. Akhavan, for example, correct?

3   A.  Well, I had conversations with him at the meeting in

4   Calabasas.

5   Q.  And that was the conversation -- the meeting at which the

6   proposal was the one that wasn't ultimately utilized, correct?

7   A.  I'm not sure if that proposal was utilized, but from my

8   understanding and what I know, I don't know if that one was

9   actually utilized.

10  Q.  That's the gift card proposal, correct?

11  A.  Right.

12          MR. TAYBACK:  I have no further questions.

13          THE COURT:  Any recross?

14          MR. GILBERT:  No, your Honor.

15          THE COURT:  Any further redirect?

16          MS. LA MORTE:  No, your Honor.

17          THE COURT:  Thank you very much.  You may step down.

18          THE WITNESS:  Thank you.

19          (Witness excused)

20          THE COURT:  Please call your next witness.

21          MR. FOLLY:  Your Honor, the government calls John

22  Verdeschi.

23          MR. GILBERT:  Your Honor, with the Court's permission,

24  we're going to switch counsel.

25          THE COURT:  Sure.

L33PWEI4                         Verdeschi – Direct

1              MR. GILBERT:  Thank you.

2              THE COURT:  Mr. Witness, come on up.  You can take

3     your mask off once you're in that box.

4      JOHN VERDESCHI,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Please be seated.  State your name,

8     spell it slowly for the record.

9              THE WITNESS:  My name is John Verdeschi.  It's spelled

10    J-o-h-n; last name, V-e-r-d-e-s-c-h-i.

11             THE COURT:  Counsel.

12             MR. FOLLY:  Thank you, your Honor.

13    DIRECT EXAMINATION

14    BY MR. FOLLY:

15    Q.  Mr. Verdeschi, where do you work?

16    A.  I work for MasterCard.

17    Q.  How long have you worked at MasterCard?

18    A.  I started at MasterCard in 1999.

19    Q.  Can you describe what MasterCard is?

20    A.  MasterCard is a global payments company.

21    Q.  When you say global payments company, can you explain what

22    you mean by that?

23    A.  We are a global payments brand and a global payments

24    network.  So the easiest way to think about it is we have a

25    brand in the interlocking circles that's recognized around the

1    world in 211 countries, and we have a network that

2    interconnects our customers and enables those customers to

3    conduct transactions over our network.  And again, that's live

4    in 211 countries around the world.

5    Q.  Mr. Verdeschi, what types of customers does MasterCard

6    have?

7    A.  So our primary customers are financial institutions or

8    banks.  They come in two categories.  They're either issuing

9    banks, those are banks that issue payment cards, or they are

10   acquiring banks, they are banks who acquire merchant accounts.

11              THE COURT:  Where does MasterCard have its principal

12   place of business?

13              THE WITNESS:  Our headquarters is in Purchase,

14   New York.

15   BY MR. FOLLY:

16   Q.  Mr. Verdeschi, what is your current role at MasterCard?

17   A.  I am a Senior Vice President in the franchise department,

18   and my role is a function called customer engagement and

19   performance.

20   Q.  Can you explain what the focus of customer engagement and

21   performance is?

22   A.  Sure.  As a franchise, we establish rules and standards for

23   our customers to adhere to, and my team's responsibility is to

24   engage those customers and ensure that the customers are

25   performing within our standards.

1   Q.  What types of rules does MasterCard impose on its

2   customers?

3   A.  So as a global network, we have many rules.  The easiest

4   way to think of them is in three categories.  We have rules

5   that govern the use of our brand; so customers that are going

6   to use our brands have brand guidelines and rules and

7   standards, and those standards are meant to protect and uphold

8   the value of our brand.

9        Secondly, we have rules that govern use of our

10  network, and as you can imagine, if it's a global network

11  that's interconnecting customers on a global basis, and where

12  transactions are happening within milliseconds, you need to

13  have good standards that enable those transactions to occur in

14  a high-quality fashion.

15       And the third area where we have rules and standards

16  is around our acceptance network, and those are rules and

17  standards that enable a card to work at a point-of-sale

18  terminal so that you always have a good experience at the

19  point-of-sale terminal.

20       So at a high level, those are the three categories.

21  Q.  How long have you been in your current position at

22  MasterCard?

23  A.  It's probably around seven years, approximately.

24  Q.  Okay.  What are some of your duties in your current

25  position at MasterCard?

L33PWEI4                        Verdeschi - Direct

1   A.   So my team is responsible, as I said earlier, for engaging

2   customers and ensuring those customers meet our rules and

3   standards.  My team is divided into four components.  We have,

4   as I was talking about earlier, we have a team called brands

5   performance, and specifically they are monitoring our customers

6   to ensure that our brand is upheld and customers are meeting

7   those brand standards and rules.

8           I have another group that's focused on the network and

9   ensuring that data quality is good throughout the network.

10          I have another group that's focused on the acceptance

11  network and ensuring that our products and services actually

12  work at the point of sale.

13          And last, but not least, I have groups that are

14  located in each region of the world, North America, Latin

15  America, Europe, Middle East, Africa and Asia.  And in each of

16  those groups, their job is to engage customers to make sure

17  that they are performing within those standards.

18  Q.   Approximately how many other members are there in your

19  group?

20  A.   My group is approximately 48 to 49 people.

21  Q.   In the course of your employment at MasterCard, have you

22  become familiar with credit and debit card processing?

23  A.   Yes, I have.

24  Q.   How have you become familiar with credit and debit card

25  processing?

1    A.  Well, if you look at MasterCard -- and when most people

2    think of MasterCard, you probably have a MasterCard credit card

3    or a debit card in your wallet -- and that is, you know, two of

4    the primary products that we promote as a company; so it's kind

5    of my job to know credit card and debit card processing.

6    Q.  Mr. Levine, can you show the witness what's been marked as

7    Government Exhibit 2314.

8            Mr. Verdeschi, do you recognize this?

9    A.  I do.

10   Q.  What is it?

11   A.  This is a chart that we typically refer to as the

12   four-party model.

13           MR. FOLLY:  Your Honor, with the Court's permission,

14   I'd ask that the witness be permitted to use this chart as a

15   demonstrative during his testimony.

16           THE COURT:  Yes.

17   Q.  If we could publish that to the jury as well.

18           Starting in the lower left corner of this chart,

19   there's a reference to "Merchant."  Can you explain what that

20   refers to?

21   A.  Sure.  The merchant is the business that accepts MasterCard

22   as a form of payment.  So as an example, McDonald's would be a

23   merchant who accepts MasterCard as a form of payment; so they

24   would be called a merchant.

25   Q.  Moving up to the upper-left corner, there's a reference to

L33PWEI4                        Verdeschi – Direct

1   "Acquirer;" what does that refer to?

2   A.  So the acquirer is one of our customers.  An acquirer is

3   typically a bank or a financial institution that has signed a

4   MasterCard license agreement; so they are officially a

5   customer.  It's part of our franchise.  And their job is to

6   acquire merchant accounts, which means that they sign up

7   merchants to accept MasterCard as a form of payment, and then

8   they help those merchants process transactions through our

9   network.

10  Q.  And I believe you referred to acquire accounts.  In some

11  instances, do those include bank accounts?

12  A.  They may, yes.

13  Q.  Looking at the lower-right corner, there's a reference to

14  "Account holder."  Can you explain what that refers to?

15  A.  The account holder is the cardholder.  It's you or me.

16  It's anyone who has a MasterCard card in their wallet.

17  Q.  Looking now at the upper-right corner, it says "Issuer."

18  Can you explain what that refers to?

19  A.  So the issuer, again, is one of our customers, one of our

20  direct customers.  They are typically a bank or financial

21  institution that has signed a license agreement to participate

22  in our franchise, and they issue cards to cardholders.

23          Now, they not only issue the card to the cardholder,

24  but they also will extend credit to the cardholder, and they

25  will apply financing charges.  That's all done by the bank.  So

1    typical banks associated with issuing would be Citibank, Bank

2    of America, Capital One, would be all examples of MasterCard

3    issuers.

4    Q.  Can you explain where MasterCard fits into this four-party

5    model?

6    A.  So we're kind of at the center of it.  We're the network.

7    So we're the network that enables customers to interconnect

8    with each other.  So if you had an account holder who was from

9    Malaysia who was shopping on a website for a merchant that was

10   located in Seattle, it's the MasterCard network that enables

11   that transaction to happen.  So we -- our role in all of this

12   basically is we provide the brand capability, and we provide

13   the networking capability.

14   Q.  Mr. Verdeschi, there's a reference in the middle of the

15   chart to the term "switching."  Can you explain what that term

16   means?

17   A.  So switching, very similar to what you have in a telephone

18   network, right?  We enable two parties that otherwise don't

19   have a relationship with each other to interconnect.

20              So again, going back to that example I just gave you.

21   You can have a bank in Malaysia interacting with a bank in the

22   United States and conducting a transaction, and so we switch

23   that transaction through our network, and we provide services.

24   One of them is called authorization.

25              Authorization is the process by which a card

1      transaction either gets approved or gets declined.  It's that

2      initial step when you insert your MasterCard into a

3      point-of-sale terminal and within a second you'll have a

4      response.  Either your card was approved or it was declined.

5      That's what's referred to as authorization.

6              We also have processes called clearing and settlement.

7      Clearing and settlement are focused on the finality of the

8      transaction, which is the transfer of funds.  So after the

9      transaction has occurred, then the banks will transfer funds

10     between each other so that the merchant ultimately gets paid.

