L34PWEI1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
               Defendants.               Trial
7
     ------------------------------x
8
                                         New York, N.Y.
9
                                         March 4, 2021
10                                       9:30 a.m.

11
     Before:
12
                         HON. JED S. RAKOFF
13
                                         District Judge
14

15                        APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25

L34PWEI1                          Trial

APPEARANCES (CONTINUED)


QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
      CHRISTOPHER TAYBACK
      SARA CLARK
      MARI HENDERSON
      DEREK SHAFFER
      PAUL SLATTERY
      -and-
ROTHKEN LAW FIRM LLP
      Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
      JARED R. SMITH

WILMER CUTLER PICKERING HALE AND DORR LLP
      Attorneys for Interested Party
      Bank of America, N.A.
BY:   JUSTIN GOODYEAR

NELSON MULLINS RILEY & SCARBOROUGH LLP
      Attorneys for Interested Party
      Circle Internet Financial, LLC
BY:   MATTHEW G. LINDENBAUM

1        (Trial resumed; jury not present)

2        THE COURT:  Please be seated.  So my law clerk

3   received last night an indication that the government intends

4   to call as their next witness FBI computer analyst Jessica

5   Volchko, V-o-l-c-h-k-o, and the defense objects to various

6   documents seized from Mr. Weigand's laptop.

7        So my first question is, how long are defense counsel

8   going to be with cross-examination with the witness that's on

9   the stand?

10       MR. BURCK:  Your Honor, I should be an hour and a

11  half.

12       MR. HARID:  I should be under an hour.

13       THE COURT:  Okay.  So we'll start on this issue now,

14  but as soon as the jury is here, we're going to bring them up

15  and continue since what you just told me, it will take us to

16  the morning break.

17       (Pause)

18       We have a bigger problem.  My courtroom deputy just

19  handed me a note that juror No. 8 has tested positive for

20  Covid-19.

21       Have you had any contact with that juror?

22       THE DEPUTY CLERK:  Trying to keep six feet.

23       THE COURT:  No, no.  I mean telephonic contact this

24  morning.

25       THE DEPUTY CLERK:  Voicemail.  I haven't called her

L34PWEI1                    Trial

1    back yet.

2              THE COURT:  All right.  I'm going to see if I can

3    reach our medical expert.  Stay here.  I'll be back in a bit.

4              (Recess)

5              THE COURT:  Please be seated.  So the word is that

6    this is why we have social distancing and so forth, and that

7    the trial can proceed.  The next alternate, which is juror 13,

8    will replace juror No. 8.  Our medical expert will be in touch

9    with the juror who is being excused, juror No. 8, to make sure

10   that she didn't have contact with the other jurors that was

11   less than six feet and so forth, but at least based on what we

12   know now, everything should be okay.

13             When they go down to the jury room, it's really a

14   courtroom that's been designed to provide actually considerably

15   more than six feet distancing between the jurors.  You know, I

16   suppose, theoretically, there might have been some slight

17   contact with two jurors in the elevator, included in the three

18   jurors, but even in there, six feet is usually the rule.

19             So anyway, the powers that be are comfortable with our

20   continuing.  This is why we have alternates, but we will

21   monitor it closely and if anything changes, I'll let you know.

22             MS. LA MORTE:  Your Honor?

23             THE COURT:  Yes.

24             MS. LA MORTE:  Just one thought.  It seems to me that

25   when the jurors come in, the time when they're sort of packed

1    together is when they're coming through here, and so I don't

2    know if there's a way to space them out as they're walking.

3         THE COURT:  Yes, that's a good idea.  When they come

4    on up, I'll have my law clerk mention that to my courtroom

5    deputy now so that when they come up, they can be more

6    separated.  Although, they are back to back even then.  So it's

7    less of a situation than if they were facing each other.

8         MR. HARID:  Your Honor, we do have a couple of

9    applications about the second witness Ms. Volchko.

10        THE COURT:  I'm sorry?

11        MR. HARID:  We have a couple of applications to make

12   about the second witness.

13        THE COURT:  Oh, okay.

14        MR. HARID:  If I may?  Your Honor, it's our

15   understanding that the government intends to offer as evidence

16   a number of documents located in Mr. Weigand's laptop through

17   the second witness, the forensic analyst.  Unfortunately,

18   there's a whole array of problems with --

19        THE COURT:  Which witness are you talking about, the

20   one who is on the stand now?

21        MR. HARID:  No, the next one.

22        THE COURT:  Unless my count is wrong, that's the third

23   one.

24        MR. HARID:  Excuse me, the third witness.  I misspoke.

25        THE COURT:  All right.  So that's what we -- now, I'm

1    clear on what you wanted.  As I say, we'll start discussing

2    that now, but if we don't finish, we'll continue with the

3    witness who is on the stand, since that is going to take us

4    past the mid-morning break, and we can talk more then.

5              As I understand it, these are all documents from

6    Mr. Weigand's laptop; is that right?

7              MS. DEININGER:  That's correct, your Honor.  They're

8    all documents off the laptop.  The forensic examiner will be

9    testifying to her examination of that laptop and her

10   confirmation that those documents were on the laptop.

11             THE COURT:  And how many documents are you planning to

12   introduce?

13             MS. DEININGER:  I can give you a count, but it is a

14   number.  I think it's between 40 and 50 that we are going to

15   move in essentially in two batches.

16             THE COURT:  Okay.  So before we turn to specific

17   documents, are there some global objections?

18             MR. HARID:  Yes, your Honor.  There are three global

19   objections, and I think you can put the documents into three

20   buckets.  The first would be documents that are not, on their

21   face, self-explanatory and for which there needs to be a

22   witness who can put them in context.  Unfortunately, the

23   government has no witness who can speak to the substance of the

24   documents or connect them to the charged scheme or connect them

25   to Mr. Weigand.  And two I put in that bucket would be

L34PWEI1                      Trial

1    Government Exhibit 1518 and Government Exhibit 1720.

2            THE COURT:  Wait, wait, wait.  Maybe I'm

3    misunderstanding.  I do want to hear your objections on any

4    specific documents, but what I was asking was, are there any

5    global objections?

6            MR. HARID:  So just to take a step back, then, a

7    number of these documents concern Mr. Weigand's preexisting

8    business relationships in Europe and his preexisting

9    relationships that have nothing to do with Eaze at all.  And

10   there's a real risk of juror confusion, juror speculation.

11   They're extremely misleading on their face; so there's a real

12   403 problem with these documents.  And --

13           THE COURT:  Let me ask the government.  Are you

14   introducing any of the documents that relate to his prior

15   business?

16           MS. DEININGER:  Your Honor, our understanding is that

17   all of these documents relate to the scheme.  Also, this was

18   the substance of Mr. Weigand's second motion in limine that you

19   already ruled on.

20           THE COURT:  So --

21           MS. DEININGER:  Your Honor --

22           THE COURT:  I guess my question is, I don't again see

23   how I can deal with this on a global basis.  If a document, on

24   its face, shows that it is arguably in relation to the business

25   that is the subject of this lawsuit, then it will come in, and

L34PWEI1                    Trial

```
1    if, on its face, shows that it's not, it won't come in.  And if

2    we don't know one way or the other, I'll see whether it's --

3    you know, we'll deal with that as well.

4              So go ahead.  What else?

5              MR. HARID:  Your Honor, just to refer back to the

6    chart that we sent the Court, your Honor's position on Weigand

7    motion in limine two was that there may be specific items where

8    it's a closer call and it will be taken up at that time.  So

9    that's the position that your Honor took.

10             And relatedly, I mean, the fundamental problem with

11   the entire set of documents --

12             THE COURT:  I'm sorry, just forgive me for one second.

13   I don't seem to be getting the LiveNote.

14             (Pause)

15             All right.  So I'm sorry.  Repeat what you were just

16   saying.

17             MR. HARID:  Your Honor, the big global problem is that

18   we believe the government has no witness capable of getting

19   into the substance of these documents and putting them in

20   context, and that leads to inevitable --

21             THE COURT:  Well, again, I mean, give me -- I guess

22   I'm finding it extremely difficult to deal with these so-called

23   global objections and, obviously, you are going to tell me

24   specific objections, but some documents on their face may show

25   their context and some may not.
```

1             MR. HARID:  I can point your Honor to two that I think

2      are representative.  The first would be Government

3      Exhibit 1518, and a close cousin would be Government

4      Exhibit 1720.

5             THE COURT:  All right.  Let me look at 1518.  In the

6      version I have, it is unreadable but that, I suppose, makes it

7      harmless error.

8             MS. DEININGER:  Mr. Levine, do you have the ability to

9      pull up Government Exhibit 1518 to make it easier?

10            THE COURT:  It's on the screen.  So it's on the

11     screen.  Is this a document you're offering?

12            MS. DEININGER:  This is a document that the government

13     intends to offer.

14            THE COURT:  And what does it show?

15            MS. DEININGER:  What it shows is, it is a table of

16     wire amounts that are going to certain entities.  If you look

17     at the third column on the left, under April to August, all of

18     these different charts on the sheet show that -- have

19     abbreviations for the merchants that are being identified by

20     the witnesses as being involved in this scheme; so Hot-R, the

21     government believes to Hot Robot; NewOp refers to NewOpal;

22     Linback refers to Lineback, and so on.

23            In fact, if you scroll to the far right of this page,

24     there's a comment that -- on the far right of the screen is a

25     comment that says "overpayment, this amount needs to be wired

L34PWEI1                        Trial

1      back to the Hot Robot account," which is a merchant that has

2      already been identified as being involved in the scheme.

3              THE COURT:  So let me -- this looks on its face

4      relevant to me.  What's the defense counsel's problem?

5              MR. HARID:  Your Honor, the response here is that

6      there is nothing connecting this document to either defendant,

7      and we don't believe the government has a witness capable of

8      connecting this document to either defendant.

9              Secondly, there's no -- this document's been plucked

10     out of the ether.  There's no metadata --

11             THE COURT:  Wait a minute.  It was on your client's

12     laptop, which means he either sent it or received it, yes?

13             MR. HARID:  Your Honor, we can get into that later,

14     but I don't think the fact that it was on his laptop is, by

15     itself, dispositive.  There's still a real 403 problem here

16     because no one can -- no one on the government's witness list

17     can explain the headers in this document, including what "GT"

18     means and what the other columns mean.  And there's nothing

19     indicating that either of the defendants received any of the

20     sums --

21             THE COURT:  First of all, we're not concerned at the

22     moment with Mr. Akhavan, whose counsel will speak for himself.

23     We're talking about your client.  This is a document that the

24     jury, I think, can reasonably infer was either sent by him or

25     received by him.  Either way, it purports to show the

1    involvement in using company names other than the --

2              THE DEPUTY CLERK:  Jury entering the courtroom.

3              THE COURT:  To be continued.

4              (Jury present)

5              THE COURT:  Get the witness on the stand, please.

6              Mr. Witness, you can come forward.

7              Please be seated.

8              So good morning, ladies and gentlemen, and thank you

9    once again for your promptness, and we are ready to continue.

10   So cross-examination.

11             MR. BURCK:  May I proceed, your Honor?

12             THE COURT:  Please.

13             MR. BURCK:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. BURCK:

16   Q.  Good morning, Mr. Verdeschi.

17   A.  Good morning.

18   Q.  My name is Bill Burck, and I represent Mr. Akhavan.  Can

19   you hear me okay?

20   A.  I can.

21   Q.  Okay.  Great.  Thank you.  So I want to start by calling up

22   Government Exhibit 2314 that was admitted into evidence

23   yesterday.  Can we publish to the jury?

24             Now, Mr. Verdeschi, you remember testifying about this

25   exhibit yesterday?

L34PWEI1                     Verdeschi - Cross

1    A.  Yes, I do.

2    Q.  So I just want to ask you a few more questions about it, to

3    make sure that it's clear what this depicts.  So MasterCard is

4    in the center.  Can you see that all right?

5    A.  Yes, I can.

6    Q.  Okay.  MasterCard is in the center of this network and --

7    is that right?

8    A.  We are the network.

9    Q.  You are the network, exactly.  And your customers are the

10   acquirer or the acquiring bank, right?

11          MR. HARID:  Excuse me, your Honor.  One of the jurors

12   has an issue.

13          JUROR:  Our monitors aren't on.

14          THE COURT:  Oh, it's not working in the back.

15          (Pause)

16          MR. BURCK:  Your Honor, should I try to proceed with

17   non-exhibit testimony first?  Would you prefer that?

18          THE COURT:  Yes.  Although, let me just ask the

19   jurors, I think you may independently remember this exhibit,

20   this is the one which showed a box, and the lower left corner

21   is merchant and an arrow going up to the acquirer and then

22   another arrow to MasterCard.  On the other side, the account

23   holder and an arrow going up to the issuer and then an arrow

24   going to MasterCard.  Do you all remember that?  Okay.  Oh, now

25   you have it.  Oh, I see.

L34PWEI1                    Verdeschi - Cross

1               JUROR:  We can see it there.

2               THE COURT:  Good.  Thank you very much.  Forge ahead.

3               MR. BURCK:  Thank you, your Honor.

4    BY MR. BURCK:

5    Q.  Returning to this Exhibit 2312, MasterCard is the network

6    as you just testified, correct?

7    A.  Yes.

8    Q.  And the issuer and the acquirer in this graphic are your

9    customers or MasterCard's customer?

10   A.  Yes.

11   Q.  And could you just speak a little more clearly in the mic?

12   I can't hear you.

13   A.  Yes.

14   Q.  And the acquirer is the same thing as the acquiring bank?

15   A.  Yes, the terms are used interchangeably sometimes.

16   Q.  And the issuer is the same thing as the issuing bank?

17   A.  Yes.  It is, yes.

18   Q.  So the contractual relationship that exists between

19   MasterCard is between MasterCard and the acquiring bank, on the

20   one hand, right?

21   A.  Yes.

22   Q.  And on the other hand, it's between MasterCard and the

23   issuing bank; is that right?

24   A.  Yes.

25   Q.  So the relationship runs from MasterCard to the acquiring

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L34PWEI1                        Verdeschi - Cross

1    bank, right?  You have to answer verbally so the --

2    A.  Yes.

3    Q.  And the other relationship runs between MasterCard and the

4    issuing bank, correct?

5    A.  Yes.

6    Q.  The merchant, which is depicted in the bottom left-hand

7    corner, that merchant does not have a contractual relationship

8    with MasterCard; isn't that right?

9    A.  Yes.

10   Q.  And in the lower right-hand corner, the account holder --

11            THE COURT:  Forgive me for interrupting.  Thanks very

12   much to our able helper.  All the jurors now can see the chart.

13            MR. BURCK:  Thank you, Mr. McLeod.  Thank you, your

14   Honor.

15   Q.  In the bottom right-hand corner is the account holder,

16   which is the cardholder, correct?

17   A.  Yes.

18   Q.  I think you described it as the regular folks who have

19   credit cards, right?

20   A.  Yes.

21   Q.  And those folks do not have a contractual relationship with

22   MasterCard, right?

23   A.  Yes, they do not.

24   Q.  So the account holders, their contractual relationship runs

25   to the issuing bank, right?

1   A.  Yes.

2   Q.  And the merchants' contractual relationship runs to the

3   acquiring bank, right?

4   A.  Yes.

5   Q.  Okay.  Now, and also, just to be for completeness, the

6   account holder does not have any relationship with the

7   acquiring bank?

8   A.  Yes, that's true.

9   Q.  And the merchant has no relationship with the issuing bank?

10  A.  That's true.

11  Q.  Okay.  Now, you testified yesterday that the acquiring bank

12  is responsible for knowing its customer, right?

13  A.  Yes.

14  Q.  And the acquiring bank here, the customer, is the merchant?

15  A.  That's true, yes.

16  Q.  So the acquiring bank's responsibility is to know what the

17  merchant does and who it is, et cetera?

18  A.  The acquiring bank's responsibility is to meet MasterCard's

19  rules and understand their merchant's business so that they are

20  always meeting MasterCard's rules and standards.

21  Q.  Okay.  So the responsibility rests with the acquiring bank

22  in the first instance, right?

23  A.  Yes.

24  Q.  And then for the issuer, same thing, they are responsible

25  for the account holder's obeying the rules set by MasterCard,

L34PWEI1                        Verdeschi - Cross

1   right?

2   A.  I don't know that we have rules that extend to cardholders.

3   Our rules and standards don't necessarily apply to cardholders.

4   Q.  So does that mean -- you testified yesterday that marijuana

5   was illegal on the network.  Does that mean the cardholder can

6   buy marijuana consistent with the rules of MasterCard?

7   A.  Well, the -- again, the rules and standards apply to the

8   issuers and the acquirers, right?  And the rule doesn't say

9   anything about a cardholder, if I recall correctly, right?  So

10  the rule, in this particular case, it applies to the issuer and

11  the acquirer.

12  Q.  Okay.  So just to be clear, the rule against purchasing

13  marijuana in your testimony does not apply to the account

14  holders, for example?

15  A.  To the best of my knowledge, you know, without having the

16  rules in front of me, I do not believe it states the

17  cardholder.

18  Q.  Okay.

19  A.  But it applies to the issuer from the standpoint of that

20  they must ensure that they do not facilitate illegal activity.

21  Q.  Got it.  And it's the same principle for the merchant, the

22  rules don't specifically say merchants can't sell marijuana?

23  A.  I'm not sure, and again, I don't have the rules in front of

24  me.  That, I believe, is a little bit different.

25  Q.  And how is it different?

L34PWEI1                          Verdeschi - Cross

1   A.   Again, I don't have the rules in front of me, but we

2   prohibit the sale of any product or service that is illegal.

3   Q.   Okay.  So your testimony --

4   A.   And I believe it actually says that, prohibit the sale,

5   right?  So that certainly is talking about the merchant, not

6   the cardholder.

7   Q.   Got it.  So in your view, your testimony is that when it

8   says "sale," that applies to the merchant, the merchant may not

9   sell on the network?

10  A.   Yes.  To the best of my knowledge, that is the -- that's

11  what it implies, that's what it means.

12  Q.   Understood.  Now, does MasterCard, with respect to the

13  acquiring bank, have a know-your-customer policy?  Do you have

14  to know what the acquiring bank is and who they are?

15  A.   I'm sorry, can you restate it?  Say it again?

16  Q.   Let me put it this way, you mentioned that the acquiring

17  bank, their customer is the merchant?

18  A.   Yes.

19  Q.   And they have a responsibility to know their customer,

20  meaning the merchant in this network, right?

21  A.   Yes.

22  Q.   And the question I have is, does MasterCard have a

23  responsibility to know its customer, which is the acquiring

24  bank in the network?

25  A.   Well, my answer is going to be that I do not manage, in

L34PWEI1                         Verdeschi - Cross

1   MasterCard, the licensing and on-boarding process for

2   customers; so I don't feel comfortable answering that.

3   Q.   Okay.  So you don't know the answer?

4   A.   I don't know the answer to that.

5   Q.   Okay.

6   A.   Just based on my role in the company.

7   Q.   Understood.  And as to the issuing bank, which is another

8   customer of MasterCard, is it also your testimony you don't

9   know if MasterCard has a know-your-customer rule for issuing

10  banks?

11  A.   I'm just unfamiliar with the on-boarding process to comment

12  on that.

13  Q.   Okay.  And so your testimony, just so I understand, is that

14  the on-boarding process is where the know-your-customer aspects

15  would be, if they're anywhere?

16  A.   The on-boarding process is where MasterCard licenses and

17  extends a license agreement to a customer, and my testimony is

18  I just -- I'm not knowledgeable about that process.

19  Q.   Understood.  So let's talk a bit about -- and I'd like to

20  keep that graphic up because I think it's helpful visually for

21  you and for me.

22          Do you know how MasterCard is paid in this whole

23  network process, just at a general level?

24  A.   At a general level, yes.

25  Q.   Can you explain it, please?

1    A.  Well, you know, if you just -- at a general level,

2    MasterCard is a network, and when we switch a transaction from

3    one customer to the next and we route that transaction, there

4    are fees that are applied.  And so, in general, that's how we

5    make money in a transaction.  There's fees that are applied,

6    transaction fees that are applied to each transaction.

7    Q.  Right.  So sometimes these are called swipe fees?

8    A.  No.

9    Q.  Do you know what a swipe fee is?

10   A.  My understanding of when people use the phrase "swipe fee,"

11   and that's not something normally I would use, normally it

12   refers to -- I believe it refers to a fee that an acquirer may

13   charge a merchant.

14   Q.  Okay.  And so let me ask you this.  You are aware, based on

15   your general knowledge, that MasterCard charges the issuing

16   bank a fee based on the gross dollar volume of transactions by

17   account holders?

18   A.  Again, that is not the side of the business that I manage;

19   so I'm just -- I'm not involved in pricing.  Pricing and, you

20   know, billing of customers is just not my area of

21   responsibility.

22   Q.  Let me ask you, do you know whether or not MasterCard

23   charges fees for the data or transaction processing that goes

24   on in the network?

25   A.  As I said earlier, we charge transaction fees to our

1    customers, issuers and acquirers.

2    Q.   Understood.  And is it true that as the volume of

3    transactions goes up, the fees that are paid to MasterCard

4    would also go up, as a general matter?

5    A.   Each transaction has a fee associated with it.

6    Q.   So the more transactions, the more fees, correct?

7    A.   That is a true statement.

8    Q.   And you also have a lot of competitors, right?  Visa is, of

9    course, one, and there are other competitors?

10   A.   We have competitors.

11   Q.   Can you tell us who some of the other competitors besides

12   Visa are?

13   A.   There's Visa, American Express, Discover.

14   Q.   And in competition with them, you're all looking for

15   volume; is that right?

16   A.   We compete with them.

17   Q.   For volume, amongst other things?

18   A.   Yeah, there's a great many things we compete on in.

19   Switching services is one.

20   Q.   Understood.  You can take that down, Mr. McLeod.

21        So you testified at some length yesterday about the --

22   and I want to make sure you can hear me because it's a little

23   bit of an echo on my end.

24   A.   I can hear you.

25   Q.   You testified yesterday about the MasterCard rules of 2016;

L34PWEI1                          Verdeschi - Cross

1   do you remember that testimony?

2   A.  I do.

3   Q.  And you testified that those rules prohibit what are called

4   illegal transactions from the network; do you recall that

5   testimony?

6   A.  I certainly do.

7   Q.  And you also testified that there are state rules or state

8   laws, excuse me, and there are federal laws, right?

9   A.  I think those are facts, yes.

10  Q.  Those are facts.  And the MasterCard rules prohibit illegal

11  transactions, but they do not specify "under federal law" in

12  those words, do they?

13  A.  If I recall correctly, the standard says that customers

14  must comply with all applicable laws.

15  Q.  All applicable laws?

16  A.  All applicable laws.

17  Q.  And does it say -- does it specifically say that it must be

18  illegal under state law?

19  A.  All applicable laws.

20  Q.  So it could be state or federal?

21  A.  Yes, all.

22  Q.  And the law, the rules don't state a preference between

23  state or federal law, right?

24  A.  No.

25  Q.  They just say "all"?

L34PWEI1                         Verdeschi - Cross

1   A.   "All."

2   Q.   And they don't say or tell customers what they should do if

3   there's a difference between state and federal law, do they?

4   A.   No, they do not.

5   Q.   And these rules are updated on a yearly basis, roughly?

6   A.   I can't really say how often they are updated.

7   Q.   Well, the government showed you the rules from 2016, right?

8   I'll show you Government Exhibit --

9   A.   Yes.

10   Q.   -- 2312.

11   A.   It was 2016, yes, I recall.

12   Q.   Okay.  And I think you testified that the rules have not

13   changed, as far as you know, since then, to this day, correct?

14   A.   Those particular rules that we were referencing have not

15   changed because they're meant to really, you know, be

16   evergreen, in a way.  It's all applicable laws in that regard.

17   Q.   Right.  So the rule -- your testimony is the rule has

18   stayed consistent from 2016 to the present?

19   A.   Mmm, hmm.

20   Q.   No illegal transactions, correct?

21   A.   That's right.

22   Q.   And the language, as far as you know, has not changed,

23   correct?

24   A.   For those rules that we referenced.

25   Q.   Only rules -- only those rules?

L34PWEI1                        Verdeschi - Cross

1    A.  Mmm, hmm.

2    Q.  Could you say "yes"?

3    A.  Yes.

4    Q.  Just for identification purposes, I'd like to show you

5    Akhavan Exhibit 4010, and just a cover page.  Do you recognize

6    that, sir?

7    A.  MasterCard rules, June 1st, 2017.

8            MR. BURCK:  And then, your Honor, just for ease, I've

9    spoken to the government about this.  I'm going to show the

10   witness each of these, and then move them into evidence

11   en mass.  There are four.

12           THE COURT:  Okay.

13           MR. BURCK:  Thank you, your Honor, just to speed

14   things along.

