```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20-CR-188 (JSR)

5   RUBEN WEIGAND and                     Corrected
    HAMID AKHAVAN,
6
                 Defendants.              Trial
7
    ------------------------------x
8
                                          New York, N.Y.
9
                                          March 8, 2021
10                                        9:40 a.m.

11
    Before:
12
                        HON. JED S. RAKOFF
13
                                          District Judge
14

15                         APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand

25
                      APPEARANCES CONTINUED
```

L20SAAKH1

```
1

2   QUINN EMANUEL URQUHART & SULLIVAN, LLP
         Attorneys for Defendant Akhavan
3   BY:  WILLIAM A. BURCK
         CHRISTOPHER TAYBACK
4        SARA CLARK
         MARI HENDERSON
5        DEREK SHAFFER
         PAUL SLATTERY
6        -and-
    ROTHKEN LAW FIRM LLP
7        Attorneys for Defendant Akhavan
    BY:  IRA P. ROTHKEN
8        JARED R. SMITH

9
```

10          (Trial resumed; jury not present)

11          THE COURT:  The last of the 13 jurors is being tested

12   right now.  We will have the results, we are told, about 10:00.

13   Assuming everyone is negative, we will start the trial at

14   10:00.

15          In the meantime, counsel has favored me with a number

16   of evidentiary questions, so I will take them up with whatever

17   order you like.  Let me ask defense counsel, which one do you

18   want to start with?

19          MR. ARTAN:  I'll defer to Mr. Tayback.

20          MR. TAYBACK:  Your Honor, I do think this witness is

21   on the stand, and I'm not sure the timing that this will occur,

22   but I do believe there are open issues --

23          THE COURT:  I'm asking, which one do you want to start

24   with.  I know there is more than one issue regarding

25   Mr. Hargreaves.

1          MR. TAYBACK:  The chats.  There are Telegrammed chats

2     that we have objected to and that are the subject of motion *in*

3     *limine* No. 7.  My colleague, Ms. Clark, is going to address

4     that point.

5          THE COURT:  I'm happy to hear.  My recollection of

6     what I said back when we were dealing with motions *in limine*

7     was that motion No. 7 would turn on the foundation laid for

8     individual items of evidence, so I am not sure I can deal with

9     it now, but I'll be happy to hear anything defense counsel has

10    to say and anything the government wants to say.

11         MS. CLARK:  Understood, your Honor.  We are happy to

12    take those up as they come through.

13         I guess just a point of clarification, as those

14    exhibits come up, do you want us to raise the objection outside

15    the presence of the jury?

16         THE COURT:  My recollection, and maybe you need to

17    refresh me, but the main question was with respect to

18    authentication of the Telegram messages.  There was also a

19    confrontation-clause question.  I don't really think the

20    confrontation-clause objection is that strong, but that would

21    be a more global objection that we could talk about now.

22         But the main thing that caused me to reserve was the

23    fact that, as I understood your motion, the Telegram is, in

24    your view, somewhat suspect because some participants can

25    delete messages from their chats, some may even be able to

1    delete other users' chats without a trace.  In an extreme case

2    that might be a problem, but I see that as being more than an

3    issue for cross-examination in most senses, as opposed to a

4    reason for exclusion.  But maybe I'm missing something here.

5    So go ahead.

6          MS. CLARK:  Understood, your Honor.

7          I think I would just want to call your Honor's

8    specific attention to one of the chats in particular, which is

9    going to be Government Exhibit 4004.  That is one of the chats

10   that we understand they are going to be introducing through

11   Mr. Hargreaves that does have some of the deleted accounts.  We

12   just want to flag that.

13         THE COURT:  I'm sorry.  Bear with me one minute.  I

14   just got a note from my law clerk.

15         Forgive me for interrupting.  All 13 jurors tested

16   negative.  So we are going to bring up the jury now, and we can

17   continue with this conversation.

18         Any of these exhibits going to come up before the

19   midmorning break?

20         MS. LA MORTE:  It's possible, your Honor.  I am not

21   entirely sure.

22         The other issue I want to bring to your Honor's

23   attention, and you can decide whether to delay it or not, is

24   that, as your Honor is aware, the defense filed a motion

25   yesterday to suppress certain electronic evidence in light of

1          an alleged or purported failure of the government --

2                    THE COURT:  I'm waiting for your response to that this

3          evening.

4                    MS. LA MORTE:  That's fine.  I just wanted to note

5          this for the Court because some of that evidence that the

6          government intends to introduce that the defense is seeking to

7          suppress is going to be introduced through Mr. Hargreaves.  So

8          they are moving to suppress certain evidence that we intend to

9          introduce today, so I wanted to call that to your Honor's

10         attention, and I'm happy to address now why even if the Court

11         found that there was some issue there, which there is not, why

12         suppression of existing electronic evidence would not be the

13         appropriate remedy under the standards of the Second Circuit.

14         My point is, regardless of --

15                   THE COURT:  Let me interrupt you.  I'm happy to hear

16         as much of that as we can deal with now.  The minute this jury

17         arrives, we start the testimony.  And, in fact, please alert

18         the witness that we will be calling him in a minute or two.

19                   But go ahead.

20                   MS. LA MORTE:  Yes, your Honor.

21                   I could start with some background about some context

22         for the Court, although I do believe that this is probably

23         going to be a longer discussion.

24                   As the Court is aware, Mr. Hargreaves was arrested in

25         September of 2018.  He was arrested with a number of items,

1   including two phones.  I'll call them phone 1 and phone 2.

2          The government created an image of phone 1., but with

3   respect to phone 2 did not do any sort of extraction of the

4   phone because the investigator at the time looked at the phone

5   and determined that it had no evidentiary value and so nothing

6   was done with it and it was returned to Mr. Hargreaves.  Phone

7   1 was also returned to Mr. Hargreaves after the government

8   extracted the phone.

9          Now, in April of 2020, the government produced in

10  discovery one phone extraction.  So the defense received that

11  extraction from phone 1 that it had conducted at

12  Mr. Hargreaves' arrest.

13         Then in November of 2020, the government produced 3500

14  materials that indicated or that showed, actually, that the

15  defendant had been arrested with two phones and that he had

16  consented to search with respect to those two phones, so the

17  defense knew.  They only got one phone in discovery.  Yet, in

18  November they knew that the cooperating witness had two phones.

19         I just provide that to you for context as to where we

20  are now because, in the government's view, this is a motion

21  that could have been brought and should have been brought

22  earlier because the defense is on notice as of November that

23  they did not receive a second phone dump because the government

24  never in fact searched that phone.

25         Your Honor, the reason I raise that, I just wanted to

1    provide you some context.  He was sent home with phone 1.  He

2    used phone 1 in connection with proactive efforts and then lost

3    that phone and had some other phones.

4         THE COURT:  Let me interrupt once again.  I misspoke.

5    Twelve of the jurors have been tested and are negative.  The

6    13th is just being tested now, so we do have a few more

7    moments.

8         THE LAW CLERK:  That's my older note.

9         THE COURT:  They are on their way up.  Confusion

10   reigns.

11        MS. LA MORTE:  Let me cut to the point since the jury

12   is on their way up.

13        The defense is asking for suppression of existing

14   electronic evidence that's not supported by the law.  If the

15   Court looks at Second Circuit law, suppression or dismissal of

16   the indictment is only appropriate if there is an intentional

17   destruction --

18        THE COURT:  You want me to look at Second Circuit law?

19   Do I have to do that?

20        MS. LA MORTE:  I know your Honor marches by the beat

21   of his own drum, which is something I admire, but we are bound

22   by the circuit.

23        THE COURT:  The record should reflect that I am the

24   dutiful humble servant of the Second Circuit.

25        MS. LA MORTE:  The law on this is very clear that for

1    a remedy such as, possibly, suppression, or usually the remedy

2    sought is dismissal, it has to be the intentional destruction

3    of exculpatory evidence.  With respect to a failure to collect

4    evidence, it has to be that the government recognized the

5    exculpatory value of the evidence and then chose not to collect

6    it and it was destroyed in bad faith.  The defense does not

7    even attempt to meet that standard here, and they can't meet

8    that standard here.

9          So the point I'm raising with the Court is that

10   regardless of how the Court considers whether the government

11   violated an obligation to collect or preserve evidence, the

12   remedy that they are seeking is not the proper remedy under

13   law.  I think, at most, they might be entitled to some sort of

14   instruction.

15         And the reason I'm raising that now is because this

16   witness is about to take the stand, and the government is going

17   to introduce these materials through this witness today.

18         THE COURT:  Let me hear from defense counsel.

19         MR. TAYBACK:  Your Honor, to address the two points

20   raised by the government, the first is when the data was

21   provided to the defendants, there is no way to know that it's

22   not the identical data, for example.  Somebody who would have

23   an iPad, an iPhone may well have all the same data on both.  It

24   does appear that there was additional data not obtained or not

25   produced, as we describe in our letter.

1          But the second point to address is, we received 3500

2     material yesterday that notwithstanding the government's

3     contention that this was simply a decision by the agent, that

4     there was no relevant information to be had on that second

5     phone, that, in fact, the witness himself described the second

6     phone as perhaps being used by him for clandestine purposes and

7     that he wiped it subsequently, indicating there was data on it,

8     or it would certainly suggest that was the plausible reason he

9     proffered to the government in 3500 materials produced

10    yesterday, which raise a lot of questions about, well, what was

11    this phone.

12          THE LAW CLERK:  Jury entering the courtroom.

13          THE COURT:  To be continued.

14          (Jury present)

15          THE COURT:  Good morning, ladies and gentlemen.

16          First, I am delighted to hear that you all tested

17    negative.  It's rare in this life that negative is a good

18    thing.  But in this case it very much is a good thing.

19          Also, I'm delighted for a different reason because, as

20    I've already expressed, I've been watching you folks from the

21    day this trial began, and you are an exceptional jury.  You are

22    so attentive.  You exercise such interest in everything that's

23    being presented and everything that's being brought to your

24    attention, which makes you an ideal jury, and it would have

25    broken my heart if we had to discontinue.  I'm delighted.

 1          I do want to make sure everyone, particularly the

 2   lawyers and the other people in the audience, remember that one

 3   of the reasons we had this negative result was, everyone abided

 4   by the rules.  Please be sure to keep social distancing, which

 5   is very important at all times.  I don't want to have to do

 6   what I threatened to do the other day, which is exclude someone

 7   from the courthouse for the rest of the trial.  I'm sure that

 8   won't be necessary.

 9          Anyway, any congratulations to you.  My thanks to you,

10   and we are ready to continue.

11   OLIVER HARGREAVES, resumed.

12          THE COURT:  I remind the witness you are still under

13   oath.

14   DIRECT EXAMINATION

15   BY MS. LA MORTE:

16   Q.  Good morning, Mr. Hargreaves.

17   A.  Good morning.

18   Q.  Mr. Hargreaves, when we left off on Friday, you were

19   testifying about a scheme you participated in with the

20   defendants involving a merchant called Eaze.

21          Do you recall that?

22   A.  Yes.

23   Q.  Where did you understand Eaze to be located?

24   A.  In California, in the United States.

25   Q.  Where did you understand its customer base to be?

 1   A.   In the United States.

 2   Q.   Overall, what was the goal of the Eaze scheme?

 3   A.   To allow Eaze to process credits and debit card

 4   transactions via their website.

 5   Q.   Mr. Hargreaves ha, when did you first start participating

 6   in the Eaze scheme?  Roughly when?

 7   A.   In and around 2016 through until 2018.

 8   Q.   Let's start with your employment around the time that you

 9   began, right before you began participating in the Eaze scheme.

10   Who were you working for at that time?

11   A.   I was working for a company called PayGo.

12   Q.   Who ultimately controlled that company?

13   A.   Gary Murphy.

14   Q.   What type of business was PayGo involved in?

15   A.   Payment processing.

16   Q.   What is payment processing?

17   A.   It is a service business provided to e-commerce businesses

18   wishing to process, amongst other payment methods, credit and

19   debit cards by their website.

20   Q.   You mentioned e-commerce business.  What do you mean by

21   that?

22   A.   I mean websites.

23   Q.   What was your title at PayGo?

24   A.   CEO.

25   Q.   Were you involved when PayGo was initially formed?

1   A.  I was, yes.

2   Q.  Why was PayGo formed?

3   A.  It was formed to provide payment services to websites in

4   high-risk arena and also illegal businesses.

5   Q.  I just didn't hear.  Did you say legal or illegal

6   businesses?

7   A.  Illegal.

8   Q.  Where was PayGo based?

9   A.  Manila.

10  Q.  Did PayGo focus on a particular market?

11  A.  It did.

12  Q.  What was that?

13  A.  Online casinos an online forex businesses, trading.

14  Q.  What were your duties and responsibilities as a CEO of

15  PayGo?

16  A.  My duties involved seeking new banking partners and

17  procuring new clients for the business.  My duties involved

18  managing the internal team involved with in the operations and

19  the day-to-day running of the company.

20  Q.  In connection with your work at PayGo in the payment

21  processing world, did you come to learn generally how online

22  card transactions are processed and funded?

23  A.  I did, yes.

24  Q.  Who are the primary participants in a card transaction?

25  A.  The cardholder, the cardholder's bank, also known as the

1    issuing bank, the merchant, the website's bank, known as the

2    acquiring bank, and Visa and MasterCard.

3    Q.  Please walk us through that process one step at a time from

4    when a cardholder seeks to use their credit card to make a

5    purchase to when the customer is billed.

6    A.  A cardholder would go on the website in which they were

7    looking to purchase a product or service.  They would pick the

8    service or product from the website.  They would then be taken

9    to a checkout on the website, and they would enter their card

10   details into that website, into that checkout.  They would

11   then -- that transaction would then either be authorized or

12   declined by that bank, the issuing bank, and would then

13   subsequently, if authorized, go through to the acquiring bank

14   and either be authorized or declined utilizing the Visa or

15   MasterCard system.

16   Q.  You mentioned issuing banks, acquiring banks, and Visa and

17   MasterCard.  When a person uses their card to make a purchase

18   online, which entity is responsible for making the initial

19   determination as to whether that transaction is going to be

20   authorized?

21   A.  The bank is, the issuing bank.

22   Q.  Are you familiar with the term merchant processing account?

23   A.  Yes, I am.

24   Q.  How are you familiar with that term?

25   A.  It is a type of business account specific to e-commerce

 1   merchants, which is provided by acquiring banks.

 2   Q.  Elaborate a little bit more.  What is a merchant processing

 3   account?

 4   A.  It is the account in which the proceeds generated from the

 5   service or product sold by the website housed.  It is a

 6   business account.

 7   Q.  What does the merchant processing account enable a business

 8   to do?

 9   A.  To receive payments from the goods or services provided by

10   their website.

11   Q.  To receive payments how?

12   A.  Via credit -- typically, credit or debit cards.

13   Q.  You may have already said this, but which participant in

14   the payment processing system houses that merchant processing

15   account?

16   A.  The acquiring bank.

17   Q.  Is the merchant processing account also referred to as a

18   mid, m-i-d?

19   A.  Yes, it is.

20   Q.  Aside from the merchant processing account, are there other

21   types of bank accounts that a business must obtain in order to

22   be able to accept debit and credit cards?

23   A.  There is another account that is required for them to then

24   be able to access the income generated via the offering on

25   their website, which is termed as a settlement account.  A

 1   settlement account in nature is what most people would term a

 2   business bank account from which you can access your money.

 3   Q.   In the course of a card transaction, how does that

 4   settlement account receive funds?

 5   A.   Once the issuing bank has approved the transaction of those

 6   funds and then subsequently the acquiring bank has approved the

 7   transaction, after a period of time, typically 14 days, the

 8   time it takes for a charge back not to be a possibility, they

 9   are able to move money from the merchant, the website would be

10   able to move money from their merchant account to their

11   settlement account.

12   Q.   Can you walk us through the flow of funds then that

13   accompanies a credit or debit transaction from the time the

14   transaction is placed to when it settles?

15   A.   Yes.  Cardholder goes onto a website, cardholder enters

16   their card details, the issuing bank decides whether to accept

17   or decline it, and then the acquiring bank will also decide

18   whether to accept or acquire it.  The merchant then, after a

19   period of time, is permitted to move to transfer the money from

20   their merchant account to their settlement account.

21   Q.   Where does that money ultimately originate from?

22   A.   The cardholder purchasing on the website.

23   Q.   So in the context of the Eaze scheme, do you have an

24   understanding of where the issuing banks were predominantly

25   located?

 1   A.  In the United States.

 2   Q.  Now, in the course of your work in the payments industry,

 3   have you participated in payment processing schemes that

 4   involved telling lies to banks?

 5   A.  Yes, I did.

 6   Q.  Did you personally participate in such schemes?

 7   A.  Yes, I did.

 8   Q.  Is it fair to say that that was part of your job working

 9   for Gary Murphy?

10   A.  Yes, it was.

11   Q.  In the course of your work how would you typically refer to

12   such schemes?

13   A.  Transaction-laundering schemes.

14   Q.  Based on your experience, can you describe for us a bit

15   more how transaction-laundering schemes work?

16   A.  Yes.  If there was a merchant -- if there was a website

17   that was operating a business that was illegal, obviously they

18   would not be able to provide -- they would not be able to apply

19   for a merchant account with an acquiring bank.  We would,

20   therefore, create fraudulent application packs with websites

21   created selling, for example, services or goods that we knew

22   would be accepted by the acquiring bank.  We would make an

23   application to the acquiring bank, and we would then provide

24   the -- allow the merchant account to be used by the merchant,

25   the -- for the sake of this conversation, the merchant

1   conducting illegal business.

2   Q.   What is the overall goal of a transaction-laundering

3   scheme?

4   A.   To allow a website that would not normally be able to

5   process or to accept credit cards via their website, to be able

6   to accept credit cards via their website.

7   Q.   You mentioned that you would present a fraudulent

8   application pack to the acquiring bank on behalf of your

9   client.   Is that right?

10  A.   That is correct.

11  Q.   In your experience, why was it necessary for those clients

12  to have to proceed by way of a fraudulent application package?

13  A.   Because if they were to apply themselves, they would be

14  declined by the acquiring bank.   They would not be able -- they

15  would not receive a merchant account.

16  Q.   A moment ago you mentioned or you testified that you

17  engaged in transaction-laundering schemes with some of your

18  PayGo clients.

19           Do you recall that?

20  A.   I do, yes.

21  Q.   Can you remind us of the types of clients that PayGo did

22  this for?

23  A.   Yes.   We provided this service to online casinos and online

24  foreign exchange trading businesses.

25  Q.   Just very briefly, if you can, can you explain what forex

1   is.

2   A.  It's the ability to trade on the FX market, buying and

3   selling currencies.

4   Q.  With respect to your PayGo clients that you did this for,

5   did you make them aware that your company, PayGo, was providing

6   a payment solution through a transactions laundering scheme?

7   A.  Yes, we did.

8   Q.  Turning to the crimes that you committed with the

9   defendant, was that a type of transaction-laundering scheme, as

10  you understood it?

11  A.  Yes, it was.

12  Q.  Who retained your services to carry out that scheme?

13  A.  Ray Akhavan.

14  Q.  Before we discuss the Eaze scheme in more detail, let's

15  talk about your experience with transaction laundering more

16  generally.

17          Taking a step back, in the ordinary course of

18  business, how does a merchant typically go about obtaining a

19  merchanting processing account with an acquiring bank?

20  A.  A merchant would research the acquiring banks that worked

21  with their particular services or goods.  Once they decided

22  upon the acquiring bank that they wished to engage with, they

23  would contact the acquiring bank.  They would request the

24  ability to apply for a merchant account, and they would receive

25  upon that request an application for and a list of supporting

 1    documents that they would be required to provide.

 2    Q.   What type of documents would they typically be required to

 3    provide in applying for a merchant processing account?

 4    A.   KYB and KYC documents.

 5    Q.   When you say KYB and KYC documents, what do you mean by

 6    that?

 7    A.   They refer to know your business and know your customer,

 8    and those documents would be incorporation papers for the

 9    company, articles of association for the company, proof of

10    address for the company, proof of address for identification

11    for the UBO of the company, the unique beneficial owner, and

12    various other documents that would be required.   Different

13    documents, depending on the specific requirements of the

14    acquiring bank.

15    Q.   That is fair to say typically what a merchant needs to do

16    to apply for a merchant processing account with an acquiring

17    bank?

18    A.   That's correct.

19    Q.   How does that process differ, if at all, with respect to

20    your clients that are engaged in transaction-laundering

21    schemes?

22    A.   Our clients -- we would buy shelf companies.   We would

23    create websites, and we would provide -- I should say, we would

24    create fraudulent websites and shelf -- link them with shelf

25    companies, fill out the application forms for these fraudulent

1   businesses, and we would submit those to the acquiring banks.

2   Q.   In the event that you obtained a merchant processing

3   account on behalf of the shelf company or fraudulent business,

4   as you say, what transactions would you then put through that

5   merchant processing account?

6   A.   The true clients' transactions.

7   Q.   Let's put this in terms of a concrete example.  Can you

8   identify for us a client of PayGo for what you submitted a

9   fraudulent application package to an acquiring bank?

10  A.   Yes, I can.

11  Q.   Give us an example.

12  A.   We had an online casino called Seftop.  For Seftop we

13  created -- we bought a company, a shelf company.  We created a

14  website, for example, selling golf equipment, golf clubs, golf

15  balls, golf clothing, and we created a fully functional website

16  selling these goods.  We linked it to the shelf company.  We

17  filled out the company forms.  We obtained a settlement account

18  for this fraudulent business.  And we submitted it -- we would

19  submit it to an acquiring bank.

20  Q.   A few times you have used the term shelf company.  Can you

21  explain what that is?

22  A.   It is a company on paper only.  It has no business

23  activities.  It is merely a company that is being created to be

24  sold to somebody who has a requirement for a company.

25  Q.   With respect to Seftop, the online casino, did the

1   application package that you submitted to the acquiring bank

2   identify Seftop as the merchant?

3   A.  No, they did not.

4   Q.  Did that application package identify that the transactions

5   that were going to be going through the account were online

6   casino transactions?

7   A.  No, they did not.

8   Q.  Sticking with this Seftop example, from the acquiring

9   bank's perspective, what transactions are being run through the

10  Seftop's merchant processing account?

11  A.  As far as the acquiring bank was concerned, the

12  transactions were for people purchasing golf equipment.

13  Q.  In reality, what transactions were being funneled through

14  the account?

15  A.  Transactions being made on an online casino.

16  Q.  Earlier a few moments ago you mentioned creating fraudulent

17  websites?

18  A.  Yes, I did.

19  Q.  Can you explain that a little bit more.  What do you mean

20  by a fraudulent website?

21  A.  I term it as fraudulent because it is not engaging in any

22  business activity.  It is created purely to trick the acquiring

23  bank into providing us with a merchant account.

24  Q.  Back to the Seftop example, the online casino example that

25  we have been talking about, you mentioned that a possible shelf

1  company that could be created would be like a golf ball

2  company, or something like that.

3       What type of fraudulent website then would you submit

4  to the acquiring bank?

5  A.   We -- whatever business models that we felt would be

6  acceptable to that acquiring bank.  It could be a multitude of

7  things, multitude of difference types of business.

8  Q.   Would that fraudulent website reflect online casino

9  activity, or would it reflect activity of the shelf company

10 that you are using to apply to the acquiring bank?

11 A.   It would reflect the activity of the shelf company.

12 Q.   Let's talk about a few other aspects of payment processing

13 in this context.  In the course of your experience with payment

14 processing, have you become familiar with the term MCC code?

15 A.   Yes, I have.

16 Q.   What is an MCC code?

17 A.   An MCC code is a code provided in order to clarify the

18 business nature for a specific type of business that is

19 acceptable to be processed by an acquiring bank provided by

20 Visa and MasterCard.

21 Q.   In the transaction-laundering schemes that you participated

22 in, were the MCC codes misleading or falsified in any way?

23 A.   They were misleading, yes, and they were falsified.

24 Q.   How so?

25 A.   We were providing businesses that were operating with MCC

1  codes that were not connected to the true original of the

2  transactions.

3  Q.  Let's go back to the Seftop online casino example that we

4  have been discussing.  Do you know what the MCC code is for

5  online gambling?

6  A.  Yes, I do.  It's 7995.

7  Q.  Was that MCC code used in connection with the

8  transaction-laundering scheme that you did on behalf of Seftop?

9  A.  No, it was not.

10 Q.  What kind of MCC code would have been used?

11 A.  One for retail goods.

12 Q.  Are you familiar with the term descriptor?

13 A.  Yes, I am.

14 Q.  How are you familiar with that term?

15 A.  It is the verbiage that appears on a cardholder's credit

16 card statement to advise them what they have made a payment for

17 utilizing their credit card.

18 Q.  Then taking the Seftop example that we have been

19 discussing, what kind of a descriptor would appear on a Seftop

20 customer's card statement?

21 A.  Golfballs.com, for example.

22 Q.  Let's turn to charge backs.  Are you familiar with charge

23 backs?

24 A.  Yes, I am.

25 Q.  What's a charge back?

1    A.  Charge back is when a client received, for example -- can I

2    use an example?

