L39PWEI1                        Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          20-CR-188 (JSR)

RUBEN WEIGAND and
HAMID AKHAVAN,

                Defendants.             Trial

------------------------------x

                                        New York, N.Y.

                                        March 9, 2021
                                        9:00 a.m.


Before:

                    HON. JED S. RAKOFF,

                                        District Judge


                        APPEARANCES

AUDREY STRAUSS
        United States Attorney for the
        Southern District of New York
BY:  NICHOLAS FOLLY
        TARA MARIE LA MORTE
        EMILY S. DEININGER
        Assistant United States Attorneys

DECHERT LLP
        Attorneys for Defendant Weigand
BY:  MICHAEL J. GILBERT
        SHRIRAM HARID
        ANDREW J. LEVANDER
        STEPHEN PELLECHI
        -and-
MICHAEL H. ARTAN
        Attorney for Defendant Weigand

L39PWEI1                         Trial

                            APPEARANCES CONTINUED

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
        CHRISTOPHER TAYBACK
        SARA CLARK
        MARI HENDERSON
        DEREK SHAFFER
        PAUL SLATTERY
        -and-
ROTHKEN LAW FIRM LLP
        Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
        JARED R. SMITH


            (Trial resumed; jury not present)

            THE COURT:  Please be seated.  All right.  Mr. Akhavan

is not yet here?

            MR. TAYBACK:  He is not here yet, your Honor.

            THE COURT:  But I assume we can discuss evidentiary

issues even in his absence, yes?

            MR. TAYBACK:  Yes.

            THE COURT:  All right.  Very good.

            All right.  So first, there is the defense motions

regarding the alleged spoliation of Hargreaves' phone data, and

I don't need further argument on this because it's been fully

briefed, and I thank both sides for their briefs.  The part of

the motion that gives the defense leave to re-call

Mr. Hargreaves on their case, but as a hostile witness and,

therefore, subject to effectively cross-examination on direct

at that point, regarding -- and solely regarding -- the iPad

1   data that was produced for the first time last Wednesday, that

2   portion of the motion is granted.

3         The further motion to impose sanctions and/or to give

4   a jury instruction for an adverse inference is denied.

5         Now, there's a second motion regarding Mr. Hargreaves,

6   and this is the defense intention to cross-examine him

7   regarding a conversation he had with Mr. Weigand in May of 2019

8   at which time Mr. Hargreaves was operating as a cooperator and

9   was recording the conversation but Mr. Weigand did not know

10  this.

11        And I allowed the defense to refer to this on opening

12  statement because it seemed to me that, based on the defense

13  representations, that Mr. Weigand had made exculpatory remarks

14  that was evidence of his intent at a time when he still

15  believed that Mr. Hargreaves' relationship to him was not that

16  of a cooperator.

17        However, I've now seen the transcript of the phone

18  conversation, and I'm not as clear that it really meets the

19  defense suggestion.  There is a question put by Mr. Hargreaves:

20  "Are you still dealing with the -- with the group that the

21  traffic -- that we were trying to deal with?"  And both sides

22  agree that that's a reference to Eaze.  The response is, from

23  Mr. Weigand, "Possibly.  I know that there's still -- there's

24  some guys that I know or that I introduced.  They are taking

25  care of it.  I've seen...hosting and phone numbers and all of

1    that.  So this is -- became to my attention and...because this"

2    and then there's unintelligible further words.

3          Mr. Hargreaves then says:  "You should beware on that

4    note..."  "In June, you know, we wanted to hand this over to

5    you.  Yeah.  We're not doing -- providing this service to

6    anyone anymore, and we wanted to hand this over to you when" --

7    and Mr. Weigand interrupts and says:  "So this is -- so you're

8    shutting this operation down."

9          Mr. Hargreaves says:  We're not.  It's just -- we've

10   just -- we're just refocused and we're really -- and I am --

11   iMerchant Pay Direct is purely going to be focused on our

12   banking relationship.

13         And Mr. Weigand says:  "Okay.  So once it's -- once

14   the thing is, there is -- I don't -- I would really need to

15   check, but there was initial payment and then I was made

16   aware."

17         And Mr. Hargreaves says:  "Your domain renewals all

18   came up."

19         And then Mr. Hargreaves further says:  "When it comes

20   to June, it needs to come -- basically -- look, whoever we're

21   communicating with -- honest, whoever's been dealing with it,

22   they're fully aware of all of this, but I am just letting you

23   know.

24         Then Mr. Weigand replies:  "Check with our guys so

25   that they can take it over."

1             And finally, Mr. Weigand says:  "So...take over so I'm

2      not operationally involved at all, but I've rearranged some

3      people; so that's -- okay.  I'll make sure that they are

4      properly aware."

5             Now, maybe I'm missing something, and I'll hear from

6      counsel in a moment, but the -- it seems to me that the most

7      he's saying is that he's no longer personally involved, but he

8      has other people who are handling the Eaze situation, and that

9      doesn't seem to be exculpatory in the same sense it was

10     originally suggested.  And it certainly is, as you can tell

11     from just my reading, confusing.

12            So let me hear from defense counsel and then from

13     government counsel.

14            MR. ARTAN:  Thank you, your Honor.  Well, I'll

15     start --

16            THE COURT:  I should note for the record that

17     Mr. Akhavan is now here.

18            MR. ARTAN:  I'll start with the end and address the

19     last thing that you said.  The fact that it's confusing, I

20     don't think is a limitation on what the defense wants in the

21     sense that --

22            THE COURT:  Well, first of all, it's obviously

23     hearsay; so it can't come in for its truth.  So it comes in, if

24     at all, as bearing on the state of mind of your client, but if

25     the jury doesn't have a rational basis for inferring anything

1    about the state of mind of your client from this conversation

2    because it's confusing, that would be a reason not to admit it.

3         MR. ARTAN:  Well, the point I'm making is if something

4    is susceptible to two different interpretations, then that's a

5    question that --

6         THE COURT:  I agree, that's a separate point.  The

7    fact that there are differing interpretations would not be a

8    reason for excluding it.  But if it's just hopelessly confused,

9    that would be.

10        MR. ARTAN:  Well, I would respectfully say it's not

11   hopelessly confused.  The fact is that Mr. Weigand is basically

12   saying he's not operationally involved at all, which I think we

13   can infer can mean that he hadn't been, and that he's

14   rearranged some people, which is the idea that he made

15   introductions, which is a theme that's come up in other

16   witnesses.

17        And, for instance, in the first witness, Michael

18   Tassone, he was saying that his contact was Andreas and Medhat

19   and not our client, and Mr. Hargreaves is painting a very

20   different picture.  The picture that Mr. Hargreaves is

21   portraying is inconsistent with this statement by our client.

22        THE COURT:  Well, are you suggesting this constitutes

23   withdrawal?

24        MR. ARTAN:  No, your Honor.

25        THE COURT:  So if he says that he was originally

 1   involved, but he's no longer operationally involved, and we

 2   take that most favorably to you, what does that show that is

 3   exculpatory?

 4           MR. ARTAN:  Well, your Honor, our interpretation is

 5   that he was never operationally involved, which is consistent

 6   with what Mr. Tassone had said.

 7           THE COURT:  Well, how do you reach that when the

 8   conversation begins with Mr. Hargreaves saying:  Are you still

 9   dealing with the group that we were trying to deal with?

10   Mr. Weigand says:  Possibly.  I knew that there's still some

11   guys that I know or that I introduced.  They are taking care of

12   it.

13           And so how is that consistent with your theory that he

14   was never involved?

15           MR. ARTAN:  I'm not saying he was never involved, your

16   Honor.  There's a big difference between introducing people and

17   having some minimal involvement at the beginning of a process,

18   and being involved throughout the process, which is what

19   Mr. Hargreaves suggests.

20           The way Mr. Hargreaves has portrayed this situation is

21   everything is Ruben, Ruben, Ruben, and I would suggest that

22   that's not the case and that that's not really what fits with

23   the other witness in the case, Mr. Tassone.

24           THE COURT:  I have your point.  Let me hear from the

25   government.

1          MS. DEININGER:  Yes, your Honor.  The defendants in

2     their opening arguments stated that they wanted to introduce

3     this for the idea that Mr. Hargreaves attempted to solicit

4     inculpatory statements and got nothing.  But that's simply not

5     what happened here.  He, in fact -- from the government's point

6     of view, this call is actually inculpatory, and he confirmed

7     his --

8          THE COURT:  If you think it's inculpatory, then you're

9     delighted to have it come in, right?

10         MS. DEININGER:  We have made the decision that we do

11    not intend to introduce it in our case in chief for a variety

12    of reasons, but I do think that the call confirms his knowledge

13    of the scheme and his involvement of it.  In fact, there's a

14    reference of having "our guys take care of it."

15         But I think more importantly, the portion that defense

16    seems to be focused on here, which is the statement that

17    Mr. Weigand is not operationally involved but I have rearranged

18    some people, that is only a reflection of his state of mind if

19    you accept it for the truth, that he was not operationally

20    involved and he's rearranged some people.  And that is not a

21    valid non-hearsay purpose.

22         I'd also argue that there is an -- that it is a very

23    confusing call, with the back and forth and the amount that's

24    unintelligible, and that introducing it, even if it was a

25    reflection of his then-present state of mind under 8033, would

1    be unduly prejudicial because of the extent to which it's mixed

2    with description of past events and the difficulty in

3    understanding the back and forth.

4           THE COURT:  Well, I hear what you're saying, and I

5    think it's a point I want to hear from the defense in a minute,

6    about the not operationally involved at all is being offered,

7    in effect, for its truth.

8           But at least as I understood it when the defense first

9    raised this before opening statements, what they were saying

10   was it also shows state of mind because here we have a

11   cooperator who is giving leading questions, who's trying to

12   suck Mr. Weigand into making admissions and, instead, what he

13   gets is non-admissions, on the defense view.

14          However, if that's the defense position, then even if

15   I let it in, they could not argue to the jury, you see, he's no

16   longer operationally involved because that would be using it

17   for its truth, not for his state of mind.  But what they could

18   argue, arguably, is the context.  This is a cooperator.  He's

19   trying to get admissions, and he doesn't get them.

20          So okay, there's going to be a colloquy among counsel

21   here.

22          MS. LA MORTE:  A mask.

23          THE COURT:  You wanted to say something more?

24          MS. DEININGER:  No, no.  I'm sorry.

25          THE COURT:  Let me go back to defense counsel.

1            MR. ARTAN:  Well, your Honor, I would suggest that the

2      Court's question to the government is consistent with what

3      we're trying to say, that -- I mean, the conversation is

4      such -- well, first, there was nothing regarding bank fraud in

5      the conversation, but moving back to the Court's observation,

6      the critical thing here is, your Honor, that the context is

7      critical in the sense that --

8            THE COURT:  In some ways I'm a little surprised that

9      you want this in for the following reason.  You can't argue for

10     the truth of any of the statements made.  You can only argue,

11     as I indicated, for state of mind.  They, the government, can

12     argue for the truth.

13           So if they view this as really inculpatory, as a

14     mincing admission, but an admission notwithstanding that,

15     they're going to be able to argue that, if I allow this in.

16     You are not going to be able to argue, oh, no, he wasn't

17     operationally involved.  So I just want to make sure you

18     understand that if we go further down this road.

19           MR. ARTAN:  I do understand that, your Honor.  I

20     appreciate that, but there has been some emphasis on the fact

21     that the context is important, and I think the defense view has

22     been strengthened by the way Mr. Hargreaves has been

23     testifying; in essence, saying that Ruben Weigand is

24     responsible for everything, every e-mail is him, everything

25     that's going on is him, everything, everything, everything.

L39PWEI1                    Trial

1              And if Mr. Weigand was giving, let's say admittedly a

2      confusing statement, this would have been the perfect

3      opportunity for Mr. Hargreaves to say, yeah, well, what about

4      all the stuff you did, all the operational stuff you did?  Or

5      even when he says, I'm no longer operational, oh, well, when

6      did you stop that?  Nothing along the lines of what you would

7      expect from a cooperator who's trying to get admissions from

8      the target of investigation.

9              The fact is when Mr. Weigand says I'm no longer

10     operationally involved, I rearranged some people, and I'll just

11     pass it on, there's no follow up because the witness actually

12     knows that Mr. Weigand really never was operationally involved,

13     that Mr. Weigand --

14             THE COURT:  So that's an interesting point.  You're

15     saying the very questions that were put by Mr. Hargreaves are,

16     you think, inferentially exculpatory?

17             MR. ARTAN:  Yes.

18             THE COURT:  Because a cooperator would have put more

19     pointed questions.  I mean, I think that's not an impossible

20     argument.  I can think the government might well argue and

21     maybe elicit from Mr. Hargreaves, if we allow this in, that I

22     was just being much more delicate because I didn't want to tip

23     him off that I was cooperating, which I would have if I'd given

24     something more explicit.  But, you know, that's a jury

25     question.

1          All right.  I'm going to allow it in.  I'm going to

2     allow it in, and I will instruct the jury, when you offer it,

3     that nothing that's being said is being offered for the truth

4     but just for state of mind.  The government, by contrast, can

5     use it for its truth, if you feel it's inculpatory, and I will

6     let the jury know that, if you go down that line.

7          MS. DEININGER:  Your Honor, I just wanted to raise one

8     additional point, which is that my understanding is that the

9     defense is seeking to use this information to impeach

10    Mr. Hargreaves and I'm --

11         THE COURT:  No, I don't think it's necessarily to

12    impeach Mr. Hargreaves.  It is to establish or try to establish

13    that their guy was so uninvolved and innocent, that when even

14    asked by a secret cooperator, how about this, he didn't give

15    the answers you would have expected someone who was involved in

16    the conspiracy to give.  I think that's the argument.  I don't

17    think that's necessarily impeachment.  Maybe it is, but it's

18    also independent evidence of state of mind.

19         All right.  Let's see what else we have.  So I think

20    another issue that was raised is when the government introduces

21    Mr. Weigand's post-arrest statement, portions of it, the

22    defense wanted to include other portions under the rule of

23    completeness.

24         I think the defense really exaggerates the scope of

25    the rule of completeness.  This is designed to deal with things

1    like someone introduces half a sentence and not the other half

2    of a sentence.  It doesn't open the door to pages and pages of

3    what is otherwise clearly hearsay just because the government

4    is offering something.

5         The only portion so far -- I'll hear from defense

6    counsel in a minute -- that really I think might be admissible

7    under the rule of completeness is after the agent says: "You

8    understand English and speak English, right?" And Mr. Weigand

9    says:  "I'm okay-ish, I think."  And it seems to me that the

10   defense is entitled to have that as context so they can, if

11   they wish, argue, well, he didn't really understand the

12   question, or something like that, if they want to make that

13   argument.

14        So I would allow in, subject to hearing from the

15   government, that question and answer, but I don't see anything

16   else that would come in under the rule of completeness.

17        So let me hear from defense counsel and then from

18   government counsel.

19        MR. ARTAN:  Your Honor, I could address it briefly

20   from memory.  I didn't realize we'd be talking about it this

21   morning; so I don't have the transcript handy.

22        THE COURT:  Oh, okay.  We can postpone it.  This won't

23   come up for a while anyway; so we can take this up at the next

24   break or something like that.

25        MR. ARTAN:  That would be great.  Thank you, your

L39PWEI1                     Trial

 1 | Honor.

 2 |         THE COURT:  All right.  Very good.  All right.  That's

 3 | all on my list.  Is there anything else anyone else wanted to

 4 | raise?

 5 |         MS. LA MORTE:  Not from the government.

 6 |         MR. TAYBACK:  Not at this time for Mr. Akhavan.

 7 |         THE COURT:  All right.  Very good.  So it's 9:30.

 8 | We'll take a break.  Everyone should be back here at 9:45, and

 9 | if the jury's here, we'll bring them right up at that time.  So

10 | I'll see you then.

11 |         (Recess)

12 |         THE COURT:  Please be seated.  Although, I think the

13 | jury is just about to come.

14 |         MR. FOLLY:  Your Honor, should we bring the witness

15 | in?

16 |         THE COURT:  Yes, please.

17 |         THE LAW CLERK:  Jury entering the courtroom.

18 |         (Jury present)

19 |         THE COURT:  Please be seated.  Good morning, ladies

20 | and gentlemen, and thank you, as always, for your great

21 | promptness.  And unless I am mistaken, there is a little hint

22 | of spring in the air; so -- but we've got important work to do

23 | here.  So let's continue.

24 |  OLIVER HARGREAVES,

25 | DIRECT EXAMINATION (Resumed)

1    BY MS. LA MORTE:

2    Q.  Good morning, Mr. Hargreaves.

3    A.  Good morning.

4            MS. LA MORTE:  Your Honor, at this time, the

5    government offers Weigand Exhibit 28, which is an audio file.

6    The parties have stipulated to the authenticity of this audio

7    file and, in addition, we would just offer 28T to be offered to

8    the jury for a demonstrative exhibit.

9            THE COURT:  Received for those purposes.

10           (Defendant's Weigand Exhibit 28 received in evidence)

11           MS. LA MORTE:  Your Honor, I'm going to -- Mr. McLeod

12   is not available right now; so I'm going to proceed, and when

13   he enters back in the courtroom to play the exhibit, we'll do

14   it at that time.

15           THE COURT:  Okay.

16           MS. LA MORTE:  Apparently, he's back.

17           Mr. McLeod, can you publish for the jury Weigand 28T,

18   starting at page 3, line 14.  And then, Mr. McLeod, as soon as

19   you're ready, if you could play Weigand Exhibit 28 beginning at

20   this portion and then playing through page 7, line 3,

21   corresponding to Weigand Exhibit 28T.

22           (Audio played)

23           MS. LA MORTE:  Thank you, Mr. McLeod.

24   BY MS. LA MORTE:

25   Q.  Mr. Hargreaves, did you hear that?

1    A.  Yes, I did.

2    Q.  Do you recall this call?

3    A.  Yes, I do.

4    Q.  Who were the participants in the call?

5    A.  Myself and Ruben Weigand.

6    Q.  Roughly when did this call occur?

7    A.  In -- in May -- May 2019.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Was that before your arrest or after your arrest?

2  A.  After my arrest.

3  Q.  Was this while you were cooperating with the government?

4  A.  Yes, it was.

5  Q.  At this time were you more actively involved or less

6  actively involved in the Eaze scheme?

7  A.  Less actively involved.

8        MS. LA MORTE:  Mr. McLeod, if you could just publish

9  28-T, again for the jury.  I will direct you to page 3, lines

10  16 to 17.

11  Q.  Mr. Hargreaves, do you see that?

12  A.  Yes, I do.

13  Q.  CS here, based on your recollection of this call, is that

14  referring to you?

15  A.  Yes, I am -- yes, it is.  Excuse me.

16  Q.  It states here:  Are you still dealing with the -- with the

17  group that the traffic -- that we were trying to deal with?

18        Generally speaking, what does that refer to?

19  A.  Eaze.

20  Q.  Thank you.

21        MS. LA MORTE:  We can take that down, Mr. McLeod.

22  Thank you very much.

23  Q.  Mr. Hargreaves, when we left off yesterday we were looking

24  at communications involving a number of participants, including

25  Ruben.

1                Do you recall that?

2    A.  Yes, I do.

3                MS. LA MORTE:  Mr. Levine, can you publish Government

4    Exhibit 4004 in evidence.  Please go to pages 83 and 84.

5    Q.  Let's start with the date.  Do you see the date in the gray

6    bubble on the top?

7    A.  Yes, I do.

8    Q.  What is that date?

9    A.  June 12, 2018.

10   Q.  Can you read the comments on this page.

11               MS. LA MORTE:  Actually, your Honor, may I have

12   permission for Mr. Hargreaves to read the comment to the

13   deleted account and myself to read the comments ascribed to

14   Mr. Weigand.  Thank you.

15   Q.  Mr. Hargreaves, I am going to ask you to read the comments

16   of the deleted account, and I will read the comments of Mr.

17   Weigand.

18   A.  "Can I check if you have any comments/amendments on the

19   completed WC forms we have sent through?  We are holding off

20   securing wet signatures until we have your confirmation and

21   would like to proceed soonest."

