L3BPWEI1                         Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                            20-CR-188 (JSR)

RUBEN WEIGAND and
HAMID AKHAVAN,

                Defendants.               Trial

------------------------------x

                                          New York, N.Y.

                                          March 11, 2021
                                          9:39 a.m.


Before:

                        HON. JED S. RAKOFF,

                                          District Judge


                        APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  NICHOLAS FOLLY
     TARA MARIE LA MORTE
     EMILY S. DEININGER
     Assistant United States Attorneys

DECHERT LLP
     Attorneys for Defendant Weigand
BY:  MICHAEL J. GILBERT
     SHRIRAM HARID
     ANDREW J. LEVANDER
     STEPHEN PELLECHI
     -and-
MICHAEL H. ARTAN
     Attorney for Defendant Weigand


                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

L3BPWEI1                        Trial

                         APPEARANCES CONTINUED

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
        CHRISTOPHER TAYBACK
        SARA CLARK
        MARI HENDERSON
        DEREK SHAFFER
        PAUL SLATTERY
        -and-
ROTHKEN LAW FIRM LLP
        Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
        JARED R. SMITH

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  Please be seated.  All right.  The jury
 3    should be up in five minutes.  Anything we need to take up
 4    before then?  Good.  All right.
 5              MR. HARID:  Your Honor?  We do have an issue that I
 6    believe your law clerk raised with you, is that we have
 7    specific objections to various documents that the government
 8    intends to offer through the special agent coming up next,
 9    Special Agent --
10              THE COURT:  All right.  Well, let's deal with as much
11    of that as we can.  So what's the first objection?
12              MS. LA MORTE:  Ms. Deininger is handling that.
13              THE COURT:  What's the first objection?
14              MR. HARID:  The first objection is to Government
15    Exhibit 1684, your Honor, and we've established, based on --
16    just one moment, your Honor.  The testimony of the first
17    witness in this case, Michael Tassone, established that this
18    e-mail predates the charged scheme.
19              I can point your Honor to page 150 of the transcript,
20    lines 1 through 7 and 18 through 20, which show that Eaze
21    didn't even begin using the card solution until the fall of
22    2016 and that they didn't even consider a current solution,
23    thinking about it, until the beginning -- the late -- the
24    spring of --
25              THE COURT:  Yes, but this sounds just like this is
```

L3BPWEI1                    Trial

from Mr. Weigand.  It looks on its face to be preparatory.  It
may have been preparatory to the conspiracy or not, but it's
still admissible.  Overruled.  Next?

          MR. HARID:  All right.  The next document is
Government Exhibit 1684 and the important point we'd make here
is that the government's entire case is focused on six
so-called proxy merchants and those include -- those were
mentioned by the government's cooperating witness,
Mr. Hargreaves, and those six proxy merchants are International
Standard, Hot Robots, New Opal, Lorry, Linebeck and Johnson.
NYC.  This entire document doesn't concern any of those proxy
merchants, and it's not relevant to this case for that reason
and its prejudice --

          THE COURT:  All right.  Let me hear from the
government on that one.

          MS. DEININGER:  Your Honor, the government's case is
not limited to the six proxy merchants.  Those are just the
proxy merchants that Mr. Hargreaves testified to, and as is
clear from --

          THE COURT:  And I think that is clear from the
indictment as well.  That objection is denied.  Next?

          MR. HARID:  Your Honor, the next one we objected to
was -- your Honor, I'd like to return to the Telegram chats
that we were beginning to discuss last week, beginning with
Government Exhibit 1720.

L3BPWEI1                     Trial

1           THE COURT:  Well, I'm happy to have you do that, but

2    since we have limited time right now, why don't we finish the

3    government exhibits that you had objections to, and then we'll

4    turn to anything else.

5           MR. HARID:  Your Honor, this is one of the government

6    exhibits that --

7           THE COURT:  I'm sorry, the next thing that I have in

8    front of me, from what I thought was your list, is 1688; is

9    that right?

10          MR. HARID:  That's correct.

11          THE COURT:  Okay.  And is this one of those --

12          MR. HARID:  Mr. McLeod, could --

13          THE COURT:  -- Telegram chats?

14          MR. HARID:  The translated version.

15          THE COURT:  Let me ask the government, what is this?

16          MS. DEININGER:  The translated version shows that this

17   is an e-mail from Christian Chmiel, who your Honor has heard

18   testimony about as a co-conspirator, sending three reports to

19   Ruben Weigand regarding three of the shell companies that

20   Mr. Hargreaves testified regarding International Standard,

21   Lorry Limited and Hot Robots Limited.

22          THE COURT:  All right.  So what's the objection?

23          MR. HARID:  And the objection, your Honor, is there's

24   no engagement by Mr. Weigand.  This is an e-mail that begins

25   "FYI."  You know, obviously, this e-mail was directed initially

L3BPWEI1                    Clow - Direct

1    to someone else, and there's no evidence to suggest that

2    Mr. Weigand ever responded to Mr. Chmiel, and that's where the

3    prejudice comes in.

4            THE COURT:  Yes, but the government's version is the

5    e-mail to Mr. Weigand from Christian Chmiel, C-h-m-i-e-l, for

6    Mr. Weigand's information.

7            THE LAW CLERK:  Jury entering the courtroom.

8            THE COURT:  To be continued.

9            (Jury present)

10           THE COURT:  Let's get the witness on the stand.

11           MS. LA MORTE:  Yes.

12           THE COURT:  Please be seated.

13           Morning, ladies and gentlemen, and thank you as always

14   for your excellent promptness.  And you will see the lights are

15   brighter; so with a little technical help, I was able to

16   accomplish something.

17           All right.  I remind the witness he's still under

18   oath.  Go ahead.

19    RICHARD CLOW,

20   DIRECT EXAMINATION (Resumed)

21   BY MS. LA MORTE:

22   Q.  Good morning, Mr. Clow.

23   A.  Good morning.

24   Q.  Where we last left off yesterday, we had introduced and

25   received into evidence Government Exhibits 2410 and 2411.

L3BPWEI1                         Clow - Direct

1              Mr. Levine, can you display for everyone Government

2      Exhibit 2410.

3              Mr. Clow, do you see that?

4      A.  Yes, I do.

5      Q.  What is the title of this document?

6      A.  Marijuana-related businesses.

7      Q.  And what is the effective date?

8      A.  21st of June, 2018.

9      Q.  And just generally what is this document?

10     A.  This is an enterprise policy that outlines our views on

11     marijuana-related businesses and prohibits working with some of

12     those businesses, and it defines exception processes for

13     others.

14     Q.  So you just mentioned that this is an enterprise policy;

15     what does that mean?

16     A.  Correct.  At the bank, that means that it applies to all

17     divisions of the company; so consumer, corporate, wealth, each

18     of the divisions that serves different segments of clients.

19     Q.  And would that include Bank of America's role as an issuer

20     withing credit and debit cards?

21     A.  Yes, it would.

22     Q.  And can we zoom in on pages 1 through 1, subsection III,

23     Policy Scope Applicability.

24              And, Mr. Clow, why don't you just read those first

25     three lines immediately under Policy Scope Applicability?

1    A.   "This policy applies globally to Bank of America

2    Corporation, including wholly owned subsidiaries and

3    affiliates, collectively Bank of America or "bank," that are

4    engaged in commercial transactions including lending, traded

5    products and other financing activities.

6    Q.   Okay.  We can zoom out of that.

7             Now, let's go to page 1 and can we highlight section

8    II, background rationale.

9             Mr. Clow, what is the overall purpose of this section,

10   background rationale?

11   A.   This is used to define why we need to have an enterprise

12   policy related to marijuana-related businesses.

13   Q.   And can you read this first paragraph aloud, skipping the

14   parts that are in parenthesis?

15   A.   Certainly.  "Marijuana is a topic that represents unique

16   and significant compliance and reputation risks for global

17   financial institutions, given the different legislative

18   frameworks applicable to marijuana established by U.S. federal

19   government and various states and non-U.S. jurisdictions.  Bank

20   of America has no appetite for accepting compliance risk and

21   will only provide products and services in a manner that is

22   fully compliant with governing laws, rules, regulations and

23   regulatory guidance.  Therefore, this policy has been developed

24   to support compliance with such legal rules, regulations

25   including, without limitation, the Controlled Substances Act,

Money Laundering, and other Anti-Money Laundering and financial

crimes regulations, while establishing a framework within which

the bank may engage with certain clients and prospects who may

have some role in a legalized marijuana economy."

Q.   Let's take a look at the highlighted part, where it states

"Bank of America has no appetite for accepting compliance

risk;" do you see that?

A.   Yes, I do.

Q.   What is meant by compliance risk?

A.   That's the risk of the bank not complying with rules or

regulations.

Q.   And then directing your attention to the last sentence or

the last clause, it states there "while establishing a

framework within which the bank may engage with certain clients

and prospects who may have some role in a legalized marijuana

economy;" do you see that?

A.   Yes, I do.

Q.   What does that mean?

A.   That means that there are economies outside the United

States where marijuana is legal.

Q.   And in certain circumstances, will Bank of America engage

in business with such entities?

A.   In certain circumstances, with the appropriate approvals.

Q.   Okay.  So let's talk now about what this policy does and

does not prohibit.  And we're going to focus on the section

1    which is already up on the screen, key definitions.  Do you see

2    that?

3    A.  Yes.

4    Q.  And so directing your attention to the line that's under

5    MRB Review Team.  Do you see where it says "for purposes of

6    this policy"?

7    A.  Yes.

8    Q.  I'll read that aloud, and then we'll look at the two bolded

9    parts underneath.  "For purposes of this policy, clients

10   engaged in MRB activities will be designated as one of the

11   following:"

12            Now, before we move on, what is the reference to MRB,

13   what does that stand for in this policy?

14   A.  That's a marijuana-related business.  It's defined above.

15   Q.  So let's start with direct marijuana-related business,

16   which is also known -- seen as "direct MRB;" do you see that?

17   A.  Yes, I do.

18   Q.  Can you read the first two sentences aloud?

19   A.  Sure.  "Any individual or legal entity that is directly

20   involved in the manufacture, cultivation, distribution, sale or

21   dispensing of marijuana.  Includes clients that have a common

22   ownership with a direct MRB, regardless of whether the entities

23   are financially independent."

24   Q.  Can you provide an example of a direct marijuana-related

25   business under this definition?

1    A.  Marijuana dispensary would be an example.

2    Q.  And will Bank of America engage in any type of activity

3    with a direct marijuana-related business in the United States?

4    A.  No, we will not.

5    Q.  Now, let's just take a look at underneath where it says

6    "indirect marijuana-related business or indirect MRB;" do you

7    see that?

8    A.  Yes, I do.

9    Q.  Can you read the first sentence up to the colon?

10   A.  "Individuals or legal entities that are not directly

11   involved in the manufacture, cultivation, distribution, sale or

12   dispensing of marijuana in violation of the CSA but either."

13   Q.  And just before we go on, that reference to CSA in there;

14   do you see that?

15   A.  Yes.

16   Q.  What does that refer to?

17   A.  That's the Controlled Substance Act.

18   Q.  Okay.  So you can go on.  Can you read the (a), (b) and (c)

19   subsections?

20   A.  Yes.  "(a) advertise or promote their products or services

21   to direct MRBs or the cannabis industry; (b) intend to promote

22   the manufacture, cultivation, distribution, sale or dispensing

23   of marijuana; or (c) earn revenue through the sale of,

24   production, provision of service or leasehold, whether directly

25   or through intermediary, sales to a direct MRB."

L3BPWEI1                          Clow - Direct

1    Q.  Can you provide an example of an indirect MRB under this

2    definition?

3    A.  An indirect MRB could be a trucking company that aids in

4    the distribution of multiple products, including cannabis.

5    Q.  And then please read aloud the last line of this definition

6    of indirect MRB?

7    A.  "Exclude service companies and mass market merchandise

8    retailers and manufacturers where neither (a) nor (b) applies,

9    and end use of products or services by direct MRBs is unknown

10   or indeterminate from customer due diligence.  Bank of

11   America" --

12   Q.  Sorry.  I actually meant the last line; so keep going.

13   A.  "Bank of America only engages with indirect MRBs under

14   limited circumstances as outlined in this policy."

15   Q.  Okay.  Now, let's look at the policy requirements.  So we

16   can zoom out, and let's go to page 2, and let's zoom in on

17   section IV, policy requirements, through the end of the

18   subsection I.

19        Okay.  So now we're looking at policy requirements,

20   subsection IV.  Can you see where it says "initial MRB

21   identification"?

22   A.  Yes.

23   Q.  Can you read aloud the first two sentences of this first

24   paragraph?

25   A.  Yes.  "Client teams must make reasonable efforts to

L3BPWEI1                          Clow - Direct

1   determine the extent of a client's (and guarantor's) engagement

2   in MRB activities through established business unit AML" --

3   which is anti-money laundering -- "and KYC" -- which is know

4   your customer -- "and credit-related due diligence processes."

5   Q.  So let's just stop there for one sec before I have you go

6   on to the next line.  What is the client teams being directed

7   to do here, in laymen's terms?

8   A.  In laymen's terms, they're being asked to do the due

9   diligence to understand the primary business that -- and

10  purpose of the business that they are -- that this specific

11  client or potential client is doing.

12  Q.  And what is the importance or significance of doing that?

13  A.  The bank has to adhere to the legal rules and regulations,

14  and as well as our policies; so we must understand the business

15  and the business practices that we're doing business with.

16  Q.  Okay.  And then just read the second sentence of this

17  paragraph, please?

18  A.  "Consideration should be given to the client's location,

19  type of operation or services, funds flow/ultimate source of

20  repayment, and likely engagement with or support of the

21  marijuana industry."

22  Q.  And what -- can you explain to us what that means?  How is

23  that information being used?

24  A.  Yes.  So clients in different businesses related to, let's

25  say, supply chain or distribution may support a

L3BPWEI1                           Clow – Direct

1  marijuana-related business and the funding may be done by

2  multiple companies.  The requirement of our client teams is to

3  understand in detail those fund flows for who is paying for

4  what, what the purpose of the payment is for and how we can

5  track that compliantly.

6  Q.  And for Bank of America to be able to perform this

7  function, is it important for the bank to have accurate

8  information concerning the nature of the business and its

9  operation and services?

10  A.  Yes.  It's one hundred percent reliant upon accurate data.

11  Q.  Okay.  Now, let's look at where it says subsection 1,

12  prohibited U.S. direct MRB; do you see that?

13  A.  Yes.

14  Q.  Can you read aloud the first paragraph under this section?

15  A.  "Bank of America must not knowingly enter into client

16  relationships with individuals or legal entities that are U.S.

17  direct MRBs unless such MRB has the proper license from the

18  federal government."

19  Q.  Keep going.

20  A.  "In no instances may bank products/services be provided to

21  a U.S. direct MRB as outlined in the financial crimes customer

22  due diligence enterprise standard."

23  Q.  Okay.  So let's, Mr. Clow, talk about an e-commerce company

24  that's located in the United States.  Under this policy, if

25  that e-commerce company facilitated the sale of marijuana

1    products, would it qualify as a U.S. direct MRB under the

2    provision that you just read?

3    A.  Yes, it would.

4    Q.  And under this policy, would Bank of America knowingly

5    conduct business directly with that U.S. e-commerce company?

6    A.  No, we would not.

7    Q.  Now, once that e-commerce -- U.S. e-commerce company was

8    authorized to facilitate the sale of marijuana products in

9    California, would Bank of America knowingly conduct business

10   with that entity?

11   A.  No, we would not.  This policy states that we are not

12   allowed to.

13   Q.  Okay.  We can zoom out of that.  Now, can we go down to

14   pages 2 through 3 and just highlight this whole section under

15   subsection 2.

16           Okay.  So, Mr. Clow, a few moments ago you testified

17   that Bank of America will allow for some business under certain

18   circumstances with an indirect marijuana-related business; is

19   that right?

20   A.  Correct.

21   Q.  And what is this section titled that we're looking at?

22   A.  "Higher risk, restricted indirect MRB and non-U.S. direct

23   MRB."

24   Q.  And can you please read the two sentences below that?

25   A.  Sure.  "The bank has a limited appetite for credit and

L3BPWEI1                          Clow - Direct

1   deposit services to some client relationships identified as an

2   indirect MRB or non-U.S. direct MRB solely in accordance with

3   this policy.  Eligible MRB activities are restricted as

4   outlined below."

5   Q.  And then we see a chart here, correct?

6   A.  Correct.

7   Q.  And just generally, what does this chart reflect?

8   A.  Really, generally, the chart reflects that if we are the

9   bank to states and localities that need to collect taxes, that

10  that's one exception in the United States, but then outside the

11  United States, in countries like Holland, where it's legal, we

12  can work with direct marijuana-related businesses.

13  Q.  Does anything in this list include a U.S. direct

14  marijuana-related business?

15  A.  No, those are strictly prohibited.

16  Q.  Is it important for Bank of America to have accurate

17  information about a particular business in order to be able to

18  determine whether it is a U.S. direct MRB or one of the

19  possibly allowable indirect marijuana-related businesses?

20  A.  Yes, it's critical.

21  Q.  Okay.  We can zoom out of that.  And I believe going back

22  to page 1, Mr. Levine.

23          Mr. Clow, I believe you indicated the effective date

24  of this policy was sometime in 2018; is that right?

25  A.  Correct.

1   Q.   And was there a subsequent version of this policy that was

2   implemented for the following years?

3   A.   Yes.  I'm not sure that it's annual, but I'm aware that

4   it's been revised once or twice.

5   Q.   Okay.  Let's just take this down then, and briefly put up

6   Government Exhibit 2411.  And this is up for everyone,

7   Mr. Levine?  Thanks.

8            Mr. Clow, do you see this Government Exhibit 2411 in

9   front of you?

10  A.   I do.

11  Q.   What is this?

12  A.   This is the updated marijuana related policy for May 13th,

13  2019.

14  Q.   And have you reviewed this policy?

15  A.   I'm familiar in that there were no material changes, just

16  clarifications in some areas.

17  Q.   Okay.  Just to be clear, then, you're saying there were no

18  material changes between the policy that we just looked at and

19  this later updated one?

20  A.   Correct.

21           MS. LA MORTE:  Okay.  We can take that down,

22  Mr. Levine.

23           Your Honor, the government now seeks to offer

24  Government Exhibits 2413 through 2416 as self-authenticating

25  records pursuant to rules 8036 and 902.11?

1    　　　　　MR. BURCK:  No objection.

2    　　　　　MR. GILBERT:  No objection.

3    　　　　　THE COURT:  Received.

4    　　　　　(Government's Exhibits 2413 through 2416 received in

5    evidence)

6    BY MS. LA MORTE:

7    Q.  Mr. Clow, do you have a binder in front of you?

8    A.  Yes.

9    Q.  Can you turn to Government Exhibit 2413?

10   　　　　　And, Mr. Levine, you can put on Government

11   Exhibit 2413 on the screen for everyone.

12   A.  Okay.

13   Q.  What is the title of this document?

14   A.  Financial crimes compliance enterprise policy.

15   Q.  And then if you just take a look in your binder --

16   actually, before we do that, what is the last review date

17   that's indicated on this policy?

18   A.  26th of July 2016.

19   Q.  And then just take a look at your binder, at Government

20   Exhibits 2414 and through 2416.

21   A.  Okay.

22   Q.  What are those?

23   A.  These are subsequent versions of the financial crimes

24   compliance enterprise policy.

25   Q.  Okay.  So let's take this down, Mr. Levine, and let's put

up Government Exhibit 2415.

And what is -- this is one of the subsequent versions
of the financial crimes compliance enterprise policy; is that
correct?

A.   That's correct.

Q.   And what is the last review date on this policy?

A.   26th of June 2018.

Q.   Okay.  So let's zoom in on subsections I and subsections II
of this policy.

Mr. Clow, can you read aloud the policy statement?

A.   Yes.  "It is the policy of Bank of America Corporation and
its enterprise subsidiaries, the company, to fully comply with
the laws, rules and regulations enacted and promulgated in the
jurisdictions in which it does business that are aimed to
address financial crimes.  It is the company's policy that it
will not knowingly facilitate any financial crime and that it
will fully cooperate with any competent authority relating to
an investigation of a financial crime.  Any employee of the
company found to be involved in an activity related to a
financial crime may be subject to disciplinary action,
including termination, and referral to a competent authority
for appropriate action."

Q.   Now, Mr. Clow, is this policy that we're looking at, this
financial crimes compliance policy, is this an enterprise
policy as well?

1   A.  Yes, it is.

2   Q.  And does that mean it applies across the bank?

3   A.  It does, all divisions.

4   Q.  Okay.  Now, let's just look at the background and rationale

5   for the policy.  Can you read that aloud?

6   A.  Yes.  "The company recognizes the harmful effect that

7   financial crimes have on the communities we serve, as well as

8   the global financial system and global markets in which we

9   participate.  Moreover, jurisdictions across the globe have

10  made compliance with laws, rules, and regulations related to

11  financial crimes a top priority for financial institutions.

12  Significant criminal or regulatory action and severe reputation

13  damage can occur when financial institutions fail to comply

14  with these laws, rules and regulations."

15  Q.  Okay.  We can zoom out of that, Mr. Levine.  Okay.  We can

16  take this down.

17          Now, Mr. Clow, I want to just spend a few minutes

18  talking about card processing.  So yesterday you mentioned that

19  Bank of America is an issuing bank, meaning that it issues

20  credit and debit cards to customers; is that right?

21  A.  Correct.

22  Q.  And based on your experience at the bank, are you familiar

23  with how credit and debit card processing works?

24  A.  Yes.

25  Q.  Mr. Levine, can you display for the witness only what has

L3BPWEI1                          Clow - Direct

1   been marked as Government Exhibit 3706.

2          Mr. Clow, do you see that exhibit in front of you?

3   A.  Yes.

4   Q.  Would Government Exhibit 3706 assist you in explaining how

5   card transactions are processed?

6   A.  Yes.

7          MS. LA MORTE:  Your Honor, the government requests

8   permission to publish Government Exhibit 3706 as a

9   demonstrative.

10          THE COURT:  Yes.

11          MS. LA MORTE:  Mr. Levine is that published?  Thank

12   you.

13   BY MS. LA MORTE:

14   Q.  So, Mr. Clow, using Government Exhibit 3706, can you walk

15   us through how this process unfolds, step by step, when a Bank

16   of America cardholder uses their card to make a purchase?

17   A.  Yes.  So the cardholder in this example is just like

18   everyday people, you and I.  We go to a merchant and we, let's

19   say, fill a basket, whether it's online or in person, and then

20   there's a total of a purchase price that were asked to pay.

21   When you choose to use your credit card, that merchant takes

22   your credit card information, and then they integrate that with

23   a little bit of information that they send to their merchant

24   acquiring bank.  That information includes the merchant name,

25   it includes the address of the merchant.  It includes a couple

L3BPWEI1                        Clow - Direct

of things about the security of the card, were you there in

person, did you use a mobile payment, and those types of

things.

It also includes what's called a merchant category

code, which classifies the kind of business that that merchant

does, and then it has the amount and the little bit of

information about the cardholder.  That information is shared

with the merchant bank, and the merchant bank's responsibility

is to collect that information and then send it over one of the

card networks, Visa or MasterCard.  That's determined by the

cardholder's card itself.

Then the cardholder bank or, in this case, Bank of

America as the issuing bank, would receive all of that

information, and we would be asked to make a decision, will we

authorize or permit this transaction on behalf of our client or

will we decline it?  So typically, that timeline that we're

required to operate on the network is less than a second.

So we take the merchant name, the amount, the address

that they're at, the way that the category -- the merchant

category is defined, and the amount that's due for our client,

and we see is this an okay transaction and okay for the

cardholder is do, they have that money in their account or do

they have access to it, if it's a credit line, and then we

would authorize.

So when we send the authorization it sends a

L3BPWEI1                         Clow - Direct

confirmation and authorization code back through the merchant

bank to the merchant, and that's when typically the cash

register rings and it opens and you know the sale is completed.

So that would complete the transaction from an authorization

perspective.

Q.   Thank you.  So you listed some categories of information

that Bank of America, as an issuing bank, receives in

connection with a decision whether to authorize the transaction

or not, correct?

A.   Correct.

Q.   I believe you said merchant name, address, security

features, MCC code and the amount, and the date of the

purchase?

A.   Correct.

Q.   Is it important to Bank of America that this information be

accurate?

A.   Yes.

Q.   Why is that?

A.   Well, it's critical for us to make a decision about that

transaction and whether it's within our rules and compliance,

as well as if it's lawful or not.

Q.   Okay.  With we can take that down, Mr. Levine.

         So you mentioned merchant category code.  Can you just

remind us briefly what that is?

A.   Merchant category code is used to describe what kind of

L3BPWEI1                        Clow - Direct

1    business the merchant is in.  The merchant acquiring bank sets

2    that up as they take a new merchant on, and it helps us

3    identify the difference between a grocery purchase or, you

4    know, let's say an online subscription or travel, like an

5    airline ticket.

6    Q.  And I believe you just said there that the merchant

7    acquiring bank is the entity that assigns the MCC code; is that

8    right?

9    A.  That's correct.

10   Q.  Is an issuing bank -- does Bank of America have any role in

11   assigning MCC codes?

12   A.  No, an issuing bank does not.

13   Q.  As an issuing bank, does Bank of America have any role in

14   creating MCC codes?

15   A.  No, we do not.

16   Q.  Now, is it important to Bank of America that the MCC code

17   that it receives in connection with a transaction is accurate?

18   A.  Yes, it is.

19   Q.  Why is that?

20   A.  Well, I think the first thing is it's important so that we

21   know how to treat that transaction.  The second thing is there

22   are actually some benefits on the card where we may provide

23   more reward points or cash back or other types of things.  So

24   there are a number of features based upon the MCC code.

25   Q.  Okay.  So you also mentioned merchant name as a piece of

information that Bank of America receives in connection with

card transactions?

