UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

v.

RUBEN WEIGAND and
HAMID "RAY" AKHAVAN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 20 Cr. 188 (JSR)

**REPLY MEMORANDUM IN SUPPORT OF HAMID "RAY" AKHAVAN'S MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

William A. Burck
Derek L. Shaffer
Brian McGrail
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW #900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7010
Email: saraclark@quinnemanuel.com

*Attorneys for Hamid "Ray" Akhavan*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ........................................................................................................2

I. THE GOVERNMENT FAILS TO REFUTE THAT MR. AKHAVAN IS ENTITLED TO RELIEF UNDER RULE 29 ........................................................................................2

A. The Evidence of Materiality Was Insufficient ........................................................2

B. The Evidence Of Intent To Defraud Was Insufficient ............................................7

II. THE GOVERNMENT FAILS TO REFUTE MR. AKHAVAN'S ALTERNATIVE ARGUMENT THAT HE IS ENTITLED TO RELIEF UNDER RULE 33 ..........................................................10

A. Martin Elliott's Remote Testimony Gravely Prejudiced The Defense ..................10

B. The Court's Curative Instruction Was Unnecessary And Prejudicial ..................12

CONCLUSION ....................................................................................................13

# TABLE OF AUTHORITIES

**Page**

## Cases

*Berean Baptist Church v. Cooper*, 460 F. Supp. 3d 651 (E.D.N.C. 2020) .................................. 11

*Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................................ 10, 11

*Loughrin v. United States*, 573 U.S. 351 (2014) ........................................................................... 8

*Maryland v. Craig*, 497 U.S. 836 (1990) ..................................................................................... 11

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ................................................................. 10

*United States v. Jacobs*, 475 F.2d 270 (2d Cir. 1973) .................................................................... 6

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) .................................................................... 8

*United States v. Nkansah*, 699 F.3d 743 (2d Cir. 2012) ................................................................. 8

*United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018) ..................................................... 3

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ................................................................. 9

*United States v. Shaw*, 137 S. Ct. 462 (2016) ................................................................................ 8

*United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020) ................................................. 8

Defendant Hamid "Ray" Akhavan hereby respectfully submits this reply memorandum of law in support of his motion for a judgment of acquittal or, in the alternative, for a new trial.

**PRELIMINARY STATEMENT**

The government remains unable to identify requisite evidence of materiality or intent to defraud. As to materiality, the government concedes it lacks evidence that any bank ever declined a marijuana card transaction. Indeed, the evidence showed that issuing banks invariably authorize marijuana transactions that are identified as such. The government collapses to observing that negligence is not a defense to bank fraud, but that misses the dispositive point, which is that banks' *uniform indifference* establishes, by definition, the *objective standard*. Akhavan Br. 9–10.

Equally lacking is the government's evidence of Defendants' intent to defraud. The government cannot credibly deny that the "essential element" requirement applies. The Court instructed the jury that it needed to find a "scheme to defraud" to return a guilty verdict, and precedent in turn requires proof that a defendant's misrepresentations implicated an essential element of the putative victim's bargain. Nor can the government persuasively claim that it satisfied the essential-element requirement here. The evidence showed that Defendants believed in good faith that the banks would benefit from authorizing marijuana transactions. And Defendants were right: Issuing banks made money by authorizing these transactions without suffering any adverse consequence. In any event, there was overwhelming evidence at trial that the banks do not care if their cardholders purchase marijuana, further foreclosing any notion that the nature of marijuana transactions is "essential" to the banks.

The government also fails to refute Defendants' alternative argument that they are entitled to a new trial under Rule 33. The government does not persuasively respond to the defense's argument that Martin Elliott's remote testimony violated Defendants' Confrontation Clause rights. By no means can the government deny the resulting prejudice: beyond being denied the

opportunity for in-court cross-examination, the defense was unable to cross examine Mr. Elliott about a key piece of evidence later admitted. Nor does the government adequately defend the Court's curative instruction. This totality of circumstances warrants a new trial absent other relief.

