UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- vs -<br><br>RUBEN WEIGAND and<br>HAMID "RAY" AKHAVAN,<br><br>Defendant. | No. 20-cr-0188 (JSR)<br><br>**FILED UNDER SEAL** |

## HAMID AKHAVAN'S SENTENCING MEMORANDUM

William A. Burck
Derek L. Shaffer
Brian McGrail
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW #900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7010
Email: saraclark@quinnemanuel.com

*Attorneys for Hamid "Ray" Akhavan*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................3

I.      Mr. Akhavan's History and Characteristics. ...................................................3

        A.      Mr. Akhavan Immigrant Childhood. ...................................................3

        B.      Mr. Akhavan's Battle with Drug Addiction .........................................4

        C.      Mr. Akhavan's Business ......................................................................6

        D.      Mr. Akhavan's Dedication to Family ...................................................7

        E.      Mr. Akhavan's Charity and Community Support...................................7

        F.      Mr. Akhavan and His Family Have Already Been Devastated by This
                Case..................................................................................................8

II.     Sentencing Guidelines: The Correct Guidelines Range is 4 to 10 Months.........9

        A.      The 26-Level Loss Enhancement is Unsupportable Because it is Premised
                on a Fundamentally Flawed Analysis. ................................................10

        B.      The Multiple Victims Enhancement Does Not Apply. ..........................12

        C.      The Enhancement for Derivation of Gross Receipts from Financial
                Institutions Does Not Apply ..............................................................13

        D.      The Enhancement for Mr. Akhavan's Role as a Leader Should Not Apply
                Because Mr. Akhavan was a Service Provider .....................................14

III.    A Fine Should Not be Imposed.......................................................................14

IV.     A Sentence of Seven Months is Appropriate for Mr. Akhavan and Will Achieve
        the Goals of Sentencing. ...............................................................................15

        A.      A Sentence of Seven Months Is Appropriate in Light of the Nature and
                Circumstances of the Offense. ...........................................................16

        B.      A Sentence of Seven Months Will Achieve the Goals of Sentencing. .................17

CONCLUSION................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Dean v. United States*,
    137 S. Ct. 1170 (2017) ............................................................................... 3

*Toohey v. Portfolio Recovery Assocs., LLC*,
    No. 15-CV-8098(GBD), 2016 WL 4473016 (S.D.N.Y. Aug. 22, 2016) ................................ 11

*United States v. Abiodun*,
    536 F.3d 162 (2d Cir. 2008) ......................................................................... 12

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................................ 3

*United States v. Canova*,
    412 F.3d 331 (2d Cir. 2005) ......................................................................... 12

*United States v. Carmona-Rodriguez*,
    No. 04 CR 667(RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) .................................... 19

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ......................................................................... 3

*United States v. Falcioni*,
    45 F.3d 24 (2d Cir. 1995) ........................................................................... 16

*United States v. Garbarino*,
    No. 87 Cr. 860(KTD) (S.D.N.Y. Jan. 7, 2013) ....................................................... 2

*United States v. Skys*,
    637 F.3d 146 (2d Cir. 2011) ......................................................................... 12

## Statutory Authorities

18 U.S.C. § 3553 ............................................................................... 10, 17

18 U.S.C. § 3553(a) ............................................................................... 3

## Additional Authorities

U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.1 ................................................ 12

U.S. Sentencing Guidelines Manual §2B1.1 cmt. n. 13 .............................................. 13

U.S. Sentencing Guidelines Manual § 2B1.1(b)(2) .................................................. 12

U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i) ........................................... 12, 13

U.S. Sentencing Guidelines Manual §2B1.1, cmt. n. 3(A)(i) ...................................................... 11

Defendant Hamid R. Akhavan respectfully submits this memorandum in advance of sentencing, currently scheduled for June 18, 2021.

## PRELIMINARY STATEMENT

Prior to this case, Mr. Akhavan represented much of what we idealize as the American Dream.  A refugee immigrant from Iran, Mr. Akhavan built a flourishing technology and internet credit card processing business from the ground up, setting his family up for success.  However, separate and apart from his primary business ventures, he tried to facilitate credit card payments for state-legal marijuana.  A jury has concluded that Mr. Akhavan's actions supported a conviction of conspiracy to commit bank fraud, notwithstanding the fact that Mr. Akhavan's conduct neither intended nor actually caused any harm to any financial institution (or anyone else).

As explained below, the near-eight-month term Mr. Akhavan has already served in custody, on top of five more months in extremely restrictive in-patient rehabilitation programs, is more than the time warranted by the crime of conviction.  In this no-loss "fraud," Mr. Akhavan spent many months in private rehabilitation facilities battling his drug addiction under effective lock-down in restrictive conditions exacerbated by the COVID-19 pandemic, followed by over seven months in federal detention facilities, including over six months in the notorious New York Metropolitan Correctional Center ("MCC").  Nothing more is needed to punish him or deter others:  already, this case has had a catastrophic impact on Mr. Akhavan and his family, fundamentally disrupting not only Mr. Akhavan's life, but that of his loved ones.  Before this case, Mr. Akhavan had a hard-earned reputation as an industry leader in payment processing, he was the beneficiary of a large income stream, and he supported his wife and two children.  He also purchased a home for his mother so that she could be closer to her grandchildren.  But this case has brought Mr. Akhavan's financial future and that of his family crashing down, leaving

him facing likely bankruptcy, the stigma of being convicted of bank fraud (impairing his livelihood in the financial payment processing industry), and the dissolution of his family—all layered on top of his ongoing battle with drug addiction.

