

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 15, 2021

**BY ECF AND HAND DELIVERY**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

      Re:    *United States v. Hamid ("Ray") Akhavan*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in response to defendant Ray Akhavan's sentencing submission, dated June 12, 2021. (Dkt. 312). For the reasons set forth below, the Government submits that Akhavan's arguments as to the calculation of the Sentencing Guidelines range should be rejected, including his contention that: 1) he was not a leader in the bank fraud scheme (the "Scheme"); 2) he made no money from the Scheme; and 3) there were no victims of the Scheme. Akhavan's further arguments, which largely amount to an attempt to minimize the severity of his crime and utterly fail to take any responsibility for his serious criminal conduct, also should be rejected the Court. A substantial sentence, below the Guidelines, remains appropriate for Akhavan.

      **I.**    **The Presentence Report Correctly Calculated the Guidelines Range**

      Akhavan objects to the U.S. Probation Office's determination that the total offense level for the offense is 43, disputing nearly all of the applicable enhancements and arguing that the correct Guidelines range is 4 to 10 months' imprisonment. Akhavan, however, ignores the plain text of the Guidelines and the weight of the evidence introduced at trial.

      **A.**  **Akhavan Was Clearly the Leader of the Scheme**

      Ignoring all of the overwhelming evidence presented at trial, Akhavan claims that he was not a leader in the Scheme, but rather, his "role was focused on troubleshooting and providing suggestions and advice." (Ak. Sentencing Memo at 14). Akhavan's argument is contrary to all of the evidence and testimony presented at the trial. Akhavan devised the Scheme, led it, and oversaw every material aspects of its implementation.

      To begin with, Akhavan's co-conspirators uniformly identified him as the leader of the Scheme throughout the relevant time period. Jim Patterson, the former CEO of Eaze who pleaded guilty pursuant to a cooperation agreement, identified Akhavan as the person "in charge of

overseeing this credit card processing operation" during both phases of the Scheme. (Tr. 1746; *see also* Tr. 1445, 2063-2064). Lower-level members of the conspiracy likewise identified Akhavan as the Scheme's leader during both of its phases. (*See* Tr. 140, 162, 163, 221 (Tassone), 164 (co-conspirator and former Eaze CEO Keith McCarty told Tassone that Ray was in charge of the processing company), 2244 (Wang identifying Akhavan as the "main person" behind the processing operation). So did Oliver Hargreaves, who was hired by Akhavan in connection with the EU Processing phase of the Scheme to create fraudulent application packages to obtain merchant processing accounts to secretly funnel Eaze transactions. (Tr. 655).

Indeed, each time the co-conspirators met to plan and discuss execution of the Scheme, Akhavan was in charge, explaining to his co-conspirators how the Scheme was to operate and instructing them as to various tasks. Each of these meetings occurred at Akhavan's offices in Calabasas, California, and he led all of them. For example, Eaze employee Michael Tassone described attending a meeting, prior to the Scheme's execution, in mid-2016, with Akhavan, former Eaze CEO Keith McCarty, and the marijuana dispensary Sweetwood, in which Akhavan led a discussion of a potential credit card processing solution for Eaze. (Tr. 174-179).[1]

After the Clearsettle solution broke down, Akhavan organized and led additional meetings to plan and execute the EU Processing phase of the Scheme. As Hargreaves testified, in January 2018, he and a co-conspirator, Koen Van Prat, traveled from Europe to Akhavan's Calabasas office to meet with Akhavan and other co-conspirators, including co-defendant Ruben Weigand, who had also traveled from abroad to attend the meeting (GX S2), and Akhavan's business partner, Guy Mizrachi, who worked out of the defendant's Calabasas office with the defendant. Akhavan led the meeting, the purpose of which was to devise and discuss the transaction laundering Scheme on behalf of Eaze. During the meeting, Akhavan mapped out a preliminary version of the Scheme on a whiteboard, with some input from Hargreaves. The diagram depicted the flow of merchant processing applications—both truthful and fraudulent—as well as the key stakeholders involved in implementing the Scheme. During the meeting, it was discussed that Weigand's role would be to manage the relationships and flow of information with the foreign banks, since Akhavan and Weigand had relationships with highly-placed insiders at those institutions. (*See* Tr. 710-731; *see also* GX 105).

