L6i5akhS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          20 Cr. 188 (JSR)

5   HAMID AKHAVAN,

6              Defendant.

7   ------------------------------x

8                                          June 18, 2021
                                           3:00 p.m.
9

10  Before:

11                     HON. JED S. RAKOFF,

12                                         District Judge

13

14                     APPEARANCES

15  AUDREY STRAUSS
         United States Attorney for the
16       Southern District of New York
    BY:  NICHOLAS FOLLY
17       EMILY DEININGER
         TARA LaMORTE
18       Assistant United States Attorneys

19  QUINN EMANUEL URQUHART & SULLIVAN, LLP
         Attorneys for Defendant
20  BY:  CHRISTOPHER TAYBACK
         SARA C. CLARK

21

22

23

24

25
```

L6i5akhS

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please identify

3     themselves for the record.

4          MR. FOLLY:  Good afternoon, your Honor.  Nicholas

5     Folly, Tara LaMorte and Emily Deininger for the government.

6          THE COURT:  Good afternoon.

7          MR. TAYBACK:  Good afternoon, your Honor.  Christopher

8     Tayback and Sarah Clark on behalf of the defendant Mr. Akhavan,

9     who is present and in custody.

10         THE COURT:  Good afternoon.  So, it is nice to see

11    some faces.  We are here for sentencing.

12          Now, the first thing I am required to do -- even

13    though, in my view, in even more ordinary cases let alone this

14    one it is an exercise in confusion and irrationality -- is to

15    calculate the sentencing guidelines.  So, it appears to me that

16    there has never been a case where the guidelines were more

17    irrational, silly, and ridiculous than in their application to

18    this case.  Nevertheless, I am required to calculate the

19    sentencing guidelines and the parties have spent a lot of space

20    and effort in their submissions discussing this issue.

21          So, recognizing in advance that my sentence will be

22    virtually unaffected by the sentencing guideline calculations

23    precisely because I think they are misleading, irrational, and

24    foolish beyond belief, I am happy to hear anything anyone wants

25    to say about the guidelines.  And, believe it or not, I will

L6i5akhS

1    even listen.

2              So, let me start with defense counsel.

3              MR. TAYBACK:  Your Honor, I think we have in fact

4    briefed exhaustively, and your Honor recognized that by asking

5    a question, I think, that was directed at one of the guideline

6    notes which I believe were answered in the second submission.

7              THE COURT:  Just so the record is clear, the

8    guidelines place inordinate weight on the loss calculation.

9    That, in itself, makes no sense.  Under Section 3553(a) the

10   statute, I have to look at a lot of factors but the Guidelines

11   don't.  They say that the overwhelming determination of the

12   guideline range should be determined by the amount of loss.

13   And then the parties in this case have a modest disagreement.

14   The defense says it is zero and the government says

15   $150 million, a 34-point difference in the offense level

16   calculation.  That very difference, with reasonable arguments

17   being made by both sides shows, again, just how stupid -- and I

18   say that knowingly willfully because it boils my blood that the

19   Sentencing Commission has not learned better.

20             But, defense counsel rests on his papers.  Let me hear

21   anything the government wants to say.

22             MR. FOLLY:  Thank you, your Honor.

23             I just want to point out a few of the disputes with

24   respect to the guidelines that I think are actually a little

25   bit more important.

L6i5akhS

