UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA       :

      :       20-cr-188 (JSR)

    -v-       :

      :       OPINION

HAMID AKHAVAN & RUBEN WEIGAND,     :

      :

   Defendants.       :

------------------------------------x

JED S. RAKOFF, U.S.D.J.

Hamid "Ray" Akhavan and Ruben Weigand conspired to defraud U.S. banks and credit unions by tricking them into processing more than $150 million of cardholder transactions for marijuana purchased through the marijuana delivery company Eaze when the banks and credit unions had a firm policy of not allowing such transactions. For their roles in this scheme, Akhavan and Weigand were each charged with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and on March 24, 2021, a jury convicted both defendants of that charge. The defendants moved, under Federal Rules of Criminal Procedure 29 and 33, for judgment of acquittal or, in the alternative, for a new trial. ECF Nos. 259 & 300. By bottom-line order dated June 18, 2021, the Court denied those motions. This Opinion sets forth the reasons for that ruling.

## LEGAL STANDARDS

The Court is required to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction." Fed. R. Crim. P. 29. "It is a fundamental general principle that [defendants] challenging the sufficiency of the evidence underlying a conviction bear a very heavy burden." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir. 1992). "In considering such a challenge, [the court] must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008) (citations, quotation marks, and brackets omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The Court is also authorized, in its discretion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). Manifest injustice can occur where, although the evidence is technically sufficient to sustain the verdict, the Court has "a real concern that an innocent person may have been convicted." United States v. Sanchez, 969 F.2d 1409, 1413 (2d

Cir. 1992). Alternatively, a court may find manifest injustice based upon a procedural issue affecting the fundamental fairness of the trial. United States v. Yannai, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial.").

## ANALYSIS

The parties' familiarity with the evidence adduced at trial is here assumed. That evidence is summarized in what follows only as necessary to address the arguments raised in the defendants' motions. The evidence is construed in the light most favorable to the Government, and all inferences and credibility determinations are drawn in the Government's favor.

Akhavan and Weigand argue that the jury verdict should be set aside for (1) insufficient evidence of materiality; (2) insufficient evidence of fraudulent intent; (3) a violation of the Confrontation Clause; (4) an improper clarifying jury instruction regarding materiality; and (5) improper denial of several of Weigand's motions in limine. The Court addresses these arguments in turn, finding that each lacks merit.

## I. Materiality

The defendants first argue that the evidence at trial was insufficient to demonstrate that their misrepresentations were material. The Court instructed the jurors that, to return a

verdict of guilty, they would need to find that the Government proved beyond a reasonable doubt two elements: "First, the existence of a conspiracy to commit federal bank fraud at any time during the charged time period of 2016 through 2019; and Second, that the defendant you are considering knowingly, willfully, and with specific intent to defraud joined and participated in this conspiracy." Tr. 2635:12-17. The Court further instructed that, to find that the object of the conspiracy was bank fraud, the jurors would need to find that the object of the conspiracy had three elements. "First, that a person devised a scheme to defraud a federally insured bank or credit union by means of misrepresentations. Second, that one or more of the misrepresentations was material. Third, that the perpetrator devised the scheme knowingly, willfully, and with a specific intent to defraud." Tr. 2636:10-16. Finally, the Court instructed the jurors that

> a material fact, as applicable here, is a fact that a reasonable banker would be reasonably likely to consider in making a decision authorizing a bank transaction involving the transfer of money or property. For example, if a perpetrator made misrepresentations designed to make marijuana purchases look like the purchases of other goods, the misrepresentations would be material if, had the banker known that the purchases – that the purchases [sic] were disguised and really were for marijuana, such knowledge would be reasonably likely to influence a reasonable banker in deciding whether to authorize the purchases. Keep in mind that the test of materiality is what a reasonable banker would think and do. The Government does not need to prove that any bank actually relied on a misrepresentation.

Tr. 2638:5-18.

On the issue of materiality, the defendants do not dispute the Court's recitation of the law. Rather, they argue that no reasonable jury could find, based on the evidence at trial, that the defendants' misrepresentations were material. The defendants are plainly mistaken; construed in the light most favorable to the Government, the evidence of materiality was overwhelming.

