```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :     20-cr-188 (JSR)
          -v-                       :
                                    :     OPINION AND ORDER
     HAMID AKHAVAN,                 :
                                    :
               Defendant.           :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Hamid "Ray" Akhavan was convicted of conspiring to defraud U.S. banks and others through a fraudulent payment processing scheme. Akhavan and his co-conspirators tricked banks and credit card issuers into processing more than $150 million of cardholder transactions for marijuana, purchased through the marijuana delivery company Eaze, when the banks and others had a firm policy of not allowing such transactions.

At the sentencing proceeding on June 18, 2021, defense counsel requested an evidentiary hearing on the issue of forfeiture. Sent. Tr. at 36–37, ECF No. 326. While the Court, after hearing argument on the Government's previous claim for forfeiture in the amount of $156,228,211.61, somewhat summarily adopted the Government's "fallback" position of forfeiture in the amount of $17,183,114.57 at the sentencing proceeding, id. at 37, the Court held off entering the final written judgment (which will issue shortly), because of remaining doubts about the forfeiture question. Accordingly, following the sentencing proceeding and upon the

1

application of the defense, the Court granted the defendant's renewed request for an evidentiary hearing on the issue of forfeiture, ECF No. 336, which the Court then held on August 12, 2021. Following the evidentiary hearing on forfeiture, the Court also granted defendant's request for supplemental briefing on the issue, which the parties subsequently filed. ECF Nos. 347-51.

For the reasons set out below, the Court finds that the Government has established by the required preponderance of the evidence that Akhavan "obtained" $17,183,114.57 for purposes of forfeiture under 18 U.S.C. § 982(a)(2). While this would otherwise be sufficient to confirm the calculation of forfeiture previously announced from the bench, the Court also concludes that such a forfeiture would constitute an excessive fine in violation of the Eighth Amendment and therefore cannot be imposed. Consequently, the Court only imposes a forfeiture of $103,750.

**LEGAL STANDARD**

Once a criminal defendant is convicted of an offense giving rise to a forfeiture allegation, the district court "must determine what property is subject to forfeiture," "based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(A)-(B). The Government

bears the burden of showing its entitlement to forfeiture by a preponderance of the evidence. United States v. Christie, 249 F. Supp. 3d 739, 743 (S.D.N.Y. 2017). The court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011) (citing United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009)).

## ANALYSIS

The Court first addresses the threshold issue of whether it has authority to further consider the forfeiture matter at all after orally announcing a forfeiture of $17,183,114.57 at the time of sentence. It then addresses the amount of forfeiture, and, in particular, the Government's renewed contention that the correct forfeiture amount should be no less than $156 million, as well as the defendant's renewed contention (also made at the time of sentencing) that the amount of forfeiture should be zero. Further, having confirmed that the right amount is the approximately $17 million figure stated at sentencing, the Court considers the constitutional impediments to imposing such a forfeiture amount in this case and concludes that a forfeiture of only $103,750 may be imposed.

I. **Oral Announcement and Final Judgment of Forfeiture**

In their final briefing following the post-sentencing evidentiary hearing on forfeiture, both parties very belatedly raised for the first time the question of whether the Court, after orally announcing forfeiture in the amount of $17,183,114.57 at the time of sentencing on June 18, has authority to now consider, more than 14 days later, another amount. ECF No. 347 at 12; ECF No. 351 at 1–4; see Fed. R. Crim. P. 35(a) ("Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error."). This belated objection was long since waived by both parties.

As noted, the Court's oral adoption at the time of sentencing of the Government's fallback position of $17 million was made with little discussion after a more extended colloquy in which the Government argued for $156 million and the defense argued for zero. Concerned by the brevity of this consideration, as well as the defense's request for an evidentiary hearing, the Court held off issuing the final written judgment. Meanwhile, however, the defense made a post-sentencing renewed request for an evidentiary hearing on forfeiture. In response, the Government did not raise any claim that the Court was bound by its oral determination, but instead renewed its argument for a $156 million forfeiture. Both parties maintained their respective positions -- $156 million from the Government and zero from the defense -- throughout the

4

forfeiture hearing and only after the hearing was over raised the instant objection to the Court's authority in their final briefing. Thus, while there is undoubtedly authority indicating that the sentence orally imposed at the time of a sentencing hearing is not subject to post-hearing change over a party's objection,[1] the absence of any objection constitutes waiver.[2]

This is not a jurisdictional matter that cannot be waived. Rather, it is a matter of procedural rules and case law, where waiver is totally permissible and, in this case, wholly

---

[1]   See, e.g., United States v. Abreu-Cabrera, 64 F.3d 67 (2d Cir. 1995).