11     Q.  You gave the example of a McDonald's purchase earlier.

12     Using this chart, can you walk us through, step by step, a

13     purchase from McDonald's by a MasterCard cardholder?

14     A.  Sure.  So if I walk into McDonald's and I buy a few items,

15     a hamburger, fries and a Coke, and it's going to cost me $10,

16     I'm prompted to pay.  So I take out my MasterCard, and most

17     likely I'll be inserting the chip into the terminal these days.

18     Once I do that, that point-of-sale terminal is now taking my

19     card information, and it's sending that data not only about my

20     card but about the purchase I'm making.  Right?

21              It sends that through to the acquiring bank, who sends

22     it through the MasterCard network, who sends it to my issuing

23     bank.  So let's say I'm holding a Citibank card.  When I walk

24     into McDonald's, I insert the card.  The MasterCard network

25     recognizes the card and routes it to Citibank as the issuer,

1   and then Citibank -- because it issued me the card, they know

2   who I am; because they have extended me credit, they know

3   how -- the standing of my account, they know if my account is

4   in good standing; they know my open-to-buy, they know if I have

5   money available -- they'll take all of those factors into

6   consideration, and then they will either approve the

7   transaction or decline the transaction.  And then the merchant

8   will be notified of that, and you'll be able to complete your

9   purchase.

10  Q.  And the example you just gave, who is the merchant?

11  A.  That would be McDonald's.

12  Q.  What, if any, type of bank account would the merchant need

13  in order to complete that credit card transaction?

14  A.  That, I don't know.  I am not -- I don't work for an

15  acquiring bank; so I don't know what type of account they may

16  need.

17  Q.  In this model, using the example you just went through,

18  what would the role of the acquiring bank be?

19  A.  The acquiring bank, their role is to manage the merchant

20  account.  So they are -- in our ecosystem, the acquirer is

21  responsible for knowing their customer, knowing the activities

22  that their customers are engaged in and for managing the

23  relationship and on a transaction-by-transaction basis for

24  routing the transaction through our network and then for

25  settling the funds with that merchant.

1    Q.  And the example that you just gave, what is the

2    responsibility of the issuing bank for that credit card

3    transaction?

4    A.  Likewise, the issuer is responsible for managing the

5    cardholder, the account holder account.  They are responsible

6    for knowing their customer, for routing the transaction, for

7    proving or declining the transaction.  That's their role.

8    Q.  And in this example that you just gave, would the acquiring

9    bank's customer be McDonald's?

10   A.  Yes.

11   Q.  Focusing on merchants who are based inside of the United

12   States, where would the acquiring banks usually be located for

13   those merchants?

14   A.  So typically an acquiring bank's merchants would typically

15   be located in the same country.  We have a rule and a standard

16   in our network that an acquiring bank must operate within their

17   area of use.  "Area of use" means it's the area that they have

18   the right types of licenses and registrations to operate

19   legally.  So typically that would be the same country.

20   Q.  When a cardholder makes a card purchase, what, if any,

21   information about the cardholder is transmitted from the

22   merchant bank to the issuing bank?

23   A.  Okay.  So there's quite a bit of information, but I'll

24   break it down to some of the kind of essential elements.  So

25   there's information about the card.  So going back to the

1    example I gave, if I'm a cardholder and I have a Citibank card

2    and I'm making a transaction at McDonald's, the point-of-sale

3    terminal, the terminal that you insert your card into, is going

4    to read the card number, the expiration date and other data

5    about the card.  It will capture the amount of the transaction.

6    That's certainly important.

7         And it also captures information about the merchant

8    themselves.  The merchant name, the merchant location, and

9    something we call the merchant category code, which is

10   sometimes referred to as the MCC code.  Most times it's

11   referred to as an MCC code.  It is a code that signifies the

12   general business that the merchant is engaged in.

13        There is many other data elements that are passed

14   through authorization, but those are some of the significant

15   ones.

16   Q.  How is that information transmitted to the issuing bank?

17   A.  Through the MasterCard network.

18   Q.  Is it important to MasterCard that that information about

19   the merchant be accurate?

20   A.  The MasterCard network relies upon, and our customers as a

21   result, rely upon accurate information.  That's the entire

22   value of our network.  The issuing bank, at the moment of the

23   transaction, is making a decision.  They're making a decision

24   based on the customer they know, and they're trying to make a

25   decision on whether or not to approve or decline that

1    transaction.

2              If they approve it and something wasn't right, it

3    could lead to fraud.  It could lead to financial loss for them.

4    So it's of paramount importance to our customers that they're

5    receiving good, quality, accurate information so that they can

6    make an informed decision.  And, as a result, it's, you know,

7    equally important for MasterCard that the data that's passing

8    through is good quality so that we're providing a high-quality

9    service.

10   Q.  If a particular transaction is approved, can you explain

11   what happens after that?

12   A.  Well, once a transaction is approved, that's a good

13   situation, in most cases.  The cardholder is usually happy,

14   they are able to take their hamburger and find a table and eat

15   it.  So that's a good situation.

16             But once that transaction has occurred, then after

17   that is when the clearing and settlement happen.  And again,

18   that's where, behind the scenes, after you're eating your

19   hamburger, where the banks now transfer money from the

20   cardholder account to the merchant account.

21   Q.  How long does the authorization part of this process take?

22   A.  The literal switching through our network takes

23   milliseconds.  Although, sometimes when you're standing there

24   and insert your card it may feel like seconds, but it takes

25   milliseconds to occur.

L33PWEI4                        Verdeschi - Direct

1   Q.   What volume of MasterCard credit card transactions are

2   there approximately in a given year?

3   A.   In 2020 there were 90 billion.

4   Q.   I'm sorry, how many?

5   A.   90 billion.

6   Q.   Are you familiar with the term merchant descriptor?

7   A.   Yes.

8   Q.   What is a merchant descriptor?

9   A.   A merchant descriptor is the merchant's name, the

10  merchant's business name, and it's the name that passes through

11  our network and ultimately will end up on the cardholder's

12  statement.

13          So when you open up your cardholder statement at the

14  end of the month and you see that, oh, I made a $10 transaction

15  at McDonald's, the word that says McDonald's that's the

16  merchant descriptor and that's passed through our network.

17  Q.   When that information is passed through the network, as you

18  just described, what entities receive the merchant descriptor

19  information from the merchant's bank?

20  A.   Well, certainly MasterCard sees it.  The issuing bank sees

21  it, and then ultimately it appears on the cardholder statement

22  or on your online account you will see it.  So it's visible to

23  MasterCard, to the issuer and to the cardholder.

24  Q.   Now, you also mentioned MCC codes earlier.  Can you explain

25  how MCC codes work?

L33PWEI4                         Verdeschi – Direct

A.   Sure.  An MCC code, as I said earlier, is a merchant

category code.  So as the name specifically states, it's a code

that represents a merchant.  It is a category, meaning that

it's meant to convey the category that the merchant operates

in, the type of business that they have, and it's a code.  It's

typically a four-digit code.

        MCC codes are industry-level codes.  They are not

codes that are created by MasterCard.  They are codes that are

created by ISO, which I believe stands for the International

Standards Organization.  I believe that's what the acronym

stands for.  They are an independent body, and they write many

more standards than just MCC code standards.  But those MCC

codes are used by payment industry at large; so they're used by

MasterCard and our competitors as well.

Q.   Who is responsible for assigning the MCC codes to a

particular merchant?

A.   The acquiring institution is responsible for assigning the

merchant and MCC code when they onboard the merchant.  So when

they begin that relationship with the merchant, it's their

responsibility to conduct due diligence, understand the

business that the merchant is in, and then choose, select the

appropriate MCC code that represents the primary source of that

merchant's business.

Q.   Are there MCC codes included with each credit card

transaction?

L33PWEI4                        Verdeschi - Direct

1    A.   Yes.

2    Q.   What entity or entities receive the MCC code information

3    from the acquiring bank?

4    A.   The MCC code, again, will be visible to MasterCard and it

5    will also be visible to the issuing bank.

6    Q.   Does every merchant account have to have an MCC code?

7    A.   According to MasterCard standards, yes, an acquirer must

8    assign an MCC code for each merchant account.

9    Q.   What is your understanding of the purpose of that

10   requirement?

11   A.   The purpose of the requirement is to provide the issuer

12   with visibility into each and every transaction, the type of

13   merchant that the cardholder is interacting with.  Issuers will

14   use that data to -- you know, depending on the MCC code, they

15   may run fraud checks, they may run money laundering checks.  It

16   enables them to conduct a refined risk decision, and it

17   ultimately is one of the data elements that enables the issuer

18   to either approve or decline the transaction.

19   Q.   Is there an MCC code for marijuana transactions?

20   A.   No.

21   Q.   Why not?

22   A.   Well, a few reasons.  No. 1, we use the ISO standards, and

23   the ISO standards do not specify an MCC code for marijuana.

24        No. 2, MCC codes, as I said earlier, are category

25   codes.  They are codes that define the primary business that a

1   merchant may be engaged in.  They do not specify specific

2   products that are being sold.  And so, for example, the MCC

3   code for McDonald's, I believe, is fast food restaurants.

4   McDonald's does not tell us if you're buying a hamburger or a

5   cheeseburger or, you know, a six-piece chicken McNuggets.  We

6   don't know the individual products being sold.  So again, it's

7   at the category level.

8         And last, but not least, we do not have -- the

9   industry does not use an MCC code for marijuana because

10  marijuana in the United States, especially, has been illegal.