15           Can you please show the witness Akhavan Exhibit 4008.

16   BY MR. BURCK:

17   Q.  Do you recognize that?

18   A.  It's another version of the manual.

19   Q.  Thank you.  And can you show the witness, for

20   identification, Akhavan Exhibit 4013.

21           Do you recognize that?

22   A.  Yes.

23   Q.  And only two more.  Can I show you -- please show the

24   witness Akhavan Exhibit 4014.

25           Do you recognize that?

L34PWEI1                        Verdeschi - Cross

1    A.   Yes.

2    Q.   And then finally, Akhavan Exhibit 1024.

3              Do you recognize that?

4    A.   Yes.

5              MR. BURCK:  Your Honor, we would move into evidence

6    Akhavan Exhibits 4010, 4008, 4013, 4014 and 1024.

7              MR. FOLLY:  Your Honor, we object to the last two

8    exhibits on the --

9              THE COURT:  For the reasons we discussed yesterday?

10             MR. FOLLY:  Yes, your Honor.

11             THE COURT:  So those two will not be received in their

12   entirety, but you can refer to specific portions, and if those

13   are admissible, I will admit those.

14             MR. BURCK:  Understood, your Honor.  Thank you.

15             (Defendant's Akhavan Exhibits  4010, 4008, 4013

16   received in evidence)

17   BY MR. BURCK:

18   Q.   You have testified again, Mr. Verdeschi, that the rules, as

19   far as you know, have not changed from 2016 to the present as

20   to the issues we're talking about, the illegal transactions?

21   A.   That is true.

22   Q.   So and yesterday you testified about gambling in

23   particular.  Do you remember the questions the prosecutor asked

24   you about gambling?

25   A.   Mmm, hmm.  Yes.  I'm sorry.

L34PWEI1                    Verdeschi - Cross

1    Q.  And you testified that gambling is legal in some states?

2    A.  Yes.

3    Q.  So you testified about gambling yesterday?

4    A.  Yes.

5    Q.  And that in some states gambling is legal?

6    A.  I think what I was saying is in certain jurisdictions, it's

7    legal.  You know, it's certain locations.  I'm not even sure

8    it's states, right?  Like in Connecticut, there's certain

9    places where you can gamble, but most places you can't.

10   Q.  Right.  So in some jurisdictions, legal jurisdictions, it's

11   legal?

12   A.  Yes.

13   Q.  So you mentioned I think Atlantic City yesterday?

14   A.  Yes.

15   Q.  And I think you mentioned Las Vegas?

16   A.  I believe I did.

17   Q.  Right.  And there are other places it's not legal, right,

18   other states or localities?

19   A.  Other localities where it's not, right.

20   Q.  So how does MasterCard explain to its customers what they

21   should do when a gambling transaction comes across the network?

22   A.  How would we explain that to our customers?  Well, No. 1,

23   the gambling transaction must be legal; No. 2, if it is legal,

24   then it must be presented in a way that's in accordance to our

25   rules.

L34PWEI1                       Verdeschi - Cross

1          We have -- expanding on that a little bit, I believe

2     we have -- and I don't have it in front of me, but we have

3     registration requirements for customers, acquiring customers

4     who participate in gambling transactions so that they have some

5     extra due diligence that they need to do for those merchants to

6     manage the risks associated with them.

7          And then, of course, there's the MCC code, and the

8     transaction must be coded with the correct MCC code.  So at a

9     high level, those are some of the requirements.

10    Q.  So let me ask you, just going back to your testimony that

11    gambling is legal in some localities and not others, how does

12    the network handle a transaction that occurs in Atlantic City,

13    you said was one place that you thought it's legal?  If the

14    transaction comes in from a place where it's not legal; so

15    somebody is in New York City, for example, and then transacts

16    in Atlantic City, how does the network handle that?

17    A.  Are you asking if a cardholder traveled to Atlantic City

18    and conducted -- if I went to Atlantic City and conducted a

19    transaction, how would our network handle that?

20    Q.  Slightly different question.  Somebody located in New York

21    uses a credit card to transact in Atlantic City, how would the

22    network handle that, with a merchant --

23    A.  Are you talking about for a card-not-present transaction or

24    a card-present transaction?

25    Q.  Card-not-present.

A.  Well, to my knowledge, I'm not sure if the Atlantic -- I'm

not an expert on this; so I don't know if the Atlantic City

casinos permit card-not-present transactions.  I believe you

have to be there in person.  Again, I'm not an expert on that.

Q.  Okay.  Well, let's talk about internet gambling.

A.  Mmm, hmm.

Q.  Do you know about internet gambling?

A.  I'm familiar with it, yes.

Q.  Okay.  Mr. McLeod, can you put up Government Exhibit 2312

and page 74, please.  Can you highlight the section "internet

gambling," the very beginning.

        So, Mr. Verdeschi, can you read from the beginning

5.1.2.1, gambling merchants, and just read the first paragraph,

the intro and then the first paragraph?

A.  "Each merchant agreement with a merchant proposing to

engage in gambling transactions must incorporate the following

terms:  if the merchant proposes to engage in internet gambling

transactions, the merchant must post a notice on its websites

(in a position such that the notice will be displayed before

account information is requested, such as a click-through

notice) stating that assertions have been made that internet

gambling may not be lawful in some jurisdictions, including the

United States, and suggesting that cardholders check whether

internet gambling is lawful under applicable law."

Q.  So, sir, in paragraph 1, you just read a statement that the

L34PWEI1                          Verdeschi - Cross

```
 1    merchant -- if the merchant proposes to engage in internet
 2    gambling, they must put up a notice on its website that
 3    assertions have been made that internet gambling may not be
 4    lawful in some jurisdictions, including the United States,
 5    right?
 6    A.   Mmm, hmm.
 7    Q.   The United States is the entire country of the United
 8    States, right?
 9    A.   Yes.
10    Q.   So doesn't this say that internet gambling, at least might
11    not be legal in the United States of America?
12              MR. FOLLY:  Objection.
13              THE COURT:  Sustained.
14    Q.   What is your understanding, sir, of what that -- what you
15    just read means?
16    A.   Okay.  Well, I mean, I think, very simply, this is really
17    just attempting to provide disclosure and ensuring that
18    merchants who are engaging in internet gambling are providing
19    cardholders and their customers with some type of notice that
20    just informs them that gambling may or may not be legal in your
21    jurisdiction, and you should be mindful of that, and you should
22    check.  And that's -- in my read of this, that's what that is
23    trying to do.
24    Q.   Including the United States, correct?
25    A.   Well, when I read it, it just says may not be lawful, so it
```

L34PWEI1                    Verdeschi - Cross

1   may or may not, that's the way I read it.

2   Q.  Okay.  So you're reading "may or may not" into what's

3   posted there?

4   A.  Yeah.

5   Q.  It doesn't say that, though, correct?

6   A.  MasterCard rules do not -- are not the law.  They do not

7   represent the law.  In fact, I believe somewhere in this rules

8   manual it always says that laws, all laws, supersede the

9   MasterCard rules manual.

10  Q.  Your Honor, I'm sorry -- excuse me, Mr. Verdeschi, you --

11  you answered a question I didn't ask.  I'm asking you, the

12  merchant must post on its website stating that assertions have

13  been made that internet gambling may not be lawful in some

14  jurisdictions, including the United States; that's an

15  instruction from MasterCard to its customers, correct?

16  A.  That is an instruction that they must have a statement on

17  their website that gambling may not be lawful and they should

18  check.  That's what it says.  This is not the law.  This

19  statement is not meant to replace the law.

20  Q.  Understood.  And I'm not asking whether or not it's the

21  law.  I'm asking what MasterCard requires to be put on the

22  website.

23  A.  A statement saying that cardholders should check.

24  Q.  Now, you can take that down, Mr. McLeod.

25           There is no similar instruction by MasterCard to its

L34PWEI1                         Verdeschi - Cross

1    customers about marijuana, right?

2    A.  I'm not aware of one.

3    Q.  And do you know why there isn't such an instruction as to

4    marijuana?

5    A.  Well, there's a difference between gambling and marijuana.

6    I think for, you know, my entire life, gambling has been legal

7    in some form or another in the United States.  I have never

8    remembered a moment where marijuana was legal in the United

9    States; so there are two different scenarios all together, in

10   my view.

11   Q.  Well, what about internet gambling, is that legal in the

12   United States; do you know?

13   A.  I'm not an expert on where it's legal and where it's not.

14   I know certain places now have begun looking at legalizing it,

15   but I'm not an expert on that.

16   Q.  Okay.  So you don't know?

17   A.  I don't know where it's legal or it's not.

18   Q.  Are you aware of any reason that MasterCard couldn't put up

19   a requirement that its customers post such a notice for

20   marijuana?

21            MR. FOLLY:  Objection.

22            THE COURT:  Sustained.

23   Q.  Marijuana is not specifically mentioned anywhere in these

24   rules, is it?

25   A.  I'm not aware of it being mentioned.

L34PWEI1                          Verdeschi - Cross

1    Q.  Is there a reason, that you're aware of, that it's not

2    mentioned specifically?

3              MR. FOLLY:  Objection.

4              THE COURT:  Overruled.  You may answer.

5    A.  It's not mentioned the same way that all -- various

6    different types of illegal activity are not mentioned.  Heroin

7    is not mentioned.  Cocaine is not mentioned.  Marijuana is not

8    mentioned.

9    Q.  Would you please show the witness, or for the jury as well,

10   Government Exhibit 2312, page 85.  Can you highlight 5.11.7.

11             Now, you just testified that marijuana is not listed

12   because it's illegal, like heroin or another drug, cocaine,

13   right?

14   A.  Mmm, hmm.

15   Q.  So yesterday you read from the first paragraph of this

16   statement about the legality; do you remember that?

17   A.  I do.

18   Q.  Can you read the second paragraph, please?

19   A.  Sure.  "No. 2.  The sale of a product or service, including

20   an image, which is patently offensive and lacks serious

21   artistic value, (such as, by way of example and not limitation,

22   images of nonconsensual sexual behavior, sexual exploitation of

23   a minor, nonconsensual mutilation of a person or body part and

24   bestiality) or any other material that the corporation deems

25   unacceptable to sell in connection with a Mark."

L34PWEI1                        Verdeschi - Cross

1   Q.  So that rule states a number of -- in some cases, criminal

2   issues, like images of sexual exploitation of a minor, correct?

3          THE COURT:  I think this comparison is totally

4   misleading and can only serve to confuse matters.  The silently

5   made objection is hereby sustained.

6          MR. BURCK:  Thank you, your Honor.

7   BY MR. BURCK:

8   Q.  So, Mr. Verdeschi, you testified yesterday that in your

9   position, you are -- your group, and you're the head of the

10  group, is supposed to be in charge of engaging with customers,

11  right?

12  A.  Well, we engage customers for the purpose of driving

13  performance to our standards, yes.

14  Q.  Right.  So the standards are important to you, and that is

15  what your job is, right?

16  A.  In a manner of speaking, yes.

17  Q.  Well, how would you describe what is your job?

18  A.  My job is to ensure that we have a strong, healthy

19  franchise and we engage customers for that purpose, to drive

20  adherence to our standards.

21  Q.  And MasterCard has tens of thousands of customers who are

22  acquiring banks or issuing banks, right?

23  A.  Yes.

24  Q.  And the acquiring banks themselves have, what, millions of

25  merchants who are their customers?

L34PWEI1                        Verdeschi - Cross

1    A.  Yes.

2    Q.  And, of course, the issuing banks have hundreds of millions

3    of customers who are the account holders, right?

4    A.  I believe it's billions.

5    Q.  Billions.  Okay.  And you testified yesterday there were

6    billions of transactions a year --

7    A.  Yes.

8    Q.  -- over the network?  So MasterCard does not rely solely on

9    the rules that we've seen to communicate with its customers,

10   right?

11   A.  That's true.

12   Q.  You will talk to them, if they have questions, right?

13   A.  Yes.

14   Q.  You will raise issues that you come across with them,

15   correct?

16   A.  Yes.

17   Q.  And if a question comes up on a particular type of

18   transaction, whether it's authorized in the network, you don't

19   just rely on the rules to talk to -- to explain it to them,

20   right?

21   A.  Certainly we provide our customers guidance.

22   Q.  And you communicate with them directly all the time, right?

23   A.  Yes.

24   Q.  And to do that effectively, you have to make sure that your

25   own team and the MasterCard employees all know what the rules

1    are, right?

2    A.  I wouldn't say all, but, yes, it's good to have broad

3    understanding.

4    Q.  Well, the members of your team need to know?

5    A.  Certainly.

6    Q.  And it's good to have a broader knowledge amongst

7    MasterCard employees, right?

8    A.  Yes.

9    Q.  And there are -- you give guidance to your employees about

10   what they should tell customers about issues that arise in the

11   network, right?

12   A.  We provide guidance to our employees.

13   Q.  Right.  And the treatment of marijuana sales has been a

14   subject of discussion at MasterCard, hasn't it?

15   A.  It has.

16   Q.  Now, you've testified earlier that MasterCard's rules

17   barring illegal transactions have remained the same since 2016,

18   right?

19   A.  Yes.

20   Q.  And to your knowledge, MasterCard has consistently

21   communicated its policy against marijuana internally at

22   MasterCard, right?

23   A.  Well, let me, just -- I want to be careful here.  I'm

24   referring to marijuana sales in the United States.

25   Q.  In the United States, that's perfectly fine.  I'm not

L34PWEI1                        Verdeschi - Cross

1    talking about anyplace outside the United States.

2    A.   Okay.

3    Q.   So the answer to the question --

4    A.   Can you restate the question?

5    Q.   I'll repeat the question.  To your knowledge, MasterCard

6    has consistently communicated its policy against marijuana

7    internally to this day?

8    A.   I wouldn't say that we had a consistent message against

9    marijuana.  We've had a consistent message against illegal

10   transactions.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L34AWEI2ps                          Verdeschi - Cross

1   Q.  And what about marijuana?  Has that been a specific topic
2   for discussion?  I think you testified before that --
3   A.  Well, we certainly discussed it, but I think what's
4   important is that the law has not changed, the federal law on
5   it being illegal hasn't changed, so therefore our policy on it
6   hasn't changed.
7   Q.  Your policy hasn't changed, and your messaging internally
8   has not changed.
9   A.  Our messaging internally has not changed.  But certainly
10  there's been questions internally, because there are states who
11  are legalizing, Canada legalized, so of course that raises
12  questions with people, and important -- you know, they, they
13  may not immediately understand what that means for the broader
14  policy.  And so we may, you know, remind people that our policy
15  on this has not changed; it's illegal at the federal government
16  level, and therefore it's prohibited on our network.
17  Q.  Understood.  And you just mentioned that in Canada it
18  changed, but that was a couple years ago?
19  A.  I don't have the date.
20  Q.  OK.
21  A.  But it's within reason.
22           MR. BURCK:  For the witness only, please show him
23  Akhavan Exhibit 403.
24  Q.  Sir, do you recognize this document, or you want to take a
25  second to look at it?

L34AWEI2ps                    Verdeschi - Cross

1   A.  I'll take a second to look at it.

2         OK.  Just, I briefly looked at it, but I recognize

3   this document.

4   Q.  Without describing what's in it, can you tell us what it

5   is?

6   A.  Yes.  This is a document that I did not write, first of

7   all.  I will start with that.  But this is a document that is

8   marked for internal use.  And I believe this document was

9   created for the intention of providing our -- not necessarily

10  my team.  This is really meant for the sales teams and our

11  customer relationship teams, who manage and interface with

12  customers on a daily basis.  It's meant to provide them with

13  some guidance on marijuana, the state of marijuana in the

14  United States and MasterCard's policies on marijuana.

15        THE COURT:  Do you know when this document was

16  created?

17        THE WITNESS:  I don't.  But I'm going to say it was

18  probably within 2020.

19  Q.  Well, let me ask another question before I offer it, your

20  Honor.  Is there -- and I don't know if you need more time to

21  review this.  Is there anything in this document that is

22  different, that is, represents a change in policy, as far as

23  you're aware, over the last five years?

24  A.  I haven't read it all the way through, but I --

25        MR. BURCK:  Your Honor, should I direct him to like

L34AWEI2ps                    Verdeschi - Cross

certain sections just to see?

               THE COURT:  No.  I think I'm not going to receive this
because of the date issue that we discussed yesterday.  If you
want to put a question about, without reference to this
document, is the policy in 2019 such and such and the policy in
2018 such and such, that you can do.

               MR. BURCK:  OK, your Honor.  Thank you.
Q.  So the policy in -- up to now has been, marijuana is
illegal.  Right?
A.  The policy on marijuana has not changed.  I -- we don't
have a policy on marijuana.  Our, our standard is, only lawful
transactions must enter our network.

               THE COURT:  Ladies and gentlemen of the jury, just so
there's no confusion on this point, you probably know this
anyway, but certain states, such as California and Oregon, have
legalized the sale of marijuana, but federal law still
prohibits it throughout the United States.  It is true that the
Department of Justice has chosen not to enforce the federal law
in those states where it's legal, but there's nothing that
requires that.  They could change their mind.  So the state of
the law is, the sale of marijuana is illegal under federal law
throughout the United States.  Nevertheless, two -- more than
two, but the two states we're concerned with here, California
and Oregon, have passed state laws legalizing as to state
criminality any sale of marijuana.  So if you are someone in

L34AWEI2ps                       Verdeschi - Cross

1   California and you sell marijuana, you cannot be prosecuted by

2   the state.  You could be prosecuted by the federal government.

3   The federal government has chosen, as a matter of discretion,

4   not to bring those federal prosecutions in those states.  But

5   the law still prohibits, throughout the United States, the sale

6   of marijuana.

7           So that's the state of the law.  And I wanted you to

8   have that as background.

9           Go ahead.

10          MR. BURCK:  Thank you, your Honor.

11  BY MR. BURCK:

12  Q.  So, Mr. Verdeschi, so the policy is communicated internally

13  to employees that illegal transactions cannot be performed?

14  A.  I mean, that's a rule.  That's a standard.

15  Q.  That's a rule.

16  A.  Yeah.

17  Q.  And is it widely understood that marijuana is an illegal

18  transaction within MasterCard, to your knowledge?

19  A.  I can't really -- I can't answer it.  I can't speculate

20  about what an average employee may know or may not know.

21  Q.  Right.  So you don't know.

22  A.  I just -- I can't speculate.

23  Q.  OK.  And the policy that's communicated to customers about

24  marijuana, what is that policy?

25  A.  I'm -- say that again?

L34AWEI2ps                    Verdeschi - Cross

1  Q.  What policy is communicated to customers, the acquiring
2  banks and issuing banks, about marijuana specifically?
3  A.  It's, it's the rules and the standards.  The rule and
4  standard says only lawful transactions.  So --
5  Q.  But my question is marijuana specifically.  Is there a
6  policy that's communicated to customers, the acquiring banks
7  and issuing banks, about marijuana specifically?
8  A.  I don't -- I don't know that we published anything
9  specifically about marijuana -- just like we haven't on cocaine
10 and heroin.  That's my example before.
11 Q.  OK.  Right.  And so you consider cocaine, heroin, and
12 marijuana to be the same.
13 A.  Well, it's just they're -- they're illegal.  They're, I
14 believe they're all considered Schedule I narcotics.
15 Q.  Do you know if any customers from 2016 to 2019 ever came to
16 one of your people and asked the question, is marijuana OK on
17 the network?
18 A.  Do I know if a customer ever asked about marijuana?  I, I
19 could only assume that that has happened.
20 Q.  But sitting here today, you don't know --
21 A.  I do not know.  I can't -- I can't comment on conversations
22 between customers and my staff.  I, I don't know.
23 Q.  Right.  But you don't recall any of your staff coming to
24 you and asking you about marijuana; "is marijuana OK, because a
25 customer is asking us about it?"

L34AWEI2ps                    Verdeschi - Cross

A.  Well, I can't think of a single instance of that, but I can
remember that we discussed the issue of marijuana many times.

Q.  And in those discussions, did you come up with a policy to
communicate to customers about what they should do with
marijuana sales?

A.  I do not recall coming up with a policy to communicate,
because the policy hasn't changed.  It's the same rule.  Only
lawful transactions must be permitted.

Q.  OK.  Let's talk about the MCC codes, or the merchant
category codes.

A.  Mm-hmm.

Q.  You testified that there is no code for marijuana.  Right?

A.  That is correct.

Q.  And there's no code for cannabis either.  I know they're
interchangeable, but --

A.  To my knowledge there is no code for cannabis.

Q.  Do you know why there is no code for marijuana, or
cannabis?

A.  Well, I do not directly manage the development of MCC
codes.  As I said, as I testified yesterday, MCC codes are
created by the International Standards Organization, a separate
standards body.  And those MCC codes are used by the various
different payment networks.

        And I gave several reasons, you know, why codes exist,
but in the case of marijuana, the fact that marijuana in the

L34AWEI2ps                    Verdeschi - Cross

1   United States is illegal and continues to be illegal is a good

2   reason why there is no MCC code for marijuana.

3   Q.   Right.  So you testified that the ISO, the International

4   Standards Organization, creates MCC codes, or the MCCs, I guess

5   is the best way to call them.

6   A.   Mm-hmm, yes.

7   Q.   And the ISO, you said, is an independent organization from

8   MasterCard, right?

9   A.   Yes.  They are a separate standards body.

10  Q.   Are you aware of whether or not Visa is an organization

11  that cooperates with ISO?

12  A.   Visa?

13  Q.   I'm sorry.  MasterCard.  Excuse me.

14  A.   I know we interact with them.

15  Q.   OK.  Do you know whether or not MasterCard -- not Visa --

16  MasterCard is on any committees or subcommittees of the ISO?

17  A.   I do not know that.

18  Q.   Do you know anything about how the ISO works at all?

19  A.   No, I don't.

20  Q.   OK.  So the testimony yesterday, which is, the ISO comes up

21  with the MCC, that's based on just sort of general knowledge.

22  A.   General knowledge.  General knowledge.

23  Q.   OK.  Now, we talked about internet gambling earlier?

24  A.   Mm-hmm.

25  Q.   And there is a code for internet gambling, right?

L34AWEI2ps                    Verdeschi - Cross

1    A.  I'm aware there's a code for gambling.  I have -- I don't

2    know if there's a distinction for internet gambling.  I just

3    don't know.

4            MR. BURCK:  Let's show the witness Akhavan Exhibit

5    4022, just for identification first.

6    Q.  Are you familiar with the security rules and procedures of

7    MasterCard?

8    A.  Yes.  I'm familiar with this document.

9    Q.  You are familiar with this document?

10   A.  Yes.

11           MR. BURCK:  Your Honor, I would offer Akhavan Exhibit

12   4022.

13           MR. FOLLY:  No objection.

14           THE COURT:  Received.

15           (Defendant's Exhibit 4022 received in evidence)

16           MR. BURCK:  Will you turn to page 112, please.  And

17   can you highlight the first paragraph.

18   Q.  Mr. Verdeschi, could you read that paragraph to the jury,

19   please.

20   A.  "A non-face-to-face gambling transaction occurs in a

21   card-not-present environment when a consumer uses an account to

22   place a wager or purchase chips or other value usable for

23   gambling provided by a wagering or betting establishment as

24   defined by MCC 7801 (Internet Gambling), MCC 7802 (Government

25   Licensed Horse and Dog Raising), or MCC 7995 (Gambling

L34AWEI2ps                    Verdeschi - Cross

1    Transactions)."

2    Q.  So this seems to indicate there's an MCC code for internet

3    gambling; is that right?

4    A.  Yes.  It does indicate that.

5           MR. BURCK:  Please take that down.  And would you show

6    the witness Akhavan Exhibit 10047, just for identification.

7    Q.  Are you familiar with the -- with this document?

8    A.  I'm familiar with it.

9           MR. BURCK:  Your Honor, we would offer Akhavan Exhibit

10   10047.

11          MR. FOLLY:  No objection.

12          THE COURT:  Received.

13          (Defendant's Exhibit 10047 received in evidence)

14          MR. BURCK:  Please turn to page 176 of this document,

15   and please highlight the bottom.

16   Q.  "MCC 7801 - Internet Gambling (U.S. region only)," see

17   that?

18   A.  I see it.

19   Q.  And that seems to be the same code that we just saw on the

20   prior two?

21   A.  It appears.

22   Q.  And it says "U.S. region only," correct?

23   A.  It does say that, yes.

24   Q.  And you've seen in a prior document of the rules for the

25   same year that there has to be a posting that says internet

L34AWEI2ps                Verdeschi – Cross

1    gambling might be unlawful in the United States, right?

2    A.  The posting said that the merchant must have a statement

3    that notifies the cardholder that they should check about the

4    legality.

5    Q.  In the United States.

6    A.  It just said they should check about the legality.  The

7    United States was mentioned, but it didn't limit it to the

8    United States.  It just, it said that was the intent of the

9    post.