3    Q.  Yes.

4    A.  If an individual was to receive their credit card statement

5    and see some language or payment on that credit card that they

6    did not recognize, they would contact their bank, the issuing

7    bank, and they would demand the issuing bank have the money

8    returned to their account.  When this demand was made, the

9    issuing bank would aggressively request the money to be

10   returned to that bank from the acquiring bank, i.e., the bank

11   where the funds are being transferred to in the course of that

12   transaction.

13   Q.  To be clear, which entity initiates a charge back?

14   A.  The issuing bank.

15   Q.  Are charge backs of particular concern in the context of a

16   transaction-laundering scheme?

17   A.  Yes, they are.

18   Q.  Why is that?

19   A.  They draw in welcome attention to the merchant account.

20   Q.  Why is that a problem or a potential problem?

21   A.  It can lead to the -- there is a threshold, a percentage

22   threshold and account threshold of charge backs that are

23   permitted via -- by Visa or MasterCard in relation to a

24   merchant account.  If the number of charge backs or the

25   percentage of charge backs goes beyond that amount, then it can

 1   lead to the account being closed.

 2   Q.  Are there measures that you have typically taken to avoid

 3   detection of a transaction-laundering scheme?

 4   A.  Yes, there were.

 5   Q.  Can you provide us with some of the key examples or steps

 6   that you have taken.

 7   A.  We would make sure that the websites that we created were

 8   fully functional, operated exactly the same as a normal website

 9   that you would visit and purchase goods from.  We would make

10   sure that there was fully functional customer support so that

11   if anybody -- if somebody from the compliance department of the

12   bank or random individual happened upon the website and decided

13   to contact the website.  Obviously, these businesses were being

14   presented as businesses that were generating a large amount of

15   money on a monthly basis.  Therefore, it was important that

16   these websites, if anyone was to check how many visitors were

17   actually going to these websites on -- during a typical month,

18   it should be a high amount.  Obviously, these websites were not

19   receiving -- nobody was visiting these websites, so we would

20   contract the services of a company that effectively had a room

21   full of people who were there purely to visit websites, to give

22   the impression that these websites had a large amount of

23   visitors on a monthly basis to support the amount of money they

24   were then generating or meant to be generating on a monthly

25   basis.

```
 1  Q.  Earlier you told us that you engaged in a

 2  transaction-laundering scheme with the defendants involving a

 3  merchant called Eaze, is that correct?

 4  A.  Yes, that is correct.

 5  Q.  Let's talk about how you came to be retained to carry out

 6  this scheme.  Earlier you told us that you engaged in

 7  transaction-laundering schemes as part of your work at PayGo,

 8  is that right?

 9  A.  Yes, that is correct.

10  Q.  At the time that you first learned of Eaze, what company

11  were you working for at that time?

12  A.  I was working for a company called Intrapay.

13  Q.  What is Intrapay?

14  A.  It's a payment service provider.

15  Q.  Who ultimately controlled Intrapay?

16  A.  Gary Murphy.

17  Q.  Is that the same person that controlled PayGo?

18  A.  Yes, it is.

19  Q.  What was the business of Intrapay?

20  A.  To provide websites with the ability to process credit and

21  debit cards via their websites.

22  Q.  Where was Intrapay headquartered?

23  A.  In Malta.

24  Q.  What was your association with Intrapay?

25  A.  I briefly worked at Intrapay in a sales role.
```

1   Q.  Who did you report to at Intrapay?

2   A.  Koen Van Prat.

3   Q.  What was his control at the company, Intrapay?

4   A.  He was the CEO.

5   Q.  Was there a particular market or client or type of client

6   that Intrapay targeted?

7   A.  Yes.  Their target audience was what we termed as high-risk

8   websites.  That would be adult content.  It could be gambling.

9   It could be FX trading.  It could be airline tickets, travel

10  tickets.

11  Q.  I believe you said you reported to Koen Van Prat, is that

12  correct?  Is that right?

13  A.  That is correct.

14  Q.  Who did he report to?

15  A.  To Gary Murphy.

16  Q.  Did you report to Gary Murphy as well?

17  A.  Yes, I did.

18          MS. LA MORTE:  Mr. Levine, can you put on the screen

19  for the witness only what has been marked for identification as

20  Government Exhibit 7.

21  Q.  Mr. Hargreaves, is that on your screen?

22  A.  Yes, it is.

23  Q.  Do you recognize this?

24  A.  Yes, I do.

25  Q.  What is it?

1    A.  It's a photo of Koen Van Prat.

2    Q.  Is it true and accurate depiction of Koen Van Prat?

3    A.  Yes, it is.

4            MS. LA MORTE:  The government offers Government

5    Exhibit 7?

6            MR. ARTAN:  No objection.

7            MR. TAYBACK:  Join.

8            THE COURT:  Received.

9            (Government Exhibit 7 received in evidence)

10           MS. LA MORTE:  Mr. Levine, can you publish that for

11   the jury.

12   Q.  Mr. Hargreaves, approximately when did Koen Van Prat become

13   the CEO of Intrapay?

14   A.  In the summer of 2017.

15           MS. LA MORTE:  You can take that down, Mr. Levine.

16   Q.  What did he do before coming to Intrapay?

17   A.  He was the chief commercial officer, as far as I

18   understood, for a bank -- an acquiring bank called Credorax.

19   Q.  Where was Credorax located or headquartered?

20   A.  In Malta and a number of other locations.

21   Q.  Now, did there come a time when Intrapay, between you and

22   Koen, began to solicit certain business opportunities from the

23   defendant, Ray Akhavan?

24   A.  Yes, that is correct.

25   Q.  Approximately when did this start?

1   A.  In August of 2017.

2   Q.  Let's walk through how that came about.  Who introduced Ray

3   as a potential client of Intrapay?

4   A.  Koen Van Prat.

5   Q.  Have you ever personally interacted with Ray prior to this

6   time?

7   A.  No, I had not.

8   Q.  Approximately when did Koen first start speaking to you

9   about pursuing Ray as a client?

10  A.  In August 2017.

11  Q.  How did he do that?

12  A.  We communicated via message and verbally using the

13  application WhatsApp.

14  Q.  Did you understand Koen and Ray to have a preexisting

15  relationship?

16  A.  Yes, I did.

17  Q.  What was your understanding of that relationship?

18          MR. TAYBACK:  Objection.  Foundation.

19          THE COURT:  Lay a foundation.

20  Q.  Mr. Hargreaves, you testified earlier that you understood

21  that Koen Van Prat and Ray had a preexisting relationship,

22  correct?

23  A.  Yes, I did.

24  Q.  Did you have conversations with Koen about his prior

25  relationship with Ray?

1    A.  Yes, I did.

2    Q.  What was your understanding of Koen's preexisting

3    relationship with Ray?

4    A.  That it was a commercial relationship.

5    Q.  What do you mean by that?

6    A.  That Ray was a client of Koen's previous employer.

7    Q.  Could you remind us who Koen's previous employer was?

8    A.  An acquiring bank called Credorax.

9    Q.  Your understanding was that Ray was a client of Credorax at

10   some point?

11   A.  It was my understanding, yes.

12   Q.  Was Koen's relationship with Ray a factor in your decision

13   to pursue business opportunities with Ray?

14   A.  Yes, it was.

15   Q.  Through your conversations with Koen, did you come to have

16   an understanding of the nature of Ray's business and certain

17   aspects of how it operated?

18              MR. TAYBACK:  Objection.  Leading and foundation.

19              THE COURT:  The proper objection would have been

20   compound, but I'll sustain the objection.

21   Q.  Did you have any conversations with Koen, Mr. Hargreaves,

22   about the nature of Ray's business?

23   A.  Yes, I did.

24   Q.  What did Koen relay to you about the nature of Ray's

25   business?

1  A.  That he had -- his business was adult content.

2  Q.  Just briefly, what do you mean by adult content?

3  A.  I mean his websites, people would pay subscriptions in

4  order to view adult videos, as in pornography.

5  Q.  Was the nature of Ray's business also a factor in your

6  decision to pursue business opportunities with Ray?

7  A.  Yes, it was.

8  Q.  Did you have conversations with Koen about certain aspects

9  of how Ray's adult business operated?

10  A.  Yes, I did.

11  Q.  Was that a factor in your decision to pursue business

12  opportunities with Ray?

13  A.  Yes, it was.

14  Q.  What was your understanding from Koen of how Ray's adult

15  business operated?

16  A.  My understanding was -- I would say the key element is that

17  it had very, very high charge backs and my understanding for

18  the reasons -- my understanding, from my conversations with

19  Koen, the reasons for this was that the marketing on the

20  websites the way -- what was offered to potential customers was

21  misleading.  And, effectively, I believe that Koen explained to

22  me that basically the websites that were presented to the

23  acquiring banks were different than the websites that were

24  presented -- were viewed by the customers.

25              (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

```
 1            MR. ARTAN:  Objection.  Move to strike as hearsay.

 2            MR. TAYBACK:  Join.

 3            THE COURT:  Sustained.

 4            MS. LA MORTE:  Your Honor, this isn't being offered

 5   for the truth.

 6            THE COURT:  I understand that, but I don't think that

 7   that level of detail is necessary for any legitimate reason

 8   that you would be offering it relating to this witness'

 9   understanding as background to his further relationship with

10   the defendant, and I think we need to move forward.  Sustained.

11            MS. LA MORTE:  Sure.

12   BY MS. LA MORTE:

13   Q.  Okay.  So, Mr. Hargreaves, at a high level, what were the

14   business opportunities that you and Koen were exploring with

15   Ray?

16   A.  We were interested in soliciting his adult business and a

17   second line of business, which was Eaze.

18   Q.  And how did Koen initially relay these opportunity to you?

19   A.  Via website.

20   Q.  Mr. Levine, can you put on the screen for the witness what

21   has been marked for identification as Government Exhibit 4105.

22            Mr. Hargreaves, just take a second and look at that.

23   Let me know if you recognize it.  And if you need Mr. Levine to

24   scroll, just let us know.

25   A.  Yes, I recognize it.
```

```
 1    Q.  What is this?

 2    A.  They are messages taken from my WhatsApp account.

 3    Q.  Messages between who and who?

 4    A.  Myself and Koen Van Prat.

 5    Q.  Are you a participant in all these messages?

 6    A.  Yes, I am.

 7    Q.  And what is the general subject matter of these messages?

 8    A.  The subject matter is the -- it's us initially discussing

 9    the opportunity of providing services to -- payment services to

10    Ray.

11              MS. LA MORTE:  Government offers government

12    Exhibit 4105.

13              MR. ARTAN:  Reiterate prior objections.

14              MR. TAYBACK:  Join.  Lack of foundation with respect

15    to the summary.

16              THE COURT:  Hold on.  Overruled.  Received.

17              MS. LA MORTE:  Mr. Levine, can you publish this for

18    the jury.

19              (Government's Exhibit 4105 received in evidence)

20              MS. LA MORTE:  And can you go to page 2 and then go to

21    page 3.  Can you highlight rows 2145 and 2146.

22    BY MS. LA MORTE:

23    Q.  Mr. Hargreaves, do you see that highlight on your screen?

24    A.  Yes, I do.

25    Q.  Focusing on that top message, 2145, that's a message from
```

1    who to who?

2    A.   It's a message from Koen Van Prat to myself.

3    Q.   And can you read it aloud?

4    A.   "Check this out as well.  We discussed tomorrow.  We can

5    process it as clean business.  Will expand on it.

6    HTTPS://www.Eaze.com."

7    Q.   And then, Mr. Levine, you can zoom back out.

8             What is your response?

9    A.   Dot, dot, dot "brilliant," exclamation mark, exclamation

10   mark.

11   Q.   And when Koen there says "we can process it as clean

12   business," what do you understand that to mean?

13   A.   I understand it to be -- to mean it has very low

14   chargebacks.

15   Q.   And what is the date of these messages?

16   A.   The 29th of the eighth month, 2017.

17   Q.   The 29th of the eighth month, is that -- what do you say,

18   is that August?

19   A.   Yes.

20   Q.   Okay.  You can take that down, Mr. Levine.

21            So a few moments ago, you told us that you and Koen,

22   through Intrapay were exploring processing Ray's adult traffic

23   and then processing traffic through him for Eaze.com.  So let's

24   start by focusing on Eaze.

25            At the time that you and Koen were exploring this

1    opportunity with Ray, did you understand that Ray had been

2    working with another payment processor?

3    A.  Yes, I did.

4    Q.  How did you learn that information?

5    A.  From Koen Van Prat.

6    Q.  And which payment processor was Ray working with?

7    A.  Clearsettle.

8    Q.  Were you familiar with Clearsettle?

9    A.  Yes, I was.

10   Q.  How were you familiar with Clearsettle?

11   A.  Because I had previously worked with them.

12   Q.  In what context, just briefly?

13   A.  Payment processing.

14   Q.  Who was in charge of Clearsettle?

15   A.  Ozan Ozerk.

16   Q.  Mr. Hargreaves, where is Clearsettle based?

17   A.  London.

18   Q.  Mr. Levine, can you put up on the screen for the witness

19   what has been marked for identification Government Exhibit 8.

20          Mr. Hargreaves, is that on your screen?

21   A.  Yes.

22   Q.  Do you recognize this?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  It's a photo of Ray Akhavan and Ozan Ozerk.

 1   Q.  It's an accurate depiction of Ray Akhavan and Ozan Ozerk?

 2   A.  Yes, it is.

 3           MS. LA MORTE:  Government offers Government Exhibit 8.

 4           MR. ARTAN:  No objection.

 5           MR. TAYBACK:  No objection.

 6           THE COURT:  Received.

 7           (Government's Exhibit 8 received in evidence)

 8           MS. LA MORTE:  Can you please publish that,

 9   Mr. Levine.  Oh, I'm sorry we can take that down, Mr. Levine.

10   BY MS. LA MORTE:

11   Q.  Mr. Hargreaves, did you come to learn that Clearsettle was

12   having problems processing the Eaze transactions?

13   A.  Yes, I did.

14   Q.  How did you learn this?

15   A.  From Koen Van Prat.

16   Q.  And what was your understanding of what those problems

17   were?

18   A.  That they were having a difficult relationship with their

19   acquiring bank due to the nature of -- due to problems

20   surrounding the transactions that they were processing on

21   behalf of other merchants.

22   Q.  And what was your understanding of what acquiring bank

23   Clearsettle was working with at that time?

24   A.  They were working -- the bank that I was aware of was a

25   bank called Clearhaus.

1    Q.   Now, did you and Koen discuss a potential solution to

2    propose to Ray?

3    A.   Yes, we did.

4    Q.   Did that solution involve processing his adult traffic, the

5    Eaze traffic, both or neither?

6    A.   Both of them.

7    Q.   And generally, what solution was that, that you and Koen

8    proposed?

9    A.   We had sourced an acquiring bank that we wanted to -- that

10   we wanted to take both the adult traffic and the Eaze traffic

11   and attempt to process it through the acquiring bank that we

12   had discussed this opportunity with and who were open to the

13   opportunity.

14   Q.   What acquiring bank was that?

15   A.   Paydantics.

16   Q.   And was Ray interested in this solution?

17   A.   Yes, he was.

18   Q.   And why were you interested in pursuing these business

19   opportunities with Ray Akhavan?

20   A.   Commercial gain for the company I worked for.

21   Q.   And did you and Koen make efforts to implement this

22   solution?

23   A.   Yes, we did.

24   Q.   And focusing on Eaze specifically, what efforts did you

25   make?

1  A.  We engaged -- we engaged with the defendant.  We engaged

2  with Clearsettle.  We engaged with Paydantics and the -- with

3  an eye -- with a view to having Clearsettle integrate into

4  ourselves, and ourselves integrating into the acquiring bank,

5  Paydantics, in order to process credit card payments for the

6  Eaze payments.  It was a tri-party relationship.

7  Q.  You say tri-party relationship, and just to be clear, who

8  were the parties?

9  A.  Paydantics, Intrapay and Clearsettle.

10 Q.  Now, who were the key people that you worked with to try to

11 implement this solution?

12 A.  Clearsettle and, internally, myself and Koen Van Prat, the

13 management team that Paydantics and a consultant.

14 Q.  What was the name of the consultant?

15 A.  Stanley Skoglund.

16 Q.  All right.  So let's start to focus on Clearsettle.  What

17 was Clearsettle's role to be in proposing a solution to Ray?

18 A.  Could you repeat the question?

19 Q.  Sure.  Focusing on Clearsettle, can you explain to us what

20 Clearsettle's role was going to be in connection with your

21 proposed solution to Ray?

22 A.  Yes.  To be perfectly honest with you, he -- the

23 requirement to have two payment solution providers sitting

24 between a merchant and an acquiring bank, which was not a

25 requirement.  It was really us trying to wedge ourselves

1   between our acquiring banking relationship and Clearsettle, who

2   had the relationship with the merchant, Eaze, and was already

3   providing the service that we had discussed.  So it was really

4   a matter of professional courtesy, if you'd like to call it

5   that.

6   Q.  All right.  So you said that Clearsettle had a relationship

7   with Eaze already; is that right?

8   A.  Well, they had a relationship with Ray.

9   Q.  Just to be clear, what were you trying to bring to the

10  table?

11  A.  We were trying to bring the acquiring bank to the table.

12  Q.  Was that Paydantics?

13  A.  That's right.

14  Q.  Was Ozan Ozerk involved in your efforts to facilitate the

15  processing of Eaze transactions?

16  A.  Yes, he was.

17  Q.  What did you discuss, generally?

18  A.  We discussed the type of fraudulent application packs that

19  we would create, the type of domain names that they were

20  already using, the historical transactional data, and we

21  discussed the integration between their platform -- their

22  payment platform and our payment platform.

23  Q.  Now, you mentioned historical transactional data; is that

24  right?  Is that something that Ozan had provided to you?

25  A.  Yes, it was.

1   Q.  And what was this transactional data; what did it generally

2   reflect?

3   A.   It reflected credit card transactions that were processed

4   by a fraudulent merchant account, fraudulently obtained

5   merchant accounts.  However, the transactions were from the

6   merchant, the true merchant, Eaze.

7   Q.  Was Eaze's identity concealed in connection with

8   Clearsettle's processing of the company's credit card

9   transactions?

10  A.   Yes, it was.

11  Q.  And what about the nature of Eaze's business, was that

12  concealed in connection with the Clearsettle processing of

13  Eaze's card payments?

14  A.   Yes, it was.

15  Q.   In your discussion with Ozan, did you come to learn of the

16  approximate volume of Eaze transactions that Clearsettle had

17  been processing per month, roughly?

18  A.   Yes, I did.

19  Q.  And what was that?

20  A.   At that time, between 3 and $4 million a month.

21  Q.   Now, you mentioned in connection with trying to implement

22  your proposed processing solution to Ray, that you had

23  conversations with representatives from Paydantics; is that

24  right?

25  A.   That's correct.

```
 1    Q.  Can you remind us what Paydantics is?

 2    A.  It's an acquiring bank.

 3    Q.  And where is Paydantics based?

 4    A.  In Bulgaria.

 5    Q.  And generally, what did you discuss with the Paydantics

 6    representative?

 7    A.  The implementation of a transaction-laundering scheme.

 8    Q.  And did that discussion involve discussion of Eaze

 9    specifically?

10    A.  Yes, it did.

11    Q.  Did Paydantics express any issues or concerns with

12    processing the Eaze traffic?

13    A.  No, they did not.

14    Q.  Were you ever able to integrate with Paydantics?

15    A.  Yes, we were.

16    Q.  And what happened?

17    A.  We -- if I can revert back to your earlier question.

18    Q.  Sure.

19    A.  In relation to issues, there was no issue processing or

20    finding a way to process transactions for the underlying

21    merchant, in this case Eaze.  However, initially we had issues

22    deciding upon what was acceptable to them in relation to the

23    fraudulent websites that we were creating, what type of

24    businesses we would create.

25          We then integrated with Paydantics.  However, due to
```

1   the slightly convoluted nature of the integration from merchant

2   to one payment service provider to another payment service

3   provider to an acquiring bank, meant that there was a lot of

4   problems on actually initially trying to process a transaction.

5          Subsequently, we then realized that Paydantics

6   actually were not really in a position to support this type of

7   business.

8   Q.  Okay.  So you testified earlier that you began exploring --

9   you and Koen began exploring these business opportunities with

10  Ray in roughly summer of 2017; do you recall that?

11  A.  Yes, I do.

12  Q.  Did there come a time when you met with Ray in person?

13  A.  Yes.

14  Q.  And approximately when did that meeting occur?

15  A.  In September 2017.

16  Q.  Was this the first time that you ever met Ray?

17  A.  Yes, it was.

18  Q.  And who attended this meeting?

19  A.  Ray, Koen and myself.

20  Q.  Where did you meet?

21  A.  In a restaurant in Luxembourg.

22  Q.  Why in Luxembourg?

23  A.  Because Ray was flying into the -- to discuss some business

24  matters with a local bank there, and it was an opportunity for

25  us to -- taking advantage of the fact that he was in Europe and

1    we were able to meet him.

2    Q.  And describe the location where you and Koen met Ray in

3    Luxembourg?

4    A.  It was in a private members club with a restaurant and a

5    bar.

6    Q.  And what topics did you discuss during this meeting with

7    Ray and Koen?

8    A.  We discussed a service that we had that we wanted to --

9    that I believe Koen had discussed with Ray already, and but it

10   was something that I was managing within the company, which was

11   a service that would reduce the chargebacks dramatically on

12   his -- for his adult traffic, and we briefly discussed Eaze as

13   a merchant.

14   Q.  So tell us about the discussion involving Eaze.  What was

15   said?

16   A.  Ray talked about the merchant in high regards, in relation

17   to low chargebacks and high -- existing high volume of monthly

18   income generated by credit card transactions that he felt would

19   only increase.

20   Q.  And at this time, what was your understanding of Ray's

21   relationship with Eaze?

22   A.  My understanding was that they were his client.

23   Q.  And you may have testified to this earlier, but did you

24   have an understanding of the location of Eaze's customer base?

25   A.  My understanding was that they were in California.

1  Q.  And did you believe that there were risks in processing the

2  Eaze traffic?

3  A.  Yes, I did.

4  Q.  What were those risks as you understood them?

5  A.  My understanding was that it was legal to sell, with a

6  license, marijuana in California.  However, it was not

7  permitted to accept credit card payments for those goods as

8  the -- as that came under federal law.

9  Q.  Did you and Koen, nonetheless, agree to pursue this

10  business opportunity with Ray?

11  A.  Yes, we did.

12  Q.  Why did you do that?

13  A.  For commercial gain.

14  Q.  What were your observations about Ray during this meeting

15  in Luxembourg?

16  A.  I found him quite shifty.  I found him slightly agitated.

17  I found him knowledgeable on his subject matter, reserved in

18  the language he used in response to what we were presenting

19  him.

20  Q.  Did Ray relay to you and Koen why he was -- seemed to be

21  agitated?

22  A.  Yes.  He -- I believe his relationship with the bank that

23  he was meeting in Luxembourg had been problem -- it was a

24  problematic meeting.  It was not going the way he wanted, and

25  also, that there were -- he had money blocked with a second

1    acquiring bank.

2    Q.  Were there any takeaways from the Luxembourg meeting?

3    A.  I couldn't tell, although I was -- although he -- I would

4    say that Ray kept his cards close to his chest.

5    Q.  Was Intrapay ever able to successfully process Ray's adult

6    traffic?

7    A.  In the future, yes.

8    Q.  And were you ever able to successfully process the Eaze

9    transactions with Clearsettle and Paydantics?

10   A.  No, I was not.

11   Q.  Why not?

12   A.  As I mentioned earlier, Paydantics were not equipped to

13   manage a US-dollar-transaction-only merchant.

14   Q.  What is your understanding of why Paydantics would not have

15   been able to manage U.S. dollar transactions from a U.S.

16   merchant?

17            MR. TAYBACK:  Objection, foundation.

18            THE COURT:  Overruled, partly because no objection was

19   made to the previous question and answer, which assumed his

20   understanding, but in any event, independent of that, I would

21   also overrule the objection.  Overruled.  You may answer.

22   A.  Could you repeat the question, please?

23   Q.  The question was, what is your understanding as to why

24   Paydantics would not have been able to manage U.S. dollar

25   transactions from a U.S. merchant?

1    A.   It was very -- it would be very strange for a U.S.

2    merchant, or U.S. website, to go to a European bank if they

3    were only processing U.S. dollars because the cost was much

4    higher.

5    Q.   Okay.  So, Mr. Hargreaves, on Friday in your testimony you

6    had told us that your role in the Eaze scheme with the

7    defendants was to create fraudulent application packs; is that

8    right?

9    A.   That's correct.

10   Q.   All right.  So let's talk about how that became your role.

11   Did you use Intrapay in connection with that work?

12   A.   No, I did not.

13   Q.   What company did you use?

14   A.   A company called 1A Commerce.

15   Q.   Did that company operate under any other names or brands?

16   A.   Yes, we operated under the brand iMerchant Services.

17   Q.   And why did you use that company instead of Intrapay?

18   A.   Because Intrapay was to be conducting legitimate business,

19   and iMerchant Services was providing an illegal service.