22   Q.  "Hey, am checking with the bank."

23   A.  "Great.  Thank you."

24   Q.  "Hey, all.  Hot Robots is associated to the last business

25   model at WC.  I tried to push, but I don't see this to be

1   successful at all.  You've prepared Hot Robots WC apps before

2   and they've been submitted and declined, so coming up with

3   another business model doesn't seem to be a great idea."

4           MS. LA MORTE:  Thank you, Mr. Levine.  Actually, you

5   can stay on page 83.

6   Q.  Just to remind us, Mr. Hargreaves, the references to WC in

7   here, what do you understand them to be references to?

8   A.  Wirecard.

9           MS. LA MORTE:  Mr. Levine, you can take that down.

10  Q.  Mr. Hargreaves, we have looked at a number of

11  communications yesterday pertaining to banks.  Do you recall

12  those communications, generally?

13  A.  Yes, I do.

14  Q.  Did you or any member of your team have access to the

15  merchant processing accounts that you prepared fraudulent

16  applications for?

17  A.  No, we did not.

18  Q.  Was your team privy to merchant account transactional

19  records, such as bank statements or the like, from the merchant

20  processing accounts?

21  A.  To which merchant accounts are you referring?

22  Q.  Pertaining to the shelf company merchant processing

23  accounts.

24  A.  No, we did not.

25  Q.  We are going to take a look at one additional communication

1   on this.

2          MS. LA MORTE:  Mr. Levine, can you put up on the

3   screen and publish Government Exhibit 3956.

4   Q.  Mr. Hargreaves, what is this?

5   A.  This is an e-mail from my ProtonMail account.

6   Q.  Who do you understand it to be from?

7   A.  It's from the email account EUprocessing.

8   Q.  Who do you understand that to be?

9   A.  Ruben.

10  Q.  Can you read the e-mail aloud, please.

11  A.  "Hey, we got some feedback from Kalixa on Linebeck.  The

12  following is needed."

13  Q.  Actually, let me pause you there.  When it states, "we got

14  some feedback from Kalixa on Linebeck," quickly remind us what

15  Kalixa is.

16  A.  Kalixa is an acquiring bank in Europe.

17  Q.  What about Linebeck?

18  A.  It's a shelf company that my team acquired for inclusion

19  within the a fraudulent application pack to be submitted to the

20  aforementioned bank.

21  Q.  You can continue reading the portion in quotes.

22  A.  "At the same time, we'd like to request some additional

23  documents/items we were not able to locate in the original

24  attachment:  Log-in details for the web page, financial record

25  or business plan.  Could you please take care of that."

1    Q.   Directing your attention to the portion in quotes, what do

2    you understand Ruben to be quoting here?

3    A.   Feedback from the bank, Kalixa.

4    Q.   Then it states on the bottom:  "Financial record or

5    business plan.  Can you please take care of that."

6            Did you and your team in fact take care of that?

7    A.   Yes, we did.

8    Q.   Did you provide a business plan for any of the shelf

9    companies to Weigand?

10   A.   Yes, we did.

11           MS. LA MORTE:  Mr. Levine, can you put up and publish

12   on the screen Government Exhibit 3958.

13   Q.   Mr. Hargreaves, what's the subject of this e-mail?

14   A.   Johnson NYC and Linebeck business plans.

15   Q.   Who is the e-mail from or who do you understand it to be

16   from?

17   A.   Michele Furlan.

18   Q.   Who do you understand it to be directed to?

19   A.   Ruben at EUprocessing, Marty25@protonmail, myself, and Kate

20   Farmer.

21   Q.   Do you see the attachments on the bottom?

22   A.   Yes, I do.

23   Q.   What are these attachments?

24   A.   Business plans for two websites or two e-commerce

25   businesses we created.

1         MS. LA MORTE:  Mr. Levine, let's go to page 18 of this

2    exhibit.

3    Q.  Mr. Hargreaves, can you read this aloud.

4    A.  Organikals business plan.

5    Q.  Who created this?

6    A.  My team.

7    Q.  Why?

8    A.  Because it was requested.

9    Q.  Who requested it?

10   A.  Ruben did.

11   Q.  Is this a real business plan or a fake business plan?

12   A.  It's a fake business plan.

13        MS. LA MORTE:  Let me direct your attention to page

14   20, Mr. Levine.  You can highlight the whole thing.  That's

15   fine.

16   Q.  Mr. Hargreaves, you see in the middle where it says company

17   ownership?

18   A.  Yes, I do.

19   Q.  Can you read aloud the first line.

20   A.  Organikals is an e-commerce website business operated by

21   Linebeck Ltd.

22   Q.  Under that it says daily operations.  Do you see that?

23   A.  Yes, I do.

24   Q.  Then there is a list of sorts under these daily operations,

25   is that right?

1   A.  A list of what?

2   Q.  A list of sorts underneath daily operations, is that

3   correct, or no?

4   A.  Yes, there is a list.

5   Q.  Could you just read aloud the first four lines of this

6   list.

7   A.  "The hours of business will be 24/7 and closed on all major

8   holidays.  All contact will be based online.  We will perform

9   most of these functions on a daily basis."

10  Q.  Then underneath, just read the next two lines.

11  A.  "Checking invoices against payments, purchasing inventory."

12  Q.  Were any of these operations actually performed?

13  A.  No, they were not.

14          MS. LA MORTE:  Let's go to page 24 of this exhibit,

15  Mr. Levine.

16  Q.  Mr. Hargreaves, you see market analysis summary there?

17  A.  Yes, I do.

18  Q.  Was there any market analysis that was actually done?

19  A.  No.

20          MS. LA MORTE:  Let's zoom out of that and go to page

21  29, Mr. Levine.

22  Q.  Mr. Hargreaves, do you see here where it says financial

23  plan?

24  A.  Yes.

25  Q.  Was there any sort of financial plan that was actually

1   created and implemented?

2   A.  No.

3            MS. LA MORTE:  We can zoom out of that.  Mr. Levine,

4   let's just briefly go to page 2 of this exhibit.

5   Q.  Mr. Hargreaves, what is this?

6   A.  It's a fictitious business plan created for one of our

7   fictitious websites, greenteacha.

8   Q.  Was that one of the fictitious websites that you and your

9   team created?

10  A.  Yes, it was.

11           MS. LA MORTE:  We can take those down, Mr. Levine.

12  Thank you.

13  Q.  I want to discuss a few other aspects of the Eaze scheme,

14  Mr. Hargreaves.  Earlier in your testimony you mentioned

15  Webshield.  Do you recall that?

16  A.  Yes, I do.

17  Q.  Can you remind us what Webshield is.

18  A.  It is a software as a service provided to acquiring banks,

19  specifically the compliance departments of acquiring banks.  It

20  is a software that allows them to enter the details of all of

21  the contents of a merchant application pack, allowing them to

22  assess effectively whether they wish to accept or decline the

23  merchant application pack for which the details have been

24  entered into this software system.

25  Q.  Was Webshield used in connection with the Eaze scheme?

1   A.  Yes, it was.

2   Q.  Can you describe how so.

3   A.  We were given access to the software allowing us to examine

4   the quality of the application packs that we were creating

5   through a similar -- with a similar eye as that of a compliance

6   department within a bank.  We were able to improve them based

7   on the scoring that we were seeing within the software.

8   Q.  Whose product was Webshield?  Who owned that product?

9   A.  The owner, to my understanding, was a man called Christian

10  Chmiel.

11          MS. LA MORTE:  Mr. Levine, can you put up Government

12  Exhibit 4004 in evidence.

13  Q.  Mr. Hargreaves, this is the Olliebaba chat that we have

14  looked at before?

15  A.  Correct.

16          MS. LA MORTE:  Mr. Levine, can you go to page 18,

17  please.

18  Q.  Mr. Hargreaves, directing your attention to the very top,

19  the gray bubble, can you read that.

20  A.  "Ray CE invited Christian Chmiel."

21  Q.  Let's read these chats.  Just to remind everyone, which of

22  these chats are yours?

23  A.  My chats are in the green bubbles.

24  Q.  Can you read your chats and then I will read Christian

25  Chmiel chats.

1   A.  "Christian, nice to meet you."

2   Q.  "Pleasure to meet you.  Let me know if you have questions."

3   A.  "Many thanks and lots, exclamation mark.  If you can

4   provide me with some log-ins to Webshield, that would be a

5   great start and then if we can arrange a call for tomorrow,

6   that would be ideal or at your earliest convenience."

7   Q.  When you were asking Christian Chmiel to provide some

8   log-ins to Webshield, what do you mean by that?

9   A.  I am asking him to provide us with account access to the

10   Webshield software suite.

11          MS. LA MORTE:  Let's go to page 19, please.

12   Q.  I will start reading Christian Chmiel's chat and then you

13   can read your chat.

14          "Perfect.  Sounds good."  Then Ray says -- what does

15   Ray say there?

16   A.  "Agreed."

17   Q.  I'm sorry.  Did you see where I was reading,

18   Mr. Hargreaves?  "Perfect, sounds good."

19   A.  Excuse me.  "God, I'm happy now.  Should have done this

20   before."

21   Q.  Then what do you say?

22   A.  "Agreed."  Smiley face.

23   Q.  Let's go to page 12 of 13.  You see Ray's comment right

24   underneath IRS.  You say:  "Hi, Ray."  You see that?

25   A.  Yes.

1   Q.  Can you please read Ray's comments through that first

2   bullet point on the third comment.

3   A.  "Take a look at this, please, and let's discuss."

4   Q.  Keep going.

5   A.  "Please delete it.  Please don't keep it.  It is super

6   important to delete after as it's a Webshield report."

7   Q.  Read the next part.

8   A.  "Gents, here the results of the checks.  Hot Robots

9   Limited.  Problematic merchant name as there is a binary/forex

10  scam out there operated by Hot Robots Limited.  Web link."

11  Q.  You could stop there.  That's fine.

12          Going back up to the chat attributable to Ray that you

13  just read, you see where it says, "please delete it, please

14  don't keep it, it's super important to delete after as it's

15  Webshield report"?

16  A.  Yes, I do.

17  Q.  What do you understand him to mean by that?

18  A.  He's telling me it's important to delete the Webshield

19  report that he has provided me.

20  Q.  Why is that?  What is your understanding as to why it would

21  be important to delete that?

22  A.  Because it's a report that somebody who does not work in

23  the compliance department of an acquired bank should not have

24  access to.

25          MS. LA MORTE:  Let's go to page 16, Mr. Levine.

1   Q.  Let's start with your comment at the top, Mr. Hargreaves,

2   and you can read your comments and I will read the Ray CE

3   comments.  OK?

4   A.  Yes.

5   Q.  Go ahead.

6   A.  "Reviewing now.  Will ping you shortly."

7   Q.  "Cool.  These are old corps that have been used."  When you

8   said I have corps, I thought they were fresh."

9   A.  "These companies were bought as dormant shelf companies,

10  checks on companies' house show they were inactive when we

11  bought them, and that they were not resold or used by anyone."

12  Q.  "Looks like the F'ers lied.  Do you have any clean or new

13  corps?  If not, let's at least run the whole list of corps

14  because we may not be able to use any of them.  I can't believe

15  the Hot Robots issue.  This is gonna cause a problem.  We need

16  clean corps immediately."  We can stop there.

17          You see the references to corps throughout this chain

18  that we just read?

19  A.  Yes, I do.

20  Q.  What is that a reference to?

21  A.  Shelf companies.

22  Q.  When Ray says towards the bottom, a few up from the

23  highlight, "if not, do you have any clean or new corps, if not,

24  let's at least run the whole list of corps because we may not

25  be able to use any of them," what do you understand him to mean

1    by that?

2    A.  I understand that he means that he wants them to be run

3    through Webshield to ascertain whether they have any -- whether

4    they are companies that have been used previously.

5    Q.  Why might that be an issue?

6    A.  Because if the software turns up something that is negative

7    surrounding a company and we find that out after submitting it

8    to an acquiring bank, we can no longer use that company and,

9    therefore, it is being -- not anybody waste time.  It would

10   also cost money to buy a new company.

11   Q.  In the string that we read the reference to clean corps,

12   what do you understand that to mean?

13   A.  Companies that have been not used, companies that have, as

14   the title shelf company implied, literally come off the shelf

15   unused, brand-new to us, incorporated, and not used prior to

16   our use.

17            MS. LA MORTE:  Mr. Levine, let's go to page 95.

18   Q.  You see, Mr. Hargreaves, Ray's comments in the middle,

19   beginning with "copy, thank you?"

20   A.  Yes.

21   Q.  Can you read those three comment bubbles.

22   A.  "Copy.  Thank you.  Please send me the pack on Linebeck

23   or -- and Organikals so I can go over the WS reports, etc.

24   Make sure we're not missing anything at all."

25   Q.  Then what do you say?

1   A.  "KF sending now."

2   Q.  Looking at that second comment bubble for Ray, "please send

3   me the pack on Linebeck and Organikals so I can go over the WS

4   reports."

5       What do you understand the WS reports to refer to?

6   A.  Webshield reports.

7       MS. LA MORTE:  Mr. Levine, we can leave that up.  Can

8   we put up next to it Government Exhibit 3939 in evidence.

9   Q.  Mr. Hargreaves, looking at Government Exhibit 3939, you see

10  the email on the bottom?

11  A.  Yes.

12  Q.  Who do you understand that e-mail to be from?

13  A.  Kate Farmer.

14  Q.  Who do you understand her to be sending it to?

15  A.  To EUprocessing.

16  Q.  Who do you understand that to be?

17  A.  Ruben.

18  Q.  Let's read the first line of the body of the e-mail,

19  please.

20  A.  "Hi, EUP.  Attach is our delivery report for Linebeck,

21  Organikals, including our review on Webshield."

22      MS. LA MORTE:  We can zoom out of those and go to the

23  attachment on Government Exhibit 3939, Mr. Levine.  Keep going

24  down.  Can you blow up this bottom portion.  You can actually

25  blow up the whole thing on that page.  This is page 3 of

1   Government Exhibit 3939.

2   Q.  Focusing on the bottom portion here, you see where it says

3   high risk.  Do you see that?

4   A.  Yes.

5   Q.  Let's go immediately above that.  Can you read the part in

6   bold that's between the two charts.

7   A.  "Webshield report with above red or yellow false flags

8   partially overruled, open bracket, cannot overrule, many

9   obvious false red flags, close brackets.  Organikals."

10  Q.  Then looking at this chart below there, you see where it

11  says high risk?

12  A.  Yes.

13  Q.  Is there some sort of risk scoring system that's associated

14  with Webshield?

15  A.  Yes, there is.

16  Q.  Can you explain that to us.

17  A.  The software would look at multiple different areas

18  surrounding the company that was -- the information of the

19  company that was plugged into the software and also to, for

20  example, the domain, the history of the domain, the hosting,

21  the address, for example, where the company was registered,

22  details surrounding the website, many, many different factors.

23       And the result of assessing all of that information,

24  it would create a traffic light -- it had a traffic light and

25  percentage score.  As you can see on the left, it says high

1    risk in red.  Top left-hand corner it says high risk and 27

2    percent.

3              As you can imagine from the color and the percentage,

4    it's classed as a high-risk application.  However, if you look

5    in the middle, you will see there is a yellow box with open

6    written on it, the green box with approve, and a red box with

7    decline.  Decline is self-explanatory.  Approved is

8    self-explanatory.  Open means it's -- the department can go --

9    what you would expect to be the compliance department of a bank

10   to be able to go back and ask questions and, based on their

11   responses to those questions, decide whether to decline or to

12   approve said merchant application.

13   Q.  Generally speaking, were there steps that your team would

14   take to try to get a better risk score for these shelf company

15   applications?

16   A.  Yes, there were.

17   Q.  Just give us some examples.

18   A.  A company that was, for example, at its office registered

19   as a virtual office was something that we could address or an

20   office where it was a WeWork style building, and potentially

21   the software would spit out that there happened to be another

22   business also located at that WeWork address, for example, that

23   had a business activity that they did not like the look of, we

24   can make sure that the address for the company was a standalone

25   address, which we would do.

1              MS. LA MORTE:  We can take that down, Mr. Levine.

2    Q.  Mr. Hargreaves, let's focus momentarily on MCC codes for

3    the shelf companies.  Do you recall earlier we discussed MCC

4    codes?

5    A.  Yes.

6    Q.  Were you involved in discussion regarding this selection of

7    MCC codes for the shelf companies using the scheme?

8    A.  Yes.

9              MS. LA MORTE:  Mr. Levine, let's put back up

10   Government Exhibit 4004, page 32.

11   Q.  Mr. Hargreaves, you see your first comment in green on this

12   page?

13   A.  Yes.

14   Q.  Then you see the comment below that?

15   A.  Yes.

16   Q.  Who do you understand the author to be of the comment below

17   your comment?

18   A.  Christian Chmiel.

19   Q.  We are going to read starting here, and then we will go on

20   to page 33.  You can read your comments, and I will read

21   Christian Chmiel's comments.  So go ahead.

22   A.  "We will look for some low-risk MCCs this morning,

23   communicate the plan to the relevant banks for their buy-in and

24   get them done."

25   Q.  "Gents, we will go for the logistics and music stores,

1    musical/sheet music for the two temporary apps.  The

2    application would then reflect a ridiculous high transaction

3    volume forecast per month, 50 MIO, that will slowly be ramped

4    up over time.  Please keep in mind, no matter how good the

5    sites will be, there will be plenty of red flags (age of the

6    website, traffic, etc.) that the compliance team will need to

7    'swallow.'"

8               Can you go to the next page.  Do you see your comment

9    at the very top?

10   A.  Yes.

11   Q.  What does it say?

12   A.  "We have started work.  We have on a pack for MCC 5733

13   music instruction."

14   Q.  Going back to page 32, Mr. Hargreaves, you see where you

15   say, "we will look for some low-risk MCCs this morning"?

16   A.  Yes.

17   Q.  What do you mean by low-risk MCCs?

18   A.  In the terms of type of businesses that websites conduct,

19   we would look at everything in terms of how it was perceived by

20   the acquiring banks we were submitting applications to.  A

21   low-risk MCC would be a business that had a low risk of charge

22   backs, a low risk of, to put it in simple terms, issues for the

23   acquiring bank.  Because we -- we had effectively carte blanche

24   of what we could submit to the bank based on the fact that they

25   were fictitious applications.  We obviously wanted to try to

1    pick MCC codes that were -- we considered to be very low risk

2    and, therefore, appealing to the acquiring banks when we were

3    submitting them.

4              MS. LA MORTE:  Let's go to the next page again, Mr.

5    Levine, page 33.

6    Q.  Then you state:  "We have started work.  We have on a pack

7    for MCC 5733 music instruction."

8              Do you see that?

9    A.  Yes.

10   Q.  Is that a reference to a particular MCC code associated

11   with one of the shelf companies?

12   A.  Yes, it is.

13             MS. LA MORTE:  We can take that down, Mr. Levine.

14   Q.  Mr. Hargreaves, I want to switch gears now and talk more

15   about your arrest and cooperation with the government.  Earlier

16   you testified that you were arrested in the United States in

17   September 27, 2018, is that right?

18   A.  That's correct.

19   Q.  Why were you in the United States at that time?

20   A.  I was on a business trip.

21   Q.  What were you arrested for on that day?

22   A.  Attempted extortion.

23   Q.  After you were arrested, did you decide to start

24   cooperating with the government?

25   A.  Yes.

1    Q.  Roughly, when did you start cooperating with the

2    government?

3    A.  Immediately.

4    Q.  The government agreed to a bail package for you, which

5    included allowing you to return home to Spain, is that right?

6    A.  That is correct.

7    Q.  As part of your cooperation you made calls and you had

8    meetings under the direction of the government, is that

9    correct?

10   A.  That is correct.

11   Q.  Roughly speaking, how many times have you met with the

12   prosecutors in this case?

13   A.  Double digits.

14   Q.  I'm sorry?

15   A.  Double digits.

16   Q.  Were you truthful with the government during those

17   meetings?