A.   Yes.

Q.   Is it important to Bank of America that the merchant name

be accurate?

A.   It is.

Q.   Why -- sorry.  Go ahead.

A.   It's important to us so that we understand who the merchant

is, in case something happened that's incorrect, and we need to

support our client for a dispute.  And it's also important so

our clients can see where did they buy something and were they

there on that day and is that amount correct and did they

receive whatever it is that they bought.

Q.   And you also mentioned location as a piece of information

that Bank of America receives; is that right?

A.   Yes, it is.

Q.   And so this seems to be an obvious question.  What does the

location information reflect, the location of what?

A.   Traditionally, where is the store that someone walked into,

but today in an e-commerce setting, it's where is that merchant

set up and doing business for their e-commerce transactions.

Q.   And so like, typically speaking, what is that with respect

to a website?  If I go on a website and I make a purchase, what

location information do you expect to see?

A.   Typically, it's the physical address of where the business

L3BPWEI1                          Clow - Direct

1   is headquartered.

2   Q.  So how, if at all, is Bank of America impacted if false

3   information concerning any of these categories is transmitted

4   across the network to Bank of America?

5   A.  We can make mistakes around transactions if they're

6   misclassified.  We can approve something that maybe we

7   shouldn't have.  We can provide too many points or cash back to

8   our clients if the information is wrong.  There are lots of

9   things that can go wrong.

10  Q.  Okay.  So just generally speaking, what happens after a

11  transaction is authorized?

12  A.  After the transaction is authorized, the bank creates a

13  file that we send over the network to the merchant.  So in the

14  case where a consumer used a debit card, then they have that

15  amount in their account, and we move it from their account to

16  what we call in a settlement account, an appropriate account

17  for the bank.  Then we add all of those up and send them over

18  to Visa or MasterCard, and then they split that to the merchant

19  acquiring bank, and the merchant acquiring bank then, in turn,

20  sends it to the bank account of the merchant.

21  Q.  That covers the debit scenario.  Let's talk about a credit

22  card scenario.  Can you explain to the jury the flow of funds

23  that happens in a credit scenario?

24  A.  Yes.  Certainly.  In a credit scenario, Bank of America has

25  given a line of credit, let's say, of $5,000 to a client.  So

1  to authorize a purchase, they have to have that amount due,

2  that amount available.  Let's say it's $100.  So we would take

3  $100 from the line of credit that we provided to the client.

4  We put that hundred dollars into a similar settlement file that

5  we aggregate or summarize, and then we would send that file

6  onto the network, who would send it to the merchant acquiring

7  bank, who would ultimately send it in the merchant's bank

8  account.

9  Q.  So in relation to these credit/debit transactions, is the

10  money coming from the Bank of America account and then

11  transmitted over, or is it something else?

12  A.  It's a Bank of America account.

13  Q.  So the bank, Bank of America, has its own bank accounts?

14  A.  Yes, we have corporate accounts.

15  Q.  Roughly how many card transactions are coming across the

16  network for Bank of America's authorization decision in any

17  given period of time?

18  A.  We typically process somewhere between 20 and 30,000

19  transactions per minute.

20  Q.  Per minute?

21  A.  Per minute.

22  Q.  Okay.  So I now want to switch gears a bit and talk about

23  Bank of America's application of the marijuana-related policy

24  that we've been discussing in the context of card transactions.

25  So, Mr. Clow, are you familiar with how Bank of America

1   monitors the card networks for marijuana-related transactions?

2   A.  Yes, I am.

3   Q.  How are you familiar with that?

4   A.  As part of my day-to-day role, I evaluate new ways to make

5   payments and part of that is being informed about the way the

6   network is currently working and the compliance with the

7   existing network rules.

8   Q.  Is there a particular team within Bank of America that's

9   dedicated to monitoring the network specifically for

10  potentially prohibited marijuana transactions?

11  A.  We have a network compliance team that evaluates both

12  potentially marijuana transactions and a number of other types

13  of high-risk transactions.

14  Q.  Are you familiar how the networks are -- or how the network

15  compliance team monitors the network for marijuana --

16  potentially prohibited marijuana transactions?

17  A.  Yes, I am.

18  Q.  And how are you familiar with that?

19  A.  The network compliance team reports to a peer of mine.

20  We -- I'm part of the management team that periodically reviews

21  the types of things that comes out on those reports.

22  Q.  Can you provide us an overview of how the network

23  compliance team monitors the networks for potentially

24  prohibited marijuana transactions?

25  A.  Yes.  In simple terms, we, on a quarterly basis, have a

L3BPWEI1                         Clow - Direct

1   group of people that use some tools to look at all of the

2   transactions that we've processed in a month, and what they do

3   is they use a couple of key words, like for instance

4   "cannabis," to see if any of the merchants are suspected of

5   supporting a marijuana- or cannabis-based business.

6          Those transactions are then identified, and we can

7   identify the merchants.  So then once the merchants are

8   identified, we have a running list that we manage.  First,

9   we'll see if that merchant's been identified in the past.

10  Let's say the merchant is new, that team would do a very simple

11  publicly available information search, typically like a Google

12  search, to see if they have a website, if it looks like they're

13  advertising that they accept credit or debit cards.  If they

14  do, then we put them on the list that we use, where we share

15  those names with the network, either Visa or MasterCard or

16  both, and we ask the networks to go do the investigation and

17  due diligence with the acquiring bank because that's really who

18  manages the information about the merchants.

19  Q.  Okay.  Just to make sure that everyone is clear, you said

20  that if Bank of America identifies a particular merchant that

21  may be suspicious for selling marijuana products, you would

22  refer that to the network.  When you say that, do you mean Bank

23  of America's own compliance team, or do you mean Visa and

24  MasterCard?

25  A.  Yes, the network compliance team creates a list of

L3BPWEI1                       Clow - Direct

1    suspected marijuana businesses that we report to the Visa team

2    and/or the MasterCard team to conduct the investigation.

3    Q.   Now, do you recall instances, Mr. Clow, where, through the

4    process you just described, Bank of America identified

5    merchants in the network that may be prohibited U.S. direct

6    marijuana-related businesses?

7    A.   Yes.

8    Q.   And just generally, what happened in those circumstances?

9    A.   In those circumstances, through an update process that we

10   have with the networks, the networks reported back that they've

11   terminated some business relationships, meaning that that

12   merchant was indeed accepting credit and debit cards for

13   marijuana transactions, and now they were eliminated from the

14   network so they can't do it going forward.

15          And in some cases, it was identified that they

16   actually weren't using the cards for marijuana-related

17   businesses or products, that it was actually not related to a

18   marijuana business.

19   Q.   So, okay.  A moment ago you outlined for us the procedure

20   that the Bank of America's network compliance team uses to try

21   and identify prohibited marijuana transactions.

22          MS. LA MORTE:  Your Honor, at this time, the

23   government offers Government Exhibits 2424, 2427, 2428, 2423

24   and 2425 pursuant to rules 8036 and 902.11.

25          MR. GILBERT:  No objection.

L3BPWEI1                            Clow - Direct

1              MR. BURCK:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibits 2424, 2427, 2428, 2423 and 2425

4      received in evidence)

5      BY MS. LA MORTE:

6      Q.  Mr. Levine, let's publish for everyone Government

7      Exhibit 2424.

8              Do you see that, Mr. Clow?

9      A.  Yes, I do.

10     Q.  What is this?

11     A.  This is the marijuana dispensary card transaction

12     monitoring process.

13     Q.  Is this reflective of the process that you had just

14     described earlier with respect to how Bank of America

15     identifies prohibited marijuana transactions?

16     A.  Yes, it is.

17     Q.  Can you read the -- just the title of the document, as well

18     as the two lines underneath?  The title in red at the top.

19     A.  Sure.

20     Q.  We can blow it up.

21     A.  "Marijuana dispensary card transaction monitoring."

22     Q.  And the two lines right underneath, "this procedure."  Can

23     you see it?  Do we have to blow it up?

24     A.  I don't see where -- oh, sorry.  "This procedure applies to

25     enterprise payments."  My apologies.

1    Q.  No, there we go.  Mr. Clow, what is transaction monitoring?

2    A.  Transaction monitoring is a way that we look at

3    transactions to try to detect patterns or anomalies or issues

4    based upon those transactions.

5    Q.  And then it states, you just read, "this procedure applies

6    to enterprise payments."  What does that mean?

7    A.  The procedure applies to enterprise payments means that

8    enterprise payments, which is the organization I'm a part of,

9    is responsible and accountable to do this transaction

10   monitoring.

11   Q.  And what is the overall purpose of this marijuana

12   transaction monitoring procedure?

13   A.  This procedure is in place so that we can continuously

14   approve our ability to know -- to make sure that we're not

15   unknowingly authorizing transactions that could be related to

16   marijuana.

17   Q.  What's the effective date of this particular procedure?

18   A.  The effective date is January 31st, 2019.

19   Q.  Can you tell, looking at this document, whether there were

20   previous versions in existence?

21   A.  I can.  There's the revision log in the table above.

22   Q.  Is that in the gray box?

23   A.  Yes, it is.

24   Q.  So just to take a step back for a minute, as a preliminary

25   matter, what type of data or information is being monitored

1    under this procedure?  Where is that data coming from?

2    A.  This information is coming from the network.  It's the same

3    information that we get for an authorization request, like I

4    described, in the basic flow chart for credit card or debit

5    card transaction.

6    Q.  Okay.  So, Mr. Levine, can we scroll in or zoom in on

7    articles I and II, which are on this page.

8         We don't have to go through all the bullet points in

9    article I, but generally, what is article I telling us?

10   A.  It's giving us the rationale for having this process.  It's

11   describing how --

12   Q.  Oh, wait.  I meant article I, those bullet points?

13   A.  Oh, overview, background, initial request, perform the

14   prohibited transactions audit, controls and monitoring,

15   escalation process, key contacts and related information.

16   Q.  Is it fair to say this is a table of contents of sorts for

17   this procedure?

18   A.  Yes, it is.

19   Q.  Okay.  Now, let's focus on article II.  Can you read that

20   aloud?

21   A.  "The marijuana dispensary card transaction monitoring

22   serves as a guideline for Bank of America network compliance

23   team to conduct monitoring of merchant transactions to identify

24   potential marijuana dispensaries, to take the necessary steps

25   to engage key stakeholders and respond timely."

L3BPWEI1                          Clow - Direct

1   Q.   And what are the "key stakeholders" referenced here,

2   generally?

3   A.   The key stakeholders generally are both the set of internal

4   Bank of America stakeholders, as well as the networks who are

5   accountable to do the investigations.

6   Q.   And that would be Visa and MasterCard predominantly?

7   A.   Correct.

8   Q.   Okay.  So let's zoom out, Mr. Levine, and go to the next

9   page.  And could we blow up article III.

10          Can you read aloud the first paragraph?

11   A.   Yes.  "Sale of marijuana is illegal under federal law,

12   while 33 states and the District of Columbia, allow sales for

13   recreational and or medical purposes.  The merchant acquirer is

14   responsible to evaluate the lawfulness of merchants before

15   allowing transactions to be submitted into the payment system.

16   Acquirers are regulated financial institutions that manage

17   risk, assess legality of transactions, and conduct due

18   diligence before they add a merchant to accept card payments.

19   Per network rules, it is necessary for acquirers to properly

20   code transactions, identifying the merchant's name and the line

21   of business using the industry standard merchant category

22   codes, MCC.  However, there is no MCC for marijuana sales as it

23   is federally prohibited."

24   Q.   Okay.  So according to this paragraph, which entity of the

25   payment processing system has the initial responsibility of

1    evaluating the lawfulness of merchants before allowing the

2    transactions to be submitted?

3    A.   The acquiring bank.

4    Q.   And then to be clear, with respect to the application of

5    this marijuana transaction monitoring procedure, in what

6    capacity is Bank of America operating --

7    A.   We're --

8    Q.   -- as a --

9    A.   We're acting as an issuer; so we're reporting on what

10   transactions were authorized that could be suspected of

11   indicating a merchant is in a marijuana business.

12   Q.   Okay.  And then in that same paragraph, one, two, three

13   four, like five lines up, do you see where it says "per network

14   rules"?

15   A.   Yes.

16   Q.   Can you just read that line aloud again?

17   A.   "Per network rules, it is necessary for acquirers to

18   properly code transactions, identifying the merchant's name and

19   line of business using industry standard merchant category

20   codes, (MCC)."

21   Q.   What is the significance of this?

22   A.   The significance is the network rules, in addition to the

23   laws, make it a requirement for acquirers to ensure they know

24   the business and that they send the information to us or the

25   issuers with valid and correct information.

1   Q.   Okay.  So now, let's turn to the second paragraph of this

2   background section.  There are some parts that are redacted,

3   but then it starts with "many;" do you see that?

4   A.   Yes.

5   Q.   Can you read that aloud?

6   A.   "Many of these businesses relate to non-marijuana product

7   transactions, such as legal services, videos, legislative

8   fund-raising, et cetera; therefore, permitted to accept cards

9   as a form of payment.  The enclosed procedure describe how Bank

10  of America conducts periodic research to confirm the acquirers

11  are not submitting marijuana dispensary transactions."

12  Q.   And what does this mean?

13  A.   What this means is that what the business is doing and the

14  way that we're receiving transactions isn't always reflected

15  accurately, and that we're seeking to identify those things

16  that we can't capture or understand during a transaction, after

17  the transaction and with the benefit of more information.

18  Q.   And is it fair to say that -- well, let me withdraw that.

19  We'll just continue.

20       Okay.  So let's zoom out of this.  And now, if we

21  scroll to pages 3 to 4 under article IV, we see -- go back up,

22  Mr. Levine.

23       Do you see we have a chart that sort of spans pages 3

24  to 4?

25  A.   Yes.

L3BPWEI1                         Clow - Direct

1    Q.  One chart.  Is there a way that we can just go up a little

2    bit more, highlight article IV and this whole chart that

3    appears underneath?  There we go.

4            Mr. Clow, what does this chart generally reflect?

5    A.  This generally reflects the steps that we take to go about

6    seeking to identify these suspected marijuana transactions.

7    Q.  Okay.  So let's just go through these steps briefly.  So

8    step one states "request data pull from Bacardi with blank key

9    words for a one-month period on a quarterly basis."  What does

10   that mean?

11   A.  Bacardi is our technology environment where we keep all the

12   transactional data and we can run analytics using things like

13   key words.  What we're doing here is saying that we're going to

14   provide those key words.  We're going to run a query or a

15   search, and then we're going to get a set of results that we

16   then need to evaluate.

17           (Continued on next page)

18

19

20

21

22

23

24

25

L3BMWEI2                          Clow - Direct

Q.  You don't have to identify specific key words, but
generally speaking, what are you looking for with the key
words?

A.  We are looking to identify if the name of the merchant has
marijuana or cannabis type of reference.

Q.  Step 2 states:  Compare results to previously researched
merchants to identify new merchants.  I believe you touched on
this before.

        What does this mean?

A.  Correct.  This is a process where we are just eliminating
duplicates.  So if we have seen transactions from a merchant
before and that merchant has been reported, we are really
seeking to identify who were the new merchants that have not
been reported before.

Q.  Then step 3:  Conduct external research Internet search for
new merchants identified to determine if any appear to accept
credit or debit cards for marijuana sales.

A.  Correct.  That's essentially the Google search to see if
there is any publicly available information about the business
and if they do accept credit and debit cards.

Q.  If a merchant is identified as potentially a prohibited
marijuana business, what is the next step?

A.  Then if they are potentially a marijuana-related business,
then we escalate them to the payment networks.

Q.  That would be Visa and MasterCard?

1   A.   Correct.

2   Q.   And then if we scroll down a little, what is step 4?

3   A.   Step 4 relates to adding the merchants to the repository

4   that we have.  Essentially, since we have implemented this

5   policy, we have kept a running list of the suspected merchants

6   and the outcomes and the investigations from each of the

7   networks.

8   Q.   Lastly, step 5.

9   A.   Provide the results in a semiannual high-risk transaction

10   stakeholder meeting.

11           This is where the network compliance team needs to

12   report out to the senior level of stakeholders to demonstrate

13   that they are doing what the policy says and allowing for any

14   questions or trends so that we can demonstrate we are adhering

15   to the policy.

16   Q.   Is this high-risk transaction stakeholder meeting an

17   internal Bank of America meeting?

18   A.   Yes, it is.

19   Q.   I believe you said this is where the network compliance

20   team is reporting its results?

21   A.   Correct.

22   Q.   Who typically attends these high-risk transaction

23   stakeholder meetings?

24   A.   It would be several of us from the leadership team at

25   enterprise payments.  It would include our compliance, our

1    risks, sometimes legal counterparts.  The marijuana-related

2    business is one of several different high-risk types of

3    transactions that are reviewed.

4            MS. LA MORTE:  We can take that down.

5            Now let's display Government Exhibit 2427 for

6    everyone.

7    Q.  Mr. Clow, what is this that we are looking at?

8    A.  This is a list of suspected merchant names and what Bank of

9    America has done in the BAC actions and the notes.

10   Q.  What is the purpose of this document?

11   A.  The purpose of this document is to show what has happened

12   since we identified a potential marijuana-related business.  It

13   gives a little bit of information about the name of the

14   merchant, the location, and the MCC code they use, and then it

15   identifies what the networks have done as a follow-up

16   afterwards.

17   Q.  Just to put this in context, how, if at all, does this

18   relate to the marijuana transaction-monitoring procedure that

19   we just looked at?

20   A.  This is evidence of how we are identifying these suspected

21   merchants and how we are making sure that they are reported to

22   the network and that the networks sufficiently investigate

23   them.

24   Q.  Looking at just a couple of these columns, there is a

25   merchant name column.

1          You see that?

2     A.   Yes.

3     Q.   A merchant location column right next to it?

4     A.   Yes.

5     Q.   An MCC column.

6     A.   Yes.

7     Q.   Where is that information coming from, that data?

8     A.   All of that data comes from the merchant-acquiring bank.

9          MS. LA MORTE:  Let's just look at a couple of

10    examples.  Let's start with the fifth one from the bottom.  Can

11    you highlight that row, Auto Flowering Cannabis.

12    Q.   The MCC all the way on the left, you see that?

13    A.   Yes.

14    Q.   What is that?

15    A.   That means it's MasterCard.

16    Q.   Then Auto Flowering Cannabis.

17         What is that?

18    A.   That's the merchant name.

19    Q.   And then California reflects what?

20    A.   That's the state or the location of that merchant.

21    Q.   Then 5192.

22    A.   That's the merchant category code that was used.

23    Q.   What about this next section.  Can you read this aloud.

24    A.   Reported the merchant to MasterCard, who researched and

25    terminated the merchant.

L3BMWEI2                              Clow - Direct

1    Q.   And then the last piece of information.

2    A.   Terminated.

3    Q.   What does that mean?

4    A.   That means that that merchant is no longer on the

5    MasterCard network to accept payments.

6    Q.   Would this be a merchant that Bank of America would

7    consider a prohibited merchant under the marijuana-related

8    business policy?

9    A.   Yes.

10        MS. LA MORTE:   Let's zoom out of that, and we will

11   just look at one more example.

12        Let's look at the sixth one up from the bottom, Swiss

13   Cannabis, that row.

14   Q.   We don't have to go through all of these columns again, but

15   Swiss Cannabis, is that the name of the merchant?

16   A.   Yes.

17   Q.   Let's look at the information that appears next to the MCC

18   code.   Can you read that aloud.

19   A.   Reported merchant to Visa compliance which resulted in a

20   Visa investigation of merchant activity.

21   Q.   What do you understand that to mean?

22   A.   That means that Visa's compliance team couldn't understand

23   at first blush what the business did, so they referred it to an

24   investigation team.

25   Q.   And then this information on the right, read it aloud.

1    A.  Per Elizabeth, via Dawn:  Swiss Cannabis SA sells only

2    products with a lower THC content than 1 percent, which are 100

3    percent legal in Switzerland.  If the delivery address is in

4    the United States, the merchant website automatically removes

5    the product from the basket.

6    Q.  So according to this particular document, would this

7    merchant have been terminated from the network?

8    A.  No.

9           MS. LA MORTE:  We can zoom back out of that.

10   Q.  Generally speaking, what does Bank of America do with the

11   information of this type that's reflected in these charts?

12   A.  We use this to report and ensure that we are compliant with

13   not knowingly permitting transactions that are against our

14   policies.

15          MS. LA MORTE:  We can take this down and put up

16   Government Exhibit 2428.

17   Q.  Mr. Clow, is that -- that's up on everyone's screen?

18   A.  Yes, it is.

19   Q.  The title of the document is network data integrity

20   escalation procedure.

21          In laymen's terms, what is that?

22   A.  In laymen's terms, this is a way when the bank identifies

23   trends or patterns from different types of merchants that we

24   believe are not in accordance with the network rules and are

25   creating issues for our clients or for us in complying that we

1   report them to Visa or MasterCard so that they could

2   investigate.

3   Q.  Would those network rules include rules involving illegal

4   transactions coming across the network?

5   A.  Yes.

6          MS. LA MORTE:  Let's look at the second and third

7   bullet points on this first page.  Mr. Levine, can you zoom in

8   on the second bullet point and the third bullet point.

9   Q.  Can you read that second bullet point aloud.

10  A.  Yes.  Transaction data integrity is critical to ensuring

11  Bank of America is within compliance with the federal

12  regulations and network rules, and that the line of business

13  strategies are executed accurately.  The following networks are

14  impacted by this process:  Visa, MasterCard, American Express,

15  PULSE, STAR.

16  Q.  When it talks about transaction data integrity is critical

17  to ensure Bank of America is within compliance, does that

18  include the marijuana transaction monitoring procedure that we

19  have been discussing?

20  A.  Yes, it does.

21         MS. LA MORTE:  Let's zoom out of that.  Let's go to

22  pages 1 through 2, so just scroll down.  Can we highlight or

23  zoom in on the text that appears between the chart on page 1

24  and the chart on page 2.

25  Q.  Can you just read the first two sentences, beginning with

L3BMWEI2                          Clow - Direct

1    payment networks strategic analyst.

2    A.   Payment networks strategic analyst follows the steps below

3    to identify, escalate, review and discuss all network data

4    integrity issues with both internal and external stakeholders

5    on an ongoing basis.  Routine meetings are held with Visa and

6    MasterCard is to review and discuss all outstanding issues on a

7    monthly basis.

8    Q.   Now let's look at the text that appears below this big

9    chart.  You see that?  Can you read that?

10   A.   The estimated time spent identifying, escalating,

11   reviewing, tracking, and resolving issues is approximately 30

12   hours weekly.

13   Q.   What does this mean?

14   A.   What this means is, we are making a pretty significant

15   investment, almost a full-time employee's worth of time, to

16   have an ongoing set of processes to improve the way that our

17   compliance to the network rules and the laws are working.

18            MS. LA MORTE:  We could zoom back out of that.

19            Now let's go to page 4 of this exhibit, 2428, page 4.

20   Thank you.

21   Q.   We see a chart here on page 4.  You see next to this

22   subsection -- let's just start at the top, action.  Can you

23   read the text under action.

24   A.   Identify new data integrity issues by reviewing the control

25   reporting outlined below and collaborating with internal

L3BMWEI2                          Clow - Direct

1    partners/stakeholders.

2    Q.   Then you see under topic, next to No. 1, it says control

3    reporting results review?

4    A.   Yes.

5    Q.   What is that?

6    A.   That is the actual reporting results.  So these are

7    actually a list of different types of reports that that team

8    runs in order to identify suspicious transactions.

9    Q.   When you say it's a list of reports that that team runs,

10   are you referring to Bank of America's network compliance team?

11   A.   Yes.

12   Q.   Is marijuana merchants reflected on this list?

13   A.   Yes.  Subsection 5, merchants accepting cards for cannabis

14   purchases.

15   Q.   Let's just look at, also, subsection 9.  You see where it

16   says merchants with high claims rates?

17   A.   Yes.

18   Q.   What is that?

19   A.   High claims rates are merchants who our transactions and

20   our clients tend to represent or dispute transactions with.  So

21   if a certain merchant sells to 100 transactions and 40 of the

22   transactions are disputed, that's typically a red flag where we

23   want to investigate their practices or have the network

24   investigate their practices.

25   Q.   With respect then to merchants that have high charge-back

1    rates, in certain circumstances Bank of America will refer that

2    to the network for investigation?

3    A.  Yes.

4              MS. LA MORTE:  We can take this down and just briefly

5    let's put back up Government Exhibit 2424, pages 2 to 3.  There

6    we go.

7    Q.  Mr. Clow, this is a marijuana transaction monitoring

8    procedure we have been looking at.

9              Do you recall that?

10   A.  Yes.

11   Q.  These were the steps that you had discussed a few moments

12   ago in your testimony?

13   A.  Yes.

14   Q.  Looking to step 3, you see where it says escalate to

15   payment networks?

16   A.  Yes.

17   Q.  Is that what we have just been discussing with respect to

18   the previous exhibit?

19   A.  Yes.

20   Q.  Now let's look at step 5, which we talked a little bit

21   about before, provide the results of a semiannual high risk

22   transaction stakeholder meeting.

23             Do you recall discussing that meeting?

24   A.  Yes.

25   Q.  Do you from time to time participate in those meetings

1   yourself?

2   A.  From time to time.  I'm not a mandatory participant.  I

3   receive the report and I attend, depending on the topics.