## ARGUMENT

### I. THE GOVERNMENT FAILS TO REFUTE THAT MR. AKHAVAN IS ENTITLED TO RELIEF UNDER RULE 29

#### A. The Evidence of Materiality Was Insufficient

1. The government does not deny that it failed to show that any bank has ever declined a marijuana card transaction, let alone that any bank declined one because of the Transaction Information. Akhavan Br. 5–6. The government argues only that "[n]o such evidence was required." Opp. 25. But the government is wrong. Despite bearing the burden of proving materiality beyond a reasonable doubt, the government left a fatal evidentiary gap on this core element.

The government concedes that the four misrepresentations identified in Akhavan's opening brief—the merchant name, merchant location, merchant category code (MCC), and merchant descriptor—are the sole bases for this prosecution. Opp. 3. Many of the government's assertions about the "Scheme" thus amount to mere distractions. For example, the government's assertion that many of the so-called "Phony Merchants" "claimed to maintain U.S.-based customer service numbers" has no bearing whatsoever on the materiality of the Transaction Information. Opp. 4. Nor do URLs of various "merchant websites" or the "Phony Merchants" matter for present purposes. Opp. 5. The government has never argued that *those* pieces of information constituted "misrepresentations" conveyed to issuing banks. Similarly irrelevant are the government's arguments that Defendants drove fake traffic to these websites and that the "Scheme" used "online tracking pixels." Opp. 5. Because these actions do not involve a "*mis*representation, a *false*

representation, or *any kind* of representation," they cannot serve as the predicate for a bank fraud conviction. *United States v. Perez-Ceballos*, 907 F.3d 863, 868 n.1 (5th Cir. 2018).[1] The materiality question reduces simply to whether an objectively reasonable bank would not have authorized Eaze transactions but for the content of the Transaction Information. Akhavan Br. 5.[2]

2. The evidence now cited by the government does not carry the government's burden on materiality. The government begins by citing bank testimony that three issuing banks would not have "knowingly" processed marijuana card transactions. Opp. 11, 17. But that whistles past Akhavan's argument as to why precisely this testimony was "wholly disconnected" from the Transaction Information. What is more, the government ignores cited evidence showing that the Transaction Information is immaterial to banks' assessments. Akhavan Br. 9–10.

The government then argues that the banks' cardholder agreements prohibited illegal transactions. Opp. 11, 15 n.1. But these agreements are contracts between the banks and their cardholders, not policies. Even if cardholders breached their contracts with the banks, any such breaches are irrelevant to the charged conspiracy. And when cardholder agreements' generic prohibition against "illegal transactions" is contrasted with the specific MRB policies the government's cherry-picked banks maintained, the only reasonable inference is that the banks consciously chose *not* to communicate the alleged prohibition to *their cardholders*. Akhavan Br. 14.

---

[1] Unless otherwise noted, internal citations, quotation marks, and alterations are omitted.

[2] The government argues that the test for materiality is whether a reasonable bank would consider the fact that the purchases were for marijuana before authorizing them. Opp. 15. Even if true, that does not advance the government's argument. Absent evidence that any bank has ever declined a marijuana transaction (even those that are identified as such), no rational factfinder could conclude that a reasonable bank would consider that information for these purposes. Given that banks uniformly and invariably authorize such transactions regardless of the Transaction Information, the Transaction Information by definition is immaterial.

Nor is the government persuasive in arguing that the banks' MRB policies are relevant to materiality. Opp. 18. Importantly, these policies relate solely to commercial banking relationships, not consumer credit or debit cards, and implicate distinct risks. There may be reputational and other risks associated with providing banking services to an MRB. For example, MRBs can serve as vehicles for money laundering, but that is not true of cardholders purchasing marijuana. It makes sense, therefore, that some large financial institutions have developed policies to manage risks associated with providing commercial banking services to MRBs *without* developing any such policies regarding their individual consumer cardholders. Indeed, it is telling that banks, even while recognizing that marijuana's unique legal status might occasion confusion, opted *against* taking steps to clarify matters with their cardholders. Akhavan Br. 13–14.

The government also argues that Visa and MasterCard prohibited marijuana transactions on their networks, that issuing banks could be "kicked off" the card networks for violating those policies, and that losing access to card networks would harm issuing banks. Opp. 11. But the government produced no evidence that any issuing bank has been kicked off a card network for authorizing marijuana transactions, knowingly or otherwise. And no evidence suggests that Visa or MasterCard would have excluded enormous financial institutions like Bank of America and Wells Fargo from their networks for authorizing their cardholders' marijuana transactions.