Mr. Akhavan has served sufficient time in prison—indeed he has served a prison sentence near the upper end of the *appropriate* range provided by the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or "USSG"), and has spent several more months in restrictive rehabilitation facilities.  Considering a proper Guidelines range of 4 to 10 months, the absence of any loss or harm suffered by any of the alleged "victims" and the dearth of evidence showing that Mr. Akhavan gained from the conduct underlying his conviction, a sentence of seven months suffices to serve the purposes of the criminal justice system.  Nor is such a sentence lenient.  Not only has Mr. Akhavan served much of this time enduring harsh conditions at one of the more infamous prisons in the country, he has done so during a time when conditions have been even more deplorable and dangerous than ever, as the prison populations have been especially hard-hit by the COVID-19 pandemic.  Furthermore, Mr. Akhavan will continue to suffer the consequences of his conviction for the rest of his life.  Justice does not require any further period of imprisonment.

As the Honorable Kevin T. Duffy once said in sentencing a defendant to time served:

> [T]he punishment lies not only in that but in the shame that [the defendant] brought to himself and more importantly to his family. [His family is] suffering now and will continue to suffer from this…. So, for the rest of his life, he will have to face up to the fact that if he ever has grandchildren, they will be the ones who say oh, yes, my grandfather, the felon.

Transcript at 10–11, *United States v. Garbarino*, No. 87 Cr. 860 (KTD) (S.D.N.Y. Jan. 7, 2013).

2

**ARGUMENT**

A sentence must be "sufficient, but not greater than necessary," to vindicate the "four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017);[1] *see also* 18 U.S.C. § 3553(a). A court fashioning a sentence must consider "the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing." *Dean*, 137 S. Ct. at 1175. It also "must … consider the pertinent Guidelines and policies adopted by the Sentencing Commission," *id.*, but not "presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Here, regardless of how the Guidelines' "abstract arithmetic" pans out, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), a sentence of seven months is appropriate.

I.      **Mr. Akhavan's History and Characteristics.**

        A.      **Mr. Akhavan Immigrant Childhood.**

Mr. Akhavan was born in Iran in 1978. His childhood was by no means easy. By the age of 6 he was a political refugee, his family having escaped Iran in 1984 after several members of his mother's family were executed for belonging to the democratic party. The family moved first to Germany, then to San Diego in 1985. PSR ¶ 68.

At the age of 13, Mr. Akhavan's father moved the family again, this time to Turkey, where Mr. Akhavan spent approximately five years. During that time, Mr. Akhavan's father removed him from school so that Mr. Akhavan could work in the a factory. While there, Mr. Akhavan first met Antonia D'Amore ("Nina"), who he would later marry. At 19, Mr. Akhavan

---

[1]    Unless otherwise noted, internal citations, quotation marks, and alterations have been removed from citations in this brief.

returned to California with his family, where he completed some college.  PSR ¶ 69.

### B.   Mr. Akhavan's Battle with Drug Addiction[2]

Mr. Akhavan has long struggled with a severe drug addiction.[3] ███████████



---

[2]   The defense notes its objection to Paragraph 81 of the PSR, which states that Mr. Akhavan did not provide consent forms.  Mr. Akhavan did provide the forms, but understands that probation did not request his medical records.  The defense has raised this with probation and understands an addendum to the PSR may be forthcoming.  In any event, the most relevant aspects of Mr. Akhavan's medical history are not disputed.

[3]   While the fact of Mr. Akhavan's drug addiction is a matter of public record, the details of his condition and treatment efforts have been redacted for privacy reasons.

[4]   ████████████████████████████████████████

[5]   ███████████████████████████████████████ and is acutely aware of the unintended consequences long-term, heavy use of such medications can have on a person.  Mr. Akhavan viewed marijuana as an effective pain management alternative with much less destructive consequences, and thus wanted to support *Eaze*'s initiative, mission, and its accessibility to users who ████████ sought relief in its medicinal and curative properties.  This led him to dedicate significant time and resources to the *Eaze* project, even when he was not compensated for doing so.