Akhavan also organized and led a second meeting at his Calabasas office in March 2018, this time to explain to Eaze and the marijuana dispensaries about credit card processing generally and about how the Scheme would operate. During this meeting, Akhavan explained virtually every material facet of the Scheme, including the money flow and the opening of fraudulent merchant processing accounts.

Akhavan recruited and/or retained high-level co-conspirators to implement the second phase of the Scheme, including Hargreaves (*see* Tr. 655, 681, 905-906, 908, 755-56 & GX 3904), Weigand (*see* GX 302 at 50; Tr. 655, 2002), and Webshield owner Christian Chmiel (*see* Tr. 745-

---

[1] Patterson also attended a meeting with Akhavan and McCarty roughly between the Clearsettle and EUP phases of the Scheme. As Patterson explained, Akhavan "was really in charge of that meeting." (Tr. 1477, 1479).

46; GX 4004 at 18). These co-conspirators all took instructions directly from, and reported directly to, Akhavan on all aspects of the Scheme's operations, including the preparation and submission of fraudulent bank application packs, the development and content of fraudulent websites, the implementation of customer service to avoid detection, and the nature of the fake descriptors to be used. Akhavan was directly involved in each of these critical activities. For example, in connection with discussing a particular fraudulent application pack to be submitted to Wirecard, Akhavan specifically instructed Weigand to do a "last and very serious check" on the fraudulent applications, and to "get Christian [Chmiel] going ASAP." (GX 4004 at 45). Confirming that Akhavan had the access to foreign banking officials necessary for the Scheme to succeed, Akhavan relayed that he would send the fraudulent application pack "to Jan [Marsalek, of Wirecard] so he can see it ahead of time." (*Id.*)

Indeed, the evidence at trial showed, over and over, how Akhavan directed other co-conspirators activities' and how they reported back to him on all critical aspects of the Scheme. *See, e.g.*, GX 4004 at 50-51 (Akhavan asking Weigand for updates and directing him to submit fraudulent application packs to banks); Tr. 772 & GX 3918 (Hargreaves' team submitting documents to Akhavan and Weigand for review); Tr. 733 (Hargreaves updating Akhavan on creation of fraudulent application packages); GX 4004 at 80 (Akhavan directing Hargreaves to wait for Chmiel's review of website); GX 4004 at 89 (Akhavan asking Chmiel for feedback on fraudulent website; directing Hargreaves to include certain information on fraudulent website); GX 4004 at 95-99 (Akhavan directing Hargreaves to revise fraudulent website); Tr. 888 (Akhavan's instructions on price points for products on the fraudulent websites); GX 4004 at 40 (Akhavan explaining problem with customer service number to Weigand and asking for update; directing Weigand to get the numbers forwarded appropriately); GX 4004 at 41 (Akhavan directing fraudulent application packs to be submitted to certain foreign acquiring banks); GX 4004 at 62 (Akhavan complaining to team about their failure to implement call forwarding); GX 4004 at 64 (Akhavan relaying that he connected Hargreaves to the Eaze customer service team); GX 4002 at 1-3 (Akhavan directing Eaze customer service that customer service phone number issue needs to be "fixed ASAP" and providing instructions to customer service regarding the numbers that can be used and what they can and cannot say when dealing with customers); Tr. 1051, 1058-59 (Akhavan instructing Hargreaves as to the nature of the descriptors to be used), 1454-55 (Akhavan instructing Eaze as to the particular domain to be used for credit card collection during the EUP phase of the Scheme); *see also* Tr. 200 (Tassone testifying that "onlinebiller.net" was provided by Clearsettle)).