```
1         THE COURT:  Let me ask you one question about if I
2   determine, which I am at least considering very much the
3   possibility of determining that there was, under the
4   Guidelines, no loss in this very substantial fraud that was
5   perpetrated by Mr. Akhavan.  Does it not follow under the
6   guidelines also that there were no victims?  For guidelines
7   purposes.
8         MR. FOLLY:  For guidelines purposes.
9         THE COURT:  There clearly were victims all over the
10  place but I'm talking about guideline victims.
11        MR. FOLLY:  Right.
12        Your Honor, I do believe that that is what would
13  follow.
14        THE COURT:  I agree.
15        MR. FOLLY:  We have set forth in our papers our
16  position on the loss but do I think some of the other disputes
17  are a little bit more relevant to --
18        THE COURT:  Well, let just say this to move to that
19  more quickly and then I will go back to defense counsel and
20  there is further things you want to say.
21        With respect to whether this was a sophisticated
22  fraud, certainly it clearly was using sophisticated means and
23  so forth so we have the enhancement for that.  There was a gain
24  of more than $1 million, I think that's crystal clear, though I
25  will hear anything defense counsel wants to say in that regard;
```

L6i5akhS

1    that's another two points for that.  Mr. Akhavan was, in the

2    Court's view, clearly the leader, so there is four points for

3    that.

4           So, I think my inclination, subject to hearing from

5    defense counsel, is to go with the government on all of those

6    points.  Was there some other one you wanted to address?

7           MR. FOLLY:  No, your Honor.

8           THE COURT:  No.  OK.

9           So, let's go back to defense counsel on those other

10   points.

11          MR. TAYBACK:  I will address them in order, your

12   Honor, because I believe also gain is relevant to the

13   forfeiture question which I understand is separate but,

14   nonetheless, is related.

15          THE COURT:  We will get to the forfeiture in a minute.

16          MR. TAYBACK:  I hope the evidence shows that there was

17   a gain to Mr. Akhavan.  In fact, what I think is unusual about

18   this case, as a fraud case among fraud cases, is that not only

19   was there no loss but there was no intended loss and the

20   participants gained money and I think the evidence showed that

21   the participants within the transaction chain --

22          THE COURT:  I don't know about intended loss.  I

23   didn't brief that because the more I looked at it the more I

24   thought there is no ambiguity, no uncertainty about actual

25   loss, it is either $150 million or zero so I don't have to

L6i5akhS

1    reach intended loss or, for that purpose, gain.  I reach gain

2    for other purposes but not for that purpose.

3           MR. TAYBACK:  And because your Honor addressed gain, I

4    think it does go hand in hand with intended loss in this sense.

5    It is an unusual fraud case and now I realize I may be a little

6    bit beyond strictly the guideline calculation questions to say

7    it's unusual because the idea here, as the evidence bore out,

8    was that everybody would get what they wanted, that is to say

9    they would get the opportunity to make the transaction fees and

10   the customer would ultimately get the product that they were

11   intending to purchase using the means of purchase that they

12   desired to use.  It is unusual --

13          THE COURT:  That's one way to look at it but another

14   way, which I think is more consistent with the evidence, is

15   that Mr. Akhavan, along with others, devised a scheme to lie --

16   blatantly, intentionally, hugely -- to banks and other

17   institutions in order so that he could make some money and so

18   that his companies could make some money as a side -- not as a

19   side -- as a result of those lies.

20          MR. TAYBACK:  That's the second part that I would take

21   issue with which is that there was a gain here to Mr. Akhavan.

22   I believe the evidence shows that Mr. Akhavan became involved

23   because a friend of his was the CEO of Eaze and he desired to

24   help him out because he is knowledgeable about the subject

25   matter of credit card processing but there is no evidence that

L6i5akhS

1    Mr. Akhavan received a payment.  There is no evidence that he

2    received a percentage.  There is no evidence that the parties

3    that contracted to process these transactions, be they Clear

4    Settle, be they EUprocessing, be they the banks or the

5    intermediaries in this fairly lengthy chain that goes through

6    MasterCard and Visa.

7              THE COURT:  Are you saying that Mr. Akhavan did not

8    intend to profit, he just did this as an interesting way to

9    while his time away?

10              MR. TAYBACK:  Well, I believe he went into it with

11    that intent.  He certainly hoped to be a beneficiary but he was

12    not an actual beneficiary.  He did not receive funds and that's

13    a distinction that matters in gain in a way that doesn't matter

14    so much with loss.

15              People talk loss and intended loss with a fraud but

16    gain is either you gain or you didn't gain.  And he did not

17    gain.  What his true motive was, was to become involved in the

18    beginning was, this is a good idea.  This is a legal product

19    that helps people and he had a friend who had a business --

20              THE COURT:  It is such a good idea that I can lie, and

21    lie, and lie again about it.

22              MR. TAYBACK:  Certainly, your Honor, he stands

23    convicted of conspiracy to commit bank fraud which entails

24    lying.  The question is now I think whether he gained from that

25    and whether he intended it to be something, that his motivation

L6i5akhS

1    was greed.

2              THE COURT:  Let me hear finally from, because I really

3    don't want to spend much more time on the guidelines.  It is,

4    to my mind, a side show at best.

5              Did you want to say something on gain in response to

6    Mr. Tayback?

7              MR. FOLLY:  Yes, your Honor.

8              The evidence clearly showed that the defendant made an

9    enormous amount of money off of this scheme as well as his

10   co-conspirators.  We set that forth in detail on page 4 of our

11   reply submission and we cited a number of Government's Exhibits

12   and trial testimony that spoke directly to that issue.  It was

13   clear that one of the biggest motivations for the scheme was

14   that they were able to charge outside fees to process these

15   transactions and to set up the network and they were charging

16   between 8.75 percent and 12 percent on these transactions which

17   totaled over $17 million.  There was also a ledger that was

18   found which clearly depicts a cut of the profits that were

19   going to Akhavan that exceeded, your Honor, just on that ledger

20   alone, nearly $6 million.

21             The suggestion that Akhavan participated for three

22   years in this scheme just as a favor and that he was not

23   actually making money on its face just defies common sense but,

24   more than that, as we clearly explain in our brief, there was

25   clear evidence showing that he made that money in this scheme.

L6i5akhS