First, the Court instructed the jury that purchasing marijuana was illegal under federal law throughout the period of the charged scheme. Even assuming for the sake of argument that a reasonable banker would ever process unlawful transactions, common sense dictates that a banker would at least consider the fact that a merchant sought to process illegal transactions when deciding whether to process that merchants' transactions. And the Government offered more than common sense: testimonial and documentary evidence from several issuing banks demonstrated that those banks had policies prohibiting unlawful transactions. Tr. 1130:11-14, 1201: 2-18, 1768:1-2, 1769:15-17, 2083:20-22, 2090:6-18. This alone was sufficient evidence for a reasonable juror to find, beyond a reasonable doubt, that the defendants' misrepresentations were reasonably likely to influence a reasonable banker in deciding whether to authorize transactions by the phony merchants.

Second, testimonial and documentary evidence from credit card networks Visa and MasterCard showed that they prohibited unlawful transactions on their networks and that issuing banks could be penalized for permitting such transactions. GX 2312, Tr. 446:16-447:10, GX 2217, Tr. 1880:9-15. Furthermore, Visa and MasterCard took steps to terminate some of the phony merchants that Akhavan, Weigand, and their coconspirators set up to facilitate the scheme. GX 2309, GX 2313, GX 2228, GX 2230, Tr. 463:8-21, Tr. 1927:3-6. From this evidence, too, a reasonable jury could find materiality beyond a reasonable doubt.

Third, the Government offered evidence that some issuing banks investigated, and in some cases terminated, merchants that were processing marijuana transactions. GX 2427, GX 2633, GX 2634, GX 2635. This further demonstrates materiality.

That banks cared whether they were processing marijuana transactions cannot come as a surprise to the defendants; after all, they went to extraordinary lengths to conceal the true nature of these transactions. Why do this if not because they believed that banks did, in fact, care?

The defendants' response is simple: the banks did not care whether they were processing marijuana transactions; they only cared about whether they appeared to be knowingly processing marijuana transactions, for which they might be penalized. Thus, the banks wanted to be kept in the dark, to remain willfully blind

of the true nature of the transactions. The Court permitted the defendants great latitude to raise at trial this creative, albeit strained, argument. Defense counsel focused on the fact that, even after the indictment in this case, U.S. issuing banks and credit unions continued to authorize tens of millions of dollars of marijuana transactions for Eaze. Eaze processed these transactions through a third-party vendor known as Circle, using a cryptocurrency known as USD Coin. (A USD Coin has a value pegged to the U.S. dollar.) Evidence at trial showed that well into 2021, banks continued to authorize transactions of the following form: the cardholder would purchase marijuana on the Eaze platform; this would trigger the purchase of USD Coin in the exact amount of the marijuana purchase. The USD Coin would be transferred to the marijuana merchant where it could immediately be converted back to dollars. The marijuana merchant would then deliver the marijuana through Eaze's delivery service.

The Court recognized that a reasonable jury might, in theory, infer from banks' continued processing of Eaze transactions through Circle that banks did not care that Eaze's transactions were ultimately for marijuana. That is why the Court declined to quash the Rule 17(c) subpoena issued to Circle, and that is why the Court permitted the defense to argue this point to the jury at length.

But the evidence in no way <u>compelled</u> the conclusion that banks do not care that they are processing marijuana transactions for Eaze, via Circle. A reasonable jury could have found beyond a reasonable doubt -- as this jury evidently did -- that the Circle transactions did not preclude a finding of materiality. For example, the jury could have concluded that the banks viewed cryptocurrency purchases differently from non-cryptocurrency purchases. Or, more straightforwardly, the jury could have concluded that the banks were not devoting many resources to rooting out marijuana purchases and so did not even learn of the Circle transactions until this trial. <u>See</u> Tr. 1275-1276 (testifying that Bank of America reported the Circle transactions to Visa and MasterCard when it learned of them). The evidence regarding banks' continued processing of marijuana transactions after the indictment in this case does not foreclose a finding of materiality beyond a reasonable doubt.

The defendants also raise a slightly different form of this argument: that the Government has offered no proof that a bank ever declined to authorize a marijuana transaction. Indeed, the defense points out, banks decide whether to authorize transactions in a fraction of a second, based on little information. There is little doubt that, even if the information provided to the issuing bank had been truthful (<u>cf.</u> the Circle transactions), a marijuana purchase would have been authorized.