[2]   Several factors distinguish the instant case from Abreu-Cabrera, where the Second Circuit determined that a district court could not, six months after the original sentencing, change the term of imprisonment imposed simply because further reflection prompted a change of heart. 64 F.3d at 72-73. In contrast, here, at sentencing and immediately after, the parties themselves requested revisiting the issue of forfeiture. Furthermore, in Abreu-Cabrera, the Second Circuit was considering the plain language and clear dictate of Rule 35(c) (now Rule 35(a)) that then required correction of a sentence within seven days of the oral pronouncement, and then only for arithmetic, technical, or other clear error. Id. at 72. Here, the relevant rule governing forfeitures, Rule 32.2, creates no such conflict, and thus, unlike in Abreu-Cabrera, this Court's approach is not outside the scope of the relevant rule. Fed. R. Crim. P. 32.2. The other Second Circuit case most relevant to this issue is a nonprecedential summary order; but it, if anything, supports the Court proceeding as laid out herein. See United States v. Papas, 715 F. App'x 88, 90 (2d Cir. 2018) (considering forfeiture under 21 U.S.C. § 853(a) and finding that "Rule 32.2 therefore permits a district court to withhold judgment on the amount of forfeiture owed by a defendant pending post-sentencing briefing and/or argument from the parties" where the district court had done so at the request of the parties).

5

appropriate. Doubtless that is why neither party questioned the Court's authority to order and conduct the evidentiary hearing to address any alleged error before the Court entered its written judgment. See Fed. R. App. P. 4(b)(2). As the Court specifically observed at the outset of the August 12 evidentiary hearing, "This is a hearing on forfeiture. I have held off entering the final judgment pending the outcome of this hearing." Hearing Tr. 2. And, once again, no objection was raised by either party at the time the Court made this statement. Instead, both parties welcomed the opportunity to provide evidentiary and other support for their respective positions that the proper forfeiture amount was not the $17 million stated at sentencing but rather, respectively, either $156 million or zero. The parties' extremely belated claim that the Court has no authority to enter a different sum or to consider whether the sum that was entered was unconstitutional is therefore untimely, waived, probably wrong in any event, and of no effect.[3]

## II. Forfeiture Amount – "Control" over the Proceeds

The criminal forfeiture statute at issue here, 18 U.S.C. § 982(a)(2), provides that when the court imposes a sentence on a person convicted of, as relevant here, a conspiracy to commit bank

---

[3] Even if the objections had been timely made, moreover, it is doubtful that the Court, before issuing the final written judgment, cannot correct the imposition of a forfeiture amount that it now finds unconstitutional.

6

fraud, the court "shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." Proceeds of a crime are forfeitable from a defendant even if they are not in the defendant's personal possession; but in order to be considered as "obtained" by the defendant, the proceeds "must have, at some point, been under the defendant's control." See United States v. Contorinis, 692 F.3d 136, 147 (2d Cir. 2012).

The relevant precedent defines "control" over the funds at issue to require the Government to show that at the relevant time the defendant had the authority, either personally or through a corporate entity he dominated, to access and direct disbursement of funds as he chose. See United States v. Tanner, 942 F.3d 60, 64 (2d Cir. 2019) (defendant "transferred" the funds to his co-defendant); United States v. Peters, 732 F.3d 93, 103-04 (2d Cir. 2013) (finding that "an individual 'obtains' proceeds 'indirectly' through a corporation when the individual 'so extensively controls' or 'dominates' the corporation and its assets that money paid to the corporation was effectively under the control of the individual," and ordering forfeiture where, among other facts, defendant and his family together owned 99 percent of the company

and where defendant could direct wire transfers from the corporate accounts (internal citations and alterations omitted)).[4]

Turning to the case at hand, the Government first argues that Akhavan "obtained," or had control over, all of the funds concerned in the fraudulent transactions that constituted the bank fraud conspiracy of which Akhavan was convicted: i.e., $156,225,211.61. In the alternative, the Government argues that Akhavan had control over, and thus obtained for purposes of forfeiture liability, the funds that were charged by the two entities -- Clearsettle and EUP -- that were responsible for processing the fraudulent transactions, which totals $17,183,114.57.