11  Q.  Are there MCC codes for other illegal products or services?

12  A.  The MasterCard --

13        MR. HARID:  Objection.  Calls for a legal conclusion.

14        THE COURT:  Overruled.

15  Q.  You can answer.

16        THE COURT:  You may answer.

17  A.  Can you repeat the question?  I want to make sure I'm

18  answering it correctly.

19  Q.  Yes.  Focusing on MCC codes still.  Are there MCC codes for

20  other illegal products or services?

21  A.  So the MasterCard rules and standards, one of our primary

22  rules is we prohibit any illegal transactions.  There are no

23  illegal transactions permitted in our network and, therefore,

24  we don't have MCC codes for illegal products and services or

25  types of transactions because the transactions should never hit

1    our network.  So you shouldn't have a code for it.

2            So that's my response.

3    Q.  Now, earlier during your testimony, you referenced ISO as

4    being the organization responsible for the MCC codes.  Does ISO

5    have an MCC code or codes for gambling?

6    A.  Yes, they do.

7    Q.  Are gambling transactions permitted under MasterCard's

8    rules?

9    A.  If they are legal.  So in the case of gambling, there are

10   various states where gambling is legal, and even at the federal

11   government level, it could be -- there's nothing prohibiting

12   it.  So there are scenarios where gambling is legal.

13           For example, in Atlantic City and Las Vegas and in

14   those cases, MasterCard permits gambling transactions because

15   they are legal transactions.  So as a result, there's an MCC

16   code in that particular case for gambling.

17   Q.  I'd like to switch topics and ask you about some of

18   MasterCard's rules that you referenced earlier.  What types of

19   rules does MasterCard have?

20   A.  So as I said earlier, we have a great many rules, and at a

21   very high level, we have rules that govern the use of our

22   brands.  And again, we're trying to uphold and protect the

23   value of our brand and manage risks associated with it.

24           We have rules that govern the use of our network, and

25   we have rules that govern the use of our acceptance channel so

L33PWEI4                    Verdeschi – Direct

1    that our products work at the point of sale.

2    Q.  You referenced earlier in your testimony rules governing

3    illegal activity.  In the course of your placement at

4    MasterCard, have you become familiar with MasterCard's rules

5    pertaining to illegal transactions?

6    A.  Yes.

7    Q.  How have you become familiar with those rules?

8    A.  Well, it is, as I said earlier, my job is to ensure that

9    customers are operating within our rules.  So it's my job, and

10   the job of my team, to apply the rules in the marketplace.  And

11   so, you know, especially with the -- this particular rule, you

12   know, I'm very familiar with it.

13                 (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Does MasterCard have specific rules regarding illegal

2   transactions at its network?

3   A.  We do.

4   Q.  What if any risks are there to MasterCard if there are

5   illegal transactions on its network?

6   A.  There could be a range of risks.  Number one, there could

7   be legal and regulatory risks, so that's certainly something we

8   as a company, as a global brand, are very concerned with.

9   There's laws and regulations that govern illegal activity not

10  only in the United States but around the world.  So that

11  certainly is of primary concern.

12          There are brand and reputational risks as well.  It's

13  definitely our intention to that illegal activity is not

14  occurring through our network so that we can manage those

15  illegal and brand regulatory risks.

16  Q.  You said earlier that MasterCard's rules do not permit the

17  transactions involving the sale of marijuana in the United

18  States; is that correct?

19  A.  That's correct.

20  Q.  Why is that?

21  A.  Because the federal government in the United States has

22  marijuana classified as an illegal substance that is not able

23  to be sold.

24  Q.  Does it make a difference to MasterCard that some states do

25  not criminalize the sale of marijuana under state law?

L33AWEI5ps                    Verdeschi - Direct

1  A.  It doesn't matter, because the federal law prohibits it.

2         MR. FOLLY:  Mr. Levine, if you could show the witness

3  what has been marked as Government Exhibit 2312.

4  Q.  Mr. Verdeschi, do you recognize this?

5  A.  I do.

6  Q.  What is it?

7  A.  This is the MasterCard rules manual.

8  Q.  Have you become familiar with these rules during the course

9  of your employment at MasterCard?

10 A.  Yes.

11        MR. FOLLY:  The government offers Government Exhibit

12 2312.

13        MR. HARID:  No objection, your Honor.

14        MR. BURCK:  No objection.

15        THE COURT:  Received.

16        (Government's Exhibit 2312 received in evidence)

17        THE COURT:  Mr. Levine, if you could publish that to

18 the jury.

19        Just so I'm clear, in the case of marijuana, because

20 the federal government still has a law that says it cannot be

21 sold, you don't accept marijuana purchases even in those states

22 where the state says it's OK.  Do I understand that correct?

23        THE WITNESS:  Yes.  The standard, and the rule in this

24 manner, states that the customer must adhere to all applicable

25 laws.

1          THE COURT:  In the case of gambling that you

2     referenced earlier, where the federal government has no law,

3     some states permit it, some states do not, you will then

4     process gambling purchases in those states that permit it.  Do

5     I have that right?

6          THE WITNESS:  That's correct.

7          THE COURT:  OK.

8     BY MR. FOLLY:

9     Q.  Mr. Verdeschi, directing your attention to Government

10    Exhibit 2312, can you read aloud the title of this document.

11    A.  "MasterCard Rules."

12    Q.  What is the effective date?

13    A.  June 9, 2016.

14    Q.  Who do the rules set forth in this document apply to?

15    A.  The rules apply to MasterCard customers.  Those would

16    include the issuers and acquirers that we were talking about

17    earlier.

18    Q.  What type of rules are set forth in MasterCard's rules?

19    A.  As I said earlier, there's a great many rules here.  But at

20    a very high level, the way I like to think of them, we have

21    rules that are designed to protect and uphold our brand; we

22    have rules that are designed to ensure our network is working

23    properly; and we have rules that are designed to ensure that

24    our products and services work.

25         MR. FOLLY:  Mr. Levine, if you could go to page 6.

1    Q.  Mr. Verdeschi, can you read aloud just the title and the

2    first paragraph.

3    A.  "MasterCard Standards.  MasterCard is dedicated to making

4    payments safe, simple, and smart.  We have a set of standards

5    in support of this mission that provides our customers with

6    clear direction as to their responsibilities.  The standards

7    include the information contained in this *MasterCard Rules*

8    manual and other manuals, along with guides, bulletins, and

9    policies that may be updated from time to time."

10   Q.  Further down the page it says "MasterCard and its

11   Customers."  Do you see that?

12   A.  "MasterCard and its Customers"?  Is that the statement?

13           Oh, yes.  Yes, I see it.  It's said several times.

14   Q.  And can you read aloud the paragraph third from the bottom

15   starting with "act with financial."

16   A.  "Act with financial integrity and in compliance with the

17   standards and law.  Operating programs in a manner that is

18   financially sound, in compliance with the standards and the law

19   helps us manage risk to MasterCard and to our customers."

20           MR. FOLLY:  Mr. Levine, if you could go to page 35.

21   Q.  Mr. Verdeschi, can you read aloud the title and the

22   introductory paragraph.

23   A.  "Termination by the Corporation.  Notwithstanding anything

24   to the contrary set forth in a license or digital activity

25   agreement, the corporation, at its sole discretion, may

L33AWEI5ps                    Verdeschi - Direct

1   terminate a customer's participation effective immediately and
2   without prior notice, if" --
3   Q.   There's a reference in the section that you just read to
4   terminating a customer's participation.  Can you explain what
5   that means.
6   A.   It's referencing customers, which would be our issuers or
7   acquirers, and by terminating their participation means that
8   they no longer would be able to issue cards or acquire merchant
9   accounts.  They would no longer be able to process
10  transactions.
11  Q.   Going now to point no. 9 at the bottom, which goes on to
12  the next page, can you read that section aloud.
13  A.   Sure.  "The customer directly or indirectly engages in or
14  facilitates any action or activity that is illegal, or that, in
15  the good faith opinion of the corporation, and whether or not
16  addressed elsewhere in the standards, has damaged or threatens
17  to damage the goodwill or reputation of the corporation or of
18  any of its marks; or makes or continues an association with a
19  person or entity which association, in the good faith opinion
20  of the corporation, has damaged or threatens to damage the
21  goodwill or reputation of the corporation or any of its marks."
22  Q.   Mr. Verdeschi, does MasterCard consider the sale of
23  marijuana in the United States to be an illegal activity under
24  this provision of the rules?
25  A.   Yes.

1    Q.  Directing your attention now to page 50.  Looking at the

2    top, can you read aloud the title and the statement directly

3    below the title.

4    A.  "Chapter 3, Customer obligations.  This chapter contains

5    rules relating to customer obligations."

6    Q.  Who are the customers who are covered by this chapter of

7    the rules?

8    A.  Again, our reference to "customer" is issuers or acquirers.

9            MR. FOLLY:  Mr. Levine, can you turn to page 53.

10   Q.  Focusing on Section 3.7, Mr. Verdeschi, is this part of the

11   same chapter that you just read aloud?

12   A.  Yes.

13   Q.  Can you read aloud the first paragraph.

14   A.  "A customer may not directly or indirectly engage in or

15   facilitate any action that is illegal or that, in the opinion

16   of the corporation and whether or not addressed elsewhere in

17   the standards, damages or may damage the goodwill or reputation

18   of the corporation or of any mark.  Upon request of the

19   corporation, a customer will promptly cease engaging in or

20   facilitating any such action."