10   Q.  Understood.  I don't know care about anyplace outside of

11   the United States.  But it did mention the United States.

12   A.  Mm-hmm.  The United States was referenced there.

13   Q.  OK.  And here, this internet gambling code is for the U.S.

14   region only.  Correct?

15   A.  It appears so.

16        MR. BURCK:  All right.  You can take that down.

17   Q.  Now, you testified that there's some gambling that's legal,

18   depending where it is, and some that's not legal, depending

19   where it is.  Right?

20   A.  Yes.

21   Q.  Now, not all cannabis products are barred from the

22   MasterCard network, correct?

23   A.  There are -- I believe you referred to that there are parts

24   of the plant that are legal, and so, for example, like hemp is

25   legal.  So, yes, if you bought a bag made of hemp, that would

L34AWEI2ps                     Verdeschi - Cross

1    be permitted on the MasterCard network.

2    Q.  And CBD oils are also --

3    A.  CBD oil is a tricky subject.  I believe there are specific

4    laws on what is legal and what is not legal when it comes to

5    CBD oil, so it's a tricky subject.

6    Q.  Are you sure of that, or is that your sort of -- is that

7    your testimony?

8    A.  My testimony is -- look, I'm not an expert on CBD oils, but

9    I believe that there are different types of CBD products.  And

10   some of them are legal and some of them are illegal.

11   Q.  Just for identification -- just -- actually not for

12   identification purposes -- but would there be a document that

13   would help you recall whether or not CBD is permitted on

14   MasterCard?

15   A.  Whether we -- well, if it's legal, we permit it.

16   Q.  OK.

17   A.  Again, we permit lawful transactions and we prohibit

18   unlawful transactions.

19   Q.  But a company that is a hemp -- sells only hemp or sells

20   only lawful CBD, do you know how they would be coded on the

21   network?

22   A.  I don't know.

23   Q.  But they wouldn't be coded as cannabis, for example.

24   A.  The acquirer -- and I'll go back to what I was talking

25   about yesterday -- the MCC codes are meant to convey the

L34AWEI2ps                    Verdeschi - Cross

general business that the merchant is engaged in.  So whatever

that is.  It could be a clothing store in that case.  It could

be a pharmaceutical.  You know, it's the general business that

the merchant is engaged in.

Q.  OK.  But also there's no code for cannabis, right?

A.  We've established that.  There's no code for cannabis.

Q.  So if you sell only cannabis with lawful products, you're

not going to be able to do an MCC for cannabis, right?

A.  There's no specific MCC related to cannabis.

Q.  OK.  You testified yesterday about the types of steps and

the procedures you have to investigate potential violations of

the rules and the standards of MasterCard, right?

A.  Mm-hmm.

Q.  You've got to say "yes."

A.  Yes.  Sorry.

Q.  You talked about the BRAM process?

A.  The BRAM program, yes.

Q.  And you also talked about web culling services?

A.  Yes.

Q.  And you also talked about that you would sometimes have

employees monitor, actively, transactions -- or not -- I

shouldn't say transactions -- customers who handle merchants.

A.  Yes.  We have staff members who monitor, yes.

Q.  And the purpose of those staff members is to determine

whether or not there is something going on in the network that

L34AWEI2ps                    Verdeschi - Cross

1   shouldn't be happening, right?

2   A.  That is one of the purposes of monitoring, yes.

3   Q.  And you've mentioned that you have a good relationship with

4   law enforcement and regulatory bodies, right?

5   A.  We have -- you know, in several instances, we, you know,

6   cooperate and participate in various different initiatives with

7   law enforcement regulators and with other kinds of bodies who

8   are concerned about, you know, consumers and citizens.  So yes.

9   Q.  And you talked about some of the potential penalties that a

10  customer could face if they violate the rules, right?

11  A.  Yes.

12  Q.  And you said there could be financial assessments.

13  A.  There can be.

14  Q.  And repeated problems can lead to termination from the

15  network, of the customers, right?

16  A.  Yes.

17  Q.  And just to remind us, the customer is the acquiring bank

18  with MasterCard, right?

19  A.  In this case, yes.

20  Q.  The merchant and MasterCard do not have a direct

21  relationship.

22  A.  That's correct.

23  Q.  And when you learn of problems in the network, MasterCard,

24  I think you testified, tells the acquiring bank about it,

25  right?

L34AWEI2ps                    Verdeschi - Cross

1    A.  Yes.  We engage the acquiring bank.

2    Q.  You don't tell the issuing bank about the issue, right?

3    A.  Normally we do not.

4    Q.  OK.  So the issuing bank, which is the other side of the

5    relationship, doesn't learn, usually, about issues you learn of

6    in the network, from -- that relate to the acquiring banks.

7    A.  Well, I would just say, in the course of an investigation

8    of a merchant who is engaged in illegal activity, we engage the

9    acquirer because they own the merchant relationship.  The

10   issuer does not.

11   Q.  OK.  But -- and I think this is what you testified

12   yesterday -- you discover a problem through engaging the

13   acquiring bank.  Your practice is not to then go and tell the

14   issuing bank, oh, we discovered this problem, correct?

15   A.  No.

16   Q.  You testified yesterday about -- and actually let me show

17   you Government Exhibit 2313, which is in evidence.

18          MR. BURCK:  You can blow up just the latter half of

19   the document.

20   Q.  You testified about this email yesterday.  Do you recall

21   that?

22   A.  I do.

23   Q.  And the person who is reporting this is named Meysam

24   Moradpour, right?

25   A.  Yes.

L34AWEI2ps                    Verdeschi - Cross

1   Q.  And you testified he's a -- he was or he was -- a

2   MasterCard employee, right?

3   A.  I believe he was a MasterCard employee.

4   Q.  He was a MasterCard employee.  But he didn't work in your

5   group, correct?

6   A.  He did not.

7   Q.  And he was not reporting this to you because he had been

8   asked to monitor Eaze, or any other company, for that matter.

9   A.  Yes.  He was -- I do not know him, and we didn't ask him to

10  do anything.  He did this on his own accord.

11  Q.  And so this -- I'm sorry.  I just couldn't hear you.

12  A.  On his own accord.

13          MR. BURCK:  Could you go up to the top of the email,

14  please.

15  Q.  And there's an email that you saw and you read from

16  yesterday from Paul Paolucci, right?  And I think you said he

17  was your deputy?

18  A.  He reported to me.

19  Q.  He reported to you.  Does he still report to you?

20  A.  No, he does not.

21  Q.  And does he still work in the compliance department?

22  A.  No, he does not.

23          MR. BURCK:  You can take that down, please.

24          Can you please show the witness Government Exhibit

25  2309.  Just maybe blow up the whole page.  Thank you.

1    Q.   So you testified about this document yesterday as well,

2    right?  You recall?

3    A.   Yes, I recall.

4    Q.   And this is an email from Andrea Bricci at

5    pxpfinancial.com?

6    A.   Yes.

7    Q.   And PXP Financial is the acquiring bank, right?

8    A.   Yes.

9    Q.   And it's written to Paul Paolucci and a bunch of other

10   people.  I assume many of these if not all are MasterCard

11   people?  Do you recognize the names?

12   A.   Yes.  I recognize a number of names.  Some I don't

13   recognize.  They may not all be MasterCard employees.

14   Q.   And at the bottom of the page, there's a whole list of

15   companies that I think you testified yesterday have been put on

16   the MATCH list; is that right?

17   A.   Yes.  These are -- once we engaged the customer, they

18   terminated these merchants and added them to the MATCH list.

19   And in this email they are notifying us that they've terminated

20   the merchants and added them to MATCH.

21   Q.   OK.  These are merchants that PXP and yourself and

22   MasterCard learned of because of what Mister -- I'm sorry, I

23   think it's Moradpour -- had initially disclosed, right?

24   A.   Yes.  He brought it to our attention and we investigated,

25   and it resulted in this email.

L34AWEI2ps                    Verdeschi - Cross

1    Q.  OK.  And on this list at the bottom of the page, is

2    eaze.com listed?

3    A.  I don't know if I see the bottom of the page, but --

4              MR. BURCK:  You can also turn to page 2.  There are

5    more on the next page.  No, that's it.

6    A.  Yeah.  I do not see the name Eaze there.

7              MR. BURCK:  Can we go back to the prior exhibit, which

8    I think was 2313.  You can go to the bottom of the email,

9    please.

10   Q.  This email, Mr. Moradpour -- I hope I'm pronouncing his

11   name correctly -- in the second paragraph, he says, "I found

12   out about this from a personal friend, and would like to report

13   a merchant fraud case in which the company eaze.com (eaze.com)

14   is using fake MCC codes and fake domains in order to --

15   (desirescent.com) in order to accept MasterCard and Visa

16   payments on their website to sell cannabis."  You see that?

17   A.  I see it.

18   Q.  Let's go back to 20 -- sorry, 2309.  And, again, Eaze is

19   not on that list, correct?

20   A.  Eaze is not on that list.

21   Q.  Now, you mentioned yesterday that acquiring banks have

22   access to the MATCH list.  Let me back up.  I think you

23   testified yesterday that the MATCH list is designed to put

24   everybody on an acquiring bank list on notice of companies that

25   you want off the network, that is, kicked off the network.  Is

L34AWEI2ps                    Verdeschi - Cross

1    that right?

2    A.  I did not phrase it in that way.

3    Q.  Please, how would you phrase it?

4    A.  OK.  The MATCH list is -- it's a database where our

5    acquirers, if they terminate a merchant for cause, they can add

6    the merchant to that MATCH list, state what the cause was, and

7    thereby any new acquirer who wants to sign up a merchant can

8    view the merchant's termination history.  And it's simply a

9    data point to tell them, hey, this particular merchant was

10   terminated by XYZ bank for the following reason.  And now that

11   new bank will look at that information and make an informed

12   decision on whether or not they want to do this with the

13   company.

14   Q.  And the acquiring banks have access to this list.  Right?

15   A.  The acquiring banks have access.

16   Q.  Do issuing banks have access to the list?

17   A.  To my knowledge, it's only available to acquirers.

18   Q.  Do you know why Eaze was not listed on that list on 2309

19   that we just looked at?

20   A.  Well, Eaze is the -- appears to be the website, and appears

21   to be the mobile app, right, in my recollection of this, but

22   when the merchant was signed up by the acquirers, the merchant

23   used different names.  It's not uncommon for a merchant to have

24   a business name that's different than their website name.  And

25   that's the way I would -- without knowing all of the details,

1    right, sitting here at the network just looking at these

2    documents, in my view that's what's occurring.  The names

3    chosen by the business are different than the website.

4    Q.  Understood.  But Mr. Moradpour had specifically identified

5    Eaze as the culprit, right?

6    A.  He identified Eaze as the website.

7    Q.  Well, let's go back to 2313 one more time.  And just -- the

8    second paragraph, top, "I found out about this from a personal

9    friend, and would like to report a merchant fraud case in which

10   the company Eaze (eaze.com) is using fake MCC codes and fake

11   domains in order to accept MasterCard and Visa payments on

12   their website to sell cannabis illegally."  You see that?

13   A.  I see it.

14   Q.  OK.  What was your understanding of what Mr. Moradpour

15   meant by that sentence?

16   A.  Well, first of all, he is not a member of my team.  He is

17   not an investigator, and he's reporting what he's seen.  And

18   what he sees is a website that's selling marijuana.  And it's

19   reporting it to us.

20           The business name of the company that's actually

21   selling marijuana may or may not be eaze.com.  It may be

22   something else.

23   Q.  Did your investigators, to your knowledge, check to find

24   out if eaze.com was using these websites to sell marijuana?

25   A.  Check?  Well, it's our standard practice -- and I can't

speak specifically to what my team investigated here and how they investigated it in this specific case. But in our general practice, if they received an email like this, they absolutely would check the website itself and they would check our transaction records.
Q. So they would check the website -- they would themselves check the website, which would be eaze.com.
A. I can only assume, looking at the email, that if he's reported eaze.com, I would think he would check eaze.com.
Q. So sitting here, you have no idea what your team did or did not do with respect to eaze.com.
A. I know they -- I know what the result was. All these merchants were terminated.
Q. But not eaze.com.
A. The transactions that were going through eaze.com were coming up under these names.
Q. Understood. Did you report or did your team report to law enforcement that eaze.com was violating federal law by selling marijuana?
A. I don't believe we reported it to law enforcement.
Q. OK. Is there a reason why you didn't report it to law enforcement?
A. That is, you know, that's an area that I couldn't comment on. I take advice from my attorneys, so --
Q. OK. Are you saying -- your attorneys told you. So I'm not

L34AWEI2ps                    Verdeschi - Cross

1    going to ask you anything that your attorneys have told you.

2    OK.

3               THE COURT:  Counsel, it turns out I have a telephone

4    matter at 11:15, so we'll have to give the jury a break, their

5    midmorning break, a little bit earlier than we normally do.  Is

6    this good?

7               MR. BURCK:  This is a good time, your Honor.  I have

8    one more section that would only go another 15 minutes.

9               THE COURT:  That's great.  So we'll take it up after

10   the break.

11              MR. BURCK:  Thank you, your Honor.

12              THE COURT:  So, ladies and gentlemen, a couple of

13   things I want to bring your attention.  First and really most

14   important, I've been watching all of you out of the corner of

15   my eye, and I am so impressed.  You are a great jury.  You are

16   all paying very close attention.  And it is really a pleasure

17   to have you in this courtroom.

18              You'll notice that on Tuesday we excused Juror No. 16,

19   the fourth alternate.  Just so you're not speculating about

20   that, it was because of some unexpected economic problem that

21   she had, and counsel and I agreed to excuse her because of

22   that.  But today, we had to excuse Juror No. 8 and replace her

23   with Juror No. 13.  And I wanted to tell you a little bit about

24   that.  She had called in and explained that she has periodic

25   COVID tests, and late yesterday she got a report that she had

1    tested positive.  Now, she tested positive on what's called the

2    rapid test, which sometimes give false positives.  So we are

3    encouraging her to have a, what they call a PCR test, which is

4    more accurate.  But we didn't want to take any chances, and

5    that's why we excused her.  She reports that both of her

6    household members tested negative, that she has no symptoms,

7    and she doesn't know of any instance where she was in contact

8    with someone, so she, you know, thinks that -- she's uncertain

9    whether it's a false positive or not.  We'll find out if she

10   takes the longer test.

11        In the meantime, she reports that she was at no time

12   within six feet not only of you guys but of anyone in the

13   courthouse.  You may know that, while it's very important to

14   keep the six feet, that the science of this is that usually you

15   only are subject to getting COVID-19 if you are less than six

16   feet for more than 15 minutes.  So a two-second contact would

17   not -- she says she had none whatsoever.  She says she kept

18   both of her masks on at all times, except when she was eating

19   lunch, and she said when she was eating lunch, she sat in the

20   corner, quote, far away from the others.  Don't take that

21   personally.

22        So, as I said, we've suggested -- we can't order her

23   to get the PCR test, which is the more definitive test, but

24   we've strongly suggested.

25        After we learned this, I consulted with all the

L34AWEI2ps                    Verdeschi - Cross

various people in the courthouse who set the standards for

making sure the courthouse is safe for all of you and for all

of us, and they were comfortable with having the case go

forward as long as we excused her, which we did.

          They point out that if you want to, we can provide any

of you with free COVID testing.  So if that's of any interest

to any of you, just let my courtroom deputy, Linda, know, and

we'll arrange for that.  But otherwise I think we are good to

continue.  And if we do hear anything further from Juror No. 8,

if she does take the PCR test, we'll let you know that as well.

          So we're going to give you your midmorning break.  I

have a short telephonic conference, so we'll probably bring you

back at 11:30.  So you're excused.

          (Jury not present)

          THE COURT:  All right.  I need to go take care of this

telephonic matter, but I'll try to come back hopefully by 11:25

so we can continue the discussion we were having about the

exhibits.

          (Recess)

          (Continued on next page)

L34PWEI3                        Verdeschi - Cross

1              (In open court; jury not present)

2              THE COURT:  Please be seated.  So let's continue with

3     the objections.  The one we were looking at, Exhibit 1518,

4     seemed to me to be a mystery.  I'm sorry, the court reporter

5     got a word wrong.  I'm sorry I wasn't loud enough.  I said it

6     seemed to be admissible.

7              I'm sorry, I didn't hear what defense counsel said.

8              MR. HARID:  The issue we have with this document is it

9     isn't clear on the face of this document who prepared it, for

10    what purpose, what any of the numbers mean, and most of all,

11    there isn't anybody who can speak to --

12             THE COURT:  The reason I'm having trouble with your

13    objections, if it's on Mr. Weigand's laptop, then the jury can

14    infer that either he sent it or he received it.  That's not the

15    only conceivable possibility, I suppose, and you could cross as

16    to other conceivable possibilities, but the likelihood is

17    overwhelming that it's one of those two things.

18             So assuming that it's in code, again, to take a

19    hypothetical, if someone had a laptop and on the laptop was the

20    message that, as we discussed, I'm about to deliver to you five

21    kilograms of heroin, that would clearly be admissible even if

22    you didn't know who sent that particular e-mail.  Here, though,

23    everything is in code.

24             So the question is, is there a basis for, in the

25    government's evidence, it to be coded?  So let me go -- my

L34PWEI3                         Verdeschi - Cross

1    understanding was that the government was saying that they

2    already had some of that evidence, such as in the comment

3    that's on the far right about Hot Robot's account, but what

4    about -- let's go back to the main.  What about things like

5    News Op, IntSt, spelled I-n-t-S-t, John, Linbeck?  What can the

6    government say, if anything, about those?

7         MS. DEININGER:  Yes, your Honor.  I think that it

8    is -- this jury will be able to reasonably infer that these are

9    shorthand for merchant names involved in the schemes, both

10   based on the consistency of names, NewOp equals New Opal, IntSt

11   equals International Standards, Linbeck is Linebeck, but also

12   because these abbreviations are used in other documents on the

13   laptop that are directly linked to the --

14        THE COURT:  All right.  So they are abbreviations, but

15   what's the connection?  How does the jury know that they are

16   abbreviations for phony names that were used as part of the

17   scheme?  Which is, I take it, what you're saying.

18        MS. DEININGER:  So I'll break it into two pieces

19   because I'm not quite sure -- so the abbreviations are linked

20   to full names of the fake merchants involved in the scheme and

21   descriptors involved in the scheme in other documents that will

22   be in evidence.

23        THE COURT:  Okay.  So it seems to me, going back to

24   defense counsel, this might have to be offered subject to

25   connection, but it would -- on the representations made, it

L34PWEI3                         Verdeschi - Cross

1    would still come into evidence because the jury then could make

2    sense of it.

3           MR. HARID:  Your Honor, even if they could

4    substantiate who these merchants, alleged phony merchants were,

5    we don't believe there is a witness who can speak to the

6    players involved, specifically the header that says G --

7           THE DEPUTY CLERK:  Jury entering the courtroom.

8           THE COURT:  To be continued.

9           (Jury present)

10          THE COURT:  Okay.  Please be seated.  We have a note

11   from juror No. 9 which we'll take up in a minute.

12          I wanted to tell you that, over the break, I checked

13   further with the people in this courthouse, who were in touch

14   with the scientists, and they said that the chance of anyone

15   getting -- assuming juror No. 8's test was even right, which it

16   may not have been, but the chance of getting Covid-19 from

17   contact with her, unless they were in contact with her of less

18   than six feet for more than 15 minutes is, this is a direct

19   quote, "extremely low" and that's based on studies done by the

20   CDC.  So these are national studies.

21          In addition, in terms of free testing, which we will

22   offer you, if you want it, the time to do that, I was told,

23   would be on Monday because a certain amount of time has to

24   pass.  So we can arrange that for anyone who wants it on

25   Monday, free of charge.

L34PWEI3                         Verdeschi – Cross

1              Now, juror No. 9, why don't you come to the robing

2      room, and we'll take up your matter.

3                   (Continued on next page)

L34PWEI3                        Verdeschi - Cross

1          (At the side bar)

2          (Juror present)

3          THE COURT:  Okay.  So I received a note from juror

4   No. 9, which I'll read to you:  Your Honor, I feel incredibly

5   uncomfortable with the situation and do not feel okay staying

6   on this jury, given the positive exposure.  I sat two seats

7   away from the woman who tested positive, and I can tell you

8   that she was not always six feet away.  I feel not okay with

9   the fact that we were all eating with masks off in the same

10  room.  We should have all been tested before and every day.  I

11  would like to have a test today and be dismissed.  Juror No. 9.

12  Ms. Albert.

13          So, Ms. Albert, I will take up with counsel your

14  request, and I understand this is, obviously, been stressful

15  for you.  We've been having these trials in this courthouse off

16  and on since November, and occasionally someone has tested

17  positive with Covid-19.  Never, ever during that time has

18  anyone else wound up having Covid-19.  That doesn't mean it

19  can't happen, but one of the reasons is that, the point I just

20  made to the jury, which is all the tests show that you really

21  have to be within less than six feet for 15 minutes or more

22  before you can, in this kind of situation, contract Covid-19

23  from another person.

24          So, you know, your health comes first, and but I just

25  wondered whether if what I've just said makes you feel any more

L34PWEI3                          Verdeschi - Cross

1   comfortable.

2                  JUROR:  It does not.

3                  THE COURT:  Okay.  All right.  Let me take it up

4   with -- just actually wait here.

5                  I'm inclined to excuse juror No. 9.  Any objection?

6                  MR. FOLLY:  Your Honor, I might ask to discuss it

7   outside the presence of juror No. 9 for a moment.

8                  THE COURT:  Why don't you go down the hallway.

9                  THE DEPUTY CLERK:  Before, I just want to mention it,

10  we can't get a test today.  It's Monday.

11                 THE COURT:  And the meaningful test would be on Monday

12  anyway because there has to be a certain amount of time before.

13                 JUROR:  Yes.

14                 THE COURT:  That's why these rapid test that juror

15  No. 8 -- we had a situation in a case I tried in November,

16  where a paralegal tested positive on a rapid test, and then she

17  got the PCR test and, of course, it was negative and it was

18  just a false positive.

19                 JUROR:  No, I understand that.  I just wish we'd all

20  been tested beforehand, and it's like just it doesn't seem

21  right.  I know like we're staying in the room for lunch because

22  they don't want us to go outside and have more exposure.  So

23  everyone goes home every night, so why doesn't that make a

24  difference?

25                 THE COURT:  That's true.  So it's not impossible.

1   There could be a problem, but all I can tell you is the track

2   record has been very good on that.  But just go a few feet down

3   the hallway and we'll hear.

4            (Juror not present)

5            THE COURT:  Yes?

6            MR. FOLLY:  Your Honor, obviously, this is a very

7   tricky situation.  I think one concern that we do have, if we

8   were to dismiss her now, is that we would already be down three

9   alternates at a very early stage in this trial and it does --

10           THE COURT:  No, two because we had to excuse one.  We

11  excused alternate No. 4 on the first day of trial because of

12  her economic problems.  We excused juror No. 8 because she

13  tested positive.  But now, so we'd be down from to one

14  alternate after this juror.

15           MR. FOLLY:  Yes, your Honor, that's my exact concern.

16           THE COURT:  Oh, I'm sorry.

17           MR. FOLLY:  And I think one idea I have would be to

18  keep this juror on the jury through Monday, to allow the juror

19  the opportunity to get a test and that might give the juror

20  greater comfort that she isn't, in fact, sick herself; she is

21  not positive.

22           THE COURT:  Well, I think, given the state of mind she

23  was in, we would then have to excuse the whole jury for the

24  rest of today.  The PCR test takes five hours; so even if she

25  came in at 9:00 a.m., we wouldn't have the results until the

L34PWEI3                        Verdeschi - Cross

1    end of the day; so we would miss Monday as well.

2                MR. FOLLY:  Right.

3                THE COURT:  And I'm concerned that, you know, we told

4    the jury three weeks.

5                MR. FOLLY:  Yes.

6                THE COURT:  They all have other things to do with

7    their lives; so I'm not real -- I understand what you're

8    saying, but I'm not real keen on that, but let me hear from

9    other counsel.

10               MR. BURCK:  Judge, I think that your -- I think we

11   agree with your Honor, that it's best to release her.  We

12   recognize that's going to leave us down to one, but we are

13   concerned that she's going to be so preoccupied for today about

14   her Covid exposure and all day Monday, that that does put us in

15   a difficult spot.

16               THE COURT:  Yes.  I think, also, I'm getting the vibes

17   that most of the jurors are reasonably comfortable and to leave

18   her on is just like to leave a stressful person communicating

19   that stress to others.  So I hear what the government is

20   saying, but I'm going to excuse her.

21               Okay.  You can bring juror No. 9 back.

22               (Juror present)

23               THE COURT:  So counsel all thought that they would be

24   heart broken not to have someone as intelligent as you on the

25   jury, but nevertheless, I'm going to excuse you.