20   Q.   And who ultimately controlled iMerchant Services?

21   A.   Gary Murphy.

22   Q.   Is that the same person that we had previously discussed

23   that you had reported to?

24   A.   Yes, it is.

25   Q.   Where is iMerchant Services based, or where was it based?

1   A.   In Malta.

2   Q.   So earlier we spoke about your Luxembourg meeting with Ray

3   and Koen; do you remember that?

4   A.   Yes, I do.

5   Q.   And did you have subsequent meetings with Ray, Koen and

6   others?

7   A.   Yes, I did.

8   Q.   Where did you meet next?

9   A.   We met in Ray's office in Calabasas, in Los Angeles.

10  Q.   Roughly when did that meeting occur?

11  A.   In January of 2018.

12  Q.   Was it a single meeting or a series of meetings?

13  A.   It was a series of meetings over a couple of days.

14  Q.   Who organized the meetings?

15  A.   Predominantly Koen and Ray's assistant, Tanya.

16  Q.   Did Tanya go by any other name?

17  A.   Bubbles.

18  Q.   And I believe you said that the meeting was held in Ray's

19  office in Calabasas; is that correct?

20  A.   Yes, it is.

21  Q.   And who did you go to the meeting with?

22  A.   Koen Van Prat.

23  Q.   What did the outside of Ray's office building look like?

24  A.   It was a nondescript, cube-like, square office.

25  Q.   Sorry, I didn't mean to interrupt you.

 1   A.  It was a nondescript, square and cube-like office.

 2   Q.  Mr. Levine, can you put on the screen just for the witness

 3   two exhibits, Government Exhibit 4102 and Government

 4   Exhibit 106.

 5          Mr. Hargreaves, is that on your screen, Government

 6   Exhibit 106 and 4102?

 7   A.  Yes, they are.

 8   Q.  Do you recognize these?

 9   A.  Yes, I do.

10   Q.  What are they?

11   A.  They are photos of Ray's office.

12   Q.  Outside or inside?

13   A.  Outside.

14   Q.  Are they accurate depictions of the outside of Ray's office

15   in Calabasas?

16   A.  Yes, they are.

17          MS. LA MORTE:  Government offers Government

18   Exhibits 4102 and 106.

19          MR. ARTAN:  No objection.

20          MR. TAYBACK:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibits 4102 and 106 received in

23   evidence)

24          MS. LA MORTE:  Please publish, Mr. Levine.  Okay.  You

25   can take those down.  Thank you.

1  BY MS. LA MORTE:

2  Q.  Mr. Hargreaves, walk us through what you saw when you

3  entered this building, up through when you get to Ray's actual

4  office.

5  A.  I entered through a door from the car park.  You would come

6  into a small, very small entrance with -- to your left was a

7  sharp set of stairs going upwards, and to the left, at the top

8  of those stairs, to the left was Ray's office.  Straight ahead,

9  if you looked straight ahead, there was a kitchenette.

10         If you were to take a right at the top of the stairs,

11 you would come into a larger room, which had desks on either

12 side.  And if you passed through those desks, there were three

13 offices, one on the left, one on the right and one at the

14 middle at the end of that room.

15 Q.  So with respect to -- you described a few interior offices;

16 is that right?

17 A.  Correct.

18 Q.  Who inhabited those interior offices?

19 A.  The office to the left at the top of the stairs was Ray's

20 office.  If you were to take a right, I don't know who occupied

21 the desks in there, in the communal office, and at the end,

22 there were three individual offices.  It was a lady, I don't

23 recall her name.  There was an office occupied by Guy, Ray's

24 partner, and I believe the other office was occupied by an

25 employee called Medhat.

 1   Q.   Okay.  So you mentioned Guy, and I believe you said he was

 2   Ray's partner; what do you mean by that?

 3   A.   I believe he was his business partner.

 4   Q.   And what makes you say that?

 5   A.   Koen Van Prat told me.

 6   Q.   And what about Medhat?  You mentioned Medhat as an

 7   employee.  Who was Medhat?

 8   A.   I believe he was in -- responsible for the technical

 9   aspects of their business.

10   Q.   And how do you know that?

11   A.   Communications I had on e-mail and conversations.

12   Q.   Communications with who?

13   A.   With Medhat.

14   Q.   Okay.  So you mentioned Ray's actual office.  Can you

15   describe for us what Ray's actual office looked like?

16   A.   If you have -- if you were to have your back to the door,

17   having entered, to your left were windows looking out on the

18   car park and some sofas underneath them, a communal sitting

19   area.

20           To the right of those sofas was his desk, and to the

21   left of the door, with your back to the door, there was a TV

22   with a games console underneath it.

23           If you looked directly across the room to your right,

24   you would see his assistant, Tanya's desk.

25           If you were to walk around to the right of the office,

1   it would take -- it was an area that was unused and would take

2   you through to a showering and toilet.

3   Q.  Okay.  So let's talk about the meeting.  You said there

4   were a series of meetings; is that right?

5   A.  Yes, that's correct.

6   Q.  Who attended the meetings at any particular time?

7   A.  Myself, Koen Van Prat, Ruben Weigand, Ray Akhavan, there

8   were a number -- there were a couple of employees from an

9   acquiring bank who were not really relative to our

10  conversations.  At certain points Guy came into the room, more

11  to say hello than anything.  And Tanya was also present.

12          MR. ARTAN:  Your Honor, objection as to meetings and

13  conflating the description.  So it's a foundational objection.

14          MR. TAYBACK:  Join.

15          THE COURT:  Overruled.  You may clarify that on cross,

16  as I suspect it will be clarified on direct.

17          MS. LA MORTE:  Yes.

18  BY MS. LA MORTE:

19  Q.  So you mentioned a number of people that were at the

20  meetings.  Were all these people there for all the meetings, or

21  were they -- was there a specific group of people that was

22  there for all the meetings?

23  A.  There was a specific group of people there that I was there

24  to meet with and I was speaking with.

25  Q.  And who was that group?

```
 1   A.  Myself, Koen, Ray and Ruben.

 2   Q.  And I believe you testified that this -- these meetings

 3   occurred in January of 2018?

 4   A.  That is correct.

 5           MS. LA MORTE:  Your Honor, at this point, I would like

 6   to read -- to publish to the jury and then read a portion of

 7   Government Exhibit S2, which is a stipulation regarding travel

 8   records.

 9           THE COURT:  Yes.

10           MS. LA MORTE:  Mr. Levine, can you put up, display.

11   Thank you.

12           Okay.  I will start reading with paragraph 2, the

13   first sentence.  So, Mr. Levine, if you can just highlight that

14   or blow it up.

15           "Defendant Ruben Weigand traveled from Munich,

16   Germany, to Los Angeles on January 15, 2018, and traveled from

17   Los Angeles to Zurich, Switzerland (Zurich) on January 29th,

18   2018."

19           Now, if we can go to the next page, paragraph 3.

20   "Oliver Hargreaves traveled from London to Los Angeles on

21   January 14th, 2018, and traveled from Chicago, Illinois, to

22   Montreal, Canada, on January 18, 2018."

23           Then finally, paragraph 4.  "Koen Van Prat's traveled

24   from Zurich to Los Angeles on January 14th, 2018, and traveled

25   from Los Angeles to Zurich on January 17th, 2018."
```

1          And we can zoom out of that.

2          "It is further agreed that this stipulation, which is

3  marked as Government Exhibit S2, may be received in evidence as

4  Government Exhibit at trial."

5          The government hereby offers Government Exhibit S2.

6          THE COURT:  Received.

7          (Government's Exhibit S2 received in evidence).

8  BY MS. LA MORTE:

9  Q.  Mr. Hargreaves, what was the overall purpose of the meeting

10 in Calabasas?

11 A.  To plan to discuss and plan the transaction-laundering

12 scheme on behalf of the merchant Eaze.  Sorry.  Also, we were

13 still -- we were still pursuing the opportunity of processing

14 payments for Ray's adult business, and I was also interested in

15 creating websites for his adult business as well.

16 Q.  Did there ever come a time that you created websites for

17 that adult business?

18 A.  No, I did not.

19 Q.  Did you take pictures at any point during these meetings?

20 A.  Yes, I did.

21 Q.  Why did you do that?

22 A.  At a certain point in the meeting, I was not involved in

23 discussions, and I was communicating with Gary Murphy, and he

24 was curious to know what certain people at the meeting looked

25 like.

1    Q.  And just briefly remind us who Gary Murphy is?

2    A.  My previous employer.

3    Q.  Mr. Levine, can you put up on the screen just for the

4    witness -- and we can do these two at a time or one at a time,

5    whatever is easier -- Government Exhibits 101 through 105; so

6    101, 102, 103, 104, 105.

7            Okay.  Now, you can put on 103 and 104.

8            And now, Mr. Hargreaves, have you been looking at

9    these as they've been displayed?

10   A.  Yes, I have.

11   Q.  And now you can put up Government Exhibit 105, please,

12   Mr. Levine.

13           Mr. Hargreaves, do you recognize the pictures that

14   were just shown to you?

15   A.  Yes, I do.

16   Q.  What are they?  I'm sorry.  What are they?

17   A.  They are photos of meetings conducted at Ray's office in

18   his office in Calabasas.

19   Q.  Are these the photographs that you took?

20   A.  Yes, they are.

21           MS. LA MORTE:  Government offers Government Exhibits

22   101, 102, 103, 104 and 105.

23           MR. TAYBACK:  Object to 102, and I'd like to be heard

24   at the sidebar on that, if possible.  No objection to the

25   others.

 1                  MR. ARTAN:  Join.

 2                  THE COURT:  All right.  I think, because I have to

 3      take a telephonic conference at 11:15 when we normally give the

 4      jury their break, that since we'll have -- you want a

 5      conversation at the sidebar, why don't we give the jury their

 6      mid-morning break now, and we'll reconvene.  My conference will

 7      take about ten minutes; so we'll reconvene at 25 after.  So

 8      you're excused until 25 after.

 9                  (Jury not present)

10                  THE COURT:  Please be seated.  So what's the objection

11      to 102?

12                  MR. TAYBACK:  Your Honor, it would be preferrable not

13      to argue this in front of the witness.

14                  THE COURT:  All right.  The witness is excused.  We'll

15      see you at 25 after.

16                  (Witness temporarily excused)

17                  THE COURT:  Okay.

18                  MR. TAYBACK:  Your Honor, GX102 is a photograph.

19                  THE COURT:  I see it.

20                  MR. TAYBACK:  It shows an IV that's being

21      administered, and I think it invites speculation.  I think it's

22      irrelevant.  I think it is potentially prejudicial, and I think

23      it's completely unnecessary.

24                  It was stipulated to the identification of my client,

25      which some of these photos may -- are going to go to, not this

                    SOUTHERN DISTRICT REPORTERS, P.C.

1    one.  I think the room is otherwise adequately photographed, as

2    are the participants at the meeting.

3           MS. LA MORTE:  Your Honor, I think the witness -- I

4    wasn't going to ask him, but I think the witness would testify

5    this is a vitamin drip.  It's just vitamins.  And I think that

6    this picture is relevant.

7           THE COURT:  What is shown on 102 that's not shown on

8    the other four photographs?

9           MR. TAYBACK:  I believe the IV.

10          THE COURT:  Excuse me?  No, no, I'm asking --

11          MR. TAYBACK:  Sorry.

12          THE COURT:  What does this add that the other four

13   photographs don't satisfy?

14          MS. LA MORTE:  Let me look at the others, your Honor.

15          THE COURT:  All right.  Let me ask defense counsel,

16   your objection is only to 102?

17          MR. TAYBACK:  I'm understanding I may have missed an

18   additional photograph.  Mr. Artan, I believe, can address the

19   second one.

20          MR. ARTAN:  It's also 102, your Honor.  Forgive us.

21          MR. TAYBACK:  102 and which other one?

22          MR. ARTAN:  101 and 102.

23          MS. LA MORTE:  Your Honor --

24          THE COURT:  Who is -- I can't tell who is receiving

25   this transfusion, or whatever it is.  Is it connected to any

 1   person?  It looks like it's connected -- looking at 101, who is

 2   the person on the left?

 3            MS. LA MORTE:  At 101?

 4            THE COURT:  Yes.

 5            MS. LA MORTE:  The witness will say it's Ruben

 6   Weigand.

 7            THE COURT:  And who is the person on the far right?

 8            MS. LA MORTE:  The far right?  Like the guy sitting --

 9   that you can't see his face?  I think he'll testify that that

10   is one of the representatives from Worldline acquiring bank

11   that was not involved in this scheme.

12            THE COURT:  And who is the person in the middle?

13            MS. LA MORTE:  Guy Mizrachi, who was a named

14   co-conspirator.

15            THE COURT:  So there's nothing -- looking at 101,

16   there's nothing here about Mr. Akhavan, who is the person

17   raising the objection, and now assuming co-counsel joins, which

18   I gather they do, there's nothing suggesting that whatever that

19   piece of equipment is designed to do, that it has any

20   relationship to Mr. Weigand.  So let me see 102 again.

21            So I'm mystified that this objection should be

22   initiated with Mr. Akhavan.

23            MR. TAYBACK:  I think it's because it's a small

24   meeting, and it raises some questions.  My concern is exactly

25   that.  Mr. Akhavan has been identified as being at this

1    meeting, and now there's this photograph of two of the

2    participants sharing an IV of some sort.

3           MS. LA MORTE:  We're happy to stipulate that that's a

4    vitamin drip.  Obviously, this is showing the relationship --

5           THE COURT:  It is being given to who?

6           MS. LA MORTE:  Well, that --

7           MR. TAYBACK:  It appears to be on both people's arms

8    in the photo.

9           MS. LA MORTE:  And, your Honor, one other piece of

10   pertinent information for the Court, which is also reflected in

11   another picture, is we're going to be talking about this white

12   board in the background of the picture, and that is basically a

13   preliminary schematic of the scheme.  So that's just a relevant

14   piece to be aware of as well.

15          MR. TAYBACK:  Your Honor, I would say the white board

16   is also in Exhibit 105 and is actually more clearly visible.

17          THE COURT:  I'm having trouble hearing you.

18          MR. TAYBACK:  I believe that white board is also in

19   Exhibit 105 and is, in fact, more clearly visible, in fact.

20          THE COURT:  Let me see 103, 104 and 105.  I have one

21   minute before I have to disappear for this telephone

22   conference.

23          MS. LA MORTE:  I expect the witness will testify that

24   103 is a Ray Akhavan, a guy from Worldline.  And the person

25   standing up, whose face is cut off, is Ruben Weigand; that

1    would be 103.

2              THE COURT:  104?

3              MS. LA MORTE:  Same thing, but with the face there.

4              THE COURT:  Yes.  So there you have both defendants.

5              MS. LA MORTE:  But we don't have Guy Mizrachi, your

6    Honor, and he's a named co-conspirator.  And we are relying on

7    that, in connection with the admission of certain evidence, and

8    the other photographs show that he's at the meeting with this

9    thing with the white board in the back, even though he was not

10   there very long.

11             THE COURT:  All right.  I'll think about this.  If I

12   admit it at all, 101 and 102, it will be with the --

13             MS. LA MORTE:  Stipulation?

14             THE COURT:  -- stipulation that the government just

15   mentioned.  I'll let you know when I come back right after this

16   telephone conference.

17             (Recess)

18             THE COURT:  Please be seated.

19             MS. LA MORTE:  Should I bring the witness out?

20             THE COURT:  I'm going to rule first.

21             So all of the exhibits will be received, but the

22   government, as it shows 101 and 102 to the witness, will simply

23   state it's stipulated that this is vitamins, or whatever you

24   want to say in that regard.  I don't regard it as particularly

25   prejudicial, if at all, once that statement is made, and it's

1    clear that 101 and 102 do provide affirmation for the

2    substantive information that was provided by the other three.

3           So now, let's bring in the witness.

4           (Government's Exhibits 101, 102, 103, 104 and 105

5    received in evidence)

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Exhibits 101 through 105 are received.

 3              (Government Exhibits 101-105 received in evidence)

 4              THE COURT:  Go ahead, counsel.

 5              MS. LA MORTE:  Mr. Levine, can you publish Exhibits

 6    101 and 102 to the jury.

 7              Before we continue further, your Honor, the government

 8    stipulates that the item in the center of Government Exhibits

 9    101 and 102 with the liquid is a vitamin drip.

10    Q.  Mr. Hargreaves, let's start with Government Exhibit 101.  I

11    am just going to ask you to identify the individuals in the

12    photos.

13              Starting with the person all the way to the left on

14    Government Exhibit 101, who is that?

15    A.  Ruben Weigand.

16    Q.  Is that the defendant?

17    A.  Yes, it is.

18    Q.  Seated next to Mr. Weigand in the blue shirt, in front of

19    the white board, who is that?

20    A.  Guy.

21    Q.  Then the person seated with the blue jacket and blue jeans

22    all the way on the right, who is that?

23    A.  I don't recall his name.

24    Q.  Do you recall anything about him?

25    A.  I believe he was a sales representative for an inquiring

1    bank called Worldline.

2    Q.   Looking at Government Exhibit 102, just, again, the person

3    to the left of the picture is?

4    A.   Ruben Weigand.

5    Q.   And the person leaning over on the chair is?

6    A.   Guy.

7              MS. LA MORTE:   You can take those down, Mr. Levine.

8              Let's put up Government Exhibit 104 for the jury.

9    Q.   Mr. Hargreaves, looking at Government Exhibit 104, you see

10   the person that's all the way to the left seated?

11   A.   Yes, I do.

12   Q.   Who is that?

13   A.   That's Ray Akhavan.

14   Q.   That the defendant?

15   A.   Yes, it is.

16   Q.   What about the person in the middle of the picture, who is

17   that?

18   A.   I don't recall his name.

19   Q.   Do you recall anything with him?

20   A.   He was also a sales representative from the acquiring bank,

21   Worldline.

22   Q.   What about the person standing all the way to the right,

23   who is that?

24   A.   That's Ruben Weigand.

25   Q.   Is that the defendant?

1    A.  Yes, it is.

2              MS. LA MORTE:  Let's please publish Government Exhibit

3    105.

4    Q.  Mr. Hargreaves, who is the person that is seated in the

5    light blue shirt?

6    A.  Guy.

7    Q.  What about the person seated on the white coach with the

8    blue jacket and the white shirt?

9    A.  Sales representative from Worldline.

10   Q.  Then there is a person, we can only see their legs and

11   socks.  Do you see that?

12   A.  Yes, I do.

13   Q.  Do you know who that person is?

14   A.  Yes.  It's Koen Van Prat.

15   Q.  How do you know that?

16   A.  I know it because he always wears silly socks.

17             MS. LA MORTE:  Mr. Levine, can you zoom in on the

18   white board that's on Government Exhibit 105.

19   Q.  Mr. Hargreaves, you see what's depicted on this white

20   board?

21   A.  Yes, I do.

22   Q.  What is this?

23   A.  It's a flow diagram depicting the flow of -- effectively,

24   the flow of the transaction-laundering scheme.

25   Q.  Was this discussed during the meeting?

1    A.  Yes, it was.

2    Q.  Who sketched this out?

3    A.  Predominantly, Ray.  I also contributed a few boxes to it.

4    Q.  Who was present when this was discussed?

5    A.  Myself, Ray, Ruben, Koen, and Tonya.

6    Q.  Can you provide us with just an overview of the steps that

7    are depicted on this white board.

8    A.  From left to right, there are two things being depicted.

9    There is the flow of a merchant identification.  If you

10   consider on the left-hand side there would be a -- the true

11   merchant handing in an application that is accurate in their

12   business to the example -- to a payment service provider in the

13   United States.  The name of the writer in the United States

14   would effectively take out a fraudulent application pack and

15   that would flow down through an ISO or an independent sales

16   operator into the hands of an acquiring bank in Europe.

17          What is second -- what is also depicted are the

18   various key stakeholders involved behind the scenes in the

19   process of creating that application pack and that application

20   pack flowing into the hands of an acquiring bank in Europe.

21   Q.  Was this version of this scheme that's depicted on this

22   white board the version that was in fact implemented?

23   A.  Not in its entirety, no.

24   Q.  Just briefly, we will go into more detail later, what were

25   the main differences between this and what was implemented?

1  A.  Initially, it was discussed it would be an individual -- we

2  discussed, for example, myself flying to a location, Germany,

3  wherever it may be, with the application packs on a pen drive

4  or something -- I'm sorry -- the fraudulent application packs

5  and providing them to the ISO, for him to provide them, by

6  whatever means, to the acquiring banks in question.

7  Q.  You've mentioned ISO a couple of times.  Can you remind us

8  what that stands for?

9  A.  It's either an independent sales operator or an independent

10  sales organization.

11  Q.  In the payment processing context, what's generally the

12  function of an ISO?

13  A.  They are effectively a broker.  They are somebody who, as a

14  salesperson, will bring a merchant -- on one hand, provide a

15  merchant with an acquiring bank and also bring business to an

16  acquiring bank in the form of merchants, e-commerce websites,

17  businesses.

18  Q.  Was there any discussion in this meeting as to who would

19  serve as the ISO in this scheme?

20  A.  Yes.  It was a friend of Ruben's.

21  Q.  Do you remember that person's name?

22  A.  Andreas.

23      MS. LA MORTE:  We can zoom out of that, Mr. Levine.

24  Q.  Mr. Hargreaves, was there a discussion of what your role

25  was going to be through iMerchant services during this meeting?

1  A.  Yes.  My role was the creation of fraudulent application

2  packs.

3          MS. LA MORTE:  Can we publish for the jury Government

4  Exhibit 104.

5  Q.  Earlier you identified Ruben Weigand, the defendant, all

6  the way on the right of this photo, is that correct?

7  A.  That is correct.

8  Q.  Was there a discussion of Ruben's role in the scheme?

9  A.  Yes.  Ruben was our main point of contact.  He was -- at

10  this point, the acquiring banks that we were submitting

11  fraudulent application packs to were not my or Koen's

12  relationships.  They were relationships from both of the

13  defendants, and he was our main point of contact.  He was

14  communicating with the banks.  We were communicating with him.

15  And we were also submitting application packs to him for

16  application for verification.

17  Q.  I didn't hear the last part of your answer.  Why was your

18  role to submit fraud application packs to Ruben?

19  A.  Because the banks -- he was providing us with the

20  application forms for the banks that they wanted, these

21  fraudulent application packs to be submitted to, and we were

22  then submitting them in part to him to submit.  Also -- and we

23  were also submitting them ourselves and also we were receiving

24  feedback from these acquiring banks from Ruben.

25  Q.  To your knowledge, did anyone employed by Eaze attend this

1    meeting?

2    A.  No, they did not.

3    Q.  Who did you understand was acting on behalf of Eaze at this

4    meeting?

5    A.  Ray.

6    Q.  At any point during the meeting did you elaborate on how

7    you were going to go about creating these fraudulent

8    application packs?

9    A.  Yes, I did.

10   Q.  Can you describe what you said.

11   A.  Yes.  It was in many ways a sales pitch.  I explained to

12   them the measures we took to try and create an authentic

13   product.  The quality of the websites, the lengths we went to

14   make them authentic and very much replicating a real business

15   and some of the methods that we utilized to do this.

16          MS. LA MORTE:  You can take that down, Mr. Levine.

17   Q.  Do you recall anything else that was discussed during this

18   meeting?

19   A.  In relation to Eaze?

20   Q.  Yes.

21   A.  We discussed some of the methods we used to avoid

22   detection.  Some of the services that we procured in order to

23   provide an authentic package, fraudulent package to the

24   acquiring banks.

25   Q.  Do you remember any particular examples that were discussed

 1   during this meeting?

 2   A.   Yes.   We -- I explained how we utilized the service

 3   provider who basically would have a room full of people

 4   visiting the website to create the appearance of a website that

 5   was visited by a vast number of people; therefore, supporting

 6   the fact that these businesses were turning over large amounts

 7   of money on a monthly basis.   We explained how we implemented

 8   customer support that we had engaged with third-party companies

 9   who provided support agents who we had created scripts for,

10   FAQs.   If people were to attempt to purchase goods on the

11   website we would in fact send them that goods, if required.   I

12   would say those are the main things that we discussed.

13   Q.   Who ran this meeting?

14   A.   Ray did.

15   Q.   How did it end?

16   A.   It came to a natural end.

17   Q.   Up until this time, in January 2018, had there been any

18   discussion of what payment you had received for your services

19   in preparing the fraudulent application packs?

20   A.   It mentioned it verbally, but there was nothing concrete in

21   place, no.