18   A.  Not all the time, but yes, in general.

19   Q.  Was every one of those meetings to prepare for trial or

20   were some of those meetings for the government to gather

21   information?

22   A.  Both.

23   Q.  Did you provide the government with information during

24   those meetings?

25   A.  Yes, I did.

1   Q.  Generally, what kind of information did you provide the

2   government during those meetings?

3   A.  I provided them -- I answered questions surrounding the

4   contents of my phone pertaining to my business activities.

5   Q.  As part of your cooperation were you required to disclose

6   to the government all the crimes that you committed?

7   A.  Yes, I was.

8   Q.  Did you do that?

9   A.  Yes, I did.

10  Q.  Did you plead guilty to the charges in this case?

11  A.  Yes, I did.

12  Q.  What crimes did you plead guilty to?

13  A.  Two counts of money laundering, one count of bank fraud,

14  and attempted extortion.

15  Q.  Let's start first with the extortion crime.  Can you tell

16  us what you did to make you guilty of extortion.

17  A.  I arranged for -- I arranged for a British marine to visit

18  the home of a man who had stolen money from a business

19  colleague, a large amount of money, and he used threatening

20  behavior with these people in an attempt to force them to

21  return that money.

22  Q.  Turning to the bank fraud and money laundering crimes, what

23  made you guilty of those crimes?

24  A.  I worked for a business that was involved in payment

25  processing, as discussed earlier -- yesterday, excuse me -- for

1   illegal gambling businesses.

2   Q.  Mr. Hargreaves, what is the maximum sentence that the judge

3   can give you as a result of your guilty pleas?

4   A.  Ninety years.

5   Q.  When you pleaded guilty did you enter into a cooperation

6   agreement with the government?

7   A.  Yes, I did.

8           MS. LA MORTE:  Mr. Levine, can you display for the

9   witness only what's marked for identification as Government

10  Exhibit 2101.

11  Q.  Mr. Hargreaves, I want you to look at this.  If you need

12  Mr. Levine to scroll down, just let us know when you need that.

13  Just take a look at each page.

14  A.  OK.

15  Q.  Mr. Hargreaves, do you recognize this document?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  It's my charges and my cooperation agreement.

19          MS. LA MORTE:  The government offers Government

20  Exhibit 2101.

21          MR. ARTAN:  No objection.

22          MR. TAYBACK:  No objection.

23          THE COURT:  Received.

24          (Government Exhibit 2101 received in evidence)

25  Q.  Mr. Hargreaves, what are your obligations under this

1    cooperation agreement?

2    A.  To tell the truth and assist, to answer -- to basically to

3    tell the truth.

4    Q.  If you meet your obligations under this agreement, what is

5    your understanding of what the government will do?

6    A.  I will receive a 510K letter.

7    Q.  What that -- generally, what does that mean?

8    A.  It advises the judge of my -- of the contents of my

9    cooperation and the contents of my crimes.

10   Q.  Do you understand that your cooperation agreement also sets

11   out conduct that you have disclosed to the government but that

12   the U.S. Government cannot prosecute?

13   A.  That is correct.

14   Q.  What conduct is that?  If you need to refresh your memory

15   with the cooperation agreement, you can do that.

16   A.  If you could please move it to the page, that would be

17   useful.

18   Q.  Mr. Hargreaves, let me direct your attention to page 4.  In

19   the paragraph, that big huge first paragraph where it begins,

20   in addition, about midway through.  Let me know if you see

21   that.

22   A.  I see it.

23   Q.  If you can read that to yourself.

24   A.  OK.

25   Q.  Can you describe for us what this conduct is that you have

1    disclosed to the government.

2    A.   The use of drugs, including cocaine, Ecstasy and marijuana,

3    the utilization of prostitutes, stealing of approximately

4    $40,000 in funds from my employer in 2019, transferring

5    approximately $200,000 in funds at the direction of my employer

6    in 2019 without disclosing it to -- the transfer to the federal

7    agent, and processing transactions for businesses engaged in

8    unlawful trading of currencies known as forex trading outside

9    of the United States.

10   Q.   I'm sorry about that.

11        Are you done?

12   A.   Yes, I am.

13   Q.   Mr. Hargreaves, was any of this conduct done while you were

14   cooperating with the government?

15   A.   Yes, it was.

16   Q.   Which conduct?

17   A.   The theft of $40,000 and the transfer of $200,000.

18   Q.   Earlier you said in meeting with the government there were

19   times when you weren't always truthful.  Did that pertain to

20   this conduct?

21   A.   Yes, it did.

22   Q.   Did there come a time when you disclosed this conduct to

23   the government?

24   A.   I disclosed it to them immediately after the transfer was

25   done that I made that transfer at the request of my employers.

1   Q.  Is that something that the government asked you about or is

2   that something that you disclosed to the government?

3   A.  I disclosed it to the government.

4          MS. LA MORTE:  Now, we can take this down, Mr. Levine.

5   Thank you.

6   Q.  Now, Mr. Hargreaves, a few moments ago you explained that

7   if you uphold your obligations under this agreement you will

8   understand that the government is going to write you what's

9   called a 5K letter, is that right?

10  A.  That's correct.

11  Q.  What is your understanding of who writes that letter?

12  A.  The lawyers of the Southern District.

13  Q.  What is your understanding of who receives that letter?

14  A.  The judge who will be determining my sentence.

15  Q.  What is your understanding of what information goes in that

16  letter?

17  A.  All of my crimes and the contents of my cooperation.

18  Q.  What sentence are you hoping to get in this case?

19  A.  I think any person in their right mind would rather not --

20  would rather avoid going to jail.

21  Q.  Have you been promised any particular sentence as you sit

22  here today?

23  A.  No, I have not.

24  Q.  Has the government indicated to you that it would recommend

25  any particular sentence?

1    A.  No, they have not.

2    Q.  Has anyone promised you that 5K letter as you sit here

3    today?

4    A.  No.

5    Q.  What is your understanding of what happens if you don't

6    tell the truth today?

7    A.  My situation is going to get worse than it already is.

8    Q.  To your understanding, does the outcome of this trial

9    affect whether you get this letter that we have been

10   discussing?

11   A.  No, it doesn't.

12   Q.  Mr. Hargreaves, I want to switch back now to the Eaze

13   scheme that we have been talking about and focus a little bit

14   more on the fictitious websites that we have been discussing.

15        Let me show you what's been marked for

16   identification -- just to the witness, Mr. Levine -- as

17   Government Exhibit 3602 and Government Exhibit 3604.

18        Mr. Hargreaves, take a look at both of these exhibits.

19   Do you recognize them?

20   A.  Mostly, yes.

21   Q.  What do you recognize them to be?

22   A.  Websites created by my team, or pages from websites created

23   by my team.

24   Q.  Do they fairly and accurately depict how the sites looked

25   at the time that your team developed them?

1   A.  Yes, they did.

2   Q.  Is there anything different about it?

3   A.  The yellow box with the government exhibit written in it

4   and there is a strip across the top with a logo to the left

5   that I don't recognize.

6   Q.  Aside from the strip on the top with the logo, are these

7   fair and accurate depictions of how the sites looked at the

8   time that your team created them?

9   A.  Yes, they are.

10          MS. LA MORTE:  The government offers Government

11  Exhibits 3602 and 3604.

12          MR. TAYBACK:  No objection.

13          MR. ARTAN:  No objection.

14          THE COURT:  Received.

15          (Government Exhibits 3602 and 3604 received in

16  evidence)

17          MS. LA MORTE:  Mr. Levine, let's publish both of these

18  for the jury.  They are kind of small.  Are they both up?  They

19  are kind of small.  Why don't we just take 3604.

20          Is there any way to make this bigger, or no?

21  Q.  Can you see this, Mr. Hargreaves?

22  A.  Yes, I can.

23  Q.  What is it?

24  A.  It's a website that was created by my team, a fraudulent

25  website.

1   Q.  I don't know if you could see it at the very top.  What is

2   the domain?

3   A.  Osteofiles.com.

4   Q.  What service or product is being offered, purportedly

5   offered through this site?

6   A.  Writing services.

7   Q.  Did your team actually have any of that service available?

8   A.  No, it didn't.

9           MS. LA MORTE:  Zoom out of that and then let's zoom in

10  on the middle part from "take a look at what we can do for you"

11  and go down, down, down.  Good.

12  Q.  You see in the middle of the page where it says "our

13  services"?

14  A.  Yes.

15  Q.  We have translations-international, female voiceover

16  recording, male voiceover recording, and medical professional

17  proofreading.

18          Do you see what is below each of those items of

19  services that I just read?

20  A.  Various costings for those services.

21  Q.  How are those prices arrived at?

22  A.  They were discussed internally between myself -- myself

23  and, I believe, Christian Chmiel, I believe Ray, perhaps Ruben.

24  I don't recall.  And possibly Kate Farmer and my team.

25  Q.  How did you arrive at these particular prices?

1   A.  One of the -- it was important that whatever prices were on

2   the fictitious websites matched the amounts that were being --

3   that were going to be actually coming into the accounts.  These

4   are amounts that would relate to the value of the goods being

5   sold on Eaze's websites.  Obviously, if an acquiring bank is

6   looking at our website and saying that this price is quoting

7   $50, $25 and we have transactions coming in for $3,000, $2,000,

8   a thousand dollars, for example, clearly something is not quite

9   right.  So this was the ideology behind the pricing we would

10  agree on as a group when looking -- when applying pricing to

11  our fictitious websites.

12          MS. LA MORTE:  Mr. Levine, let's zoom out of that.

13  Can we, starting from that green rectangle three-quarters of

14  the way down, and then just do the whole bottom part.

15  Q.  Mr. Hargreaves, you see where it says "get in touch" on the

16  right-hand side?

17  A.  Yes, I do.

18  Q.  You see that there is an e-mail address listed there?

19  A.  Correct.

20  Q.  What is that e-mail address?

21  A.  Info@osteofiles.com.

22  Q.  Who created that e-mail address?

23  A.  My team.

24          MS. LA MORTE:  We can take this down, Mr. Levine.

25  Thank you.

1    Q.  Mr. Hargreaves, earlier you testified that you would

2    arrange for a company to click on the sites that your team

3    developed.

4              Do you recall that?

5    A.  Yes, I do.

6    Q.  Can you just briefly remind us how you did that.

7    A.  We contracted a service provider that had a roomful of

8    people that would literally visit the website and do it a lot,

9    and it would create the appearance of a website that has a lot

10   of visitors and, therefore, it is justified that that website

11   is turning over a lot of money on a monthly basis.

12              MS. LA MORTE:  Let's go to Government Exhibit 4004,

13   page 80.

14   Q.  Can you read Ray's comments starting from the top through

15   your comment on this page.

16   A.  "Ollie, let's not fill the apps until Christian is happy

17   with the site.  Let's discuss all the aspects.  We have to get

18   this right.  It's our last corp.  Let's list out the issue and

19   make sure we tick the box correctly this time.  Ollie is

20   working on traffic clicks, Christian.  Let's know everything we

21   are doing and let's make it work this time, guys."

22   Q.  What is your comment?

23   A.  "They will start being pushed latest tomorrow morning."

24   Q.  What do you mean when you refer to that?  What do you mean?

25   A.  I'm referring to the clicks will commence.  By clicks, I

1   mean people visiting the website the following morning.

2   Q.  Let's look at just a few other communications regarding the

3   website.

4           MS. LA MORTE:  Mr. Levine, can we go on page 89 of

5   this exhibit.

6   Q.  Mr. Hargreaves, why don't you read the comments

7   attributable to Ray, and I will read Christian Chmiel's

8   comments.

9   A.  "Christian, can you please give us feedback on the site,

10  brother?  This is our last chance to get this right for real,

11  as we are out of Kalixa by end of the month?"

12  Q.  "Yes, of course, will do."

13  A.  "Thank you, sir."

14  Q.  "No real additions from my side.  The only thing I would

15  adapt is to ensure the meet the founders' information matches

16  the registered directors of the corp."

17  A.  "Ollie, have you made an e-mail addy with the UBO's name at

18  this domain?  This may not be a bad idea . . Christian?"

19  Q.  Next one.

20  A.  "So you think this will get through Christian?"

21  Q.  "Yes.  It really looks good to me."  And then a thumbs-up

22  emoticon.

23          MS. LA MORTE:  Let's go to page 95 to 96.

24  Q.  Let's start with your comment towards the bottom, "we

25  started pushing traffic."  Then I will read Ray's comments.

1    A.   "We started pushing traffic to the matcha site last night."

2    Q.   "Amazing.  What's the domain?

3    A.   "www.greenteacha.com."

4    Q.   Just to pause, is that a website that you and your team

5    created?

6    A.   Yes, it is.

7              MS. LA MORTE:  Let's go to the next page.

8    Q.   "Ollie, can you please set up e-mails with the UBO's names,

9    first name or abbreviations, just so it looks real, that the

10   owner and UBO would have his e-mail on there."

11             The reference to UBO in the comments I just read, what

12   do you understand that to be?

13   A.   It's a reference to the ultimate beneficial owners of the

14   shelf companies.

15             MS. LA MORTE:  Let's go to page 98.

16   Q.   Do you see where it says RC on the green dot on the left?

17   A.   Yes.

18   Q.   Can you read aloud Ray's comments below that up until when

19   you get to point one.

20   A.   "Do you agree we also shouldn't or can't use Mr. Tango

21   again.  Ollie, I showed the site to everyone and everyone likes

22   it a lot.  The look and feel and everything about it went over

23   well.  Just a few quick things we need to fix ASAP please."

24   Q.   So the reference here, "Ollie I showed the site to

25   everyone," generally, what is the reference to site, do you

1    understand that to refer to?

2    A.   Sorry.  Is the question --

3    Q.   What is the reference to site, generally?

4    A.   The website.

5         MS. LA MORTE:  Let's go to page 99.

6    Q.   You see Ray's second comment on the page?

7    A.   Yes.

8    Q.   Can you read that aloud.

9    A.   "But, overall, everyone liked it and it should be ready to

10   submit."

11   Q.   And then you see where it says June 20, 2018?

12   A.   Yes.

13   Q.   Can you read Ray's comments below that.

14   A.   "Ollie, can we please stick a few more order-now buttons on

15   it.  . . . noticed it has very little sales push, which is

16   unlike most real sites."

17   Q.   Keep going.

18   A.   "On the home page and other pages there are lots of places

19   where in each subsection we could have a order now.  Guy looked

20   at the site just now and couldn't figure it out."

21        MS. LA MORTE:  We can take that down.

22   Q.   Earlier in your testimony, Mr. Hargreaves, we talked about

23   customer service.

24        Do you recall that?

25   A.   Yes, I do.

1    Q.  What type of customer service information was typically

2    included on the fictitious websites?

3    A.  Typically, e-mails.  Potentially, phone numbers as well.

4    Q.  Let's start with the customer service phone numbers.

5            MS. LA MORTE:  Mr. Levine, can we put up Government

6    Exhibit 4004, page 40.

7    Q.  You see Ray's comments there, starting at the top?

8    A.  Yes.

9    Q.  Can you read those aloud.

10   A.  "Ruben.  Eaze is saying that nuybers aren't working, the

11   ones we put up, and they want those forwarded to their own CS

12   numbers."

13   Q.  Just pause one second.  When it says there, "they want

14   those forwarded to their own CS numbers," what do you

15   understand CS to be a reference to?

16   A.  Customer support.

17   Q.  Keep going.

18   A.  "Do you have those and is that in progress, brother?"

19   Q.  I'll respond for Ruben's comments.  "They send two numbers

20   today, but I guess we'll close down Kalixa.  I need to

21   understand what they've in mind."

22   A.  "Let's get those numbers forwarded to the numbers they sent

23   today.  Even after we leave Kalixa, those are still the Eaze CS

24   numbers that whatever numbers we get have to be forwarded to.

25   We need it changed immediately and we need the apps to be

1   submitted to WC."

2   Q.  Let's go to the next page and keep going.

3           MS. LA MORTE:  I'm sorry.  Not you, Mr. Levine.

4   Q.  Mr. Hargreaves, keep reading the chats.

5   A.  "Hot Robots and Lorry should be submitted to WC and Yonis

6   Bank immediately.  Kalixa needs to tmove this out.  I can't get

7   why this is taking so dam logn."

8           MS. LA MORTE:  Go back to the previous page, page 40.

9   Q.  These comments that we just read from Ray when he says

10  "Ruben, Eaze is saying the numbers aren't working, the ones we

11  put up, and they want those forwarded to their own CS numbers,"

12  what do you understand Ray to mean there?

13  A.  We had phone -- my team had purchased phone numbers that we

14  were going to be utilizing as customer-support numbers.  It was

15  Ray's belief that they were not working.  And either -- anyway,

16  those phone numbers needed to be forwarded to Eaze's customer

17  support to -- in order to provide customer support to their

18  customers.

19          MS. LA MORTE:  Let's now go to page 62.

20  Q.  Why don't I read Ray's comments, Mr. Hargreaves, and then

21  you could read Ruben's comments.  OK?

22  A.  Yes.

23  Q.  "From their CS guy.  I am dialing 1-877-974-7750 and

24  1-877-975-5510 and still getting errors.  Guys, I don't see the

25  two numbers that we have them on your list above for Hot

1  Robots.  What gives?"  Series of question marks.  "Why is it so

2  hard, guys?  Why do I have to ask three F'g days in a row to

3  forward a God damn number?  Ollie, I am gonna hook you up with

4  the Eaze CS guy.  This is bullshit.  I can't blow smoke up

5  their ass for one more day."

6  A.  "We got the numbers yesterday, not three days ago."

7  Q.  Next page.  Keep going.

8  A.  "And we are asking for a month.  So what's the issue?

9  Somebody here not being able to forward 24 hours -- forward in

10 24 hours after waiting a month."

11 Q.  "Yes.  That's an F'g issue.  Every day counts.  Forwarding

12 a number takes minutes."

13 A.  "I agree."

14 Q.  "Check to go see if it works is important.  I'm tired of

15 looking like a retard, and we know this merchant is stupid

16 anyway, so we can't leave it up to them to not provide or have

17 a CS route open and available.  These idiots don't know that

18 they're creating CBs, but we do, Ruben."

19 A.  "You're not looking like a retard."

20 Q.  I'm sorry.  Keep going.  One more.

21        "Ruben, imagine we get compliant and accounts shut

22 down because these retards don't have a way to pick up and talk

23 to clients who don't recognize our descriptors.  It's such a

24 shame."

25 A.  "I agree.  But it's in progress and everybody here is

1    working on it."

2              MS. LA MORTE:  Let's go back up.  Let's stay on this

3    page.

4    Q.  You see towards the bottom Ray's last comment on this page

5    where he says, "these idiots don't know that they're creating

6    CBs, but we do, Ruben"?

7    A.  Yes.

8    Q.  You see that?

9    A.  Yes, I do.

10   Q.  With respect to CBs, what do you understand CBs to refer

11   to?

12   A.  Charge backs.

13   Q.  What is the issue with creating charge backs?

14   A.  A higher percentage or number of charge backs leads to

15   account closure.

16   Q.  You may have recalled that we talked about this before.

17   But in the payment processing system, which participant in the

18   system is responsible for initiating charge backs?

19   A.  The issuing bank.

20   Q.  Sorry.  I thought you were done.

21   A.  The bank of the cardholder, basically.

22             MS. LA MORTE:  Let's now go to page 64.

23   Q.  You see in the middle the third RC icon there?

24   A.  Yes.

25   Q.  "I connected Ollie with the Eaze CS guys."

1    A.  Yes, I see that.

2    Q.  Did Ray in fact connect you with the Eaze CS guys?

3    A.  There was a group created on Telegram, yes.

4              MS. LA MORTE:  Mr. Levine, let's put up Government

5    Exhibit 4002.

6    Q.  Mr. Hargreaves, let's focus on the top first.  You see the

7    two gray bubbles?

8    A.  Yes.

9    Q.  What do they say?  Read them both.

10   A.  May 10, 2018.  Ray CE created the group Eaze CS.

11   Q.  What do you understand Eaze CS to refer to?

12   A.  Eaze customer support.

13   Q.  Looking at this Telegram chat, you see in the middle the

14   second RC icon?