4           MS. LA MORTE:  Let's zoom out of that.

5           Mr. Levine, we can take this down and let's put up

6   side by side Government Exhibits 2423 and 2425 in evidence for

7   everyone.

8   Q.  Mr. Clow, what are these documents?

9   A.  These are the presentations for the semiannual high-risk

10  transaction monitoring review.

11  Q.  Is this the output of step 5 of the transaction monitoring

12  procedure that we have just been discussing?

13  A.  Yes.

14  Q.  Let's actually just look at 2423 as an example.  Can you

15  just remind us what the purpose is of preparing these

16  documents.

17  A.  The purpose is to make sure that a wider group of people

18  than the network compliance team at an executive level can

19  review and inspect to make sure that the policy is being

20  adhered to, as well as the networks are complying with what we

21  need from them.

22          MS. LA MORTE:  Let's go to page 2.  We could blow up

23  this slide.

24  Q.  This is a Power Point presentation, is that right?

25  A.  Yes.

1   Q.  We don't have to go through everything on here, but,

2   generally, what does this reflect?

3   A.  This is the agenda and the outline of the key topics that

4   are reviewed in the meeting.

5   Q.  Is the marijuana transaction monitoring reflected on here?

6   A.  Yes.  The marijuana overview and audit results are right

7   here in the middle.

8           MS. LA MORTE:  Let's zoom back out and let's go to

9   page 12.  That's page 11.  We will go one more.  I was looking

10  at the page numbers on the bottom.  There we go.

11  Q.  It states here marijuana audit results.  What does that

12  refer to?

13  A.  This is the summary of the suspected transactions we spoke

14  about earlier and the disposition of what's happened in the

15  networks.

16          MS. LA MORTE:  Let's go to the next page.  Let's blow

17  this up.

18  Q.  You see this chart on the top, multilayer approach to

19  monitor marijuana industry?

20  A.  Yes.

21  Q.  Just a few things.  This first row, you see where it says

22  perform ad hoc reviews of merchants thought to be engaged in

23  sale of marijuana using credit/debit cards and then it says

24  reactive?

25  A.  Yes.

L3BMWEI2                          Clow - Direct

1    Q.   What does that mean?

2    A.   That means if there is public information available or if

3    an employee, perhaps, walks into a suspected business, that

4    that can also be reported to trigger review.

5    Q.   And then the next row states:  Quarterly search for

6    credit/debit card transactions known, legal marijuana

7    dispensaries, currently 10 states plus Washington, D.C.

8    Proactive.

9              What does that refer to?

10   A.   That refers to the policy where we stated on a quarterly

11   basis we will look at all transactions on a month-by-month

12   basis and report them.

13   Q.   Lastly, quarterly search of consumer credit/debit

14   transactions for the terms which are blocked out.  Follow-up

15   research will focus on trying to identify likely dispensaries.

16   Research will include Internet search and network engagement as

17   appropriate, proactive.

18             Does this relate to the marijuana transaction

19   monitoring procedure that we have been discussing?

20   A.   Yes, it does.

21   Q.   Let's just look here.  This is an example in this bottom

22   chart.  What is this bottom chart telling us?

23   A.   This bottom chart tells the results of the audit where it

24   shows counts of the types of merchants and the categories that

25   they are identified or classified in.

1    Q.  By way of example, Q3 2018, what does that mean?

2    A.  So, from the beginning of the third quarter to the end of

3    the third quarter in 2018, we did the key word search in

4    looking across those transactions, and this is the summary of

5    the merchants that were identified.

6    Q.  It states in that quarter Bank of America reviewed 21

7    merchants, is that right?

8    A.  Yes.  The search resulted in 21 suspected merchants.

9    Q.  Then this top bullet point, eight merchants not a

10   dispensary based on internal research, what does that mean?

11   A.  That means eight of the companies, when we did that

12   publicly available Google search and investigated it a little

13   further, we realized it was actually not cannabis or

14   marijuana-based business.

15   Q.  Then it states nine of those merchants were sent to Visa?

16   A.  Correct.

17   Q.  And then these three bullet points reflect what?

18   A.  So the three bullets are the sum total of the nine, so five

19   were terminated, two were verified as not a dispensary, so they

20   are still on the network, so two were still under

21   investigation.

22   Q.  Then that last bullet point, is that essentially the same

23   but with respect to MasterCard?

24   A.  Correct.

25   Q.  Mr. Clow, if Bank of America receives false information

L3BMWEI2                        Clow - Cross

1    about a merchant across the network, does that impact Bank of

2    America's ability to identify potentially prohibited marijuana

3    transactions under the policies and procedures we have been

4    discussing?

5    A.  Yes.  We completely rely on the data that we receive.

6             MS. LA MORTE:  One moment, your Honor.

7             THE COURT:  Yes.

8             MS. LA MORTE:  No further questions.

9             THE COURT:  Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. BURCK:

12   Q.  Good morning, Mr. Clow.  Can you hear me OK?

13   A.  Yes, I can.

14   Q.  My name is Bill Burck.  I'm a lawyer for Ray Akhavan.

15            MR. BURCK:  I wanted to start with, if we could put up

16   Government Exhibit 3706.

17   Q.  You recall testifying about this on direct examination,

18   this demonstrative?

19   A.  Yes.

20   Q.  I just want to talk about some of the relationships on this

21   demonstrative.

22            First of all, in this demonstrative Bank of America

23   would be the cardholder bank on the right-hand side, correct?

24   A.  Correct.

25   Q.  And the cardholder is, of course, below that, correct?

1   A.  Yes.

2   Q.  The client for the cardholder bank in this demonstrative is

3   the cardholder, correct?

4   A.  Correct.

5   Q.  The customer is the cardholder, correct?

6   A.  Yes.

7   Q.  You have an agreement or, I should say, Bank of America has

8   an agreement with cardholders about how to use the cards,

9   correct?

10  A.  Correct.

11  Q.  That's a contractual agreement?

12  A.  Yes.

13  Q.  You also have an agreement with Visa or MasterCard on how

14  to use their network, correct?

15  A.  Correct.

16  Q.  That's also a contractual agreement, correct?

17  A.  Correct.

18  Q.  For both of those agreements there are rights and

19  responsibilities that flow between the parties, correct?

20  A.  Correct.

21  Q.  Now, Bank of America does not have any kind of contractual

22  agreement with the merchant bank, right, the acquiring bank in

23  this chart?

24  A.  Correct.

25  Q.  Bank of America does not have any kind of relationship with

L3BMWEI2                         Clow - Cross

1   the merchant in this chart, correct?

2   A.  Correct.

3   Q.  No contractual relationship, correct?

4   A.  Correct.

5   Q.  You would also agree with me that the merchant is not a

6   client of the cardholder bank, correct?

7   A.  Correct.

8   Q.  And not a customer of the cardholder bank?

9   A.  Correct.

10  Q.  Same goes for the merchant bank, the acquiring bank, also

11  not a customer or a client, correct?

12  A.  In this context, correct.

13  Q.  That's all I'm talking about, this context.

14          The points of contact that Bank of America has in the

15  network are only with Visa, MasterCard, and the cardholder,

16  correct, direct points of contact?

17  A.  Correct.

18  Q.  No point of contact with the merchant bank, correct?

19  A.  Correct.

20  Q.  And no point of contact with the merchant as well, isn't

21  that right?

22  A.  Correct.

23  Q.  Now, you testified about the process by which a cardholder

24  submits the card and it goes to the network to make a payment

25  for a product, right?

L3BMWEI2                            Clow - Cross

1    A.  Yes.

2    Q.  And you testified about the point at which the issuing bank

3    comes into that process, right?  I think you said that the

4    issuing bank, once they receive the information from the

5    merchant, merchant bank, the network, will then authorize or

6    decline a transaction, right?

7    A.  Correct.

8    Q.  Now, when the issuing bank is making that decision, it has

9    the following information.  It has the merchant's name, right?

10   A.  Yes.

11   Q.  The location --

12   A.  Yes.

13   Q.  -- of the merchant.

14          Yes?

15   A.  Yes.

16   Q.  I'm sorry.  You have to say it so the record --

17   A.  Sure.

18   Q.  It also has the name of the cardholder?

19   A.  Yes.

20   Q.  The cardholder's card number?

21   A.  Yes.

22   Q.  You said there was some security features it has?

23   A.  Yes.

24   Q.  It doesn't have, for example, though, the descriptor

25   information, correct?

L3BMWEI2                           Clow - Cross

1    A.  Correct.

2    Q.  And it doesn't have anything about what the specific

3    product is, right?

4    A.  Correct.

5    Q.  So when you receive that information, you either will

6    either authorize it or decline it, based on the information you

7    receive, correct?

8    A.  Correct.

9    Q.  When the issuing bank is making decisions, sometimes it

10   will call the cardholder once the cardholder submits the card,

11   correct?

12   A.  There are certain strategies we have where we can do that.

13   Q.  And that happens, correct?

14   A.  Periodically.

15   Q.  If somebody submits a card for a purchase and there is a

16   question the issuing bank has about it, the issuing bank can

17   and sometimes does call the cardholder, correct?

18   A.  Yes.  The majority of the cases, when it's about a fraud,

19   it's actually when we suspect it's not the client making the

20   transaction.

21   Q.  Exactly.  So when you do that, when you call the customer,

22   the cardholder, what types of questions are asked of the

23   cardholder about the transaction?

24   A.  Generally, it's, is this merchant the merchant transaction

25   that you want to authorize or not.  Are you there.  Do you have

L3BMWEI2                        Clow - Cross

1    your card.  Basic questions like that.

2    Q.  You do not ask if it is an illegal transaction, correct?

3            MS. LA MORTE:  Objection.  Foundation.

4            THE COURT:  No.  I'll allow that.

5    A.  Not to my knowledge.

6    Q.  You don't ask what product are you buying, do you?

7    A.  Only for a deep investigation.

8    Q.  That's not my question.

9            When somebody from Bank of America calls the customer

10   in the circumstance we are talking about, do they ask what

11   product are you buying?

12   A.  Not to my knowledge.

13   Q.  When Bank of America as the issuing bank makes the decision

14   about whether or not to authorize or decline, it doesn't have

15   any information about what the product is, the specific product

16   that's being purchased, correct?

17   A.  Correct.

18   Q.  And it doesn't have any information about the merchant

19   other than the merchant's name, isn't that correct?

20   A.  The merchant category code also describes the business that

21   the merchant is in.

22   Q.  The merchant category code, the merchant name, and the

23   location.  That's what you have?

24   A.  Yes.

25   Q.  But you don't have the descriptor information, correct?

L3BMWEI2                         Clow - Cross

1   A.  Correct.

2   Q.  And the descriptor information has more information about

3   the merchant than just the merchant name, correct?

4   A.  Correct.

5   Q.  It has more information than the MCC code does, correct?

6   A.  Correct.

7   Q.  Let's talk briefly about the payment structure for

8   cardholders with the issuing bank, with Bank of America.

9           I am going to show, just for the witness, Government

10  Exhibit 2407.  I don't believe this is in evidence.

11          Do you recognize this document?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  It's a credit card agreement for a consumer.

15          MR. BURCK:  Your Honor, we would offer Government

16  Exhibit 2407.

17          MS. LA MORTE:  No objection.

18          THE COURT:  Received.

19          (Government Exhibit 2407 received in evidence)

20          MR. BURCK:  Thank you, your Honor.

21          Publish that to the jury, please.

22  Q.  Now, you testified that this is a credit card agreement

23  between Bank of America and a consumer?

24  A.  Correct.

25  Q.  When you say consumer, you mean the cardholder?

1    A.   Yes.

2    Q.   The beginning of this says:  This agreement is for your

3    credit card account with us, right?

4    A.   Yes.

5    Q.   And the your there, you're talking the cardholder.  The us

6    is Bank of America, is that right?

7    A.   Correct.

8         MR. BURCK:  I'd like to go to page 2 of this document:

9    Can we blow up under interest rates and interest charges just

10   the first paragraph, annual percentage rate.

11        This says:  Interest rates and interest charges,

12   annual percentage rate, APR for purchases.  It says it's a 0.0

13   percent introductory APR beginning January 12, 2019 through

14   your statement closing date in February 2020 on purchases.

15   Then we go down to the 19.49 percent.  19.49 percent.  This APR

16   will vary -- after that, your APR for the purchase introductory

17   balances will be 19.49 percent.  This APR will vary with the

18   market based on prime rate.

19        The 19.49 percent, that's the interest rate that's

20   charged on the card, credit card, correct?

21   A.   That's -- actually, it's the APR that's charged for the

22   transactions or balance that's not paid after the first billing

23   cycle.

24   Q.   The first billing cycle is 25 days after the purchase?

25   A.   Depending on when the transaction is, yes.

L3BMWEI2                         Clow - Cross

1    Q.  If you don't pay off your balance within 25 days, you are

2    charged 19.49 percent, correct?

3    A.  For this agreement, yes.

4    Q.  For this agreement.

5         When it says this APR will vary with the market based

6    on the prime rate, what is the prime rate?

7    A.  The prime rate is a market rate that's set that's a

8    standard for all banks.

9    Q.  That can go up or down?

10   A.  Correct.

11   Q.  So this could be higher or lower, depending on the prime

12   rate?

13   A.  Correct.

14   Q.  It goes on to say:  For any other purchase transactions not

15   subject to an introductory APR, your APR will be 19.49 percent.

16        Again, same principle that you just testified about,

17   is that correct?

18   A.  That's correct.

19        MR. BURCK:  We can zoom out of that.  Can we go down

20   to the penalty APR and when it applies, third from the bottom.

21   Q.  Penalty APR and when it applies.  Up to 29.99 percent,

22   based on your credit worthiness.  This APR will vary with the

23   market based on the prime rate.  This APR may be applied to new

24   transactions on your account if you make a late payment,

25   correct?  Is that what it says?

L3BMWEI2                          Clow - Cross

1    A.  I am just reading.

2    Q.  Sure.

3    A.  Correct.

4    Q.  Below that it says:  How long will the penalty APR apply?

5    If your APR is increased for this reason, the penalty APR will

6    apply indefinitely, correct?

7    A.  Correct.

8    Q.  Mr. Clow, this says that if you are late in the payment,

9    you can have a penalty APR of up to 29.99 percent, right?

10   A.  Based upon your creditworthiness.

11   Q.  Based on your creditworthiness.

12        So it could be higher or lower than that?

13   A.  Correct.

14   Q.  What does it mean to make a late payment?

15   A.  It means if you have a minimum balance due on a specific

16   date, let's say it's the 15th of the month and it's not applied

17   or posted on your account by the 15th, then you could incur a

18   late fee.

19        MR. BURCK:  You can zoom out of that.

20   Q.  Bank of America charges interest for using -- or the APR

21   for using the credit cards, correct?

22   A.  No.  Actually, we don't.  We don't charge anything for

23   using the card.  We only charge when people have a balance that

24   they are lending from us.

25   Q.  If you have a balance beyond 25 days, you do charge the

1    cardholder the APRs that are listed here?

2    A.  Well, for this agreement, yes.

3    Q.  For this agreement.  And for other agreements, whatever is

4    in those agreements, right?

5    A.  Correct.

6    Q.  That's revenue for Bank of America, correct?

7    A.  Yes.  It's a lending revenue, yes.

8    Q.  It's like a loan, right?

9    A.  Correct.

10   Q.  And the more that people use their cards, the more

11   transactions are used and the more that Bank of America could

12   make off these transactions, right?

13   A.  For credit card transactions in this case.

14   Q.  Yes.

15   A.  Yes.

16   Q.  And then if people have balances they don't pay, at the end

17   of the 25 days, the interest rates that appear here would

18   apply, correct?

19   A.  Well, again, for this agreement or this person, yes.

20   Q.  If they are late, there are additional APR penalties that

21   apply, correct?

22   A.  Correct.

23           MR. BURCK:  Let's turn to page 12 of this agreement.

24   Can you highlight, Mr. McLeod, the purpose for using your

25   account under limitations and warnings.  No.  Purposes.  Sorry.

L3BMWEI2                          Clow - Cross

1   The one above that.  Thank you.

2   Q.  This is a limitation or warning in the credit card

3   agreement, isn't that right?

4   A.  Correct.

5   Q.  This is directed to the cardholder who is the recipient of

6   this agreement, correct?

7   A.  Correct.

8   Q.  It says:  Purposes for using your account.  Then it says,

9   you, which, again, is the cardholder, is that right?

10  A.  Yes, correct.

11  Q.  You may not use this account to make a payment on this or

12  any other credit account with us or our affiliates.  You may

13  not use or permit your account to be used to make any illegal

14  transaction.  Right?

15  A.  Correct.

16  Q.  You will only use your account for transactions that are

17  legal where you conduct them, correct?

18  A.  Correct.

19  Q.  For example, Internet gambling transactions may be illegal

20  in your state.

21          You see that?

22  A.  Yes.

23  Q.  You go on below to say:  We will -- I'm sorry.  I'm saying

24  you just as a representative of Bank of America.  We, we as

25  Bank of America, will not be liable if you engage in an illegal

1  transaction.

2          You see that?

3  A.  Yes.

4  Q.  We may deny authorization of any transactions identified as

5  Internet gambling.

6          You see that?

7  A.  Yes.

8  Q.  Now, you've testified at length that Bank of America

9  believes that marijuana transactions are illegal, right?

10  A.  Correct.

11  Q.  They are illegal because they are illegal under federal

12  law, right?

13  A.  Correct.

14  Q.  To Bank of America it doesn't matter that in California,

15  for example, it is legal, correct?

16  A.  Correct.

17  Q.  Isn't that what you testified?

18          Here, you don't say that marijuana is a prohibited

19  transaction, correct?

20  A.  We don't list it as another example, no.

21  Q.  And you list gambling, Internet gambling, as a potential

22  problem, right?

23  A.  Yes.

24  Q.  And you go on to say that you are still not going to be

25  liable if you engage in illegal transaction, right?

1   A.  Correct.

2   Q.  What does that mean, that you are not going to be liable

3   for that?

4   A.  It means that the bank would -- is protecting ourselves

5   from an illegal transaction that a customer does with one of

6   our products.

7   Q.  When you say you are not going to be liable, that means you

8   are still expecting to be paid for -- let me withdraw the

9   question.

10          Bank of America is still expecting that even if a

11  cardholder engages in a transaction that's illegal, Internet

12  gambling of some sort, the cardholder will pay for that

13  transaction, correct?

14  A.  Correct.  If we authorize the transaction on behalf of the

15  client for what they want to purchase, then we expect to be

16  repaid.

17  Q.  Got it.  OK.

18          Just briefly, again, the credit card service network

19  that we talked about, the two people or entities that know what

20  the customer bought are the customer who is purchasing it and

21  the merchant, right?

22  A.  Correct.

23  Q.  Everybody else, including the issuing bank, doesn't

24  actually know what the person bought, right?

25  A.  Correct.

1   Q.  Do you know why Bank of America has not included marijuana

2   in this list or in this particular paragraph?

3   A.  It's not intended to be an exhaustive list.

4   Q.  You have testified about multiple different policies

5   internally at Bank of America talking extensively about

6   marijuana, right?

7   A.  Correct.

8   Q.  Those were internal policies, right?

9   A.  Correct.

10  Q.  None of those policies is intended to be provided to the

11  external world, correct?

12  A.  Correct.

13  Q.  They are meant to be used by personnel at Bank of America,

14  correct?

15  A.  Correct.

16  Q.  This is something that you are trying to communicate to the

17  cardholder, correct?

18  A.  Yes.

19  Q.  This does not say that you cannot use credit cards from

20  Bank of America to make marijuana transactions, correct?

21  A.  Correct.

22  Q.  Also, when you write -- I'm sorry to say you.  I am just

23  trying to make it easier.  You will only use your account for

24  transactions that are legal where you conduct them.

25          You see that?

L3BMWEI2                         Clow - Cross

1   A.   Yes.

2   Q.   It doesn't say anything about federal versus state there,

3   right?

4   A.   Correct.

5   Q.   It doesn't say anything about a distinction between federal

6   law and state law, right?

7   A.   It does not.

8   Q.   When it says that the transactions that are legal where you

9   conduct them, it literally means the location where you are,

10  correct?

11  A.   Where you are in an Internet transaction is a very

12  different situation than where you are if you are standing in a

13  shop, so I do think that's worth a distinction.

14  Q.   That's very complicated, so let me ask you about an

15  example.  If you are in New York or if you are a New Yorker and

16  you are in New York and you want to buy some kind of Internet

17  gambling product in Las Vegas, what would Bank of America think

18  of that?  I'm assuming that in New York it's illegal?

19           MS. LA MORTE:  Objection.

20           THE COURT:  I don't have any real difficulty seeing

21  the relevance of any of this, counsel, but maybe we will give

22  the jury their midmorning break and you can explain it to me.

23           We will take a 15-minute break at this time.

24           (Jury not present)

25           MS. LA MORTE:  Your Honor, may the witness step down?

1    THE COURT:  Yes.

2    MR. BURCK:  Your Honor, I'm actually done with this

3    area.  I was going to move on to something else, anyway.

4    THE COURT:  That's fine.  Please explain to me the

5    relevance of what we just spent ten minutes on.

6    MR. BURCK:  Your Honor, the point of it was, all the

7    policies that the witness was testifying to were all directed

8    internally at people inside of Bank of America.

9    When they have an opportunity to talk to the

10   cardholder, who is the only person who is making the decision

11   about whether or not to purchase marijuana from a merchant --

12   and the witness testified that the only two people who know

13   anything about what actually is purchased are the cardholder

14   and the merchant.  They don't say anything about marijuana.

15   They say that illegal transactions, they have an ambiguous

16   clause --

17   THE COURT:  All of that, your questions, to your

18   credit, were a model of clarity.  I am still finding the

19   relevance hard to grasp.  If I understand the charge in this

20   case, it is that false statements were made in the form of

21   disguising marijuana as something else and that one of the

22   purposes of making those false statements was to defraud the

23   bank because they wanted to know the truth.

24   If, for example, there was a transaction that, in

25   fact, the bank might have approved, but you, the purchaser, or

L3BMWEI2                        Clow - Cross

1    the person who was forwarding the information thought the bank

2    would not approve it, so you disguise it as something else,

3    that would be bank fraud, would it not?

4             MR. BURCK:  Your Honor, it would be if it actually

5    mattered to the bank.  This is the point of the questioning.

6    If I may explain.  I can also give you a preview of where I am

7    going with the cross-examination.

8             One of our defenses, your Honor, is that regardless of

9    the particulars of what the government has alleged is the

10   scheme, the fact is that the banks and MasterCard and Visa have

11   set up the system in a way where that information, the

12   information that they say is fraudulent, actually doesn't

13   actually matter or is even considered by the bank.  For

14   example, your Honor, very importantly, in the witness'

15   testimony --

16            THE COURT:  I have allowed what the bank thought as

17   bearing on materiality, but the ultimate standard is what a

18   reasonable bank in that situation, whether they would care or

19   not.

20            MR. BURCK:  Absolutely, your Honor.

21            THE COURT:  Your position, as I understand it, forgive

22   me, is that banks don't care -- reasonable banks don't care

23   about being lied to repeatedly over the course of years

24   involving hundreds of millions of dollars in transactions,

25   right?  That is your position.

L3BMWEI2                        Clow - Cross

1          MR. BURCK:  That's not quite my position, your Honor.

2     My position is a little different.  My position is that the

3     effort that's made -- your Honor, you will see this as I think

4     the cross goes on.  What they say, this is the whole plausible

5     deniability issue.  They understand that marijuana -- they

6     don't want to appear to be endorsing marijuana sales.  And they

7     are -- one of the reasons why I have elicited -- the only

8     reason I have elicited information about the payments that they

9     could receive --

10         THE COURT:  Just forgive me for interrupting.

11    Assuming for the sake of argument that all they want is

12    plausible deniability.  That still doesn't get you where you

13    want to go because the question is not what Bank of America

14    wanted, but what a reasonable bank would -- your argument has

15    got to be, if I understand it, that rather than wanting the

16    truth, a reasonable banker wouldn't care being lied to about

17    something that he thought was illegal.  All he cared about was

18    maintaining plausible deniability, this reasonable banker.

19    What's reasonable about that?

20         MR. BURCK:  Your Honor, I think it's reasonable for

21    several reasons.

22         One is, there is a financial motive, meaning that they

23    are making --

24         THE COURT:  We have to assume on your hypothesis that

25    a reasonable banker would say I will acquiesce in what

1    otherwise would be illegal because a reasonable banker wants

2    money above everything.

3          MR. BURCK:  Not above everything, but I'll go on.

4          Also, as the Court has already instructed the jury,

5    the Federal Government is not prosecuting most of these types

6    of transactions, so there is actually no regulatory risk to the

7    banks, which is very important, your Honor.  Again, the Court

8    has already acknowledged that and has told the jury that, which

9    I think is exactly right.

10         THE COURT:  That's a clever point.  You get one for

11   that.  I'll think about that one.

12         MR. BURCK:  Your Honor, one other point is that they

13   are also -- I am not sure we are going to be able to get this

14   in evidence.  Completely understood.  But the cannabis business

15   is a obviously a rapidly growing business, huge business, and

16   these banks, they want to be part of that business if and when

17   it is ever legalized.

18         THE COURT:  You think you are going to get that?

19         MR. BURCK:  That's why I said I don't think I am going

20   to get there.

21         THE COURT:  You've answered my questions.  I'm still a

22   little skeptical, but you have at least crossed the threshold

23   of conceivable relevance.  That's all you need at the moment.

24         Let me ask you one other thing.

25         MR. BURCK:  Sure, your Honor.

L3BMWEI2                          Clow - Cross

 1          THE COURT:  If I recall, there are subpoenas out for

 2   the testimony, I can't remember which of the defendants served

 3   the subpoenas, but the testimony of two other Bank of America

 4   people.  What is it that you can get from them that you can't

 5   get from this guy?

 6          MR. BURCK:  Your Honor, I am going to consult with my

 7   colleagues.  I don't think we are going to enforce those

 8   subpoenas.  I don't want to commit to that.

 9          THE COURT:  That's what I want to know because if

10   that's the case, I'll let those witnesses know that they can go

11   their merry way.

12          MR. BURCK:  I just want to be able to talk to people

13   to make sure that I know what's going on.

14          THE COURT:  OK.  Very good.