Next, the government argues that Visa and MasterCard terminated certain so-called "Phony Merchants." Opp. 11. That evidence is irrelevant. Whether card networks (which are not banks) took steps to terminate merchants has no bearing on whether issuing banks would have authorized cardholders' marijuana transactions but for Defendants' alleged misrepresentations. If anything, this evidence shows that, to the limited extent banks and card networks sought to exclude marijuana transactions, they did so by means *other than* declining marijuana transactions.

Relatedly, the government argues that certain issuing banks terminated marijuana merchants and that Wells Fargo closed Eaze-affiliated bank accounts. Opp. 12. That evidence, too, misses the mark. That the banks would not provide banking services to marijuana *merchants* does not show that they cared if their *cardholders* purchased marijuana. Akhavan Br. 13–14. The government also cites testimony that, if the Bank of America compliance team "discovers [a] marijuana *merchant*" on the network, they "refer the *merchant*" to the card networks and then, if the card networks determine it is accepting cards for marijuana transactions, the "*merchant* would be terminated." Opp. 16–17 (emphases added). But none of this translates to materiality here.

The government argues that issuing banks rely on the Transaction Information to calculate the risk associated with processing. Opp. 12. That is misleading. The evidence showed that when issuing banks evaluate the "risk" associated with a transaction, they care about whether (1) the cardholder is making the purchase and (2) the cardholder has sufficient funds to cover the purchase. Akhavan Br. 6. Specifics of *what* is being purchased are irrelevant to this equation.

Finally, the government argues that Defendants *believed* that issuing banks would not authorize marijuana transactions. Opp. 12, 17. Even if true, however, that would be irrelevant. As the government has repeatedly emphasized, the materiality inquiry is *objective*, making Defendants' *subjective* belief altogether beside the point.

3. The Government similarly falls short in addressing other important arguments by Akhavan. In response to evidence that hundreds of banks authorized $50 million worth of transactions with the word "Eaze" in the descriptor via the Circle platform, the government notes "substantial differences" between Circle-enabled marijuana transactions and other marijuana transactions. Opp. 14. But that misses the point. The key facts about Circle transactions are that (1) these transactions use the word Eaze in the descriptor and (2) issuing banks have been glad to

process them. *See also* Akhavan Br. 5 (highlighting evidence that Actors Federal Credit Union authorized undisguised MedMen transactions during the conspiracy). In the face of that evidence, no reasonable juror could conclude that the banks would have refused to authorize the disputed Eaze transactions if only the descriptor had used the word "Eaze"—as a juror must in order to find materiality. The government does not respond to the gravamen of this argument,[3] and it similarly ignores the immateriality of the merchant name, merchant location, and MCC. Akhavan Br. 6, 8.[4]

The government also says there was no smoking-gun proof that banks made a conscious decision to authorize marijuana transactions. Opp. 13–14. Of course, it "is seldom possible to prove" knowledge via direct evidence, *United States v. Jacobs*, 475 F.2d 270, 287 n.37 (2d Cir. 1973), and no one could expect banks to admit in court that they consciously decided to authorize marijuana transactions while maintaining hollow policies for the sake of plausible deniability.

The government remains unable to provide a coherent explanation for the evidence that banks authorized marijuana transactions identified as such. In its opposition, the government repeats its argument that "negligence is not a defense" to bank fraud. Opp. 15 n.1. That is unresponsive to Akhavan's argument that banks and card networks "have made a calculated *and reasonable* decision not to investigate whether they are processing marijuana transactions because *even if* they are authorizing such transactions, they do not care." Akhavan Br. 10. The government

---

[3] The government neither denies that the descriptor's purpose is to aid cardholders in recognizing the transactions on their statements (not to provide issuing banks information they use to authorize or decline transactions), nor addresses evidence showing that banks authorize transactions that shroud in opacity specifics of what a customer purchased. Akhavan Br. 5.