████████████████████████████████████████████████

███████████████████████████████████

      ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

      ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Despite these setbacks, Mr. Akhavan has continued to make efforts to defeat his addiction.  Since his indictment in this case, Mr. Akhavan has entered two inpatient treatment facilities ████████████████████████████████████.  In both cases, due to the COVID-19 pandemic, he endured what amounted to lockdown conditions, unable to have visitors and cut off from his support network; even legal visits were severely restricted.  He also contracted with

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

addiction specialists and counselors to help him continue his recovery efforts at home. Unfortunately, as is common in cases of severe addiction, his efforts have yielded imperfect results. However, Mr. Akhavan remains committed to achieving sobriety, and will continue his efforts upon his release.[7]

###    C.    Mr. Akhavan's Business

In approximately 2006, after returning to the United States, and following a break up with his then-girlfriend, Nina, Mr. Akhavan moved to San Diego and opened a software and internet marketing company with his brother and two friends. The company began by packaging advertisements for various websites, which provided commissions for sales based on purchases driven by those ads. It eventually migrated to include payment processing for on-line purchases of products with a high rate of returns (such as some (legal) adult content). Through his hard work, the business became very successful (PSR ¶89), enabling Mr. Akhavan and his brother (one of his business partners) to provide for their entire extended family. The growth of the Internet and on-line payment processing allowed Mr. Akhavan's business to become extremely profitable for a period of several years leading up to the instant offense, which, as described below, was a departure for him from his principal business.

---

[7]    To the extent the Court elects to impose a sentence greater than the time Mr. Akhavan has served, Mr. Akhavan urges the court to make a special recommendation that Mr. Akhavan be considered for the Non-Residential Drug Abuse Treatment (or Cognitive-Behavioral Therapy), and/or, if applicable, the Residential Drug Abuse Program run by the Federal Bureau of Prisons, and that he be recommended for placement at FCI Terminal Island 1, a facility that has those programs and is located in the greater Los Angeles area, nearer to Mr. Akhavan's support network. *See Substance Abuse Treatment*, Federal Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (providing program descriptions and location information). Further, if the Court elects a term of supervised release, the defense would request the Court include provisions for Mr. Akhavan to begin or continue substance abuse treatment on an outpatient basis. The defense understands that although Mr. Akhavan has not been enrolled in substance abuse treatment while incarcerated, Mr. Akhavan has sought to participate in drug treatment programs since his incarceration began, but remains on the waiting list, and so has not been enrolled in any such program to date.

### D.      Mr. Akhavan's Dedication to Family

Mr. Akhavan was raised with a strong commitment to family.  His father expected him to provide for the family and ensure its security.  Mr. Akhavan met his future wife, Nina, in Turkey while the two were teenagers.  They dated through high school and into college, though their relationship at the time ended ████████████████████.  They reunited as adults, ████████████████████████████████████████████████ ████████████████████ Ex. 2 (Letter from Antonia Akhavan).  Nina and Mr. Akhavan later married, and had a daughter together in 2016 ████████████████.  *Id.* Mr. Akhavan also adopted Nina's daughter from her prior marriage, and treated her as his own. *Id.*

Mr. Akhavan has provided for his wife, biological and adopted daughters, as well as his extended family.  Though his addiction has strained his family relationships, Mr. Akhavan remains dedicated to the financial stability and security of his family.

### E.      Mr. Akhavan's Charity and Community Support

Mr. Akhavan has developed a record of exceptional generosity, in particular towards children in need.  Since 2012, he has matched fundraising efforts for the Yavaran Orphan Helpers Charitable Foundation,[8] a non-profit organization that provides much-needed aid to orphan children in Iran.[9]  Since 2015, he has also supported the work of For the Unseen, and in particular its mission to provide educational services to displaced Syrian refugee children

---

[8]    Exhibit 3 (Letter from M. Noohi).

[9]    *Yaravan*, http://yavaran.org/Default.aspx?PageName=pages&ID=31.

through the Birds of Hope project.[10]  The school now serves approximately 2,000 children—growth made possible in part by Mr. Akhavan's contributions and advice to the charity.[11]

Mr. Akhavan also regularly shows personal generosity towards others.  He has always been the first to step in when someone is in need, and, when well, was the pillar of his family.  *See* Ex. 1 (Letter from Ardeshir Akhavan); Ex. 2 (Letter from Antonia Akhavan).  Even while in rehabilitation centers himself, Mr. Akhavan demonstrated his desire to help others, including helping to house them.[12]

### F.    Mr. Akhavan and His Family Have Already Been Devastated by This Case.

For Mr. Akhavan and his family, the fallout from this prosecution already goes well beyond any sentence the Court might impose.  The stigma from the case has caused Mr. Akhavan's business to collapse (PSR ¶ 89)—he has become a pariah among the international banks with which he previously did business.  This has deprived Mr. Akhavan and his business associates, including family and close friends, of their financial stability.

The most concrete and obvious consequences are financial.  His income has dropped precipitously from a high of $14 million in 2017 to a few hundred thousand in 2020, and it is rapidly dwindling to nearly nothing.  Mr. Akhavan faces the prospect of personal bankruptcy based on the collapse of his businesses and the practical inability to manage his financial affairs while incarcerated.[13]  Further, it will be impossible for Mr. Akhavan to return to his prior field of

---

[10]    *For the Unseen: Birds of Hope*, https://fortheunseen.org/birds-of-hope.

[11]    Exhibit 4 (Letter from P. Ala'i).

[12]    Exhibit 5 (Letter from S. Federico).