The evidence on this issue is clear and overwhelming: Akhavan was not only a leader in the Scheme, he was *the* leader. The aggravating role enhancement under section 3B1.1 of the guidelines clearly applies.

### B. Akhavan Derived Far More than One Million Dollars As a Result of the Scheme

Akhavan also argues that "[t]here was no evidence at trial that . . . Akhavan ever derived any revenue from the scheme." Akhavan's position is contradicted by the record. Indeed, the evidence at trial showed that Akhavan derived in access of $17,000,000 from the Scheme.

3

As the Scheme's leader, Akhavan charged fees to devise and implement the Scheme. Specifically, he charged 8.75% per transaction during the Clearsettle phase of the Scheme, and 12% per transaction during the EUP phase of the Scheme. These fees applied to the gross amount of each transaction, and Akhavan set these rates to reflect the risks inherent in processing high-risk traffic. (*See* Tr. 176-78 (Tassone explaining that in mid-2016 meeting with Akhavan, McCarty, and Sweetwood dispensary owners, Akhavan stated he would charge 8.75% per transaction processed because he had experience with high-risk industries, which involved a higher burden and higher administrative cost); GX 425 (Email string attaching dispensary settlement statement from Clearsettle, showing a 8.75% fee applied on the gross of each card transaction); Tr. 222 (EUP's fee was 12% plus a foreign exchange fee between 3 and 5%); GX 485 (dispensary statement during EUP phase of Scheme reflecting 12% transaction fee); Tr. 1448, 1552 (Patterson testifying to rates charged by Akhavan over course of Scheme)). In total, Akhavan derived $17,183,114.57 from the Scheme, reflecting the rates he charged during the Clearsettle (8.75%) phase of the conspiracy and the corresponding total transaction volume ($48,120,332.95), added to the rate he charged during the EUP phase of the conspiracy (12%) and the corresponding total transaction volume generated during that period ($108,104,878.66). (*See* GX 687.)

Furthermore, even limiting this total to the amount personally obtained by Akhavan as his profits from the Scheme, a reasonable estimate of his personal profits from the Scheme is *$8,445,097.63*. GX 1518 shows that during the EUP phase of the Scheme, Akhavan—i.e. "Jaw13" (see, e.g., Tr. 754; GX 4108)—received a "share" of 5,081,790.22 Euros. Using the average euro to dollar conversion rate from January 1, 2018 to December 31, 2019, that is, 1.1505, this equates to $5,846,599.65, which in turn represents approximately 5.4% of $108,104,878.66 (i.e. the total transaction volume during that time period). Applying this percentage to the total transaction volume generated during the Clearsettle phase of the Scheme ($48,120,332.95) yields a profit of $2,598,497.98. Combining these estimated profit figures results in a total profit of $8,445,097.63.

In light of all of the evidence described above, the gross receipts enhancement under U.S.S.G. § 2B1.1(b)(17)(A) clearly applies to Akhavan.

### C. The Twenty-Six Level Loss Enhancement Is Properly Applied Because Akhavan Deceived U.S. Issuing Banks into Authorizing More Than $150 Million in Disguised Marijuana Transactions

At trial, the Government proved "that the defendant intend[ed] 'to obtain . . . moneys . . . owned by, or under the custody or control of, a financial institution,'—that is, 'intend[ed] to obtain bank property.'" *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (quoting *United States v. Loughrin*, 134 S. Ct. 2384, 2389 (2014)). As such, the loss amount under Section 2B1.1 is properly keyed to the "scheme's goal" of "obtaining bank property." *Id.* This harm to the banks' property interests is real regardless of whether they ultimately were recouped for their financial loss by the cardholders. And because that harm "otherwise is readily measurable in money"—i.e., the amount of money the U.S. Issuing Banks were deceived into processing—it constitutes a "reasonably foreseeable pecuniary harm that resulted from the offense" warranting the 26-level enhancement under the Guidelines. U.S.S.G. § 2B1.1 app. note 3(A)(i) & (iii).