1          THE COURT:  So, the offense level begins with the

2     seven points for the offense, I find that there are two points

3     to be added for the sophisticated means adjustment, two points

4     to be added for the gain of more than $1 million, and four

5     points to be added for organizer or leader.  So, that comes to

6     an offense level of 15 and the Criminal History Category is I

7     and the guideline range is, therefore, 18 to 24 months.

8          I will note for the record, and then just leave the

9     subject alone, that the sentence that I expect to impose in

10     this case, after hearing from counsel -- and I thank both sides

11     for their excellent submissions -- would be the same if the

12     guideline offense level was 7 with no adjustments or if it

13     were, as the Probation Department following on the government's

14     views, believes it would be, which is 43.  These are hollow

15     numbers having little or nothing do with reality let alone the

16     particulars of this particular case.

17          Also, I take note of the various objections that have

18     been made to the PSR.  They are all denied and the Court adopts

19     the PSR as it is.

20          Now let's turn to what is really important which is

21     where this person, this human being who stands before the

22     Court, should be sentenced under Section 3553(a).  Let me hear

23     from defense counsel, then government counsel, and then the

24     defendant if he wishes to be heard.

25          MR. TAYBACK:  Your Honor, the 3553 factors, just

L6i5akhS

1  punishment, protection of the public, deterrence, and

2  relocation, are not served here by a lengthy, or as the Court's

3  use of the term, substantial term of imprisonment.  I say that

4  because --

5       THE COURT:  Although even they agreed that the

6  guideline calculation of 360 months was too much even for them

7  to swallow.  But, go ahead.

8       MR. TAYBACK:  Certainly we agree with that, that that

9  would be too much.  Mr. Akhavan stands before you as a person,

10  again, in a somewhat unusual realm, that is to say, the realm

11  of marijuana transactions in the country at this moment in

12  history where people can buy it in most states, and for a while

13  medicinally, and then after that.  And as the letters and

14  background information on Mr. Akhavan I think amply portrays,

15  he has some sympathy for those who suffer from chronic pain and

16  he has had issues in the past which feed right into this

17  addiction issue which I will get to.

18       But, the question here is, given the context -- and

19  your Honor certainly rightly focuses on the unique aspects of

20  the individual human being who is here and the human being

21  aspects, relationship to this offense, this is a case that was

22  borne not out of just I'm going to lie for the sake of

23  obtaining this.  There certainly were other ways that one could

24  try to create a fraud, to lie to people, to obtain things that

25  they're not entitled to.  That's a different class of fraud.

L6i5akhS

1    This is a case where he was a participant, based on the

2    evidence, in a scheme to try to allow what in fact is allowed

3    through cash but he tried to do it through -- tried to

4    facilitate helping others -- and there were many others --

5    banks, sophisticated entities that were engaged knowing Eaze,

6    which is really the ultimate beneficiary of this endeavor, was

7    in fact the primary motivator, the primary driver, the flywheel

8    that Mr. Patterson described it as.  The credit cards were

9    something that they wanted because they wanted to expand their

10   then legal or quasi-legal business.

11           It is unusual in that sense because there is not a

12   person, I think, who is not a lawyer who could look at, say,

13   the Cole memo and understand, well, it's OK for you to withdraw

14   money from the bank and hand that cash over and purchase

15   marijuana but it is not OK to use that HAR payment card

16   directly to purchase marijuana.  So, it is an unusual fact

17   pattern for a fraud case.

18           The real question, I think, is whether or not the

19   situation here, whether or not the crime here is deterred

20   either specifically or generally, warrants a punishment of

21   incarceration, or is necessary to protect the public or

22   rehabilitate this particular individual.  And I think what you

23   have before you is a person who is -- and your Honor knows this

24   at this point from the papers but you also know it from the

25   proceedings and from the proceedings prior to the trial -- he

L6i5akhS

1     is a person that suffers from extreme addiction.  He has a

2     problem.  And that problem, no doubt, you don't have to be an

3     expert in substance abuse or an expert in psychology to

4     understand that substance abuse affects your judgment and it

5     does make you lapse in ways.  But, this is not an irredeemable

6     person, this is not a person who comes before you with a

7     history of committing fraud.  This is a person who got

8     embroiled, through friends, in a unique industry to do

9     something that, whether one could quarrel with the manner --

10    and certainly I understand the judgment and so does

11    Mr. Akhavan, he will speak to you as well -- but the fact is

12    his motivations were not derived of fraud.

13           And I will address the gain issue because I don't

14    think that the spreadsheet that the government relies upon,

15    Exhibit 1518, shows what the government says it does.  It

16    certainly purports to show an allocation attributable to

17    Mr. Akhavan as a referral but it does not show payment to

18    Mr. Akhavan.  In fact, that same document is part of --

19           THE COURT:  I come back to when I went to you.  For

20    guideline calculations, which I have tried to politely express

21    are of very little value to me, you can have this whole debate

22    but can you seriously suggest that Mr. Akhavan did not enter

23    into this fraudulent scheme other than so that he could make

24    money?

25           MR. TAYBACK:  For reasons other than that, yes, he did

L6i5akhS

1   have other reasons.

2           THE COURT:  What was that?

3           MR. TAYBACK:  I think he believed that marijuana was a

4   valid, helpful alternative to more serious pain medication.

5           THE COURT:  That may be, although I don't want to get

6   into it because I have so many cases before me where I see both

7   the pluses and minuses of marijuana, it is not before the Court

8   on this sentence.  So, his personal belief in that is fine if

9   he wanted to go out and write an article about why marijuana

10  should be more available but that's not what he did.  He

11  decided he was going to lie to facilitate its purchase and I

12  think it is self-evident that he did that in at least material

13  part because he wanted to make money.

14          MR. TAYBACK:  And there is two questions.  One is

15  whether he hoped to eventually make money.  There is no doubt

16  that he did take that stock certificate from Eaze that was

17  given to him, it was a stock option which was never exercised,

18  it was never right side up, so to speak, and it expired.  So,

19  Eaze did try to offer --

20          THE COURT:  So you are saying that Mr. Akhavan is just

21  not quite yet sane but he suffers from huge eleemosynary