However, this argument misunderstands the Government's burden in two separate ways. First, the Government was only required to prove that a reasonable banker was reasonably likely to consider the fact that these were marijuana transaction, not that this consideration would have been dispositive. The evidence at trial was more than sufficient to support a juror's inference that the illegality of the transactions was something a reasonable banker would consider. Second, the defendants take far too narrow a view of what it means for a banker to decline to authorize a transaction. Even if a bank would have processed any single marijuana transaction based upon accurate information presented about that transaction, the defendants conspired to carry out an overarching scheme spanning many transactions. In assessing whether those misrepresentations were material, the jury was entitled to consider whether a bank, upon review of past, previously authorized transactions, might have declined to process future Eaze transactions. The evidence adduced at trial supports the conclusion that, when they learned the truth, banks did so. In particular, the Government demonstrated that banks sometimes referred merchants to Visa or MasterCard when the banks suspected the merchants were processing marijuana transactions, and ultimately, Visa and MasterCard terminated some such merchants. Although this was an indirect means of refusing to process a

transaction, it supports a conclusion that the defendants' misrepresentations were material.

For all these reasons, when the evidence is construed in the light most favorable to the Government, it overwhelmingly supports the jury's finding of materiality.

## II. **Fraudulent Intent**

The defendants next argue that the Government was required, but failed, to prove that they intended to cause actual harm through misrepresentations that affected an "essential element" of the banks' agreements with cardholders.

This Court previously described the elements for federal bank fraud in denying the defendants' motions to dismiss the indictment, and the Court incorporates by reference that discussion. See Opinion & Order, ECF No. 91 (Aug. 31, 2020). For present purposes, the Court constrains its assessment of the sufficiency of the evidence to a bank fraud scheme under 18 U.S.C. § 1344(2).[1] To

---

[1] To the extent Akhavan argues that the Court only instructed the jury on § 1344(1), he is mistaken. Although the Court used the phrase "scheme to defraud," rather than the less parsimonious phrase "scheme to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises," the Court's instructions made abundantly clear that the jury could find the defendants guilty based upon a violation of § 1344(2). See Court's Instructions of Law, ECF No. 246, at 16 ("[A] scheme to defraud a bank or credit union means a scheme to use one or more misrepresentations to obtain money or property from a bank or credit union.").

prove such a scheme, the Government must show that a defendant
(1) knowingly executed (or attempted to execute) a scheme through
which the defendant "intend[ed] to obtain any of the moneys . . .
or other property owned by, or under the custody or control of, a
financial institution" by means of misrepresentations; (2) one or
more of the misrepresentations was material; and (3) the defendant
acted knowingly, willfully, and with a specific intent to defraud.
See Loughrin v. United States, 573 U.S. 351, 355-56 (2014).

The Government need not prove an intent to cause harm other
than the obtaining of bank property, nor need it prove that the
misrepresentations related to an "essential element" of the bank's
agreement with its cardholders. The defendants' arguments
relating to the "essential element" requirement turn on caselaw
that applies only to § 1344(1). Here, however, the evidence also
supported a conviction under § 1344(2), so the Court need not
consider the "essential element" requirement. Compare United
States v. Lebedev, 932 F.3d 40 (2d Cir. 2019) (finding sufficient
evidence to sustain bank fraud conviction under § 1344(2) where
defendants used phony merchant to conceal true nature of Bitcoin
transaction).

Even if the Government were required to prove that the
defendants' misrepresentations went to an "essential element" of
the bank's bargain, the defendants do not persuasively explain why
the proper bargain to look to is the bargain between the banks and

their cardholders.  Here, the misrepresentations were conveyed by the merchant bank through the card payment network to the issuing bank -- the cardholder was not a conduit for misinformation.  Thus, the more reasonable approach in this case would be to ask whether the misrepresentations related to an essential element of the bargain between the issuing bank and the card payment network. And they did: testimony at trial demonstrated that Visa and MasterCard were completely unwilling to process payments for illegal goods and services, such as marijuana transactions in the United States.  The misrepresentations directly related to an essential element of the issuing banks' bargain with Visa and MasterCard, so, even if the Government were required to demonstrate this, they did so.[2]

For these reasons, the Court finds that the evidence was sufficient to support the jury's verdict.

---

[2] To the extent the defendants argue that there was no evidence to show that the defendants intended to defraud a federally insured bank, this argument is without merit.  The Government demonstrated that, even though the defendants' misrepresentations were made directly to merchant banks, rather than issuing banks, those representations would "naturally reach the [issuing] bank." Loughrin, 573 U.S. at 365 n.8.  The evidence adduced at trial showed that the defendants were aware of this fact including, for example, from discussions held in Akhavan's office in Calabasas. This is, if anything, probably more than is required to satisfy this element (that is, the Government was not also required to prove that the defendants knew that the issuing banks were federally insured).