### A. Control over the $156,225,211.61

The Government advances two theories for how Akhavan "obtained," or had control over the entire $156,225,211.61 processed in the fraudulent transactions. First, the Government argues that Akhavan had control over all funds in the fraudulent transactions because he was the mastermind of the scheme and thus was responsible for all proceeds flowing through it. Second, the

---

[4] The Government also cites several nonprecedential summary orders, none of which, in any event, provide support for the Government's argument. See United States v. Bergstein, 788 F. App'x 742, 748 (2d Cir. 2019) (defendant "effectively controlled" proceeds of funds where he "was able to transfer the funds" to both shell companies and for his personal expenses); Rajaratnam v. United States, 736 F. App'x 279, 284 (2d Cir. 2018) (defendant obtained funds and "distributed" them to investors).

Government argues that Akhavan effectively controlled the aforementioned processing entities, including playing a role in setting up the accounts, and could direct the people running those entities to the extent that he effectively controlled them.

The Government's first argument is insufficient because, even in the case of a scheme's "mastermind," the relevant statute and case law still require the Government to show that Akhavan had actual "control" over the funds at issue.[5] As to the second argument, the Government has not established by a preponderance of the evidence either that Akhavan could direct or redirect disbursement of the funds flowing through Clearsettle or EUP, or that he could direct other co-conspirators to do so.

As noted, the relevant precedent defines "control" over the funds at issue to require showing that the defendant had the authority, either himself or through a corporate entity he dominated, to access and direct disbursement of the forfeitable funds as he chose. See Tanner, 942 F.3d at 64; Peters, 732 F.3d at 103-04. The record evidence does not support such a conclusion in this case. The Government has not established by a preponderance

---

[5] For its claim that showing that the defendant is the "mastermind" of the fraud is sufficient in itself, the Government relies on a hypothetical in Honeycutt v. United States, 137 S.Ct. 1626, 1633 (2017), and an inapposite D.C. Circuit case, United States v. Leyva, 916 F.3d 14 (D.C. Cir. 2019). Neither allows the Government to shortcut a showing of "control" under 18 U.S.C. § 982(a)(2), which, as discussed below, it has not done here.

9

of the evidence -- or presented much evidence at all -- that either Clearsettle or EUP (or for that matter any of the other entities involved in the scheme) were owned or dominated by Akhavan or even that he was responsible for the day-to-day running of those entities. On the contrary, the evidence at trial showed that Clearsettle was largely controlled by co-defendant Mizrachi and EUP by co-defendant Weigand.

To be sure, the Government adduced evidence that Akhavan played a substantial role in designing how the overall scheme would work, thus justifying the Government's reference to him as the "mastermind." But beyond this, Akhavan's involvement in the actual processing of the payments through Clearsettle and EUP was modest, consisting only of evidence that Akhavan and his team assisted in opening the customers' accounts, see, e.g., Trial Tr. 1746, Trial Tr. 1560-61, and that Akhavan (along with Mizrachi and Weigand) sometimes served as a "point person" for communications about money flow issues that arose during the scheme, see, e.g., GX 303, Trial Tr. 2001, Trial Tr. 186. None of this evidence establishes that Akhavan could direct the disbursement of funds, either himself or through a corporate entity he effectively controlled.[6]

---

[6] The Government also introduced a WhatsApp conversation between two other people involved in the scheme, where one asks, "Why doesn't Jan or Henry say to [Akhavan] bro you can't take that money it belongs to our merchants." GX 1733. Without more, including identifying what money they are referring to, this is not enough to establish by a preponderance that Akhavan had

10

Indeed, if anything, the evidence at trial cuts against finding that Akhavan had practical control over the disbursement of the funds passing through the scheme. Akhavan may have helped set up accounts, but once they were linked to a dispensary, the funds flowed from those accounts to the dispensaries without his involvement. See GX 566, 678, 704 (emails where Eaze employees and EUP set up new processing channels). Nor could Akhavan effect the release of funds. See GX 934, 935, GX 303 at 3, GX 302 at 13 (emails and chats including Akhavan and discussing the banks releasing settlement payments with no indication that Akhavan could control those releases).