21   Q.  Does this section of the rules apply to issuing banks?

22   A.  Yes.  It applies to customers.  So issuers or acquirers.

23   Q.  Does the sale of marijuana in the United States violate

24   this section of the rules?

25   A.  Yes.

1          MR. FOLLY:  Mr. Levine, let's turn to page 73, Section

2     5.1.1.

3     Q.  Can you read aloud the title and first section of Section

4     5.1.1.

5     A.  "Verify Bona Fide Business Operation.  Before entering

6     into, extending, or renewing a merchant agreement or ATM owner

7     agreement, an acquirer must verify that the merchant or ATM

8     owner from which it intends to acquire transactions is bona

9     fide, has sufficient safeguards in place to protect account

10    data from unauthorized disclosure or use, and complies with

11    applicable laws, and that each point of sale transaction, POS

12    transaction, will reflect bona fide business between the

13    merchant or submerchant and a cardholder."

14    Q.  Who does this particular rule apply to?

15    A.  It applies to an acquirer specifically.

16    Q.  There's a reference in the section that you just read to

17    "merchant agreement."  Can you explain what a merchant

18    agreement is?

19    A.  So each acquirer must have a contract, an agreement with

20    each one of their merchants.  It's basically a contract.

21    Q.  Turning now to Section 5.1.2, titled "Required Merchant

22    Agreement Terms," can you please read aloud the first sentence

23    of this rule.

24    A.  "Each merchant agreement must contain the substance of each

25    of the standards set forth in Rules 5.4 through 5.13 and any

1    other standards applicable to the nature and manner of the

2    merchant's business."

3    Q.  There's a reference here to Rules 5.4 through 5.13.  Do you

4    see that?

5    A.  I do.

6    Q.  What does that refer to?

7    A.  It refers to sections that are later in this chapter.

8              MR. FOLLY:  Mr. Levine, can you please turn to page

9    85, Section 5.11.7.

10   Q.  Mr. Verdeschi, can you read aloud 5.11.7 through point

11   number 1.

12   A.  "Illegal or Brand-damaging Transactions.  A merchant must

13   not submit to its acquirer, and a customer must not submit to

14   the interchange system, any transaction that is illegal, or, in

15   the sole discretion of the corporation, may damage the goodwill

16   of the corporation or reflect negatively on the marks.

17             "The corporation considers any of the following

18   activities to be in violation of this rule:

19             "No. 1.  The sale or offer of sale of a product or

20   service other than in full compliance with law then applicable

21   to the issuer" -- I'm sorry -- "to the acquirer, issuer,

22   merchant, cardholder, cards, or the corporation."

23   Q.  Mr. Verdeschi, focusing just on the segments of the rules

24   that you read aloud here today, were there any changes to those

25   sections of the rules between 2016 through 2020?

L33AWEI5ps                    Verdeschi - Direct

1    A.  No.

2    Q.  Do these rules apply to the entirety of MasterCard's

3    network?

4    A.  Yes.

5            MR. FOLLY:  Mr. Levine, you can take this down.

6            I want to switch topics and ask you about a term

7    called "chargebacks."  Are you familiar with that term?

8    A.  Yes, I am.

9    Q.  Can you explain what a chargeback is?

10   A.  A chargeback is a type of transaction that's processed in

11   our network, and it facilitates a dispute.  So card holders may

12   have disputes for various different reasons.  You may see a

13   charge on your statement that you don't recognize.  So in that

14   case you'll call your bank and say, hey, there's a charge here

15   that I don't recognize.  You could have disputes with a

16   merchant over, you know, you ordered a red sweater and they

17   sent you a blue sweater and they wouldn't take a, you know, a

18   return on it.  There are various different scenarios where a

19   cardholder will have a dispute and a merchant is not

20   necessarily cooperative or the merchant has done something

21   wrong, and so the cardholder will contact their bank and then

22   file a dispute, and then the issuer conducts a chargeback

23   transaction, which literally means to charge back, to get my

24   money back.

25   Q.  Does MasterCard monitor chargeback data?

1    A.  We do.

2    Q.  Why does it do that?

3    A.  Chargebacks are, they are signals for us of unrest in the

4    network.  They're signals of a cardholder and a merchant having

5    a bad experience.  And it could be the cardholder's fault or

6    the merchant's fault, it could be either side.  But it's a

7    point of conflict.  And so we monitor for chargeback levels

8    because we want to ensure that card holders and merchants are

9    having a good experience.

10        So that's the reason we do it.

11   Q.  Does MasterCard have rules regarding chargebacks?

12   A.  We do.

13   Q.  Can you explain generally how those rules work?

14   A.  Well, there are a great many chargeback rules.  The rules

15   govern how disputes are handled.  There's various different

16   scenarios that will occur.  If you're renting a car or buying a

17   hamburger, those are two different experiences.  We have rules

18   that govern all of those situations.  But we also have rules

19   that monitor for excessive chargebacks in our system, which are

20   looking for those scenarios where a merchant may have a high

21   number of chargebacks occurring, and for us that could be a red

22   flag that that merchant is not providing a good quality service

23   and card holders are having a bad experience.  So in those

24   cases we engage and we try to take corrective actions.

25   Q.  What if any steps does MasterCard take if it determines

1   that there is a merchant with high chargebacks?

2   A.  So high chargebacks could happen for various reasons, but

3   the steps we take, we contact the merchant's acquirer, the bank

4   that's responsible for this, for the merchant.  We inform them

5   of what we've found.  And we ask them for a plan of action to

6   resolve the situation.  We would like to ultimately see that

7   the merchant repairs whatever the issue is that's occurring and

8   begins providing card holders with a better experience so that

9   there's less disputes in the system.  And if the issue is not

10  resolved within an adequate time frame, we may use what we call

11  noncompliance assessments, which are fees, meant to incentivize

12  the merchant to fix the underlying cause of the conflict.

13  Q.  Who would those, in that scenario that you just described,

14  who would those assessments be imposed upon?

15  A.  Those assessments would be applied to the acquiring bank.

16  Q.  I'd like to ask you some questions about how MasterCard

17  enforces the rules that you've been discussing.  What if any

18  proactive steps does MasterCard take to enforce its rules

19  pertaining to illegal transactions?

20  A.  So there are -- we have -- we have steps that we take

21  proactively to not only prevent illegal transactions in our

22  network but also to detect when illegal actions are taken.  So

23  we have rules and standards surrounding illegal activity, which

24  we just went over.  We have a program, which we call the BRAM

25  program, B-R-A-M, which requires our customers to monitor their

1    merchants to ensure that the merchants are not engaged in

2    illegal activity.

3           And they also, you know, our customers will use web

4    culling services, services that scour the internet looking for

5    illegal content.  We monitor ourselves through the use of our

6    own employees.  We have staff members that will proactively

7    monitor and looking for things that could potentially be

8    illegal.

9           We also have, you know, good partnerships with law

10   enforcement, with regulators, with certain groups that are

11   focused on individual areas, where we don't necessarily have

12   expertise, like areas like counterfeit -- sale of counterfeit

13   goods.  It's a very, very nuanced area.  And we have

14   partnerships with organizations that alert us to potential

15   illegal activity.

16          So we have measures in place to prevent illegal

17   activity from occurring, to detect when it is occurring, and

18   then to respond to it.  We have a program or procedures in

19   place.  And when we find it, we engage, and we -- we engage the

20   customer and we ensure that the activity is terminated.

21   Q.  Can you walk us through what steps MasterCard takes in

22   situations when an allegation of illegal activity is brought to

23   its attention.

24   A.  When something is brought to our attention -- it could be

25   by anyone, it could be by law enforcement, a regulator, it

1    could be by just a concerned citizen -- we will conduct our own

2    investigation.  We will use our own staff to see if we could

3    verify the activity.  We will always contact the merchant's

4    acquirer, the acquiring bank, because it's their responsibility

5    to ensure that they have not signed up an entity who's going to

6    conduct illegal activity on our network.

7              So we'll engage those customers.  They will conduct

8    their own investigations.  And if it's indeed verified that the

9    activity is illegal, our customer will be instructed to cease

10   the activity and terminate the activity as soon as possible.

11   Q.   Are there any challenges that MasterCard has confronted in

12   identifying illegal activity on its network?

13   A.   There are challenges.

14   Q.   What types of challenges has MasterCard confronted?

15   A.   So most often entities who are engaged in conducting some

16   type of an illegal activity are deceptive in nature, and they

17   are intentionally trying to deceive both -- both their bank,

18   the acquiring bank, and us, and the issuer on the true nature

19   of the transaction.  So merchant deception will take many

20   forms.  Sometimes they will create shell corporations, which

21   are kind of fictitious names and addresses.  They will --

22   they'll quote a transaction in a certain way to make it appear

23   that it's a legitimate transaction.  They'll even set up fake

24   websites.

25              So they will, when they're being signed up by their

1    acquirer, you know, just for an example, they may set up a

2    website that shows that they're selling T-shirts, and the

3    acquirer may believe that they're actually selling T-shirts,

4    but what's actually being processed is some type of illegal

5    activity or underneath it.  They may have another website

6    that's selling counterfeit goods and they're processing it

7    through that T-shirt account.

8         So all together, you take all of that together, I

9    would call that merchant deception.  So that's one of the

10   primary challenges we face.

11   Q.  You mentioned, when you were just explaining the merchant

12   deception, that sometimes the transactions are coded in a

13   certain way to make it look legitimate.  Can you explain what

14   you mean by that, "coded in a certain way"?