L34PWEI3                      Verdeschi - Cross

1           JUROR:  Thank you.

2           THE COURT:  So I will ask you, because I don't think

3  the other jurors feel quite as stressful as you do, not to have

4  any contact with them.  Just, you know, go about your business.

5  Go back down to the jury room now, get your stuff and leave,

6  and we'll continue with the other jurors.  But thank you for

7  serving, and I understand your stress.

8           JUROR:  Thank you for understanding, and it really is

9  interesting.  I'm sorry I couldn't have stayed on and sorry to

10 delay everything.

11          THE COURT:  These things happen.

12          (Juror excused)

13          THE COURT:  Okay.  So let's go back.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  All right.  So ladies and gentlemen, juror

3    No. 9 has some issues that are personal to her and are causing

4    her some distress.  Frankly, I'm not sure they're warranted,

5    but in an excess of caution, the counsel and I agreed to excuse

6    her.

7           So the next alternate should now move up, and you are

8    now juror No. 9.  Congratulations.

9           Okay.  Let's get the witness back on the stand.  We

10   are ready to continue.  Okay.

11          MR. BURCK:  May I proceed, your Honor?

12          THE COURT:  Yes.

13   BY MR. BURCK:

14   Q.  Hi, Mr. Verdeschi.  Can you hear me?

15   A.  I can hear you.

16   Q.  Okay.  Thank you.  So briefly, just to conclude, the last

17   point which we were discussing, the removal of certain

18   companies from the network and put on the MATCH system, do you

19   recall that testimony?

20   A.  We were discussing merchants that were terminated by the

21   acquirer in that circumstance.

22   Q.  Right.  And the acquirer in that circumstance was PXP

23   Financial, right?

24   A.  Yes, in the circumstances, yes.

25   Q.  And that's an acquiring bank, correct?

L34PWEI3                        Verdeschi - Cross

1   A.  That's what, in general, we would term an acquirer.

2   Q.  An acquirer.  And they have an agreement or relationship

3   directly with MasterCard, correct?

4   A.  I can't comment on the specifics of this particular

5   relationship, but yes, in general, we have a relationship with

6   the acquirer.

7   Q.  Okay.  And in this case, again, as we saw from the exhibit,

8   PXP identified a series of merchants they were going to

9   terminate and put on the MATCH system, or MATCH list, to

10  MasterCard, correct?

11  A.  Yes.

12  Q.  And you testified yesterday that there are penalties that

13  can be assessed against a customer, against acquiring banks, if

14  there are violations of the standards and rules of MasterCard,

15  correct?  Do you remember that testimony?

16  A.  Yes.

17  Q.  To your knowledge, was PXP Financial penalized in any way

18  for this apparent violation of the MasterCard rules?

19  A.  I don't believe they were.

20          MR. FOLLY:  Objection.  Foundation.

21          THE COURT:  Oh, I'm sorry.

22          MR. FOLLY:  Foundation.

23          THE COURT:  Overruled.  The answer will stand.

24          MR. BURCK:  And I'm sorry, I didn't hear you.

25          THE COURT:  The answer was "I don't believe they

L34PWEI3                          Verdeschi - Cross

1    were."

2                MR. BURCK:  Okay.  Thank you, your Honor.

3    BY MR. BURCK:

4    Q.  Turning to another topic.  Mr. Verdeschi, your testimony is

5    that use of the MasterCard network is prohibited for marijuana

6    transactions, right?

7    A.  It's prohibited for illegal transactions.

8    Q.  Which include marijuana transactions?

9    A.  In the United States, yes, they --

10   Q.  In the United States, yes, yes.  And that doesn't matter if

11   it's a credit card or debit card, right?

12   A.  Our rules do not distinguish -- on that topic, it does not

13   distinguish between credit or debit.

14   Q.  And I'm going to show you for identification purposes,

15   Akhavan Exhibit 10,043.  Do you see that?

16   A.  I do.

17   Q.  Do you know what it is?

18   A.  It appears to be a MasterCard issued by Citibank.

19               MR. BURCK:  Your Honor, we would offer Akhavan Exhibit

20   10,043.

21               THE COURT:  Any objection?

22               MR. FOLLY:  No, your Honor.

23               THE COURT:  Received.

24               (Defendant's Akhavan Exhibit 10,043 received in

25   evidence)

1                    MR. BURCK:  Thank you, your Honor.

2    BY MR. BURCK:

3    Q.  And so you testified that this is a -- let's go through the

4    card.  Citibank, of course, is the issuing bank?

5    A.  Yes.

6    Q.  And MasterCard is the network?

7    A.  Yup.

8    Q.  And it says "debit," correct?

9    A.  Yes.

10   Q.  Okay.  So this is a debit card?

11   A.  It appears so.

12   Q.  Okay.  Let me show you, just for identification purposes,

13   Akhavan Exhibit 1,047 -- oh, I'm sorry, wrong exhibit.

14                   MR. BURCK:  Hold on, your Honor.  Apologies, your

15   Honor.

16                   THE COURT:  All right.  Since I am technologically

17   incompetent, I always enjoy company.

18                   MR. BURCK:  I am as incompetent as it comes, your

19   Honor.

20                   So if you blow up the card, please.  Thank you.

21   BY MR. BURCK:

22   Q.  Mr. Verdeschi, do you recognize what this appears to be?

23   A.  It appears to be a MasterCard issued by Citibank.

24                   MR. BURCK:  Your Honor, we'd offer this exhibit.

25                   MR. FOLLY:  No objection.

1             THE COURT:  Received.

2             (Defendant's Exhibit 1047 received in evidence)

3   BY MR. BURCK:

4   Q.  And, Mr. Verdeschi, does this appear to be a credit card?

5   A.  I can't say for sure.

6   Q.  Okay.  But it doesn't say debit card on it?

7   A.  It doesn't.  It doesn't say credit card either.

8   Q.  Can you go down to the bottom of the exhibit, please, and

9   highlight the --

10            It says it's from a website; do you see that?

11  A.  Yes.

12  Q.  And at the end it says Citi secured credit card?

13  A.  I see that.

14  Q.  Do you have any reason to believe it's not a credit card?

15  A.  I have the reason to believe it is an image of a credit

16  card.

17            MR. FOLLY:  Objection.

18            MR. BURCK:  There's an objection, I'm sorry.

19            THE COURT:  Overruled.  The answer will stand.

20  Q.  What was your answer?

21            THE COURT:  His answer was "I believe it's an image of

22  a credit card."

23            MR. BURCK:  Thank you, your Honor.

24  BY MR. BURCK:

25  Q.  You testified earlier that, and yesterday, that one of the

L34PWEI3                    Verdeschi - Cross

1   things that you were supposed to do with your group is to

2   protect the brand and the reputation of MasterCard, right?

3   A.   That is -- yes.

4   Q.   And you want to do that by making sure the customers don't

5   engage in activity that would be detrimental to the brand or to

6   the reputation of MasterCard, correct?

7   A.   Yes.

8   Q.   And to accomplish that, you want to make sure, as one

9   example, that illegal transactions don't occur on the network,

10  correct?

11  A.   Yes.

12  Q.   Now, the two credit cards we just saw -- show the witness

13  the two right next to each other.   Perfect.

14         In both of these, the Citibank is pretty prominently

15  displayed, correct?

16  A.   Yes.

17  Q.   Their brand is there?

18  A.   Yes.

19  Q.   And in both of these MasterCard frames, MasterCard is

20  there?

21  A.   Yes.

22  Q.   And both are very noticeable, correct?

23  A.   Yes.

24  Q.   So consistent with your prior testimony, you would not

25  believe that either a debit card or a credit card could be used

L34PWEI3                          Verdeschi - Cross

```
 1   to conduct an illegal transaction on the network, correct?
 2   A.  My testimony was that acquirers are and issuers are
 3   prohibited from conducting illegal transactions in the network.
 4   Q.  Regardless if it's a credit card or debit card, right?
 5   A.  Transactions, right.  So any transaction, credit, debit,
 6   prepaid, it doesn't matter.
 7   Q.  It doesn't matter.  Okay.  And that's, in part, because the
 8   brand appears on both cards, correct?
 9   A.  Yes.
10   Q.  Okay.
11   A.  True statement.
12   Q.  Now, after the PXP -- after PXP Financial put certain
13   merchants on the MATCH list to terminate them from the network,
14   you testified that Eaze -- or you didn't see Eaze listed on
15   that list, correct?
16   A.  Yes.
17   Q.  Okay.  Sitting here today, are you aware of whether or not
18   Eaze remains on the MasterCard network?
19   A.  As I sit here today, I don't know that.
20   Q.  Okay.  And so you don't know if Eaze is using debit cards,
21   or I should say -- let me withdraw.  Withdraw the question.
22           You don't know, sitting here today, whether account
23   holders use their debit cards to buy marijuana from Eaze on the
24   MasterCard network?
25           MR. FOLLY:  Objection.
```

L34PWEI3                          Verdeschi - Cross

```
 1              THE COURT:  Sustained.
 2   Q.  You testified you don't know if Eaze remains on the
 3   platform or the network, correct?
 4   A.  Yes.
 5   Q.  Would it be important to you, in your job, to know whether
 6   or not Eaze is on the network?
 7   A.  Yes.  To the extent that Eaze is selling marijuana, yes.
 8   Q.  Have you ever sent a MasterCard employee, one of your
 9   people, into a cannabis store to see if MasterCard is being
10   used in cannabis stores?
11              MR. FOLLY:  Objection.
12              MR. BURCK:  Your Honor, I'll lay a foundation.
13   Q.  Yesterday you testified that you used, on occasion, your
14   own employees to monitor activity in the network, correct?
15   A.  Yes.
16   Q.  Do you occasionally use employees to -- let me ask you.
17   How do you use those employees to monitor the network?
18   A.  Well, let me respond to your question by saying this.  We
19   would never, and I would never, instruct one of our employees
20   to conduct an illegal transaction.
21   Q.  Understood.  But my question was whether or not anyone had
22   ever been inside a cannabis store?
23   A.  I have never instructed anyone to go into a cannabis store.
24   Q.  Have you ever been in a cannabis store?
25   A.  No.
```

L34PWEI3                    Verdeschi - Cross

1    Q.  Have you been to Los Angeles?

2    A.  Yes.

3    Q.  Have you ever seen any billboards in Los Angeles?

4    A.  I can't remember the last time I was in Los Angeles.  Maybe

5    it was five years ago.  Did I see a billboard?  Sure.

6    Q.  You testified about the proactive and the reactive

7    processes you used to ensure that the network is not misused,

8    correct?

9    A.  I did.

10   Q.  As far as you know, have any of those measures been used

11   since PXP Financial put all of those merchants on the MATCH

12   list, to check to see if Eaze is still on the MasterCard

13   network?

14          MR. FOLLY:  Objection.  Government motion in limine

15   No. 3.

16          MR. BURCK:  Your Honor, it's not being offered for

17   that purpose.

18          THE COURT:  I'll allow it.

19          MR. BURCK:  Thank you, your Honor.  Let me repeat the

20   question.

21   BY MR. BURCK:

22   Q.  And I'll try to make it a more succinct question.  You

23   testified yesterday about proactive and reactive means of

24   testing to make sure that the network is not being misused,

25   correct?

L34PWEI3                         Verdeschi - Cross

1    A.  Yes.

2    Q.  I couldn't hear you?

3    A.  Yes.

4    Q.  To your knowledge, has any of those proactive or reactive

5    processes been used since PXP Financial alerted -- was alerted

6    to the merchants that were put on the MATCH list?  Has

7    MasterCard used any of those proactive or reactive methods to

8    check to see if Eaze is still on the network?

9    A.  Well, what I can say is I don't know what my team does on a

10   daily basis on every situation.  They certainly will follow up

11   with cases, and they will revisit cases.  When it comes to

12   Eaze, I actually just saw on the news just last week, or

13   actually it may have been even on the weekend, a news story

14   about Eaze --

15            THE COURT:  Whoa, whoa.  I think you've answered the

16   question that was put.

17            MR. BURCK:  I think so too, your Honor.  Your Honor,

18   may I have a moment?

19            THE COURT:  Yes.

20            (Pause)

21            MR. BURCK:  No further questions, your Honor.

22            THE COURT:  Cross-examination from counsel for

23   Mr. Weigand?

24   CROSS-EXAMINATION

25   BY MR. HARID:

1   Q.  Good morning, Mr. Verdeschi.  Can you hear me?

2   A.  Good morning.  Yes, I can hear you.

3   Q.  If you have trouble hearing me, please stop me at any

4   point.

5   A.  I will.

6   Q.  How are you feeling today?

7   A.  Very good.

8   Q.  I represent Mr. Weigand.  My name is Shriram Harid.

9   A.  Okay.

10  Q.  I'd like to discuss the authorization phase of the

11  transaction with you.  As you testified yesterday, when a

12  credit or debit card is used, the authorization involves the

13  sending of pieces of information to the issuing bank, yes?

14  A.  Yes.

15  Q.  And there are various pieces of information sent to the

16  issuing bank?

17  A.  That is correct.

18  Q.  And that would include, in a typical case, the name of a

19  merchant?

20  A.  Yes.

21  Q.  And the merchant address?

22  A.  Mmm, hmm.  Yes.

23  Q.  And the acquiring bank's name?

24  A.  Yes.

25  Q.  And the transaction amount?

L34PWEI3                    Verdeschi - Cross

1   A.   Yes.

2   Q.   And the level of security of the credit or debit card?

3   A.   Yes.  My understanding is there are various different data

4   elements that talk to the level of security, the type of card

5   being used, and the type of terminal being used.

6   Q.   And in some cases, that information would also include a

7   merchant descriptor?

8   A.   Merchant descriptor is something that I would typically

9   refer to as the merchant name.

10   Q.   I understand.  Thank you.  And finally, we've discussed MCC

11   codes.  Those would be conveyed to the issuing bank also, yes?

12   A.   Yes.  The MCC code is part the authorization.

13   Q.   And as you've testified yesterday, after receiving all of

14   that information, an issuing bank would decide whether to

15   approve or deny a transaction within milliseconds?

16   A.   That is true, yes.

17   Q.   And you also testified yesterday that one of the factors

18   that the issuing bank considered is a credit or debit card

19   holder's ability to pay for the transaction, his financial

20   capacity?

21   A.   I am not an issuing bank; so I can't comment at length

22   about that.  But yes, they are concerned about does the

23   customer pay their bills, do they have the available credit to

24   make that transaction.  So that factors into their decision.

25   Q.   Would you call that the primary factor the issuing bank

L34PWEI3                          Verdeschi - Cross

1   considers?

2   A.   Again, I don't work for an issuing bank; so I can't really

3   say what's primary or secondary.  It's a factor.

4   Q.   I'd like to turn to MCC codes and kind of walk through what

5   they mean and how much information they carry.

6   A.   Mmm, hmm.

7   Q.   As you testified yesterday, these are four-digit numeric

8   codes, yes?

9   A.   Yes.

10  Q.   And the code for grocery stores and supermarkets is 5411,

11  yes?

12  A.   I don't know for sure.

13  Q.   I can represent that's true.

14  A.   Okay.

15  Q.   So let's say one of the fine men and women in this jury

16  went to a Gristede's or a Fairway and made some purchases.  The

17  code 5411 would be sent to an issuing bank, yes?

18  A.   That's correct.

19  Q.   I can also represent to you that the code for drug stores

20  and pharmacies is 5912.  So let's say --

21        MR. FOLLY:  Objection.

22        THE COURT:  Sustained.  You can't testify.

23  Q.   The code for drug stores and pharmacies is different than

24  the code for grocery store, yes?

25  A.   I would expect it would be.

1  Q.  Do you have any reason to believe it isn't 5912?

2           MR. FOLLY:  Objection.

3           THE COURT:  Sustained.

4  Q.  Mr. Verdeschi, you testified that MCC codes are not product

5  specific but they're merchant related?

6  A.  Well, I say that generally, yes.  In general, they tend to

7  be -- they are category codes.  They are focused on a category

8  of the merchant, not -- in general, not the product that the

9  merchant is selling.

10  Q.  So let's say that one of us went to a grocery store like

11  Gristede's and bought a bundle of goods, let's say bread, milk

12  and aspirin.  That purchase would carry a code for a grocery

13  store, yes?

14  A.  Assuming that the acquirer assigned them a grocery store

15  MCC and the transaction was coded correctly, yes.

16  Q.  Would that be the same if we went to a pharmacy, like a

17  CVS, and bought the same bundle of goods, like bread, milk,

18  aspirin?  That purchase would carry a pharmacy code, yes?

19  A.  Assuming that's the way the transaction was coded, yes.

20  Q.  Mr. McLeod, can you put up what's been designated

21  Government Exhibit 2312.

22           You reviewed these rules with the government and with

23  Mr. Burck today, yes?

24  A.  Yes.

25  Q.  And we've established at length that there's no MCC code

L34PWEI3                         Verdeschi - Cross

1   for marijuana purchases in the U.S., correct?  No specific MCC

2   code for marijuana purchases?

3   A.  Yes, we've established that.

4   Q.  Mr. McLeod, can you please turn to page 79, rule 5.7.1.

5           Mr. Verdeschi, can you read the sentence beginning

6   "any transaction" in the middle?

7   A.  Sure.  "Any transaction that includes the sale of products

8   or services properly identified with one of the following MCCs

9   must be identified with such MCC."

10  Q.  And, Mr. Verdeschi, that's "must," not "may;" yes?

11  A.  Yes.

12  Q.  That's a mandatory MCC code?

13  A.  That is a must, yes.

14  Q.  And as we can see, that applies to gambling transactions?

15  A.  Yes.

16  Q.  And so gambling transactions have to be coded 7995, yes?

17  A.  Legal gambling transactions need to be coded 7995.

18  Q.  This rule sets out mandatory MCCs for other products and

19  services, yes?

20  A.  Yes.

21  Q.  Including quasi-cash and money transfer?

22  A.  Yes.

23  Q.  Mr. McLeod, can you please turn to page 208.  Will you

24  please blow up the bottom of the page.

25          Mr. Verdeschi, I think you went over this with

L34PWEI3                              Verdeschi - Cross

1    Mr. Burck, but it's clear, based on this rule, that there's

2    a -- there's an MCC code for internet gambling, 7801, yes?

3    A.  Non-sports, intrastate, internet gambling.  7801 internet

4    gambling.

5    Q.  And there's also a specific MCC code 7802 for government

6    licensed horse and dog racing, yes?

7    A.  There is.

8    Q.  So that means the ISO, as you put it, has the ability and

9    has taken steps to assign very specific MCCs for very specific

10   products and services, yes?

11   A.  In these situations, they have assigned these specific

12   MCCs, yes.

13   Q.  And the purpose of assigning these MCC codes is to give the

14   issuing bank visibility, as you said yesterday?

15   A.  Give the issuing bank visibility into legal transactions,

16   yes.

17   Q.  And gives them visibility and let's them track those

18   transactions, yes?

19   A.  Say again?

20   Q.  It let's both the network and issuing banks track or, you

21   know, keep track of transactions?

22   A.  It let's us monitor, yes.  I would agree with that.

23   Q.  As we've established, Mr. Verdeschi, there is no specific

24   MCC code for marijuana in the U.S., yes?

25   A.  I believe we've established that.

1    Q.  Yes.  But the network MasterCard has assigned an existing

2    MCC code for marijuana purchases in Canada, yes?

3    A.  I -- I don't recall what we announced on how to treat

4    Canadian transactions.  I don't recall.

5    Q.  Mr. McLeod, can you please pull up what's been marked

6    Akhavan Exhibit 4013, which has previously been admitted into

7    evidence.

8            What is this, Mr. Verdeschi?

9    A.  MasterCard rules manual.

10   Q.  And the date is?

11   A.  December 18, 2018.

12   Q.  Mr. McLeod, can you please turn to page 183, rule 5.7.1.

13   Can you blow up the -- can you highlight the second paragraph

14   beginning with "A Canada" and ending with "recreational

15   cannabis"?  Thank you.

16           Mr. Verdeschi, can you read that?

17   A.  Certainly.  "A Canada region acquirer must use MCC 5912

18   (drug stores, pharmacies) to identify transactions arising from

19   a Canada region merchant or submerchant whose primary business

20   involves the legal sale of recreational cannabis."

21   Q.  Mr. Verdeschi, this rule was in effect when these rules

22   were in effect, which was in 2018, yes?

23   A.  Yeah, I'm going to assume that they would be in effect at

24   the time the manual was published.

25   Q.  And what this rule means is that Canadian marijuana

L34PWEI3                    Verdeschi - Cross

1   purchases must carry the MCC code 5912, yes?

2   A.  Yes.

3   Q.  Mr. Verdeschi, as you testified, the network, the

4   MasterCard network, is a global payments network?

5   A.  Yes.

6   Q.  And credit and debit cards issued by U.S. banks do work in

7   Canada, yes?

8   A.  They do work in Canada.

9   Q.  So let's say one of us took a credit or debit card and went

10  to Canada on vacation --

11  A.  Mmm, hmm.

12  Q.  -- and then we went to a Canadian pharmacy and bought

13  Advil, some kind of legal pharmaceutical product.  That

14  transaction would be coded the code for drug stores,

15  pharmacies, 5912, yes?

16  A.  I would assume so.

17  Q.  And the U.S. issuing bank would see that code, 5912, yes?

18  A.  Yes.

19  Q.  Let's say one of us went to Canada with a U.S. issued

20  credit or debit card, and we used that card to buy marijuana,

21  which we've established was legal in Canada.  The U.S. issuing

22  bank would see the same code 5912, yes?

23  A.  I presume they would.

24  Q.  In other words, using MCC codes, it is practically -- it is

25  impossible for a U.S. issuing bank to distinguish between an

L34PWEI3                          Verdeschi - Cross

1    Advil purchase in Canada and a marijuana purchase in Canada,
2    through Canada, yes?
3    A.  Using MCC codes on their own, yes.
4    Q.  So if a U.S. issuing bank relied entirely on MCC codes to
5    monitor transactions, in the second scenario I described
6    involving marijuana, it would be facilitating a processing of a
7    marijuana transaction, yes?
8              MR. FOLLY:  Objection.
9              THE COURT:  Sorry.  I'm sorry.  I lost my LiveNote; so
10   Ms. Reporter, can you read the last question, please.
11             (Record read)
12             THE COURT:  Sustained.
13   BY MR. HARID:
14   Q.  Mr. Verdeschi, I'd like to talk to you about the merchant
15   descriptors that you testified about yesterday.  Unlike MCC
16   codes, there is no finite set of merchant descriptors that a
17   merchant is required to use, yes?
18   A.  It's -- a descriptor is meant to be in the merchant's name;
19   so that it could be -- it's sort of a free-form field.  They
20   could populate it how they see fit.  However, we do have
21   standards around ensuring that, for the cardholder's benefit,
22   that they have an accurate description.
23   Q.  But a single merchant is allowed to use more than one
24   descriptor at any point in time, yes?
25   A.  Yes.

L34PWEI3                           Verdeschi - Cross

1    Q.   And that merchant's descriptor may evolve or change over

2    time?

3    A.   It may, but in general, they are meant to provide the

4    issuer and the cardholder with an accurate description of the

5    business.

6    Q.   MasterCard doesn't prescribe what descriptors a merchant

7    must use, right?

8    A.   No, we don't identify to the merchant how they should be

9    coded unless they, of course, are using a descriptor that is

10   non-descriptive.  And that happens from time to time.  And then

11   in those cases, we will engage and ask them to change it.

12   Q.   I'd like to return to the four-prong model that Mr. Burck

13   discussed with you.

14             And, Mr. McLeod, could you pull up Government

15   Exhibit 2314.

16             As we established, issuing banks have a contractual

17   relationship, a direct contractual relationship with the

18   cardholder in a credit card transaction or a debit card

19   transaction, yes?

20   A.   Yes.

21   Q.   But they do not have a contractual or direct relationship

22   with a merchant?

23   A.   That's true.

24   Q.   In fact, the only entity on this page that has a direct

25   contractual relationship with the merchant is the acquirer on

L34PWEI3                        Verdeschi - Cross

1    the left of the picture?

2    A.  That's true.

3    Q.  And it's an acquiring bank's responsibility, as we've

4    established, to evaluate and approve merchants before they're

5    on-boarded, yes?

6    A.  Yes.

7    Q.  And yesterday, I believe you testified that the only way

8    the issuing side or the acquiring side would interact would be

9    through the network; is that right?

10   A.  I'm not sure I understand the question.  The only way you

11   would interact -- I guess what I said was the transaction

12   occurs over our network.  I don't think I said that's the only

13   way they would interact.

14        MR. HARID:  Can I refresh Mr. Verdeschi's recollection

15   by showing him page 431 of the transcript from yesterday, lines

16   17 through 19?

17        THE COURT:  You're only showing this to the witness.

18   A.  Yes, I said that in the context of switching.  Yes, that's

19   how they would interact for our network.