22   Q.   Was that typical in your business?

23   A.   Not really, no.

24   Q.   Why did you not engage with respect to your compensation?

25   A.   There was a level of trust.

```
 1    Q.   For who?

 2    A.   It was based on the fact there was an existing relationship

 3    between Koen and Ray.

 4    Q.   Did there come a time when you next met -- had a meeting

 5    involving Ray and Ruben?

 6    A.   Yes, there was.

 7    Q.   When was that, roughly?

 8    A.   That was in February of 2018 in London.

 9    Q.   How did that come about?

10    A.   It was organized, again, I think Koen, myself, and Tonya.

11    Q.   Remind us who Tonya is.

12    A.   Ray's assistant.

13    Q.   Where did this meeting take place?

14    A.   In London in a hotel called the Café Royal.

15    Q.   Did you go alone or with anyone else?

16    A.   I attended the meeting with Koen Van Prat.

17              MS. LA MORTE:  Your Honor, at this time I request

18    permission to read from Government Exhibit S2 in evidence, the

19    travel stipulation.

20              THE COURT:  Yes.

21              MS. LA MORTE:  Mr. Levine, can you display it.

22              Mr. Levine, can you highlight the second sentence of

23    the first paragraph.  It states:  Akhavan also traveled from

24    Los Angeles to London on February 3, 2018, and returned from

25    London to Los Angeles on February 11, 2018.
```

1              Mr. Levine, you can take that down.

2   Q.  Mr. Hargreaves, you mentioned that the meeting occurred at

3   a hotel in London called the Café Royal, is that right?

4   A.  That's correct.

5   Q.  Where in the Café Royal did the meeting take place?

6   A.  In the sitting room of Mr. Akhavan's suite.

7   Q.  Who was present at this meeting?

8   A.  Myself, Koen Van Prat, Ray, Ruben, man called Jan Marsalek,

9   Ozan Ozerk, an employee of Mr. Marsalek.  I don't recall his

10  name.  And some other people, I don't recall their names.

11  Q.  What was the overall purpose or purposes of this meeting?

12  A.  This was a flowing -- this was a flowing situation when I

13  was there.  The discussions that I was involved with were

14  surrounding -- I provided Ray with an update on the

15  applications, very brief update on the progress we were making

16  with the application packs.  Predominantly, the meeting that I

17  was involved with was surrounding the -- what we call the

18  charge-back reduction scheme.

19  Q.  Just very briefly, could you just describe the charge-back

20  reduction.

21  A.  We had a service that we had brought to -- to Ray's

22  attention during our trip, during our meeting in Luxembourg,

23  and we were continuing to develop, which was effectively a

24  method of reducing the charge backs associated with his

25  adult-content websites.

1          The purpose of this was to allow him to process his

2    payments through banks who otherwise may not be able to support

3    or wish to have supported processing his payments from this

4    business.  This was -- however, this was a complicated subject

5    to make it work commercially, maybe from a cost point of view,

6    and it was a bank that -- it was representatives of a bank that

7    could have potentially helped us.

8    Q.  Now, you mentioned that Ozan was at the meeting.  Remind us

9    who Ozan is.

10   A.  He is the owner of a payment service provider called

11   Clearsettle.

12   Q.  You also mentioned the name Jan Marsalek.  Who is Jan

13   Marsalek?

14   A.  He was the CEO -- COO of a bank called Wirecard.

15   Q.  What is Wirecard?

16   A.  It's an acquiring bank.

17   Q.  Where is it headquartered?

18   A.  Munich.

19   Q.  Was Wirecard one of the banks that was involved in the Eaze

20   scheme?

21   A.  Yes, it was.

22   Q.  Who led this meeting at the Café Royal?

23   A.  Ray did.

24   Q.  And you mentioned that Ruben was present at the meeting as

25   well?

 1    A.   That is correct.

 2    Q.   Did Ruben speak during the meeting?

 3    A.   Yes, he did.

 4    Q.   Do you recall anything that he said?

 5    A.   Not especially, no.

 6    Q.   Do you recall generally what he said?

 7    A.   It was in relation to how -- it was in relation to the

 8    discussion surrounding charge backs.

 9    Q.   Is there anything about that that stood out in your mind?

10    A.   Only -- at one point he proffered an opinion, but was

11    pretty much shot down by Ray, and he was defended quite

12    staunchly by Mr. Marsalek.

13    Q.   Why does that stand out in your mind?

14    A.   I was impressed by it.

15    Q.   What is your understanding of why Ruben was at the meeting?

16    A.   My understanding was that he had an existing relationship

17    with both Ray and also with the gentleman from Wirecard.

18    Q.   Did anyone from Eaze attend this meeting?

19    A.   No, they did not.

20    Q.   What was the atmosphere of the meeting?

21    A.   Fairly relaxed.

22    Q.   How did the meeting end?

23    A.   When my -- with my involvement ending, myself and Koen

24    leaving that meeting.

25    Q.   Did everyone leave or did just you and Koen leave and

1   others remained?

2   A.   We left and others remained.

3   Q.   Were there any further discussions that you had that day in

4   London regarding Eaze?

5   A.   I spoke with Ruben and his friend Andreas in the bar, in

6   the hotel bar.

7   Q.   When did that occur?

8   A.   I don't recall the time, but it was on the same day.

9   Q.   Was it a lunch meeting, dinner meeting?  Do you recall

10   anything like that?

11   A.   I think we just crossed paths in the bar, and then we

12   arranged to meet for dinner later in the evening in a local

13   restaurant.

14   Q.   Do you remember the name of the restaurant?

15   A.   I do.  It was called the Gaucho Restaurant.

16   Q.   Who was present there?

17   A.   Myself, Ruben, and his friend Andreas.

18   Q.   What was discussed?

19   A.   The purpose of the dinner was really to discuss logistics,

20   as per the original plan of how these fraudulent application

21   packs were going to be provided to the independent sales

22   operator, the role of which was being -- of which Andreas, he

23   was the ISO.

24   Q.   Mr. Hargreaves, do you see a drive in front of you that's

25   marked for identification as Government Exhibit 4013?

 1    A.  Yes, I do.

 2    Q.  Do you recognize this?

 3    A.  I do, yes.

 4    Q.  How do you recognize it?

 5    A.  Because I've initialed it.

 6    Q.  Have you reviewed the contents of this drive?

 7    A.  Yes, I have.

 8    Q.  When did you last review them, approximately?

 9    A.  In the last week.

10    Q.  What is contained on here?

11    A.  Telegram -- messages from my Telegram account.

12    Q.  Were you a participant on each and every one of the

13    Telegram messages that are on Government Exhibit 4013?

14    A.  Yes, I was.

15    Q.  What is the subject matter or the communications contained

16    in these Telegram messages?

17    A.  The transaction laundering scheme on behalf of Eaze.

18    Q.  Are these a fair and accurate reflection of the content of

19    Telegram telecommunications that you had with others at the

20    time that you had them?

21    A.  Yes.

22    Q.  Does Government's Exhibit 4013 contain Government Exhibits

23    4001, 4002, and 4004 through 4012?

24    A.  Yes, it does.

25    Q.  How do you know that?

1    A.  Because I have reviewed them.

2            MS. LA MORTE:  Your Honor, the government offers

3    Government Exhibit 4013 and the government exhibits contained

4    therein.

5            MR. TAYBACK:  Same objections as previously asserted.

6            MR. ARTAN:  Joined.

7            THE COURT:  Overruled.  Received.

8            (Government Exhibits 4013, 4001, 4002, and 4004-4012

9    received in evidence)

10           MS. LA MORTE:  Mr. Levine, can you publish Government

11   Exhibit 4010.

12   Q.  Mr. Hargreaves, do you see that?

13   A.  Yes, I do.

14   Q.  What is this?

15   A.  It is -- it's a discussion from my -- it's an excerpt from

16   my Telegram account.

17   Q.  Who are the participants in this discussion?

18   A.  Myself and Ruben Weigand.

19   Q.  Your messages and calls are indicated where?  Can you

20   identify them in any particular way?

21   A.  The green boxes, bubbles, are mine and the white bubbles

22   are Mr. Weigand.

23   Q.  You see at the very top, you see there is a date in a gray

24   bubble there?

25   A.  Yes, I do.

1   Q.   What is that date?

2   A.   It's February 7, 2018.

3   Q.   Is this within the time frame that you went to London for

4   the Café Royal meeting?

5   A.   Yes, it is.

6   Q.   Now, can you read your first green -- your first message in

7   green?

8   A.   We've gotta table at Gaucho Grill opposite the hotel at

9   8:30.

10   Q.   Is that the restaurant that we were just discussing before

11   where you had dinner with Ruben, yourself and Andreas?

12   A.   Yes, it was.

13           MS. LA MORTE:   Mr. Levine, you can take that down.

14   Q.   We were talking about what happened at this meeting at the

15   Gaucho between yourself and Andreas and Ruben.  I believe that

16   you were explaining -- first of all, let me back up.

17           Who introduced you to Andreas?

18   A.   Ruben did.

19   Q.   What were your observations of Andreas?

20   A.   Apart from the fact that he was very tall, he was unwell.

21   He was wearing a mask like this one.

22   Q.   Was there any discussion of what Andreas' role was to be in

23   the Eaze scheme?

24   A.   Yes.  He was going to be the person submitting the

25   application packs, fraudulent application packs to the

1   acquiring banks.

2   Q.  Was anything else regarding the Eaze scheme discussed

3   during this meeting at the Gaucho Restaurant?

4   A.  It was a fairly high-level discussion.  It was a discussion

5   that could have been had in probably about 10 minutes.  I think

6   it was just more about bonding, whatever you want to call it,

7   people working together, sort of getting to know each other a

8   bit better.

9   Q.  Mr. Hargreaves, I now want to turn and talk about the

10  people that you worked with to develop the fraudulent

11  application packages that we have been discussing.

12          Did you work with a core team of people?

13  A.  Yes, I did.

14  Q.  Who would you consider to be your core team?

15  A.  Kate Farmer and Michele Furlan.

16  Q.  Where geographically was your team based?

17  A.  In Malta.

18  Q.  Did you make your team aware of the fraudulent nature of

19  the application packages that you were developing?

20  A.  They were aware, yes.

21  Q.  Who is Kate Farmer?

22  A.  She was my operations manager.

23  Q.  Who did she report to?

24  A.  She reported to myself.

25  Q.  Generally, what were her duties and responsibilities with

1    respect to the Eaze scheme?

2    A.   She was responsible for -- she was very much the -- she

3    was -- make sure that all of the different swim lanes, all of

4    the different jobs that needed to be done, the areas that

5    needed to be covered off were done and managed in their

6    totality and moved together towards a timely conclusion.

7    Q.   Can you give us an example.

8    A.   Yes.   There was a lot of moving parts, an awful lot of

9    moving parts in putting together these application packs, from

10   arranging for documents to be signed, re-signed, recompleted,

11   and making sure that the application packs, when checked, were

12   meeting the necessary requirements, making sure that websites,

13   areas that had been asked to be changed or updated were being

14   done and done in a timely fashion.

15   Q.   You also mentioned Michele Furlan as a member of your core

16   team.   Who is that?

17   A.   He was a gentleman who we contracted to manage the whole

18   process of actually creating the application packs, so

19   purchasing the shelf companies to building the websites.

20   Q.   I believe you said you independently contracted with him,

21   is that right?

22   A.   Yes.   As far as we were concerned, he worked for our

23   company, but the actual -- we actually contracted a company --

24   that he had a team that worked for his company, and he invoiced

25   us from his company.   He was a contractor, in essence.

1    Q.   What company was that that he worked for?

2    A.   Spinwald.

3    Q.   How did you come to work with Michele Furlan?

4    A.   I met him -- I was introduced to him a number of years -- I

5    think a number of years before.  He was at the time seeking

6    Asian -- he was looking for Asian-acquiring banks on behalf of

7    Mr. Akhavan.  I was introduced to him on that basis because we

8    have relationships with Asian-acquiring banks.  For some time

9    we engaged on this subject matter without it coming to any

10   fruition.

11   Q.   Can you repeat what Michele's duties and responsibilities

12   were with respect to the Eaze scheme.

13   A.   He was responsible for -- he had a team of people who, in

14   one hand, were responsible for all elements of the creation of

15   the website, so copyrighters, web designers.  He was

16   responsible for creating the content and building the websites,

17   and he also had the external relationships with companies that

18   we could acquire shelf companies from.

19   Q.   Now, aside from your core team, were there external people

20   to your core team that you and your team consulted with in

21   creating the application packages?

22   A.   Yes.  We consulted with the gentleman called Christian

23   Chmiel, who provided us with access to software that allowed us

24   to effectively scrub the quality of the websites.  It was a

25   software service that was provided to acquiring banks that was

1    used by the compliance departments when assessing -- checking

2    whether they would like to provide a merchant account to the

3    merchant or not.

4    Q.  Aside from Christian Chmiel, who we will talk about in more

5    detail later, was there any other external people that your

6    team consulted with?

7    A.   Initially, Stanley Skoglund at an earlier date.

8    Q.   Who was Stanley Skoglund?

9    A.   He was an exemployee of Visa who had a consultancy,

10   provided consulting services to payment service providers,

11   people operating within the payment industry.

12   Q.   What were the purposes of consulting with Stanley Skoglund?

13   A.   He had been providing consulting choices to Clearsettle in

14   relation to Eaze.

15            MS. LA MORTE:  Mr. Levine, can you put on the screen

16   for the witness what's been marked for identification as

17   Government Exhibit 4106.  You could probably blow it up a

18   little.  It's hard to read.

19   Q.  Mr. Hargreaves, do you recognize this?  Take a look.

20   A.  Yes, I do.

21   Q.  What is this?

22   A.  Discussions, messages taken from my WhatsApp account

23   involving myself, Koen Van Prat and Stanley Skoglund.

24   Q.  Is this a fair and accurate reflection of the contents of

25   your WhatsApp communications between Stanley Skoglund and Koen

 1    Van Prat?

 2    A.  Yes, they are.

 3            MS. LA MORTE:  The government offers Government

 4    Exhibit 4106.

 5            MR. TAYBACK:  Objection.  Inadequate foundation.

 6            MR. ARTAN:  Join.

 7            THE COURT:  Overruled.

 8            (Government Exhibit 4106 received in evidence)

 9            MS. LA MORTE:  Mr. Levine, can you highlight the third

10    row.  If you could blow it up and highlight it and publish it

11    to the jury.

12    Q.  You see the message there, Mr. Hargreaves?

13    A.  Yes, I do.

14    Q.  Who sent this message?

15    A.  It's a mention sent from myself.

16    Q.  Can you read the message aloud.

17    A.  Good morning, Stanley.  I hope your trip is going well.  I

18    have been looking at Visa fraud rules relating to cross-border

19    and domestic transactions and how fraud is monitored.  Both

20    Kate and Koen have shared some interesting thoughts on this.  I

21    would like to discuss this further with you and Koen when you

22    come on line.  TKS, Ollie.

23    Q.  What does TKS mean?

24    A.  Thanks.

25    Q.  You see here where it says, I have been looking at Visa

     1   fraud rules and how fraud is monitored.  Do you see that

     2   sentence in there?

     3   A.  Yes, I do.

     4   Q.  Why did you ask Stanley Skoglund how fraud is monitored?

     5   A.  Because this was -- he was a subject matter expert.  He was

     6   an exemployee of Visa and that's what his consulting firm was

     7   built on.

     8   Q.  What was your interest on that topic?

     9   A.  It was in relation to the Eaze scheme.

    10          MS. LA MORTE:  We can take that down.

    11          Mr. Levine, can you now put on the screen, just for

    12   the witness, what has been marked for identification as

    13   Government Exhibit 5.

    14   Q.  Mr. Hargreaves, do you recognize this?

    15   A.  Yes, I do.

    16   Q.  What do you recognize it to be?

    17   A.  It's a photo of Christian Chmiel.

    18          MS. LA MORTE:  The government offers Government

    19   Exhibit 5.

    20          MR. TAYBACK:  No objection.

    21          MR. ARTAN:  No objection.

    22          THE COURT:  Received.

    23          (Government Exhibit 5 received in evidence)

    24          MS. LA MORTE:  Please publish, Mr. Levine.

    25   Q.  Mr. Hargreaves, who introduced you to Christian Chmiel?

 1   A.  Ray did.

 2   Q.  Again, we will discuss his role in more detail later, but

 3   for now, generally, what was your purpose in consulting with

 4   him?

 5   A.  To provide advice on the best -- he was providing us with

 6   advice in relation to the creation of the fraudulent websites.

 7        MS. LA MORTE:  Mr. Levine, you can take that down.

 8   Q.  Mr. Hargreaves, before we focus on the application packs

 9   that you and your team created for the Eaze scheme, I want to

10   talk first about the primary ways that you and your team

11   communicated with the defendants and Christian Chmiel.  What

12   were the primary ways that you communicated with these

13   individuals?

14   A.  Via e-mail and via Telegram.

15   Q.  Let's start with e-mail.  What e-mail service was used to

16   communicate with these individuals?

17   A.  ProtonMail.

18   Q.  What is ProtonMail?

19   A.  It's an e-mail provider very much like Google is or Yahoo

20   is with the fundamental differences, it's highly encrypted and,

21   therefore, considered a secure method of communication.

22   Q.  Is ProtonMail a form of communication that you generally

23   use in your work?

24   A.  No, it's not.

25   Q.  When would you use it?

1   A.   For illegal activities.

2   Q.   I believe it was used in connection with the Eaze scheme,

3   is that correct?

4   A.   Yes, it was.

5   Q.   Who used it?

6   A.   Myself and my team and also Ray, Ruben, Tonya, Medat.

7   Ray's team, basically.

8   Q.   Let's turn to Telegram.  I believe we have already seen the

9   example of a Telegram chat.  What is Telegram?

10  A.   It's a very similar to the application WhatsApp, except it

11  has different features and it's generally considered to be more

12  secure, a more secure method of communication.

13  Q.   Who used Telegram in connection with the Eaze scheme?

14  A.   All of us.

15  Q.   Why was it used?

16  A.   Because it was considered a more secure method of

17  communication.

18  Q.   Mr. Hargreaves, do you see in front of you a drive that's

19  marked as Government Exhibit 3971?

20  A.   Yes, I do.

21  Q.   Do you recognize this?

22  A.   Yes, I do.

23  Q.   Thank you.

24          What is that?

25  A.   It's a pen drive.

1   Q.  How do you recognize it?

2   A.  I initialed it.

3   Q.  What is contained on Government Exhibit 3971?

4   A.  My ProtonMail account.

5   Q.  Does that include ProtonMail marked Government Exhibit 3902

6   through 3968 and 3970?

7   A.  Yes, it does.

8   Q.  How do you know that?

9   A.  Because I reviewed it.

10  Q.  When did you last review it, roughly?

11  A.  In this last week.

12  Q.  Are these true and accurate copies of your ProtonMail

13  communications?

14  A.  Yes, they are.

15  Q.  What is the general subject matter of the ProtonMail

16  communications?

17  A.  Eaze.

18          MS. LA MORTE:  Your Honor, the government offers

19  Government Exhibit 3971 and the exhibits contained therein,

20  which are Government Exhibits 3902 through 3968 and 3970.

21          MR. TAYBACK:  Objection.  Foundation.

22          MR. ARTAN:  Join.

23          THE COURT:  Yes.  For the reasons already discussed in

24  some degree outside the presence of the jury, as well as what

25  I've now seen as adequate foundation, the objections are

1    overruled and the exhibits are received.

2              (Government Exhibits Exhibit 3971, 3902-3968, and 3970

3    received in evidence)

4              MS. LA MORTE:  Mr. Levine, can you publish Government

5    Exhibit 3968.

6    Q.  Mr. Hargreaves, what is this?

7    A.  It's an e-mail from my ProtonMail account.

8    Q.  Mr. Hargreaves, you also have a binder with the government

9    exhibits in front of you.  I am just noting that in the event

10   that's easier for you than the screen.

11   A.  OK.

12   Q.  Mr. Hargreaves, let's go through this.  I believe you said

13   this is an e-mail from your ProtonMail, is that right?

14   A.  That's correct.

15   Q.  What is the date of this e-mail?

16   A.  March 17, 2018.

17   Q.  When is this in relation to the meetings that we discussed

18   earlier that you attended with Ray and Ruben and Calabasas at

19   Café Royal?

20   A.  It comes afterwards.

21   Q.  Let's go through the e-mails listed at the top here.

22             The from e-mail, it says oh@syntrek.ws, do you see

23   that?

24   A.  Yes.

25   Q.  Who is that?

1   A.   That's my e-mail.

2   Q.   You see the e-mail to taken to jawbreaker13@protonmail.com.

3          Do you see that?

4   A.   Yes, I do.

5   Q.   Who do you understand to use that e-mail?

6   A.   Ray.

7   Q.   You see underneath is bubbles13@protonmail.com.

8          Do you see that?

9   A.   Yes, I do.

10  Q.   Who do you understand that to use that e-mail?

11  A.   Tonya.

12  Q.   And then you see where it says below that,

13  gzman@protonmail.com.

14          Do you see that?

15  A.   Yes, I do.

16  Q.   Who do you understand to use that e-mail?

17  A.   Guy.

18  Q.   Then underneath that you see p2kv@protonmail.com?

19  A.   Yes, I do.

20  Q.   Who do you understand that to use that?

21  A.   Koen.

22  Q.   You sent this e-mail, is that correct?

23  A.   Yes, I did.

24  Q.   And you address it to jawbreaker13@protonmail.com?

25  A.   Yes, I did.

1    Q.   Can read just the greeting of the e-mail.

2    A.   Hi, Ray.

3    Q.   Let's read the first paragraph.  Can you read the first

4    paragraph of the e-mail.

5    A.   Hi, Ray.  I trust you are well.  I have reviewed with my

6    team how we can support with website creation bank accounts and

7    incorporation services for all the projects we discussed last

8    week and can confirm we can provide the following in Q2.

9    Q.   Generally speaking, what is the purpose of this e-mail?

10   A.   It's providing the costing for services rendered or to be

11   rendered.  Sorry.  To be provided.

12   Q.   Sorry.  I interrupted you.

13   A.   Sorry.  Not services rendered.  Services to be provided.

14   Q.   You see the section EU corporations in bold?

15   A.   Yes, I do.

16   Q.   What does EU corporations refer to?

17   A.   Companies incorporated in Europe, shelf companies

18   incorporated in Europe.

19   Q.   And then can you read what it says after EU corporations?

20   A.   We can provide 80 EU companies by the second week of April

21   2018.

22   Q.   How did you intend to provide those companies?

23   A.   Acquire them.

24   Q.   How?

25   A.   Through service providers known to Michele.

1  Q.  When you say Michele, are you referring to Michele Furlan?

2  A.  Yes, I am.

3  Q.  Let's now turn to where it says websites in bold.  Can you

4  read the first sentence of that section.

5  A.  Websites–at this time we can provide you with between 15 to

6  20 websites per month starting in April.

7  Q.  Just remind us, what was the purpose served by the websites

8  in the Eaze scheme?

9  A.  They were submitted as part of a fraudulent application

10 pack, to be submitted as part of a fraudulent application packs

11 to certain acquiring banks.

12 Q.  The websites that you are referencing here, are these

13 intended to be truthful or fictitious websites?

14 A.  Fictitious.

15 Q.  How so?

16 A.  They were not conducting the businesses that we were

17 presenting them to be conducting.

18 Q.  Then can you read just the second sentence in the website

19 section.

20 A.  If you would like to commission more sites on a monthly

21 basis, we could increase to 30 sites per month by May 2018.

22 Beyond that, will require additional staff which can be

23 actioned to generate 50 sites per month by the third week of

24 May.

25 Q.  You see under both the EU corporation section and the

1   website section there is a fee?

2   A.   Yes.

3   Q.   What does that fee represent?

4   A.   It represents the cost to Ray for a company every year.

5          MS. LA MORTE:   Can we go, Mr. Levine, to the second

6   page of this exhibit.

7   Q.   You see this line that's in the middle of the page?

8   A.   Yes, I do.

9   Q.   I want to focus your attention on the portion below the

10  line.   Can you read aloud that first sentence there.

11  A.   I have forwarded Ruben's X3 complete app packs for Eaze

12  containing three companies and six websites.

13  Q.   You see the reference there to Ruben there?

14  A.   Yes, I do.

15  Q.   Who is that a reference to?

16  A.   Mr. Weigand.

17  Q.   Is that the defendant?

18  A.   Yes, it is.

19  Q.   Now, you say:   I have forwarded Ruben X3 complete app packs

20  for Eaze containing three companies and six websites.

21         What does that refer to?   Or what do you mean by that?

22  A.   I'm informing the recipient of this e-mail that I've sent

23  to Ruben three -- what I would presume is three fraudulent

24  application packs with two websites attached to each company.

25  Q.   Why are you forwarding these application packs to Ruben?

1   A.  For him to have a look at and to check.

2           MS. LA MORTE:  We can take this down.  Thank you, Mr.

3   Levine.

4   Q.  A moment ago, Mr. Hargreaves, you told us that the

5   jawbreaker13 Proton e-mail was used by Ray, is that correct?

6   A.  That's correct.

7           MS. LA MORTE:  Mr. Levine, can you put on the screen

8   just for the witness what's been marked as Government Exhibit

9   4108 for identification.

10  Q.  Mr. Hargreaves, do you recognize this?

11  A.  Yes, I do.

12  Q.  What do you recognize it to be?

13  A.  It's from my contacts in my phone.

14          MS. LA MORTE:  The government offers Government

15  Exhibit 4108.

16          MR. TAYBACK:  Same objection as previously asserted.

17          MR. ARTAN:  Join.

18          THE COURT:  Same ruling.  Received.

19          (Government Exhibit 4108 received in evidence)

20          MS. LA MORTE:  Please publish that to the jury.

21  Q.  Mr. Hargreaves, you see on the top of this contact it says

22  Ray CE?

23  A.  Yes, I do.

24  Q.  What does that mean?

25  A.  It's the name of the person -- it's the name of the

 1  | contact --

 2  | Q.  Let's do it this way.  Who is Ray?