15   A.  Yes.

16   Q.  That's a chat from Ray, is that right?

17   A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

1   Q.  Can you read that?

2   A.  "We need this fixed ASAP.  It's extremely risky and stupid

3   to run without a CS number."

4   Q.  What do you understand that to mean?

5   A.  He's referring to the fact that it is risky to be operating

6   in -- to operate an e-commerce business without a customer

7   support phone number, and the reason for that would be if

8   there's a problem and customers cannot contact the website,

9   then -- or in this case Eaze, if the numbers were to be

10  forwarded, then it would lead to chargebacks, which would lead

11  to accounts being looked at and potentially closed, which is

12  not what we were wishing to happen.

13  Q.  Okay.  Now, let's go to page 2.

14          So you see Ray's first comment on this page, "Let's

15  see if we can do that"?  Do you see that?

16  A.  Yes.

17  Q.  Could you read that comment and the one below from Ray

18  aloud?

19  A.  "Let's see if we can do that.  They may have to be toll

20  free and, more importantly, when you Google those numbers or do

21  research, they absolutely cannot come up as Eaze numbers.  So

22  regardless of what 877 numbers are set up on the EU side, and

23  since there will be many, many accounts with different

24  descriptors and numbers, we have to forward them all to your

25  numbers."

1    Q.  Okay.  So focusing on this first comment, "let's see if we

2    can do that, they may have to be toll free," when it says "they

3    may have to be toll free," what do you understand the "they" to

4    be a reference to?

5    A.  Phone numbers.

6    Q.  "They may have to be toll free and, more importantly, when

7    you Google those numbers or do research, they absolutely cannot

8    come up as Eaze numbers," what is your understanding of the

9    issues that Ray is identifying there?

10    A.  These phone numbers are meant to be associated with our

11    fraudulent websites and, therefore, should not -- it would be

12    very problematic if someone was to enter the phone number into

13    a Google search and instead of our website coming up or a

14    reference to our website, the reference to the company Eaze was

15    to appear.

16    Q.  Okay.  Now, let's go to page 3, Mr. Levine.

17         And let's start with -- why don't you read -- before

18    we get there, do you see this reference to Mick Frederick?

19    A.  Yes.

20    Q.  Do you know who that is?

21    A.  I believe -- these are -- they work for the customer

22    service in Eaze.

23    Q.  All right.  So why don't you read Ray's comments, and I'll

24    read Mick Frederick's comments?

25    A.  "And it's critical that they don't answer saying it's Eaze.

1    They have to be generic and say they are a CS center for many

2    companies and ask for the person's info to pull them up, and

3    then once you see they are e-legit Eaze customer, they can be

4    transferred or dealt with as Eaze, but not before that."

5    Q.   "I called them twice using the 510 numbers.  Team is

6    answering appropriately.  They get a big banner popping up

7    announcing who it is."

8    A.   "Then the bank, Visa and MC, do tests and mystery shopping;

9    so we have to be careful of them."

10   Q.   Okay.  We can stop there.  So going starting at the top,

11   "and it's critical that they don't answer saying it's Eaze,"

12   what is your understanding of why that is?

13   A.   Because if the bank's compliance department was, for

14   example, to phone one of these phone numbers doing a random

15   check, as they -- it's part of their job to do so to keep an

16   eye on -- to make sure that the merchants they were -- the

17   websites they were providing banking services to were behaving

18   in a fit and proper manner in line with their contract, they

19   would make random phone calls and if you were phoning

20   golfballs.com and someone picked up the phone saying "Eaze,"

21   that would lead to account closure for us.

22   Q.   Okay.  Now, you see the other highlighted part, Ray's

23   comment, "the bank, Visa and MC do tests and mystery shopping;

24   so we have to be careful of them;" do you see that comment?

25   A.   Yes.

1   Q.  What is your understanding of what "MC" refers to?

2   A.  MasterCard.

3   Q.  And "mystery shopping," what is your understanding what

4   "mystery shopping" means?

5   A.  These are -- Visa and MasterCard had a department or have a

6   department where their sole job is to enter transactions into

7   websites that they deem to be -- they think to be partaking in

8   suspicious activity and follow that transaction through the

9   banking system to see where it ends up; so they can then

10  contact the acquiring bank where the transaction ends up and

11  notify them of suspicious activity on one of their merchant

12  accounts.

13  Q.  Okay.  We can take this down, Mr. Levine.

14          Now, you also mentioned that the fictitious website

15  would contain e-mail addresses, correct?

16  A.  Yes.

17  Q.  And one of those that we looked at was

18  info@osteofiles.com --

19  A.  Correct.

20  Q.  -- as an example?  Did your team ever receive inquiries or

21  anything like that at those customer service addresses?

22  A.  Yes, a couple.

23  Q.  And who was responsible for handling customer complaints or

24  inquiries, or what have you, that would come into the e-mail?

25  A.  Michele Furlan and his team.

1   Q.  Okay.  Mr. Levine, let's put up Government Exhibit 3949,

2   and let's actually highlight -- not that part, let's just

3   highlight that bottom e-mail.

4            Okay.  So you see here the "from" line,

5   Mr. Hargreaves?

6   A.  Yes.

7   Q.  It says Goode and Green Bazaar, and the e-mail address is

8   info@goodegreenbazaar.com; do you see that?

9   A.  Yes.

10  Q.  What is Goodegreenbazaar.com?

11  A.  It is a fraudulent website that I -- that my team created.

12  Q.  And who did you understand to man this e-mail address?

13  A.  My team.

14  Q.  And now, you see the subject.  What is the subject of the

15  e-mail?

16  A.  Forward: FW: account fraud.

17  Q.  And who do you understand this e-mail to be going to?

18  A.  This e-mail is being sent to the fraudulent website, it is

19  being sent to the e-mail provided on the fraudulent website

20  Goodegreenbazaar.

21  Q.  And to who do you understand Goodegreenbazaar to be sending

22  the e-mail?

23  A.  EUprocessing@ProtonMail and Marty25@ProtonMail.

24  Q.  Can you read aloud the body of the e-mail?

25  A.  Hi, this morning I looked at my bank account and I have a

1   charge from your company.  I did not make a purchase and have

2   never, ever heard of your company.  I want a refund, and I will

3   also be contacting my bank.  Please respond with the info you

4   need.  Thanks, Kristal.  Sent from my iPhone.

5   Q.  Okay.  You can zoom out.  Put up -- I'm sorry, can you zoom

6   back in on that, Mr. Levine?

7          Okay.  Do you see where this individual says "I want a

8   refund and I will also be contacting my bank"?

9   A.  Yes.

10  Q.  Does that raise any concerns for you and your team?

11  A.  Yes.

12  Q.  Why?

13  A.  Because if she contacts her bank, the issuing bank, and the

14  issuing bank decides, instead of pursuing a refund, which

15  although is not ideal, if they decided to pursue a chargeback,

16  that's -- as I mentioned before, a certain number of

17  chargebacks can lead to account scrutiny and account closure,

18  and neither of these two things are things that we wish to

19  happen.

20  Q.  Okay.  Mr. Levine, let's put up Government Exhibit 3950,

21  and you can blow up the whole thing.

22          And you see that e-mail on the bottom?

23  A.  Yes.

24  Q.  Can you read that aloud?

25  A.  "Hi, I am in the U.S. and have never used or heard of

1   Goodegreenbazaar.com, but I see this charge on my credit card

2   for some reason.  Please remove it.  How did this happen?  Can

3   you tell me the purchaser's name and other order details?  I

4   want to make sure it's not anyone I know who stole my credit

5   card.  The card ends 3357."

6   Q.  And you can stop there.  Now, who was this e-mail forwarded

7   to?

8   A.  EUprocessing.

9   Q.  And who do you understand that to be?

10  A.  Ruben.

11  Q.  And can you read aloud the response, that e-mail?

12  A.  "FYI, it is already taken care of, both the complaints.

13  Best, EUP."

14  Q.  Okay.  We can zoom back out of that and close that.  Thank

15  you, Mr. Levine.

16          Okay.  Mr. Hargreaves, did you and your team charge

17  for the services that you provided in the scheme?

18  A.  Yes, we did.

19  Q.  And who did you speak to to discuss receiving payment for

20  your services?

21  A.  Ruben and Ray.

22  Q.  Did you arrange for invoices to be prepared?

23  A.  Yes, I did.

24  Q.  And who prepared them?

25  A.  My team.

1    Q.   Who would you send those invoices to?

2    A.   Initially we sent them to both Ray and Ruben, and then

3    predominantly Ruben.

4    Q.   Let's put up on the screen Government Exhibit 3962, and

5    let's just zoom in on the August 17th, 2018, e-mail at 10:32.

6            Who is this e-mail being directed to, to your

7    understanding?

8    A.   Jawbreaker13 and EUprocessing.

9    Q.   And who do you understand to use those accounts?

10   A.   Ray and Ruben.

11   Q.   Can you read the e-mail aloud?

12   A.   "Dear all, we do require payment for work completed.  Copy

13   payment advice attached for convenience.  Please, can you

14   arrange payment as soon as possible?  Appreciate your priority

15   attention on this.  Kind regards, KF."

16   Q.   Okay.  Let's just zoom out and scroll down to the next

17   page.  Keep going.  Stop.

18            This is page 3 of the exhibit.  Just, Mr. Hargreaves,

19   briefly, what is this?

20   A.   It's a payment advice generated by one of my -- Kate

21   Farmer.

22   Q.   And let's just scroll down one more page.  And can you

23   describe for us what this is?

24   A.   It's a breakdown of what the payment advice is for.

25   Q.   And just generally, we don't have to go line by line or

1   column or anything like that, but generally, what's being

2   reflected here?

3   A.   The work that we did for them.

4   Q.   Okay.

5   A.   Creation of websites and -- yeah, the work we did for them.

6   Q.   Okay.  Let's zoom out of that.

7           THE COURT:  Counsel, find an appropriate spot to give

8   the jury their mid-morning break.

9           MS. LA MORTE:  Yes, your Honor.  We can stop here.  I

10  am almost finished.  I probably have ten minutes or so left.

11          THE COURT:  Well, if it's ten minutes, we'll go ten

12  minutes.

13  BY MS. LA MORTE:

14  Q.   Okay.  Let's zoom out of that, Mr. Levine.  And now, let's

15  put up Government Exhibit 3963.

16          Before we actually read this e-mail, Mr. Hargreaves,

17  did you have any problems collecting on the payments?

18  A.   Some of them, yes.

19  Q.   And who would you try to go to to resolve those issues?

20  A.   Both Ray and Ruben.

21  Q.   Okay.  Now, let me direct your attention to Government

22  Exhibit 3963.

23          Can you highlight the e-mail on the very bottom,

24  Friday November 9th, 2018.

25          Who is this e-mail from?

1   A.   Myself.

2   Q.   And can you read it -- and who is it to?

3   A.   Kate Farmer.

4   Q.   Can you read the e-mail aloud?

5   A.   "Hi Kate.  Ray is refusing to pay the last invoice and is

6   using my e-mail requesting that our invoice be resolved as an

7   excuse to throw his toys out the pram...see below messages."

8   Q.   Go ahead.

9   A.   "There is a major disconnect between what he thinks was

10  done and what was actually done."

11  Q.   Before you go on, do you see the next part is in quotes?

12  A.   Yes.

13  Q.   What are you reflecting by using the quotes?

14  A.   I'm quoting what Ray told me.

15  Q.   Can you read the quote aloud?

16  A.   "Just heard from Ruben that you're not signing unless we

17  pay more.  We paid you 120K for four F'ing corps for which we

18  had to redo all the sites, which we already paid you for.  If

19  you don't sign this, you and me will have a problem."

20  Q.   Okay.  And then continue on with the rest of your e-mail?

21  A.   "I want to push back on this, as I believe that we can

22  demonstrate that we did everything they asked us to do and

23  more.  But in order for me to fight him on this, we need to

24  provide tangible evidence."

25  Q.   Okay.  We can zoom out.

```
 1            Mr. Hargreaves, when did you -- roughly, when did you
 2   stop creating application packs and websites for the Eaze
 3   scheme?
 4   A.  I mean, the easiest way to put it is before I was arrested.
 5   Q.  Before you were arrested?
 6   A.  Yes.
 7   Q.  And after you were arrested, were there any activities that
 8   you continued to handle in connection with the Eaze scheme?
 9   A.  Yes, we continued to chase -- we continued to chase payment
10   for the unpaid invoices, and there was hosting and domain --
11   domains that were purchased and hosting that were purchased,
12   which carried on through, which was maintained.
13   Q.  Okay.  Mr. Levine, let's put up Government Exhibit 3970,
14   and let's just highlight this e-mail on the bottom.
15            Mr. Hargreaves, what's the date of this e-mail?
16   A.  April 17, 2019.
17   Q.  Was this before or after you were arrested?
18   A.  It was after I was arrested.
19   Q.  Who was the e-mail from?
20   A.  EUprocessing.
21   Q.  Let me direct your attention --
22   A.  Sorry, apologies.  Kate Farmer.
23   Q.  And who did you understand her to be directing it to?
24   A.  EUprocessing.
25   Q.  And who did you understand that to be?
```

1    A.   Ruben.

2    Q.   So let's just read this e-mail aloud, up until the end of

3    the bolded part in the middle.

4    A.   "Hi EUP.  I have captured the fees for supporting domains,

5    hosting telephone numbers and marketing service-traffic to

6    sites in the attached invoice.

7            "The invoice supports payments for these services

8    through to the 30th of June 2019.  The second page provides a

9    full breakdown of these fees."

10   Q.   And read the bolded part as well?

11   A.   "Please note we are ceasing operations for support of

12   websites and their maintenance.  We will cease paying for these

13   services after the 30th of June 2019."

14   Q.   Now, Mr. Hargreaves, do you recall that in the beginning of

15   your testimony today we listened to a phone call between you

16   and Ruben?

17   A.   Yes, I do.

18   Q.   How, if at all, does that phone call relate to -- or what's

19   being discussed on that phone call relate to this e-mail?

20   A.   I was -- it relates to it in the fact that I was advising

21   him that we already informed -- we were discussing that we were

22   basically ceasing to provide these services as listed in this

23   e-mail by that -- by the date that was quoted in the

24   conversation.  It's pretty much a mirror of the conversation I

25   had.

1    Q.  Mr. Hargreaves, was this then the end of your participation

2    in the scheme?

3    A.  Yes, it was.

4    Q.  And who took over management of your services?

5    A.  The company that we were employing.

6    Q.  Which is what?

7    A.  Spinwild.

8    Q.  And who was in charge of that company, Spinwild?

9    A.  Michele Furlan.

10   Q.  And lastly, Mr. Levine, let's just put up Government

11   Exhibit 4004.  This is the Olliebaba chat.  Let's please go to

12   page 69.  Can you -- do you see where Ray's comments begin

13   towards the bottom, under Christian Chmiel?

14   A.  Yes.

15   Q.  Can you read those aloud?

16   A.  "Thank you, guys.  There's no smarter or better group than

17   us when we work together properly.  We just need to learn how

18   to always operate that way.  We have the talent, the

19   resources."

20   Q.  And now, let's go to page 80.  And you see Ray's comments

21   under your comments?  Your first comment on the page in green;

22   do you see that?

23   A.  Yes.

24   Q.  Do you see Ray's two comments under there?

25   A.  Yes.

1    Q.  Can you read them aloud?

2    A.  "There is no way all these people can pull this off and we

3    can't.  With our brain trust, we should be way ahead of

4    everyone else."

5    Q.  When Ray says "there's no way all these people can pull

6    this off," what do you understand him to mean by "pull this

7    off"?

8    A.  The transaction laundering scheme.

9              MS. LA MORTE:  No further questions, your Honor.

10             THE COURT:  All right.  Thank you very much.

11             Ladies and gentlemen, we'll give you your mid-morning

12   break, about 20 minutes, and we'll resume in 20 minutes.

13             (Jury not present)

14             Okay.  We'll see you in 20 minutes.  You may step

15   down.

16             (Witness temporarily excused)

17             (Recess)

18             (Jury not present)

19             THE COURT:  Let's get the witness back on the stand.

20             Counsel, cross will go until 12:45 on the dot, and

21   then we'll have to break for lunch because of another matter

22   that I have to handle at that time and, of course, we'll resume

23   after lunch.

24             THE LAW CLERK:  Jury entering the courtroom.

25             (Jury present)

1          THE COURT:  Please be seated.  All right.  Counsel.

2          MR. ARTAN:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. ARTAN:

5    Q.  Good morning, Mr. Hargreaves.  Can you hear me?

6    A.  I can, yes.

7    Q.  My name is Michael Artan.  I represent Ruben Weigand.

8          MR. ARTAN:  Your Honor, could I have one moment?  My

9    hearing aid battery just told me it had to be replaced.

10         THE COURT:  Yes.

11         (Pause)

12         MR. ARTAN:  This is a first.  Forgive me.  Thank you,

13   your Honor.

14         THE COURT:  Go ahead.

15   BY MR. ARTAN:

16   Q.  Mr. Hargreaves, I'd like to remind you of the day you were

17   arrested on September 27th, 2018.  You have that day in mind,

18   don't you?

19   A.  Yes, I do.

20   Q.  The FBI agents and IRS agents who arrested you, arrested

21   you here in Manhattan, correct?

22   A.  That is correct.

23   Q.  And you were getting out of a cab, correct?

24   A.  I was stopped while I was in a taxi.

25   Q.  I'm sorry?  I'm having trouble hearing you.

1   A.  Sorry.  Apologies.  I was in a taxi.

2   Q.  And from that moment on, the government has had a certain

3   measure of control over you; isn't that correct, sir?

4   A.  I've been -- I mean, I've been out -- since being arrested,

5   I've been subsequently on bail; so yes.

6   Q.  It was frightening, being arrested, wasn't it?

7   A.  Yes, it was, sir.

8   Q.  It's a shocking experience, correct?

9   A.  That's correct.

10  Q.  And you were rather promptly taken to a room at the U.S.

11  Attorney's Office about a block away from this building; is

12  that correct?

13  A.  That is correct.

14  Q.  And in an enclosed room, the agents told you that you were

15  under suspicion for extortion; did they not?

16  A.  Yes, that's correct.

17  Q.  They told you you were being arrested on probable cause,

18  correct?

19  A.  Yes, that's correct.

20  Q.  And it's serious business to be arrested by the FBI,

21  correct, sir?

22  A.  Yes.

23  Q.  You knew at that moment that you might conceivably spend

24  years away from your family, correct?

25  A.  Yes, that is correct.

1   Q.  And at the time, and now, you're married and have a child,

2   right?

3   A.  That is correct.

4   Q.  And you thought a great deal about the fact that having

5   been arrested, you would be away from them, correct?

6   A.  That is correct.

7   Q.  Now, that evening, once they told you that you were

8   charged -- actually, let me go back.  The agents took your

9   baggage, correct?

10  A.  Yes.

11  Q.  They took money out of your wallet and paid the cab,

12  correct?

13  A.  Yes, they did.

14  Q.  They took you to that room, told you what you were charged

15  with, and then that night they didn't take you to lockup, did

16  they?

17  A.  I was taken to a jail.

18  Q.  Did they drive you around for a while?

19  A.  They drove me to a jail.

20  Q.  Did you tell the agents you were appreciative of the two of

21  them driving you around for a while?

22  A.  I don't recall.

23  Q.  May we have item 3501-0051 put up on the screen for the

24  witness.

25          If we could look at page 2, sir, at the bottom.  Do

1   you see that language, sir?

2        MS. LA MORTE:  Objection, your Honor.  Foundation.

3        MR. ARTAN:  It's to refresh his memory, your Honor.

4        MS. LA MORTE:  Is there be a question asking if there

5   would be something to refresh his memory?

6        THE COURT:  I don't see it as inconsistent.

7   Sustained.

8   BY MR. ARTAN:

9   Q.  Does that refresh your memory, sir, that you stated that

10  you were appreciative of the two agents driving you around last

11  night and having been nice to him?