15          You want to consult right now?

16          MR. BURCK:  Your Honor, I've consulted.  We expect we

17   will not be enforcing those subpoenas.  The only reason why I

18   say expect.  We want to hear the end --

19          THE COURT:  That is perfectly fair.  At the end of the

20   testimony you will let me know.

21          MR. BURCK:  Yes, your Honor.  Thank you.

22          THE COURT:  We will take the remaining five-minute

23   break and resume.

24          (Recess)

25          THE COURT:  Please get the witness, and the jury is on

L3BMWEI2                              Clow – Cross

1    their way up.

2              MR. BURCK:  Your Honor, just for your own scheduling

3    purposes, I should be done before the lunch break.

4              THE COURT:  Great.

5              (Jury present)

6              MR. BURCK:  Thank you, your Honor.

7    Q.  Mr. Clow, can you hear me OK?

8    A.  Yes, I can.  Thank you.

9    Q.  Thank you.

10             I just wanted to go back on one topic and then we will

11   move on.

12             You testified about the information that the credit

13   card issuer receives when an authorizer declines a transaction.

14             Do you recall that testimony?

15   A.  Yes.

16   Q.  You testified that descriptor information is not part of

17   what the issuing bank considers or even receives when the

18   authorizer declines a transaction, right?

19   A.  Correct.

20             MS. LA MORTE:  As to Bank of America.

21             MR. BURCK:  Bank of America.  I'm only talking about

22   Bank of America here.

23   Q.  The answer to that is that that was not considered by Bank

24   of America, correct?

25   A.  At the time of authorization, correct.

L3BMWEI2                          Clow - Cross

1    Q.  And also any information about the websites or the URLs of
2    these companies is also not considered or even received by Bank
3    of America at the time of authorization, right?
4    A.  Correct.
5    Q.  In fact, Bank of America makes no effort to determine
6    whether or not a transaction is legal or illegal at the time of
7    the authorization, correct?
8    A.  That's not correct.  We use the information that's
9    available to us, and we trust in the network that they are
10   going to enforce their policies.
11   Q.  You trust the network to determine whether something is
12   legal or illegal?
13   A.  Correct.
14   Q.  You testified earlier that you do not ask the cardholder,
15   when you call them in those circumstances, whether or not they
16   are making a lawful transaction, correct?
17              MS. LA MORTE:  I am going to object, your Honor, under
18   motion in limine No. 3.
19              MR. BURCK:  Your Honor, I think he already testified
20   as to this.
21              MS. LA MORTE:  Understood.  But the government objects
22   to the line of questioning.
23              MR. BURCK:  Ms. La Morte, I can't hear you.
24              THE COURT:  I think the objection as to this specific
25   question has been waived by the objection not having been put

L3BMWEI2                              Clow - Cross

1    when the question was put.

2                    MS. LA MORTE:  Understood.

3                    THE COURT:  What's the answer?

4    A.  Can you repeat the question, please.

5    Q.  Sure.  The question was, if Bank of America's employees

6    call or when Bank of America's employees call the cardholder in

7    some circumstances to determine if they are using their card,

8    they don't ask, is it a legal or lawful transaction?

9    A.  Correct, we do not.

10   Q.  I want to turn to Government Exhibit 2410, which is in

11   evidence.

12                    You recall you testified about this document?

13   A.  Correct.

14   Q.  This is, as you described it, an enterprise policy for Bank

15   of America relating to marijuana-related businesses, right?

16   A.  Correct.

17   Q.  I want to go over some of the language and also some of the

18   other language in it.  Let's start with the first paragraph,

19   policy statements.

20   A.  Yes.

21                    MR. BURCK:  Can you highlight the entire first

22   paragraph, Mr. McLeod.  Thank you.

23   Q.  Policy statement.  It says the marijuana-related businesses

24   policy establishes a framework for managing risks in conducting

25   business with clients that are engaged in marijuana-related

1  business activities, right?  That's what it says?

2  A.  Yes.

3  Q.  In this case the clients are clients of Bank of America,

4  right?

5  A.  Yes.

6  Q.  Who are engaged in marijuana-related business activities,

7  right?

8  A.  Yes.

9  Q.  Those are defined as MRBs?

10  A.  Correct.

11  Q.  We talked about a different kind of client or customer a

12  few minutes ago, which were the credit card holders, right?

13  A.  Yes.

14  Q.  Credit card holders are not MRBs, right?

15  A.  Correct.  They are not MRBs.

16  Q.  So this policy is establishing a framework for managing

17  risks and conducting business with clients that are MRBs,

18  right?

19  A.  Correct.

20  Q.  It doesn't say anything about credit card holders, does it?

21  A.  It does not mention credit card holders.

22  Q.  In fact, nothing in this document ever mentions the word

23  credit cards or debit cards, does it?

24  A.  They are not explicitly mentioned, but the payments are

25  called out as an example of what's covered by the policy.

L3BMWEI2                         Clow - Cross

Q.  What about Visa and MasterCard, are they mentioned in this
document?

A.  No.

Q.  Let's go down to the key definitions.  The second paragraph
there:  For purposes of this policy, clients engaged in MRB
activities will be designated as one of the following:  Direct
marijuana-related businesses, direct MRBs.  I think you
testified that these are the types of businesses you will not
do business with, right?

A.  Correct.

Q.  Again, this is not a credit card holder, right?

A.  It does say any individual or legal entity.  I think that
when we are talking about an enterprise policy, we take the
broadest outlook on the applicability of the policy.

Q.  So you are testifying now that a credit card holder, a
person who has a credit card from Bank of America, is an MRB if
they engage in marijuana sales?

A.  No.  I'm saying if they directly sold, manufactured,
cultivated, etc.

Q.  You agree this is a definition?

A.  This is a definition.

Q.  A definition is of an MRB, correct?

A.  That's correct.

Q.  It is your testimony that any individual would include a
credit card holder as an MRB?

1   A.  No.  That's misstated.  I understand now.  No.

2   Q.  So credit card holders are not MRBs, right?

3   A.  Correct.

4   Q.  Going down to indirect marijuana-related businesses, you

5   testified that these sometimes, under certain circumstances,

6   can be in fact -- you can do business with them, right?

7   A.  Correct.

8   Q.  Again, these are not credit card holders, right?

9   A.  Correct.

10  Q.  So an indirect marijuana-related business is not a credit

11  card holder, right?

12  A.  Correct.

13  Q.  We saw, and you just testified, that this enterprise policy

14  was designed to be a framework for managing relationships with

15  clients who are MRBs or indirect MRBs, correct?

16  A.  Correct.

17  Q.  Didn't say anything about designing policies to deal with

18  credit card holders, did it?

19  A.  It does not.

20  Q.  We looked at the credit card holder agreement, the contract

21  between Bank of America and credit card holders, a few minutes

22  ago, right?

23  A.  Yes.

24  Q.  And we looked at the language in which it says you do not

25  allow illegal transactions, correct?

1    A.  Correct.

2    Q.  In that paragraph it didn't say anything about marijuana,

3    did it?

4    A.  No.  It didn't say anything about lots of other illegal

5    transactions, also.

6    Q.  But it did not say anything about marijuana, right?

7    A.  Correct.

8    Q.  It did say something about Internet gambling?

9    A.  Yes.  As an example.

10            MR. BURCK:  Can you show the witness what I believe is

11   in evidence as Government Exhibit 2423.  Let's start with

12   Government Exhibit 2427.  Sorry, Mr. McLeod.  This is in

13   evidence, your Honor.

14   Q.  You recall you testified about this document on direct

15   examination?

16   A.  Yes.

17   Q.  This was a document that reflected the work that was done

18   to monitor, after transactions have been authorized, to monitor

19   the use of credit cards with potential marijuana distributors,

20   right?

21   A.  It wasn't the use of credit cards.  It was just the

22   merchants themselves, suspected merchants.

23   Q.  Suspected merchants.  So this has nothing to do with credit

24   cards either?

25   A.  No.  What I'm saying is, the credit card and debit card

L3BMWEI2                          Clow - Cross

1    transactions are used to identify the merchants.  But the

2    investigations with the merchants are all that this represents.

3    Q.  Understood.  But this information is drawn from credit card

4    use and debit card use?

5    A.  Correct.

6    Q.  Your team used that information to monitor to see what

7    people are doing with their credit cards, correct?

8    A.  No, we don't.

9    Q.  Tell me what you do.

10   A.  What we do is, we use the data to identify these suspected

11   merchants, and then we report the suspect merchants to the

12   networks.  So we are looking for the networks to enforce the

13   rules that we have with them in our contract and that's really

14   the basis of this list.  The list is around the merchants and

15   their participation on the network.

16   Q.  Could you speak a little bit more into your microphone.

17   I'm having a little time hearing you.

18   A.  Sorry.

19   Q.  Just to break that down, Bank of America has information

20   from its credit card holders and its debit cardholders on their

21   use of credit cards and debit cards, correct?

22   A.  Yes.

23   Q.  And in that information are the merchant names that they

24   have bought goods or services from, correct?

25   A.  Yes.

L3BMWEI2                        Clow - Cross

1   Q.  And from that information Bank of America will do searches

2   to determine whether or not some of these merchants are in fact

3   involved in the cannabis business, correct?

4   A.  Yes.

5   Q.  Then you send that information onto Visa or MasterCard in

6   order for them to determine if these businesses are in fact

7   involved in the cannabis business, right?

8   A.  Correct.

9   Q.  Then they go to the merchant-acquiring banks to tell them

10  if there is -- or seek more information if there is a problem,

11  right?

12  A.  Correct.

13  Q.  Again, this information is drawn from credit card holders'

14  use of their credit cards, right?

15  A.  From their transactions, yes.

16          MR. BURCK:  Would you please, Mr. McLeod, blow up

17  Swiss Cannabis line.  I think it's the sixth from the bottom.

18  Q.  Before I ask you about Swiss Cannabis, I notice -- I should

19  say, the document here, every one of these merchants appears to

20  have the word cannabis or marijuana in them, right?

21  A.  Yes.  In this document, yes.

22  Q.  Those are the two key search words your team uses to

23  monitor for merchants that engage in cannabis sales, right?

24  A.  There are several of them.  It's not an exhaustive list.

25  Q.  What are some of the others?

L3BMWEI2                        Clow - Cross

1    A.  I'm not at liberty to disclose that.  They are considered

2    proprietary to the bank.

3    Q.  Are they versions of cannabis and marijuana?

4    A.  Those are the primary subjects, yes.

5    Q.  But all of these are, in fact, cannabis or marijuana,

6    right?

7    A.  Yes.

8    Q.  So, on the Swiss Cannabis one you testified this was a

9    merchant that actually was allowed to stay in the system, the

10   network, right?

11   A.  That's what Visa determined.

12   Q.  Visa determined that.  You reported it up because you saw

13   the word -- again, I am saying you just for ease, no pun

14   intended -- that Swiss Cannabis, you reported up through the

15   Visa network and Visa determined actually they are OK.

16   A.  Correct.

17   Q.  You testified about the MCC codes that are used, right?

18   A.  Yes.

19   Q.  And you testified that MCC codes are very important to the

20   integrity of the system, right?

21   A.  Yes.

22   Q.  And you testified that there is no MCC code for marijuana,

23   right?

24   A.  Correct.

25   Q.  So you noticed that Swiss Cannabis uses an MCC code called

1    8099.

2             You see that?

3    A.  Yes.

4    Q.  Do you know what 8099 is?

5    A.  Not off the top of my head.

6             MR. BURCK:  Can we show the witness what's in evidence

7    as Akhavan Exhibit 10047).

8    Q.  Sir, that is a MasterCard quick reference booklet merchant

9    edition.  I don't know if you have seen this before.

10            Do you recognize it?

11   A.  I'm generally familiar with them.

12            MR. BURCK:  Let's take that down for a moment.

13   Q.  You are not aware of what 8099 is, correct?

14   A.  Not off the top of my head, no.

15   Q.  But you know it's not marijuana, right?

16   A.  Yes.

17   Q.  Because there is no MCC code for marijuana?

18   A.  Correct.

19   Q.  So in this particular case Swiss Cannabis, even though it's

20   engaged in some kind of marijuana-related business by the Visa

21   standard, did not use an MCC code that says marijuana, right?

22   A.  Correct.

23   Q.  And they weren't terminated from the system, were they?

24   A.  No.

25            MS. LA MORTE:  Object, your Honor, on 403.  I think

1    this is misleading.

2              THE COURT:  You can have redirect to clarify, but I

3    think it's allowable.  Overruled.

4              MR. BURCK:  Thank you, your Honor.

5              We can take that down.

6    Q.  Let's talk about the monitoring that's done after the fact,

7    after the authorizations have occurred, monitoring where you

8    draw information out of the credit card use.  Let's start with

9    Government Exhibit 2423.  You testified about this document.

10   This is actually kind of a summary of the information that we

11   were just looking at and other information you used to monitor

12   transactions after they have occurred, correct?

13   A.  Correct.

14   Q.  And it's called the 2018 year-end high risk transaction

15   monitoring review, right?

16   A.  Yes.

17             MR. BURCK:  Let's turn to page 12.  12 on the bottom

18   of the page.

19   Q.  The marijuana audit results, right.  This was a

20   presentation made by your team or people on your team, more

21   broadly, to stakeholders at Bank of America about what the

22   audit showed for marijuana, right?

23   A.  Correct.

24   Q.  If we turn to the next page -- and you testified about this

25   page as well, right?

L3BMWEI2                        Clow - Cross

1   A.  Correct.

2   Q.  I want to talk a little bit more about some of the numbers

3   that are listed here.  It's in the Q3 2018, Q4 2018.  So the

4   bottom of this slide.

5           Q3 2018 means the third quarter of 2018?

6   A.  Correct.

7   Q.  What months does that cover?

8   A.  That covers July, August, September of 2018.

9   Q.  Q4 2018 is the rest of the year?

10  A.  Correct.

11  Q.  Does this show the information that your team had collected

12  about a potential marijuana dispensary and other business sales

13  using the network at that time?

14  A.  Yes.

15  Q.  And you testified that there are 20 to 30,000 transactions

16  per minute that Bank of America will process?

17  A.  Correct.

18  Q.  That's credit card and debit card?

19  A.  Yes.

20  Q.  So that's, obviously, millions a day?

21  A.  Yes.

22  Q.  And billions over the course of a year?

23  A.  Of transactions, yes.

24  Q.  In Q3 2018, that's for those three months, your team

25  identified 21 total merchants who might be selling marijuana?

L3BMWEI2                          Clow - Cross

1    A.   Correct.

2    Q.   Then it says that there were eight merchants not a

3    dispensary base on internal research, meaning that eight of

4    them you determined were not marijuana sales?

5    A.   Correct.

6    Q.   Then nine were sent to Visa, right?

7    A.   Yes.

8    Q.   Five of them were terminated.  That's because they were

9    determined to be dispensaries or marijuana MRBs?

10   A.   Through Visa's process.

11   Q.   Visa informed you of this, this information that you are

12   reporting.  Two were not a dispensary and two remain under

13   research.  Below that it says four merchants were sent to

14   MasterCard.  Three were terminated.  One was not a dispensary.

15   Right?

16          There are, I think, 21 total merchants reviewed in Q3

17   2018 and eight of those 21 were terminated, is that right?

18   A.   Yes.

19   Q.   Now, let's look at Q4 2018.  In Q4 about half the number

20   that were identified in Q3 were identified.  That's ten.  Ten

21   merchants total, right?

22   A.   Correct.

23   Q.   Nine merchants not a dispensary based on internal research,

24   meaning the research that your team had done.

25   A.   Yes.

L3BMWEI2                          Clow - Cross

1  Q.  That's like Google searches, things like that, right?

2  A.  Yeah.

3  Q.  Then one merchant was sent a Visa and Visa determined not a

4  dispensary, right?

5  A.  Correct.

6  Q.  So zero for ten, zero for ten were terminated for being

7  marijuana-related businesses in Q4 2018, isn't that right?

8  A.  Correct.

9  Q.  Let's go to the next, which is Government Exhibit 2425.

10  This was the following year, 2019, semiannual high risk

11  transaction monitoring review?

12  A.  Yes.

13  Q.  The following year.  Same process that we just talked

14  about?

15  A.  Correct.

16  Q.  Same kind of document?

17  A.  Correct.

18  Q.  Let's go to page 12 in the document first, marijuana audit

19  results.  Same thing as last time, last document we looked at.

20  It's going to show the results?

21  A.  Yes.

22  Q.  Let's go to the next page, page 13.  Let's go to the bottom

23  half of the page again.

24        This is now Q1 2019 and Q2 2019, right?

25  A.  Correct.

1  Q.  These are the months immediately after the months we just

2  looked at, right?  Q1 2019 is January, February, March, right?

3  A.  Yes.

4  Q.  Of 2019?

5  A.  Yes.

6  Q.  Q2 is April, May, June of 2019?

7  A.  Yes.

8  Q.  First total audit results.  Merchant name audit.  Sixteen

9  merchants reviewed.  So a total of 16 potential merchants that

10 you discovered that might be marijuana dispensaries or

11 cannabis-related businesses?

12 A.  Yup.

13 Q.  Fifteen merchants not a dispensary, based on internal

14 research.  So that was the work that your team did and decided

15 in fact they were not dispensaries?

16 A.  Correct.

17 Q.  One merchant sent to MasterCard, confirmed not a

18 dispensary, right?

19 A.  Yes.

20 Q.  Then there is something, audit found no transactions at

21 dispensaries.  That's blacked out, but this seems to say that

22 zero of 16 merchants were terminated from the system in Q1

23 2019.

24 A.  Zero that we reported.  That doesn't mean that the networks

25 didn't terminate others.

L3BMWEI2                        Clow - Cross

1   Q.  I'm asking you about what you did, not what other people

2   did.

3            Did Bank of America terminate, based on this process,

4   any merchants in the Q1 2019?

5   A.  We can't terminate the merchants, but none that we reported

6   were terminated.

7   Q.  So anyone that you reported, were any of them terminated by

8   the network in Q1 2019?

9   A.  No.

10  Q.  Zero, right?

11           Q2 2019.  Merchant name audit.  Twelve merchants

12  reviewed.  Again, ten merchants were identified by your process

13  as potential cannabis or marijuana-related businesses, right?

14  A.  Correct.

15  Q.  Ten merchants not a dispensary based on internal research.

16  Again, your team found ten, decided they were not?

17  A.  Correct.

18  Q.  And two were sent to Visa and determined not a dispensary?

19  A.  Correct.

20  Q.  In Q2 2019, of the 12 that your team reported into the

21  network, zero were terminated, right?

22  A.  Correct.

23  Q.  So between Q2 2019, Q1 2019, and Q4 2018, there were zero

24  merchants who were terminated based on the work that your team

25  did to identify potential cannabis and marijuana businesses,

L3BMWEI2                              Clow - Cross

1   right?

2   A.  Correct.

3            THE COURT:  You can't terminate, correct?  You can

4   only refer it to Visa or MasterCard or whoever to terminate it.

5            THE WITNESS:  That's correct.  We can only identify

6   the list of suspected merchants.

7            THE COURT:  When you make that reference, do you make

8   a recommendation one way or the other or do you simply say here

9   is what we have learned?

10            THE WITNESS:  We simply identify them.  We can't make

11   a recommendation.

12            THE COURT:  The decision making there is made by Visa

13   and MasterCard, not by Bank of America?

14            THE WITNESS:  100 percent, yes.

15   Q.  Just to follow up on a couple of the judge's questions, you

16   relied on Visa and MasterCard to make the determination as to

17   whether or not a merchant should be terminated, right?

18   A.  Correct.

19   Q.  And your agreement with Visa and MasterCard is they are the

20   ones who are going to make that decision, based on the

21   information they have, correct?

22   A.  They have to enforce their rules.

23   Q.  I'm sorry.  Can you please --

24   A.  Visa and MasterCard have to enforce their rules, so whether

25   it's them that terminates it or their acquiring bank, because

L3BMWEI2                        Clow - Cross

1    the network shows them illegal transactions, there could be a

2    nuance if it's the network or the acquiring bank, is my point.

3    Q.  But, again, as the judge asked you, it's Visa, MasterCard

4    that will make that determination based on your sending

5    information to them, correct?

6    A.  Correct.

7    Q.  Then they do their own work?

8    A.  Yes.

9    Q.  Again, Visa and MasterCard apparently -- I guess both did

10   not recommend any terminations, as far as you know, in those

11   three quarters, for three quarters of the year?

12   A.  For the merchants we reported.

13   Q.  You didn't report any others, as far as you know, right?

14   A.  Not to my knowledge.

15             MR. BURCK:  I'd like to show the witness only, I don't

16   believe these are in evidence, Government Exhibit 2421.

17   Q.  Do you recognize this?

18   A.  Yes.

19   Q.  What is it?

20   A.  This is a list of transactions that were identified during

21   our search.

22             MR. BURCK:  Your Honor, we would offer Government

23   Exhibit 2421.

24             MS. LA MORTE:  No objection.

25             (Government Exhibit 2421 received in evidence)

L3BMWEI2                         Clow - Cross

1    Q.   This is information that was acquired by your monitoring

2    team?

3    A.   Correct.

4    Q.   And you will see the highlighted section, merchant name.

5    Auto Flowering Cannabis, SQ Cannabis card, Orla, SQ Cannabis

6    with Love, SQ Marijuana Therapeu.

7    A.   Yes.

8    Q.   That's the merchant name, right?

9    A.   Yes.

10   Q.   Then you have the location:  San Francisco, Orlando,

11   Shreveport, Coral Gables.

12   A.   Yes.

13   Q.   Merchant country code?

14   A.   Yes.

15   Q.   That's the currently it's located, right?

16   A.   Correct.

17   Q.   Now, nothing in here shows the descriptor information,

18   right.

19   A.   Correct.

20   Q.   You testified there is a search process that's done by Bank

21   of America after the transaction has been authorized to see if

22   there are any cannabis businesses that have been part of the

23   network, right?

24   A.   Correct.

25   Q.   You testified about two of those terms, which are cannabis

L3BMWEI2                        Clow - Cross

1    and marijuana, right?  There were others that you didn't want

2    to testify to because they are proprietary information.  Fine.

3    But you run those against the merchant name, right?

4    A.  Correct.

5    Q.  You don't run them against the descriptor information,

6    right?

7    A.  Correct.

8    Q.  You receive the descriptor information, isn't that right?

9    A.  Yes.

10   Q.  And you in fact send that on to the cardholder in a

11   statement at the end of the month, right?

12   A.  Yes.

13   Q.  But you don't search the descriptor information, right?

14          MS. LA MORTE:  Objection, your Honor.  Again, I am

15   going to go to motion *in limine* No. 3.

16          MR. BURCK:  Your Honor, I can probably clarify it so

17   motion *in limine* No. 3 doesn't become an issue.

18   Q.  Your team has made a decision about what information it

19   wants to use to do its searches, correct?

20          MS. LA MORTE:  Same objection.

21          THE COURT:  I am going to have to refresh my own

22   recollection about motion *in limine* No. 3.

23          MR. BURCK:  Your Honor, if you are inclined to

24   sustain, I would ask for a sidebar on this one.

25          THE COURT:  Just give me a minute.

1          MR. BURCK:  Sure, your Honor.

2          THE COURT:  I have now refreshed my recollection.  The

3     objection is denied.

4          MR. BURCK:  Thank you, your Honor.

5     Q.  Let me repeat briefly, succinctly, your team makes a

6     decision about the information it wants or needs to determine

7     if a cannabis merchant is in the system, right?

8     A.  Correct.

9     Q.  It's a conscious decision, right?

10    A.  Well, it is a conscious decision about which words we

11    choose and what we search for, yes.

12    Q.  You testified that you have the descriptor information,

13    right?

14    A.  Yes.

15    Q.  And you testified earlier that the descriptor information

16    contains more information than just the merchant name, correct?

17    A.  It can if it's valid.  A lot of times the descriptor isn't

18    that valuable.

19    Q.  Understood.  What about the merchant name?  Is the merchant

20    name always accurate?

21    A.  The merchant name is always supposed to be accurate, yes.

22    Q.  What does a merchant name tell you about the merchant?

23    A.  It just tells them who they are doing business as, tells

24    them who they are.

25    Q.  You are familiar with, for example, Amazon, correct?

L3BMWEI2                          Clow - Cross

1    A.  Yes.

2    Q.  Amazon's name -- obviously, we all know what Amazon is,

3    right?

4    A.  Correct.

5    Q.  But Amazon's name doesn't tell you anything about the

6    business, does it?

7    A.  Correct.

8    Q.  If there was a company that is not as famous as Amazon, its

9    name wouldn't necessarily tell you anything about what the

10   business is, right?

11   A.  That's right.

12   Q.  There is no requirement that you're aware of that merchant

13   names reflect the business they are in, right?

14   A.  Correct.

15   Q.  Like Google doesn't mean anything, right?

16   A.  I think Google means something.

17   Q.  Does Google say search engine in the title?

18   A.  No.

19   Q.  Apple.  Do they sell apples?

20   A.  No.

21   Q.  We know what they are, right?

22   A.  Yes.

23   Q.  Then there are companies that are not as famous as those

24   companies, right?  Those companies also have names that don't

25   necessarily reflect the business they are in, right?

L3BMWEI2                              Clow - Cross

1    A.  Correct.

2    Q.  And there is no requirement they do, right?

3    A.  Correct.

4    Q.  And the descriptors do contain more information than the

5    merchant name, right?

6    A.  Correct.

7    Q.  And your team has made a conscious decision not to check

8    the descriptor information when they do their monitoring,

9    correct?

10             MS. LA MORTE:  Objection.  Same motion *in limine*.

11             THE COURT:  I will explain at the next break why I'm

12   overruling that objection.

13             You may answer that question.

14   Q.  I'm sorry.  I'll repeat it.  Your team made a conscious

15   decision not to check descriptor information as part of its

16   process of monitoring for whether or not the cannabis

17   businesses are being used in network.

18   A.  Correct.

19             THE COURT:  Why?

20             THE WITNESS:  Two reasons.  One, the descriptor

21   information isn't structured and it's very hard to search at

22   the scale of the data that we have in our environment and, two,

23   the accuracy of the descriptor data is not as clear and concise

24   or understandable as other key indicators, like the name and

25   the MCC code.

1   Q.  Just following the judge's question and your answer, in

2   most cases or in all cases the descriptor contains the merchant

3   name, doesn't it?

4   A.  Yes.

5   Q.  You just testified that the descriptor information is less

6   reliable than the merchant name?

7   A.  I said that the data that we get in the transaction can be

8   unreliable in both of those things.

9   Q.  That's a little different than what you testified to.  Let

10  me ask you --

11          THE COURT:  Counsel.

12          MR. BURCK:  Sorry, your Honor.  I'm having a little

13  bit of trouble hearing him, your Honor.

14          THE COURT:  That wasn't the thrust of your comment.

15          MR. BURCK:  You are right, your Honor.  I'm sorry.

16  Q.  Mr. Clow, you testified that your team checks the merchant

17  name, right?

18  A.  We search against the merchant name.

19  Q.  And the merchant name your team believes to be a

20  potentially reliable source of information, right?

21  A.  Right.  As reliable as it is for authorizing the

22  transaction.

23  Q.  Understood.

24          The merchant name is included in the descriptor

25  information, right?