[4] In response to Akhavan's observation that "the banks did not push for a specific MCC for marijuana, even though they could have," Opp. 15 n.1, all the government does is repeat its mantra that negligence is not a defense to bank fraud. But Akhavan's substantive point stands: That the banks and card networks chose not to adopt a marijuana-specific MCC shows that they did not care whether cardholders purchased marijuana, and that banks were glad to process the transactions at issue irrespective of any specific MCC. Akhavan Br. 6.

also fails to explain how *systematic*, *uniform* practice equates with *negligence*. Akhavan Br. 9–10. It is telling, and, indeed, dispositive that the government cannot reconcile its premise that the banks would not authorize marijuana transactions once identified as such with abundant evidence that banks *uniformly and invariably do* authorize their cardholders' marijuana transactions.

The government also argues that merchant applications that allegedly contained false information and were submitted to European acquiring banks are relevant to materiality because that information was "passed on" to issuing banks. Opp. 18. Undisputed trial testimony refutes that argument. In fact, merchant applications are *not* "passed on" to issuing banks. Akhavan Br. 13. Likewise, the government effectively concedes that the Defendants' use of the "Webshield" program is irrelevant because Webshield is "designed to help *acquiring* banks" assess merchant risk. Opp. 4 (emphasis added). The government produced no evidence that *issuing* banks consider information produced by Webshield in deciding whether to authorize marijuana transactions.

Finally, the government simply ignores the arguments that its proof regarding policies from three non-representative banks constituted a constructive amendment of, or prejudicial variance from, the indictment. Akhavan Br. 6–7. Nor does the government respond to the argument that its evidence from three non-representative banks in any event failed to carry its burden of proving that an *average*, reasonable bank would enforce a policy against marijuana. Akhavan Br. 7–8.

**B. The Evidence Of Intent To Defraud Was Insufficient**

1. Governing precedent required the government to prove that Defendants' misrepresentations implicated an "essential element" of their bargain with cardholders. Akhavan Br. 15–20. The government's arguments to the contrary are unavailing. The government concedes that the Court instructed the jury that it must find that Defendants engaged in a "scheme to defraud" to find them guilty of bank fraud. Opp. 21 n.4. Nor does the government dispute that the "essential element" requirement is a necessary component of a "scheme to defraud." Akhavan Br. 15. The

government argues instead that the Court defined the term "scheme to defraud" "in the language of Section 1344(2)." Opp. 21 n.4.[5] But subsection 2 does not require proof of a "scheme to defraud," so it would make little sense for the Court to have used that term to instruct the jury under subsection 2. *See also* Akhavan Br. 19 n.13 (distinguishing *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019)). If the government believed that it did not need to prove a scheme to defraud, it should have objected to that language before the Court instructed the jury.[6]

In any event, the government ignores that "a criminal intent to effect harm on *someone* … is inherent in the idea of a 'scheme or artifice,'" which is required under both subsections of the bank fraud statute. Akhavan Br. 18 (quoting *United States v. Nkansah*, 699 F.3d 743, 757 (2d Cir. 2012) (Lynch, J., concurring in part and concurring in the judgment in part)).[7] Under binding precedent, proof that the defendants' misrepresentations implicated an essential element of the victim's bargain is necessary to prove intent to harm.

2. The government failed to satisfy the essential element requirement. The evidence showed that Defendants "believe[d] in good faith that [any] misrepresentation was innocently intended to further a transaction that would in the end benefit the bank" and thus "lack[ed] any criminal intent." Akhavan Br. 18–19 (quoting *Nkansah*, 699 F.3d at 757 n.2)). Although the

---

[5] By focusing exclusively on subsection 2 in its opposition, the government effectively concedes that the evidence was insufficient under subsection 1.

[6] Contrary to the government's argument, the Court never said that the "essential element" requirement does not apply. Indeed, the Court rejected the government's argument that intent to harm is not required. *United States v. Weigand*, 482 F. Supp. 3d 224, 235 (S.D.N.Y. 2020).