[13]    The government has suggested that Mr. Akhavan has hidden wealth.  He does not.  Although he earned significant sums in previous years, his business has been destroyed and his substance abuse and spending habits have depleted his assets.  Ex. 1 (Letter from Ardeshir Akhavan).  Even an attempt by the family to create a trust to protect his assets failed.  Though the government has argued that some correspondence admitted at trial suggested there was an (footnote continued)

expertise—credit card processing—with a felony conviction for conspiracy to commit bank fraud.  While Mr. Akhavan will make every effort to re-establish economic stability and explore opportunities in other fields, the very nature of the conviction is yet another aspect of this case that will punish him on a continuing basis because, rather than build on his years of hard work and experience, he will be starting from square one.

The impact on Mr. Akhavan's personal life also cannot be understated.  The case has contributed to the dissolution of Mr. Akhavan's marriage.  While his family relationships were strained by Mr. Akhavan's struggle with drug addiction, Mr. Akhavan's incarceration in New York away from his family and the extreme restrictions placed on him due to COVID-19 have resulted in even further strain on those relationships.  Further, Mr. Akhavan has been unable to see his parents during his incarceration—his mother's deteriorating health and the COVID-19 visitation restrictions have made any visit virtually impossible.  An additional period of incarceration might well mean that Mr. Akhavan misses the limited remaining time that his mother has left to spend with her son.  For someone for whom family is paramount, this would be a needless additional punishment with devastating emotional consequences for Mr. Akhavan as well as his parents.

Whatever sentence the Court imposes, the consequences of this case are—and will continue to be—severe for Mr. Akhavan and his family.

## II.     Sentencing Guidelines: The Correct Guidelines Range is 4 to 10 Months.

Mr. Akhavan stands convicted of a Class B felony, and his Guidelines range is 4 to 10 months.  Mr. Akhavan's criminal history category is I (PSR ¶ 63) and his Total Offense Level is

---

offshore trust for Mr. Akhavan (*see* PSR p.33; GX 1733), the trust discussed was never even funded.  The effort by the family to protect Mr. Akhavan from himself was, proverbially, "a day late and a dollar short."  Ex. 6 (Decl. of P. Phancao).

9—a figure generated by adding 2 points to a Base Offense Level of seven (PSR ¶ 47) because much of the alleged scheme was conducted from Europe (PSR ¶ 50).

The Guidelines term of imprisonment as calculated in the PSR (PSR ¶ 96) is incorrect as a matter of law and excessive as a matter of common sense. Indeed, but for the 30 year statutory maximum, the Guidelines would suggest life imprisonment (PSR ¶ 96), driven primarily by an incorrect equation of "loss" with "transaction value" (PSR ¶ 48), which accounts for an absurd enhancement in this case of 26 points. The PSR additionally suggests inapplicable enhancements for the number of victims, Mr. Akhavan's role as a leader, and for gross receipts by the defendant. Each of these enhancements is unsupported by the evidence in the case and erroneously applied, as set forth below. And, while the defense recognizes the 96 month (8 year) sentence recommended by the Probation Department is a significant departure from a term of 30 years, the fact remains that the PSR recommendation is derived from a fundamentally erroneous Guidelines calculation. An appropriate sentence for Mr. Akhavan is much lower, both based on a correct application of the Guidelines, and the factors set forth at 18 U.S.C. § 3553.

**A.     The 26-Level Loss Enhancement is Unsupportable Because it is Premised on a Fundamentally Flawed Analysis.**

This case presents a seemingly unique situation where the purported victims made money, rather than suffered any loss, just as the defendants intended they would. [14] Characterizing the $156,225,211.61 in transactions as a "loss," as stated in the PSR (PSR ¶ 35, 43, 48,), is entirely unsupported by the record in this case. The PSR explains that the government "informed [Probation] that the loss figures represent the dollar amount of transactions authorized by [Issuing Banks] based on the fraud." PSR ¶ 43. This untenable formulation equates transaction volume with loss, and is contrary both to law and common sense.

---

[14]   The defense has not been able to identify a similar fact pattern in the case law to date.

The Guidelines define actual loss for purposes of the enhancement as "reasonably foreseeable *pecuniary harm* that resulted from the offense."  USSG §2B1.1, cmt. n. 3(A)(i).  Pecuniary harm, in turn means "harm that is monetary or that otherwise is readily measurable in money."  *Id.* §2B1.1, cmt. n.3(A)(iii).  In this case, that would be pecuniary harm suffered by the Issuing Banks as a result of their approval of the transactions.  Yet, not one Issuing Bank testified that it lost a penny, nor was there any evidence of any pecuniary harm to anyone.  This is bolstered by the fact that there is no restitution sought in this case, as no Issuing Bank suffered any *pecuniary* harm.  Equating the object of the scheme—here defined as causing the Issuing Banks to *approve transactions* and release funds—to *pecuniary harm* for purposes of a sentencing enhancement is incorrect.[15]  Rather, the evidence conclusively showed that the purported victims—the Issuing Banks—made money on these transactions, logically and legally precluding a conclusion that Mr. Akhavan's conduct caused them a "loss."[16]  Indeed, the only testimony on the topic of loss—from a convicted coconspirator testifying under a grant of immunity—was that everyone

---

[15]  A simple hypothetical demonstrates why this is so.  Let's say a person takes out a loan for a vehicle, and falsely represents to the bank that the vehicle, pledged as collateral for the loan, is worth $20,000 when, in fact it is only worth $10,000.  Let's also say the person fails to make the payments, and the bank repossesses the vehicle, only to learn its value was misrepresented.  Mad as the bank might be about it, the *pecuniary* harm to the bank is the difference in the value of the vehicle that secured the loan versus what was represented—that is, $10,000.  The bank does not suffer $20,000 in harm because it has recovered $10,000 through the vehicle.  Likewise, here, the banks were paid by their customers, and collected various transaction fees and interest.  They recovered every dime to which they were entitled, and thus did not suffer any pecuniary harm.