Akhavan's argument to the contrary should be rejected because it would lead an absurd calculation of the Guidelines. Under Akhavan's theory, Akhavan and his co-conspirators, who

4

purposefully tricked financial institutions into parting with over one hundred and fifty million dollars, and collected tens of millions of dollars for themselves, would be considered no more culpable than a fraudster who submitted a single fraudulent bank application seeking a $5 loan. That is completely inconsistent with the Sentencing Commission's determination that "sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes." U.S.S.G. § 2B1.1, background; *see also United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 102 (2d Cir. 2014) (explaining that the Guidelines loss amount "seeks [] to measure the seriousness of [the defendant's conduct]").[2]

Because the amount of funds that the U.S. Issuing Banks were tricked into releasing is a reasonably determinable loss amount, that amount—more than $150 million—should be used rather than relying upon Akhavan's gain as an alternative measure of loss. *See* U.S.S.G. § 2B1.1, app note 3(B).

---

[2] *United States v. Markert*, 774 F.3d 922 (8th Cir. 2014), which co-defendant Weigand relies upon in support of his position on the Guidelines, is completely consistent with the Government's interpretation of the Guidelines. In that case a bank officer wrongfully approved nominee loans, the proceeds of which were redirected to other accounts at the bank to cover an overdrawn account. *Id.* at 924. In concluding that the total amount of the loans was not the best measure of loss, the Eighth Circuit accordingly stressed that that issue, unlike in this case, was that "*the money never left the Bank*." *Id.* at 926 (emphasis in original). As *Markert* explained, however, "[f]or many, perhaps most fraud offenses, actual loss is properly and readily measured by the fair market value of property 'taken' from the victim—here, the more than $108 million in authorized transaction. *Id.*

*United States v. Abbey*, 288 F.3d 515 (2d Cir. 2002), also cited by Weigand, easily distinguishable on similar grounds. In *Abbey*, which involved a defendant that fraudulently obtained a loan by misrepresenting the value of his assets, the Second Circuit held that the relevant Guidelines application note required the loss amount to be reduced by the bank's recovery of assets pledged by the defendant to secure the loan. *Id.* at 518. Notably, that application note applied only where a *defendant* pledged assets to secure a loan—in other words, where there were assets controlled by the defendant, not a third party, that offset the intended or actual loss amount. This is consistent with the Sentencing Guidelines overall "net loss" approach, which "'recognizes that the offender who transfers something of value to the victim[] generally is committing a loess serious offense than an offender who does not.'" *Markert*, 774 F.3d at 925 (quoting U.S.S.G. App. C., Vol. II, Amend. 617, at 183). The current application notes to Section 2B1.1 recognize this same distinction, providing for a credit against loss in cases where (a) the *defendant or co-conspirators* returned money or property to the victim before the offense was detected, or where (b) collateral had been "pledged or otherwise provided *by the defendant*." U.S.S.G. § 2B1.1 app note 3(E)(i) & (ii). In contrast, here, the defendant pledged no collateral and made no repayments to the victims. Whether U.S. cardholders would make timely payments on their credit card bills was outside of his control, and beyond his intent, which was merely to get the transactions authorized so that the defendant and his co-conspirators could collect their fees and commissions from the processing.

5

That being said, the Government accepts that using gain as an alternative measure of loss would more accurately reflect the seriousness of the offense than Akhavan's proposition that the loss amount is zero. Accordingly, to the extent the Court determines that the actual loss amount is not readily determinable here, the Government respectfully submits that it should use gain as an alternative measure of loss. As set forth above, the gain to Akhavan and his co-conspirators during the Scheme was $17,183,114.57. *See* U.S.S.G. § 2B1.1, app note 3(B) (permitting Court to use "gain that resulted from the offense" as alternative measure of loss); *United States v. Tzolov*, 435 F. App'x 15, 16-17 (2d Cir. 2011) (affirming district court's use of commissions earned on fraudulent sales as an alternative measure of loss); *see also* U.S.S.G. § 1B1.3(a)(1)(B) (each co-conspirators is liable for all reasonably foreseeable acts of other co-conspirators taken in furtherance of the conspiracy).