22  tendencies, he was doing this out of the fullness of his heart

23  and the fact that money was involved peripherally was just

24  epiphenomenon.  Is that what are you saying?

25          MR. TAYBACK:  No.  But I am saying that, in direct

L6i5akhS

1   response to your Honor's question about whether there are other

2   motivating factors beside making money, there are.

3          THE COURT:  Fair enough.

4          MR. TAYBACK:  And then the question then becomes how

5   did he become involved?  Well, Eaze was a business that was

6   started by a friend of his.  That became an avenue to help his

7   friend because Mr. Akhavan -- and this is in the PSR -- had a

8   very lucrative business.  He didn't need this as a source of

9   revenue.

10          THE COURT:  I have heard that argument for I think a

11   hundred percent of all fraud cases before me.

12          MR. TAYBACK:  But what you also have is evidence from

13   the trial where midway through, three quarters of the way

14   through the time period that is the alleged conspiracy, he is

15   writing to the people at Eaze who he has introduced them to

16   other people and they're doing various things and he is saying

17   I have lost tons of money working with you.  Essentially he is

18   not getting paid.  So, did he want to be paid?  Perhaps.  How

19   relevant is that?  I think it is part of the mosaic of his

20   motive.  It is certainly not the entirety of the motive.

21          THE COURT:  All right.

22          MR. TAYBACK:  For those reasons, plus the additional

23   factors that I believe you should look at in terms of whether

24   or not this is a person that needs to be incarcerated to

25   protect other people, I don't think the record establishes that

L6i5akhS

1    type of history for this defendant, and in fact I would say

2    that what this defendant needs is some place where he can

3    regroup, reorganize his life.  He has lost virtually

4    everything, both his business and his family, and he needs to

5    be able -- he is a smart man who has the mental capabilities

6    and resources to be able to be a productive member of society,

7    he needs to get a handle on his addiction, and I suggest to

8    your Honor that that is always an up and down battle and that

9    he would be best permitted to do that in a facility or be

10   allowed to do that without trying to go through the various

11   systems of the Bureau of Prisons.  I think, for that reason, I

12   don't think he is a candidate for a substantial or even a

13   significant term of imprisonment.

14           THE COURT:  OK.  Thank you very much.

15           Let me hear from the government.

16           MR. FOLLY:  Thank you, your Honor.

17           Many of the arguments that were just made largely seem

18   to be an attempt to both minimize the severity of the crime

19   that was committed and also minimize the role that this

20   defendant played in committing those crimes.  I want to start

21   with the issue of whether there is a need here to protect the

22   public from any future crimes of this defendant.  One issue

23   that was almost completely not addressed by the defendant was

24   his conduct while on bail after being charged in this case and

25   facing these very serious crimes.  And it was clear from his

L6i5akhS

1    conduct during the conspiracy that he was aware he was doing

2    something wrong and he didn't care.  At all.  He mentioned to

3    other co-conspirators that he knew that he was under

4    investigation by the FBI and other federal agencies and it did

5    not deter him in the least from continuing to commit those

6    crimes.

7              You would think that being arrested in this case would

8    be a wake-up call to him, but while he was on bail he committed

9    very serious crimes.  He was in possession of firearms.  That

10   is a big deal while he was subject to the terms of release that

11   this Court imposed on him.  He also engaged in a pattern of

12   conduct with respect to his drug treatment where he was lying

13   to the officials in connection with that process.  Both of

14   those are real concerns as to whether this defendant is going

15   to continue to engage in crimes if he is not prevented from

16   doing so by the sentence that this Court imposes here.

17             The other issue, your Honor, just very briefly on this

18   issue of deterrence, this is a crime -- this was not a sort of

19   heat of the moment crime.  It was well thought out, it was

20   calculated, there were meetings where they devised the scheme

21   in great detail.  They thought about it beforehand.  They even

22   thought about the risks.  There was a situation where Akhavan

23   was explaining the risk to someone like him, that was at the

24   high end of the scale, that was an 8, 9, or 10.  The risk to

25   some of the other participants was much lower.

L6i5akhS

1          So, this is not a crime that is something that just

2     happened on a whim; it was very deliberate, it was calculated.

3     This individual, Mr. Akhavan, had a whole team in place to

4     carry out this scheme and he led, at every step of the way.  He

5     was the leader, he oversaw the goal of the scheme, he conducted

6     the meetings, he led the meetings.  He even managed the

7     day-to-day operations.  It was clear from the text messages

8     that were introduced at the trial that he was constantly

9     involved, every step of the way, in making the day-to-day

10    decisions of the scheme.  And the reason I am pointing out this

11    level of thought that went into this scheme is it is a case in

12    which there is the chance to deter other similar schemes from

13    happening because there is forethought.  There is calculation,

14    as we saw in this case, as to what the risks are to this type

15    of dirty payment processing and that is another factor that

16    must be considered by this Court when imposing a sentence.

17         Another factor, your Honor, that was raised by the

18    defense, is his history and characteristics and, in particular,

19    the issue of addiction.  And we absolutely do not dispute that

20    there is clear evidence that Mr. Akhavan struggles with

21    addiction.  There is not evidence that that played into this

22    crime.  This was not a crime that seems to have been fueled by

23    his addiction.  He wasn't stealing things, he was not trying to

24    make a quick buck so he could go out and get his next fix.

25    This is not that.  This is someone who was extremely wealthy

L6i5akhS

already, he was running his own businesses.  And, again, this

scheme required enormous sophistication, thought, planning,

things that are totally inconsistent with the idea that he is

someone who was so possessed by his addiction that he could not

have been making clear decisions in exercising judgment in the

way that he otherwise would.

Your Honor, finally, I just want to go back to the

point about money and whether this defendant made money on this

scheme or intended to make money on this scheme.  I made these

arguments before but it reminds me of a situation where if you

went into a drug den during a drug bust and you found a ledger

that said that there was a specific name of a co-conspirator

and it said how much money went to them, and then you came to