The defendants' Rule 33 motions argue that, even if the evidence is technically sufficient to support the verdict, the risk of wrongful conviction is so high that the Court should set aside the verdict and order a new trial to prevent manifest injustice. The Court totally disagrees. The evidence overwhelmingly supported the guilty verdicts in this case, so the Court will neither enter a judgment of acquittal nor order a new trial for insufficiency of evidence.

### III. **Confrontation Clause**

Over the defendants' objection, the Court permitted one Government witness, Martin Elliott of Visa, to testify by live two-way videoconference. The defendants argued in advance of trial that permitting such testimony would violate the Confrontation Clause. The Court analyzed the relevant caselaw and rejected the defendants' argument, finding that under Supreme Court and Second Circuit precedent, the use of live two-way video testimony may be permitted, without violating the Confrontation Clause, "[u]pon a finding of exceptional circumstances . . . when this furthers the interests of justice." United States v. Gigante, 166 F.3d 75, 80-81 (2d Cir. 1998).

This Court was forced to balance competing considerations in the face of a global pandemic. Vaccines were not yet widely available, but defendant Weigand was fervently pressing his constitutional and statutory rights to a speedy trial, and the

case was trial-ready.  The witness, Elliott, averred that given the ages and medical conditions of the members of his household, complying with the Government's subpoena by flying across the country to testify in person would imperil his and his family members' lives.  This was an extraordinarily unusual situation, and the Court found that "exceptional circumstances" warranted the use of live two-way videoconferencing.  The Court incorporates by reference its detailed pretrial assessment of the governing law and its finding of exceptional circumstances.  Opinion and Order, ECF No. 208 (Mar. 1, 2021).[3]  In their post-trial motions, the defendants largely rehash their prior arguments on this topic, but they offer no change in law or fact to warrant reconsideration of the Court's prior ruling.

Akhavan raises one new Confrontation Clause-related argument: that the defendants suffered practical difficulties when cross-examining Elliott by video that were exacerbated by the time limits the Court imposed on cross-examination.  Akhavan first argues that there were certain minor issues with video transmission or with locating exhibits; such arguments are entirely without

---

[3] Notably, the Court set detailed guidance to ensure that the two-way video would have the hallmarks of live testimony: the defendants were permitted to have representatives in the room from which the witness testified, and at all times the witness could see and be seen by the defendants, the jurors, the examiner, and the judge.

merit. Both the raising and the resolution of these issues was incredibly brief and was about as disruptive as a witness's sneeze.

Akhavan next argues that he would have been able to better "control" the witness if he were present in open court. This is unsubstantiated speculation; from all the evidence offered at trial, the Court sees no reason to believe that Elliott would have testified differently on any relevant topic merely because he was in the same room as the defendant. To be sure, the ephemeral coercive force of being contemporaneously present in the same room as the accused is a theory that, though both highly speculative and seemingly contrary to ordinary trial practice,[4] is sometimes said to be partly behind the Confrontation Clause right. But the Supreme Court and the Second Circuit have made clear that the right to contemporaneous physical presence is subject to exceptions under extraordinary circumstances. See, e.g., Maryland v. Craig, 497 U.S. 836, 844 (1960). When such circumstances are present, as here, the defense must offer more than mere speculation to show that the witness would have testified differently in the courtroom.

Akhavan next argues that the Court imposed improper time limits upon his cross-examination of Elliott and that this, combined with the added logistical difficulties of cross-examining

---

[4] If, for example, a defense counsel was "badgering" an adverse witness, no judge would hesitate to intervene to put a stop to such misconduct.

by video, rendered the trial fundamentally unfair. But the Court acted within its "wide discretion" in limiting the time for cross-examination. United States v. Flaherty, 295 F.3d 182, 190-91 (2d Cir. 2002). And the accusation is itself misleading. In actuality, the Court asked defense counsel how much longer defense counsel would need for cross-examination, and the Court then permitted defense counsel to take that time, and more.

Moreover, Akhavan points to no significant topic he was unable to cover with the witness on cross-examination. He points to a slide deck of modest relevance, HAX-5014, and argues that he would have asked questions about the deck if given additional time. But this slide deck bordered on the trivial, and the defense repeatedly adduced evidence and testimony from Elliott and others to support the overarching point for which he offered the slide deck: that credit card companies and banks profited from marijuana transactions, giving them a motive to be willfully blind to the defendants' misrepresentations. From such other evidence, the jurors were well aware that banks profited from marijuana transactions. They evidently, and reasonably, refused to infer from this that the banks did not care whether the transactions were for marijuana. Further testimony on this topic would have been cumulative.