In short, the Government has not established by a preponderance of the evidence that Akhavan had control over the entirety of the $156 million in funds processed through the scheme.

### B. Control Over the $17,183,114.57

The Government's evidence as to the rates charged by the processing entities, totaling $17,183,114.57, does, however, establish Akhavan's "control" over those funds sufficient for forfeiture liability. Specifically, the Government's evidence

---

authority direct disbursement of funds from the processing accounts or that he in fact did direct disbursement of funds from the processing accounts. The Government's other evidence is either inapposite or it goes to rates set and processing fees and thus to Akhavan's control over the $17 million figure, as discussed below.

11

showed that it was Akhavan who controlled, even dictated, what these charges would be and how they would be disbursed to the co-conspirators.

The Government's evidence that Akhavan personally dictated the processing fees was quite strong. See GX 932 (email from Akhavan setting out the rates to be charged for the Clearsettle phase and directing others to implement); Trial Tr. 177-78 (testimony that Akhavan set Clearsettle rates); Trial Tr. 1549 (testimony that Akhavan was demanding to increase rates charged for EUP phase); GX 411 (email from Akhavan to Eaze CEO explaining rates);[7] Trial Tr. 1448, 1552 (testimony about rates Akhavan charged over course of scheme).

To be sure, not all of the $17 million in charges went to Akhavan personally. But he nonetheless controlled these charges by setting the rates and exercising some authority to direct their disbursement, even if they did not go into his accounts and even if some small portion was diverted to cover Visa, Mastercard, and

---

[7] In this email, Akhavan states that "if they are willing to be the merchant of record and own the processing merchant account and bank accounts, and therefor [sic] take the liability, we can possible do 6" percent as a rate charged for services. GX 411. The reasonable inference here is that otherwise, Akhavan's team "owned" the processing merchant accounts and bank accounts. While this may not be enough to clearly establish Akhavan's ability to direct disbursement of any funds passing through the processing merchant accounts, nevertheless, when taken together with the other evidence here described, it does establish his "control" over the funds that were the product of the rates charged, i.e., the $17 million.

other fees. See United States v. Peters, 732 F.3d 93, 101-02 (2d Cir. 2013) (holding that proceeds forfeitable under 18 U.S.C. § 982(a)(2) are gross receipts of offense, not merely profits).

As to the dollar amount of these disbursements, the Court "need only make a reasonable estimate" of the forfeiture amount, "given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011) (citing United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009)). Here, $17,183,114.57 is a reasonable estimate of the amount Akhavan "obtained" and that is thus subject to forfeiture. The Government's evidence established by a preponderance that the rate set for the Clearsettle phase of the processing was 8.75% and 12% for the EUP phase. See GX 425, GX 932, Trial Tr. 177-78 (Clearsettle phase, 8.75%); GX 485, Tr. 222 (EUP phase, 12%). The Government's evidence also reasonably established the amount of the funds processed in each phase. See GX 687 (funds processed in Clearsettle phase in the amount of $48,120,332.95, and funds processed in EUP phase in the amount of $108,104,878.66). When the charged rates are applied to the funds processed in each phase, the processing fees for the Clearsettle phase equal $4,210,529.13 ($48,120,332.95 x 8.75%) and for the EUP phase $12,972,585.44 ($108,104,878.66 x 12%).[8] The fees for both

---

[8]  Akhavan argues that at least some portion of these amounts would have gone to Visa and Mastercard fees, among other costs. See ECF No. 347 at 6-8. As discussed above, while these may have been costs, the relevant analysis is the amount over which Akhavan

13

phases taken together thus total $17,183,114.57 – a reasonable estimate, given the available information, of the proceeds over which Akhavan had control. The Court thus reconfirms its view stated at the sentencing hearing that the proper forfeiture amount under 18 U.S.C. § 982(a)(2) is $17,183,114.57.