15   A.  Yeah.  I mean, they will, as I said earlier, they will,

16   instead of using the real merchant name, they'll use a

17   different name.  Instead of using the real merchant location,

18   they'll use a different location.  They will use a different

19   MCC code.

20   Q.  Is the use of a different MCC code in this context

21   sometimes referred to as miscoding?

22   A.  Well, I think the term "miscoding" refers to any type of

23   miscoding.  You know, even choosing the wrong merchant name I

24   would call miscoding.  But, yes, choosing the wrong, the

25   improper MCC code, which also -- would also qualify as

L33AWEI5ps                          Verdeschi – Direct

1    miscoding.

2    Q.  And focusing on the MCC code being represented in one way

3    to make it look legitimate, can you walk us through an example

4    of how that would work.

5    A.  Yeah.  I mean, you know, we talked a little bit about

6    gambling before, right.  And gambling can be a legal

7    transaction.  There's an MCC code for gambling.  And if someone

8    was conducting, you know, illegal gambling or -- they may

9    choose, you know, a different MCC altogether that seems like a

10   legitimate business, like, you know, a fast-food restaurant,

11   for example.

12   Q.  In that scenario, what entities would receive the

13   information about the MCC code?

14   A.  So as I said earlier, the MCC code would be visible to

15   MasterCard, would be visible to the issuing bank.

16   Q.  And in that example, what entities would receive the

17   information about the merchant name?

18   A.  The merchant name would appear in the MasterCard network.

19   It would appear in the issuer's systems.  It would also appear

20   on the cardholder's statement as well.

21   Q.  When a merchant is onboarded at the acquiring bank, who

22   provides the information to the bank about that merchant?

23   A.  I'm sorry.  Can you repeat the question?

24   Q.  Yes.  In a situation where a merchant is being onboarded at

25   the acquiring bank, who provides the information about the

1    business that the merchant is engaged in to the acquiring bank?

2    A.  It should be the merchant.

3    Q.  And who assigns the merchant its MCC code?

4    A.  That would be the acquirer.  It's the acquirer's responsi-

5    bility to choose and assign the most appropriate MCC code.

6    Q.  How does the acquirer in that situation decide what MCC

7    code to assign to the merchant?

8            MR. HARID:  Objection.  Foundation, your Honor.

9            THE COURT:  Well, if you have an understanding as to

10   what normally occurs in that situation, you can answer it.

11   Q.  Mr. Verdeschi, if you have an understanding as to what

12   usually occurs in that situation, you can answer the question?

13   A.  And I'm sorry.  Can you repeat the question?  What's the

14   situation?

15   Q.  I believe I asked --

16           THE COURT:  The question was, "How does the acquirer

17   in that situation decide what MCC code to assign to the

18   merchant?"

19   A.  Yeah.  They're instructed by MasterCard's standards and

20   rules to choose the MCC code that reflects the merchant's

21   primary business.

22   Q.  Focusing on the detection of illegal activity on

23   MasterCard's network, are you aware of any third-party banks --

24   sorry.  Are you aware of any third-party companies that assist

25   merchant banks in order to detect illegal transactions?

L33AWEI5ps                    Verdeschi – Direct

1   A.  Yes.

2   Q.  Are you familiar with a company named Webshield?

3   A.  Yes.

4   Q.  Can you explain your understanding of what Webshield is?

5   A.  Webshield is one of several companies that provide what I

6   will call merchant risk services, where they will help

7   acquirers assess the risks associated with merchants in their

8   portfolio.  So they will assist with onboarding risk, so as the

9   acquirer is onboarding a merchant, a company like Webshield and

10  others will try to determine what level of risk exists wit the

11  business to determine if they're a bona fide operation like we

12  were discussing before.  But they also will continually monitor

13  the merchant to ensure that the merchant may have started out

14  with a good business model, to ensure that it always remains a

15  good business model.  So they offer risk mitigation services.

16  Q.  Do you know any of the principals of Webshield?

17              MR. HARID:  Objection.

18              THE COURT:  Ground.

19              MR. HARID:  Withdrawn.  Excuse me.

20              THE COURT:  You may answer.

21  A.  Yes.

22  Q.  Who do you know?

23  A.  The CEO, Christian Chmiel.

24  Q.  Approximately when did you first hear of Webshield?

25  A.  Several years ago.

L33AWEI5ps                    Verdeschi – Direct

1    Q.  Are you aware of any other similar companies?

2    A.  Yes.

3    Q.  Approximately how many such companies are you aware of?

4    A.  I think I can name four or five, so at least, you know,

5    there's a half a dozen.

6    Q.  Mr. Verdeschi, I'd like to ask you some questions about the

7    possible consequences for violating the rules that you've been

8    discussing during your testimony.  First let me ask you about

9    potential consequences for your customers if they are found to

10   be in violation of any of MasterCard's rules.  Can you remind

11   us again who your customers are?

12   A.  The customers are the issuing banks, who issue the cards,

13   and the acquiring banks, who sign up merchants.

14   Q.  What are some of the potential consequences if MasterCard

15   found that a bank was violating its rules against illegal

16   transactions?

17   A.  Well, number one, there are potential consequences of

18   financial assessments, so noncompliance assessments could be

19   applied.  If there is a continual, repeated problems, it could

20   result in the termination of a customer.

21   Q.  When you say "termination of a customer," can you explain

22   what that would mean.

23   A.  It would mean that the customer would no longer be able to

24   either accept or issue MasterCards and they would no longer be

25   able to conduct transactions within our network.

1    Q.   Does MasterCard have a direct relationship with the

2    merchant?

3    A.   No, we do not.

4    Q.   Who has the direct relationship with the merchants?

5    A.   The acquirers.

6    Q.   If MasterCard discovers illegal activity on its network,

7    does it typically reach out to the acquiring banks or the

8    issuing banks?

9    A.   The acquirers.

10   Q.   Can you explain why that is.

11   A.   Well, the illegal activity is emanating from a merchant

12   who's selling product or services that is illegal, and since

13   the acquirer owns the merchant relationship, our way of

14   rectifying the problem is to contact the owner of the

15   relationship, who is the acquirer.

16   Q.   What role if any does your group at MasterCard play in the

17   enforcement of MasterCard's rules on illegality?

18   A.   That is one of the roles we play.  My group enforces

19   MasterCard's standards.

20   Q.   Mr. Verdeschi, I want to direct your attention to

21   approximately April of 2019.  Did you become aware of an

22   incident involving the alleged sale of marijuana on

23   MasterCard's network?

24   A.   I did.

25   Q.   How did that come to your attention?

L33AWEI5ps                    Verdeschi - Direct

1    A.  My team was having a meeting, and they just mentioned this

2    particular case about, you know, illegal marijuana.

3    Q.  And what was brought to your attention at that time?

4           MR. BURCK:  Objection, your Honor.  Hearsay.

5           THE COURT:  Clearly it is hearsay if it's being

6    offered for its truth.  If it's being offered for action he

7    then took, it would be admissible.  Which is it?

8           MR. FOLLY:  Your Honor, it's not being offered for its

9    truth.  It's being offered to demonstrate an action that an

10   employee at MasterCard took in response to learning of this

11   violation of MasterCard's rules, and that action was informing

12   Mr. Verdeschi --

13          THE COURT:  Was that an action which this witness

14   initiated?

15          MR. FOLLY:  No, your Honor.  This witness was --

16   witnessed the action, which was the sharing of the information

17   to that witness.

18          THE COURT:  All right.  I will hear the answer to the

19   next few questions, but we may have to strike this.  I'm not

20   sure.

21          So the question was:  "And what was brought to your

22   attention at that time?"

23          THE WITNESS:  What was brought to my attention was

24   kind of the unique qualities of this case.  There were two.

25   Number one, there was a MasterCard employee who notified us of

1    this merchant who seemed to be selling marijuana.  So that was

2    kind of unique, that, you know, a MasterCard employee brought

3    it forward, and it was interesting.  And also the fact that

4    this merchant seemed to be using a mobile application to sell

5    marijuana, again, that was just something that was unique at

6    the time.  And so that's why it was brought up in the course of

7    one of our meetings.

8              THE COURT:  What happened next?

9              THE WITNESS:  In the context of that discussion, there

10   was -- they were just alerting me to that.  But I knew what

11   they were doing.  I knew they were conducting an investigation.

12             THE COURT:  Well, was any action taken?

13             THE WITNESS:  Yes.

14             THE COURT:  What?

15             THE WITNESS:  My team had engaged the acquiring bank,

16   as we were talking about earlier, engaged this particular

17   acquirer to, to try to confirm that this was their merchant and

18   confirm that illegal activity was occurring, and once that was

19   confirmed, the acquirer was instructed to cease the activity.

20   And that is what had occurred.  The acquirer terminated those

21   merchant accounts.

22             THE COURT:  All right.  So all of that will be

23   received on the issue of materiality, but not for its truth.

24             MR. BURCK:  Your Honor, just for the record, we object

25   to the --

1           THE COURT:  Excuse me?

2           MR. BURCK:  Just for the record, we object to the

3  statements, the witness testimony.  Just for the record, your

4  Honor.

5           MR. FOLLY:  Thank you, your Honor.

6           THE COURT:  I'm happy to have your objection for the

7  record.

8           MR. BURCK:  Thank you, your Honor.

9           MR. FOLLY:  Thank you, your Honor.  At this time, the

10  government is going to offer a set of self-authenticating

11  MasterCard records.  Those exhibits are Government Exhibits

12  2301 through 2311, as well as 2313.