20        (Continued on next page)

21

22

23

24

25

L34AWEI4ps                    Verdeschi - Cross

1   Q.  Would you -- I believe it's a fair statement to say that

2   the issuing side and the acquiring side are effectively siloed

3   but for the network.

4   A.  I don't know what you mean by "siloed."

5   Q.  OK.  But the network's function is to connect the issuing

6   bank to the acquiring bank, the bank which we've established --

7   A.  To enable them to conduct the transaction, yes.

8           MR. HARID:  Mr. McLeod, can you please turn to Exhibit

9   2312, page 73.

10  Q.  I believe yesterday you reviewed 5.1.1 verify bona fide

11  business operation with Mr. Folly.  And the first sentence of

12  this rule says, "Before entering into, extending, or renewing a

13  merchant agreement, an acquirer must verify that the merchant

14  or ATM owner is a bona fide issue, has sufficient safeguards,

15  and complies with applicable laws."  What this rule means,

16  then, Mr. Verdeschi, is that acquiring banks are responsible

17  for making sure that the merchants they sign on are real and

18  comply with the law.  Yes?

19  A.  That is the intent, yes.

20          MR. HARID:  Mr. McLeod, can you turn to page 76, Rule

21  5.2.

22  Q.  Mr. Verdeschi, can you read the first paragraph.

23  A.  "The acquirer is responsible for ensuring that each of its

24  merchants and submerchants complies with the standards, and the

25  acquirer is itself responsible to the corporation and to other

L34AWEI4ps                    Verdeschi - Cross

1    customers for any merchant's or submerchant's failure to do

2    so."

3    Q.  Simply, this rule means that if a merchant breaks rules,

4    the acquiring bank is held responsible.  Yes?

5    A.  Yes.

6    Q.  Mr. Verdeschi, you discussed the internal system that

7    MasterCard has in place to hold acquiring banks responsible for

8    illegal and brand-damaging transactions.  Yes?

9    A.  I'm sorry.  Can you repeat that?

10   Q.  You testified about the internal system that MasterCard has

11   in place to hold acquirers responsible for illegal brand-

12   damaging transactions.

13   A.  I testified that we take proactive and reactive measures to

14   address illegal transactions.

15          MR. HARID:  Mr. McLeod, can you please put up

16   Government Exhibit 2312, page 85.  Can you please blow up Rule

17   5.11.7."

18   Q.  Mr. Verdeschi, this is a rule that sets out a framework, or

19   a blueprint, for the network to use to hold acquiring banks

20   accountable.  Yes?

21   A.  This section refers to illegal or brand-damaging activity.

22   Q.  And I believe you testified about the various escalating

23   steps that the network may take in response to illegal merchant

24   activity.

25   A.  I did.

L34AWEI4ps                    Verdeschi - Cross

1   Q.  And the first step the network would typically take would

2   be to contact the acquiring bank and ask them to investigate.

3   A.  I think, if I recall my testimony, I think I was talking

4   about that my team first would conduct its own investigation,

5   look at the merchant's website, and then we would contact the

6   acquirer.

7   Q.  And the acquirer would be expected to investigate and then

8   report back with its findings.

9   A.  Yes.

10  Q.  And even after reporting to MasterCard, the acquirer could

11  still have to face or pay a noncompliance assessment, or fee --

12  correct?

13  A.  Yes.

14  Q.  -- to account for the illegal merchant activity.

15  A.  Yes.

16  Q.  And as this rule indicates the following, I believe the

17  next page, the fine would be $200,000 per merchant, or 2500 per

18  day, beginning on the day the illegal activity began.

19  A.  Yes.

20  Q.  But hypothetically if the acquirer didn't investigate and

21  the illegal activity continued, that would open up even more

22  disciplinary avenues to MasterCard.

23          MR. FOLLY:  Objection.

24          THE COURT:  Sustained.

25  Q.  The network could require the acquiring bank to submit to

L34AWEI4ps                    Verdeschi - Cross

1   an audit.

2              MR. FOLLY:  Objection.

3              THE COURT:  Sustained.

4              MR. HARID:  Mr. McLeod, can you please highlight the

5   section at the top of page "an audit at the sole expense of the

6   acquirer."

7   Q.  Mr. Verdeschi, as this section of the rule shows, the

8   acquirer could require -- could be held -- could be subjected

9   to an audit, in the event of illegal activity.

10  A.  Yes.

11             MR. HARID:  You can close that, Mr. McLeod.

12             Go back in the document.  You could highlight point

13  one on the top.

14  Q.  The acquirer could also be subject to a risk review.  Yes?

15  A.  Yes.

16  Q.  And finally, as we've discussed, the merchant would also be

17  added to the MATCH if it was terminated.

18  A.  If the acquirer terminated the merchant, then yes.

19  Q.  And in your experience, termination of the merchant or the

20  acquirer would be the final step that the network would take,

21  yes?

22  A.  Not necessarily.

23  Q.  What else might it do?

24  A.  Depending on the situation, we would probably follow up

25  with the acquirer.  We would probably continue to monitor, to

L34AWEI4ps                    Verdeschi – Cross

1   ensure that the illegal activity did not reenter the network.

2   So I wouldn't say it ends with a termination.  It's just one

3   step in the process.

4   Q.  The process would still be governed by MasterCard rules and

5   would remain an internal process.

6        Let me withdraw that question.

7        The remedial process would not involve referrals to

8   law enforcement or prosecutors, would it?

9   A.  As I said earlier, we do not refer to law enforcement.

10  Q.  And as you told us earlier, even in the case of Eaze, you

11  didn't refer Eaze to law enforcement.  Yes?

12  A.  Yes.

13  Q.  And you may recall that in December of 2020, there was an

14  incident involving the merchant Porn Hub.  Do you remember

15  that?

16        MR. FOLLY:  Objection.

17        THE COURT:  Well, I think this is probably a good time

18  to give the jury their lunch break.  We can argue about that

19  question outside their presence.

20        So, ladies and gentlemen, we'll give you your lunch

21  break and we'll reconvene in about an hour.

22        (Continued on next page)

23

24

25

L34AWEI4ps

1          (Jury not present)

2          (Witness excused)

3          THE COURT:  So what's this question all about?

4          MR. HARID:  Your Honor, the point of the question is

5    to highlight that even in unusual and extreme basis, there is

6    an internal mechanism to deal with the illegal conduct.  I was

7    going to lay a foundation for that.

8          THE COURT:  What's the relevance of this?

9          MR. HARID:  The relevance is that there's an internal

10   system, an internal MasterCard system, to address illegal

11   conduct that doesn't involve referrals to law enforcement and

12   don't involve, don't make, don't make criminal implications.

13         THE COURT:  So what?  What's the relevance of that to

14   any issue in this case?

15         MR. HARID:  Your Honor, I understand your position.

16         THE COURT:  About how much more do you have?

17         MR. HARID:  I would say about 15 minutes.

18         THE COURT:  OK.  So now back to the documents.  The

19   only one I think I ruled on specifically so far is Government

20   Exhibit 1518, which will be received.  Other objections?

21         MR. HARID:  Your Honor, there's a separate collection

22   of Telegram chats, Government Exhibit 1728, 1733, and 1722.

23   These have all been very heavily redacted, and they include

24   some of the alleged co-conspirators in this case and the

25   defendants, concern entirely personal matters and entirely

L34AWEI4ps

1    unrelated business matters, and given the heavy redactions,

2    it's essentially impossible to make sense of these redactions,

3    and more importantly, there is a real threat of misleading the

4    jury by speculation.

5              THE COURT:  So give me an example.  You gave me three

6    exhibits: 1728, 1733 --

7              MR. HARID:  Let's look at Government Exhibit 1722.

8              THE COURT:  All right.  Allow me to find it.  OK.  Got

9    it.

10             MR. HARID:  Page 3.  The issue, your Honor, is this --

11             THE COURT:  I'm sorry.  Hang on.  Just before you --

12   OK.

13             So, at least in its current form, Exhibit 1722, the

14   first page other than the name Andrea Bricci, B-r-i-c-c-i, and

15   the date, 16 January 2019, and the time, 16:47, is redacted.

16   The next page is totally redacted.

17             The next page is redacted except for the words "It is

18   not related to your is -- with the Swiss grade register to be

19   deleted."  I don't know what that means.  I feel that that was

20   supposed to have been, that's a message to the government and

21   it shouldn't have been part of this, but anyway.  And then

22   there's, from Ms. Bricci, "Hey, audit went well, we kept

23   talking all the time, so she didn't get to ask all her

24   questions."  Then the next page is totally redacted.  The page

25   after that is totally redacted.  The page after that is totally

L34AWEI4ps

redacted.  The page after that is totally redacted.

Then the page after that is totally redacted except
for the following: "for the MC case with Esepa, E-s-e-p-a,
they're asking for a list of any additional merchants accounts
that PXP identified who were involved in the scheme."

Then we have, contrary to past precedent, a couple of
pages that are actually not redacted.  And they include, for
example, such heavy evidence as, on one of those two pages, a
message from Ruben W., "Hey, how are you.  Please let me know
when you have a second."  That certainly is going to be helpful
to the jury, I have no doubt.

And then the rest of the exhibit is essentially not
redacted but not of any relevance.

So let me ask the government, number one, what is the
relevance of the unredacted portions?  And, number two, doesn't
the fact that almost everything in this exchange is redacted
prevent the jury from having a fuller context in which to
evaluate it?

So let me hear you.

MS. DEININGER:  Yes, your Honor.  So Andrea Bricci is
a co-conspirator in the scheme.  The evidence included --

THE COURT:  So Andrea Bricci is a co-conspirator.
That's helpful because how many co-conspirators did you list?
140 or something like that?  Were you able to consult the
Manhattan phone book before coming up with that list?

L34AWEI4ps

1          MS. DEININGER:  I think we left a few people off the

2     phone book.  I do know there were a lot of co-conspirators.

3     Andrea Bricci was one of the identified co-conspirators.  And

4     she is actually -- or he, I'm sorry, I actually do not know the

5     gender of the person -- but is an employee of PXP Financial, is

6     a co-conspirator in the scheme, and was involved in

7     corresponding with MasterCard after they found out about the

8     scheme.

9          THE COURT:  How are you going to establish that?

10         MS. DEININGER:  We saw this document yesterday through

11    MasterCard.  It was Government Exhibit 2309 was admitted.  And

12    it was admitted.  That is an email from Andrea Bricci listing

13    all the merchants that were terminated after their

14    investigation.  And this Telegram is a conversation between

15    Andrea Bricci and Ruben saying, "for the MC case," the master

16    case, "with Esepa," which is the -- an ISO of basically a

17    payment processor that is also discussed --

18         THE COURT:  How does the jury know, just from this,

19    without someone providing testimony as to context, who they are

20    in that sense?

21         MS. DEININGER:  For the MC case?

22         THE COURT:  I'm looking at the first.  This is the, as

23    near as I can tell, the -- well, let me go back because I

24    missed -- so on the third page -- these pages don't seem to be

25    numbered, but they are -- and they have peculiar time entries,

L34AWEI4ps

1    which make me wonder whether they're in reverse order.  But the

2    first page you have not redacted, other than the mistake that

3    was made about a direction to redact, is from Andrea Bricci

4    saying, "Hey, audit went well, we kept talking all the time, so

5    she didn't get to ask all her questions."  First, how does the

6    jury know what that's in reference to?

7         MS. DEININGER:  Your Honor, this particular statement

8    is not being admitted for the truth of anything they're

9    discussing, but it's part of the demonstration of the

10   relationship.

11        THE COURT:  That's fine.  So let's go on.  We go on

12   through some more redacted pages.  And we get to what

13   apparently is the first entry that you want to make reference

14   to, which bears the time stamp 14:16, although the start of

15   this document indicates that it started at 16:47.

16        MS. DEININGER:  This is a chat that stretches over

17   many months, and so this is a -- these chats all took place on

18   May 2nd, 2019.  The date is on the next page.  The first shown

19   time is 14:16 and the second is 14:17.

20        THE COURT:  All right.  So this is a different

21   communication.  It's part of a chain, but it's a different

22   communication from the one, one or ones, that you redacted in

23   the previous pages.

24        MS. DEININGER:  Many conversations occurring on

25   different days, and only one of which prior was unredacted, not

L34AWEI4ps

1    all of them.

2                THE COURT:  So in this one, it starts out "for the MC

3    case" -- a jury could infer that means MasterCard -- "with

4    Esepa" -- what's Esepa?

5                MS. DEININGER:  My understanding, Esepa is what is

6    referred to as an ISO administrator or payment processor, and

7    the cooperating witness will be testifying among other things

8    that Esepa was involved in the fraud, in this particular fraud

9    scheme.

10               THE COURT:  All right.  And it says, "They are asking

11   for a list of any additional merchants' accounts that PXP" --

12   what's PXP?

13               MS. DEININGER:  PXP is PXP Financial.  And again,

14   going back to the document we looked at yesterday with

15   Mr. Verdeschi, that was a document just a few days before this

16   where Andrea Bricci from PXP sent MasterCard a list of

17   merchants that had been terminated.  It says that those

18   merchants had been referred to them by Esepa.

19               THE COURT:  All right.  So the only reason you had the

20   previously redacted pages, 1, 2, 3 --

21               MS. DEININGER:  Your Honor, these are just long

22   conversations.  We were trying to trim it down to what was

23   relevant.

24               THE COURT:  I understand that.  But the point is, you

25   need something -- if we were to start with this page as the

L34AWEI4ps

first relevant page, you would still need the date from the

first page of this document.  But otherwise you don't need any

of the intervening stuff.

            MS. DEININGER:  That's correct.

            THE COURT:  So rather than redact it, we could simply

start with this page and you could have the date and then the

three dots and then this page.

            All right.  So then the next page is a different

conversation.

            MS. DEININGER:  This is a continuation.

            THE COURT:  And it's five months later.

            MS. DEININGER:  No.  No, I'm sorry, your Honor.  The

message we've just read, about the master case with Esepa, is a

minute before this page.

            THE COURT:  I'm sorry.  Now, the first page of this

document says 16 January 2019.  Right?

            MS. DEININGER:  That's correct.

            THE COURT:  And the --

            MS. DEININGER:  I think what we --

            THE COURT:  And then the next piece of this document

that you're offering, which is quite a few pages later, doesn't

have a date but says 14:16.  So if this exhibit were admitted,

the jury would infer that that was 14:16 on January 16th.

            MS. DEININGER:  I think your Honor has a good point

there, and we could unredacted date that is on that page with

L34AWEI4ps

1    the 14:16 time stamp.

2              THE COURT:  And what is the date?

3              MS. DEININGER:  May 2nd, 2019.

4              THE COURT:  All right.  So now we have the May 2nd

5    conversation.  And first is from Ms. Bricci, the person who

6    you're offering, the reference to the MC case, then you block

7    out something.  Is that a response from Mr. Weigand?

8              MS. DEININGER:  It is not.  It was a conver-- it was a

9    continuation of an unrelate -- of a separate conversation.

10   There were two topics that were could commingled, so we had

11   redacted that.

12             THE COURT:  I see.  So what's on the next page,

13   starting with "there are a few more merchants," is part of the

14   same message that began on the previous page.

15             MS. DEININGER:  That's right.

16             THE COURT:  OK.  And then there is a response -- the

17   last sentence of what you have there and at the top of that

18   page is, from Ms. Bricci, "the terminated and the new one from

19   April they could potentially identify themselves too, should we

20   put -- provide the details as being additional merchants from

21   this ISO?"  Then there's the name Ruben W. and an arrow.  What

22   does that signify?

23             MS. DEININGER:  The arrow is -- I think some context

24   of how this document was created would help.  So these are all

25   Telegrams, they were Telegram chats that were on Mr. Weigand's

L34AWEI4ps

1    computer.  When a forensic image of the computer was extracted,

2    Telegrams, because of their encryption, were not able to be

3    extracted with everything else.  So in order to recover --

4              THE COURT:  Yes.  I hear what you're saying.  But if

5    I'm a juror looking at this, I assume the government's view of

6    this is that the response from Ruben W. is the foreign words

7    "good question."

8              MS. DEININGER:  That's correct.

9              THE COURT:  But no juror could fill that out without a

10   lengthy exposition of how this intervening --

11             MS. DEININGER:  Your Honor, this is exactly how the

12   chat --

13             THE COURT:  I understand, but the objection in part is

14   to incomprehensibility.

15             All right.  So she says, "Let me know what you think,

16   please.  I need to respond to them by tomorrow."  And then,

17   "This is the list of additional names."  That's at 4:26.  But

18   at 4:20 -- are I'm sorry, 14:26.  But at 14:23 --

19             MS. DEININGER:  That's another day.  There's an

20   intervening --

21             THE COURT:  That's a different day?

22             MS. DEININGER:  May 8, 2019.  You can see it in the

23   center.

24             THE COURT:  Oh, I'm sorry.  Thank you very much.

25   That's from Ruben W.  "Hey! How are you?  Please let me know

L34AWEI4ps

1    when you have a second."  What's the relevance of that?

2                MS. DEININGER:  It's just to demonstrate the continued

3    relationship between defendant and his co-conspirator.

4                THE COURT:  All right.  Then we have, on still another

5    day, October 24th, many months later, we have Ruben W.

6    saying -- or I'm not sure what this translates to --

7    *"ausgehender anruf."*

8                I'm sure our court reporter got that down perfectly.

9    She has it beginning with "Alice," but -- close enough.  We'll

10   provide a copy of this to our court reporter, who recognizes

11   that my German leaves something to be desired.

12               So what's the relevance of that?

13               MS. DEININGER:  That is just an outgoing call by

14   Telegram.  It demonstrates the relationship between Ruben and

15   the co-conspirator.

16               MS. CLARK:  Your Honor?

17               THE COURT:  How is that -- oh, it's an outgoing call

18   to Ms. Bricci?

19               MS. DEININGER:  Yes.  This was a Telegram chat that

20   was solely between Mr. Weigand and Bricci.  As you will hear

21   from agent testimony, Telegram can be used for both exchanging

22   chats and making phone calls.

23               THE COURT:  And taking this exhibit in its glorious

24   entirety, what do you think it shows?

25               MS. DEININGER:  I think it is part of the relationship

L34AWEI4ps

1      between Weigand and the co-conspirator.  It shows specific --

2      it shows that they had a relationship with Bricci, who is an

3      insider at PXP Financial, and it shows in particular they

4      corresponded about the MasterCard investigation and what

5      merchant should be identified to MasterCard after MasterCard

6      asked PXP about that investigation.

7              MS. CLARK:  Your Honor, may I make one point of

8      clarification in discussing this exhibit?

9              THE COURT:  Yes.

10             MS. CLARK:  I don't believe that Andrea Bricci is

11     listed on the list of co-conspirators.  I did hear

12     Ms. Deininger's representation that she worked for Kalixa, but

13     I think on the lists that we have, Ms. Bricci is not included.

14             MR. HARID:  Your Honor, I think the more significant

15     point is that there's a significant incomprehensibility

16     problem, as you noted.  And it's a document that's impossible

17     to place in any kind of context without a testifying witness.

18             And there is also a 403 problem because Mr. Weigand

19     did have a relationship with Ms. Bricci that had nothing to do

20     with anything alleged here.

21             And that's why there is a real risk of misleading the

22     jury.  And these are perfectly benign exchanges between him and

23     Ms. Bricci about things that are completely unrelated, just as

24     the other Telegram chats are.

25             THE COURT:  Taking it most favorably to the

L34AWEI4ps

1   government, the most I can think would be relevant is that this
2   shows that Ms. Bricci is in contact with Mr. Weigand regarding
3   MasterCard's acquirers.  Is this what it's being offered for?
4            MS. DEININGER:  That is the primary purpose that it's
5   being offered for.
6            THE COURT:  Now, what about the point that was just
7   made by Mr. Akhavan's counsel that Ms. Bricci is not on a list
8   of co-conspirators?
9            MS. DEININGER:  Your Honor, we're confirming, but
10  my -- my recollection was that she was, but I believe that also
11  PXP Financial and Kalixa were, which is the entity she was
12  involved -- employed by.
13           THE COURT:  Because if she's not, this is hearsay.
14           MS. DEININGER:  If she's not, we would still argue
15  there is a valid non-hearsay purpose, which is to show that
16  Weigand, because of his involvement in the scheme, was being
17  notified of this investigation, and his response.
18           THE COURT:  I think it's questionable for that
19  purpose.  So here's my ruling, because you all need to get your
20  lunch.  If she was listed on the list of co-conspirators, I
21  will admit this document, but I think it's got to be cleaned up
22  so that what the jury receives is a much more limited --
23           MS. DEININGER:  Yes, your Honor.  We have confirmed.
24  She was listed on our list of co-conspirators.
25           THE COURT:  OK.

L34AWEI4ps

1          MR. HARID:  Your Honor, there is a risk that even a

2     cleaned-up version would not resolve the 403 problems here,

3     because --

4          THE COURT:  I understand that.  But it would have been

5     an easy call to exclude if she wasn't on the list of

6     co-conspirators.  The harder issue is whether, because of its

7     many redactions and awkward arrangement, reflecting of course

8     in the first instance the government's proper exclusion of

9     things that have nothing to do with the case, and in the latter

10    respect reflecting the technology from which this was taken,

11    whether those are so confusing, or inviting such speculation or

12    are prejudicial in some respect, that they outweigh the

13    probative value.  That's the 403 issue.  The Second Circuit has

14    made clear that unless the confusion or prejudice or whatever

15    substantially outweighs the probative value, the exhibit will

16    be received.  I think therefore the exhibit will be received.

17         I do think, maybe with agreement of counsel or just on

18    your own, it can be shortened and cleaned up in a way that will

19    still make clear to the jury that this is not the entirety of

20    everything that was in the chain, but will prevent them from

21    having to go through the wonderful process that I just went

22    through.

23         All right.  So hopefully that's guidance for other

24    documents.  But in any event, we're going to take our lunch

25    break, what's left of it.  To the extent there were objections

L34AWEI4ps

1  to other documents that we haven't talked about -- I know there

2  are -- they will be taken up as they are offered.

3          MS. DEININGER:  Your Honor, one thing I just wanted to

4  flag -- it might make a difference in terms of our discussion

5  of those objections -- is that while the government was

6  intending to have Ms. Volchko authenticate a number of

7  documents based on recovering them from the laptop, she will

8  not be reading the substance of any of them into evidence.

9  That is, the government will not be eliciting --

10          THE COURT:  So you're going to save it for later.

11          MS. DEININGER:  Exactly.

12          THE COURT:  Well, when later?

13          MS. DEININGER:  I think we anticipate calling an FBI

14  agent who will offer some of it into evidence after --

15          THE COURT:  What I would not permit, just so you're

16  clear, is having these documents come into evidence now and

17  then their being read to the jury or presented to the jury in

18  any substantive fashion at the time of summation, if they

19  haven't been the subject of intervening testimony from some

20  government witness.

21          MS. DEININGER:  Understood.

22          THE COURT:  In other words, no sandbagging.  Got it?

23          MS. DEININGER:  Yes.

24          THE COURT:  OK.  Very good.  All right.

25          (Luncheon recess)

1              A F T E R N O O N   S E S S I O N

2                            1:58 P.M.

3           (Trial resumed; jury not present)

4           THE COURT:  Please be seated.  The jury is on its way

5    up; so let's get the witness back on the stand.

6           THE DEPUTY CLERK:  Jury entering the courtroom.

7           (Jury present)

8           THE COURT:  Please be seated.  All right.  Counsel.

9    BY MR. HARID:

10   Q.  Good afternoon, Mr. Verdeschi.  Welcome back.

11   A.  Good afternoon.

12   Q.  Sir, can you please pull up Government Exhibit 2313.  Can

13   you blow up the bottom of the e-mail.

14           Mr. Verdeschi, the man who appears on this e-mail,

15   Meysam Moradpour, is the one who made the Eaze referral to you,

16   yes?

17   A.  He referred it to my team, yes.

18   Q.  Did you know him when he worked at MasterCard?

19   A.  I did not know him.

20   Q.  Have you had any contact with him since?

21   A.  I have never had any contact with him.

22   Q.  So you're not aware that he currently works at the

23   marijuana business Tuli?

24           MR. FOLLY:  Objection.

25           THE COURT:  Sustained.

L34PWEI5                        Verdeschi - Cross

1   Q.  Mr. McLeod, can you go to Government Exhibit 2303.

2          Mr. Verdeschi, what is this document?

3   A.  This is a report generated by the MasterCard MATCH system.

4   Q.  And the point of the MATCH system is to put other acquirers

5   on notice, right?

6   A.  I wouldn't phrase it like that.  It's -- the point of it is

7   to help acquirers manage risk and manage risk during the

8   merchant on-boarding process and by providing them with

9   information that could help them assess the risk of the

10  merchant that they're on-boarding.

11  Q.  And the more specificity, the more precision, the better

12  from their perspective, from the acquirer's perspective?