 3  | A.  It's the defendant.

 4  | Q.  What is the CE a reference to?

 5  | A.  His company.

 6  | Q.  Then you see it says:  Home -- there is like two places

 7  | where it says home.

 8  |       MS. LA MORTE:  Can you we highlight the second one.

 9  | Q.  What does that say?

10  | A.  Jawbreaker13@protonmail.com.

11  |       MS. LA MORTE:  We can take that down, Mr. Levine.

12  | Q.  Mr. Hargreaves, did there come a time when you became the

13  | exclusive generator of application packs for Ray Akhavan?

14  | A.  Yes, I believe so, yes.

15  |       MS. LA MORTE:  Mr. Levine, can you publish Government

16  | Exhibit 3904 in evidence.

17  | Q.  Mr. Hargreaves, what is this?

18  | A.  It's an e-mail from my ProtonMail account.

19  | Q.  What's the date of this e-mail?

20  | A.  April 22, 2018.

21  | Q.  Can you walk us through the participants in the e-mail.

22  | Who is it from?

23  | A.  It's from myself and it is -- the recipients are Michele

24  | Furlan, MF and Syntrek and Kate Farmer.

25  | Q.  You see at the top it says re CE project?

 1   A.   Yes.

 2   Q.   What is that reference to?

 3   A.   It's in relation to the Eaze project.

 4   Q.   What does the CE there refer to?

 5   A.   Ray's company, CE.

 6   Q.   Let's walk through the e-mail.  Can you read the first two

 7   lines in this e-mail aloud.

 8   A.   I had a lengthy call with Ray over at CE last night, the

 9   result of which is that we will be working much more closely

10   with CE and will be the sole partner generating and managing

11   all the application packs for the MMJ business.

12   Q.   When you are referencing the MMJ business, what is that a

13   reference to?

14   A.   Eaze.

15   Q.   You see where it says key points underneath those first two

16   lines?

17   A.   Yes, I do.

18           MS. LA MORTE:  Mr. Levine, can you blow that section

19   up.

20   Q.   Mr. Hargreaves, can you just read the first four of these

21   bullet points under the key points.

22   A.   Five to ten application packs every month for an indefinite

23   period of time.  Open bracket, we will present a proposal for

24   12 months, close bracket.  Mix of business sectors and

25   subsectors.  Mix of business models within sectors and

 1    subsectors.  Unique site look and feel.

 2    Q.  We could pause there.  Looking at that top bullet point,

 3    five to ten application packs every month for an indefinite

 4    period of time, what does that refer to?

 5    A.  It refers to us creating five to ten fraudulent application

 6    packs on a monthly basis for an indefinite period of time.

 7    Q.  For who?

 8    A.  For Ray.

 9    Q.  Then underneath it says:  Mix of business sectors and

10    subsectors.

11         Do you see that?

12    A.  Yes.

13    Q.  Can you explain what you mean there?

14    A.  I'm talking about the nature of the businesses depicted on

15    the fraudulent websites we would create.

16    Q.  Why are you suggesting a mix of business sectors and

17    subsectors?  What's the purpose of that?

18    A.  To create diversity.  Obviously, all of these fraudulent

19    application packs are meant to be standalone individual

20    companies that have nothing to do with each other.  Obviously,

21    with a scale of application packs that we were looking to

22    create that we believed was a requirement to create, it's

23    pretty hard, after a while, to make things look different.  So

24    there was a lot of brainstorming surrounding not just different

25    sectors, but also subsectors of those sectors.

1    Q.  Now, let's just read the first part of the fifth bullet

2    point aloud, the part in the smaller font.

3    A.  The descriptors have to remind the customers what they

4    purchased and also relate to the proxy site content.

5    Q.  When you say here the descriptors have to remind the

6    customer what they purchased, can you remind us what the

7    descriptors are?

8    A.  It's if you open up your credit card statement and you

9    check your bills at the end of the month, it would be the

10   information that explains to you where and what you've

11   purchased.

12   Q.  It says the descriptors have to remind the customer what

13   they purchased and also relate to the proxy site content.

14           What do you mean by proxy site content?  What is that

15   referring to?

16   A.  Proxy sites, we refer to the fraudulent websites as proxy

17   sites.  When I say the descriptor has to relate to the proxy

18   site content, I am referring -- the descriptor, the information

19   on the credit card statement has to relate to the products or

20   services that were being sold on the fraudulent -- presented on

21   the fraudulent website.

22           MS. LA MORTE:  We can zoom out of that, Mr. Levine.

23   We can take that down.

24   Q.  Let's talk about implementing this.  Earlier you told us

25   that you used shelf companies for the Eaze scheme.  Let's start

1  there.  How did your team obtain shelf companies for the Eaze

2  scheme?

3  A.  We acquired them.

4  Q.  Who on your team would acquire that?

5  A.  Michele.

6  Q.  How would he acquire them?

7  A.  He had service providers known to him.

8  Q.  Were these purchased companies?

9  A.  Yes, they were.

10 Q.  Did those shelf companies -- let me take a step back.

11 Before, you mentioned the term unique beneficial owner.

12        Do you recall that?

13 A.  Yes, I do.

14 Q.  What is a unique beneficial owner?

15 A.  In relation to what we are discussing, it's an individual

16 who is willing to be the sole owner of a company.

17 Q.  Did the shelf companies that your team purchased come with

18 unique beneficial owners?

19 A.  Yes, they did.

20        MS. LA MORTE:  Let's publish for the jury Government

21 Exhibit 3902 in evidence.

22 Q.  Mr. Hargreaves, what is this?

23 A.  This is an e-mail from my ProtonMail account.

24 Q.  What's the date?

25 A.  March 27, 2018.

1   Q.  What is the subject line?

2   A.  FW RE 80 corporations, target countries.

3   Q.  What does that refer to?

4   A.  It refers to the countries we would like, preferred

5   countries where the companies that we were wishing to purchase

6   were incorporated.

7   Q.  Let's start with the bottom e-mail on this page.  You see

8   at the very bottom, from kf@syntrek.ws.

9          Do you see that?

10  A.  Yes, I do.

11  Q.  Can you remind us who kf@syntrek is?

12  A.  She was my operations manager.

13  Q.  Her name?

14  A.  Kate Farmer.

15  Q.  Can you read the e-mail aloud.

16  A.  Hi, Michele.  Thank you for investigating the corporations.

17  For the 80 we have been tasked to cost, are you able to confirm

18  which locations these corporations will be from.  If there's a

19  split roughly, how many from each?  Thank you, Kate.

20  Q.  To be clear, what is your understanding of the reference to

21  corporations in this e-mail?

22  A.  She is referring to shelf companies to be included within

23  fraudulent applications.

24  Q.  Let me direct your attention now to the e-mail in the

25  center on 27 March 2018, MF wrote.

```
 1                Do you see that?
 2    A.  Yes, I do.
 3    Q.  Just to remind us, who do you understand at mf@syntrek.ws
 4    to be?
 5    A.  Kate Farmer.
 6    Q.  Can you read the e-mail loud.
 7    A.  Hi, Kate.  Target countries for corps.  We have no
 8    limitations, and we can pick and choose as we refer between UK,
 9    Netherlands, Cyprus, Gibraltar, and U.S.
10    Q.  Keep going.
11    A.  However, UBOs are the bottleneck, and I am waiting
12    confirmation.  The amount of UBOs is not a problem.  We get 80
13    easy and fast.  The issue is the pricing.  I have spoken with
14    the provider again yesterday, and I am pending an answer today.
15    Open bracket, he is on California time zone, so I will speak to
16    him late tonight, close bracket.  Best regards, Michele.
17    Q.  Just to clarify, in the second paragraph that first line,
18    however, UBOs are the bottleneck, what do you understand the
19    reference to UBOs to be?
20    A.  These unique beneficial owners are the owners of these
21    companies in title only.  They have nothing to do with the
22    companies.  Therefore, I guess the question would be, how
23    comfortable would you be putting your name on a company that
24    you were going to have no involvement with.
25                (Continued on next page)
```

SOUTHERN DISTRICT REPORTERS, P.C.

 1              MR. ARTAN:  Objection, move to strike, nonresponsive.

 2              MR. TAYBACK:  Join.

 3              THE COURT:  Sustained.

 4   BY MS. LA MORTE:

 5   Q.  Mr. Hargreaves, directing your attention to the third line

 6   of the second paragraph:  "I have spoken with the provider

 7   again yesterday, and I am sending an answer today;" do you see

 8   that?

 9   A.  Yes, I do.

10   Q.  What do you understand the reference to the "provider" to

11   be?

12   A.  The service provider selling Michele's Company.

13   Q.  Okay.  Mr. Levine, we can zoom back out.

14              Mr. Hargreaves, were there documents that were

15   associated with these shell companies?

16   A.  Yes, there were.

17   Q.  What kind of documents?

18   A.  Articles of association, incorporation papers, proof of

19   address for the unique beneficial owners, proof of address for

20   the companies, bank statements.

21   Q.  And were those documents -- did you and your team assemble

22   those documents with respect to each of the shell companies

23   that you purchased?

24   A.  Could you repeat the question, please?

25   Q.  Yes.  Did you and your team assemble those types of

1  documents with respect to the shell companies that you

2  purchased for the Eaze scheme?

3  A.  Yes, we did.

4  Q.  And why did you need to assemble those documents?

5  A.  Because we were utilizing them.  We were including them

6  within the fraudulent application packs that we were submitting

7  to the acquiring banks.

8  Q.  Mr. Levine, can you publish for everyone Government

9  Exhibit 3905 in evidence.

10          Mr. Hargreaves, what is this?

11 A.  It's an e-mail from my account.

12 Q.  And starting at the top, what is the date of the e-mail?

13 A.  April the 22nd, 2018.

14 Q.  Who is the e-mail from?

15 A.  Myself.

16 Q.  And let's go through the "to" line.  Do you see the e-mail,

17 EUprocessing@Protonmail.com?

18 A.  Yes, I do.

19 Q.  Who do you understand to use that address?

20 A.  Reuben Weigand.

21 Q.  Is that the defendant?

22 A.  Yes, it is.

23 Q.  And then next to EUprocessing, you see MF@Syntrek?

24 A.  Yes, I do.

25 Q.  And who do understand that to be?

1    A.  Michele Furlan.

2    Q.  And then the cc line, jawbreaker13@ProtonMail.com, can you

3    just remind us who used that e-mail?

4    A.  Ray.

5    Q.  And then, finally, KF@Syntrek?

6    A.  Kate Farmer.

7    Q.  Okay.  So let's point out a few things.  The subject of

8    this e-mail line at the top, do you see that?

9    A.  Yes, I do.

10   Q.  What does it say?

11   A.  Re: Re Update.

12   Q.  And what is the overall purpose of this e-mail?  If you

13   need us to put on the scroll down, just let us know.

14   A.  It's introducing Michele to Ruben and advising Michele that

15   Ruben has access to the Proton e-mail account that he set up,

16   where we were going to be placing applications.

17   Q.  Okay.  So, Mr. Levine, can we scroll down a little bit?

18   Yes, perfect.  Thank you.

19          Do you see this e-mail that starts on the bottom of

20   page 1 and goes into page 2?  Yes.

21          Mr. Hargreaves, can you see that on your screen?

22   A.  I can, yes.

23   Q.  And who is this e-mail from?

24   A.  It's from myself.

25   Q.  Can you read aloud the first three lines of e-mail that

1    appear on page 1?

2    A.   "Update from my side the six Hot Robots sites and six

3    support sites will be complete today.  Application packs will

4    contain KYB/KYC."

5    Q.   And when it says there "update from my side the six Hot

6    Robots sites and six support sites will be complete today,"

7    what do you mean by "Hot Robots"?  What is Hot Robots?

8    A.   It was the name of a shell company we purchased.

9    Q.   And then when you referenced six hot robot sites and six

10   support sites, what do you mean there?

11   A.   In the early stages of the scheme, we decided that we were

12   going to have websites, fraudulent websites, and then

13   separately fraudulent support sites for those websites.

14   Q.   And then it states underneath "application packs will

15   contain KYB/KYC"?

16   A.   Yes.

17   Q.   Can you remind us what KYB and KYC is?

18   A.   KYB stands for "know your business" and KYC stands for

19   "know your customer."

20   Q.   And what type of documents -- I believe you referenced

21   before, so quickly, just what kind of documents are we talking

22   about there?

23   A.   In relation to the "know your business" documents, we're

24   referring to articles of incorporation -- articles of

25   association, incorporation documents, proof of address of a

1   business; in relation to "know your customer," we're talking

2   about proof of identity and proof of address.

3   Q.  Okay.  So now, let's go to the portion of this e-mail that

4   says at EUprocessing; do you see that?

5   A.  Yes, I do.

6   Q.  And, Mr. Levine, you can highlight that?

7          Can you read -- well, I'll read it.  It says:

8   "@EUprocessing:  Can you forward us a blank WC app ASAP, pls?"

9   Do you see that section?

10  A.  Yes, I do.

11  Q.  And this is being directed to who?

12  A.  To -- it's an e-mail that was used by Ruben.

13  Q.  And then you say:  "Can you forward us a blank WC app."

14  What do you mean by "blank WC app"?

15  A.  I mean, a "WC" stands for wire card and "blank" as in not

16  filled out, blank.

17  Q.  Okay.  And why are you asking Ruben for a blank wire card

18  app?

19  A.  I don't actually recall.

20  Q.  Okay.  So let's go up to the e-mail above this one.  Oh,

21  and before we -- oh, that's fine.  Yes.

22          So the e-mail above that, do you see that e-mail on

23  Friday, April 27, 2018, at 11:19?

24  A.  Yes, I do.

25  Q.  Who is this e-mail from?

1    A.   It's from EUprocessing.

2    Q.   And what -- can you read that first line?

3    A.   "Attached WC app.  Each app has to come with."

4    Q.   And then there's a list.  Do you see that, or two lists?

5    A.   Yes, I do.

6    Q.   Or three lists.  Just generally speaking, what do the

7    documents on this list reflect?

8    A.   They reflect KYB and KYC documents.

9    Q.   And the reference to WC is here, I believe you said it's

10   wire card?

11   A.   Yes.

12   Q.   Was that one of the acquiring banks that was used in the

13   e-scheme?

14   A.   That is correct.

15   Q.   Now, looking at this list that appears here that you

16   identified as KYB and KYC documents, did your team, in fact,

17   assemble these documents for the shell companies?

18   A.   Yes, we did.

19   Q.   And were they used in connection with applying for merchant

20   processing accounts at wire cards?

21   A.   Yes, they were.

22   Q.   And were those documents also used to apply for merchant

23   processing accounts at other acquiring banks?

24   A.   Yes, they were.

25   Q.   Okay.  So we're going to start by taking a look at some of

1    the KYB and KYC docs, and then we'll focus on the account

2    applications.

3              And we can take that down.

4              THE COURT:  Counsel, keep in mind, however, that we're

5    inclined to give the jury their lunch break in about five

6    minutes.

7              MS. LA MORTE:  Your Honor, would you like to stop

8    here?  I'm about to go through another whole document.

9              THE COURT:  I had a suspicion that might be the case;

10   so, yes.  All right.

11             So, ladies and gentlemen, we'll take our lunch break

12   now, and we'll reconvene in an hour and continue at that time.

13             (Jury not present)

14             THE COURT:  Please be seated.  The witness is excused.

15   We'll see you in an hour.

16             (Witness temporarily excused)

17             Now, how much longer will you be on direct?

18             MS. LA MORTE:  I think we're going to go into tomorrow

19   for maybe an hour or so, your Honor.

20             THE COURT:  Okay.  And who do we have after that?

21             MS. LA MORTE:  Go ahead, Emily.

22             MS. DEININGER:  I think the government anticipates

23   calling after Mr. Hargreaves, Robert Hupcher, an FBI special

24   agent.

25             THE COURT:  Okay.  Just so I can start planning

things, like the charging conference and so forth, as we get a

little bit later into this week, I'll want to know from the

government when they think they'll rest, and I'll want to know

from the defense how long they think they will be.

There is, of course, some hearings that I think we may

need to have on some of the defense witnesses, and I want to

start scheduling all of that; so start looking ahead and

someone give me a heads up maybe by Wednesday.  Okay?

MS. LA MORTE:  Yes, your Honor.

THE COURT:  Very good.  See you in an hour.

(Luncheon recess)

```
 1                       AFTERNOON SESSION

 2                          1:45 p.m.

 3             THE COURT:  The jury is on their way up.  Please get

 4   the witness back on the stand.

 5             The only sure way to get the jury is start having

 6   legal argument on some issue.

 7             Is there anything they want to raise that they think

 8   is going to come up this afternoon?  Let's start with that.

 9             MS. LA MORTE:  No, nothing new.

10             MR. TAYBACK:  Your Honor, if the government is going

11   to move to Government Exhibit 4004, there were some

12   particularized objections included in our other objections, but

13   they are particular to that document about the deleted accounts

14   that show up.  Therefore, we believe --

15             THE COURT:  Maybe somebody could put that up on the

16   screen.

17             MR. TAYBACK:  If you look at page 56, where it's cut

18   off, or page 83, where there is a deleted account reference, or

19   page 89 there is a deleted account reference.

20             THE COURT:  Blow that up a little bit.

21             MS. LA MORTE:  Are you sure, 56?

22             MR. TAYBACK:  Let me check.

23             Page 56, it cuts off and then there is, on page --

24   there are numbers in the lower right-hand corner.

25             THE COURT:  Never mind.  Here is the jury.
```

```
 1                (Jury present)

 2                THE COURT:  Counsel.

 3   Q.  Good afternoon, Mr. Hargreaves.

 4   A.  Good afternoon.

 5   Q.  When we took a break for lunch we were about to look at

 6   some KYB and KYC documents associated with the shelf companies.

 7                Do you recall that?

 8   A.  Yes, I do.

 9                MS. LA MORTE:  Mr. Levine, can you put up on the

10   screen for everybody Government Exhibit 3918 in evidence.

11   Q.  Mr. Hargreaves, what is this?

12   A.  It's an e-mail from my ProtonMail account.

13   Q.  Who is the e-mail from?

14   A.  It's from Kate Farmer.

15   Q.  Can you list the e-mails to whom this e-mail from Kate

16   Farmer is addressed?

17   A.  EUprocessing@protonmail.com, jawbreaker@protonmail.com.

18   Q.  I'm sorry?

19   A.  And OH Syntrek.

20   Q.  OH Syntrek is you, is that right?

21   A.  Correct.

22   Q.  Who do you understand to be EUprocessing@protonmail.com to

23   be?

24   A.  Ruben.

25   Q.  Jawbreaker 13?
```

1   A.  Ray.

2   Q.  Can you read the subject of the e-mail on the top.

3   A.  FW:  International Standard WC app pack updated with new

4   bank account details.

5   Q.  International Standard, what is International Standard?

6   A.  It's a shelf company that we acquired.

7   Q.  For what purpose?

8   A.  For inclusion within the fraudulent application packs.

9   Q.  The reference to WC app pack, do you see that on top?

10  A.  Yes, I do.

11  Q.  What is WC app pack?

12  A.  It's an application pack for Wirecard.

13  Q.  You see on the bottom of the e-mail there is a list there?

14  A.  Yes, I do.

15  Q.  Are these attachments to this e-mail?

16  A.  Yes, they are.

17  Q.  Generally speaking, what do these attachments reflect?

18  A.  They are KYB and KYC documents pertaining to this

19  fraudulent application pack.

20  Q.  What was the purpose of sending these documents to Ruben

21  and Ray?

22  A.  For their review.

23         MS. LA MORTE:  Let me direct your attention to page 28

24  of this exhibit, Mr. Levine.

25  Q.  Mr. Hargreaves, is this one of the attachments to this

1   exhibit?

2   A.  Yes, it is.

3   Q.  What is this?

4   A.  It's part of an application for -- from the acquiring bank

5   Wirecard.

6          MS. LA MORTE:  Mr. Levine, can you blow up the section

7   where it says contractual partner near the top, just blow up

8   that whole section.

9   Q.  You see where it says contractual partner (merchant) on the

10  upper left, Mr. Hargreaves?

11  A.  Yes, I do.

12  Q.  What is listed here as the contractual partner

13  name/corporate name?

14  A.  International Standard Limited.

15  Q.  Directing your attention to the right-hand side --

16  actually, can you zoom out of this for a second.  I'm sorry.

17  Stay in.  On the right-hand side, you see where it says object

18  of the company?

19  A.  Yes, I do.

20  Q.  What is listed as the object of this company?

21  A.  Production and sale of sheet music.

22  Q.  You see right above there it says company URL?

23  A.  Yes.

24  Q.  What is the URL that's listed here?

25  A.  Goodegreenbazaar.com.

1    Q.  Who developed that website?

2    A.  I did.  My team did.

3    Q.  With respect to the production and sale of sheet music,

4    does International Standard in fact produce and sell sheet

5    music?

6    A.  No, it does not.

7    Q.  Did you in fact or your team have sheet music for sale?

8    A.  No, we did not.

9    Q.  According to this portion of the form, where is

10   International Standard based?

11   A.  In Leeds, city in the north of the United Kingdom.

12           MS. LA MORTE:  We can zoom out of that.

13           Mr. Levine, if you could just scroll down one more as

14   well and keep scrolling.  Keep scrolling.  You can go back up.

15   Q.  Mr. Hargreaves, is there a reference to Eaze anywhere on

16   this Wirecard set up or contract data form?

17   A.  No, there is not.

18   Q.  Does this form contain any reference to Eaze.com?

19   A.  No, it does not.

20   Q.  Is there any reference to California on here?

21   A.  No, there is not.

22   Q.  Let's look at a few other things on this form.

23           MS. LA MORTE:  If we go back to page 28, Mr. Levine.

24   See where it says the section manager director, authorized

25   representative, if we could blow that up.

1   A.  Yes, I do.

2           MS. LA MORTE:  Could you zoom out and blow up that

3   whole section, Mr. Levine.  Contacts as well.  Managing

4   director down to contacts.  There we go.

5   Q.  You see where it says manager/director/authorized

6   representative?

7   A.  Yes, I do.

8   Q.  What does that reflect?

9   A.  That reflects the manager or the director or the person

10  authorized to represent the company.

11  Q.  Who is listed here as the manager/director/authorized

12  representative at International Standard?

13  A.  Anna Sinkovska.

14  Q.  According to this document, in what country does she

15  reside?

16  A.  France.

17          MS. LA MORTE:  If we can zoom out of this, Mr. Levine,

18  and go to page 4 of the PDF.

19  Q.  Mr. Hargreaves, is this one of the attachments to the

20  government exhibit that we have been looking at?

21  A.  Yes, it is.

22  Q.  What is this?

23  A.  It's the passport of the unique beneficial owner.

24  Q.  You mentioned unique beneficial owner.  Could you again

25  provide us with just the definition of unique beneficial owner.

```
 1   A.  Unique beneficial owner is the owner of a company.

 2   Q.  Who is listed on this documentation here?

 3   A.  You have to go back to the other document for me to tell

 4   you that.

 5   Q.  Do you see a name that's listed on this document?

 6   A.  Yes.

 7   Q.  What is the name?

 8          THE COURT:  I think he has to have it blown up.

 9          MS. LA MORTE:  Thank you, your Honor.

10   A.  Thank you.  Anna Sinkovska.

11   Q.  Is that the same name that we saw on the Wirecard form that

12   we were just looking at?

13   A.  Yes, it was.

14   Q.  Do you know this person, Anna Sinkovska?

15   A.  No, I do not.

16   Q.  Have you ever communicated with this person?

17   A.  No, I have not.

18   Q.  To your knowledge, is she affiliated with Eaze in any way?

19   A.  No, she is not.

20          MS. LA MORTE:  We can zoom out of this, Mr. Levine,

21   and go back to page 28 of the PDF exhibit.  Can we now blow up

22   the area under contacts.

23   Q.  Mr. Hargreaves, directing your attention to the right, you

24   see where it says mk@esepa.biz?

25   A.  Yes, I do.
```

SOUTHERN DISTRICT REPORTERS, P.C.

1    Q.   Do you know what that's a reference to?

2    A.   In relation to this document or --

3    Q.   In relation to the Eaze scheme.

4    A.   I believe Esepa was a company that was used.  Esepa, I

5    believe, was a Swiss company that was used by Ray to -- I

6    believe the business activity of the company was something to

7    do with payments.

8              MS. LA MORTE:  We can zoom out of that.

9              Can we blow up the portion under describer.

10   Q.   You see where here it says describer, text on card

11   statement?

12   A.   Yes, I did.

13   Q.   What is the describer that's listed here?

14   A.   Goodegreenbazaar.com.

15   Q.   In the context of this scheme under what circumstances

16   would goodegreenbazaar.com appear on a customer's card

17   statement?

18   A.   If the customer had acquired something from the

19   goodegreenbazaar.com website.

20   Q.   Was this website -- this is a website that you created, I

21   believe?