12  A.  Yes, it does.

13  Q.  So what did you mean by that?

14  A.  If my memory of the evening serves me correctly, I was very

15  emotional.  I was very scared, and I was being treated civilly.

16  Q.  Now, a little earlier this morning you said that you

17  cooperated immediately, correct?

18  A.  That is correct.

19  Q.  And in fact, by September 29th, which is just a day and a

20  half after your arrest, you sat down with prosecutors and FBI

21  agents, with your lawyer, and had a long meeting with the

22  government, correct?

23  A.  Correct.

24  Q.  In fact, it was about a block away, in the U.S. Attorney's

25  Office, right?

1    A.  Yes, that's correct.

2    Q.  And Mr. Folly was present, correct?

3    A.  I actually don't recall who was specifically there.  There

4    was a number of lawyers there, and at the time, I wasn't

5    particularly familiar with who these people were.

6    Q.  And it was explained to you that what you said would not be

7    used against you; what you said during the meeting would not be

8    used against you, correct?

9    A.  I don't recall that.

10   Q.  And you were told that you mustn't lie during the meeting,

11   right?

12   A.  That has been a constant theme.

13   Q.  And you decided, after being given some admonitions, that

14   you would cooperate with the government, correct?

15   A.  I made a decision at a certain point to cooperate with the

16   government, yes.

17   Q.  Now, the government was very much interested in your

18   activities regarding the extortion you mentioned earlier this

19   morning, correct?

20   A.  Yes, they were.

21   Q.  And they were also very much interested in activity

22   concerning payment processing for illegal gambling, correct,

23   sir?

24   A.  That is also correct.

25   Q.  And you described to the government the fact that you

L39PWEI1                          Hargreaves – Cross

1    worked for someone called Gary Murphy, correct?

2    A.   That is correct.

3                    (Continued on next page)

1    Q.  You spoke briefly about Gary Murphy yesterday, did you not?

2    A.  Yes, I did.

3    Q.  And Mr. Murphy was sort of a notorious character, right?

4            MS. LA MORTE:  Objection.

5            THE COURT:  Sustained:  I sustained the objection.

6    Put another question.

7    Q.  When you worked with Gary Murphy, you were aware that he

8    was involved in drug dealing in the past, correct, sir?

9    A.  I knew that he had served time in prison for offenses.

10   Q.  Now, at the time you first met Gary Murphy, what were you

11   doing?

12   A.  I was living in Barcelona.  I was introduced to him.

13   Q.  When was that?

14   A.  I don't recall.

15   Q.  I beg your pardon?

16   A.  I said I don't recall.

17   Q.  Was it before 2016?

18   A.  Possibly, yeah.

19   Q.  When you say possibly, does that suggest it was around that

20   time?

21   A.  Possibly, yes.

22   Q.  Now when did you start working for him?

23   A.  I'm sorry.  I really don't recall.

24   Q.  In what context did you first start working for him?

25   A.  I worked bringing in clients for -- sorry.  I was sourcing,

1   acquiring banks for a client of his.

2   Q.  At some point you worked for a company called Pago, right?

3   A.  That's correct, yes.

4   Q.  That was his company, right?

5   A.  Yes, it was.

6   Q.  When did that start?

7   A.  That started around about 2016.

8   Q.  What was your role with Pago?

9   A.  I was the CEO.

10  Q.  Was that the first job you had with Mr. Murphy?

11  A.  No.  Prior to that, I was --

12  Q.  You were what?

13  A.  Prior to that, I was looking for acquiring banks for a

14  client of his.  I didn't really have an official title.

15  Q.  What kind of work had you been doing with respect to

16  acquiring banks at the time you met Gary Murphy?

17  A.  I'm sorry.  I didn't understand the question.

18  Q.  You were saying that you initially started with Gary Murphy

19  to set him up with acquiring banks, is that correct?

20  A.  No.  I was introducing a client that he had to acquiring

21  banks.  He knew -- it was really a he knew somebody and I -- he

22  had a relationship with somebody who was in the payment

23  processing world and was looking for acquiring banks and, I was

24  trying to broker -- I was trying to broker that relationship, I

25  guess you could say.

L39MWEI4                     Hargreaves - Cross

1   Q.  So you had relationships with acquiring banks at that time
2   already, correct?
3   A.  No, I didn't.  I was learning about a new subject, and I
4   was trying to find them.
5   Q.  Can you say approximately when in 2016 this was happening?
6   A.  Sorry.  Which part?
7   Q.  Good question.  I'll start with the time you met with Mr.
8   Murphy and had an informal arrangement to try and find
9   acquiring banks for one of his clients.
10  A.  I am going to say in advance of 2016.
11  Q.  Was it early, late?
12  A.  I don't recall.  Sorry.
13  Q.  Now, you testified yesterday that you started on the Eaze
14  processing structure in 2016.  That's not correct, is it, sir?
15  A.  Let me think.  One second.
16  Q.  I'm sorry, sir.
17  A.  I know you are waiting.  I'm not very good with dates.  I
18  am just trying to remember.
19  Q.  We will come back to that.
20          Let's go back to this meeting that you had with the
21  U.S. Attorney's Office and various federal agents on September
22  29.  OK?
23  A.  Sure.
24  Q.  During that meeting you told the government some of the
25  details about you and Gary Murphy, correct?

1    A.  Yes, I did.

2    Q.  And you told them that Gary Murphy had a contact with

3    someone named Gilbert, correct?  Gilbert Armenta?

4    A.  I don't think I told them that.  I think they were aware of

5    that.

6    Q.  They already knew about that, right?

7    A.  Yes, sir.

8    Q.  Mr. Armenta wanted to collect $30 million that he was owed,

9    correct?

10   A.  That is correct, yes.

11   Q.  And he was counting on Gary Murphy and you to help him

12   collect that money, correct?

13   A.  That is correct, sir.

14   Q.  That money, the 30 million, was somehow the proceeds of a

15   Ponzi scheme called OneCoin, correct?

16   A.  I did not understand that at the time, but, yes, I

17   believe -- I am led to believe so.

18   Q.  That was your understanding, right?

19   A.  No.

20   Q.  I'm sorry?

21   A.  I said no.  I did not -- I had a different understanding of

22   what I thought the proceeds were from.

23   Q.  Now, you understand, of course, that threatening someone is

24   not a legal way to collect money, correct?

25   A.  I do, yes.

1   Q.  And you understand that hiring a former special forces

2   officer to threaten someone to get money is illegal, correct?

3   A.  Yes, I do.

4   Q.  You knew that when you helped arrange that, correct?

5   A.  Yes, I did.

6   Q.  And you were in constant touch with a special forces

7   retired officer, correct?

8   A.  Yes, I was.

9   Q.  And his name was Dominick Welsh, correct?

10  A.  That is correct.

11  Q.  Mr. Welsh was sending surveillance photos to the person who

12  was the target of the extortion, correct?

13  A.  That is correct.

14  Q.  At some point Mr. Welsh and a colleague of his went to this

15  target and tried to collect the money from him directly,

16  correct?

17  A.  That is correct.

18  Q.  All that happened in 2016 and '17, correct?

19  A.  Yes, that is correct.

20  Q.  And, nonetheless, you continued to work with Gary Murphy,

21  correct?

22  A.  I did continue to work with Gary Murphy, yes.

23  Q.  And you understood, too, that the target of the person who

24  was being extorted -- let me rephrase that, please.

25          You understood the target, the person who was being

1    extorted, was not the person who actually had the money.  You

2    knew that the money was from a different pot, so to speak,

3    correct?

4    A.  Sorry.  Could you repeat the question.

5    Q.  You had understood that the money to be collected was from

6    a different pot of money than the money that was received.

7    A.  I'm sorry.  I am not sure I really understand what you are

8    asking me.

9    Q.  I'll come back to that.

10            With respect to Mr. Murphy, you were also involved in

11   a company called PaySec, correct?

12   A.  Not really, no.  They were both his companies.  I really

13   didn't have a great deal of involvement with PaySec.

14   Q.  You had a PaySec e-mail address, right?

15   A.  I did, yes.

16   Q.  Does that mean it is your company?

17   A.  No, it does not.  It wasn't my company, no.

18   Q.  But you had the e-mail address, right?

19   A.  Yes, I did.

20   Q.  Now, you went forward with this extortion business because

21   you had the potential to make a lot of money, correct?

22   A.  That is correct.

23   Q.  It wasn't just Gilbert Armenta, but a man called Mauro,

24   correct?

25   A.  Correct.

1   Q.  Eventually, Armenta and Mauro called off the whole deal,

2   correct?

3            MS. LA MORTE:  Objection.  Vague.

4            THE COURT:  It is a little vague.  But if the witness

5   can answer it, I will allow him to answer it.

6            MR. ARTAN:  I could restate it, your Honor.

7   Q.  Do you understand the question?

8   A.  You are asking me if there is two gentlemen involved.

9   Q.  Let me start over.

10           The extortion attempt was eventually called off,

11   right?

12  A.  I am not sure if I would phrase it like that.  But there

13  was certain -- I am trying to think how to answer this without

14  giving you a long-winded answer.

15  Q.  You didn't do anything to stop it, did you, sir?

16  A.  No, I did not.

17  Q.  Mr. Armenta was participating in Chinese gaming traffic,

18  correct, sir?

19  A.  Yes, that's correct.

20  Q.  And this is one of the subjects you discussed with the U.S.

21  Attorney's Office that first day you were debriefed, on

22  September 29, 2018, correct?

23  A.  That is correct.

24  Q.  And you knew that Armenta's money was illegal, correct,

25  sir?

1    A.  I did, yes.

2    Q.  And you knew about OneCoin, correct?

3    A.  That's the name of it, yes.

4    Q.  And you knew that there was some potential relationship

5    between the OneCoin situation and Gary Murphy and Armenta,

6    correct?

7    A.  I discovered this later, yes.

8    Q.  And to put it in context, your understanding of OneCoin was

9    that it was a massive Ponzi scheme that resulted in billions of

10   dollars lost, correct?

11              MS. LA MORTE:  Objection.

12              THE COURT:  Ground.

13              MS. LA MORTE:  Foundation, your Honor.

14              THE COURT:  He is asking if that was his

15   understanding.  If he didn't have such an understanding, he

16   will say so.

17              Overruled.

18   A.  Yes, I did have an understanding that it was a big crypto

19   Ponzi scheme.

20   Q.  And returning to the extortion, what was your fee?  What

21   was going to be your fee for the money collected?

22   A.  There was a percentage discussed which was, I believe, 30

23   percent.

24   Q.  So you were hoping to get 30 percent of a $30 million

25   payout, correct?

1    A.  That is correct.

2    Q.  You were willing to engage in extortion for that money,

3    correct?

4    A.  That is correct.

5    Q.  You, in fact, had even spoke to Dominick Welsh about what

6    means he would use for the extortion, correct?

7    A.  Yes.

8    Q.  Now, that meeting lasted several hours, correct?

9    A.  Which meeting?  Sorry.

10   Q.  That first meeting we have been talking about on September

11   29, 2018.

12   A.  I don't recall how many hours it lasted for.

13   Q.  I'm sorry?

14   A.  I don't actually recall how many hours it lasted for.

15   Q.  Now, the very next day you had another meeting with the

16   same people for the government, correct?

17   A.  Yes.

18   Q.  During that meeting you discussed payment processing for

19   illegal gambling, correct?

20   A.  Correct.

21   Q.  And you were interfacing with Gilbert Armenta so you could

22   get involved in that payment processing for illegal gambling,

23   correct, sir?

24   A.  Yes, I was.

25   Q.  And you were ambitious and wanted to do well in that field

1   of illegal gambling, correct?

2   A.  I was ambitious and wanted to do well for my company.

3   Q.  And Gilbert Armenta had a bank in Georgia, correct?

4   A.  I believe so, yes.

5   Q.  And that also fit in with your interest in acquiring banks,

6   correct?

7   A.  No, it didn't.  I learned that information separately

8   myself.  It was not part of my discussions with or business

9   dealings with Gilbert Armenta.

10  Q.  Other than the extortion, what business were you attempting

11  to get involved in with Gilbert Armenta when you first met him?

12  A.  Payment processing.

13  Q.  When did you start working in the world of payment

14  processing?

15  A.  I was first introduced to payment processing when I was

16  informed about it by Mr. Murphy and the opportunity to make

17  commissions if I could find acquiring banks that were able

18  to -- were willing to provide processing for illegal gaming

19  merchants.

20  Q.  Fair enough.  When was that?

21  A.  I would imagine, before 2016.

22  Q.  Are we talking five years, ten years, six months?  Do you

23  have some estimate you could give us?

24  A.  Yeah.  I would say 2015, I guess.

25  Q.  What were you doing before that?

1   A.  I was a salesman.  I was selling investment products.

2   Q.  Now, at some point you began processing payments for

3   Armenta for gambling, correct?

4   A.  Sorry.  Can you just say the question the way you just said

5   it again, please.

6   Q.  At some point you began processing payments for Armenta for

7   illegal gambling, correct?

8   A.  No.  That was the other way around, actually.

9   Q.  The other way around in what respect, sir?

10  A.  He was processing payments for us or for clients that I

11  procured.

12  Q.  So you had illegal gambling clients who needed payment

13  processing?

14  A.  I did, yes.

15  Q.  And these clients were from the United States, right?

16  A.  Some of them had customers from the United States, but none

17  of them were from the United States.

18  Q.  A big part of PaySec's activities were illegal gambling,

19  correct?

20  A.  Correct.

21  Q.  In the context of your being involved in these activities,

22  you came to understand that acquiring banks would be processing

23  payments for various merchants, correct?

24  A.  Yes.  That was the idea.

25  Q.  And, generally, the acquiring banks were actually

1    functioning banks, correct?

2    A.  Yes.

3    Q.  In the context of the work that acquiring banks were doing,

4    they would process payments and collect fees just like any

5    other normal business, correct?

6    A.  Yes, they would.

7    Q.  They would process the payments and collect their fees,

8    whether it was illegal or not, correct?

9            MS. LA MORTE:  Objection.

10           THE COURT:  Sustained.

11   Q.  In your experience, in that world of payment processing,

12   the acquiring banks would be gaining their fees on processing

13   payments, whether the work was illegal or not, correct?

14   A.  I really don't know how to answer that question because if

15   you would like me to elaborate, I can.

16   Q.  I'm having trouble hearing you, sir.

17   A.  Apologies.  I was saying, I don't really know how to answer

18   that question and I can elaborate as to why not, if you would

19   like me to.

20   Q.  Maybe I'll try it a different way.

21   A.  OK.

22   Q.  In the work you were doing you were aware of what acquiring

23   banks were doing in respect to payment processing, correct?

24   A.  Yes.  They were processing payments for a multitude of

25   different businesses, sir.

1    Q.  A lot of what you were doing was illegal business?

2    A.  Yes, sir, that's correct.

3    Q.  In that context the acquiring banks were collecting their

4    fees just as though the business was legal, correct?

5    A.  Well, I would say that 99 percent of the bank was of the

6    opinion that it was legal.

7    Q.  It is your belief, sir, isn't it, that the acquiring banks

8    wanted some level of plausible deniability about the work that

9    they were doing to process illegal payments, correct?

10            MS. LA MORTE:  Objection.

11            THE COURT:  Sustained.  When I sustain an objection,

12   you don't answer.

13            THE WITNESS:  Thank you.

14            MR. ARTAN:  Your Honor.  Was it the form?  I might be

15   able to restate it.

16            THE COURT:  That was an additional problem.  But the

17   main problem is this that you haven't laid a foundation, and I

18   doubt that you can, that he had personal knowledge that would

19   warrant his being able to say whether or not the banks wanted

20   some level of plausible deniability.  There is also the

21   ambiguity in what's meant by plausible deniability.  I

22   understand you were getting at his understanding of that.  I am

23   not sure you've yet established that the relevance of his

24   understanding of that, even if he could, even if he had that

25   understanding.  Those are the starting problems.  There are

1    some others.  If you want to take a different stab, absolutely.

2              MR. ARTAN:  Can I give it one more shot and then move

3    on if it doesn't work?

4              THE COURT:  Yes.

5              MR. ARTAN:  Thank you, your Honor.

6    Q.  During that second meeting with the government, did you

7    tell the government that the banks were willing to do the

8    processing and all they wanted was plausible deniability that

9    they could pass off to the merchants?

10   A.  If I was able to find someone in the bank that was willing

11   to work with me based on a fraudulent application pack, then

12   that individual, yes, they would want the fraudulent

13   application packs to pass muster.

14   Q.  You told the government --

15             THE COURT:  Now I'm not clear on what the witness is

16   saying.  The question was, did you say to the government that

17   the bank -- all they wanted was plausible deniability that they

18   could pass off to the merchants.  Did you say that to the

19   government or not?

20             THE WITNESS:  I don't actually recall.

21             THE COURT:  You don't remember one way or another.

22             That is the answer to the question, but of course you

23   can give him something to refresh his recollection.

24             MR. ARTAN:  Your Honor, if we could put item number

25   3501-0011 in front of the witness.

1            THE COURT:  You want to blow up the relevant portion.

2            MR. ARTAN:  The third page.

3            THE COURT:  You want to blow up the relevant portion.

4            MR. ARTAN:  Yes.  On the third page.  It is --

5     unfortunately, it is not lined and numbered.  But if I could

6     approach.

7     Q.  Do you see that?

8     A.  I am just reading it.

9     Q.  Does that refresh your recollection about acquiring banks?

10    A.  I am still reading it.

11    Q.  You said it's better to deal with banks that know what you

12    are doing, right?

13    A.  Yeah.  I think I should probably qualify this statement.  I

14    am not talking about the entire bank.

15    Q.  Right.  You are talking about people at the bank, correct?

16    A.  Yes, that's correct.

17    Q.  People at the bank are normally people in management

18    positions, correct?

19    A.  Preferably, yes.

20    Q.  You are not going to interface with a teller or someone who

21    has got a less senior position in the bank, correct?

22    A.  No, probably not.  Probably wouldn't be worthwhile.

23    Q.  You explained to the government some of your activities

24    with respect to processing payments for illegal gambling,

25    correct?

1   A.  Yes, I did.

2   Q.  And you described how you were doing some work in the

3   Philippines, correct?

4   A.  Yes.  I worked in the Philippines.

5   Q.  And worked with gaming companies in Costa Rica, correct?

6   A.  That's correct.

7   Q.  You gave quite a list of companies involved in illegal

8   gambling that you worked with, correct, sir?

9   A.  I didn't give them unless they had a list from my -- I did

10  not give the government a list.  The list was extracted from my

11  phone.

12  Q.  Your companies had accounts in Manila, Hong Kong, and

13  Dubai, correct?

14  A.  These are not my companies, by the way.  But, yes, those

15  companies had bank accounts in various locations.

16  Q.  Now, at the time you met with the government did you tell

17  them you were afraid of Gary Murphy?

18  A.  Yes, I did.

19  Q.  At that time you were still working with Gary Murphy,

20  correct?

21  A.  Yes, I was.

22  Q.  Now, your processing also involved forex accounts, correct?

23  A.  My past processing, is that the question?  Could you repeat

24  the question?

25  Q.  Yeah.  I would be happy to.  I'll restate it.

1            The payment processing you were doing also involved

2    forex processing, correct?

3    A.   Forex trading, yes.

4    Q.   And in and of itself, forex trading is not illegal, right?

5    A.   I think it's more an issue of licensing.

6    Q.   So the payment processing you were doing was for unlicensed

7    foreign currency exchange processing, correct?

8    A.   In part, yes.

9    Q.   And you told the government about all that, too, right?

10   A.   Yes, I did.

11   Q.   You told the government about the fees you would make,

12   correct?

13   A.   Yes.

14   Q.   And this was a lengthy meeting, correct?

15   A.   Correct.

16   Q.   And you had further discussions about the extortion,

17   correct?

18   A.   Correct.

19   Q.   At some point towards the end of the meeting you briefly

20   mentioned that you had tried to process medical marijuana

21   traffic, correct?

22   A.   Do you have something you could show me that would jog my

23   memory?