L3BMWEI2                          Clow - Cross

1   A.   Yes.  It's also in the descriptor.

2   Q.   And the descriptor has additional information, too,

3   correct?

4   A.   It can, yes.

5   Q.   So the merchant name, which you think your team says is

6   reliable, is in the descriptor information, right?

7   A.   Yes.

8   Q.   Yet, you don't check the descriptor information, right?

9   A.   Correct.

10  Q.   Again, you do send that information, the descriptor

11  information, on to the cardholder at the end of the month,

12  right?

13  A.   Yes.

14       MR. BURCK:  I want to show -- I don't believe this is

15  in evidence -- Government Exhibit 2426, just for the witness.

16  Q.   Do you recognize this?

17  A.   Yes.

18  Q.   What is this?

19  A.   This is a list of the suspected merchants.

20  Q.   Understood.

21       MR. BURCK:  Your Honor, we would offer government

22  Exhibit 2426.

23       MS. LA MORTE:  No objection.

24       THE COURT:  Received.

25       (Government Exhibit 2426 received in evidence)

L3BMWEI2                         Clow - Cross

1   Q.  This is, again, some information that was pulled by your

2   team for the summary purposes we talked about earlier, the

3   monitoring purposes?

4   A.  Correct.

5   Q.  You'll see a list of information:  State, merchant,

6   address, right?

7   A.  Correct.

8   Q.  Then you'll see some notes at the end:  Could not find in

9   merchant master list, etc., right?

10  A.  Correct.

11  Q.  As far as you recall, do you know if these merchants were

12  terminated from the system?

13  A.  I don't recall.

14  Q.  You don't recall.

15          Is there anything on this document that suggests they

16  were?

17  A.  No.  But some of these had multiple columns that go beyond.

18  Q.  Let me ask you, when you look at this information, it has

19  the state and then the merchants, for example, the first one,

20  the Herbal Cache?

21  A.  Yes.

22  Q.  Then it has an address, right?

23  A.  Yes.

24  Q.  It doesn't say cannabis or marijuana in it, right?

25  A.  That's correct.

L3BMWEI2                         Clow - Cross

1    Q.  The one blow it, Jet Room?

2    A.  Correct.

3    Q.  Then Green Dragon?

4    A.  Yup.

5    Q.  There is one that says Caroline's Cannabis, right?

6    A.  Yes.

7    Q.  And there is one a couple down, Southern Vermont Wellness?

8    A.  Yes.

9           MR. BURCK:  And then you go to the next page, please.

10   Q.  A couple of examples.  Again, these are all companies that

11   were at least suspected of potentially being cannabis related,

12   right?

13   A.  Yes.

14   Q.  That's why they are on this list?

15   A.  Yes.

16   Q.  And you have a lot of different companies in here, right?

17   A.  Yes.

18   Q.  And I'm not going to ask you to read them all because it

19   would take way too long, but there is nothing in here that says

20   cannabis or marijuana.  There are a couple that say canna,

21   right?

22   A.  Yup.

23   Q.  We looked at the number of companies that were terminated

24   in this time frame, right?

25   A.  Correct.

1  Q.  I think it was eight total in the course of a year?  They

2  are all in the Q --

3  A.  These have a long range on the audit, but I'll say, in

4  principle, in that timeline there were very few.

5  Q.  When your team is looking at this information, again, all

6  they are seeing is the merchant name, right, and the state and

7  the address?

8  A.  This is a summary, but yes.

9  Q.  But they can search online if they want to?

10  A.  Correct.

11  Q.  Here, for example, it says Big Sur Canna Botanicals.  You

12  will see that sort of toward the top?

13  A.  Yes.

14  Q.  There is the word canna in it, but canna is not a search

15  term.  It may -- it popped up here, but you are not going to

16  know necessarily whether this is a cannabis-related business,

17  right?

18  A.  No, we would not from the name.

19  Q.  There is nothing in here about the descriptor, right?

20  A.  That's on this page, no.

21  Q.  Then you go down:  Takoma Wellness Center, right?

22  A.  Yes.

23  Q.  Again there is nothing in the name that suggests marijuana,

24  right?

25  A.  No.

 1              MR. BURCK:  You can take that down.

 2    Q.  I am going to show you for identification purposes Akhavan

 3    Exhibit 10017.

 4              First of all, do you recognize that?

 5    A.  Yes.  That's an image of one of our card products.

 6              MR. BURCK:  Please show the witness Akhavan Exhibit

 7    10018.

 8    Q.  Do you recognize that?

 9    A.  Yes.  That's another one of our card products.

10              MR. BURCK:  Can you show the witness Akhavan Exhibit

11    10037.

12    Q.  You recognize that?

13    A.  Yes.  That's our newest debit product.

14    Q.  I'm sorry?

15    A.  It's our newest debit product.

16              MR. BURCK:  Your Honor, we would offer Akhavan

17    Exhibits 10017, 10018, and 10037.

18              MS. LA MORTE:  No objection.

19              THE COURT:  Received.

20              (Defendant's Exhibits Akhavan 10017, 10018, and 10037

21    received in evidence)

22              MR. BURCK:  Let's start with 10017 and 10018.  We can

23    put them on together.  Thank you, Mr. McLeod.

24    Q.  These are two Bank of America issued credit cards, one

25    under MasterCard, one under Visa, correct?

1   A.  Correct.

2   Q.  This is what Chris Martin, whoever that might be, probably

3   a fictitious name, these is the cards that he would have,

4   correct?

5   A.  Correct.

6   Q.  And these are the cards that somebody would use to make a

7   purchase either at a store, online, or whatever, right?

8   A.  Correct.

9   Q.  And each of the cards has Bank of America very promptly

10  displayed, right?

11  A.  Yes.

12  Q.  And has MasterCard and Visa very promptly displayed, right?

13  A.  Yes.

14  Q.  I think you testified to, and I think it's in some of the

15  documents that you testified about, that one of the issues that

16  Bank of America is concerned about to be engaging in marijuana

17  sales is brand risk, right?

18  A.  Correct.  Reputational risk.

19  Q.  I'm sorry.  Say that again.

20  A.  Reputational risk.

21  Q.  And the reputational risk relates to the value of the brand

22  of Bank of America, right?

23  A.  Actually, it's just as much of the perception that we are

24  doing -- we are supporting illegal businesses.

25  Q.  Right.  You don't want to be perceived as supporting a

1   marijuana business, right?

2   A.  Correct.  And legally we can't.

3   Q.  Legally you can't, but you also don't want to be?

4   A.  Correct.

5   Q.  Having the Bank of America logo used to make a marijuana

6   purchases is harmful to the reputation of the bank in the

7   bank's view, correct?

8   A.  If we knowingly supported the transaction it would be.

9   Q.  If you don't know about it, it's fine.

10  A.  I'm saying, if we are using our practices and the tools and

11  the contracts we have on our network to authorize the

12  transaction and our card member thinks that it's permissible,

13  it doesn't necessarily put us in a brand risk or reputational

14  risk.

15  Q.  If your cardholder thinks it's permissible, it doesn't put

16  you at risk?

17  A.  Again --

18  Q.  I'm sorry.  Reputational risk.

19  A.  Reputational risk.

20          MR. BURCK:  Can we show the witness Akhavan Exhibit

21  10037.  We can just use either one.  Perfect.  Thank you,

22  Mr. McLeod.

23  Q.  The card on the right is one we just looked at.  It's a

24  credit card?

25  A.  Yes.

L3BMWEI2                         Clow - Cross

1   Q.  And the one on the left is a debit card?

2   A.  Yes.

3   Q.  I think you testified debit cards are somewhat different

4   than credit cards, right?

5   A.  Yes.

6   Q.  The debit card comes from the bank account of the

7   individual who holds the card?

8   A.  Correct.

9   Q.  Or is linked to.  I'm sorry.  Linked to the bank account of

10  the individual that holds the card?

11  A.  That's right.

12  Q.  Then the credit card is an extension of credit by the bank?

13  A.  Yes.

14  Q.  In your testimony it doesn't matter at all whether or not a

15  cardholder uses his or her debit card or credit card to make a

16  marijuana purchase, right?

17  A.  They are both -- correct.  They are both considered

18  illegal.

19  Q.  Both are equally illegal?

20  A.  Correct.

21  Q.  No difference, right?

22  A.  No difference.

23  Q.  So the extension of credit that you do for a credit card

24  doesn't create any additional risk for you versus the debit

25  card, right?

1    A.  It creates credit risk.

2    Q.  Credit risk.

3    A.  In addition to the legal and reputational risk.

4    Q.  Let me ask you, in the course of the monitoring and the

5    work that you've done to understand if marijuana sales are

6    being done using your cards, have you ever done an analysis of

7    whether or not marijuana purchasers are less creditworthy than

8    others?

9    A.  Not to my knowledge.

10            MS. LA MORTE:  Objection to foundation for that.

11            THE COURT:  Sustained.

12   Q.  You testified, Mr. Clow, that credit risk is an issue for

13   credit cards, correct?

14   A.  Yes.

15   Q.  You have also testified about the fact that the bank does

16   not want its credit cards to be used to make marijuana

17   purchases, correct?

18   A.  Correct.

19   Q.  As far as you are aware, is there any credit risk to making

20   marijuana purchases?

21   A.  Based on what I'm aware of, there is no additional credit

22   risk for marijuana-based transaction than many other types of

23   transactions.

24   Q.  Thank you.

25            MR. BURCK:  You can take those down.

L3BMWEI2                          Clow - Cross

 1              I'm sorry, Mr. McLeod.  Keep them up, please.

 2   Q.  Mr. Clow, are you aware of a company called Circle Wallet?

 3   A.  I am.

 4   Q.  What is Circle Wallet?

 5   A.  Circle Wallet is -- we would call it a staged wallet.  It's

 6   a wallet that allows people to load funds from a bank account

 7   or card and then use the credits that they purchase within

 8   Circle to buy things at merchants who accept Circle.

 9              MR. BURCK:  Your Honor, I'm sorry.  I just got a note

10   that the audio has cut out.  Is that right?

11              MS. LA MORTE:  I believe for the outside line, because

12   I just got a note, too, for whoever is dialing in.

13              MR. BURCK:  As long as the jury can hear me, I'm fine.

14              Sorry, your Honor.  Apologies.

15   Q.  I'm sorry, Mr. Clou.  Could you just repeat the last

16   answer.

17   A.  Sure.  Circle Wallet is an example of what we call a staged

18   wallet where a consumer can load credits onto that wallet using

19   a bank account or a card and then use those credits with

20   merchants who accept Circle as a method of payment.

21   Q.  Now, are you aware that Circle Wallet works with a company

22   called Eaze?

23   A.  I am.

24              MS. LA MORTE:  Objection.  401 and 403.

25              THE COURT:  It breaks my heart, but I think we are

L3BMWEI2                        Clow - Cross

1    going to need a sidebar on this one.  Let's go to the sidebar.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  First, so I don't forget, with respect to

3     the objection that was raised under motion *in limine* No. 3,

4     that motion was directed at whether the banks had acted

5     negligently, and I ruled that that was irrelevant.

6          But the questions that were put where you raised that

7     objection were designed to show that the bank made a conscious

8     decision not to do X or Y or Z., so it's not a matter of

9     negligence.  The implication is that they don't care.  That's

10    why they don't pursue descriptor information or whatever.

11    There are, of course, many arguments going the other way, but

12    it has nothing to do with negligence.  It's a question of

13    conscious decision.  That's why I asked the witness, so that

14    the jury would have a greater basis for evaluating that

15    argument why that was done, and he gave reasons that obviously

16    are different from what the defense is suggesting is the

17    reason, but that's a question for argument.

18          MS. LA MORTE:  For purposes of clarification, because

19    I find the argument to be circular, under the law, negligence

20    is not relevant to materiality.  The way I understand my

21    reading of this, too, is that also encompassed a failure of

22    diligence, and so an argument that a bank always could have

23    done more --

24          THE COURT:  That's not the argument.  Their argument

25    is, as I understand it --

L3BMWEI2                          Clow - Cross

1          MR. BURCK:  Your Honor, you are doing it better than I

2    am.

3          THE COURT:  -- is that this was purposeful because

4    they don't want to know and they don't want to terminate and it

5    is all part of this defense of, all they care about is making

6    money.  So the key word in the question he put, was that a

7    conscious decision.  That's different from failure to exercise

8    due diligence or negligence or anything like that.

9          Now, so far the evidence is they have made that

10   conscious decision for two reasons, neither of which support

11   the argument they want to make, but we will see whether they

12   will have enough to make that argument in summation.

13   Nevertheless, we will worry about that in a few days.

14         Now, on this one, let me hear, first, the government's

15   objections.

16         MS. LA MORTE:  The government believes that the Circle

17   evidence is both irrelevant and unfairly prejudicial and

18   misleading, in fact.  The use of a debit card or a credit card

19   to purchase marijuana directly, which is what the Eaze scheme

20   was about, is one thing.  Circle is a completely different

21   animal.  Again, it was post scheme.  I understand your Honor's

22   view on that.  It still may have some relevance there.

23         But as the witness just explained, the way that this

24   works is, you use your debit card, it's only a debit card, and

25   you use that to purchase an electronic wallet.  The witness

1    didn't say this yet.

2           What we know from the arguments is that this is a

3    cryptocurrency that you're purchasing in the wallet.  You use

4    your Bank of America debit card, you purchase things in a

5    wallet, in a cryptowallet, and that wallet can be used to buy

6    anywhere that accepts Circle.  It's different than your use of

7    a credit card directly to purchase a marijuana product.

8           So it's misleading, in the government's view, and not

9    relevant to what's charged in the scheme.

10          THE COURT:  Let me hear from the defense counsel.

11          MR. BURCK:  Your Honor, that's only part of the story.

12          The way that Circle actually works, which I believe

13   this witness will know about -- by the way, he learned of this,

14   based on the 302s, 3500 material, I should say, from the

15   government after we subpoenaed and then the Court issued its

16   ruling.  So he didn't know about Circle until then, apparently.

17          MS. LA MORTE:  He wasn't asked about Circle.  It's

18   different.

19          THE COURT:  For the purpose of my ruling on the

20   immediate objection, it is completely irrelevant.

21          MR. BURCK:  Totally irrelevant, your Honor.  It was a

22   side argument.

23          The core argument is that what Circle does is, Circle

24   will issue a wallet to a credit card or a debit card holder.

25   And if they want to buy $17.75 worth of marijuana, Circle will

give them $17.75 in cryptocurrency.  It's not as if there is

like an ATM where I take a thousand dollars out and I use it

however I want to use it.

          This is a situation in which this company will say,

you buy a wallet from me for $17.75 or 19.99, or whatever, and

we will send that off to Eaze to send you marijuana.

          The other thing, your Honor, which is critical, in the

credit card statements, which were received by the account

holders every month, it says Circle Wallet Eaze, E-a-z-e, on

the credit card statements, as of today, and the bank obviously

knows all about Eaze as of today and has for a while, if it

didn't know about it before.  It's the most famous --

          THE COURT:  I do think this is potentially confusing,

and I'm reasonably confident that although I've had cases

involving cryptocurrency, many of the jurors don't even know

what that word means.

          Why don't you just ask him, are you familiar with a

company called Eaze?  Have you heard such and such?  Is that

currently known to the bank, as far as you know, and have you

done anything about it?  That's what you want to get at.

          MR. BURCK:  Perfect, your Honor.

          MS. LA MORTE:  The government doesn't have an

objection to that.  But to the extent Circle is being

introduced --

          THE COURT:  I am going to sustain the objection but

1    allow those other questions.

2           I do think that the whole Circle argument, as you

3    point out, I think, for the jury to really fully appreciate it,

4    even with the explanation you gave, would require a very

5    considerable amount of background that would have to be adduced

6    and it would not be worth the candle.  But I will allow those

7    other questions.

8           MR. BURCK:  Your Honor, two brief points.

9           One thing is, Judge, I will do what you said in terms

10   of asking the questions.

11          On the Circle issue, I was just introducing that so

12   that there was some context for the jury as to how this is

13   happening.

14          THE COURT:  It doesn't matter.  It really doesn't

15   matter.  I think it does invite confusion.

16          I should note, this is a total irrelevancy, but I will

17   say it anyway because I've had the pleasure of Mr. Burck now

18   for two trials.  His demeanor is a model of what every trial

19   lawyer's demeanor should be.  I invite all of you to pay

20   attention to that.  He really knows what he's doing except, of

21   course, in this particular case.

22          All right.  Let's go.

23          MR. BURCK:  Your Honor, I should be able to finish

24   before lunch.

25          (Continued on next page)

L3BMWEI2                        Clow - Cross

1              (In open court)

2              MS. LA MORTE:  Will your Honor sustain the objection

3    on the record?

4              THE COURT:  Yes, sure.  The objection is sustained.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3BPWEI3                          Clow - Cross

Q.  Mr. Clow, are you familiar with a company called Eaze,

E-a-z-e?

A.  Yes, I've heard of them.

Q.  And you know that they are a marketplace for marijuana

sales, correct?

A.  Correct.

Q.  And they're an online business, correct?

A.  Yes.

Q.  And you're aware that Eaze was using the Visa network and

the MasterCard network to facilitate sales of marijuana, right?

A.  I became aware of that recently, yes.

Q.  Okay.  And are you aware that Eaze continues to sell

marijuana on the MasterCard and Visa network?

A.  I'm not aware of if that's still happening today.  I will

say we included that in one of our ad hoc reports to the

networks several weeks ago.

Q.  So you're saying you don't not know whether or not Eaze is

part of the Visa network or MasterCard network for selling

marijuana?

A.  To my knowledge, they weren't a direct merchant on the

network.  They worked through a wallet.

Q.  They worked through a wallet.  What's a wallet?

A.  A wallet, what we --

          MR. BURCK:  Can I interrupt?  Your Honor, is this fair

testimony?

1           MS. LA MORTE:  I was going to object.

2           THE COURT:  I think he invited this and, therefore, I

3   think we have to allow it.

4           MR. BURCK:  Okay.  Thank you, your Honor.

5   BY MR. BURCK:

6   Q.  Please, go ahead.

7   A.  A wallet in the case of Eaze it's Circle.  It's what's

8   considered a staged wallet, where a consumer can use their bank

9   account or their debit card or credit card, in some cases, to

10  load value into the wallet.  So for us, as a bank, we see a

11  transaction that comes from Circle.  And a Circle transaction,

12  MCC code is called a wallet load.  It's a very specific thing.

13  Once the value is on Circle, then the owner of that Circle

14  wallet can shop at different marketplaces that support Circle

15  as a checkout process, and my understanding is Eaze is one of

16  those places.

17  Q.  So Eaze works with Circle, as far as you know?

18  A.  As far as I know.

19  Q.  Just for identification purposes, can I show the witness

20  Akhavan Exhibit 11,009?

21          I'm sure you've never seen this particular document,

22  but do you recognize it?

23  A.  It looks like a transaction detail screen.

24          MR. BURCK:  Your Honor, we would offer --

25  Q.  For Bank of America?

L3BPWEI3                          Clow - Cross

1          MS. LA MORTE:  Objection.

2     A.  For --

3          MS. LA MORTE:  I'm sorry, are you done?  Objection.

4          THE COURT:  Well, it is ironic that after the sidebar,

5     the witness, who of course was not party to that sidebar,

6     opened the door.  But I think he has, to this limited extent.

7          MR. BURCK:  Your Honor, I'm going to show this

8     document, and then I've got three more questions.

9          THE COURT:  All right.  So received.

10         (Defendant's Akhavan Exhibit 11,009 received in

11    evidence)

12         MR. BURCK:  You can publish that to the jury, please.

13    BY MR. BURCK:

14    Q.  So, Mr. Clow, this is a Bank of America statement, correct?

15    A.  Yes.  It's a transaction detail summary, yup.

16    Q.  Got it.  And then it says the date is 11-9-2020?

17    A.  Correct.

18    Q.  And that's November 9th of last year, 2020?

19    A.  Yes.

20    Q.  Amount $226.22, right?

21    A.  Yes.

22    Q.  Debit card, type?

23    A.  Yes.

24    Q.  Purchaser is a gentleman by the name of Daniel Whelan,

25    right?

1    A.  Yes.

2    Q.  And then underneath that description, Circle Wallet star

3    Eaze, 11/07 purchase, London; do you see that?

4    A.  I do.

5    Q.  And then -- and that's the descriptor information, correct?

6    A.  Yes, that's a descriptor.

7    Q.  And then a couple down, there's a merchant category code,

8    6540; do you see that?

9    A.  Yes, I do.

10   Q.  Do you know what that is?

11   A.  Yes, that's a stored value card load or purchase.

12   Q.  Okay.  And then above that it says "merchant category:

13   Stored value card purchase or load," right?

14   A.  Yes.

15   Q.  And that's describing what this merchant does, right?

16   A.  Correct, stored value.

17   Q.  And then below that it says the merchant name is Circle

18   Wallet star Eaze, correct?

19   A.  Yes.

20   Q.  What does the star mean, do you know?

21   A.  Typically --

22   Q.  Or the asterisk.  I'm sorry.  Asterisk or star.

23   A.  So in a merchant name or transaction, typically the first

24   name is the merchant that is facilitating the transaction, and

25   then the star, and the name that would come after it would be a

L3BPWEI3                          Clow - Cross

1   merchant on the marketplace, or however the transaction would

2   be settled between the wallet and the merchant.

3   Q.   Okay.  So based on the information that's here, when it

4   says the merchant category is stored value card purchase, or

5   load, I think you testified that circle wallet, that's their

6   business, stored value card purchase or load?

7   A.   Correct.

8   Q.   And you testified about what you understand Eaze to be,

9   correct?

10  A.   Correct.

11  Q.   Does Eaze do stored value card purchase or load, to your

12  understanding?

13  A.   Not to my knowledge.

14  Q.   And what about the merchant name, Circle Wallet, and it

15  says "Eaze," right?  I'm sorry.  Under merchant name it says

16  "Circle Wallet star Eaze"?

17  A.   Yes.

18  Q.   All right.  Anything on this statement say anything about

19  marijuana?

20  A.   No.

21  Q.   It doesn't say it's the merchant category code?

22  A.   No.

23  Q.   And it doesn't say --

24        THE COURT:  So counsel, you said you had three

25  questions.

1            MR. BURCK:  Your Honor --

2            THE COURT:  I've run out of fingers to count them.

3            MR. BURCK:  Your Honor, I am done with this document.

4    I'm moving on to my last three questions.

5            THE COURT:  All right.

6            MR. BURCK:  Now, maybe five questions, just two to

7    preface.

8            THE COURT:  In all seriousness, I'm going to -- we

9    have three minutes until we give the jury their lunch break.

10   That will conclude your examination.

11           MR. BURCK:  Okay.  Thank you, your Honor.

12   BY MR. BURCK:

13   Q.  So you testified that cardholders are the customers, the

14   clients of the bank with these card transactions, right?

15   A.  Yes.

16   Q.  You have a contract with them, right?

17   A.  Yes.

18   Q.  And you tell them they can't do illegal transactions,

19   right?

20   A.  Yes.

21   Q.  And that includes marijuana sales, correct?

22   A.  We don't tell them that that includes marijuana sales, but

23   marijuana sales is included.

24   Q.  Exactly right.  Thank you.  Has Bank of America terminated

25   a single, a single cardholder's card because they have used

L3BPWEI3                          Clow - Cross

1    their cards to buy marijuana, to your knowledge?

2    A.  Not to my knowledge.

3               MR. BURCK:  That's it, your Honor.  Thank you.

4               THE COURT:  Okay.  We'll take our lunch break and then

5    continue with this witness after lunch.  So we'll take an hour

6    for lunch.

7               (Jury not present)

8               THE COURT:  Please be seated.  The witness is excused.

9               (Witness temporarily excused)

10              I received an e-mail last night in which defense

11   counsel kindly brought to my attention that they had probably

12   underestimated their case when they said two days; that

13   depending on my rulings on various other witnesses, it might be

14   as much as three days.  So I think it's important that we get

15   those rulings made.  Most of them regarded, if I recall,

16   experts.  So are those experts all in New York?

17              MR. BURCK:  No, your Honor.  Some are -- we have to

18   bring to New York imminently in order for them to meet the --

19              THE COURT:  All right.  So what I'm thinking is that

20   maybe after we excuse the jury tomorrow afternoon, we might

21   have, if it can be arranged, a hearing where those witnesses

22   could appear by Zoom, and that way, they would know if they're

23   going to have to come or not.

24              But in terms of setting that up, I remind both sides

25   that whenever we have any of the Zoom stuff, it's the

1   responsibility of the party who wants to call a witness to set

2   it up and work with our folks.  We have all sorts of wires

3   ready to be connected, but it's not my responsibility, it's not

4   my law clerk's responsibility.  So why don't you figure out

5   what you want in that regard, and I'm willing to go Friday

6   evening as long as the marshals are willing to have Mr. Akhavan

7   remain here; so....

8           THE DEPUTY CLERK:  Judge, just so you know, we have a

9   proceeding at 4:00 p.m.  It should last to 4:30.

10          THE COURT:  What is that?

11          THE DEPUTY CLERK:  That's in re:  George Washington

12   Bridge, tomorrow.

13          THE COURT:  What's that about?

14          THE DEPUTY CLERK:  It's one of Audrey's cases.  I'll

15   find out.

16          THE COURT:  We may move that.  Why don't you plan at

17   least to have this begin at 4:00, and we'll go as long as we

18   can.

19          MR. BURCK:  Great.  Thank you, your Honor.  We will do

20   that.

21          MS. LA MORTE:  Your Honor, can I ask one clarifying

22   question?  With respect to what happened at the sidebar,

23   victory from the jaws of defeat type of thing, and this witness

24   opening the door, the government's position would be that this

25   is not an issue that's necessarily open for the rest of the

L3BPWEI3                          Clow - Cross

trial.  I'm just wondering what the Court's view is on this.
This witness opened the door with his testimony, but the
government --

          THE COURT:  No, I think the questioning of this
witness was permissible for the reasons given, but the door has
not been opened to -- we're not going to hear about Circle and
cryptocurrency and all of that.  As I said at the sidebar, I
will permit, in a much more limited way, whether any of the
banks are still processing, knowingly processing Eaze
transactions.  That, I will permit, but not all the mishegoss.

          MS. LA MORTE:  Mishegoss.  Thank you, your Honor.

          THE COURT:  Yes.  The reporter has it down as
Michigan, but we'll correct that, and some of you will need a
translation from your fellow attorneys.

          Okay.  We see you all in an hour.

          MR. BURCK:  Your Honor, just one quick thing, and this
is really just to put it on your radar on the Circle issue.
Per your ruling that allowed us to subpoena documents from
Circle, this is how we know a lot of this about Circle.  We
have been in touch with Circle's counsel about having a
witness, in our affirmative case, from Circle to testify, and
we believe it will be very relevant.  And we want to -- again,
I'm not asking you to rule on it now, of course.  I just want
to make sure that that's on your radar screen.

          THE COURT:  Okay.  Thank you for reminding me of that,

L3BPWEI3                          Clow — Cross

1  and we'll deal with that when we get to that.

2               MR. BURCK:  Thank you, your Honor.

3               THE COURT:  Okay.

4               (Luncheon recess)