[7] The government argues that *Nkansah* was overruled by *United States v. Shaw*, 137 S. Ct. 462 (2016) and *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014). Opp. 24. But Judge Lynch's concurring opinion in *Nkansah* has not been "overruled," and its analysis comports with the Supreme Court's decisions in *Shaw* and *Loughrin*. Akhavan Br. 18–19. Indeed, the *Loughrin* Court *approvingly* cited Judge Lynch's opinion in the same footnote the government cites as "overruling" that opinion. *Loughrin*, 573 U.S. at 366 n.9.

government argues in response "there was no evidence that this was the defendants' intent," Opp. 24, the disputed transactions *did* in fact benefit the banks because they made money by authorizing them, just as Defendants knew they would. And the government produced no evidence of any adverse consequences the banks suffered because they authorized these transactions, or any evidence that the Defendants believed the banks would suffer any such adverse consequences.

More broadly, the evidence at trial showed that banks do not care if their cardholders purchase marijuana. Even assuming that the government somehow proved materiality, it is undeniable that ferreting out their cardholders' marijuana transactions was, at best, an extremely low priority for issuing banks. Akhavan Br. 10–11. That is the very opposite of *essential*.

*United States v. Schwartz* differs fundamentally. 924 F.2d 410, 420–21 (2d Cir. 1991) (cited at Opp. 24). There was no evidence in that case that the alleged "victim" of the scheme to defraud uniformly and invariably approved sales of night-vision goggles to restricted nations. In this case, by contrast, there was evidence that the banks have authorized tens of millions of dollars of marijuana transactions. Moreover, the night vision goggles in *Schwartz* were neither legal under state law nor openly sold in many States, as is true for marijuana.

3. The government also failed to prove that Defendants had the requisite intent to deceive an FDIC-insured bank. Akhavan Br. 21–23. The government argues that its evidence showed that Defendants' intent was to "cause" the Transaction Information to "pass[]" to U.S. issuing banks. Opp. 25. To the contrary, however, the evidence showed that (if anything) Defendants intended to deceive European *acquiring* banks, so that they would open merchant accounts for the "Phony Merchants."[8] There was no evidence that Defendants intended this information to be "passed" to

[8] The government concedes that even the acquiring banks were not deceived because their high-level "insiders" ensured the applications would be approved. Opp. 4; *see* Akhavan Br. 22.

U.S. issuing banks, via the card networks or otherwise. Akhavan Br. 22. It is likewise undisputed that U.S. issuing banks do not receive the "fraudulent application packs" Oliver Hargreaves testified about at length. Akhavan Br. 22–23. In sum, there was no evidence that Defendants intended to deceive *U.S. issuing* banks by submitting information to *European acquiring* banks.[9]

## II. THE GOVERNMENT FAILS TO REFUTE MR. AKHAVAN'S ALTERNATIVE ARGUMENT THAT HE IS ENTITLED TO RELIEF UNDER RULE 33

### A. Martin Elliott's Remote Testimony Gravely Prejudiced The Defense

1. *Crawford v. Washington*, 541 U.S. 36 (2004) is irreconcilable with *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999). Akhavan Br. 24–27. The government's principal response is that the *Crawford* and *Gigante* "address fundamentally different questions." Opp. 29. But that dodges *Crawford*'s disavowal of prior decisions that had "replac[ed] categorical constitutional guarantees with open-ended balancing tests." 541 U.S. at 67–68. Because *Gigante* reflected an open-ended balancing test, it does not survive *Crawford*. Nor does the government address cases that specifically recognize the deficiencies of remote cross examination. Akhavan Br. 25–26.

Even under *Gigante*, however, Mr. Elliott should not have been permitted to testify remotely. The government points to Mr. Elliott's underlying health conditions (Opp. 26, 28) without denying that these health conditions are commonplace rather than "exceptional." Akhavan Br. 27. Permitting Mr. Elliott to testify remotely dramatically expands *Gigante* when that decision should be read narrowly—at a minimum—following the Supreme Court's intervening decision in

---

[9] In any event, card networks are not banks, and, even as to the card networks, "acquiring banks have a non-delegable duty to code the four data points at issue." Akhavan Br. 22–23.

*Crawford*. In short, "[t]here is no pandemic exception to the Constitution," and this Court should not create one. *Berean Baptist Church v. Cooper*, 460 F. Supp. 3d 651, 654 (E.D.N.C. 2020).[10]

2. The government struggles to deny the prejudice to the defense from Mr. Elliott's remote testimony. To be clear, the defense does not question the Court's general discretion to manage cross examination, including via time limits. Opp. 30. But that general discretion operates in the context of normal cross-examination; here, the defense suffered an extraordinary denial of in-court cross-examination, for an especially important and challenging witness, while tightly and specially constrained. Akhavan Br. 29. These circumstances combined to work substantial prejudice.