[16]  Even accepting, solely for sake of argument, that the Issuing Banks were "harmed" in some intangible fashion by the misrepresentations, such intangible harm does not equate to pecuniary loss for purposes of this enhancement.  Courts recognize that harm may or may not be pecuniary (*e.g., Toohey v. Portfolio Recovery Assocs., LLC*, No. 15-CV-8098 (GBD), 2016 WL 4473016, at *10 (S.D.N.Y. Aug. 22, 2016) ("the harm caused by the improper freezing of a bank account might qualify as actual injury, even if no pecuniary injury accrued")).  But the Guidelines provision at issue by its own terms relates exclusively to *pecuniary* (or economic) harm.  Conflating generalized intangible harm with financial loss represents a significant departure from the Guidelines.

was to get paid what they were owed under the scheme.  Tr. 1659:23 – 1660:24 (Patterson) (Q. You never intended to cause anyone to lose any money, correct? Patterson. That's right. Q. And to your knowledge, no one did lose any money on the credit card purchases. Correct? Patterson. Correct, to my knowledge.").[17]

### B.       The Multiple Victims Enhancement Does Not Apply.

No enhancement under § 2B1.1(b)(2)(A)(i) is likewise appropriate because, as just discussed, there is no proof that *anyone* suffered actual loss attributable to Mr. Akhavan—or anyone else involved in the alleged scheme, for that matter.  *Cf.* U.S.S.G. § 2B1.1 cmt. n.1 (defining "victim" as "any person who sustained any part of the actual loss determined under (b)(1)").  The "number of victims" enhancement applies only where the government can prove loss *and* identify those who were harmed.  *See, e.g.*, *United States v. Skys*, 637 F.3d 146, 154–55 (2d Cir. 2011); *United States v. Abiodun*, 536 F.3d 162, 168–69 (2d Cir. 2008).[18]  The government's    inability    to    establish    actual    loss    precludes    an    enhancement    under

---

[17]   Though an imperfect analog, this case is more akin to those cases in which a contract is procured by fraud, but performed "to the perfect satisfaction" of the allegedly defrauded party. In such cases the contracting party suffers so loss.  *See United States v. Canova*, 412 F.3d 331, 353 (2d Cir. 2005).  Here, even while the jury convicted Mr. Akhavan of conspiring to make misrepresentations to Issuing Banks, all the available evidence indicates the banks received what they were due under the terms of their various agreements with Visa, MasterCard, and their cardholders, and suffered no loss.  *See id.* ("if the contract is performed to the perfect satisfaction of the contracting agency. . . there was no loss").

[18]   Further the Second Circuit has agreed with the Sixth and Eleventh Circuits that, where a party suffers only a "short-lived loss" that is "immediately covered by third parties," the party is not a victim for purposes of U.S.S.G. § 2B1.1(b)(2).  *United States v. Abiodun*, 536 F.3d 162, 168 (2d Cir. 2008). In this case, there is no evidence that any Issuing Bank failed to collect from the applicable cardholder in a timely fashion.  Nor is there evidence that any Issuing Bank expended any time or effort in pursuit of recovery of funds for authorized transactions, or otherwise suffered any adverse effect that might otherwise cause them to be categorized as victims.  *C.f. id*, at 168-169 (noting that expenditure of appreciable time to recover funds or identify was sufficient to constitute loss such that a party could be considered a victim).  In short, there is no evidence, or even credible suggestion, that the Issuing Banks suffered any loss, pecuniary or otherwise, that would bring them within the realm of this enhancement.

§2B1.1(b)(2)(A)(i).  *See id.*

### C.    The Enhancement for Derivation of Gross Receipts from Financial Institutions Does Not Apply

There was no evidence at trial that Mr. Akhavan ever derived any revenue from the scheme.  What was established was that *Eaze* and its employees and officers were paid, the dispensaries were paid, European banks were paid, and Visa, Mastercard, and the Issuing Banks were paid what each was due under the terms of the transactions.  However, there was no evidence that Mr. Akhavan actually ever received so much as one cent from the entire scheme.[19] Mr. Akhavan was not a paid consultant to Eaze; nor to any of the banks involved.  To the extent the government argues that a chat about the need to establish an off shore trust account supports the government's position, that conversation concerned money he had previously earned and his family's perception that his drug addiction had made him a risk to squander his money.  While the family's concerns may have been prescient, ultimately they were for naught.  Although a trust was set up it was never funded because Mr. Akhavan had depleted the bulk of his funds.[20]