### D. The Two-Level "10 or more Victims" Enhancement is Properly Applied

Akhavan does not dispute that there were more than 10 such banks who authorized transactions and released funds based on his and his co-conspirators' misrepresentations; rather, he claims that there were *no* victims of the defendants' Scheme. Again, this absurdly minimizes the seriousness of this sprawling, complex offense which in actuality impacted thousands of banks in the United States alone. As the Government previously noted, the costs to the U.S. Issuing Banks went beyond the loss of their property. It also included necessary investment in enhanced compliance programs and risk assessment procedures in an attempt to identify these types of schemes and enforce their own rules and policies. (Dkt. 311 at 8-9). Regardless, for the reasons described above, each of the U.S. Issuing Banks that was tricked into parting with its money suffered "actual loss" for purposes of the Guidelines, and this enhancement should be applied.

### II.    A Substantial Sentence of Imprisonment is Warranted under 18 U.S.C. § 3553

The Government has already set forth the basis for its position that a substantial sentence, below the Guidelines range of life imprisonment, is appropriate under Section 3553, and will not repeat those arguments here. The Government disagrees with Akhavan that a sentence of seven months is sufficient in this case.

Akhavan's first argument is that a sentence of seven months is sufficient because Akhavan did not obtain any profit from the Scheme, and there was no actual or intended victim and no harm. (Ak. Sentencing Mem. 17). Akhavan is wrong. First, as noted above, Akhavan charged $17,183,114.57 for orchestrating the Scheme. Furthermore, Akhavan made a profit of $8,445,097.63 during the Scheme. The enormous financial profit made by Akhavan, as well as his co-conspirators, demonstrates why a substantial sentence is needed in this case. Although the financial institutions in this case were repaid by their cardholders, this is far from "a victimless crime" as the defense asserts. (Ak. Sentencing Mem. 16). As noted in the Government's sentencing submission, the defendant's Scheme and others like it are enormously costly for banks and credit card companies. (Dkt. 311 at 8).

Akhavan next argues that he is not a threat to the public. In doing so, he greatly minimizes the criminal conduct he engaged in and fails to accept responsibility for orchestrating a vast criminal conspiracy. For instance, he attempts to justify his conduct by claiming that the status of marijuana was "uncertain." (Ak. Sentencing Mem. at 17-19). Far from uncertain, marijuana was

(and remains) illegal under federal law, which was the very reason that Akhavan disguised over $150,000,000 in illegal transactions. Akhavan's justifications for his criminal conduct should be rejected and a substantial sentence should be imposed.

Akhavan also argues that specific deterrence is not needed here because this case has "destroyed his life—both economically and personally." (Ak. Sentencing Mem. 19). These were the natural consequences of Akhavan's knowing decision to orchestrate an international payment processing fraud scheme, if he were to get caught. In other words, any financial, professional, or personal harm he is suffering was foreseeable and yet was insufficient to deter him from commencing the instant offense conduct, presumably because he believed that he would not, in fact, get caught. Indeed, Akhavan's actions throughout the Scheme reflected his belief that he was above the law. (Dkt. 311 at 9-10). Furthermore, it is notable that even after being arrested in this case, he continued to commit serious crimes. (*Id.*). His continued failure to take responsibility for his criminal actions is further evidence of the need for specific deterrence. In addition, for the reasons set forth in the Government's sentencing memo, the need for general deterrence in a case like this is considerable. Crimes like Akhavan's are planned in advance, calculated, immensely profitable, and very difficult to detect. All of these reasons underscore the need for general deterrence.

        Respectfully submitted,

        AUDREY STRAUSS
        United States Attorney

By: s/
    Nicholas Folly
    Emily Deininger
    Tara LaMorte
    Assistant United States Attorneys
    (212) 637-1060 / 2472 / 1041

Cc:    Defense counsel (by ECF)