court at sentencing and tried to argue they didn't make any

money off of this scheme, it just flies in the face of the

evidence we have here in the record.  It was a clear ledger, it

said what his cut was, and it was excess of $5 million which is

a lot of money.

So, your Honor, in light of all those reasons, we

maintain that a substantial sentence is needed and warranted

here.

If your Honor would like, we would also like to be

heard on the issue of forfeiture.  I don't know if you would

like to address that now or --

THE COURT:  I was going to deal with that later after

L6i5akhS

1    I dealt with all the other aspects of sentencing.  So, unless

2    you feel the need to discuss it now, we will reserve it for a

3    few minutes from now.

4         MR. FOLLY:  Very well, your Honor.

5         THE COURT:  Let me hear from the defendant, if he

6    wishes to be heard.

7         MR. TAYBACK:  On that last point, your Honor, the

8    ledger that the government relies upon is part of a larger

9    document, it is called document 1801 cited in the papers to

10   show the actual wires.  There were wires that were made of

11   certain amounts not to Mr. Akhavan, to some entity called

12   Senjo.  Not Mr. Akhavan.  And just like Mr. Akhavan --

13        THE COURT:  Well, I come back on this issue -- first

14   of all, I am persuaded that he made more than $1 million but,

15   putting that aside for purposes of the broader points that you

16   are making and the government is making, I am not persuaded

17   that he entered into this scheme for primarily non-monetary

18   reasons.  I think his primary motivation was to make money and

19   that's, I think, self-evident from the evidence at trial.

20        I hear you on saying that he had a big-hearted regard

21   for the benefits of marijuana.  I don't think that's remotely

22   what prompted him to get involved in this scheme of lying, and

23   lying, and lying.  So, on the monetary issue to me, the most

24   important thing at sentence and one of the reasons I reject the

25   sentencing guidelines -- the most important reason, factor --

L6i5akhS

1    is the human being before me.  I try as best I can, with the

2    small powers that I have of psychology and perception, to try

3    to figure out what kind of human being this person was when he

4    committed the crime and what kind of human being he is now.

5    That seems to me to be the most relevant thing in determining

6    what is the appropriate sentence.  There are other factors I

7    must consider under the statute and I do.  I do consider all

8    the factors under Section 3553(a) but I do not join with you in

9    perceiving as positive a view of the human being before me here

10   for sentencing, as you understandably have as his counsel.

11   Let's hear from him and then we will see where we go.

12            Mr. Akhavan, if you wish to be heard.

13            THE DEFENDANT:  Thank you.

14            Dear Judge Rakoff, I want to start by thanking the

15   Court and the government for the respect and dedication they

16   have shown to the judicial process and to the rights of

17   criminal defendants in the United States.  I know that I would

18   not have been shown the same respect as a criminal defendant in

19   a lot of places in the world including my home country.  I want

20   to express that I value and respect the process that brings me

21   before you today.

22            While I accept the verdict, I want to emphasize to the

23   Court that I truly meant no harm.  I know enough to realize

24   that breaking the law is wrong.  In my business, in my

25   universe, our own universe was the Visa and MasterCard rules.

L6i5akhS

1    I truly had never given thought to the issuing banks.  And

2    while I may have lost sight of that, I certainly did not mean

3    to cause them any harm nor to anyone else.  Obviously my

4    assessment of legal risk was wrong.

5        I do want to explain my motivations.  For many years

6    from my early teens I suffered from degenerative disc disease.

7    At around 20 years old I became paralyzed the from the waist

8    down and was confined to a wheelchair for about two years.

9    After multiple back surgeries at the Mayo Clinic in Scottsdale,

10   Minnesota and Rochester, Minnesota, I regained my motor control

11   and started my rehab.

12       During that time I was prescribed a lot of very strong

13   opioids such as oral Fentanyl.  They are very serious drugs and

14   were very addictive and I was naive to them and, like a lot of

15   people, I did become addicted to them.

16       I am sympathetic to people like me who suffer from

17   serious nerve pain.  I generally believe marijuana is a

18   relatively harmless pain reliever for many people.  Based on my

19   experience with prescription main medication, I did not see the

20   harm in helping people gain access to something less damaging

21   than what I was given.  It seemed silly to me at the time that

22   prescription marijuana could not be purchased with a credit

23   card but cash was OK.

24       I didn't help Eaze process credit cards for money.

25   And I understand that sounds crazy to everyone here but that's

L6i5akhS

1    the truth.  At the time I had plenty of money, I had a

2    successful business when this all started.

3            I started my role with Eaze as a favor to my then

4    friend Keith McCarty who is not a friend anymore to help his

5    business move from all cash to electronic payments because

6    dispensaries were being robbed at the time.  And I did

7    sincerely believe that this business was helping bring relief

8    to people who were in pain, and was taking marijuana out of the

9    world of cash transactions and money laundering.  Using credit

10   cards seemed to make it more legitimate and accessible but not

11   for a minute did I think anyone would be hurt by my actions.

12           My financial motivations were honestly that, if I

13   wanted to, one day if I owned a U.S. Bank, take that business

14   back.  That was my ultimate financial motivation.  That favor,

15   your Honor, has cost me my entire life.  I have let down my

16   business partner and my employees.  I had a hundred employees

17   that I was responsible for for their lives.  Most importantly,

18   I let down my family.  I have lost everything.  And to them I

19   want to say that I am sorry I let them down.  I should never

20   have put myself in this position.

21           Another thing I want to address is my drug addiction.

22   However difficult it is for me to admit, I know that I am an

23   addict and my judgment had been seriously impaired by my

24   addiction.  But I am not the person I am when I was high or

25   desperately looking to get high.  I am better than that and I

L6i5akhS

1    hope that you will see that I want nothing more than to be the

2    person I know I can when I am sober.

3            I want to turn my life around.  I have spent 18 months

4    out of the last 24 months in confinement including state and

5    federal facilities and lockdown rehabs.  I have had a lot of

6    time to think about where I want, where I need to go from here.

7    And, I do have a plan.  As you read, family is everything to me

8    and I want to begin the work to make amends and to provide for

9    them again.

10           I know the payment processing industry is close to me.