Finally, the Court notes that even in the unlikely event that the Supreme Court and the Second Circuit were to adopt the extreme

view of the Confrontation Clause asserted by the defense, any error in this case would have been harmless beyond a reasonable doubt. Elliott's testimony was largely duplicative of John Verdeschi's (of MasterCard), and more generally, there was no shortage of testimony by the credit card companies.

IV. **Curative Instruction**

During closing arguments, Akhavan's counsel argued that "the question for bank fraud isn't what the banks do after the fact; remember, it's what they do to authorize a transaction." Tr. 2581. This raised the risk that the jurors might be led to take a myopic, single-transaction view of materiality. The jurors might have mistakenly believed that the defendants' misstatements could not possibly have been material because banks only have limited information and process transactions in milliseconds. In truth, however, misrepresentations about transactions, and about the merchants processing those transactions, may be material because of what the bank does "after the fact." As explained above in connection with the defense's materiality arguments, a juror could reasonably find that had a bank learned the truth about an already-authorized transaction (i.e., that it was for marijuana, rather than pet supplies or SCUBA gear), the bank may have relied on that information in making a subsequent decision not to process further transactions by that merchant (or to report that merchant to Visa and MasterCard, potentially leading to the same result).

That is why the Court instructed the jury that a material fact is one "a reasonable banker would be reasonably likely to consider in making a decision authorizing a bank transaction" -- not in authorizing the specific transaction to which the misrepresentation most directly related. See Court's Instructions of Law, ECF No. 246, at 17.

Given the possibility that the defense's argument could have confused the jury into adopting an overly narrow view of materiality, the Court offered a minor responsive clarification:

> [I]t is not necessary that a misrepresentation made in connection with a particular transaction be reasonably likely to affect the decision to authorize that particular transaction at that particular time [because] what is charged here is an ongoing scheme to defraud, including a course of misrepresentations over a period of time through a pattern or a course of deceptive conduct. So you need to look at the whole picture.

Tr. 2673-38.

This curative instruction properly stated the law and did not jeopardize the defendants' rights to a fair trial.

## V. **Weigand's Motions in Limine**

Finally, Weigand argues that five of the Court's rulings on motions in limine were erroneous and, together, amounted to a miscarriage of justice. Weigand's arguments on this score largely duplicate his arguments previously made with respect to the motions in limine, and the Court rejects them for the reasons stated below and the reasons stated orally during the trial.

## A. Weigand's Laptop

The Court received in evidence many exhibits obtained from Weigand's laptop, which was seized incident to his arrest. Weigand argues that the Court erred by admitting these documents, in two respects.

First, Weigand objects to certain files for which metadata suggests that the files were added to Weigand's laptop in January 2020, after the charged scheme. The exhibits were properly received in evidence. The jurors could have reasonably inferred, for example, that Weigand possessed these files on another electronic device, and that they were then added to his laptop in January 2020. Alternatively, the jurors could have reasonably inferred that Weigand received these files from a co-conspirator for the first time in January 2020. Even if he did not possess them during the charged conspiracy, the fact that a coconspirator would send them to him, and that he would retain them on his laptop, is probative.

That is not to say the metadata was irrelevant. The Court permitted the defense to inquire about the metadata at trial, and it did so. After learning that these exhibits may have been added to Weigand's laptop as late as January 2020, it was for the jury to decide how much weight to afford each exhibit.

Second, Weigand argues that certain documents were improperly admitted because they were admitted without context, requiring the

jury to speculate about them. He maintains that some of the documents predated his involvement in the scheme and others concerned legitimate business relationships in Europe. But many of these documents were highly probative, revealing Weigand's awareness of, and involvement in, various aspects of the fraudulent scheme. And none was unduly prejudicial or misleading. Again, Weigand was entitled to argue that the jury should have afforded little weight to these documents, but they were properly received in evidence.

B. Wirecard

Weigand argues that his trial was fundamentally unfair because the Government offered evidence regarding a merchant bank, Wirecard, which has been in the news for other alleged misconduct. This argument borders on the frivolous. The Government adduced evidence regarding multiple merchant banks, including Wirecard. The evidence was directly probative of the scheme charged in this case, and neither the evidence nor the Government's arguments came remotely close to suggesting that Weigand was involved with any alleged wrongdoing involving Wirecard other than the charged bank fraud conspiracy.