### III. Punitive Forfeiture as an Unconstitutional Excessive Fine

The Court must finally consider whether such a forfeiture amount violates the Eighth Amendment's protection against excessive fines. United States v. Bajakajian, 524 U.S. 321, 324, 334–36 (1998). The defendant bears the burden of showing the unconstitutionality of a forfeiture order. United States v. Castello, 611 F.3d 116, 120 (2d Cir. 2010); United States v. Viloski, 814 F.3d at 104, 109 (2d Cir. 2016).

At the first step of the inquiry, a court asks whether the Excessive Fines Clause applies, which it does only to forfeitures "that may be characterized, at least in part, as 'punitive,'" that is, "for which a defendant is personally liable." Viloski, 814 F.3d at 109. In contrast, the Excessive Fines clause does not apply to purely "remedial" forfeitures -- *in rem* forfeitures not intended

---

had control, even if he did not personally keep the entire amount, and even if that sum was greater than his profits. Peters, 732 F.3d at 101-02. In any event, the Court "need only make a reasonable estimate" of the forfeiture amount, "given the available information," and this calculation of $17,183,114.57 meets that requirement.

to punish the defendant, but instead to compensate the Government for loss or to restore property to its rightful owner. Id. at 109.

If the forfeiture is punitive and the Excessive Fines clause applies, the second step of the inquiry asks whether the forfeiture is excessive, that is, "if it is grossly disproportional to the gravity of a defendant's offense." Bajakajian, 524 U.S. at 334; Viloski, 814 F.3d at 110. The Second Circuit has recognized, based on the Supreme Court's analysis in Bajakajian, that several factors may be relevant in assessing proportionality: (1) "the essence of the crime of the defendant and its relation to other criminal activity," (2) "whether the defendant fits into the class of persons for whom the statute was principally designed," (3) "the maximum sentence and fine that could have been imposed," (4) "the nature of the harm caused by the defendant's conduct," and (5) "whether the forfeiture would deprive the defendant of his livelihood, *i.e.*, his future ability to earn a living." Viloski, 814 F.3d at 110-11 (internal citations and quotations omitted). It should be noted, however, that the Supreme Court did not specifically prescribe these factors in Bajakajian, and the Second Circuit in Viloski noted that courts should not treat these factors as exhaustive nor apply them too rigidly. Viloski, 814 F.3d at 110.

### A. Step One: Does the Excessive Fines Clause Apply?

As noted, the Excessive Fines Clause applies to punitive forfeitures, and neither party disputes that the forfeiture at issue here is punitive. In this case, the Government itself experienced no loss and the fraud's "victims" were not deprived of any property; thus, the forfeiture serves no remedial purpose to compensate the Government or return property to the rightful owner. Viloski, 814 F.3d at 109. Thus, as the Government conceded at the evidentiary hearing, the criminal forfeiture at issue here is inherently punitive. Hearing Tr. at 5 ("It's not remedial. That's very clear. It's not about paying back victims. It is about punishment, and it's really about taking the proceeds out of crime and acting as a deterrent factor going forward."). Because the Excessive Fines Clause therefore applies to this punitive forfeiture, we proceed to the second step of the inquiry: whether the forfeiture is unconstitutionally excessive.

### B. Step Two: Is the Forfeiture Unconstitutionally Excessive?

A forfeiture is unconstitutionally excessive if it is grossly disproportional to the gravity of the defendant's offense. Bajakajian, 524 U.S. at 334. In assessing proportionality, the Court considers the factors identified by the Second Circuit in Viloski, being careful, however, not to apply them rigidly.