13           And, your Honor, two of those exhibits were part of

14  the discussion that we previously had about the emails.

15           MR. HARID:  Your Honor, the exhibits at issue were

16  2309 and 2313.

17           THE COURT:  All right.  Let me see if I can find my

18  copies.

19           MR. HARID:  Your Honor, if we could just ask the

20  government to display for counsel the documents.  2309.

21           THE COURT:  So let's take them one at a time.  There's

22  an objection to 2309?

23           MR. HARID:  Yes, your Honor.  Again, it's hearsay as

24  to this witness.

25           THE COURT:  Yes.

L33AWEI5ps                    Verdeschi - Direct

1              Now, this is why it's good to wait to see the context

2    in which it arises.  The objection is overruled in the sense

3    that this is being received on the issue of materiality, not

4    necessarily for the truth of any of the underlying allegations

5    set forth but just on the issue of what actions were taken as

6    it bears on materiality.  So it will be received for that

7    purpose.

8              (Government's Exhibit 2309 received in evidence)
               (Government's Exhibits 2301-2313 received in evidence)
9              MR. FOLLY:  Thank you, your Honor.

10             Mr. Levine, if you could publish for the jury

11   Government Exhibit 2313 at page 2.

12             Actually, starting at the bottom of page 1, going into

13   page 2.  Thank you.

14   BY MR. FOLLY:

15   Q.  Mr. Verdeschi, can you read aloud the "to" and "from"

16   lines, the date and the subject.

17   A.  Yes.  This is an email from Meysam Moradpour.  And the

18   email is being sent to Kimberly Gillis.  And it's being done on

19   Tuesday, April 16, 2019.

20   Q.  Looking at the "to" line where it says Kimberly Gillis, are

21   you familiar with who that is?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Kimberly Gillis is my assistant.

25   Q.  Can you read aloud the body of the message.

1   A.   Yes.  "Hi Kimberly.  Aparna Mohan pointed me towards John

2   Verdeschi regarding this matter.  He's out of the office till

3   next week, so I hope you can help me in the meantime.

4          "I found out about this from a personal friend and

5   would like to report a merchant fraud case in which the company

6   Eaze is using fake MCC codes and fake domains in order to

7   accept MasterCard and Visa payments on their website to sell

8   cannabis illegally.  Eaze has over $65 million in funding and

9   acting as if they're above the law.  As you know, cannabis is

10  classified as a substance 1 drug federally and hence it's

11  illegal to sell it federally.  I'd like to avoid that

12  MasterCard gets associated with selling weed to random people,

13  which reflects bad on our mission statement and values.

14  Eaze.com is accepting credit card payments from all major

15  networks on their website, and then sends customers a text that

16  their card statement will not state Eaze.com but dummy domains

17  such as Desirescent.com (which are legal).  They also use fake

18  MCC codes to cover what they're really selling."

19  Q.   Can you finish it.

20  A.   Oh, I'm sorry.  "I hope you can help me with this matter or

21  point me towards the right direction.  Thanks!"

22          MR. FOLLY:  Mr. Levine, can you scroll up to the

23  message directly what was just read aloud, pausing there in the

24  middle, the message from Kimberly Gillis to Paul Paolucci.  Can

25  you highlight that.

L33AWEI5ps                    Verdeschi – Direct

1    Q.  Mr. Verdeschi, focusing on the "to" line where it says Paul

2    Paolucci, who was Paul Paolucci?

3    A.  Paul Paolucci was the leader of the brand performance team.

4    He was my direct report.

5           MR. FOLLY:  And, Mr. Levine, if you can zoom back out

6    and scroll up to the message directly above this.

7    Q.  Mr. Verdeschi, the message is from Paul Paolucci and then

8    it's "to," and then it says "compliance review."  Are you

9    familiar with compliance review?

10   A.  Yes.

11   Q.  Can you explain what compliance review is?

12   A.  Yeah.  It's an email box that's used by my compliance

13   investigation team.

14   Q.  Can you read aloud the message set forth in this email.

15   A.  Mm-hmm.  Paul is telling the compliance review team to

16   please investigate and take appropriate actions.

17   Q.  Mr. Levine, if you can now turn to Government Exhibit 2309.

18          Mr. Verdeschi, can you read aloud the "from" date as

19   well as the "to" and "from" lines.

20   A.  Sure.  This is an email from Andrea Bricci.  It's being

21   sent on Friday, April 26, 2019.  And it's sent to the

22   compliance review mailbox.

23   Q.  And is that the same compliance review mailbox that you

24   referenced just a moment ago?

25   A.  Yes.

L33AWEI5ps                      Verdeschi - Direct

1    Q.  It says, "Dear MasterCard Team," and then if you could

2    focus in on the second paragraph, the first sentence.

3    A.  "The termination date" -- "the termination date and

4    addition to MATCH details have been added to the file."

5    Q.  Are you familiar with something called MasterCard's alert

6    to control high-risk merchants?

7    A.  Yes, I am.

8    Q.  Is that also referred to as MATCH?

9    A.  Yes.

10   Q.  Can you explain what MATCH is.

11   A.  So MATCH is one of our tools that we use to prevent illegal

12   activity from getting access to our system.  MATCH is a

13   database that our customers will use to add merchants to it if

14   they have terminated a merchant for cause.  So if a merchant

15   went bankrupt or had excessive fraud or they were conducting

16   illegal activity and the acquirer decided to terminate that

17   relationship, they are required by our rules to add the

18   merchant's name into MATCH.  Now, the way this helps the

19   customer who is onboarding a merchant, before they onboard that

20   merchant, they are required by our rules to inquire in MATCH,

21   search the MATCH database, and see if the merchant that they

22   are looking to sign up has had a termination history, so that

23   if a merchant was terminated for cause, that that history would

24   be present and now that next customer could see that and be

25   aware before they sign on that merchant.

1   Q.  Mr. Verdeschi, when you were explaining that, you referred
2   to "customer."  Can you explain in this context who you were
3   referring to by "customer"?
4   A.  In this context it's referring to MasterCard acquirers.
5   It's the acquirers who sign up the merchants who use the MATCH
6   system.
7   Q.  Who has access to the MATCH data?
8   A.  All MasterCard acquirers.
9   Q.  Focusing on the lower portion of the email, it says "MATCH
10  addition details."  In the middle there's a column that says
11  "merchant/business name."  Can you just read aloud the names
12  that are listed there.
13  A.  Sure.  "Conetild Limited.  New Opal Ltd.  New Opal Ltd.
14  Lanicaso Limited.  Lytrej Limited.  Jonnur Limited.  Grandmoor
15  Holding Limited.  Torger Holding Limited."  There's two of
16  those.  "International Standard Ltd."
17  Q.  Mr. Verdeschi, do you have personal knowledge about any of
18  these merchants/businesses that are listed here?
19  A.  No.
20          MR. FOLLY:  Mr. Levine, can you turn to page 4 of the
21  same exhibit.
22  Q.  And if we could first just zoom in on the top row, focusing
23  on the far left, the second column, it says "DE43 merch name."
24  Is that a term that you are familiar with?
25  A.  Yes.

L33AWEI5ps                    Verdeschi – Direct

1    Q.  What does it mean?

2    A.  It literally means the merchant name, the business's name.

3            MR. FOLLY:  If we can zoom back out.

4    Q.  Can you read aloud the first three merchant names that are

5    listed there.

6    A.  "Soniclogistix.com.  Www.somepearls.com.

7    MyEZdelivery.com."

8    Q.  Can you zoom back out.  Going down to the middle of the

9    page on the same column, zooming in from Outdoormaxx.com down

10   to the bottom of the page, can you read these merchant names

11   aloud, starting with Outdoormaxx.com.

12   A.  "Outdoormaxx.com.  Diverkingdom.com.  Fly2skyshop.com.

13   Starstyles.com.  Fly2skyshop.com.  Starstyles.com.

14   Outdoormaxx.com.  Diverkingdom.com.  Organikals.store.

15   Desirescent.com.  Euphoriumjewelry.com.  Euphoriumjewelry.com.

16   Soniclogistix.com.  Somepearls.com.  Essentialsurface.com.

17   Thehiddenkitten.com.  Happypuppybox.com.  Absolutesoda.com."

18   There's two of those.  "Thehiddenkitten.com.  Essential

19   surface.com.  Happy puppy box.com.  2easydelivery.com."

20   Another one of those.  "Goeasydelivery.com.

21   2easydelivery.com."  And again that one is repeated again.

22   Goeasydelivery.com.  "Goodegreenbazaar.com."

23   Q.  Thank you.

24           MR. FOLLY:  You can zoom back out now, Mr. Levine.

25   Q.  Looking at the next column over, just focusing first on the

1    title, it says "DE26 merch category Cd."  Are you familiar with

2    that terminology?

3    A.  Yes.

4    Q.  What does that represent?

5    A.  That is the merchant category code that we were speaking of

6    earlier why, the MCC code.

7    Q.  Zooming back out, to the right of that in the next column

8    at the top, it says "merch category name."  Are you familiar

9    with that terminology?

10   A.  Yes.

11   Q.  What does that represent?

12   A.  That is the name associated with the merchant category

13   code.

14   Q.  When you say "name associated with," what does that mean?

15   A.  Each merchant category code has a name associated with it,

16   and so this represents the -- there's a one-to-one relationship

17   between them.

18   Q.  And just zooming back out, can you read aloud the first

19   three merchant category names.