13  A.  Certainly.

14  Q.  Hot Robots, the name of the merchant that appears here on

15  the top, was terminated from the network for illegal activity,

16  yes?

17  A.  It appears so, yes.

18  Q.  What is the point of the reason code at the bottom?

19  A.  The reason code is assigned by the acquirer to convey the

20  reason for the termination.

21  Q.  And what does code 10, violation of standards, mean?

22  A.  That is a code that is used that is kind of a generalized

23  code to indicate that there was a violation of standards.

24  Q.  And that could be any violation of the MasterCard rulebook?

25  A.  It could be.  What I would also say is that -- and again, I

1   don't know why the acquirer used that particular code in this

2   case, but it could also -- it could mean that it was any

3   general violation.  It could also mean there were multiple

4   violations or there were multiple reasons that a merchant was

5   terminated.

6   Q.  Are you aware that there's another reason code, reason code

7   13, that flags illegal activity?

8   A.  Yes, I'm aware of that.

9   Q.  Why wasn't that used in this case?

10  A.  I can't say.  The acquirer made the entry.  It wasn't

11  MasterCard who made the entry.

12  Q.  Is it fair to say that this is an inaccurate MATCH record?

13  A.  I can't say because, as I just mentioned, the acquirer

14  decided to terminate this merchant, and I don't have insight

15  into what the reasons were.  There may have been multiple

16  reasons, not only illegal activity, and so that code that they

17  selected may be accurate.  I don't know.

18  Q.  But you would agree that code 13 would be more accurate

19  than code 10?

20  A.  No, I wouldn't agree with that.

21  Q.  Mr. Verdeschi, as the senior vice president in charge of

22  customer engagement, you would know if an acquiring bank was

23  penalized in any way?

24  A.  I'm sorry, can you repeat the question?  I missed a few

25  words.

L34PWEI5                          Verdeschi - Cross

1   Q.  You would know of an acquiring bank on the net who was

2   penalized in any way for illegal merchant activity, yes, as the

3   senior vice president who handles customer engagement?

4   A.  Are you asking me if I would know?

5   Q.  If you would know?

6   A.  No, not -- my team has -- I've delegated decision-making

7   capability to my team; so I would not know on a case-by-case

8   basis.

9   Q.  But you would expect that information to trickle up to you

10  if it was significant?

11  A.  If it was a significant case, perhaps, yeah.

12  Q.  Can we pull up Government Exhibit 2301, please.

13          Do you recall Mr. Folly showed you this document

14  yesterday?

15  A.  I believe so, yes.

16  Q.  And this says "transaction data," apparently concerning

17  Eaze, correct?

18  A.  I believe so.

19  Q.  That was processed on the MasterCard network?

20  A.  Yes.

21  Q.  The fifth column, the column that says column F, what do

22  you understand ACQ name to mean?

23  A.  That would be the name of the acquirer.

24  Q.  On row 2, do you see the name E-Merchant Pay Limited under

25  acquirer name?

1   A.  Yes.

2   Q.  Are you familiar with that entity?

3   A.  Not really.

4   Q.  To your knowledge, has that entity been fined?

5   A.  I don't know.

6   Q.  And you don't know if it's been penalized in any way in

7   connection with this case?

8   A.  I don't know.

9   Q.  Scrolling down to row 8, Clearhaus, are you familiar with

10  that entity?

11  A.  I'm familiar with the entity.

12  Q.  Has Clearhaus been audited in connection with this case?

13  A.  I don't know.

14  Q.  You don't know if it's been fined or penalized?

15  A.  I don't know.

16           MR. HARID:  No further questions, your Honor.

17           THE COURT:  Redirect?

18  REDIRECT EXAMINATION

19  BY MR. FOLLY:

20  Q.  Mr. Verdeschi, do you recall on cross-examination you were

21  asked some questions about Eaze?

22  A.  Yes.

23  Q.  And specifically, you were asked some questions about an

24  investigation at MasterCard pertaining to transactions

25  involving Eaze; is that right?

1    A.  Yes.

2    Q.  Mr. Levine, if you could publish what's in evidence as

3    Government Exhibit 2309.  Just 2309, yes.

4            And you testified earlier that this e-mail concerned

5    or pertained to information about merchants who had been

6    terminated; do you recall that?

7    A.  Yes.

8    Q.  And if you'll recall, Mr. Burck drew your attention to the

9    fact that Eaze was not listed here; is that right?

10   A.  That's correct.

11   Q.  Could we go to page 4 of this same document.

12           Now, Mr. Verdeschi, there is also a list of names in

13   the second column, merch name; do you see that?

14   A.  I do.

15   Q.  And I believe you testified merch name represents the name

16   of the particular merchant; is that right?

17   A.  Yes.

18   Q.  Now, Eaze, spelled E-a-z-e, is not listed anywhere on this

19   list, correct?

20   A.  I don't see it.

21   Q.  And focusing for a moment on those merchants that are

22   listed -- if you could zoom in on that column -- there's a

23   reference, if you can see in the middle there, to

24   Outdoormaxx.com; do you see that?

25   A.  I do.

L34PWEI5                        Verdeschi - Redirect

1    Q.  That name does not appear to have any connection to Eaze,

2    does it?

3    A.  It does not.

4              MR. BURCK:  Objection, your Honor.

5              THE COURT:  Well, as phrased, sustained.  But I take

6    it that the document does not show any connection between that

7    name and Eaze; is that right, Mr. Witness?

8              THE WITNESS:  I'm sorry, can you --

9              THE COURT:  I'm sorry.  The document does not show any

10   connection between that name and Eaze; is that correct?

11             THE WITNESS:  Which document are we referring to?

12             THE COURT:  The one we were just -- the column we were

13   just looking at.

14             THE WITNESS:  I didn't see this name, Outdoormaxx, on

15   that other document.

16             THE COURT:  Okay.  Put it another way.

17             MR. FOLLY:  Your Honor, my question is slightly

18   different.

19   BY MR. FOLLY:

20   Q.  The term that's highlighted does not have the word Eaze in

21   it, correct?

22   A.  That's true.  Outdoormaxx does not have the word Eaze in

23   it.

24   Q.  The term directly below that, Diverkingdom.com, does not

25   have the word Eaze in it?

L34PWEI5                        Verdeschi – Redirect

1    A.  Correct.

2    Q.  The word below that, Organic Stored, does not have the word

3    Eaze in it?

4    A.  Correct.

5    Q.  Now, if we could zoom back out for a moment.  There's a

6    column you testified about, as well, that pertains to the

7    merchant category name?

8    A.  Mmm, hmm.

9    Q.  Do you see --

10   A.  Yes.

11   Q.  -- that column?

12   A.  Yes.

13   Q.  If you could just zoom in there.

14        Now, focusing on the first entry there, Freight

15   Carrier Trucking, that merchant category name is not connected

16   in any way to the sale of narcotics, correct?

17             MR. BURCK:  Objection, your Honor.  Foundation.

18             THE COURT:  Yes, sustained.

19   Q.  On cross-examination you were shown a document reflecting

20   that there was a merchant category code 5912 that is used in

21   connection with drug stores and pharmacies; do you recall that?

22   A.  I do.

23   Q.  And that would be the code that would be used if there was

24   a transaction involving a legal sale of narcotics, correct?

25             MR. BURCK:  Objection, your Honor.  Again, foundation.

1              THE COURT:  Overruled.

2       Q.  You can answer.

3       A.  I think -- if I recall correctly, I think in the context of

4       Canada, specifically that was the appropriate MCC.

5       Q.  And is it your understanding that there is an MCC code that

6       can be used for the sale, for example, of narcotics at a

7       pharmacy in the United States?

8       A.  What do you mean by narcotics?

9       Q.  For example, a prescription drug such as Oxycodone?

10      A.  Right.  I mean, again, I'm not an expert on this, but if

11      you ordered a prescription drug at a pharmacy, likely the MCC

12      code that would be used would be the pharmacy MCC code.

13      Q.  And Freight Carrier Trucking listed here that's

14      highlighted, is not a pharmacy MCC code, correct?

15      A.  It seems to be completely unrelated.

16      Q.  And directly below that, Clock Jewelry Watch and Silver

17      Store is also not a pharmacy MCC code, correct?

18      A.  Unrelated.

19      Q.  A little bit further down the page there's a reference to

20      Cosmetics Stores, that is also not a pharmacy related MCC code,

21      correct?

22      A.  It seems to be unrelated.

23      Q.  Directly below that, Department Stores is also not a

24      pharmacy related MCC code, correct?

25      A.  Yes.

1   Q.  Now, if you'll recall, you were also asked some questions

2   about the MATCH records; do you recall that?

3   A.  Yes.

4   Q.  And in this particular case, Eaze was not listed on those

5   MATCH records, correct?

6   A.  That's correct.

7   Q.  And I believe part of your testimony earlier was that your

8   understanding was that the merchant name that was being used

9   for the Eaze.com transactions was not, in fact, Eaze.com; is

10  that correct?

11  A.  It appears so.

12  Q.  And that it was other merchant names, to your

13  understanding, that were being used for those transactions?

14  A.  Yes.

15  Q.  And if that's the case, in those transactions if it is not

16  the name Eaze.com that is being used, Eaze.com will not be

17  provided to the issuing bank in connection with those

18  transactions, correct?

19  A.  That's correct.

20          MR. BURCK:  Objection.

21          THE COURT:  Overruled, the answer will stand.

22  Q.  Now, if you'll recall -- we can take this exhibit down.

23          If you'll recall, on cross-examination you were also

24  asked some questions about gambling MCC codes; do you recall

25  that?

1    A.   Yes.

2    Q.   And I believe you testified there's at least one MCC code

3    for gambling transactions?

4    A.   Yes.

5    Q.   Now, is gambling -- withdrawn.

6         You also testified, I believe, that there's no MCC

7    codes for illegal activity, correct?

8    A.   Yes.

9    Q.   Now, gambling, as you've testified, is legal in certain

10   parts of the world, correct?

11   A.   Yes, I believe so.

12   Q.   Has MasterCard uncovered situations where non-gambling MCC

13   codes were used for gambling transactions?

14   A.   Yes.

15   Q.   Is that an example of what you testified to before of

16   what's called miscoding?

17   A.   Yes, in the general sense, miscoding is -- could just be

18   any incorrect data that's passed through our systems.  But,

19   yes, if a merchant or an acquirer used an incorrect MCC code

20   for a gambling transaction, in general, that would be called

21   miscoded.

22   Q.   And what does MasterCard do if it is brought to it's

23   attention that there is a merchant that is engaged in

24   miscoding?

25   A.   We would engage and drive corrective actions.  It is

1  important to realize that that could occur on illegal

2  transactions, it could occur on legal transactions.

3  Q.  Now, if you could just publish Government Exhibit 2312.

4        If you'll recall, you were asked some questions about

5  if the word marijuana specifically was referenced in these

6  rules; do you recall that?

7  A.  I do.

8  Q.  Now, these rules do not contain a comprehensive list of

9  illegal activities, correct?

10  A.  Correct.

11  Q.  And there are many illegal activities that are not

12  specifically referenced in these MasterCard rules, correct?

13  A.  Correct.

14  Q.  These rules do not reference specifically the sale of

15  cocaine as an illegal activity, correct?

16  A.  Correct.

17  Q.  They do not reference specifically the sale of heroin as an

18  illegal activity, correct?

19  A.  Correct.

20  Q.  They do not reference specifically the sale of illegal

21  narcotics as an illegal activity, correct?

22  A.  Correct.

23  Q.  Now, you also testified about the information that is

24  provided to the issuing banks; do you recall that?

25  A.  Yes.

L34PWEI5                          Verdeschi – Redirect

```
 1   Q.  And I believe one of the pieces of information that you
 2   testified that is provided is the merchant name; is that right?
 3   A.  Yes.
 4   Q.  Now, do issuing banks have the ability to monitor
 5   particular merchant names?
 6   A.  Yes, they do.
 7   Q.  In other words, if an issuing bank discovered that a
 8   particular merchant was engaged in illegal transactions, would
 9   they have the ability to monitor transactions from that
10   specific merchant?
11   A.  Yes, they would.
12   Q.  If a merchant did business under a different name, would
13   that interfere with the issuing bank's monitoring system?
14            MR. HARID:  Objection.  Foundation.
15            THE COURT:  Overruled.
16   A.  Answer the question?  So any type of deception that causes
17   the issuer to treat a transaction differently because incorrect
18   information was provided is a problem in our network.  We
19   expect there to be full transparency about the nature of the
20   transaction and who the merchant is that conducts it.
21   Q.  And to be clear on this specific point, MCC codes are not
22   the only piece of information that is provided to issuing banks
23   in connection with particular transactions, correct?
24   A.  Correct.
25   Q.  If we could go to Government Exhibit 2313, at pages 10 and
```

1    11.  Focusing first on the message on the right side of the

2    page from Ryan Brown, if we could just zoom out slightly so

3    that the signature line is there, the physical.  It looks like

4    it's not there; so we can focus on that portion.

5            Can you read aloud the body of the message there?

6    A.  "I was given this referral from Paul Paolucci, and I would

7    like to know if there are any other merchants and/or their

8    associated MCCs that you are aware of who are operating with

9    Eaze.com?  The site "desirescent.com" that was referenced in

10   your e-mail from April 16th is no longer operating."

11   Q.  If we could just scroll up above that.

12           Could you just read the first two sentences of the

13   next sentences?

14   A.  "Eaze keeps constantly changing these dummy domains.  If

15   you register with them and make a purchase on their website,

16   then they will send you a text with whatever their current

17   dummy website domain is.  Not sure if you can make a purchase

18   on your own and test this out?  I purchased twice from them and

19   received a text with Desirescent.com and forgot the name of the

20   other one.  I can dig it from my credit card statement if you

21   need me to."

22   Q.  Looking now on the page on the left side, the e-mail at the

23   bottom, from compliance review, April 17th, 2019, can you read

24   aloud the message listed there?

25   A.  "Yes, please provide the descriptor and dates of the

1    purchases and anything else that can point to the acquirer.  We

2    would like to find out who the acquirer is for this merchant so

3    that we can make them aware of the activity taking place.  I

4    can also look up the transaction in transaction investigator,

5    however, I would need your complete PAN information."

Q.  And at the bottom it lists Ryan Brown, Senior Analyst,

7    Franchise Customer Engagement and Performance, Brand

8    Performance.  Do you recognize the group that is referred to

9    there?

10   A.  Yes, that is my group.

11   Q.  You were also asked some questions about how a cardholder

12   can use their credit card, and I just want to make sure we're

13   clear about that.

14       Where does a cardholder get their credit card from?

15   A.  Their issuing bank.

16   Q.  And can a customer somehow use a credit card without an

17   underlying issuing bank that issued them that card?

18       MR. HARID:  Objection.  Unclear.

19       THE COURT:  Why don't you rephrase it.  I think it's a

20   little bit ambiguous.

21   Q.  Mr. Verdeschi, is there a manner in which the cardholder

22   can transact transactions, credit card transactions, without

23   being issued the credit card by the issuing bank?

24   A.  I can't think of one.

25   Q.  And would there be a way for a cardholder with a MasterCard

1    credit card to conduct card transactions without the

2    involvement of MasterCard's network?

3    A.   Oh, the transaction should go across our network, yup.

4    Q.   I believe you were also asked a question about an

5    individual by the name -- we can take this exhibit down -- an

6    individual by the name of Paul Paolucci?

7    A.   Yes.

8    Q.   And I believe you referenced that he was no longer with

9    your group; is that right?

10   A.   That is correct.

11   Q.   And was that because he was terminated?

12   A.   Yes.

13   Q.   And what is your understanding -- is he someone who was

14   working in your group specifically?

15   A.   Yes.

16   Q.   What is your understanding of why he was terminated?

17            MR. BURCK:  Objection, your Honor.  It goes beyond

18   cross.

19            THE COURT:  No, I don't think so.  Overruled.  You may

20   answer.

21   A.   My understanding is that he mishandled confidential

22   information.

23            MR. FOLLY:  No further questions, your Honor.

24            THE COURT:  All right.  Anything else?

25            MR. BURCK:  Your Honor, if I could, just briefly?

1            THE COURT:  Go ahead.

2    RECROSS EXAMINATION

3    BY MR. BURCK:

4    Q.  Mr. Verdeschi, you were just asked a number of questions

5    about Eaze and the investigation of Eaze and those merchant

6    names back in 2019?

7    A.  Yes.

8    Q.  And we saw a number of e-mails that the prosecutor showed

9    you for Mr. Moradpour talking about what he had discovered,

10   correct?

11   A.  Correct.

12   Q.  And he kept on talking about Eaze, correct?

13   A.  Correct.

14   Q.  And the merchant names that were then taken down were the

15   names that he said were dummy domains, correct?

16   A.  I'm not sure I could answer that.

17   Q.  How would you describe the merchant names that were taken

18   down?

19   A.  The merchant names that were taken down were the names that

20   the acquirers -- they were the names of the merchants that the

21   acquirers had signed up.

22   Q.  Okay.

23   A.  In my view, based on the e-mails I read and based on my

24   understanding of the case, Eaze.com is the website where the

25   transactions occurred, but the businesses that were conducting

1   credit card transactions or payment card transactions were the

2   merchants that were ultimately terminated by the acquirer.

3   Q.   Okay.  And to your knowledge, MasterCard did nothing to

4   report Eaze.com to issuing banks, correct?

5   A.   To my knowledge, no.

6          MR. BURCK:  Thank you, your Honor.  No further

7   questions.

8          THE COURT:  Any anything further from counsel for

9   Mr. Weigand?

10         MR. HARID:  No, your Honor.

11         THE COURT:  Anything further from the government?

12         MR. FOLLY:  No, your Honor.

13         THE COURT:  Thank you.  You may step down.

14         Please call your next witness.

15         (Witnessed excused)

16         MS. DEININGER:  Your Honor, the government is calling

17  Jennifer Volchko, but before that is a relevant stipulation.

18         THE COURT:  A stipulation?  That is exciting.

19         A stipulation is where two sides agree on some kind of

20  fact.  You can consider it just like any other evidence.  It

21  just saves some time to have the parties agree.

22         MS. DEININGER:  Can the witness take the stand, or

23  would you prefer for her to wait outside for the stipulation?

24         THE COURT:  I'm sorry?

25         MS. DEININGER:  Can the witness take the stand?

1           THE COURT:  Yes, that's fine.

2   JESSICA VOLCHKO,

3       called as a witness by the Government,

4       having been duly sworn, testified as follows:

5           THE DEPUTY CLERK:  Please be seated.  Speak directly

6   into the microphone and spell your name for the record.

7           THE WITNESS:  Jessica Volchko, J-e-s-s-i-c-a,

8   V-o-l-c-h-k-o.

9           THE COURT:  All right.  You wanted to read a

10  stipulation?

11          MS. DEININGER:  Yes, your Honor.  May we publish that

12  to the jury?

13          THE COURT:  Yes.

14          MS. DEININGER:  Mr. Levine, if you can publish

15  Government Exhibit S1.

16          Your Honor, do you need me to read the introductory

17  paragraph, or can I jump to the body?

18          THE COURT:  Yes.

19          MS. DEININGER:  Paragraph 1.  Government Exhibit 1803

20  is an Apple MacBook Pro, the laptop that was seized by the

21  Federal Bureau of Investigations, FBI, agents from defendant

22  Ruben Weigand on March 9th, 2020, when he was arrested.

23          On or about March 9th, 2020, the laptop was placed in

24  the overnight evidence drop bin within the secure evidence

25  facility at the FBI's Los Angeles field office.

L34PWEI5                        Volchko - Direct

1              On or about March 10th, 2020, the laptop was removed

2      from the FBI overnight evidence drop bin, vouchered as evidence

3      item 1B2 for case No. 272G-New York-3108447 and entered into

4      the Los Angeles field office's secure evidence storage.

5              On or about March 23rd, 2020, the laptop was shipped

6      from the FBI's Los Angeles field office to the FBI's New York

7      field office.

8              On or about March 25th, 2020, the laptop was received

9      at the FBI's New York field office and secured into the

10     New York field office's secure evidence facility.

11             It is further stipulated and agreed that this

12     stipulation, which is marked as Government Exhibit S1, may be

13     received in evidence as a government exhibit at trial.

14             Your Honor, the government offers Government

15     Exhibit S1.

16             THE COURT:  Received.

17             (Government's Exhibit S1 received in evidence).

18     DIRECT EXAMINATION

19     BY MS. DEININGER:

20     Q.  Good afternoon, Ms. Volchko.  Where do you work?

21     A.  I work for the FBI.

22     Q.  What is your title?

23     A.  I am an IT specialist and forensic examiner.

24     Q.  Which FBI office do you work in?

25     A.  The New York field office.

L34PWEI5                    Volchko - Direct

1   Q.  How long have you been an IT specialist and forensic
2   examiner with the FBI?
3   A.  Approximately five years.
4   Q.  What are your duties and responsibilities in that position?
5   A.  As a forensic examiner, I'm responsible for the collection,
6   preservation and analysis of digital evidence.
7   Q.  What certifications do you have in that field?
8   A.  Part of the forensic examiner certification process, it
9   encompasses a couple of FBI courses, as well as yearly
10  training.
11  Q.  And what certifications do you receive at the end of those
12  FBI courses?
13  A.  I am a certified forensic examiner with the FBI, and I also
14  have certifications in computer forensics and cell phone
15  forensics.
16  Q.  What types of devices do you deal with the most?
17  A.  Mostly cell phones.
18  Q.  Do you also deal with other electronic devices?
19  A.  I do.  Computers and hard drives.
20  Q.  You mentioned computer hard drives, do you have any
21  training --
22          MR. HARID:  Objection, misstates the witness'
23  testimony.
24          THE COURT:  I'm sorry?
25          MR. HARID:  Withdrawn.  Excuse me.

L34PWEI5                          Volchko - Direct

1              THE COURT:  Yes, I think there is no such mistake.  Go

2      ahead.

3      BY MS. DEININGER:

4      Q.  You mentioned computer hard drives, do you have any

5      training in analyzing computer hard drives?

6      A.  I do.

7      Q.  Can you describe that training?

8      A.  The training involves the proper collection and

9      preservation of digital evidence on the hard drive in order to

10     ensure that nothing changes over the course of the examination.

11     Q.  Do you continue to do any periodic training relating to

12     your role as a forensic examiner?

13     A.  I do.

14     Q.  And what periodic training do you do?

15     A.  Typically, I take at least one course a year.  It's a

16     whole-week-long course, 40 hours.

17     Q.  Do you also take any annual proficiency tests?

18     A.  I do.

19     Q.  Have you been asked to analyze evidence obtained from a

20     computer hard drive in criminal investigations?

21     A.  I have.

22     Q.  Approximately how many computer hard drives have you

23     analyzed in your experience?

24     A.  Over a hundred.

25     Q.  So taking a step back, what does it mean to forensically

1    examine a computer hard drive?

2    A.   In order to examine the hard drive, it's important to

3    collect all of the data and ensure that nothing changes and

4    that you're getting an accurate copy of the data on the hard

5    drive.

6    Q.   And how do you ensure that you are -- how do you ensure

7    that you do that?

8    A.   You use write protection when possible, and also use tested

9    and validated tools.

10   Q.   What is write protection?

11   A.   Write protection or write blocker ensures that it can

12   either be a physical device that you connect a hard drive to or

13   it can be software.  So it ensures that no data is being

14   changed while you're getting your copy of the data.

15   Q.   And do you do anything to ensure that the copy of the data

16   that you extract does not change during the course of your

17   analysis?

18   A.   Yes.  So when I get a copy, I generate an MD5 hash, which

19   is kind of like a digital fingerprint for all of the data on

20   the hard drive, and then when I'm done with my examination, I

21   rehash the copy and verify that they match, which tells me that

22   nothing changed.

23   Q.   And generally, what types of data do you extract from a

24   computer hard drive?

25   A.   User data and system files.

L34PWEI5                         Volchko - Direct

1    Q.   What is user data?

2    A.   User generated files are documents, e-mails, messages.

3    Q.   And what are system files?

4    A.   They could be logs or operating system files that the

5    computer generates while it's running.

6    Q.   In your training and experience, what is the standard

7    protocol for conducting a forensic examination of a laptop?

8    A.   The standard is to, when I receive the evidence, is to

9    check that there is legal authority, and depending on the type

10   of evidence that I receive, whether it's a cell phone or a

11   laptop, will determine the course of action and the tools that

12   I use.

13   Q.   What do you mean by legal authority?

14   A.   It could be a search warrant.  It could be consent.

15   Basically, that I have authority to examine the contents of the

16   evidence that I have in front of me.

17   Q.   Do you do any physical examination of the device?

18   A.   I do.  So when I receive the evidence, after reviewing the

19   legal authority, I document the -- any unique identifiers on

20   the items, might be serial number, make and model, as well as

21   the condition of the item.