22   A.   Yes, it was.

23   Q.   Was it a truthful or fictitious website?

24   A.   It was a fictitious website.

25             MS. LA MORTE:  Let's zoom out of here.  Let's go to

 1    page 26 of the exhibit.

 2    Q.  Mr. Hargreaves, is this one of the attachments to

 3    Government Exhibit 3918?

 4    A.  Yes, it is.

 5    Q.  What is this?

 6    A.  It's a screenshot providing proof of the main ownership to

 7    the acquiring bank.

 8    Q.  What is the domain that's in the red on the top of this

 9    page?

10    A.  Goodegreenbazaar.com.

11    Q.  If we look at the bottom, in the red rectangle, you see

12    where it says registry contacts, administrator contacts,

13    technical contacts, and billing contacts.

14            Do you see that?

15    A.  Yes, I did.

16    Q.  To your knowledge, did Anna Sinkovska register this domain?

17    A.  No, she did not.

18    Q.  Who did?

19    A.  Michelle Furlan.

20    Q.  To your knowledge, is Anna Sinkovska the administrative,

21    technical, or billing contact for this domain?

22    A.  No, she was not.

23    Q.  To your knowledge, who is?

24    A.  My team.

25            MS. LA MORTE:  Let's zoom back out of this and go back

1   to page 28 of the exhibit.

2              Let's actually now scroll down to page 29.  Sorry, Mr.

3   Levine.  Go up a little bit.  I'm sorry.  Down one.  Here we

4   go.

5   Q.  You see where it says risk assessment sales data?

6   A.  Yes, I do.

7   Q.  It states monthly credit card volume?

8   A.  Yes.

9   Q.  What does that mean, monthly credit card volume?  What does

10  that refer to?

11  A.  It's the volume of credit card transactions processed on a

12  monthly basis.

13  Q.  What is the volume that's listed here?

14  A.  35M-45M EUR.

15  Q.  Are these numbers accurate or are they fabricated?

16  A.  They are fabricated.

17  Q.  Then the same with respect to, you see two columns over it

18  says transactions number?

19  A.  I see it.

20  Q.  What is the number that's listed here?

21  A.  1,046,500 forward slash month.

22  Q.  Is this a truthful number or fabricated number?

23  A.  It's a fabricated number.

24  Q.  Where did you obtain the numbers to put in here?

25  A.  We decided among ourselves internally.

1            MS. LA MORTE:  Let's zoom out of that.

2   Q.  You see where it says shipping regions?

3   A.  Yes, I do.

4            MS. LA MORTE:  We could blow up that whole section.

5   Q.  What does shipping regions refer to?

6   A.  The areas where our services or products are being sold

7   into or shipped to.

8   Q.  When it says domestic 8 percent, you see that?

9   A.  I do, yes.

10  Q.  In this context of this Wirecard forum, what does domestic

11  mean?

12  A.  Domestic would be referring in this case to the United

13  Kingdom.

14  Q.  Why would it be referring to the United Kingdom?

15  A.  Because the company is incorporated in the United Kingdom.

16  Q.  Then there is a Europe, 15 percent and international, 77

17  percent?

18  A.  Correct.

19  Q.  Are these numbers truthful or fabricated?

20  A.  Fabricated.

21           MS. LA MORTE:  You could zoom out of that and look at

22  page 6 of the exhibit.

23  Q.  Firstly, is this one of the attachments to the government

24  exhibit that we have been looking at?

25  A.  Yes, it is.

1    Q.   What is this?

2    A.   It's a model articles for private companies shares.

3            MS. LA MORTE:   Mr. Levine, you can just scroll down a

4    few pages, scroll down.

5    Q.   As Mr. Levine is scrolling, Mr. Hargreaves, how was this

6    document obtained?

7    A.   It was provided by the service provider to my team.

8    Q.   To your knowledge, are these the articles of association

9    for Eaze?

10   A.   No, they are not.

11   Q.   Mr. Hargreaves, based on your participation in the Eaze

12   scheme, what transactions were intended to be run through the

13   International Standard merchant processing account?

14   A.   Transactions from the Eaze website.

15           MS. LA MORTE:   We can take that down, Mr. Levine.

16   Q.   Mr. Hargreaves, I think the easiest way to do this will be

17   for you to look at the binder with the 3900 exhibit list.

18   A.   I have it.

19   Q.   If you could take a look at the following exhibits.   3912.

20   A.   I have it.

21   Q.   3915.

22   A.   I see it, yes.

23   Q.   3917.

24   A.   Yes, I see it.

25   Q.   And 3941.

1    A.   Yes, I also see it.

2    Q.   Generally speaking, what are these documents?

3    A.   These are all e-mails from my ProtonMail account.

4    Q.   On there do each of these e-mails have attachments?

5    A.   Yes, they do.

6    Q.   Generally speaking, what are the attachments?

7    A.   They are KYB and KYC documents relevant to their companies

8    quoted in the subject lines of each e-mail.

9    Q.   We are going to quickly take a look at these.

10           MS. LA MORTE:   Mr. Levine, can you publish for

11   everyone Government Exhibit 3912.

12   Q.   Mr. Hargreaves, you see here the reference to Lorry LTD

13   full Settlego app pack?

14   A.   Yes, I do.

15   Q.   What's Lorry LTD?

16   A.   It's a shelf company we acquired for inclusion within the

17   fraudulent-application packs for the transaction-laundering

18   scheme on behalf of these.

19           MS. LA MORTE:   We could take that down.

20           Mr. Levine, can you now publish 3915.

21   Q.   Mr. Hargreaves, you see the reference on the top here to

22   Kalixa app Hot Robots?

23   A.   Yes, I do.

24   Q.   What is Hot Robots?

25   A.   It's another shelf company that we acquired for inclusion

1    also within the fraudulent application packs that we were

2    creating on behalf of the transaction-laundering scheme for

3    Eaze.

4            MS. LA MORTE:  Mr. Levine, you can take that down.

5            Let's put up Government Exhibit 3917.

6    Q.  Mr. Hargreaves, you see the reference to New Opal WC app

7    pack?

8    A.  Yes, I do.

9    Q.  What is New Opal?

10   A.  It is also a shelf company that was acquired for the same

11   purposes as the others.

12           MS. LA MORTE:  We can take that down.

13           Lastly, Mr. Levine, can you put up Government Exhibit

14   3941.

15   Q.  You see on the top, what does it say there?

16   A.  It says Johnson NYC KYB forward slash KYC docs.

17   Q.  What is Johnson NYC?

18   A.  It's also a shelf company acquired for the same purposes as

19   previously stated.

20           MS. LA MORTE:  We can leave that up, actually.

21   Q.  Mr. Hargreaves, with respect to the shelf companies that

22   you just named, did any of those shelf companies actually

23   conduct any type of business operations?

24   A.  No, they did not.

25   Q.  Did any of those shelf companies actually make any

1    products?

2    A.  No, they did not.

3    Q.  Did any of those self companies actually offer services to

4    the public?

5    A.  No, they did not.

6    Q.  Did any of those shelf companies actually self-generate

7    income?

8    A.  No, they did not.

9    Q.  Did any of the shelf companies ever hire any employee?

10   A.  No, they did not.

11   Q.  Did any of these shelf companies have any affiliation with

12   Eaze?

13   A.  No, they did not.

14   Q.  According to the exhibits that we just looked at, where

15   were each of these shelf companies incorporated?

16   A.  In the United Kingdom.

17   Q.  According to these documents, where does the unique

18   beneficial owner for each of the shelf companies reside, in

19   what country?

20   A.  In France.

21   Q.  Mr. Hargreaves, who was primarily responsible for filling

22   out the merchant processing account applications for these

23   shelf companies?

24        MS. LA MORTE:  Mr. Levine, you can take this down.

25   A.  Various members of my team.

 1   Q.  We are going to spend some time looking at the application

 2   packages.  But before we do that, I want to take a few moments

 3   and focus on how you communicated with Ruben, the defendant.

 4   What are the main ways that you and your team communicated with

 5   Ruben?

 6   A.  We -- by e-mail and by Telegram, chat, and telephone.

 7   Q.  When you and your team wanted to communicate with Ruben

 8   over e-mail, what e-mail address would you send the e-mail to?

 9   A.  EUprocessing.

10   Q.  Why is that?

11   A.  Because it was his e-mail.

12   Q.  Now, were the application forms that you and your team

13   filled out generally sent out to Ruben at that e-mail address?

14   A.  We certainly sent them to that e-mail address.  We were

15   also sending them directly, in part, to banks that we --

16   acquiring banks that we were advised to.

17   Q.  Sure.  But to the extent that Ruben was reviewing any of

18   your application packs, would you send them to him at that

19   address, typically?

20   A.  Yes, we would.

21            MS. LA MORTE:  Mr. Levine, can you put on the screen

22   for everybody Government Exhibit 4008 in evidence.

23   Q.  Let me direct your attention to the -- first of all, what

24   is this?

25   A.  It's a group chat taken from my Telegram account.

1   Q.  Who are the participants in this chat?

2   A.  Myself, Kate Farmer, and Ruben Weigand.

3   Q.  Directing your attention to the very top of this Telegram

4   chat, what is the date here?

5   A.  May 1, 2018.

6   Q.  That gray bubble underneath the date, can you read that?

7   A.  OH created the group Kate-N-Ruben, exclamation mark.

8   Q.  Is that you, are you OH?

9   A.  Yes, I am.

10  Q.  If you look at the very bottom you see the green bubble?

11  A.  Yes, I do.

12  Q.  Are your chats reflected in the green bubbles?  Is that

13  you?

14  A.  Yes, it is me.

15  Q.  What are you saying here?

16  A.  Hi, Kate, meet Ruben.

17          MS. LA MORTE:  Then we can scroll down to the next

18  page.

19  Q.  Does Ruben respond?

20  A.  He does, yes.

21  Q.  What does he say?

22  A.  Hey, pleasure meeting you.

23  Q.  Can you read your chart immediately below that.

24  A.  The purpose of the group is streamline communication.

25  Between us.  Ruben is aware of your role as project manager.

 1          MS. LA MORTE:  Let's go to page 5 of this Telegram

 2     chat.

 3     Q.  You see where it says, Mr. Hargreaves, May 10, 2018, sort

 4     of towards the top?

 5     A.  I believe so, yes.

 6     Q.  You see the little icon with the ghost in this chat?

 7     A.  Yes, I do.

 8     Q.  What does that reflect?

 9     A.  It reflects an account that no longer exists.

10     Q.  How do you know that?

11     A.  Because I'm familiar with the application.

12     Q.  We are going to read aloud this chat.  Can you start

13     reading from where it says deleted account under May 10, 2018.

14     A.  Hi, Ruben, please, can you confirm which banking details we

15     use for the e-com apps.  Mister Tango or Swiss, question mark.

16     Q.  Before we go further, Mr. Hargreaves, do you know who this

17     deleted account is?

18     A.  Yes, I do.

19     Q.  Who is it?

20     A.  Kate Farmer.

21     Q.  How do you know that?

22     A.  The context of the conversation.

23     Q.  In this first chat, who is Kate asking to confirm banking

24     details?

25     A.  Ruben.

1    Q.  What does she say after her first chat?  What's the second

2    chat?

3    A.  We assume Mister Tango for all, but would like your

4    confirmation.  Thank you.

5    Q.  Does Ruben provide confirmation in response to this chat?

6    A.  Yes, he does.

7    Q.  What does he say?

8    A.  All Mr. tango.

9    Q.  What does Kate say?

10   A.  Thanks for confirming.

11   Q.  What does Ruben say after that?

12   A.  Please don't send to Gotthardus, but to EUprocessing.

13   Q.  When Ruben Weigand tells Kate to send to EUprocessing, what

14   is your understanding of the reference to EUprocessing?

15   A.  It's in reference to his e-mail address.

16   Q.  After that chat Ruben says, as soon as we have them we'll

17   submit.

18            What do you understand that to mean?

19   A.  It means as soon as they have the application packs, they

20   will submit them to the relevant inquiring banks.

21   Q.  Can you read Kate's last chat on the bottom.

22   A.  Yes.  I've sent all WC apps to you now for both Swiss

23   versions and Mister Tango versions.  They should all be in your

24   inbox.

25   Q.  When Kate says WC apps, what do you understand that to be a

1    reference to?

2    A.   Application forms for Wirecard.

3    Q.   When Kate says they should all be in your inbox, what do

4    you understand that to mean?

5    A.   That she sent them to his inbox.

6    Q.   Which is what?

7    A.   EUprocessing.

8    Q.   What is the date of the chats that we just read?

9    A.   May 10, 2018.

10        MS. LA MORTE:   Mr. Levine, let's take that down and

11   display Government Exhibits 3918 and 3919.

12   Q.   Mr. Hargreaves, what is the date of Government Exhibit 3918

13   and 3919?

14   A.   3918 is May 10, Thursday May 10, 2018, and 3919 is

15   Thursday, May 10, 2018 also.

16   Q.   Is this the same day as the chats that we just looked at in

17   Government Exhibit 4008?

18   A.   Yes.

19   Q.   With respect to Exhibit 3918, who is the e-mail that Kate

20   addresses this to?

21   A.   EUprocessing@protonmail.com and

22   jawbreaker13@protonmail.com.

23   Q.   With respect to the Government Exhibit 3919, what is the

24   e-mail address that Kate directs the e-mail to?

25   A.   EUprocessing@protonmail.com.

1    Q.   Going back to 3918, looking at the body of the e-mail, what

2    is stated here?

3    A.   WC application pack with Mistertango, two of three,

4    including IBAN, PDF received.

5    Q.   What do you understand Kate to be sending EUprocessing and

6    Jawbreaker?

7    A.   The Wirecard application pack, including the bank -- the

8    bank settlement account details from the settlement bank,

9    Mistertango.

10   Q.   Now, looking at 3919, you see we just pointed out that the

11   e-mail address to which Kate sends this information is

12   EUprocessing@protonmail.com.

13            Do you see that?

14   A.   Yes, I do.

15   Q.   What is the greeting in the e-mail?

16   A.   Sorry.  What is the what of the e-mail?

17   Q.   Greeting.

18   A.   Hi, Ruben.

19   Q.   Could you read the first line.

20   A.   We already received these from Patrick earlier this

21   afternoon and completed all the WC application forms with these

22   details.

23            MS. LA MORTE:  We could take these down.  Thank you.

24            Mr. Levine, can you put up on the screen Government

25   Exhibit 4004 in evidence.

1    Q.  Mr. Hargreaves, what is the title of this -- what is this,

2    first of all?

3    A.  It's the group info page from Telegram for a Telegram group

4    chat.

5    Q.  What is the title of the group chat?

6    A.  Olliebaba.

7          MS. LA MORTE:  Let's go to page 2.  Let's look at the

8    two gray bubbles on the very top.

9    Q.  You see the gray bubbles on the top, Mr. Hargreaves?

10   A.  Yes, I do.

11   Q.  What is the date that's reflected here?

12   A.  April 23, 2018.

13   Q.  What does the gray bubble underneath say?

14   A.  Ray CE created the group Olliebaba.

15   Q.  Who do you understand created this Telegram chat thread?

16   A.  Ray.

17   Q.  Looking at the monikers or icons on the left-hand side of

18   the chat, do you see that?

19   A.  Yes, I do.

20   Q.  You see where it says RC in a green circle?

21   A.  Yes, I do.

22   Q.  Who do you understand that to refer to?

23   A.  Ray.

24   Q.  Then are your chats reflected in here?

25   A.  In the green bubbles.

1          MS. LA MORTE:  Can we scroll down a little bit.  You

2     can stop right there.

3     Q.  You see the chat on page 2 where it says have you been able

4     to obtain better quality scans?  Do you see that?

5     A.  Yes, I do.

6     Q.  You see the little moniker to the left?

7     A.  Yes, I do.

8     Q.  Who does that represent?

9     A.  Ruben Weigand.

10    Q.  In fact, is Ruben Weigand's name indicated on this chat, on

11    any of these chats?

12    A.  Yes, it is.

13    Q.  Let's go to page 45, Mr. Levine, of this PDF.

14          What is the date that's indicated in the gray bubble

15    on the top?

16    A.  May 10, 2018.

17    Q.  Now, you see where Ray's comments begin, understood, sort

18    of partway down the page?

19    A.  Yes, I did.

20    Q.  Can you read the chat that's immediately under that.

21    A.  But the Hot Robots WC app that OU sent me is ready to go

22    and ready to be submitted, right, question mark.

23    Q.  What do you understand the Hot Robots WC app to refer to?

24          MR. TAYBACK:  Object, your Honor to the incompleteness

25    of that particular text.  It relates to the prior objection I

1    made.

2            MR. ARTAN:  Join.

3            MS. LA MORTE:  Your Honor, there is an objection.

4            THE COURT:  The prior objection is noted, but I think

5    this is substantive in itself.  Overruled.

6    Q.  Mr. Hargreaves, we just were looking at a chat from Ray

7    that you just read.  I asked you your understanding of the

8    reference to the Hot Robots WC app.  What is that a reference

9    to?  What do you understand that to be a reference to?

10   A.  The acquiring bank Wirecard and application pack to be

11   submitted to and on behalf of the shelf company -- sorry -- a

12   fraudulent application pack to be submitted on behalf of the

13   shelf company, hot robots.

14   Q.  Can you read Ray's chat immediately underneath the one you

15   just read.

16   A.  Ruben equals let's do a last and very serious check.  Let's

17   get Christian going ASAP.  I'll send it to Jan so he can see it

18   ahead of time, but we need to make sure it's all right.

19   Q.  The reference to Ruben here, who do you understand that to

20   be?

21   A.  Ruben Weigand.

22   Q.  It states:  Let's do a last and very serious check.  Let's

23   get Christian going ASAP.

24           What do you understand the reference to Christian to

25   be?

```
 1   A.   It's in reference to Christian Chmiel.

 2   Q.   Then you see it says:  I'll send to Jan?

 3   A.   It's in reference to Jan Marsalek.

 4   Q.   Can you remind us who Jan Marsalek is?

 5   A.   He was the CEO -- COO of the acquiring bank, Wirecard.

 6            MS. LA MORTE:  Let's go to page 46, Mr. Levine.

 7   Q.   Mr. Hargreaves, can you read your green chat all the way at

 8   the bottom.

 9   A.   We send to you all the application packs to a secure e-mail

10   address.

11   Q.   Who is that chat addressed to?

12   A.   Ruben.

13   Q.   Let's go to the top of page 47.  You say what next?

14   A.   Gotthardus@protonmail.CH.

15   Q.   What do you say next?

16   A.   You have log-ins for this e-mail drop.

17   Q.   Read your next two chats, please.

18   A.   It is a proton we set up to drop the apps in for Ruben's

19   team to access.  If you prefer, we can just send them to you

20   directly, question mark.

21   Q.   When you say, if you refer, we can just send them to you

22   directly, who are you directing that to?

23   A.   Ruben.

24   Q.   What is Ruben's response?

25   A.   It's not my Proton.  I thought that's a one time, and
```

 1   future apps to go to EU, as all the communication is there

 2   anyway.

 3   Q.  When Ruben references future apps go to EU, what is your

 4   understanding of his reference to EU?

 5   A.  To the e-mail account EUprocessing.

 6   Q.  He says, all the communication is there anyway?

 7   A.  That is correct.

 8          MS. LA MORTE:  Let's go to the top of page 48.

 9   Q.  What is Ruben's first full comment on that page?

10   A.  Please, to EU.

11   Q.  What do you say in response?

12   A.  Ruben, I'm going to advise my team to start sending all app

13   packs to EU, and we will cease and desist with the e-mail drop.

14   OK, question mark.

15          MS. LA MORTE:  Mr. Levine, let's go to page 65 of this

16   Government Exhibit 4004.

17   Q.  You see Ray's comment:  So that's three of our subs.  You

18   see where that starts toward the bottom of the page?

19   A.  Yes, I do.

20   Q.  Can you read that comment aloud.

21   A.  So that's three of -- three submerchants I've talked to so

22   far, and they all have clean payout info and can take euros,

23   too.

24   Q.  What is Ruben's response to this?

25   A.  Can you shoot this to EUP, underscore, question mark.

1   Q.  When Ruben says, EUP, what do you understand him to be

2   referring to?

3   A.  The e-mail account EUprocessing.

4          MS. LA MORTE:  Let's go to page 90 of Government

5   Exhibit 4004.

6          Mr. Levine, I'm sorry.  Can you go out of that because

7   I want to sort of straddle 90 and 91.

8   Q.  See on page 91 -- he can scroll down a little bit more.

9   What is the date that's indicated in the gray bubble?

10  A.  June 19, 2018.

11  Q.  Do you see Ray's comment, who is EUP?  Do you see that?

12  Towards the top.

13  A.  Yes, I do.

14  Q.  What is your response?

15  A.  EU equals Ruben.  Yes, they were sent last night.

16  Q.  When you say EU equals Ruben, what do you mean there?

17  A.  I'm referring to the e-mail account EUprocessing.

18  Q.  Now, you see there is a reference here to deleted account.

19  Do you see that?  The second comment bubble from the top.

20  A.  Yes, I do.

21  Q.  If you need to take a look at the page before or after,

22  that's fine, but who do you understand deleted account to be?

23  A.  Can I see the page before, please?  Thank you.  Could you

24  repeat the question.

25  Q.  Who do you understand the deleted account to be?

```
 1   A.  Ray's.

 2   Q.  Mr. Hargreaves, let's go to page 90.  Let me direct your

 3   attention to that second ghost icon.  You see where it appears

 4   on the second time on this page.  That's the first time.  You

 5   see where that appears?

 6   A.  Yes, I do.

 7   Q.  Can you read that aloud.

 8   A.  Confirming all forms for Linebeck, Organikals, Kalixa, ECP

 9   and WC have been sent to EUP.  They require wet signature.

10   We've also sent through our delivery report, which includes our

11   review on Webshield.  Have good evening, all.

12   Q.  What is Ray's response to this comment?

13   A.  Thank you very much, Kate.

14   Q.  Does that refresh your recollection as to who the deleted

15   account is?

16   A.  Yes, it does.

17   Q.  Who is the deleted account?

18   A.  It belongs to Kate Farmer.

19   Q.  Remind us who Kate Farmer is.

20   A.  My operations manager.

21           MS. LA MORTE:  Mr. Levine, can you put up 3919, which

22   is something that we have looked at before.

23   Q.  Let's start with this bottom e-mail.  Do you see the e-mail

24   on the bottom on May 10, 2018, at 6:05 p.m.?

25   A.  Yes, I do.
```

1    Q.  Which e-mail is this from?

2    A.  EUprocessing@protonmail.com.

3    Q.  Read the e-mail aloud, please.

4    A.  Hey, KF, please go ahead with the attached.  Best, EUP.

5    Q.  Does Kate respond to this e-mail?  Directing your attention

6    to the top.

7    A.  Yes, she does.

8    Q.  What does she say?

9    A.  Hi, Ruben.  We have already received these from Patrick

10   earlier this afternoon and completed all the WC application

11   forms with these details.

12   Q.  You can stop there.

13           And which e-mail address does Kate address this e-mail

14   to Ruben?

15   A.  EUprocessing@protonmail.com.

16           MS. LA MORTE:  Mr. Levine, can you take that down and

17   now display Government Exhibit 3923 in evidence.

18   Q.  Mr. Hargreaves, what is this?

19   A.  It's an e-mail from my ProtonMail account or e-mails from

20   my ProtonMail account.

21   Q.  What is the date of this e-mail?

22   A.  Top e-mail is dated May 21, 2018.

23   Q.  Take a look at a minute at this e-mail.  I am going to ask

24   you just the overall purpose of the e-mail.  If you need Mr.

25   Levine to scroll down, just ask.

1    A.  I think I'm clear.

2    Q.  I'm sorry --

3    A.  I think I'm clear.

4    Q.  What is the overall purpose of this e-mail?

5    A.  It's communication between Kate and EUP asking if there has

6    been any further feedback on application forms that were

7    presumably submitted to ECP, which is an abbreviation for

8    E-commprocessing, which is an acquiring bank in Europe.

9    Q.  Is that another acquiring bank that you arranged to submit

10   fraudulent applications to?

11   A.  Yes, it is.

12            MS. LA MORTE:  Let's start the e-mail May 15, 2018 at

13   10:59 a.m.

14            Mr. Levine, this e-mail spans two pages.  There we go.

15   Q.  Who do you understand the author of this e-mail to be?

16   A.  Kate Farmer.

17   Q.  Can you just read the portion that's on the top of the

18   screen, the portion of the e-mail on the top of the screen.

19   A.  Hi, EUP, re ECP applications, Hot Robots, Lorry, New Opal,

20   INTL STD.

21   Q.  Is INTL standard an abbreviation for something?

22   A.  For International Standard.

23   Q.  Just remind us, what are Hot Robots, Lorry, New Opal, and

24   International Standard?

25   A.  They are shelf companies that we acquired for inclusion

 1   within the fraudulent application packages.

 2   Q.  I believe you said Kate addressed this e-mail to EUP?

 3   A.  That's correct.

 4   Q.  Let's read the last paragraph of this e-mail.

 5   A.  Given the explanation above, please confirm current volumes

 6   stated on the ECP applications are acceptable.  Kind regards.