24   Q.   Yes.  It's the same document, 3501-0011.  It's the fifth

25   page.  I think it's the next page after that.  Pardon me.  I'm

1    sorry.  It's the eighth page.  One before that.

2          You see the long paragraph towards the bottom?

3    A.  Yes.  Thank you.

4    Q.  When I asked you if you tried to process medical marijuana

5    traffic, that's correct, isn't it?

6    A.  Yes, that's correct.

7    Q.  In that meeting you mentioned someone called Ray, correct?

8    A.  That's correct.

9    Q.  You didn't even know Ray's last name when you had that

10   discussion, correct?

11   A.  No, I didn't.

12   Q.  So let's put this in context.  September 30 now of 2018,

13   you are meeting with the government, you are telling them about

14   Ray, and you didn't know his last name, is that correct?

15   A.  As I said -- maybe I should retract that.  When I said I

16   didn't know his surname, again, if you can show me something

17   that says that I didn't say his name because, to my

18   recollection, I'm fairly sure that I would know Ray's surname.

19   I may have mispronounced it, I may have misspelled it, which,

20   based on my knowledge of myself and my memory, is highly

21   possible.

22   Q.  Didn't you have another meeting with the government in

23   November of 2018 where you discussed Ray and you expressly said

24   you didn't know his last name?

25   A.  I don't recall that.  If you would like to show me

1    something, by all means.

2            MR. ARTAN:  Can we put 3501-0303 up.

3    Q.  If you could look at the second page, sir.

4    A.  I see the first line, Ray, last name unknown.

5    Q.  You spoke a lot about this topic and the entire time you

6    didn't know --

7            THE COURT:  I need to let the witness know a little

8    bit about the rules of the game here.  When something is shown

9    to you to refresh your recollection, it itself is not in

10   evidence and, therefore, you can't say what's in that piece of

11   paper.

12           THE WITNESS:  Sorry.

13           THE COURT:  If it creates an independent recollection

14   on your part, so, oh, yes, now I remember I said such and such

15   to the government, that you can testify to.  But if it doesn't

16   create an independent recollection, you can't just read from

17   the document.  It's not in evidence.  OK?

18           THE WITNESS:  OK.  Thank you.

19   Q.  Does that refresh your recollection that even in November

20   of 2018, you did not know his last name?

21   A.  Not really, no.

22   Q.  During the September 30 meeting, the second meeting you had

23   with the government, did you say you had not processed a single

24   dollar of marijuana transactions?

25   A.  Yes.  Initially, we were engaging with a bank called

1   Paynetics, and we were not successful.

2   Q.  You told the government you did not process a single dollar

3   in marijuana transactions, correct?

4   A.  Yes.  I personally, my banking relationship, we did not,

5   which was Paynetics.  That's what I'm referring to.

6   Q.  You are saying you are part of this scheme for payment

7   processing and you are telling the government that you had not

8   processed a single dollar, correct?

9   A.  I just explained to you what I meant.

10  Q.  You told the government you were trying to code the

11  marijuana transactions as a medical services code, 8099,

12  correct?

13  A.  Initially, yes.

14  Q.  You didn't tell the government that that changed.  You just

15  told them that that's all you were trying to do, 8099, right?

16  A.  I don't recall what I told them.  I'm telling you initially

17  that when we engaged in this transaction laundering scheme, the

18  dynamic was, we had an acquiring bank, they had a partner

19  called Clearsettle, and we were wanting Clearsettle to

20  integrate with us and therefore into this bank.  This

21  integration happened, but we did not process a single payment

22  to my acquiring relationship.  If I didn't word it like that, I

23  don't really know what to say.

24  Q.  You didn't say a single word about false applications, did

25  you?

1   A.  I don't recall.

2   Q.  You didn't say a single word about everything you've

3   testified yesterday --

4            THE COURT:  I'm sorry.  When are you talking about?

5            MR. ARTAN:  I'll start again, your Honor.

6   Q.  When I'm asking you these questions I am talking about the

7   September 30, 2018 meeting which was shortly after your arrest.

8   Do you have that in mind, sir?

9   A.  I'm going to be perfectly honest with you.  I was terrified

10  out of my wits on that day, and I don't really have a great

11  recollection of the details of it, to be perfectly honest.

12  Q.  You spoke to the government for hours and hours that day,

13  correct, sir?

14  A.  I don't dispute that.

15  Q.  I'm sorry?

16  A.  I don't dispute that, sir.

17  Q.  Are you suggesting that what you told the government was

18  somehow inaccurate?

19  A.  I am not suggesting that what I told the government was

20  inaccurate.

21  Q.  What is it you are trying to suggest when you say you were

22  under a lot of stress?

23  A.  I am not trying to suggest anything, sir.  I am just trying

24  to answer your questions.

25  Q.  My question was, in that meeting where you talked about

1  trying to process medical marijuana traffic, you didn't say

2  anything about putting together false applications, did you?

3  A.  I'm sorry, but I really don't recall what exactly we

4  discussed.

5  Q.  You did tell them that you were going to try to process

6  medical marijuana through Paynetics, correct?

7  A.  Again, I don't recall what I told them in that specific

8  meeting.

9  Q.  Is that correct?

10  A.  Is what correct?  Sorry.

11  Q.  That you were trying to process medical marijuana through

12  Paynetics.

13  A.  Yes, that is correct.

14          MR. ARTAN:  Your Honor this might be a good time.

15  It's kind of a break in what I'm doing.

16          THE COURT:  That's fine.

17          Ladies and gentlemen, we are going to take our lunch

18  break at this time, and we will resume at a quarter of 2.  See

19  you then.

20          (Jury not present)

21          THE COURT:  We will see you at quarter of 2.

22          MR. TAYBACK:  Your Honor, may I make one request.

23          I am going to be meeting with my client over lunch,

24  and he did not sleep well last night, but I'd like to request

25  that I be able to bring him a Coca-Cola.  The marshals will

L39MWEI4                          Hargreaves – Cross

1    allow it in a cup, and I can provide all that.

2              THE COURT:  If he really wants a Coca-Cola, I am not

3    going to keep him from it.  All right.  That's fine.

4              MR. TAYBACK:  Thank you, your Honor.

5              (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                  2:10 p.m.

1            THE COURT:  I think you already know this from my law

2    clerk, but there was a screwup on the part of the cafeteria, so

3    the jury didn't get lunch until about a half hour ago, so I

4    wanted to give them time to enjoy their lunch.  I think they

5    are ready now.  We can probably bring them up.

6            One other thing while we are talking logistics.

7    Tomorrow, and I'll tell the jury this at the end of the day, we

8    will start at 10:15, rather than 9:45, because of other things

9    I have to take care of.

10           Let me ask first, Mr. Artan, how much longer do you

11   think you have?

12           MR. ARTAN:  It is hard to know, your Honor.

13           THE COURT:  I know.  But now that I have got your

14   focus.

15           MR. ARTAN:  I think there is a good chance that I'll

16   go through the end of the day.  I can't be sure, your Honor.

17           THE COURT:  That would not be unreasonable.

18   Obviously, I wouldn't want to have you go very much into

19   tomorrow.  Then, of course, there is counsel for Mr. Akhavan.

20           More generally, I think at the end of the day tomorrow

21   I want to talk about the schedule generally, things like

22   charging conference and so forth.

23           (Jury present)

1              THE COURT:  Ladies and gentlemen, for reasons that no

2       one knows, there was some problem in the cafeteria.  Usually,

3       they are very good down there.  I don't know what happened.

4              So I'm glad we were able -- I want you to know that

5       there is one other jury trial going on in this courthouse.  My

6       law clerks fought hard to get priority for your lunch over the

7       other one.  The hell with the other one.

8              Anyway, in all seriousness, we are sorry for that

9       delay.  We are ready to continue.

10             Go ahead.  Counsel.

11             MR. ARTAN:  Thank you, your Honor.

12      BY MR. ARTAN:

13      Q.  I thought I was moving on to another issue, but there is

14      one quick question I have with respect to an area that we

15      covered already.

16             Mr. Hargreaves, we were talking about the meeting that

17      you had with the government on September 30 of 2018, a couple

18      of days after your arrest.

19             Do you remember that?

20      A.  Yes.

21      Q.  Isn't it true you never said a word about Ruben Weigand

22      during that interview, is that correct?

23             MS. LA MORTE:  Objection, your Honor.  I believe this

24      line is improper impeachment.

25             THE COURT:  Ground.

1          MS. LA MORTE:  I believe it's improperly impeaching,

2     your Honor.

3          THE COURT:  I don't understand.  If you want a

4     sidebar, I'll give it to you, but beyond the objection.

5          MS. LA MORTE:  Your Honor, I believe there is a lack

6     of foundation because there needs to be an inconsistency in the

7     testimony before asking the witness about prior statements that

8     the witness may have made outside of the courtroom.

9          THE COURT:  I will explain to you at the break why you

10    are wrong.

11         MS. LA MORTE:  All right, your Honor.  I'll look

12    forward to it.

13         THE COURT:  Go ahead.  The question will stand.

14    A.  I don't recall.

15    Q.  Now, you had several other meetings with the government in

16    the week or so following your arrest, correct?

17    A.  I did, yes.

18    Q.  It was your understanding that there was an agreement that

19    you would be pleading guilty to the charge of extortion and be

20    allowed to go back to Europe, correct?

21    A.  I pled guilty to attempted extortion, yes.

22    Q.  You were granted bond allowing you to go back to Europe on

23    October 12 of 2018, which was just two weeks after your arrest,

24    correct?

25    A.  That is correct.

1   Q.  And you were given time to post that bond, correct?

2   A.  Yes, I was.

3   Q.  You were allowed to handle that in payments, correct?  Let

4   me rephrase it.

5        You were given an additional week beyond the October

6   12 date, correct?

7   A.  Along those lines.

8        MR. ARTAN:  Your Honor, the real time thing is not

9   working here.  I don't know if that's an issue that is easily

10  fixed.  If it's not, I'll move on.

11       MS. LA MORTE:  It's all good on our end.

12       THE COURT:  It's working on my screen.

13       MR. ARTAN:  The only reason I say is because it's been

14  kind of hard to hear the witness.

15       THE COURT:  We will need to have the witness speak

16  louder.  I don't want to talk about the two centuries of trials

17  that occurred in this country without real time, but --

18       MR. ARTAN:  I think Ms. Deininger fixed it.  I think

19  we can applaud the government's ingenuity.  Thank you.

20  Q.  You were allowed to go back to Europe under the terms of

21  the bond, correct?

22  A.  I was allowed to go back under the terms of my cooperation

23  agreement.

24  Q.  And there was an understanding that your cell phone was to

25  have GPS on it and be shared with the case agents, is that

1   correct?

2   A.   That is correct.

3   Q.   You were to live in Barcelona, Spain and check in with the

4   agents every 48 hours, correct?

5   A.   That is correct.

6   Q.   And you were expected and it was hoped that you would be

7   going to Belgrade on November 6 and 7, correct?

8   A.   It is correct.

9   Q.   You were going to go to Belgrade in order to meet with some

10  people related to illegal gambling payment processing, correct?

11  A.   That is correct.

12  Q.   And not just the people involved in the gambling, but also

13  acquiring bank people, correct?

14  A.   Representatives of the company operating in the payment

15  industry.

16  Q.   Well, the director of Intesa Bank, for instance.

17  A.   That meeting was not to go ahead at the end as it was --

18  that was a lead that was followed and was -- on my part is the

19  way I can describe that.

20  Q.   But the intention was that, correct?

21  A.   No.  The intention was to meet with another party.

22  Q.   So before you left, you had -- if I'm not mistaken, you had

23  five more meetings with the government, correct?

24  A.   I don't recall the exact amount.

25  Q.   Now, one of the understandings in your departure was that

1   you would not be committing any illegal acts while you were

2   gone, correct?

3   A.   That is correct.

4   Q.   But there was an exception so that you could prepare and

5   send fraudulent application packages to Alpha Bank and Bank

6   Intesa, correct?

7   A.   I did send application packs to Alpha Bank, yes.  I'm

8   sorry.  I should say, to an employee of Alpha Bank and not to

9   Intesa, no.

10  Q.   There was no exception for the medical marijuana

11  processing, was there?

12  A.   Sorry.  Are you asking me if I was directly told not to do

13  something?

14  Q.   Correct.

15  A.   I was not instructed to, no.

16  Q.   Let me put it to you a different way.  You were authorized

17  to engage in particular illegal activity, correct?

18  A.   I'm sorry.  I'm struggling to hear you.

19  Q.   You are having trouble hearing me?

20  A.   Yes, I was.  Sorry.

21  Q.   I'm speaking pretty loudly.  I am not sure it's me.

22         Can you hear me now?

23  A.   Yes, I can.

24  Q.   You were authorized by the government to engage --

25         MS. LA MORTE:  I think the mic is out.

1              MR. ARTAN:  It's not working.  The green light is on.

2    Q.  This better?

3    A.  Yes.  That's great.

4    Q.  Sorry.

5    A.  No problem.

6    Q.  I am not sure what it was.  Let me start over.

7    A.  Please.

8    Q.  You were authorized to engage in particular illegal

9    activity from October 30, 2018 onward, correct?

10   A.  I was not authorized to engage.  I believe my team -- I

11   believe myself personally, I did not engage in providing

12   information.

13   Q.  Let me restate the question because maybe it's not being

14   clear.

15           On October 30, 2018, you were given an admonishment by

16   the FBI and you were authorized to engage in particular illegal

17   activity, correct?

18   A.  I'm sorry.  Which particular illegal activity?  I was not

19   told by anyone to engage in illegal activity.

20   Q.  Maybe I can put something up, with the Court's permission,

21   to refresh your memory and guide us through this.  It would be

22   Exhibit IWX-31.

23           I believe you are looking at the caption of the first

24   page.  Do you see that, sir?

25   A.  Yes, I do.

L39MWEI4                         Hargreaves - Cross

1   Q.   If you can look at the second page, read the top half of

2   the page and see if that refreshes your recollection.

3   A.   Understood.  Thank you.

4   Q.   On October 30, 2018, you were admonished not to engage in

5   any illegal activity except with one exception, correct?

6   A.   Correct.

7   Q.   And the exception was to prepare and send fraudulent

8   application packages to intermediaries or representatives of

9   Alpha Bank and Bank Intesa, correct?

10  A.   Correct.

11  Q.   And there was no exception for anything other than Alpha

12  Bank and Bank Intesa, correct?

13  A.   To the best of my knowledge, at this stage, no.

14  Q.   Are you aware of any other written authorization you had to

15  engage in illegal activity from that date forward?

16  A.   You'd have to jog my memory, I'm afraid.

17  Q.   Well, are you telling us you are not aware currently of

18  having had any written authorization to that effect, correct?

19  A.   I'm telling you I don't remember now.

20  Q.   Are you saying that it is possible you have such

21  authorization, you just don't remember?

22  A.   I am telling you that I don't remember.

23  Q.   Forgive me, but is it you don't remember either way or you

24  just don't remember it happening?

25  A.   To be perfectly honest with you, the document you showed me

1    is the first time I have ever seen that document, so I don't

2    really know how else to answer the question.  I'm sorry.

3    Q.  You were read that admonishment, correct?

4              MS. LA MORTE:  Objection.

5              THE COURT:  Ground.

6              MS. LA MORTE:  Misleading, 403.

7              THE COURT:  Sustained.

8              MR. ARTAN:  Your Honor, may I show him the exhibit

9    again to refresh his memory?

10             THE COURT:  Yes.

11             MR. ARTAN:  Can we have IWX-31 placed before the

12   witness, page 2.

13   Q.  You see the top paragraph, sir?

14   A.  Yes, I do.

15   Q.  Does that refresh your memory as to whether you were read

16   an admonishment about engaging in illegal activity?

17   A.  Yes, it does.  Thank you.

18   Q.  It's true that you were, correct?

19   A.  It's true that I was.  Sorry.  Could you repeat that

20   question.

21   Q.  It is true that you were admonished in that way, correct?

22   A.  Yes, it is.

23   Q.  And that's the same admonishment we talked about before

24   concerning Alpha Bank and Bank Intesa, correct?

25   A.  Yes, it is.

1   Q.  If I'm understanding your recollection, sir, you don't

2   remember whether you were admonished in any other way

3   concerning illegal activity.  Is that your recollection?

4   A.  Yes, that's my recollection.

5   Q.  Now, you had pled guilty before you left for Europe in

6   October of 2018, correct?

7   A.  That's correct.

8   Q.  Now, you were subsequently charged in a superseding

9   indictment, correct?

10  A.  That's correct.

11  Q.  Because the first indictment you pled guilty for was just

12  for the attempted extortion, correct?

13  A.  It is correct.

14  Q.  Then in February of 2020, you entered into a cooperation

15  agreement with the government and ended up pleading guilty to

16  the four charges that you talked about this morning, correct?

17  A.  Correct.

18  Q.  And the cooperation agreement you entered into, which I

19  believe was Exhibit 2101, Government Exhibit 2101, makes

20  mention of the fact that on page 4, in the middle of the page,

21  that you stole approximately $40,000 in funds from your

22  employer in 2019 outside of the United States.

23  A.  That is correct.

24  Q.  Was that Gary Murphy?

25  A.  Yes, it was.

1  Q.  Now, you had acknowledged that you were afraid of Gary

2  Murphy, correct?

3  A.  That's correct.

4  Q.  And yet you stole money from him?

5  A.  Yes, that's correct.

6  Q.  Under what circumstances did you steal money from him?

7  A.  Sorry.  Could you elaborate what you mean, in what

8  circumstances?

9  Q.  Did you take it out of his pocket?  What did you do?  How

10  did you steal it from him?

11  A.  There were funds returned to the company that were owed to

12  us, and I had -- I was actually owed money by the company.  I

13  think it is probably relevant to mention that.  I had been

14  unpaid and I took matters into my own hands incorrectly.  I

15  stole the money.  I acknowledge that.  And I transferred those

16  monies to -- sorry.  I had one of my employees transfer the

17  money to my account.

18  Q.  If I'm understanding you, you didn't make a demand for the

19  money, you just took it instead?

20  A.  That's correct.

21  Q.  Is that part of the reason that these extra charges were

22  added in the superseding indictment?

23  A.  No, they were not.

24  Q.  Now, you acknowledged earlier today that you are facing 90

25  years in a potential sentence, correct?

L39MWEI4                        Hargreaves - Cross

1    A.   A maximum of 90, yes.

2    Q.   And there has been some discussion about a 5K letter.

3         Do you recall that?

4    A.   Yes, sir.

5    Q.   In fact, you made reference to it yourself, correct?

6    A.   Yes, sir.

7    Q.   Now, let me put it to you this way.  Is it your

8    understanding that a 5K letter would be a letter from the

9    government making a recommendation as to your sentence and

10   giving the Court information as to what you had done on behalf

11   of the government?

12   A.   I don't believe it's a recommendation.  I think it just

13   contains the content of my cooperation and also my crimes.  If

14   my understanding is incorrect, please tell me.

15   Q.   It is your understanding of the sentencing process that the

16   government and your lawyer will each make recommendations to

17   the Court as to your potential sentence, correct?

18   A.   Sorry.  I'll repeat what I said.  My understanding is that

19   the 5K 10K letter contains the content of my cooperation and

20   also outlines my crimes.

21   Q.   And whether the government offers such a letter to the

22   Court depends on whether they determine you have given

23   substantial assistance to the government, correct?

24   A.   My understanding is whether I have held up the terms of my

25   cooperation agreement.

1              MR. ARTAN:  Just one moment, please, your Honor.

2       Forgive me.

3       Q.  The government has discretion as to whether or not they

4       provide the Court with such a letter, correct?

5       A.  Yes, that's correct.

6       Q.  And it's your understanding of the law that such a letter

7       is based on whether the government decides you have provided

8       what's termed substantial assistance, correct?

9              MS. LA MORTE:  Objection.  Just to law.

10             THE COURT:  Well, let's just take out those three

11      words.

12             So the question is:  Is it your understanding that

13      such a letter is based on whether the government decides you

14      have provided what's termed substantial assistance.  Is that

15      your understanding?