```
 1                    A F T E R N O O N   S E S S I O N

 2                              1:47 P.M.

 3              (In open court; jury not present)

 4              THE COURT:  Please be seated.  The jury is on their

 5   way up.  Please bring the witness up.

 6              MR. BURCK:  Judge, I just want to note that

 7   Mr. Akhavan is not here.

 8              THE COURT:  Oh.

 9              (Pause)

10              Okay.  So Mr. Akhavan is here now.

11              THE LAW CLERK:  Jury entering the courtroom.

12              (Jury present)

13              THE COURT:  Please be seated.  Counsel?

14              MR. GILBERT:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MR. GILBERT:

17   Q.  Good afternoon, Mr. Clow.  My name is Michael Gilbert.  I

18   represent Ruben Weigand in this case.  How are you?

19   A.  Good afternoon.

20   Q.  Mr. Clow, you were asked, I believe it was the last

21   question you were asked, on cross-examination whether there's

22   been any circumstances you're aware of in which Bank of America

23   terminated a cardholder because Bank of America determined that

24   cardholder had used the card to buy marijuana.  Do you recall

25   that question?
```

L3BPWEI3                          Clow – Cross

1    A.   Yes.

2    Q.   And your answer, sir, was that you're not aware of a single

3    situation where Bank of America has ever terminated a

4    cardholder based on a conclusion that that cardholder used the

5    card to buy marijuana, correct?

6    A.   That's my understanding.

7    Q.   And in fact, there have been circumstances, and you

8    testified today about them, where Bank of America has

9    determined that there were cardholders who were using a Bank of

10   America card to buy marijuana, correct?

11   A.   No.  I said that we have identified suspected merchants

12   where purchases took place.

13   Q.   So the process that Bank of America undertook, determined

14   that there had been cardholders who made purchases at merchants

15   such as Swiss Cannabis was one of them that we talked about,

16   correct?

17   A.   Correct.

18   Q.   And the process determined that there had been Bank of

19   America cardholders who made purchases at merchants named

20   Cannabis Consumers, correct?

21   A.   I can't recall that specific merchant.

22   Q.   Fair enough.  I'll help you.

23        If we could please, Mr. McLeod, show in evidence

24   Government Exhibit 2427.

25        Do you recall this exhibit, Mr. Clow?

L3BPWEI3                          Clow - Cross

1   A.  Yes.  Thank you.

2   Q.  You're welcome.  So you see there's a list of various

3   merchants in the column Merchant Name, and take a look?

4   A.  Yes.

5   Q.  If you'd like -- can we agree that they all appear to have

6   the word "cannabis" or "marijuana" in them?

7   A.  Yes.

8   Q.  And so the process that Bank of America undertook was to

9   determine that all of those merchants had been on the Bank of

10  America system, correct?

11  A.  No, those are transactions.  They're not necessarily -- so

12  it's data on our system.

13  Q.  It was data on the Bank of America system to indicate that

14  a Bank of America cardholder had made a purchase at all of the

15  merchants that are listed on this list, correct?

16  A.  That is correct.

17  Q.  And at the time that determination was made, that

18  transaction with the merchants on this list had taken place

19  several months earlier, correct?

20  A.  Correct.

21  Q.  And once Bank of America made the determination that there

22  had been purchases at the merchants reflected on Government

23  Exhibit 2427, Bank of America made a conscious decision not to

24  shut down that cardholder's account, correct?

25  A.  Correct.

L3BPWEI3                         Clow – Cross

 1   Q.  And did Bank of America take any steps to determine -- to

 2   prevent that same cardholder from engaging in other

 3   transactions that might be related to marijuana going forward?

 4   A.  No.

 5   Q.  So as of the time Government Exhibit 2427 was prepared,

 6   Bank of America had actual knowledge that its cardholders had

 7   made purchases at these merchants all including the name

 8   "cannabis" or "marijuana," correct?

 9   A.  Correct.

10   Q.  And at that point, then, had reason, you would agree, to

11   conclude that the cardholders who had made the purchases

12   reflected in Government 2427 would use the card again to buy

13   more marijuana, correct?

14   A.  I don't know that.

15   Q.  There's no way for you to know for sure, but would you

16   agree that that's a reasonable inference, that if a Bank of

17   America cardholder uses the card to buy marijuana on Monday,

18   that they may well look to buy marijuana again on Wednesday?

19           MS. LA MORTE:  Objection.

20           THE COURT:  Sustained.

21   Q.  Does Bank of America, to your knowledge, do anything to

22   increase its surveillance of the use of a card by a Bank of

23   America cardholder after it's been determined that that card

24   has been used to engage in a marijuana transaction?

25           MS. LA MORTE:  Objection.

L3BPWEI3                        Clow – Cross

1                THE COURT:  Sustained.

2       Q.  The transactions at the merchants listed on Government

3       Exhibit 2427 would have been, to your knowledge, reflected in

4       the monthly account statement for the Bank of America

5       cardholder, correct?

6       A.  Correct.

7       Q.  And the amounts of those transactions would have been

8       included in the determination of what interest payment was due

9       in any particular month, correct?

10      A.  The determination of the interest isn't a part of the

11      calculation for the month the transaction takes place.  It

12      would only take place in a month that they had not paid the

13      balance due.

14      Q.  So if a cardholder made a purchase at Auto Flowering

15      Cannabis in July of 2018, for example, that transaction would

16      be reflected in that month's statement for that cardholder?

17      A.  Correct.

18      Q.  And if that cardholder didn't make their payment on time,

19      then in the next month, interest would be charged by the bank

20      on the transaction that that cardholder made at that merchant,

21      correct?

22      A.  Correct.

23      Q.  And thereby, the Bank of America would have been collecting

24      interest on a transaction for marijuana, correct?

25      A.  Correct.

L3BPWEI3                        Clow - Cross

1    Q.  Looking at Government Exhibit 2427, let me refer your

2    attention to a transaction at the top of the first page,

3    October of -- October the 5th of 2018.

4    A.  Okay, yes.

5    Q.  Do you see the merchant name that's listed there is

6    Cannabis Store Sanremo and the open date is October 5th, 2018,

7    correct?

8    A.  Yes.

9    Q.  And there's -- in the following column it says MCC 5499; do

10   you see that?

11   A.  I do.

12   Q.  Do you know what 5499 is?

13   A.  Not off the top of my head.

14   Q.  And this was a transaction, I believe -- well, withdrawn.

15   This was a transaction, according to the notes, that was

16   determined to be compliant because it was in Italy, where the

17   marijuana was legal; is that fair?

18   A.  That's what the notes say, yes.

19   Q.  And that transaction was processed under the code 5499,

20   correct?

21   A.  Correct.

22   Q.  And I think we've established that there is no code for

23   marijuana.  The code that was used here is 5499, which, to your

24   knowledge, is not a marijuana-specific code, correct?

25   A.  Correct.

1   Q.  And if you go down two transactions below, it's also on

2   October 5th, 2018, and it says Cannabis Ischia, I believe, is

3   the merchant name.  Do you see that transaction?

4   A.  Yes.

5   Q.  And this transaction, too, the notes column appears to

6   reflect the same conclusion about the lawfulness of it in

7   Italy; is that fair?

8   A.  Yes.

9   Q.  And this transaction was coded 5411.  Do you know what that

10  one is for?

11  A.  Not off the top of my head.

12  Q.  And I believe Mr. Burck asked you about this one earlier,

13  but if you go down a little bit further in the page, there's

14  one also on October 5th of 2018 from Swiss Cannabis?

15  A.  Yes.

16  Q.  Do you see that one?

17  A.  Yes.

18  Q.  And that one, I believe you testified, was also deemed to

19  be a lawful marijuana transaction, correct?

20  A.  Correct.  It was deemed by the network, yes.

21  Q.  And it was coded 8099, and that one I think you knew what

22  the code was for?

23          MS. LA MORTE:  Objection.  I don't think that's

24  correct.

25  A.  I don't recall what 8099 is.  I know the wallet load.  I'm

1  not sure what the 8099 is.

2  Q.  But you do see that you've now looked at three transactions

3  involving lawful marijuana and there are three different MCC

4  codes connected to those transactions, correct?

5  A.  Correct.

6  Q.  And these transactions were all flagged by Bank of America

7  to be reviewed by Visa, correct?

8  A.  Correct.

9  Q.  And Visa determined that these were proper transactions,

10  correct?

11  A.  Correct.

12  Q.  Now, are you familiar, from your work at the bank, with ACH

13  transactions?

14  A.  Generally familiar, yes.

15  Q.  What are ACH transactions?

16  A.  ACH stands for automatic clearing house, and that's the way

17  that items like checks and account-to-account transfers are

18  managed in the United States.

19  Q.  So is it a way -- is it a direct connection -- well,

20  withdrawn.

21       If a holder of a Bank of America account engages in an

22  ACH transaction through a merchant, how does that work?

23       MS. LA MORTE:  Objection, your Honor.  401, 403, with

24  respect to ACH transactions.

25       THE COURT:  Sustained.

L3BPWEI3                         Clow - Cross

1    Q.  You testified that you're familiar with Eaze, correct?

2    A.  Yes.

3    Q.  Are you aware that Eaze permits its customers to engage in

4    ACH transactions?

5               MS. LA MORTE:  Objection, your Honor.

6               THE COURT:  Sustained.

7    Q.  I'd like to show the witness Weigand Exhibit 2601 in

8    evidence, and that's in evidence so you can display it.  Thank

9    you, Mr. McLeod.

10              Mr. Clow, the exhibit that's before you, sir, has the

11   word "Eaze" on top of it; is that correct?  And then it says:

12   "Select your bank"?

13   A.  Yes.

14   Q.  And then it's got a number of logos beneath it for various

15   institutions, including the Bank of America; do you see that?

16   A.  Yes.

17   Q.  And looking at this, do you have an understanding of how

18   this website is utilized in connection with the Bank of

19   America?

20              MS. LA MORTE:  Objection.

21              THE COURT:  Sustained.

22   Q.  Do you have an understanding of what this exhibit reflects?

23              MS. LA MORTE:  Objection.

24              THE COURT:  Sustained.

25   Q.  We can take it down, Mr. McLeod, thank you.

1        And you were asked a number of questions on both

2   direct and on cross-examination about the authorization

3   process; do you recall that?

4   A.  Yes.

5   Q.  And I believe you testified that the bank's decision

6   whether or not to authorize a transaction is made in a matter

7   of seconds?

8   A.  Typically less than a second.

9   Q.  But is it the case that Bank of America regularly declines

10  transactions based on information it learns in that second?

11  A.  Typically, we do decline a small percentage of

12  transactions.

13  Q.  And one of the reasons Bank of America might decline a

14  transaction is because the cardholder hasn't paid the bill; is

15  that fair?

16  A.  Typically not paying a bill wouldn't, in and of itself, be

17  a reason why we declined the transaction.  If the account is in

18  good standing, then we would authorize the transaction in most

19  cases.

20  Q.  Would Bank of America decline a transaction if a cardholder

21  had exceeded their credit limit?

22  A.  Yes.

23  Q.  In a debit card transaction, would the Bank of America

24  have -- does the Bank of America regularly decline transactions

25  if a cardholder is seeking to withdraw more funds than are

1    available in the account?

2    A.   Yes.

3    Q.   And Bank of America can make that determination in a matter

4    of less than a second, correct?

5    A.   Correct.

6    Q.   And you'd agree that it's important to the bank's business

7    that it not approve a transaction for a cardholder who doesn't

8    have enough money in the account, correct?

9    A.   Yes.

10   Q.   Or has gone above their credit limit, correct?

11   A.   Yes.

12   Q.   And so the bank has made a conscious decision to set up a

13   system to capture those situations and decline those

14   transactions, correct?

15   A.   Correct.

16   Q.   Now, I believe you've testified that in the circumstances

17   where Bank of America determines that a transaction might have

18   been with a merchant selling marijuana, what Bank of America

19   does is refer that to Visa or MasterCard, correct?

20   A.   Correct.

21   Q.   And as far as you're aware, that is the extent of what Bank

22   of America does, correct?

23   A.   Well, we follow up with the networks and make sure the

24   investigation is completed, but yes.

25   Q.   And Bank of America doesn't report it to the government,

L3BPWEI3                              Clow - Redirect

1  correct?

2  A.  No, we do not.

3  Q.  Nor has Bank of America ever reported concerns about Eaze

4  to the government, as far as you know, correct?

5  A.  Not to my knowledge.

6          MR. GILBERT:  Just one moment, your Honor.

7          (Pause)

8          Thank you very much.  No further questions at this

9  time.

10          THE COURT:  All right.  Redirect?

11          MS. LA MORTE:  Yes, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. LA MORTE:

14  Q.  Good afternoon, Mr. Clow.

15  A.  Good afternoon.

16  Q.  Mr. Levine, can we put up Government Exhibit 2426 in

17  evidence.

18          Mr. Clow, do you recall testifying about this document

19  in cross-examination?

20  A.  Yes.

21  Q.  Just briefly remind us what it is?

22  A.  This is a list of suspected merchants that we identified

23  based upon the transactions for our credit and debit cards.

24  Q.  And on cross-examination you also identified -- you did

25  identify terms like "cannabis" and "marijuana" as key words

1    that Bank of America would use to search merchant names; is

2    that right?

3    A.  That's correct.

4    Q.  And in some of these names that have been identified

5    suspicious marijuana merchants, "cannabis" or "marijuana" do

6    not appear in the names; is that correct?

7    A.  Correct.

8    Q.  So understanding that Bank of America has a proprietary

9    interest in keeping all of its -- you know, not revealing all

10   of its key word terms, fair to say that there's more than

11   "marijuana" and "cannabis" when Bank of America is doing key

12   word searches?

13   A.  That's correct.  There is also an ad hoc process, where, as

14   I said, in the policy people can identify or report, whether

15   it's an employee or information in a news report, suspected

16   activity.

17   Q.  Do you recall that happening?  Do you recall any occasion,

18   even if you don't recall specifics?

19   A.  Eaze was one that was recently one of those types of

20   incidents.

21   Q.  Okay.  Let's talk about that for a minute.  What can you

22   tell can you tell us about Eaze being one of those types of

23   incidents being reported to Bank of America?

24   A.  There was a significant amount of publicity around Eaze,

25   and we did our investigation.  We identified the Circle Wallet

L3BPWEI3                          Clow - Redirect

1   and Eaze transactions, and we simply reported them to Visa and

2   MasterCard based upon the processes in place.

3   Q.  So Eaze is something that Bank of America did report for

4   further investigation?

5   A.  Yes.

6   Q.  Okay.  So since you mentioned it, there has -- you did talk

7   a little bit on cross-examination about Circle; do you recall

8   that?

9   A.  Yes.

10  Q.  Just briefly remind us your understanding of what Circle

11  is?

12  A.  Circle is what we refer to as a staged wallet.  It's a

13  place where I can take money out of my bank account or credit

14  card, I can put it into that staged wallet, and then I can buy

15  things wherever that wallet is accepted.

16  Q.  Okay.  So taking a step -- let's take a step back for a

17  minute.  We talked a lot about, on direct examination, about

18  how credit -- how typical credit and debit transactions are

19  processed.  Do you recall that?

20  A.  Yes.

21  Q.  And we talked about the flow of funds with respect to those

22  ordinary credit and debit transactions; is that right?

23  A.  Yes.

24  Q.  And you testified in substance that with respect to

25  settling such transactions, there are Bank of America accounts,

1   and money is leaving those Bank of America accounts for the

2   settlement process of a credit and debit transaction; is that

3   right?

4   A.  Correct.

5   Q.  Now, and we also talked a lot about, on direct and cross,

6   Bank of America's marijuana-related businesses policy?

7   A.  Yes.

8   Q.  Do you recall that?

9   A.  Yes.

10  Q.  And you talked about a few examples of things that would

11  violate that policy and things that might be permitted under

12  the policy; is that right?

13  A.  Yes.

14  Q.  Now, Mr. Clow, if a Bank of America customer uses a debit

15  card to withdraw cash from an ATM and then goes into a

16  marijuana dispensary and uses their cash to purchase a

17  marijuana product, does that violate Bank of America's

18  marijuana-related business policy?

19  A.  No.

20  Q.  And with respect to the wallet transactions that we're

21  talking about, Circle being an example, I believe you said that

22  the customer uses their debit card to put onto a wallet, right?

23  A.  Correct.

24  Q.  And then they can use those funds at anyplace where the

25  wallet is accepted, right?

1    A.  Correct.

2    Q.  Okay.  So does Bank of America own that customer's wallet?

3    A.  No.

4    Q.  Does Bank of America have control over that, how the

5    customer uses the money in the wallet?

6    A.  No.

7    Q.  It's the customer's wallet, right?

8    A.  Correct.

9    Q.  Now, since we're on -- I'll withdraw that.

10           Let's put up Government Exhibit 2407.

11           This is the Bank of America credit card agreement that

12   you spoke about on cross; is that right?

13   A.  Correct.

14   Q.  Let's go down to -- hold on.  Go to the table of contents,

15   so we can find what page.  Let's try page 12.

16           Okay.  Do you see where it says

17   "Limitations/warnings"?

18   A.  Yes.

19   Q.  Mr. Levine, can you blow that up, along with the purposes

20   for using your account.

21           Do you recall that you testified on cross, you read

22   aloud portions of this paragraph, and among the things you read

23   aloud are, you may not use or permit your account to be used to

24   make any illegal transaction.  That's the second sentence.  Do

25   you recall that?

 1    A.  Yes.

 2    Q.  Now, and then it was noted on cross-examination that an

 3    example that's given is gambling, right?

 4    A.  Yes.

 5    Q.  And marijuana is not given as an example; is that correct?

 6    A.  Correct.

 7    Q.  Are there other illegal transactions that one can do with

 8    their Bank of America card that are not listed in this

 9    paragraph?

10    A.  Yes, there are a number of those transactions.

11    Q.  For example, purchases of other drugs, correct?

12    A.  Correct.

13    Q.  Prostitution, that kind of --

14    A.  Prostitution, yes.

15    Q.  And then we have this gambling example, and I believe you

16    testified on cross that gambling is legal in some jurisdictions

17    and not other jurisdictions; is that right?

18    A.  Yes.

19    Q.  Is it your understanding that marijuana sales are still

20    illegal globally at the federal level?

21    A.  Yes, it's illegal at a federal level.

22    Q.  Okay.  We can take that down.

23         Mr. Clow, so also on cross-examination you were asked

24    about Bank of America's reasons for not including

25    descriptor-level information in connection with its marijuana

1   transaction monitoring system; do you recall that?

2   A.   Yes.

3   Q.   And one of the things that you testified about was that the

4   descriptor -- I believe it's words to the effect that, the

5   descriptor data is not structured?

6   A.   Correct.

7   Q.   Can you explain what that means, that the data isn't

8   structured?  You can start with that.  What does that mean?

9   A.   So the data not being structured is it's a longer field.

10  There's more space, where you can put characters in it and try

11  to describe things than the merchant name, which is a fixed

12  number of characters.  So it's easier to search for things like

13  names or phrases.

14  Q.   Okay.  So then just to put it another way, how does the

15  fact that the descriptor data is not structured affect Bank of

16  America's ability to do its various searches to try and

17  identify suspicious merchants?

18  A.   Well, in two ways.  One, it's more intense to do it on the

19  size of the data that we have.  It's very -- it's challenging.

20          And then secondly, there's the quality.  Just because

21  there's more space doesn't mean that the information there is

22  any better than in the merchant name.

23  Q.   Okay.  And then going back to the key word searches that

24  Bank of America does on merchant names to try and identify

25  suspicious merchants, if there is a merchant that's providing

1    false information to the network about its name, for example,

2    and other information, does that make it more difficult for

3    Bank of America to identify that merchant as a suspicious

4    merchant?

5    A.  Yes, it would be very hard.

6              MS. LA MORTE:  One moment, your Honor.

7              (Pause)

8              No further questions.

9              THE COURT:  I'm sorry, my apologies.  Any recross?

10             MR. BURCK:  Very brief, your Honor.

11             THE COURT:  Go ahead.

12             MR. BURCK:  I think Ms. LaMorte is having trouble

13   finding her mask.

14             MS. LA MORTE:  I think my mask dropped somewhere, your

15   Honor, and I'm trying to locate it.  Oh, here it is.  I'll get

16   it, Bill.

17   RECROSS EXAMINATION

18   BY MR. BURCK:

19   Q.  Mr. Clow, you were just asked questions about the wallet

20   process and debit cards; do you recall those questions?

21   A.  Yes.

22   Q.  And I'm just going to put on the screen Akhavan Exhibit

23   11,009.  And Ms. LaMorte asked you, gave you an example if

24   somebody goes to their ATM and withdraws money and then uses

25   that money to buy marijuana, she gave that example; do you

1   recall that?

2   A.  Yes.

3   Q.  And she asked you whether or not that would violate Bank of

4   America's policy, correct?

5   A.  Correct.

6   Q.  And you said no?

7   A.  Correct.

8   Q.  Correct?  Now, if you look at Akhavan Exhibit 11,009, this

9   was a credit card or debit card statement, correct?

10  A.  Yes.

11  Q.  And we talked about this before, but it says Circle Wallet

12  star Eaze, correct, is the description and the merchant name?

13  A.  Yes.

14  Q.  And this -- you understand Eaze to be a marijuana

15  distributor, correct?

16  A.  Yes.

17  Q.  Now, when a -- in the first example, when a debit card is

18  used to take money out and go to buy marijuana, does the

19  customer typically tell you that's what they did with their

20  money?

21  A.  No.

22  Q.  So you have no idea, correct, when they use their debit

23  card to withdraw money from the ATM, correct?

24  A.  That's correct.  We have no idea.

25  Q.  Here it says Eaze, correct?

1    A.  It says Circle Wallet Eaze.

2    Q.  Eaze, yes.  And then just a last couple of questions.

3    Ms. LaMorte was saying or this -- let me withdraw that.

4         The Eaze Circle Wallet transaction we see here is akin

5    to a debit card transaction, an ATM transaction, in your mind?

6    A.  It's slightly different.  You're loading a value into

7    Circle.

8    Q.  Okay.

9    A.  So if it's $100, instead of getting $100 out in cash, I'm

10   getting $100 worth of credits in Circle to do whatever I want.

11   Q.  And here, you're told it's used to buy Eaze products,

12   correct?

13   A.  Again, the asterisk and the information that comes after

14   the asterisk is optional by the merchant.  The merchant name

15   and the merchant of record would be Circle Wallet.

16   Q.  And you testified on redirect that you reported Eaze and

17   Circle Wallet to Visa and MasterCard, right?

18   A.  Yes, we reported Eaze.

19   Q.  You reported Eaze.  The same Eaze that appears here,

20   correct?

21   A.  Correct.

22   Q.  And that's because you're concerned that they're dealing in

23   marijuana, correct?

24   A.  Well, they are suspected of dealing in marijuana.  Their

25   public site says they do, and it's up to the networks to

1    determine if they're operating on the network in a compliant

2    way and a legal way.

3    Q.  And it's these types of transactions, the example we see

4    here, Circle Wallet star Eaze, that's why you became aware that

5    Eaze was still on the network, correct?

6    A.  No.  There's been a lot of press around Eaze.  That's

7    separate from our transaction histories that brought this to

8    our attention.

9    Q.  But your transaction history is a part of it, correct?

10   A.  Yes.

11   Q.  And you were concerned enough that you then sent it to the

12   network, to investigate, correct?

13   A.  Yes.

14   Q.  And that was when?

15   A.  Several weeks ago.

16   Q.  Several weeks ago.  And this case was indicted about March

17   of last year; is that correct?

18   A.  I don't know.

19              MR. BURCK:  Thank you, your Honor.  That's it.

20              THE COURT:  Anything else?

21              MR. GILBERT:  Yes, very briefly.

22   RECROSS EXAMINATION

23   BY MR. GILBERT:

24   Q.  Mr. Clow, in addition to referring the Eaze matter to Visa

25   and MasterCard, did Bank of America, to your knowledge, conduct

L3BPWEI3                      Clow - Recross

1   any investigation into the volume of transactions that Circle

2   Wallet Eaze that Bank of America had processed?

3   A.   Not to my knowledge.

4   Q.   Never looked at that information one way or the other?

5   A.   I don't know.  I was not asked to.

6   Q.   If we can bring up please Government Exhibit 2427.

7            Do you see -- Mr. Clow, do you have that in front of

8   you now?  I'm sorry.

9   A.   Yes.

10  Q.   Thank you.  About midway through the page there's a

11  transaction that says the merchant name is PayPal star

12  ADMCannabis; do you see that?

13  A.   Yes.

14  Q.   What's your understanding of what type of transaction that

15  is?

16           MS. LA MORTE:  Objection.  401, 403.

17           THE COURT:  Sustained.

18  Q.   Mr. Clow, do you have an understanding of the reference in

19  Government Exhibit 2427 to PayPal star AdmCannabis?

20           MS. LA MORTE:  Objection.  Same ground.

21           THE COURT:  Sustained.

22  Q.   Does to your knowledge does Bank of America accept payments

23  through PayPal?

24           MS. LA MORTE:  Objection.

25           THE COURT:  Sustained.

L3BPWEI3                         Clow - Recross

1   Q.  Mr. Clow, in addition to -- well, withdrawn.

2           Mr. Clow, are you aware whether, in addition to

3   referring the Eaze matter to the card schemes Visa and

4   MasterCard, Bank of America took any other steps in connection

5   with its -- in connection with that matter?

6   A.  To my knowledge, we haven't heard back about the

7   investigation.  So we wouldn't take action until we knew.

8   Q.  So you're just waiting to hear what Visa and MasterCard get

9   back to you and tell you?

10  A.  Yes.

11          MR. GILBERT:  Thank you.

12          THE COURT:  Anything else?

13          MS. LA MORTE:  No, your Honor.

14          THE COURT:  Thank you very much.  You may step down.

15          (Witness excused)

16          THE COURT:  Please call your next witness.

17          MS. DEININGER:  The government calls Robert Hupcher.

18          THE COURT:  You can take your mask off and remain

19  standing.

20   ROBERT HUPCHER,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23          THE COURT:  Please be seated.  State and spell your

24  full name.

25          THE WITNESS:  My name is Robert Hupcher, R-o-b-e-r-t,

1    H-u-p-c-h-e-r.

2    DIRECT EXAMINATION

3    BY MS. DEININGER:

4    Q.  Good afternoon, Mr. Hupcher.

5    A.  Good afternoon.

6    Q.  Can you hear me?

7    A.  I can.

8    Q.  Okay.  Good.  Mr. Hupcher, where do you work?

9    A.  I work for the FBI.

10   Q.  What's your title there?

11   A.  Special agent.

12   Q.  How long have you worked at the FBI?

13   A.  Since 2017.

14   Q.  And what unit are you assigned to work with?

15   A.  The securities fraud squad.

16   Q.  What are your duties and responsibilities as a special

17   agent?

18   A.  I investigate instances of complex financial crimes,

19   including securities fraud, bank fraud, investment fraud,

20   corporate fraud, and while doing that, I conduct

21   investigations, conduct interviews, execute searches, anything

22   of that nature.

23            THE COURT:  Are there any agents of the FBI who are

24   not special agents?

25            THE WITNESS:  Not to my knowledge, but there are other

L3BPWEI3                         Hupcher - Direct

1    agents.

2    Q.  Do you have any certifications relevant to your work in the

3    securities fraud unit at the FBI?

4    A.  Yes, I'm a CPA.

5    Q.  And what's a CPA?

6    A.  A certified public accountant.

7    Q.  How long have you held that certification?

8    A.  Since approximately 2012 or 2013.

9    Q.  Mr. Hupcher, did there come a time when you began to assist

10   in preparing for the trial of the defendants here, Hamid

11   Akhavan and Ruben Weigand?

12   A.  Yes.

13                (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  How did you assist in preparing for trial?