The government has no good rejoinder. It argues that delays in Mr. Elliott's testimony were "promptly addressed," Opp. 30, but the time limitations persisted—by diminishing the defense's already-limited time, the delays posed prejudice. The lost time could have otherwise been used by the defense, for example, to cross-examine Mr. Elliott about HAX-5014.

The government also misconstrues the defense's argument as to how Mr. Elliott's evasive answers compounded the prejudice. Opp. 30–31. The specific problem is that that the defense did not have sufficient time or other opportunity to press for responsive answers from Mr. Elliott as he testified *remotely*. Controlling the witness in court, efficiently and effectively, would have been one thing. But trying to do so remotely—on a tight clock, amidst technical and logistical difficulties—was something quite different. Tellingly, the government fails to address the specific examples of Mr. Elliott's evasive answers cited in Mr. Akhavan's opening brief. Akhavan Br. 30–31. Defense counsel's inability to elicit straight answers from Mr. Elliott, from one side of the

[10] Nor does the government's brief footnote persuasively respond to the argument that Visa failed to carry its heavy burden to show that remote testimony was warranted under the Supreme Court's decision in *Maryland v. Craig*, 497 U.S. 836, 846 (1990). Opp. 29 n.9; *see* Akhavan Br. 27–28.

country to the other, amply shows prejudice. And the prejudice was all the more acute given the importance of Visa's testimony in this case. Akhavan Br. 28–29.[11]

Finally, the government disputes that inability to cross examine as to HAX-5014 posed prejudice because the defense argued from *other* evidence that Visa was biased during summation. Opp. 31. But HAX-5014 may have been the *best* evidence validating the defense's theory because it demonstrates not only that Visa had a financial incentive but that Visa *recognized* that incentive and *communicated with U.S. issuing banks* about the profits to be earned by servicing the burgeoning marijuana industry. Akhavan Br. 32. This is hard evidence, not "mere speculation." Opp. 31. And there is a crucial difference between cross-examining a witness about a key item of evidence and arguing from it in closing. In court, Mr. Elliott may have admitted that HAX-5014 validated the defense's "plausible deniability" theory. Such uncertainty commends a new trial.

**B. The Court's Curative Instruction Was Unnecessary And Prejudicial**

According to the government, defense counsel "misstated the law and risked confusing the jury" when he focused the jury's attention on a reasonable bank's decision to authorize a transaction during his summation. Opp. 32. But the Court's jury instructions likewise focused, correctly, on precisely that decision by a bank. Akhavan Br. 33. As such, defense counsel neither misstated the law nor risked confusing the jury. Moreover, the prejudice to the defense from the late change in instructions was acute because it came after summations, at which point the defense could not address the newly-revised jury instructions before the case went to the jury. Indeed, it

---

[11] *A fortiori*, the government's is wrong to argue in passing that any error was "harmless beyond a reasonable doubt." Opp. 32. Were Mr. Elliott's testimony "largely cumulative" of Mr. Verdeschi's testimony, the government would not have gone to such lengths to call both. Of particular note, Mr. Verdeschi did not testify to any equivalent of HAX-5014.

was presumably to avoid this problem that the Court held the charging conference—at which the Court finalized the jury instructions—before summations. Akhavan Br. 33.

## CONCLUSION

For the foregoing reasons, the Court should issue a judgment of acquittal or, in the alternative, vacate Mr. Akhavan's conviction and set a date for a retrial.

May 19, 2021

Respectfully submitted,

ROTHKEN LAW FIRM

/s/ Ira Rothken
Ira Rothken
Jared Smith
3 Hamilton Landing
Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ William A. Burck
William A. Burck
Derek L. Shaffer
Brian McGrail
1300 I St. NW #900
Washington, DC 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemauel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Sara C. Clark
711 Louisiana St., Ste. 500
Houston, Texas 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: saraclark@quinnemanuel.com