---

[19]   The government refers to statements by Mr. Akhavan regarding the collection of fees by processors Clearsettle and EU Processing (PSR p. 29).  However, there was no evidence at trial that any portion of those fees made their way to Mr. Akhavan.  There was no account tracing performed on any of Mr. Akhavan's bank accounts, and the sole document the government relies on is a spreadsheet (not created by Mr. Akhavan) showing a "shares" allocated to "Jaw13."  *Id.* But there is no evidence that any "shares" or money was ever transmitted to Mr. Akhavan. Based on testimony about transaction flows, some portion no doubt went to the Issuing Banks, some to Visa and MasterCard, and some to the acquiring banks.  Further, the Guidelines make clear that gross receipts for purposes of this enhancement include only gross receipts to the defendant *individually*, rather than to all participants.  U.S.S.G. §2B.1.1 cmt. n. 13.  However, there is no evidence that Mr. Akhavan ever received any compensation.

[20]   Ex. 6 (Declaration of P. Phancao).

### D.   The Enhancement for Mr. Akhavan's Role as a Leader Should Not Apply Because Mr. Akhavan was a Service Provider

Mr. Akhavan acted as a consultant or service provider to Eaze.  It was Eaze, and its CEOs, Keith McCarty and later James Patterson, who were the driving forces behind Eaze's efforts to obtain and maintain credit card processing at all costs, as *Eaze* derived a majority of its revenue from card transactions.  Tr. 1686:13-18.  Patterson described accepting credit cards as the "flywheel" that would keep the business growing.  Tr. 2015:4-19 (Cozzetto:   My understanding was that, you know, a flywheel is something that gains momentum as it turns, and so credit cards were an important thing that—if I recall correctly what Jim explained, was credit cards can gain us more customers.  Customers can gain us more revenue. More revenue can gain us more growth, and the flywheel will continue to improve).  Mr. Akhavan was approached by *Eaze* to find a solution.   When *Eaze* pushed for a solution, Mr. Akhavan used his industry contacts to connect willing processors and intermediaries with Eaze, making sure all parties were fully informed of the risks involved.  *See* Tr. at 1833:18-23; 1838:17 – 1839:13.  However, *Eaze* and its employees primarily handled the day to day matters, and sustained the necessary contact with their European business partners, Tr. at 2032:7 – 2033:2, while Mr. Akhavan's role was focused on troubleshooting and providing suggestions and advice.  Thus, an enhancement for a leadership role is inappropriate.

## III.   A Fine Should Not be Imposed

The PSR proposes that Mr. Akhavan pay a Guidelines range fine of $50,000 based on an offense level of 43 (PSR p. 37).  As set forth above, the offense level is grossly overstated in the PSR.  Applying the proper offense level of 9, Mr. Akhavan's Guidelines fine range is between $2,000 and $20,000.

As is clear from his finances, 

. Though Mr. Akhavan has certain assets left, he has substantial liabilities that he needs to satisfy,

. Further, that income is anticipated to decrease as Mr. Akhavan's prior business shuts down as a result of this case.

. The imposition of a fine is unnecessary given that, largely as a result of this case, Mr. Akhavan has already suffered financial ruin.

Finally, Mr. Akhavan has historically supported his wife and two daughters. A further reduction of his assets—none of which have been shown to be related to the offense of conviction, will unduly punish Mr. Akhavan's family. The sentence of imprisonment Mr. Akhavan has already served, and the devastation this case has wrought on his family, is more than sufficiently punitive.

## IV.   A Sentence of Seven Months is Appropriate for Mr. Akhavan and Will Achieve the Goals of Sentencing.

A sentence of seven months is sufficient but not greater than necessary to punish Mr. Akhavan for the crime at issue in this case. Although the crime is serious, Mr. Akhavan has already served sufficient time for his sentence, and suffered severe consequences: he has been humiliated before his family, friends, and community, with his reputation in his industry tarnished, prospects limited, and financial security erased. The seven months already served is more than sufficient to achieve the aims of sentencing.

---

21

15

### A.    A Sentence of Seven Months Is Appropriate in Light of the Nature and Circumstances of the Offense.

Mr. Akhavan's conviction, though a serious one, has significant mitigating factors that should be taken into account when considering appropriate sentence.

**First**, unlike most bank fraud cases, this is a victimless crime.  Far from suffering any pecuniary harm, the Issuing Banks actually made money off of the transactions at issue.  Tr. 2164:22–2165:21 (Steinbach), 1202:18–1203:16 (Clow), 1783:22–1784:24 (Brown).  Nor did these banks face any regulatory risk or reputational harm.  Tr. 1242:5–14 (Clow).