11   I have lost that.  But I can and will be a productive member of

12   society.  I have failed in rehabs in the past but I have also

13   learned why some of those failures were never destined to be

14   successful.  Whatever sentence the Court sets, when I get out I

15   want to take what I have learned from my own failures in rehabs

16   and apply it to the field that has been unable to help me.  I

17   think there is a space for me with the insight that I can

18   provide with drug abuse rehabilitation and I want to help

19   people like me not end up where I am standing.

20           I sincerely regret the toll this ordeal has taken on

21   my family and friends.  To my mom and dad who are old and sick,

22   I am sorry that I have not been able to be with you.  To my

23   wife Nina, I know we have had a lot of difficulties and I take

24   responsibility for all of my poor decisions, but please know

25   that I love you and the kids always.

L6i5akhS

1          To my friends and business colleagues, I realize have

2    I basically destroyed our business with my selfishness.  I

3    don't know how, but I hope to make amends to you each best I

4    can.

5          Your Honor, I just hope you can appreciate that this

6    experience has brought me to my knees and I wish more than

7    anything that I made different choices.  I have literally lost

8    not only almost two years of my life but my marriage, my

9    relationships, my family, my wealth, my business, my home.

10          I need to concentrate on my health and support my

11   family again from square one.  I ask that you give me the

12   opportunity to show you that I can move more than my past

13   mistakes.  I hope you will give me that chance.

14          Thank you.

15          THE COURT:  Thank you very much.

16          So, as you might expect, I don't totally share the

17   views of either the government or the defense of what was the

18   reality of this situation.  I think, with respect to many the

19   fraud itself, it was a calculated, sophisticated, carefully

20   planned method of deceiving banks and other financial

21   institutions about something that was not only important to

22   them but that was still of great relevance to them because of

23   the uncertainty of federal law enforcement in this area.  And

24   so, the banks made the choice, and the credit card companies as

25   well, to adhere to federal law, the law on the books, because

L6i5akhS

1  whatever the day-to-day situation with respect to enforcement

2  of those laws in states that had legalized marijuana as a

3  matter of state law, it was their obligation to adhere to

4  federal law, and they correctly feared that if they willy-nilly

5  did not adhere to that law, they could face huge consequences

6  in the future.

7  So, they made a determination to follow the law and

8  Mr. Akhavan and his co-conspirators said, *How are we going to*

9  *get around that?  I know, let's lie.  Let's tell hundreds of*

10 *lies in transaction after transaction.  And let's make it even*

11 *more sophisticated so we will have different cover numbers for*

12 *each phony transaction that we substitute for the actual*

13 *marijuana transaction.*  And whatever Mr. Akhavan's

14 motivations -- and I continue not to share the view that is

15 being expressed from the defense side but, even if it were

16 otherwise, that is no excuse.

17 So the fraud, in this Court's view, was a very serious

18 fraud.  And I also agree with the government that whatever

19 Mr. Akhavan, whatever remorse he may feel today, that was not a

20 view he came to during at least the portion of the time he was

21 incarcerated.  But, having said all of that, I don't agree with

22 the government that the defendant's addiction has nothing to do

23 with this case.  I think everything I see about this defendant

24 suggests that it did impact his personality, his judgment.  Not

25 an immediate way of someone going out to rob a bank to get a

L6i5akhS

fix, get money for a fix, but more so in ways I think, after 25

years of seeing the effects of addiction in my court, I see how

deleterious it can be to judgment as well as to family

relations and other important matters.  So, I have some

sympathy for Mr. Akhavan on that score.

I also note that he is in a Criminal History Category

of I.  We are not dealing with a person who is a life-long

criminal.  Quite to the contrary, we are dealing with someone

who had so far as anything before me, lawful business

activities for a substantial period of years.

With respect to general deterrence, I agree with the

government that there is always a need in white collar cases

for general deterrence because of the potential to commit the

sophisticated frauds and to have them go undetected is not

inconsequential but no one has meaningful insight as to whether

a sentence of five years is twice as much a deterrent as a

sentence of two and a half years or whatever.  This is all,

except at the extremes, guesswork.  So, the sentence always has

to be enough that no one who is contemplating similar activity

would not be deterred by the thought of, *oh my gosh, I may go

to prison and for more than a month or two or something like

that*, but it doesn't mean that they have to have the knowledge

that someone else similarly situated went to prison for 30

years in order to be deterred.  And, the statute says that I

should impose the sentence that is only what is necessary to

L6i5akhS

1    achieve the various provisions of that statute.  So, when it

2    comes to general deterrence, I think one should err on the side

3    of caution.  It counsels for some prison time in a case like

4    this but not a huge amount.

5            There are other factors that have been dwelt on by

6    counsel in their papers and I won't burden the record further

7    with them, but putting all of those factors together and also

8    recognizing that while Mr. Akhavan will get credit for the time

9    he has served in federal incarceration it is not an

10   automatically, it is any time any credit for state

11   incarceration.  But then, nevertheless, he served that time and

12   I need to factor that in as well.

13           Putting all of that together, I think the appropriate

14   sentence is two and a half years -- 30 months -- to be followed

15   by three years of supervised release on terms I will get to in

16   a moment.

17           I think a fine is called for here.  He is a wealthy

18   individual, he does have liabilities as well, but I think a

19   fine of $100,000 is appropriate to be paid at a rate of 10

20   percent of his gross monthly income beginning on the second

21   month of supervised release.

22           There is also a mandatory special assessment of $100.

23   That must be paid immediately.  Since I have determined, for

24   guideline purposes, that there was no loss, therefore there is

25   no restitution that needs to be made.

L6i5akhS

1          With respect to the conditions of supervised release,

2     they are the mandatory conditions that the defendant not commit

3     another federal, state, or local crime; that he not unlawfully

4     possess a controlled substance; that within 15 days of his

5     release from prison he submit to one drug test to be followed

6     by two periodic drug tests thereafter as determined by the

7     probation office; and that he comply in the -- or he cooperate