C. Expert Witness

The Court excluded proposed testimony by Weigand's expert witness, Stephen Mott. Weigand argues that the Court erred by excluding three categories of proffered testimony. First, Mott

would have testified that companies commonly "locate subsidiaries or related entities" in the same jurisdiction as the merchant bank to "comply with Visa and MasterCard's 'Area of Use' rules." ECF No. 227. However, such testimony would have been misleading in this case. No evidence adduced at trial suggested either that the overseas companies incorporated by the conspirators were "subsidiaries or related entities" to Eaze in any legitimate sense or that they were created to comply with "area of use" rules. Rather, they were phony merchants used to launder transactions. Insofar as Mott would have theorized a potential alternative reason for incorporating overseas entities -- one divorced from the evidence -- his testimony would have been irrelevant and misleading. The Court properly excluded it.

Second, the Court held that Weigand's expert disclosure regarding Mott's proffered testimony concerning ISOs was inadequate. The defense merely proffered that Mott would testify regarding "the influence that credit card networks and the issuing banks have over the [ISO] with respect to the creation of Merchant Category Codes." This disclosure was far too vague and offered no indication either of Mott's opinion or the basis for that opinion. Therefore, such testimony was properly excluded.

Finally, Weigand indicated that Mott would opine that merchant banks bear the risks of chargebacks with respect to non-secure e-commerce transactions. The Court found that this

topic was properly the subject of lay testimony, not expert testimony, and that it was cumulative because substantial testimony was offered regarding chargebacks by other witnesses. The evidence before the jury made it abundantly clear that U.S. issuing banks profited from these transactions and that cardholders' money would be returned following a successful chargeback.

The only respect in which Mott's testimony was arguably not cumulative was that Mott might have opined that merchant banks, rather than issuing banks, bore the financial risk of chargebacks for Eaze transactions. If this was true, however, it should have been demonstrated through lay evidence showing how, in fact, Eaze chargebacks were processed. In any event, the only possible relevance of such testimony would be to rebut the Government's evidence of materiality, and as noted above, the defense had many other opportunities to demonstrate that banks benefited financially from these Eaze transactions.

For these reasons, the Court properly excluded the proffered expert testimony of Stephen Mott.

D. Weigand's Post-Arrest Statement

The Government offered into evidence a statement Weigand made to the FBI following his arrest. Of course, such a statement is admissible despite the rule against hearsay as the statement of a party opponent. Weigand responded by seeking to introduce a much

larger excerpt of his post-arrest statement, arguing that the larger excerpt was necessary under the rule of completeness.

However, as the Court explained at trial, Weigand "really exaggerates the scope of the rule of completeness. This is designed to deal with things like someone introduces half a sentence and not the other half of a sentence. It doesn't open the door to pages and pages of what is otherwise clearly hearsay." Tr. 856-857.

The Court permitted defense counsel to introduce Weigand's statement that his understanding of English was "okayish," finding that that disclaimer offered necessary context for the remainder of Weigand's post-arrest statement. However, the other statements offered by Weigand were not admissible under the rule of completeness. The Court adheres to its oral ruling on this topic. Tr. 2120-2125 (explaining why each of the other statements Weigand sought to introduce was not admissible under the rule of completeness).

E. Pecuniary Harm

Finally, Weigand maintains that he should have been permitted to argue that he lacked fraudulent intent because he did not intend pecuniary harm to the banks. Weigand misapprehends the law. As this Court has repeatedly held throughout this case based on Supreme Court precedent, to prove bank fraud the Government need not demonstrate that banks suffered pecuniary harm. E.g., Shaw v.

United States, 137 S. Ct. 462, 467 (2016); Loughrin v. United States, 573 U.S. 351, 366 n.9 (2014).  Thus, to prove fraudulent intent, the Government need not demonstrate that the defendants intended pecuniary harm.  Rather, the Government needed to prove that the defendants knowingly and willfully devised a scheme with the specific intent to deprive banks of money or property by means of misrepresentations.  This the Government proved beyond a reasonable doubt.

The Court permitted the defense to argue extensively that banks profited from the scheme; such evidence was relevant to materiality.  What the Court did not permit, and properly so, was an argument that the defendants needed to cause, or to intend, pecuniary harm; that is not an element of bank fraud.

For the foregoing reasons, by bottom-line order dated June 18, 2021, the Court denied the defendants' motions for judgment of acquittal or, in the alternative, for a new trial, ECF Nos. 259 & 300.

Dated:     New York, NY
           July 2, 2021              JED S. RAKOFF, U.S.D.J.