The first factor is "the essence of the crime of the defendant and its relation to other criminal activity." Viloski, 814 F.3d at 110. Here, the defendant agreed, with other co-conspirators, to defraud federal banks and others into processing payments that they would not otherwise have allowed. This occurred over a period of several years and concerned roughly $156 million worth of transactions. It is true that the fraudulent payment processing scheme allowed marijuana customers to facilitate what were otherwise lawful marijuana purchases in their respective states (chiefly, California). However, the scheme was intended to fool the banks and others into accepting what were disguised marijuana purchases that, in furtherance of the federal law prohibition on the distribution of marijuana, they had decided not to process. It was thus a serious fraud that potentially placed the banks at risk; but from the economic standpoint, no one lost money.

The second factor is "whether the defendant fits into the class of persons for whom the statute was principally designed." Viloski, 814 F.3d at 110. As the one who designed a scheme specifically intended to defraud federal banks, Akhavan clearly fits into the class of persons for whom the bank fraud statute was designed.

The third factor is "the maximum sentence and fine that could have been imposed." Viloski, 814 F.3d at 110. Here, the maximum sentence was 360 months' imprisonment; the maximum fine was $1

17

million. 18 U.S.C. § 1344.[9] The Court actually imposed thirty months' imprisonment, followed by three years of supervised release, and a fine of $100,000. A $17 million forfeiture order would be 17 times the maximum fine possible under § 1344 and would be 170 times the amount of the fine actually imposed in this case. In either case, it is wholly out of proportion to the maximum and actual fine (which, of course, is the principal and historic means of punishing a defendant financially).

The fourth factor is "the nature of the harm caused by the defendant's conduct." Viloski, 814 F.3d at 110. Here, neither the banks nor the Government suffered any financial loss as a result of the defendant's conduct. The banks, in fact, made money as a result of this scheme.[10]

The fifth factor is "whether the forfeiture would deprive the defendant of his livelihood, *i.e.*, his future ability to earn a

---

[9] The Government argues for the first time in post-hearing briefing, see ECF No. 348 at 7-8, that the maximum fine amount could have exceeded $300 million under a different statute, 18 U.S.C. § 3571. The Court declines to consider this argument raised for the first time after the Government had previously agreed that the maximum fine was $1 million and after the Court has already imposed the fine at sentencing in this case.

[10] The Government argues that banks would have had to spend money on fraud prevention in general, and that these sums should be considered in terms of the harm here. ECF No. 348 at 8. However, the Government fails to make any concrete connection between any resources expended in general fraud prevention by banks with the fraud or even the kind of fraud at issue in this case. Trial Tr. 2161.

living." Viloski, 814 F.3d at 111 (internal citations and quotations omitted). The defense argues that given Mr. Akhavan's future earning potential now that he is a convicted felon, a $17 million forfeiture order would effectively deprive him of his livelihood. However, the history of forfeiture collection suggests that Akhavan could still engage in employment, though the forfeiture would substantially diminish his assets and his effective income.

Each of these five considerations informs the Court's assessment of proportionality in this case; the overarching question, however, remains whether a $17 million forfeiture order is grossly disproportional to the gravity of Akhavan's offense. As laid out above, there was no articulable loss to any party as a result of Akhavan's crime and a $17 million forfeiture order is seventeen times the maximum fine and 170 times the actual fine imposed in this case. Though this was indeed a serious fraud, and though the defendant fits into the class of persons for whom the statute was principally designed, neither of these factors outweighs the huge disproportionality that these figures suggest. As the Supreme Court itself concluded in Bajakajian: "such a forfeiture would be grossly disproportional to the gravity of [the defendant's] offense" because it is "larger than the [] fine imposed by the District Court by many orders of magnitude, and it

bears no articulable correlation to any injury suffered by the Government." 524 U.S. at 340-41. The same is true here.

### C. An Alternative

While the Court thus finds the $17 million forfeiture amount unconstitutionally excessive, the Court must still consider what forfeiture amount would be constitutional. The Court finds that $103,750 -- the value of the Eaze stock option given to Akhavan -- is proportional to the gravity of his offense. DX-2. This amount is a reasonable estimate, given the available information, and roughly equivalent to the amount of the fine the Court imposed.

For the foregoing reasons, the Court orders forfeiture in the amount of $103,750.

SO ORDERED.

Dated:   New York, NY
         Aug 30, 2021                    _____
                                         JED S. RAKOFF, U.S.D.J.