20   A.  "Freight carrier trucking, long-distance moving storage.

21   Clock jewelry watch and silverware store.  Miscellaneous food

22   store, convenience market specialty vending."

23   Q.  And zooming back out, staying on the same column, further

24   down the page, starting at "department stores."  Can you read

25   the -- starting at "department stores," can you read the first

1   three that are listed there after that?

2   A.  Oh.  "Freight carrier trucking, local-long distance moving

3   storage, clock jewelry watch and silverware store.

4   Miscellaneous general merchandise."

5   Q.  And directly above the top department stores, can you read

6   that aloud as well.

7   A.  "Cosmetic stores."

8   Q.  Zooming back out, looking two columns over, it says "Acq

9   Mktg Child ICA Name."  Are you familiar with that terminology?

10  A.  Yes.

11  Q.  What does that represent?

12  A.  This is the acquirer of the merchant.

13  Q.  And zooming back out so we can see the full column here,

14  who is listed as the acquirer in this column?

15  A.  The acquirer's name is PXP Financial Limited.

16  Q.  Zooming back out, looking at the last column on the far

17  right, it says "Merch Country Cd.  Are you familiar with that

18  terminology?

19  A.  Yes.

20  Q.  What does that represent?

21  A.  That is the merchant's country code.

22  Q.  Are you familiar with the three letters depicted there,

23  "GBR"?

24  A.  Yes.

25  Q.  What does that represent?

1  A.   That's Great Britain.

2  Q.   And what about "CYP"?

3  A.   Cyprus.

4        MR. FOLLY:  So, Mr. Levine, you can zoom back out.

5        Mr. Levine, if you could publish what's in evidence as

6  Government Exhibit 2303.

7  Q.   Mr. Verdeschi, are you familiar with what's depicted in

8  this document?

9  A.   Yes.

10  Q.   What is shown here, generally?

11  A.   This is the result of a MATCH inquiry.  So if a customer in

12  our ecosystem, if an acquirer who uses MATCH, if they were to

13  search in MATCH for a merchant, this is the results that they

14  would find.

15  Q.   Looking towards the top, it says "merchant name."  Can you

16  read aloud what's listed there.

17  A.   The merchant's name in this case is Hot Robots Limited.

18  Q.   Looking further down the page, towards the middle, it says

19  "reason code."  Are you familiar with that terminology?

20  A.   Yes, I am.

21  Q.   What does "reason code" mean?

22  A.   "Reason code," it's just a code, to signify, in this

23  particular case, why the merchant was terminated by the

24  acquirer.

25  Q.   And then to the right of that it says "10 -- violation of

1   standards."  Generally what does "violation of standards" refer

2   to?

3   A.  In this case it is a general code meaning violation of

4   MasterCard's standards.

5   Q.  Turning to Government Exhibit 2304, Mr. Verdeschi, can you

6   read aloud the merchant name here.

7   A.  "Johnson NYC Ltd."

8   Q.  What's listed under the reason code?

9   A.  "Violation of standards."

10  Q.  Turning to Government Exhibit 2306, Mr. Verdeschi, can you

11  read aloud the merchant name.

12  A.  "New Opal Ltd."

13  Q.  Can you read aloud the reason code.

14  A.  "Violation of standards."

15  Q.  Going to Government Exhibit 2307, can you read aloud the

16  merchant name.

17  A.  "International Standard Ltd."

18  Q.  What was the reason code listed?

19  A.  "Violation of standards."

20        MR. FOLLY:  Mr. Levine, can you publish what's in

21  evidence as Government Exhibit 2301.

22  Q.  Mr. Verdeschi, do you recognize generally what's reflected

23  in this exhibit?

24  A.  Generally yes.

25  Q.  Can you explain what's reflected in it?

L33AWEI5ps                    Verdeschi - Direct

1   A.  It is transaction data.

2   Q.  Is that MasterCard transaction data?

3   A.  Yes.

4   Q.  Directing your attention to column F, it says at the top

5   "acq_name."  Are you familiar with what that represents?

6   A.  Yeah.  That is the acquirer's name.

7   Q.  Going to column I, can you read aloud the title there.

8   A.  "Issuer Name."

9   Q.  What does that represent?

10  A.  The issuer's name.

11  Q.  Directing your attention to column G, what does that

12  represent?

13  A.  That represents the issuer's country, where the issuing

14  bank is located.

15          MR. FOLLY:  Mr. Levine, can you scroll down focusing

16  on that same column and keeping it highlighted, can you just

17  scroll down this Excel document.  You can stop there.

18  Q.  Mr. Verdeschi, where it says "USA" in that column, what did

19  that represent?

20  A.  United States of America.

21  Q.  And going back to the top of the column if we can, where it

22  lists USA as the issuer's country, what does that signify?

23  A.  That means that the issuers that are appearing in this

24  report appear to all be located in the United States of

25  America.

L33PWEI6                    Verdeschi – Direct

1    Q.  Directing your attention to column O, that's

2    de43_merch_name; are you familiar with that terminology?

3    A.  Yes.

4    Q.  What does that represent?

5    A.  That is the merchant's name.

6    Q.  Mr. Levine, can you scroll up to row 40,387.  Can you read

7    aloud the name listed there, Mr. Verdeschi, in the zero column?

8    A.  Square.SQ.Lorry.Limited.

9    Q.  Mr. Levine, can you scroll to 40,441 and can you scroll

10   directly below that.  Mr. Verdeschi, can you read aloud the

11   merchant name listed directly below that?

12   A.  HOTROBOTS.

13   Q.  Mr. Levine, can you go now to row 91,819.

14           Mr. Verdeschi, can you read that out loud?

15   A.  Outdoormaxx.com.

16   Q.  And can you read the merchant listed above that, directly

17   above it?

18   A.  Soniclogistix.

19   Q.  What about directly below that?

20   A.  Greenteacha.com.

21   Q.  Let's turn to column T, Mr. Levine, going all the way to

22   the top.  It lists De43_merch_country.  Can you remind us what

23   that represents?

24   A.  That represents the merchant's country.

25   Q.  Mr. Levine, can you scroll all the way down to the very

1    bottom of this chart, going back all the way to the left?

2           Mr. Verdeschi, focusing on the entry listed in the

3    column to the right of the A column, where it lists the

4    numbers, all the way down on the very bottom, can you just read

5    aloud what the final number is that's listed there?

6    A.  I don't think I can see the entire thing.  I think it's

7    2020 - --

8    Q.  To the left of the A column, to the left of the A column.

9    It starts with 134?

10   A.  The left of the A column?  Oh, I'm sorry.  Okay, 134428.

11   Q.  So that's 134,428; is that right?

12   A.  Yes.

13   Q.  And to your understanding, is that the total number of

14   transactions listed in this chart that we just reviewed?

15   A.  It would appear so.

16          MR. FOLLY:  No further questions, your Honor.

17          THE COURT:  All right.  Do you want to take ten

18   minutes of cross, or do you want to start tomorrow?

19          MR. BURCK:  Your Honor, because of the issue we were

20   going to talk about with that document, which is important to

21   my cross --

22          THE COURT:  Okay.  So we'll excuse the jury at this

23   time.

24          MR. BURCK:  Thank you, your Honor.

25          THE COURT:  Okay, ladies and gentlemen.  So we will

L33PWEI6                        Verdeschi - Direct

1   let you go for today.  Please be as prompt tomorrow as you were

2   today, and we'll start at 9:45, and have an excellent

3   weekend -- excellent evening, not a weekend yet, not a weekend

4   yet.

5            (Jury not present)

6            THE COURT:  You can step down now.

7            (Witness temporarily excused)

8            Please be seated.  All right.  So we're looking at

9   Exhibit --

10           MR. BURCK:  It's --

11           THE COURT:  Defense Exhibit HAX4003, and there were

12  three questions about them.  First is whether it is within the

13  period of the alleged conspiracy, since it says current as of

14  February 2020, but let me ask the government.  The indictment

15  says the conspiracy went through 2019.  Are you claiming it

16  went further or not?

17           MS. LA MORTE:  Than 2019?

18           THE COURT:  Yes.

19           MS. LA MORTE:  No.

20           THE COURT:  When do you say it ended?

21           MS. LA MORTE:  Your Honor, mid- to late 2019.

22           THE COURT:  Mid- to late?

23           MS. LA MORTE:  Mid- to late 2019.

24           THE COURT:  Okay.  So that's the first question, is

25  whether it could be viewed by the jury as within that time

L33PWEI6                        Verdeschi - Direct

1  period.

2          Before we hear on that from defense counsel, the

3  second question is the statement made at the very end of the

4  document about what customers should be told.  Assuming the

5  document is timely, I think that is relevant; so that will not

6  be stricken.

7          The third item is the portion in the middle of the

8  second page regarding the not-enacted Safe Banking Act.  I

9  don't see the relevance of that.

10         MR. BURCK:  And, your Honor, we were not going to

11  offer that at all.  In fact, we would have offered to have that

12  redacted.

13         THE COURT:  Okay.  So that should be redacted.

14         MR. BURCK:  Yes, your Honor.

15         THE COURT:  All right.  So we're really down to the

16  question of is this timely or not.

17         MR. BURCK:  Your Honor, we -- and as I was saying

18  earlier -- can you hear me okay, your Honor?

19         THE COURT:  Yes.

20         MR. BURCK:  Okay.  Thank you.  The issue here is this

21  document says it's current as of February 2020; so it does

22  indicate this particular document was created in February 2020,

23  but the content of the document seems very clearly to reflect

24  the ongoing policy of MasterCard for who knows how long before

25  this.