22   Q.   What particular software products do you often use to

23   forensically examine computer hard drives?

24   A.   To collect evidence from or data from the hard drive, I

25   typically use FTK Imager or BlackLight -- or I'm sorry,

1   MacQuisition.

2   Q.  And what is MacQuisition used for?

3   A.  MacQuisition is used to collect data from an Apple device,

4   such as a MacBook or an iMac.

5   Q.  Ms. Volchko, did you forensically examine any computers in

6   this case?

7   A.  I did.

8   Q.  How many?

9   A.  One.

10  Q.  Did you extract data from it?

11  A.  I did.

12  Q.  Did you forensically examine any other devices in

13  connection with this case?

14  A.  I did.

15  Q.  How many -- or sorry, what types?

16  A.  Cell phones.

17  Q.  Other than searching the computer and the cell phones, did

18  you have any involvement in this case?

19  A.  I did not.

20  Q.  On the table in front of you, you should have an item

21  that's been marked for identification as Government

22  Exhibit 1803; do you have that?

23  A.  I do.

24  Q.  And what is it?

25  A.  That's the laptop that I examined.

L34PWEI5                        Volchko - Direct

1   Q.  What type of laptop is it?

2   A.  It's a MacBook.

3   Q.  How do you recognize it?

4   A.  It has a sticker with my initials on it.

5   Q.  What is the evidence number for this computer?

6   A.  1B2.

7   Q.  Does it have an associated case number?

8   A.  It does.

9   Q.  What's that case number?

10  A.  It is 272G-NY-3108447.

11  Q.  Thank you.  Did you perform a forensic examination of this

12  computer?

13  A.  I did.

14  Q.  Okay.  Let's take a step back for a minute.  How did you

15  first come to be involved in this case?

16  A.  Typically, we receive a request for examination, and then

17  that request is assigned.  So I was assigned via request by my

18  supervisor.

19  Q.  And what was -- what did the request ask you to do?

20  A.  It was for the examination of a laptop and some cell

21  phones.

22  Q.  And what was the first thing that you did after receiving

23  that request?

24  A.  I contacted the case agent to discuss legal authority and

25  obtain the evidence items.

L34PWEI5                        Volchko - Direct

1    Q.   What did you do to obtain the evidence items?

2    A.   I went to New York's evidence control unit and received

3    items directly from them.

4    Q.   And where is the New York -- where is the evidence control

5    unit?

6    A.   It's in New York field office.

7    Q.   What did you do after you obtained the computer?

8    A.   After I obtained the computer, I made sure that I did a

9    physical inventory.  Since I already have the legal authority

10   and reviewed it, I started with my physical inventory,

11   documenting the serial number, make, model of the devices, the

12   condition.  And because it was a Mac, that determined the next

13   steps for my examination.

14   Q.   Okay.  And what were those next steps?

15   A.   I used MacQuisitions.  I got a forensic image of the hard

16   drive, which is basically a large file that pulls all of the

17   data that was on the hard drive of the laptop.

18   Q.   Were there any -- was the forensic image that you obtained,

19   was it readable?

20   A.   It was encrypted at the time.

21   Q.   And so then what did you do next?

22   A.   I requested assistance from the secure technology

23   exploitation unit, which typically assists with any encrypted

24   or locked devices.

25   Q.   And did you receive anything from them?

L34PWEI5                         Volchko - Direct

1    A.  I received the password back.

2    Q.  And what did you do with that?

3    A.  I attempted to process the encrypted image that I obtained

4    using forensic tools and the password that I received back, but

5    was unsuccessful.  So at that point, I went back to the

6    physical device to get an unencrypted image using that

7    password.

8    Q.  And were you able to obtain an unencrypted image of the

9    computer?

10   A.  I was.

11   Q.  Generally, what types of files were you able to recover in

12   the forensic image?

13   A.  Both user-generated files and systems files.

14   Q.  And just as a reminder, can you remind us what the

15   user-generated files are?

16   A.  Those are things like documents and e-mails.

17   Q.  And were there any types of files that you were not able to

18   recover in the unencrypted forensic image?

19   A.  I wasn't able to recover messages from Telegram.

20   Q.  What is Telegram?

21   A.  Telegram is a chat application that a user can send

22   messages or files.

23   Q.  And what are some features of Telegram?

24   A.  It's an encrypted messages application.

25   Q.  What does that mean?

L34PWEI5                        Volchko - Direct

1    A.  It means that without the keys or knowing where the keys

2    are, you can't access or read the data.  It's kind of

3    scrambled.

4    Q.  What is a key?

5    A.  An encryption key, it could be a password.  It could be

6    built into the software.

7    Q.  Without the key, if you're logged onto the computer, are

8    you able to see what's available in the Telegram application?

9    A.  Yes.

10   Q.  Were you able to tell, based on your review of the forensic

11   image of the computer, whether there were Telegram files on the

12   computer?

13   A.  Yes.  I did see that Telegram was installed, and I did see

14   that there were files related to Telegram.

15   Q.  And so what, if anything, was done to make those Telegram

16   files available for the investigative team to review?

17   A.  I attempted to export the files out and process it with

18   forensic tools, but the tools that I attempted to use weren't

19   processing the messages.  So I went back to the physical device

20   and determined that the next best course of action would be to

21   get a screen recording from the laptop.

22   Q.  And by this physical device, do you mean the computer

23   that's marked as Government Exhibit 1803?

24   A.  Yes.

25   Q.  And so -- and what do you mean by making a screen

L34PWEI5                              Volchko - Direct

1    recording?

2    A.   It records everything on the screen.  It could be either be

3    the whole screen or a small selection of the screen.

4    Q.   And what screen recordings were made?

5    A.   Screen recordings were made using QuickTime.

6    Q.   What is QuickTime?

7    A.   It's an application that's come on every Mac, and you can

8    use it to watch videos or listen to audio files, but it can

9    also record the screen and your interaction on the screen.

10   Q.   So was QuickTime used in connection with Telegram messages

11   that were on Government Exhibit 1803?

12   A.   Yes.  I instructed the case agent how to properly record

13   messages, obtain screen recordings of the messages.

14   Q.   And did you end up making those recordings or did someone

15   else?

16   A.   The case agent did.

17   Q.   After you extracted the forensic image of Government

18   Exhibit 1803, did you use any software programs to examine the

19   extracted data from the computer?

20   A.   I did.  I used BlackLight.

21              (Continued on next page)

22

23

24

25

L34AWEI6ps                         Volchko - Direct

1   Q.   What is blacklight?

2   A.   BlackLight is a forensic tool that we use to analyze data

3   when taking a forensic image.  We process it through there.  It

4   kinds of puts things into categories so you can review

5   messages, documents, basically all the documents on the laptop.

6   Q.   When you were reviewing the forensic image, did you -- what

7   if anything did you see regarding cellphone backups?

8   A.   I saw that there were a couple devices that were backed up

9   to the laptop.

10  Q.   And so what did you do with regard to those?

11  A.   I exported the backups when I could find them, and I

12  processed them using Cellebrite, which is a tool that we use

13  for control phones.

14  Q.   Can you explain to me what Cellebrite does?

15  A.   Cellebrite takes a phone backup or an extraction of the

16  phone and it puts data in a categories so you can review

17  messages, images, emails, basically everything that you would

18  store on your cellphone.

19  Q.   And so were you able to create Cellebrite reports from the

20  telephone backups that were found on the laptop?

21  A.   Yes.

22  Q.   Before you on the desk, you should have what's marked for

23  identification as Government Exhibit 1810.  Do you see that?

24  A.   I do.

25  Q.   Do you recognize that?

1    A.   I do.

2    Q.   What is it?

3    A.   That is a thumb drive containing documents from the laptop.

4    Q.   And did you review all of those documents on the thumb

5    drive?

6    A.   I did.

7    Q.   How do you recognize that thumb drive?

8    A.   My initials are on the back of it.

9    Q.   Are the documents and files contained on Government Exhibit

10   1810 true and accurate copies of documents and files recovered

11   from the computer labeled Government Exhibit 1803?

12   A.   Yes.

13   Q.   How do you know that?

14   A.   I visually verified the documents on the thumb drive are

15   the documents that I obtained from the forensic image.

16   Q.   Were any of the documents that are on that thumb drive

17   contained on the phone backups?

18   A.   Yes.

19   Q.   Was that Government Exhibit 1709?

20   A.   I believe so.

21   Q.   Did you have to do anything different to verify whether

22   that document was a true and accurate copy of data from the

23   cell -- from one of the cellphone backups?

24   A.   Yes.  I went back to the cellphone report that I generated

25   using Cellebrite.

L34AWEI6ps                    Volchko - Direct

Q.   And what did you do with that report?

A.   I visually verified that the content of the document

matched the message on the cellphone report.

Q.   Does Government Exhibit 1810 contain -- and I have a fairly

long list here to read -- Government Exhibits 1001, 1002, 1037,

1043, 1149, 1151, 1227, 1265, 1346, 1347, 1348, 1449, 1506,

1507, 1518, 1572, 1593, 1596, 1597, 1598, 1599, 1612, 1613,

1614, 1615, 1616, 1622, 1654, 1678, 1682, 1684, 1686, 1688 --

almost there -- 1690, 1695, 1696, 1706, 1709, 1716, 1719, 1720,

and 1801?

         The question was whether all of those exhibits are on

the thumb drive that's labeled Government Exhibit 1810.

A.   Yes.

         MS. DEININGER:  Your Honor, the government moves

Government Exhibit 1810 and that list of exhibits contained

within it into evidence.

         THE COURT:  You don't want to reread all those

numbers?

         MS. DEININGER:  I will if you'd like me to.

         THE COURT:  1801 was a great year.  I remember it

well.

         Yes.  Those are received.

         (Government's Exhibits 1001, 1002, 1037, 1043, 1149,

1151, 1227, 1265, 1346, 1347, 1348, 1449, 1506, 1507, 1518,

1572, 1593, 1596, 1597, 1598, 1599, 1612, 1613, 1614, 1615,

L34AWEI6ps                    Volchko - Direct

1    1616, 1622, 1654, 1678, 1682, 1684, 1686, 1688, 1690, 1695,

2    1696, 1706, 1709, 1716, 1719, 1720, and 1801 received in

3    evidence)

4                MR. HARID:  Your Honor, can we just review on the

5    record the objections we previously made.

6                THE COURT:  Yes.  The objections previously made, my

7    rulings stand.  If you have objections to specific exhibits, as

8    they're offered, those will still be heard at the time those

9    exhibits are offered.

10                MR. HARID:  Thank you, your Honor.

11                MS. CLARK:  And, your Honor, this is Sara Clark for

12    defendant Akhavan.  The same:  We would like to preserve our

13    objections.

14                THE COURT:  Yes.  I'm sorry.  I'm having a little

15    trouble hearing you.  Can you speak into the mike.

16                MS. CLARK:  We just want to make sure that our

17    objections are --

18                THE COURT:  Yes.  All previously argued objections

19    that were argued outside the presence of the jury are

20    preserved, but my rulings denying those objections stand.  In

21    addition, as each exhibit is proffered to the witness, whether

22    now or at some later date, at that point any specific

23    objections you have to that particular exhibit can be raised at

24    that time, and they will not be considered to have been waived.

25                MS. CLARK:  Thank you, your Honor.

L34AWEI6ps                    Volchko - Direct

1    BY MS. DEININGER:

2    Q.  Ms. Volchko, are you familiar with metadata?

3    A.  I am.

4    Q.  What is metadata?

5    A.  The definition is data about data.

6    Q.  Can you give me some examples to help understand that?

7    A.  It could be created or modified dates of the file.  It

8    could be the name of the file, the size of the file.

9    Q.  Do the software programs that you use to forensically

10   examine -- that you used to forensically examine the computer,

11   do those collect metadata?

12   A.  They do.

13   Q.  Did you use any software programs to examine metadata from

14   the materials included on Government Exhibit 1810, the thumb

15   drive?

16   A.  I did.  I used BlackLight and AD Lab.

17   Q.  What if anything was the output from those software

18   programs?

19   A.  After, I generate a report using them.

20   Q.  In front of you should also be a manila folder with what's

21   marked for identification as Government Exhibit 1806, 1807, and

22   1809.  Do you have those?

23   A.  Yes, I do.

24   Q.  Do you recognize those?

25   A.  I do.

L34AWEI6ps                    Volchko - Direct

1    Q.  What are they?

2    A.  These are reports that I generated with data from the

3    laptop.

4    Q.  Can you walk us through the three different reports, kind

5    of just what software was used to process them and why there

6    are three.

7    A.  1806 was a -- is a report that was generated using

8    BlackLight to include Mac-specific metadata, such as date added

9    and a couple other more specific Mac metadata.

10             1807 was a report that was generated using AD Lab, and

11   that contains documents from the laptop that had MD5 hashes as

12   well as dates.

13             And 1808 is a report that was generated also using AD

14   Lab, but it was generated based on files that were found in the

15   Windows virtual machine of the MacBook.

16   Q.  What is a Windows virtual machine?

17   A.  It's -- it kind of emulates a Windows computer, so it

18   allows you to run Windows software on, on a Mac.

19   Q.  And was there a Windows virtual machine on the laptop that

20   you examined in this case?

21   A.  There was.

22   Q.  And did you discover that when you were reviewing the

23   forensic image from that laptop?

24   A.  Yes.

25   Q.  So let's go back to -- you mentioned BlackLight, that you

L34AWEI6ps                     Volchko - Direct

```
1    used BlackLight.  What kind of metadata is BlackLight able to

2    collect?

3    A.  BlackLight collects most, like, dates and times, like any

4    other computer, so it has a created, a modified, access date,

5    but it also includes the date added, which has a time stamp

6    that's typically only on Macs.

7    Q.  So what does the date-added metadata tell you?

8    A.  The date added is the date that a file was added to a

9    specific location on the Mac, so that exact folder.

10   Q.  So does that mean that a file had to have been on the

11   computer as of its date-added metadata date?

12   A.  Yes.

13   Q.  Is there any other Mac-specific metadata that BlackLight

14   collects?

15   A.  Yeah.  There's the com.apple.quarantine attribute, which

16   tells you what application was used to download the file.

17   Q.  And what do you mean by "application"?

18   A.  Some examples could be web browsers, like Safari, that

19   allow you to browse the internet, or other browsers.

20   Q.  And so were you able to use BlackLight to obtain date-added

21   metadata for files contained within Government Exhibit 1810?

22   A.  Yes.

23   Q.  Were you able to obtain date-added metadata for all of the

24   files contained in Government Exhibit 1810?

25   A.  No.
```

L34AWEI6ps                    Volchko - Direct

1    Q.  And are there particular types of files for which there was

2    not -- for which you were not able to collect date-added

3    metadata?

4    A.  It was mostly files that were within the zip folder.

5    Q.  Can you -- so can you -- can you explain that a little more

6    for me.  What does it mean that documents were within the zip

7    folder?

8    A.  So the documents -- a zip folder is basically just a

9    compressed folder.  It makes files easier to send.  It

10   compresses them to a smaller size.  So the date added was

11   applied -- associated with that zip folder, but not necessarily

12   the documents inside, because the zip folder was added on the

13   date, and the documents weren't.  The zip folder wasn't

14   expanded.  So the date-added date was only associated with the

15   folder.

16   Q.  OK.  So there would be a date added metadata for a zip

17   folder in its entirety; is that correct?

18   A.  Yes.

19   Q.  But not necessarily for specific documents within the zip

20   folder.

21   A.  It encompasses the documents inside.

22   Q.  Are there any other portions of the documents you reviewed

23   for which BlackLight would not have been able to collect

24   metadata?

25   A.  Not that I recall.

L34AWEI6ps                    Volchko - Direct

1   Q.  Would BlackLight have been able to collect metadata for

2   documents that were on the Windows virtual machine that we

3   discussed earlier?

4   A.  No, because that's a win file.  It wasn't stored on the Mac

5   side.  And the date added is specific to Mac.

6   Q.  During your review of the documents contained in Government

7   Exhibit 1810 and your creation of the reports labeled

8   Government Exhibit 1806, 1807, and 1808, did you confirm the

9   file name of each Government Exhibit that you reviewed?

10  A.  I did.

11  Q.  Did you confirm the MD5 hash of each government exhibit you

12  reviewed?

13  A.  I did.

14  Q.  And where available, did you -- can you remind me again

15  what an MD5 hash is.

16  A.  An MD5 hash is kind of like an additional fingerprint.

17  It's unique to a file.

18  Q.  And where available, did you review the information

19  available regarding date-added metadata?

20  A.  I did.

21          MS. DEININGER:  Mr. Levine, if you can pull up for the

22  witness what's been marked for identification as Government

23  Exhibit 3707.

24  Q.  Ms. Volchko, do you recognize that?

25  A.  I do.

L34AWEI6ps                    Volchko - Direct

1    Q.  What is it?

2    A.  This is a spreadsheet containing information on the files

3    that are on the thumb drive, that were obtained from the

4    laptop.

5              MS. DEININGER:  Your Honor, the government would

6    submit Government Exhibit 3707.

7              THE COURT:  Do you have any objection?

8              MS. CLARK:  No objection.

9              THE COURT:  It's received.

10             (Government's Exhibit 3707 received in evidence)

11             MS. DEININGER:  Mr. Levine, if you can publish that so

12   the jury can see it as well.

13   Q.  So Ms. Volchko looking at Government Exhibit 3707, what

14   does the first column show us?

15   A.  The first column is the government exhibit number.

16   Q.  And what's the second column?

17   A.  The MD5 hash.

18   Q.  Looking at this first page, there are certain documents

19   with an MD5 hash listed but not a government exhibit number.

20   Why is that?

21   A.  Those are documents that were within the zip folders.

22   Q.  And so is it correct that the government exhibit numbers

23   are associated with a zip folder in its entirety?

24   A.  Yes.

25             MS. DEININGER:  Mr. Levine, if you can turn to the

1    second page.

2    Q.  Ms. Volchko, there are also certain documents listed here

3    that have a government exhibit number but no MD5 hash.  Why is

4    that?

5    A.  Those were emails, so those were -- those files typically

6    aren't hashed.  The reason why they have a dot-html extension

7    is, that's a file that's generated by the software to make it

8    viewable in the report.

9          MS. DEININGER:  Mr. Levine, we can go back up to the

10   top.  Thank you.

11   Q.  Ms. Volchko, what information is in these third columns,

12   that's titled "Filename"?

13   A.  The name of the file.

14   Q.  And the fourth column?

15   A.  Date added.

16   Q.  So for the files for BlackLight, does that "Date Added"

17   column, does that reflect the date-added metadata that you were

18   able to obtain?

19   A.  Yes.  That's the date that it was added to a specific

20   location on the map.

21   Q.  So if a file for BlackLight was able to obtain date-added

22   metadata, were the files in the computer that you reviewed

23   generally added to the computer before or after July 2019?

24   A.  Generally before.

25   Q.  What information does BlackLight obtain regarding the

L34AWEI6ps                    Volchko - Direct

1    sources for the files recovered during the extraction?

2    A.   Depending on how it downloaded to the laptop, it can obtain

3    the application that was used to download it, as well as a

4    specific location, the website.

5    Q.   And what were some of the applications that, based on your

6    review of the files, the files that you reviewed, had been

7    downloaded from?

8    A.   From what I recall, Safari and Tor Browser.

9    Q.   What is Safari?

10   A.   Safari is a web browser that allows the user to navigate

11   the internet.

12   Q.   And what is Tor Browser?

13   A.   Tor Browser is also a web browser.

14   Q.   What are some feature of Tor Browser?

15   A.   It's mainly used for anonymity and obfuscation of location,

16   and it does that by routing traffic and multiple routers.

17   Q.   You mentioned that it will give you metadata on the website

18   that files were downloaded from.  What types of websites did

19   you see that some of these files had been downloaded from?

20   A.   Google Mail and ProtonMail.

21   Q.   What is ProtonMail.

22   A.   ProtonMail is web mail that is typically encrypted.

23   Q.   What does that mean?

24   A.   It means that, without the proper keys, you can't read the

25   messages that are being sent.

L34AWEI6ps                    Volchko - Direct

1    Q.  In front of you, in the manila folder, you should also have

2    what's marked for identification as Government Exhibit 1722,

3    1724, 1728, 1730, and 1733.  Do you have those?

4    A.  I do.

5    Q.  Do you recognize those?

6    A.  I do.

7    Q.  What are they?

8    A.  These are messages from the Telegram application.

9    Q.  And are these true and accurate copies of excerpts of the

10   Telegram message contained in the computer that's labeled as

11   Government Exhibit 1803?

12   A.  They are.

13   Q.  How do you know that?

14   A.  I visually verified them on the device.

15            MS. DEININGER:  Your Honor, the government moves to

16   admit Government Exhibit 1722, 1724, 1728, 1730, and 1733 into

17   evidence.

18            THE COURT:  Yes.

19            (Government's Exhibits 1722, 1724, 1728, 1730, and

20   1733 received in evidence)

21            MR. HARID:  We're preserving our objections, your

22   Honor.

23            THE COURT:  Yes.  So the previously raised objections

24   are preserved.  All my previous rulings stand denying those

25   objections.  I think we had done the entirety of the objections

L34AWEI6ps                    Volchko - Cross

1     as to 1722 but not as to the others.  So as the others are

2     offered in evidence -- they are being offered now, but as

3     they're discussed in evidence, those objections can be raised

4     then and will be treated de novo at that time.

5                MS. DEININGER:  Thank you, your Honor.

6                Your Honor, I have no further questions.

7                THE COURT:  Cross-examination.

8     CROSS-EXAMINATION

9     BY MR. HARID:

10    Q.  Good afternoon, Ms. Volchko.  Can you hear me?

11    A.  Yes.

12    Q.  Ms. Deininger showed you what's been marked Government

13    Exhibit 3707.

14                MR. HARID:  Mr. McLeod, can you put that up, please.

15    Q.  Ms. Volchko, do you see that there are multiple zip files

16    included on this exhibit?

17    A.  I do.

18    Q.  Those are identified under Government Exhibit 1149, 1151,

19    1265, 1346, and "new opal.zip" under Government Exhibit 1507.

20    Did you look at all at the metadata for those zip files?

21    A.  What kind of metadata are you referring to?

22    Q.  Specifically the author of those zip files, who created

23    them.

24    A.  I did not.

25    Q.  Did you look at the metadata for the files within those zip

L34AWEI6ps                     Volchko – Cross

1    files?

2    A.   Once again, what kind of metadata?

3    Q.   Specifically the author metadata for those constituent

4    files.

5    A.   I did not.

6    Q.   So you have no idea who created any of these files?

7    A.   I do not.

8    Q.   And you have no idea if any of those files -- when any of

9    those files were last changed?

10   A.   Typically you can use a modification date for change, but

11   that can vary.  So that would be your best indicator.

12   Q.   Is it accurate to say that, for this entire government

13   exhibit, 3707, you didn't look at any of the author metadata?

14   A.   I did not specifically look at the author, no.

15   Q.   And did you look at any of the last-modified data for this

16   document?

17   A.   Those would have been in the report where available.

18   Q.   Looking at Government Exhibit 1149, for example, the PDFs

19   under the zip file, "kalixa applications.zip," those are the

20   constituent files within the zip file, correct?

21   A.   That's correct.

22   Q.   And you have no idea who authored them and when they were

23   last changed.

24              MS. DEININGER:  Objection.

25   A.   Sustained as to the second part of the question.

L34AWEI6ps                    Volchko - Cross

1    Q.  And you have no idea if my client, Mr. Weigand, authored

2    any of the documents on this page here.

3              MS. DEININGER:  Objection.

4              THE COURT:  Grounds?

5              MS. DEININGER:  She's already said she doesn't know

6    who the author was.

7              THE COURT:  I'll allow that.

8              You may answer.

9    A.  I do not know who authored the documents.

10   Q.  Ms. Volchko, you said you looked at user data on the hard

11   drive that you reviewed.  Is that correct?

12   A.  I processed the user data.

13   Q.  And that included reviewing emails, yes?

14   A.  Emails were one of the types of files that were processed.

15   Q.  And documents saved on the hard drive?

16   A.  Yes.  There were documents on the hard drive.

17   Q.  And you said you also reviewed internet browser history.

18   Yes?

19             MS. DEININGER:  Objection.  Misstating the testimony.

20             THE COURT:  Well, did you review internet browser

21   history?

22             THE WITNESS:  I did not review specific browser

23   history.

24   Q.  And you said you were able to review the Telegram chats

25   that you recovered?

L34AWEI6ps                    Volchko - Cross

1    A.  I reviewed the chats on the physical device.

2    Q.  Sorry.  Couldn't hear you.

3    A.  I reviewed the chats on the physical device.

4    Q.  Thank you.

5           Did you look at all at -- am I correct to assume that

6    you did not look at the websites that were accessed?  So,

7    reframing that, you didn't look either at internet browser

8    history or website access.  Is that accurate?