 7   KF.

 8   Q.  What do you understand Kate to be saying when she says

 9   please confirm the current volumes on the ECP applications are

10   acceptable?

11   A.  She is referring to the sections on the application forms

12   that request information on the dollar volumes that are

13   processed on a monthly basis on an application on behalf of a

14   merchant.  So the income that is generated by that merchant on

15   a monthly basis.

16   Q.  Let's scroll up then, up one e-mail.  Do you see where the

17   e-mail says, May 15, 2018 at 3:39 p.m.?

18   A.  Yes, I do.

19   Q.  From EUprocessing@protonmail.com?

20   A.  Yes, I do.

21          MS. LA MORTE:  Mr. Levine, can you blow up this

22   e-mail.

23   Q.  Can you read this e-mail aloud.

24   A.  Hey, KF.  The volumes are not acceptable as both banks

25   complain about it.  They are fine with volumes between 175 and

1    250K a month.  You can hold back for a moment as there might be

2    more changes.  All my best, Ruben.

3              MS. LA MORTE:  Mr. Levine, can you zoom out of that

4    and then go up.

5    Q.  You see, Mr. Hargreaves, there are two more e-mails above

6    the one that we just read.

7    A.  Yes, I see them.

8    Q.  Who were these two e-mails from on the top?

9    A.  They are from Kate Farmer.

10   Q.  Who does she address those e-mails to in the greeting?

11   A.  Do you mean in the body of the e-mail?

12   Q.  Yes.  I'm sorry the body of the e-mail.

13   A.  To EUP.

14   Q.  Is this typically how Kate addressed e-mails to Ruben,

15   using EUP?

16   A.  Not initially, but in the latter stages, yes.

17   Q.  Why is that the case?

18   A.  Because she was asked to.

19   Q.  Who asked her to?

20   A.  Ruben and myself.

21             MR. ARTAN:  Your Honor, move to strike as to what

22   Ruben told Kate.  Lack of foundation.

23             THE COURT:  How do you know that Ruben asked her as

24   opposed to yourself?

25             THE WITNESS:  To the best of my recollection, I

1    believe it was requested in a Telegram chat.

2            THE COURT:  From Ruben?

3            THE WITNESS:  I believe so, yes.

4            THE COURT:  Overruled.

5            MS. LA MORTE:  Mr. Levine, we can zoom out of that.

6    We can take that down.

7    Q.  Mr. Hargreaves, I now want to focus more on the fraudulent

8    application packs that your team prepared.  What acquiring

9    banks did your team prepare fraudulent application packs for?

10   A.  Sorry.  Could you repeat the question?

11   Q.  Sure.  Which acquiring banks did your team prepare

12   fraudulent applications for?

13   A.  Kalixa, Wirecard, E-commprocessing.

14   Q.  Did you select those acquiring banks?

15   A.  No, I did not.

16   Q.  Who directed you to prepare application packages for those

17   particular acquiring banks?

18   A.  Ruben.

19   Q.  To your knowledge, were these fraudulent application

20   packages actually submitted to the acquiring banks?

21   A.  To my knowledge, yes.

22   Q.  How do you know that?

23   A.  Because we submitted some of them directly.

24   Q.  Now, before the application packs were submitted to the

25   acquiring banks, were they reviewed by anyone outside of your

1  core team?

2  A.  Yes, they were.

3          MS. LA MORTE:  Mr. Levine, can we publish Government

4  Exhibit 4004.  Let's go to page 2.

5  Q.  Can you read your two comment bubbles towards the bottom of

6  the page, Mr. Hargreaves.

7  A.  Thanks.  We will acquire all new URLs today.  All existing

8  site updates have been completed and we aim to complete five

9  support sites by the weekend and 11 by the following weekend.

10         Hot Robot application pack is ready minus bank

11  reference letter and IBAN details.  Settlego informed us we

12  will have them Monday morning.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And what is -- who responds to your chat?

2   A.  Ruben Weigand.

3   Q.  And what does he say?

4   A.  "Let's submit Monday morning in that case.  If you want,

5   send through for review."

6   Q.  Okay.

7           MR. TAYBACK:  Objection, to the extent that the

8   document itself is cutoff.

9           MR. ARTAN:  Join.

10          THE COURT:  Yes.  Overruled.

11  BY MS. LA MORTE:

12  Q.  Okay.  We can take that down, Mr. Levine.

13          Let's look at some of the fraudulent application forms

14  that your team prepared and submitted to the acquiring banks.

15  Let's start with Wirecard.  Can you remind us where Wirecard is

16  headquartered?

17  A.  In Munich, Germany.

18  Q.  Mr. Levine, can you publish Government Exhibit 3925 in

19  evidence.

20          What -- Mr. Hargreaves, what is this?

21  A.  It's an e-mail from my personal e-mail account.

22  Q.  Mr. Hargreaves, who is it from?

23  A.  Kate Farmer.

24  Q.  And who is it to?

25  A.  EUprocessing.

1   Q.   And who do you understand that to be?

2   A.   Ruben.

3   Q.   And can you just read the greeting in the first line?

4   A.   "Hi EUP."

5   Q.   Next line also?

6   A.   "Please find completed forms for WC."

7   Q.   And then you see that there is a list under here.  The list

8   says side letter, agreement; do you see that list?

9   A.   Yes, I do.

10  Q.   And what do you understand, generally, this list to be?

11  A.   Components of the fraudulent application packs submitted on

12  behalf of the company Hot Robots.

13  Q.   And then take a look at the attachments that are indicated

14  on the bottom of the page; do you see them?

15  A.   Yes, I do.

16  Q.   How, if at all, do these attachments correlate with the

17  list that we were just looking at?

18  A.   They are the documents listed in the body of the e-mail.

19  Q.   Okay.  Mr. Levine, let's go to page 2, and we can just keep

20  it there for now.  Actually, let's blow up the top half.

21          Do you see where it says "client details,"

22  Mr. Hargreaves?

23  A.   Yes, I do.

24  Q.   What is the client name here?

25  A.   Hot Robots LTD.

 1    Q.  And then do you see where it says, the right-hand side,

 2    under "client details" towards the bottom, "Short description

 3    about the business model;" do you see that?

 4    A.  Yes, I do.

 5    Q.  Can you read that description?

 6    A.  "Research, copyrighting, data entry, proofrea."

 7    Q.  What do you understand the "proofrea" to be a reference to?

 8    A.  Proofreading.

 9    Q.  Is Hot Robots actually engaged in that particular business

10    that you just read aloud?

11    A.  No, it's not.

12    Q.  Do you see where it says "company website" on the top

13    right?

14    A.  Yes, I do.

15    Q.  Can you read aloud the websites here that are listed here?

16    A.  Osteofiles.com, mentaldossier.com, optoclear.net,

17    chirodocs.cc, shrinksmart.cc, psypapers.com.

18    Q.  Did your team design some or all of these websites?

19    A.  They designed all of the websites.

20    Q.  Okay.  We can zoom out of this.

21             And what is on the top, Mr. Hargreaves?  What's the

22    title of this document?

23    A.  Anti-fraud Merchant Checklist.

24    Q.  Okay.  Let's go to page 4.  Scroll down, Mr. Levine, to

25    page -- keep scrolling.  Great.

 1            Mr. Hargreaves, we're now on page 4 of the exhibit.

 2    Is this application signed?

 3    A.  Yes, it is.

 4    Q.  Now, let's take a look at some of the other representations

 5    on these Wirecard forms.

 6            Let's go to page 14 of this exhibit.

 7            Directing your attention to the upper right-hand side,

 8    Mr. Hargreaves, what does it state there on the very upper

 9    right?

10    A.  Contract.

11    Q.  What is stated below that?

12    A.  "On the acceptance of cards in card-not-present

13    transactions."

14    Q.  What are the card-not-present transactions?

15    A.  A transaction that is made by a cardholder not at a

16    brick-and-mortar shop; so, therefore, no -- particularly on a

17    website.

18    Q.  Okay.  So let's look at -- do you see where it says in the

19    middle, "director/board member/authorized representative"?

20    A.  Yes, I do.

21    Q.  Who is listed there?

22    A.  Joachim Cohen.

23    Q.  Do you know who Joachim Cohen is?

24    A.  No, I do not.

25    Q.  Have you ever communicated with this person?

1    A.   No, I have not.

2    Q.   According to this form, what country does this person

3    reside in?

4    A.   France.

5    Q.   To your knowledge, does this person have any affiliation

6    with Eaze?

7    A.   Not to my knowledge, no.

8    Q.   Do you see the e-mail that's listed on the right-hand side?

9    Do you see where it says "e-mail"?

10   A.   Yes, I do.

11   Q.   What is the e-mail that's listed there?

12   A.   Mk@esepa.biz.

13   Q.   I'm sorry, not that e-mail.  If you go up a little under

14   Director/Board Member/Authorized Representative section?

15   A.   Info@osteofiles.com.

16   Q.   Who created this e-mail address?

17   A.   My team.

18   Q.   Who manned it?

19   A.   My team.

20   Q.   And to your knowledge, was this e-mail here provided to

21   Joachim Cohen?

22   A.   No, it was not.

23   Q.   Okay.  Let's zoom out of this.  And now, let's go to page

24   25 of this Exhibit 3925.

25              Now, directing your attention, just for now, to the

1   very upper right-hand side, very upper right part of this

2   exhibit.  Do you see where it says -- can you read that?

3   A.  Special terms and conditions.

4   Q.  And keep reading?

5   A.  "For the acceptance of cards in card-not-present

6   transactions."

7   Q.  Okay.  So let's scroll down a little bit.  And do you see

8   where on the bottom right-hand side of the page where it says

9   section 6?

10  A.  I see that, yes.

11  Q.  Can you read the title, just the title of section 6?

12  A.  "Acceptance of payment cards by the merchant,

13  preconditions."

14  Q.  Okay.  You can zoom out of that.  And then scrolling down

15  to subsection 4, can you blow that up?  Thank you.

16          What does it say at the top here?

17  A.  Prohibited Card Transactions.

18  Q.  And can you read subsection 4(a)?

19  A.  "The claim to be paid" --

20  Q.  Sorry.  Let me pause you.  Start with what's next to the

21  No. 4 and then read the (a).

22  A.  "The merchant shall not allow card transactions if, (a) the

23  claim to be paid does not originate from the merchant's course

24  of business, but from the business operations of any third

25  parties or related to goods or services which the merchant does

1    or did not render for its own account."

2    Q.  Mr. Hargreaves, is this provision implicated in connection

3    with this Hot Robots' Wirecard application?

4              MR. TAYBACK:  Objection, lack of foundation.

5              MR. ARTAN:  Join.

6              THE COURT:  I'm sorry, repeat the question.

7              MS. LA MORTE:  I said, is this provision of this

8    application implicated in the Hot Robots Wirecard application,

9    which is what this document is.

10             THE COURT:  Sustained.

11   BY MS. LA MORTE:

12   Q.  Mr. Hargreaves, who was the merchant that's listed in this

13   Wirecard application?

14   A.  Could we scroll back to the top, please?  Hot Robots

15   Limited.

16   Q.  Now, could you go back to page 26.

17             So I believe you just said the merchant that's listed

18   on the Wirecard application is Hot Robots; is that correct?

19   A.  Yes, I did.

20   Q.  Now, based on your participation in the scheme, what

21   transactions were intended to be run through this Hot Robots

22   merchant processing account?

23   A.  Transactions made on the Eaze website.

24   Q.  Would transactions originated on the Eaze website originate

25   from the Hot Robots' course of business?

1   A.  No, they would not.

2   Q.  So, Mr. Hargreaves, taking a look at all of these Wirecard

3   documents, is there any mention of Eaze in any of these

4   documents?  And if you need to scroll through, that's fine, or

5   you can use the binder.

6   A.  No, they were not.

7   Q.  Is the fact that Eaze transactions were intended to be run

8   through the Hot Robots' merchant processing account disclosed

9   anywhere on these forms?

10  A.  No, they were not.

11  Q.  Okay.  We can take that down, Mr. Levine.  And now can we

12  put back up Government Exhibit 4004.

13          Mr. Hargreaves, is this the Olliebaba chat that we

14  were looking at before?

15  A.  Yes, it is.

16  Q.  Okay.  Mr. Levine, can you go to page 50 of this exhibit.

17          Do you see, Mr. Hargreaves, sort of a little beyond

18  halfway down there's a comment from Ray that begins "so

19  darling;" do you see that?

20  A.  Yes, I do.

21  Q.  Can you read that -- we're going to read these comments to

22  the bottom of the page.  Can you read that comment?

23  A.  "So darling, tell me what's gonna be submitted when I wake

24  up?"

25  Q.  And who responds?

1   A.  Ruben.

2   Q.  What does he say?

3   A.  "I'll check now what we got."

4   Q.  And what does Ray say in response?

5   A.  "Def Hot Robots at WC, right?"

6   Q.  And what does Ruben say in response?

7   A.  "WC is not working today, but we can hand it in."

8   Q.  Keep going.

9   A.  Ray responds, "But what else can we get done?  It's fine."

10  Let's hand it in.  "Let's hand in."  Sorry.

11  Q.  So do you see the -- scroll up a little, Mr. Levine.

12          Do you see where Ray says "def Hot Robots at WC,

13  right?"

14  A.  Yes, I do.

15  Q.  What does that -- what do you understand that to be a

16  reference to?

17  A.  He's saying definitely hand in the Hot Robots' application

18  into Wirecard, right?

19  Q.  And going back to Government Exhibit 3925, was that a Hot

20  Robots' Wirecard application package?

21  A.  Yes, it was.

22  Q.  Now, let's go to page 51.  And let's start with Ray's

23  comment in the middle of the page, where it begins "Okay, now."

24  Can you read that?

25  A.  "Ok.  Now what about the other three corps and packs?

1   Where are we with that?  Why can't we also submit them to WC

2   and Kalixa?"

3   Q.  Keep going.

4   A.  "Ruben???"

5   Q.  Does Ruben respond?

6   A.  "Yep?"

7   Q.  What else does he say?

8   A.  "We'll submit all we have of course."

9   Q.  And what does Ray say?

10  A.  "Okay, thank you.  Christian."

11  Q.  Sorry, keep going.

12  A.  "Christian, please put time aside to look at them really

13  good so we don't make stupid mistakes and so we know they're

14  right before they're submitted."

15  Q.  Mr. Hargreaves, what do you understand Ray and Ruben to be

16  discussing here?

17          MR. ARTAN:  Objection.  Calls for speculation.

18          MR. TAYBACK:  Objection.  Joined.

19          THE COURT:  Overruled.

20  Q.  You can answer, Mr. Hargreaves.

21  A.  They're discussing application packs and submis- -- sorry

22  they're discussing fraudulent application packs and the

23  submission of those to the banks, Wirecard and Kalixa.

24  Q.  And at the bottom, when Ray says "Christian, please put

25  time aside to look at them really good so we don't make stupid

mistakes and so we know they're right before they're

submitted," what do you understand that to mean?

A.  He's -- the message is directed to a gentleman called

Christian Chmiel, and he's asking them to review the

application.  Ray is asking him to review the application packs

to make sure there's no stupid mistakes before they're

submitted.

Q.  Okay.  Now, let's go to page 55 of Government Exhibit 4004.

Okay.  Let's start, do you see the first full comment

that begins with "regardless"?

A.  Yes, I do.

Q.  Whose comment bubbles are these?

A.  They are Ray's.

Q.  Can you read that comment and the following comments?

A.  "Regardless we just need Christians to decide what we think

is best.  We take Kalixa's input, but this going to WC and has

to be tailored for them.  But I do think it's important to give

them absolutely no reason to look due to anything not

matching."

Q.  Okay.  So when Ray says in the comment above the one that

was highlighted, "we take Kalixa's input but this is going to

WC," what do you understand that to mean?

A.  He's referring to the fact that these are two different

acquiring banks with two different sets of views, sets of

criteria for reviewing and deciding whether to approve or

1     decline a merchant application.  Therefore, although Kalixa's

2     feedback should be taken into consideration, we should bear in

3     mind that Wirecard is a different acquiring bank, and we need

4     to tailor the fraudulent application pack to meet that bank's

5     specific set of criteria.

6     Q.  And then in the highlighted comment, Ray says "but I do

7     think it's important to give them absolutely no reason to look

8     due to anything not matching," what is your understanding of

9     what that means?

10    A.  To make sure that the application packages can be all that

11    it can be to avoid any additional scrutiny that could lead to

12    being declined.

13    Q.  And, Mr. Levine, we can take that down.

14            Mr. Hargreaves, were additional Wirecard applications

15    that were submitted on behalf of the shell companies in

16    relation to the Eaze scheme?

17    A.  Yes, there was.

18            MR. ARTAN:  Objection.  Lack of foundation as to what

19    was actually submitted for the --

20            MR. TAYBACK:  Join.

21            THE COURT:  Overruled.

22    Q.  Mr. Hargreaves, were there additional wire applications

23    submitted to the shell companies in the Eaze scheme?

24    A.  Yes, there was.

25    Q.  I direct your attention to the binder, which I think is

1    probably quicker.  Let me --

2    A.  Which binder?

3    Q.  The 3900 binder.

4    A.  I have it.

5    Q.  So I'd like you to take a look at government exhibits in

6    evidence 3926, 3927 and 3928 to look at those first?

7    A.  Yes, I have them open.

8    Q.  Have you looked at those, 3926, 3927, 3928?

9    A.  Yes, I have.

10   Q.  And then the other one to look at is 3938.

11   A.  Yes, I have.

12   Q.  What are these documents?

13   A.  The coverings of the first page of each section is our

14   e-mails taken from my ProtonMail account.

15   Q.  And what are the attachments generally with respect to each

16   of these exhibits?

17   A.  They're the documents contained within fraudulent

18   application packages submitted to Wirecard.

19          MR. ARTAN:  Your Honor, pardon me.  They're not on our

20   screen.

21          MS. LA MORTE:  I'm going to put them on.  I'm trying

22   to be efficient and have him look and identify them before I

23   put them up one by one.  But I'm happy to do it whatever way

24   the Court prefers.  They are all in evidence.

25          THE COURT:  Yes, they're in evidence.  I'm not quite

1  sure what this heavy dispute about the parties amounts to, but

2  now it's on the screen.  Yes, do you have it on your screen

3  now?

4          MR. ARTAN:  Just now, your Honor.

5          THE COURT:  So what's the objection?

6          MR. ARTAN:  I was hoping to be able to watch it.

7          THE COURT:  I'm sorry?

8          MR. ARTAN:  I just want to be able to see it.

9          THE COURT:  Okay.  Well, now you can, yes.

10         MR. ARTAN:  Yes, thank you.

11         THE COURT:  Yes.

12 BY MS. LA MORTE:

13 Q.  Mr. Hargreaves, what is displayed on the screen, 3926?

14 A.  It's an e-mail from my ProtonMail account.

15 Q.  And what is the title?

16 A.  International Standard WC additional forms.

17 Q.  And what's attached to this e-mail?

18 A.  Documents included in the fraudulent application pack

19 submitted to Wirecard on behalf of the shell company

20 International Standard.

21 Q.  Okay.  Let's put on 3927, please.

22         MR. ARTAN:  Your Honor, move to strike.  It doesn't

23 say it was submitted.

24         MS. LA MORTE:  Your Honor, I --

25         MR. TAYBACK:  Join.

```
 1              THE COURT:  I'm sorry.  Are you talking about -- it's
 2     in evidence.
 3              MS. LA MORTE:  Your Honor, a few moments ago you
 4     overruled an objection --
 5              THE COURT:  Yes, yes.
 6              MS. LA MORTE:  -- to my question.
 7              THE COURT:  I do not understand the objection, but in
 8     any event, to the extent there is a further objection or motion
 9     to strike, that motion is denied.
10     BY MS. LA MORTE:
11     Q.  Okay.  Mr. Hargreaves, I believe 3927 is on your screen
12     now?
13     A.  Yes, it is.
14     Q.  Can you explain to us what this is?
15     A.  An e-mail from my ProtonMail account.
16     Q.  And what is the title?
17     A.  Lorry LTD WC additional forms filled.
18     Q.  Remind us what Lorry is?
19     A.  It's a shell company acquired for a fraudulent application
20     about to be submitted to the acquiring bank Wirecard.
21     Q.  And what are the attachments to this document, generally?
22     A.  They are documents that are to be included within the
23     fraudulent application pack.
24     Q.  And let's go to 3928.  You identified New Opal earlier as a
25     shell company that was used in connection with the Eaze scheme;
```

1  is that right?

2  A.  That is correct.

3  Q.  And what does generally the attachments to 3928 reflect?

4  A.  Documents included within the fraudulent application pack

5  submitted on behalf of New Opal Limited, a shell company

6  purchased, as you mentioned, for inclusion within the

7  fraudulent application pack to Wirecard.

8  Q.  And then lastly, 3938?  And you see the reference here on

9  the top of Linebeck?

10 A.  Yes, I do.

11 Q.  What is Linebeck?

12 A.  Another shell company.

13 Q.  And what is generally attached to this e-mail?

14 A.  They are the documents included within the fraudulent

15 application pack submitted to Wirecard.

16          MR. ARTAN:  Objection.  Objection.  There's nothing in

17 the e-mail that says that these documents were actually

18 submitted.

19          THE COURT:  I understand that.  You made that

20 objection a minute ago, and that is grounds for

21 cross-examination.  But particularly in view of the fact that

22 the count here is conspiracy, that objection is overruled.

23 Q.  Now, Mr. Hargreaves, a moment ago you recall that we went

24 through a number of representations on the Hot Robots' Wirecard

25 application forms; do you recall that?

1    A.  Yes, I do.

2    Q.  And do you recall that we -- that you identified

3    representations as false; do you recall that?

4    A.  Yes, I do.

5    Q.  Now, we just looked at four other fraudulent application

6    packs for other shell companies in Government Exhibits 3926,

7    3927, 3928 and 3938.  Do each of these Wirecard applications

8    contain false representations?

9    A.  Yes, they do.

10   Q.  Are each of the Wirecard applications signed?

11   A.  Yes, they are.

12   Q.  And you can take a look, or we could put something on the

13   screen.  Maybe we should.  Mr. Levine, can you scroll down.

14   Keep going.  Keep going.  I'm not finding it on this one, but

15   you can take this down, Mr. Levine.

16        Mr. Hargreaves, was there someone on your team who was

17   responsible for obtaining signatures on the fraudulent

18   application packages?

19   A.  Yes, there was.

20   Q.  Who had that responsibility?

21   A.  Michele Furlan.

22   Q.  Did Michele make any comments in that regard?

23   A.  Yes, he did.

24   Q.  What did he say?

25   A.  He commented that his mother was very good at copying

SOUTHERN DISTRICT REPORTERS, P.C.

 1     signatures.

 2     Q.  Now, Mr. Hargreaves, did the defendant Ray Akhavan provide

 3     input on the content of these applications?

 4     A.  Yes.

 5     Q.  And how about the defendant Ruben Weigand, did he provide

 6     input on the contents of these applications?

 7     A.  Yes, he did.

 8     Q.  Mr. Levine, can we put up side by side Government

 9     Exhibit 4004 and Government Exhibit 3928.

10             Okay.  Now, on Government Exhibit 4004, can we go to

11     page 55.  Can we do that when they're side by side?  And then

12     on Government Exhibit 3928 can we go to page 2.

13             Okay.  So on Government Exhibit 4004, Mr. Hargreaves,

14     which should be on the left side of your screen, do you see

15     that, the Olliebaba chat?

16     A.  Yes, I do.

17     Q.  Can you read -- do you see where Ray starts commenting "and

18     on that note"?

19     A.  Yes, I do.

20     Q.  It's like the third chat down on the page?

21     A.  Yes, I do.

22     Q.  Okay.  Can you read Ray's chats there?

23     A.  "And on that note, I also think we should raise the

24     expected limits to at least up to 1M.  If we get stuck and

25     don't get new accounts added fast, we are fucked.  We might as

1    well overstate and under deliver cuz compliance won't have as

2    much problem with that as the vice versa.  Sending not enough

3    is a sales dept issue whereas sending too much becomes a

4    compliance problem."

5    Q.  And then what is your response?  What are your two comments

6    in response?

7    A.  "We've put up to 50M and variance of this per month on the

8    WC apps with actual volume being 1M per month.  This was the

9    strategy, right, Christian?"

10   Q.  And then looking at page 2 of Government Exhibit 3928, do

11   you see under "client details" where it says "volume in sales

12   per month"?

13   A.  Yes, I do.

14   Q.  What does it state there?

15   A.  M25 to M50 EUR.

16   Q.  Okay.  Let's go to page 57 of the Olliebaba chat.  And then

17   you see on the top of the chat, you see the picture of

18   Christian Chmiel?

19   A.  Yes, I do.

20   Q.  And then you see where your comment is on that first bubble

21   "OH.  This was the right strategy, Christian?"

22   A.  Yes, it is.

23   Q.  Does Christian respond?

24   A.  Yes, he does.

25   Q.  What does he say?

 1   A.  "Yes," exclamation, and then he asks Ruben, "Any

 2   objections?"