16             THE WITNESS:  Yes.

17      Q.  It is your understanding of the sentencing process that

18      you'll have a hearing, correct?

19      A.  Yes.

20      Q.  And is your understanding of the sentencing process that

21      before the hearing your lawyer and the government's lawyers

22      will provide the Court with submissions, correct?

23      A.  Yes.

24      Q.  It is your understanding that part of the submissions will

25      include recommendations from your lawyer and the government

1    about your potential sentence, correct?

2              MS. LA MORTE:  Objection.  Asked and answered.

3              THE COURT:  Well, I'm not sure that there is a basis

4    for part of that question.  But if you want to point me to

5    something in the cooperation agreement that deals with that

6    problem, I will consider it.

7              MR. ARTAN:  I'm sorry for being slow here, your Honor,

8    but is the issue about a recommendation or --

9              THE COURT:  Excuse me.

10             MR. ARTAN:  Is the issue about whether there is a

11   recommendation made?

12             THE COURT:  Yes.  The issue is about whether the

13   government makes a recommendation about potential sentencing.

14   Maybe I'm misunderstanding your question.

15             MR. ARTAN:  It could be that I don't practice so much

16   in this district as in other parts of the country.

17             THE COURT:  That may be.  I don't want to interrupt

18   for a sidebar.  I will fill you in later.  Why don't you just

19   move on.

20             MR. ARTAN:  I'll move on.  I don't want to take up the

21   Court's time with this issue.

22             THE COURT:  Just to move this along, it is your

23   expectation, is it not, that if the government writes a letter

24   to the judge, a 5K letter that you have described, describing

25   your substantial assistance, that may result in a reduced

1    sentence?

2              THE WITNESS:  Yes.

3              MR. ARTAN:  Thank you, your Honor.

4    Q.  Mr. Hargreaves, you ended up going back to Europe in late

5    October 2018, correct?

6    A.  That's correct.

7    Q.  And in the succeeding months you had numerous meetings with

8    potential targets of an investigation, correct?

9    A.  That is correct.

10   Q.  I am going to come back to that later, but what I'd like to

11   do now is turn to 2017.  If I'm understanding what you talked

12   about yesterday, you and Koen Van Prat and Steve Bueshner and

13   Stanley Skoglund were interacting in relation to work for

14   Intrapay, correct?

15   A.  Correct.

16   Q.  Now, Intrapay was one of Gary Murphy's businesses, correct?

17   A.  Correct.

18   Q.  And Intrapay was Mr. Murphy's effort to get into clean

19   legal business, correct?

20   A.  Correct.

21   Q.  Koen Van Prat was a well-established figure in finance and

22   banking, correct?

23   A.  I never heard of him before I met him, to be honest with

24   you.

25   Q.  And Stanley Skoglund had a history of working in -- to your

1    understanding, had a history of working in risk assessment and

2    was in management and finance, correct?

3    A.   My only understanding about Stanley Skoglund was the

4    information provided to me by Koen Van Prat in a chance meeting

5    that I had with him in an elevator in Dubai some years before,

6    so I know he had a consulting firm called Minerva, and I know

7    he was an exemployee of Visa.  That's the extent of my

8    knowledge of Mr. Skoglund.

9    Q.   Steve Bueshner, what was your understanding about him?

10   A.   He had -- I don't remember the specific organizations, but

11   I know that he had been employed prior to being employed by

12   Intrapay at some sizeable payment institutions.

13   Q.   To set the stage, Intrapay was set up to do legal business,

14   correct?

15   A.   Correct.

16   Q.   And Intrapay had engaged the services of Koen Van Prat,

17   correct?

18   A.   Correct.

19   Q.   And relied on consultancy from Mr. Skoglund, correct?

20   A.   That is correct.

21   Q.   And also was relying on the services of Steve Bueshner,

22   correct?

23   A.   Correct.

24   Q.   Now, in 2017, those of you in that group of Intrapay people

25   were interested in getting involved in payment processing for

1   at that time medical marijuana, correct?

2   A.  That is correct.

3   Q.  Now, when you were working initially with Intrapay in

4   2017 -- let me take the word initially out and start over.

5   When you were working in 2017 with Intrapay, you were also

6   working for Pago Global, correct?

7   A.  It was being wound up.  Yes.  I was transitioning.

8   Q.  Koen Van Prat reached out to Mr. Akhavan's company to

9   introduce his services as a potential sister in credit card

10  processing for Eaze, is that correct?

11  A.  I don't know how that communication went.  I just know the

12  aftermath of that presumed communication was my receiving

13  WhatsApp communications discussing this subject, which led to

14  us then having interaction.

15          MR. ARTAN:  If I could show the witness Exhibit IWX-4

16  and ask Mr. McLeod to put that up.

17  Q.  Could you review that, please, sir.

18  A.  Tonya, Guy --

19  Q.  I would ask you to review it, please.

20  A.  Sorry.

21  Q.  That's all right.

22  A.  All right.

23  Q.  Do you recognize that?

24  A.  I do, yes.

25  Q.  That's an e-mail from Koen Van Prat to Guy Mizrachi at Mr.

1   Akhavan's company, correct?

2   A.  It is, yes.

3   Q.  You are copied on that e-mail, correct?

4   A.  Yes, I am.

5           MR. ARTAN:  Your Honor, move it into evidence, please.

6           MS. LA MORTE:  No objection.

7           THE COURT:  Received.

8           (Defendant's Exhibit IWX-4 received in evidence)

9   Q.  In this e-mail Koen Van Prat is introducing himself and

10  saying that he wants to introduce his role as a company.

11          MS. LA MORTE:  Objection, your Honor.

12          MR. ARTAN:  I'll just read it.

13  Q.  In the e-mail Mr. Van Prat says:  I trust you are all doing

14  fine.

15          Based on a few WhatsApp exchanges I had with Ray, I

16  would like to plan a call for me to introduce my new role and

17  company I represent and, at the same time, exchange a few ideas

18  Oliver and I have in regards to how believe we have a few

19  interesting solutions for your business.

20          We took liberty in doing some research as to how we

21  can help you with the adult traffic, but equally believe we can

22  offer a solution for www.eaze.com processing.

23          You see that?

24  A.  Yes, sir.

25  Q.  At the time Koen Van Prat sent that e-mail, he was working

1   with you under Intrapay with the understanding that Intrapay

2   would be running clean business, correct?

3   A.  Correct.

4   Q.  And Koen Van Prat then followed up further to try and get

5   the business for this kind of processing, correct?

6   A.  That is correct.

7   Q.  Just so it's clear, when it says adult traffic, that's

8   legal business as well, correct?

9   A.  Pornography is a legal business, yes.

10  Q.  And in mid October, Koen Van Prat also reached out to

11  Mr. Akhavan's business to push ahead with the payment

12  processing ideas he had, correct?

13  A.  That would be consistent with my communications with Koen.

14  I don't know if I was cc'd on those e-mails or not.

15  Q.  Perhaps I can show you -- Mr. McLeod would be the one

16  actually showing you IWX-25.

17          That's an e-mail from Koen Van Prat to Ray Akhavan and

18  you are copied on that, correct?

19  A.  Yes, I am.

20          MR. ARTAN:  Your Honor, I would move that into

21  evidence.

22          MS. LA MORTE:  One moment, your Honor.

23          No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit IWX-25 received in evidence)

1   Q.  Koen Van Prat was making a business pitch, correct?

2   A.  That is correct.

3   Q.  And there was nothing secretive about what he was going,

4   correct?

5   A.  No, nothing secretive.

6   Q.  In fact, this e-mail is going to four or five different

7   e-mail domains, correct?

8   A.  That is correct.

9   Q.  And the reason there was nothing secretive about it was

10  that the intention was to carry through with a legal payment

11  processing system, correct?

12  A.  Could you repeat that.

13  Q.  The reason there was nothing secretive about this was the

14  intention was that the process be legal, correct?

15  A.  I am just going to answer very, very plainly on this.  This

16  was a slightly -- there is a level of what appeared -- if I

17  tell you it now, you are going to think sounds very stupid.

18  Quite frankly, we didn't really know the nuances, I certainly

19  didn't, between state and federal law in the U.S.  And stupid

20  as it sounds, yeah.  The short answer to your question is yeah.

21       MR. ARTAN:  One moment, please, your Honor.

22  Q.  If I understand your comments you just made, it was your

23  mindset at that time that these ideas going forward were for

24  legal business, correct?

25  A.  Yes.

1    Q.  In fact --

2    A.  Do you mind -- I would like to actually amend that answer,

3    if I may.

4            THE WITNESS:  May I?

5            THE COURT:  All right.  Go ahead.

6    A.  I knew that we were doing something that was not wholly

7    white, and there was a term that was used very much certainly

8    in the industry where I worked which was, is it gray or is it

9    white.  And I would say, my view on this was that this was gray

10   business.  That may be difficult for the Court to understand,

11   but I would say that I understood there was areas of this that

12   were illegal, but also there were areas to the fact that

13   medical marijuana was legal to purchase that made it legal.  We

14   therefore considered it to be something a little bit gray, as

15   opposed to black or white.

16           I'm sorry if that's a slightly ambiguous answer, but

17   that's -- but that is my answer.

18   Q.  Thank you.

19           By the time you were set up to go and meet in November

20   with the idea of meeting in November, you and Mr. Van Prat and

21   the others in Intrapay had come up with a plan, basically, to

22   conduct the payment processing, correct?

23   A.  We had an acquiring bank that was interested in miscoding,

24   yes.

25   Q.  Well, you wrote an e-mail to Mr. Akhavan's company

1    outlining the process, correct?

2    A.  Could you show it to me?

3    Q.  Yup.

4         MR. ARTAN:  If Mr. McLeod will please show IWX-22.

5    Q.  Have you had a chance to review that?

6    A.  Yes, I have.

7    Q.  It's an e-mail from you to Guy and Ray at Mr. Akhavan's

8    company, correct?

9    A.  Yes, it is.

10        MR. ARTAN:  We would move it into evidence, your

11   Honor.

12        MS. LA MORTE:  No objection.

13        THE COURT:  Received.

14        (Defendant's Exhibit IWX-22 received in evidence)

15   Q.  Now, it's a fairly detailed explanation of your plan,

16   correct?

17   A.  Yes.

18   Q.  It suggests that there be a payment flow from CE to

19   Clearsettle to Pago to Paynetics, right?

20   A.  Yes, that's correct.

21   Q.  It suggests setting up sites.  It also talks about

22   businesses that you already had purchased, correct, Lorry

23   Limited and others, correct?

24   A.  I didn't see the mention of those names.

25   Q.  I beg your pardon?

1   A.   You referenced a company name.  I don't see it referenced.

2   Q.   It's further down.  I'm sorry.

3         You see that?

4   A.   I do, yes.  Thank you.

5   Q.   You had basically supplied Mr. Akhavan's company with a

6   turnkey plan for going forward with the payment processing,

7   correct?

8   A.   I had experience in creating fraudulent application packs,

9   yes, and I did submit this, yes.

10  Q.   Sir, I notice when I ask you one question you intervene and

11  say that it was fraudulent.

12        Have you been coached to say that things are

13  fraudulent when I ask you some question that has a different

14  issue?

15  A.   No, sir.

16  Q.   Because yesterday you used the word fraudulent something

17  like 50 times.

18        Do you remember that?

19  A.   But they are fraudulent.

20  Q.   In fact, on two occasions yesterday you did not use the

21  word fraudulent and then you said, sorry, and you added in

22  fraudulent.

23        Do you remember that?

24  A.   I don't, no.

25  Q.   Maybe we can show you.

1              MR. ARTAN:  One moment, please, your Honor.

2              If we could look at the trial transcript from

3      yesterday, page 728.

4      A.  Could you guide me by number.

5      Q.  Lines 1 through 6.

6      A.  Yes, I see it.

7      Q.  Your answer was:  "Initially it was discussed, it would be

8      an individual we discussed, for example, myself flying to a

9      location, Germany, wherever it might be, with the application

10     packs on a pen drive or something -- I'm sorry -- the

11     fraudulent application packs and providing them to the ISO, for

12     him to provide them, by whatever means, to the acquiring banks

13     in question."

14             You see you apologized for not using the word

15     fraudulent.  Do you see that?

16     A.  Yes, I do.

17     Q.  You did that again yesterday, right?

18     A.  This is what you are showing me, right.

19             (Continued on next page)

20

21

22

23

24

25

1          MR. ARTAN:  We'll look at another one.  At page 793,

2     lines 10 to 13.

3          MR. FOLLY:  Your Honor, may we have a brief sidebar?

4          THE COURT:  I'm sorry?

5          MR. FOLLY:  May we have a brief sidebar?

6          THE COURT:  I haven't heard any objection yet from the

7     government.  Are you making an objection?

8          MS. LA MORTE:  Your Honor, there --

9          THE COURT:  Sustained.

10          MS. LA MORTE:  Your Honor, there's an issue regarding

11     the exhibits that are being shown.

12          THE COURT:  All right.  Let's have a sidebar.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  The usual is one attorney for each side,

3     but all right.

4          MS. LA MORTE:  Thank you, your Honor.

5          THE COURT:  Okay.  First, the prior testimony, even

6     from this very trial, cannot be read unless it's inconsistent.

7     So those questions as to the way -- and you didn't even put a

8     question.  You just started reading from it.  That was

9     improper.

10         MR. ARTAN:  Okay.  I apologize, your Honor.

11         THE COURT:  Second, what's your problem?

12         MR. FOLLY:  Your Honor, I apologize.  I think there

13    was an issue -- we're still trying to get to the bottom of

14    this.  My understanding is there was an e-mail that was

15    intended to be sent from the defense to the prosecutors last

16    night that contained certain exhibits that are being used

17    today, and in fact, I don't think we were included on that

18    e-mail, as I understand it.  And as a result, we haven't seen

19    documents that are intended to be shown to this witness during

20    this cross-examination, including some of the documents that

21    were already shown.

22         THE COURT:  What is your basis for saying that you

23    ever have to be shown in advance any exhibits that are being

24    used for cross-examination?

25         MS. LA MORTE:  Your Honor, I don't believe these are

1    impeachment documents.

2                 THE COURT:  You had that wrong, and now you have that

3    wrong.  We'll talk about that later.  I don't want to waste my

4    time right now with your mistake.

5                 I repeat, there is no rule that says that exhibits

6    that are used on cross-examination have to be furnished in

7    advance by even one minute before they are put on the screen.

8    That is a rule that's existed for at least 200 years.

9                 MS. LA MORTE:  Your Honor, may I ask a clarifying

10   question?  You had ordered that the defendants produce an

11   exhibit list.

12                THE COURT:  That they intended to use on their case.

13                MS. LA MORTE:  And again, just clarifying.  That

14   wouldn't apply --

15                THE COURT:  No.

16                MS. LA MORTE:  Okay.

17                THE COURT:  If it's not proper cross-examination,

18   which is what I think you're trying to get at by saying

19   impeachment, that's a different question.  You can object to it

20   if it's not proper cross-examination.  You were under the

21   impression --

22                MS. LA MORTE:  Mmm, hmm.

23                THE COURT:  -- that cross-examination is limited to

24   inconsistent statements.  That's not true.  There is nothing in

25   the federal rules of evidence that so limits it.  And, in fact,

most cross-examination has all sorts of other things.

          For example, the cross-examination that you objected
to was the defense trying to show that when first asked to
cooperate, first importantly cooperate, he didn't say one word
about Mr. Weigand.  That is, if the jury accepts his argument,
evidence that he was later on making it up.  And the reason the
jury could infer that he was making it up later on is that he
didn't mention it first.  That's classic cross-examination.  I
am sorry --

          MR. ARTAN:  Your Honor?

          THE COURT:  I am sorry that I am unfairly imputing to
all of you my 50 years of familiarity with the federal rules of
evidence.  Now, let's go back to work.

          (Continued on next page)

 1                    (In open court)

 2                    THE COURT:  Go ahead, counsel.

 3       BY MR. ARTAN:

 4       Q.  So, Mr. Hargreaves, do you -- do you recall a couple of

 5       times apologizing for not using the word "fraudulent" when

 6       you're talking about applications?

 7       A.  Yes, I do.

 8       Q.  Is that because it was suggested to you that you should use

 9       the word fraudulent as much as possible?

10       A.  No, it was not.

11       Q.  And looking at Exhibit IWX22, is there anything in that

12       exhibit about miscoding?

13       A.  Could you scroll down, please?  Is that the total?  No,

14       there is not.  I'm sorry.  Thank you.

15       Q.  Is there any suggestion in that e-mail that anything --

16       I'll withdraw that question.

17                    So prior to your January 2018 meeting in Calabasas,

18       you had already sent a specific proposal as to how the payment

19       processing would be occurring, correct?

20       A.  An initial proposal or suggestion, yes.  How I would have

21       done it at that time, yes.

22       Q.  And this was a plan that you and Koen Van Prat and Stanley

23       Skoglund and Steve Buechner had talked about before you sent it

24       off, correct?

25       A.  Correct.

1    Q.  Now, yesterday you talked about defining the word

2    fraudulent because your activity was created to trick the

3    acquiring bank into providing us -- you with a merchant

4    account, correct?

5    A.  Correct.

6    Q.  Now, earlier today, you acknowledged that the acquiring

7    banks were often aware of these inconsistencies, correct?

8                 THE COURT:  Sustained.  That's inconsistent with his

9    prior testimony.

10   Q.  Now, you discussed a January meeting in Calabasas, correct?

11   A.  Do you mean, did we plan one?  Do you mean, did we attempt

12   to coordinate one?

13   Q.  No.  You actually discussed having one, correct?

14   A.  Yes.

15   Q.  Okay.

16   A.  Coordinating it.

17   Q.  Well, I'm not following you.  You just said "coordinating

18   it"?

19   A.  Oh, sorry.  Apologies.  I thought you were talking about

20   communications between -- sorry, you're talking about

21   communication -- yesterday, yes, we did.  Yes.

22   Q.  Okay.  Let's start over so there's clarity in my mind at

23   least.  You had a meeting in Calabasas in January, correct?

24   A.  Yes, sir.

25   Q.  And it was one meeting, correct?

1    A.  It was a couple of meetings over a few days.

2    Q.  Well, that -- it was only one meeting; isn't that true?

3    A.  No, it's not.

4            MS. LA MORTE:  Objection.

5            MR. ARTAN:  I'll withdraw that.

6    Q.  Where were these couple of meetings you're talking about?

7    A.  In the office in Calabasas, in Ray's house.

8    Q.  Isn't it true that you had a meeting, there were people

9    from Worldline who came, you left and Koen went on a plane and

10   left California after the one meeting; isn't that true?

11   A.  No, it's not.

12   Q.  So what day was the first meeting?

13   A.  I don't recall.

14   Q.  What day was the second meeting?

15   A.  You'd have to look at the flight times and the time we

16   stayed in the hotel.

17   Q.  Well, the flight times show that Mr. Koen left the same

18   day?

19   A.  The day he arrived?  That's impossible.

20   Q.  So you don't know what day the meeting occurred, but it's

21   impossible that the date that Mr. Koen left was the same day?

22   A.  The reason I say that is because we stayed in the hotel for

23   at least two nights, which was arranged by Mr. -- by Ray.

24   Q.  So yesterday you said there was a series of meetings, but

25   you only described one; is that correct?

1   A.  I'm sorry.  As I said, we had a couple of meetings.  We had

2   meetings at his office.  We had dinner at his house.

3   Q.  Now, you never met with Mr. Weigand at Mr. Akhavan's house,

4   did you?

5   A.  No, I didn't.

6   Q.  And for part of your meeting in Calabasas, Worldline people

7   were there, correct?

8   A.  Yes, they came in.

9   Q.  And you weren't keeping anything secret from those

10  Worldline people, correct?

11  A.  We certainly weren't discussing the Eaze project in front

12  of them, no.

13  Q.  I'm not following your answer.  Did you discuss the Eaze

14  project in front of the Worldline people?

15  A.  Not to my recollection, no.  They were not part of it.

16  Q.  Now, in London you met with someone named Andreas who was

17  with Mr. Weigand, right?

18  A.  If -- yeah, I believe that was his name.  The tall

19  gentleman.