2  A.  So, I reviewed certain summary charts and I checked the

3  accuracy of those charts.

4  Q.  Prior to your review of those documents, did you have any

5  involvement in the investigation of this case?

6  A.  I did not.

7       MS. DEININGER:  Mr. Levine, if you can pull up what's

8  in evidence as Government Exhibit S1.  Can you display that for

9  everyone.  Thank you.

10  Q.  Mr. Hupcher, can you read paragraph 1 of this document?

11  A.  Sure.  GX-1803 is an Apple MacBook Pro, a laptop, that was

12  seized by Federal Bureau of Investigation, FBI agents, from

13  defendant Ruben Weigand on March 9, 2020, when he was arrested.

14  Q.  Thank you.

15       MS. DEININGER:  Mr. Levine, you can take that down and

16  you can pull up Government Exhibit 3707.  That's in evidence.

17  If you can publish it for everyone.  Thank you.

18  Q.  Mr. Hupcher, you see how the first column here says GX.

19  What is your understanding of what that stands for?

20  A.  Government exhibit.

21  Q.  You see the second column says MD5 hash?

22  A.  Yes.

23  Q.  The third column says file name?

24  A.  Yes.

25  Q.  The last column says date added?

L3BMWEI4                        Hupcher – Direct

1   A.  Yes.

2   Q.  Leaving that up, Mr. Hupcher, do you see Government Exhibit

3   1706 listed in this document?

4           MS. DEININGER:  Mr. Levine, I think we may need to

5   scroll to the second page.

6   A.  I do.

7           MS. DEININGER:  Mr. Levine, can you pull up Government

8   Exhibit 1706 just for the witness.

9           Your Honor, this was admitted through Ms. Volchko, but

10  I understand that the defendants have an objection, which is

11  why I pulled it up just for the witness for now.

12          THE COURT:  It has been received in evidence already?

13          MS. DEININGER:  It was received in evidence when

14  Ms. Volchko was testifying.

15          MR. HARID:  Your Honor, we preserved our objections at

16  that time.  We preserved them so we can object on a

17  document-by-document basis.

18          THE COURT:  We dealt with that yesterday, but you are

19  right to preserve that for the record.  You'll have a

20  continuing objection.  You don't have to keep raising it after

21  each exhibit.  That objection is denied.

22          MS. DEININGER:  Mr. Levine, if you can publish for the

23  jury.  Thank you.

24  Q.  Mr. Hupcher, do you see this document?

25  A.  I do.

1   Q.  What is it?

2   A.  It looks like an e-mail exchange.

3   Q.  Let's look at the e-mail at the bottom of the chain, the

4   one that's dated September 21, 2017 at 9:46 a.m.

5        Do you see that?

6   A.  I do.

7   Q.  Who sends that e-mail?

8   A.  Medhat Mourid.

9   Q.  Who is it sent to?

10  A.  It's sent to Ray and Ray Akhavan.

11  Q.  Can you read the two e-mail addresses used for the

12  individuals in the to line?

13  A.  Sure.  Ray@cestaff.com and rayakhavan@me.com.

14  Q.  What is the subject of this e-mail?

15  A.  Eaze history.

16  Q.  Can you read the body of the e-mail.

17  A.  Attached.  Not really sure what the data is supposed to

18  look like.  Take a look at what's attached and LMK if you need

19  more date/different formatting.

20  Q.  Can you tell whether there was an attachment included with

21  this e-mail?

22  A.  Yes, there appears to be.

23  Q.  What was the title of that attachment?

24  A.  Processing_six months.XLSX.

25        MS. DEININGER:  Let's move up one e-mail on this chain

1   to the response.

2   Q.  Who sends that response?

3   A.  Ray Akhavan.

4   Q.  Can you read the body of that e-mail for me.

5   A.  It needs to explain it properly to new processors without

6   naming the current banks.  Ruben is submitting it and is cc'd.

7   Q.  Thank you.

8          MS. DEININGER:  Mr. Levine, if you can zoom out and

9   let's look now at the last e-mail on this thread, the one at

10  the top.

11  Q.  Mr. Hupcher, who is this e-mail from?

12  A.  Ruben Weigand.

13  Q.  Who does he send it to?

14  A.  Ray Akhavan.

15  Q.  What's the date of the e-mail?

16  A.  September 21, 2017.

17  Q.  Can you read the body of the e-mail for me.

18  A.  Thanks, man.  It doesn't differentiate between VI and MC.

19  Do you know the split?  Best, Ruben.

20  Q.  Thank you.

21         MS. DEININGER:  Mr. Levine, can you pull back up

22  Government Exhibit 3707 and go to the second page.

23  Q.  Mr. Hupcher, do you see Government Exhibit 1709 listed

24  here?

25  A.  I do.

1           MS. DEININGER:  Mr. Levine, can you pull up Government

2     Exhibit 1709, which is admitted into evidence.

3     Q.  Mr. Hupcher, looking at this document, generally, from your

4     experience and training, what is this?

5     A.  This is a conversation on WhatsApp.

6     Q.  How can you tell?

7     A.  You can see instances where it says WhatsApp.net and then

8     it also says source app is WhatsApp.

9     Q.  What is WhatsApp?

10    A.  WhatsApp is an encrypted messaging application.

11    Q.  What does it mean that it's encrypted?

12    A.  It means that when messages are sent between two people,

13    while they are in transit, they are not able to be read and

14    they only get decrypted when they are received by one of the

15    recipients.

16    Q.  Looking at the top of this document, what was the start

17    date of this exchange of messages?

18    A.  December 18, 2017.

19    Q.  And the date of the last activity?

20    A.  February 8, 2018.

21    Q.  Who were the participants?  You can just read the names and

22    not all of the numbers.

23    A.  Sure.  It looks like Vaida, Daniel, Ozan, Guy Mizrachi,

24    Ruben, Kat and Jolanta Narmontaite.

25          MR. HARID:  Your Honor, for the record, this document

L3BMWEI4                          Hupcher - Direct

1    has not been received in evidence and we have objections.  The

2    bases would be relevance and 403.

3            THE COURT:  Overruled received.

4    Q.  Near the top of the document where it says body, do you see

5    that?  Can you read for me what it says underneath that.

6    A.  Messages to this group are now secured with end-to-end

7    encryption.  Tap for more info.

8    Q.  Looking down the page just a bit, there is a message sent

9    on January 3, 2018 at 9:33 a.m.

10           Do you see that?

11   A.  I do.

12   Q.  Who sent that?

13   A.  Guy Mizrachi.

14   Q.  What does it say?

15   A.  I just added Ruben to our group.  He is channeling

16   communications with the submerchant payees and is providing

17   statements and client support, suppcommunicating with.

18   Q.  Can you keep reading the messages down the page for me,

19   indicating for each message who sent it.

20   A.  Sure.  Then Guy Mizrachi says:  Ruben, we -- we are in the

21   process of transferring funds to the submerchants.  Daniel and

22   his team at Settlego are doing a great job at processing the

23   incoming wires, doing the conversions, and handling the

24   payouts.  By the end of the day, Jolanta and Vaida will let you

25   know when the payments are completed and who was paid what.

1  Daniel responds:  Guy, USD was just made available to you.

2  Q.  If I can stop you right there, based on your training and

3  experience, what do you believe USD stands for?

4  A.  US dollars.

5  Q.  Thank you.  You can start again with the message right

6  below that.

7  A.  Sure.  Daniel says:  505K circa.  Then Guy Mizrachi

8  responds:  Perfect.  Thank you.  That means we have enough in

9  both accounts to handle the projected payout of $1,021,269.78

10  per the Excel sheet, which I attached once more for Ruben's

11  benefit.  Then Guy Mizrachi attaches a file called final

12  payout, January 3, 2017.XLSX.  Daniel responds:  Super duper

13  lemon trooper.

14  Q.  If you want to jump down to the third message from the

15  bottom of the page sent January 3, 2018 at 9:51, who sends

16  that?

17  A.  Ruben.

18  Q.  What does he say?

19  A.  He says:  Hey, everybody, with a winking face.

20  Q.  Does he send another message after that?

21  A.  Yes.  He says:  Perfect.  Will take care of the statements.

22  Q.  Thank you.

23        MS. DEININGER:  Mr. Levine, if you can turn to the

24  next page.  I'm sorry.  The one after that.

25  Q.  Mr. Hupcher, do you see the message exchange that starts on

1   January 12, 2018 at 16:22?

2   A.  I do.

3   Q.  Can you read that message from Daniel.

4   A.  Sure.  Daniel says:  Hey, team, let me know with regards to

5   the other accounts you've set up.

6   Q.  Now, if you look to the fifth message down, who is that one

7   from?

8   A.  From Daniel as well.

9   Q.  Can you read that?

10  A.  But a question.  Many of the accounts that we opened for

11  you are as yet unused.  Are we expecting any activity for them?

12          MS. DEININGER:  Mr. Levine, if you can scroll to the

13  next page now.

14  Q.  Mr. Hupcher, do you see a message from Guy Mizrachi at

15  January 15, 2018?

16  A.  Yes.

17  Q.  Can you read that for us.

18  A.  Sure.  He says:  Hi, Daniel.  The accounts are activated

19  when we are able to set up merchant processing.  Bielriso and

20  Paranthia will continue through the end of this month.  Then we

21  will likely shift to two other accounts, Knutled and Conetild.

22  Q.  Daniel then writes:  Ah, OK.  Got it.

23          Can you read for us Guy Mizrachi's response?

24  A.  Sure.  He says:  We probably won't use more than two or

25  three together at any one time for the foreseeable future.

L3BMWEI4                        Hupcher - Direct

1    Q.  Thank you.

2              Mr. Levine, you can take that down.

3              MS. DEININGER:  Your Honor, the government would now

4    offer into evidence a self-authenticating document, pursuant to

5    Rule 902(11), in the Court's February 14, 2021 memorandum and

6    order, Government Exhibit 4301.

7              MS. CLARK:  Objection, your Honor.

8              MR. HARID:  Join.

9              MS. CLARK:  403 and also, I believe, this document, at

10   least as it has been presented to us, currently contains a

11   significant amount of --

12             THE COURT:  I don't want Ms. Clark to repeat because

13   my rule is that objections should be no more than three words.

14   The objection is denied.  Received.

15             (Government Exhibit 4301 received in evidence)

16   Q.  Mr. Hupcher, looking at Government Exhibit 4301, near the

17   top left do you see where it says account information?

18   A.  Yes.

19   Q.  Can you read the title of the account for me.

20   A.  Quantum Solutions, Inc.

21   Q.  The address for that account holder.

22   A.  5146 Douglas Fir Road No. 205, Calabasas, California 91302.

23   Q.  Now, if you look just below that, to where it says business

24   entity information.

25   A.  Yes.

L3BMWEI4                        Hupcher - Direct

1    Q.   Can you read the business name for me?

2    A.   Quantum Solutions, Inc.

3    Q.   Then on the right-hand side of the page where it says date

4    established, what's the date?

5    A.   December 23, 2013.

6    Q.   What does it say for primary location?

7    A.   Los Angeles.

8    Q.   Back on the left-hand side, on the bottom, what does it

9    list under contact name?

10   A.   Hamid R. Akhavan.

11   Q.   What is the current title?

12   A.   President.

13            MS. DEININGER:   Mr. Levine, if you can go to page 27

14   of this document.

15   Q.   Mr. Hupcher, can you read the title of this document up at

16   the top of the screen.

17   A.   Minutes of first meeting of board of directors of Quantum

18   Solutions, Inc.

19   Q.   Can you just read the first paragraph for me.

20   A.   The first meeting of the board of directors of Quantum

21   Solutions, Inc. convened on the 27th day of December 2013,

22   pursuant to waiver of notice and consent to the holding thereof

23   executed by each director of the corporation.   Present were all

24   the directors.

25   Q.   If you can read the name of the two directors listed there.

1    A.   Hamid Ray Akhavan, Guy Mizrachi.

2    Q.   Thank you.

3              MS. DEININGER:  Mr. Levine, can you turn to the next

4    page, page 28 of this document.  Highlight just the paragraph

5    in the middle right above the handwritten names.

6    Q.   Mr. Hupcher, can you read this for me?

7    A.   The chairman called for the nomination of officers of the

8    corporation.  Thereupon, the following persons were nominated

9    for the officers of the corporation:  President, Hamid Ray

10   Akhavan; vice-president, Hamid Ray Akhavan; Guy Mizrachi;

11   treasurer, Hamid Ray Akhavan.

12   Q.   Thank you.

13             MS. DEININGER:  Mr. Levine, we can take this down now.

14             Mr. Levine, can you pull back up what's been admitted

15   in evidence as Government Exhibit 3707.

16   Q.   Mr. Hupcher, do you see Government Exhibit 1690 is listed

17   on this?

18   A.   Yes, it is.

19             MS. DEININGER:  Mr. Levine, can we pull up Government

20   Exhibit 1690.

21             MR. HARID:  Your Honor, objection.  Relevance.  403.

22             MS. DEININGER:  Mr. Levine, can you pull this up just

23   for the witness for one moment.

24             This was admitted in evidence when Ms. Volchko was

25   testifying.

1          THE COURT:  This is already in evidence?

2          MS. DEININGER:  This was admitted into evidence when

3    Ms. Volchko was testifying.

4          MR. HARID:  Your Honor, we have a dispute on this

5    issue.  We can take this up at a sidebar, if needed.  Our

6    understanding was that Ms. Volchko was just authenticating to

7    the documents.  We planned to object document by document.

8          THE COURT:  I'm sorry.  Unless objections were raised

9    when the document was received in evidence, they had been

10   waived.

11         MR. HARID:  Your Honor, we did.

12         THE COURT:  Excuse me?

13         MR. HARID:  We did, your Honor, as to all of these

14   documents when Ms. Volvo testified.

15         THE COURT:  I don't see a need for a sidebar.  The

16   objection is overruled.

17         MS. DEININGER:  Thank you.

18         Mr. Levine, if you can publish for the jury.

19   Q.  Mr. Hupcher, generally, what is this?

20   A.  E-mail exchange.

21   Q.  If we can look at the first e-mail in this exchange, which

22   is actually the one on the bottom, dated Thursday, February 22,

23   2018.

24         Mr. Hupcher, who is this e-mail from?

25   A.  Guy Mizrachi.

1    Q.  Who did he send it to?

2    A.  Medhat Mourid, Michael Burtscher, Ruben Weigand.

3    Q.  What e-mail address is Medhat Mourid using?

4    A.  Medhat@quantumsolutions.com.

5    Q.  Can you read the body of the e-mail for me.

6    A.  Medhat, Kalixa, Ruben, and Michael has been working hard to

7    earn your business.  They are boarding a bunch of new low risk

8    this month, and we should have some capacity in the millions in

9    the next month or so.  In the meantime, they have asked us to

10   increase our volume by another 100K per month.  Can you fill

11   that?  Thanks.  Guy.

12   Q.  Thank you.

13          MS. DEININGER:  Mr. Levine, we can now pull up the

14   response to this.

15   Q.  Mr. Hupcher, who sends this response?

16   A.  Medhat Mourid.

17   Q.  Who is it sent to?

18   A.  Guy Mizrachi, Michael Burtscher, and Ruben Weigand.

19   Q.  What e-mail address is Guy Mizrachi using?

20   A.  Guy@quantumsolutions.com.

21   Q.  Can you read this e-mail for me.

22   A.  The accounts through Wirecard were turned live yesterday,

23   so we should see an increased volume, and we will try to target

24   200K per month total.

25   Q.  Thank you.

1           MS. DEININGER:  Mr. Levine, we can take this down.

2           Can we go back to Government Exhibit 3707.

3    Q.  Mr. Hupcher, do you see Government Exhibit 1719 listed in

4    this document?

5    A.  I do.

6    Q.  What does Government Exhibit 3707 say under date added for

7    Government Exhibit 1719?

8    A.  June 6, 2018.

9           MS. DEININGER:  Mr. Levine, can we now pull up

10   Government Exhibit 1719.

11   Q.  Mr. Hupcher, what does it say on the top right of this

12   document?

13   A.  Visa.

14   Q.  Generally, what does this document appear to be?

15   A.  It looks like a letter from Visa.

16   Q.  Who is this letter sent to?

17   A.  Kalixa Accept Limited.

18   Q.  In what country does it indicate that Kalixa is located?

19   A.  United Kingdom.

20   Q.  What's the date of this letter?

21   A.  June 6, 2018.

22   Q.  Can you read the first paragraph for me under dear

23   acquirer.

24   A.  The Visa charge-back monitoring program, VCMP, is a

25   merchant-level charge-back monitoring program to help acquirers

1    identify merchants with excessive levels of charge backs and
2    implement corrective plans to protect the integrity of the
3    payment system.  This letter served as notification to Kalixa
4    Accept Limited that your merchant Hot Robots has been
5    identified in the VCMP early-warning report for the month of
6    June '18 by exceeding the VCMP thresholds based on charge-back
7    transactions submitted by issuers.
8    Q.  Now, do you see where it says next steps lower down in this
9    letter?
10   A.  Yes.
11   Q.  Can you read the paragraph for me under next steps.
12   A.  Although no action is currently required, it is strongly
13   recommended that your institution investigates the root causes
14   and drivers of the charge backs with the merchants and develops
15   a remediation plan to reduce the impact of charge backs or take
16   alternative actions as appropriate.
17   Q.  Thank you.
18          MS. DEININGER:  Mr. Levine, we can take this one down.
19          Mr. Levine, can we go back to Government Exhibit 3707.
20   Q.  Mr. Hupcher, do you see Government Exhibit 1506 listed on
21   Government Exhibit 3707?
22   A.  I do.
23          MS. DEININGER:  Mr. Levine, can we pull up Government
24   Exhibit 1506.
25   Q.  Mr. Hupcher, looking at this table, do you see where it

L3BMWEI4                         Hupcher - Direct

1    says depots on the top left?

2    A.   Yes.

3    Q.   What does it say next to depots?

4    A.   Superior Health.

5    Q.   What does it say next to legal name?

6    A.   Superior Herbal Health.

7    Q.   What does it say next to bank account name?

8    A.   Panicle Management LLC.

9           MS. DEININGER:  Mr. Levine, can we pull up next to

10   Government Exhibit 1506 Government Exhibit 687, page 3.

11   Q.   Mr. Hupcher, the legal name in Government Exhibit 1506 was

12   Superior Herbal Health.  Do you also see that name on

13   Government Exhibit 687?

14   A.   I do.

15          MS. DEININGER:  One second, your Honor.

16          Mr. Levine, can you pull up Government Exhibit 1724

17   for the witness.

18          Your Honor, again, I'm just pulling this up for your

19   Honor and the witness because I understand that defendants

20   raised an objection.  Originally, this was authenticated by

21   Ms. Volchko, but I do understand that they had reserved the

22   right to renew objections when it was read into evidence.

23          THE COURT:  To the extent that they preserved the

24   objections, as they did in some cases, though I am not totally

25   clear in all, they may raise them again now and I'll rule.  The

1    objection they did not preserve is authentication.

2              Go ahead.  Is there an objection?  If you are waiting

3    for their objection, you first have to put the question to the

4    witness that you think responds to their objections.  So that's

5    why you put it up just before the witness.  Or have you just

6    put it up before the witness so they can state their objection?

7              MS. DEININGER:  I just put it up for the witness so

8    that they can let us know if they still have an objection.

9              THE COURT:  What are the objections?

10             MS. CLARK:  403.

11             MR. HARID:  Same, and relevance.

12             THE COURT:  403 and?

13             MR. HARID:  Relevance.

14             THE COURT:  Relevance?

15             MR. HARID:  Correct.

16             THE COURT:  Denied.  Received.

17             (Government Exhibit 1724 received in evidence)

18             MS. DEININGER:  Mr. Levine, can you please publish

19    this for the jury.  Thank you.

20    Q.  Mr. Hupcher, can you see Government Exhibit 1724?

21    A.  Yes.

22    Q.  What does this appear to be?

23    A.  A chat.

24    Q.  Can you see the date the message was sent?

25    A.  December 21, 2018.

1   Q.  On the left-hand side there is a blue box that says

2   Easycompany.

3           What is your understanding of what that represents?

4   A.  That represents the chat.

5   Q.  What's the name of the person that sends the message?

6   A.  John.

7   Q.  Can you read the message for me?

8   A.  Hey, we received the three new mids for HTH-EB.  Can we

9   make sure we have tracking pixels enabled for them.

10  Q.  Can you read those websites for me.  You don't have to read

11  everything at the end, but just the main www.

12  A.  Sure.  The first is starsstyles.com, the second is

13  outdoormaxx.com, and the third is fly2skyshop.com.

14  Q.  Thank you.

15          MS. DEININGER:  Mr. Levine, can we go back to

16  Government Exhibit 3707.

17  Q.  Mr. Hupcher, do you see Government Exhibit 1654 listed in

18  Government Exhibit 3707?

19  A.  I do.

20  Q.  What does Government Exhibit 3707 say under date added for

21  Government Exhibit 1654?

22  A.  April 5, 2019.

23          MS. DEININGER:  Mr. Levine, could you now pull up

24  Government Exhibit 1654, which is in evidence.

25  Q.  Mr. Hupcher, based on your training and experience,

1  generally, what does this appear to be?

2  A.  An invoice.

3  Q.  What company name is at the top of the invoice?

4  A.  1A Commerce.

5  Q.  What's the document date?

6  A.  March 28, 2019.

7  Q.  In the table where it says description, can you read for us

8  what it says under that.

9  A.  Annual renewal for corporations:  Lorry Limited, New Opal

10  Limited, Johnson NYC, International Standard Limited.

11  Q.  What's the amount in the bottom right corner of this table?

12  A.  28,665 euro.

13        MS. DEININGER:  Mr. Levine, can we now pull up next to

14  Government Exhibit 1654 Government Exhibit 3962, which is in

15  evidence.

16  Q.  Looking at the top right now of Government Exhibit 3962, do

17  you see that e-mail?

18  A.  Yes.

19  Q.  Who is that from?

20  A.  OH Syntrek.

21  Q.  Who is it to?

22  A.  Jawbreaker13.

23  Q.  Can you read the body of the message for me.

24  A.  Hi.  For your review, please see below outstanding invoice.

25  TKS, O.

L3BMWEI4                     Hupcher - Direct

1               MS. DEININGER:  Mr. Levine, can we scroll down to page

2       3 of Government Exhibit 3962.

3       Q.  Mr. Hupcher, the invoice we were looking at a minute ago,

4       Government Exhibit 1654, said 1A Commerce at the top.

5               Does this attachment, Government Exhibit 3962, list

6       the same information at top?

7       A.  It does, with a different date.

8       Q.  Do these documents appear to follow the same general

9       format?

10      A.  They do.

11              MS. DEININGER:  Your Honor, I'd now like to show for

12      the jury what's been admitted into evidence as Government

13      Exhibit 1728.

14              MS. CLARK:  Objection.  403, 401.

15              MR. HARID:  The same.

16              THE COURT:  Overruled.  Received.

17              (Government Exhibit 1728 received in evidence)

18      Q.  Mr. Hupcher, based on your experience and training,

19      generally, what does this appear to be?

20      A.  A chat.

21      Q.  What is the date at the top of the chat?

22      A.  April 4, 2019.

23      Q.  Based on this page you are looking at right now, who are

24      the participants in this chat?

25      A.  Ray and Ruben W.

1   Q.  I'll have you read the messages from Ray, and I'll read

2   those from Ruben W.  Can you start at the top?

3   A.  Sure.  "Let me call you back in meeting."

4   Q.  "All right.  Important.  Please don't forget."

5        Mr. Hupcher, what's the date at the top of this next

6   exchange of messages?

7   A.  May 19, 2019.

8   Q.  Can you please read those messages from Ray.

9   A.  "Yo, did you guys get in touch with the dispensary?  Where

10  are we with that?"  Then it looks like there is a phone call

11  for 15 minutes.  Then Ray says:  "Hey, let's chat on Wickr Me.

12  Download the private messenger for free at the link.  My Wickr

13  ID is jawbreaker13.  This is the best apparently.  Get it,

14  please."  Then two similar messages follow.

15  Q.  Based on your experience and training, are you familiar

16  with Wickr?

17  A.  I am.

18  Q.  What is it?

19  A.  Wickr is an encrypted messenger application where one of

20  the features is that the messages automatically self destruct

21  after a certain amount of time.

22        MS. DEININGER:  Mr. Levine, I would now like to pull

23  up what's been admitted into evidence as Government Exhibit

24  1722.

25        MR. HARID:  Objection.  Relevance, 403.

1    MS. CLARK:  Join.

2    THE COURT:  Overruled.  Received.

3    (Government Exhibit 1722 received in evidence)

4  Q.  Looking just at this first page, Mr. Hupcher, what is this?

5  A.  Looks to be another chat.

6  Q.  Looking up at the very top, can you tell what type of chat

7  this is, what application it was being used?

8  A.  Yes.  Telegram.

9  Q.  Based on your training and experience, are you familiar

10 with Telegram?

11 A.  Somewhat.

12 Q.  What is Telegram?

13 A.  It's another encrypted messaging application.

14 Q.  What does it mean that it's an encrypted messaging

15 application?

16 A.  It means that messages, when they are sent, are not able to

17 be deciphered.  They get sent over the air and they are

18 encrypted, and then once they land at the recipient's device

19 they get decrypted just for that recipient to read.

20 Q.  What's the date at the top of this first page?

21 A.  January 16, 2019.

22    MS. DEININGER:  Mr. Levine, if you can scroll to page

23 2.

24 Q.  Mr. Hupcher, what's the date at the beginning of the

25 conversation at the top of this page?

1  A.  May 2, 2019.

2  Q.  Can you read the message from Andrea Bricci.

3  A.  MC case with Esepa.  They are asking for list of any

4  additional merchant accounts that PXP identified who were

5  involved in the scheme.

6         MS. DEININGER:  Mr. Levine, if you can scroll to the

7  next page.

8  Q.  Mr. Hupcher, if you can keep reading.

9  A.  There are few more merchants not included in their list,

10  one to two terminated in the past, one had just started

11  processing in April, few that were testing in April.  The

12  terminated and the new one from April, they could potentially

13  identify themselves, too.  Should we put -- provide the details

14  as being additional merchants from this ISO?

15  Q.  Is there a response from Ruben W?

16  A.  Yes.

17  Q.  What's that response?

18  A.  He quotes the previous message from Andrea Bricci and says

19  good question.

20  Q.  Then what does Andrea Bricci say?

21  A.  Let me know what you think, please.  I need to respond to

22  them by tomorrow.

23  Q.  Thank you.

24         MS. DEININGER:  Mr. Levine, you can pull that down,

25  and I'd now like to pull up what has been admitted into

1    evidence as Government Exhibit 1730.

2              MR. HARID:  Objection.  Relevance, 403.

3              MS. CLARK:  Join.

4              THE COURT:  Overruled.  Received.

5              (Government Exhibit 1730 received in evidence)

6              MS. DEININGER:  Mr. Levine, can you scroll to the next

7    page.

8    Q.  Mr. Hupcher, under the top date, August 3, 2019, there are

9    several symbols with phones and numbers next to them.  Based on

10   your training and understanding, what do you understand that to

11   represent?

12   A.  Phone calls within the application.

13   Q.  Are you able to tell, is each one of those a separate phone

14   call?

15   A.  Yes.

16   Q.  Can you tell who those phone calls are being placed

17   between?

18   A.  It looks to be Ruben W and Ray.

19   Q.  Now, looking at the entry under 24 August 2019, do you see

20   that message from Ruben W?

21   A.  Yes.

22   Q.  Based on your training and experience, what is occurring

23   here?

24   A.  It looks like Ruben W is sending a file.

25   Q.  What's the name of the file?

1    A.  E.zip.

2    Q.  Are you familiar with zip files?

3    A.  I am.

4    Q.  Generally, what are zip files used for?

5    A.  Zip files are used to take multiple files in a folder and

6    compress them into a smaller format and make them into just one

7    file.

8    Q.  Can you tell whether Ruben W is sending or receiving this

9    file?

10   A.  It looks like he's sending it.

11   Q.  Who does he appear to be sending it to?

12   A.  It looks to be Ray.

13           MS. DEININGER:  Mr. Levine, if you can pull up what's

14   been admitted into evidence as Government Exhibit 1801.

15   Q.  Mr. Hupcher, do you recognize this?

16   A.  I do.

17   Q.  What is it?

18   A.  This is a folder structure for the E.zip file.

19   Q.  Have you reviewed the material contained in this folder?

20   A.  I have.

21   Q.  Are you familiar with its structure and contents?

22   A.  Generally, yes.

23   Q.  Just looking at what you see in front of you, can you walk

24   us through the top-level folders that you are able to see in

25   the E folder?

1   A.   Sure.   There is four.   There is ACQ-statements, Android,

2   Senjo-proofs-shares and supplier-statements.

3   Q.   Thank you.

4            MS. DEININGER:   Mr. Levine, we can now go back --

5   sorry.   This is a lot of document jumping -- to Government

6   Exhibit 1802.   We can show that just to the witness.

7   Q.   Mr. Hupcher, now we are showing you what's been marked for

8   identification as Government Exhibit 1802.

9            Do you recognize this?

10  A.   I do.

11  Q.   What is it?

12  A.   It's the same contents of the E.zip file, but just in

13  further detail.

14  Q.   Looking up at the top left, in the folder bar, do you see

15  the name of the zip file?

16  A.   Yes.

17  Q.   Can you read that.

18  A.   E.zip.

19  Q.   Is this a true and accurate screenshot showing the folder

20  structure of the E.zip folder?

21  A.   Yes.

22  Q.   Would reference to this aid your testimony today?