**Second**, unlike many criminal defendants, Mr. Akhavan was not personally enriched through the fraud at issue.  The government has not presented any credible evidence linking any portion of any transaction back to Mr. Akhavan.  And for good reason, as Mr. Akhavan never received compensation for his work for Eaze.[22]

**Third**, in contrast to cases where there was no loss due to some defect in the defendant's scheme, *c.f., e.g., United States v. Falcioni*, 45 F.3d 24, 27 (2d Cir. 1995) (no loss where authorities were alerted to the scheme in a sting operation), in this case *there was no loss by design*.  The purpose of the alleged scheme was *not* to deprive any participant in any transaction of anything.  Just the opposite—it was intended that every participant in the scheme, including the Issuing Banks, get precisely what they were owed.  Tr. 1659:14 – 1659:24.

The crime for which Mr. Akhavan was convicted is seemingly unique among bank fraud cases.  The defense has not been able to identify a single bank fraud case where there was neither any definable actual harm, intent to harm anyone, nor any gain to the defendant, and these features should weigh heavily against the imposition of any further term of incarceration.

---

[22]   Mr. Akhavan received a stock option.  However, the option was never exercised and its value is below par.  *See* Tr. at 1614:6 – 1615:2.

### B. A Sentence of Seven Months Will Achieve the Goals of Sentencing.

A sentence of seven months—the time Mr. Akhavan has already served in federal detention—will achieve the goals of sentencing in this case as set forth in 18 U.S.C. §3553.

*Just Punishment:* This case is unlike many criminal matters in that there truly was no actual or intended victim and no harm to any party to any of the transactions at issue, nor did the defendant, Mr. Akhavan, obtain any receipts from the activity. Nevertheless, Mr. Akhavan has served more than seven months in federal detention, over six of which have been at the MCC.[23]

The conditions at the MCC are, by all accounts, deplorable. The facility has featured in exposes and news stories over the last year, and as recently as in the last few months, highlighting the squalid conditions in which inmates are kept.[24] The facility is over-crowded, rodent-infested, and lacks basic necessities for the inmates like adequate clothing, shower facilities, restrooms, and even heating.[25] These cramped and unsanitary conditions only exacerbated the already devastating impact of COVID-19 on the prison population.

Mr. Akhavan's experience lines up with media reports—in his first two months at MCC, he was locked in a room with six inmates, with little to no light, and was not permitted outside at all. He lacked basic necessities, like toilet paper and blankets, and he and his fellow inmates

---

[23] Though not all directly related this case, between restrictive rehabilitation facilities, mental health facilities, and state and federal penitentiaries, Mr. Akhavan has spent approximately 18 months in confinement since October of 2019.

[24] Stephen Rex Brown, *SEE IT: Contraband video gives rare look at 'disgusting' conditions inside Manhattan federal jail*, Daily News (Apr. 27, 2020), https://www.nydailynews.com/new-york/ny-mcc-video-disgusting-conditions-20200427-7jnmpcbnovasphw32cm3pj677q-story.html; Tiffany Days, *IN HER OWN WORDS: An inmate describes conditions at NYC federal jail*, Daily News (May 7, 2021), https://www.nydailynews.com/new-york/ny-mcc-inmate-account-20210507-4qhsp2zjmzfy7mqonvnixoprmq-story.html; Ben Feuerherd, *Manhattan Judge says NYC federal lockups are 'run by morons'*, New York Post (May 7, 2021), https://nypost.com/2021/05/07/manhattan-judge-says-nyc-federal-lockups-are-run-by-morons/.

[25] *Id.*

were permitted one ten minute shower each per week.  In his next three months, he was allowed

30 minutes outside his cell three times a week, but still has had no access to fresh air, and the

cramped conditions have continued, meaning individual needs have been set aside.  For example,

███████████████████████████████████████████████████, but is nevertheless forced to sleep on

a top bunk.[26]  Due to his condition, he has had near falls several times.  He has been unable to

secure adequate dental care, and ██████████████████████████████████████████████████

████████████████████████████████████████████  Mr. Akhavan has had irregular

communication, and being held far from home in the midst of the pandemic has made visitation

from family and friends, who live in California, impractical, even for the limited period of time it

has been possible.  In sum, Mr. Akhavan has already served more than six months in what

former Chief Judge Colleen McMahon recently described as "disgusting, inhumane"

conditions,[28] and isolating confinement—justice does not demand he serve any more.

Further, the case has brought Mr. Akhavan to financial ruin, shuttered his businesses, and

contributed to the breakdown of his marriage.  The government has, on top of this, indicated its

intent to seek forfeiture of an undisclosed amount.  That crushing loss, plus the time he has

served, adequately reflect the seriousness of his crime.

**Protecting the Public:** Mr. Akhavan is not a threat to the public.  Conspiracy is a serious

offense, but Mr. Akhavan's crime was specifically tied to the unique and uncertain legal status of

---

[26]   Mr. Akhavan has a bottom bunk pass, but is nevertheless assigned to a top bunk, where he is at increased risk of injury.

[27]   Mr. Akhavan's defense counsel received this information on the afternoon of June 11, 2021, and will provide any additional clarifying information or confirmation of diagnosis received prior to sentencing.

[28]   Shayna Jacobs, *Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions*, *Washington Post*   (May 7, 2021), https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html.

marijuana, which is very much up in the air as Congress considers decriminalization and removal of marijuana from the federal Controlled Substances Act.[29]  If such legislation passes, there is a real possibility that Mr. Akhavan's crime would, in fact, be impossible to repeat.