8     in the collection of DNA as directed by the probation office.

9          There will also be imposed the standard conditions 1

10     through 12, they appear on the face of the judgment and will be

11     gone over with the defendant by the probation officer when the

12     defendant reports to begin his period of supervised release

13     which he must do within 72 hours of his release from prison.

14          Then there are the special conditions that he

15     participate in an outpatient drug and alcohol treatment program

16     under standard terms and conditions; second, that he not incur

17     new credit charges or open additional lines of credit without

18     the express prior approval of the probation officer unless he

19     is in compliance with the installment payment schedule of

20     restitution that I just prescribed; thirdly, that he provide

21     the probation officer with access to any requested financial

22     information; and finally, but for a forfeiture which we will

23     get to in a second, that I recommend that he be supervised by

24     the district of his residence.

25          Now, let me hear from the government on forfeiture.

L6i5akhS

1          MR. TAYBACK:  Your Honor, before we move to

2     forfeiture, with respect to his incarceration, may I make a

3     request that he be -- that you make a recommendation to be

4     incarcerated at FCI Terminal Island, which is in the southern

5     California area closest to his family?

6          THE COURT:  I am happy to recommend.  As I am sure you

7     have told Mr. Akhavan, I can't order that.

8          MR. TAYBACK:  Yes.

9          THE COURT:  That's up to the Bureau of Prisons but I

10    certainly will recommend it.

11         MR. TAYBACK:  Thank you, your Honor.

12         THE DEPUTY CLERK:  I'm sorry.  What area of

13    California?

14         MR. TAYBACK:  It is in southern California, it is

15    called FCI Terminal Island.

16         THE DEPUTY CLERK:  Thank you.

17         THE COURT:  Let me hear the government on forfeiture.

18         MS. LAMORTE:  Yes, your Honor; this is Tara LaMorte

19    addressing forfeiture.

20         Your Honor, the government submits, in accordance with

21    the letter that it submitted and for the reasons outlined in

22    the letter, that roughly over $156 million is the correct

23    forfeiture amount in this case.

24         THE COURT:  I have already determined there was no

25    loss so why should there be any forfeiture?

L6i5akhS

1           MS. LAMORTE:  Because forfeiture is not tied to loss,

2      your Honor, forfeiture is a criminal penalty that is tied to

3      the proceeds of the offense.  It does not matter whether the

4      defendant dissipates the funds, it doesn't matter what the

5      defendant's profit was, it does not matter whether there was a

6      loss.  The key inquiry here is what the proceeds were.  And

7      when those lies were told to those banks and those banks

8      released, in total, roughly $156 million, that is the

9      appropriate measure of criminal forfeiture in this case.

10          THE COURT:  So you would forfeit $150 million and

11     where would that go?

12          MS. LAMORTE:  To the Treasury.

13          THE COURT:  Pardon?

14          MS. LAMORTE:  Where would it go?

15          THE COURT:  Yes.

16          MS. LAMORTE:  I imagine it would go to the Treasury.

17          THE COURT:  Sustained.

18          So, part of me -- what I am missing, here normally

19     forfeiture, whatever the standard, is really a way to provide

20     monies that can be used for restitution to the victims.  It is

21     a multi-step process and it is not automatic but that's what's

22     going on.  If the notion is that forfeiture exists as a

23     punishment, the proper way to handle that is through a fine

24     which I have already imposed.  Why beat around the bush with

25     the nuances of forfeiture when you can directly, as clear

L6i5akhS

1   punishment, can impose a fine which goes to the good old

2   Treasury which can use every penny, I'm sure.

3        With respect then, if it is not going to the victims,

4   if it is not a punishment, then as it is common-law origins

5   suggest, it's designed to get in the government's hands monies

6   that the defendant should never have possessed.  That's why you

7   have, as I know you undoubtedly know the difference between *in*

8   *rem* forfeiture and *in personam* forfeiture and are other issues

9   that Lord Coke and Lord Blackstone argued about for centuries.

10        But, I don't see the purpose here.

11        MS. LAMORTE:  Your Honor, there is a number of

12   purposes served by forfeiture.  Fine and forfeiture are

13   obviously two separate things under the law and one of the

14   ideas is it is not just about restitution -- and I know that

15   your Honor is well read in the case law that outlines the

16   various reasons why there is forfeiture, and one of them is

17   that the proceeds of a criminal enterprise should not be able

18   to be kept or used by the defendant.  Those are monies that

19   should have never been expended because those are monies that

20   were used by fraud.

21        THE COURT:  So, if you were asking to forfeit the

22   amount of his gain, that I can see is an argument but no one

23   claims he gained $150 million.

24        MS. LAMORTE:  That's correct, your Honor; but if you

25   look to the Second Circuit's decision, I believe it is in

L6i5akhS

1    *Peters*, the idea of forfeiture is not to return the defendant

2    to the economic position he was in had he not committed the

3    crime.  It is not just about only on profits, it is punitive,

4    and so it is more than that.

5              THE COURT:  I know there is case law that supports --

6              MS. LAMORTE:  I know you know the case law.

7              THE COURT:   -- what you are saying but it seems to

8    me, as applied to the unique facts of this case, kind of crazy.

9              MS. LAMORTE:  It does also operate as a deterrent,

10   your Honor.  I will say there are cases that talk about --

11             THE COURT:  Oh, I agree that it operates as a

12   deterrent and, therefore, why stop at $150 million?  Let's make

13   it a billion because that would have even greater deterrent

14   effect.

15             MS. LAMORTE:  Well, your Honor it has to be tethered

16   to the gravity of the offense.

17             THE COURT:  Oh.  Tethered -- tethered -- to the

18   gravity of the offense but it is not being tethered to how much

19   he made.  It is not being tethered to how much the victims

20   lost.  It is not being tethered to anything other than the

21   momentary transfer to his and his colleagues' businesses of

22   money that just was passing through.  And why does that make

23   any sense?

24             MS. LAMORTE:  Your Honor, I would dispute that it was

25   just passing through.  We had raised two main arguments in

L6i5akhS

1    support of forfeiture of the entire amount; one, the defendant

2    being the mastermind of the entire, every facet of the scheme

3    and you set forth that case law, but the second argument had to

4    do with his control of the accounts that received the proceeds.

5    His organization or his enterprise controlled those accounts.

6    It is those settlement accounts at the foreign merchant