1          It's entirely consistent not only with what is in the

2     rules of MasterCard for the years prior to this right up to the

3     present, it's also consistent with what we heard from the

4     witness today and what the government has alleged.  So all this

5     document does, and the reason why it's particularly helpful, is

6     it's actually part of the policy and it's a statement of policy

7     that preexisted --

8          THE COURT:  Well, so I think the answer to that is

9     this is a question for the witness.  If the witness says, oh,

10    yeah, this is just a reiteration of what we've had for years

11    before, I will receive it.  If the witness says, no, this has

12    important changes, then I may not receive it.  So I think it's

13    a simple question for the witness because that's who you want

14    to question about it.

15         MR. BURCK:  That's fine, your Honor.  In fact, what

16    I'll do, with the Court's permission, I don't know if you want

17    to do a voir dire with him before or if you would like me to do

18    it in front of the jury.

19         THE COURT:  No, in front of the jury is fine.

20         MR. BURCK:  Okay.  Thank you, your Honor.

21         MR. HARID:  Your Honor, can you hear me?

22         THE COURT:  Yes.

23         MR. HARID:  There's a related issue, which I'd like to

24    preempt right now, which is we would like to offer subsequent

25    versions of the rules into evidence, specifically what's been

1    marked Akhavan Exhibit 4014, which is MasterCard rules from

2    December 19th, 2019.  My understanding is that the government

3    doesn't dispute that these are, you know, self-authenticating

4    rules and --

5         THE COURT:  I'm sorry, weren't these already in

6    evidence, or did I --

7         MR. HARID:  No, the government offered into evidence

8    the 2016 version.

9         THE COURT:  Oh, but you want to offer into evidence

10   one that is -- this one is clearly after the conspiracy, 19

11   December 2019.  There's no ambiguity, as there is on the

12   exhibit we just talked about.

13        MR. HARID:  The reason these rules are extremely

14   relevant, your Honor, is that they highlight critical aspects

15   of the network's approach to issues like MCC codes, how they

16   evolved and different region's approaches to MCC codes.

17        THE COURT:  You can question the witness about things

18   that happened to the rules between 2015 and the end of the

19   conspiracy, but I don't see how that gets you to admit rules

20   that were enacted after the conspiracy.

21        MR. BURCK:  Your Honor, can I just make one point on

22   this?  I think the government did not object to these rules,

23   but the one issue that I think may be useful, your Honor --

24        THE COURT:  Let me just say, lots of stuff has come in

25   from both sides already in this case that could have been

1    objected to, each side chose not to and, of course, that makes

2    my job easy.  I'm not going to rule out something that no one

3    objected to unless it is really some, you know bizarre

4    situation.  So that's fine, but I don't understand your point

5    vis-a-vis this.

6           MR. BURCK:  No, your Honor, my point is that there are

7    other parts of the June 2016 rules that were offered into

8    evidence today, that the witness testified to, that language

9    has stayed identical through the present.  And so one of the

10   things that we thought was useful, and again the government had

11   not objected to it, would be to offer -- to just have -- elicit

12   from him that it had, in fact, stayed --

13          THE COURT:  Well, let me ask the government.  Are you

14   objecting to the exhibit, the rules as of December 2019 or not?

15          MR. FOLLY:  Your Honor, our position is that the rules

16   that intervened between the ones we introduced today through

17   the end of the conspiracy, even though they overlap with what

18   has been introduced, we don't have an objection as to that.  If

19   there are rules that postdate that, we don't see a basis that

20   they're relevant.

21          THE COURT:  That sounds sensible to me.  So I think we

22   have to take it, you know, rule by rule, so to speak, as you

23   get to cross-examine the witness.

24          MR. HARID:  Right, and just to reiterate my point,

25   your Honor, the rules that postdate the conspiracy, as you put

1    it, kind of reflect the network's approach to specific issues

2    and they'd be introduced for that purpose.

3         THE COURT:  To reflect the network's approach to

4    specific issues.  I have allowed, though I frankly think I went

5    further with this than maybe I should have, I've allowed you to

6    get into certain of the current positions, for example, of Eaze

7    with the previous witness on the theory that the jury could

8    infer something about materiality if Eaze, even after this

9    whole case was brought and so forth, was still processing

10   certain marijuana transactions or whatever.

11        I don't see the same argument applying to MasterCard.

12   The relevant -- if they change their mind tomorrow, so what?

13   The question is, the ultimate question is, really, by the way,

14   not even what was in their mind but what was in the mind of a

15   reasonable bank at the time of these transactions.  But you

16   have convinced me that the jury can take account of what was in

17   the mind and practice of the banks and MasterCard and Visa

18   presumably at the time in the transactions, as bearing on what

19   a reasonable person in that situation would do.

20        But now you take it one step further and say, oh, and

21   after the conspiracy and after the case was brought and so

22   forth, they changed some rule.  I mean, think of the government

23   trying to make that kind of argument and say, oh, after the

24   indictment, they changed their rule and said we're never going

25   to do business with Eaze again, and you'd be screaming bloody

1   murder that that shouldn't come in because it would then show

2   what the attitude was at the time, which is the only thing

3   that's relevant, and that's only indirectly relevant to

4   materiality, which is what is the hook you're basing all this

5   on.

6           So anyway, bottom line, this is not going to come in

7   as an entire document.  You may be able to get in specific

8   rules, depending on what the witness says.

9           MR. HARID:  Thank you.

10          MR. BURCK:  And, your Honor, just to make the one

11  quick point, we agree with what you just said a hundred

12  percent.  Our view with these documents is only to elicit that

13  it has stayed the same over the course of the conspiracy when

14  you imposed them, that's all.

15          THE COURT:  That, I'm allowing.

16          MR. BURCK:  Thank you, your Honor.

17          THE COURT:  Yes.  All right.  Anything else?

18          MR. ARTAN:  (Indiscernible).

19          MR. BURCK:  Your Honor, we have one other question,

20  and it's maybe what Mr. Artan is going to ask about.  It's a

21  question relating to the witness after Mr. Verdeschi, which is

22  Oliver Hargreaves.

23          THE COURT:  Oh, I never heard that name before.

24          MR. BURCK:  Ollie, as he's referred to, your Honor.

25  We understand from the government that he may not now be their

1      next witness.  They may have another witness come before him.

2      I don't know if that has something to do with the production or

3      not, but we thought it would be just useful to -- and so just

4      for everyone's planning purposes, because I think that

5      Mr. Hargreaves is a very long witness, as opposed to the next

6      witness, if they switch, will be a very short witness.

7               THE COURT:  My general rule on this, not just for this

8      trial, because even separate from the pandemic there are always

9      complications in producing witnesses from various parts of the

10     country and so forth, but by no later than 6:00 the evening

11     before the next court day, the party, whoever's case is on at

12     that time, must state definitively who is going to be called

13     during that day and that cannot be changed.  But you can make

14     alterations up to 6:00 p.m.  Okay?

15              MR. BURCK:  Thank you, your Honor.

16              THE COURT:  There was something else?

17              MR. TAYBACK:  Your Honor, there's one other brief oral

18     application --

19              THE COURT:  You can take your mask off.

20              MR. TAYBACK:  -- that I would like to make on behalf

21     of Mr. Akhavan.

22              THE COURT:  Oh, it's you.

23              MR. TAYBACK:  Surprise.  We had -- yesterday I had

24     been able to meet with him in lockup during the lunch hour and

25     provide a sandwich and a bottle of water for him so we could

1    talk during the lunch break.

2            Apparently, today that was not allowed.  Although, I

3    think they did take the sandwich, but they seem to indicate

4    that I could make an application to your Honor to allow me to

5    bring him a sandwich and a bottle of water such that I can meet

6    with him during the lunch break.

7            THE COURT:  What kind of sandwich?  Does it contain

8    cannabis?

9            MR. TAYBACK:  It does not.

10           THE COURT:  That application is granted.

11           MR. TAYBACK:  Thank you, your Honor.

12           THE COURT:  All right.  Real good.  See you tomorrow.

13           MR. BURCK:  Thank you, your Honor.

14           MR. FOLLY:  Your Honor, would you like us here at

15    9:00 a.m. tomorrow?

16           THE COURT:  Yes, I think since it sounds like we're

17    done, why don't we just start at 9:30 tomorrow.  If there is

18    anything, we can deal with it between 9:30 and 9:45.

19           MR. FOLLY:  Thank you, your Honor.

20           (Adjourned to 9:30 a.m. on March 4, 2021)

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   MICHAEL TASSONE

 4   Cross By Mr. Tayback . . . . . . . . . . . . 321

 5   Cross By Mr. Gilbert . . . . . . . . . . . . 371

 6   Redirect By Ms. La Morte . . . . . . . . . . 412

 7   Recross By Mr. Tayback . . . . . . . . . . . 421

 8    JOHN VERDESCHI

 9   Direct By Mr. Folly  . . . . . . . . . . . . 425

10                      GOVERNMENT EXHIBITS

11   Exhibit No.                          Received

12    2312    . . . . . . . . . . . . . . . . . 444
      2309    . . . . . . . . . . . . . . . . . 465
13    2301-2313   . . . . . . . . . . . . . . . 465

14                      DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16   WX 197    . . . . . . . . . . . . . . . . . 398
     WX 199    . . . . . . . . . . . . . . . . . 400
17   WX 2601   . . . . . . . . . . . . . . . . . 405

18

19

20

21

22

23

24

25
```