9    A.  I, I processed the data and staged it for review for the

10   case agent.  I was not going to review all of the data on the

11   laptop.

12   Q.  Based on your review of the user data, including emails,

13   texts, and anything else you reviewed during your review, did

14   you see any evidence at all of website creation on the device?

15   A.  Once again, I staged the data for review.  I was not the

16   one reviewing all of the files.

17   Q.  Did either you or any of your colleagues see any evidence

18   of website creation on the device?

19           MS. DEININGER:  Objection.

20           THE COURT:  If she knows, she may answer.

21   A.  I was not the one to review, and I can't speak for anyone

22   else, but I was not the one to review website history.

23   Q.  You mentioned Tor Browser.  Can you just describe what that

24   is.

25   A.  It's a web browser that you can browse.

L34AWEI6ps                    Volchko - Cross

1   Q.  And you said -- isn't it accurate that Tor Browser has

2   certain encryption features that preserve confidential user

3   information?

4   A.  It can.

5   Q.  And it's a browser just like Google Chrome or Internet

6   Explorer.

7   A.  It has a couple additional features, depending on how

8   you're using it.

9   Q.  And those additional features are designed to protect

10  sensitive user information like passwords, banking information,

11  and things of that sort.

12  A.  You could say that.

13  Q.  For example, if any one of us was in a setting that had a

14  public Wi-Fi with people we didn't know, if we were trying to

15  keep our sensitive information private, we may be sort of using

16  an encrypted browser like Tor Browser?

17          MS. DEININGER:  Objection.

18          THE COURT:  Sustained.

19  Q.  Are you aware that Tor Browser is a nonprofit, a 501c3

20  company?

21          MS. DEININGER:  Objection.

22          THE COURT:  Sustained.

23  Q.  Would you agree that there are -- you, I, would have

24  perfectly legitimate reasons to use Tor Browser?

25          MS. DEININGER:  Objection.

L34AWEI6ps                         Volchko - Cross

```
 1              THE COURT:  Counsel, I think you'd better go on to
 2    something else because I don't want to have to instruct the
 3    jury that all that on a question is improper.
 4              MR. HARID:  Sure.  Thank you, your Honor.
 5    Q.  You said you reviewed the documents, emails, and files on
 6    the drive that you looked at.  Correct?
 7    A.  I reviewed the documents that were listed in the
 8    spreadsheet.
 9    Q.  And based on your entire review, did you see any evidence
10    of any communication between the user of those files and a U.S.
11    bank?
12    A.  I only reviewed the documents that were on the spreadsheet.
13    Q.  Did you look at all for any communications with the U.S.
14    bank?
15    A.  I did not.
16    Q.  Did you look at all for any communications with a U.S. bank
17    employee?
18    A.  I only looked at documents that were on the spreadsheet.
19    Q.  In other words, you had no idea if there were or were not
20    communications with a U.S. bank.
21    A.  I have no knowledge of that, no.
22              MR. HARID:  Could I just confer with my client for a
23    minute?  Thank you.
24              No further questions, your Honor.
25              THE COURT:  All right.  Counsel for Mr. Akhavan.
```

1              You can take your mask off.

2              MS. CLARK:  Thank you, your Honor.

3              Can you hear me?  Ms. Volchko, can you hear me?

4              THE WITNESS:  Yes.

5    CROSS-EXAMINATION

6    BY MS. CLARK:

7    Q.  Ms. Volchko, you said that you reviewed the documents

8    listed on the spreadsheet.  Is that correct?

9    A.  I did.

10   Q.  Does that include Government Exhibit 1572?

11   A.  I don't recall off the top of my head.  I'd have to verify.

12             MS. CLARK:  Mr. McLeod, could you put up the

13   government spreadsheet.  I can go back to the table and get the

14   exhibit number, but this is much faster.

15             Mr. McLeod, could you scroll down to the next page,

16   please.

17   Q.  Ms. Volchko, do you see Exhibit 1572 referenced here?

18   A.  I do.

19   Q.  Did you review that document?

20   A.  I did.

21             MS. CLARK:  Mr. McLeod, could you put Government

22   Exhibit 1572 up for the witness, please.

23   Q.  Ms. Volchko, I believe you testified that you reviewed the

24   documents from the laptop and confirmed that they matched what

25   was on the physical device.

L34AWEI6ps                    Volchko – Cross

1    A.  I verified the documents to the forensic image.

2    Q.  OK.  And so is Government Exhibit 1572 from that forensic

3    image?

4    A.  Yes.

5    Q.  And that document matched what was on the physical device,

6    correct?

7    A.  Yes.

8    Q.  OK.  Ms. Volchko, do you see the name Ray Akhavan anywhere

9    on Government Exhibit 1572?

10   A.  I do not.

11            MS. CLARK:  All right.  Just one moment.

12            OK.  You can take that down, Mr. McLeod.

13   Q.  Ms. Volchko, you mentioned that you collected -- among the

14   files that you attempted to collect, there were Telegram

15   messages.  Is that correct?

16   A.  That's correct.

17   Q.  And is it correct that you were unsuccessful in collecting

18   those in the forensic image?

19   A.  I was unsuccessful in parsing the data from the forensic

20   image.

21   Q.  You said "unsuccessful in parsing the data from the

22   forensic image"?  What do you mean by that?

23   A.  I mean that when I tried to attempt to use forensic

24   software to review the messages, it wasn't parsing the

25   messages, which I took as meaning it was most likely still

L34AWEI6ps                    Volchko - Cross

1   encrypted.

2   Q.  And you said, I believe, that after that, you attempted to

3   decrypt the messages again, and that that was unsuccessful as

4   well?

5   A.  I used another tool to view the messages.

6   Q.  So it -- and was that successful?

7   A.  That was not successful.

8   Q.  And so you said that because that was not successful, the

9   next-best step was to take a screen recording.

10  A.  That was the next step that was taken.

11  Q.  And did you make that recording?

12  A.  I did not.

13  Q.  When you say "make a screen recording," does that capture

14  the entirety of the messages available on the device?

15  A.  It will capture whatever is on the screen.  You can set it

16  to capture the entire screen or a small selection of the

17  screen.  And then as you scroll through, it's going to record

18  the messages scrolling through.

19  Q.  OK.  And Ms. Volchko, did you undertake that exercise?

20  A.  I did not.

21  Q.  And so do you know whether the Telegram images that are

22  listed on the government's spreadsheet are full and complete

23  copies of the Telegram messages available on the device?

24  A.  I was not the one to capture the recording, but I went back

25  to the recording, back to the device to verify.

L34AWEI6ps                  Volchko - Cross

1   Q.  And Ms. Volchko, are you aware of how -- sorry, strike
2   that.
3           I understand from your testimony it was the agent that
4   you instructed on how to make the recordings; is that correct?
5   A.  That's correct.
6   Q.  And do you have any knowledge on how the agent decided what
7   he would record?
8   A.  I do not.
9   Q.  Ms. Volchko, are you aware -- let me back up.
10          Ms. Volchko, are you aware that Telegram's chats
11  permit users to delete messages?
12  A.  Yes.
13  Q.  And in your experience, do those deleted messages leave a
14  record in the Telegram chat?
15  A.  I am not sure.
16  Q.  You don't know one way or the other?
17  A.  I do not.
18  Q.  And, Ms. Volchko, are you aware that a Telegram user can
19  delete their own account?
20  A.  Yes.
21  Q.  And are you aware if that leaves any record of who the
22  prior owner of the account was?
23  A.  I am not sure of that.
24  Q.  You don't know one way or the other.
25  A.  I do not.

1              MS. CLARK:  No further questions.

2              THE COURT:  Any redirect?

3              MS. DEININGER:  Very briefly, your Honor.

4    REDIRECT EXAMINATION

5    BY MS. DEININGER:

6    Q.  Ms. Volchko, you did not make the screen recordings of the

7    Telegram messages from the computer, right?

8    A.  I did not.

9    Q.  But the government identified certain Telegram messages

10   that were marked as government exhibits for you, correct?

11   A.  That's correct.

12   Q.  And tell us again what you did to verify whether those

13   messages were true and accurate copies of what was on the

14   computer.

15   A.  I went back to the physical device and verified that the

16   content of the messages matched the screen recordings on the

17   physical device.

18   Q.  So everything that's in those government exhibits that were

19   Telegram messages -- and that was Government Exhibits 1722,

20   1724, 1728, 1730, and 1733 -- you saw that content on the

21   computer.  Right?

22   A.  I did.

23             MS. DEININGER:  No further questions, your Honor.

24             THE COURT:  All right.

25             Anything else?

L34AWEI6ps                        Hargreaves - Direct

1                MR. HARID:  No, your Honor.

2                MS. CLARK:  No, your Honor.

3                THE COURT:  Very good.  Thank you very much.  You are

4      excused.

5                (Witness excused)

6                THE COURT:  Please call your next witness.

7                MS. LA MORTE:  The government calls Oliver Hargreaves.

8                (Pause)

9                THE COURT:  Law school training is a wonderful thing.

10               You can take off your mask, Mr. Hargreaves.  You can

11     take off your mask now, and raise your right hand.

12

13     OLIVER HARGREAVES,

14          called as a witness by the government,

15          having been duly sworn, testified as follows:

16               THE COURT:  Please be seated, speak directly into the

17     mike, and state and spell your first and last name.

18               You have to get closer to the mike.

19               THE WITNESS:  Oliver Hargreaves, O-l-i-v-e-r

20     H-a-r-g-r-e-a-v-e-s.

21               THE COURT:  Counsel.

22     DIRECT EXAMINATION

23     BY MS. LA MORTE:

24     Q.  Mr. Hargreaves, how old are you?

25     A.  I'm 41 years old.

L34AWEI6ps                    Hargreaves - Direct

1   Q.  Where did you grow up?

2   A.  I grew up in the United Kingdom.

3   Q.  Where do you live now?

4   A.  In the United Kingdom.

5   Q.  Mr. Hargreaves, on September 27, 2018, did anything of

6   significance happen to you?

7   A.  Yes, it did.

8   Q.  What happened?

9   A.  I was arrested in Manhattan, New York.

10  Q.  What were you arrested for?

11  A.  Extortion, attempted extortion.

12  Q.  Did you in fact participate in an extortion scheme?

13  A.  I did, yes.

14  Q.  Have you also committed other crimes?

15  A.  I have, yes.

16  Q.  Following your arrest, did you cooperate with U.S. law

17  enforcement authorities?

18  A.  I did, yes.

19  Q.  Did you speak with them about the extortion scheme that led

20  to your arrest?

21  A.  I did, yes.

22  Q.  Did you plead guilty to committing that crime?

23  A.  I did, yes.

24  Q.  In the course of speaking with law enforcement authorities,

25  did you tell them about other crimes you had committed as well?

1    A.  I did, yes.

2    Q.  What crimes were those?

3    A.  Two counts of money laundering and one count of bank fraud.

4    Q.  Did you then also plead guilty to committing these other

5    crimes that you told them about?

6    A.  I did, yes.

7    Q.  So we'll discuss the details of those crimes later in your

8    testimony, but for now, can you tell the jury generally what

9    made you guilty of the money laundering and bank fraud crimes.

10   A.  Yes.  I was involved -- I was in-- I worked for a pay

11   authorization provider, a company that processes payments for

12   online businesses wishing to accept credit cards on their

13   websites as a way of payment.

14   Q.  What did you actually do that made you guilty of the

15   offenses, in that capacity?

16   A.  I submitted fraudulent application -- fraudulent

17   application packs to acquiring banks in order to obtain

18   merchant bank accounts for illegal businesses.

19   Q.  And what kind of illegal businesses did you do that for?

20   A.  Gambling and marijuana.

21   Q.  What was the name of the merchant for which you concealed

22   marijuana transactions?

23   A.  Eaze.com.

24   Q.  What did you help Eaze do?

25   A.  I facilitated the ability, via submission of a fraudulent

L34AWEI6ps                    Hargreaves - Direct

1   application pack to the acquiring bank, the ability to process

2   credit card and debit card payments by MasterCard.

3   Q.   And what was the goal of the scheme?

4   A.   Transaction laundry.

5   Q.   Did you commit the bank fraud and money laundering offenses

6   by yourself in the Eaze scheme?

7   A.   No, I did not.

8   Q.   So you worked with other people to commit those crimes in

9   the Eaze scheme?

10  A.   That is correct.

11  Q.   Please look around the courtroom.  Do you see anyone in

12  this courtroom that you committed any of those crimes with?

13  A.   Yes, I do.

14  Q.   Who do you see?

15  A.   I see Ray Akhavan.

16  Q.   Do you see anyone else?

17  A.   Yes, I do.

18  Q.   Who else do you see?

19  A.   Ruben Weigand.

20          MR. TAYBACK:  I'll stipulate Mr. Akhavan is the person

21  seated next to me.

22          THE COURT:  I'm sorry?

23          MR. TAYBACK:  I stipulate that Mr. Akhavan is the

24  person seated next to me.

25          THE COURT:  Yes.  All right.  So the record will

1   reflect that the witness has identified the two defendants.

2           Go ahead.

3           MS. LA MORTE:  Yes, your Honor.

4           Mr. Levine, could you put on the screen just for the

5   witness who has been marked for identification as Government

6   Exhibit 1.

7   Q.  Mr. Hargreaves, do you recognize Government Exhibit 1?

8   A.  Yes, I do.

9   Q.  Who is depicted in Government Exhibit 1?

10  A.  Ray Akhavan.

11          MS. LA MORTE:  The government offers Government

12  Exhibit 1.

13          MR. TAYBACK:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 1 received in evidence)

16          MS. LA MORTE:  Mr. Levine, please publish that.

17          You can take that down.

18          Mr. Levine, could you put on the screen for the

19  witness what has been marked for identification as Government

20  Exhibit 2.

21  Q.  Mr. Hargreaves, do you recognize Government Exhibit 2?

22  A.  Yes, I do.

23  Q.  Who is depicted in Government Exhibit 2?

24  A.  Ruben Weigand.

25          MS. LA MORTE:  The government offers Government

1    Exhibit 2.

2              MR. TAYBACK:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 2 received in evidence)

5              MS. LA MORTE:  Mr. Levine, can you publish Government

6    Exhibit 2.

7              OK.  You can take that down.

8    Q.  Now, Mr. Hargreaves, focusing on the bank and money

9    laundering crimes involving Eaze, what was your role in the

10   scheme?

11   A.  My role in the initial stages was to source acquiring banks

12   that were willing to process payments using fraudulent

13   application apps on behalf of a third-party true business.

14   Q.  Did your scheme change over time -- I'm sorry -- did your

15   role change over time?

16   A.  Yes, it did.

17   Q.  How did it change?

18   A.  I was responsible for the creation of fraudulent

19   application packs and the submission of those fraudulent

20   application packs to acquiring banks.

21   Q.  Roughly when did you commit those crimes?

22   A.  In 2018, 2019.

23   Q.  Mr. Hargreaves, what was Ray Akhavan's role in the Eaze

24   scheme?

25   A.  He was my client.

L34AWEI6ps                      Hargreaves - Direct

1    Q.  Can you elaborate on that a bit more.

2    A.  He has -- he had a relationship with the -- with the

3    website eaze.com, and he was -- he was responsible for bringing

4    said clients and representing said client.

5    Q.  Were you retained -- were your services retained in

6    connection with the Eaze scheme?

7    A.  Yes, they were.

8    Q.  Who retained them?

9    A.  Mr. Akhavan.

10   Q.  Now, turning to Mr. Weigand, Mr. Harvey, what was Ruben

11   Weigand involved in, in the scheme, with Eaze?

12   A.  I would have classified him as the operations manager and

13   our main point of contact.

14   Q.  Can you elaborate on that a little bit more?  What did he

15   do as the so-called operations manager?

16   A.  We -- he would be the person that would be advising us what

17   the acquiring -- as the acquiring banks were there, for his

18   relationships and Mr. Akhavan's relationships, when we were

19   obviously -- we were communicating on a daily basis in relation

20   to the content of the application packs that we were submitting

21   to the acquiring banks, and we were receiving feedback and

22   guidance from him in relation to those application packs.

23   Q.  Now, I'm going to discuss the Eaze scheme in detail in a

24   bit, but first I want to get some background about your

25   employment at the time.

L34AWEI6ps

1          THE COURT:  Counsel, I wonder whether, since we're

2     going to be leaving the jury go in five minutes, maybe this is

3     a good point to break at this point, yes?

4          MS. LA MORTE:  I agree, your Honor.

5          THE COURT:  Very good.  The witness may step down.

6          (Witness excused)

7          THE COURT:  All right.  So, ladies and gentlemen, you

8     are about to have a three-day weekend.  Do not take this as

9     precedent.  Next Friday we will be sitting.  But let me just

10    remind you, since this is a three-day break:  First, don't

11    discuss the case with anyone else.  Second, don't try to Google

12    anything about the case or do your own research.  Third, in the

13    unlikely event you see anything in the media about the case,

14    turn away; don't even look at it.  And the reason for those

15    rules, I just want to remind you, is, we want you to decide

16    this case on the testimony and evidence you're hearing right

17    here, not on anything else.

18         we've arranged that you will all be COVID tested on

19    Monday.  I'm not quite sure when in the morning.  It will be

20    sometime in the morning.  We may work around that.  But my

21    suggestion is that you get here at 9:30, just so we can take

22    advantage of that extra time for the COVID test.

23         So, listen, have a great weekend.  And I will see you

24    at 9:30 on Monday morning.  You're excused.

25         (Jury not present)

L34AWEI6ps

1          THE COURT:  All right, anything that any counsel needs
2     to raise?
3          MR. TAYBACK:  Your Honor, there is one thing I would
4     like to raise.  Christopher Tayback on behalf of Mr. Akhavan.
5     In the motion in limine proceedings in the tentative, the issue
6     with respect to the defense of Mr. Akhavan's proposed expert
7     was, I believe it would be held essentially in abeyance and you
8     would hear more testimony.  I'm in the process of trying to
9     figure out timing for making arrangements for witness arrivals
10    and quarantine and all of that.  So I have two questions that
11    are related.  The first one is, it would be helpful to
12    understand when your Honor might be contemplating that those
13    issues might be ripe for decision.  And, second, whether I
14    could have leave to make an application for any of them to
15    testify remotely and maybe have to avoid the five-day
16    quarantine period.
17         THE COURT:  I note for the record that the defense,
18    having proposed the proposal by one of the government's
19    witnesses to appear electronically, has now embraced that
20    opportunity with respect to their own witnesses.  But --
21         MR. TAYBACK:  We don't need a confrontation clause.
22    Right.  We have our own.
23         THE COURT:  I understand that, and that's why I'm not
24    saying you're blatantly inconsistent.
25         MR. TAYBACK:  That ship has left the dock, so to

L34AWEI6ps

1    speak, your Honor, I think, as far as remote testimony appears.

2                THE COURT:  But I'm generally fine with that, given

3    the pandemic, subject of course to hearing from anyone who

4    opposes it.  So you can make that application if you want over

5    the weekend.  Just send in a message to my law clerk.

6                I should tell you my schedule.  I am teaching tonight,

7    all day tomorrow, and all day Saturday by Zoom at Berkeley Law

8    School.  So -- because I'm really bored with the trial, it

9    seemed like something worth doing.  So I can't get you

10   decisions until Sunday.  But you can make applications before

11   that.

12               MR. TAYBACK:  I understand, your Honor.  I don't -- I

13   mean, with this case, it's hard for me to envision that they

14   would be ripe for testimony next week anyhow.

15               THE COURT:  It's a perfectly sensible point you're

16   raising.

17               In terms of the schedule more generally, I think the

18   government should figure out, as best they can, when it expects

19   to rest, should advise defense counsel then but before Monday,

20   and we can figure out more about the issues you raise in terms

21   of timing.

22               MR. TAYBACK:  Thank you, your Honor.

23               MS. LA MORTE:  Your Honor, can I raise one issue?

24               THE COURT:  Yes.

25               MS. LA MORTE:  You had given an instruction to the

L34AWEI6ps

1    jury today regarding DOJ's enforcement of marijuana sales, with

2    respect to states that are legal.  We're looking into it.  It's

3    our understanding that might be a little bit more nuanced than

4    your Honor had --

5              THE COURT:  Oh, no.  I purposefully didn't get into

6    the arguable nuance about medical marijuana, if that's what

7    you're referring to.

8              MS. LA MORTE:  No.  Actually what I was referring to

9    was --

10             THE COURT:  The reason I didn't, by the way, was, I

11   thought, we'll deal with that if we have to deal with it at all

12   in the final charge.  But for the purposes that they were

13   hearing the evidence at the time, I thought the broad picture

14   was more than sufficient.

15             MS. LA MORTE:  No, I understand, your Honor.  The way

16   I heard the instruction -- we can go back and look at it -- was

17   that DOJ generally doesn't enforce at all with respect to

18   states where marijuana is legal.  Again, I have to go back and

19   look.  My understanding is that the 2018 guidance is still the

20   guidance that governs DOJ policy in this regard, and I believe

21   there are some sort of heightened factors that -- like, for

22   example, a marijuana trafficking organization, let's say

23   they're operating in California --

24             THE COURT:  Oh, yes.  That's a good point.  So that's

25   another nuance.  Cuts the other way.

L34AWEI6ps

1          MS. LA MORTE:  Yes.

2          THE COURT:  So there are even situations where the

3     federal government will prosecute people who are involved in

4     marijuana sales in states that legalized it.

5          MS. LA MORTE:  Yes.  When violence is involved.  I

6     have to go back and look at the memo.

7          THE COURT:  That's a very good point.  It didn't seem

8     to me -- and what I thought the jury needed was an overview,

9     since they had heard about, from various witnesses, what's your

10    understanding of this, what is your understanding of that.  And

11    that was relevant too.  But since these are matters of law, I

12    wanted to give them an overall.  And there was no objection

13    from anyone at the time.  And besides that, I think it was a

14    correct statement of the overall situation.

15          I agree that there are nuances that will have to be

16    spelled out in the final charge to the jury.  And if anyone

17    wants to get into questioning about them, they should alert me

18    first so I could deal with that.  But I didn't think it was

19    appropriate at that time to give more than a broad overview.

20          MS. LA MORTE:  OK.

21          THE COURT:  OK.

22          MR. TAYBACK:  Thank you, your Honor.

23          MS. LA MORTE:  Thank you, your Honor.

24          What time would you like to us meet on Monday here?

25          THE COURT:  Why don't you guys come in at 9 o'clock,

L34AWEI6ps

1    because just something -- just a wild speculation on my part,

2    but I think there probably will be things that counsel will

3    raise that I'll need to deal with.  So 9 o'clock.

4              MR. TAYBACK:  You've done this for a while, your

5    Honor.

6              THE COURT:  Anyway, you all have a very good weekend.

7    I'll see you at 9 o'clock.  Thank you.

8              MS. LA MORTE:  Thank you.

9              (Adjourned to 9:00 a.m., March 4, 2021)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            INDEX OF EXAMINATION

Examination of:                                        Page

Cross By Mr. Burck . . . . . . . . . . . . . . 498

Cross By Mr. Harid . . . . . . . . . . . . . . 564

Redirect By Mr. Folly  . . . . . . . . . . . 599

Recross By Mr. Burck . . . . . . . . . . . . 611

 JESSICA VOLCHKO

Direct By Ms. Deininger  . . . . . . . . . . 614

Cross By Mr. Harid . . . . . . . . . . . . . 638

Cross By Ms. Clark . . . . . . . . . . . . . 644

Redirect By Ms. Deininger  . . . . . . . . . 648

OLIVER HARGREAVES

Direct By Ms. La Morte . . . . . . . . . . . 649

                          GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 S1   . . . . . . . . . . . . . . . . . . . . 614
 1001, 1002, 1037, 1043, 1149, 1151, . . . . . 627
            1227, 1265, 1346, 1347, 1348,
            1449, 1506, 1507, 1518, 1572,
            1593, 1596, 1597, 1598, 1599,
            1612, 1613, 1614, 1615, 1616,
            1622, 1654, 1678, 1682, 1684,
            1686, 1688, 1690, 1695, 1696,
            1706, 1709, 1716, 1719, 1720,
            and 1801
 3707   . . . . . . . . . . . . . . . . . . . 634
 1722, 1724, 1728, 1730, and 1733 . . . . . . 637
 1   . . . . . . . . . . . . . . . . . . . . . 653
 2   . . . . . . . . . . . . . . . . . . . . . 654

              (Index continues on next page)

```
 1                          DEFENDANT EXHIBITS

 2    Exhibit No.                                      Received

 3      4010, 4008, 4013  . . . . . . . . . . . . 511
      4022    . . . . . . . . . . . . . . . . 530
 4    10047   . . . . . . . . . . . . . . . . 531
      10,043   . . . . . . . . . . . . . . . 557
 5    1047    . . . . . . . . . . . . . . . . 559

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```