 3   Q.  Does Ruben respond?

 4   A.  He does, yes.

 5   Q.  What does he say?

 6   A.  "No objections."

 7   Q.  Okay.  Let's now go to page 70 of the Olliebaba chat, and

 8   let's go to page 1 of Government Exhibit 3928.

 9           Now, Mr. Hargreaves, you see in the Olliebaba chat, do

10   you see where it says May 23rd, 2018?

11   A.  Yes, I do.

12   Q.  Can you read your two chats below there?

13   A.  "All docs for WC and ecom and reports have been e-mailed to

14   EUP.  Ruben, can you get the ISO to complete the anti-fraud

15   section.  TKS."

16   Q.  And then going to Government Exhibit 3928, what is the date

17   of this?

18   A.  May the 23rd, 2018.

19   Q.  And then it says "Hi, EUP.  Please find completed forms for

20   WC;" do you see that?

21   A.  Yes, I do.

22   Q.  And what e-mail address is it sent to?

23   A.  EUprocessing@ProtonMail.com.

24   Q.  Okay.  We can take these both down.  Okay.  So let's now

25   talk about Ecom Processing.  Can you remind us what Ecom

1    Processing is?

2    A.   It's a European acquiring bank.

3    Q.   Do you know where it's based?

4    A.   Bulgaria.

5    Q.   Do you know who the owner of Ecom Processing is?

6    A.   I know his first name.

7    Q.   What is it?

8    A.   Yani.

9    Q.   And I believe you identified Ecom Processing as one of the

10   acquiring banks that fraudulent application packs were

11   submitted to?

12   A.   That's correct.

13   Q.   Mr. Levine, can you display Government Exhibit 3942.

14        Okay.  Looking at the top, "ECP wet signed Johnson

15   Greenteacha;" do you see that at the very top of the e-mail?

16   A.   Yes, I do.

17   Q.   What is the reference to ECP there?  Is that the acquiring

18   bank?

19   A.   Yes, it's an abbreviation for Ecom Processing.

20   Q.   And what does wet signed mean?

21   A.   It means it has to be signed by hand.

22   Q.   What is Johnson Greenteacha, what is that a reference to?

23   A.   Johnson is a reference to a shell company that we acquired

24   from Johnson NYC, and Greenteacha, Greenteacha I should say, is

25   a fictitious website that we created as part of the application

1    pack for Johnson NYC referenced in that subject line.

2    Q.  And can you read the body of the e-mail aloud?

3    A.  "Hi EUP.  ECP application form for Johnson NYC completed

4    with wet signature attached for you.  Kalixa to follow.  Kind

5    regards.  Kate."

6    Q.  And then you see the attachment on -- listed there?

7    A.  Yes, I do.

8    Q.  Okay.  So let's now go to the attachment itself.  Right

9    there.  Perfect.

10           Mr. Hargreaves, what is this?

11   A.  This is a -- it's a merchant processing application and

12   agreement from Ecom Processing, the acquiring bank we've just

13   been discussing.

14   Q.  All right.  Let's go to page 3 of this document.  Okay.

15           Do you see -- let's blow up, Mr. Levine, the top sort

16   of like three boxes, the top half-ish.  Yes, there you go.

17           So what is the company name that's listed here?

18   A.  Johnson NYC LTD.

19   Q.  And who is listed as the beneficial owner of this company

20   on this document?

21   A.  Vanessa Benko.

22   Q.  Do you know this person?

23   A.  No, I do not.

24   Q.  Do you have any knowledge if this person is affiliated with

25   Eaze in any way?

1    A.   No, I don't believe she is affiliated with Eaze.

2    Q.   And according to this application, where does she reside?

3    A.   In France.

4    Q.   And according to this application form, where is Johnson

5    NYC located?

6    A.   In Liverpool in the north of England.

7    Q.   Okay.  So let's go to page 4 of this document.  Great.

8             So we're looking at the business overview section.  Do

9    you see that?

10   A.   Yes.  Yes, I do.

11   Q.   So you see sort of halfway down the page it says

12   "description of product services"?

13   A.   Yes, I do.

14   Q.   What does it say there?

15   A.   "Powdered Japanese green tea."

16   Q.   What does this reflect?

17   A.   This section reflects the product sold by the website.

18   Q.   Does Johnson NYC actually sell powdered Japanese green tea?

19   A.   No, it does not.

20   Q.   Now, you see that there, on the right-hand side, a little

21   up a little more on the right-hand side, there's a customer

22   service phone number?

23   A.   Correct.

24   Q.   Did your team have responsibilities for obtaining customer

25   service phone numbers?

1   A.  Yes, we did.

2   Q.  Can you explain that, or elaborate on what your team did?

3   A.  We purchased customer service numbers to be placed on the

4   fraudulent websites.

5   Q.  And did you arrange for there to be a customer service in

6   any way?

7   A.  We did initially, yes.

8   Q.  How did you do that?

9   A.  We found a customer service company in Europe.  We

10   contracted their services, and we trained them, provided them

11   with scripts, provided them with escalation process and

12   protocol of how to answer questions, and when the questions

13   went beyond their scope, how to then escalate that to a member

14   within our internal team.

15   Q.  Okay.  And then at the top under "business overview," do

16   you see the applicant website?

17   A.  Yes, I do.

18   Q.  What is that?

19   A.  Greenteacha.com.

20   Q.  Is this a website that your team developed?

21   A.  Yes, it is.

22   Q.  Was this website real or fictitious?

23   A.  It was fictitious.

24   Q.  So you see then on the right-hand side of this chart, under

25   "business overview," do you see where it says "desire

1    descriptor merchant name to appear on card statement"?

2    A.   Yes, I see that.

3    Q.   What is the merchant descriptor that is indicated here?

4    A.   Greenteacha.

5    Q.   And so, Mr. Hargreaves, based on your participation in the

6    scheme, what transactions were going to be funneled through

7    the -- this Johnson NYC merchant processing account?

8    A.   Transactions made on the Eaze website.

9    Q.   And then with respect to those Eaze customers, what could

10   they expect to see on their card statements?

11   A.   Greenteacha.com.

12   Q.   If there any mention of Eaze anywhere on this exhibit?

13   A.   No.

14   Q.   Mr. Hargreaves, throughout the course of your testimony,

15   we've discussed several shell companies that your team

16   purchased for use in the Eaze scheme; do you recall that?

17   A.   Yes, I do.

18   Q.   Were applications on behalf of each of these shell

19   companies submitted to Ecom Processing, as well?

20   A.   Yes, they were.

21   Q.   And based on your participation in the scheme, what

22   transactions were intended to be run through those Ecom

23   Processing merchant processing account?

24   A.   Transactions from the Eaze website.

25   Q.   Was that disclosed anywhere on the Ecom Processing

1   application form?

2   A.  No, it was not.

3   Q.  We can take that down.

4          All right.  Mr. Hargreaves, you identified one Kalixa

5   as the third acquiring bank that your team prepared application

6   forms for; do you recall that?

7   A.  Yes, I do.

8   Q.  What is Kalixa?

9   A.  It's an acquiring bank based in Europe.

10  Q.  Do you know where in Europe it's based?

11  A.  Vienna.

12  Q.  Vienna?

13  A.  Vienna, that's correct, to the best of my knowledge.

14  Q.  Okay.  Mr. Levine, can you display Government Exhibit 3955.

15         Mr. Hargreaves, what is this?

16  A.  This is an e-mail from my ProtonMail account.

17  Q.  And do you see the subject line at the top?

18  A.  Yes, I do.

19  Q.  What does that say?

20  A.  "Re: Updated MAF Kalixa."

21  Q.  What is your understanding of what that refers to?

22  A.  It's an updated merchant application form going into

23  Kalixa.

24  Q.  Okay.  And the date of this e-mail?

25  A.  July 16th, 2018.

 1   Q.  Who do you understand it to be from?

 2   A.  Michele Furlan.

 3   Q.  Now, Do you see where it says "to"?

 4   A.  Yes, I do.

 5   Q.  It says Marty25@ProtonMail.CH?

 6   A.  Yes, I see that.

 7   Q.  Do you know who that refers to?

 8   A.  No, I don't.

 9   Q.  And then on the cc line, you're there; is that right?

10   A.  Yes, I am.

11   Q.  Kate Farmer, is she there?

12   A.  Yes, she is.

13   Q.  Is Ruben in here?

14   A.  Yes.

15   Q.  And then you see where it says esepa@ProtonMail.com?

16   A.  Yes.

17   Q.  Do you know who utilized that address?

18   A.  I don't know that I have names of others.

19   Q.  That's fine.  Just that e-mail?

20   A.  No, I do not know.

21   Q.  And do you see frostdeakan@ProtonMail.com?

22   A.  I do not know who that is.

23   Q.  And then can you just read the first two lines of the

24   e-mail?

25   A.  "Hi.  All signed and scanned attached."

1    Q.  And then let's look at the attachments that are listed on

2    the bottom here.  Do you see that?

3    A.  Yes, I do.

4    Q.  What are these attachments?

5    A.  They are application forms for Johnson NYC, Lorry Limited,

6    International Standard and Linebeck and New Opal, for the

7    application forms for Kalixa.

8    Q.  Okay.  So let's take a look at just one of these.  We'll

9    take Linebeck as an example.

10            Mr. Levine, can you go to page 20 of this exhibit,

11   3955.

12            Mr. Hargreaves, is this a merchant application form

13   for Kalixa?

14   A.  Yes, it is.

15   Q.  And what is the name of the -- what shell company is this

16   application form on behalf of?

17   A.  Linebeck Limited, LTD.

18   Q.  Now, you see under this company detail section there's a

19   URL?

20   A.  Yes, I do.

21   Q.  What is the URL?

22   A.  HTTPS://orkanikals.store.

23   Q.  Is this one of the websites that your team devised?

24   A.  Yes, it is.

25   Q.  Is it truthful or is it fraudulent?

1   A.   It's fraudulent.

2   Q.   And then you see where it says on the bottom form, the

3   bottom of the company says "form completed by"?

4   A.   "ISO Partner ESEPA."

5   Q.   Okay.  So let's go to page 22.  Now, you see in the center

6   box where it says "services/activities"?

7   A.   Yes, I do.

8   Q.   And you see in that first row, "main company

9   activities/nature of the business"?

10  A.   Yes, I do.

11  Q.   What is listed there?

12  A.   "Custom skincare products online."

13  Q.   Does Linebeck -- is this true or is this fabricated?

14  A.   It's fabricated.

15  Q.   Does Linebeck have any custom skin products for sale

16  online?

17  A.   No, it doesn't.

18  Q.   Does Linebeck operate any type of business transactions

19  whatsoever?

20  A.   No, it does not.

21  Q.   Is Eaze disclosed -- and you can take a look at all these

22  application forms, if you like.  Is Eaze disclosed on any of

23  these Kalixa application forms?

24  A.   No, it's not.

25  Q.   And based on your participation in the scheme, what

1    transactions were intended to be run through the Kalixa

2    merchant processing accounts for these shell companies?

3    A.  Transactions from the Eaze website.

4    Q.  Okay.  We can take this down.

5           Mr. Hargreaves, so we just walked through a number of

6    fraudulent application packs that you and your team prepared

7    for Wirecard, Ecom Processing and Kalixa.  So in connection

8    with preparing these application packages, would you and your

9    team have questions from time to time?

10   A.  Yes, we would.

11   Q.  And who would you typically direct those questions to?

12   A.  Ruben.

13   Q.  And were there times when you submitted application

14   packages, and you learned that they needed to be revised in

15   some fashion?

16   A.  Yes, there were times like that.

17   Q.  And who typically communicated that information to you?

18   A.  Ruben did.

19   Q.  Mr. Hargreaves, who did you understand had control over the

20   merchant processing accounts for the shell companies?

21   A.  I would say Ruben.  I'd have to presume Ruben and Ray.

22          MR. ARTAN:  Objection, speculation.

23          MR. TAYBACK:  Join.

24          THE COURT:  Sustained.

25   Q.  Okay.  Let's take a look at some of your communications on

 1   these topics.

 2             Mr. Levine, can you display Government Exhibit 3959?

 3             Mr. Hargreaves, what is this?

 4   A.  It's an e-mail from my ProtonMail account.

 5   Q.  Who is the e-mail from?

 6   A.  Michele Furlan.

 7   Q.  And who is it directed to?

 8   A.  EUprocessing@ProtonMail.com.

 9   Q.  Who do you understand that to be?

10   A.  Ruben.

11   Q.  Okay.  Can you read the subject line of this e-mail?

12   A.  "Re:  First feedback Kalixa for Johnson NYC."

13   Q.  So a few moments ago we actually looked at a portion of

14   Johnson NYC's Kalixa application; do you recall that?

15   A.  Yes, I do.

16   Q.  So let's look at the e-mail on the bottom, where it begins

17   on July 23rd, 2018, at 11:03 a.m.; do you see that?

18   A.  Yes, I do.

19   Q.  From EUprocessing?

20   A.  Yes.

21   Q.  Can you read that e-mail aloud?

22   A.  "Hey, we have a request from the bank according to Johnson

23   NYC.  'The product is USDA certified as per the information in

24   the footer.  Please provide a proof that it has been verified

25   by a USDA-accredited certifying agent.'  Is this something you

```
 1   can provide?  Best EUP."

 2   Q.  Who do you understand to be the author of this e-mail?

 3   A.  Ruben.

 4   Q.  And do you see the portion that you read in quotes?

 5   A.  Yes.

 6   Q.  What do you understand the quotations to reflect?

 7   A.  Comments from somebody within Kalixa.

 8   Q.  And then does Michele respond to the e-mail?

 9   A.  Yes, he does.

10   Q.  What does he say?

11   A.  "Hi, the product doesn't exist in the first place; so we

12   cannot provide any certification.  We can remove those claims

13   from the site if you are okay with that."

14   Q.  Is that accurate, that the product doesn't exist?

15   A.  Yes, it is.

16   Q.  Okay.  We can take that down.  Mr. Levine, can you now

17   publish Government Exhibit 3908.

18            Mr. Hargreaves, what is this?

19   A.  These are e-mails from my ProtonMail account.

20   Q.  Okay.  So what -- can you read aloud the subject line of

21   the e-mail?

22   A.  "Re:  New Settlego app for Hot Robots limited/Ref 8884."

23   Q.  What is Settlego?

24   A.  It's a settlement bank.

25   Q.  What do you mean by that?
```

1   A.   It's a company that provides settlement accounts, as I

2   mentioned earlier, business accounts specifically for -- well,

3   not specifically, but mostly for merchants in this case, the

4   website businesses.

5   Q.   Were settlement accounts established for each of the shell

6   companies that were used in the Eaze scheme?

7   A.   Yes, they were.

8   Q.   And who typically -- who generally was responsible for

9   obtaining those accounts?

10  A.   My team in conjun- -- with guidance from Ruben.

11  Q.   Okay.  So let's start with the e-mail towards the bottom of

12  the first page, May 2nd, 2018 at 14:17.  Who do you understand

13  this e-mail to be from?

14  A.   Kate Farmer.

15  Q.   Can you read the e-mail aloud?

16  A.   "Hi Daniel, Shahrukh.  Sorry to chase, please can you

17  provide an update on expected ETA for this application.  Kind

18  regards KF."

19  Q.   Okay.  You can zoom out of that.  And who do you understand

20  Daniel and Shahrukh to be?

21  A.   Daniel and Shahrukh are employees of the company Settlego.

22  Q.   And then you see more e-mails up from Kate, from Daniel?

23  A.   Yes, I do.

24  Q.   Can you read that aloud?

25  A.   "Hi, I responded to Ruben the introducer yesterday.  Please

SOUTHERN DISTRICT REPORTERS, P.C.

1   see him for feedback.  Thanks, Daniel."

2   Q.  Who do you understand the reference to Ruben to be in here?

3   A.  To Ruben Weigand.

4   Q.  And let's now go to the top e-mail.  Who do you understand

5   to have written this e-mail?

6   A.  Kate Farmer.

7   Q.  And what is -- how does she respond?

8   A.  "Hi Daniel.  Thank you.  Will speak with Ruben.  Kind

9   regards KF."

10  Q.  We can take that down.

11          Mr. Hargreaves, did you, in fact, learn that there

12  were communications with Ruben regarding Settlego?

13  A.  Yes, I did.

14  Q.  Mr. Levine, can you put on the screen Government

15  Exhibit 3910.

16          Can you read the subject line of this e-mail?

17  A.  "FW: re: bank app beneficiary/receipt info."

18  Q.  And then the first e-mail on the top, can you just read

19  that e-mail?

20  A.  "Beneficiaries FYI.  However, I am concerned this will

21  raise a likely red flag at Settlego.  With different

22  merchants/corporations submitting same beneficiaries through

23  same ISO."

24  Q.  And is Settlego the settlement bank that we were just

25  discussing before?

1   A.  Yes, it is.

2   Q.  Okay.  We can come out of that.  So now, let's go to page

3   2.  The e-mail dated May 1st, right above the chart.  May 1st,

4   2018 at 11:27?

5   A.  I see it.

6   Q.  Can you read the greeting and the text portion up to when

7   the chart appears?

8   A.  "Hi, EUP.  We are completing the IBAN/bank application form

9   for the corporation Lorry LTD.  There is information required

10  on receipts and beneficiaries, copy of Hot Robots' app below.

11  Do you have guidance on what we should complete for Lorry

12  Limited?"

13  Q.  What is your understanding as to who Kate is addressing

14  this e-mail to?

15  A.  She's addressing to Ruben.

16  Q.  Okay.  Now, let's go to page 1.  Hold on one sec.  Can you

17  scroll down, Mr. Levine?  Okay.  I'm sorry, I meant one e-mail

18  up.  Can you go an e-mail up from the e-mail we just read?

19       What is Ruben's response?  Can you read it aloud?

20  A.  "We are currently checking with Settlego.  Hope to have

21  info tomorrow.  Best, EUP."

22  Q.  Okay.  We can take down this exhibit.  Okay.  Mr. Levine,

23  can we put up Government Exhibit 3911.

24       What is the subject of this e-mail?

25  A.  "Settlego applications."

1   Q.  And who is the e-mail from?

2   A.  Kate Farmer.

3   Q.  And who do you understand she addresses it to?

4   A.  Ruben at EUprocessing.

5   Q.  Okay.  So now, let's look at the body of the e-mail.  Can

6   you read aloud the e-mail from the beginning through the end of

7   point one?

8   A.  "Hi EUP.  I wanted to highlight two concerns we have on the

9   current Settlego applications.  No. 1, we are moving

10  Soniclogistix.com from Lorry Limited to Opal Limited.  We have

11  already submitted Lorry Limited application to Settlego showing

12  Soniclogistix.  It will be clear the same domain has appeared

13  on a new company.  Lorry Limited submitted Settlego application

14  is also showing the other, now redundant, URLs on it

15  –deliverax.com logisbutr.com.  How do you want to handle this

16  with Settlego?"

17  Q.  What is your understanding what the concern is here?

18  A.  That they were moving one website that has been linked with

19  a company that apparently has nothing to do with another

20  company, and we're moving the website owned by one company to

21  another company, and the bank would have already seen this

22  application with the websites attached to the former company.

23  Q.  Okay.  And then point 2, can you read that aloud?

24  A.  "Beneficiaries.  The list is limited and it will be clear

25  to Settlego that we are repeating same beneficiaries across

1   different corporations.  This will likely be a red flag for

2   their compliance team.  Let me know how you would like to

3   handle both items.  Thank you, KF."

4   Q.  What do you understand Kate to be addressing these Settlego

5   questions to?

6   A.  To Ruben.

7   Q.  Okay.  And now, let's go to 3923, please.  Now, let's go to

8   page 2.  This is something we looked at before, and we're going

9   to start with the e-mail on the bottom of page 2.  Can you read

10  this aloud?

11  A.  "Dear all, please find attached completed Ecom Processing

12  application forms for:  Hot Robots LTD, Lorry LTD,

13  International Standard LTD, and New Opal LTD.  This completes

14  deliverables for all items requested.  Kind regards, KF."

15  Q.  Okay.  We can zoom out of that.  And let's go up one e-mail

16  to May 15th, 2018.  Who do you understand to have authored this

17  e-mail?

18  A.  EUprocessing, Ruben.

19  Q.  Can you read the e-mail aloud?

20  A.  "Dear KF, could you please adapt all the apps to

21  250K/month?  On page 6, could you please add: ISO: esepa GmbH,

22  PSP: Inoviopay?  Thanks and all my best, EUP."

23  Q.  Okay.  Let's zoom out of that and go up one e-mail to the

24  bottom of page 1, and just -- I just need you to read the

25  greeting.  What's the greeting?

1    A.   "Hi EUP."

2    Q.   And now read the very last sentence in this e-mail?

3    A.   "Given the explanation above, please confirm current

4    volumes stated on the ECP applications are acceptable.   Kind

5    regards, KF."

6    Q.   And who do you understand Kate to be addressing this

7    request to?

8    A.   Ruben.

9    Q.   Now, let's go up one more e-mail to 3:39 p.m., right there.

10   And can you read aloud the body of this e-mail?

11   A.   "Hey KF.   The volumes are not acceptable as both banks

12   complain about it.   They are fine with the volumes between 175

13   and 250K a month.   You can hold back for a moment as there

14   might be more changes.   All my best, Ruben."

15   Q.   And we can take that down.

16           THE COURT:   All right.   Counsel, find a good place to

17   stop for the day.

18           MS. LA MORTE:   Your Honor, I think if I do one more

19   document, then that will be a good place to stop.

20           THE COURT:   Go ahead.

21   BY MS. LA MORTE:

22   Q.   Okay.   Government Exhibit 3935.

23           Mr. Hargreaves, what's the subject of this e-mail?

24   A.   "Orkanikals/Linebeck Kalixa application."

25   Q.   And can you remind us what Orkanikals/Linebeck refers to?

1   A.  Orkanikals is a fictitious website created by my team, and

2   Linebeck is a shell company acquired by my team for inclusion

3   within a fraudulent application pack to be submitted in this

4   case to Kalixa, an acquiring bank in Europe.

5   Q.  What is the date of the e-mail?

6   A.  June  18, 2018.

7   Q.  Who do you understand it to be from?

8   A.  Kate Farmer.

9   Q.  Who is she directing it to?

10  A.  Michele and myself and Tima.

11  Q.  Who is Tima?

12  A.  A member of Michele's team.

13  Q.  Okay.  Let's read aloud the body of the e-mail.

14  A.  "Hi Michele.  Okay reviewed and amendments we have

15  communicated are:  more description for the site.  Amend

16  transaction count to align to roughly 250K per month.  State

17  ATV and EUR, rather than USD.  Bank details to be supplied by

18  Ruben.  Have stated to be supplied for now.  Kate."

19  Q.  Who does Kate relay to the team is going to supply the bank

20  details?

21  A.  Ruben.

22  Q.  Is this consistent with your understanding of Ruben's role

23  in the scheme?

24  A.  Yes, it is.

25          MS. LA MORTE:  Your Honor, this is a good stopping

1    point.

2              THE COURT:  Very good.  All right, ladies and

3    gentlemen, you put in a very full day.  Thank you again.

4    Tomorrow we will go back to our normal schedule; so we will

5    start at 9:45.  So be in the jury room a few minutes before

6    then, and we'll continue then, and have a very good evening.

7              (Jury not present)

8              THE COURT:  All right.  Please be seated.  So I think

9    we should probably start at 9:00 tomorrow to deal with any and

10   all remaining issues that we weren't able to dispose of today.

11   How much longer do you have?

12             MS. LA MORTE:  I would say like two hours, at the

13   outer limits.

14             THE COURT:  Two hours?

15             MS. LA MORTE:  I don't want to underestimate, your

16   Honor.  I think I'll be done before then, but I got through a

17   lot.  I got through a lot.  It's just some of the chats take a

18   little bit of time putting on the screen and then focusing on

19   the chats, but that would be the outer --

20             THE COURT:  Well, of course, how you try your case is

21   entirely up to you, and the jury, to their great credit, paid

22   attention throughout the afternoon.  I cannot say the same was

23   true for me.

24             MS. LA MORTE:  I hear you, your Honor.

25             THE COURT:  All right.  Very good.  We'll see you
     tomorrow.          (Adjourned to 9:00 a.m., on March 9, 2021)

INDEX OF EXAMINATION

Examination of:                                    Page

OLIVER HARGREAVES

Direct By Ms. La Morte . . . . . . . . . . . 673

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

7 . . . . . . . . . . . . . . . . . . . . 691

4105 . . . . . . . . . . . . . . . . . . . 696

8 . . . . . . . . . . . . . . . . . . . . 699

4102 and 106 . . . . . . . . . . . . . . . 711

S2 . . . . . . . . . . . . . . . . . . . . 716

101, 102, 103, 104 and 105 . . . . . . . . 723

101-105 . . . . . . . . . . . . . . . . . 724

4013, 4001, 4002, and 4004-4012 . . . . . 738

4106 . . . . . . . . . . . . . . . . . . . 744

5 . . . . . . . . . . . . . . . . . . . . 745

Exhibit 3971, 3902-3968, and 3970 . . . . . 749

4108 . . . . . . . . . . . . . . . . . . . 754