20  Q.  Well, his role was going to be an ISO in your payment

21  processing plan, correct?

22  A.  His role was pretty, it literally meant him being handed --

23  at the time of that discussion, it pretty much involved him

24  being handed a memory stick, and handing it in to the acquiring

25  bank.  That was the original discussion that was had.

1      Obviously, that situation morphed quite dramatically.

2      Q.  Did you say yesterday that he was going to be the ISO?

3      A.  Yes, I did.

4      Q.  And that would have involved him interfacing with the

5      acquiring banks, right?

6      A.  That is correct, yes.

7      Q.  And that's, in fact, what happened, right?

8      A.  I couldn't tell you how -- I know that we were submitting

9      application packs directly to the acquiring bank, and we were

10     also submitting application packs to Ruben.

11     Q.  You were faxing them?

12     A.  Submitting was the word I used.

13     Q.  Did you say you were faxing them?

14     A.  No, sir.

15     Q.  Okay.  I'm just looking at the transcript here.

16          Well, when you say you were submitting them to Ruben,

17     you were submitting them to EUprocessing, correct?

18     A.  That is correct, yeah.

19     Q.  And you didn't say -- you didn't address those e-mails --

20     you didn't say "hi Ruben," correct?

21     A.  Originally, I think some, yes; some, no.

22     Q.  Well, how many yes?

23     A.  I can't answer that.  We had hundreds of e-mails flying

24     around.

25     Q.  And none of them said "hi Ruben"?

1   A.  I don't think that's the case.  I think some of them did.

2   Q.  Well, you would --

3   A.  You'd have to check, but my understanding is that some of

4   them did.

5   Q.  And you were friendly with Mr. Weigand, correct?

6   A.  I wouldn't say we were friends, no.

7   Q.  Now, Andreas, the only e-mail for him was EUprocessing.com

8   at ProtonMail, right?

9   A.  No, I didn't -- no, I don't believe that is the case.

10  Sorry, did you say Christian?

11  Q.  No, I said Andreas.

12  A.  Sorry.  Then, no, I don't believe that was his e-mail.

13  Q.  So what was his e-mail?

14  A.  I don't know.

15  Q.  If your team wanted to communicate with him, they would

16  send an e-mail to EUprocessing, correct?

17  A.  Communicate with whom, Andreas?

18  Q.  Yes.

19  A.  I never really communicated with Andreas apart from meeting

20  him.  In fact, I met with him at the Cafe Royal in the bar and

21  in the restaurant in the evening, and beyond that, I didn't

22  communicate with him.  Unless you're telling me that he was one

23  of those other e-mails that we don't -- that I don't know --

24          THE COURT:  No, no, no.  First of all, you can't put

25  questions to the lawyer, and he can't make statements of fact

1  to you.  So --

2            THE WITNESS:  Sorry.

3            THE COURT:  -- move on.

4  BY MR. ARTAN:

5  Q.  So it's your testimony that you're not aware of

6  communicating with Andreas, even though he was the ISO?

7  A.  Unless he was using one of the e-mails that I don't know

8  who the user was, the answer is no.

9  Q.  Now, you were saying that you don't generally use

10  ProtonMail in your work; is that correct?

11  A.  At the time I didn't.

12  Q.  I'm sorry?

13  A.  At that time, I would only use ProtonMail for projects that

14  I felt require a high level of discretion, typically projects

15  that were illegal.

16  Q.  Well, didn't you use ProtonMail to communicate with the

17  U.S. government?

18  A.  Yes, because it is discrete.  In actual effect, I'm not --

19  I'm just trying to remember if I did or didn't.  Yes, I did

20  communicate at times using a ProtonMail account to the U.S.

21  government.

22  Q.  Now, you were asked about -- yesterday you were asked about

23  a plan where you would be submitting five to ten applications,

24  application packs, a month; do you remember that?

25  A.  Yes, I do.

1    Q.  Now, how many total packs were submitted?

2              MS. LA MORTE:  Objection.

3              THE COURT:  Ground?

4              MS. LA MORTE:  Personal knowledge by him or throughout

5    the scheme or what?

6              THE COURT:  Okay.  So do you want to narrow the

7    question?

8              MR. ARTAN:  Sure.

9    BY MR. ARTAN:

10   Q.  So yesterday you were testifying a lot -- about a lot of

11   packets getting submitted, correct?

12   A.  I was testifying -- I was testifying about packs, a lot

13   of -- the plan, the rollout of what we wanted to.  Bear in mind

14   that this was also a sales pitch.  We wanted this to grow

15   beyond the initial submissions.  As, unfortunately, we

16   discovered fairly quickly, that the apparently friendly banks

17   weren't so friendly.

18   Q.  Please listen to my question.  Yesterday, you testified

19   about packs being submitted, correct?

20   A.  Yes, sir.

21   Q.  Okay.  And you stated yesterday that these packs were

22   submitted by your people, correct?

23   A.  Yes, sir.

24   Q.  And you didn't submit them yourself, did you?

25   A.  Me, myself, personally?

1   Q.  Correct.

2   A.  No, I did not.

3   Q.  Okay.  So yesterday when you were asked about packs being

4   submitted, you were speaking for your company, correct?

5   A.  Yes, I was.

6   Q.  Without personal knowledge, correct?

7   A.  I was cc'd on a lot of e-mails.

8   Q.  Without personal knowledge, correct?

9          THE COURT:  Sustained.

10  Q.  Now, today when I asked --

11         THE COURT:  It's ambiguous.

12  Q.  Today when I asked you about packs being submitted, you

13  said you don't know because you weren't doing them?

14         MS. LA MORTE:  Objection.

15         THE COURT:  So maybe I can move this along.  When

16  these packs were submitted, were you notified?

17         THE WITNESS:  Yes, I was.  I was typically cc'd.

18         THE COURT:  Okay.  And roughly, to the best of your

19  recollection, how many fraudulent packs were submitted?

20         THE WITNESS:  I think we had four in total -- I think

21  four or five companies with different amounts of websites

22  submitted to multiple banks.

23         THE COURT:  So four or five companies.  And did each

24  of them submit numerous packets, a few packets, some both?

25         THE WITNESS:  They were linked to multiple websites,

1   some with one, some with two, and they were submitted to

2   different acquiring banks.

3           THE COURT:  All right.

4   BY MR. ARTAN:

5   Q.  Okay.  Let me be more clear.  When I'm talking about

6   submitted, I'm talking about submitted to EUprocessing.

7   A.  Okay.  What was the question in relation?

8   Q.  I want to ask you if the question you just gave pertains to

9   submissions to EUprocessing?

10  A.  We submitted some packs to EUprocessing and some directly

11  to the acquiring banks.

12  Q.  Is there a single e-mail that shows that your team

13  submitted a packet directly to an acquiring bank?

14  A.  I don't know.  I can't answer that.

15  Q.  And you didn't do it personally, did you?

16  A.  No, I didn't.

17          MR. ARTAN:  One moment.  I'm sorry, your Honor.

18          THE COURT:  Take your time.

19  Q.  Now, you've mentioned more than once a gentleman named

20  Michele Furlan, correct?

21  A.  Yes, sir.

22  Q.  And he, if I understood, worked for Intrapay helping create

23  the application packets, correct?

24  A.  He worked for -- he was contracted by iMerchant Services.

25  Q.  And he also had a company called Spinwild, correct?

1    A.  Yes.

2    Q.  And Spinwild had involvement in the processing of the Eaze

3    transactions, correct?

4    A.  No, they -- no.  Spinwild's responsibility was in the

5    creation of the application packs.

6    Q.  Well, didn't all the wires concerning this -- these

7    transactions go through Spinwild?

8           MS. LA MORTE:  Objection.  Foundation.

9           THE COURT:  Sustained.

10   Q.  So you have no knowledge of Spinwild having done anything

11   related to the payment processing?

12          MS. LA MORTE:  Objection.  Vague.

13          MR. ARTAN:  I'll restate it.

14   Q.  Other than creating the application packs, you don't have

15   any knowledge of Spinwild having been involved in the payment

16   processing?

17   A.  They -- I mean, the acquiring -- so whenever you talk to me

18   about payment processing, I presume you're referring to the

19   actual action of processing a payment.  And in regards to this

20   transaction laundering scheme, no, that was not -- they were

21   not involved in relationships with entities that could process

22   payments.  Their role, certainly while they worked with me, was

23   in supporting and the creation of these application packs.

24          MR. ARTAN:  Your Honor, I'd like to show the witness

25   an exhibit.

1              THE COURT:  Okay.

2    BY MR. ARTAN:

3    Q.  IWX35.  Can you have a look at that, sir?

4    A.  Yes.

5    Q.  Do you recognize it?

6    A.  I recognize the company name on it.

7    Q.  Do you know what the document is?

8    A.  Honestly, no, I don't.  It looks like a payment.  It looks

9    like -- yeah, it looks like a payment advice from a company

10   called Kantox Limited.

11             THE COURT:  Whoa, whoa, whoa.  It's not in evidence.

12   Q.  So yesterday you said --

13             THE COURT:  Bear with me one minute.

14             (Pause)

15             These lights should go on higher, but they're not, for

16   some reason.  Oh, well.  Sorry, counsel.  Go ahead.

17             MR. ARTAN:  Thank you, your Honor.

18   BY MR. ARTAN:

19   Q.  I have a quick question to ask about something I forgot to

20   ask earlier.  In London, you talked about having discussions

21   with various people in a hotel room; do you remember that?

22   A.  Yes, I do.

23   Q.  And you had mentioned that several people were there,

24   including Mr. Akhavan, and I think you said my client had

25   arrived also?

1   A.  Yes.

2   Q.  And you said there were some peoples whose names you don't

3   remember?

4   A.  That's correct.

5   Q.  And there were people you didn't even know, correct?

6   A.  That's correct.

7   Q.  And is it your testimony that you discussed the payment

8   processing plan in that context, in that circumstance?

9   A.  So this was quite a common theme when meeting with Ray,

10  that people would come and go.  People would come through.  It

11  was -- I wouldn't say it was a sit down with people, discussing

12  one thing at that meeting, and then they would go out and the

13  next people would come in.  It was quite a -- people were

14  coming in and out and discussions would stop, start.  So, yes,

15  that is the case.

16  Q.  Was there any discussion of anything that was questionable?

17          MS. LA MORTE:  Objection.

18          THE COURT:  Overruled.

19  A.  If there was anything questionable?  My discussion --

20          THE COURT:  So you were discussing in your meeting or

21  meetings with Ray some fraudulent plans, yes?

22          THE WITNESS:  Are we talking about this specific

23  meeting?

24          THE COURT:  I'm asking a question, yes or no?

25          THE WITNESS:  Could you repeat the question, please?

1             THE COURT:  Excuse me?

2             THE WITNESS:  Would you mind repeating the question?

3             THE COURT:  Yes.  So in your meeting or meetings with

4     Ray, you discussed some fraudulent proposals, yes?

5             THE WITNESS:  Yes.

6             THE COURT:  And there were other people who came in

7     and out?

8             THE WITNESS:  Yes, sir.

9             THE COURT:  Were you concerned that they were finding

10    out that you were discussing fraudulent proposals?

11            THE WITNESS:  Discussions stopped and started, sir.

12            THE COURT:  Excuse me?

13            THE WITNESS:  Discussions stopped and started.

14            THE COURT:  I see.  Go ahead, counsel.

15            MR. ARTAN:  Thank you, your Honor.

16    BY MR. ARTAN:

17    Q.  So from the point of asking about -- let me start over.

18            From the point of creating an application and someone

19    on your team sending it somewhere, is it your testimony you

20    have no other understanding of what happened beyond that point?

21    A.  I mean, we had communication back.  If the applications

22    were handed in and there were problems with them, we would

23    receive communications about amendments that needed to be made,

24    updated about documentation, but beyond that, no, I don't.

25    Q.  So you don't know if any money went from one place to the

1  other, correct?

2  A.  In relation to what?

3  Q.  In relation to this structure, the Eaze structure.

4  A.  Are you asking me whether I know whether the money -- was

5  whether these --

6  Q.  Let me ask it differently.  Do you have any understanding

7  of what acquiring banks were processing these applications

8  supposedly?

9  A.  I only know the one -- I only know that we filled in

10  applications and submitted to either EUprocessing e-mail and a

11  number of the settlement banks.  I don't know what happened

12  beyond that, no.  I know that we received credentials, which

13  were also forwarded, but beyond that, I don't know.

14  Q.  Okay.  So you don't know which, if any, acquiring banks

15  processed these transactions, correct?

16  A.  No, sir.

17  Q.  I think we have a double negative.  Forgive me.  Do you

18  know if any acquiring banks processed these transactions?

19        THE COURT:  Now, that's a different question.  I

20  thought your previous question was directed at whether he knew

21  which acquiring banks, if any, processed these transactions.

22        And your answer to that is no, correct?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Now you want to know whether he knows

25  whether any of these were processed through acquiring banks?

1          MR. ARTAN:  Yes, your Honor.

2          THE COURT:  As opposed to knowing which acquiring

3    banks; is that the question?

4          MR. ARTAN:  No, you're right.  It was the two

5    questions.  The first one because it was a double negative --

6          THE COURT:  No, I understand.  And the reason I took

7    the liberty of interrupting, other than the joy I always get

8    from doing so, is that your new formulation had other problems.

9          MR. ARTAN:  Okay.  Let me start all over, with the

10   hope that I evade whatever problem it was.

11   BY MR. ARTAN:

12   Q.  Do you have any knowledge, personal knowledge, of any

13   acquiring bank processing these Eaze transactions?

14   A.  Across the board, period?  Or any of these banks as in the

15   banks that we created packs for?

16   Q.  Across the board, any acquiring bank.  Do you have any

17   personal knowledge that transactions were processed?

18   A.  Clearhaus.

19   Q.  And how do you know personally that that happened?

20   A.  I can only go on the fact that we received payment

21   processing data -- sorry, transaction data from Clearsettle,

22   which was given to us to be able to provide to Paydantics.

23   Q.  Okay.  Let me be more clear in my question.

24          From January 2018 onward, do you have any knowledge of

25   any acquiring bank processing for Eaze?

1   A.  No, I do not.

2                MR. ARTAN:  Your Honor, I've got two areas.  Each one

3   will take about ten minutes, and if you'd mind, I'd rather not

4   start them up.

5                THE COURT:  Okay.  So we will let you go for today.

6   Tomorrow we're starting at 10:15 rather than 9:45 because of

7   another matter that I have to handle before that.  So again,

8   please be in the jury room a little bit before 10:15, but it's

9   a half-hour later than it normally is.  I know that breaks your

10  heart, but bear up with it as best you can.  All right.  See

11  you tomorrow.  Have a good evening.

12               (Jury not present)

13               THE COURT:  Okay.  Please be seated.  So I have the

14  greatest respect for all counsel in this case, but --

15               MS. LA MORTE:  Oh, your Honor, should we excuse the

16  witness?

17               THE COURT:  Oh, I'm sorry.  You're excused until

18  tomorrow.

19               Thank you very much.

20               (Witness temporarily excused)

21               So I have the greatest respect for all counsel in this

22  case, but I do expect all counsel to be more careful than

23  perhaps they have been in putting questions and comments.  For

24  example, Mr. Gilbert, at some point in the last hour or so, you

25  said as a flat statement -- I'm sorry?

1           MR. ARTAN:  I'm Artan.

2           THE COURT:  I'm sorry.

3           MR. ARTAN:  I don't want my colleague to get in

4    trouble.

5           THE COURT:  I'm sorry.  When everyone is behind a

6    mask, it's -- you know, you all look fungible to me.  Anyway,

7    you said, the flight records say he came and left on the same

8    day, or words to that effect.  That was a statement of fact by

9    you.  No lawyer should ever, ever become a witness and make a

10   statement of fact.

11          You don't have the capacity to do that.  You don't

12   have the right to do it, and it is misleading to the jury.  You

13   can put a question in a form:  Isn't it a fact that... and,

14   within limits, you can then follow it up with if, it's

15   something that this witness would have within his knowledge,

16   which you can then say:  didn't you see him come and leave on

17   the same day, or something like that, but not what you did.

18          MR. ARTAN:  If I could just briefly, your Honor?

19          THE COURT:  Yes.

20          MR. ARTAN:  And I won't belabor it.  We did have a

21   stipulation as to when he left.  My normal practice is to say,

22   isn't it true; so I blew that one.  I'm not trying to get out

23   of that.

24          THE COURT:  I don't care what stipulations and what's

25   in the record or not in the record.  I understand.  I know you

1  weren't intentionally doing something wrong.  I'm just trying

2  to tell you for future reference I don't want anything but

3  questions.

4        I don't also approve of comments, which you gave

5  several of -- although, it's of lesser importance -- I don't

6  understand your answer, as you said to him several times.  No

7  one cares whether you understand his answer or not.  Just put

8  another question.  Got it?  Very good.

9        Anything else we need to take up now?

10        MR. TAYBACK:  Nothing on behalf of Mr. Akhavan.

11        MR. ARTAN:  Can we do the post-arrest statement, your

12  Honor?

13        THE COURT:  Unfortunately, I'm going to arrive right

14  at 10:15.

15        MR. ARTAN:  Well, later in the day tomorrow.  This

16  doesn't come up for some time.

17        THE COURT:  Fine.  How much longer are you going to

18  be?

19        MR. ARTAN:  Well, I want to talk to my colleagues, but

20  I think it would be under half an hour.

21        THE COURT:  Okay.  What I'll ask you to do is

22  tomorrow, right before we begin, give me a more or less

23  binding -- you can't do it now, but after you talk to them; I

24  won't hold you to it absolutely -- but fairly precise.  And

25  then I'll want to know -- this will be more of a ballpark

1   because you haven't started yet, but -- approximately how long

2   you're going to be.  You can tell me that in the morning.

3           MR. TAYBACK:  I will tell you, your Honor, in the

4   morning.

5           THE COURT:  All right.  Anything else?

6           MS. LA MORTE:  No, your Honor, not from the

7   government.

8           THE COURT:  Very good.  Thanks a lot.

9           oh, there is one other thing, I'm sorry, and think

10  want to double-check that I have it right.  I interrupted

11  counsel on the -- I'm sorry, please be seated.  You put a

12  question to the witness along the lines of:  and then at the

13  sentencing, the government and the defense are going to make a

14  sentencing recommendation to the judge.

15          MR. ARTAN:  Mr. Gilbert --

16          THE COURT:  In this district, that's not the way it

17  works.

18          MR. ARTAN:  Mr. Gilbert set me straight on that.  I

19  apologize for that.

20          THE COURT:  Again, you know, it was not a big point,

21  but I just wanted to make sure you get it corrected.

22          MR. ARTAN:  I did.  I followed up there, and I

23  realized where my mistake might have been.

24          THE COURT:  No, the government in this district never

25  makes, almost never -- not always, but very rarely makes a

1    specific recommendation.

2            MR. ARTAN:  It's the exact opposite --

3            THE COURT:  They just say things like, his assistance

4    was magnificent, it was fantastic, we've never had someone who

5    was so wonderful and, of course, that doesn't convey any

6    message at all to the judge.

7            MR. ARTAN:  In California, there's fights over very

8    specific sentencing issues.  I kind of like it the way you do

9    it, your Honor.

10           THE COURT:  California is known for its

11   idiosyncrasies.

12           (Adjourned to 10:15 a.m. on March 10, 2021)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

  OLIVER HARGREAVES

Direct By Ms. La Morte . . . . . . . . . . . 859

Cross By Mr. Artan . . . . . . . . . . . . . 913

                   GOVERNMENT EXHIBITS

Exhibit No.                               Received

  2101    . . . . . . . . . . . . . . . . . 882

  3602 and 3604   . . . . . . . . . . . . . 887

                   DEFENDANT EXHIBITS

Exhibit No.                               Received

  28    . . . . . . . . . . . . . . . . . . 859

  IWX-4   . . . . . . . . . . . . . . . . . 959

  IWX-25   . . . . . . . . . . . . . . . . 960

  IWX-22   . . . . . . . . . . . . . . . . 963