23  A.   It would.

24            MS. DEININGER:   Your Honor, the government offers

25  Government Exhibit 1802 into evidence.

1           MR. HARID:  No objection.

2           MS. CLARK:  No objection.

3           THE COURT:  Received.

4           (Government Exhibit 1802 received in evidence)

5           MS. DEININGER:  Mr. Levine, can you now publish that

6    for the jury.

7    Q.  Mr. Hupcher, what does the left-hand side of this page

8    show?

9    A.  It shows the structure of the zip file and it shows each of

10   the subfolders and then the subfolders within those folders.

11   Q.  Is it fair to say that it's a reflection of how the

12   contents of the E.zip folder were organized?

13   A.  That's fair.

14   Q.  Looking just at the top half, what are the folder names

15   below where it says ACQ-statements?

16   A.  There is ECP.  Below that is INST, Johnson, Linebeck, NO.

17   Then there is Kalixa-PXP.  Under that is Kalixa and PXP.  Under

18   PXP is Conetild, GIS, GM, INTLSTD, Johnson, Jonnur, Lanicaso,

19   Linebeck, Lytrej, New Opal, Prekaw, Torger, Veja and Wirelet.

20   Q.  Looking at the bottom half, under where it says supplier

21   statements, what are the folder names below supplier

22   statements?  Basically, the bottom third.

23   A.  Sure.  There is ECP with the same folders as above:

24   INTESTD, Johnson, Linebeck, New Opal.  Then PXP-Kalixa under

25   which is Kalixa.  Under that is HOTR.  Then there is PXP.

1   Under that is Conetild, GIS, GM, INTLST, Johnson, Jonnur,

2   Lanicaso, Linebeck, Lytrej, New Opal, Prekaw, Torger, Veja and

3   Wirelet.

4          MS. DEININGER:  Mr. Levine, if you can pull up just

5   for the witness Government Exhibit 3703 and then 3704 and then

6   3705.

7   Q.  Mr. Hupcher, do you recognize those?

8   A.  I do.

9   Q.  What are they?

10  A.  These are the summary tables that I talked about earlier.

11  Q.  Do these accurately summarize the information that you

12  reviewed from Government Exhibit 1801, the E.zip folder?

13  A.  They do.

14         MS. DEININGER:  The government offers Government

15  Exhibit 3703, 3704, and 3705 into evidence.

16         MR. HARID:  No objection.

17         MS. CLARK:  Same.

18         THE COURT:  Received.

19         (Government Exhibits 3703, 3704, and 3705 received in

20  evidence)

21         MS. DEININGER:  Mr. Levine, can you pull up Government

22  Exhibit 3704 for everyone.

23  Q.  Mr. Hupcher, can you just walk us through what each of

24  these columns -- first of all, what's the title of this

25  document?

1  A.   Summary table, E.zip, and ACQ-statements folder.

2  Q.   Is it fair to say that this table reflects contents of

3  documents that you reviewed in the ACQ-statements folder in the

4  E.zip?

5  A.   It does.

6  Q.   Can you just walk us through what each of these columns

7  represents.

8  A.   Sure.  The first one, the subfolder name and location is

9  where the folder is located within the structure of the file.

10  The second column, the categories of documents were the types

11  of documents that were in that folder.  The third column,

12  merchant name descriptor, where the various merchant names or

13  descriptors that were contained within the files, the number of

14  documents where -- the total number of documents in those

15  folders.  And then the date range was the overall date range

16  for the documents in those folders.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  And just briefly, Mr. Levine, can you pull up Government

2    Exhibit 1802 next to Government Exhibit 3704.  And on 1802, if

3    you can just zoom in on the Acq statement half of the left

4    side.  Okay.

5            So, Mr. Hupcher, how does the information in the first

6    column of Government Exhibit 3704 correspond to the folders

7    pictured under the Acq-statements in Government Exhibit 1802?

8    A.  So you'll see in the first line there's ECP, which was the

9    first folders you can see on the right, and then after the

10   arrow, there's INTST, which is the first subfolder, and then

11   the next line you'll see the next subfolder is Johnson, the

12   next subfolder is Linebeck and the next subfolder is NO.

13   Q.  And does this follow that pattern to reflect every

14   subfolder under the Acq-statement folder of the E.zip?

15   A.  It does.

16   Q.  So going back just to Government Exhibit 3704 -- you can

17   actually leave it open.  In Government Exhibit 3704, there are

18   several different types of documents listed under Categories of

19   Documents.  So let's just quickly look at what those are.  In

20   the first line, what's listed there?

21   A.  ECP merchant settlement statements.

22   Q.  Okay.  And then in the fifth line?

23   A.  Kalixa settlement report and fees invoice.

24   Q.  And then in the sixth line?

25   A.  PXP settlement report and fees invoices, PXP payment

1    requests.

2    Q.  All right.  I just want to briefly look at some examples of

3    those.  So, Mr. Levine, if we can go back to Government

4    Exhibit 1801, and then go into -- which you can show for

5    everyone.  And then go into the top subfolder for

6    Acq-statements and then to ECP, and then to Linebeck.

7              And we can see a number of documents that are

8    contained within this folder.  If you can scroll down within

9    the file titled Merchant Settlement Statement 5740 Linebeck

10   Organikals, USD 1-1-2019.

11             All right.  Mr. Hupcher, can you read the information

12   at the top of this document for me?

13   A.  Merchant settlement statement, ECP Ecom Processing.

14   Q.  And now, what's the -- what's indicated in the top of the

15   box on the left-hand side?

16   A.  Linebeck Organikal USD.

17   Q.  And on the right box on the right-hand side, what's the

18   settle -- what's the date of this document?

19   A.  January 1, 2019.

20   Q.  And what does it say below that?  What does it say next to

21   ISO/PSP?

22   A.  Esepa Finance.

23   Q.  Now, looking down, and we can kind of slowly scroll through

24   this document, what are the different category of fees and

25   other inputs listed under the reference column?

1    A.   Assessment fee, captured transaction fee, chargeback fee,

2    chargebacks, cross-border fee, gross sales.

3    Q.   We can keep going to the next page, Mr. Levine.

4    A.   Interchange fee, refund fee, refunds.

5    Q.   And keep going.

6    A.   And representatives, settlement, transaction authorization,

7    VBV monthly fee.

8    Q.   Okay.  And for this particular statement, what's the total

9    in the bottom right?

10   A.   $189,820.36.

11   Q.   Okay.  Did you review other documents in Government

12   Exhibit 1801, that's the E.zip folder, that generally followed

13   this same format?

14   A.   I did.

15   Q.   And are those all referred to in the summary chart marked

16   as Government Exhibit 3704 as ECP merchant settlement

17   statements?

18   A.   They are.

19   Q.   Mr. Levine, we can close this document.  And now going back

20   to Government Exhibit 1801, if we can go back out to -- under

21   to Acq-statements, and then to the Kalixa PXP folder.  Now to

22   the Kalixa subfolder, and then into the second file titled K

23   statement with a date that starts 03.05.  That one, yes.

24          Okay.  Mr. Hupcher, what does this document say at the

25   top?

1   A.  This says Kalixa, and it is a settlement report and fees

2   invoice.

3   Q.  And under Kalixa, what entity names is listed in bold?

4   A.  Hot Robots.

5   Q.  And to the right of that, what's the collection period?

6   A.  March 5th, 2018, to October 5th, 2018.

7   Q.  Now, again kind of just scrolling through this --

8   A.  Actually, I'm sorry.  I think with that one, that one, the

9   days are first.  So that one is probably May 3rd, 2018, to

10  May 10th, 2018.

11  Q.  Thank you.  I think you're right.

12          So now looking under payment method, if we can just

13  again kind of go through this document, and can you tell us all

14  what the categories are for this settlement report?

15  A.  Sure.  ECMC deposit, ECMC refund, ECMC chargeback, Visa

16  deposit, Visa refund, Visa chargeback.

17  Q.  And then for this particular statement, what was the net

18  settlement amount at the bottom right?

19  A.  672,656.95.  I don't know what currency, based on this.

20  I'm sorry, it says USD.  So that would be dollars.

21  Q.  And did you review other documents in Government

22  Exhibit 1801 that generally followed this same format?

23  A.  I did.

24  Q.  Are those all referred to in the summary chart marked as

25  Government Exhibit 3704, as settlement report and fees

1   invoices?

2   A.   They are.

3   Q.   All right.  Mr. Levine, we can now go back to Government

4   Exhibit 1801, and to the Acq-statement folder, and then to the

5   Kalixa.PXP folder.  This time there's a PXP subfolder, and then

6   into the Johnson subfolder, and the second file, the Jo payment

7   request to 11.3.19.

8        All right.  So, Mr. Hupcher, what information is at

9   the top of this document?

10  A.   This is a payment request, and it's PXP Financial.

11  Q.   And what entity is listed at the top left under PXP

12  Financial?

13  A.   Johnson NYC.

14  Q.   And what was the reporting -- report date for this payment

15  request?

16  A.   I think the report date was March 11th, 2019.

17  Q.   And again, what are the categories on the left, under

18  payment method?

19  A.   EMC chargeback, Visa chargeback.

20  Q.   And for this payment request, what's the net settlement

21  amount on the bottom right?

22  A.   109.76 Euros.

23  Q.   Okay.  Did you review other documents in Government

24  Exhibit 1801 that generally followed this same format?

25  A.   I did.

1  Q.  Did you review other documents in Government Exhibit 1801

2  that generally followed the same format?

3  A.  I did.

4  Q.  Are those all referred to in the summary chart labeled

5  Government Exhibit 3704 as PXP payment requests?

6  A.  They are.

7  Q.  All right.  One more example.  Mr. Levine, if you can go

8  back out to Government Exhibit 1801 now, to the acquired

9  statements folder, to the Kalixa PXP folder, to the PXP

10 subfolder, to the Johnson subfolder, and then to the documents,

11 I think it's the one we looked at Jo settlement report

12 2.03.12.18, on a couple up, fourth from the bottom -- I'm

13 sorry, fourth from the top.  There we go.  All right.

14         Mr. Hupcher, what information is at the top of this

15 document?

16 A.  Settlement report and fees invoice and PXP again.

17 Q.  And what entity is listed at the top left?

18 A.  Johnson NYC.

19 Q.  And what's the settlement date on this, for this settlement

20 report and fees invoice?

21 A.  December 3rd, 2018.

22 Q.  And looking at the payment method column on the left, what

23 are the different categories under that, where it says payment

24 method?

25 A.  ECMC deposit, ECMC refund, ECMC chargeback, Visa deposit,

1   Visa refund, Visa chargeback, Visa reverse chargeback.

2   Q.  And can we go to the next page.  For this settlement report

3   and fees invoice, what was the net settlement amount which is

4   the bottom right?

5   A.  160,128.99 Euros.

6   Q.  Did you review other documents in Exhibit 1801 that

7   generally followed this same format?

8   A.  I did.

9   Q.  And are these all referred to in the summary report as PXP

10  Financial statement report and fees in Government Exhibit 3704?

11  A.  They are.

12  Q.  Okay.  Mr. Levine, can we go back to Government

13  Exhibit 3704.  And if you can pull that up for everyone.  Thank

14  you.

15          Okay.  So, Mr. Hupcher, is it fair to say that each

16  one of these lines represents documents similar to the ones we

17  just looked at, that the entries in this -- is it fair to say

18  that the entries in this chart each reflect documents similar

19  to one of the categories that we just looked at?

20  A.  Yeah, I think that's fair.

21  Q.  And so let's look at just -- we don't need to look at every

22  line in this chart, but let's just look at -- let's scroll

23  down.  Let's go to the third page and the top row.

24          So looking at that, what categories of documents did

25  you find in the subfolder labeled New Opal, under Kalixa PXP,

1  PXP?

2  A.  Kalixa settlement report and fees invoices, PXP settlement

3  report and fees invoices and PXP payment requests.

4  Q.  And what merchant names or descriptors were referenced?

5  A.  New Opal and New Opal Limited.

6  Q.  And how many documents were in that folder?

7  A.  Seventy-three.

8  Q.  And what was the date range?

9  A.  August 2018 to June 2019.

10  Q.  Okay.  You can zoom out of that, Mr. Levine.  And we can

11  just scroll back up.

12          And looking at the second line from the top here, what

13  categories of documents did you find in the Kalixa PXP, PXP

14  International Standard folder?

15  A.  Kalixa settlement report and fees invoices, PXP settlement

16  report fees and invoices and PXP payment requests.

17  Q.  And what merchant name did you find referenced in those

18  documents?

19  A.  International Standard.

20  Q.  And what was the date range of the documents you found?

21  A.  August 2018 to May 2019.

22  Q.  Okay.  Thank you.

23          Mr. Levine, can you now publish Government

24  Exhibit 3703 in evidence for the jury.

25          Okay.  Mr. Hupcher, we're looking at a similar summary

1   chart here.  Can you read this title for us at the top?

2   A.  Summary table E.zip supplier statements folder.

3   Q.  And so does this chart reflect information that you

4   observed in the supplier statement subfolder at the E.zip file?

5   A.  It does.

6   Q.  And this chart also lists several different types of

7   documents.  We have looked at the second row, second column.  I

8   think that lists both of them.  What's listed there?

9   A.  Statements for provided services and depot bank account

10  information.

11  Q.  Okay.  So let's look at an example of each of those.

12          Mr. Levine, if we can go back to Government

13  Exhibit 1801.  And now, let's go into the supplier statements

14  folder.  And then the ECP folder and then New Opal.  Oh, I'm

15  sorry.  Can we go back to supplier statements and instead go to

16  the PXP Kalixa subfolder, and then PXP, and then New Opal.  And

17  then can we open the -- what's titled 585681-FU.zip, at the

18  top.

19          Okay.  We have a number of documents in here, too.  In

20  that zip folder can you open the document titled 585681-15.

21  Okay.  Thank you.

22          So, Mr. Hupcher, what does this say at the top left?

23  A.  Statement for provided services.

24  Q.  And what is the service period that's indicated?

25  A.  November 24th, 2018, to December 1st, 2018.

1    Q.   And below that, what's the partner name?

2    A.   Clear Lake Grove Fund Two, Inc.

3    Q.   What does it say as to where the partner is located?

4    A.   The address is in California.

5    Q.   On the right, to the right of that, what does it say next

6    to service?

7    A.   K-NewOp-Soniclogistix.

8    Q.   And then can you read the information under total

9    transactions?

10   A.   Number of approved transactions, 392; number of declined

11   transactions, 52; number of refunds, one; number of

12   chargebacks, two.

13   Q.   And then under turnover, can you read what it says for the

14   net turnover?  It's on the right side there.

15   A.   27,276.19 Euro.

16   Q.   Under deductions, can you read what it says for rates on

17   the right-hand side of the page?  There we go.

18   A.   12 percent, and 3,333.06 Euro.

19   Q.   And then a little bit below that, in a section called

20   payouts, what does it say for total settlement amount?

21   A.   23,805.03 Euro.

22   Q.   Did you review other documents in Government Exhibit 1801

23   that generally follows this same format?

24   A.   I did.

25   Q.   And are those all referred to in the summary chart marked

L3BPWEI5                         Hupcher - Direct

1    Government Exhibit 3703 and statements for provided services?

2    A.  They are.

3    Q.  All right.  Mr. Levine, let's go back up to Government

4    Exhibit 1801 and to the supplier statements folder.  Let's go

5    back into the PXP-Kalixa folder and into Kalixa.  Sorry, after

6    PXP, let's go back.  Let's go to PXP instead of Kalixa, and

7    into Veja, and then into the zip folder 1585685-FTE.zip.  And

8    can you open the document that's labeled Bank Account Details.

9            Okay.  Mr. Hupcher, can you read the sentence at the

10   top of this document?

11   A.  "Hi, From the Earth is actually launching a second location

12   but will have different banking info for these.  The last three

13   wires to their first location have been successfully received."

14   Q.  And so looking at the table below that, what does it say to

15   the right of depots?

16   A.  From the Earth Ventura and From the Earth Orange County.

17   Q.  And what does it say for bank account name?

18   A.  DBO Investments LLC, for From the Earth Ventura and Earsa

19   Management LLC for From the Earth Orange County.

20   Q.  Did you review other documents in Government Exhibit 1801

21   that followed a format similar to this table?

22   A.  Yes.

23   Q.  And are those referred to in the summary chart in

24   Government Exhibit 1803 as depot bank account information?

25   A.  Yes.

1   Q.  Can we go back to Government Exhibit 3703.  Okay.

2           So again, this is a summary of information you

3   reviewed in the supplier statements folder, correct?

4   A.  Yes.

5   Q.  From the E.zip file, right?

6   A.  Yes.

7   Q.  So looking just at the fifth column, what are some of the

8   depots or service descriptors you found mentioned in the

9   documents in the suppliers statements folder?  And we can start

10  by looking at the second row, the second row, fifth column.

11  A.  Superior health and superior herbal health.

12  Q.  How about if we go to page 2 and the second and third rows?

13  A.  G-Greenteacha and G-Organikals.

14  Q.  And how about if we go down to page 4 and we look at the

15  second-to-last row?

16  A.  K-conetild-absolute.  K-conetild-essential surf,

17  K-conetild-happy puppy, K-cone tild-the hidden kitten, and

18  K-GIS.

19  Q.  And just to confirm, Mr. Levine, can you pull up what's

20  been admitted in Government Exhibit 3705 next to Government

21  Exhibit 1802.  Sorry, 3703.  Okay.  Sorry, can you pull up 3703

22  next to 1802?  Okay.

23          And so again just to confirm, looking at the bottom

24  half of Government Exhibit 1802, starting with where it says

25  Supplier Statements, how does the information on the first

1    column of Government Exhibit 3703 relate to what we're looking

2    at right now with Government Exhibit 1802?

3    A.   It shows the folder structure.  So, for example, with the

4    first entry, you'll see ECP, which is the main folder under the

5    supplier statements, and within that there is INTESTD, and then

6    within that is the zip file that contains the other documents.

7    Q.   All right.  Can we now pull up what's in evidence as

8    Government Exhibit 3705.  Sorry.

9          All right.  Mr. Hupcher, can you just briefly walk us

10   through these columns what the different categories of

11   information are?

12   A.   Sure.  The first one is categories of documents.  The next

13   one is the debtor name, if it was listed, and then the

14   beneficiary name, if it was listed, the total number of

15   documents in the folder, and then the date range of those

16   documents.

17   Q.   I should have had you start with this, but what's the title

18   of this chart?

19   A.   Sure.  It's Summary Table for E.zip, and it's the Senjo

20   Proofs Shares folder.

21   Q.   And does that mean that all of the information in this

22   chart is information that you reviewed from that Senjo

23   proofs-shares folder in the E.zip file?

24   A.   Yes.

25   Q.   Let's look at these two types of documents.  So,

1    Mr. Levine, if we can go back to Government Exhibit 1801, and

2    we're going to go into the Senjo-proofs-shares folder.  And

3    let's open the document titled wire-01.

4            Okay.  Mr. Hupcher, in this document, do you see where

5    it says Ultimate Debtor?  It's one of the pieces of information

6    kind of in the middle.

7    A.  Yes.

8    Q.  And who is listed there?

9    A.  Spinwild Limited.

10   Q.  And what entity is listed next to beneficiary?

11   A.  Senjo Payment Asia PTO Limited.

12   Q.  And what is the payment date?

13   A.  July 30th, 2018.

14   Q.  And what is the ordered amount?

15   A.  476,586 Euro.

16   Q.  And going down to the bottom left, can you read the first

17   line, where they provide contact information or what entity it

18   says to contact?

19   A.  Please contact Kantox.

20   Q.  Okay.  Did you review other documents in this folder of

21   Government Exhibit 1801 that generally follows this same

22   format?

23   A.  I did.

24   Q.  Are those all referred to in the summary chart marked as

25   Government Exhibit 3705, as Kantox proofs of wire payment?

1    A.  Yes.

2    Q.  Mr. Levine, we can close out of this document, but staying

3    in Government Exhibit 1801, open up the Excel file titled

4    Senjo-distribution.  And can we go to the tab titled 2018, and

5    scroll up to the top.

6            Okay.  So focusing on row 3, can you read what's in

7    columns B and C?

8    A.  Column B is Kalixa; Column C is Hot R.

9    Q.  And then if you keep following row 3 all the way over to

10   the right, to column O, can you read what's written in that

11   cell?

12   A.  Overpayment.  This amount needs to be wired back to the Hot

13   Robot's account.

14   Q.  So now, let's go back to the left, and focusing on the

15   second table, where it says "September" on the left-hand side.

16   Can you read the column, the kind of row headers in columns B

17   and C, below where it says September?

18   A.  Just the headers?

19   Q.  Yes.  Just the information in columns B and C from lines 18

20   to 25?

21   A.  Sure.  ECP and then INTST, ECP New OP, ECP John, ECP

22   Linebeck, and then Kalixa INTST, Kalixa New OP, Kalixa John,

23   Kalixa Linebeck.

24   Q.  And, Mr. Levine, if you can just scroll to the bottom of

25   this page briefly for us.  Thank you.  And now if you can just

1    open up, go to the page, the 2019 tab, and scroll up to the

2    top.

3              And let's look this time at the table labeled

4    November, the one kind of at the top.  Mr. Hupcher, if you can

5    read the information that's in Column B and C for lines 3 to

6    14.

7    A.  ECP INTST, ECP NewOp, ECP John, ECP Linebeck, Kalixa INTST,

8    Kalixa NewOp, Kalixa John, Kalixa Grandmoor, Kalixa Linebeck,

9    Kalixa Johnur, Kalixa torger, Kalixa conetild.

10   Q.  And now we can go to the totals tab.  Focusing just on the

11   content at the bottom of columns B, C and D, can you read what

12   that table says for us?

13   A.  Period is 2018 to 2019.  Shares for G team is 738,372.20

14   Euro; share for jaw 13/Senjo, 5,081,790.22 Euro.

15   Q.  Thank you.  All right.  Mr. Levine, we can close out of

16   Government Exhibit 1801 now.

17              THE COURT:  I think we've --

18              MS. DEININGER:  Your Honor, if I may pull up one more

19   thing?  I promise it's one question.

20              THE COURT:  All right.

21   BY MS. DEININGER:

22   Q.  If we can pull back up Government Exhibit 3707.

23              And, Mr. Hupcher, can you just confirm that Government

24   Exhibit 1801 is listed in Government Exhibit 3707?

25   A.  It is.

1    Q.   Thank you.

2              THE COURT:  All right.  Very good.  So, ladies and

3    gentlemen, I know it's hard for you to tear yourself away from

4    this rivetting testimony, but we will continue tomorrow at

5    9:45, our usual time.  So have a good evening.  We'll see you

6    then.

7              (Jury not present)

8              THE COURT:  You may step down.

9              (Witness temporarily excused)

10             Okay.  Please be seated.  So just to clarify the

11   record.  It was a little confused.  When some of these exhibits

12   were previously introduced, I dealt, outside the hearing of the

13   jury, with a number of global objections, which I denied, but I

14   gave defense counsel the right to reserve more specific

15   objections when the exhibits were reintroduced in effect

16   through this witness, and they did so.  And I considered them

17   in that context.  So those are all preserved.

18             So anything else we need to take up now?

19             MS. LA MORTE:  Yes, your Honor.  I have two things.

20   First is your Honor had asked whether the defense intends to

21   call the other Bank of America witnesses, in light of

22   Mr. Clow's testimony, and I believe that was one matter that

23   was going to be taken up now.

24             THE COURT:  Yes.  Thank you for reminding me.  So

25   what's the answer?

1           MR. TAYBACK:  No, we do not.

2           THE COURT:  Okay.  Excellent.

3           MS. LA MORTE:  The other matter, your Honor, is just

4    if your Honor is so inclined, your expectation as to what we

5    should expect tomorrow with respect to the expert witness

6    hearing?  If there's any guidance the Court has as to how your

7    Honor expects that to proceed?

8           THE COURT:  Well, I have to go back, and I will do so

9    tonight, and look at the objections that were raised.  Some of

10   them can be dealt with without reference to the witness'

11   testimony, but others require, I think, some inquiry of the

12   witness.

13          For example, I think there was a witness who was going

14   to be called to testify about reasonableness in this context,

15   and that's not going to be allowed.  But I think, by memory --

16   and I haven't gone back and looked -- there were some other

17   things that he may be talking about that were admissible.  So

18   that's the kind of thing that we need to deal with.

19          MR. TAYBACK:  On the subject matter of the hearing,

20   your Honor, I believe you indicated it could be conducted by

21   Zoom, and so we --

22          THE COURT:  Yes.

23          MR. TAYBACK:  My understanding is we have the

24   capability here.  You already have a camera.

25          THE COURT:  I'm happy to do it by Zoom, and I think we

 1    should accommodate the witnesses in that respect because if I

 2    rule them out, they won't have to come.

 3              MR. TAYBACK:  Yes.

 4              THE COURT:  And if I rule them in, they'll know that

 5    they've got to get going.

 6              MR. TAYBACK:  So we'll make the arrangements.

 7              THE COURT:  Excellent.

 8              MS. CLARK:  Your Honor, this is Sara Clark.  Your

 9    Honor, I understand that I went over my red limit on my

10    objection to 4301, but I did want to raise -- we would like to

11    request, at a minimum, redactions of Social Security numbers

12    and driver's licenses on that document?  I believe --

13              THE COURT:  So if there's no objection, I'm all for

14    that, but there is this caveat.  There is a reporter who sent a

15    letter, which I forwarded to all you folks, objecting to

16    redactions.  I don't know that he understood these were mostly

17    redactions to protect the identity of people, things like

18    Social Security numbers and things like that, but I'm waiting

19    to get your responses to that by 8:00 tonight.

20              So but as a general matter, is there any objection to

21    redactions of Social Security numbers and driver's licenses?

22              MS. LA MORTE:  No, there's not.

23              THE COURT:  Okay.  So the only real question is going

24    to be the issue raised by the reporter of the Public Document

25    Doctrine, which, you know, after I see your responses tonight,

1    I'll rule on it.  Okay.

2            MR. HARID:  Your Honor, we have a related redaction,

3    related request, and this concerns Government Exhibit 1733,

4    which hasn't been received in evidence yet.  Certain

5    individuals and entities that are not alleged to have been

6    co-conspirators are named in that document.  We would

7    respectfully request that those names be redacted.

8            THE COURT:  Any objection?

9            MS. DEININGER:  Yes, your Honor.  We would object to

10   that request.  This is not PII.  These are just individuals

11   that are referenced in a relevant conversation.

12           THE COURT:  All right.  I'll take a look at that

13   tonight as well and let you know when I make my rulings first

14   thing tomorrow.  So why don't we get together at 9:15 tomorrow.

15           MR. TAYBACK:  Thank you, your Honor.

16           MR. HARID:  Thank you.

17           THE COURT:  Very good.

18           (Adjourned to 9:15 a.m. on March 12, 2021)

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    RICHARD CLOW

 4   Direct By Ms. La Morte . . . . . . . . . . .1144

 5   Cross By Mr. Burck . . . . . . . . . . . . .1190

 6   Cross By Mr. Gilbert . . . . . . . . . . . .1263

 7   Redirect By Ms. La Morte . . . . . . . . . .1274

 8   Recross By Mr. Burck . . . . . . . . . . . .1281

 9   Recross By Mr. Gilbert . . . . . . . . . . .1284

10    ROBERT HUPCHER

11   Direct By Ms. Deininger . . . . . . . . . .1287

12                     GOVERNMENT EXHIBITS

13   Exhibit No.                              Received

14    2413 through 2416  . . . . . . . . . . . .1156

15    2424, 2427, 2428, 2423 and 2425  . . . . .1169

16    2407   . . . . . . . . . . . . . . . . . .1196

17    2421   . . . . . . . . . . . . . . . . . .1229

18    2426   . . . . . . . . . . . . . . . . . .1236

19    4301   . . . . . . . . . . . . . . . . . .1297

20    1724   . . . . . . . . . . . . . . . . . .1305

21    1728   . . . . . . . . . . . . . . . . . .1308

22    1722   . . . . . . . . . . . . . . . . . .1310

23    1730   . . . . . . . . . . . . . . . . . .1312

24    1802   . . . . . . . . . . . . . . . . . .1315

25
```

1    3703, 3704, and 3705  . . . . . . . . . . . .1316

2                       DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4     Akhavan 10017, 10018, and 10037  . . . . . .1240

5     11,009   . . . . . . . . . . . . . . . . .1255

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25