But, regardless of marijuana's future legal status, Mr. Akhavan's conduct in this case did not cause harm to the public in the first instance.  Indeed, the members of the public most directly involved—Eaze's online customers who accounted for 60% of its business—received what they viewed as a welcome service from Mr. Akhavan, and no member of the public suffered any harm as a result of Mr. Akhavan's actions.  Nor is there any evidence that Mr. Akhavan at any point in time intended any harm to the public.  Further, as explained before, this case has ruined Mr. Akhavan's reputation and all but ensured he will be unable to enter the financial services sector again, even if he were so inclined.  Finally, Mr. Akhavan's age—41—makes him statistically less likely to re-offend than younger defendants,[30] regardless of whether he is incarcerated.

*Deterrence:* No incarceration is necessary to promote specific or general deterrence here. With respect to Mr. Akhavan, this case has destroyed his life—both economically and personally.  His reputation in the industry in which he worked is tarnished such that he is extremely unlikely to return, even if he desired to do so.  With respect to general deterrence, incarceration is unnecessary for similar reasons.  Already, the consequences suffered by Mr. Akhavan and his family send a powerful reminder to anyone considering bank fraud or even working at the edges of the payment processing industry, that, even if no one gets hurt—even if

---

[29]  Burns Levinson, *MORE Act: Federal Cannabis Legalization Reintroduced in House*, JD Supra (Jun. 3, 2021), https://www.jdsupra.com/legalnews/more-act-federal-cannabis-legalization-4151224/.

[30]  Defendants "over the age of forty," like Mr. Akhavan, "exhibit markedly lower rates  of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez*, No. 04 CR 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005).

no one *could* get hurt— the U.S. government will not hesitate to bring a scorched earth prosecution threatening a potential sentence of 30 years in prison, and leave in its wake a person's reputation, finances, and personal life.  Indeed, the government's chilling tactics have already borne fruit—no sooner did Circle get off the witness stand than Circle Wallet processing disappeared from Eaze's platform, notwithstanding the government's hollow urging that the instantaneous crypto-wallet transfer was somehow "different."[31]  Anyone considering toying at the boundaries of card processing will most certainly think twice in the wake of this highly publicized case.

**Rehabilitation**:  Mr. Akhavan has been a hard worker his entire life, and is no stranger to working from the bottom up.  With his businesses razed by this matter, Mr. Akhavan and society will be best served by Mr. Akhavan's re-entry into the workforce.  But, perhaps more importantly, prior to incarceration Mr. Akhavan had been engaged in a continuing, albeit imperfect, effort to address his drug addiction through several inpatient programs, as well as in-home services from additional counselors and professionals.  These programs and services were bolstered, at the time, by Mr. Akhavan's support system in the Los Angeles area, including his friends and parents, who have supported his treatment goals.  If Mr. Akhavan is incarcerated, he will lack access to this support network in a meaningful way.  Further, if he is able to work, Mr. Akhavan may be able to pay for his own treatment, alleviating the societal burden he would otherwise represent if he were incarcerated.

*       *       *

---

[31] *See Online Payment Terms*, *Eaze*  (Updated Mar. 24, 2021), https://www.*Eaze*.com/article/online-payment-terms (offering only payment via checking account).

## CONCLUSION

For the foregoing reasons, the time that Mr. Akhavan has served is more than a sufficient term of imprisonment for the crime of conviction.  Mr. Akhavan caused no actual harm to any of the purported victims, nor was any such harm ever contemplated.  The time Mr. Akhavan has already served is within the Guidelines range, and more importantly is a sufficient sentence to serve the ends of just punishment, public protection, deterrence and rehabilitation.  Accordingly, we request the Court impose a sentence seven months imprisonment.

June 12, 2021                              Respectfully submitted,

ROTHKEN LAW FIRM                QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Ira Rothken*                          */s/ William A. Burck*
Ira Rothken                               William A. Burck
Jared Smith                               Derek L. Shaffer
3 Hamilton Landing                        Brian McGrail
Suite 280                                 1300 I St. NW #900
Novato, CA 94949                          Washington, DC 20005
Telephone: (415) 92404250                 Telephone: (202) 538-8000
Email: ira@techfirm.net                   Fax: (202) 538-8100
Email: jared@techfirm.net                 Email: williamburck@quinnemanuel.com
                                          Email: derekshaffer@quinnemauel.com
                                          Email: brianmcgrail@quinnemanuel.com

                                          Christopher Tayback
                                          Mari Henderson
                                          865 S Figueroa Street 10th Floor
                                          Los Angeles, CA 90017
                                          Telephone: (213) 443-3000
                                          Fax: (213) 443-3100
                                          Email: christayback@quinnemanuel.com
                                          Email: marihenderson@quinnemanuel.com

                                          Sara C. Clark
                                          711 Louisiana St., Ste. 500
                                          Houston, Texas 77002
                                          Telephone: (713) 221-7000
                                          Fax: (713) 221-7100
                                          Email: saraclark@quinnemanuel.com