7    settlement banks that they were responsible for sending

8    proceeds, enormous sums of money to other co-conspirators which

9    were the marijuana dispensaries located in the United States.

10   This was not just a transient passing like a corresponding bank

11   account, they had control of this money.  They held up wires

12   when the beneficiary -- when the marijuana dispensary bank

13   accounts were in the names that you would be able to Google and

14   it turned out to be a marijuana dispensary or something like

15   that.

16          So, I dispute your Honor's point of regarding what the

17   evidence shows with respect to the defendant's control over the

18   entire corpus of funds.  The defendant did control the corpus

19   of funds, he did direct virtually all of those funds to the

20   co-conspirators and charged rates that equated to roughly

21   $17 million in the end.

22          THE COURT:  I have your point.  Let me hear from the

23   defense.

24          MR. TAYBACK:  Our position is, as your Honor somewhat

25   engaged in the rhetorical back and forth with the government,

L6i5akhS

1    as your Honor articulated those questions which is it is

2    inappropriate in a case like this to seek to forfeit that which

3    the evidence doesn't support Mr. Akhavan ever received.

4            It is a fiction to say that he controlled those

5    accounts or that he received those funds.  He didn't.  He

6    doesn't have them now, he didn't have them then.  This is not a

7    case where he -- where the evidence shows that he received

8    $10 million and then bought a yacht and then that yacht is

9    sitting in a dock somewhere and that can be forfeited.  This is

10   not a case where he received $10 million and it went to -- it

11   was distributed among other individuals.

12           THE COURT:  What if I, assuming as I do that I agree

13   with the government on their basic account of how much he

14   personally gained, why shouldn't I impose a forfeiture in that

15   amount?

16           MR. TAYBACK:  Because I think --

17           THE COURT:  Pardon?

18           MR. TAYBACK:  Because obviously putting aside that I

19   disagree with the evidence --

20           THE COURT:  I understand.  You made that clear.

21           MR. TAYBACK:  The reason is because, at this point, it

22   doesn't advance any purposes, it is not mandatory, and I

23   believe it would be unreasonable under the circumstances of

24   this case to order a forfeiture order under those

25   circumstances.

L6i5akhS

1          MS. LAMORTE:  Your Honor, it is mandatory.  The

2     statute says "shall."

3          THE COURT:  I spent most of the last few days thinking

4     about --

5          MS. LAMORTE:  Your Honor --

6          THE COURT:  -- prison time and how much I wanted to

7     impose.  If the case were restitution I could enter judgment

8     now and still have 90 days to determine the amount.  Can I do

9     that with respect to forfeiture?

10          MS. LAMORTE:  I don't believe so.  I think forfeiture

11     has to be pronounced at sentencing because it is part of the

12     sentence.  I can check.

13          THE COURT:  No, I think you are probably right.  Hope

14     springs eternal.

15          All right.  Well, then we are going to take a

16     five-minute break while I think about it.

17          MS. LAMORTE:  All right, your Honor.  Can I say one

18     more thing before you take your break?

19          To the extent that the Court is not inclined to agree

20     with the government to the $156 million figure -- and I do

21     submit that is what the case law supports in the government's

22     view -- the alternative would not be the profit to the

23     defendant, it would be what he charged in this case for his

24     services which is the 8.5 percent and then the 12 percent.

25          THE COURT:  So how much is that in monetary amounts?

L6i5akhS

|    |    |
|----|----|
| 1  | MS. LAMORTE:  That amounts to a little over |
| 2  | $17 million and that's in the footnote in our papers. |
| 3  | THE COURT:  I'm sorry? |
| 4  | MS. LAMORTE:  That amounts to a little over |
| 5  | $17 million and that calculation is in a footnote in our |
| 6  | letter. |
| 7  | THE COURT:  OK.  Actually, what we can do, you can sit |
| 8  | down because I think I am going to adopt that view. |
| 9  | MR. TAYBACK:  Can we just be -- |
| 10 | THE COURT:  Go ahead. |
| 11 | MR. TAYBACK:  We do dispute that that.  Those numbers |
| 12 | which the government presented, reflect amounts charged by |
| 13 | other institutions, a company called Clear Settle and a company |
| 14 | called EUprocessing.  They're not amounts charged by or even |
| 15 | purported to be charged by Mr. Akhavan who there is no evidence |
| 16 | actually tendered any invoice for his services. |
| 17 | THE COURT:  Do you want a Fatico hearing on this? |
| 18 | MR. TAYBACK:  May I have one moment, your Honor? |
| 19 | THE COURT:  Yes. |
| 20 | (Defendant and counsel conferring) |
| 21 | MR. TAYBACK:  I believe the evidence shows that those |
| 22 | amounts being charged by the middleman entity -- Clear Settle, |
| 23 | for example -- a portion of that is the bank's fees. |
| 24 | THE COURT:  My question to you is did you want a |
| 25 | Fatico hearing on this. |

L6i5akhS

1          MR. TAYBACK:  We would, your Honor.

2          MS. LAMORTE:  Your Honor, this is amply supported by a

3     preponderance of the evidence in the trial testimony.  There is

4     numerous co-conspirators that testified that Mr. Akhavan set

5     those rates.  There is numerous co-conspirators that testified

6     that he was in charge of Clear Settle and EUP and those are

7     entities that he brought in and had control over.

8          This is all laid out in our letter but there is

9     overwhelming evidence that Mr. Akhavan is the one that set

10    these rates.

11         THE COURT:  That's my view as well of the evidence.

12    It is one of the reasons I disagree with defense counsel more

13    generally as to Mr. Akhavan's role which seemed to me, very

14    clearly, that of a leader and orchestrator of every aspect of

15    the scheme.  So, give me -- I am sure if I search I can find

16    your footnote but maybe you can find the number first.

17         MS. LAMORTE:  Oh.  Yes, your Honor.  It is on page 9

18    of our letter, footnote 4.

19         THE COURT:  All right.  Hang on.  Ah, there is it is.

20         MS. LAMORTE:  In very tiny font.  I apologize, your

21    Honor.

22         THE COURT:  No.  I congratulate my ophthalmologist

23    because I can actually read it.

24         So, I am going to impose forfeiture in the sum of

25    $17,183,114.57.

L6i5akhS

1          THE COURT:  Mr. Akhavan, you have a right to appeal

2     the sentence.  Do you understand that?

3          THE DEFENDANT:  Yes, sir.  Yes, your Honor.

4          THE COURT:  If you can't afford counsel for the appeal

5     the Court will appoint one for you free of charge.

6          Do you understand that?

7          THE DEFENDANT:  Yes, your Honor.

8          MR. TAYBACK:  And your Honor denied the request for a

9     hearing?

10         THE COURT:  Yes, yes, yes.  Yes, I did.  Thank you

11    very much.

12         Very good.  That concludes this proceeding.  Counsel

13    can set up for the next proceeding.

14                              o0o

15

16

17

18

19

20

21

22

23

24

25